No. 25-4115

UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

BRIDGER LEE JENSEN, SINGULARISM, AND PSYCHE HEALING AND BRIDGING, LLC,
*Plaintiffs - Appellees*,

v.

UTAH COUNTY, PROVO CITY, AND JEFFREY GRAY,
*Defendants-Appellants*.

On appeal from the United States District Court, District of Utah,
The Honorable Jill N. Parrish, No. 2:24-cv-00887-JNP-CMR

## BRIEF OF APPELLANTS

Respectfully submitted,

Troy L. Booher
Caroline Anais Olsen
ZIMMERMAN BOOHER
341 South Main Street, Fourth Floor
Salt Lake City, Utah 84111
(801) 924-0200
tbooher@zbappeals.com
colsen@zbappeals.com

*Attorneys for Appellants Utah County,
Provo City, and Jeffrey Gray*

ORAL ARGUMENT REQUESTED

December 10, 2025

**Additional Counsel**

Mitchell A. Stephens
Justin L. James
Dillon P. Olson
JAMES DODGE RUSSELL & STEPHENS, P.C.
545 East 300 South
Salt Lake City, Utah 84102
(801) 363-6363
mstephens@jdrslaw.com
jjames@jdrslaw.com
dolson@jdrslaw.com

*Attorneys for Appellants Utah County and
Jeffrey Gray*

J. Brian Jones
Gary D. Millward
Nicholas Muhlestein
Richard A. Roberts
PROVO CITY ATTORNEY'S OFFICE
445 W Center Street, Suite 300
Provo, Utah 84601
(801) 852-6140
bjones@provo.gov
gmillward@provo.gov
nmuhlestein@provo.gov
rroberts@provo.gov

*Attorneys for Appellant Provo City*

# Table of Contents

Prior or Related Appeals ........................................................................ xii

Jurisdictional Statement ...........................................................................1

Statement of the Issues.............................................................................2

Introduction ..............................................................................................3

Statement of the Case...............................................................................6

    1.    Factual and Legal Background................................................6

        1.1    Psilocybin is a Schedule I controlled substance under both federal and state law ........................................6

        1.2    Bridger Jensen forms Singularism in 2023, maintaining that psilocybin is essential to Singularism's religious practices ..........................................................8

            1.2.1  Singularism's tenets........................................9

            1.2.2  The role of psilocybin in Singularism's practice..........12

    2.    Procedural Background ........................................................14

        2.1    A state judge issues a warrant to search Singularism's premises ....................................................14

        2.2    Plaintiffs file this action, and the district court issues a TRO.....................................................15

        2.3    Criminal charges are filed against Jensen; plaintiffs seek an anti-suit injunction ...........................................16

        2.4    The district court grants an anti-suit injunction and denies defendants' motion to dismiss ................................17

Standard of Review.................................................................................20

Summary of Argument ...........................................................................21

Argument ........................................................................................................23

1.    This Court Has Jurisdiction ................................................................23

2.    Plaintiffs' Claims Should Be Dismissed ............................................25

   2.1    Plaintiffs' Free Exercise claim fails as a matter of law ...........26

      2.1.1  Utah's Controlled Substances Act is a generally
             applicable law subject to rational basis review .............27

      2.1.2  Plaintiffs' claim fails under rational basis review ........34

   2.2    Plaintiffs' Fourth Amendment claim fails as a matter of
          law ...........................................................................................34

   2.3    Plaintiffs' state-law claims should be remanded to Utah
          state court ................................................................................35

3.    The Anti-Suit Injunction Should Be Vacated ....................................37

   3.1    The district court abused its discretion in granting the
          anti-suit injunction .................................................................38

      3.1.1  All *Younger* factors support abstention ........................40

      3.1.2  None of the *Younger* exceptions applied ......................42

         3.1.2.1  An injunction is not necessary to prevent
                  irreparable harm ................................................43

         3.1.2.2  The state prosecution was not brought in
                  bad faith ............................................................48

   3.2    Defendants did not waive *Younger* arguments .......................57

Conclusion .....................................................................................................60

Statement Regarding Oral Argument ....................................................60

Certificate of Compliance .......................................................................62

Certificate of Digital Submission............................................................63

Certificate of Service ...............................................................................64

**Attachments**

A    Memorandum Decision and Order Denying Defendants' Motion to Dismiss and Granting Plaintiffs' Motion for Anti-Suit Injunction (August 4, 2025)

B    Order Granting Motion for Preliminary Injunction (Feb. 20, 2025)

C    Order Granting Temporary Restraining Order (December 18, 2024)

# Table of Authorities

<u>Federal Cases</u>

*All. for Cannabis Therapeutics v. DEA*,
  930 F.2d 936 (D.C. Cir. 1991) ................................................................6

*Amanatullah v. Colo. Bd. of Med.,*
  *Exams.*, 187 F.3d 1160 (10th Cir. 1999) ...........................................40

*Anderson v. Creighton*,
  483 U.S. 635 (1987) .............................................................................35

*Armco, Inc. v. United Steelworkers of Am.*,
  280 F.3d 669 (6th Cir. 2002) ...............................................................58

*Bailey v. State Farm Fire & Cas. Co.*,
  414 F.3d 1187 (10th Cir. 2005) ...........................................................20

*Bauchman v. West High School*,
  132 F.3d 542 (10th Cir. 1997) .............................................................37

*Braunfeld v. Brown*,
  366 U.S. 599 (1961) .............................................................................46

*Bristol-Meyers Squibb Co. v. Connors*,
  979 F.3d 732 (9th Cir. 2020) ...............................................................47

*Brown v. Hotel & Rest. Employees & Bartenders Int'l Union*
  *Local 54*,
  468 U.S. 491 (1984) ........................................................................ 57-58

*Chick Kam Choo v. Exxon Corp.*,
  486 U.S. 140 (1988) .......................................................................38, 39

*Chiles v. Salazar*,
  116 F.4th 1178 (10th Cir. 2024) ...............................................20, 27, 34

*Courthouse News Serv. v. New Mexico Admin. Office of the Courts*,
  53 F.4th 1245 (10th Cir. 2022) ...........................................................20

*Cummings v. Husted*,
  795 F. Supp. 2d 677 (S.D. Ohio 2011) ...............................................59

*D.L. v. Unified Sch. Dist. No. 497*,
  392 F.3d 1223 (10th Cir. 2004) ........................................................60

*Daves v. Dallas Cnty.*,
  64 F.4th 616 (5th Cir. 2023) ..............................................................46

*Dee v. United States*,
  241 F. Supp. 2d 50 (D. Me. 2003) ....................................................54

*Deitchman v. E.R. Squibb & Sons, Inc.*,
  740 F.2d 556 (7th Cir. 1984) ............................................................55

*Diamond "D" Const. Corp. v. McGowan*,
  282 F.3d 191 (2d Cir. 2002) .............................................................24

*Doe v. Office of Kan. Secs. Comm'r*,
  No. 17-cv-80656, 2017 WL 6557431 (S.D. Fla. Nov. 28, 2017)......................41

*Dombrowski v. Pfister*,
  380 U.S. 479 (1965)...........................................................................46

*Doran v. Salem Inn, Inc.*,
  422 U.S. 922 (1975)...........................................................................37

*Espinoza v. Mont. Dep't of Rev.*,
  591 U.S. 464 (2020)...........................................................................26

*Est. of Reat v. Rodriguez*,
  824 F.3d 960 (10th Cir. 2016) ..........................................................36

*F.D.I.C. v. Geldermann, Inc.*,
  975 F.2d 695 (10th Cir. 1992) ..........................................................23

*Fenn v. City of Truth or Consequences*,
  983 F.3d 1143 (10th Cir. 2020) ........................................................35

*Fulton v. City of Philadelphia*,
  593 U.S. 522 (2021)...........................................................................29

*Gallagher v. Dhillion*,
  No. 3:18-cv-2801, 2020 WL 2737246 (N.D. Tex. May 7, 2020) ...................54

*George v. Newman*,
    726 F. App'x 699 (10th Cir. 2018) ................................................. 37

*Grace United Methodist Church v. City of Cheyenne*,
    451 F.3d 643 (10th Cir. 2006) ............................................. 26, 28-29

*Hartman v. Moore*,
    547 U.S. 250 (2006) ...................................................................... 48

*Johnson v. Smith*,
    104 F.4th 153 (10th Cir. 2024) ...................................................... 20

*Kaylor v. Fields*,
    661 F.2d 1177 (8th Cir. 1981) ....................................................... 41

*Kennedy v. Bremerton Sch. Dist.*,
    597 U.S. 507 (2022) ...................................................................... 27

*Kenny A. ex rel. Winn v. Perdue*,
    218 F.R.D. 277 (N.D. Ga. 2003) ............................................... 58-59

*Kingston v. Utah Cnty.*,
    No. 97-4000, 161 F.3d 17, 1998 WL 614462
    (10th Cir. Sept. 8, 1998) ............................................ 41, 42, 57, 60

*Krahm v. Graham*,
    461 F.2d 703 (9th Cir. 1972) ......................................................... 49

*MAI Basic Four, Inc. v. Basis, Inc.*,
    962 F.2d 978 (10th Cir. 1992) ....................................................... 23

*Malik v. Arapahoe Cnty. Dep't of Soc. Servs.*,
    191 F.3d 1306 (10th Cir. 1999) ..................................................... 24

*Meredith v. Oregon*,
    321 F.3d 807 (9th Cir. 2003) ......................................................... 24

*Mitchum v. Foster*,
    407 U.S. 225 (1972) ................................................................. 38, 39

*Moore v. Sims*,
    442 U.S. 415 (1979) ................................................................. 43, 46

*Morrow v. Winslow,*
    94 F.3d 1386 (10th Cir. 1996) ....................................................................57, 60

*Multi Denominational Ministry of Cannabis & Rastafari, Inc. v.*
    *Gonzales,*
    474 F. Supp. 2d 1133 (N.D. Cal. 2007) ...........................................................28

*Munaf v. Geren,*
    553 U.S. 674 (2008) ...........................................................................................24

*Netflix, Inc. v. Babin,*
    88 F.4th 1080 (5th Cir. 2023) ...........................................................................49

*Nick v. Abrams,*
    717 F. Supp. 1053 (S.D.N.Y. 1989) .................................................................41

*O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft,*
    282 F. Supp. 2d 1236 (D.N.M. 2002) ...............................................................30

*Ohio Bureau of Employment Servs. v. Hodory,*
    431 U.S. 471 (1977) ...........................................................................................58

*Oklevueha Native Am. Church of Hawaii, Inc. v. Holder,*
    No. 09-cv-00336, 2012 WL 6738532 (D. Haw. Dec. 31, 2012) ......................28

*Olsen v. Mukasey,*
    541 F.3d 827 (8th Cir. 2008) ............................................................................31

*Orlando v. Smith,*
    No. 5:22-cv-062, 2023 WL 3306555 (W.D. Va. May 8, 2023) .......................41

*Perez v. Ledesma,*
    401 U.S. 82 (1971) .............................................................................................48

*Petrella v. Brownback,*
    787 F.3d 1242 (10th Cir. 2015) ........................................................................25

*Peyote Way Church of God, Inc. v. Thornburgh,*
    922 F.2d 1210 (5th Cir. 1991) ..........................................................................28

*Phelps v. Hamilton,*
    122 F.3d 885 (10th Cir. 1997) .....................................................................49, 55

*Rivera-Feliciano v. Acevedo-Vila*,
    438 F.3d 50 (1st Cir. 2006)..............................................................24

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
    592 U.S. 14 (2020)........................................................................46

*Ryan v. State Bd. of Elections of Ill.*,
    661 F.2d 1130 (7th Cir. 1981) .....................................................59

*Seneca-Cayuga Tribe of Okla. v. Okla. ex rel. Thompson*,
    874 F.2d 709 (10th Cir. 1989) .....................................................24

*Serna v. City of Colorado Springs*,
    No. 24-1149, 2025 WL 471224 (10th Cir. Feb. 12, 2025)..............60

*Smith v. Bayer Corp.*,
    564 U.S. 299 (2011).......................................................................39

*Sosna v. Iowa*,
    419 U.S. 393 (1975).......................................................................58

*St. Mary Cath. Par. in Littleton v. Roy*,
    154 F.4th 752 (10th Cir. 2025) ..................................... 26, 27, 28, 29

*Staffer v. Bouchard Transp. Co.*,
    878 F.2d 638 (2d Cir. 1989) .........................................................39

*Stockton v. Brown*,
    152 F.4th 1124 (9th Cir.2025) ................................................ 45-46

*Sw. Air Ambulance, Inc. v. City of Las Cruces*,
    268 F.3d 1162 (10th Cir. 2001) ...................................................37

*Texas Ass'n of Business v. Earle*,
    388 F.3d 515 (5th Cir. 2004) .......................................................41

*Turney v. O'Toole*,
    898 F.2d 1470 (10th Cir. 1990) ...................................................35

*United Mine Workers of Am. v. Gibbs*,
    383 U.S. 715 (1966).......................................................................36

*United States v. Boyll*,
    774 F. Supp. 1333 (D.N.M. 1991) ....................................................28

*United States v. Christie*,
    825 F.3d 1048 (9th Cir. 2016) .......................................................28

*United States v. Meyers*,
    95 F.3d 1475 (10th Cir. 1996) ......................................... 27-28, 52, 53

*United States v. Meyers*,
    906 F. Supp. 1494 (D. Wyo. 1995) ..................................................53

*United States v. Oakland Cannabis Buyers' Co-op*,
    532 U.S. 483 (2001) ..................................................................6

*Weitzel v. Div. of Occupational & Prof'l Licensing*,
    240 F.3d 871 (10th Cir. 2001) ............................................. 44-45, 52

*Winn v. Cook*,
    945 F.3d 1253 (10th Cir. 2019) ....................................... 40, 42, 43, 44

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972) .................................................................53

*Yelp Inc. v. Paxton*,
    137 F.4th 944 (9th Cir. 2025) .......................................................50

*Younger v. Harris*,
    401 U.S. 37 (1971) ..............................................................4, 45, 52

State Cases

*California v. Trippet*,
    56 Cal. App. 4th 1532 (Cal. Ct. App. 1997) .....................................28

*Hawaii v. Sunderland*,
    168 P.3d 526 (Haw. 2007) .........................................................28

*Ohio v. Cook*,
    No. 5-19-26, 2020 WL 615076 (Ohio Ct. App. Feb. 10, 2020) .................28

*Trujillo v. Wyoming*,
    2 P.3d 567 (Wyo. 2000) ............................................................28

## Federal Statutes

U.S. Const. amend. I ................................................................26

21 U.S.C. § 801 ......................................................................29

21 U.S.C. § 801a .....................................................................29

21 U.S.C. § 812 ........................................................................6

21 U.S.C. § 823 ........................................................................7

28 U.S.C. § 1292 ..................................................................1, 23

28 U.S.C. § 1331 ......................................................................1

28 U.S.C. § 1367 .................................................................17, 36

28 U.S.C. § 1441 ......................................................................1

28 U.S.C. § 1446 ......................................................................1

28 U.S.C. § 2283 .....................................................................38

42 U.S.C. § 1983 .....................................................................15

## State Statutes

Utah Code § 26B-2-202 ...........................................................32

Utah Code § 58-37-3.5 .................................................7, 8, 30, 31

Utah Code § 58-37-4 ...............................................................6, 7

Utah Code § 58-37-8 ................................................................7

Utah Code § 58-37-18 ...............................................................7

Utah Code § 63G-33-101 ..........................................................53

Utah Code § 63G-33-201 .......................................................42, 53

Utah Code §§ 78B-3-401 to -428 ................................................32

## State Regulations

Utah Admin. Code R432-100-8 ..........................................................................32, 33

Utah Admin. Code R432-100-26 ............................................................................33

Utah Admin. Code R432-100-35 ............................................................................32

Utah Admin. Code R432-100-36 ............................................................................33

Utah Admin. Code R432-300-15 ............................................................................33

## Other Authorities

16 Charles Alan Wright & Arthur R. Miller, Federal Practice &
    Procedure § 3923 (3d ed. 2025) .......................................................................23

## Prior or Related Appeals

None.

**Jurisdictional Statement**

Plaintiffs filed this action in Utah state court. [App-1:40–75.[1]] Defendants timely removed the action to federal district court. [App-1:35–38.] *See* 28 U.S.C. §§ 1441, 1446. The district court had jurisdiction over the complaint based on plaintiffs' federal constitutional claims. 28 U.S.C. § 1331.

On August 4, 2025, the district court issued an order denying defendants' motion to dismiss the complaint and entering an anti-suit injunction against a pending state criminal proceeding. [App-5:162–93.] Defendants noticed an appeal on August 29, 2025. [App-5:194–95.] This Court has jurisdiction under 28 U.S.C. § 1292(a).

Consistent with this Court's September 24, 2025 Order, this brief addresses "this court's jurisdiction to review the interlocutory order with specificity" (at 23–25).

---

[1] Citations to the Appellants' Appendix will be formatted as "App-[Volume Number]:[Bates Number]."

**Statement of the Issues**

1. Whether this Court has jurisdiction to review an order that: (i) granted an anti-suit injunction against ongoing state criminal proceedings, and (ii) denied defendants' motion to dismiss the complaint.

2. Whether the district court erred in denying defendants' motion to dismiss plaintiffs' First and Fourth Amendments claims, where (1) the challenged law—the Utah Controlled Substance Act—is a neutral and generally applicable law for which there is a rational basis, and (2) the Fourth Amendment claim depends on the First Amendment claim and, regardless, the challenged search was authorized by a neutral magistrate.

3. Whether the district court abused its discretion in enjoining an ongoing state criminal proceeding based on its conclusion that (1) two of the narrow exceptions to *Younger* abstention applied, and (2) defendants waived *Younger*-based arguments.

## Introduction

This appeal arises from the district court's decision to enjoin a state criminal prosecution of Bridger Jensen. It did so on the theory that Jensen and his nascent religion, called Singularism, are entitled to a religious exemption from prosecution under the Utah Controlled Substances Act (CSA) for their use of psilocybin.

Psilocybin—commonly known as hallucinogenic mushrooms—is a schedule I drug under both federal and state law, given its high potential for abuse and the absence of established medical applications.

Jensen established Singularism in the fall of 2023. According to him, sacramental use of psilocybin is a central part of Singularism's religious practice.

After a lengthy investigation, Provo City police officers executed a search warrant of Singularism's premises and found over 450 grams of psilocybin. Plaintiffs then sued Provo City, Utah County, and Jeffrey Gray (the Utah County Attorney), to prevent defendants from interfering with their religious practice. After defendants initiated criminal charges against Jensen, plaintiffs also sought an anti-suit injunction against the state criminal proceedings.

The district court granted the anti-suit injunction and denied defendants' motion to dismiss. This Court should reverse.

Most of the reversible errors in this appeal stem from the district court's acceptance of plaintiffs' Free Exercise claim under the First Amendment to the U.S. Constitution. The court ruled that Utah's CSA is not generally applicable and

therefore must survive strict scrutiny. That conclusion ignores the overwhelming weight of authority, which almost uniformly recognizes that the federal CSA and its state-law counterparts are generally applicable. The Free Exercise claim should have been dismissed summarily under the rational basis standard.

Plaintiffs' Fourth Amendment claim falls with the First Amendment claim. The Fourth Amendment claim asserts that defendants should have known that Singularism is entitled to a religious exception from the CSA and that the search of its premises was thus unreasonable. But Singularism is entitled to no such exception.

The district court separately erred when it enjoined the criminal proceeding against Jensen based on two exceptions to the otherwise mandatory abstention doctrine articulated in *Younger v. Harris*, 401 U.S. 37 (1971).

The court ruled that one of the exceptions was satisfied because plaintiffs would suffer irreparable harm to their Free Exercise rights if they were forced to adjudicate their federal claims in the state criminal proceeding. The court's reasoning runs headlong into the principles of comity and federalism that underlie *Younger*. But it also falters because Singularism is not entitled to a Free Exercise exception under Utah's CSA.

The court ruled that another exception was satisfied based on its conclusion that defendants commenced the criminal prosecution in bad faith. The court's bad-faith determination was legally incorrect. All the evidence confirms

4

defendants' good faith attempts to protect their vital interests in enforcing state drug laws.

Plaintiffs have not been singled out for their religious views, nor do those views exempt them from the CSA.

**Statement of the Case**

**1.     Factual and Legal Background**

**1.1    Psilocybin is a Schedule I controlled substance under both federal and state law**

Psilocybin is a Schedule I controlled substance under both federal and state law. *See* 21 U.S.C. § 812 sch. I, (c)(15); Utah Code § 58-37-4(2)(a)(iii)(Y).

Under federal law, "Schedule I is the most restrictive schedule." *United States v. Oakland Cannabis Buyers' Co-op*, 532 U.S. 483, 492 (2001). Schedule I drugs have (i) "a high potential for abuse," (ii) "no currently accepted medical use in treatment in the United States," and (iii) "a lack of accepted safety for use of the drug . . . under medical supervision." 21 U.S.C. § 812(b)(1). For these reasons, Schedule I drugs "are subject to the most severe controls and give rise to the harshest penalties." *All. for Cannabis Therapeutics v. DEA*, 930 F.2d 936, 937 (D.C. Cir. 1991).

Psilocybin is one of the most abused drugs in the United States.[2] [App-3:211–14.] For example, psilocybin use within the past years is multiples higher than the use of LSD, ecstasy, methamphetamine, or cocaine in people aged 12 or older.[3]

---

[2] *See* U.S. Dep't of Health & Hum. Servs., *Key Substance Use and Mental Health Indicators in the United States*, https://www.samhsa.gov/data/sites/default/files/reports/rpt56287/2024-nsduh-annual-national/2024-nsduh-annual-national-html-071425-edited/2024-nsduh-annual-national.htm.

[3] Id.

Since 2018, the FDA has granted investigatory status to two formulations of psilocybin in clinical trials as a potential medical treatment for depression.[4] But psilocybin remains a Schedule I drug, and its use is legal only within FDA-approved clinical trials or state-regulated access programs. *See* 21 U.S.C. § 823(g).

Utah has adopted a modified version of the Uniform Controlled Substances Act, the latter of which is modeled on federal law. The Utah Legislature has thus directed that the Utah CSA be construed to promote uniformity with similar drug laws. Utah Code § 58-37-18(3).

Under Utah's CSA, psilocybin is a Schedule I drug. *Id.* § 58-37-4(2)(a)(iii)(Y). Knowingly and intentionally possessing psilocybin with an intent to distribute it is a felony. *Id.* § 58-37-8(1)(a)(iii), 1(b)(i).

In 2024, Utah enacted a medical exemption to the CSA for specific formulations of psilocybin in FDA "Phase 3 testing for an investigational drug." *Id.* § 58-37-3.5(1)(a). The exemption authorizes qualifying "[h]ealthcare system[s]" to "develop a behavioral health treatment program that includes a treatment based on [psilocybin] that the healthcare system determines is supported by a broad collection of scientific and medical research." *Id.* § 58-37-3.5(2).

---

[4] National Institute for Drug Abuse, *Psychedelic and Dissociative Drugs* (Apr. 2023), https://nida.nih.gov/research-topics/psychedelic-dissociative-drugs#used-as-medicine.

Only Utah's two largest healthcare systems—Intermountain Health and the University of Utah—qualify to participate. *Id.* § 58-37-3.5(1)(b). [App-5:150.] Both must comply with detailed licensing and reporting requirements. Utah Code § 58-37-3.5.

### 1.2    Bridger Jensen forms Singularism in 2023, maintaining that psilocybin is essential to Singularism's religious practices

Jensen launched Singularism in 2023. [App-4:100–03.] Before that, he had been a licensed mental health therapist for approximately sixteen years. [App-1:120.] His clinical license lapsed in 2019. [App-1:120; App-7:195.]

Jensen began experimenting with psychedelic drugs in his twenties, unaffiliated with any religious practice. [App-1:119–20.] At some point during his clinical career, he began "immers[ing]" himself "in the study of psychedelic therapy." [App-1:121.]

Jensen began administering psilocybin to third parties six or seven years before forming Singularism. [App-7:190–91.] By 2017, psilocybin had become an established part of his psychotherapy practice. [App-7:191.] He continued to administer psilocybin to third parties even after his professional license lapsed. [App-7:191.] From 2020 onward, Jensen charged for his administration of psilocybin. [App-7:192.]

Also around 2020, he became "more nervous about practicing without a license," and "hadn't found the religion or my protection." [App-7:192.] But he continued administering psilocybin to third parties. [App-7:191–92.]

Singularism opened its spiritual center in 2023. Jensen described its origin story this way: "[F]ollowing years of various transcendent and spiritual experiences facilitated through psilocybin, Mr. Jensen determined to share his spiritual enlightenment with the community by founding his own religious organization, Singularism." [App-4:103.]

After Singularism opened, Detective Jackson Julian, a member of Provo Police Department's Special Enforcement Team, led an undercover investigation into Singularism's practices. [App-1:294; App-4:218.] During an October 2024 webinar Julian attended, Jensen told participants "the way that he founded the religion was by talking with his lawyer to review prior cases in which people claimed religious exemption; where those claimants won or lost; and the judge[']s comments, and essentially created a roadmap to create his religion of Singularism." [App-1:296–97.] Singularism's website similarly states that Singularism is "[p]ioneering legal pathways for spiritual wellness," by "meticulously align[ing] with legal frameworks that honor the religious and sacred use of entheogens."[5]

### 1.2.1    Singularism's tenets

During this litigation, plaintiffs submitted numerous documents to describe Singularism's tenets. [*E.g.*, App-1:116–23,132–41,230–44; App-3:005–20; App-5:067–78.]

---

[5] Singularism, *Frequently Asked Questions*, https://singularism.org/frequently_asked_questions.

According to Singularism's Articles of Belief and Governance, Singularism's adherents "believe in the oneness of all existence, cosmically and quantumly." [App-1:231.] "Singularism is built upon aphorisms—simple yet profound truths that emerge from individual voyagers and collective experiences." [App-1:232.] "Voyagers" in this context refers to individuals who participate in Singularism's psilocybin ceremonies—which it refers to as "voyages." "Members are free to contribute their insights, helping to create a dynamic and adaptable religion that reflects the oneness and wisdom we uncover together." [App-1:232.]

The same document explains that "[t]he Octadrant is the guiding framework for our understanding truth within Singularism." [App-1:232; *see* App-3:007–08.] The Octadrant "divides knowledge into eight interconnected perspectives, called octants, offering a structured yet adaptable tool to navigate personal and collective insights." [App-1:232.] The octants include: "Knowledge/Illumination, Faith, Sacred Trust, Deep Mysteries/Eternal Enigmas, Lies/Shadowplay, Deceptions/Ignorance/Blinding Mirage, Myths/Woven Legends, and The Unimaginables/TheAbyss." [App-3:008.]

Jensen testified that "[t]he Octadrants were revealed to me during sacred ceremonies involving the sacrament of psilocybin." [App-3:008.] "In what is often described as a []download or singularity with source information, I experienced a vision of the Octogoddess, an ethereal entity who has been speaking to me for years in meditative and sacramental states." [App-3:008.] "She entrusted me with

the Octadrants as a gift for humanity to categorize and navigate the realms of knowledge, from the empirical to the metaphysical." [App-3:008; *see* App-7:145–46.]

According to Jensen, "[t]he Octogoddess specifically commanded me to avoid claiming exclusive revelatory powers, emphasizing that everyone can access their own visions and entities." [App-3:008.] "Singularism thus empowers individuals to '*write their own scripture*,' fostering spiritual autonomy while providing a structured framework for understanding existence." [App-3:008.]

Before this litigation, Jensen withheld most of these religious tenets from Singularism's adherents. [App-7:145,216.] "While the Oct[a]drants are a core spiritual framework of Singularism, I do not share the Octadrants or my visions with all voyagers before their voyages." [App-3:008.] "This is intentional, as it allows participants to form their own connections with entities and receive their own revelations." [App-3:008.]

Singularism is a "non-exclusive faith practice." [App-3:013.] According to Jensen, "a voyager can continue to believe and practice in another belief system while also participating in Singularism[']s spiritual practices." [App-3:013.] One member explained she held Christian beliefs that align with Singularism's principles; atheists are equally welcome. [App-7:085,089.] Anyone who joins Singularism is free to determine what they believe, so "long as it fits within the confines of the mission to alleviate suffering and to do no harm." [App-7:205.]

Besides Jensen, Singularism employs additional "facilitators" who help guide participants through psilocybin ceremonies. [App-1:161.] The facilitators "do not position themselves as spiritual authorities or gurus." [App-1:123.] "Rather, they serve as scribes and guides, helping participants" to "access their highest potential and deepest truths." [App-1:123.] As one facilitator testified: "We aren't there to tell them that they have to leave another religion to join ours." [App-7:054.] Rather, Singularism "takes whatever you believe in and adds a little bit of a multiplier factor." [App-7:133.]

In addition to Singularism, Jensen operates a "Psychedelic Therapy Academy," where he trains facilitators to oversee participants' use of psilocybin. [App-7:095.] It costs approximately $5,700 to become a facilitator. [App-7:136.] None of Singularism's facilitators have an active license from the State to dispense psilocybin, although Jensen and another member have medical backgrounds. [*See* App-7:129.]

Jensen has repeatedly sworn to his "deeply held, unwavering faith in Singularism." [App-5:077.]

### 1.2.2    The role of psilocybin in Singularism's practice

According to plaintiffs, "Psilocybin is the central sacrament to Singularism's ceremonies." [App-3:009.] Participants drink psilocybin tea "to access the divine, open spiritual pathways, and alleviate human suffering by weaving together

centuries of entheogenic religious practice with what Plaintiffs view as illuminated approaches of modern mental health clinicians." [App-4:099.]

To participate in a psilocybin ceremony, a person must undergo a "six-criteria screening process." [App-3:010.] The process includes a "Safety" screening that looks for mental health risks, medical conditions, or drug interactions that could pose a risk to a participant's health. [App-3:010.] Yet every participant must sign an acknowledgement that "[t]he advice from Singularism's staff, despite being informed, is not a substitute for licensed and qualified professional medical advice." [App-1:135.]

If a person qualifies to participate, they can purchase packages for two to four psilocybin ceremonies. [App-1:297.] Prices range from $3,900–$6,400, depending on the number of "voyages" purchased. [App-1:297; App-7:082–83.]

Singularism lacks a uniform dosage system for its ceremonies, with doses ranging from 2–3.5 grams. [App-7:101,104.] Facilitators—who lack medical licenses—determine dosage based on a variety of factors. [App-7:101–02.]

Singularism's facilitators acknowledge that psilocybin use is not without risk. As one testified, psilocybin is contraindicated by some medications, and it can exacerbate certain mental illnesses. [App-7:070; *see also* App-4:281–82.] Psilocybin can also pose dangers if the substance is impure. [App-7:070,129–30.]

Despite the risks posed by impurities, Singularism does not test its psilocybin for contaminants. [App-7:070–71,073,129–30.] According to

Singularism's office manager, the psilocybin is tested by their source; but she was unaware of who the source was or how the drug was tested, except that it comes from Oregon. [App-7:071–72.] The psilocybin is delivered in freeze-dried form from a person named Inge (last name unknown). [App-7:070–71.]

Perhaps given these risks, participants are required to "waive and release Singularism, its facilitators, organizers, and any associated parties from any liability or claims that may arise from their participation in the psychedelic ceremonies." [App-1:139.]

While this case was pending, a participant suffered an adverse reaction to psilocybin. [App-4:108.] According to the resulting police statement, she was not referred to Singularism for religious reasons: "I was recommended to this treatment facility by my licensed therapist." [App-6:094.] She "had a severely bad reaction to the treatment." [App-6:094.] After her emergency contact arrived at the center, "we called the police because I was so scared & hysterical." [App-6:094.] She was driven to the hospital by ambulance to recover. [App-6:094.]

## 2.    Procedural Background

### 2.1    A state judge issues a warrant to search Singularism's premises

Following several months of investigation, Detective Julian submitted an affidavit requesting a search warrant for Singularism's premises. [App-1:293–98.] A state district court judge authorized the search. [App-2:149–50.]

14

During the search, officers seized over 450 grams of psilocybin mushrooms, psilocybin paraphernalia, two ounces of THC, and various paperwork and writings. [App-2:152.] The quantity of psilocybin mushrooms was sufficient for more than 100 doses. [App-4:212–14; App-8:195.]

The proceedings in this case have primarily focused on psilocybin. According to Jensen, the THC had nothing to do with Singularism. [App-7:204.] Rather, Jensen is also a member of the Native American Church (ONAC), and he claimed to lawfully possess THC because of his sincere religious beliefs in ONAC. [App-7:170–71,204–07.]

## 2.2    Plaintiffs file this action, and the district court issues a TRO

Following the search, plaintiffs filed a complaint and sought a temporary restraining order (TRO) and preliminary injunction in state court. [App-1:074–75.] The complaint asserted claims under 42 U.S.C. § 1983, alleging violations of the First and Fourth Amendments to the U.S. Constitution. [App-1:057–59,063–65.] It also alleged violations of parallel provisions of the Utah Constitution and Utah's Religious Freedom Restoration Act (URFRA). [App-1:059–63,065–68.] Defendants removed the case to federal court based on plaintiffs' federal claims. [App-1:035–38.]

In federal court, Plaintiffs renewed their request for a TRO and preliminary injunction. [App-1:076–115.] After a hearing, the court granted a TRO, reasoning that plaintiffs were likely to succeed on their URFRA claim. [App-3:021–25;

App-7:243–25.] The district court did not address plaintiffs' likelihood of success on any other claims. [App-3:024–25.] Pursuant to the TRO, the court ordered defendants to "return the psylocibin [sic] and records seized on November 11 to Plaintiffs as soon as possible." [App-3:025; *see* App-7:245.]

The court clarified that its order was "very, very narrow" and "said nothing about criminal prosecution." [App-7:245,249.] The court reiterated: "I have no opinion with respect to what would happen if you engaged in criminal prosecution." [App-7:249.]

### 2.3    Criminal charges are filed against Jensen; plaintiffs seek an anti-suit injunction

After the court declined to enjoin the criminal prosecution, the Utah County Attorney filed criminal charges against Jensen. Jensen is charged with a state-law second degree felony and two class B misdemeanors for his possession of both psilocybin and THC. [App-3:066–68.]

Around the time the charges were filed, defendants moved to stay or modify the TRO to prevent the return of the psilocybin, given that it constituted evidence in the criminal action. [App-3:026–32.] The court granted the request, temporarily staying the portion of its TRO requiring the psilocybin's return. [App-3:038–39, 162–65.]

Shortly after the criminal action was filed, plaintiffs moved for an anti-suit injunction to enjoin the state criminal case. [App-3:056–64.] They also requested a

16

hearing to take additional evidence in support of their request to convert the TRO into a preliminary injunction. [App-3:040–41.]

### 2.4    The district court grants an anti-suit injunction and denies defendants' motion to dismiss

To prepare for the preliminary injunction hearing, defendants moved for expedited discovery. [App-3:093–97.] The court denied the request. [App-3:165–69.]

Defendants also moved to dismiss the complaint. [App-3:069–92.] The motion argued that plaintiffs' federal and state-law claims all fail as a matter of law. [App-3:073–80,083–92.] But it noted that the court need not address the state-law claims, because dismissal of the federal claims would warrant their dismissal under 28 U.S.C. § 1367(c). [App-3:080–83.]

While the motion was pending, plaintiffs amended their complaint. [App-4:098–134.] As relevant here, plaintiffs deleted the named police officers as defendants and added factual allegations. [App-4:059–95.] The parties stipulated that the amendment would not moot the pending motion to dismiss "because Plaintiffs have not removed or added any claims for relief." [App-4:056; *see* App-4:081–93.]

In February 2025, the district court granted a preliminary injunction. [App-5:118–55.] As with the TRO, the injunction was based solely on URFRA. [App-5:135.] Under the injunction, defendants were again ordered to return the psilocybin. [App-5:155.] The court also ordered "Defendants to not interfere with

Plaintiffs' sincere religious use of psilocybin from the date of this order until this litigation is complete." [App-5:155.] That injunction remains in effect.

In the same ruling, the court declined to resolve the other pending motions, in part because plaintiffs failed to give the Utah Attorney General notice of their constitutional challenge to the Utah CSA. [App-5:120,153–54,162.] The court then notified the Attorney General of the action. [App-5:115–17.] The Attorney General ultimately "join[ed] in and "adopt[ed] the arguments" made in the motion to dismiss.[6] [App-5:156–57.]

On August 4, the district court granted the anti-suit injunction and denied defendants' motion to dismiss. [App-5:193.]

With respect to the anti-suit injunction, the court concluded that the circumstances warranted the "exceptionally extraordinary remedy" of enjoining state criminal proceedings. [App-5:191.]

The district court rejected defendants' argument that it should abstain from enjoining state criminal proceedings under *Younger*. It ruled that defendants had waived *Younger*-based arguments by removing the case to federal court. [App-5:180–85.] It also concluded that the case fell within two exceptions to *Younger* abstention. First, the court concluded the criminal charges were brought in bad faith because they were filed shortly after the court granted the TRO—even though the court expressly declined to enjoin the filing of criminal charges.

---

[6] In June 2025, the court granted the parties' joint request to stay the action for sixty days while they engaged in settlement negotiations. [App-5:159–61.]

[App-5:185–86.] Second, it concluded plaintiffs would suffer irreparable harm to their Free Exercise rights if the criminal prosecution moved forward—even though plaintiffs would be free to raise their Free Exercise defense in state court. [App-5:186–87.]

With respect to the motion to dismiss, the court concluded that plaintiffs adequately pleaded federal constitutional claims. [App-5:166–70.]

On the Free Exercise claim, the court concluded that, although the "issue is close," the Utah CSA is not generally applicable and thus should be subject to strict scrutiny. [App-5:166–69.] The court declined to resolve whether the CSA would survive strict scrutiny, as it "depends on the strength of [defendants'] evidence, an issue typically ill-suited for resolution on a motion to dismiss." [App-5:169.]

With respect to plaintiffs' Fourth Amendment Claim, the court stated that "[d]efendants provide no basis for dismissing these claims"—even though defendants submitted substantial briefing on why the Fourth Amendment claim should be dismissed. [App-5:170; *see* App-3:078–80.]

The court also denied defendants' arguments to dismiss plaintiffs' various state-law claims. [App-5:170–79.]

Defendants now appeal.[7]

---

[7] After the appeal was filed, the district court stayed "[a]ll further proceedings and discovery" pending resolution of this appeal. [Dist. Ct. Dkt. 122 at 8–9.] The stay does not affect "any existing order issued by the court." [*Id.* at 8.]

## Standard of Review

This appeal challenges the district court's decision to enjoin state criminal proceedings against Jensen. This Court reviews the decision to grant an anti-suit injunction for abuse of discretion. *Bailey v. State Farm Fire & Cas. Co.*, 414 F.3d 1187, 1189 (10th Cir. 2005). "A district court's decision crosses the abuse-of-discretion line if it rests on an erroneous legal conclusion." *Chiles v. Salazar*, 116 F.4th 1178, 1200 (10th Cir. 2024). Legal conclusions drawn in connection with an order granting an injunction are reviewed de novo. *Id.*

The district court here expressly tied its decision to grant the anti-suit injunction to *Younger*'s abstention doctrine. [App-5:179–92.] The applicability of *Younger* and its exceptions is a legal determination reviewed de novo. *Courthouse News Serv. v. New Mexico Admin. Office of the Courts*, 53 F.4th 1245, 1254 (10th Cir. 2022).

This appeal also challenges the district court's denial of defendants' motion to dismiss plaintiffs' federal constitutional claims. This Court reviews de novo a denial of a motion to dismiss. *Johnson v. Smith*, 104 F.4th 153, 167 (10th Cir. 2024).

## Summary of Argument

Many of the errors in this appeal stem from the district court's erroneous analysis of plaintiffs' Free Exercise Claim—a claim that seeks to exempt Singularism and its founder from enforcement of Utah's criminal drug laws.

The court ruled that Utah's CSA is not generally applicable and thus not entitled to rational basis review. That ruling is anomalous: federal and state courts have repeatedly held that the federal CSA and its state-law counterparts are generally applicable. Utah's law is indistinguishable from those statutes. Accordingly, plaintiffs' challenge should have been reviewed under the rational basis standard and summarily dismissed.

Plaintiffs' Fourth Amendment claim falls with their Free Exercise claim. The Fourth Amendment claim alleges that the search of Singularism's spiritual center was unreasonable because defendants should have known that Singularism was entitled to a religious exemption from the CSA. But plaintiffs have no such entitlement. Regardless, immunity considerations independently warrant dismissal.

Without any federal claims, the remaining state-law claims should be dismissed without prejudice to be adjudicated in state court.

Even if plaintiffs' claims have merit, the anti-suit injunction does not. It runs contrary to the bedrock principles of federalism and comity articulated in *Younger*. The district court enjoined criminal proceedings based on two narrow exceptions to *Younger*. Neither applies. There is no irreparable harm, because a state prosecution

will not irreparably harm Jensen's Free Exercise rights. And there is no bad faith, because the evidence overwhelmingly supports defendants' *good faith*. *Younger*-based arguments are also preserved.

## Argument

**1.    This Court Has Jurisdiction**

Defendants appealed from an interlocutory order that (i) granted an anti-suit injunction against ongoing state criminal proceedings, and (ii) denied defendants' motion to dismiss federal constitutional claims. [App-5:193.] This Court has jurisdiction over both issues arising from that order.

*First*, this Court has jurisdiction to review the district court's anti-suit injunction under 28 U.S.C. § 1292(a)(1). That section grants appellate courts jurisdiction over appeals from "[i]nterlocutory orders of the district courts of the United States" granting injunctions. 28 U.S.C. § 1292(a)(1).

The injunction here fits squarely within § 1292(a)(1): "An order that prohibits a party from pursuing litigation in another forum unquestionably is an injunction for purposes of § 1292(a)(1)." 16 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 3923 (3d ed. 2025) (hereafter, Wright & Miller). This Court routinely exercises appellate jurisdiction over interlocutory anti-suit injunctions. *E.g.*, *MAI Basic Four, Inc. v. Basis, Inc.*, 962 F.2d 978, 980, 983 (10th Cir. 1992); *F.D.I.C. v. Geldermann, Inc.*, 975 F.2d 695, 697 (10th Cir. 1992).

Ordinarily an order denying *Younger* abstention is not immediately appealable. But the district court here tied its anti-suit injunction to two exceptions to *Younger*'s mandatory abstention doctrine. [App-5:179–92.] That analysis is

inarguably part of the injunction under § 1292(a)(1) and thus immediately appealable. Indeed, this Court has exercised jurisdiction over a district court's *Younger* analysis in a similar posture. *Seneca-Cayuga Tribe of Okla. v. Okla. ex rel. Thompson*, 874 F.2d 709, 711–17 (10th Cir. 1989). Other courts have too.[8]

*Second*, this Court has jurisdiction to review the district court's denial of the motion to dismiss the federal claims. Although standalone denials of motions to dismiss generally are not immediately appealable, they are immediately appealable when linked to the entry of an injunction. *Munaf v. Geren*, 553 U.S. 674, 691 (2008).

Even were that not the case, because this Court has jurisdiction of the anti-suit injunction under § 1292(a)(1), it can review all the issues that are "inextricably intertwined" with that injunction based on its pendent appellate jurisdiction. *Malik v. Arapahoe Cnty. Dep't of Soc. Servs.*, 191 F.3d 1306, 1317 (10th Cir. 1999). Exercise of such jurisdiction is appropriate "where the legal and factual claims are very closely related." *Id.*

Here, the abstention and federal claims are closely related to the anti-suit injunction. The district court issued the anti-suit injunction based on two exceptions to *Younger*'s abstention mandate. [App-5:179–92.] Accordingly, the court's *Younger* analysis is properly before the court on appeal. *E.g., Meredith v. Oregon*, 321 F.3d 807, 816 (9th Cir. 2003).

---

[8] *E.g., Rivera-Feliciano v. Acevedo-Vila*, 438 F.3d 50, 59 (1st Cir. 2006); *Diamond "D" Const. Corp. v. McGowan*, 282 F.3d 191, 197–02 (2d Cir. 2002).

The denial of defendants' motion to dismiss plaintiffs' federal claims is also inextricably intertwined with the anti-suit injunction. In granting that injunction, the court found "irreparable injury" based on its conclusion that Utah's CSA likely violated plaintiffs' Free Exercise rights. [App-5:186–87,191–92.] The anti-suit injunction is thus inextricably intertwined with the merits of the Free Exercise claim, and this Court can review the court's denial of defendants' motion to dismiss. *E.g.*, *Petrella v. Brownback*, 787 F.3d 1242, 1255 (10th Cir. 2015).

By similar logic, because this Court has jurisdiction over the First Amendment claim, it also has jurisdiction over the Fourth Amendment claim, because the latter depends on the survival of the former.

## 2.    Plaintiffs' Claims Should Be Dismissed

Most of the errors in this case can be traced to the district court's erroneous conclusion that Utah's CSA is not a generally applicable law. Courts have nearly uniformly ruled that the federal CSA and its state-law counterparts are generally applicable and thus subject to rational basis review. Under that standard, Singularism's Free Exercise claim is easily dismissed.

The rest of the complaint falls with the dismissal of the Free Exercise claim. Plaintiffs' Fourth Amendment claim hinges on the viability of the Free Exercise violation. And without any viable federal claims, the remaining state-law claims should be dismissed.

### 2.1    Plaintiffs' Free Exercise claim fails as a matter of law

The Free Exercise Clause, as incorporated by the Fourteenth Amendment, prohibits states from enacting laws "prohibiting the free exercise" of religion. U.S. Const. amend. I. At its core, the Clause "protects religious observers against unequal treatment and against laws that impose special disabilities on the basis of religious status." *Espinoza v. Mont. Dep't of Rev.*, 591 U.S. 464, 475 (2020) (quotation simplified).

"The Free Exercise Clause does not prevent individuals from being subject to a 'valid and neutral law of general applicability' that incidentally conflicts with their religion." *St. Mary Cath. Par. in Littleton v. Roy*, 154 F.4th 752, 765 (10th Cir. 2025) (quoting *Emp. Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872, 879 (1990)). "While the Constitution protects religious freedom, courts have long recognized the simple reality that the government must be able to enforce the law equally against everyone, no matter an individual's beliefs, lest we 'permit every citizen to become a law unto himself.'" *Id.* (quoting *Smith*, 494 U.S. at 879). "Thus, we ask if the law is neutral and generally applicable to assess if the law is holding everyone to the same standard, regardless of their religion." *Id.*

"If a law is neutral and generally applicable, it 'need only be rationally related to a legitimate governmental interest to survive a constitutional challenge.'" *Id.* (quoting *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 649 (10th Cir. 2006)). Rational basis applies "even if the application of the neutral

26

rule has the incidental effect of burdening a particular religious practice." *Chiles v. Salazar*, 116 F.4th 1178, 1222 (10th Cir. 2004) (quotation simplified).

If, on the other hand, "a law that burdens a religious practice is not neutral or generally applicable, it is subject to strict scrutiny." *St. Mary*, 154 F.4th at 765 (quotation simplified). Under strict scrutiny, a government entity must show "that its restrictions on the plaintiff's protected rights serve a compelling interest and are narrowly tailored to that end." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 532 (2022).

Here, the district court correctly observed that plaintiffs' claim would fail under rational basis review. [App-5:165.] Its error lies in its determination that strict scrutiny applies.

### 2.1.1   Utah's Controlled Substances Act is a generally applicable law subject to rational basis review

On appeal, the dispositive question is whether Utah's CSA "is a neutral law of general applicability." *St. Mary*, 154 F.4th at 765–66.

It is undisputed the CSA is neutral. As the district court recognized, "Plaintiffs do not argue, and the court sees no reason to doubt, that the Act is neutral: nothing in its text or history suggests that it was enacted to target any particular religious practice." [App-5:166.]

The dispute centers on general applicability. This Court and many others have recognized that the federal CSA—on which the Utah CSA was modeled—is generally applicable. *E.g.*, *United States v. Meyers*, 95 F.3d 1475, 1479, 1481 (10th

Cir. 1996).[9] Several state courts have reached the same conclusion, both with respect to the federal CSA and its state-law counterparts, including in the context of psilocybin prosecutions.[10]

The district court attempted to distinguish this case law based on Utah's recently enacted medical exemption for psilocybin. [App-5:166–68.] That ruling is wrong as a matter of law.

"[G]eneral applicability is a question of a law's structure and implementation." *St. Mary*, 154 F.4th at 768. On its face, the Utah CSA's structure evinces its general applicability: the statute categorically classifies psilocybin as a schedule I drug that is subject to criminal prohibition.

The medical exemption does not defeat the statute's general applicability or entitle Singularism to an equivalent exemption. "Consistent with the majority of our sister circuits," this Court has "refused to interpret *Smith* as standing for the

---

[9] *See also United States v. Christie*, 825 F.3d 1048, 1054 & n.3 (9th Cir. 2016); *Peyote Way Church of God, Inc. v. Thornburgh*, 922 F.2d 1210, 1213 (5th Cir. 1991*); Multi Denominational Ministry of Cannabis & Rastafari, Inc. v. Gonzales*, 474 F. Supp. 2d 1133, 1144 (N.D. Cal. 2007*); Oklevueha Native Am. Church of Haw., Inc. v. Holde*r, No. 09-cv-00336, 2012 WL 6738532, at *9 (D. Haw. Dec. 31, 2012).

Defendants are aware of one case, *United States v. Boyll*, which found the federal CSA's criminalization of peyote was not generally applicable, because it exempts some religions but not others. 774 F. Supp. 1333, 1341 (D.N.M. 1991).

[10] *E.g.*, *California v. Trippet*, 56 Cal. App. 4th 1532, 1541–43 (Cal. Ct. App. 1997); *Hawaii v. Sunderland*, 168 P.3d 526, 533–34 (Haw. 2007); *see also Ohio v. Cook*, No. 5-19-26, 2020 WL 615076, at *6 (Ohio Ct. App. Feb. 10, 2020) (psilocybin prosecution); *Trujillo v. Wyoming*, 2 P.3d 567, 577 (Wyo. 2000) (same).

proposition that a secular exemption automatically creates a claim for a religious exemption." *Grace United*, 451 F.3d at 651.

This Court has recognized two types of exemptions that can negate a statute's general applicability. The first arises when a statute puts in "place a system of individual exemptions." *St. Mary*, 154 F.4th at 768 (quoting *Smith*, 494 U.S. at 884)). Such exemptions arise only "to the extent that officials apply a subjective test to grant particular claimants exceptions." *Id.* at 771 n.15 (quotation simplified). The latter type of exemption—which is more constitutionally suspect—is not at issue here.

The second type of exemption arises when a law "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton v. City of Philadelphia*, 593 U.S. 522, 534 (2021). The district court erroneously concluded the medical exemption here fit into that category.

As defendants explained below, the purposes of the Utah CSA parallel those of the federal CSA. [App-3:075–76,210–11.] And the federal CSA "has long recognized the danger involved in the manufacture, distribution, and use of certain psychotropic substances for nonscientific and nonmedical purposes." 21 U.S.C. § 801a(1). Strict regulatory measures are necessary to prevent the "substantial and detrimental effect on the health and general welfare" of the public. 21 U.S.C. § 801(2).

Utah's medical exemption for psilocybin *furthers* that purpose. The exemption permits the State's two largest healthcare systems—Intermountain Healthcare and the University of Utah—to "develop a behavioral health treatment program" for psilocybin. Utah Code § 58-37-3.5(1)–(2). To participate, the programs must ensure that the psilocybin is used "only under the direct supervision and control of the healthcare system and the healthcare system's health care providers who are licensed under this title." *Id.* § 58-37-3.5(3)(a). Moreover, the exception is limited to forms of psilocybin in FDA "Phase 3 testing for an investigational drug." *Id.* § 58-37-3.5(1)(a).

Courts have routinely found that similar types of medical and research exemptions do not defeat general applicability. Such exemptions do not "jeopardize the same interests that the government uses to justify the restrictions on religious conduct imposed by the CSA." *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 282 F. Supp. 2d 1236, 1246 (D.N.M. 2002). "[A]llowing certain uses of drugs in controlled scientific, research, and medical environments does not run counter to the government's interest in promoting public health." *Id.* By contrast, "[t]he unregulated consumption of drugs in ceremonial settings may present risks of adverse health effects and illegal diversion in a way that the research exceptions do not." *Id.*

The district court here concluded otherwise, ruling that the Utah CSA's medical exemption is unique because it "is specifically directed at psilocybin—

indicating a legislative judgment that the restriction on psilocybin can admit of certain exemptions." [App-5:168.]

That reasoning is unpersuasive. The Utah Legislature authorized a narrow research exception for very specific forms of psilocybin in a *controlled and highly regulated medical environment*—where both the facility and the providers are licensed by the State as health care providers. Utah Code § 58-37-3.5(1), (3). The requirement that the healthcare systems be licensed and provide detailed reports on their findings confirms the research nature of the exemption. *Id.* § 58-37-3.5(4).

The State authorized a narrow exemption, for research purposes, to determine whether there are medical benefits to psilocybin. *Id.* § 58-37-3.5(4). The exemption does not reflect a legislative judgment that psilocybin is safe to use outside the medical-research context.

Other circuits have ruled that substance-specific exemptions do not defeat general applicability. For example, in *Olsen v. Mukasey*, the plaintiff contended that the federal CSA and a state equivalent were not generally applicable, "because they exempt the use of alcohol and tobacco, certain research and medical uses of marijuana, and the sacramental use of peyote. 541 F.3d 827, 832 (8th Cir. 2008). The Eighth Circuit rejected that argument, holding that those "[e]xceptions do not negate that the CSAs are generally applicable." *Id.*

The district court also viewed the medical exemption as distinguishable because, in its view, the safety risks of using psilocybin under the exemption are equivalent to the safety risks of using psilocybin at Singularism. [App-5:167.]

The court's analysis suffers from multiple problems. To begin, it erroneously assumes that use of a schedule I drug at Singularism has equivalent safety assurances as Utah's two largest healthcare systems. The latter are governed by hundreds of safety regulations—and subject to inspection by Utah's Department of Health and Human Services (DHHS). *See* Utah Code § 26B-2-202(1). Those regulations contain strict requirements for licensed medical and professional staff. *E.g.*, Utah Admin. Code R432-100-8. Health care systems are required to keep medical records, which can track medical history and drug interactions. *Id.* R432-100-35. And of course, health care providers at facilities can be subject to civil liability under Utah's Healthcare Malpractice Act. Utah Code §§ 78B-3-401 to -428.

By contrast, Singularism's psilocybin ceremonies are administered by unlicensed "facilitators," most of whom lack medical training. Singularism does not even have uniform criteria for dosing. [App-7:101.] Most clinical studies, by contrast, use a fixed dose. [App-4:214,281; App-5:012.] And of course, Singularism requires participants to waive all civil liability. [App-1:139.]

The court's method of analysis also lacks rigor. Rather than compare the complaint's allegations of safety mechanisms in place at Singularism with the

statutory protections in place at the two healthcare systems, the court focused its comparison on one—and only one—of Singularism's safety hazards: its failure to ensure the safety of the psilocybin it uses. [App-7:070–72,129–30.] As the court acknowledged, the "sum total" of the evidence about Singularism's sourcing "is that [the psilocybin] was delivered by a woman, I forgot her name, who got it from a lab in Oregon." [App-8:139; *see* App-7:070–72.]

The court concluded that the research exemption posed an equivalent threat because the CSA "imposes no sourcing, testing, or chain-of-custody requirements for the psilocybin administered by healthcare systems." [App-5:167.] But the CSA didn't need to re-specify those requirements; they are supplied in *other* statutes and regulations that govern licensed health care facilities. Among other things, those regulations include strict quality-control and sourcing requirements for the administration of drugs. *E.g.*, Utah Admin. Code R432-100-8 (hospital staffing and licensing), -26 (pharmacy services), -36 (supply services); R432-300-15 (medication administration at outpatient facilities).

It strains credulity to suggest that the medical exemption for psilocybin research at the State's two largest health care facilities undermines the State's interest in protecting public health to the same extent as Singularism's unlicensed and unregulated use of psilocybin. Indeed, when one of Singularism's adherents had an adverse reaction to psilocybin, she was taken by ambulance from Singularism to an Intermountain facility. [App-6:234.]

### 2.1.2    Plaintiffs' claim fails under rational basis review

Because Utah's CSA is generally applicable, rational basis applies. It follows that plaintiffs' claims fail.

To survive rational basis review, the CSA need only be "rationally related to a legitimate government purpose or end." *Chiles*, 116 F.4th at 1215 (quotation simplified). As the district court recognized, the Utah CSA "would undoubtedly pass" such a standard. [App-5:165.] Plaintiffs did not argue otherwise below. [App-3:189–97.]

Because plaintiffs have no claim that enforcement of the Utah CSA violates their Free Exercise rights, this Court should reverse the denial of defendants' motion to dismiss plaintiffs' Free Exercise claim.

### 2.2    Plaintiffs' Fourth Amendment claim fails as a matter of law

The district court declined to dismiss the Fourth Amendment claim on the ground that defendants "provide[d] no basis for dismissing these claims" as to Jeffrey Gray, Provo City, and Utah County. [App-5:170.] That ruling was incorrect: defendants offered *two* grounds for dismissal of the Fourth Amendment claim, either of which requires dismissal.

*First*, the Fourth Amendment claim fails if the Free Exercise claim fails. [App-8:024,073.] The crux of the plaintiffs' Fourth Amendment claim is that the search of Singularism's premises was unreasonable because "Defendants knew or should have known Plaintiffs' religious practices were lawful." [App-4:127.]

Because plaintiffs can show no First Amendment violation, they can show no Fourth Amendment violation. Both claims must be dismissed.

*Second*, and independent of the above, the Fourth Amendment claim is subject to dismissal on immunity grounds. [App.3:078–80.] A neutral magistrate issued a search warrant, based on a finding of probable cause, that "COMMANDED" the search of Singularism's spiritual center. [App-2:150.]

Given that judicial determination, defendants and their officers are entitled to absolute immunity. "[O]fficials charged with the duty of executing a facially valid court order enjoy absolute immunity from liability for damages in a suit challenging conduct prescribed by that order." *Turney v. O'Toole*, 898 F.3d 1470, 1472 (10th Cir. 1990) (quotation simplified). That immunity applies even if the probable cause determination for the warrant was ultimately mistaken. *Anderson v. Creighton*, 483 U.S. 635, 641 (1987).

And if no officers violated the constitution, Utah County and Provo also cannot be liable. "[A] municipality may not be held liable where there was no underlying constitutional violation by any of its officers." *Fenn v. City of Truth or Consequences*, 983 F.3d 1143, 1150 (10th Cir. 2020) (quotation simplified).

## 2.3    Plaintiffs' state-law claims should be remanded to Utah state court

Besides the federal constitution claims addressed above, plaintiffs alleged three state-law causes of action: (1) a violation of article I, section 4 of the Utah

Constitution; (2) a violation of article I, section 14 of the Utah Constitution; and (3) a violation of URFRA. [App-4:122–26,128–31.]

This brief does not challenge the merits of the district court's denial of defendants' motion to dismiss those claims. Because those claims did not form the basis for the court's anti-suit injunction, their substance falls outside the scope of this Court's jurisdiction. That said, if this Court reverses the denial of plaintiffs' federal claims, it can and should direct the district court to remand the remaining state-law claims to state court.

As the district court correctly recognized below, "[i]f the federal claims go, the whole case needs to be remanded." [App-8:009; *see also* App-8:037.] That is because when "federal claims are dismissed before trial," state claims "should be dismissed as well." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966); *see* 28 U.S.C. § 1367(c)(3). Accordingly, this Court has routinely instructed district courts to dismiss state claims after dismissing all federal claims. *E.g.*, *Est. of Reat v. Rodriguez*, 824 F.3d 960, 967 (10th Cir. 2016).

Dismissal of the state-law claims is particularly appropriate because they implicate several unresolved questions of Utah law. 28 U.S.C. § 1367(c)(1). As the district court acknowledged, plaintiffs' challenge under Utah's Free Exercise Clause "raises novel and complex issues." [App-5:171.] Moreover, as defendants pointed out below, URFRA is new and has not been given authoritative interpretation by any Utah court. [App-3:083.]

36

Given the novelty of these state-law claims, a state court should resolve them. As this Court explained in *Bauchman v. West High School*, when "Utah courts have never squarely addressed" an important state-law issue, especially one with constitutional dimensions, comity concerns "counsel us to leave the development and application of private causes of action under the Utah Constitution to the Utah courts." 132 F.3d 542, 549 (10th Cir. 1997).

If this Court reverses the denial of defendants' motion to dismiss the federal claims, it should remand with instructions to dismiss the state-law claims without prejudice so they can be adjudicated in state court. *E.g.*, *George v. Newman*, 726 F. App'x 699, 708–09 (10th Cir. 2018).

### 3.    The Anti-Suit Injunction Should Be Vacated

Federal courts should "refuse to interfere with an ongoing state criminal proceeding" absent "all but the most exceptional circumstances." *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 930 (1975). "This refusal to exercise federal jurisdiction arises from a desire to avoid undue interference with states' conduct of their own affairs." *Sw. Air Ambulance, Inc. v. City of Las Cruces*, 268 F.3d 1162, 1178 (10th Cir. 2001) (quotation simplified). An injunction of state proceedings "seriously impairs the State's interest in enforcing its criminal laws, and implicates the concerns for federalism which lie at the heart of *Younger*." *Doran*, 422 U.S. at 931.

Contrary to the district court's view, this is not an exceptional case warranting interference with a state criminal proceeding. For one thing, the predicate for the court's ruling was wrong: plaintiffs are not likely to prevail on the merits of their Free Exercise Claim. If that determination is incorrect, there was no basis for an anti-suit injunction against state proceedings to protect federal rights. In any event, even if the court's federal constitutional analysis was correct, the injunction was improper.

### 3.1    The district court abused its discretion in granting the anti-suit injunction

To determine whether an anti-suit injunction is appropriate, a federal district court must make two determinations: (1) whether it has authority to issue the injunction notwithstanding the Anti-Injunction Act, and (2) even if it has authority, whether exceptional circumstances warrant the injunction. *See Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 146, 151 (1988).

Here, the district court correctly determined that it had authority.[11] But it abused its discretion in determining that this is one of the exceptional cases warranting interference with an ongoing state criminal action.

---

[11] The Anti-Injunction Act provides that "[a] court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283. The exception for expressly-authorized acts applies because plaintiffs asserted claims under § 1983. *Mitchum v. Foster*, 407 U.S. 225, 242–43 (1972).

The "Supreme Court has admonished lower courts to refrain from enjoining state court proceedings unless absolutely necessary." *Staffer v. Bouchard Transp. Co.*, 878 F.2d 638, 644 (2d Cir. 1989) (citing *Atl. Coast Line R.R. Co. v. Brotherhood of Locomotive Eng'rs*, 398 U.S. 281, 297 (1970)). "[T]he fact that an injunction *may* issue under the Anti-Injunction Act does not mean that it *must* issue." *Chick Kam Choo*, 486 U.S. at 151. "[A]ny doubts as to the propriety of a federal injunction against state court proceedings should be resolved in favor of permitting the state courts to proceed." *Smith v. Bayer Corp.*, 564 U.S. 299, 306 (2011) (quotation simplified).

To determine whether an anti-suit injunction is warranted, the Supreme Court has directed lower courts to consider the factors underlying the *Younger* abstention doctrine. As the Court explained in *Mitchum v. Foster*, even when section 1983 authorizes an anti-suit injunction, that does not alter "in any way the principles of equity, comity, and federalism that must restrain a federal court when asked to enjoin a state court proceeding." 407 U.S. 225, 243 (1972). "These principles, in the context of state criminal prosecutions, were canvassed at length . . . in *Younger*[.]" *Id.*

Here, all those factors required the district court to abstain from interfering with Utah's criminal prosecution of Jensen.

### 3.1.1    All *Younger* factors support abstention

*Younger* "dictates that federal courts not interfere with state court proceedings by granting equitable relief—such as injunctions of important state proceedings . . . when such relief could adequately be sought before the state court." *Amanatullah v. Colo. Bd. of Med. Exams.*, 187 F.3d 1160, 1163 (10th Cir. 1999).

"[F]ederal courts are to abstain from exercising jurisdiction to interfere with state proceedings" when three conditions are satisfied. *Winn v. Cook*, 945 F.3d 1253, 1258 (10th Cir. 2019). First, "there is an ongoing state criminal . . . proceeding." *Id.* Second, "the state court provides an adequate forum to hear the claims raised in the federal complaint." *Id.* And third, "the state proceedings involve important state interests, matters which traditionally look to state law for their resolution or implicate separately articulated state policies." *Id.* (citation omitted).

Abstention is "non-discretionary; it must be invoked once the three conditions are met, absent extraordinary circumstances." *Amanatullah*, 187 F.3d at 1163. Here, all three conditions were met.

The district court correctly concluded that two of the three criteria were satisfied. As the court observed, (1) Jensen can "raise his various claims in defense in the state criminal case (the second *Younger* condition)," and (2) "the state criminal case implicates the State of Utah's important interests in prosecuting those

who violate its controlled-substances laws (the third *Younger* condition)."
[App-5:180–81.]

The court declined to resolve the remaining *Younger* consideration: whether the state criminal proceeding was ongoing because it denied abstention on other grounds (discussed *infra* at 42–60). [App-5:182.]

Had the court resolved the issue, it would have concluded that the state criminal proceeding was ongoing (the first *Younger* condition) because execution of the search warrant began that proceeding.

The search warrant against Jensen was executed eight days before the plaintiffs filed their complaint. [App-5:184.] And as the district court correctly acknowledged, "the weight of the authority appears to indicate" that "the execution of a search warrant begins a state criminal proceeding for *Younger* purposes."[12] [App-5:182.]

This Court has concluded as much in an unpublished but persuasive opinion, *Kingston v. Utah Cnty.*, No. 97-4000, 161 F.3d 17, 1998 WL 614462 (10th Cir. Sept. 8, 1998). There, as here, "the defendants had begun an investigation and executed a search warrant" before the plaintiff "filed her federal complaint."

---

[12] *See, e.g., Texas Ass'n of Business v. Earle*, 388 F.3d 515, 519–21 (5th Cir. 2004) (state grand jury proceedings); *Kaylor v. Fields*, 661 F.2d 1177, 1182 (8th Cir. 1981) (similar); *Nick v. Abrams*, 717 F. Supp. 1053, 1056 (S.D.N.Y. 1989) (issuance of search warrant); *Orlando v. Smith*, No. 5:22-cv-062, 2023 WL 3306555, at *2 (W.D. Va. May 8, 2023) (similar); *Doe v. Office of Kan. Secs. Comm'r*, No. 17-cv-80656, 2017 WL 6557431, at *2 (S.D. Fla. Nov. 28, 2017) (similar).

*Id.* at *4. This Court "conclude[d] these facts are sufficient to establish the existence of a pending state criminal proceeding." *Id.* Although the plaintiff had not been charged when the complaint was filed, the criminal proceedings were deemed commenced: "the allegedly illegal activity had already taken place, the investigation had been conducted, the search warrant had been executed, the necessary evidence had been obtained, and the charges" were imminent. *Id.*[13]

### 3.1.2    None of the *Younger* exceptions applied

"When *Younger*'s three requirements are met, abstention is mandatory unless one of three exceptions applies: the prosecution was (1) commenced in bad faith or to harass, (2) based on a flagrantly and patently unconstitutional statute, or (3) related to any other such extraordinary circumstance creating a threat of irreparable injury both great and immediate." *Winn*, 945 F.3d at 1258–59 (quotation simplified).

---

[13] In a footnote, the district court erroneously suggested that defendants took inconsistent positions on when the criminal proceedings began. [App-5:182 n.9.] In their opposition to plaintiffs' URFRA claim, defendants argued that plaintiffs failed to invoke an exception to the governmental immunity statute, which applies when the "government action alleged in the action . . . is ongoing." Utah Code § 63G-33-201(5)(b). [App-1:269.] Defendants argued that plaintiffs could not invoke the exception, because the *searches* plaintiffs challenged were not ongoing, and because plaintiffs had been under the threat of criminal prosecution for a year. [App-1:269.] Defendants made a similar point at the TRO hearing. [App-7:235–36.] They did not argue that state criminal proceedings had not yet commenced for *Younger* purposes.

The court concluded that, even if all the three *Younger* requirements were met, abstention was not mandatory, because its first and third exceptions applied. [App-5:185–87.] Governing precedent foreclosed that conclusion.

### 3.1.2.1    An injunction is not necessary to prevent irreparable harm

The court first concluded that the case fits within the *Younger* exception for "irreparable harm." *Winn*, 945 F.3d at 1258–59. To fit that exception, the harm must be "great, immediate, and irreparable." *Moore v. Sims*, 442 U.S. 415, 432 (1979). Moreover, the circumstances must be "extraordinary." *Id.* at 432–33.

The district court concluded the exception applies because plaintiffs would suffer an immediate, irreparable injury to their Free Exercise rights if they had to wait for the conclusion of the state criminal proceedings to vindicate those rights. [App-5:186–87,191–92.]

That conclusion is wrong for at least two reasons.

First, as explained above (at 26–34), the Utah CSA does not violate plaintiffs' Free Exercise rights. Whatever burden enforcement may pose on Singularism's practices, it does not amount to a constitutional violation, much less extraordinary circumstances. Put simply, plaintiffs are not harmed, let alone irreparably harmed, by the application of a valid law.

Second, even if it is ultimately determined that the CSA cannot be constitutionally applied to Singularism, requiring plaintiffs to litigate the exception in state court is not irreparable harm under *Younger*.

"*Younger* said that irreparable injury significant enough to permit federal court interference must pose a threat to the plaintiff's federally protected rights that cannot be eliminated by his defense against a state criminal prosecution." *Winn*, 945 F.3d at 1259 (quotation simplified). "The cost, anxiety, and inconvenience of having to defend against a single criminal prosecution, could not by themselves be considered irreparable in the special legal sense of that term." *Id.* (quotation simplified).

Courts have rarely found this high bar satisfied. Indeed, after surveying the case law, this Court explained that federal courts have recognized "two circumstances" where the exception would apply: "(1) when the defendant's trial is being delayed in violation of the constitutional right to a speedy trial, and (2) when the current trial would violate the Double Jeopardy Clause.*" Id.* at 1260. Neither category is implicated here.

Even so, the district court offered several reasons why it believed plaintiffs would suffer irreparable harm absent an injunction. None hold up.

The district court first concluded that plaintiffs would suffer irreparable harm to their Free Exercise rights if they were forced to wait until the end of their criminal proceedings to vindicate their Free Exercise rights. [App-5:186–87,191–92.] But as explained above, that justification fails.

It is "beyond dispute that the Utah state judiciary provides an adequate forum for [a party] to assert his constitutional claims." *Weitzel v. Div. of*

*Occupational & Prof'l Licensing*, 240 F.3d 871, 876 (10th Cir. 2001). Because the pending criminal proceeding "may resolve any violation which may have occurred to [Jensen]'s protected rights," this "is not one of the extraordinary circumstances where irreparable injury can be shown." *Id.* at 877.

The district court suggested this case might be unique because waiting for the culmination of the criminal proceedings could infringe on Singularism's associational interests due to the potential chilling effect on its practices. [App-5:186–87,191–92.] In the court's view, "[t]he prosecution has already caused Singularism to lose many of its practitioners and affiliates, and forcing Plaintiffs to wait until the conclusion of the criminal proceedings to secure their free-exercise rights would be the equivalent of issuing a death warrant for their nascent religion." [App-5:192.] That reasoning is flawed as a matter of both law and fact.

As a legal matter, *Younger* rejects the idea that the chilling of First Amendment conduct constitutes the kind of irreparable harm warranting an injunction. There, the Supreme Court ruled that the "chilling effect" of a state prosecution on Free Expression rights did "not by itself justify federal intervention" in state criminal proceedings. 401 U.S. at 50 (quotation simplified).

That rule makes sense. By the district court's logic, every case involving a Free Exercise challenge would warrant an exception to *Younger* because any prosecution implicating religious practices will have a chilling effect on that religion. *Cf. Stockton v. Brown*, 152 F.4th 1124, 1140 (9th Cir.2025)

("[N]otwithstanding the importance of free speech rights in our democratic society, there is no free-speech exception to *Younger* abstention.").

None of the cases the district court cited leads to a different conclusion. [App-5:191–92.] The court principally relied on *Dombrowski v. Pfister*, but that case is distinguishable. 380 U.S. 479, 487–88 (1965). There, the Court found irreparable injury in the context of an overbreadth Free Expression challenge, where there was a risk of "further arrests and seizures" of third parties. *Id.* at 489. Here, no one has raised concerns about the possibility of third-party prosecutions.

Moreover, the Supreme Court "signaled a major retreat from *Dombrowski* in *Younger*." *Daves v. Dallas Cnty.*, 64 F.4th 616, 624 (5th Cir. 2023). "*Younger* rejected two notions: that adverse impacts on First Amendment rights alone could justify federal intervention, and that the ordinary pains of undertaking a defense against criminal charges could constitute sufficiently irreparable injury for equitable relief." *Id.*

The district court also cited *Braunfeld v. Brown*, 366 U.S. 599, 612 (1961). But that case stands only for the unobjectionable principle that Free Exercise is a fundamental right. The other case it cited, *Roman Catholic Diocese of Brooklyn v. Cuomo*, recognizes only that the loss of Free Exercise rights can constitute irreparable injury for purposes of an injunction pending appeal. 592 U.S. 14, 19 (2020). But the *Younger* standard requires more "extraordinary" harm. *Moore*, 442 U.S. at 433. "*Younger* abstention routinely applies even when important rights

are at stake—indeed, without some claim that a prosecution affects federally protected rights, there would be no basis for federal jurisdiction in the first place, and thus nothing from which to abstain." *Bristol-Meyers Squibb Co. v. Connors*, 979 F.3d 732, 738 (9th Cir. 2020).

Factually, the complaint provides strong reasons to doubt the court's concern that the criminal prosecution would be Singularism's death knell. According to the complaint, the very patient who experienced an adverse reaction to psilocybin participated *after* the criminal charges were filed but *before* the district court enjoined the prosecution. [App-4:108,113; App-5:193.] That fact undercuts the court's conclusion that the criminal prosecution will deter all participants.

The complaint also provides additional reasons to doubt criminal prosecution is fatal to Singularism. According to the complaint, both Provo City and the Utah County Attorney responded to Singularism's founding by issuing statements in November 2023 clarifying that there is no religious exception to the CSA for psilocybin and that violators would be prosecuted. [App-4:104–05.] Despite this concrete threat of criminal prosecution, Singularism continued to operate. Although some may be deterred by the state criminal action, the complaint itself makes clear that not everyone will be.[14]

---

[14] As evidence of irreparable harm, the district court noted that "Defendants pressured the landlord of Singularism's spiritual center to evict Singularism." [App-5:186.] Provo City did notify Singularism's landlord that Singularism was dispensing illegal drugs and recommended eviction. [App-7:185–86.] But that is not irreparable harm. As Provo City explained, similar letters are sent as a matter of course in any drug case, and there is typically "no further action from the police

Moreover, independent of the criminal prosecution, the district court has separately stayed defendants from interfering with Singularism's religious practice—including psilocybin ceremonies. [App-5:155.]

### 3.1.2.2    The state prosecution was not brought in bad faith

The district court also concluded that this case falls within the exception to *Younger* for prosecutions commenced in bad faith. [App-5:185–86,192.] No fact or law supports that conclusion.

The bad-faith analysis begins with "the longstanding presumption of regularity accorded to prosecutorial decisionmaking." *Hartman v. Moore*, 547 U.S. 250, 263 (2006). A plaintiff seeking to invoke this exception must show that the "prosecutions [were] undertaken by state officials in bad faith without hope of obtaining a valid conviction." *Perez v. Ledesma*, 401 U.S. 82, 85 (1971).

This Court has articulated three factors to consider in determining whether a prosecution was commenced in bad faith or to harass for *Younger* purposes: "(1) whether it was frivolous or undertaken with no reasonable objective hope of success; (2) whether it was motivated by the defendant's suspect class or in retaliation for the defendant's exercise of constitutional rights; and (3) whether it was conducted in such a way as to constitute harassment and an abuse of

---

department." [App-7:185–86.] Here, the landlord took no adverse action against Singularism. [App-7:061–62.] And Provo City has committed to not pursuing the issue further. [App-8:123.]

prosecutorial discretion, typically through the unjustified and oppressive use of multiple prosecutions." *Phelps v. Hamilton*, 122 F.3d 885, 889 (10th Cir. 1997).

The very few out-of-circuit cases finding bad faith demonstrate that this case does not come close to fitting within the exception. One example is *Krahm v. Graham*, 461 F.2d 703 (9th Cir. 1972). There, a city brought "over 100 criminal charges for the sale of allegedly obscene books" against bookstore and magazine owners; "[e]leven of the cases came to trial," and "[n]one resulted in convictions." *Id.* at 705. In addition, the mayor circulated petitions to 50,000 city residents, admitting "publicly that the purpose of the petitions was to influence the tenor of the community so that jurors would be more likely to convict than they had been in the cases already tried." *Id*.

More recently, in *Netflix, Inc. v. Babin*, the Fifth Circuit found no abuse of discretion in the district court's finding of bad faith. 88 F.4th 1080 (5th Cir. 2023). There, the prosecutor "charged Netflix and issued a press release about the unprecedented prosecution," yet "the case sat idle for a year." *Id.* at 1092. Then, after Netflix filed a habeas petition, "there was a burst of prosecutorial alacrity," including "*four* new indictments." *Id.* To secure the indictments, the prosecutor selectively presented evidence to the grand jury. *Id.* at 1093. And it "inexplicably charged Netflix" for violating child pornography laws "for a scene that involved a verifiably adult actress." *Id.* at 1085.

This case is nowhere close to those facts. There is only one criminal prosecution. It began with the execution of a valid search warrant *before* plaintiffs filed this action. (See *supra* at 41–42.) A district court found probable cause to issue the warrant, fully aware that plaintiffs claimed a religious exemption to the CSA. [App-1:295; App-2:149–50.]

Moreover, the criminal charges—although filed after the TRO—were brought with a reasonable hope of success. As the district court acknowledged, if Singularism is not entitled to a religious exemption to the CSA, Jensen has "admitted to violating the State's criminal drug laws." [App-5:186.] That admission makes it impossible to rule that the case lacks merit—the standard necessary for bad faith. *E.g.*, *Yelp Inc. v. Paxton*, 137 F.4th 944, 952 (9th Cir. 2025) (lack of merit needs to be "palpable and overwhelming").

The district court nonetheless pointed to several purported indicia of bad faith. Each lacks merit.

The district court first accused defendants of forum-shopping, concluding that filing criminal charges after the court granted the TRO "suggests that the government, having preliminarily lost in this court, is attempting to get a favorable ruling from a more sympathetic court." [App-5:186.]

But Defendants did not file criminal charges against Jensen to get a more "favorable ruling" in a different forum. They filed criminal charges because, after executing a valid search, defendants found evidence that Jensen violated state

criminal law: Singularism possessed over 450 grams of a Schedule I drug. [App-2:152; App-4:212–15.] It goes without saying the State had a vital interest in enforcing its drug laws.

Evincing the prosecution's *good faith*, defendants expressly asked the district court at the TRO hearing if it was enjoining the criminal prosecution—and the court repeatedly said no:

> Well, my order said nothing about criminal prosecution. I have no opinion with respect to what would happen if you engaged in criminal prosecution. I suppose that under the theory that you articulated, the way you thought things would work is that if a criminal prosecution were filed, then the RFRA or the First Amendment or Utah Constitution Freedom of Religion Claim could be raised as an affirmative defense.

> I suspect that if, in fact, you file a criminal prosecution, that might happen, and it may also be that this TRO order may be offered into evidence in the criminal prosecution, but I'm not enjoining any criminal prosecution.

[App-7:249–50.]

Not only did the court express "no opinion" on the filing of criminal charges, it made clear that the TRO was not the final word on the merits. As the court elsewhere acknowledged, "a one-day [TRO] hearing may not have sufficed for the parties to introduce all the evidence they wished to present in connection Plaintiffs' motion for a preliminary injunction." [App-3:038.] Thus, regardless of the initial adverse ruling, the court's ruling was tentative. At a minimum, it could eventually be corrected through the appellate process.

Defendants had a good-faith basis to believe in the possibility of reversal. Among other things, the TRO was based solely on URFRA—a new law that Utah's state courts have not yet interpreted. [App-3:083; App-5:135.]

In any event, pursuing a prosecution based on a potentially unconstitutional law does not amount to bad faith. *Weitzel*, 240 F.3d at 877. "Assuming arguendo that the statute is unconstitutional," the bad faith exception does not apply unless "it is so patently unconstitutional that [defendants'] actions could be considered frivolous or without reasonable hope of success." *Id.*; *see Younger*, 401 U.S. at 54. Under this standard, defendants' actions were not in the vicinity of bad faith.

The court's second indicia of bad faith was its conclusion that "the prosecution is grounded in the government's refusal to recognize the sincerity of a religion that to it appears foreign, strange, or illogical." [App-5:186.]

But the government's questioning of plaintiffs' religious sincerity and Singularism's religious nature is not evidence of bad faith. Such probing is required by the relevant legal tests.

For example, under the federal RFRA—which the court took as a guidepost for interpreting URFRA [App-5:135]—a plaintiff's "prima facie" case includes demonstrating that "[t]he governmental action must (1) substantially burden, (2) a religious belief rather than a philosophy or way of life, (3) which belief is sincerely held by the plaintiff." *United States v. Meyers*, 95 F.3d 1475, 1482

(10th Cir. 1996).[15] Indeed, the district court considered many of these factors. [App-5:137–39.]

The sincerity of an individual's religious belief is a factual determination on which plaintiff carries the burden of proof. *Id.* at 1482. Inquiry into a plaintiff's sincere religious practice is thus necessary and expected.

And although "a determination of what is a 'religious' belief or practice entitled to constitutional protection may present a most delicate question, the very concept of ordered liberty precludes allowing every person to make his own standards on matters of conduct in which society as a whole has important interests." *Wisconsin v. Yoder*, 406 U.S. 205, 215–16 (1972). Accordingly, this Court has authorized inquiry into multiple considerations, including the religion's "[m]etaphysical [b]eliefs" and the [a]ccoutrements of [r]eligion," among other considerations. *Meyers*, 95 F.3d at 1483. Were defendants not permitted to test these elements, the First Amendment "could easily become the first refuge of scoundrels if defendants could justify illegal conduct simply by crying 'religion.'" *United States v. Meyers*, 906 F. Supp. 1494, 1498 (D. Wyo. 1995).

Given the legal standard, the fact that defendants' counsel probed these elements for a novel religion—the core sacrament of which uses a schedule I

---

[15] Under URFRA, "a government entity may not substantially burden the free exercise of religion of a person, regardless of whether the burden results from a rule of general applicability." Utah Code § 63G-33-201(2). "'Free exercise of religion' means the right to act or refuse to act in a manner substantially motivated by a sincerely held religious belief, regardless of whether the exercise is compulsory or central to a larger system of religious belief." *Id.* § 63G-33-101(2).

drug—evinces sound legal practice, not bad faith. That is particularly true where similar requests for religious exemptions to federal and state CSAs have been dismissed as frivolous. *E.g.*, *Gallagher v. Dhillion*, No. 3:18-cv-2801, 2020 WL 2737246, at *2 (N.D. Tex. May 7, 2020); *Dee v. United States*, 241 F. Supp. 2d 50, 51 (D. Me. 2003) (similar).

Related to this element, the court also found evidence of bad faith based on purportedly "intrusive, offensive questioning from Defendants' counsel during the [TRO] hearing." [App-5:186.] Yet the order does not identify any specific questions or line of questioning that it found offensive.

The hearing transcript does not clarify the issue. Over the course of a full-day hearing, plaintiffs' counsel lodged just twelve objections—only nine of which were sustained. [App-7:076,077,078,090,099,106,107,109,139,194,207–08,213–14.] At no point did the court caution defense counsel regarding the scope of its questioning. On the contrary, at the conclusion of the hearing it commended all counsel for their "excellent work." [App-7:250.]

In a discovery order, the district court suggested that defendants' questioning was overbroad because defendants probed the identity "of the person supplying Singularism with psilocybin." [App-3:166 n.4.] But such questioning was highly pertinent to evaluating the State's interest in applying the CSA to Singularism: ensuring adherents' safety. That concern was prompted by testimony that Singularism fails to test its psilocybin for impurities. [App-7:070–72.] The relevant

line of questioning revealed that Singularism knew almost nothing about the safety of its psilocybin. [App-7:070–72.] Given this red flag, defendants reasonably sought information intended to identify the source of plaintiffs' Schedule I controlled substance—"Inge." [App-7:071.] But Singularism's office manager could not recall Inge's last name, nor did she have Inge's contact information readily available. [App-7:71–75.] Plaintiffs' counsel did not object to this line of questioning—and at one point he directed the witness to answer. [App-7:70–75.]

If the district court's concern arose from defendants' exploration of Singularism's tenets or its adherents' sincerity, those concerns are again misplaced. As explained (at 52–53), the relevant legal tests make those inquiries relevant. Defense counsel was not acting in bad faith by posing such questions—they were doing their job.

Finally, the court found evidence of bad faith in defendants' "vastly overbroad expedited discovery requests." [App-5:186.] But overly broad discovery requests—an element of nearly all civil litigation—cannot constitute bad faith. Such requests are "normally just a means of opening discussion between discoverer and discoveree." *Deitchman v. E.R. Squibb & Sons, Inc.*, 740 F.2d 556, 560 (7th Cir. 1984).

This Court has said that a prosecutor's filing of "20 cases against members of the Westboro Baptist Church since she has been in office" was not evidence of bad faith. *Phelps*, 122 F.3d at 890–91. If the filing of multiple criminal

prosecutions is not harassment, a single application for discovery, even if overly broad, does not remotely demonstrate bad faith.

The court's conclusion that defendants sought overly broad discovery appears to be based on an earlier discovery order denying defendants' request for expedited discovery in anticipation of the preliminary injunction hearing. [App-3:165–69.] In that ruling, the court acknowledged that "some of Defendants' requests may be legitimate following a Rule 26(f) conference." [App-3:168.] But it found the requested discovery was "far broader than necessary to ensure that [defendants] may adequately prepare for the preliminary injunction hearing," and it declined to authorize any discovery on a short timeline.[16] [App-3:166,169.]

Scope aside, defendants had legitimate grounds for seeking discovery on an expedited basis. As the court acknowledged elsewhere, the TRO hearing was truncated, and the parties could have a legitimate desire to present more evidence for a preliminary injunction. [App-3:038; App-7:246.] As defendants emphasized, "[d]uring the TRO hearing, Defendants were prevented from offering the full breadth of their evidence in opposition to Plaintiffs' claims, which placed them at a disadvantage." [App-3:096.]

---

[16] For overbreadth, the district court separately pointed to discovery related to Jensen's use of psilocybin before 2023. [App-5:133–34.] But such evidence is directly relevant to the sincerity of Singularism's religious beliefs—as opposed to Singularism's creation to legally use psilocybin as part of Jensen's mental health practice. Although the district court did not view Jensen's prior, non-religious use as detracting from religious sincerity, it elsewhere acknowledged that it "may raise eyebrows at first glance" [App-5:143]—thus bringing it within the scope of relevance for discovery.

In the discovery order, the court expressed some concern that defendants were seeking broad discovery to aid the criminal process. [App-3:166 n.4.] But that was not defendants' aim, and to avoid any appearance that defendants were pursuing such a course, they agreed to a protective order limiting the use of discovered materials to *this* litigation. [App-3:126,166 n.4; *see* App-3:170–71 (protective order).] The court even thanked them for doing so. [App-3:166 n.4.]

Far from proceeding in bad faith, defendants' conduct was beyond reproach.

### 3.2    Defendants did not waive *Younger* arguments

The district court separately declined to abstain based on its conclusion that defendants waived *Younger*-based arguments. [App-5:182–85.] The court's analysis was flawed.

This Court has recognized that defendants can waive application of *Younger*. *Morrow v. Winslow*, 94 F.3d 1386, 1390 (10th Cir. 1996). "However, the only instances of waiver this court has been able to find have been express (*i.e.,* the state urged the court to proceed to an adjudication of the constitutional merits)." *Kingston*, 1998 WL 614462, at *3 (quotation simplified) (citing *Ohio Civil Rights Comm'n v. Dayton Christian Schs., Inc.*, 477 U.S. 619, 626 (1986)).

Under the express waiver standard, courts have found waiver where a party affirmatively disclaimed reliance on *Younger* and submitted an issue to a federal court "to obtain a more expeditious and final resolution of the merits of the constitutional issue." *Brown v. Hotel & Rest. Employees & Bartenders Int'l Union*

*Local 54*, 468 U.S. 491, 500 n.9 (1984); *Ohio Bureau of Employment Servs. v. Hodory*, 431 U.S. 471, 480 (1977) (similar); *Sosna v. Iowa*, 419 U.S. 393, 396 n.3 (1975) (similar).

That is not this case. Defendants never disavowed *Younger* abstention. Rather, when plaintiffs moved for an anti-suit injunction, defendants immediately and affirmatively asserted *Younger* as grounds for denying the injunction. [App-3:134–38.]

The district court ruled that defendants' decision to remove the action to federal court nonetheless constituted waiver. It observed that the "weight of the authority" suggests that removal waives a *Younger* abstention defense. [App-5:182–83.] But in other cases where defendants have removed, federal appellate courts have reversed the denial of abstention. *E.g.*, *Armco, Inc. v. United Steelworkers of Am.*, 280 F.3d 669, 672, 681–83 (6th Cir. 2002). Although these cases do not expressly address waiver, they suggest that removal is not an automatic waiver.

The cases on which the district court relied are also not relevant. To the extent courts have ruled that removal waives *Younger*, they have ruled that removal waives the right *to return the same case to state court* based on abstention. In each case the district court cited, the defendant sought to dismiss or remand the pending action to state court based on *Younger* after removing that same case to federal court. *Kenny A. ex rel. Winn v. Perdue*, 218 F.R.D. 277, 284–85 (N.D. Ga.

2003); *Ryan v. State Bd. of Elections of Ill.*, 661 F.2d 1130, 1132, 1134 (7th Cir. 1981).

But defendants have not invoked *Younger* to get back to state court. They did not move to dismiss based on *Younger*. Rather, they invoked *Younger* as grounds for denying an injunction that stopped a separately pending criminal case. [App-3:134–138.] Even if removal waived defendants' ability to seek dismissal on *Younger* grounds, it did not waive what defendants did here: object to the district court's exercise of a disfavored equitable remedy.

The reasoning of the waiver cases does not apply for another reason: courts typically apply waiver when the federal plaintiff would lose the ability to adjudicate its claims anywhere. For example, in *Kenny A.*, the court expressed concern that allowing abstention after removal "would permit defendants effectively to prevent plaintiffs from pursuing their federal claims in *any* forum." 218 F.R.D. at 285. That is not a concern here—Jensen can assert his constitutional claims as defenses in state criminal court.

In any event, defendants elected to remove a *civil* case filed by plaintiffs. They never chose to remove the *criminal* case that plaintiffs now seek to enjoin. The State of Utah is a party to that action but not this proceeding. [App-3:066.] One of the cases on which the district relied declined to find waiver under similar circumstances—i.e., where the "cases involve different parties and different issues." *Cummings v. Husted*, 795 F. Supp. 2d 677, 692 (S.D. Ohio 2011).

The Court should address *Younger* under these circumstances, especially because this Court could address abstention even if defendants had waived *Younger*. *Morrow v. Winslow*, 94 F.3d 1386, 1390 (10th Cir. 1996); *Kingston*, 1998 WL 614462, at *2. Indeed, this Court has described *Younger* abstention as "jurisdictional." *Serna v. City of Colorado Springs*, No. 24-1149, 2025 WL 471224, at *2 (10th Cir. Feb. 12, 2025); *D.L. v. Unified Sch. Dist. No. 497*, 392 F.3d 1223, 1228–29 (10th Cir. 2004).

## Conclusion

This Court should reverse the denial of defendants' motion to dismiss plaintiffs' federal claims, vacate the anti-suit injunction, and remand with instructions to dismiss the remaining state-law claims.

## Statement Regarding Oral Argument

Defendants respectfully request oral argument. This appeal involves important questions underlying Free Exercise jurisprudence and the scope of two narrow exceptions *Younger*. Defendants believe oral argument will aid the Court's resolution of those questions.

DATED this 10th day of December, 2025.

ZIMMERMAN BOOHER

s/ Caroline Anais Olsen

Troy L. Booher
Caroline Anais Olsen
ZIMMERMAN BOOHER
341 South Main Street, Fourth Floor
Salt Lake City, UT 84111
tbooher@zbappeals.com
colsen@zbappeals.com
(801) 924-0200

*Attorneys for Appellants*

JAMES DODGE RUSSELL & STEPHENS, P.C.
Mitchell A. Stephens
Justin L. James
Dillon P. Olson

*Attorneys for Appellants Utah County and Jeffrey Gray*

PROVO CITY ATTORNEY'S OFFICE
J. Brian Jones
Gary D. Millward
Nicholas Muhlestein
Richard A. Roberts

*Attorneys for Appellant Provo City*

## Certificate of Compliance

## Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) because this brief contains 13,000 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Word for Microsoft 365 in a 14-point Times New Roman font.

I certify that the information on this form is true and correct to the best of

my knowledge and belief formed after a reasonable inquiry.

Dated this 10th day of December, 2025.

<div style="margin-left: 45%;">

s/ Caroline Anais Olsen

Troy L. Booher
Caroline Anais Olsen
ZIMMERMAN BOOHER
341 South Main Street, Fourth Floor
Salt Lake City, UT 84111
tbooher@zbappeals.com
colsen@zbappeals.com
(801) 924-0200

*Attorneys for Appellants*

</div>

## Certificate of Digital Submission

I hereby certify that with respect to the foregoing Brief of Appellants:

(1)    any required privacy redactions have been made;

(2)    the paper copies of the brief to be filed with the court are exact copies of the scanned brief; and

(3)    the digital submission has been scanned for viruses with Microsoft Defender Antivirus Security intelligence version 1.443.15.0 (updated December 10, 2025) and according to the program is free of viruses.

Dated this 10th day of December, 2025.

s/ Caroline Anais Olsen
Troy L. Booher
Caroline Anais Olsen
ZIMMERMAN BOOHER
*Attorneys for Appellants*

**Certificate of Service**

I hereby certify that on the 10th day of December, 2025, I caused the

foregoing *Brief of Appellants* to be filed via the CM/ECF System, which

electronically served the following:

> Tanner James Bean (tbean@fabianvancott.com)
> Jacqueline Rosen (jrosen@fabianvancott.com)
> FABIAN VANCOTT
>
> *Attorneys for Appellees*

<div align="right">

s/ Caroline Anais Olsen
Troy L. Booher
Caroline Anais Olsen
ZIMMERMAN BOOHER
*Attorneys for Appellants*

</div>

# Attachment A

Memorandum Decision and Order Denying Defendants' Motion to Dismiss and
Granting Plaintiffs' Motion for Anti-Suit Injunction (August 4, 2025)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BRIDGER LEE JENSEN, SINGULARISM, and PSYCHE HEALING AND BRIDGING, | **MEMORANDUM DECISION AND ORDER DENYING DEFENDANTS' MOTION TO DISMISS AND GRANTING PLAINTIFFS' MOTION FOR ANTI-SUIT INJUNCTION** |
| Plaintiffs, | |
| v. | |
| UTAH COUNTY, PROVO CITY, and JEFFREY GRAY, | Case No. 2:24-cv-00887-JNP-CMR |
| Defendants. | District Judge Jill N. Parrish |

In February, the court issued an order granting Plaintiffs' motion for preliminary injunction under the Utah Religious Freedom Restoration Act ("RFRA"). ECF No. 92; *Jensen v. Utah County*, No. 2:24-cv-00887, 2025 WL 582812 (D. Utah Feb. 20, 2025). That left Defendants' motion to dismiss and Plaintiffs' motion for anti-suit injunction. The court could not rule on these motions at that time because they required resolving Plaintiffs' constitutional claims, which the court could not consider until the Attorney General of Utah had had an adequate opportunity to weigh in with evidence or argument on Plaintiffs' constitutional challenges. The court sent notice to the Attorney General of Plaintiffs' constitutional claims and gave him until April 11 to present evidence or argument. On April 11, the Attorney General notified the court that he joined in and adopted the arguments made in Defendants' briefing on their motion to dismiss. Before the court issued a decision resolving the two pending motions, the parties requested a 60-day stay because they were engaged in settlement discussions. The stay has now expired, the court has not received notice of settlement, and the remaining two motions are ready for resolution. For the reasons

below, the court DENIES Defendants' motion to dismiss and GRANTS Plaintiffs' motion for anti-suit injunction.

<div align="center">

**ANALYSIS**

</div>

The court's previous order thoroughly laid out the factual and procedural background of this case. *Jensen*, 2025 WL 582812, at *2–8. Nothing noteworthy has occurred since. The court assumes familiarity with this background and proceeds directly to the legal analysis.

**I.    Defendants' Motion to Dismiss**

When considering a motion to dismiss, the court must "accept all well-pled allegations in the complaint as true and view them in the light most favorable to the nonmoving party." *Davis-Warren Auctioneers, J.V. v. FDIC*, 215 F.3d 1159, 1161 (10th Cir. 2000). The court should not grant the motion "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Id.* (internal quotation marks omitted).

Defendants move to dismiss all claims in Plaintiffs' complaint. The court first addresses the claims under the Federal Constitution, then the claims under the Utah constitution, and finally the claims under the Utah RFRA.

   A.    Federal Constitution First Amendment Claim

The Free Exercise Clause of the First Amendment to the U.S. Constitution, incorporated against the States through the Fourteenth, forbids the States from making any law "prohibiting the free exercise [of religion]." U.S. CONST. amend. I; *Cantwell v. Connecticut*, 310 U.S. 296 (1940) (incorporating the Clause against the States). Under the so-called *Smith* rule after the Supreme Court's decision in *Employment Division v. Smith*, 494 U.S. 872 (1990), "laws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable." *Fulton v. City of Philadelphia*, 593 U.S. 522,

<div align="center">

2

</div>

533 (2021). A law fails to be "neutral" when it "discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." *Lukumi*, 508 U.S. at 532. And a law fails to be "generally applicable" when it "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 593 U.S. at 534. If a law burdens sincere religious exercise and is either not neutral or not generally applicable, it is subject to strict scrutiny.[1] *Id.* at 533.

---

[1] Courts debate whether the Free Exercise Clause protects only against "substantial" burdens on religious exercise (as opposed to simply burdens, whatever the degree). Before *Employment Division v. Smith*, 494 U.S. 872 (1990), free-exercise claims were often analyzed under *Sherbert v. Verner*, 374 U.S. 398 (1963). *Smith* summarized the *Sherbert* test as follows: "governmental actions that *substantially* burden a religious practice must be justified by a compelling governmental interest." *Smith*, 494 U.S. at 883 (emphasis added). In rejecting the *Sherbert* test, the *Smith* Court stated, "It is no more appropriate for judges to determine the 'centrality' of religious beliefs before applying a 'compelling interest' test in the free exercise field, than it would be for them to determine the 'importance' of ideas before applying the 'compelling interest' test in the free speech field." *Smith*, 494 U.S. at 886–87.

Some judges have read this language from *Smith* to suggest that courts may not constitutionally require that litigants demonstrate a substantial burden on free exercise before claiming protection under the Free Exercise Clause. *See, e.g.*, *Wiggins v. Griffin*, 86 F.4th 987, 1000 (2d Cir. 2023) (Menashi, J., concurring) ("The substantial burden test . . . is constitutionally offensive. It conflicts with the reasoning . . . in *Smith*."). Some circuits do not require litigants to show a substantial burden; others still do. *Compare Williams v. Morton*, 343 F.3d 212, 217 (3d Cir. 2003) ("There is no support for th[e] assertion [that the plaintiff must show a substantial burden]."), *with Levitan v. Ashcroft*, 281 F.3d 1313, 1320 (D.C. Cir. 2002) ("[T]he First Amendment is implicated when a law or regulation imposes a substantial, as opposed to inconsequential, burden on the litigant's religious practice.").

Although it has not squarely addressed the issue, the Tenth Circuit appears not to require that a burden on religious exercise be substantial to trigger First Amendment protections. *See Ashaheed v. Currington*, 7 F.4th 1236, 1243 (10th Cir. 2021) ("The Supreme Court's free exercise cases primarily address *laws that burden religious exercise*." (emphasis added)). And recent Supreme Court cases have relied on the sincerity of the plaintiff's claim, not substantiality of the burden. *See, e.g.*, *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022).

In line with recent circuit and Supreme Court decisions, this court declines to require Plaintiffs to show a substantial burden for their federal constitutional claims. However, the analysis would

3

When a law is subject to strict scrutiny, the government must show that the law "advances interests of the highest order" (i.e., that it advances compelling interests) and "is narrowly tailored to achieve those interests" (i.e., that it is the least restrictive means of achieving those interests). *Id.* at 541. The government may not couch its compelling interests in broad terms, such as promoting the public safety or ensuring equal treatment of protected groups; rather, it must articulate the "harm of granting specific exemptions to particular religious claimants." *Id.*

Plaintiffs' allegations, if proven, would establish that the government has burdened their sincere religious exercise. Plaintiffs allege, for example, that they "administer[] . . . ceremonial and sacramental psilocybin to [their] voyagers [i.e., spiritual followers]" during their ceremonies and that the Utah Controlled Substances Act categorically prohibits this conduct. ECF No. 2-2 (Complaint), at 9. Being deprived of a sacrament undoubtedly constitutes a burden on religious exercise. *Church of the Holy Light of the Queen v. Mukasey*, 615 F. Supp. 2d 1210, 1219 (D. Or. 2009), *vacated on other grounds*, 443 F. App'x 302 (9th Cir. 2011).

The more difficult question is the appropriate level of scrutiny. Defendants argue that the Act is neutral and generally applicable and that it therefore triggers only rational-basis review (which, the court agrees, it would undoubtedly pass). As they see it, the broad prohibition on possession or distribution of psilocybin does not target religion, either in its history or in its text, and any secular exceptions for psilocybin apply regardless of religious beliefs or affiliations. On the other hand, Plaintiffs argue that the law is not generally applicable, and therefore triggers strict scrutiny, because it allows certain healthcare systems to administer psilocybin in specific

---

proceed no differently even under the alternative formulation because the court finds the burden of Defendants' actions on Plaintiffs' religious exercise to be substantial. *See infra* Section I.E.

nonreligious situations—that is, it provides exemptions for secular use but not for religious use. Although the issue is close, the court agrees with Plaintiffs.

The Utah Controlled Substances Act generally makes it unlawful to knowingly and intentionally possess, use, or dispense a controlled substance. UTAH CODE ANN. § 58-37-8(1)(a)(i), (2)(a)(i). Psilocybin is listed as a Schedule I controlled substance. *Id.* § 58-37-4(2)(a)(iii)(Y). A separate provision of the Act creates an exception for "[d]rugs [used] for behavioral health treatment." *Id.* § 58-37-3.5. This provision allows certain healthcare systems to "develop a behavioral health treatment program that includes a treatment based on a drug that the healthcare system determines is supported by a broad collection of scientific and medical research." *Id.* § 58-37-3.5(2). And it defines "drug" to include "any form of psilocybin . . . that is in federal Food and Drug Administration Phase 3 testing for an investigational drug." *Id.* § 58-37-3.5(1)(a). As long as the healthcare system "ensure[s] that [the psilocybin] . . . is used by a patient [who is at least 18 years old] only under the direct supervision and control of the healthcare system and [its licensed] providers," it may distribute, possess, and administer the drug without penalty. *Id.* § 58-37-3.5(3), (5). But the Act creates no exceptions for sincere religious use of psilocybin.

Plaintiffs do not argue, and the court sees no reason to doubt, that the Act is neutral: nothing in its text or history suggests that it was enacted to target any particular religious practice. Nevertheless, the law creates an exemption for secular psilocybin use without also creating an exemption for religious psilocybin use. Whether the secular exemption causes the law to no longer be generally applicable turns on the extent to which the secular use and Plaintiffs' sincere religious use undermine the government's stated interests. If the secular use undermines the stated interests to the same or greater degree than Plaintiffs' religious use does, then the law is not generally applicable. *See Fulton*, 593 U.S. at 534.

5

The governmental interest behind the Act, at least according to Defendants, is preventing harm from and abuse of substances that are dangerous or addictive. A religious exemption for Plaintiffs risks undermining these interests, they claim: the psilocybin used for a voyage may be tainted, a facilitator may fail to recognize a contraindicating drug, or a recreational user may pose as a religious practitioner to obtain psilocybin for illegal, nonreligious purposes. But these same risks inhere in the secular exemption, too, especially since the medical exemption imposes no sourcing, testing, or chain-of-custody requirements for the psilocybin administered by healthcare systems. For example, a hospital may source its psilocybin from a disreputable source or accidentally administer psilocybin while the patient is on a contraindicating drug. Or a recreational-user patient may feign certain symptoms to be put on a treatment plan involving psilocybin. A religious exemption for Plaintiffs would not necessarily undermine the government's interest any more than the secular exemption does. And Defendants have provided no evidence so far that Plaintiffs' psilocybin use in practice undermines the government's interest. *See Jensen*, 2025 WL 582812, at *14 ("[T]he evidence here fails to show that Plaintiffs' controlled, sincerely religious use of psilocybin . . . creates a meaningful risk of compromising the government's . . . interests [in preventing abuse, possible harms from drug use, and drug trafficking]."). Therefore, the Act is not generally applicable.

Defendants resist this conclusion, observing that the medical psilocybin exemption does not differentiate based on religion because it applies to all licensed healthcare providers regardless of their religious beliefs or affiliations. Their observation, although correct, misses the point. The Free Exercise Clause is concerned not just with evenhandedness among religions but also evenhandedness between religion and nonreligion. *McCreary County v. Am. C.L. Union of Ky.*, 545 U.S. 844, 860 (2005) (internal quotation marks omitted). A specific, secular exemption for

6

psilocybin without an accompanying religious exemption indicates that the law is not evenhanded as between religion and nonreligion because it "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 593 U.S. at 534. In doctrinal terms, this feature means that the law is not generally applicable.

Defendants also argue that the Utah Controlled Substances Act with its medical exemption for psilocybin mirrors the law at issue in *Smith* and its medical exemption; since *Smith* found that law to be neutral and generally applicable and upheld it on rational-basis review, Defendants urge the court to do the same here. In the court's view, the medical exemption in *Smith* is distinguishable from the medical exemption for psilocybin here because the medical exemption here is specifically directed at psilocybin—indicating a legislative judgment that the restriction on psilocybin can admit of certain exemptions—whereas the medical exemption in *Smith* was merely a general medical exemption.

The plaintiffs in *Smith* sought a religious exemption for peyote, a controlled substance. The Oregon law at issue in *Smith* prohibited the knowing or intentional possession of a controlled substance "unless the substance ha[d] been prescribed by a medical practitioner." *Smith*, 494 U.S. at 874. That state law created a general medical exemption so that controlled substances with legitimate medical uses would not be subject to the law's restrictions; the exemption was not directed toward any particular substance. Accordingly, the law did not by its text create a secular exemption for peyote, the specific drug that the plaintiffs sought to use in their religious practice; the letter of the law prohibited all uses of peyote, secular and religious alike. (It does not appear that peyote was used for medical purposes under the exception.)

The medical exemption Plaintiffs rely on here, by contrast, explicitly creates a secular exemption for psilocybin administered in the context of certain behavioral-health treatment programs. That means that the Utah legislature, unlike the Oregon legislature at the time of *Smith*, specifically considered the risks, harms, and benefits of the drug at issue and decided to legalize certain secular uses of it. And as explained above, the risks and harms resulting from the legal secular use of psilocybin are comparable to the risks and harms that would result from Plaintiffs' religious use of psilocybin. So, under the Free Exercise Clause, the State may not provide the secular exemption without also providing a comparable religious exemption. *See Fulton v. City of Philadelphia*, 593 U.S. 522, 534 (2021) (explaining that the government may not "prohibit[] religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way"). Since the law fails to provide a comparable religious exemption, it triggers strict-scrutiny review.

On strict scrutiny, the government bears the burden of showing that the law accomplishes a compelling interest using the least restrictive means. Whether the government can meet this burden depends on the strength of its evidence, an issue typically ill-suited for resolution on a motion to dismiss. Because Plaintiffs' allegations support a prima facie case under the First Amendment, the court denies Defendants' motion to dismiss the First Amendment claim.[2]

---

[2] As it happens, the court has already held an evidentiary hearing in this case and determined that the government is unlikely to meet its burden on strict scrutiny. *See Jensen v. Utah County*, No. 2:24-cv-00887, 2025 WL 582812, at *13–16 (D. Utah Feb. 20, 2025). Although the basis for the court's decision was the Utah RFRA, the strict-scrutiny analysis is identical under the Utah RFRA and the First Amendment. *See* UTAH CODE ANN. § 63G-33-201(3); *Fulton v. City of Philadelphia*, 593 U.S. 522, 541 (2021).

B.      Federal Constitution Fourth Amendment Claim

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. amend. IV. Plaintiffs' complaint alleges that the officers executing the search warrant on Singularism's spiritual center lacked probable cause to do so because they should have known that Singularism was entitled to a religious exemption for psilocybin. As remedy, Plaintiffs seek damages from Utah County Attorney Jeffrey Gray personally and from the municipalities (Provo City and Utah County). Defendants provide no basis for dismissing these claims.[3] Accordingly, the court denies the motion to dismiss the Fourth Amendment claims.

C.      Utah Constitution Free Exercise Claim

The Utah constitution contains a clause protecting the free exercise of religion similar to that in the Federal Constitution: "The State shall make no law respecting an establishment of religion or prohibiting the free exercise thereof . . . ." Utah Const. art. I, § 4. This clause, however, has never been authoritatively interpreted, at least not in the context of a claim for a religious exemption from a criminal law, so it remains unclear how far its protections extend. *See State v. Holm*, 137 P.3d 726, 738 (Utah 2006) ("[O]ur state constitution may well provide greater protection for the free exercise of religion in some respects than the federal constitution . . . ."); *Jeffs v. Stubbs*, 970 P.2d 1234, 1249 (Utah 1998) ("We have never determined whether the free

_____

[3] Plaintiffs originally sued the individual officers executing the search warrant as well, and Defendants invoked absolute immunity for public officers but provided no basis for dismissing the claims against Mr. Gray or the municipalities. Plaintiffs subsequently removed the individual officers as Defendants.

9

exercise clause . . . of the Utah Constitution provides protection over and above that provided by the First Amendment to the United States Constitution.").

Given the "novel [and] complex issue" that Plaintiffs' state-constitution free-exercise claim raises, Defendants urge the court to decline to exercise supplemental jurisdiction over this claim and remand it to state court. 28 U.S.C. § 1367(c). When considering whether to decline to exercise supplemental jurisdiction, "a federal court should consider and weigh . . . the values of judicial economy, convenience, fairness, and comity." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988), *superseded on other grounds by* 28 U.S.C. § 1447(c) (1988). "When the balance of these factors indicates that a case properly belongs in state court . . . , the federal court should decline the exercise of jurisdiction . . . ." *Id.* Although Plaintiffs' state free-exercise-clause claim raises novel and complex issues, the court finds that the balance of the factors weighs toward exercising supplemental jurisdiction. That claim "[is] largely identical" to and "require[s] the same evidence" as Plaintiffs' First Amendment claim (which as explained above survives Defendants' motion to dismiss), and Plaintiffs would ordinarily be expected to try both claims in a single proceeding. *Mabey v. Ray*, No. 4:18-cv-00061, 2019 WL 962183, at * 3 (D. Utah Feb. 4, 2019). "Severing and remanding the state law claims would require the parties to litigate nearly identical matters, based on the same operative facts . . . , in two separate forums . . . [,] expend[ing] unnecessary judicial resources." *Id.* The court therefore rejects Defendants' invitation to decline to exercise supplemental jurisdiction.

When as here a federal court is asked to pass on the meaning of a state law that has not yet been authoritatively interpreted, the court "must make an *Erie*-guess as to how the [state s]upreme [c]ourt would rule" based on "all resources available." *Pehle v. Farm Bureau Life Ins. Co.*, 397 F.3d 897, 901–02 (10th Cir. 2005) (internal quotation marks omitted). The Utah Supreme Court

has indicated in other areas of constitutional law that when a state constitutional provision mirrors

a federal one, the state provision must be analyzed independently with "no presumption that federal

construction of similar language is correct." *State v. Tiedemann*, 162 P.3d 1106, 1114–15 (Utah

2007). When analyzing a question of first impression under the Utah constitution, the Utah

Supreme Court "exmain[es] the historical background against which [that clause] . . . was drafted,"

among other things. *West v. Thomson Newspapers*, 872 P.2d 999, 1013 (Utah 1994). Here, the

court has received minimal briefing on the historical background against which article I, section 4

was adopted, making an *Erie*-guess especially difficult.

Plaintiffs ask the court to interpret this clause to require strict scrutiny for any laws

burdening free exercise.[4] Defendants on the other hand propose that this clause stands for a

principle of strict neutrality and therefore does not protect against free-exercise burdens stemming

from neutral laws. In essence, the parties propose the following two doctrinal formulations: (1) if

a litigant can show a burden on his sincere religious exercise, the government must satisfy strict

scrutiny for the challenged law to stand; and (2) if a law is entirely neutral toward religion generally

and neutral among religions, then the law stands no matter how great a burden it incidentally

imposes on the religious litigant. The former resembles the Supreme Court's jurisprudence before

*Employment Division v. Smith* (except that the Court's pre-*Smith* doctrine first required the

plaintiff to show a *substantial* burden, *see Smith*, 494 U.S. at 883; *supra* note 1); the latter, the

Court's current jurisprudence.

---

[4] Plaintiffs propose strict scrutiny for any free-exercise violation, but they do not explain what
should constitute a free-exercise violation. By violation, they most likely mean burden. So, their
proposed interpretation would subject a law to strict scrutiny anytime it burdens a litigant's
religious exercise.

In choosing between these proposals for the state free-exercise clause, the court is aware of the lively debate surrounding the interpretation of the Federal Free Exercise Clause. Jurists and commentators of all stripes have long criticized the Court's rule under *Smith* (which echoes Defendants' proposal) as insufficiently protective of religious liberty. *See, e.g.*, *Rader v. Johnston*, 924 F. Supp. 1540, 1549 (D. Neb. 1996) ("[T]he majority opinion in *Smith* has been harshly criticized by virtually every legal scholar and commentator addressing the decision, and various members of the Court have demanded reconsideration of the *Smith* holding at the first opportunity." (citation omitted)). Despite the broad consensus, however, the Court has not overruled *Smith*, in part because it is not obvious what a workable alternative doctrine would be. *See Fulton*, 593 U.S. at 543 (Barrett, J., concurring) ("[W]hat should replace *Smith*? The prevailing assumption seems to be that strict scrutiny would apply whenever a neutral and generally applicable law burdens religious exercise. But I am skeptical about swapping *Smith*'s categorical antidiscrimination approach for an equally categorical strict scrutiny regime, particularly when this Court's resolution of conflicts between generally applicable laws and other First Amendment rights . . . has been much more nuanced."). Plaintiffs' proposal, which closely resembles the leading alternative, would raise all sorts of difficult questions. To name just a couple, "Should there be a distinction between indirect and direct burdens on religious exercise?" *Id.* at 544. Or what threshold showing must the religious claimant make to shift the burden to the government to satisfy strict scrutiny?

The court is also aware that most States, about 35, provide greater free-exercise protections than the Federal Constitution does (often in response to the perceived deficiencies in the *Smith* rule). In about 10 of them, those greater protections have come through judicial interpretation of the state constitutions' counterparts to the Free Exercise Clause. *See, e.g.*, *Coulee Cath. Schs. v.*

12

*Lab. & Indus. Rev. Comm'n*, 768 N.W.2d 868, 886 (Wis. 2009) (Wisconsin); *Cath. Charities of Diocese of Albany v. Serio*, 859 N.E.2d 459, 466 (N.Y. 2006) (New York). By contrast, in the remaining 25 or so (including Utah), those greater protections have come through state RFRAs enacted by the state legislatures. *See, e.g.*, 775 ILL. COMP. STAT. 35/1 et seq. (Illinois); TENN. CODE ANN. § 4-1-407 (Tennessee). Finally, the court considers the reality that in this litigation, any relief the state constitution could provide Plaintiffs would overlap with the relief they are already likely to receive under the Federal Constitution and the Utah RFRA.[5]

These considerations at this procedural juncture counsel that it would be wisest to assume—without deciding—that the Utah constitution's free exercise clause provides protections equal to those of the Federal Constitution's Free Exercise Clause. Doing so adheres to "the general rule that courts should avoid reaching constitutional issues if the case can be decided on other grounds." *West*, 872 P.2d at 1004. And it leaves the state court "free and unfettered . . . in interpreting [its] state constitution[]." *Michigan v. Long*, 463 U.S. 1032, 1041 (1983).

Assuming a lockstep interpretation of Utah's free exercise clause, then, the court's analysis of Plaintiffs' federal Free Exercise Clause claims above also controls the resolution of Plaintiffs' state free-exercise-clause claims. Under that analysis, the Utah Controlled Substances Act's restrictions on psilocybin possession and use, though neutral, are not generally applicable due to the secular exemption for behavioral-health treatment by certain healthcare systems and accordingly trigger strict scrutiny if a plaintiff can show that the restrictions burden its religious exercise. And Plaintiffs' complaint alleges facts sufficient for the court to conclude that Plaintiffs

---

[5] Plaintiffs could potentially obtain a declaratory judgment and injunction under the Federal Constitution and the Utah RFRA, and damages under the Federal Constitution (through § 1983). The Utah constitution would not provide any additional remedies.

13

have alleged a burden on their free exercise. At this stage, then, the court denies Defendants'
motion to dismiss Plaintiffs' state free-exercise-clause claim.

    D.    Utah Constitution Search and Seizure Claim

Much like its federal counterpart, the Utah constitution protects against "unreasonable
searches and seizures" and provides that "no warrant shall issue but upon probable cause supported
by oath or affirmation." UTAH CONST. art. I, § 14. As with their Fourth Amendment claim,
Plaintiffs allege that the officers who executed the search warrant and seized the mushrooms and
scripture lacked probable cause to do so. Defendants invoke the Utah Governmental Immunity
Act.

Utah's Governmental Immunity Act immunizes governmental entities and their employees
"from suit for any injury that results from the exercise of a governmental function," UTAH CODE
ANN. § 63G-7-201(1), unless immunity is waived, *id.* § 63G-7-301 (setting out various waivers of
immunity). The Act defines governmental function broadly to include "each activity, undertaking,
or operation performed by a department, agency, employee, agent, or officer of a governmental
entity." *Id.* § 63G-7-102(5)(b). However, the Act "does not apply to claims alleging state
constitutional violations." *Jensen ex rel. Jensen v. Cunningham*, 250 P.3d 465, 479 (Utah 2011).
Because Plaintiffs' claim is based in the Utah constitution, under binding Utah Supreme Court
law, immunity under the Act does not attach. Accordingly, the court denies Defendants' motion to
dismiss as to this claim.

    E.    Utah RFRA Claim

As noted previously, Utah passed its version of RFRA last year. Under the Utah RFRA, "a
government entity may not substantially burden the free exercise of religion of a person, regardless
of whether the burden results from a rule of general applicability," unless "the government

14

entity . . . demonstrates that the burden on the person's free exercise of religion is: (a) essential to furthering a compelling governmental interest; and (b) the least restrictive means of furthering the compelling governmental interest"—that is, unless the government satisfies strict scrutiny. UTAH CODE ANN. § 63G-33-201(2)(a), (3).

As a threshold matter, Defendants argue that Plaintiffs cannot seek relief under the Utah RFRA because they did not satisfy its notice requirement. Under the statute, "a person may not bring an action against a government entity unless, at least 60 days before the day on which the person brings the action, the person provides written notice to the government entity." UTAH CODE ANN. § 63G-33-201(5)(a). That notice must "(i) state[] that the person intends to bring an action against the entity for a violation of [RFRA]; (ii) describe[] the government action that has burdened . . . the person's free exercise of religion; and (iii) describe[] the manner in which the government action burdens . . . the person's free exercise of religion." *Id.* Defendants concede that Plaintiffs emailed them a notice of claim on November 19, 2024—more than 60 days before Plaintiffs filed an amended complaint on January 22, 2025.[6] Plaintiffs' Utah RFRA claim is therefore properly before the court.

Onto the merits of the claim then. The plain text of the statute requires the plaintiff to demonstrate not just a burden but a *substantial* burden on sincere religious exercise.[7] This language is nearly identical to that in the federal RFRA on which the Utah RFRA was modeled,

_____

[6] Plaintiffs originally filed their amended complaint as an exhibit to the document containing the parties' stipulation concerning the amended complaint. ECF No. 73-1. On February 4, 2025, the court ordered Plaintiffs to file their amended complaint as a separate entry on the docket, which Plaintiffs did the next day. ECF No. 83.

[7] It is unsettled whether the Free Exercise Clause also contains this requirement under recent case law, though the Tenth Circuit appears to have indicated that it does not. *See supra* note 1.

15

42 U.S.C. § 2000bb–1(a), and the federal RFRA drew this language from pre-*Smith* case law, *see id.* § 2000bb(b). How courts should assess whether a burden on religious exercise is substantial in a principled manner without wading into questions of theology is a subject of ongoing debate. *See, e.g.*, Michael A. Helfand, *Substantial Burdens as Civil Penalties*, 108 IOWA L. REV. 2189 (2023) (encouraging courts to consider the burdens of civil penalties for noncompliance); Sherif Girgis, *Defining "Substantial Burdens" on Religion and Other Liberties*, 108 VA. L. REV. 1759 (2022) (encouraging courts to consider whether a challenged law leaves adequate alternative ways to exercise religious rights). The court need not begin to resolve this issue, however, because by any measure, Plaintiffs' allegations, if proven, would establish that the government has substantially burdened their sincere religious exercise. Plaintiffs allege that they offer a "sacramental psilocybin tea" to their voyagers, who then embark on a spiritual journey by which they "write their own scripture." Complaint at 8. A law that categorically prohibits the possession and use of the psilocybin sacrament—thereby preventing Singularism's adherents from pursuing their spiritual voyages and hindering them from producing their sacred scripture—not only burdens but substantially burdens the free exercise of Singularism and its adherents.[8] *Church of the Holy Light of the Queen*, 615 F. Supp. 2d 1210.

Defendants challenge this commonsense conclusion by arguing that Plaintiffs cannot allege a substantial burden as that term is defined in the Utah RFRA. As they see it, Defendants' actions of seeking a criminal penalty, as opposed to assessing a criminal penalty, do not count as a

---

[8] Although it does not matter for deciding the motion to dismiss, this court has also found that Plaintiffs' allegations are supported by evidence. *See Jensen*, 2025 WL 582812, at *9.

substantial burden. *See* UTAH CODE ANN. § 63G-33-101(6)(b)(i)(B) (noting that "substantially

burden" includes "*assessing* criminal, civil, or administrative penalties" (emphasis added)).

This challenge entirely misses the mark and borders on the disingenuous. Most

fundamentally, Defendants fixate on their criminal prosecution as the source of the burden on

Plaintiffs' religious exercise when the root of the burden is the Utah Controlled Substances Act

and its direct prohibitions on psilocybin use. If the statute did not prohibit Plaintiffs' psilocybin

use, Defendants would have no basis for prosecuting Mr. Jensen. And to state the obvious, a statute

can substantially burden religious exercise. *See id.* § 63G-33-101(6)(b)(ii)(A)(I).

Even if the court focused narrowly on Defendants' prosecution as the source of the burden,

the prosecution still fits comfortably within the statute's expansive definition of substantially

burden. *See id.* (recognizing that an "assertion of governmental authority" can substantially burden

religious exercise). In pressing their argument about seeking versus assessing criminal penalties,

Defendants grossly misconstrue the text they cite. The subsection Defendants point to says that

"'substantially burden' *includes* . . . assessing criminal . . . penalties." *Id.* (emphasis added). The

word "includes" indicates that what follows is not an exhaustive list, and nothing in the statute

excludes a criminal prosecution from the definition of substantial burden. Rather, the subsection

consistently uses very broad language to define substantial burden. *See, e.g.*, § 63G-33-101(6)

(recognizing that substantial burdens could be imposed "directly" or "indirectly" and could stem

from "law, statute, ordinance, rule, policy, order, or other assertion of governmental authority" or

"any other means").

Finally, the implications of Defendants' argument are breathtaking. Suppose the State of

Utah decided to give Prohibition another try and passed a law banning the possession, use, or

distribution of alcoholic beverages with a limited exception for red wine administered by a

17

healthcare system for medical reasons. Then suppose that Catholic priests in Provo, believing themselves to be protected by the Utah RFRA, distributed wine during Mass and consequently faced criminal prosecution by Utah County. According to Defendants' theory, as long as no criminal penalties were actually imposed on the priests, their religious exercise would not be substantially burdened, either by the law banning alcoholic beverages or by the criminal prosecution. The ludicrousness of Defendants' argument here needs no explanation. In any event, the court concludes that Plaintiffs have alleged a substantial burden on their free exercise and consequently established their prima facie case. It accordingly denies Defendants' motion to dismiss the state RFRA claim as well.

## II.    Plaintiffs' Motion for Anti-Suit Injunction

After the government filed criminal charges against Mr. Jensen, Plaintiffs also moved for an anti-suit injunction against the state criminal prosecution. In their view, the state-court prosecution—brought by the same government Defendants that removed this civil case to federal court in the first place—subverts the purposes of the removal statute by giving the government a second opportunity to litigate the issues on which the government appears poised to lose in this court. Plaintiffs accordingly urge this court to exercise its authority under the All Writs Act, 28 U.S.C. § 1651, to enjoin the state-court prosecution pending final judgment in this court. Defendants' opposition invokes abstention and the Anti-Injunction Act, 28 U.S.C. § 2283, to argue that it would be improper for the court, at least at this preliminary stage in the proceedings, to enjoin the prosecution. The court begins by addressing abstention.

In our system of federalism, "when federal courts are asked to enjoin pending proceedings in state court[]," the "normal thing to do . . . is not to issue such injunctions." *Younger v. Harris*, 401 U.S. 37, 45 (1971). This abstention principle is grounded in comity—a proper respect for state

functions—and applies even more powerfully when the state proceeding is criminal in nature because state officers "are charged with the duty of prosecuting offenders against the laws of the state." *Fenner v. Boykin*, 271 U.S. 240, 243 (1926).

The doctrine guiding federal courts in determining whether to proceed in a federal case that would interfere with a pending state case is called *Younger* abstention after the Supreme Court's decision in *Younger v. Harris*. Although *Younger* abstention sometimes applies even when the pending state case is civil in nature, it primarily protects state criminal cases from federal interference. *See Huffman v. Pursue*, 420 U.S. 592, 604 (1975). Under *Younger*, a federal court should abstain from hearing the merits in a federal case challenging a state prosecution when (1) the state proceeding is "ongoing"; (2) the state forum provides an adequate opportunity to raise the relevant federal claims; and (3) the state proceeding implicates an important state interest. *Graff v. Aberdeen Enterprizes, II, Inc.*, 65 F.4th 500, 523 (2023). Because *Younger* abstention is a doctrine based on comity, not jurisdiction, a defense based on *Younger* can be waived. *Ohio C.R. Comm'n v. Dayton Christian Schs., Inc.*, 477 U.S. 619, 626 (1986). Moreover, the doctrine recognizes certain narrow exceptions, such as in cases where the state prosecution is brought in bad faith or the plaintiff faces irreparable harm. *Younger*, 401 U.S. at 49.

Defendants urge this court to deny Plaintiffs' motion for anti-suit injunction on the grounds that a state criminal case is now proceeding against Mr. Jensen that allows him a full and fair opportunity to raise his constitutional and statutory claims in defense. The court sees no reason why Mr. Jensen could not raise his various claims in defense in the state criminal case (the second *Younger* condition). And it is beyond debate that the state criminal case implicates the State of Utah's important interests in prosecuting those who violate its controlled-substances laws (the

third *Younger* condition). Whether the state criminal case is "ongoing" within the *Younger* analysis, however, is a more difficult issue.

In assessing whether a state proceeding is ongoing at the time the federal case begins, the federal court may not simply compare the filing dates of the two cases. Rather, the court must examine whether "state criminal proceedings are begun . . . before any proceedings of substance on the merits have taken place in the federal court." *Hicks v. Miranda*, 422 U.S. 332, 349 (1975). Even if the state proceeding commences after the federal case is filed, the federal court must abstain if the federal case was still in in an "embryonic stage and no contested matter had been decided" when the state proceeding began. *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 929 (1975).

What counts as a state proceeding in this analysis is not settled: "[c]ircuits are split on the issue of whether *Younger* abstention applies in the pre-indictment stages of a criminal proceeding." *Pawelsky v. County of Nassau*, 684 F. Supp. 3d 73, 82 (E.D.N.Y. 2023). The Supreme Court has hinted that *Younger* abstention should apply to "about-to-be-pending state criminal action[s]." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 n.1 (1992). And as relevant to the facts here, many courts have determined that a state criminal proceeding for *Younger* purposes begins with the execution of a search warrant. *See, e.g.*, *Kingston v. Utah County*, No. 97-4000, 1998 WL 614462, at *4 (10th Cir. 1998); *Pawelsky*, 684 F. Supp. 3d at 83 ("[J]udicial authorization of a search warrant is part of a criminal proceeding because it occurs in a criminal court and is related to a prospective criminal action or involves a criminal investigation." (internal quotation marks omitted)); *Nick v. Abrams*, 717 F. Supp. 1053, 1056 (S.D.N.Y. 1989) ("[C]ommon sense dictates that a criminal investigation is an integral part of a criminal proceeding."). *But see Moore v. Garland*, No. CV 19-00290, 2024 WL 4534597, at *3 (D. Ariz. 2024) (implying that the state-

20

court proceeding was initiated when the indictment was returned, not when the search warrants

were executed).

The Tenth Circuit appears not to have published a binding decision on the matter yet. If

the execution of a search warrant begins a state criminal proceeding for *Younger* purposes—as the

weight of the authority appears to indicate—then the conditions for *Younger* abstention would be

satisfied here because the search warrants were executed even before Plaintiffs filed their action

in state court seeking declaratory judgment and preliminary relief. (That Plaintiffs filed the action

in state court and Defendants subsequently removed it to federal court does not affect the analysis

here. The court considers this procedural feature in its discussion of waiver and bad faith below.)

Ultimately, however, the court determines that it need not decide whether a state criminal

proceeding was ongoing when this federal case began because it can resolve the issue of *Younger*

abstention on waiver and the bad-faith and irreparable-harm exceptions.[9]

As noted above, a state can waive a *Younger* abstention defense. The court finds that

Defendants have waived their *Younger* defense by removing to federal court the civil action

Plaintiffs originally filed in Utah state court. The weight of the case law "support[s] . . . the

principle that the *Younger* abstention defense is waived when an action is removed from state court

---

[9] The court also notes that Defendants appear to have taken inconsistent positions on whether state proceedings had begun when the federal case began. At the December 13 hearing on Plaintiffs' motion for a temporary restraining order, Defendants argued that the mere threat of criminal prosecution at the time of the federal case did not constitute government action as part of their attempt to persuade the court that the ongoing-harm exception to the Utah RFRA notice requirement did not apply. *See* ECF No. 53-1 ("TRO Hearing Transcript"), at 233. Now, in their opposition to Plaintiffs' motion for anti-suit injunction, Defendants urge the court to take a broader view of the criminal process and find that a state criminal proceeding was ongoing at the time the federal case began because the government had executed search warrants and threatened prosecution. If nothing else, this shift in position simply underscores the court's finding of bad faith, *infra*.

and federal jurisdiction is thereby invoked by the defendant." *Cummings v. Husted*, 795 F. Supp.

2d 677, 692 (S.D. Ohio 2011); *see also Ryan v. State Bd. of Elections*, 661 F.2d 1130, 1136 (7th

Cir. 1981) ("[When a] state defendant affirmatively remove[s a] case from state to federal

court[, i]ts submission to a federal forum . . . renders *Younger* abstention inapplicable."). As one

district court explained by analogy to Eleventh Amendment immunity, "*Younger* abstention is a

doctrine of federal-state comity that limits the extent to which state defendants may be sued in

federal court." *Kenny A. ex rel. Winn v. Perdue*, 218 F.R.D. 277, 285 (N.D. Ga. 2003). When state

defendants "are in federal court only because of their own decision to remove the case from state

court[, i]t would be fundamentally unfair to permit [them] to argue that th[e federal c]ourt must

abstain from hearing the case." *Id.* "To do so would permit [state] defendants effectively to prevent

[the] plaintiffs from pursuing their federal claims in *any* forum." *Id.*

 To avoid the straightforward consequences of their own decision to remove this case,

Defendants point to *Dowden v. City of Sacramento*, 40 F. Supp. 2d 1146 (E.D. Cal. 1999), which

stated in a footnote that "a state does not waive the comity and federalism interests undergirding

*Younger* by invoking the jurisdiction of the federal courts." *Id.* at 1152 n.5. In this court's view,

*Dowden* incorrectly interpreted a passage from the Supreme Court's opinion in *Ohio Civil Rights

Commission v. Dayton Christian Schools, Inc.*, to mean that a state defendant does not waive its

*Younger* abstention defense by removing an action to federal court.

 In *Ohio Civil Rights Commission*, the plaintiffs, a private school system and various

individuals, sued in federal court to enjoin a pending state civil-rights administrative proceeding

against the private school system. *Ohio C.R. Comm'n*, 477 U.S. at 622. The state defendant

stipulated in the federal district court that the court had jurisdiction of the action but urged the

court to abstain under *Younger*. *Id.* at 626. The plaintiffs then argued that the defendants had

waived their *Younger* defense by stipulating to the federal court's jurisdiction, but the Supreme

Court disagreed: since *Younger* abstention is based in considerations of comity, not jurisdiction,

the defendants' stipulation to jurisdiction did not waive their *Younger* defense. *Id.* To waive their

*Younger* defense, the defendant would have had to "voluntarily submit to federal jurisdiction." *Id.*

The *Dowden* case appears to have conflated stipulating to federal jurisdiction on the one hand with

voluntarily submitting to federal jurisdiction on the other.

    A state defendant's decision to remove an action to federal court is perhaps the most

straightforward way for it to voluntarily submit to federal jurisdiction and thereby waive its

*Younger* defense. *See Kenny A.*, 218 F.R.D. at 285; *see also Ohio Bureau of Emp. Servs. v. Hodory*,

431 U.S. 471, 480 (1977) ("If the State voluntarily chooses to submit to a federal forum, principles

of comity do not demand that the federal court force the case back into the State's own system.").

A finding of waiver is particularly warranted where, as here, "the [state] defendant seek[s] to

manipulate the forum in order to . . . hedge its bet on the merits." *Adibi v. Cal. State Bd. of*

*Pharmacy*, 461 F. Supp. 2d 1103, 1111 (N.D. Cal. 2006).

    Recall that Plaintiffs filed their civil action in state court on November 19 (eight days after

state officers executed a search warrant at Singularism's spiritual center and seized their

mushrooms and scripture). Defendants then removed the action to federal court on November 27,

and the court held a hearing on Plaintiffs' request for a temporary restraining order on December

13. Only after this court determined that Plaintiffs were likely to prevail on the merits of their state

RFRA claim did Defendants institute criminal proceedings against Mr. Jensen and invoke *Younger*

abstention. From this sequence of events, the court finds that Defendants commenced the state

criminal action (the basis for their abstention argument now) in order to relitigate the RFRA issue

on which they appear to be poised to lose in this court—in other words, to get a second bite at the

apple. The court will not allow the shield of the *Younger* doctrine to be used as a gamesmanship
sword.

Even if Defendants had not waived their *Younger* abstention defense by voluntarily
invoking federal jurisdiction, the court finds that the bad-faith and irreparable-injury exceptions
apply. In the Supreme Court's formulation, *Younger* does not prevent a federal court from granting
injunctive relief against pending state criminal proceedings "in cases of proven harassment or
prosecutions undertaken by state officials in bad faith without hope of obtaining a valid conviction
and perhaps in other extraordinary circumstances where irreparable injury can be shown." *Perez
v. Ledesma*, 401 U.S. 82, 85 (1971).

In assessing whether a state prosecution was commenced in bad faith, courts consider the
following factors: "(1) whether it was frivolous or undertaken with no reasonably objective hope
of success; (2) whether it was motivated by the defendant's suspect class or in retaliation for the
defendant's exercise of constitutional rights; and (3) whether it was conducted in such a way as to
constitute harassment and an abuse of prosecutorial discretion." *Phelps v. Hamilton*, 122 F.3d 885,
889 (10th Cir. 1997). The court finds that the balance of the factors weighs strongly in favor of
finding that the state prosecution was commenced in bad faith.[10] The government filed its criminal

---

[10] The court expresses no view on whether the issuance and execution of the search warrants was
done in bad faith. The court also recognizes that earlier in this opinion, it declined to settle the
issue of when state criminal proceedings began for *Younger* purposes—whether they began with
the execution of the search warrants or whether they began with the commencement of the
prosecution against Mr. Jensen—but recognized that the weight of the authority suggested the
former. One could plausibly argue that if the execution of the search warrant marked the start of
the state criminal proceedings and if the search warrant was issued and executed in good faith (as
it may well have been here), then the bad-faith exception cannot apply, regardless of the
circumstances surrounding the subsequent prosecution. But this argument would potentially allow
a state to insulate a bad-faith prosecution from federal-court review by pointing to the initial good-
faith issuance and execution of a search warrant. Given that "the issue of *Younger* abstention can

24

charges five days after this court had already issued a temporary restraining order concluding that

Plaintiffs were likely to succeed on the merits of their claim that their use of psilocybin for religious

purposes is protected. As explained above, this fact in context suggests that the government, having

preliminarily lost in this court, is attempting to get a favorable ruling from a more sympathetic

court. Although this court does not find the prosecution to be objectively frivolous (after all, if

Plaintiffs' religious-exercise claims do not ultimately succeed, they will have admitted to violating

the State's criminal drug laws), the court does find that the prosecution is grounded in the

government's refusal to recognize the sincerity of a religion that to it appears foreign, strange, or

illogical. And in the context of the intrusive, offensive questioning from Defendants' counsel

during the December 13 hearing and the vastly overbroad expedited discovery requests, the court

has no hesitation finding that the government pursued the prosecution primarily to harass Plaintiffs

into ceasing their sincere religious practices.

Separately, the threat to a plaintiff's federally protected rights is irreparable within the

meaning of the *Younger* doctrine "only . . . if it 'cannot be eliminated by his defense against a

single criminal prosecution.'" *Id.* (quoting *Younger*, 401 U.S. at 46). Even before the prosecution

commenced against Mr. Jensen, Defendants pressured the landlord of Singularism's spiritual

center to evict Singularism. Plaintiffs also presented evidence that Singularism was losing

adherents due to Defendants' raid, and the very real threat of criminal prosecution against more of

Singularism's members and affiliates will only continue to shrink its ranks. Mr. Jensen's defense

---

be addressed by a federal court at any time," not just "at the onset of a case," *Adibi v. Cal. State Bd. of Pharmacy*, 461 F. Supp. 2d 1103, 1109 (N.D. Cal. 2006), the court finds it proper to assess whether the subsequent prosecution was brought in bad faith even if the relevant state proceeding triggering *Younger* abstention was the initial execution of the search warrant.

in state court, even if successful, cannot remedy these associational harms to Singularism and its

adherents. *See Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975) ("[A]bsent preliminary relief

[enjoining a state-court prosecution], [the federal plaintiffs] would suffer substantial loss of

business and perhaps even bankruptcy.").

      In sum, Defendants have waived their defense of *Younger* abstention by removing the

action to federal court, but even if removal did not constitute waiver, this case falls into the bad-

faith and irreparable-injury exceptions to *Younger* abstention. Having resolved the threshold issue

of abstention, the court now considers its authority to issue the injunction Plaintiffs request. To do

so, it must examine the All Writs Act and the Anti-Injunction Act.

      The All Writs Act, which traces its origins to the Judiciary Act of 1789 organizing the

federal judiciary, authorizes federal courts to "issue all writs necessary or appropriate in aid of

their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651.

This authority is limited by the Anti-Injunction Act, adopted just a few years later in 1793, which

prohibits federal courts from granting injunctions to stay proceedings in a state court except in

three limited situations: "as expressly authorized by Act of Congress, or where necessary in aid of

its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283. The purpose of the

Anti-Injunction Act is to "forestall the inevitable friction between the state and federal courts that

ensues from the injunction of state judicial proceedings by a federal court." *Vendo Co. v. Lektro-

Vend Corp.*, 433 U.S. 623, 630 (1977). It acts as an "absolute prohibition enjoining state court

proceedings, unless the injunction falls within one of the specific[] . . . exceptions." *Atl. Coast Line

R.R. Co. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 286 (1970). Plaintiffs argue that this case

falls into both of the first two exceptions and is likely to fall into the third exception as well.

The third exception, known as the relitigation exception, is easy to reject here. This "strict and narrow" exception applies only when "the claims or issues which the federal injunction insulates from litigation in state proceedings *actually have been decided* by the federal court." *Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 148 (1988) (emphasis added). Since the current action is in a preliminary stage, no claims or issues have been actually decided by this court, and the relitigation exception cannot prevent a parallel state-court action.

The second exception, "in aid of" the federal court's jurisdiction, is also simple to reject here because it applies only to actions in rem—that is, actions concerning ownership of a specific piece of property. In those actions, "the effect of [a parallel state] action would be to defeat or impair the jurisdiction of the federal court" because the federal court deciding the claims must exercise "possession or control, actual or potential, of the res [i.e., piece of property]." *Kline v. Burke Constr. Co.*, 260 U.S. 226, 229 (1922). But "a controversy over a mere question of personal [or governmental] liability does not involve the possession or control of a thing, and an action brought to enforce such liability does not tend to defeat the jurisdiction of the court in which a prior action for the same cause is pending." *Id.* This case concerns Defendants' alleged liability for violating Plaintiffs' constitutional and statutory free-exercise rights, not a specific piece of property, so the second exception is inapplicable.[11]

---

[11] Plaintiffs point to more recent cases to argue that this second exception should not be construed so narrowly as to apply only to in rem actions; rather, they urge, it also applies to actions removed from state to federal court. *See, e.g.*, *Est. of Brennan ex rel. Britton v. Church of Scientology Flag Serv. Org., Inc.*, 645 F.3d 1267, 1273 (11th Cir. 2011). Even if so, the exception would apply only to the action that is removed, not to a closely related separate action. "[N]ecessity is required to invoke this exception; 'it is not enough that the requested injunction is related to th[e exercise of federal] jurisdiction.'" *Id.* (quoting *Atl. Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 295 (1970)).

The first exception, as "expressly authorized" by Congress, though, does support issuing an anti-suit injunction insofar as it is based on Plaintiffs' First Amendment claims. For this first exception to apply, "an Act of Congress must have created a specific and uniquely federal right or remedy . . . that could be frustrated if the federal court were not empowered to enjoin a state court proceeding." *Mitchum v. Foster*, 407 U.S. 225, 237 (1972).

Initially, Plaintiffs argue that the removal provisions, 28 U.S.C. § 1441, 1446, under which Defendants brought this civil case from state court to federal court, constitute an express authorization from Congress to enjoin the state prosecution here. Under Supreme Court precedent, "[t]he statutory procedures for removal of a case from state court to federal court provide that the removal acts as a stay of the state-court proceedings," explicitly authorizing the federal court to enjoin further litigation of the removed action in state court. *Vendo Co.*, 433 U.S. at 640. Whether those provisions also permit the federal court to enjoin a separate state action filed to litigate the same issues between the same parties in state court is the subject of a longstanding circuit split.

Several appellate courts have concluded that "[a]lthough the removal statute . . . commands the state court to stay [only] the case that was actually removed, it [also] . . . authorize[s] courts to enjoin later filed state cases that were filed for the purpose of subverting federal removal jurisdiction." *Kan. Pub. Emps. Retirement Sys. v. Reimer & Koger Assocs., Inc.*, 77 F.3d 1063 (8th Cir. 1996); *see also Lou v. Belzberg*, 834 F.2d 730, 741 (9th Cir. 1987) ("It would be of little value to enjoin continuance of a state case after removal and then permit the refiling of essentially the same suit in state court."); *Frith v. Blazon-Flexible Flyer, Inc.*, 512 F.2d 899, 901 (5th Cir. 1975) ("[W]here a district court finds that a second suit filed in state court is an attempt to subvert the purposes of the removal statute, it is justified and authorized by § 1446(e) in enjoining proceedings in the state court."). *But see Ackerman v. ExxonMobil Corp.*, 734 F.3d 237, 252 (4th Cir. 2013)

28

("[Section] 1446(d) invalidates post-removal actions taken in state court in the removed case, but it does not reach (and therefore does not invalidate) actions taken in cases other than the removed case."). These cases followed a similar pattern: a plaintiff filed an action in state court, the defendant removed the action to federal court, then the plaintiff filed a nearly identical action again in state court but without the federal jurisdictional hook (i.e., a federal claim if the defendant's removal was based on federal-question jurisdiction, or complete diversity of parties if the defendant's removal was based on diversity jurisdiction) to preclude removal a second time.

The Tenth Circuit has yet to resolve the question, and the court finds the Fourth Circuit's view more persuasive than that of the other three appellate courts cited above. Crucially, the text of the removal statute appears to cover only the action removed from the state system. 28 U.S.C. § 1446(d) ("[T]he clerk of [the] State court . . . shall effect the removal[,] and the State court shall proceed no further unless and until *the case* is remanded." (emphasis added)). Courts should hesitate to read the removal statute more expansively given the Supreme Court's repeated admonition that "[a]ny doubts as to the propriety of a federal injunction against state court proceedings should be resolved in favor of permitting the state courts to proceed in an orderly fashion to finally determine the controversy." *Vendo Co.*, 433 U.S. at 630 (alteration in original) (quoting *Atl. Coast Line*, 398 U.S. at 297)).

But even if this court interpreted the removal statute to permit injunctions against copycat state-court actions, it still would not permit an injunction against the criminal prosecution here. As noted above, "in order to qualify as an 'expressly authorized' exception to the anti-injunction statute, an Act of Congress must have created a specific and uniquely federal right or remedy, enforceable in a federal court of equity, that could be frustrated if the federal court were not empowered to enjoin a state court proceeding." *Mitchum*, 407 U.S. at 237. That is, this exception

29

may be invoked only to protect a specific federal right created by Congress. The federal removal statute provides the defendant a specific and uniquely federal right to have the claims against it heard in federal court. So, any injunction authorized by the removal statute must be directed toward protecting the defendant's right to be heard in a federal forum (for example, an injunction against the plaintiff's copycat state-court action). An injunction against the state government's own criminal prosecution here, by contrast, would do nothing to protect Defendants' right to be heard in a federal forum because that prosecution does not threaten Defendants' removal rights in the first place. Indeed, it is *Plaintiffs* here, not Defendants, who request the court to enjoin the separate state-court proceeding.

Although the federal removal statute does not expressly authorize the court to enjoin the state prosecution, it is well settled that "§ 1983 is an Act of Congress that [does] fall[] within the 'expressly authorized' exception." *Mitchum*, 407 U.S. at 242–43. Thus, the court may enjoin the state prosecution insofar as the prosecution "subjects . . . [Plaintiffs] to the deprivation of . . . rights . . . secured by the [Federal] Constitution." 42 U.S.C. § 1983. To be sure, an injunction against a state prosecution is an exceptionally extraordinary remedy given the "general rule" that a federal court "has no jurisdiction to enjoin criminal proceedings . . . under the state law." *Ex Parte Young*, 209 U.S. 123, 161 (1908). That rule, however, does not apply in "situation[s] in which defense of the State's criminal prosecution will not assure adequate vindication of constitutional rights." *Dombrowski v. Pfister*, 380 U.S. 479, 485 (1965).

Based on a thorough review of the evidence, the court concludes "that a substantial loss or impairment of freedoms of expression will occur if appellants must await the state court's disposition and ultimate review in [the Supreme] Court of any adverse determination." *Id.* at 486. As explained above, Plaintiffs have alleged a prima facie case under the Free Exercise Clause—

that is, the Utah Controlled Substances Act is subject to strict scrutiny insofar as it restricts

Plaintiffs' religious use of psilocybin—and this court has already found that the government is

unlikely to meet its burden on strict scrutiny. That means that Plaintiffs are likely to succeed on

the merits of their Free Exercise Clause claim. And "religious freedom . . . has classically been

one of the highest values of our society." *Braunfeld v. Brown*, 366 U.S. 599, 612 (1961). So, the

loss of Plaintiffs' religious freedom pending the conclusion of the state criminal prosecution

"unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592

U.S. 14, 19 (2020) (internal quotation marks omitted).

The irreparable injury to Plaintiffs is not merely theoretical. Based on the record in this

case, the court notes once again its finding that the prosecution was brought in bad faith as part of

a larger effort to harass Plaintiffs for their entheogenic religious practices and in hopes of giving

the government a second opportunity to litigate the free-exercise issues presented squarely in this

case. The prosecution has already caused Singularism to lose many of its practitioners and

affiliates, and forcing Plaintiffs to wait until the conclusion of the criminal proceedings to secure

their free-exercise rights would be the equivalent of issuing a death warrant for their nascent

religion. For these reasons, the court grants Plaintiffs' motion for an anti-suit injunction pending

final judgment in this court enjoining further proceedings in the state criminal case against Mr.

Jensen insofar as that case prosecutes him for violating the Utah Controlled Substances Act's

prohibitions on psilocybin.[12]

---

[12] The state criminal case, *State v. Jensen*, Case No. 241404407 (4th Dist. Utah), also prosecutes
him for possession and use of THC. Mr. Jensen represents that he is a member of the Church of
the Native Americans and possesses a membership card indicating that he is qualified to carry,
possess, and use Native American Church sacraments like cannabis. However, he has not made

## CONCLUSION AND ORDER

The court **DENIES** Defendants' motion to dismiss and **GRANTS** Plaintiffs' motion for

anti-suit injunction restraining the state criminal case against Mr. Jensen. Defendants Utah County

and Utah County Attorney Jeffrey Gray are **ORDERED** to cease further proceedings in *State v.*

*Jensen*, Case No. 241404407 (4th Dist. Utah), pending final judgment in this court.

Signed August 4, 2025.

BY THE COURT

Jill N. Parrish
United States District Court Judge

---

any argument in this court for enjoining the prosecution against him for THC possession and use,
so the court does not disturb the prosecution insofar as it concerns THC.

App-5:193

# Attachment B

Order Granting Motion for Preliminary Injunction (Feb. 20, 2025)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BRIDGER LEE JENSEN, SINGULARISM, and PSYCHE HEALING AND BRIDGING, | **ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION** |
| Plaintiffs, | |
| v. | Case No. 2:24-cv-00887-JNP-CMR |
| UTAH COUNTY, PROVO CITY, and JEFFREY GRAY, | District Judge Jill N. Parrish |
| Defendants. | |

Our nation was built on an "essential commitment to religious freedom." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 524 (1993). As the Supreme Court has repeatedly recognized, this guarantee of religious liberty "lies at the heart of our pluralistic society." *Bostock v. Clayton County*, 590 U.S. 644, 681 (2020). The Religion Clauses of the First Amendment provide the basic guarantee of religious freedom for our nation. U.S. CONST. amend. I ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."). Many States have enacted special laws modeled on the federal Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb et seq., to provide additional protections for religious exercise. *See* Christopher C. Lund, *Religious Liberty After* Gonzales*: A Look at State RFRAs*, 55 S.D. L. REV. 466, 469–79 (2010) (summarizing the history of the enactment of these laws). Utah passed its version of RFRA just last year. UTAH CODE ANN. § 63G-33-201; *see* Katie McKellar, *Utah Legislature Passes Bill to Codify State Version of Religious Freedom Restoration Act*, UTAH NEWS DISPATCH (Feb. 22, 2024), https://utahnewsdispatch.com/briefs/utah-religious-

freedom-restoration-act-rfra. Laws like these further instantiate the guarantee of religious freedom so central to our republic. But for that guarantee of religious liberty to mean anything, the laws must protect unfamiliar religions equally with familiar ones, both in design and in practice. In this litigation, the religious-exercise claims of a minority entheogenic religion put the State of Utah's commitment to religious freedom to the test.

Plaintiffs are members and associates of a new religious group called Singularism that uses psilocybin mushrooms in its religious ceremonies. After the government raided their spiritual center in November 2024 and seized their mushrooms and scripture, Plaintiffs filed for a temporary restraining order and preliminary injunction in state court, claiming that the Utah RFRA, Utah constitution, and Federal Constitution protect their use of psilocybin, a psychedelic substance otherwise illegal under the Utah Controlled Substances Act. Defendants then removed the case to federal court.

In December, the court held a full-day evidentiary hearing, determined that Plaintiffs were likely to succeed on the merits of their RFRA claim, and issued a temporary restraining order requiring the government to return the mushrooms and scripture.[1] Five days later, the government filed criminal charges against Plaintiff Bridger Lee Jensen, the founder of Singularism, for possession of psilocybin with intent to distribute, possession of THC, and use or possession of drug paraphernalia. Defendants then moved to dismiss Plaintiffs' federal claims, and Plaintiffs moved for an anti-suit injunction against the state prosecution. Plaintiffs' request for a preliminary injunction remained pending.

---

[1] At Defendants' request, the court stayed the portion of its order requiring return of the psilocybin mushrooms. *See infra* pages 15–16.

The court set aside time in January for a further evidentiary hearing, but the parties stipulated to have the motion for preliminary injunction decided without further live testimony. The court then heard argument on the three pending motions and ordered supplemental briefing on several legal and factual questions. Defendants observed in their supplemental brief that the Attorney General of Utah must be notified when, as here, a litigant challenges the constitutionality of a state statute, but that the Attorney General in this case had not been notified of Plaintiffs' constitutional challenges to the Utah Controlled Substances Act. Accordingly, the court ordered Plaintiffs to send the Attorney General appropriate notice, and the court submitted its own certification of Plaintiffs' constitutional claims to him shortly thereafter. The Attorney General has until April 11, 2025 (60 days from the date of the court's certification), to present evidence or argument on the constitutional questions should he wish to do so.

In the meantime, the court has considered Plaintiffs' claim under the Utah RFRA and now GRANTS Plaintiffs' motion for preliminary injunction. The court will rule on Defendants' motion to dismiss and Plaintiffs' motion for anti-suit injunction in due course.

<div align="center">

**FINDINGS OF FACT AND PROCEDURAL BACKGROUND**

</div>

The following findings of fact are based on the live testimony that the court heard in December, the allegations of the First Amendment Verified Complaint, the declarations, and the several dozen exhibits that the parties have submitted since the case was filed.

**I.    Singularism, Its Origins, Its Beliefs, and Its Practices**

Singularism is a religious organization based in Provo City, Utah, whose core mission is alleviating human suffering. Singularism was founded in fall 2023 by Mr. Jensen after years of exploration convinced him that entheogens, specifically psilocybin, could help spiritual seekers more effectively access the Divine. As a clergyman for Singularism, Mr. Jensen makes

<div align="center">3</div>

entheogenic spiritual experiences accessible to those in Provo and surrounding communities by facilitating psilocybin ceremonies for participants to connect more deeply with themselves and with God. To best understand Singularism's beliefs and religious practices, it first helps to know a little about Mr. Jensen's spiritual journey.

A.    Mr. Jensen's Spiritual Journey

Mr. Jensen grew up in Provo in a devout family belonging to The Church of Jesus Christ of Latter-day Saints. From an early age, he was taught to revere faith and truth and to seek his own spiritual path. This foundation inspired him to explore and question religion and spirituality more deeply, and he yearned for a personal connection with the Divine. During high school, he immersed himself in the religious and intellectual tradition of his upbringing, competing (and winning) in scripture-mastery competitions, attending seminary classes with dedication, and spending long hours conversing with seminary teachers. His experience serving as a missionary for the Church of Jesus Christ of Latter-day Saints helped him develop his spiritual orientation as he found himself gravitating toward leaders who emphasized love, charity, and devotion over discipline and rigidity. Through his father, Mr. Jensen was also introduced to the works of renowned psychologists and philosophers, and found deep connection with ideas like Carl Jung's that strove to integrate science and spirituality. His exploration of other faith traditions like Buddhism, Taoism, and Hinduism further inspired him to bridge mental health and spirituality in his own life. In his mid-20s, he entered a period of agnosticism and stepped away from the faith of his childhood, but his commitment to bridging the two often-separated spheres of science and religion remained strong.

During that period of agnosticism, Mr. Jensen encountered psychedelics for the first time in Peru when he consumed a sacred drink (likely ayahuasca) with Sherpas speaking an ancient Incan language. That night, he experienced a profound vision of unity, love, and divine

connection—precisely the kind of transcendent experience he had wished for as a young boy. Although this experience was transformative, he kept it private and did not use psychedelics for spiritual purposes for almost a decade. His second entheogenic experience came in Hawaii, and this time too he felt an overwhelming sense of unity with the earth, stars, and all of creation. As he described it, "It was as if God's love enveloped me completely, and I wept for the time I had spent in my twenties dismissing religion as a potential human construct." This experience rekindled his faith in God and his desire to fill his life with meaning and purpose.

Around 2019, after more than 16 years as a successful child and family therapist with referrals from across the world, Mr. Jensen found himself disenchanted with traditional therapy and decided to explore entheogenic practices and the academic literature examining them more deeply. He allowed his therapist license to expire because he worried that his spiritual use of psychedelics might conflict with his work as a licensed therapist. The research from institutions like Johns Hopkins University and Harvard Medical School further convinced him that when approached with care and reverence, entheogens could reveal deep spiritual truths and facilitate healing.

Through his own experiences with entheogens, Mr. Jensen perceived an entity he calls the OctoGoddess calling him to help others connect with God. In response to that call, Mr. Jensen founded Singularism in September 2023, combining ancient, mystical traditions with modern, empirically supported methods. He also established the Psychedelic Therapy Academy, a center for training Singularism's prospective facilitators and interested non-affiliates in psychedelic harm reduction.

B.      Singularism's Beliefs

Singularism's central teaching is that we are all one, we are all connected, and we came from a higher power (hence the name Singularism, which suggests a unity with all things). The expectation is that each participant (whom it calls a voyager) will emerge from a psilocybin ceremony feeling a sense of unity with all things, feeling deeply connected with even his enemies and those who have harmed him. That said, Singularism does not itself claim special access to divine truths but instead considers itself religiously inclusive. One does not need to give up any prior religious affiliation to become a voyager or member of Singularism. Unlike religions that prescribe a core set of beliefs or practices for their members, Singularism encourages each voyager to connect with his own beliefs and experience his own spirituality, whether it is walking with Jesus, praying to Allah, or hearing a call from the OctoGoddess. In Singularism's view, everyone can connect with the Divine and receive equally valid revelation because the great spirit of the universe loves everyone equally.

Although one need not participate in the psilocybin ceremonies to be a member of Singularism, the religion does consider psilocybin to play an essential role. As Singularism sees it, we humans are now profoundly deceived about who we are, what our purpose is, and what we desire and need. Psilocybin allows voyagers to temporarily disengage from those deceptions, desires, and needs, and experience sheer consciousness without the burden of their bodies. Although one could perhaps get the same experience through years of dedicated meditation, most people do not have that luxury of time, so psilocybin makes that transformative experience accessible to the average seeker.

Although Mr. Jensen founded Singularism, he is not the prophet of the religion, at least not in the typical sense. Rather, his role is to assist others to access their own spiritual insights through

6

the psilocybin ceremonies. In a sense, then, each voyager is his own prophet, and the facilitator (the one overseeing the voyager's tea ceremony) serves as a scribe by recording the voyager's insights during the ceremony. These recordings become Singularism's core scripture, primarily for the individual voyager but also collectively insofar as different voyagers' insights reveal common truths about human existence and humanity's place in the world (such as the singularity of the universe). Because Singularism believes that each person can receive divine truths, its leaders generally keep their beliefs and spiritualities private to avoid interfering with other voyagers' understandings of their own journeys.

One scripture included in the religion's articles of belief, though, does come from a revelation that Mr. Jensen received through the OctoGoddess during a voyage. That scripture, called the Octadrant, is an epistemological framework for understanding truth, a resource for ongoing discovery rather than a source of eternal truth. It divides knowledge into eight interconnected perspectives (called octants) by the spectrums of Truth, Verifiability, and Awareness. (Imagine a 3D graph where the x-, y-, and z- axes divide the space into eight regions. Each region is an octant, and each axis is a spectrum.) The eight octants are Knowledge, Faith, Discoverables, Deep Mysteries, Lies, Deceptions, Myths, and the Unimaginables. Knowledge is true, verifiable, and aware (i.e., truth is both provable and consciously understood); Faith is true and aware but unverifiable (i.e., truth resonates deeply with intuition but cannot be empirically validated); and so on. Singularism uses the Octadrant to guide voyagers during their psilocybin ceremonies and explain humanity's place within the cosmic structure.

C.    Singularism's Practices

Singularism's central, most distinctive practice is the psilocybin tea ceremony. Participating in a tea ceremony with Singularism is a multistep process beginning with a rigorous

7

screening. During the screening, which can last up to two hours, Mr. Jensen (or whoever happens to be conducting the screening) asks detailed questions about the prospective participant's objectives, mental-health history, and medical history. The goal is ensuring physical and psychological readiness—making sure that voyagers participate because of their own sincere desire for a deep spiritual experience and screening them for preexisting conditions or ongoing medications that could interfere with the psilocybin.

Once a prospective voyager has passed the screening, he is ready for a prep session. During a prep session, the voyager discusses his goals for the ceremony, and the facilitator explains what to bring, what to wear, what to eat, and when to fast. The facilitator also asks the voyager to sign a waiver form and then invites him to set out an intention statement for the ceremony. It could something as simple as "acceptance of the unknown" or "reconnection with God." Finally, the voyager "commit[s] to using the wisdom and insights revealed to [hi]m through the sacred ceremonies . . . to create a more enlightened world."

A tea ceremony typically begins late morning, around 9:30 or 10:00. The facilitator brews the tea using psilocybin mushrooms in front of the participant, who then drinks the tea and begins his voyage. A voyage lasts between five and eight hours, and during that time, the facilitator guides the voyager, now playing the role of his own prophet, to discover spiritual insights and records them on a notepad. For example, one voyager revealed, "Why don't I listen to my body. I need to start listening. Why don't you?" These notes then become sacred scripture, and the facilitator meets with the participant post-voyage to reflect on the notes and discuss how he can strengthen the spiritual gifts received during that session. A voyager typically engages in two to four tea ceremonies. (Mr. Jensen himself participates in about four per year.)

Other than the tea ceremonies, Singularism's practice includes observing holidays on the solstices. The ceremonies performed on the solstices are meant to call in the spirits of the season, and they do not include the use of entheogens. Singularism also recognizes Christian holidays like Christmas and Easter.

D.    Singularism's Safety Protocols

For Singularism, safety is paramount, and the organization and its leaders have always striven for full transparency with facilitators, participants, and outside entities (including the government). Singularism has never sought to conceal its use of psilocybin, instead viewing its mission as educating a broader audience about the spiritual power of entheogens and making transformative spiritual experiences more accessible to those in the community.

To do so securely, Singularism has implemented several safety measures, beginning with the treatment of its psilocybin mushrooms, which arrive freeze dried from a lab in Oregon after being tested for contaminants. (Psilocybin is legal for therapeutic uses in Oregon.) The mushrooms are used only as a sacrament; they are never sold or otherwise distributed to non-affiliates for recreational purposes. The mushrooms are stored in a locked safe in Singularism's spiritual center, and only Singularism's facilitators have access to them. As mentioned above, each prospective voyager must pass through a rigorous screening process to ensure psychological and physiological fitness for the psilocybin ceremony. The medical portion of the screening is conducted by two or more facilitators, at least one of whom has a medical degree or background in clinical therapy. And the facilitators always brew the tea in front of the voyagers so that the voyagers can rest assured that no other substances go into the tea. Finally, voyagers must agree not to drive themselves on the day of their voyage. Mr. Jensen is present at the center for each voyage even if he is not himself facilitating it.

Even the best safety protocols, however, cannot entirely eliminate the risk of an accident or unexpected reaction. In Singularism's history, one voyager has had an adverse reaction. This particular voyager had successfully participated in one psilocybin ceremony with Singularism, but as she was completing her second one in January 2025, she began to display symptoms of paranoia and mistrust, and demanded to leave Singularism's spiritual center. Singularism deployed its emergency protocol, calling the voyager's emergency contacts (her mother and ex-husband) and ensuring that she received the treatment she needed at the hospital. Mr. Jensen also remained at the spiritual center until the end of the day as required by the protocol in case the voyager returned. While the voyager was in the hospital, Singularism discovered that she had an undisclosed mental-health issue. According to Mr. Jensen, if that issue had been disclosed during the screening process, Singularism likely would not have included the voyager in a psilocybin ceremony. Throughout this process, Singularism maintained its commitment to transparency and safety, and the voyager called the next day to thank Singularism for coordinating her care with her emergency contacts. At no point was the voyager (or anyone else) in physical danger because of the adverse reaction.

E.    Singularism's Impact on Its Participants

Singularism's participants often come to the religion after exhausting conventional treatments like medication or therapy, partly because they seek healing along both the physical and spiritual dimensions. Based on the record in this case so far, voyagers and facilitators describe their experience at Singularism in uniformly positive terms.

Several witnesses testified that Singularism saved their life—literally. For example, Singularism's office manager, Brandi Lee (who is also a facilitator), found Singularism at a time when she was seriously contemplating suicide; she was suffering from an eating disorder, had recently lost her father, lost a brother to suicide, and then learned that her then-husband wanted to

divorce her. She wanted to "find out who [she was], and who [her] highest self [wa]s." She "wanted to find out and connect with God, and . . . the spirits, and [her] ancestors."

The night before her first voyage, Mr. Jensen (who was facilitating the voyage) told her to meditate and read her patriarchal blessing. During that voyage, she found herself laughing for several hours and thereby rediscovered the funny part of herself that she had pushed to the side during her marriage because her husband was supposed to be the funny one. She summarized her spiritual insight as "There you are, Brandi." In subsequent voyages, she found her father and brother at peace, walked alongside Jesus, and embraced Heavenly Mother and Father. In those encounters, Jesus taught her that true spirituality resides within all of us, and Heavenly Mother and Father assured her that they were with her every step of the way in her life journey. As she described her takeaway from these experiences, "[S]pirituality isn't just in a box, in a . . . religious organization . . . . Spirituality is so broad, and I was able to take away that I am special, and that everyone is special, and that we all just need to love each other. That was the answer from Jesus[—]love, just love."

Other witnesses expressed that Singularism had helped them rediscover a faith that they thought they had lost, possibly forever. For instance, Jenna DenBleyker, a facilitator in training, explained that she found Singularism after she grew increasingly disconnected from God and some of the people closest to her. Try as she did, she could not rekindle her faith. That is, until she experienced a psilocybin ceremony. The entheogen "facilitated [the] renewed spiritual connection [that she] had been seeking for decades." She continued, "I was able to experience God not by traveling through space to where I imagined that He resided, but by having him show up in the very air molecules that surrounded me . . . , always near and available to me."

11

F.      Government Recognition of Singularism's Religious Practices

Two government bodies—the Utah Division of Professional Licensing and Provo City—have already recognized Singularism's religious use of psilocybin. After Mr. Jensen's therapist license had expired, the Division received a complaint that Mr. Jensen was practicing mental-health therapy without a license. Mr. Jensen explained the basics of Singularism and his role in the religion to the Division and asserted that he qualified for the clergy exemption to the licensing requirement. (The clergy exemption allows "a recognized member of the clergy" to provide mental-health therapy, among other kinds of treatment, without a license "while functioning in a ministerial capacity." UTAH CODE ANN. § 58-60-107(2)(b).) The Division's investigator then closed the complaint as unfounded.

Separately, Singularism applied to Provo City for a business license to operate its spiritual center. Religious organizations and non-profit organizations are not required to obtain a license if they conduct their activities wholly for charitable, religious, or non-profit purposes, and the burden rests on the organization claiming the exemption to establish that it is entitled to the exemption. PROVO CITY, UTAH, CITY CODE §§ 6.01.130, .140. Provo City responded to Singularism's application with a letter stating that "churches or religious organizations are not required to obtain a business license to operate . . . for activities directly associated with religious purposes" and closed Singularism's application accordingly.

## II.    Procedural History of This Action

When he founded Singularism and opened the spiritual center in September 2023, Mr. Jensen sent the Provo City Council and Provo City Mayor Michelle Kaufusi a letter "to establish an open line of communication." The letter explained what Singularism is, disclosed its entheogenic religious practices, and invited local government officials to ask any questions they

may have had and to tour Singularism's spiritual center. It concluded, "Singularism is optimistic that through partnership and dialogue, it can foster an environment that respects diversity and upholds individual rights."

The government did not take Singularism up on its invitation. Instead, over a year later on November 11, 2024, officials arrived at the spiritual center to execute a search warrant based largely on the affidavit of an undercover officer who had posed as a prospective Singularism facilitator. The officers came by around five pm so as not to disturb any religious ceremonies and proceeded to search the premises for over an hour and a half. Mr. Jensen, maintaining his stance of full transparency, showed the officers the safe where Singularism kept its psilocybin. They seized the psilocybin, psilocybin paraphernalia, sacred scripture, and a small amount of THC that Mr. Jensen kept there for his own use (Mr. Jensen is also affiliated with the Church of the Native Americans, which uses marijuana as a sacrament). During the search, the officers recommended that Singularism cease its religious practices and told Mr. Jensen to expect criminal charges. Two days later, the Provo City Police Department sent a letter to the landlord of Singularism's spiritual center claiming that Singularism was a drug-distributing nuisance, instructing the landlord to evict Singularism as soon as possible, and threatening civil abatement if the landlord did not comply. The landlord responded saying that Singularism has been an "exemplary tenant[]" and requesting that further action be deferred until Singularism's legal status had been finally adjudicated in the courts. In January 2025, at the hearing on the various motions resolved in this order, Defendant Provo City expressed that it did not intend to follow through on the threat of eviction.

Singularism's leaders were deeply dismayed by the government's response to their new religion—first silence, then a criminal investigation. Mr. Jensen, who is himself from Provo, testified that it was extremely difficult "to be accused of being a nuisance to a city [he]

love[s], . . . in a country [he] really love[s]" because of "an involuntary spiritual calling." Although

the seizure of the psilocybin sacrament was frustrating, he was "much more concerned" when the

officers started taking the scripture—"scripture that [he and others] ha[d] written and worked for

years on." Ms. Lee described a "feeling of obviously betrayal and fear, . . . fear [for] all of

us[,] . . . [fear] of not being able to practice what [she] believe[s] is a way to help better humanity."

Unsurprisingly, the government's actions took a toll on Singularism's strength as a religious

organization. Singularism could not pay its employees for at least one month, and Mr. Jensen's

disclosures to voyagers about Singularism's legal troubles reduced participation overall.

Given these developments, Singularism (along with Psyche Bridging and Healing, the LLC

through which Singularism runs its business operations) and Mr. Jensen filed suit in the Utah

County Fourth District Court on November 19, 2024, against Utah County, Provo City, and several

individuals, seeking, among other things, (1) a declaratory judgment that Defendants' actions

violated their right to free exercise under the First Amendment to the U.S. Constitution; right to be

free from unreasonable searches and seizures under the Fourth Amendment to the U.S.

Constitution; right to free exercise under article I, section 4 of the Utah constitution; right to be

free from unreasonable searches and seizures under article I, section 14 of the Utah constitution;

and right to free exercise under the Utah RFRA; and (2) an injunction ordering the government to

return the psilocybin, paraphernalia, and sacred scripture, and forbidding the government from

interfering with their religious exercise.[2] A few days later, on November 27, Defendants removed

the case to this court under 28 U.S.C. §§ 1331, 1441, 1446.

---

[2] Plaintiffs originally sued the following individuals: Jeffrey Gray, the Utah County Attorney; Troy
Beebe, the chief of the Provo City Police Department; Brian Wolken, a captain of the Police
Department; Jackson Julian, a detective of the Police Department who served as the undercover

On December 13, the court held a full-day evidentiary hearing on Plaintiffs' request for a temporary restraining order and concluded that Plaintiffs were likely to succeed on the merits of their claim that Defendants' actions violated their rights under the Utah RFRA. Under that statute, once a plaintiff shows a substantial burden on sincere religious exercise, the burden shifts to the government to show that the challenged law furthers a compelling state interest using the least restrictive means. UTAH CODE ANN. § 63G-33-201(2), (3). The court found that Plaintiffs were "likely to be able to show a substantial burden on the exercise of their beliefs about ps[i]loc[y]bin, that those beliefs [we]re sincere, and that those beliefs [we]re religious in the way that the law conceptualizes religion." ECF No. 24 ("TRO"), at 2. It also found that "the government ha[d] not shown a compelling interest in prohibiting Singularism from using ps[i]loc[y]bin outright and accordingly ha[d] not carried its burden." *Id.* The court found the other preliminary-relief factors satisfied (irreparable harm and balance of the equities) and therefore issued a temporary restraining order requiring the government to return the seized materials as soon as possible. *Id.* at 3.

Five days later, on December 18, the government filed criminal charges against Mr. Jensen and moved to stay the portion of the temporary restraining order requiring return of the mushrooms. The government argued that it was obligated to retain possession of the mushrooms for the criminal case under Utah's evidence-retention laws. The court, although skeptical of Defendants' argument, granted the motion for a partial stay, reasoning that "the most prudent course" was to err on the side of avoiding premature interference with the pending state

---

officer investigating Singularism; and John Does 1–4, police officers with the Police Department. At the hearing on January 23, 2025, Plaintiffs stated that they did not wish to proceed against any of the individual Defendants except for Jeffrey Gray. *See* ECF No. 83 (First Amended Verified Complaint).

prosecution. ECF No. 56 (Order Granting Motion to Stay and Denying Motion for Expedited Discovery), at 5.

Shortly after the government filed criminal charges against Mr. Jensen, Plaintiffs moved for an anti-suit injunction against the state-court prosecution, and Defendants moved to dismiss Plaintiffs' claims. According to Plaintiffs, the criminal case—initiated after this court had issued a temporary restraining order in Plaintiffs' favor—is the government's effort to relitigate in a more favorable forum the same issues presented in this action; so, they request that this court enjoin further proceedings in the state criminal case until the issues in this civil action have been finally resolved. In Defendants' view, the federal claims in Plaintiffs' complaint fail; accordingly, they request the court to dismiss the federal claims and thereafter decline to exercise supplemental jurisdiction over Plaintiffs' state-law claims and remand them to the state court. This court scheduled a two-day evidentiary hearing in January 2025 to hear additional evidence and argument regarding these two motions and Plaintiffs' then-still-pending motion for preliminary injunction.

Soon after Plaintiffs filed their motion for anti-suit injunction and Defendants filed their motion to dismiss, Defendants moved for expedited discovery, claiming that they needed discovery to prepare for the preliminary-injunction portion of the hearing in January. Although their argument was not in theory unreasonable, the court found their discovery requests offensively overbroad. For example, Defendants sought discovery on "each instance where [Mr.] Jensen consumed drugs prohibited by the Controlled Substances Act between 2015 and the present" and "documents sufficient to identify each individual to whom Plaintiffs have administered psilocybin from 2019 to present." ECF No. 4 (Motion for Expedited Discovery), at 4, 6. That is, Defendants' requests concerned criminal conduct far in the past and effectively demanded Singularism to disclose the identities of all individuals who had affiliated with the religion. In the court's view, "the sheer

breadth of the requests strongly suggest[ed] that Defendants' purpose [wa]s to use discovery in this civil lawsuit to investigate Plaintiffs for the pending state criminal case—a patently improper purpose." Order Granting Motion to Stay and Denying Motion for Expedited Discovery at 6. Accordingly, the court denied Defendants' motion for expedited discovery.

On January 22, the day before the scheduled two-day hearing, the parties stipulated that they would present only argument, no additional evidence, at the hearing. The court heard argument on the three motions and ordered supplemental briefing. As Defendants noted in their supplemental brief, the Attorney General of Utah was not notified of the constitutional challenges in this action even though he was supposed to be so notified. The court ordered Plaintiffs to notify the Attorney General accordingly, and the court sent him its own certification of the constitutional questions. The court cannot to rule on Defendants' motion to dismiss and Plaintiffs' motion for anti-suit injunction until the Attorney General has had an opportunity to present evidence or argument on the constitutional questions underlying those motions. In the meantime, the court resolves Plaintiffs' motion for preliminary injunction based on their claim under the Utah RFRA.

## ANALYSIS

Plaintiffs seek a preliminary injunction barring enforcement of the Utah Controlled Substances Act as applied to their psilocybin ceremonies. To succeed on their motion, Plaintiffs "must establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Because the government is the opposing party, the third and fourth factors merge. *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 112 (10th Cir. 2024). And "[i]n the First Amendment context," or quasi–First Amendment context as here, "the likelihood of success

on the merits will often be the determinative factor because of the seminal importance of the interests at stake." *Verlo v. Martinez*, 820 F.3d 1113, 1126 (10th Cir. 2016) (internal quotation marks omitted).

In this order, the court considers only Plaintiffs' Utah RFRA claim because the Attorney General is entitled to respond to their constitutional claims and his deadline for doing so has yet to expire. As noted previously, Utah passed its version of RFRA last year. Under the Utah RFRA, "a government entity may not substantially burden the free exercise of religion of a person, regardless of whether the burden results from a rule of general applicability," unless "the government entity . . . demonstrates that the burden on the person's free exercise of religion is: (a) essential to furthering a compelling governmental interest; and (b) the least restrictive means of furthering the compelling governmental interest"—that is, unless the government satisfies strict scrutiny. UTAH CODE ANN. § 63G-33-201(2)(a), (3). The Utah RFRA, like its federal counterpart, is a quasi-constitutional statute, meaning that it protects a fundamental constitutional right (namely, the right to free exercise of religion) and supersedes other conflicting statutes unless those other statutes are explicitly exempted. *See id.* § 63G-33-101(6)(b)(ii)(A) (defining substantial burden to include burdens imposed by "law, statute, ordinary, rule, policy, order, or other assertion of governmental authority"); Bethany Ao, Comment, *Achieving Appropriate Relief for Religious Freedom Violations in Prisons After* Tanzin, 90 U. CHI. L. REV. 1967, 1971 (2023); Douglas Laycock, *The Religious Freedom Restoration Act*, 1993 BYU L. REV. 221, 254. And courts interpreting the federal RFRA have looked to constitutional cases for guidance in applying RFRA, whose compelling-interest test was expressly adopted from constitutional caselaw predating *Employment Division v. Smith*, 494 U.S. 872 (1990). *See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006); *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693–95

18

(2014). So, both federal RFRA and federal constitutional cases inform the court's analysis here under the Utah RFRA.

As a threshold matter, Defendants argue that Plaintiffs cannot seek relief under the Utah RFRA because they did not satisfy its notice requirement. Under the statute, "a person may not bring an action against a government entity unless, at least 60 days before the day on which the person brings the action, the person provides written notice to the government entity." UTAH CODE ANN. § 63G-33-201(5)(a). That notice must "(i) state[] that the person intends to bring an action against the entity for a violation of [RFRA]; (ii) describe[] the government action that has burdened . . . the person's free exercise of religion; and (iii) describe[] the manner in which the government action burdens . . . the person's free exercise of religion." *Id.* Plaintiffs do not claim that they satisfied this requirement but point to an exception: the notice requirement "does not apply if the government action alleged . . . (i) is ongoing, and complying with [the requirement] will place an undue hardship on the person or increase the harm suffered by the person." *Id.* § 63G-33-201(5)(b).

The court concludes that Plaintiffs' case falls under the exception for ongoing government action. Plaintiffs have established that psilocybin mushrooms are used as a sacrament in Singularism, so each day that Plaintiffs are deprived of their sacrament they suffer harm to their religious exercise. The Utah Controlled Substances Act prohibits Plaintiffs from using psilocybin, and the government still possesses the mushrooms that the officers seized in November. The court recognizes that the reason the government still possesses the mushrooms is that the court granted Defendants' request to keep the mushrooms pending resolution of Plaintiffs' motion for preliminary injunction on the finding that the potential harm to the government of having to return the mushrooms outweighed the harm to Plaintiffs of being deprived of the mushrooms in the

meantime. But that finding does not mean that Plaintiffs do not suffer any harm from the deprivation of their mushrooms. Even if the ongoing-action exception did not apply, however, Defendants concede that Plaintiffs emailed them a notice of claim on November 19, 2024, and because 60 days have passed since that time, Plaintiffs' Utah RFRA claim is properly before the court.[3]

Onto the merits of the claim then. The plain text of the statute requires the plaintiff to demonstrate a substantial burden on sincere religious exercise. Based on the evidence in this case, Plaintiffs have established that the government has substantially burdened their sincere religious exercise. Simply put, Plaintiffs offer a sacramental psilocybin tea to their voyagers, who then embark on a spiritual journey by which they write their own scripture. A law that categorically prohibits the possession and use of the psilocybin sacrament—thereby preventing Singularism's adherents from pursuing their spiritual voyages and hindering them from producing their sacred scripture—substantially burdens the free exercise of Singularism and its adherents. *Church of the Holy Light of the Queen*, 615 F. Supp. 2d 1210.

Defendants argue that complying with the Utah Controlled Substances Act does not substantially burden Plaintiffs' religious exercise for three reasons apart from the sincerity and character of their beliefs: Singularism values compliance with governmental laws (like the Controlled Substances Act); it does not require the use of psilocybin mushrooms; and it expressly

---

[3] One could potentially argue, though the court would be skeptical of this argument, that if a Utah RFRA plaintiff fails to provide a notice of claim at least 60 days before filing suit and the notice exception does not apply, then the court must dismiss the case entirely once the defendant points out the plaintiff's failure to comply with the notice provision. Even under this argument, however, Plaintiffs' RFRA claim would be properly before the court because Plaintiffs filed an amended complaint (which operates as a new complaint) on February 5, 2025—more than 60 days after they emailed their notice of claim.

defers to medical providers. But these arguments amount to an assertion that Singularism is not what its adherents claim it is—in other words, that the government is best situated to interpret Singularism and its teachings. The government's claimed ability to interpret Singularism and its teachings contrary to the way in which Singularism and its adherents do runs headlong into the long-established principle that "it is not within the judicial function [or] judicial competence to inquire whether the [plaintiff] . . . correctly perceive[s] the commands of [his] . . . faith." *Thomas v. Rev. Bd.*, 450 U.S. 707, 716 (1981). Even if psilocybin were not essential to Singularism's practice, the Utah Controlled Substances Act would still be vulnerable to Plaintiffs' challenge. After all, the Utah RFRA, building on basic First Amendment principles, protects not just practices mandated by the claimant's religion or practices common to all members of that religion but rather any practices motivated by sincere religious belief. UTAH CODE ANN. § 63G-33-101(2); *LaFevers v. Saffle*, 936 F.2d 1117, 1119 (10th Cir. 1991).

Having failed to challenge Plaintiffs' interpretation of their own religion, Defendants then challenge the sincerity and character of Plaintiffs' beliefs. To prevail on their motion for preliminary injunction, Plaintiffs must establish that their beliefs underlying their psilocybin use are sincere and religious. *See Hobby Lobby*, 573 U.S. at 717–18 & n.28. Pretextual beliefs or beliefs rooted in nonreligious considerations do not qualify for protection under RFRA. *See United States v. Christie*, 825 F.3d 1048, 1055–56 (9th Cir. 2016). The sincerity inquiry is important for eliminating sham free-exercise claims, but "it must be handled with a light touch, or judicial shyness." *Moussazadeh v. Tex. Dep't of Crim. Just.*, 703 F.3d 781, 792 (5th Cir. 2012). So, "the inquiry into the sincerity of [the] plaintiff's religious beliefs is almost exclusively a credibility assessment." *Kay v. Bemis*, 500 F.3d 1214, 1219 (10th Cir. 2007) (cleaned up).

As for assessing the character of the beliefs underlying the conduct for which the plaintiff claims an exemption, district courts in the Tenth Circuit consider the following factors, known as the *Meyers* factors after the leading case: (1) *Ultimate ideas*—"Religious beliefs often address fundamental questions about life, purpose, and death." (2) *Metaphysical beliefs*—"Religious beliefs often are 'metaphysical,' that is, they address a reality which transcends the physical and immediately apparent world." (3) *Moral or ethical system*—"Religious beliefs often prescribe a particular manner of acting, or way of life, that is 'moral' or 'ethical.'" (4) *Comprehensiveness of beliefs*—"Another hallmark of 'religious' ideas is that they are comprehensive[,] . . . provid[ing] the believer with answers to many, if not most, of the problems and concerns that confront humans." (5) *Accoutrements of religion*—The presence of "external signs" like a founder or prophet, important writings, gathering places, keepers of knowledge, ceremonies and rituals, structure or organization, holidays, diet, clothing, and propagation to non-believers "may indicate that a particular set of beliefs is 'religious.'" *United States v. Meyers*, 95 F.3d 1475, 1483–84 (10th Cir. 1996). No one factor is dispositive.[4] *Id.*

Based on all the evidence in the record, the court has no difficulty concluding that Plaintiffs are sincere in their beliefs and that those beliefs are religious in nature. Begin with the government's own recognition that Singularism is a religion. As described earlier, when Mr.

---

[4] Defining what religion is in a way that accommodates the vast diversity of religious beliefs, practices, and traditions across time and space is no small feat, and social scientists have dedicated entire books, if not entire careers, to the question. *See, e.g.*, CHRISTIAN SMITH, RELIGION: WHAT IT IS, HOW IT WORKS, AND WHY IT MATTERS (2017). The caselaw attempts not to answer comprehensively what makes a religion—a question best left to those social scientists—but rather to identify what qualifies an individual or organization for religious protections under the law. So, in saying here that Singularism is a religion, the court is saying simply that the court finds Singularism to be the kind of entity that qualifies for legal religious protections.

Jensen was investigated by the Utah Division of Professional Licensing for practicing mental-health therapy without a license, he explained his belief that as a facilitator at Singularism, he qualified for the exemption for "recognized member[s] of the clergy." UTAH CODE ANN. § 58-60-107(2)(b). The Division agreed with him and closed the complaint as unfounded. And when Singularism applied to Provo City for a business license to operate its spiritual center, the City responded by saying that Singularism did not need a license to conduct its religious activities. Although these statements and actions from the Division and the City do not estop Defendants from challenging Plaintiffs' religious sincerity, they are nonetheless persuasive evidence that Singularism is a legitimate religion and that its adherents are sincere in their practices.

Next, all of Singularism's witnesses connected their practice of Singularism to their faith journeys, expressing that the tea ceremonies had helped them rediscover their religious faith. Mr. Jensen, for example, stated that he founded Singularism after psychedelics helped him experience "an overwhelming sense of unity with the Earth, the stars, and all of creation . . . [,] as if God's love enveloped [him] completely" and thereby "awakened in [him] a renewed faith in God." As he further explored entheogenic spiritual practice, he encountered the OctoGoddess, a spiritual entity, who revealed to him the Octadrant, an epistemological framework for processing truth in its different dimensions. Ms. Lee testified that her voyages, during which she met Jesus and her Heavenly Parents, "opened up a lot of spiritual gifts that [she] didn't quite realize [she] had," such as "communicat[ing] with angels and spirits." And Ms. DenBleyker, for her part, testified that Singularism "helped facilitate [the] renewed spiritual connection [that she] had been seeking for decades" by allowing her to "experience God . . . in the very air molecules that surrounded [her,] . . . always near and available to [her]." These witnesses, whom the court finds very credible, show that Singularism's entheogenic practice is intimately connected with fundamental questions

23

about life and addresses a reality that transcends the physical world. Indeed, as Mr. Jensen explained, "[W]e are profoundly deceived about who we are and what we are, and what our purpose is, about what our desires are, . . . [a]nd the essential role of psilocybin is that for a few moments you can disengage from some of those temporal real deceptions . . . [and] experience she[e]r consciousness without the burden of our bodies."

Moreover, Singularism features several "accoutrements" of religion, as the caselaw calls it. Most simply, it has prophets and a scripture. As Mr. Jensen explained, during a tea ceremony, the voyager is a prophet receiving spiritual insight, and the facilitator serves as a scribe to record those insights; thus, the recordings from every voyage individually and collectively become Singularism's sacred scripture. On top of that, the tea ceremony is a carefully organized and guarded ritual. The voyager must first pass a screening to ensure his sincerity, and during the prep session, he sets an intention for the voyage. Other preparations for the tea ceremony could include something more familiar from larger religions, such as fasting and reading and internalizing one's patriarchal blessing.

Defendants observe that Singularism "does not claim special access to divine truths," instead encouraging its practitioners to more deeply "discover and define their own beliefs," and explicitly states that "no organization, including [it], has all the answers to life's most difficult questions." In Defendants' view, these features weaken Singularism's claim to be a religion because they show that Singularism's beliefs are not comprehensive. *See United States v. Quaintance*, 471 F. Supp. 2d 1153, 1162 (D.N.M. 2006) (holding that a religious belief is comprehensive if it includes "multiple beliefs" and is "uniform" across members). As the court sees it, however, these features less so detract from Singularism's religious nature than they illustrate Singularism's commitment to existential humility. Existential humility means holding

24

cherished beliefs regarding the meaning of life and death loosely enough to revise them with more evidence, data, and experiences—that is, holding profound beliefs alongside a recognition of the limits of our knowledge and our fallibility. *See* Jeffrey D. Green, W. Keith Campbell & Daryl R. Van Tongeren, *Existential Humility: Strong Tests of Intellectual Humility*, 18 J. POSITIVE PSYCHOLOGY 259 (2022); Alberto R. Coll, *"That Vast External Realm": The Limits of Love and Law in International Politics*, *in* AGAPE, JUSTICE, AND LAW: HOW MIGHT CHRISTIAN LOVE SHAPE LAW? 291, 308 (Robert F. Cochran, Jr., & Zachary R. Calo eds., 2017). As Mr. Jensen put it, "I think that people do too much pretending about what [they] know. So I want to very sincerely guide people into what they truly believe and help them find their purest religion . . . ."

To be sure, a commitment to existential humility need not foreclose prescribing certain beliefs to define the boundaries of a religious community. But in the context of the full record here, including the statements and testimony referenced just above, Singularism's expressions of existential humility appear more to be sincere invitations for its members to discover religious truth through its psilocybin ceremonies than a neglect of religious beliefs altogether. Considering that existential humility is important for enabling and supporting the smooth functioning of a pluralistic society like ours, it would be inappropriate to hold Singularism's existential humility against it. *See* David Robson, *Why 'Existential Humility' May Be the Answer to Today's Culture Wars*, NEWSCIENTIST (Nov. 15, 2023), https://www.newscientist.com/article/mg26034652-700-why-existential-humility-may-be-the-answer-to-todays-culture-wars; David French, *Pope Francis is Turning Certainty on Its Head*, N.Y. TIMES (Sept. 19, 2024), https://www.nytimes.com/2024/09/19/opinion/pope-francis-god-election.html.

Defendants also observe that Singularism does not offer a moral or ethical system for its adherents. On this point, the court agrees—Singularism's ethical teaching appears to be simply

that its members should love others because love is "humanity's ultimate purpose in life." *See*

*Quaintance*, 471 F. Supp. 2d at 1161 ("A simple phrase may sum up a morality, but the phrase

alone cannot be the extent of the morality."). The court's agreement with Defendants on this point

is not to suggest that love is anything less than a noble ethical lodestar; indeed, the world could

always use more love. Rather, all it means is that Singularism lacks the kind of systematized

concepts of right and wrong behavior that the *Meyers* factor refers to. But the absence of a moral

or ethical system does not mean that Singularism is not a religion because this factor is simply one

of several non-dispositive factors. *Meyers*, 95 F.3d at 1484.

Finally, Defendants point to several other pieces of evidence that in their view undermine

Singularism's claim to be a religion entitled to protection under the law: Singularism's citations to

scientific and medical research on the therapeutic potential of psilocybin; Mr. Jensen's testimony

that he sought a safer way of using psychedelic drugs after observing unethical behaviors within

the underground psychedelic community; Mr. Jensen's testimony that he has been using

psychedelic drugs for several years now (i.e., that his drug use predates Singularism's founding);

and Singularism's financial interest in administering psilocybin. Although some of this evidence

may raise eyebrows at first glance, on closer examination the court is not convinced that it detracts

from Singularism's claim of religious sincerity.

Singularism's citations to scientific and medical research on psilocybin hardly undermine

its claims. An overlap between scientific and religious reasons for a practice "cannot render th[ose]

actions . . . any less religious." *University of Great Falls v. NLRB*, 278 F.3d 1335, 1346 (D.C. Cir.

2002). Indeed, many religious practices in more common religions, such as gathering in

community for music, prayer, and fellowship, can be justified by a litany of nonreligious reasons

and scientific research. *See, e.g.*, Sandra Feder, *Religious Faith Can Lead to Positive Mental*

*Benefits, Writes Stanford Anthropologist*, STANFORD REPORT (Nov. 13, 2020), https://news.stanford.edu/stories/2020/11/deep-faith-beneficial-health (describing recent anthropology research finding that "religious involvement . . . is better for [the] body in terms of immune functions and reducing loneliness"). Those nonreligious justifications do not make the practice of communal worship any less religious, and the same goes for Singularism's practice of psilocybin tea ceremonies.

Mr. Jensen's testimony about his past use of psychedelic drugs and desire to find safer ways of using them may at first support the inference that he conveniently founded Singularism as a religion to bypass the law and engage in otherwise-illegal drug use. However, the evidence as a whole weighs against this inference. For example, he testified at great length about his spiritual revelations from his voyages and his conviction that psilocybin is nearly essential for ordinary people to be able to access spiritual experiences and wisdom. He further testified that he engages in only about four voyages a year, and a typical package for a new voyager consists of two to four voyages. This evidence cuts against a finding that Mr. Jensen's beliefs about psilocybin are insincere or that Singularism is no more than a drug-distribution operation masquerading as religion. *Compare with United States v. Meyers*, 906 F. Supp. 1494, 1504 (D. Wyo. 1995) (claimant seeking religious exemption for marijuana explained that his religion "[wa]s to grow, possess, and distribute marijuana" and that he "smoke[d] between 10 and 12 joints per day").

As for Singularism's financial motivation, it admittedly looks suspicious at first that Singularism charges about $1,600 per tea ceremony (so given that two to four ceremonies is a standard package, members pay anywhere from $3,200 to $6,400 for participation). This fact looks even more problematic for Singularism's claims considering Mr. Jensen's testimony that the marginal cost of the psilocybin used in each voyage ranges from $50 to $150 depending on the

<center>27</center>

dose. Once again, however, the full context strongly suggests that Singularism is driven by religious rather than purely financial considerations. Mr. Jensen testified that he was making over $120,000 a year as a licensed mental-health practitioner before founding Singularism; now, he makes considerably less—$3,400 per month, or $40,800 per year. (Defendants did not introduce any evidence to challenge his testimony on this point.) He also testified that he was asked by the OctoGoddess to found Singularism to make transformative spiritual experiences more accessible. If Mr. Jensen were actually motivated by the promise of large profits, he would not have given up a stable six-figure salary to found Singularism and receive a monthly payment that barely puts him past the poverty line.[5]

But even if Mr. Jensen made more money at Singularism than he previously did as a therapist, or even if the evidence suggested that Singularism made considerable profits on facilitating psilocybin voyages, the court's finding would not change. To begin, for-profit businesses can claim religious-liberty protections because "[b]usiness practices [may be] compelled or limited by the tenets of a religious doctrine." *Hobby Lobby*, 573 U.S. at 710. So, a religious claimant's for-profit status—or by extension evidence that the claimant makes large sums of money from its religious activities—does not necessarily mean that its free-exercise claims are disingenuous. Religious protections, after all, are not only for the destitute. *See* Lukas Hund, *The Finances Behind Vatican City*, MICH. J. ECON. (May 24, 2022), https://sites.lsa.umich.edu/

---

[5] Mr. Jensen is divorced with four children. The federal poverty line for a family of five in 2025 is $37,650. *See* Office of the Assistant Sec'y for Planning and Eval., *Poverty Guidelines*, U.S. DEP'T OF HEALTH & HUM. SERVS., https://aspe.hhs.gov/topics/poverty-economic-mobility/poverty-guidelines (2025). Although he is now in a relationship with Ms. Lee, who works 20 to 30 hours earning $40 an hour at Singularism, Ms. Lee also has four children of her own. In any event, based on the evidence presented, the court finds that Mr. Jensen gave up a significantly more remunerative career to follow his religious calling to found Singularism.

mje/2022/05/24/the-finances-behind-vatican-city ("[T]he Roman Catholic Church[, which certainly qualifies for religious protections, is] one of the largest and wealthiest organizations in the world."). Moreover, prominent religions like the Church of Jesus Christ of Latter-day Saints, which no one would doubt qualifies for religious-liberty protections under the law, require payment of tithes for good-standing membership. *See* Peggy Fletcher Stack, *Does Tithing Requirement for Entry into LDS Temples Amount to Mormons Buying Their Way into Heaven?*, Salt Lake Trib. (Mar. 26, 2018), https://www.sltrib.com/religion/2018/03/26/does-tithing-requirement-for-entry-into-lds-temples-amount-to-mormons-buying-their-way-into-heaven ("[T]o gain access to the sacred spaces and saving rituals of a Mormon temple, LDS believers must donate 10 percent of their income to the church."). Singularism's payment expectation for its tea ceremonies is analogous and similarly does not negate its free-exercise claims.[6]

From all the evidence in the record, the court is hard-pressed to find, as Defendants urge, that Singularism is essentially a drug-dealing business cloaked in a minister's robe. To the contrary, the court is convinced that Singularism is a legitimate religion and that Plaintiffs are sincere practitioners of it. This is not a case where a group of people claim a religious right to do little more than use and distribute large quantities of drugs. *Compare with, e.g.*, *Quaintance*, 471 F. Supp. 2d at 1172 (officers seized enough marijuana for 229,000 joints, suggesting an illegal commercial rather than legitimate religious purpose); *Meyers*, 906 F. Supp. 2d at 1504 (marijuana church's "only ceremony revolve[d] around one act: the smoking and passing of joints"). By establishing the sincerity of their religious beliefs, Plaintiffs have fulfilled their responsibility of

---

[6] The court also heard evidence that Singularism has on occasion given discounts or performed ceremonies for free.

establishing a prima facie case under the Utah RFRA, shifting the burden to the government to demonstrate that the Utah Controlled Substances Act accomplishes a compelling state interest using the least restrictive means.

Defendants initially argue that the psilocybin ban serves the government's interests in preventing abuse, preventing possible harms from drug use such as suicidal ideation, and protecting the public from illicit drug trafficking. The court does not doubt that these interests are compelling in the abstract, but the government must go beyond "broadly formulated interests" like these to satisfy its burden. *Fulton*, 593 U.S. at 541 (quoting *O Centro*, 546 U.S. at 431). That is, "[t]he question . . . is not whether the [government] has a compelling interest in enforcing its [psilocybin laws] generally, but whether it has such an interest in denying an exception to [Plaintiffs]." *Id.* On this front, Defendants have cited studies showing that psilocybin is one of the most commonly used hallucinogens, that psilocybin trafficking is closely linked with trafficking for other drugs like fentanyl and marijuana, and that psilocybin mushrooms may be tainted and therefore cause harm to even sincere users. They also claim that the single search of Singularism's spiritual center in November yielded about 150 doses of psilocybin, a quantity that in their view is suspicious because it represents about half of all doses Singularism has administered in its 15-plus-month history.[7]

---

[7] Defendants base their calculations on the testimony of Plaintiffs' witnesses at the December 13 hearing. According to Mr. Jensen, about 100 voyagers have participated in a psilocybin ceremony through Singularism, each voyager participates in 2 to 4 ceremonies total, and the dose for each ceremony is anywhere between 2 and 3.5 grams of psilocybin mushrooms. Assuming that 100 voyagers have participated in 3 voyages each using 3 grams of psilocybin for each voyage, Singularism has administered 900 grams of psilocybin mushrooms total.

The parties disagree about the quantity of psilocybin mushrooms seized in November. According to Defendants, the single search in November yielded over 450 grams of mushrooms and mushroom-like material—half, if not more than half, of the total that Singularism has presumably

On the one hand, the evidence suggests that Plaintiffs ensure a high level of safety for Singularism's voyagers and the surrounding community. The mushrooms are tested at the lab in Oregon for contaminants before being freeze dried for transportation to Singularism's spiritual center, only facilitators have access to the mushrooms (which are never used other than in the sacramental tea ceremonies), and every voyager must undergo a careful screening process with two or more facilitators, at least one of whom has a background in medicine or clinical therapy. And when a voyager has a rare adverse reaction to the psilocybin (as has happened once in Singularism's history), Singularism and Mr. Jensen follow the safety protocol, which includes calling the voyager's emergency contacts, remaining at the facility in case the voyager returns, and getting the voyager treatment in the hospital if necessary.[8]

On the other hand, Singularism itself does not seem to have a rigorous method to test for contamination, and diversion to non-affiliates in theory could be occurring based on the quantity of psilocybin Singularism appears to keep on hand. That said, the government has not shown evidence of actual contamination or actual diversion in Plaintiffs' case. To be sure, the government can establish a compelling interest in denying Plaintiffs an exemption even without proof of actual diversion by pointing to evidence suggesting a real risk of diversion. *Christie*, 825 F.3d at 1057–

---

administered over 15 months. Plaintiffs speculate that the actual amount was closer to one-third of this amount, but because the mushrooms have been in the government's custody, Plaintiffs have not been able to ascertain the quantity. The court finds Defendants credible on this point and therefore takes 450 grams to be the quantity of mushrooms seized in November.

[8] As noted above, one voyager showed signs of paranoia and mistrust during a voyage, and Singularism coordinated her care with her emergency contacts and supported her receiving treatment in the hospital. The next day, she expressed gratitude to Singularism for ensuring her safety throughout her episode. The court finds that at no point during that episode did the voyager threaten her own or anyone else's physical safety.

58 (upholding a finding that the plaintiffs' assumedly religious use of cannabis created a real risk of diversion in part because of "lax enforcement of [their] distribution protocols"). But the evidence here fails to show that Plaintiffs' controlled, sincerely religious use of psilocybin more likely than not creates a meaningful risk of compromising the government's compelling interests. *See O Centro Espirita Beneficiente Uniao do Vegetal v. Ashcroft*, 282 F. Supp. 2d 1236, 1262 (D.N.M. 2002) (holding that the government had failed to show a compelling interest when the evidence as to the health risks of plaintiffs' sacramental use of hoasca was "in equipoise").

Even if the evidence supported a finding that the government had a compelling interest in denying Plaintiffs an exemption, the government must still show that its approach is the least restrictive means of accomplishing that interest. On this front too, the court concludes that the government has not met its burden. "The least-restrictive-means standard is exceptionally demanding, and it requires the government to show that it lacks other means of achieving its desired goal without imposing a substantial burden on the [plaintiff's] exercise of religion . . . ." *Holt v. Hobbs*, 574 U.S. 352, 364 (2015). Although the government need not "refute every conceivable option in order to satisfy the least restrictive means prong," it must "refute the alternative schemes offered by the challenger . . . through the evidence presented in the record." *United States v. Wilgus*, 638 F.3d 1274, 1289 (10th Cir. 2011). And it must "explain why obvious and available alternatives are not workable . . . , especially those that have been proven to work in analogous circumstances." *Singh v. Berger*, 56 F.4th 88, 104 (D.C. Cir. 2022); *see also Hobby Lobby*, 573 U.S. at 692 (noting that the government had already devised a less restrictive scheme for religious nonprofits and putting the burden on the government to explain why a similar scheme could not work for religious for-profit corporations).

Defendants argue that the burden rests on Plaintiffs to suggest alternative schemes. Although a religious plaintiff may sometimes be required to suggest an alternative regulation that lessens the burden on his religious exercise while still accomplishing the government's compelling interest, the burden of satisfying the least-restrictive-means prong ultimately rests on the government, which "must at a minimum explain why . . . [it] reject[s a] readily at hand alternative[]." *Singh*, 56 F.4th at 104. Here, the most obvious alternative at hand is for the government to simply do nothing. After all, the government waited over a year after Singularism opened its spiritual center—at which time Mr. Jensen had fully disclosed Singularism's practices—to perform its criminal investigation. Defendants have pointed to zero evidence that this do-nothing period threatened its interests in public safety.[9]

But assuming that some form of regulation is necessary for the government to protect the public, an alternative is readily at hand in the Utah Controlled Substances Act itself. Two alternatives, in truth. First, the Act creates an exemption for psylocibin administered as part of behavioral health treatment programs developed by certain healthcare systems and imposes relatively few restrictions on how covered healthcare systems may use psilocybin.[10] UTAH CODE ANN. § 58-37-3.5. The main restrictions are that the drug must be in phase 3 testing by the U.S.

---

[9] Plaintiffs have also submitted evidence that the Divine Assembly, a far larger self-described magic-mushroom church based in Salt Lake County with a possible presence in Utah County, has never been investigated or threatened, despite that the Divine Assembly even sells home-growing mushroom kits and membership cards. *See Are You Ready to Grow Mushrooms?*, THE DIVINE ASSEMBLY, https://www.thedivineassembly.org/grow-kits.

[10] The exemption applies to private, non-profit healthcare systems that operate at least 15 hospitals in the state and healthcare systems affiliated with public institutions of higher education. It thus appears that the exemption is essentially private legislation for Intermountain Healthcare (the only private healthcare system operating at least 15 hospitals in the state) and University of Utah Health Care (the only healthcare system affiliated with a public institution of higher education in the state).

Food and Drug Administration, that it must be used under the supervision of a "licensed" provider, and that it may not be used by minors. *Id.* § 58-37-3.5(1), (3). Other than that, it appears that healthcare systems have wide discretion to determine how to administer psilocybin. Defendants do not attempt to explain why the government could not implement an analogous system of oversight for Singularism's sincere religious practices. The evidence in the record suggests it would not be particularly difficult to do so. Singularism already does not administer the drug to minors, and the Utah Department of Commerce Division of Professional Licensing recently determined that Mr. Jensen qualifies for a clergy exemption to the licensing requirement for mental-health practitioners. It also likely would not be difficult for Plaintiffs to ensure that their psilocybin is of the same variety allowed by the behavioral-treatment exemption.

Second, the Act creates a religious exemption for peyote. That exemption provides, "Civil or criminal liability may not be imposed under this section on any Indian . . . who uses, possesses, or transports peyote for bona fide traditional ceremonial purposes in connection with the practice of a traditional Indian religion . . . ." UTAH CODE ANN. § 58-37-8(12)(a). The Act requires no more of the claimant than that the claimant use (or possess or transport) the peyote for sincere religious purposes connected with a Native American religion, and the exemption provides the claimant an affirmative defense (established by a preponderance of the evidence) in a prosecution alleging a violation of the Act regarding peyote. *Id.* § 58-37-8(12)(b). Peyote, like psilocybin, is a Schedule I controlled substance. *Id.* § 58-37-4(2)(a)(iii)(V), (Y). Defendants do not attempt to explain why the government could not create a similar exemption for sincere religious use of psilocybin. Defendants thus have not satisfied the least-restrictive-means component of strict scrutiny, so Plaintiffs have shown a likelihood of success on the merits of their statutory free-exercise claim.

Although the likelihood of success on the merits often controls the outcome in a case like this one where the motion for preliminary injunction is based on a quasi–First Amendment claim, the court must still consider irreparable harm and the public interest. Plaintiffs have satisfied the court that they will be irreparably harmed absent preliminary relief. Defendants' enforcement of the Utah Controlled Substances Act against Plaintiffs and Defendants' continued possession of the psilocybin mushrooms seized in November deprive Plaintiffs of their religious sacrament. And Plaintiffs have introduced evidence that Singularism is losing adherents because of Defendants' actions. No amount of damages later can compensate Plaintiffs for these injuries. As to the public interest, it "favors [P]laintiffs' assertion of their [quasi–]First Amendment rights," particularly because Defendants have not shown that Plaintiffs' actions have threatened public safety. *Elam Constr., Inc. v. Reg'l Transp. Dist.*, 129 F.3d 1343, 1347 (10th Cir. 1997).

"[S]o long as the government can achieve its interests in a manner that does not burden religion, it must do so." *Fulton*, 593 U.S. at 541. The government has not done so here, and the court accordingly grants Plaintiffs' motion for a preliminary injunction. Defendants are ordered to return the psilocybin mushrooms seized in November along with any other items seized and not yet returned. Moving forward, Defendants are also ordered not to interfere with Plaintiffs' sincere religious use of psilocybin until this litigation is complete. That means Defendants may not treat Plaintiffs' sincere religious use of psilocybin from the date of this order as unlawful under the Utah Controlled Substances Act. Note that this injunction does not prevent the government from

continuing to prosecute Mr. Jensen in the pending state criminal case.[11] Indeed, the court lacks

authority at this point to enjoin or interfere with any proceedings in state court.[12]

_____

[11] In their motion to stay a portion of the court's temporary restraining order, Defendants argued that requiring immediate return of the mushrooms would jeopardize the state prosecution and force the government to violate evidence-retention laws. Out of an abundance of caution, the court granted Defendants' motion for a partial stay, although the court expressed skepticism about these arguments. Now, having had the opportunity to consider these arguments in greater depth, the court finds them unconvincing and deems it appropriate to require the government to return the mushrooms.

As for the first contention, requiring return of the mushrooms will not stymie the state criminal case because that case turns entirely on the purely legal question of whether Mr. Jensen is entitled to a religious exemption under the Utah RFRA. After all, Mr. Jensen admitted in open court during the December 13 hearing that he possessed, used, and administered psilocybin. The government may use his testimony to establish the elements of a Controlled Substances Act violation should Mr. Jensen put the government to its proof; the government will not need the physical mushrooms.

Regarding the second contention, it is true that the government is ordinarily required to "retain evidence of a felony offense" while a criminal case is pending (and Mr. Jensen's prima facie violation of the Controlled Substances Act is a felony offense). UTAH CODE ANN. § 77-11c-301(1). But the claimant of the property "may file a petition . . . for the return of the property that is being retained as evidence" in "the court in which criminal proceedings have commenced" or in "the district court with [proper] venue . . . if there are no pending criminal proceedings." *Id.* § 77-11a-305(1)(a), (b). If the claimant establishes "by clear and convincing evidence" that he "may lawfully possess the property," then "the court may order that the property [be] . . . returned to the claimant." *Id.* § 77-11a-305(2)(b)(i), (3)(b).

When Plaintiffs first filed for a temporary restraining order and preliminary injunction requiring return of the mushrooms, no criminal proceedings were pending. Plaintiffs filed their complaint in the Utah County Fourth District Court, the same court where the criminal proceedings against Mr. Jensen are now pending. Before that court could assess Plaintiffs' claim for return of the mushrooms, Defendants removed the action to this court. Given the factual findings and legal analysis above, this court finds by clear and convincing evidence that Plaintiffs have established that they may lawfully possess the mushrooms. Utah law requires then that "the agency with custody of the [mushrooms] . . . return [them] to [Plaintiffs] as expeditiously as possible." *Id.* § 77-11a-305(4).

[12] The Anti-Injunction Act, 28 U.S.C. § 2283, prohibits federal courts from granting injunctions to stay proceedings in a state court except in three limited circumstances. One of these is when an Act of Congress has "expressly authorized" the federal court to grant the injunction, *id.* Section 1983, under which Plaintiffs have brought their constitutional claims, "is an Act of Congress that falls within the 'expressly authorized' exception." *Mitchum v. Foster*, 407 U.S. 225, 243 (1972). But enjoining the state-court prosecution under § 1983 would require the court to evaluate

*    *    *

"Religious liberty is one of America's great contributions to the world." Douglas Laycock, *Religious Liberty and the Culture Wars*, 2014 Univ. Ill. L.R. 839, 840. But a commitment to religious liberty in the abstract does not dictate one way or another whether a religious group like Singularism should receive an exemption from a State's controlled-substances law. Abstract commitments must be instantiated through concrete legal regimes, and different societies claiming fealty to the same abstract religious-liberty principle may choose different legal regimes. Whatever legal regime a society chooses, however, it must apply its protections equally to unpopular or unfamiliar religious groups as to popular or familiar ones if that commitment to religious liberty is to mean anything. As sang Jonas Gwangwa, a South African jazz musician who was exiled by the apartheid government, "Freedom for some is freedom for none." Indeed, the very founding of the State of Utah reflects the lived experience of that truth by members of the Church of Jesus Christ of Latter-day Saints. Perhaps it is ironic then that not long after enacting its RFRA to provide special protections for religious exercise, the State of Utah should so vigorously deploy its resources, particularly the coercive power of its criminal-justice system, to harass and shut down a new religion it finds offensive practically without any evidence that that religion's practices have imposed any harms on its own practitioners or anyone else.

---

Plaintiffs' constitutional claims, which the court may not do until the Attorney General of Utah has had an opportunity to present evidence or argument on those claims.

## CONCLUSION AND ORDER

The court **ORDERS** Defendants to return any items seized from Singularism's spiritual

center not yet returned as soon as possible but no later than 14 days from the date of this order.

The court also **ORDERS** Defendants to not interfere with Plaintiffs' sincere religious use of

psilocybin from the date of this order until this litigation is complete.


Signed February 20, 2025.

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge

38

App-5:155

# Attachment C

Order Granting Temporary Restraining Order (December 18, 2024)

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BRIDGER LEE JENSEN, SINGULARISM, and PSYCHE HEALING AND BRIDGING,<br><br>Plaintiffs,<br><br>v.<br><br>UTAH COUNTY, PROVO CITY, JEFFREY GRAY, TROY BEEBE, BRIAN WOLKEN, and JACKSON JULIAN,<br><br>Defendants. | **ORDER GRANTING TEMPORARY RESTRAINING ORDER**<br><br>Case No. 2:24-cv-00887-JNP-CMR<br><br>District Judge Jill N. Parrish |

Plaintiffs are members and affiliates of Singularism, a new religion founded in 2023. Singularism uses psylocibin as a sacrament in its ceremonies conducted at its center in Provo, Utah. Psylocibin is a Schedule I controlled substance banned under the Utah Controlled Substances Act ("CSA") with narrow exceptions, UTAH CODE ANN. § 58-37-1 et seq.

On November 11, 2024, Provo City law enforcement executed a search warrant at Singularism's address and seized psylocibin mushrooms and records considered by Singularism to be sacred scripture. Plaintiffs then filed for a temporary restraining order and preliminary injunction, invoking the Free Exercise Clause of the First Amendment to the U.S. Constitution, the free exercise clause of the Utah constitution, and Utah's Religious Freedom Restoration Act ("RFRA"), UTAH CODE ANN. § 63G-33-201. Defendants removed the action to federal court.

Under federal law, a plaintiff moving for a temporary restraining order or preliminary injunction must show that (1) he has a substantial likelihood of success on the merits; (2) he is

likely to suffer irreparable harm absent the preliminary relief; (3) the threatened harm outweighs the harm the preliminary relief would pose to the opposing party; and (4) the preliminary relief would not adversely affect the public interest. *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 112 (10th Cir. 2024). When the government is the opposing party, the third and fourth factors merge. *Id.*

Based on the materials filed with the briefing and the testimony the court heard on December 13, the court concludes that Plaintiffs have shown a likelihood of success on their claim under the Utah RFRA. Under that law, once a plaintiff shows a substantial burden on his free exercise of religion, the government must show that the challenged regulation serves a compelling government interest and that the regulation is the least restrictive means of accomplishing that interest. UTAH CODE ANN. § 63G-33-201(3). The court credits the testimony of Plaintiffs' witnesses, finding that Plaintiffs are likely to be able to show a substantial burden on the exercise of their beliefs about psylocibin, that those beliefs are sincere, and that those beliefs are religious in the way that the law conceptualizes religion. The court also finds that the government has not shown a compelling interest in prohibiting Singularism from using psylocibin outright and accordingly has not carried its burden.

Defendants claim that the court does not have jurisdiction over the action because Plaintiffs have not satisfied the 60-day notice requirement in the Utah RFRA. *See id.* § 63G-33-201(5)(a). The court finds that Plaintiffs satisfy the requirements for the exception for "ongoing" government action, *id.* § 63G-33-201(5)(b)(i). The deprivation of their psylocibin and records is ongoing, and requiring Plaintiffs to wait until the 60-day window passes would impose an "undue hardship," *id.*

The court also finds that Plaintiffs have shown that they will suffer irreparable harm absent preliminary relief. The ongoing deprivation of their psylocibin and scripture hinders their free exercise of religion, and no amount of damages later can fully compensate for this harm.

Finally, the court also finds that the balance of the equities favors Plaintiffs. The government has identified no harm to either Plaintiffs or society more broadly from Plaintiffs' sacramental use of psylocibin.

Accordingly, the court **GRANTS** Plaintiffs' motion for a TRO. Defendants are **ORDERED** to return the psylocibin and records seized on November 11 to Plaintiffs as soon as possible. This TRO shall remain in place until the court either dissolves it or converts it into a preliminary injunction. If Defendants wish to present further evidence or argument for the court to consider in ruling on the motion for preliminary injunction, they may request the court no later than December 20 to schedule another hearing.

So ordered December 13, 2024.

BY THE COURT

Jill N. Parrish
United States District Court Judge

3

App-3:025