No. 25-4115

UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

_____

BRIDGER LEE JENSEN, SINGULARISM, AND PSYCHE HEALING AND BRIDGING, LLC,
*Plaintiffs - Appellees*,

v.

UTAH COUNTY, PROVO CITY, AND JEFFREY GRAY,
*Defendants- Appellants*.

_____

On appeal from the United States District Court, District of Utah,
The Honorable Jill N. Parrish, No. 2:24-cv-00887-JNP-CMR

_____

**APPELLANTS' APPENDIX**
**Volume 1 of 8**

_____

Respectfully submitted,

Troy L. Booher
Caroline A. Olsen
ZIMMERMAN BOOHER
341 South Main Street, Fourth Floor
Salt Lake City, Utah 84111
tbooher@zbappeals.com
colsen@zbappeals.com
(801) 924-0200

*Attorneys for Appellants*

_____

December 10, 2025

App-1:001

**Additional Counsel**

Mitchell A. Stephens
Justin L. James
Dillon P. Olson
JAMES DODGE RUSSELL & STEPHENS, P.C.
545 East 300 South
Salt Lake City, Utah 84102
(801) 363-6363
mstephens@jdrslaw.com
jjames@jdrslaw.com
dolson@jdrslaw.com

*Attorneys for Appellants Utah County and Jeffrey Gray*

J. Brian Jones
Gary D. Millward
Nicholas Muhlestein
Richard A. Roberts
PROVO CITY ATTORNEY'S OFFICE
445 W Center Street, Suite 300
Provo, Utah 84601
(801) 852-6140
bjones@provo.gov
gmillward@provo.gov
nmuhlestein@provo.gov
rroberts@provo.gov

*Attorneys for Appellant Provo City*

| USDC Dkt. No. | Date Filed | Description | App- |
|---|---|---|---|
| | | **Volume 1 of 8** | |
| | | District Court docket | 1:017 |
| 002 | 11/27/24 | Notice of Removal | 1:035 |
| 002-02[1] | | Verified Complaint and Jury Demand | 1:039 |
| 002-03 | | [State District Court] Docket | 1:072 |
| 009 | 12/04/24 | Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction | 1:076 |
| 009-01 | | Exhibit A — Declaration of Bridger Jensen, November 19, 2024 | 1:116 |
| 009-02 | | Exhibit B — Letters from Tanner Bean to Mayor Michelle Kaufusi, Provo City Council, and Utah County Attorney's Office | 1:124 |
| 009-03 | | Exhibit C — Singularism attestation | 1:132 |
| 009-04 | | Exhibit D — Declaration of Allan Johnson, November 18, 2024 | 1:142 |
| 009-05 | | Exhibit E — Declaration of Brandi Lee, November 18, 2024 | 1:146 |
| 009-06 | | Exhibit F — Declaration of Marjorie Johnson, November 18, 2024 | 1:151 |
| 009-07 | | Exhibit G — Declaration of Jennifer Denbleyker, November 18, 2024 | 1:155 |

---

[1] Docket numbers match the document bookmarks. Leading zeros are used for organization.

1

| USDC Dkt. No. | Date Filed | Description | App- |
|---|---|---|---|
| 009-08 | | Exhibit H — Declaration of Jake Wood, November 18, 2024 | 1:159 |
| 009-09 | | Exhibit I — Search Warrant, November 4, 2024 | 1:163 |
| 009-11[2] | | Exhibit K — Letter from Provo City Police Department to Utah Foot and Ankle LLC [Landlord] | 1:166 |
| 009-12 | | Exhibit L — Letter from Utah Foot and Ankle LLC [Landlord] to Provo City Police Department | 1:168 |
| 009-13 | | Exhibit M — Emails between DOPL and Jensen and Bean | 1:170 |
| 009-14 | | Exhibit N — Settlement Agreement *CEC v. Garland*, 22-cv-01004-SRB (D. Ariz.) | 1:179 |
| 009-15 | | Exhibit O — Human hallucinogen research: guidelines for safety | 1:211 |
| 009-16 | | Exhibit P — Singularism: Articles of Belief and Governance | 1:230 |
| 009-17 | | Exhibit Q — Singularism beliefs | 1:235 |
| 013 | 12/09/24 | Defendants' Joint Memorandum Opposing Motion for Temporary Restraining Order and Preliminary Injunction | 1:245 |
| 013-01 | | Exhibit A — Julian Affidavit for Search Warrant, November 4, 2024 | 1:292 |

---

[2] Docket 9-10 is a duplicate of Exhibit B [Dkt. 9-2].

2

| USDC Dkt. No. | Date Filed | Description | App- |
|---|---|---|---|
| | | **Volume 2 of 8** | |
| 013-02 | | Exhibit B — Google Reviews | 2:004 |
| 013-03 | | Exhibit C — BridgerLeeJensen.com | 2:006 |
| 013-04 | | Exhibit D — LinkedIn | 2:019 |
| 013-05 | | Exhibit E — Psychedelic Therapy Academy | 2:025 |
| 013-06 | | Exhibit F — Facilitator Application | 2:038 |
| 013-07 | | Exhibit G — Mental Gurus | 2:044 |
| 013-08 | | Exhibit H — Bridger Lee Jensen Facebook | 2:059 |
| 013-09 | | Exhibit J — Reveal Myself | 2:065 |
| 013-10 | | Exhibit K — Psyche Healing (State) | 2:097 |
| 013-11 | | Exhibit L — Psyche Healing (Provo) | 2:100 |
| 013-12 | | Exhibit M — Psychedelic Conference | 2:102 |
| 013-13 | | Exhibit N — Psychedelic Therapy Journey | 2:118 |
| 013-14 | | Exhibit O — Search Warrant | 2:148 |
| 013-15 | | Exhibit P — Return to Search Warrant | 2:151 |
| 014 | 12/10/24 | Docket Text Order | 2:153 |
| 019 | 12/11/24 | Plaintiffs' Reply Brief in Support of Motion for Temporary Restraining Order and Preliminary Injunction[3] | 2:154 |

[3] Due to the filing of an errata, Dkt. 21, the exhibits to Dkt. 19 were omitted.

3

| USDC Dkt. No. | Date Filed | Description | App- |
|---|---|---|---|
| 021 | 12/12/24 | Plaintiffs' Notice of Errata Regarding Exhibits Filed with Reply in Support of Motion for Temporary Restraining Order and Preliminary Injunction | 2:196 |
| 021-01 | | Exhibit R — Singularism creation story | 2:199 |
| 021-02 | | Exhibit S — Singularism beliefs and creed | 2:216 |
| 021-03 | | Exhibit T — September 8, 2023 Letter from Tanner Bean | 2:277 |
| 021-04 | | Exhibit U - Julian Affidavit for Search Warrant (redacted), November 4, 2024 | 2:280 |
| **Volume 3 of 8** | | | |
| 021-05 | | Exhibit V — Supplemental Declaration of Bridger Jensen, December 11, 2024 | 3:005 |
| 022 | 12/13/24 | Minute Entry for 12/13/24 hearing | 3:021 |
| 024 | 12/16/24 | Order Granting Temporary Restraining Order | 3:023 |
| 032 | 12/18/24 | Defendants' Expedited Motion to Stay or Modify Order Requiring Return of Psilocybin | 3:026 |
| 036 | 12/19/24 | Order Temporarily Staying TRO Requiring Return of Mushrooms and Reiterating Previous Order to Notify Court of Any Request for Additional Evidentiary Hearing | 3:037 |
| 037 | 12/19/24 | Plaintiffs' Status Report and Request for Preliminary Injunction Hearing | 3:040 |

4

| USDC Dkt. No. | Date Filed | Description | App- |
|---|---|---|---|
| 038 | 12/19/24 | Plaintiffs' Opposition to Defendants' Expedited Motion to Stay or Modify Order Requiring Return of Psilocybin | 3:043 |
| 039 | 12/19/24 | Plaintiffs' Motion for Anti-Suit Injunction | 3:056 |
| 039-01 | | Exhibit A — Criminal Indictment | 3:065 |
| 040 | 12/19/24 | Defendants' Motion to Dismiss | 3:069 |
| 044 | 12/20/24 | Defendants' Joint Motion for Expedited Discovery | 3:093 |
| 044-01 | | Exhibit 1 — Defendants' Expedited Preliminary Injunction Discovery Requests | 3:098 |
| 047 | 12/23/24 | Plaintiffs' Opposition to Defendants' Joint Motion for Expedited Discovery | 3:106 |
| 049 | 12/27/24 | Defendants' Reply in Support of Joint Motion for Expedited Discovery | 3:117 |
| 050 | 01/02/25 | Defendants' Memorandum in Opposition to Motion for Anti-Suit Injunction | 3:130 |
| 051 | 01/02/25 | Defendants' Reply Memorandum in Support of Expedited Motion to Stay or Modify Order Requiring Return of Psilocybin | 3:151 |
| 056 | 01/07/25 | Memorandum Decision and Order Granting Defendants' Motion for Stay and Denying Defendants' Motion for Expedited Discovery | 3:161 |
| 057 | 01/07/25 | Protective Order | 3:170 |

5

| USDC Dkt. No. | Date Filed | Description | App- |
|---|---|---|---|
| 058 | 01/09/25 | Plaintiffs' Reply in Support of Motion for Anti-Suit Injunction | 3:172 |
| 059 | 01/14/25 | Plaintiffs' Opposition to Defendants' Motion to Dismiss | 3:184 |
| 066 | 01/21/25 | Defendants' Supplemental Memorandum Supporting Joint Opposition to Preliminary Injunction | 3:208 |
| 067 | 01/22/25 | Stipulation of All Parties Regarding January 23-24, 2025, Hearing | 3:221 |
| 069 | 01/22/25 | Defendants' Reply Memorandum in Support of Motion to Dismiss | 3:225 |
| 071 | 01/22/25 | Plaintiffs' Supplemental Brief in Support of Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction | 3:240 |
| 071-01 | | ExW — Forensic Analysis Report-Controlled Substance Analysis | 3:259 |
| 071-02 | | ExX — Second Supplemental Declaration of Bridger Jensen | 3:262 |
| 071-03 | | ExY — Claire's Voluntary Statement | 3:269 |
| **Volume 4 of 8** | | | |
| 071-05[4] | | ExAA — Letter from Provo City re no business license needed | 4:004 |
| 071-06 | | ExBB — Police report (updated through Dec. 2, 2024) | 4:006 |

---

[4] 071-4 is ExZ: a slipsheet for body camera footage that is not pertinent on appeal.

6

App-1:008

| USDC Dkt. No. | Date Filed | Description | App- |
|---|---|---|---|
| 071-07 | | ExCC — News article | 4:027 |
| 071-08 | | ExDD — Two FinCEN Reports | 4:033 |
| 073 | 01/22/25 | Plaintiffs' Written Consent to Filing of First Amended Verified Complaint | 4:055 |
| 073-2 | | First Amended Complaint redline | 4:058 |
| 083 | 02/05/25 | Plaintiffs' First Amended Verified Complaint | 4:098 |
| 083-01 | | Exhibit A — Singularism attestation to beliefs | 4:135 |
| 083-02 | | Exhibit B — Search Warrant | 4:145 |
| 083-03 | | Exhibit C — Property Report Utah County Major Crimes Task Force | 4:148 |
| 083-04 | | Exhibit D — Letter from Provo City Police Department to Utah Valley Foot and Ankle LLC | 4:150 |
| 083-05 | | Exhibit E — Letter from Utah Valley Foot and Ankle LLC to Provo City Police Department | 4:152 |
| 083-06 | | Exhibit F — Settlement Agreement, *CEC et al. v. Garland et al.*, 22-cv-01004-SRB (D. Ariz.) | 4:154 |
| 083-07 | | Exhibit G — USDC March 20, 2023 Order, *CEC v. Garland*, 22-cv-01004-SRB (D. Ariz.) | 4:172 |
| 083-08 | | Exhibit H — Jensen/DOPL email exchange | 4:187 |

7

App-1:009

| USDC Dkt. No. | Date Filed | Description | App- |
|---|---|---|---|
| 083-09 | | Exhibit I — Letter from Provo 311 Customer Service to Jensen | 4:196 |
| 084 | 02/05/25 | Defendants' Supplemental Memorandum of Authorities Pursuant to Court Order | 4:198 |
| 084-01 | | Exhibit A — Declaration of Jackson Julian | 4:216 |
| 084-02 | | Exhibit B — Therapeutic Use of Psilocybin | 4:277 |
| **Volume 5 of 8** | | | |
| 084-03 | | Exhibit C — Psilocybin Assisted Therapy | 5:004 |
| 084-04 | | Exhibit D — TRO Transcript Excerpts | 5:024 |
| 084-05 | | Exhibit E — Psyche Healing Business License | 5:029 |
| 084-06 | | Exhibit F — Singularism Business Application | 5:031 |
| 084-07 | | Exhibit G — Divine Assembly Utah Business Registration | 5:034 |
| 084-08 | | Exhibit H — Divine Assembly Articles of Incorporation | 5:038 |
| 084-09 | | Exhibit I — Divine Assembly Facebook Page | 5:043 |
| 085 | 02/05/25 | Plaintiffs' Second Supplemental Brief in Support of Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction | 5:045 |

8

| USDC Dkt. No. | Date Filed | Description | App- |
|---|---|---|---|
| 085-01 | | Exhibit FF — Third Supplemental Declaration of Bridger Jensen | 5:067 |
| 085-02 | | Exhibit GG — Divine Assembly | 5:079 |
| 085-03 | | Exhibit HH — Claire Hart Waiver (redacted) | 5:083 |
| 085-04 | | Exhibit II — Oregon CSA | 5:094 |
| 088 | 02/10/25 | Certification Under 28 U.S.C. § 2403 | 5:115 |
| 092 | 02/20/25 | Order Granting Motion for Preliminary Injunction | 5:118 |
| 096 | 04/11/25 | Utah Attorney General's Response to Certification of Plaintiffs' as Applied Constitutional Challenge to the Utah Controlled Substances Act Under 28 U.S.C. § 2403 | 5:156 |
| 099 | 06/03/25 | Stipulated Motion to Stay Proceedings | 5:159 |
| 101 | 06/03/25 | Order Granting Stipulated Motion for Stay | 5:161 |
| 102 | 08/04/25 | Memorandum Decision and Order Denying Defendants' Motion to Dismiss and Granting Plaintiffs' Motion for Anti-Suit Injunction | 5:162 |
| 105 | 08/29/25 | Defendants' Notice of Appeal | 5:194 |
| 106 | 09/02/25 | Defendants' Answer to First Amended Verified Complaint | 5:196 |

9

| USDC Dkt. No. | Date Filed | Description | App- |
|---|---|---|---|
| **Volume 6 of 8 — Exhibits** | | | |
| 028 | 12/16/2024 | Plaintiffs' Exhibits Related to 12/13/2024 Hearing | 6:005 |
| 028-01 | | ExW — Jensen's Oklevueha Native American Church Official Membership Card | 6:008 |
| 028-02 | | ExX — Plaintiffs' notice of claim | 6:011 |
| 029 | 12/17/2024 | Defendants' Exhibits Related to 12/13/2024 Hearing | 6:016 |
| 029-01 | | ExQ — Binder | 6:018 |
| 029-02 | | ExR — Notes 11-2-23 | 6:031 |
| 029-03 | | ExS — Notes 10-3-24 | 6:033 |
| 074 | 01/22/25 | Exhibit List Stipulation of All Parties Regarding January 23-24, 2025, Hearing | 6:035 |
| 074-01 | | Exhibit A — January 13, 2025, letter from Provo City, Subject: Business License Not Required for Religious Organizations | 6:038 |
| 074-02 | | Exhibit B — November 27, 2024, Forensic Analysis Report-Controlled Substance Analysis | 6:040 |
| 074-03 | | Exhibit C — Provo Police, Officer Report for Incident 24PR24922 (updated copy through December 2, 2024) | 6:043 |

10

App-1:012

| USDC Dkt. No. | Date Filed | Description | App- |
|---|---|---|---|
| 074-04 | | Exhibit D — November 28, 2023, FinCEN Continuing Activity Report | 6:064 |
| 074-05 | | Exhibit E — March 12, 2024, FinCEN Continuing Activity Report | 6:076 |
| 074-06 | | Exhibit F — Psychedelic Mushroom Interest Grows in Utah With Center Opening in Provo, FOX 13 News (Nov. 2, 2023) | 6:087 |
| 074-08[5] | | Exhibit H — Voluntary Statement Form, 25PR01087, Jan. 17, 2025 (some information redacted under Federal Rule of Civil Procedure 5.2) | 6:093 |
| 074-10[6] | | Exhibit J1 — Website prints for: Singularism | 6:096 |
| 074-11 | | Exhibit J2 — Website prints for: Bridger Lee Jensen | 6:161 |
| 074-12 | | Exhibit J3 — Website prints for: Psychedelic Therapy Journey | 6:174 |
| 074-13 | | Exhibit J4 — Website prints for: Jensen's LinkedIn | 6:204 |
| 074-14 | | Exhibit J5 — Website prints for: Psychedelic Therapy Academy | 6:210 |
| 074-15 | | Exhibit K — Certificate of Organization for Psyche Healing and Bridging, LLC | 6:228 |

---

[5] Docket 74-7 is Exhibit G: a slipsheet for body camera footage that is not pertinent on appeal.

[6] Docket 74-9 is Exhibit I: a slipsheet for audio that is not pertinent on appeal.

11

| USDC Dkt. No. | Date Filed | Description | App- |
|---|---|---|---|
| 074-16 | | Exhibit L — Police and EMT reports from Jan. 16, 2025 (some information redacted under Federal Rule of Civil Procedure 5.2) | 6:231 |
| 074-19[7] | | Exhibit O — State court criminal docket | 6:245 |

| USDC Dkt. No. | Hearing Date | Description | App- |
|---|---|---|---|
| **Volume 7 of 8 — Transcript** | | | |
| 053-1 | 12/13/24 | Hearing transcript — Motion for Temporary Restraining Order and Motion for Preliminary Injunction | 7:003 |
| **Volume 8 of 8 — Transcript** | | | |
| 090 | 01/23/25 | Hearing transcript — Motion for Anti-Suit Injunction and Motion to Dismiss | 8:003 |

---

[7] Dockets 74-17 and 74-18 are Exhibits M and N: slipsheets for video and audio that are not pertinent on appeal.

12

## Certificate of Digital Submission

I hereby certify that with respect to the Appellants' Appendix Volumes 1-8:

(1)    any required privacy redactions have been made;

(2)    any paper copies of the Appellant's Appendix Volumes 1-8 to be filed with the court are exact copies of the scanned appendix; and

(3)    the digital submissions have been scanned for viruses with Microsoft Defender Antivirus Security intelligence version 1.443.15.0 (updated December 10, 2025) and according to the program are free of viruses.

Dated this 10th day of December, 2025.

s/ Caroline Anais Olsen
Troy L. Booher
Caroline Anais Olsen
ZIMMERMAN BOOHER
Felt Building, Fourth Floor
341 South Main Street
Salt Lake City, UT 84111
tbooher@zbappeals.com
colsen@zbappeals.com
(801) 924-0200
*Attorneys for Appellants*

13

## Certificate of Service

I hereby certify that on the 10th day of December, 2025, I caused the

*Appellants' Appendix Volumes 1-8* to be filed via the CM/ECF System, which

electronically served the following:

Tanner James Bean (tbean@fabianvancott.com)
Jacqueline Rosen (jrosen@fabianvancott.com)
FABIAN VANCOTT

s/ Caroline Anais Olsen
Troy L. Booher
Caroline Anais Olsen
ZIMMERMAN BOOHER
Felt Building, Fourth Floor
341 South Main Street
Salt Lake City, UT 84111
tbooher@zbappeals.com
colsen@zbappeals.com
(801) 924-0200
*Attorneys for Appellants*

14

STAYED,(b)(1)(A),MAG,APPEAL,JURY,LC2

Email All Attys
Email All Attys and Secondary Emails

## US District Court Electronic Case Filing System
## District of Utah (Central)
## CIVIL DOCKET FOR CASE #: 2:24−cv−00887−JNP−CMR

Jensen et al v. Utah County et al
Assigned to: Judge Jill N. Parrish
Referred to: Magistrate Judge Cecilia M. Romero
Case in other court:  Fourth Judicial District of Utah County,
                        240406123
Cause: 28:1441 Notice of Removal− Civil Rights Act

Date Filed: 11/27/2024
Jury Demand: Both
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Bridger Lee Jensen**
*an individual*

represented by **Jacqueline Rosen**
FABIAN VANCOTT
95 S STATE ST STE 2300
SALT LAKE CITY, UT 84111−2323
435−776−5062
Email: jrosen@fabianvancott.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Number: 18530*
*Bar Status: Active*

**Tanner J. Bean**
FABIAN VANCOTT
95 S STATE ST STE 2300
SALT LAKE CITY, UT 84111−2323
801−323−2266
Email: tbean@fabianvancott.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Number: 17128*
*Bar Status: Active*

**Anna Pitcher Christiansen**
CHRISTENSEN & JENSEN PC
257 E 200 S STE 1100
SALT LAKE CITY, UT 84111
801−317−3564
Email: anna.christiansen@chrisjen.com
*TERMINATED: 01/28/2025*
*ATTORNEY TO BE NOTICED*
*Bar Number: 17518*
*Bar Status: Active*

**Plaintiff**

represented by

1

App-1:017

Appellate Case: 25-4115    Document: 26-1    Date Filed: 12/11/2025    Page: 18

Case 2:24-cv-00887-JNP-CMR    Document 107-1    Filed 09/09/25    PageID.2769    Page
Appellate Case: 25-4115    Document 2 of 52    Date Filed: 09/09/2025    Page: 3

**Singularism**
*a non−profit corporation*

**Jacqueline Rosen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Number: 18530*
*Bar Status: Active*

**Tanner J. Bean**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Number: 17128*
*Bar Status: Active*

**Anna Pitcher Christiansen**
(See above for address)
*TERMINATED: 01/28/2025*
*ATTORNEY TO BE NOTICED*
*Bar Number: 17518*
*Bar Status: Active*

**Plaintiff**

**Psyche Healing and Bridging**
*LLC; a limited liability company*
*doing business as*
Psychedelic Therapy Journey

represented by **Jacqueline Rosen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Number: 18530*
*Bar Status: Active*

**Tanner J. Bean**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Number: 17128*
*Bar Status: Active*

**Anna Pitcher Christiansen**
(See above for address)
*TERMINATED: 01/28/2025*
*ATTORNEY TO BE NOTICED*
*Bar Number: 17518*
*Bar Status: Active*

V.

**Defendant**

**Utah County**
*a political subdivision*

represented by **Mitchell A. Stephens**
JAMES DODGE RUSSELL &
STEPHENS PC
545 E 300 S
SALT LAKE CITY, UT 84102

2

App-1:018

801−363−6363
Email: mstephens@jdrslaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Number: 11775*
*Bar Status: Active*

**Dillon P. Olson**
JAMES DODGE RUSSELL &
STEPHENS
545 E 300 S
SALT LAKE CITY, UT 84102
801−363−6363
Email: dolson@jdrslaw.com
*ATTORNEY TO BE NOTICED*
*Bar Number: 16120*
*Bar Status: Active*

**Justin L. James**
JAMES DODGE RUSSELL &
STEPHENS
545 E 300 S
SALT LAKE CITY, UT 84102
801−363−6363
Email: jjames@jdrslaw.com
*ATTORNEY TO BE NOTICED*
*Bar Number: 15167*
*Bar Status: Active*

**Lara A. Swensen**
JAMES DODGE RUSSELL &
STEPHENS
545 E 300 S
SALT LAKE CITY, UT 84102
801−363−6363
Email: lswensen@jdrslaw.com
*ATTORNEY TO BE NOTICED*
*Bar Number: 8493*
*Bar Status: **RegLapsed***

**Defendant**

| | | |
|---|---|---|
| **Provo City**<br>*a political subdivision* | represented by | **Gary DeMott Millward**<br>PROVO CITY ATTORNEYS OFFICE<br>351 W CENTER ST<br>PO BOX 1849<br>PROVO, UT 84603<br>(801)852−6141<br>Email: gmillward@provo.org<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br>*Bar Number: 12170*<br>*Bar Status: Active* |

3

App-1:019

Appellate Case: 25-4115    Document: 26-1    Date Filed: 12/11/2025    Page: 20

Case 2:24-cv-00887-JNP-CMR    Document 107-1    Filed 09/09/25    PageID.2771    Page
Appellate Case: 25-4115    Document 4 of 52    Date Filed: 09/09/2025    Page: 5

**Richard A. Roberts**
PROVO CITY − LEGAL DEPARTMENT
445 W CENTER ST STE 300
PROVO, UT 84601
801−852−6140
Email: rroberts@provo.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Number: 12217*
*Bar Status: Active*

**Dillon P. Olson**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Number: 16120*
*Bar Status: Active*

**J. Brian Jones**
PROVO CITY ATTORNEYS OFFICE
351 W CENTER ST
PO BOX 1849
PROVO, UT 84603
801−852−6140
Email: bjones@provo.utah.gov
*ATTORNEY TO BE NOTICED*
*Bar Number: 11816*
*Bar Status: Active*

**Nicholas Muhlestein**
PROVO CITY ATTORNEY'S OFFICE
445 W CENTER ST
PROVO, UT 84601
801−852−6369
Email: nmuhlestein@provo.gov
*ATTORNEY TO BE NOTICED*
*Bar Number: 15686*
*Bar Status: Active*

**Defendant**

**Jeffrey Gray**                    represented by    **Mitchell A. Stephens**
*an individual*                                      (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*
                                                     *Bar Number: 11775*
                                                     *Bar Status: Active*

                                                     **Dillon P. Olson**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*
                                                     *Bar Number: 16120*
                                                     *Bar Status: Active*

4

App-1:020

**Justin L. James**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Number: 15167*
*Bar Status: Active*

**Lara A. Swensen**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Number: 8493*
*Bar Status: **RegLapsed***

**Defendant**

**Troy Beebe**
*an individual*

represented by **Gary DeMott Millward**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Number: 12170*
*Bar Status: Active*

**Richard A. Roberts**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Number: 12217*
*Bar Status: Active*

**Dillon P. Olson**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Number: 16120*
*Bar Status: Active*

**J. Brian Jones**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Number: 11816*
*Bar Status: Active*

**Defendant**

**Brian Wolken**
*an individual*

represented by **Gary DeMott Millward**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Number: 12170*
*Bar Status: Active*

**Richard A. Roberts**
(See above for address)
*LEAD ATTORNEY*

5

*ATTORNEY TO BE NOTICED*
*Bar Number: 12217*
*Bar Status: Active*

**Dillon P. Olson**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Number: 16120*
*Bar Status: Active*

**J. Brian Jones**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Number: 11816*
*Bar Status: Active*

**Defendant**

| | | |
|---|---|---|
| **Jackson Julian** | represented by | **Gary DeMott Millward** |
| *an individual* | | (See above for address) |

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Number: 12170*
*Bar Status: Active*

**Richard A. Roberts**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Number: 12217*
*Bar Status: Active*

**Dillon P. Olson**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Number: 16120*
*Bar Status: Active*

**J. Brian Jones**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Number: 11816*
*Bar Status: Active*

**Intervenor**

| | | |
|---|---|---|
| **Utah Attorney General** | represented by | **David N. Wolf** |
| 160 E 300 S | | UTAH ATTORNEY GENERAL'S |
| P.O. Box 140856 | | OFFICE (160−6−140856) |
| Salt Lake City, UT 84114 | | LITIGATION UNIT |
| 801−366−0100 | | 160 E 300 S 6TH FL |
| | | PO BOX 140856 |
| | | SALT LAKE CITY, UT 84114−0856 |

6

(801)366−0100
Email: dnwolf@agutah.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Number: 6688*
*Bar Status: Active*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/27/2024 | 1 | Case has been indexed and assigned to Judge Jill N. Parrish. Defendants Troy Beebe, Jeffrey Gray, Jackson Julian, Provo City, Utah County, Brian Wolken is directed to E−File the Notice of Removal  and civil cover sheet (found under Complaints and Other Initiating Documents) and pay the filing fee of $ 405 by the end of the business day. NOTE: The court will not have jurisdiction until the opening document is electronically filed and the filing fee paid in the CM/ECF system. (kec) (Entered: 11/27/2024) |
| 11/27/2024 | 2 | NOTICE OF REMOVAL from 4th District Utah County, case number 240406123, (Filing fee $ 405, receipt number AUTDC−5256471) filed by Utah County, Jeffrey Gray. (Attachments: # 1 Civil Cover Sheet Civil Cover Sheet, # 2 Exhibit A−Complaint, # 3 Exhibit B−Docket) (Stephens, Mitchell) (Entered: 11/27/2024) |
| 11/27/2024 | 3 | NOTICE OF AVAILABILITY OF JUDICIAL SETTLEMENT CONFERENCE. For the benefit of the public and the bar, the District of Utah offers judicial settlement conference as an alternative for dispute resolution assistance in all civil cases and bankruptcy adversary proceedings. The court offers this alternative because, when compared with litigation, it can resolve a dispute faster, at less expense, and with solutions that are better able to meet the parties' needs and interests. Parties may file a stipulated motion for judicial settlement conference. A form motion is available on the court's website. Notice e−mailed or mailed to Defendants Troy Beebe, Jeffrey Gray, Jackson Julian, Provo City, Utah County, Brian Wolken, Plaintiffs Bridger Lee Jensen, Psyche Healing and Bridging, Singularism. (sg) (Entered: 11/27/2024) |
| 11/27/2024 | 4 | NOTICE OF MAGISTRATE JUDGE AVAILABILITY TO PRESIDE OVER CASE− Under 28 U.S.C. 636(c), Fed. R. Civ. P. 73, and DUCivR 72−4, you are hereby notified that a magistrate judge for the District of Utah may conduct any or all proceedings in this case, including a jury or bench trial and entry of a final judgment. Exercise of this jurisdiction by the magistrate judge is permitted only if all parties voluntarily sign and return the form. To consent, return the Consent Form to the clerk's office within 21 days via email at consents@utd.uscourts.gov or mail at the address on the form. **Please do not efile the Consent Form in the case.** Notice emailed or mailed to Defendants Troy Beebe, Jeffrey Gray, Jackson Julian, Provo City, Utah County, Brian Wolken, Plaintiffs Bridger Lee Jensen, Psyche Healing and Bridging, Singularism. (Notice generated by Clerk's Office) Form due by 12/18/2024. (sg) (Entered: 11/27/2024) |
| 12/02/2024 | 5 | DOCKET TEXT ORDER: The defendants removed this action to federal court but did not file a copy of the plaintiffs motion for a TRO and preliminary injunction that was filed in state court. The court sets the following schedule to ensure the timely consideration of the plaintiffs motion. Plaintiffs shall have until December 4, 2024 to file a motion in this court. The motion should address the federal standard for granting injunctive relief. The defendants shall have until December 9, 2024 to file a |

7

App-1:023

| | | |
|---|---|---|
| | | response brief. The plaintiffs may file a reply brief by December 11, 2024, if they wish to do so. The court will hold a hearing on the motion on December 13, 2024 at 10:00 a.m. Signed by Judge Jill N. Parrish on 12/2/24. (ksb) (Entered: 12/02/2024) |
| 12/03/2024 | 6 | Stipulated MOTION for Leave to File Overlength Motion for Temporary Restraining Order and Preliminary Injunction and Memorandum in Support filed by Plaintiffs Bridger Lee Jensen, Psyche Healing and Bridging, Singularism. (Attachments: # 1 Text of Proposed Order Granting Stipulated Motion for Leave to File Overlength Motion for Temporary Restraining Order and Preliminary Injunction)(Bean, Tanner) (Entered: 12/03/2024) |
| 12/03/2024 | 7 | REQUEST to Submit for Decision re 6 Stipulated MOTION for Leave to File Overlength Motion for Temporary Restraining Order and Preliminary Injunction and Memorandum in Support filed by Plaintiffs Bridger Lee Jensen, Psyche Healing and Bridging, Singularism. (Bean, Tanner) (Entered: 12/03/2024) |
| 12/04/2024 | 8 | DOCKET TEXT ORDER granting 6 Motion for Leave to File Over−length Brief. The plaintiffs may file a motion for a TRO/preliminary injunction not to exceed 31 pages in length. Signed by Judge Jill N. Parrish on 12/4/24. (ksb) (Entered: 12/04/2024) |
| 12/04/2024 | 9 | MOTION for Temporary Restraining Order and Memorandum in Support , MOTION for Preliminary Injunction and Memorandum in Support filed by Plaintiffs Bridger Lee Jensen, Psyche Healing and Bridging, Singularism. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q, # 18 Text of Proposed Order Granting Motion for Temporary Restraining Order and Preliminary Injunction)(Bean, Tanner) Modified on 1/24/2025: unterminated Preliminary Injunction relief as only TRO was granted on 12/16/24 (alt) (Entered: 12/04/2024) |
| 12/06/2024 | 10 | **NOTICE OF HEARING ON MOTION** re: 9 MOTION for Temporary Restraining Order MOTION for Preliminary Injunction : (Notice generated by JNP Chambers) Motion Hearing set for 12/13/2024 at 10:00 AM **VIA ZOOM** before Judge Jill N. Parrish. (lwh) (Entered: 12/06/2024) |
| 12/09/2024 | 11 | Stipulated MOTION for Leave to File Overlength Joint Opposition to Motion for Temporary Restraining Order and Preliminary Injunction filed by Defendants Jeffrey Gray, Utah County. (Attachments: # 1 Text of Proposed Order)(Stephens, Mitchell) (Entered: 12/09/2024) |
| 12/09/2024 | 12 | ORDER granting 11 Motion for Leave to File Overlength Joint Opposition. Signed by Judge Jill N. Parrish on 12/9/24. (dle) (Entered: 12/09/2024) |
| 12/09/2024 | 13 | Joint MEMORANDUM in Opposition re 9 MOTION for Temporary Restraining Order and Memorandum in Support MOTION for Preliminary Injunction and Memorandum in Support filed by Defendants Jeffrey Gray, Utah County. (Attachments: # 1 Exhibit A − Julian Aff., # 2 Exhibit B − Google Reviews, # 3 Exhibit C − BridgerLeeJensen.com, # 4 Exhibit D − LinkedIn, # 5 Exhibit E − PsychedelicTherapyAcademy, # 6 Exhibit F − Facilitator Application, # 7 Exhibit G − Mental Gurus, # 8 Exhibit H − Facebook Profile, # 9 Exhibit J − RevealMyself, # 10 Exhibit K − Psyche Healing (State), # 11 Exhibit L − Psyche Healing (Provo), # 12 Exhibit M − Psychedelic Conference, # 13 Exhibit N − Psychedelic Therapy Journey, # 14 Exhibit O − Search Warrant, # 15 Exhibit P − Return to Search |

| | | |
|---|---|---|
| | | Warrant)(Stephens, Mitchell) (Entered: 12/09/2024) |
| 12/10/2024 | 14 | Having reviewed the briefing filed thus far, the court is under the impression that Defendants are not planning to submit evidence during the hearing scheduled for Friday, December 13. The court now clarifies that it has set aside the entire day on Friday for the hearing. To the extent the parties wish to support their briefing with additional evidence, they should avail themselves of the opportunity to do so on Friday. DOCKET TEXT ORDER No attached document Signed by Judge Jill N. Parrish on 12/10/2024. (ead) (Entered: 12/10/2024) |
| 12/11/2024 | 15 | Stipulated MOTION for Leave to File Overlength Reply Brief and Memorandum in Support *of Motion for Temporary Restraining Order and Preliminary Injunction* filed by Plaintiffs Bridger Lee Jensen, Psyche Healing and Bridging, Singularism. (Attachments: # 1 Text of Proposed Order Granting Motion for Leave to File Overlength Reply Brief in Support of Motion for Temporary Restraining Order and Preliminary Injunction)(Bean, Tanner) (Entered: 12/11/2024) |
| 12/11/2024 | 16 | CIVIL STANDING ORDER Signed by Judge Jill N. Parrish on 12/11/2024. (lwh) (Entered: 12/11/2024) |
| 12/11/2024 | 17 | ORDER REFERRING CASE to Magistrate Judge Cecilia M. Romero under 28:636 (b)(1)(A), Magistrate Judge to hear and determine all nondispositive pretrial matters. No attached document. Signed by Judge Jill N. Parrish on 12/11/2024. (lwh) (Entered: 12/11/2024) |
| 12/11/2024 | 18 | ORDER granting 15 Motion for Leave to File an overlength reply to Defendants joint opposition to Plaintiffs motion for a temporary restraining order and preliminary injunction. Plaintiffs reply shall not exceed 45 pages. Signed by Judge Jill N. Parrish on 12/11/2024. (alf) (Entered: 12/11/2024) |
| 12/11/2024 | 19 | REPLY to Response to Motion re 9 MOTION for Temporary Restraining Order and Memorandum in Support MOTION for Preliminary Injunction and Memorandum in Support filed by Plaintiffs Bridger Lee Jensen, Psyche Healing and Bridging, Singularism. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q, # 18 Exhibit R, # 19 Exhibit S, # 20 Exhibit T, # 21 Exhibit U, # 22 Exhibit V)(Bean, Tanner) (Entered: 12/11/2024) |
| 12/12/2024 | 20 | ORDER TO PROPOSE SCHEDULE − See order for details. Signed by Magistrate Judge Cecilia M. Romero on 12/12/2024. (sg) (Entered: 12/12/2024) |
| 12/12/2024 | 21 | ERRATA to 19 Reply Memorandum/Reply to Response to Motion,, filed by Plaintiffs Bridger Lee Jensen, Psyche Healing and Bridging, Singularism . (Attachments: # 1 Exhibit R, # 2 Exhibit S, # 3 Exhibit T, # 4 Exhibit U, # 5 Exhibit V)(Bean, Tanner) (Entered: 12/12/2024) |
| 12/13/2024 | 22 | Minute Entry for proceedings held before Judge Jill N. Parrish: Motion Hearing held on 12/13/2024 re 9 MOTION for Temporary Restraining Order and Memorandum in Support MOTION for Preliminary Injunction and Memorandum in Support filed by Singularism, Bridger Lee Jensen, Psyche Healing and Bridging.

The court outlined the timeframe for today's hearing and addressed preliminary matters. Each party made opening statements. Brandi Lee was sworn and testified. The Psychedelic Therapy Academy Binder was offered and admitted. Jenna |

DenBleyker was sworn and testified. Bridger Lee Jensen was sworn and testified on direct examination. Oklevueha Native America Church Membership Card was offered and admitted. Before Mr. Jensens cross−examination occurred, Mr. Millward made a proffer to the court regarding law enforcement witness testimony relevant to the TRO. Mr. Millward may put additional evidence on the docket and/or call these witnesses at a later−scheduled hearing prior to the resolution of the PI motion. Mr. Jensen's cross−examination was completed. Mr. Olson made a proffer to the court regarding an American Fork law enforcement witness testimony relevant to the TRO, and he may testify at a later−scheduled hearing. The court then heard additional argument from counsel from all parties. Following a short recess, the court ruled on the record and granted the TRO. A written order will follow. The court asked the parties to meet and confer regarding timing on a preliminary injunction hearing and any additional witnesses/evidence that may be submitted to the court. Additional logistics were discussed. The parties are directed to contact the court following their meet and confer efforts.

Attorney for Plaintiff: Tanner Bean, Anna Christiansen, Attorney for Defendant: Mitch Stephens, Dillon Olson, Gary Millward. Court Reporter: Michelle Gonsalves. Recording: Zoom.(tcs) (Entered: 12/13/2024)

| 12/13/2024 | 23 | List of Witnesses and Exhibits Not Previously Filed on Docket from TRO Hearing of 12/13/2024.(tcs) (Entered: 12/13/2024) |
|---|---|---|
| 12/16/2024 | 24 | ORDER granting 9 Motion for Temporary Restraining Order. Signed by Judge Jill N. Parrish on 12/13/24. (dle) (Entered: 12/16/2024) |
| 12/16/2024 | 25 | AO 436 ELECTRONIC SOUND/AUDIO RECORDING ORDER FORM filed by Jeffrey Gray, Utah County for proceedings held on 12/13/2024 before Judge Judge Jill N. Parrish. Name of Hearing on Motion for Temporary Restraining Order. Time Start 10:00 am. Time End 5:00 pm. (Audio Recording fee $ 34, receipt number AUTDC−5273249). (Stephens, Mitchell) (Entered: 12/16/2024) |
| 12/16/2024 | 26 | NOTICE FROM THE COURT re 25 AO 436 Electronic Sound/Audio Recording Order Form. Per the court's Court Reporting Services Management Plan, available on the court's website, the clerk is unable to complete the request for audio recording because a court reporter was present at the hearing. A transcript from the court reporter is the official record of the hearing. An audio recording of the hearing is therefore not available. To order a transcript of the hearing, counsel must complete and file the AO 435 Transcript Request Form in the case. This form is available on the court's website. Counsel may request a refund for the expense of the audio recording by completing and filing the attached Refund Request for Fees form. (jwt) (Entered: 12/16/2024) |
| 12/16/2024 | 27 | AO 435 TRANSCRIPT REQUEST ORDER FORM by Jeffrey Gray, Utah County for proceedings held on 12/13/2024 before Judge Jill N. Parrish.. (Stephens, Mitchell) (Entered: 12/16/2024) |
| 12/16/2024 | 28 | EXHIBITS filed by Bridger Lee Jensen, Psyche Healing and Bridging, Singularism. (Attachments: # 1 Exhibit W, # 2 Exhibit X)(Bean, Tanner) (Entered: 12/16/2024) |
| 12/17/2024 | 29 | EXHIBITS filed by Jeffrey Gray, Utah County. (Attachments: # 1 Exhibit Q−Binder, # 2 Exhibit R−Notes 11−2−23, # 3 Exhibit S−Notes 10−3−24)(Stephens, Mitchell) |

| | | (Entered: 12/17/2024) |
|---|---|---|
| 12/18/2024 | 30 | NOTICE OF ACKNOWLEDGMENT of Civil Standing Order 16 filed by Plaintiffs Bridger Lee Jensen, Psyche Healing and Bridging, Singularism (Bean, Tanner) (Entered: 12/18/2024) |
| 12/18/2024 | 31 | NOTICE OF ACKNOWLEDGMENT of Civil Standing Order 16 filed by Defendants Jeffrey Gray, Utah County (Stephens, Mitchell) (Entered: 12/18/2024) |
| 12/18/2024 | 32 | Emergency MOTION to Stay re 24 Order on Motion for TRO, Order on Motion for Preliminary Injunction filed by Defendants Jeffrey Gray, Utah County. Motions referred to Cecilia M. Romero.(Stephens, Mitchell) (Entered: 12/18/2024) |
| 12/18/2024 | 33 | NOTICE OF ACKNOWLEDGMENT of Civil Standing Order 16 filed by Defendants Troy Beebe, Jackson Julian, Provo City, Brian Wolken (Millward, Gary) (Entered: 12/18/2024) |
| 12/19/2024 | 34 | NOTICE of Appearance by Dillon P. Olson on behalf of Jeffrey Gray, Utah County (Olson, Dillon) (Entered: 12/19/2024) |
| 12/19/2024 | 35 | NOTICE of Appearance by Justin L. James on behalf of Jeffrey Gray, Utah County (James, Justin) (Entered: 12/19/2024) |
| 12/19/2024 | 36 | <span style="color:red">ORDER temporarily staying TRO requiring return of mushrooms and reiterating previous order to notify court of any request for additional evidentiary hearing. Signed by Judge Jill N. Parrish on 12/19/2024. (ead) (Entered: 12/19/2024)</span> |
| 12/19/2024 | 37 | STATUS REPORT *and Request for Preliminary Injunction* by Bridger Lee Jensen, Psyche Healing and Bridging, Singularism. (Bean, Tanner) (Entered: 12/19/2024) |
| 12/19/2024 | 38 | MEMORANDUM in Opposition re 32 Emergency MOTION to Stay re 24 Order on Motion for TRO, Order on Motion for Preliminary Injunction filed by Plaintiffs Bridger Lee Jensen, Psyche Healing and Bridging, Singularism. (Bean, Tanner) (Entered: 12/19/2024) |
| 12/19/2024 | 39 | MOTION for Anti−Suit Injunction and Memorandum in Support filed by Plaintiffs Bridger Lee Jensen, Psyche Healing and Bridging, Singularism. (Attachments: # 1 Exhibit A − Criminal Charges) Motions referred to Cecilia M. Romero.(Bean, Tanner) Modified on 8/4/2025: corrected entry/relief text (alt) (Entered: 12/19/2024) |
| 12/19/2024 | 40 | MOTION to Dismiss and Memorandum in Support filed by Defendants Jeffrey Gray, Utah County. (James, Justin) (Entered: 12/19/2024) |
| 12/20/2024 | 41 | Motions No Longer Referred: 32 Emergency MOTION to Stay re 24 Order on Motion for TRO, Order on Motion for Preliminary Injunction , 39 MOTION Anti−Suit Injunction and Memorandum in Support . District Judge Parrish will handle the motion. (ead) (Entered: 12/20/2024) |
| 12/20/2024 | 42 | **NOTICE OF HEARING ON MOTION** re: 39 MOTION Anti−Suit Injunction , 40 MOTION to Dismiss : (Notice generated by JNP Chambers) Motion Hearing set for 1/21/2025 at 09:00 AM **VIA ZOOM** before Judge Jill N. Parrish. (lwh) (Entered: 12/20/2024) |
| 12/20/2024 | 43 | **AMENDED NOTICE OF HEARING ON MOTION** re: 39 MOTION Anti−Suit Injunction , 40 MOTION to Dismiss : (Notice generated by JNP Chambers) Motion Hearing reset for 1/23/2025 at 09:00 AM **VIA ZOOM** before Judge Jill N. Parrish. Hearing reset due to court calendar. The court will take a one−hour lunch break from |

Appellate Case: 25-4115    Document: 26-1    Date Filed: 12/11/2025    Page: 28

Case 2:24-cv-00887-JNP-CMR    Document 107-1    Filed 09/09/25    PageID.2779    Page
Appellate Case: 25-4115    Document 12 of 52    Date Filed: 09/09/2025    Page: 13

| | | 12:00 p.m. to 1:00 p.m. (lwh) (Entered: 12/20/2024) |
|---|---|---|
| 12/20/2024 | 44 | Joint MOTION to Expedite Discovery filed by Defendants Jeffrey Gray, Utah County. (Attachments: # 1 Exhibit 1 − Defendants' Expedited Preliminary Injunction Discovery Requests) Motions referred to Cecilia M. Romero.(Olson, Dillon) (Entered: 12/20/2024) |
| 12/20/2024 | 45 | REQUEST for a Preliminary Injunction Hearing to Present Evidence filed by Defendants Jeffrey Gray, Utah County. (James, Justin) (Entered: 12/20/2024) |
| 12/23/2024 | 46 | Motions No Longer Referred: 44 Joint MOTION to Expedite Discovery . District Judge Parrish will handle the motion. (ead) (Entered: 12/23/2024) |
| 12/23/2024 | 47 | MEMORANDUM in Opposition re 44 Joint MOTION to Expedite Discovery filed by Plaintiffs Bridger Lee Jensen, Psyche Healing and Bridging, Singularism. (Bean, Tanner) (Entered: 12/23/2024) |
| 12/23/2024 | 48 | Remark The court clarifies that at the hearing scheduled for January 23, 2025, the parties should be prepared to present legal arguments on 39 Plaintiffs' Motion for Anti−Suit Injunction and 40 Defendants' Motion to Dismiss in addition to presenting any further evidence or legal arguments they wish the court to consider in ruling on Plaintiffs' Motion for Preliminary Injunction. The court may revise this guidance after considering Defendants' request for a five−day hearing on the Motion for Preliminary Injunction. (ead) (Entered: 12/23/2024) |
| 12/27/2024 | 49 | REPLY to Response to Motion re 44 Joint MOTION to Expedite Discovery filed by Defendants Jeffrey Gray, Utah County. (Olson, Dillon) (Entered: 12/27/2024) |
| 01/02/2025 | 50 | Defendant's MEMORANDUM in Opposition re 39 MOTION Anti−Suit Injunction and Memorandum in Support filed by Defendants Jeffrey Gray, Utah County. (Stephens, Mitchell) (Entered: 01/02/2025) |
| 01/02/2025 | 51 | REPLY to Response to Motion re 32 Emergency MOTION to Stay re 24 Order on Motion for TRO, Order on Motion for Preliminary Injunction filed by Defendants Troy Beebe, Jeffrey Gray, Jackson Julian, Provo City, Utah County, Brian Wolken. (Millward, Gary) (Entered: 01/02/2025) |
| 01/06/2025 | 52 | Remark The court has considered the parties' positions regarding the hearing on Plaintiffs' Motion for Preliminary Injunction. The court will hold a two−day hearing from January 23, 2025, to January 24, 2025. At the hearing, each side will have six hours to present evidence, conduct cross−examinations, and present argument. (At the TRO hearing on December 13, 2024, Plaintiffs used 139 minutes and Defendants used 181 minutes.) As a reminder, the parties should be prepared to present legal arguments on 39 Plaintiffs' Motion for Anti−Suit Injunction and 40 Defendants' Motion to Dismiss in addition to presenting any further evidence or legal arguments they wish the court to consider in ruling on Plaintiffs' Motion for Preliminary Injunction. (ead) (Entered: 01/06/2025) |
| 01/06/2025 | 53 | **RESTRICTED DOCUMENT** NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Motion for Temporary Restraining Order, Motion for Preliminary Injunction held on 12/13/24 before Judge Jill N. Parrish. Court Reporter/Transcriber Michelle B. Gonsalves, RPR, CRR, CBC, CSR, Telephone number (801) 783−8657.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Please review the transcript within 14 days after receiving this notice to determine if personal data identifiers** |

**need to be redacted. If redaction is not required, the transcript will be made electronically available 90 days after this notice. If redaction of personal identifies is needed, a party must file a Notice of Intent to Request Redaction within 21 days after receiving this notice. Within 42 days after receiving this notice, a party must file a Redaction Request identifying the information that must be redacted. Please review DUCivR 5.2−1 for additional information about redacting personal identifiers or protected information. The Attorney Filing the Notice of Intent To Request Redaction and Redaction request must send a copy to the court reporter. The court will not send a copy to the court reporter.**

**Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Request Redaction due 1/27/2025. Redaction Request due 2/18/2025. Redacted Transcript Deadline set for 3/10/2025. Release of Transcript Restriction set for 4/7/2025. (dle) (Additional attachment(s) added on 1/6/2025: # 1 Corrected Transcript) (jrj). Modified by removing restricted text on 4/7/2025 (kec). (Entered: 01/06/2025)**

| | | |
|---|---|---|
| 01/06/2025 | 54 | Transcript Purchased by: Mitchell A. Stephens re 53 transcript(s) of 12/13/24. (dle) (Entered: 01/06/2025) |
| 01/06/2025 | 55 | **NOTICE OF HEARING ON MOTIONS** re: 39 MOTION Anti−Suit Injunction , 40 MOTION to Dismiss, in addition to presenting any further evidence or legal arguments the parties wish the court to consider in ruling on Plaintiffs' Motion for Preliminary Injunction. : (Notice generated by JNP Chambers) Motion Hearing set for 1/23/2025 and 1/24/2025 at 09:00 AM **VIA ZOOM** before Judge Jill N. Parrish. (lwh) (Entered: 01/06/2025) |
| 01/07/2025 | 56 | MEMORANDUM DECISION AND ORDER granting 32 Defendants' Motion to Stay and denying 44 Defendants' Motion for Expedited Discovery. Signed by Judge Jill N. Parrish on 1/7/25. (dle) (Entered: 01/07/2025) |
| 01/07/2025 | 57 | PROTECTIVE ORDER: The court **ORDERS** that Defendants may use the evidence presented during the course of this caseevidence previously presented as well as evidence that will be presented in the futureonly to litigate this civil action; they may not use it directly or indirectly (i.e., derivatively) in any pending or future state criminal investigation or prosecution. This protective order shall remain in place until this civil action is fully litigated or until the court dissolves it on motion or sua sponte. Signed by Judge Jill N. Parrish on 1/7/25. (dle) (Entered: 01/07/2025) |
| 01/09/2025 | 58 | REPLY to Response to Motion re 39 MOTION Anti−Suit Injunction and Memorandum in Support filed by Plaintiffs Bridger Lee Jensen, Psyche Healing and Bridging, Singularism. (Bean, Tanner) (Entered: 01/09/2025) |
| 01/14/2025 | 59 | RESPONSE to Motion re 40 MOTION to Dismiss and Memorandum in Support filed by Plaintiffs Bridger Lee Jensen, Psyche Healing and Bridging, Singularism. (Bean, Tanner) (Entered: 01/14/2025) |
| 01/14/2025 | 60 | NOTICE of Appearance by Jacqueline Rosen on behalf of Bridger Lee Jensen, Psyche Healing and Bridging, Singularism (Rosen, Jacqueline) (Entered: 01/14/2025) |
| 01/14/2025 | 61 | MOTION for Attorney Fees and Memorandum in Support *Regarding Denial of Defendants' Joint Motion for Expedited Discovery* filed by Plaintiffs Bridger Lee Jensen, Psyche Healing and Bridging, Singularism. (Attachments: # 1 Affidavit of |

| | | |
|---|---|---|
| | | Tanner Bean in Support of Motion for Attorney Fees) Motions referred to Cecilia M. Romero.(Bean, Tanner) (Entered: 01/14/2025) |
| 01/15/2025 | 62 | ORDER denying 61 Motion for Attorney Fees. Signed by Judge Jill N. Parrish on 1/15/25 (alt) (Entered: 01/15/2025) |
| 01/16/2025 | 63 | NOTICE of Appearance by Nicholas Muhlestein on behalf of Provo City (Muhlestein, Nicholas) (Entered: 01/16/2025) |
| 01/17/2025 | 64 | Defendant's MOTION for Leave to File Supplemental Memorandum Supporting Joint Opposition to Preliminary Injunction filed by Defendants Troy Beebe, Jackson Julian, Provo City, Brian Wolken. (Attachments: # 1 Exhibit −A) Motions referred to Cecilia M. Romero. Attorney Dillon P. Olson added to party Troy Beebe(pty:dft), Attorney Dillon P. Olson added to party Jackson Julian(pty:dft), Attorney Dillon P. Olson added to party Provo City(pty:dft), Attorney Dillon P. Olson added to party Brian Wolken(pty:dft)(Olson, Dillon) (Entered: 01/17/2025) |
| 01/17/2025 | 65 | DOCKET TEXT ORDER granting 64 Motion for Leave to File Supplemental Memorandum Supporting Joint Opposition to Preliminary Injunction. Plaintiffs are welcome to file a reply anytime before the hearing set to begin on January 23 (or, if they should require additional time, they may raise it with the court at the hearing). Signed by Judge Jill N. Parrish on 1/17/2025. No attached document. (ead) (Entered: 01/17/2025) |
| 01/21/2025 | 66 | Supplemental MEMORANDUM re 13 Memorandum in Opposition to Motion,,, filed by Jeffrey Gray, Utah County. (Stephens, Mitchell) (Entered: 01/21/2025) |
| 01/22/2025 | 67 | STIPULATION *of All Parties Regarding January 23−24, 2025 Hearing* by Jeffrey Gray, Utah County. (Stephens, Mitchell) (Entered: 01/22/2025) |
| 01/22/2025 | 68 | Stipulated MOTION for Leave to File Excess Pages filed by Defendants Jeffrey Gray, Utah County. (Attachments: # 1 Text of Proposed Order Granting Stipulated Motion for Leave to File Overlength Reply Memorandum in Support of Motion to Dismiss) Motions referred to Cecilia M. Romero.(Stephens, Mitchell) (Entered: 01/22/2025) |
| 01/22/2025 | 69 | Defendant's MEMORANDUM in Support re 40 MOTION to Dismiss and Memorandum in Support filed by Defendants Jeffrey Gray, Utah County. (James, Justin) (Entered: 01/22/2025) |
| 01/22/2025 | 70 | Motions No Longer Referred: 68 Stipulated MOTION for Leave to File Excess Pages. District Judge Parrish will handle the motion. (ead) (Entered: 01/22/2025) |
| 01/22/2025 | 71 | Supplemental MEMORANDUM in Support re 9 MOTION for Temporary Restraining Order and Memorandum in Support MOTION for Preliminary Injunction and Memorandum in Support filed by Plaintiffs Bridger Lee Jensen, Psyche Healing and Bridging, Singularism. (Attachments: # 1 Exhibit W − Forensic Analysis Report−CONTROLLED SUBSTANCE ANALYSIS, # 2 Exhibit X − Second Supplemental Declaration of Bridger Jensen, # 3 Exhibit Y − Claire's Voluntary Statement, # 4 Exhibit Z − January 17, 2025 Body Camera Footage, # 5 Exhibit AA − Letter from Provo City re no business license needed, # 6 Exhibit BB − Police report (updated through Dec. 2, 2024), # 7 Exhibit CC − News Article, # 8 Exhibit DD − Two FinCEN Reports, # 9 Exhibit EE − Updated Order [Proposed] Granting Plaintiffs' Motion for Entry of Temporary Restraining Order and Preliminary Injunction)(Bean, Tanner) (Entered: 01/22/2025) |

| | | |
|---|---|---|
| 01/22/2025 | 72 | NOTICE OF NONELECTRONIC FILING of Exhibits G, I, M and N filed by Defendants Jeffrey Gray, Utah County re 67 Stipulation (Stephens, Mitchell) (Entered: 01/22/2025) |
| 01/22/2025 | 73 | STIPULATION *Written Consent to Filing of First Amended Verified Complaint* by Bridger Lee Jensen, Psyche Healing and Bridging, Singularism. (Attachments: # 1 Exhibit A − First Amended Verified Complaint, # 2 Exhibit B − First Amended Verified Complaint (Redlined))(Bean, Tanner) (Entered: 01/22/2025) |
| 01/22/2025 | 74 | EXHIBITS filed by Jeffrey Gray, Utah County re 67 Stipulation. (Attachments: # 1 Exhibit −A, # 2 Exhibit −B, # 3 Exhibit −C, # 4 Exhibit −D, # 5 Exhibit −E, # 6 Exhibit −F, # 7 Exhibit −G, # 8 Exhibit −H, # 9 Exhibit −I, # 10 Exhibit −J1, # 11 Exhibit −J2, # 12 Exhibit −J3, # 13 Exhibit −J4, # 14 Exhibit −J5, # 15 Exhibit −K, # 16 Exhibit −L, # 17 Exhibit −M, # 18 Exhibit −N, # 19 Exhibit −O)(Stephens, Mitchell) (Entered: 01/22/2025) |
| 01/22/2025 | 75 | ORDER granting 68 Motion for Leave to File Excess Pages (overlength reply memo). Signed by Judge Jill N. Parrish on 1/22/25 (alt) (Entered: 01/22/2025) |
| 01/22/2025 | 76 | EXHIBITS G, I, M, and N, re 74 Exhibits to 67 Stipulation filed by Jeffrey Gray, Utah County, consisting of 3 MP4 files, 1 M4A file, and 2 WAV files on a single USB flash drive. The files are not uploaded to the docket due to non−PDF file type and the drive will be retained in a case file folder in the Clerk's Office while the case is active, and according to the retention schedule set forth by the Judicial Conference thereafter. (alt) Modified on 1/23/2025: corrected Date Filed (alt) (Entered: 01/23/2025) |
| 01/23/2025 | | Modification of Docket re 76 Exhibits. Error: Wrong date (1/23/25) was entered as the Date Filed. Correction: Date Filed corrected to 1/22/25. (alt) (Entered: 01/23/2025) |
| 01/23/2025 | 79 | Minute Entry for proceedings held before Judge Jill N. Parrish: Motion Hearing held on 1/23/2025 re 39 MOTION Anti−Suit Injunction filed by Singularism, Bridger Lee Jensen, Psyche Healing and Bridging, 40 MOTION to Dismiss filed by Jeffrey Gray, Utah County. All parties appear via zoom. After hearing oral argument on the motions, the court took the motions under advisement. The court will issue an order on 1/24/2025 if additional briefing is necessary. Court adjourned. Attorney for Plaintiff: Tanner J. Bean, Anna Pitcher Christiansen, Jacqueline Rosen, Attorney for Defendant: Justin L. James, Nicholas Muhlestein, Mitchell A. Stephens. Court Reporter: Laura Robinson. Recording: ZOOM.(lwh) (Entered: 01/27/2025) |
| 01/24/2025 | 77 | ORDER Requesting Supplemental Briefing and Regarding Supplemental Exhibits: Each party should submit one supplemental brief addressing all issues re 9 MOTION for Preliminary Injunction, 39 MOTION Anti−Suit Injunction, and 40 MOTION to Dismiss, by no later than 2/5/25. Signed by Judge Jill N. Parrish on 1/24/25 (alt) (Entered: 01/24/2025) |
| 01/27/2025 | 78 | AO 435 TRANSCRIPT REQUEST ORDER FORM by Bridger Lee Jensen, Psyche Healing and Bridging, Singularism for proceedings held on 01/23/2025 before Judge Jill N. Parrish.. (Bean, Tanner) (Entered: 01/27/2025) |
| 01/27/2025 | 80 | AO 435 TRANSCRIPT REQUEST ORDER FORM by Jeffrey Gray, Utah County for proceedings held on 1/23/2025 before Judge Jill N. Parrish.. (Stephens, Mitchell) (Entered: 01/27/2025) |

15

| 01/27/2025 | 81 | NOTICE OF WITHDRAWAL OF COUNSEL of Anna P. Christiansen filed by Anna Pitcher Christiansen on behalf of Bridger Lee Jensen, Psyche Healing and Bridging, Singularism (Christiansen, Anna) (Entered: 01/27/2025) |
|---|---|---|
| 02/04/2025 | 82 | DOCKET TEXT ORDER The court notes that the parties stipulated to Plaintiffs filing their First Amended Verified Complaint. See Dkt. 73 . The parties specifically agreed that the filing of that motion would not render the pending 40 Motion to Dismiss moot. Plaintiffs attached their First Amended Verified Complaint as an exhibit to the stipulation. The court now ORDERS Plaintiffs to file their First Amended Verified Complaint as a separate entry on the docket as soon as possible. No attached document. Signed by Judge Jill N. Parrish on 2/4/2025. (ead) (Entered: 02/04/2025) |
| 02/05/2025 | 83 | AMENDED COMPLAINT against All Defendants with Jury Demand. filed by Psyche Healing and Bridging, Bridger Lee Jensen, Singularism. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I) (Bean, Tanner) (Entered: 02/05/2025) |
| 02/05/2025 | 84 | Supplemental BRIEF re 9 MOTION for Temporary Restraining Order MOTION for Preliminary Injunction, 39 MOTION Anti−Suit Injunction, 40 MOTION to Dismiss filed by Defendant Provo City. (Attachments: # 1 Exhibit Ex. A − Declaration of Jackson Julian, # 2 Exhibit Ex. B − Therapeutic Use of Psilocybin, # 3 Exhibit Ex. C − Psilocybin Assisted Therapy, # 4 Exhibit Ex. D − TRO Transcript Excerpts, # 5 Exhibit Ex. E − Psyche Healing Business License, # 6 Exhibit Ex. F − Singularism Business Application, # 7 Exhibit Ex. G − Divine Assembly Utah Business Registration, # 8 Exhibit Ex. H − Divine Assembly Art. Inc., # 9 Exhibit Ex. I − Divine Assembly Facebook Page)(Millward, Gary) (Entered: 02/05/2025) |
| 02/05/2025 | 85 | Supplemental BRIEF re 9 MOTION for Temporary Restraining Order MOTION for Preliminary Injunction, 39 MOTION Anti−Suit Injunction, 40 MOTION to Dismiss filed by Plaintiffs Bridger Lee Jensen, Psyche Healing and Bridging, Singularism. (Attachments: # 1 Exhibit FF − Third Supplemental Declaration of Bridger Jensen, # 2 Exhibit GG − Divine Assembly, # 3 Exhibit HH − Claire Hart Waiver (redacted), # 4 Exhibit II − Oregon CSA)(Bean, Tanner) (Entered: 02/05/2025) |
| 02/06/2025 | 86 | DOCKET TEXT ORDER The court notes that Plaintiffs have "file[d] a pleading, written motion, or other paper drawing into question the constitutionality of a... state statute." Fed. R. Civ. P. 5.1(a). However, it does not appear that Plaintiffs have provided the Attorney General of Utah notice of their constitutional challenge as required by Rule 5.1 of the Federal Rules of Civil Procedure. Plaintiffs are now ORDERED to comply with the notice requirement of Rule 5.1 as soon as possible and file a certificate of service with the court. No attached document. Signed by Judge Jill N. Parrish on 2/6/2025. (ead) (Entered: 02/06/2025) |
| 02/07/2025 | 87 | CERTIFICATE OF SERVICE by Bridger Lee Jensen, Psyche Healing and Bridging, Singularism re 86 Order,, (Attachments: # 1 Exhibit A − Notice via Email, # 2 Exhibit B − Letter and Proof of Service)(Bean, Tanner) (Entered: 02/07/2025) |
| 02/10/2025 | 88 | Certification to Attorney General of Utah Under 28 U.S.C. § 2403. If the Attorney General wishes to intervene to present evidence or argument, he must do so no later than **60 days** from the date of this certification. The clerk of court is **ORDERED** to send this certification to the Attorney General. Signed by Judge Jill N. Parrish on 2/10/25. (dle) (Entered: 02/10/2025) |
| 02/10/2025 | 89 | |

| | | |
|---|---|---|
| | | Remark re: ECF No. 88 Certification to Attorney General of Utah Under 28 U.S.C. § 2403. The certification was emailed to notices@agutah.gov and mailed by the clerk to the Utah Attorney General at:<br>Office of the Utah Attorney General<br>Attn: Utah Solicitor General<br>250 North State Street, Suite 230<br>PO Box 142320<br>SLC UT 84114 (jwt) (Entered: 02/10/2025) |
| 02/11/2025 | 90 | **RESTRICTED DOCUMENT** NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Zoom Motion for Anti−Suit Injunction and Motion to Dismiss held on January 23, 2025 before Judge Jill Parrish. Court Reporter/Transcriber Laura W. Robinson, RPR, FCRR, CSR, CP, Telephone number (801)201−9731.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Please review the transcript within 14 days after receiving this notice to determine if personal data identifiers need to be redacted. If redaction is not required, the transcript will be made electronically available 90 days after this notice. If redaction of personal identifies is needed, a party must file a Notice of Intent to Request Redaction within 21 days after receiving this notice. Within 42 days after receiving this notice, a party must file a Redaction Request identifying the information that must be redacted. Please review DUCivR 5.2−1 for additional information about redacting personal identifiers or protected information. The Attorney Filing the Notice of Intent To Request Redaction and Redaction request must send a copy to the court reporter. The court will not send a copy to the court reporter.**<br><br>**Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Request Redaction due 3/4/2025. Redaction Request due 3/25/2025. Redacted Transcript Deadline set for 4/15/2025. Release of Transcript Restriction set for 5/12/2025. (jrj) Modified by removing restricted text on 5/12/2025 (kec). (Entered: 02/11/2025)** |
| 02/11/2025 | 91 | Transcript Purchased by: Tanner Bean, Mitchell Stephens re 90 transcript(s) of 1/23/25. (jrj) (Entered: 02/11/2025) |
| 02/20/2025 | 92 | ORDER granting 9 Motion for Preliminary Injunction. The court **ORDERS** Defendants to return any items seized from Singularism's spiritual center not yet returned as soon as possible but no later than 14 days from the date of this order. The court also **ORDERS** Defendants to not interfere with Plaintiffs' sincere religious use of psilocybin from the date of this order until this litigation is complete. Signed by Judge Jill N. Parrish on 2/20/25. (dle) (Entered: 02/20/2025) |
| 02/21/2025 | 93 | MOTION for Attorney Fees and Memorandum in Support *Regarding Order Granting Motion for Preliminary Injunction* filed by Plaintiffs Bridger Lee Jensen, Psyche Healing and Bridging, Singularism. (Attachments: # 1 Affidavit of Tanner Bean in Support of Motion for Attorneys Fees Regarding Order Granting Motion for Preliminary Injunction) Motions referred to Cecilia M. Romero.(Bean, Tanner) (Entered: 02/21/2025) |
| 02/24/2025 | 94 | Motions No Longer Referred: 93 MOTION for Attorney Fees and Memorandum in Support Regarding Order Granting Motion for Preliminary Injunction. District Judge |

| | | Parrish will handle the motion. (ead) (Entered: 02/24/2025) |
|---|---|---|
| 03/06/2025 | 95 | WITHDRAWAL OF MOTION by Plaintiffs Bridger Lee Jensen, Psyche Healing and Bridging, Singularism re 93 MOTION for Attorney Fees and Memorandum in Support *Regarding Order Granting Motion for Preliminary Injunction* filed by Singularism, Bridger Lee Jensen, Psyche Healing and Bridging . (Bean, Tanner) (Entered: 03/06/2025) |
| 04/11/2025 | 96 | RESPONSE re 88 Certification of Issue to State Supreme Court,, filed by Utah Attorney General. Attorney David N. Wolf added to party Utah Attorney General(pty:intv)(Wolf, David) (Entered: 04/11/2025) |
| 04/24/2025 | 97 | STATUS REPORT ORDER The court orders the parties to submit a joint status update informing the court of the status of the criminal proceedings against Mr. Jensen in state court. Status Report due 4/30/2025. Signed by Judge Jill N. Parrish on 4/24/2025. (ead) (Entered: 04/24/2025) |
| 04/29/2025 | 98 | STATUS REPORT *Joint Status Report* by Bridger Lee Jensen, Psyche Healing and Bridging, Singularism. (Attachments: # 1 Exhibit A)(Bean, Tanner) (Entered: 04/29/2025) |
| 06/03/2025 | 99 | Stipulated MOTION to Stay *Proceedings* filed by Defendant Provo City. Motions referred to Cecilia M. Romero.(Roberts, Richard) (Entered: 06/03/2025) |
| 06/03/2025 | 100 | Motions No Longer Referred: 99 Stipulated MOTION to Stay Proceedings. District Judge Parrish will handle the motion. (ead) (Entered: 06/03/2025) |
| 06/03/2025 | 101 | ORDER granting 99 Motion to Stay case for 60 days. No further stays will be granted. If the court does not receive notice that all claims are fully resolved by Monday, August 4, 2025, it will proceed to issue its order resolving Defendants motion to dismiss and Plaintiffs motion for anti−suit injunction. Signed by Judge Jill N. Parrish on 06/03/2025. (kpf) (Entered: 06/03/2025) |
| 08/04/2025 | 102 | MEMORANDUM DECISION AND ORDER denying 40 Motion to Dismiss; granting 39 Motion for Anti−Suit Injunction. Defendants Utah County and Jeffrey Gray are to cease further proceedings in State v. Jensen, Case No. 241404407 (4th Dist. Utah), pending final judgment in this court. Signed by Judge Jill N. Parrish on 8/4/25 (alt) (Entered: 08/04/2025) |
| 08/18/2025 | 103 | Stipulated MOTION for Extension of Time to File Answer re 83 Amended Complaint, and Memorandum in Support filed by Defendant Provo City. Motions referred to Cecilia M. Romero.(Roberts, Richard) (Entered: 08/18/2025) |
| 08/19/2025 | 104 | DOCKET TEXT ORDER granting 103 Motion for Extension of Time to Answer. For good cause appearing, the court hereby GRANTS the Motion and ORDERS that the deadline for Defendants to file an answer to Plaintiffs' First Amended Complaint is extended to September 2, 2025. Signed by Magistrate Judge Cecilia M. Romero on 8/19/2025. No attached document. (jfm) (Entered: 08/19/2025) |
| 08/29/2025 | 105 | NOTICE OF APPEAL as to 102 Order on Motion for Miscellaneous Relief,, Order on Motion to Dismiss,, Memorandum Decision, filed by Jeffrey Gray, Provo City, Utah County. Appeals to the USCA for the 10th Circuit. Filing fee $ 605, receipt number AUTDC−5538514. (Olson, Dillon) (Entered: 08/29/2025) |
| 09/02/2025 | 106 | *Defendants'* ANSWER to 83 Amended Complaint, with Jury Demand filed by Provo City.(Roberts, Richard) (Entered: 09/02/2025) |

App-1:034

Mitchell A. Stephens (11775)
Lara A. Swensen (8493)
JAMES DODGE RUSSELL & STEPHENS, P.C.,
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Email: mstephens@jdrslaw.com
       lswensen@jdrslaw.com

*Counsel for Utah County and Jeffrey Gray*

---

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BRIDGER LEE JENSEN, SINGULARISM, PSYCHE HEALING AND BRIDGING, LLC dba PSYCHEDELIC THERAPY JOURNEY<br><br>Plaintiffs,<br><br>vs.<br><br>UTAH COUNTY, PROVO CITY, JEFFREY GRAY, TROY BEEBE, BRIAN WOLKEN, JACKSON JULIAN, JOHN DOES 1-4,<br><br>Defendants. | **NOTICE OF REMOVAL**<br><br>Civil No. 2:24-cv-00887-JNP<br><br>Judge Jill N. Parrish<br><br>(Removed from Fourth Judicial District Court, Utah County, State of Utah, Case No. 240406123) |

Pursuant to 28 U.S.C. §§ 1331, 1441, and 1446, Defendants Utah County and Jeffrey Gray (collectively "Utah County") and Provo City, Troy Beebe, Brian Wolken, and Jackson Julian (collectively "Provo") (together "Defendants") hereby give notice of removal of the action *Jensen v. Utah County*, Case No. 240406123, from the Fourth Judicial District Court, Utah County, State of Utah, to the United States District Court for the District of Utah. As grounds for removal, Defendants state as follows:

1

**State Court Proceedings**

1.      Plaintiffs Bridger Lee Jensen, Singularism, and Psyche Healing and Bridging, LLC dba Psychedelic Therapy Journey ("Plaintiffs") filed their Complaint on November 19, 2024. Consistent with 28 U.S.C § 1446(a), a copy of the underlying Complaint ("Complaint") is attached hereto as Exhibit A.

2.      Because the Complaint was filed fewer than 30 days ago, removal is timely. *See* 28 U.S.C. § 1446(b).

3.      A copy of the state court docket is attached hereto as Exhibit B.

4.      Removal to this District is proper because the United States District Court for the District of Utah embraces the place where the action is pending, i.e., the Fourth Judicial District Court in and for Utah County, Utah. *See* 28 U.S.C. § 1441(a).

**Federal Question**

5.      Defendants base their removal on federal question jurisdiction pursuant to 28 U.S.C. §§ 1331, 1441(a), and 1446. The Complaint includes claims asserted pursuant to 42 U.S.C. § 1983, the First Amendment to the United States Constitution, and the Fourth Amendment to the United States Constitution.

6.      The Court has jurisdiction over the remainder of the case because all the claims form part of the same case or controversy. *See* 28 U.S.C. § 1367.

**Notice**

7.      Pursuant to 28 U.S.C. § 1446(d), Defendants will notify Plaintiffs and the Fourth Judicial District Court of the filing of this Notice of Removal by filing a copy of the same with the state court.

2

Dated this 27th Day of November, 2024

JAMES DODGE RUSSELL & STEPHENS, P.C.

/s/ Mitchell A. Stephens
Mitchell A. Stephens
Lara A. Swensen

*Counsel for Utah County and Jeffrey Gray*

PROVO CITY LEGAL

/s/ Rich Roberts
Rich Roberts

*Counsel for Provo City, Troy Beebe, Brian Wolken, and Jackson Julian*

3

App-1:037

**CERTIFICATE OF SERVICE**

A copy of the foregoing was served upon the following via electronic mail:

tbean@fabianvancott.com

achristiansen@fabianvancott.com

gmillward@provo.gov

rroberts@provo.gov

DATED this 27th day of November, 2024.

JAMES DODGE RUSSELL & STEPHENS, P.C.

/s/ Mitchell A. Stephens
Mitchell A. Stephens
Lara A. Swensen

*Counsel for Utah County and Jeffrey Gray*

Case 2:24-cv-00887-JNP   Document 2-2   Filed 11/27/24   PageID.9   Page 1 of 33

# EXHIBIT  A

Tanner J. Bean (A17128)
tbean@fabianvancott.com
Anna P. Christiansen (A17518)
achristiansen@fabianvancott.com
**FABIAN VANCOTT**
95 South State Street, Suite 2300
Salt Lake City, UT 84111-23323
Telephone: (801) 531-8900
*Attorneys for Plaintiffs*

## IN THE FOURTH JUDICIAL DISTRICT

## UTAH COUNTY, STATE OF UTAH

| | |
|---|---|
| BRIDGER LEE JENSEN, an individual; SINGULARISM, a non-profit corporation; PSYCHE HEALING AND BRIDGING, LLC dba PSYCHEDELIC THERAPY JOURNEY; a limited liability company; <br><br> Plaintiffs, <br> vs. <br><br> UTAH COUNTY, a political subdivision, PROVO CITY, a political subdivision; JEFFREY GRAY, an individual; TROY BEEBE, an individual; BRIAN WOLKEN, an individual; JACKSON JULIAN, an individual; JOHN DOES 1-4, individuals; <br><br> Defendants. | **VERIFIED COMPLAINT AND JURY DEMAND** <br><br> Case No. _____ <br><br> Honorable _____ |

Plaintiffs Bridger Lee Jensen, Singularism, and Psyche Healing and Bridging LLC dba Psychedelic Therapy Journey (collectively, "Singularism"), by and through their counsel, hereby complain against Defendants Utah County, Provo City, Jeffrey Gray, Troy Beebe, Brian Wolken, Jackson Julian, and John Does 1-4, as alleged below.

**INTRODUCTION**

"Respect for religious expressions is indispensable to life in a free and diverse Republic . . ." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 543 (2022). Indeed, "preserving the promise of the free exercise of religion enshrined in our Constitution . . . lies at the heart of our pluralistic society." *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1754 (2020). "[R]eligious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Fulton v. City of Philadelphia, Pennsylvania*, 593 U.S. 522, 532, (2021) (quoting *Thomas v. Review Bd. of Ind. Employment Security Div.*, 450 U.S. 707, 714 (1981)). "A way of life that is odd or even erratic but interferes with no rights or interests of others is not to be condemned because it is different." *Wisconsin v. Yoder*, 406 U.S. 205, 224 (1972).

Bridger Jensen is the sincere founder of a small, entheogenic minority religion known as Singularism. Like many religious organizations, it has both non-profit and for-profit entities. As part of their sincere religious exercise, Plaintiffs utilize sacramental psilocybin tea to access the divine, open spiritual pathways, and alleviate human suffering by weaving together centuries of entheogenic religious practice with what Plaintiffs view as illuminated approaches of modern mental health clinicians.

The sincerity of Plaintiffs' religious conviction is unquestionable. Mr. Jensen gave up a successful career to pursue his higher spiritual calling in Singularism. Since its founding, he, on behalf of Singularism, has publicly and transparently broadcast the faith, indicating Singularism relies upon the protections for free exercise of religion to operate, while knowing that misunderstanding authorities may at any moment prosecute Singularism for its faith. After over a year of Plaintiffs peacefully exercising their religious freedom, providing spiritual care to many

2

without incident and without a single ounce of psilocybin leaving Singularism's spiritual center, that moment has come.

Law enforcement authorities, to whom Mr. Jensen sent a letter explaining Singularism's religious practices at the opening of its religious center over a year ago, searched Singularism's spiritual center and, among other things, seized the sacramental psilocybin used in Singularism's ceremonies. The next day, law enforcement threatened Singularism's landlord to evict Singularism from its spiritual center. Mr. Jensen now faces impending criminal charges related to psilocybin, and Singularism, a small minority religious group, risks being evicted and otherwise wiped off the map by overzealous authorities. Defendants have knowingly and recklessly proceeded in defiance of the protections afforded to sincere religious believers under the U.S. Constitution, the Utah Constitution, and the Utah Religious Freedom Restoration Act.

The Court should right these wrongs. Plaintiffs request the Court enjoin Defendants from their actions burdening Plaintiffs' sincere religious free exercise, declare Defendants' actions a violation, order the payment of damages for the violation of Plaintiffs' constitutional and statutory rights, and compensate Plaintiffs for the attorney fees and costs required to defend their rights in court, despite clear legal protections for their religious exercise.

## PARTIES

1.      Plaintiff Bridger Lee Jensen is an individual who resides in Provo, Utah.

2.      Plaintiff Singularism is a non-profit organization registered under the laws of the State of Utah located in Provo, Utah.

3.      Plaintiff Psyche Healing and Bridging LLC dba Psychedelic Therapy Journey is a limited liability corporation registered under the laws of the State of Utah located in Provo, Utah.

4.      Defendant Utah County is a political subdivision of the State of Utah. The Utah County Attorney's Office is an agency, program, or arm of Utah County.

5.      Jeffrey Gray is, and has been, the Utah County Attorney since January 2023. Upon information and belief, Jeffrey Gray is a resident of Utah County.

6.      Defendant Provo City is a political subdivision of the State of Utah located in Utah County. The Provo City Police Department is an agency, program, or arm of Provo City.

7.      Troy Beebe is, and was, at all times relevant to this Complaint, the Chief of the Provo City Police Department. Upon information and belief, Troy Beebe is a resident of Utah County.

8.      Brian Wolken is, and was, at all times relevant to this Complaint, a Captain of the Provo City Police Department. Upon information and belief, Brian Wolken is a resident of Utah County.

9.      Jackson Julian is, and was, at all times relevant to this Complaint, a Detective of the Provo City Police Department. Upon information and belief, Jackson Julian is a resident of Utah County.

10.     John Does 1-4 are, and were, at all times relevant to this Complaint, Police Officers of the Provo City Police Department. Upon information and belief, John Does 1-4 are residents of Utah County.

11.     At all times relevant to this Complaint, Defendants Gray, Beebe, Wolken, Julian, and Officers Does 1-4 were acting under color of state law.

## **JURISDICTION AND VENUE**

12.     This Court has jurisdiction pursuant to Utah Code § 78A-5-102.

13.     Venue is proper in this Court under Utah Code §§ 63G-7-502 and 78B-3a-201, as the causes of action arise and Defendants reside in Utah County, Utah.

14.     Because this Complaint seeks recovery of damages in an amount exceeding $100,000 and non-monetary relief, it is classified as a Tier 2 action under Utah Rule of Civil Procedure 26.

15.     Plaintiffs claims are exempt from the notice-of-claim provisions of the Utah Governmental Immunity Act, according to the terms of that Act and Utah's Religious Freedom Restoration Act and because of the exigent circumstances presented herein. Even so, out of an abundance of caution, Plaintiffs' claims were included and described in a notice of claim served upon Defendants concurrently with the service of this Complaint.

## FACTUAL BACKGROUND

*The Founding and Religious Practices of Singularism*

16.     In the fall of 2023, following years of various transcendent and spiritual experiences facilitated through psilocybin, Mr. Jensen determined to share his spiritual enlightenment with the community by founding his own religious organization, Singularism.

17.     Although previously licensed as a mental health therapist, Mr. Jensen allowed his license to lapse and discontinued his professional clinical practice, understanding that, as clergy, he would be exempt from licensure requirements under the Utah Mental Health Professional Practice Act, *see* Utah Code § 58-60-107(2)(b), and would transition to becoming a spiritual leader and provide religious mental health therapy.

18.     After much effort and coordination, Mr. Jensen was able to found Singularism as a non-profit organization and Psyche Healing and Bridging as a related for-profit corporation, and was able to locate a space to rent as a spiritual center in Provo, Utah.

5

19.     Singularism held a public ribbon-cutting ceremony for its spiritual center in fall of 2023. It invited many individuals and organizations from all walks of life to attend the ribbon-cutting event, and many individuals attended. During the ribbon-cutting ceremony, individuals shared their profound religious and spiritually healing experiences with psilocybin. Others shared they had felt marginalized according to their unorthodox religious views regarding psilocybin and the spiritual experiences it had opened for them. Others attended merely to learn about Singularism and the potential for religious enlightenment.

20.     During the ribbon-cutting ceremony, Mr. Jensen discussed one of Singularism's mantras: that psilocybin permits individuals to directly access the divine and thereby be able to "write your own scripture." It was this mantra that Mr. Jensen invited all in attendance to say as he cut the ceremonial ribbon.

21.     Thereafter, individuals socialized, learned more about Singularism's religious beliefs, and were able to tour Singularism's spiritual center.

22.     As part of its efforts to become known in the community and prevent authorities' misunderstanding of Singularism, in fall of 2023, Singularism sent letters to local government leaders, inviting them to come tour Singularism's spiritual center and informing them of Singularism's spiritual practices utilizing psilocybin. For example, letters were sent to the Mayor of Provo City, the Provo City Council, the Provo Police Department, as well as to the Utah County Attorney's Office. Neither office took advantage of Singularism's invitation to tour its spiritual center. The letters also informed these government offices of Singularism's claims to religious free exercise and raised the constitutional and statutory bases for those claims.

App-1:045

23.     Following Mr. Jensen's invitations to tour Singularism's space, there was media coverage regarding Singularism's religious practices which included a statement from the Utah County Attorney's Office:

> Based upon research conducted by the Utah County Attorney's office, it does not appear that Singularism has Constitutional protections to either use of administer psilocybin.[1]

24.     Following the ribbon-cutting event, beginning in September 2023, Singularism began its ceremonial practice of ushering sincere religious believers into transcendent experiences at its spiritual center. As part of doing so, Singularism carefully prepares a diluted, sacramental psilocybin tea, offers it to what it calls its "Voyagers," and supervises the voyager in a private, controlled, safe, and comfortable environment within Singularism's spiritual center, following safety guidelines such as those published by Harvard Medical School and Johns Hopkins. Before, during, and after the ceremony, religious guides such as Mr. Jensen attend to the voyager, help guide their spiritual inquiry, and record the voyager's spiritual insights, thereby allowing the individual to write their own scripture.

25.     One of Singularism's principal doctrines is that the American cultural line drawn between religion and science is illusory and that the two fields are complementary and interwoven. As such, Singularism takes full advantage, for religious purposes, of the benefits and wisdoms of clinical practices used in mental health therapy. Concurrent to Singularism's religious practices and beliefs, there are active scientific bodies, including those as notable as Harvard Medical School and Johns Hopkins, which have extensively researched and published regarding the positive usages of psilocybin for a variety of physical and mental issues in the secular context.

---

[1]     *Psychedelic Mushroom Interest Grows in Utah with Center Opening in Provo*, Fox13 News, updated Nov. 06, 2023, https://www.fox13now.com/news/local-news/psychedelic-mushroom-interest-grows-in-utah-with-center-opening-in-provo.

26.    Before administering its ceremonial and sacramental psilocybin to its voyagers, Singularism puts interested individuals through a screening process. During this multi-stage screening process, Singularism evaluates each voyager's physical, mental, and emotional suitability and readiness to participate in a psilocybin ceremony. As part of this multi-stage screening process, Singularism also evaluates the voyager's religious sincerity and prohibits individuals attempting to ingest psilocybin solely for secular or recreational purposes from participating in its ceremonies.

27.    In fact, even after deeming an individual religiously sincere, Singularism requires the individual to sign an attestation of their religious sincerity before participating in a psilocybin ceremony. The document including that attestation also requires the voyagers to take or not take certain actions to protect their own physical, mental, emotional, and spiritual well-being following a voyage through a Singularism ceremony. *See* Exhibit A.

28.    Singularism turns away individuals that it deems religiously insincere, as well as individuals for which a psilocybin ceremony could potentially be harmful to the individual's physical, mental, emotional, or spiritual well-being.

29.    Singularism's voyagers that are sincere and suited for the ceremonies have reported many significant and varied religious experiences during their Singularism ceremonies. As a few examples:

> a.    One voyager described his experience as "profoundly transformative," that he "experienced an overwhelming sense of unity with all things," which was a "deeply religious encounter with the sacredness of existence."

8

b.  Another voyager described her experience walking "alongside Jesus," encountering deceased relatives, embracing "Heavenly Mother and Father [and] feeling their unconditional love and reassurance."

c.  Another voyager described that she "experienced an overwhelming sense of joy, inner peace, and enlightenment," which was "nothing short of transcendent—a deeply spiritual encounter that connected me to something greater than myself."

30.   To participate in Singularism's therapeutic religious ceremonies via Singularism's for-profit organization, Psyche Healing and Bridging, individuals pay a fee. The fee is calculated according to the typical time spent in a ceremonial voyage and the amount of ceremonies the voyager intends to participate in, taking into consideration what a comparable secular therapeutic service might entail. In some instances where sincere individuals are seeking this religious experience, but do not have the financial resources to contribute, Singularism has permitted voyagers to participate in ceremonies at reduced or no cost.

31.   Because of Singularism's convictions in the correctness of its doctrines and the spiritual benefits of its practices, it openly shares about its mission and invites others to learn more about its beliefs. As part of Singularism's missionary efforts, it has begun to develop processes and procedures whereby others can become certified spiritual guides in its doctrines to expand the reach of its spiritual movement. Presently, only a handful of these guides have received Singularism's religious training. They are taught to abide by and conduct the same screening procedures discussed above.

32.   Singularism has operated peacefully and without any private or public incident or complaint related to it or any of its voyagers since it opened the doors of its spiritual center.

*Law Enforcement Knowingly Disregards Singularism's Religious Exemption, Seizes Singularism's Sacrament, Pursues Criminal Charges, and Threatens Eviction*

9

33. That peaceful religious practice was interrupted on November 11, 2024 when law enforcement from the Provo City Police Department—Detective Julian and Officers Does 1-4—presented at Singularism's spiritual center with a warrant to search the premises and seize certain items. *See* Exhibit B.

34. For roughly two hours, law enforcement searched Singularism's spiritual center, detained Mr. Jensen, and interrogated him regarding his and Singularism's religious practices. Mr. Jensen is a single, divorced father, and as a result, had to instruct one of Singularism's assistants to head to Mr. Jensen's home to care for his children, fearing that law enforcement would arrest him and prevent him from being able to return to take care of them that night.

35. From the outset, Detective Julian explained that he and Officers Does had been instructed to obtain the search warrant by Utah County Attorney, Defendant Gray. Detective Julian told Mr. Jensen that he was fully aware of Singularism's claim to sincere religious exemption, but that the Utah County Attorney had instructed that there does not exist, and cannot exist, any religious exemptions from the Utah Controlled Substances Act related to psilocybin.

36. Detective Julian explained that he had, undercover, posed as an individual interested in Singularism, going through some of the initial stages of Singularism's screening process, to obtain information regarding Singularism's usage of psilocybin.

37. At no point during law enforcement's search and seizure did Detective Julian or Officers Does appear to doubt Mr. Jensen or Singularism's religious sincerity that psilocybin ceremonies are a vital and core part of their religious practice.

38. Rather, Mr. Jensen explained in detail the integral nature of psilocybin to Singularism's religious practices, outlining Singularism's screening mechanisms, the other procedures it keeps to ensure safety for its voyagers, and that psilocybin tea or any other form of

10

psilocybin is never administered or distributed to anyone outside one of its ceremonies, all which occur within the walls of Singularism's spiritual center.

39.    During the entirety of law enforcement's presence, Mr. Jensen was wholly cooperative with law enforcement.

40.    At one point, Detective Julian and/or Officers Does indicated that in additional to sacramental psilocybin, they would be seizing certain records kept by Singularism. When Mr. Jensen saw which records they were referring to, it caused him immense grief, as these were the records in which Mr. Jensen and other of Singularism's spiritual guides recorded the personalized and living scripture of Singularism's voyagers. Mr. Jensen expressed that although the seizure of Singularism's sacramental psilocybin was difficult to endure, seizure of this sacred scripture was even more devastating.

41.    In total, law enforcement removed psilocybin, a black grinder, a black scale, and a gold scale used in preparing Singularism's sacramental psilocybin tea, THC, and "Bridging Model Paperwork" from Singularism's religious center. *See* Exhibit C. Although not recorded on the officers' seizure receipt, law enforcement also seized additional Psyche Bridging and Healing's business records, as well as a significant portion of Singularism's voyager's attestations to their religious sincerity and their religious intention statements.

42.    At the end of the encounter, Detective Julian told Mr. Jensen that he recommended Singularism cease all its religious practices.

43.    Recognizing Mr. Jensen's religious sincerity, his cooperation during the search, seizure, and interrogation, and their assessment of Mr. Jensen's low flight risk, the officers released Mr. Jensen without arrest. However, they told him to expect criminal charges. They also told Mr. Jensen they recommended he cease Singularism's operations.

11

44.     Upon law enforcement's departure, Mr. Jensen was left in a devastating state of distress, facing the reality that Defendants were placing before him an impossible choice: (1) practice his religion and continue the religious practices of Singularism, as deity had instructed him to do, under the prospect of escalated threats from law enforcement and promised prosecution or (2) give up his sincerely held religious beliefs, disband Singularism, give up his and others' livelihoods through the religious business arm of Singularism, Psyche Healing and Bridging, and turn away voyagers expecting to access the divine under Singularism's careful watch.

45.     This distress continues to the present and increased when, the next day, on November 12, 2024, Defendant Wolken served Singularism's landlord with a letter, threatening that if he did not evict Singularism from their rented space, that law enforcement would pursue the landlord for civil abatement and forfeiture. *See* Exhibit D.

46.     The letter, written with a header containing Defendant Beebe's name, asserted, without any basis in evidence, that Singularism was performing "illegal and dangerous activity" and that "residents in that neighborhood . . . are living in unnecessary fear and danger . . ." *Id.*

47.     As stated above, no incidents of any kind have ever occurred at or around Singularism's religious center related to Singularism's religious practices. Neither Singularism, nor its landlord, are aware of any complaint to either of them regarding Singularism's spiritual practices. The business park in which Singularism's spiritual center strictly enforces rules and security of the premises and has never made any complaint.

48.     Singularism's landlord responded to Defendant Wolken and the Provo City Police Department. In his letter, he asserted that he understood that Singularism was taking legal action to protect their religious rights. Because of that, he asserted that if he evicted Singularism as law

enforcement desired, he would expose himself to potential liability for religious discrimination in his renting practices. *See* Exhibit E.

49.     The landlord also stated that he had not observed any behavior that would prompt any concern. He stated that his employees present in the same building have not reported feeling unsafe or threatened by Singularism's presence. Additionally, he stated that he had not seen any questionable activity nor any unsavory people coming or going from Singularism's spiritual center. He stated that, if anything, "they have been exemplary tenants."

*The Utah Code Exempts Other Secular and Religious Uses of Controlled Substances*

50.     The Utah Code contains explicit exemptions for secular and religious uses of psilocybin and other controlled substances:

    a.  First, in 2024, the Utah Legislature passed S.B. 266 Medical Amendments, now codified within the Utah Controlled Substances Act at Utah Code § 58-37-3.5 ("Utah Psilocybin Act"). The Act grants broad permission to the largest healthcare systems in the state to develop and administer psilocybin programs for secular, medicinal usage. The Act places very few limitations on the healthcare systems' ability to determine how, when, where, to whom, and for what reason psilocybin is administered to patients and only requires the healthcare systems to report to the legislature on July 1, 2026. Through the Act, the Utah Legislature has made psilocybin accessible to the general public for secular, medical reasons.

    b.  Second, the Utah Controlled Substances Act also contains an exemption for secular, medicinal usage of cannabis. Utah Code § 58-37-3.7(2)-(5); *see also* Utah Code § 58-37-3.6(2)-(3); Utah Code § 58-37-3.8. Accordingly, the Utah Code also treats

13

cannabis usage as a protected class status in the context of public employment. *See* Utah Code § 34A-5-115.

c. Third, the Utah Controlled Substances Act also contains an exemption for religious usage of peyote, but only for a single racial, ethnic, and/or religious group, Native Americans. Utah Code § 58-37-8(12); Utah Code § 58-37-2(1)(w).

51. Additionally, the Utah Mental Health Professional Practice Act grants exemptions from licensure in at least two contexts:

a. First, the Utah Mental Health Professional Practice Act permits "a recognized member of the clergy while functioning in a ministerial capacity" to practice mental health therapy "as long as the member of the clergy does not represent that the member of the clergy is, or use the title of, a license classification" included in the Act. Utah Code § 58-60-107(2)(b).

b. Second, the Utah Mental Health Professional Practice Act permits individuals to practice hypnosis on others without a license in order to achieve mental and physical outcomes, as long as the individual (1) "induces a hypnotic state in a client for the purpose of increasing motivation or altering lifestyles or habits, such as eating or smoking, through hypnosis;" (2) "consults with a client to determine current motivation and behavior patterns;" (3) "prepares the client to enter hypnotic states by explaining how hypnosis works and what the client will experience;" (4) "tests clients to determine degrees of suggestibility;" (5) "applies hypnotic techniques based on interpretation of consultation results and analysis of client's motivation and behavior patterns;" and (6) "trains clients in self-hypnosis conditioning." Utah Code § 58-60-107(2)(d)(i).

*Utah and Other Authorities Have Permitted the Religious Usage of Psilocybin and Other Entheogenic Substances*

52.     Upon information and belief, other entheogenic religious organizations continue to worship in Utah without interference from Utah authorities, including Defendants.

53.     For example, a larger religious organization called "The Divine Assembly" appears to operate openly and without recourse under the same religious protections that should protect Singularism. It holds regular meetings with its members in Orem, Utah. On its website, The Divine Assembly discusses the legality of its worship involving psilocybin, offers church membership cards in exchange for a $75 fee, offers certificates of ministry, offers mushroom-growing kits and instructions, and advertises an event called "Psychedelics in the Beehive."[2]

54.     Psychedelics in the Beehive is an expansive event which, as it self-describes, "evolved from a conference and expo into a dynamic three-day festival" in downtown Salt Lake City, Utah. The event invites "attendees to explore new perspectives on psychedelics through a blend of learning and creative expression" and connects "Utah's diverse plant medicine community, bringing together experts, leaders, business owners, and newcomers to collaborate and choose their own path in exploring psychedelics."[3] The festival's next event is slated for January 24-26, 2025 and attendees will be able to choose to participate in religious psilocybin ceremonies under the same religious protections that should protect Singularism.[4]

---

[2]     *The Divine Assembly*, THE DIVINE ASSEMBLY, available at, https://www.thedivineassembly.org/.

[3]     *About Psychedelics in the Beehive*, PSYCHEDELICS IN THE BEEHIVE, available at, https://psychedelicsinthebeehive.org/explore.

[4]     *Worship at Psychedelics in the Beehive*, PSYCHEDELICS IN THE BEEHIVE, available at, https://psychedelicsinthebeehive.org/ceremonies.

15

55.     Additional organizations, such as Oklevueha Native American Church, centered in Spanish Fork, Utah, and Temple of Hermes, in Salt Lake City, Utah, openly practice their religious rites which include entheogenic practices, including in ceremonies occurring in Heber, Utah.

56.     On November 19, 2024, following a complaint made to the Utah Department of Commerce's Division of Professional Licensing ("DOPL") that Mr. Jensen was practicing therapy without a license, DOPL conducted an investigation during which Mr. Jensen provided a statement asserting his practice of religious therapy under the clergy licensure exemption under the Utah Mental Health Professional Practice Act. Following DOPL's investigation, DOPL informed Mr. Jensen that "it was decided this complaint would be closed as 'unfounded'. This means DOPL is not taking any action and [is] closing this complaint out with no further action taken at this time." *See* Exhibit H.

57.     Elsewhere in the country, authorities and courts have affirmed the religious rights of sincere individuals and organizations to conduct religious ceremonies with controlled substances.

58.     For example, the U.S. Supreme Court, under the federal Religious Freedom Restoration Act, famously confirmed a Christian Spiritist sect's religious exemption from the federal Controlled Substances Act for the religious consumption of hoasca, an entheogenic and sacramental tea made from plants unique to the Amazon region. *See Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 425 (2006).

59.     More recently, the Court of Appeals for the Ninth Circuit affirmed, under the federal Religious Freedom Restoration Act, not only (1) an entheogenic church's religious exemption from the federal Controlled Substances Act for the religious use of Daime tea, but also (2) the church's entitlement to attorney fees for the government's violation of their religious rights.

16

*See Church of Holy Light of Queen v. Holder*, 443 F. App'x 302 (9th Cir. 2011); *Church of the Holy Light of the Queen v. Holder*, 584 F. App'x 457 (9th Cir. 2014).

60.     And in April 2024, several federal agencies, including the Drug Enforcement Administration, entered into a public settlement agreement with an entheogenic church regarding the importation and religious use of ayahuasca, following a federal district court's confirmation of the church's religious exemption under the federal Religious Freedom Restoration Act. *See* Exhibits F and G.

61.     In light of these instances of agency and judicial confirmation of entheogenic religious rights, together with the open, public, and unprosecuted religious and secular usage of psilocybin and other entheogenic substances in Utah, and the various codified exemptions in the Utah Religious Freedom Restoration Act, Utah's Controlled Substances Act, and the Utah Mental Health Professional Practice Act, Defendant Gray's instruction to Defendant Julian and Defendants Does (and their following of that instruction) that no religious exemption related to psilocybin from the Utah Controlled Substances Act is possible amounts to knowing disregard, or, at least, reckless disregard, of Singularism's religious rights. The law has clearly established that sincere religious individuals and entheogenic organizations in the precise circumstance presented in this case have a right to their religious practice without governmental interference.

62.     Defendants violated clearly established law when, despite knowledge of Plaintiffs' religious sincerity, they proceeded to seek a search warrant without probable cause when Defendants knew or should have known Plaintiffs' religious practices were lawful, detain Mr. Jensen, search Singularism's religious center, seize Singularism and Psyche Healing and Bridging's sacramental psilocybin and other items,  threaten Mr. Jensen with criminal prosecution,

17

and threaten Singularism's landlord that if he did not evict Singularism from its rented space, law enforcement would pursue the landlord for civil abatement.

63.     As a result of Defendants' statutory and constitutional violations, Plaintiffs have been deprived of the possession and usage of their sacramental psilocybin, have been deprived of precious scripture regarding Singularism's voyagers, have been placed under threat of eviction, have been placed under threat of criminal prosecution and criminal forfeiture, their livelihoods have been threatened, and they have endured substantial emotional and mental distress. It is anticipated that the course of Defendants' conduct will only deepen the present and future harms to Plaintiffs' statutory and constitutional religious rights. For example, Plaintiffs expect that Singularism's religious community will be irreparably diminished, voyagers will no longer feel safe participating in a Singularism ceremony, and Psyche Bridging and Healing, as a result, will sustain substantial financial losses to the point of closure.

64.     Additionally, to defend their statutory and constitutional religious rights, Plaintiffs were forced to incur substantial attorney fees and costs in bringing this Complaint and an accompanying motion for temporary restraining order and preliminary injunction.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
*42. U.S.C. § 1983 and the First Amendment to the U.S. Constitution*

65.     Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

66.     At all times relevant hereto, Plaintiffs had clearly established rights under the First Amendment of the United States Constitution to, according to their sincere religious beliefs, freely exercise their entheogenic religious ceremonies utilizing entheogenic substances such as psilocybin.

18

App-1:057

67. At all times relevant hereto, and in performance of the acts set forth herein, Defendants Utah County, Provo City, Gray, Beebe, Wolken, Julian, and Officers Does acted under color of state law.

68. At all times relevant hereto, and in performance of the acts set forth herein, Defendants actively and personally caused the violation of constitutional rights alleged herein.

69. Defendants' conduct alleged herein—including, but not limited to, seeking a search warrant without probable cause when Defendants knew or should have known Plaintiffs' religious practices were lawful, detaining Mr. Jensen, threatening to bring criminal charges against Mr. Jensen, searching Singularism's religious center, seizing Singularism's sacramental psilocybin and other items, and threatening Singularism's landlord to evict Singularism from its rented space—violated Plaintiffs' constitutional rights.

70. Defendants' enforcement of the Utah Controlled Substances Act to specifically prohibit Plaintiffs' usage of psilocybin is not essential to furthering any compelling government interest.

71. Defendants possess less restrictive means of furthering any governmental interest they may have in specifically prohibiting Plaintiffs' usage of psilocybin.

72. The unlawful misconduct of Defendants was objectively unreasonable, flagrantly unlawful, and undertaken intentionally with willful indifference to Plaintiffs' rights.

73. Defendants' actions violated Plaintiffs' clearly established constitutional rights of which reasonable police officers are or should be aware.

74. Utah County and Provo City are liable for the actions described herein because (collectively and in the alternative):

App-1:058

    a.   The actions were caused or directed by Defendant Gray, a final decision-making authority;

    b.   The fact that multiple members of the Provo City Police Department, including the Chief, Captain, Detective, and other officers, undertook patently unlawful conduct, suggests a complete or reckless lack of training on a subject that officers will encounter on a regular basis.

75.    Defendants' unlawful actions caused Plaintiffs to incur costs in defending against the unlawful detention, search, and seizure, as well as the impending criminal charges, and other actual damages.

76.    Plaintiff is further entitled to attorney fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest, and costs as allowable by law.

**SECOND CLAIM FOR RELIEF**
*Article I, Section 4 of the Utah Constitution*

77.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

78.    At all times relevant hereto, Plaintiffs had clearly established rights under Article I, Section 4 of the Constitution, which exceed the protections afforded under the First Amendment to the U.S. Constitution, to, according to their sincere religious beliefs, freely exercise their entheogenic religious ceremonies utilizing entheogenic substances such as psilocybin.

79.    Since 1993, the Utah Supreme Court has stated that a free exercise analysis conducted under the First Amendment "does not control [the] analysis under the Utah Constitution," *Soc'y of Separationists, Inc. v. Whitehead*, 870 P.2d 916, 930 (Utah 1993), and has indicated strict scrutiny review likely applies. *See Snyder v. Murray City Corp.*, 124 F.3d 1349, 1354 (10th Cir. 1997); *Summum v. Pleasant Grove City*, 2015 UT 31, ¶ 7, 345 P.3d 1188; *Jeffs v.*

20

*Stubbs*, 970 P.2d 1234, 1249 (Utah 1998); *State v. Green*, 2004 UT 76, ¶ 70 n.1, 99 P.3d 820 (Durrant, J., concurring); *State v. Holm*, 2006 UT 31, ¶ 34 n.8, 137 P.3d 726.

80.     At all times relevant hereto, and in performance of the acts set forth herein, Defendants Utah County, Provo City, Gray, Beebe, Wolken, Julian, and Officers Does acted under color of state law.

81.     At all times relevant hereto, and in performance of the acts set forth herein, Defendants actively and personally caused the violation of constitutional rights alleged herein.

82.     Defendants' conduct alleged herein—including, but not limited to, seeking a search warrant without probable cause when Defendants knew or should have known Plaintiffs' religious practices were lawful, detaining Mr. Jensen, threatening to bring criminal charges against Mr. Jensen, searching Singularism's religious center, seizing Singularism's sacramental psilocybin and other items, and threatening Singularism's landlord to evict Singularism from its rented space—violated Plaintiffs' constitutional rights.

83.     Defendants' enforcement of the Utah Controlled Substances Act to specifically prohibit Plaintiffs' usage of psilocybin is not essential to furthering any compelling government interest.

84.     Defendants possess less restrictive means of furthering any governmental interest they may have in specifically prohibiting Plaintiffs' usage of psilocybin.

85.     The unlawful misconduct of Defendants was objectively unreasonable, flagrantly unlawful, and undertaken intentionally with willful indifference to Plaintiffs' rights.

86.     Defendants' actions violated Plaintiffs' clearly established constitutional rights of which reasonable police officers are or should be aware.

87.    Utah County and Provo City are liable for the actions described herein because (collectively and in the alternative):

   a.   The actions were caused or directed by Defendant Gray, a final decision-making authority;

   b.   The fact that multiple members of the Provo City Police Department, including the Chief, Captain, Detective, and other officers, undertook patently unlawful conduct, suggests a complete or reckless lack of training on a subject that officers will encounter on a regular basis.

88.    Defendants' unlawful actions caused Plaintiffs to incur costs in defending against the unlawful detention, search, and seizure, as well as the impending criminal charges, and other actual damages.

89.    Plaintiff is further entitled to attorney fees and costs, pre-judgment interest, and costs as allowable by law.

**THIRD CLAIM FOR RELIEF**
*Utah Religious Freedom Restoration Act*

90.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

91.    At all times relevant hereto, Plaintiffs had clearly established rights under the Utah Religious Freedom Restoration Act, Utah Code § 63G-33-101 *et seq.*, which exceed the protections afforded under Article I, Section 4 of the Constitution and the First Amendment to the U.S. Constitution, to, according to their sincere religious beliefs, freely exercise their entheogenic religious ceremonies utilizing entheogenic substances such as psilocybin.

22

App-1:061

92.     At all times relevant hereto, and in performance of the acts set forth herein, Defendants Utah County, Provo City, Gray, Beebe, Wolken, Julian, and Officers Does acted under color of state law.

93.     At all times relevant hereto, and in performance of the acts set forth herein, Defendants actively and personally caused the violation of statutory rights alleged herein.

94.     Defendants' conduct alleged herein—including, but not limited to, seeking a search warrant without probable cause when Defendants knew or should have known Plaintiffs' religious practices were lawful, detaining Mr. Jensen, threatening to bring criminal charges against Mr. Jensen, searching Singularism's religious center, seizing Singularism's sacramental psilocybin and other items, and threatening Singularism's landlord to evict Singularism from its rented space— violated Plaintiffs' statutory rights.

95.     Defendants' conduct alleged herein substantially burdened Plaintiffs' free exercise of religion by, but not limited to, constraining, limiting, and denying Plaintiffs' free exercise of religion; compelling Plaintiffs to act, or fail to act, in a manner contrary to Plaintiffs' free exercise of religion; and assessing criminal, civil, or administrative penalties or damages on Plaintiffs.

96.     Defendants' enforcement of the Utah Controlled Substances Act to specifically prohibit Plaintiffs' usage of psilocybin is not essential to furthering any compelling government interest.

97.     Defendants possess less restrictive means of furthering any governmental interest they may have in specifically prohibiting Plaintiffs' usage of psilocybin.

98.     The unlawful misconduct of Defendants was objectively unreasonable, flagrantly unlawful, and undertaken intentionally with willful indifference to Plaintiffs' rights.

99.     Defendants' actions violated Plaintiffs' clearly established statutory rights of which reasonable police officers are or should be aware.

100.    Utah County and Provo City are liable for the actions described herein because (collectively and in the alternative):

    c.   The actions were caused or directed by Defendant Gray, a final decision-making authority;

    d.   The fact that multiple members of the Provo City Police Department, including the Chief, Captain, Detective, and other officers, undertook patently unlawful conduct, suggests a complete or reckless lack of training on a subject that officers will encounter on a regular basis.

101.    Defendants' unlawful actions caused Plaintiffs to incur costs in defending against the unlawful detention, search, and seizure, as well as the impending criminal charges, and other actual damages.

102.    Plaintiff is further entitled to attorney fees and costs pursuant to Utah Code § 63G-33-201(6), pre-judgment interest, and costs as allowable by law.

103.    The notice of claim provision of Utah's Religious Freedom Restoration Act, *see* Utah Code § 63G-33-201(5), does not apply to this action. Defendants' wrongful actions are ongoing and complying with the notice of claim provision will place an undue hardship on Plaintiffs and increase the harm suffered and to be suffered by Plaintiffs. Further, the harm alleged herein is likely to occur or reoccur before the end of the 60-day period described in the notice of claim provision.

**FOURTH CLAIM FOR RELIEF**
*42. U.S.C. § 1983 and the Fourth Amendment to the U.S. Constitution*

24

104.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

105.    At all times relevant hereto, Plaintiffs had clearly established rights under the Fourth Amendment of the United States Constitution to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, and that no warrants shall issue against them without probable cause.

106.    At all times relevant hereto, and in performance of the acts set forth herein, Defendants Utah County, Provo City, Gray, Beebe, Wolken, Julian, and Officers Does acted under color of state law.

107.    At all times relevant hereto, and in performance of the acts set forth herein, Defendants actively and personally caused the violation of constitutional rights alleged herein.

108.    Defendants' conduct alleged herein—including, but not limited to, seeking a search warrant without probable cause when Defendants knew or should have known Plaintiffs' religious practices were lawful, detaining Mr. Jensen, threatening to bring criminal charges against Mr. Jensen, searching Singularism's religious center, seizing Singularism's sacramental psilocybin and other items, and threatening Singularism's landlord that if he did not evict Singularism from their rented space then law enforcement would pursue the landlord for civil abatement and forfeiture—violated Plaintiffs' constitutional rights.

109.    The unlawful misconduct of Defendants—done without probable cause—was objectively unreasonable, flagrantly unlawful, and undertaken intentionally with willful indifference to Plaintiffs' rights.

110.    Defendants' actions violated Plaintiffs' clearly established constitutional rights of which reasonable police officers are or should be aware.

25

111.    Utah County and Provo City are liable for the actions described herein because (collectively and in the alternative):

    a.  The actions were caused or directed by Defendant Gray, a final decision-making authority;

    b.  The fact that multiple members of the Provo City Police Department, including the Chief, Captain, Detective, and other officers, undertook patently unlawful conduct, suggests a complete or reckless lack of training on a subject that officers will encounter on a regular basis.

112.    Defendants' unlawful actions caused Plaintiffs to incur costs in defending against the unlawful detention, search, and seizure, the impending criminal charges, the threatened eviction action, and other actual damages.

113.    Plaintiff is further entitled to attorney fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest, and costs as allowable by law.

## FIFTH CLAIM FOR RELIEF
*Article I, Section 14 of the Utah Constitution*

114.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

115.    At all times relevant hereto, Plaintiffs had clearly established rights under the Article 1, Section 14 to the Utah Constitution that they shall be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause.

116.    At all times relevant hereto, and in performance of the acts set forth herein, Defendants Utah County, Provo City, Gray, Beebe, Wolken, Julian, and Officers Does acted under color of state law.

App-1:065

117. At all times relevant hereto, and in performance of the acts set forth herein, Defendants actively and personally caused the violation of constitutional rights alleged herein.

118. Defendants' conduct alleged herein—including, but not limited to, seeking a search warrant without probable cause when Defendants knew or should have known Plaintiffs' religious practices were lawful, detaining Mr. Jensen, threatening to bring criminal charges against Mr. Jensen, searching Singularism's religious center, seizing Singularism's sacramental psilocybin and other items, and threatening Singularism's landlord that if he did not evict Singularism from their rented space then law enforcement would pursue the landlord for civil abatement and forfeiture— violated Plaintiffs' constitutional rights.

119. The unlawful misconduct of Defendants—done without probable cause—was objectively unreasonable, flagrantly unlawful, and undertaken intentionally with willful indifference to Plaintiffs' rights.

120. Defendants' actions violated Plaintiffs' clearly established constitutional rights of which reasonable police officers are or should be aware.

121. Utah County and Provo City are liable for the actions described herein because (collectively and in the alternative):

    a. The actions were caused or directed by Defendant Gray, a final decision-making authority;

    b. The fact that multiple members of the Provo City Police Department, including the Chief, Captain, Detective, and other officers, undertook patently unlawful conduct, suggests a complete or reckless lack of training on a subject that officers will encounter on a regular basis.

122.   Defendants' unlawful actions caused Plaintiffs to incur costs in defending against the unlawful detention, search, and seizure, the impending criminal charges, the threatened eviction action, and other actual damages.

123.   Plaintiff is further entitled to attorney fees and costs, pre-judgment interest, and costs as allowable by law.

## SIXTH CLAIM FOR RELIEF
*Declaratory and Injunctive Relief*

124.   Plaintiffs incorporate all other allegations of this Complaint as if fully set forth herein.

125.   Defendants' conduct has caused and will cause Plaintiffs to suffer irreparable harm.

126.   Plaintiffs intend to continue their religious ceremonial usage of psilocybin. Unless this Court enjoins Defendants, Defendants will continue to cause irreparable harm to Plaintiffs through violation of their free exercise of religion.

127.   Plaintiffs fear that, without a court order, they will again be subjected to harassment, threats, arrest, criminal charges, forfeiture, eviction, and other retaliation and actions violative of their constitutional and statutory rights.

128.   Plaintiffs are likely to succeed on the merits of their constitutional claims.

129.   Plaintiffs are likely to suffer the same violations upon their future performance of their religious sacraments in Provo City and Utah County.

130.   The continued injury to Plaintiffs outweighs any damage to Defendants that could be caused by an injunction. Plaintiffs allege there is no damage to Defendants because there are no negative impacts to the community because of Singularism's private, safe, and controlled religious ceremonies.

28

131.    An injunction is in the public interest, as the U.S. Supreme Court, Utah Supreme Court, and the Utah Legislature has repeatedly recognized that religious free exercise is a fundamental right which merits protection and that there exist circumstances, both religious and secular, in which entheogenic substances are a public good.

132.    Plaintiffs are entitled to a declaration that Defendants have violated Plaintiffs' constitutional and statutory religious free exercise rights. The Court should enter injunctive relief against Defendants requiring that Defendants cease their unlawful violation of Plaintiffs' religious free exercise.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request the entry of judgment in their favor and against Defendants as follows:

1.     A declaratory judgment, pursuant to Utah Code § 78B-6-401, declaring that Defendants' actions violated Plaintiffs' First Amendment right of religious free exercise.

2.     A declaratory judgment, pursuant to Utah Code § 78B-6-401, declaring that Defendants' actions violated Plaintiffs' right of religious free exercise under Article I, Section 4 of the Utah Constitution.

3.     A declaratory judgment, pursuant to Utah Code § 78B-6-401, declaring that Defendants' actions violated Plaintiffs' right of religious free exercise under the Utah Religious Freedom Restoration Act.

4.     A declaratory judgment, pursuant to Utah Code § 78B-6-401, declaring that Defendants' actions violated Plaintiffs' rights under the Fourth Amendment of the United States Constitution to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, and that no warrants shall issue against them without probable cause.

5.     A declaratory judgment, pursuant to Utah Code § 78B-6-401, declaring that Defendants' actions violated Plaintiffs' rights under Article 1, Section 14 to the Utah Constitution that they shall be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated, and that no warrant shall issue but upon probable cause.

6.     Injunctive relief ordered the return of all items seized by Defendants from Singularism's spiritual center.

7.   Injunctive relief temporarily and permanently enjoining Defendants from prosecuting Plaintiffs' sincere free exercise of religion, threatening Singularism's eviction, or otherwise acting to interfere with Plaintiffs' sincere free exercise of religion regarding its religious entheogenic ceremonies.

8.   A judgment awarding compensation to Plaintiffs for their economic and non-economic loss and other personal injury resulting from the violations of their constitutional and statutory rights. Although the precise value of these damages is presently unknown, will increase as Defendants' unlawful conduct continues, and will be determined by the jury at trial, it is expected the value of the damages at the time of trial will exceed $100,000.

9.   A judgment assessing punitive damages against the individual Defendants.

10.   A judgment awarding Plaintiffs their costs of suit, including reasonable attorney fees and litigation expenses, under 42 U.S.C. § 1988, Utah Code § 63G-33-201(6), and other applicable law.

11.   A judgment awarding Plaintiffs pre- and post-judgment interest to the extent permitted by law.

12.   Nominal damages to the extent a factfinder determines that a particular constitutional violation did not cause actual damages.

13.   Such other and further relief as this Court may deem just and proper.


Respectfully submitted this 19th day of November, 2024:

/s/ *Tanner J. Bean*
Tanner J. Bean
Anna P. Christiansen
FABIAN VANCOTT
*Attorneys for Plaintiffs*

31

## VERIFICATION

I declare that the matters stated in the above Verified Complaint are within my personal knowledge or are based upon my review of the records kept in the regular course of Plaintiff's business. Based upon the information so obtained and compiled, which I believe to be accurate, I believe the facts stated in the foregoing Verified Complaint are true and correct and are based on a reasonable inquiry, and I make this verification to the best of my information and belief. I declare under criminal penalty under the laws of the State of Utah that the foregoing is true and correct.

DATED this 19th day of November, 2024.


*/s/ Bridger Lee Jensen*
Bridger Lee Jensen
*(signed with permission granted to Tanner J. Bean
via email on November 19, 2024)*

32

App-1:071

# EXHIBIT  B

FOURTH JUDICIAL DISTRICT - PROVO DISTRICT COURT
UTAH COUNTY, STATE OF UTAH


et al. vs. JEFFREY GRAY et al.

CASE NUMBER 240406123 Civil Rights

CURRENT ASSIGNED JUDGE
        KRAIG POWELL


PARTIES
        Plaintiff - SINGULARISM
        Represented by: TANNER BEAN
        Represented by: ANNA CHRISTIANSEN

        Plaintiff - BRIDGER JENSEN
        Represented by: TANNER BEAN
        Represented by: ANNA CHRISTIANSEN

        Plaintiff - PSYCHE HEALING AND BRIDGING LL
        Represented by: TANNER BEAN
        Represented by: ANNA CHRISTIANSEN

        Defendant - UTAH COUNTY

        Defendant - PROVO CITY
        Represented by: RICHARD ROBERTS
        Represented by: J JONES
        Represented by: GARY MILLWARD

        Defendant - BRIAN WOLKEN
        Represented by: RICHARD ROBERTS
        Represented by: J JONES
        Represented by: GARY MILLWARD

        Defendant - JACKSON JULIAN
        Represented by: RICHARD ROBERTS
        Represented by: J JONES
        Represented by: GARY MILLWARD

        Defendant - JEFFREY GRAY

        Defendant - JOHN DOES 1-4


ACCOUNT SUMMARY
            Total Revenue Amount Due:        625.00
                        Amount Paid:        625.00
                      Amount Credit:          0.00
                             Balance:          0.00
            Bail/Cash Bonds Amount Due:       300.00
                        Amount Paid:          0.00

11-27-2024 10:54 AM                                        Page 1 of 3

```
                    Amount Credit:           0.00
                          Balance:         300.00
      REVENUE DETAIL - TYPE: COMPLAINT - NO AMT S
               Original Amount Due:         375.00
               Amended Amount Due:          375.00
                     Amount Paid:           375.00
                    Amount Credit:            0.00
                          Balance:            0.00


      REVENUE DETAIL - TYPE: JURY DEMAND - CIVIL
               Original Amount Due:         250.00
               Amended Amount Due:          250.00
                     Amount Paid:           250.00
                    Amount Credit:            0.00
                          Balance:            0.00


   BAIL/CASH BOND DETAIL - TYPE: CASH BOND: Civil, Misc.
                  Posted By: KARALYNN E NIELSON
                          Posted:          300.00
                       Forfeited:            0.00
                      Exonerated:            0.00
                          Balance:          300.00
```

CASE NOTE


PROCEEDINGS
```
11-19-2024   Filed: Verified Complaint and Jury Demand
11-19-2024   Case filed by efiler
11-19-2024   Fee Account created Total Due: 375.00
11-19-2024   Fee Account created Total Due: 250.00
11-19-2024   COMPLAINT - NO AMT S Payment Received:  375.00
11-19-2024   JURY DEMAND - CIVIL Payment Received:  250.00
11-19-2024   Judge KRAIG POWELL assigned.
11-19-2024   Note: discovery tier set to 2
11-19-2024   Filed: Return of Electronic Notification
11-19-2024   Filed: Exhibits A-H to Complaint
11-19-2024   Filed: Return of Electronic Notification
11-19-2024   Filed: Request to Submit - Motion for Leave to File Overlength
             Motion for Temporary Restraining Order and Preliminary
             Injunction
11-19-2024   Filed: Motion for Leave to File Overlength Motion for Temporary
             Restraining Order and Preliminary Injunction
                   Filed by: PSYCHE HEALING AND BRIDGING LL et al.
11-19-2024   Filed: Order (Proposed) Granting Motion for Leaving to File
             Overlength Motion for Temporary Restraining Order and
             Preliminary Injunction
11-19-2024   Filed: Return of Electronic Notification
11-19-2024   Filed: Motion for Temporary Restraining Order and Preliminary
             Injunction
                   Filed by: PSYCHE HEALING AND BRIDGING LL et al.
11-19-2024   Filed: Exhibits A-K
11-19-2024   Filed: Exhibits L-R
```

| | |
|---|---|
| 11-19-2024 | Filed: Return of Electronic Notification |
| 11-20-2024 | Bond Account created Total Due: 300.00 |
| 11-20-2024 | Bond Posted  300.00 |
| 11-20-2024 | Filed: Notice of Appearance - Anna P. Christiansen |
| 11-20-2024 | Filed: Return of Electronic Notification |
| 11-20-2024 | Filed: Order (Proposed) Granting Motion for Temporary Restraining Order |
| 11-20-2024 | Filed: Return of Electronic Notification |
| 11-23-2024 | Filed order: Order Granting Motion for Leaving to File Overlength Motion for Temporary Restraining Order and Preliminary Injunction<br>        Judge KRAIG POWELL<br>        Signed November 23, 2024 |
| 11-23-2024 | Filed: Return of Electronic Notification |
| 11-25-2024 | Filed: Notice of Limited Appearance |
| 11-25-2024 | Filed: Return of Electronic Notification |

Tanner J. Bean (A17128)
tbean@fabianvancott.com
Anna P. Christiansen (A17518)
achristiansen@fabianvancott.com
**FABIAN VANCOTT**
95 South State Street, Suite 2300
Salt Lake City, UT 84111-23323
Telephone: (801) 531-8900
*Attorney for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BRIDGER LEE JENSEN, an individual; SINGULARISM, a non-profit corporation; PSYCHE HEALING AND BRIDGING, LLC dba PSYCHEDELIC THERAPY JOURNEY; a limited liability company; <br><br> Plaintiffs, <br> vs. <br><br> UTAH COUNTY, a political subdivision, PROVO CITY, a political subdivision; JEFFREY GRAY, an individual; TROY BEEBE, an individual; BRIAN WOLKEN, an individual; JACKSON JULIAN, an individual; JOHN DOES 1-4, individuals; <br><br><br> Defendants. | **MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** <br><br> Civil No. 2:24-cv-00887-JNP <br><br> Judge Jill N. Parrish <br><br> (Removed from Fourth Judicial District Court, Utah County, State of Utah, Case No. 240406123) |

Plaintiffs Bridger Lee Jensen, Singularism, and Psyche Healing and Bridging LLC dba Psychedelic Therapy Journey (collectively, "Singularism"), by and through their counsel, hereby file this Motion for Temporary Restraining Order and Preliminary Injunction to preserve the status quo and protect against Defendants' violation of Plaintiffs' constitutional and statutory rights to free exercise of religion.

i

## TABLE OF CONTENTS

**TABLE OF CONTENTS** …………………………………………………………… ii

**TABLE OF AUTHORITIES** ……………………………………………………… iii

**INTRODUCTION** …………………………………………………………….. 1

**RELIEF SOUGHT AND GROUNDS FOR RELIEF** ………………………… 2

**STATEMENT OF FACTS** ……………………………………………………… 2

**ARGUMENT** ………………………………………………………………….. 9

I.   **PLAINTIFFS MEET EACH REQUIREMENT FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION.** ……. 9

a.   **Plaintiffs Are Substantially Likely to Prevail on the Merits of Their Claims.** …………………………………………………………... 10

i.   *The First Amendment to the U.S. Constitution Grants Singularism a Religious Exemption for the Free Exercise of Its Religion.* ……. 10

ii.   *Article I, Section 4 of the Utah Constitution Grants Singularism a Religious Exemption for the Free Exercise of Its Religion.* ……… 14

iii.   *Utah's Religious Freedom Restoration Act Grants Singularism a Religious Exemption for the Free Exercise of Its Religion.* ……… 17

iv.   *The Utah Code Contains Various Exemptions Which Undermine the Government's Interest and Indicate There are Less Restrictive Means.* ……………………………………………………… 22

v.   *Courts and Agencies Permit Sincere Religious Adherents to Conduct Religious Ceremonies with Entheogenic Substances.* ….. 25

vi.   *Strict Scrutiny Requires Plaintiffs' Religious Exemption from the Utah Controlled Substances Act.* ………………………………… 26

b.   **Plaintiffs Have Suffered and Will Suffer Irreparable Harm.** ……….. 30

c.   **The Injury to Plaintiffs Greatly Outweighs Any Potential Damage to Defendants.** ……………………………………………………… 30

d.   **A Temporary Restraining Order and Preliminary Injunction Advance the Public Interest.** …………………………………………… 31

**CONCLUSION** …………………………………………………………… 31

App-1:077

## TABLE OF AUTHORITIES

Page(s)

Cases

*Attorney General v. Desilets*,
  636 N.E.2d 233 (Mass. 1994) ............................................................................. 16
*Bostock v. Clayton Cnty., Georgia*,
  140 S. Ct. 1731 (2020) ........................................................................................ 11
*Braunfeld v. Brown*,
  366 U.S. 599 (1961) ...................................................................................... 18, 19
*Burwell v. Hobby Lobby Stores, Inc.*,
  573 U.S. 682 (2014) ....................................................................... 17, 18, 19, 20
*Church of Christ v. Metropolitan Board of Zoning Appeals*,
  371 N.E.2d 1331 (Ind. Ct. App. 1978) ............................................................. 16
*Church of Holy Light of Queen v. Holder*,
  443 F. App'x 302 (9th Cir. 2011) ...................................................................... 26
*Church of Lukumi Babalu Aye, Inc. v. Hialeah*,
  508 U.S. 520 (1993) ........................................................................................... 12
*Church of the Holy Light of the Queen v. Holder*,
  584 F. App'x 457 (9th Cir. 2014) ................................................................ 26, 29
*City Chapel Evangelical Free Inc. v. City of South Bend*,
  744 N.E.2d 443 (Ind. 2001) ............................................................................... 16
*City of Boerne v. Flores*,
  521 U.S. 507 (1997) ........................................................................................... 18
*City of Woodlinville v. Northshore United Church of Christ*,
  211 P.3d 406 (Wash. 2009) ................................................................................ 16
*Core Progression Franchise LLC v. O'Hare*,
  2022 WL 1741836 (10th Cir. May 31, 2022) ................................................... 30
*Coulee Catholic Schs. v. Labor & Indus. Review Comm'n*,
  768 N.W.2d 868 (Wis. 2009) ............................................................................. 16
*Davis v. The Church of Jesus Christ of Latter-day Saints*,
  852 P.2d 640 (Mont. 1993) ................................................................................ 16
*Dedman v. Board*,
  740 P.2d 28 (Haw. 1987) ................................................................................... 16
*Employment Division, Department of Human Resources of Oregon v. Smith*,
  494 U.S. 872 (1990) ............................................................................... 12, 13, 24
*Foltin v. Roman Catholic Bishop*,
  871 A.2d 1208 (Me. 2005) ................................................................................. 16
*Fulton v. City of Philadelphia, Pennsylvania*,
  141 S. Ct. 1868 (2021) ........................................................................... 11, 12, 13
*Gipson v. Brown*,
  749 S.W.2d 297 (Ark. 1988) .............................................................................. 16

iii

*Gonzales v. O Centro Espírita Beneficente União do Vegetal,*
  546 U.S. 418 (2006) .......................................................................... 13, 19, 25

*Harmon v. City of Norman, Oklahoma,*
  981 F.3d 1141 (10th Cir. 2020) ........................................................... 10

*Heideman v. S. Salt Lake City,*
  348 F.3d 1182 (10th Cir. 2003) ........................................................... 30

*Hobby Lobby Stores, Inc. v. Sebelius,*
  723 F.3d 1114 (10th Cir. 2013) ........................................................... 10

*Holt v. Hobbs,*
  574 U.S. 352 (2015) ............................................................................ 17

*Humphrey v. Lane,*
  728 N.E.2d 1039 (Ohio 2000) ............................................................. 16

*In re Brown,*
  478 So. 2d 1033 (Miss. 1985) ............................................................. 16

*Janny v. Gamez,*
  8 F.4th 883 (10th Cir. 2021) .......................................................... 11, 12

*Jeffs v. Stubbs,*
  970 P.2d 1234 (Utah 1998) ............................................................ 14, 15

*Kennedy v. Bremerton Sch. Dist.,*
  597 U.S. 507 (2022) .................................................................. 10, 11, 12

*Larson v. Cooper,*
  90 P.3d 125 (Alaska 2004) .................................................................. 16

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,*
  140 S. Ct. 2367 (2020) ........................................................................ 17

*Lower v. Bd. of Dirs. of the Haskell Cnty. Cemetery Dist.,*
  56 P.3d 235 (Kan. 2002) ..................................................................... 16

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n,*
  138 S. Ct. 1719 (2018) ........................................................................ 12

*Matter of Browning,*
  476 S.E.2d 465 (N.C. Ct. App. 1996) ................................................. 16

*McCready v. Hoffius,*
  586 N.W.2d 723 (Mich. 1998) ............................................................ 16

*Hill-Murray Federation of Teachers v. Hill- Murray High School,*
  487 N.W.2d 857 (Minn. 1992) ............................................................ 16

*Munns v. Martin,*
  930 P.2d 318 (Wash. 1997) ................................................................. 16

*Catholic Charities v. Serio,*
  859 N.E.2d 459 (N.Y. 2006) ............................................................... 16

*Porth v. Roman Catholic Diocese,*
  532 N.W.2d 195 (Mich. Ct. App. 1995) .............................................. 16

*Rasheed v. Comm'r of Corr.,*
  845 N.E.2d 296 (Mass. 2006) ............................................................. 16

*Rocky Mountain Gun Owners v. Polis,*
  121 F.4th 96 (10th Cir. 2024) ............................................................. 10

iv

*Rupert v. Portland*,
  605 A.2d 63 (Me. 1992) ................................................................................ 16
*Salt Lake City Corp. v. Salt Lake City Civ. Serv. Comm'n*,
  2006 UT App 47 ......................................................................................... 26
*Sherbert v. Verner*,
  374 U.S. 398 (1963) .................................................................................... 13
*Sierra Club, Inc. v. Bostick*,
  539 F. App'x 885 (10th Cir. 2013) ............................................................. 30
*Snyder v. Murray City Corp.*,
  124 F.3d 1349 (10th Cir. 1997) .................................................................. 14
*Snyder v. Murray City Corp.*,
  2003 UT 13, 73 P.3d 325 ............................................................................ 14
*Soc'y of Separationists, Inc. v. Whitehead*,
  870 P.2d 916 (Utah 1993) ........................................................................... 14
*St. John's Lutheran Church v. State Comp. Ins. Fund*,
  830 P.2d 1271 (Mont. 1992) ....................................................................... 16
*State ex rel. Swann v. Pack*,
  527 S.W.2d 99 (Tenn. 1975) ....................................................................... 16
*State v. Evans*,
  796 P.2d 178 (Kan. Ct. App. 1990) ............................................................ 16
*State v. Everly*,
  146 S.E.2d 705 (W.Va. 1966) ..................................................................... 16
*State v. Green*,
  2004 UT 76 .................................................................................................. 15
*State v. Hershberger*,
  462 N.W.2d 393 (Minn. 1990) .................................................................... 16
*State v. Holm*,
  2006 UT 31, 137 P.3d 726 .......................................................................... 15
*State v. Loudon*,
  857 S.W.2d 878 (Tenn. Crim. App. 1993) ................................................. 16
*State v. Mack*,
  173 N.H. 793, 249 A.3d 423 (2020) ..................................................... 16, 26
*State v. Miller*,
  549 N.W.2d 235 (Wis. 1996) ...................................................................... 16
*State v. Mooney*,
  2004 UT 49, 98 P.3d 420 ............................................................................ 26
*State v. Victor*,
  15–339 (La. App. 5 Cir. 5/26/16), 195 So. 3d 128 .................................... 16
*Summum v. Pleasant Grove City*,
  2015 UT 31, 345 P.3d 1188 ........................................................................ 14
*Swanner v. Anchorage Equal Rights Comm'n*,
  868 P.2d. (Alaska 1994) ............................................................................. 16
*Tanzin v. Tanvir*,
  592 U.S. 43 (2020) ................................................................................. 17, 18

v

App-1:080

*Thomas v. Review Bd. of Ind. Employment Security Div.*,
  450 U.S. 707 (1981) ........................................................................... 11
*Toledo v. Nobel-Sysco, Inc.*,
  892 F.2d 1481 (10th Cir. 1989)....................................................... 26
*United States v. Boyll*,
  968 F.2d 21 (10th Cir. 1992) ......................................................... 26
*Verlo v. Martinez*,
  820 F.3d 1113 ............................................................................ 10, 31
*Wisconsin v. Yoder*,
  406 U.S. 205 (1972) ............................................................ 11, 13, 31
*Wolf v. Sundquist*,
  955 S.W.2d 626 (Tenn. App. 1997) .............................................. 16

Statutes

42 U.S.C. § 1996a........................................................................... 24
42 U.S.C. § 2000bb-1 ..................................................................... 17
775 Ill. Comp. Stat. 35/1 to 35/99................................................. 16
Ala. Const. art. I § 3.01.................................................................. 16
Ariz. Rev. Stat. §§ 41-1493 to 41-1493.02 .................................. 16
Ark. Code §§ 16-123-401 to 16-123-407 ..................................... 16
Article I, Section 4 of the Utah Constitution ................................. 2, 14, 15, 27
Article III, Section 1 of the Utah Constitution.............................. 15
Conn. Gen. Stat. § 52-571b............................................................ 16
Fla. Stat. §§ 761.01 to 761.05 ....................................................... 16
Kan. Stat. § 60-5301 to 60-5305 ................................................... 16
Ky. Rev. Stat. § 446.350 ................................................................ 16
La. Rev. Stat. §§ 13:5231 to 13:5242 ........................................... 16
Miss. Code § 11-61-1..................................................................... 16
Mo. Stat. §§ 1.302-1.307 ............................................................... 16
Mont. Code §§ 27-33-101 to 27-33-105 ....................................... 16
N.D. Cent. Code § 14-02.4-08.1 .................................................... 16
N.M. Stat. §§ 28-22-1 to 28-22-5 ................................................. 16
Okla. Stat. tit. 51, §§251-258........................................................ 16
PL 103–344..................................................................................... 24
R.I. Gen. Laws §§ 42-80.1-1 to 42-80.1-4.................................... 16
S.C. Code §§ 1-32-10 to 1-32-60................................................... 16
S.D. Codified Laws § 1-1A-4 ........................................................ 16
Tenn. Code § 4-1-407 ..................................................................... 16
Tex. Civ. Prac. & Rem. Code §§ 110.001 to 110.012 ................... 16
Title 58 of the Utah Code............................................................... 28
U.S. Const. amend. I ...................................................................... 11
Utah Code § 34A-5-115.................................................................. 23
Utah Code § 58-37-2(1)(w) ............................................................ 24

vi

Utah Code § 58-37-3.5 .................................................................................................. 22, 28
Utah Code § 58-37-3.6(2)-(3) ........................................................................................... 23
Utah Code § 58-37-3.7(2)-(5) ........................................................................................... 23
Utah Code § 58-37-3.8 ...................................................................................................... 23
Utah Code § 58-37-8(12) .................................................................................................. 24
Utah Code § 58-60-102(7) ................................................................................................ 24
Utah Code § 58-60-103(1)(a) ........................................................................................... 24
Utah Code § 58-60-107(2) ................................................................................................ 25
Utah Code § 63G-33-101 .................................................................................................. 20
Utah Code § 63G-33-201(1) ............................................................................................. 21
Va. Code § 57-1 ................................................................................................................. 16
W. Va. Code § 35-1A-1 ..................................................................................................... 16

Regulations

21 C.F.R. § 1307.31 .......................................................................................................... 24

Other Authorities

*S.B. 150* ........................................................................................................................... 20
S.B. 266 ............................................................................................................................. 22
SB0150 .............................................................................................................................. 20
SB0266 .............................................................................................................................. 22
*Senate – 2024* .................................................................................................................. 21
*Smith* decision.,
  *What Goes Around Comes Around: The New Relevancy of State Constitution Religion Clauses*
  ”38 Val. U. L. Rev. 353 (2004) ...................................................................................... 15

App-1:082

**INTRODUCTION**

With full knowledge of Singularism's sincere religious belief that sacramental psilocybin usage is essential to accessing the divine, Defendants detained Singularism's founder, searched its spiritual center, seized its sacramental psilocybin and other items, and threatened Singularism's landlord to evict Singularism from its spiritual center. These unconstitutional acts were intentional. Utah County Attorney Jeffrey Gray, with knowing and reckless disregard for the law and Plaintiffs' rights, instructed Provo City Detective Julian and other officers that no exemption from the Utah Controlled Substances Act for psilocybin is *ever* proper, even for sincere religious believers who pose no harm to the public.

Defendants' position is plainly wrong. It is ignorant of the long history of clearly established law regarding religious free exercise in this country. The First Amendment protects Plaintiffs' religious worship, the Utah Constitution protects it in greater force, and the newly passed Utah Religious Freedom Restoration Act's protections are greater still. Defendants grievously erred when they refused to even begin the nuanced analysis which is focused on Plaintiffs' specific religious needs.

The Court should immediately grant a temporary restraining order and thereafter a preliminary injunction enjoining Defendants' constitutional and statutory violations of Plaintiffs' free exercise. Plaintiffs' unquestionable religious sincerity and their record of conducting religious ceremonies without *any* effect on public safety, paired with the constitutional and statutory authorities described below, demonstrate Plaintiffs will prevail in this matter. They have already been irreparably harmed. Allowing Defendants' egregious conduct to continue will wipe Singularism off the map, devastate its adherents, and destroy the livelihoods of its clergy who run

App-1:083

Singularism's non- and for-profit organizations. In contrast, no damage comes to Defendants by an injunction. Thus, an injunction is in the public interest, protecting what the Utah Legislature said, only months ago, was a "fundamental right," and what the U.S. Supreme Court has called "indispensable to life in a free and diverse Republic."

## RELIEF SOUGHT AND GROUNDS FOR RELIEF

The Court should enjoin Defendants from burdening Plaintiffs' religious free exercise. The injunction should expressly permit Plaintiffs to practice their entheogenic religion and perform psilocybin ceremonies. The injunction should prohibit Defendants from taking any action to limit Plaintiffs' free exercise of religion.

## STATEMENT OF FACTS

1.    Singularism is a small, minority faith which views the ingestion of sacramental psilocybin tea as central to accessing the divine. Verified Compl., ECF 2-2, at ¶¶ 2-3, 16, 24; Decl. of Bridger Jensen, attached as Exhibit A, at ¶¶ 18-27.

2.    Singularism was founded by Plaintiff Bridger Lee Jensen, who, following years of various transcendent and spiritual experiences facilitated through psilocybin, felt compelled to share his spiritual enlightenment with the community. Mr. Jensen founded Singularism first as a community of believers, and then, second, as a non-profit organization, together with an associated for-profit organization, Psyche Healing and Bridging, LLC. Verified Compl. at ¶¶ 1-3, 16-21; *see generally* Ex. A.

3.    Singularism has openly and publicly operated its religious community since November 2023. Verified Compl. at ¶¶ 18-24, 31-32; Ex. A, at ¶ 18. Singularism even invited the

2

Provo City Mayor, the Provo City Council, and the Utah County Attorney's Office to tour its spiritual center in Provo shortly after opening. *See* letters attached together as <u>Exhibit B</u>.

4.      One of Singularism's principal beliefs is that psilocybin ceremonies permit a "voyager" to access the divine and thereby "write their own scripture" by interpreting and recording their experiences. Verified Compl. at ¶¶ 20, 24; Ex. A, at ¶ 20. Singularism has set forth extensive statements regarding its beliefs and doctrine. *See, e.g.,* <u>Exhibits P, Q, and R</u>.

5.      Singularism also believes that the American cultural line drawn between religion and science is illusory and that the two fields are complementary and interwoven. As such, Singularism takes full advantage, for religious purposes, of the benefits and wisdoms of clinical practices used in mental health therapy, integrating a broad collection of scientific and medical research. Verified Compl. at ¶ 25; Ex. A, at ¶¶ 17, 19, 24; *see, e.g.,* research utilized by Plaintiffs, attached as <u>Exhibit O</u>.

6.      Before administering its ceremonial and sacramental psilocybin to its voyagers, Singularism puts interested individuals through a screening process. During this multi-stage screening process, Singularism evaluates each voyager's physical, mental, and emotional suitability and readiness to participate in a psilocybin ceremony. As part of this multi-stage screening process, Singularism also evaluates the voyager's religious sincerity and prohibits individuals attempting to ingest psilocybin solely for secular or recreational purposes from participating in its ceremonies. Verified Compl. at ¶ 26; Ex. A, at ¶ 19.

7.      Singularism requires the individual to sign an attestation of their religious sincerity before participating in a psilocybin ceremony. The document requires the voyagers to to protect their well-being following a voyage. Verified Compl. at ¶ 27; *See* <u>Exhibit C</u>.

8.      Singularism turns away individuals that it deems religiously insincere, as well as individuals for which a psilocybin ceremony could potentially be harmful. Verified Compl. at ¶ 28; Ex. A, at ¶ 19.

9.      Singularism's voyagers have reported significant and varied religious experiences. As a few examples:

   a.   One voyager described his experience as "profoundly transformative," that he "experienced an overwhelming sense of unity with all things," which was a "deeply religious encounter with the sacredness of existence." *See* Decl. of Allan Johnson, attached as <u>Exhibit D</u>, at ¶ 7.

   b.   Another voyager described her experience walking "alongside Jesus," encountering deceased relatives, embracing "Heavenly Mother and Father [and] feeling their unconditional love and reassurance." *See* Decl. of Brandi Lee, attached as <u>Exhibit E</u>, at ¶ 9.

   c.   Another voyager described that she "experienced an overwhelming sense of joy, inner peace, and enlightenment," which was "nothing short of transcendent—a deeply spiritual encounter that connected me to something greater than myself." *See* Decl. of Marjorie Johnson, attached as <u>Exhibit F</u>, at ¶ 7.

   d.   Others have had similar experiences. *See* Decl. of Jennifer Eden, attached as <u>Exhibit G</u>; Decl. of Jake Wood, attached as <u>Exhibit H</u>.

10.     Because of Singularism's convictions, it openly shares about its mission and invites others to learn more about its beliefs. As part of Singularism's missionary efforts, it has begun to develop processes and procedures whereby others can become certified spiritual guides in its

doctrines to expand the reach of its spiritual movement. Presently, only a handful of these guides have received Singularism's religious training. They are taught to abide by and conduct the same screening procedures discussed above. Verified Compl. at ¶ 31.

11.     Singularism has operated peacefully and without any private or public incident or complaint related to it or any of its voyagers since it opened the doors of its spiritual center. Verified Compl. at ¶ 32; Ex. A, at ¶ 16, 19, 21.

12.     However, on November 11, 2024, law enforcement from the Provo City Police Department—Detective Julian and Officer Does 1-4—presented at Singularism's spiritual center with a warrant to search the premises and seize certain items. Verified Compl. at ¶ 33; *see* search warrant attached as <u>Exhibit I</u>.

13.     For roughly two hours, law enforcement searched Singularism's spiritual center, detained Mr. Jensen, and interrogated him regarding his and Singularism's religious practices. Verified Compl. at ¶ 34.

14.     From the outset, Detective Julian explained that he and Officers Does had been instructed to obtain the search warrant by Utah County Attorney, Defendant Gray. Detective Julian told Mr. Jensen that he was fully aware of Singularism's claim to sincere religious exemption, but that the Utah County Attorney had instructed him that there does not exist, and cannot exist, any religious exemptions from the Utah Controlled Substances Act related to psilocybin. Verified Compl. at ¶ 35.

15.     Detective Julian explained that he had, undercover, posed as an individual interested in Singularism, going through some of the initial stages of Singularism's screening process. Verified Compl. at ¶ 36.

16.     At no point during law enforcement's search and seizure did Detective Julian or Officers Does 1-4 appear to doubt Mr. Jensen or Singularism's religious sincerity that psilocybin ceremonies are a vital and core part of their religious practice. Verified Compl. at ¶ 37.

17.     Rather, Mr. Jensen explained in detail the integral nature of psilocybin to Singularism's religious practices, outlining Singularism's screening mechanisms, the other procedures it uses to ensure safety for its voyagers, and that psilocybin tea or any other form of psilocybin is never administered or distributed to anyone outside one of Singularism's ceremonies. Verified Compl. at ¶ 38.

18.     At one point, Detective Julian and/or Officers Does indicated they would be seizing certain records kept by Singularism. When Mr. Jensen saw which records they were referring to, it caused him immense grief, as these were the records in which Mr. Jensen and other of Singularism's spiritual guides recorded the personalized scripture for Singularism's voyagers. Mr. Jensen expressed that although the seizure of Singularism's sacramental psilocybin was devastating, seizure of this sacred scripture would be even more devastating. Verified Compl. at ¶ 40.

19.     In total, law enforcement removed psilocybin, a black grinder, a black scale, and a gold scale used in preparing Singularism's sacramental psilocybin tea, THC, and "Bridging Model Paperwork" from Singularism's religious center. *See* <u>Exhibit J</u>. Although not recorded on the officers' seizure receipt, law enforcement also seized additional Psyche Bridging and Healing's business records, as well as some of Singularism's voyager's attestations to their religious sincerity. Verified Compl. at ¶ 41.

6

20.     At the end of the encounter, Detective Julian told Mr. Jensen that he recommended Singularism cease all its religious practices. Verified Compl. at ¶ 42.

21.     The officers released Mr. Jensen without arrest. However, they told him to expect criminal charges. Verified Compl. at ¶ 43.

22.     Upon law enforcement's departure, Mr. Jensen was left in an immense state of distress, facing the reality that Defendants were placing before him an impossible choice: (1) practice his religion and continue the religious practices of Singularism under the prospect of escalated threats from law enforcement and promised prosecution or (2) give up his sincerely held religious beliefs, disband Singularism, give up his and other clergy's livelihoods through Psyche Healing and Bridging, and turn away voyagers expecting to access the divine under Singularism's spiritual care. Verified Compl. at ¶ 44.

23.     This distress continues to the present and increased when, the next day, on November 12, 2024, Defendant Wolken served Singularism's landlord with a letter, threatening that if he did not evict Singularism from their rented space, that law enforcement would pursue the landlord for civil abatement. Verified Compl. at ¶ 45; *See* Exhibit K.

24.     The letter, written with a header containing Defendant Beebe's name, asserted that Singularism was performing "illegal and dangerous activity" and that "residents in that neighborhood . . . are living in unnecessary fear and danger . . . ." Verified Compl. at ¶ 46; Ex. K.

25.     As stated above, no incidents of any kind have ever occurred at or around Singularism's religious center related to Singularism's religious practices. Neither Singularism, nor its landlord, are aware of any complaint regarding Singularism's spiritual practices. Verified Compl. at ¶ 47.

7

26.    Further, others in the Singularism community have observed only the sincere religious practice of religion at Singularism's spiritual center. *See* Exs. E-H.

27.    Singularism's landlord responded to Defendant Wolken and the Provo City Police Department. In his letter, he asserted that he understood that Singularism was taking legal action to protect their religious rights. Because of that, he asserted that if he evicted Singularism as law enforcement desired, he would expose himself to potential liability for religious discrimination in his renting practices. Verified Compl. at ¶ 48; *see* eviction letter, attached as Exhibit K.

28.    The landlord also stated that he had not observed any behavior that would prompt any concern. He stated that his employees present in the same building have not reported feeling unsafe or threatened by Singularism's presence. Additionally, he stated that he had not seen any questionable activity nor any unsavory people coming or going from Singularism's spiritual center. He stated that, if anything, "they have been exemplary tenants." Verified Compl. at ¶ 49; Ex. L.

29.    As a result of Defendants' actions, Mr. Jensen was detained and Plaintiffs have been deprived of the possession and usage of their sacramental psilocybin, have been deprived of precious records regarding Singularism's voyagers, have been placed under threat of eviction, have been placed under threat of criminal prosecution and forfeiture, have had their livelihoods threatened, and have endured substantial emotional and mental distress. It is anticipated that the continued course of Defendants' conduct will only deepen the present and future harms to Plaintiffs' statutory and constitutional religious rights. For example, Plaintiffs expect that Singularism's religious community will be irreparably diminished, voyagers will no longer feel safe participating in a Singularism ceremony, and Psyche Bridging and Healing, as a result, will sustain substantial financial losses to the point of closure. Verified Compl. at ¶ 63.

8

30.     Defendants appear to have decided not to prosecute very similarly situated religious groups, including the Divine Assembly and Psychedelics in the Beehive, which utilize psilocybin, and others which utilize other entheogenic substances, such as Oklevueha Native American Church and Temple of Hermes. *See* Verified Compl., at ¶¶ 52-55.

31.     On November 19, 2024, the Utah Department of Commerce's Division of Professional Licensing ("DOPL") concluded that Mr. Jensen is entitled to practice mental health therapy under the clergy exemption to the Utah Mental Health Professional Practice Act and according to the dictates of Singularism's sacramental ceremonies. *See* Verified Compl., at ¶¶ 56; *see* email correspondence attached as Exhibit M.

32.     On November 19, 2024, Singularism filed its Complaint against Defendants in state court, along with a motion for temporary restraining order and preliminary injunction. *See* ECF 2-2, 2-3.

33.     On November 27, 2024, before the state court judge could hear Singularism's motion for temporary restraining order and preliminary injunction, Defendants removed the case to this Court. Defendants' notice of removal did not include a copy of Singularism's motion for temporary restraining order and preliminary injunction, *see* ECF 2, so the Court set a briefing schedule for it to be refiled incorporating federal injunctive frameworks on December 4, 2024, as well as a hearing date for the motion on December 13, 2024, *see* ECF 5.

## **ARGUMENT**

### I.      **PLAINTIFFS MEET EACH REQUIREMENT FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION.**

Plaintiffs demonstrate each of the four elements required for the Court to grant their motion for a temporary restraining order and preliminary injunction:

(1) a substantial likelihood that they will ultimately succeed on the merits of their suit;
(2) that they are likely to suffer irreparable harm in the absence of preliminary relief;
(3) this threatened harm outweighs the harm a preliminary injunction may pose to the opposing party; and,
(4) if issued, the injunction will not adversely affect the public interest.

*Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 112 (10th Cir. 2024) (quotation omitted).

"The likelihood-of-success and irreparable-harm factors are the most critical in the analysis." *Id.* (quotation omitted). Additionally, "the third and fourth factors merge when, like here, the government is the opposing party." *Id.* (quotation omitted).

### a.   Plaintiffs Are Substantially Likely to Prevail on the Merits of Their Claims.

To demonstrate this factor, Plaintiffs must "make a prima facie case showing a reasonable probability that they will ultimately be entitled to the relief sought." *Harmon v. City of Norman, Oklahoma*, 981 F.3d 1141, 1146 (10th Cir. 2020). In "the First Amendment context, the likelihood of success on the merits will often be the determinative factor because of the seminal importance of the interests at stake." *Id.* (cleaned up) (quoting *Verlo v. Martinez*, 820 F.3d 1113, 1126 (10th Cir. 2016 and *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013) (en banc), *aff'd*, 573 U.S. 682 (2014)). Plaintiffs allege a prima facie case of each of their causes of action and that they are likely to ultimately prevail on each of them according to the authorities below.

> ### i.   The First Amendment to the U.S. Constitution Grants Singularism a Religious Exemption for the Free Exercise of Its Religion.

"Respect for religious expressions is indispensable to life in a free and diverse Republic—whether those expressions take place in a sanctuary or on a field, and whether they manifest through the spoken word or a bowed head." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 543

(2022). Indeed, "preserving the promise of the free exercise of religion enshrined in our Constitution . . . lies at the heart of our pluralistic society." *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1754 (2020).

The First Amendment, applicable to the States under the Fourteenth Amendment, provides that "Congress shall make no law . . . prohibiting the free exercise" of religion. U.S. CONST. amend. I; *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2022); *Fulton v. City of Philadelphia, Pennsylvania*, 141 S. Ct. 1868, 1876 (2021). Singularism's "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Fulton*, 141 S. Ct. at 1876 (quoting *Thomas v. Review Bd. of Ind. Employment Security Div.*, 450 U.S. 707, 714 (1981)). "A way of life that is odd or even erratic but interferes with no rights or interests of others is not to be condemned because it is different." *Wisconsin v. Yoder*, 406 U.S. 205, 224 (1972).

The First Amendment "protects not only the right to harbor religious beliefs inwardly and secretly," but also "the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through the performance of (or abstention from) physical acts." *Kennedy*, 597 U.S. at 524 (quotation omitted). It "guarantees the right of every person to freely choose his own course in the matter of religion, free of any compulsion from the state," so the "government may neither compel affirmation of religious beliefs, nor punish the expression of religious doctrines it believes to be false." *Janny v. Gamez*, 8 F.4th 883, 911 (10th Cir. 2021) (cleaned up).

To demonstrate a violation of the Free Exercise Clause, a plaintiff must first show "that a government entity has burdened his sincere religious practice." *Kennedy*, 597 U.S. at 525. "A plaintiff states a claim [his or] her exercise of religion is burdened if the challenged action is

11

App-1:093

coercive or compulsory in nature." *Janny*, 8 F.4th at 911. Such is "not limited to acts motivated by overt religious hostility or prejudice" as the Free Exercise Clause has "been applied numerous times when government officials interfered with religious exercise not out of hostility or prejudice, but for secular reasons." *Id.* at 912 (cleaned up).

Even so, the U.S. Supreme Court held in *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872, 878-82 (1990), that "laws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable." *Fulton*, 141 S. Ct. at 1876. However, laws intentionally burdening religion, laws that are not neutral, and laws that are not generally applicable *are* subject to strict scrutiny under the First Amendment. "Failing either the neutrality or general applicability test is sufficient to trigger strict scrutiny." *Kennedy*, 597 U.S. at 526.

For example, "[g]overnment fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton*, 141 S. Ct. at 1877 (quoting *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719, 1730–1732 (2018); *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 531–532 (1993)). "A government policy will not qualify as neutral if it is specifically directed at religious practice," "discriminates on its face," or "if a religious exercise is otherwise its object." *Kennedy*, 597 U.S. at 526 (cleaned up).

Further, a "law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton*, 141 S. Ct. at 1877 (cleaned up). In particular, where "the government [may] grant exemptions [from a law] based on the circumstances" of each case before it, the law is not

12

generally applicable. *Id.* (pointing to *Smith*'s explanation of the lack of general applicability demonstrated in *Sherbert v. Verner*, 374 U.S. 398 (1963)). In such instances "where the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of 'religious hardship' without compelling reason." *Id.* (quoting *Smith*). "The creation of a formal mechanism for granting exceptions renders a policy not generally applicable, regardless whether any exceptions have been given, because it invites the government to decide which reasons for not complying with the policy are worthy of solicitude . . . ." *Id.* at 1879. In other words, the "creation of a system of exemptions" undermines governmental contentions that its laws "can brook no departures." *Id.* at 1882. "A law also lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Id.* at 1877.

"A government policy can survive strict scrutiny only if it advances interests of the highest order and is narrowly tailored to achieve those interests. Put another way, so long as the government can achieve its interests in a manner that does not burden religion, it must do so." *Fulton*, 141 S. Ct. at 1881; *see, e.g., generally Yoder*, 406 U.S. 205. A government may not advance its interests "at a high level of generality" because "the First Amendment demands a more precise analysis." *Fulton*, 141 S. Ct. at 1881. "Rather than rely on broadly formulated interests, courts must scrutinize the asserted harm of granting specific exemptions to particular religious claimants.'" *Id.* (cleaned up) (quoting *Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 431 (2006)). The question before this Court, then, is not whether the government "has a compelling interest in enforcing its non-discrimination policies generally, but whether it has such an interest in denying an exception" to Singularism specifically. *Id.*

13

> ii. *Article I, Section 4 of the Utah Constitution Grants Singularism a Religious Exemption for the Free Exercise of Its Religion.*

Utah's constitutional protection for the free exercise of religion exceeds that of the First Amendment. Although Utah Constitution, Article I, Section 4 contains the same language as the First Amendment—that the State "shall make no law . . . prohibiting the free exercise" of religion—the Utah Supreme Court has indicated the two are not to be equated in terms of rigor, breadth, or interpretation.

Since 1993, the Utah Supreme Court has stated that a free exercise analysis conducted under the First Amendment "does not control [the] analysis under the Utah Constitution . . . ." *Soc'y of Separationists, Inc. v. Whitehead*, 870 P.2d 916, 930 (Utah 1993); *see also Snyder v. Murray City Corp.*, 124 F.3d 1349, 1354 (10th Cir. 1997); *Snyder v. Murray City Corp.*, 2003 UT 13, 73 P.3d 325; *Summum v. Pleasant Grove City*, 2015 UT 31, ¶ 7, 345 P.3d 1188. Although it has yet to conduct a free exercise analysis under Article I, Section 4, this Court, or the Utah Supreme Court by certification of the question, is poised to do so in a case like Singularism's.

For example, in *Jeffs v. Stubbs*, 970 P.2d 1234, 1249 (Utah 1998) the Utah Supreme Court stated that although it had not previously "determined whether the free exercise clause of article I, section 4 of the Utah Constitution provides protection over and above that provided by the First Amendment," and that it would "not decide that question" in the *Jeffs* case, the Utah Supreme Court proceeded to analyze the case as if it had done precisely that. For its articulation of strict scrutiny, the Utah Supreme Court cited to foundational strict scrutiny cases under pre-*Smith* First Amendment caselaw: *Yoder* and *Sherbert*. *Id.* at 1249-50. The Utah Supreme Court thereafter found the government's interest in that case was compelling and that its means of accomplishing

14

that interest was the least restrictive possible, thereby stating the government had met its burden of proof. *Id.* at 1250-51.

Years later, in *State v. Green*, 2004 UT 76, ¶ 70 n. 1, 99 P.3d 820 (Durrant, J., concurring), a concurring opinion indicated two justices of the Utah Supreme Court fully supported the strict scrutiny analysis in *Jeffs*. The opinion cited Justice Durham's law review article "*What Goes Around Comes Around: The New Relevancy of State Constitution Religion Clauses*" of the same year, which analyzed state constitutional free exercise interpretation in the wake of the *Smith* decision. 38 VAL. U. L. REV. 353 (2004). It concluded that these broader interpretations of religious liberty "when given effect in today's pluralistic society, may turn out to be instrumental in allowing those with beliefs outside the mainstream to honor their own consciences in the way the founders of this nation sought to honor theirs." *Id.* at 371.

*Green* led the Utah Supreme Court two years later to state that "our constitution may well provide greater protection of the free exercise of religion in some respects than the federal constitution," citing to the view expressed by "[a]t least two justices" that "pursuant to the guarantees contained in our state constitution, religiously motivated conduct should not be burdened by the State unless the burden furthers a compelling state interest and is narrowly tailored to serve that interest." *State v. Holm*, 2006 UT 31, ¶ 34 n.8, 137 P.3d 726. However, because the case was resolved on the unambiguous prohibition of polygamy contained in Article III, Section 1 of the Utah Constitution, the Utah Supreme Court did not expound further on strict scrutiny. *Id.* at ¶¶ 36-48.

By confirming strict scrutiny to be the official interpretive framework for Article I, Section 4, this Court or the Utah Supreme Court would break no new ground. In fact, in the wake

of *Smith* reducing strict scrutiny's application within the First Amendment framework, twenty-five states inserted it back into their legal systems by statute or constitutional provision through state-level Religious Freedom Restoration Acts, including several acts passed after 2020.[1] And independent of state statutory protections, an additional eleven states interpret their state constitution's free exercise clause to require strict or heightened scrutiny.[2] In other words, Utah

---

[1] *See* Ala. Const. art. I § 3.01; Ariz. Rev. Stat. §§ 41-1493 to 41-1493.02; Ark. Code §§ 16-123-401 to 16-123-407; Conn. Gen. Stat. § 52-571b; Fla. Stat. §§ 761.01 to 761.05; Idaho Code §§ 73-401 to 73-404; 775 Ill. Comp. Stat. 35/1 to 35/99; Ind. Code § 1.IC34-13-9;  Kan. Stat. § 60-5301 to 60-5305; Ky. Rev. Stat. § 446.350; La. Rev. Stat. §§ 13:5231 to 13:5242; Miss. Code § 11-61-1; Mo. Stat. §§ 1.302-1.307; Mont. Code §§ 27-33-101 to 27-33-105; N.M. Stat. §§ 28-22-1 to 28-22-5; N.D. Cent. Code § 14-02.4-08.1; Okla. Stat. tit. 51, §§251-258; Pa. Const. Stat. tit. 71, §§ 2401 to 2407; R.I. Gen. Laws §§ 42-80.1-1 to 42-80.1-4; S.C. Code §§ 1-32-10 to 1-32-60; S.D. Codified Laws § 1-1A-4; Tenn. Code § 4-1-407; Tex. Civ. Prac. & Rem. Code §§ 110.001 to 110.012; Va. Code § 57-1 to 2.02; W. Va. Code § 35-1A-1.

[2] *See* Alaska (*Larson v. Cooper*, 90 P.3d 125, 131–32, n.31 (Alaska 2004); *Swanner v. Anchorage Equal Rights Comm'n*, 868 P.2d. 274 (Alaska 1994)); Maine (*Foltin v. Roman Catholic Bishop*, 871 A.2d 1208, 1227–30 (Me. 2005); *Rupert v. Portland*, 605 A.2d 63 (Me. 1992)); Massachusetts (*Rasheed v. Comm'r of Corr.*, 845 N.E.2d 296, 302–03, 308 (Mass. 2006); *Attorney General v. Desilets*, 636 N.E.2d 233 (Mass. 1994)); Michigan (*McCready v. Hoffius*, 586 N.W.2d 723, 729 (Mich. 1998), vacated on other grounds, 593 N.W. 2d 545 (Mich. 1999); *Porth v. Roman Catholic Diocese*, 532 N.W.2d 195 (Mich. Ct. App. 1995)); Minnesota (*Hill-Murray Federation of Teachers v. Hill- Murray High School*, 487 N.W.2d 857 (Minn. 1992); *State v. Hershberger*, 462 N.W.2d 393, 396–99 (Minn. 1990)); New Hampshire (*State v. Mack*, 173 N.H. 793, 249 A.3d 423 (2020)); New York (*Catholic Charities v. Serio*, 859 N.E.2d 459, 465–68 (N.Y. 2006)); North Carolina (*Matter of Browning*, 476 S.E.2d 465 (N.C. Ct. App. 1996));  Ohio (*Humphrey v. Lane*, 728 N.E.2d 1039 (Ohio 2000)); Washington (*City of Woodlinville v. Northshore United Church of Christ*, 211 P.3d 406, 410 (Wash. 2009); *Munns v. Martin*, 930 P.2d 318 (Wash. 1997)); Wisconsin (*Coulee Catholic Schs. v. Labor & Indus. Review Comm'n*, 768 N.W.2d 868, 884–87 (Wis. 2009); *State v. Miller*, 549 N.W.2d 235 (Wis. 1996)).

Additionally, 9 states that have passed state-level RFRA acts also interpret their state constitutional protections of free exercise of religion to require strict or heightened scrutiny. *See* Arkansas (*Gipson v. Brown*, 749 S.W.2d 297 (Ark. 1988)); Hawaii (*Dedman v. Board*, 740 P.2d 28 (Haw. 1987)); Indiana (*City Chapel Evangelical Free Inc. v. City of South Bend*, 744 N.E.2d 443, 445–51 (Ind. 2001); *Church of Christ v. Metropolitan Board of Zoning Appeals*, 371 N.E.2d 1331 (Ind. Ct. App. 1978); Kansas (*Lower v. Bd. of Dirs. of the Haskell Cnty. Cemetery Dist.*, 56 P.2d 235, 244–46 (Kan. 2002); *State v. Evans*, 796 P.2d 178 (Kan. Ct. App. 1990)); Louisiana (*State v. Victor*, 15–339 (La. App. 5 Cir. 5/26/16), 195 So. 3d 128); Mississippi (*In re Brown*, 478

16

would join thirty-six other states which regard strict or heightened scrutiny to be the proper analysis for free exercise violations.

> ### iii.  Utah's Religious Freedom Restoration Act Grants Singularism a Religious Exemption for the Free Exercise of Its Religion.

This year, the Utah Legislature confirmed by statute that strict scrutiny is the proper analysis for free exercise claims by passing the Utah Religious Freedom Restoration Act. That Act has its genesis in the U.S. Supreme Court's 1993 decision in *Smith*. Shortly afterward, Congress rejected the Supreme Court's determination in *Smith* that free exercise claims are only subject to strict scrutiny absent a neutral and generally applicable law, as described above. To remedy the problem, Congress passed the federal Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb-1 *et seq.*, which, as its name suggests, restores the strict scrutiny analysis for free exercise burdens imposed by federal actors. *Tanzin v. Tanvir*, 592 U.S. 43, 45-46 (2020).

RFRA "provides very broad protection for religious liberty" given that religious exercise is an "unalienable" right, *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2383 (2020) (cleaned up) (citing *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693 (2014)), and provides "greater protection for religious exercise than is available under the First Amendment," *Holt v. Hobbs*, 574 U.S. 352, 357 (2015). The U.S. Supreme Court has instructed that RFRA be "construed in favor of broad protection of religious exercise, to the maximum extent permitted . . . ." *Burwell*, 573 U.S. at 696, 714 (2014). Religious individuals and organizations that

---

So. 2d 1033 (Miss. 1985)); Montana (*Davis v. The Church of Jesus Christ of Latter-day Saints*, 852 P.2d 640 (Mont. 1993); *St. John's Lutheran Church v. State Comp. Ins. Fund*, 830 P.2d 1271, 1276–77 (Mont. 1992)); Tennessee (*State ex rel. Swann v. Pack*, 527 S.W.2d 99, 107 (Tenn. 1975); *Wolf v. Sundquist*, 955 S.W.2d 626 (Tenn. App. 1997); *State v. Loudon*, 857 S.W.2d 878 (Tenn. Crim. App. 1993)); West Virginia (*State v. Everly*, 146 S.E.2d 705 (W.Va. 1966)).

17

prevail under RFRA are entitled to damages in addition to injunctive relief. *Tanzin*, 592 U.S. at 50-52. However, the U.S. Supreme Court limited RFRA's application to free exercise violations committed by federal government actors. *See City of Boerne v. Flores*, 521 U.S. 507, 532-36 (1997).

The leading case regarding RFRA's application to a religious business is *Hobby Lobby Stores*. In that case, three faith-infused businesses—a wood-working shop, an arts-and-crafts store, and a Christian bookstore—sued, seeking an exemption under RFRA from a federal mandate requiring businesses to provide health insurance coverage for contraception under threat of massive financial penalties. 573 U.S. at 688, 700-04.

The U.S. Supreme Court first concluded that these businesses were entitled to RFRA's protection just like an individual would be. *Id.* at 706-09. The Court made clear that regardless of whether the businesses were "closely held corporations," "nonprofit corporations," "for-profit corporations," some other corporations, or "natural persons," they would be within RFRA's ambit. *Id.* at 708-09. Further, the U.S. Supreme Court determined that "[b]usiness practices that are compelled or limited by the tenets of a religious doctrine fall comfortably within" RFRA's definition of "exercise of religion." *Id.* at 710. This is true even if the religious business seeks "to make a profit as [a] retail merchant[]." *Id.* (referencing the Court's decision in *Braunfeld v. Brown*, 366 U.S. 599 (1961)). Faith-infused businesses do not lose their RFRA protections just because "the purpose of such corporations is simply to make money." *Id.* at 710-13.

Because the religious businesses qualified for RFRA's protection, the U.S. Supreme Court continued the RFRA analysis, beginning with the threshold finding that the businesses were substantially burdened by the government's contraceptive mandate because failure to comply

18

would result in steep fines. *Id.* at 726. The Court then proceeded to evaluate whether the government had a "compelling governmental interest." *Id.* In the Court's earlier description of the contraceptive mandate, it explained that the mandate applied only to employers with fifty or more full time employees, but that there were several exemptions, including for religious nonprofits, as well as for grandfathered health plans that existed before March 23, 2010, meaning the contraceptive mandate did "not apply to tens of millions of people." *Id.* at 696-700. Describing the mandate in this way underscored the Court's subsequent conclusions of the government's lack of a compelling interest and least restrictive means.

In the U.S. Supreme Court's compelling interest analysis, it rejected the government's broadly asserted interests such as promoting public health or gender equality, and explained that RFRA requires

> a more focused inquiry: It requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened. This requires us to look beyond broadly formulated interests and scrutinize the asserted harm of granting specific exemptions to particular religious claimants—in other words, to look to the marginal interest in enforcing [a particular governmental policy] in [the instant case].

*Id.* at 726-27 (cleaned up) (quoting *Gonzales*, 546 U.S. at 430-31). However, for the purposes of argument, the Court assumed that an "interest in guaranteeing cost-free access to the four challenged contraceptive methods [was] compelling" and proceeded to the last prong of RFRA: least restrictive means. *Id.* at 728.

The U.S. Supreme Court explained that the "least-restrictive-means standard is exceptionally demanding." *Id.* It then described other alternatives for the government to achieve its interest in guaranteeing cost-free access to contraception which the government had not taken,

19

including the existing exemption set up for non-profit religious organizations. *Id.* at 729-32. The Court brushed away an argument that expanding this exemption under RFRA to for-profit religious businesses would "lead to a flood of religious objections" that would undermine the government's contraceptive mandate, as the government was unable to provide any evidence of that claim. *Id.* at 732-36. Because the Court concluded the government had other, less restrictive means available to it to accomplish its interest, the Court held the government had failed to satisfy strict scrutiny as expressed under RFRA, thereby granting the three religious businesses an exemption from compliance with the government's contraceptive mandate. *Id.* at 736.

Utah's RFRA builds upon the federal RFRA, providing additional clarity and protections to religious individuals and organizations under the strict scrutiny framework, and for free exercise violations committed by Utah government actors. Utah's RFRA was passed *unanimously* by the Utah Legislature in 2024[3] and is now codified at Utah Code § 63G-33-101 *et seq.*

> Testifying in favor of Utah's RFRA, Senator Todd Weiler expressed that the bill was
>
> designed to make sure that religious rights, and *especially minority religious rights*, are protected 20 years from now, 30 years from now, and so this bill would protect, in Utah, it would protect the rights of Muslims to worship as they choose, it would protect the rights of Jews, and Seventh-day Adventists, and other religions. *This is not a bill for any one church or any one religion*. It is to codify in our code that if the government is impeding on someone's sincerely held religious beliefs that [the government is] going to have to show and meet the highest constitutional standard in order to do so. . . . This sets the highest constitutional standard that a government would have to jump over if its laws were impeding on someone's religious rights.

---

[3]     *S.B. 150 Exercise of Religion Amendments*, UTAH STATE LEGISLATURE, available at, https://le.utah.gov/~2024/bills/static/SB0150.html.

(emphasis added).[4]

The text of Utah's RFRA provides:

(2) Except as provided in Subsection (3):
    (a) a government entity may not substantially burden the free exercise of religion of a person, regardless of whether the burden results from a rule of general applicability; and
    (b) a person other than a government entity may not seek to apply or enforce government action against another person that substantially burdens the free exercise of religion of the other person, regardless of whether the burden results from a rule of general applicability.
(3) A government entity or government action may substantially burden a person's free exercise of religion only if the government entity, or any other person seeking to enforce government action, demonstrates that the burden on the person's free exercise of religion is:
    (a) essential to furthering a compelling governmental interest; and
    (b) the least restrictive means of furthering the compelling governmental interest.

UTAH CODE § 63G-33-201(2)-(3).

Utah's RFRA includes several clarifications and definitions: (1) that the "free exercise of religion is a fundamental right and applies to all government action, including action that is facially neutral," UTAH CODE § 63G-33-201(1); (2) that "'Free exercise of religion' means the right to act or refuse to act in a manner substantially motivated by a sincerely held religious belief, regardless of whether the exercise is compulsory or central to a larger system of religious belief," UTAH CODE § 63G-33-101(2); (3) that "Government action" includes statutes and rules, application of those statutes and rules, and actions taken by government entities, UTAH CODE § 63G-33-101(3), (6)(b); (4) that "'Substantially burden' means that government action, directly or indirectly: (i) constrains, limits, or denies the free exercise of religion by a person; or (ii) compels a person to act, or fail to

---

[4]    *Senate – 2024 General Session – Day 29*, at 2SB150 Exercise of Religion Amendments, Weiler, UTAH STATE LEGISLATURE, available at, https://le.utah.gov/av/floorArchive.jsp?markerID=125928.

act, in a manner that is contrary to the person's free exercise of religion," including by "assessing criminal, civil, or administrative penalties or damages," UTAH CODE § 63G-33-101(6).

Utah's RFRA empowers religious individuals and organizations to assert the statute's protections "as a claim or defense in a judicial or administrative proceeding to obtain relief," UTAH CODE § 63G-33-201(4)(1), and awards them attorney fees if they prevail, UTAH CODE § 63G-33-201(6). Uniquely, Utah's RFRA contains a notice of claim provision, but it does not apply where the government action burdening religious exercise "is ongoing, and complying with [the notice of claim provision] will place an undue hardship on the person or increase the harm suffered by the person," or the burdensome action "is likely to occur or reoccur before the end of the 60-day [notice of claim] period . . ." UTAH CODE § 63G-33-201(5).

> iv. *The Utah Code Contains Various Exemptions Which Undermine the Government's Interest and Indicate There are Less Restrictive Means.*

*Utah Psilocybin Act*. In 2024, in the same legislative session in which the Utah Legislature enacted Utah's RFRA, the legislature passed S.B. 266 Medical Amendments,[5] now codified within the Utah Controlled Substances Act at Utah Code § 58-37-3.5 ("Utah Psilocybin Act"). The Utah Psilocybin Act grants broad permission to the largest healthcare systems in the state, UTAH CODE § 58-37-3.5(1)(b), to "develop a behavioral health treatment program that includes a treatment based on a drug that the healthcare system determines is supported by a broad collection of scientific and medical research." UTAH CODE § 58-37-3.5(2). The word "drug" is defined to mean "*any form of psilocybin . . .* that is in federal Food and Drug Administration Phase 3 testing for an investigational drug . . . ." UTAH CODE § 58-37-3.5(1)(a) (emphasis added).

---

[5]   *Medical Amendments*, UTAH STATE LEGISLATURE, available at, https://le.utah.gov/~2024/bills/static/SB0266.html.

The Utah Psilocybin Act's only limitations on these healthcare systems' development and administration of psilocybin programs are that (a) psilocybin be administered "under the direct supervision and control of the healthcare system," (b) psilocybin not be administered to individuals under eighteen years old, (c) that the program, in the healthcare system's own determination, "is supported by a broad collection of scientific and medical research," and (d) before July 1, 2026, the healthcare systems "provide a written report to the Health and Human Services Interim Committee" regarding the drugs they used, the health outcomes of their patients, any side effects, and other information for the Legislature "to evaluate the medicinal value of any drugs." UTAH CODE § 58-37-3.5(3)-(4). Otherwise, these healthcare systems have broad leeway to determine how, when, where, to whom, and for what reason psilocybin is administered to their patients. The Act insulates individuals administering or participating in the psilocybin program from a violation of Utah's Controlled Substances Act. UTAH CODE § 58-37-3.5(5).

*Medical Cannabis*. In addition to the Utah Psilocybin Act, the Utah Controlled Substances Act exempts the usage of medical cannabis from prosecution. All that individuals need to do to be insulated from prosecution and guilt is to become a medical cannabis cardholder and abide by dosage limits. UTAH CODE § 58-37-3.7(2)-(5); *see also* UTAH CODE § 58-37-3.6(2)-(3); UTAH CODE § 58-37-3.8 (limiting law enforcement, government agencies, and political subdivisions from expending resources to enforce or take adverse action against individuals and organizations regarding medical cannabis). Accordingly, the Utah Code also treats cannabis usage as a protected class status in the context of public employment. *See* UTAH CODE § 34A-5-115.

*Peyote*. The Utah Controlled Substances Act also exempts individuals from civil and criminal liability for the usage of peyote "in connection with the practice of a traditional Indian

23

religion . . ." UTAH CODE § 58-37-8(12). The Act defines "Indian religion" to mean "any religion: (i) the origin and interpretation of which is from within a traditional Indian culture or community; and (ii) which is practiced by Indians." UTAH CODE § 58-37-2(1)(w).

This exemption has its roots in religious freedom. Indeed, as a result of the U.S. Supreme Court's *Smith* decision described above, Congress not only enacted RFRA, but also amended the federal Controlled Substances Act to insert an exemption for peyote usage for Native Americans. 42 U.S.C. § 1996a; 21 C.F.R. § 1307.31; American Indian Religious Freedom Act Amendments of 1994, PL 103–344, October 6, 1994, 108 Stat 3125. That was in direct response to *Smith*, in which case the U.S. Supreme Court denied a religious exemption for peyote for native religious purposes. *See Smith*, 494 U.S. at 874. The Utah Controlled Substances Act's inclusion of substantially the same exemption carries with it the recognition that religious groups for which sacramental usage of a controlled substance is a sincerely held part of their religion should be exempted from the burdens imposed by the Controlled Substances Act.

*Clergy Exemption.* The Utah Mental Health Professional Practice Act also contains an exemption for clergy which permits Singularism's religious guides to practice mental health therapy without a license and according to Singularism's religious beliefs.

By statute, the practice of mental health therapy includes conducting professional evaluations of mental health, mental illness, or emotional disorders; diagnosing such conditions; prescribing treatment or prevention plans; and performing psychotherapy. UTAH CODE § 58-60-102(7). Unless exempted, the Act requires individuals to be licensed to practice mental health therapy. UTAH CODE § 58-60-103(1)(a). Exempt individuals include "a recognized member of the clergy while functioning in a ministerial capacity as long as the member of the clergy does not

24

represent that the member of the clergy is, or use the title of, a license classification in Subsection 58-60-102(5)." UTAH CODE § 58-60-107(2)(b). If clergy do not use these license classifications and are functioning in a ministerial capacity, they "may engage in acts included within the definition of practice as a mental health therapist . . ." UTAH CODE § 58-60-107(2).

*Hypnosis.* Additionally, the Utah Mental Health Professional Practice Act exempts individuals practicing hypnosis from licensure requirements as long as the individual performing the hypnosis: (1) "induces a hypnotic state in a client for the purpose of increasing motivation or altering lifestyles or habits, such as eating or smoking, through hypnosis;" (2) "consults with a client to determine current motivation and behavior patterns;" (3) "prepares the client to enter hypnotic states by explaining how hypnosis works and what the client will experience;" (4) "tests clients to determine degrees of suggestibility;" (5) "applies hypnotic techniques based on interpretation of consultation results and analysis of client's motivation and behavior patterns;" and (6) "trains clients in self-hypnosis conditioning." UTAH CODE § 58-60-107(2)(d)(i). Notably, this exemption is stricter than the clergy exemption. Where the clergy exemption permits clergy to practice mental health therapy, and even diagnose and treat health conditions, the hypnosis exemption does not. *Compare* UTAH CODE § 58-60-107(2)(b) *with* UTAH CODE § 58-60-107(2)(d)(ii).

> *v. Courts and Agencies Permit Sincere Religious Adherents to Conduct Religious Ceremonies with Entheogenic Substances.*

Where courts and agencies are presented with sincere religious individuals and organizations for which entheogenic substances are used as a sacramental and ceremonial portal to the divine, they have held religious free exercise rights require exemption from the Controlled Substances Act. For example, in *Gonzales*, 546 U.S. 418, the U.S. Supreme Court confirmed a

25

religious exemption from the Controlled Substances Act for a Christian Spiritist sect's communion through hoasca, a sacramental tea made from plants from the Amazon. Similarly, the Ninth Circuit confirmed an entheogenic church's religious exemption from the Controlled Substances Act for the religious use of Daime tea. *See Church of Holy Light of Queen v. Holder*, 443 F. App'x 302 (9th Cir. 2011); *Church of the Holy Light of the Queen v. Holder*, 584 F. App'x 457 (9th Cir. 2014).[6] And in April 2024, several federal agencies, including the Drug Enforcement Administration, entered into a public settlement agreement with an entheogenic church regarding the importation and religious use of ayahuasca, following a federal district court confirming the church's religious exemption. *See* Exhibit N.

> ### vi. Strict Scrutiny Requires Plaintiffs' Religious Exemption from the Utah Controlled Substances Act.

Three independent sources of law require this Court to review Defendants' actions burdening Plaintiffs' religious free exercise under strict scrutiny. First, although the First Amendment interprets free exercise claims under strict scrutiny only where the law or action burdening religion is not neutral or generally applicable, that is the case here. The Utah Controlled Substances Act is so riddled with exemptions for religious *and* secular purposes that it is not generally applicable. The Act, as of 2024, contains a gaping exemption for secular psilocybin usage, as well as significant exemptions for secular cannabis and religious peyote usage. Between these three exemptions, substantial portions of Utahns are not subject to the general rules of the

---

[6]     *See also Toledo v. Nobel-Sysco, Inc.*, 892 F.2d 1481 (10th Cir. 1989); *United States v. Boyll*, 968 F.2d 21 (10th Cir. 1992) (unpublished); *State v. Mooney*, 2004 UT 49, 98 P.3d 420; *Salt Lake City Corp. v. Salt Lake City Civ. Serv. Comm'n*, 2006 UT App 47; *State v. Mack*, 173 N.H. 793, 817, 249 A.3d 423 (2020).

Act, and for both secular and religious reasons. Thus, under the First Amendment, strict scrutiny applies.

Second, strict scrutiny also applies under Article I, Section 4 of the Utah Constitution. According to the authorities above, Article I, Section 4's protections for religious free exercise are greater than the Supreme Court's interpretation of the First Amendment, meaning that strict scrutiny applies to all free exercise claims, regardless of whether the law or government action is neutral or generally applicable.

Third, Utah's RFRA explicitly states that strict scrutiny applies regardless of whether the law or action at issue is neutral or generally applicable. Accordingly, under all three sources of law, the government must justify its burden upon Singularism's free exercise of religion under strict scrutiny, the most exacting constitutional standard.

Defendants will fail to shoulder their first burden under strict scrutiny: that denying a religious accommodation for Singularism to practice its private psilocybin ceremonies is "essential to furthering a compelling governmental interest." Although Defendants have yet to articulate their interest, generalized interests, such as public health and safety or uniform application of the law, will not suffice. Defendants' interest must be specific to Singularism. Additionally, whatever interests Defendants attempt to articulate, they are significantly undercut by the secular and religious exemptions found in the Utah Controlled Substances Act, particularly the exemption permitting secular psilocybin usage.

Should Defendants argue that psilocybin poses a danger to public health or safety, that interest would be undermined by the Utah Legislature's determination that it does not, as this year the legislature passed the Utah Psilocybin Act permitting secular usage according to private

27

healthcare systems' discretion. Even the federal government appears to recognize psilocybin does not pose the threat to public health or safety once thought, placing it, as the Utah Legislature has said in the Utah Psilocybin Act, in the "Food and Drug Administration Phase 3 testing for an investigational drug."

Should Defendants argue that the Utah Psilocybin Act protects health and safety in a way Singularism lacks because of the healthcare system supervision required by the Utah Psilocybin Act, that argument, too, would fail. The supervision required by the Act is "the direct supervision and control of the healthcare system and the healthcare system's health care providers who are licensed *under this title* . . ." UTAH CODE § 58-37-3.5 (emphasis added). The Act does not specify what type of health care provider must supervise an individual ingesting psilocybin. Thus, any licensed mental health care providers licensed under Title 58 of the Utah Code suffice. But that requirement, too, is undermined by the fact that the Utah Mental Health Professional Practice Act, which *is also located in Title 58*, exempts clergy from licensure and allows clergy like Mr. Jensen to practice mental health therapy according to the dictates of their religion. Thus, Defendants lack the ability to articulate any legitimate interest in denying a religious exemption to Singularism.

Additionally, Defendants' articulation of government interests is significantly undermined by their apparent decision not to prosecute similarly situated religious groups, including the Divine Assembly and Psychedelics in the Beehive, which utilize psilocybin, and others which utilize other entheogenic substances, such as Oklevueha Native American Church and Temple of Hermes. Moreover, another governmental agency—the Utah Department of Commerce's Division of Professional Licensing—concluded, on November 19, 2024, that Mr. Jensen is entitled to practice mental health therapy under the clergy exemption to the Utah Mental Health Professional Practice

28

Act and according to the dictates of Singularism's sacramental ceremonies, dismissing a complaint made regarding his lack of licensure.

Even if Defendants could state a compelling governmental interest in denying Singularism a religious exemption, Defendants have an obviously less restrictive means of furthering their governmental interest. The Utah Psilocybin Act's secular exemption from the Utah Controlled Substances Act for psilocybin usage is the clearest example and is a model Singularism already follows: close supervision of individuals, administration only to individuals over eighteen years old, and administration which follows a broad collection of scientific and medical research, which, in Singularism's case, is enriched with spiritual wisdom. Defendants will be unable to articulate a reason why secular individuals may utilize psilocybin under these circumstances, but religious individuals cannot. And although Plaintiffs need not speculate on every other potential less restrictive means, the cases of *Gonzales*, *Church of Holy Light of Queen v. Holder*, and the DEA's recent settlement agreement all provide additional examples of less restrictive means Defendants might follow to advance their governmental interests.

Because Defendants do not have particularized compelling governmental interests in denying Singularism a religious exemption from the Utah Controlled Substances Act, and because Defendants have obviously less restrictive means available to accomplish their governmental interests, Defendants fail strict scrutiny. Their burden on Plaintiffs' religious free exercise is unlawful, must be enjoined, and Defendants must compensate Plaintiffs for their damages suffered and attorney fees incurred to defend their religious free exercise. Accordingly, Defendants lacked probable cause to obtain a search warrant, detain Mr. Jensen, search Singularism's spiritual center, or seize any items from Singularism. According to all the above authorities, Plaintiffs will prevail

in this action, thus establishing the first element for a temporary restraining order and preliminary injunction.

### b. Plaintiffs Have Suffered and Will Suffer Irreparable Harm.

The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1190 (10th Cir. 2003). Here, Plaintiffs have already suffered and will continue to suffer continued and increasing irreparable harm unless the Court enjoins Defendants' violations of Plaintiffs' free exercise of religion. Defendants' seizure of Plaintiffs' sacramental psilocybin imposes irreparable harm by prohibiting Singularism's central religious practice, thereby stripping Plaintiffs of their fundamental right to religious free exercise, a harm which cannot be adequately compensated by damages. Defendants' vows to both prosecute Plaintiffs and evict Singularism from its spiritual center will affect even greater violations of Plaintiffs' free exercise, with the potential to wholly wipe out a small minority religion by decimating its religious, physical, and financial assets and instilling fear in its adherents. This is precisely the type of harm Rule 65 exists to protect against.

### c. The Injury to Plaintiffs Greatly Outweighs Any Potential Damage to Defendants.

"In balancing harms, a court looks at whether the moving party's threatened injury outweighs the injury the opposing party will suffer under the injunction." *Core Progression Franchise LLC v. O'Hare*, No. 21-1151, 2022 WL 1741836, at *3 (10th Cir. May 31, 2022) (cleaned up) (quoting, *Sierra Club, Inc. v. Bostick* 539 F. App'x 885, 889 (10th Cir. 2013)). The injuries to Plaintiffs are monumental violations of constitutional and statutory fundamental rights, with the potential to destroy an entire religious minority and the livelihoods of its clergy. This injury vastly outweighs any potential damage to Defendants. In fact, it is difficult to conceive of

30

*any* potential damage an injunction would impose upon Defendants. Where Singularism is acting according to its fundamental right of religious free exercise, and doing so has no impact whatsoever on public health, safety, or any other concern for the broader community, Defendants cannot articulate any damage. And even if they could, such damage would pale in comparison to that Plaintiffs are suffering.

### d. A Temporary Restraining Order and Preliminary Injunction Advance the Public Interest.

Enjoining Defendants' unconstitutional acts advances the public interest by protecting and validating the right to religious free exercise for all sincere religious individuals and organizations. While many might not share the beliefs, doctrines, or dogmas espoused by Singularism and its adherents, *all* citizens, especially religious minorities, benefit from a robust protection of the right to free exercise of religion. That is precisely what the Utah Legislature enacted Utah's RFRA to do: "to make sure that religious rights, and especially minority religious rights, are protected." It "is always in the public interest to prevent the violation of a party's constitutional rights." *Verlo*, 820 F.3d at 1127-28.

Entitlement to the fundamental right of religious free exercise is not predicated upon whether religious beliefs are "acceptable, logical, consistent, or comprehensible" to others. Again, a "way of life that is odd or even erratic but interferes with no rights or interests of others is not to be condemned because it is different." *Yoder*, 406 U.S. at 224. Protecting Singularism's free exercise ensures that others' religious beliefs, including those which presently are viewed as mainstream, will remain protected even when they are out of vogue.

## CONCLUSION

31

For the above reasons, the Court should grant the motion, grant Plaintiffs a temporary restraining order, and, thereafter, a preliminary injunction.

DATED this 4th day of December 2024.

/s/ *Tanner J. Bean*
Tanner J. Bean
Anna P. Christiansen
*Attorneys for Plaintiffs*

## PAGE LIMIT CERTIFICATION

I, Tanner Bean, certify that the foregoing document contains 31 pages and complies with DUCivR 7-1(a)(4) and ECF 8 granting the parties stipulated motion for overlength briefing.

/s/ *Tanner J. Bean*
Tanner J. Bean
Anna P. Christiansen
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of December 2024, a true and correct copy of the

foregoing was served via the Court's electronic filing service and by email on the following:

       Mitchell A. Stephens
       Lara A. Swensen
       JAMES DODGE RUSSEL & STEPHENS, P.C.
       10 West Broadway, Ste 400
       Salt Lake City, Utah 84101
       (801) 363-6363
       mstephens@jdrslaw.com
       lswensen@jdrslaw.com
       *Attorneys for Defendants Utah County and Jeffrey Gray*

       J. Brian Jones
       Gary D. Millward
       Richard A. Roberts
       PROVO CITY ATTORNEY'S OFFICE
       445 West Center St.
       Provo, Utah 84601
       (801) 852-6140
       bjones@provo.gov
       gmillward@provo.gov
       rroberts@provo.gov
       *Attorneys for Defendants Provo City, Troy Beebe, Brian Wolken, and Jackson Julian*

       */s/ Tanner J. Bean*

# EXHIBIT A

Tanner J. Bean (A17128)
tbean@fabianvancott.com
**FABIAN VANCOTT**
95 South State Street, Suite 2300
Salt Lake City, UT 84111-23323
Telephone: (801) 531-8900
*Attorney for Plaintiffs*

---

## IN THE FOURTH JUDICIAL DISTRICT

## UTAH COUNTY, STATE OF UTAH

| | |
|---|---|
| BRIDGER LEE JENSEN, an individual; SINGULARISM, a non-profit corporation; PSYCHE HEALING AND BRIDGING, LLC dba PSYCHEDELIC THERAPY JOURNEY; a limited liability company; <br><br> Plaintiffs, <br> vs. <br><br> UTAH COUNTY, a political subdivision, PROVO CITY, a political subdivision; JEFFREY GRAY, an individual; TROY BEEBE, an individual; BRIAN WOLKEN, an individual; JACKSON JULIAN, an individual; JOHN DOES 1-4, individuals; <br><br> Defendants. | **DECLARATION OF BRIDGER JENSEN** <br><br> Case No. _____ <br><br> Honorable _____ |

I, Bridger Jensen, declare:

1.    I am over eighteen years old and competent to testify.

2.    I have personal knowledge of the facts set forth in this declaration, and if called as a witness, I could and would testify competently to them under oath.

3.    I come from a family with a deep and storied religious history. My great-grandfathers were Lutheran pastors who attended a Lutheran school in Denmark in the 1860s. After immigrating to the United States, one of them was appointed the first bishop of Star Valley,

1

App-1:117

Wyoming. His legacy is remembered for fostering honest and equitable relationships with Native Americans in the region, reflecting a commitment to fairness and compassion that has been passed down through generations.

4.      Born into a devout Mormon family, I was raised with the encouragement to seek my own spiritual path. My upbringing instilled in me a reverence for faith and truth, and it was this foundation that inspired me to actively explore and question the nature of religion and spirituality. My parents taught me to prioritize the religion of my heart, which gave me the courage to embark on a lifelong journey of spiritual discovery.

5.      From a young age, I was known for my thoughtful questions about the universe and the nature of God. At just eight years old, I fervently prayed for the same visions that the prophets of scripture had received. I wanted not proof, but a direct and personal connection with the Divine. My mother often remarked that I asked more profound and challenging questions than any of her other children, reflecting a unique and sincere engagement with my faith.

6.      As a child, I often laid awake at night, journaling about the mysteries of the universe and my love for all of creation. In high school, I found my identity in religion, attending seminary classes with fervor. I competed in scripture mastery competitions, winning first or second place for two consecutive years, and spent lunch hours conversing with seminary teachers. These experiences deepened my commitment to spiritual growth and missionary work.

7.      I served as a missionary for the Church of Jesus Christ of Latter-day Saints, continuing my scriptural studies and developing a reputation for compassion and understanding. While I had a strong grasp of church doctrine, I gravitated toward leaders who emphasized love, charity, and devotion over discipline and rigidity. This orientation shaped my approach to faith as one rooted in kindness and humility.

8. My father, a professor at BYU, introduced me to the works of great psychologists and philosophers. Figures like Martin Buber, a devout Hasidic and existential philosopher, and Carl Jung, a psychologist who integrated science and spirituality, deeply influenced my perspective. Jung's exploration of divine archetypes and universal truths, criticized for being "too religious for science and too scientific for religion," resonated profoundly with me. I also explored existentialism, Buddhism, Taoism, Confucianism, Christianity, and Hinduism—traditions that, despite their differences, share a universal focus on self-awareness, mental wellness, and connection with the Divine. These teachings further inspired me to bridge spirituality and mental health in my own life and work.

9. In my mid-twenties, I stepped away from my upbringing, driven by a desire for intellectual honesty and self-acceptance. I entered a period of agnosticism, during which I explored physics and atheism while maintaining my belief in meaning and purpose. This phase deepened my understanding of the complexities of faith and reinforced my commitment to authenticity.

10. During this time, I aspired to become a therapist specializing in spiritual counseling. Inspired by thinkers like Allen Bergin, who emphasized the integration of spirituality into therapy, I sought to address the often-neglected spiritual dimensions of mental health.

11. My first experience with psychedelics occurred in my mid-twenties during a hiking trip in Peru. I consumed a sacred drink—likely ayahuasca—shared by Sherpas who spoke the ancient Incan language. That night, on the summit of a mountain, I had a vision that transformed my understanding of existence. I felt a profound sense of unity, love, and divine connection—a transcendent experience that I had prayed for throughout my life. The insights and emotions I encountered were ineffable, leaving me with a sense of gratitude for every sentient being and a renewed faith in the Divine.

12. This awakening left a lasting impression, but I kept this sacred experience private for many years, processing its significance in the quiet of my heart.

13. Nearly a decade passed after my initial entheogenic experience before I once again used psychedelics for spiritual purposes. On my 32nd birthday, I found myself alone on a beach in Hawaii, where I experienced a profound reconnection with the Divine. I felt an overwhelming sense of unity with the Earth, the stars, and all of creation. It was as if God's love enveloped me completely, and I wept for the time I had spent in my twenties dismissing religion as a potential human construct. This encounter awakened in me a renewed faith in God, moral values, and the importance of pursuing a life filled with meaning and purpose. It reignited my childhood desire to make a positive impact on the world and strengthened my commitment to live authentically.

14. Despite my dedication to faith and family, my spiritual sincerity ultimately played a significant role in my marriage ending. My efforts to align with traditional religious expectations were not enough to bridge the gap between my personal beliefs and my then-wife's unwavering devotion to our shared faith. Our spiritual differences became the primary reason for the dissolution of our marriage, a deeply painful experience that continues to weigh heavily on my heart. I believe that my unyielding pursuit of spiritual authenticity, while difficult, was necessary for me to honor my own inalienable rights and the path I felt called to follow. This commitment to truth has been both a source of personal challenge and spiritual growth.

15. For over 16 years, I enjoyed a successful career as a therapist, gaining national recognition for my work with children, adolescents, and families. Clients were referred to me from across the country and internationally. However, in 2019, as my license was due for renewal, I made the difficult decision not to renew it. This choice was not due to any complaints or issues with my practice but was driven by my belief that continuing as a licensed therapist might conflict

with my sincere use of psychedelics as a healing and spiritual tool. I sacrificed a thriving career because I believed it was the ethical and honest decision to make in pursuit of my spiritual calling.

16.     During the early stages of exploring entheogenic practices, I encountered unsafe and unethical behaviors within the underground psychedelic community. Some practitioners failed to disclose the substances they used, blurred professional boundaries, or neglected safety protocols. These experiences deeply troubled me and reinforced my commitment to creating a safer, more ethical approach. I dedicated myself to studying the research and refining my practices, ensuring that safety and accountability were at the forefront of every session.

17.     I immersed myself in the study of psychedelic therapy, reviewing research from esteemed institutions like Johns Hopkins University and Harvard Medical School. This research validated my belief that these practices, when approached with care and reverence, could unlock profound spiritual truths and healing. I documented my own experiences and insights in art and journals, using creative expression to process my visions and revelations. These practices helped heal my heart and clarified the path I felt called to pursue.

18.     Inspired by my own experiences and the concept of the "mystical experience" described in clinical research, I founded the religion of Singularism in the fall of 2023. Singularism is a humble, sincere religion focused on reducing harm and fostering safe, transformative spiritual experiences. It draws upon ancient traditions and marries them with modern, empirically supported methods to ensure both safety and efficacy.

19.     Singularism prioritizes safety through stringent screening processes based on clinical standards. Participants are carefully evaluated for physical and psychological readiness, and I ensure that no one engages in a ceremony without confirming that it is safe and appropriate for them. I also encourage participants to consult with their clinicians about potential

App-1:121

contraindications. Unlike some underground communities, we respect medical advice and work to integrate spiritual and clinical wisdom. In over a year of practice, there has not been a single incident of harm or unsafe outcome during a Singularism ceremony.

20. Singularism does not claim special access to divine truths or elevate itself above others. Instead, at Singularism, we teach participants to find their own spiritual revelations and solutions. These insights are documented as "living scripture" in the form of aphorisms, which affirm their authenticity and personal growth.

21. Singularism provides a safe and legitimate space for those seeking spiritual healing. Participants often come to us after exhausting traditional methods, such as therapy or medication, and finding them insufficient for addressing their spiritual and mental wellness needs. By offering a structured, ethical, and supportive environment, Singularism reduces harm in the community and provides a pathway to greater self-understanding and connection with the Divine.

22. My beliefs are deeply held and my actions are guided by a genuine desire to help and heal. I have worked diligently to ensure that Singularism's practices are safe and beneficial. Singularism has actively sought to reduce harm, promote healing, and create a safe environment for all interested in our community.

23. My religious community, which I consider a collective endeavor, reflects the sincere contributions of its members. I do not see myself as a prophet or leader in the traditional sense but as a facilitator who helps individuals access their own spiritual insights. Together, we create active scripture—wisdom drawn from safe and meaningful ceremonies that build upon traditions practiced by humans across cultures and history.

24. My practices are informed by extensive research and guided by the dictates of my conscience and faith. I adhere to the highest standards of safety, implementing protocols inspired

App-1:122

by clinical journals and research from renowned institutions such as Johns Hopkins University, Harvard University, and University College London. These guidelines ensure that the substances used are safe and non-threatening and that participants are appropriately screened and supported.

25.     I do not claim any special or unique access to God that is unavailable to others. Instead, I hold that all people are capable of connecting with the Divine and receiving equally valid and transformative revelations. My faith teaches that the great spirit of the universe loves all of us equally, embracing both our flaws and our greatness.

26.     The practitioners in my faith do not position themselves as spiritual authorities or gurus. Rather, they serve as scribes and guides, helping participants—whom we call Voyagers—access their highest potential and deepest truths. By documenting these personal insights, practitioners help individuals feel their connection to the Divine without imposing any pre-defined doctrine or claiming to be the source of spiritual revelation.

27.     The true heroes of our faith are the Voyagers themselves, who courageously embark on guided journeys in safe and supportive settings. It is their insights, experiences, and personal growth that define and enrich our collective practice. My role is simply to facilitate and protect this process with integrity and reverence.

28.     I declare under criminal penalty of perjury under the law of Utah that the foregoing is true and correct.

DATED this 19th day of November, 2024.

/s/ _____

Bridger Jensen

7

App-1:123

Case 2:24-cv-00887-JNP   Document 9-2   Filed 12/04/24   PageID.107   Page 1 of 8

# EXHIBIT B

App-1:124

# FABIAN VANCOTT

Tanner J. Bean
Attorney
Tel. 801-323-2266
tbean@fabianvancott.com

September 8, 2023

Mayor Michelle Kaufusi
City Hall
445 W Center St Suite 500
Provo, UT 84601

RE: Introduction and Information about Singularism's Entheogenic Religious Practices

Dear Mayor Michelle Kaufusi:

I hope this letter finds you well. My name is Tanner J. Bean and I represent Singularism, a spiritual wellness center and religious non-profit organization. I am writing to establish an open line of communication between Singularism and your department.

My client asked me to convey its gratitude for introducing the four Provo Pillars and your commitment to strengthening foundational principles while positioning Provo for growth. Singularism deeply appreciates these ideals and aspires to contribute significantly. Singularism believes it can enhance Provo's pillars: Welcoming, Safe & Sound, Economically Vibrant, and Forward-looking. Singularism's leadership has discussed ways to meaningfully contribute, and it is eager to do so.

This letter is also meant to provide insight into Singularism's entheogenic religious practices and to foster mutual understanding and cooperation with your office as they have recently established a wellness center to hold their counseling sessions and spiritual ceremonies in Provo. The founders and organizers are hoping for an endorsement of support for their practice from you or your office, seeing how they have shared goals with your four Provo pillars.

Singularism is an entheogenic religious organization consistent with Provo's pillars and is committed to fostering spirituality, self-discovery, and inclusion. Singularism's founders and members are sincere and they practice safe religious ceremonies necessary to their spiritual beliefs.

Singularism understands that the state of Utah, including Utah County, and Provo City has a rich history of recognizing and safeguarding the religious rights of various communities, such as those of Native American groups and other entheogenic religious organizations. This recognition reflects the diversity and inclusivity that underpins our society's core values, and Provo's Pillars. Furthermore, Utah's own history is intertwined with religious practices that were considered unconventional at the time they were founded, thereby underscoring the importance of upholding and respecting constitutional rights. Singularism's practices are conducted consistent with the protections granted by the First Amendment of the United States Constitution, Article 1, Section 4 of the Utah Constitution,

95 South State, Suite 2300
Salt Lake City, UT 84111

ATTORNEYS AT LAW
www.fabianvancott.com

App-1:125

the Religious Freedom Restoration Act, and the Religious Land Use and Institutionalized Persons Act.

My client respectfully asks for your compassionate tolerance of its religion and acceptance of its presence in Provo City as it exercises its religious rights. It is Singularism's sincere hope and belief that by openly engaging with the community's leadership, it can establish a harmonious relationship based on mutual respect and shared goals. At the core of Singularism's 's mission is the creation of a secure and inclusive environment for its members to develop their spirituality and practice religious ceremonies for healing.

Singularism places the utmost emphasis on the safety and well-being of their parishioners and members. Their entheogenic practices are meticulously designed, drawing inspiration from recognized medical institutions such as Johns Hopkins and Harvard Medical School, as well as adhering to many clinical protocols.

The founders of Singularism acknowledge that their practices may be unfamiliar to some and may give rise to sincere questions. They are committed to transparency wherever possible. They have asked me to extend an invitation to discuss any question you may have and visit their wellness center in Provo, where they intend to practice their religion. They value your perspective and believe that through open dialogue, they can address any misconceptions the community may have and work together to ensure that their practices are conducted safely and in accordance with the law, which the members of Singularism deeply respect.

Again, on behalf of Singularism, the purpose of this letter is to open dialogue and thank you for the four Provo Pillars, and to humbly ask for your support of their safe and sincere religious activities. Singularism would deeply appreciate a statement of support from you or your office of any kind.

If you wish, please feel free to contact me to schedule a meeting with myself and Singularism's representatives at your convenience. Singularism eagerly anticipated the opportunity to discuss its practices and values and to explore avenues of collaboration that promote mutual respect and understanding.

Thank you for your dedication to maintaining a safe and inclusive community. Singularism is optimistic that through partnership and dialogue, it can foster an environment that respects diversity and upholds individual rights.

Sincerely,

Tanner J. Bean
FABIAN VANCOTT

## FABIAN VANCOTT

95 South State, Suite 2300
Salt Lake City, UT 84111

ATTORNEYS AT LAW

www.fabianvancott.com

App-1:126

# FABIAN VANCOTT

Tanner J. Bean
Attorney
Tel. 801-323-2266
tbean@fabianvancott.com

September 8, 2023

Provo City Council
Provo City Hall
445 W Center St Suite 420
Provo, UT 84601

RE: Introduction and Information about Singularism's Entheogenic Religious Practices

To Whom It May Concern,

As legal counsel for a newly organized religious institution, Singularism, I am writing to establish communication between Singularism and your offices, to provide insight into Singularism's entheogenic religious practices, and to foster mutual understanding and cooperation. Singularism seeks further understanding of your office's policies as it believes it has a shared interest in serving the state, county, and city's well-being.

Singularism asked me to convey its gratitude for the four Provo Pillars and your commitment to strengthening foundational principles while positioning Provo for growth. Singularism deeply appreciates these ideals and aspires to contribute significantly by being (1) Welcoming, (2) Safe & Sound, (3) Economically Vibrant, and (4) Forward-looking. Singularism's leadership has discussed ways to meaningfully contribute and is eager to do so though their wellness center.

Singularism is an entheogenic spiritual organization devoted to nurturing self-discovery, spirituality, communal well-being, self-discovery, and inclusion. Singularism practices sincere and safe religious ceremonies necessary to their spiritual counseling. Singularism has recently established a spiritual wellness center in Provo that it hopes will be regarded as an asset to the community. In this space members engage in practices that are clinically informed, spiritually motivated, and which help individuals in the community.

Singularism believes the state of Utah, Utah County, and Provo City has a rich history of recognizing and safeguarding the rights of various religious communities, such as those of Native American groups and other entheogenic spiritual organizations. This recognition reflects the diversity and inclusivity that underpins our society's core values. Furthermore, Utah's own history is intertwined with religious practices that were considered unconventional in the time they were founded, thereby underscoring the importance of upholding and respecting individuals' rights to practice their faith when done so safely and according to their sincere beliefs and as is necessary according to their faith.

95 South State, Suite 2300
Salt Lake City, UT 84111

ATTORNEYS AT LAW
www.fabianvancott.com

App-1:127

My client respectfully asks for your compassionate tolerance of their religious practice, and for acceptance of their presence in Provo City as they exercise their religious liberties and contribute to the diversity and betterment of the city of Provo. It is crucial to emphasize that their practices are conducted in alignment with the protections granted by the First Amendment of the United States Constitution, Article 1, Section 4 of the Utah Constitution, the Religious Freedom Restoration Act, and the Religious Land Use and Institutionalized Persons Act. It is Singularism's sincere hope that by openly engaging with the community's leadership, it can establish a harmonious relationship based on mutual respect and shared goals.

Singularism's leadership acknowledges that its practices may be unfamiliar to some and may give rise to sincere questions from citizens and government. Singularism is committed to the highest standard of transparency possible in its commitment to helping the community obtain answers to these questions and concerns.

At the core of Singularism's mission is the creation of a secure and inclusive environment for its members to develop their spirituality and practice religious ceremonies for healing. Singularism views your council's partnership as an opportunity to contribute positively to the community and to engage in meaningful dialogue that benefits the entire community.

Singularism's representatives have asked me to extend an invitation to discuss any question you may have. They value your perspective and believe that through open dialogue, any misconceptions can be addressed and they can demonstrate that their spiritual ceremonies are conducted safely and in accordance with the law, which the members of Singularism deeply respect. If you wish, you can contact me to schedule a meeting with myself and Singularism's representatives at your convenience.

Thank you for your dedication to maintaining a safe and inclusive community. Singularism is optimistic that through partnership and dialogue, it can foster an environment that respects diversity and upholds individual rights.

Sincerely,

Tanner J. Bean
FABIAN VANCOTT

**FABIAN VANCOTT**

ATTORNEYS AT LAW

95 South State, Suite 2300
Salt Lake City, UT 84111

www.fabianvancott.com

App-1:128

# FABIAN VANCOTT

**Tanner J. Bean**
Attorney
Tel. 801-323-2266
tbean@fabianvancott.com

November 3, 2023

**_VIA MAIL & EMAIL_**

Utah County Attorney's Office
Attn: Chad Grunander & Tim Taylor
100 East Center Street, Suite 2100
chadgr@utahcounty.gov
timt@utahcounty.gov

### Re: Singularism's Religious Practices

Mr. Grunander & Mr. Taylor,

I write to you today on behalf of my client, Bridger Lee Jensen, founder of Singularism. My good friend from law school, Tye Christensen, suggested that you would be good contacts at the Utah County Attorney's Office on this matter, but please forward this letter to whomever is most appropriate within your office.

Mr. Jensen thanks your office for its service to the great state of Utah. Your office's efforts in upholding and enforcing the law have played an integral role in making Utah County a safe and secure place to live for all its residents. Singularism, its founder, and followers are truly appreciative of the work done by your office and intend to support your efforts in any way possible.

As you may know, Singularism was recently featured in the media and your office was referenced as currently developing a position on the matter of Singularism's legality. I have thoroughly consulted with Singularism regarding its spiritual practices and have evaluated how those are permitted by the Religious Freedom Restoration Act, the Religious Land Use and Institutionalized Persons Act, the First Amendment to the U.S. Constitution, and Article 1, Section 4 of the Utah Constitution. Singularism has taken every effort to accord with those authorities as well as additional proactive efforts to ensure only faithful followers of its practices participate in its closed ceremonies and have access to its sacraments. For example, Singularism has thoroughly reviewed the seminal memorandum provided by former Attorney General Jeff Sessions, titled "Guidance on Federal Law Protections For Religious Liberty," which elucidates pertinent exemptions for religious practices akin to those espoused by Singularism. Even so, it may be helpful for you to have additional information about Singularism.

Singularism is a religious organization centered around the safe and sincere use of entheogenic substances as part of its spiritual and religious practices. Singularism

95 South State, Suite 2300
Salt Lake City, UT 84111

ATTORNEYS AT LAW
www.fabianvancott.com

App-1:129

Page 2

exercises its rights with profound reverence for the lawful use of entheogenic compounds. Cognizant of the fact that Singularism is a recent addition to Utah's religious tapestry, Singularism understands that religious minorities often face misconceptions and apprehensions. However, with Utah's history regarding religious persecution, our community appears more sensitive to viewpoints and needs of minority faiths.

It is Singularism's earnest desire to engage in open, good faith, and constructive dialogue with your office to ameliorate any doubts or reservations regarding the legality of Singularism's religious tenets. Such religious tenets are bona fide and span pages and pages of doctrine. Singularism extends an open invitation to discussion and remains at your disposal to provide clarity and to demonstrate adherence to safety, sincerity, and other established legal parameters.

Singularism wishes to convey its unwavering commitment to lawfulness, openness, and productive engagement with the community it aspires to serve. To that end, Singularism has proactively reached out to the Mayor of Provo City and engaged with the State Attorney General's Office to advocate for its religious rights and the responsible use of entheogenic compounds for spiritual healing purposes.

Singularism, in adherence to its religious doctrine, asserts that the safe and controlled utilization of entheogenic compounds is an intrinsic and necessary component of their sacramental practices. Singularism's religious followers are sincere in their pursuit of these religious practices and maintain that entheogenic use is a central part of their belief system for adult members that wish to partake of their sacraments safely and privately. Singularism even screens its followers for religious sincerity before permitting any to engage in their ceremonies.

Notably, Utah's jurisprudential landscape bears witness to this commitment in the recognition and protection afforded to the religious practices of the Native American Church, as well as other religious organizations. For example, Utah's Controlled Substances Act contains a statutory religious exemption "in connection with the practice of a traditional Indian religion," Utah Code § 58-37-8(12), as well as an exemption for medical use of cannabis, Utah Code § 58-37-3.7. Such underscores the jurisprudential path toward protecting the rights and practices of religious minorities like Singularism.

In sum, allow me to reiterate Singularism's appreciation for the unwavering dedication of your office in ensuring the safety and security of the citizens of Utah County. Singularism's objective is to elucidate its practices and ensure an accurate comprehension of their legality, thereby fostering an environment in which diverse faiths can coexist harmoniously within the state.

## FABIAN VANCOTT

ATTORNEYS AT LAW

95 South State, Suite 2300
Salt Lake City, UT 84111

www.fabianvancott.com

Page 3

Thank you for your time and consideration. Singularism eagerly anticipates the prospect of engaging in mutually beneficial discourse to address any concerns and to reinforce the lawful nature of Singularism's religious activities.

Sincerely,

Tanner J. Bean
FABIAN VANCOTT

**FABIAN VANCOTT**
95 South State, Suite 2300
Salt Lake City, UT 84111

ATTORNEYS AT LAW
www.fabianvancott.com

App-1:131

# EXHIBIT C



**Participant Identification:**

I, _____, hereinafter referred to as "the Participant," willingly enter into this agreement on this day, _____, in relation to my participation in the psychedelic ceremonies conducted as part of the religious practices of Singularism.

**Introduction and Purpose:**

This document serves as a comprehensive informed consent and waiver for my voluntary participation in the ceremonial use of psychedelic substances within the religious context of Singularism. It is intended to ensure that I am fully informed about the nature, potential benefits, and risks associated with the use of psychedelics in these ceremonies.

This document acts as an informed consent and comprehensive waiver for individuals like myself who are engaging in Singularism's sacred ceremonies involving the use of psychedelic substances. Participation is entirely voluntary and predicated on a full understanding and acknowledgment of the ceremonial, spiritual, and religious context of this practice. This document is intended to provide complete transparency about the benefits, risks, and nature of psychedelic use in our religious ceremonies.

# DECLARATIONS:

**Legal declaration of Rights:**

I declare that my participation in the psychedelic ceremonies of Singularism is protected under the United States Constitution, legal precedent, and case law, specifically under the provisions for the free exercise of religion. I understand that this right is recognized and upheld in the context of religious practices, and I assert that my participation in these ceremonies is a lawful expression of my religious freedom.

While I am aware that my participation is under the protection of the United States Constitution, I also understand that local municipalities and state governments may have differing interpretations and may mistakenly view such ceremonies as illegal. I recognize that these variations in interpretation exist and that legal protections for religious practices, especially those involving entheogenic substances, may not be uniformly recognized or applied across different jurisdictions.

**Declaration of Sincerity and Honesty:**

I affirm that I have represented myself sincerely and honestly in all interactions with the facilitators of Singularism. I have been truthful in my statements during the screening and preparation process. I have disclosed all relevant information about my health, mental state, and any other factors that may impact my participation in the ceremony. This disclosure is essential to assist the guides in making informed decisions for the safety and benefit of everyone involved.



### Declaration of Personal Spiritual Necessity:

I recognize and sincerely declare that participating in this entheogenic ceremony is a vital and central component of my spiritual well-being. While I understand that not everyone will consider this path essential, I ask for understanding and respect for my personal belief in the significance of this ceremony to my personal spiritual pursuits. I assert my legal right to participate in this religious ceremony, firmly believing it to be integral to my spiritual journey. I enter this ceremony with a deep conviction, informed by thorough self-education and external research, that this experience is indispensable for my spiritual development and religious exploration. I view this ceremony as a crucial step in my ongoing quest for spiritual growth and understanding, essential to my life's spiritual journey.

### Declaration of Voluntary Participation:

By signing this document, I confirm that my decision to participate in the ceremony is made willingly and with full awareness of its nature. I acknowledge that my participation is a conscious choice, free from any external pressures or expectations. I affirm that I am over 18 years of age, in sound mind, and acting in good faith of my own volition.

### Declaration of informed Consent:

By signing this document, Participants affirm that they have received thorough information regarding the ceremony, have had the opportunity to ask questions and express concerns, and have received satisfactory responses. They acknowledge their participation is of their own free will, without any undue pressure or persuasion.

## ACKNOWLEDGMENTS:

### Acknowledgment of Religious and Spiritual Context:

Participants expressly acknowledge and understand that Singularism's use of psychedelics is a deeply religious and spiritual practice. It is conducted in a sacred, respectful manner and is central to our religious beliefs and spiritual explorations. This practice is not recreational, nor clinical whatsoever. This ceremony is a significant part of our spiritual journey and religious expression.

### Acknowledgment  Non-Clinical Nature of Ceremonial Practice:

Participants acknowledge and understand that the psychedelic ceremonies conducted under the auspices of Singularism are strictly religious and spiritual in nature and are not intended to be clinical or therapeutic interventions. Singularism and its facilitators make no clinical claims regarding the efficacy of these practices for the treatment or alleviation of any medical or psychological conditions.These ceremonies do not replace professional medical advice, diagnosis, or treatment. Participants are encouraged to continue any ongoing medical treatments and consult with healthcare professionals regarding their participation in these ceremonies.

### Acknowledgment of Non Licensure:



I understand and acknowledge that Singularism does not operate its sessions under any clinical license whatsoever. If any employee, facilitator, or individual associated with Singularism happens to hold a professional license in another field, I recognize that their licensure is entirely separate and not related to their work and activities within Singularism. The roles and activities undertaken in the context of Singularism's ceremonies are distinct from any licensed professional capacities that these individuals might hold outside of this religious setting.

### Acknowledgment of Religious Inclusivity:
I further acknowledge and respect that Singularism does not require "religious exclusivity" from its adherents. I understand that participation in Singularism's ceremonies does not necessitate forgoing or abandoning my affiliations, beliefs, or practices in other religions. Rather, Sinuglaism teaches religious inclusivity. I recognize that Singularism respects the coexistence of multiple spiritual paths and that my involvement in these ceremonies is a personal choice, made in accordance with my own spiritual and mental well-being needs. My participation in Singularism's ceremonies is a testament to my sincere commitment to exploring diverse spiritual experiences as I deem necessary for my personal growth and development.

### Preparation and Education Acknowledgement:
Participants confirm that they have undertaken adequate preparation for the ceremony. This includes self-education about the nature of psychedelic experiences and consultation with outside resources or experts as needed. Participants affirm that they have been provided with sufficient information and resources by Singularism to make an informed decision about their participation.

### Medical Advisory Acknowledgment:

I acknowledge that while Singularism's ceremonies incorporate clinical insights and prioritize safety, they operate within a religious context, not a medical one. I understand the importance of consulting with a medical professional about my participation, especially if I'm undergoing psychopharmacological treatment. The advice from Singularism's staff, despite being informed, is not a substitute for licensed and qualified professional medical advice, and we acknowledge their clinical advice supersedes our spiritual advice in medical and physical matters. Singualrsim always advises that you seek your own medical council. Therefore, I commit to seeking medical counsel to ensure my health and safety regarding any treatments I am receiving, or medical concerns I have.

This shortened version maintains the essential information about the importance of seeking medical advice and the non-medical nature of Singularism's ceremonies, while being more concise.

## AGREEMENTS:

### Commitment to Safety and Guidance:
I, the participant, commit to maintaining a safe environment during the ceremony and agree to follow all rules and instructions provided by the guides and facilitators. I understand that these guidelines are in

Page 3 of 9



place to ensure the safety and well-being of all participants, including myself. I agree to listen attentively to my guide and adhere strictly to the established protocols throughout the ceremony.

### Ceremony Participation Agreement

As a Participant in Singularism ceremonies, I commit to following the guidance and instructions of the lead facilitator throughout the ceremony. I place my trust in the facilitator's expertise and agree to openly express any concerns or discomfort I may experience during the process. This commitment is made to ensure my physical and emotional safety, as well as to uphold the sanctity and integrity of the ceremony.

I understand the importance of communication and agree to voice my needs and concerns so that the facilitators can provide the necessary support to maintain a safe and supportive environment. By signing below, I acknowledge my understanding and agreement to the terms outlined above, committing to follow the lead facilitator's instructions and to communicate openly during Singularism ceremonies.

### Facility Stay Agreement

As a Participant in Singularism ceremonies, I agree to remain within the designated facility premises until my lead facilitator formally releases me at the conclusion of the ceremony. This agreement is in place to ensure my safety and the integrity of the ceremonial process, allowing for a fully immersive and secure experience. I understand that leaving the facility prematurely may compromise both my safety and the collective experience of all participants. **By signing below, I affirm my commitment to stay within the facility as required and to follow the release instructions provided by my lead facilitator.**

### No Driving Agreement:

I agree that I will not operate a vehicle under any circumstances on the day of the ceremony. Even if I feel capable of driving, I understand the importance of adhering to this rule for my safety and the safety of others. The effects of psychedelic substances used during the ceremony can be unpredictable, and my judgment may be impaired. I commit to arranging transportation to and from the ceremony location through a trusted friend, family member, or reliable ride service. This ensures that I do not have to drive under any circumstances, maintaining safety as a top priority.

### Audio Recording and Note Usage Policy and Consent Agreement:

By engaging in sessions with Singularism, clients acknowledge and consent to the potential audio recording of parts of their sessions and the use of handwritten notes as visuals, primarily for training purposes and occasionally for use in anonymized media clips. These recordings will be audio-only unless explicitly agreed otherwise, and any notes used will not contain identifiable personal information. Clients are assured that their confidentiality will be maintained in all materials.

### Phone Use Restriction:

I agree to not use my phone during the ceremony sessions without explicit permission from the guide. I understand that this guideline is in place for my emotional safety and to enhance the effectiveness of the sessions. Using a phone can be distracting and may disrupt the immersive and introspective nature of the



experience. I acknowledge that maintaining a phone-free environment is essential for creating a focused and conducive setting for all participants.

## DISCLOSURES:

### Potential Benefits: Transformative Potential of Psychedelic Experiences - Legal Disclosure:

As participants in this ceremony, you are embarking on a journey that has the potential to profoundly impact your personal and spiritual growth. The ceremonial use of psychedelics could lead to life-changing experiences and insights. Just a few of the many benefits include, but is not even remotely limited to:

1. Enhanced Self-Awareness: You may experience a deepening of self-understanding, peeling back layers of your consciousness to reveal a richer, more nuanced understanding of your identity and purpose.
2. Spiritual Awakening: Many participants report transformative spiritual experiences, feeling a profound connection to a greater existence beyond the physical realm. This awakening can offer new perspectives on life and existence.
3. Emotional Catharsis: The experience may facilitate a powerful release of pent-up emotions, leading to therapeutic and healing outcomes. It's not uncommon for participants to emerge with a sense of emotional renewal and resilience.
4. Deepened Connection with the Universe: You might find yourself experiencing an intense sense of unity and interconnectedness with the universe, nature, and fellow beings. This often leads to a greater sense of empathy and compassion.
5. Strengthened Sense of Interconnectedness: The feeling of being deeply connected with others and the environment around you can foster a sense of belonging and understanding, promoting harmony and empathy in your interactions.
6. Personal Development and Enlightenment: These experiences have the potential to contribute significantly to your personal development, providing insights and perspectives that can lead to a more enlightened, fulfilling life.

It is important to understand that while these experiences can be transformative and profound, they are subjective and can vary greatly from person to person. The journey you embark upon is unique to you, influenced by your personal mindset, environment, and life experiences.

### Disclosure of Risks and Side Effects:

Participants are thoroughly informed about the potential risks and side effects associated with the use of psychedelic substances, framed in an optimistic yet realistic manner. While many individuals experience positive and transformative effects, it's important to understand that reactions can vary:

Page 5 of 9

App-1:137



1. Psychological Responses: In some rare instances, participants may experience temporary feelings of anxiety, confusion, or unpredictable emotional responses. These are typically short-lived and often contribute to a deeper understanding of personal emotions and thought processes.
2. Physical Reactions: Some individuals might encounter minor physical reactions such as mild nausea or slight dizziness. Changes in sensory perception, a common aspect of the psychedelic experience, are generally perceived as part of the journey towards greater self-awareness.
3. Worldview and Belief Systems: There's a possibility for long-term changes in personal belief systems and worldview. While this can be profound and positive, leading to a more open and inclusive perspective on life, it's important to approach this potential change with an open mind and readiness for personal growth.
4. Rare Cases: In very rare cases, more intense experiences can occur, including psychotic breaks that are impossible to screen or predict. These are usually in populations with specific predispositions and are not common in the general population.

It is important for participants to understand that these risks are inherent to the experience and can vary from person to person. This disclosure is provided not to dissuade but to ensure a fully informed, positive, and conscious decision to participate.

**<u>Health and Safety Considerations:</u>**

I affirm that I have provided a complete and honest disclosure of all relevant health information to the facilitators of Singularism. This includes a thorough account of my mental health history and any current physical health conditions. I understand the importance of this disclosure, as certain health conditions can increase the risk of adverse reactions during the ceremony.

In recognition of these risks, I commit to discussing any potential contraindications with my healthcare provider before participating in the ceremony. This discussion is a crucial step in ensuring my safety and well-being, as it helps in identifying any personal health factors that might influence my experience.

Furthermore, I acknowledge and appreciate the organization's commitment to maintaining rigorous safety protocols and providing continuous support throughout the ceremony. This commitment includes monitoring the ceremony environment, being responsive to participants' needs, and having measures in place to address any unexpected situations. I understand that this support is in place to foster a safe and nurturing space for my spiritual journey, but it does not substitute for my personal responsibility in assessing my fitness to participate.

By acknowledging this, I accept that while the organization takes extensive measures for safety, the nature of such experiences involves a degree of unpredictability, and I assume responsibility for my decision to partake in the ceremony."

This expanded statement emphasizes the participant's responsibility in disclosing their health information and consulting with healthcare providers, alongside acknowledging the organization's commitment to



safety and support.

## Recognition of Potential Risks and Assumption of Responsibility

While we at Singularism are committed to establishing and following groundbreaking best practices and standards of care in our ceremonies, it is important to recognize that, as with any human endeavor, mistakes can happen. Participants should be aware that despite our best efforts, there is an inherent risk associated with any activity involving psychedelic substances. By choosing to participate, you understand and assume all risks associated with this ceremony. This acknowledgment is not a reflection of an expectation of negative outcomes but is a standard precaution to ensure that participants are aware of their personal responsibility in choosing to partake in these ceremonies."

## Voluntary Participation and Comprehensive Informed Consent:

By signing this document, Participants affirm that they have received thorough information regarding the ceremony, have had the opportunity to ask questions and express concerns, and have received satisfactory responses. They acknowledge their participation is of their own free will, without any undue pressure or persuasion.

## Legal Release of Liability and Indemnification:

Participants agree to waive and release Singularism, its facilitators, organizers, and any associated parties from any liability or claims that may arise from their participation in the psychedelic ceremonies. They understand this waiver includes any unforeseen risks or outcomes not explicitly mentioned in this document.

## Provisions for Emergency Medical Care:
In the event of a medical emergency, Participants consent to receive necessary medical treatment and understand that the organization will take all appropriate actions to ensure their safety and well-being, including contacting emergency medical services if needed



**Supportive/Emergency Contact Authorization**
As a Participant of Singularism ceremonies, I recognize the value of having a supportive network available in times of need. I have selected three individuals with whom I feel both emotionally and physically safe. I grant Singularism unconditional permission to contact any of these individuals whenever a facilitator deems it necessary for my well-being or safety. I have informed them that they are being used as an emergency contact in this context

**Supportive/Emergency Contact 1:**

    Contact Full Name:_____

    Relationship to Participant:_____

    Phone Number:_____

    Email: _____

    City of Residence:_____

**Supportive/Emergency Contact 2:**

    Contact Full Name:_____

    Relationship to Participant:_____

    Phone Number:_____

    Email: _____

    City of Residence:_____

**Supportive/Emergency Contact 3:**

    Contact Full Name:_____

    Relationship to Participant:_____

    Phone Number:_____

    Email: _____

    City of Residence:_____



**Intention Statement:**

Participants are invited to state their intention for participating in the ceremony. This intention, while personal, plays a crucial role in shaping the individual's experience. It is understood that setting a clear and positive intention can significantly influence the nature of one's experience.

Intention (please write below):

_____

_____

**Confidentiality and Respect for Privacy:**

Participants commit to respecting the privacy and confidentiality of all individuals involved in the ceremonies. They agree not to disclose sensitive information about the ceremonies or other participants without explicit permission.

**Acknowledgment and Binding Signature:**

I, _____, hereby affirm that I have read, fully understand, and agree to all terms and conditions outlined in this waiver. I acknowledge that my participation in Singularism's psychedelic ceremonies is informed, voluntary, and at my own risk.

Signature: _____

Printed Name:_____

Date: _____

Case 2:24-cv-00887-JNP   Document 9-4   Filed 12/04/24   PageID.125   Page 1 of 4

# EXHIBIT D

App-1:142

Tanner J. Bean (A17128)
tbean@fabianvancott.com
FABIAN VANCOTT
95 South State Street, Suite 2300
Salt Lake City, UT 84111-23323
Telephone: (801) 531-8900
*Attorney for Plaintiffs*

---

## IN THE FOURTH JUDICIAL DISTRICT

## UTAH COUNTY, STATE OF UTAH

| | |
|---|---|
| BRIDGER LEE JENSEN, an individual; SINGULARISM, a non-profit corporation; PSYCHE HEALING AND BRIDGING, LLC dba PSYCHEDELIC THERAPY JOURNEY; a limited liability company;<br><br>    Plaintiffs,<br>vs.<br><br>UTAH COUNTY, a political subdivision, PROVO CITY, a political subdivision; JEFFREY GRAY, an individual; TROY BEEBE, an individual; BRIAN WOLKEN, an individual; JACKSON JULIAN, an individual; JOHN DOES 1-4, individuals;<br><br>    Defendants. | **DECLARATION OF ALLAN JOHNSON**<br><br>Case No. _____<br><br>Honorable _____ |

I, Allan Johnson, declare:

1.    I am over eighteen years old and competent to testify.

2.    I have personal knowledge of the facts set forth in this declaration, and if called as a witness, I could and would testify competently to them under oath.

1

App-1:143

3.      I am a retired First-Class Petty Office Navy Seal. I currently work as a software engineer.

4.      I have served two combat tours in Iraq and have faced unique challenges and sought deeper meeting and connection in my life, so I approached Singularism.

5.      My wife and I were impressed by the care and attention given during Singularism's preparation and screening process. Before my ceremony, we had a thorough conversation with Bridger and his team. They spoke thoughtfully about the spiritual significance of the experience and emphasized how Singularism complements, rather than contradicts, existing religious or spiritual practices. This immediately resonated with me, as it framed the practice as a way to deepen spiritual connection rather than replace or undermine it.

6.      The screening process itself was comprehensive and conducted with great care. I was asked detailed medical questions to ensure I was in a stable condition to proceed. I also underwent a multi-hour preparation interview, during which I shared my background, the challenges I was facing, and my personal spiritual goals for the experience. This allowed the team to tailor the process to ensure it addressed my specific struggles. The preparation was intentional, emphasizing the spiritual nature of the journey and making it clear that the goal was not to prescribe a one-size-fits-all solution, but rather to help me explore my own mind and find personal insights.

7.      The ceremony itself was profoundly transformative. One moment stands out in particular: I experienced an overwhelming sense of unity with all things. This wasn't just a fleeting sensation but a deeply religious encounter with the sacredness of existence. I felt as though the boundaries between myself and the universe dissolved, revealing a divine interconnectedness that

Appellate Case: 25-4115     Document: 26-1     Date Filed: 12/11/2025     Page: 145
Case 2:24-cv-00887-JNP   Document 9-4   Filed 12/04/24   PageID.128   Page 4 of 4

App-1:145

was both awe-inspiring and grounding. This realization brought clarity, healing, and a renewed sense of purpose that continues to guide me in my daily life.

8. For me, Singularism is much more than a therapeutic practice—it is a sacred, spiritual journey. Its teachings, such as "All is one," align deeply with my understanding of faith and the interconnectedness of all things. Singularism has enriched my spiritual life and provided me with tools to address challenges with a greater sense of peace and clarity.

9. It is my hope that my story helps convey the sacred and spiritual nature of Singularism and the care and intention behind its practices.

10. I declare under criminal penalty of perjury under the law of Utah that the foregoing is true and correct.

DATED this 18th day of November, 2024.

/s/ _____
Allan Johnson

3

# EXHIBIT E

Tanner J. Bean (A17128)
tbean@fabianvancott.com
**FABIAN VANCOTT**
95 South State Street, Suite 2300
Salt Lake City, UT 84111-23323
Telephone: (801) 531-8900
*Attorney for Plaintiffs*

---

## IN THE FOURTH JUDICIAL DISTRICT

## UTAH COUNTY, STATE OF UTAH

| | |
|---|---|
| BRIDGER LEE JENSEN, an individual; SINGULARISM, a non-profit corporation; PSYCHE HEALING AND BRIDGING, LLC dba PSYCHEDELIC THERAPY JOURNEY; a limited liability company; <br><br> Plaintiffs, <br> vs. <br><br> UTAH COUNTY, a political subdivision, PROVO CITY, a political subdivision; JEFFREY GRAY, an individual; TROY BEEBE, an individual; BRIAN WOLKEN, an individual; JACKSON JULIAN, an individual; JOHN DOES 1-4, individuals; <br><br> Defendants. | **DECLARATION OF BRANDI LEE** <br><br> Case No. _____ <br><br> Honorable _____ |

I, Brandi Lee, declare:

1.    I am over eighteen years old and competent to testify.

2.    I have personal knowledge of the facts set forth in this declaration, and if called as a witness, I could and would testify competently to them under oath.

3.    I am a Practitioner at Singularism.

4.    Before discovering Singularism, I was a mother of four, happily married for 24 years, and a member of the LDS Church. However, beneath the surface, I struggled with an eating

1

App-1:147

disorder, anxiety, and severe PMDD. In 2020, my world was shattered by the unexpected loss of my father. Grief and fear consumed me, and just eight months later, my beloved brother tragically took his own life. The pain was almost unbearable. Witnessing the devastation and trying to support his young daughters left me feeling lost and broken.

5.      As if life hadn't tested me enough, six months after my brother's passing, my husband, my best friend and partner of 24 years, asked for a divorce. The gaslighting and verbal abuse that followed left me questioning my own sanity and self-worth. I spiraled into a dark abyss, battling panic attacks, unable to eat, and spending countless hours hiding in my closet.

6.      For a year, I endured unimaginable pain, contemplating ending my own life to escape the torment. In desperation, I turned to my faith, attending the temple weekly and fasting, hoping for a miracle. Thankfully, a dear friend introduced me to Bridger and Singularism. It felt like a lifeline, a final chance to reclaim my life.

7.      From my very first meeting with Bridger, I felt a sense of hope. He carefully screened me to ensure my safety and explained the process and the potential for healing. He emphasized the importance of personal religious exploration and the journey toward unlocking our authentic selves.

8.      During my first session, Bridger prepared the psilocybin tea with transparency and care. We engaged in an intention ceremony, and as I drank the tea, something remarkable happened. I found myself laughing uncontrollably, a deep and joyful laughter that had been absent for far too long. In that moment, I reconnected with a lost part of myself, the playful and humorous spirit I had suppressed for years.  I hadn't realized that I had blocked this part of me after meeting my husband when I was 17 years old.  He was really funny and so I stepped aside to let him be the funny one.

9. Each subsequent session brought further insights and profound healing. I encountered my brother and father, radiant and at peace. I walked alongside Jesus, who reminded me that love is the answer to everything. He taught me that true spirituality resides within each of us, transcending any specific religion. I embraced Heavenly Mother and Father, feeling their unconditional love and reassurance. They acknowledged my pain and reminded me of my purpose, assuring me that they were with me every step of the way.

10. The experiences I had during those sessions were transformative. After completing my four sessions, I emerged a new person. My anxiety had dissipated, my grief had eased, and my eating disorder was finally manageable. Singularism saved my life and, in doing so, helped me rediscover my true self – a person filled with love, empathy, and a deep appreciation for the beauty and resilience of the human spirit.

11. My belief in the healing power of Singularism is so strong that I felt called to help others find the same solace and transformation. In September 2023, I began working as a facilitator with Singularism. Witnessing the healing journeys of others has been an incredible privilege and a testament to the profound impact of this practice.

12. It is a religion of healing, self-discovery, and love. It has the power to transform lives, one voyager at a time. Bridger's professionalism and the controlled, safe environment of the wellness center, where the sacrament is never sold or removed, instilled in me a sense of security and trust. This allowed me to fully surrender to the experience and embrace the healing journey that awaited me.

13. I declare under criminal penalty of perjury under the law of Utah that the foregoing is true and correct.

3

DATED this 18th day of November, 2024.

/s/ *Brandi Lee*
Brandi Lee

Case 2:24-cv-00887-JNP   Document 9-6   Filed 12/04/24   PageID.134   Page 1 of 4

# EXHIBIT F

Tanner J. Bean (A17128)
tbean@fabianvancott.com
FABIAN VANCOTT
95 South State Street, Suite 2300
Salt Lake City, UT 84111-23323
Telephone: (801) 531-8900
*Attorney for Plaintiffs*

## IN THE FOURTH JUDICIAL DISTRICT

## UTAH COUNTY, STATE OF UTAH

| | |
|---|---|
| BRIDGER LEE JENSEN, an individual; SINGULARISM, a non-profit corporation; PSYCHE HEALING AND BRIDGING, LLC dba PSYCHEDELIC THERAPY JOURNEY; a limited liability company; <br><br> Plaintiffs, <br><br> vs. <br><br> UTAH COUNTY, a political subdivision, PROVO CITY, a political subdivision; JEFFREY GRAY, an individual; TROY BEEBE, an individual; BRIAN WOLKEN, an individual; JACKSON JULIAN, an individual; JOHN DOES 1-4, individuals; <br><br> Defendants. | **DECLARATION OF MARJORIE JOHNSON** <br><br> Case No. _____ <br><br> Honorable _____ |

I, Marjorie Johnson, declare:

1.      I am a 48-year-old mother of four and am the CEO of a female-owned local business.

2.      I was introduced to Singularism after meeting its visionary founder, Bridger Jensen, who shared his worldview and experiences with me. He spoke with such passion about the transcendent experiences his followers had, and I felt a strong pull to explore whether this

App-1:152

practice could be the right path for me. At that time, I was struggling deeply with my sense of self, my understanding of life, and my shattered worldview. I felt as though I had no solid foundation on which to rebuild my life or guide my children in truth. When I came to Singularism, I was desperate for enlightenment and direction.

3. The experiences I've had with Singularism, particularly the sacred rituals and sacraments, are profoundly spiritual to me—they saved my life. They offered me hope when I had lost all hope, light in the midst of darkness, and a renewed sense of purpose when all seemed lost. These teachings provided me with a worldview that reconnected me to faith, something I thought I had lost forever.

4. Singularism has not only helped me personally but has also strengthened my familial relationships. It enabled me to overcome the emotional scars of childhood abuse, rediscover my sense of self, and embrace a renewed faith. It has also deepened my understanding of love for others and for all living creatures, awakening in me a profound sense of interconnectedness.

5. One of the most transformative aspects of Singularism is the sacred ritual of setting an intention, speaking it aloud during the ceremony, and partaking of the sacramental tea. During one ceremony, I experienced an overwhelming sense of joy, inner peace, and enlightenment. This moment was nothing short of transcendent—a deeply spiritual encounter that connected me to something greater than myself. It helped me see that all life on Earth exists in a beautiful, synergistic state.

6. Before my participation, Bridger screened me with great care, ensuring I was ready for the spiritual journey ahead. The conversations I had with him in his church were filled

with kindness, patience, and understanding. His approach is unlike anything I've encountered in either therapy or traditional religious ceremonies.

7.      Singularism is not a business—it is a sacred practice and a deeply spiritual path that has changed my life in ways I never thought possible. It is vital that we protect our right to worship freely and practice our spiritual beliefs without interference. Our founding fathers enshrined these freedoms in the Constitution, and we must honor their vision of a truly free country.

Declaration

8.      I declare under criminal penalty under the law of Utah that the foregoing is true and correct.

DATED this 18th day of November, 2024.

/s/ _____
Marjorie Johnson
Singularism Member

Case 2:24-cv-00887-JNP   Document 9-7   Filed 12/04/24   PageID.138   Page 1 of 4

# EXHIBIT G

Tanner J. Bean (A17128)
tbean@fabianvancott.com
**FABIAN VANCOTT**
95 South State Street, Suite 2300
Salt Lake City, UT 84111-23323
Telephone: (801) 531-8900
*Attorney for Plaintiffs*

---

**IN THE FOURTH JUDICIAL DISTRICT**

**UTAH COUNTY, STATE OF UTAH**

| | |
|---|---|
| BRIDGER LEE JENSEN, an individual; SINGULARISM, a non-profit corporation; PSYCHE HEALING AND BRIDGING, LLC dba PSYCHEDELIC THERAPY JOURNEY; a limited liability company; <br><br> Plaintiffs, <br><br> vs. <br><br> UTAH COUNTY, a political subdivision, PROVO CITY, a political subdivision; JEFFREY GRAY, an individual; TROY BEEBE, an individual; BRIAN WOLKEN, an individual; JACKSON JULIAN, an individual; JOHN DOES 1-4, individuals; <br><br> Defendants. | **DECLARATION OF JENNIFER DENBLEYKER** <br><br> Case No. _____ <br><br> Honorable _____ |

I, Jennifer DenBleyker, declare:

1.      I am over eighteen years old and competent to testify.

2.      I have personal knowledge of the facts set forth in this declaration, and if called as a witness, I could and would testify competently to them under oath.

3.      I am a medical doctor that has practiced for 20 years.

4.      I found Singularism last year while struggling with a growing disconnection from God and the breakdown of some key relationships. Despite following all the religious advice I had

1

App-1:156

been given, I couldn't find a successful way forward. When I met with Bridger, we explored my spiritual history in depth as well as the role psilocybin might play in reconnecting me with the God to which I had dedicated my life. With my medical background, I was impressed by the thorough screening process. I felt reassured that my safety and well-being were priorities, which gave me confidence to proceed.

5.     During the guided sessions, the psilocybin helped facilitate a renewed spiritual connection which I had been seeking for decades. I was able to experience God not by traveling through space to where I imagined that He resided, but by having him show up in the very air molecules that surrounded me and indwelt me with every breath, always near and available to me. Another insight I had was how awkward my body felt, and I heard the words "it's not supposed to fit." This was freeing to my perfectionist prone ego which realized in a more experiential way that my body is just a temporary housing for my spiritual self. The psilocybin also helped me understand some of the issues that were blocking my most important relationships. It provided me metaphors showing me that I needed to not let fear keep me from going "all in" on my relationships.

6.     This experience has been transformative, strengthening my spiritual life, improving my emotional health, and offering a blueprint for better relationships. The journey was so impactful that I decided to pursue facilitator training through Singularism, hoping to help others achieve similar healing and spiritual connection. The training was professional and thorough, with a focus on safety, well-being, and helping others connect with the divine.

7.     I declare under criminal penalty of perjury under the law of Utah that the foregoing is true and correct.

2

App-1:157

DATED this 18th day of November, 2024.

/s/ _____

Jennifer DenBleyker

App-1:158

Case 2:24-cv-00887-JNP   Document 9-8   Filed 12/04/24   PageID.142   Page 1 of 4

# EXHIBIT H

Tanner J. Bean (A17128)
tbean@fabianvancott.com
**FABIAN VANCOTT**
95 South State Street, Suite 2300
Salt Lake City, UT 84111-23323
Telephone: (801) 531-8900
*Attorney for Plaintiffs*

---

## IN THE FOURTH JUDICIAL DISTRICT

## UTAH COUNTY, STATE OF UTAH

| | |
|---|---|
| BRIDGER LEE JENSEN, an individual; SINGULARISM, a non-profit corporation; PSYCHE HEALING AND BRIDGING, LLC dba PSYCHEDELIC THERAPY JOURNEY; a limited liability company;<br><br>          Plaintiffs,<br>vs.<br><br>UTAH COUNTY, a political subdivision, PROVO CITY, a political subdivision; JEFFREY GRAY, an individual; TROY BEEBE, an individual; BRIAN WOLKEN, an individual; JACKSON JULIAN, an individual; JOHN DOES 1-4, individuals;<br><br>          Defendants. | **DECLARATION OF JAKE WOOD**<br><br>Case No. _____<br><br>Honorable _____ |

I, Jake Wood, declare:

1.      I am over eighteen years old and competent to testify.

2.      I have personal knowledge of the facts set forth in this declaration, and if called as a witness, I could and would testify competently to them under oath.

3.      I am a 41-year-old Resilience and Transformation Coach. I am also a spiritual facilitator for Singularism.

1

App-1:160

4.       I became involved with Singularism because I was drawn to its potential to bring about deep emotional and spiritual transformation for others, something I had not seen with traditional therapeutic approaches. As a facilitator, I have had the privilege of working closely with participants as they navigated their own healing journeys through psilocybin therapy.

5.       During my time as a facilitator, I have witnessed firsthand the profound effects Singularism has on individuals. Many participants come to us after struggling with conventional therapies, unable to make progress in their emotional or spiritual well-being. Through the carefully guided ceremonies and the principles of Singularism, I have seen participants experience breakthroughs that were both transformative and deeply spiritual.

6.       The work I do with Singularism is more than just facilitation. It is part of something sacred. The care, intention, and spiritual depth involved in every ceremony ensures that participants feel prepared, safe, and fully supported throughout their journey. We conduct thorough screenings and follow strict safety protocols to ensure that each participant is in the right state physically, emotionally, and spiritually for the experience. The emphasis on preparation and integration is key to making the process as safe and effective as possible. It is this dedication to safety that allows participants to truly let go and engage fully with their healing journey.

7.       Singularism is much more than a therapeutic approach; it is a deeply spiritual practice that helps individuals reconnect with themselves and something greater. I believe it is a necessary pathway for those seeking profound emotional and spiritual progress, offering a kind of transformation that many people simply cannot find through traditional means.

8.       I declare under criminal penalty of perjury under the law of Utah that the foregoing is true and correct.

App-1:161

DATED this 18th day of November, 2024.

/s/ Jacob Wood

Jake Wood

App-1:162

# EXHIBIT I

IN THE FOURTH DISTRICT COURT - ALL DEPARTMENT

IN AND FOR UTAH COUNTY, STATE OF UTAH

## SEARCH WARRANT

No. 2992661

COUNTY OF UTAH, STATE OF UTAH

To any peace officer in the State of Utah:

Proof by Affidavit made upon oath or written affirmation subscribed under criminal penalty of the State of Utah having been made to me by Detective JACKSON JULIAN of Provo Police Department, this day, I am satisfied that there is probable cause to believe

THAT

On the premises known as 1969 N State Street, Provo, UT, further described as A brown brick building located in a business complex on the west side of North State St. The numbers "1969" are displayed on a white pillar, just outside the front entrance which sits at the bottom of an outdoor stair case. The word "Singularism" is printed on the glass front entrance door.;

On the person(s) described as:

Bridger Lee Jensen (DOB 9/6/1981)

In the City of Provo, County of Utah, State of Utah, there is now certain property or evidence described as:

- Psilocybin Mushrooms
- Equipment used to ingest and/or cultivate psilocybin
- Business records which document the administering of psilocybin to clients
- Financial records which indicate transaction history of purchasing cultivation equipment, income produced by administering psilocybin to clients, and where the money garnered from this business is being kept

and that said property or evidence:

Was unlawfully acquired or is unlawfully possessed;

has been used or is possessed for the purpose of being used to commit or conceal the commission of an offense; or

is evidence of illegal conduct.

Affiant believes the property and evidence described above is evidence of the crime or crimes of - Possession of Psilocybin (Schedule I Controlled Substance) with the Intent to distribute, per UCA 58-37-8
- Possession of Drug Paraphernalia, Per UCA 58-37A-5.

YOU ARE THEREFORE COMMANDED:

to make a search in the daytimeof the above-named or described person, vehicle, item, and/or premises for the herein-above described property or evidence and if you find the same or any part thereof, retain such property in your custody subject to the direction of a prosecutor or an order of this Court.

Dated: 4th day of November, 2024 @ 05:05 PM  /s/    **SEAN PETERSEN**
**District Court Judge**

- Page 2 of Search Warrant No. 2992661 -

App-1:165

# EXHIBIT K



POLICE

CHIEF TROY BEEBE

TEL (801) 852-6257
445 West Center St
PROVO, UT 84601

Dear Utah Valley Foot and Ankle LLC,

This letter is in reference to your property located at 1969 N. State St., Provo, Utah 84604.

The Provo Police Department has obtained information regarding criminal activity, based on case number 24PR24922 (Bridger Jensen/Singularism.org), where psilocybin and THC drugs and drug paraphernalia were seized.

This evidence shows that drug distribution and use/possession is occurring. Therefore, a nuisance exists on the property that you own, in violation of 78b-6-1107, Utah Code Annotated. We hope you agree that this type of activity in the community is unacceptable.  Our primary concern is for the residents in that neighborhood who are living in unnecessary fear and danger should this kind of illegal activity be allowed to continue.

As members of the Provo Police Department, we are asking for your cooperation by evicting your tenant(s) as soon as possible. We are confident that you may not have been aware of the illegal and dangerous activity that was occurring on your property, and that you will take the appropriate steps to ensure that your offending tenant is evicted.

Please be advised that if you allow your current tenants to continue to reside at this property, Provo City will have no choice but to proceed with the civil abatement process authorized by the State of Utah Code section 78b-6-1108, Utah Code Annotated. The statute mandates that you be made a party defendant and if Provo City demonstrates that a nuisance exists, Provo City can also collect its cost and attorney's fees against you.

In addition, should Provo City develop sufficient facts showing ongoing drug nuisances, Provo City may seek forfeitures of real property, automobiles and other property used for the distribution, storage or manufacture of controlled substances, pursuant to the section 58-37-8, Utah Code Annotated.

Please contact me if you have any questions or concerns.

Sincerely,

Captain Brian Wolken
Provo City Police Department
Special Operations Division
801 852 7251

POLICE.PROVO.ORG

App-1:167

# EXHIBIT L

Date 11/18/2024

**To: Captain Brian Wilkin**
Provo City Police Department
Special Operations Division

**Subject: Response to Notice Regarding Property at 1969 North State Street, Provo, Utah**

Dear Captain Wilkin,

Thank you for notifying me of the activities you referenced in your recent undated letter regarding the property at 1969 North State Street. I appreciate the opportunity to respond with transparency and cooperation.

I would like to emphasize that my position here is complicated. I find myself between conflicting obligations, as I am tasked with both respecting legal non-discrimination requirements and complying with the concerns raised in your letter. After speaking with Singularism (I was in the act of letting them know they could no longer rent), I understand they are actively working to clarify their legal standing and are pursuing a temporary restraining order (TRO) as they believe their practices are protected under the law. Singularism has expressed to me that they have a willingness to comply with law enforcement and has even extended an open invitation to Provo City officials to tour their facilities. From my perspective as a landlord, I have not observed any behavior that would typically prompt concern. I have asked my employees about Singularism's presence in the same building and they have not reported feeling unsafe or threatened by their presence. We have not seen any questionable activity nor have we had unsavory people coming and going from their facility. If anything, they have been exemplary tenants.

At this time, I intend to continue a professional distance from Singularism, maintaining a clear separation between my business and their organization. However, the situation leaves me in a challenging position: either to take action that could be perceived as unlawful discrimination based on religious grounds or to risk noncompliance with the concerns you have raised.

While I am fully prepared to comply with any direct court order regarding this matter, I respectfully request that further action be deferred until these legal questions are resolved. My role here is to ensure that I meet my responsibilities as a landlord in full compliance with applicable laws and, given the complexity of the situation, to proceed with caution.

Thank you for understanding the difficult position I am in and for considering this perspective. Please feel free to reach out with any further questions or to discuss this matter further.

**Sincerely,**

Jared Clegg
Utah Valley Foot and Ankle LLC

# EXHIBIT M

**From:** Russell Godfrey
**To:** Bridger Jensen
**Cc:** Tanner J Bean
**Subject:** Re: DOPL Investigation 155999
**Date:** Tuesday, November 19, 2024 12:26:04 PM

Mr. Jensen and Mr. Bean,

I spoke with my supervisor about closing this case and it was decided this complaint would be closed as "unfounded". This means DOPL is not taking any action and closing this complaint out with no further action taken at this time. I want to thank you for your cooperation in this matter and wish you all the best in the future. If you have any questions, please let me know.

Thanks,

Russ Godfrey

## Russ Godfrey | Investigator



**Email: rgodfrey@utah.gov**
**Cell: 385-622-1583 | Fax: 801-530-6301**
**Heber M. Wells Bldg.**
**160 E 300 S**
**Salt Lake City, UT 84114**

The information contained in this e-mail message is privileged and/or confidential information intended only for the receipt by and use of the individual or entity to whom or which it is addressed If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this message in error, please immediately notify us by telephone or by reply to this message. Also, please delete the original message. Thank you.

On Tue, Nov 12, 2024 at 9:56 AM Bridger Jensen <bridgerjensen@gmail.com> wrote:
Please see attached.

I wish to also express that I am in full compliance with the law, and that I am absolutely willing to speak openly with you and even have you come for a tour anytime. :) Just let me know.

Thank you,

Bridger Jensen

On Mon, Nov 11, 2024 at 12:44 AM Bridger Jensen <bridgerjensen@gmail.com> wrote:
Russ-

I have prepared a statement for you and I will send it by the end of the business day Monday. I got delayed a little bit over the weekend.

App-1:171

Thank you for your patience and know that I fully intend to comply with your investigation. After you've received the statement, I am open to speak in person or on the phone at your request.

Thank you,

**Bridger Jensen**
Utah Psychedelic Therapy, Founder

On Wed, Oct 30, 2024 at 1:17 PM Russell Godfrey <rgodfrey@utah.gov> wrote:

Mr. Jensen,

My name is Russ Godfrey and I am an investigator with the Division of Professional Licensing (DOPL). I have been assigned to follow up on a complaint made to our Division regarding Singularism and your State-issued license. The complaint stated you were practicing therapy without a license (your State-issued license expired in 2019) and the business license was about to expire (which it did at the end of September 2024). I want you to write me a statement responding to this complaint. I would like you to address your role at Singularism and what function(s) you perform for the company. Can you also address the reason the company license has expired, yet your website still shows active with an address in Provo, Utah. Once I get your statement I would like to follow up with you either in person or over the phone if necessary.

Thank you and I look forward to hearing from you,

Russ Godfrey

**Russ Godfrey | Investigator**

Email: **rgodfrey@utah.gov**
Cell: **385-622-1583** | Fax: **801-530-6301**
Heber M. Wells Bldg.
**160 E 300 S**
**Salt Lake City, UT 84114**

The information contained in this e-mail message is privileged and/or confidential information intended only for the receipt by and use of the individual or entity to whom or which it is addressed If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this message in error, please immediately notify us by telephone or by reply to this message. Also, please delete the original message. Thank you.

App-1:172

# FABIAN VANCOTT

Tanner J. Bean
Attorney
Tel. 801-323-2266
tbean@fabianvancott.com

November 11, 2024

**_VIA EMAIL_**

Division of Professional Licensing
State of Utah Department of Commerce
Attn: Russell Godfrey
P.O. Box 146741
Salt Lake City, UT 84114-6741
rgodfrey@utah.gov

### Re: Clarification of Religious Exemption – Bridger Lee Jensen

Mr. Godfrey,

I am writing on behalf of my client, Bridger Lee Jensen, regarding the recent inquiry from the Division of Professional Licensing regarding his organization, Singularism, and his religious work in the state of Utah.

As you are aware, Utah's Mental Health Professional Practice Act governs the licensure and practices of individuals engaging in the practice of mental health therapy. Utah Code § 58-60-101 *et seq*. Although generally an individual must be licensed to engage in the practice of mental health therapy, Utah Code § 58-60-107 includes a list of individuals who are exempted from licensure. Relevant here, this list includes "a recognized member of the clergy while functioning in a ministerial capacity as long as the member of the clergy does not represent that the member of the clergy is, or use the title of, a license classification in Subsection 58-60-102(5)." Utah Code § 58-60-107(2)(b) (due to a clerical error in the statute, the reference should be to subsection 58-60-102(15), not 58-60-102(5)).

As further attested to in Mr. Jensen's declaration attached hereto, Mr. Jensen was previously licensed as a therapist in the state of Utah, but he voluntarily surrendered his licensure to pursue his sincere religious beliefs associated with Singularism. We have worked at great length with Mr. Jensen to ensure that he understands the religious exemptions provided to him under state and federal law, and he has exerted substantial effort to ensure his compliance with and transparency regarding such exemptions.

We understand the unique nature of our client's religious practices as a minority religion in the state of Utah, and we appreciate the Division of Professional Licensing's efforts to ensure that individuals are complying with Utah law. Based on the statutes

App-1:173

Page 2

above and Mr. Jensen's declaration attached hereto, we respectfully request the Division recognize Mr. Jensen's religious exemption and conclude its investigation.

Please do not hesitate to contact me at the phone number or email set forth above if you need any further information or clarification regarding my client's activities or to ensure compliance with Utah's professional practice standards.

Sincerely,

Tanner J. Bean
FABIAN VANCOTT

## DECLARATION OF BRIDGER LEE JENSEN

I, Bridger Lee Jensen, declare and state as follows:

**Regarding the allegation of practicing therapy without a license:**

1. I was previously licensed as a mental health professional in the state of Utah.

2. I no longer practice under that licensure, having voluntarily surrendered such licensure in 2019 in order to pursue my sincerely held religious beliefs associated with a religious organization known as Singularism.

3. Singularism is a contemporary religion of which I am the founder.

4. As explained on Singularism's website, singularism.org, Singularism "provide[s] a sacred space where science and spirituality united, offering a holistic path to healing, growth, and self-discovery. Through this unique synergy, [Singularism] guides individuals toward profound insights, authentic connections, and lasting change."

5. At "the heart of [Singularism's] spiritual practice lies the sacred tradition of Entheogenic Spiritual Guidance. [Singularism] integrate[s] the profound potency of psilocybin, a revered entheogenic substance with long standing religious use into our own ceremonies as a means to facilitate deep spiritual connections and foster profound inner spiritual transformation. [Singularism's] ceremonies are performed safely, sincerely religious, and crucial for producing the effective results from which our members reap invaluable benefits."

6. My current activities related to Singularism are strictly religious in nature. I provide services that are limited to guided psilocybin sessions and spiritual exploration, all of which are grounded in the belief that psilocybin is a sacred sacrament that can serve as a conduit to profound spiritual experiences, informed by the tenets and sacred tradition of Entheogenic Spiritual

App-1:175

Guidance. These services are intended solely for the spiritual and religious guidance of individuals and are delivered within a religious framework.

7.  I understand that Utah Code § 58-60-107(2)(b) provides an exemption from licensure requirements for individuals who offer counseling or guidance in a religious context. It states, "In addition to the exemptions from licensure in Section 58-1-307, the following may engage in acts included within the definition of practice as a mental health therapist, subject to the stated circumstances and limitations, without being licensed . . . (b) a recognized member of the clergy while functioning in a ministerial capacity as long as the member of the clergy does not represent that the member of the clergy is, or use the title of, a license classification in Subsection 58-60-102(5)."

8.  In accordance with this law, I go to great lengths not represent myself as a license classification from Subsection 58-60-102(5). I have taken extensive steps to comply with the religious exemption from licensure, including:

a.  Contacting the Division of Professional Licensing in 2022 to confirm my understanding of the legal exemptions. At this time, I spoke and emailed with Julie Pulsipher, a Division Board Secretary, seeking guidance on the Mental Health Professional Practice Act.

b.  Clarifying in consultations, webinars, and conversations that I am not operating under a license.

c.  Engaging legal counsel to ensure my interpretation of Utah law was and continues to be accurate.

d.  Requiring participants to sign a waiver before participating in our spiritual guidance in which they explicitly acknowledge that:

i. Singularism's use of psychedelics is intended solely for religious and spiritual reasons, not recreational or non-religious purposes.

ii. Singularism operates without clinical licensure, and to the extent that any facilitators of Singularism's practices hold licenses or other professional credentials, those licenses and professional credentials are unrelated to the facilitator's work with Singularism.

9. I hold a sincere belief in Singularism and its practices. I founded Singularism as a legitimate, sincerely practiced religion, with a clear mission centered around mental wellness in a religious and spiritual context.

10. I have taken extensive measures to adhere to the legal and religious exemption requirements by refraining from presenting myself as a licensed professional and by refraining from referring to myself by any of the titles listed in Utah Code § 58-60-109(1)(c) or § 58-60-102(15) (due to a clerical error, although the statute for religious exemption from licensure in Utah Code § 58-60-107(2)(b) references Subsection 58-60-102(5), the reference should be to Subsection 58-60-102(15)).

11. I have committed to being transparent about Singularism's religious practices and my involvement in those practices, both with the public, individual participants, and government entities.

12. I reserve all rights and privileges afforded by this exemption. I intend to follow the law dutifully.

**Regarding the allegation of operating a business without a license:**

13. Due to moving this year, and due to some unforeseen complications with our businesses mailboxes, much of my business mail has been mailed to the wrong address and then returned. Included in this was the notice reminders to update our business registration. As a result,

App-1:177

I had an expired license for approximately a month. I updated said registration on Oct, 31st 2024, as soon as it came to my attention, and it is currently active.

    I declare under criminal penalty under the laws of the State of Utah that the foregoing is true and correct.

EXECUTED on the 11th day of November, 2024

Bridger Lee Jensen, Founder of Singularism and Psychedelic Therapy Journey

# EXHIBIT N

**SETTLEMENT AGREEMENT**
*CEC et al. v. Garland et al.*, **22-cv-01004-SRB (D. Ariz.)**

## I. INTRODUCTION

This action arises under the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb *et seq.* and the Freedom of Information Act ("FOIA"), 5 U.S.C. § 522(a)(4)(B). This Settlement Agreement and Release ("Agreement"), effective as of the last date of execution below ("Effective Date"), is made by and between Plaintiffs—Church of the Eagle and the Condor ("CEC"), Joseph Tafur, Belinda Eriacho, Kewal Wright, Benjaman Sullivan, and Joseph Bellus—and Defendants—Merrick Garland, in his official capacity as Attorney General of the United States, Alejandro Mayorkas, in his official capacity as Secretary of Homeland Security, Anne Milgram, in her official capacity as Administrator of the U.S. Drug Enforcement Administration ("DEA"), and Troy Miller, in his official capacity as Acting Commissioner of U.S. Customs and Border Protection ("CBP") (together the "Government")—in Case No. 22-cv-1004-SRB (D. Ariz.). Plaintiffs and Defendants hereinafter are referred to collectively as the "Parties."

## II. RECITALS

Plaintiff CEC seeks to import, manufacture, distribute, and possess ayahuasca[1] for use in religious ceremonies. Ayahuasca contains dimethyltryptamine ("DMT"), a Schedule I controlled substance under the Controlled Substances Act ("CSA"), 21 U.S.C. §§ 801 *et seq.* The CSA and its regulations are enforced by DEA. CBP enforces certain federal laws and regulations related to the importation of controlled substances at the U.S. border.

The Parties have expended effort and resources in investigating and evaluating the allegations set forth in CEC's complaint, including initial discovery.

The Parties, through their authorized representatives, and without either adjudication of CEC's allegations and claims or admission by the Government of any alleged violation or wrongdoing, now wish to resolve and settle all disputes, obligations, and purported or actual claims or causes of action, which may exist by and between CEC and the Government, including without limitation, any disputes, obligations, claims, and/or causes of action that were or could have been asserted in or pursuant to RFRA or FOIA.

The Parties agree it is in their mutual interest to enter into this Settlement Agreement ("Agreement"). By entering into this Agreement, the parties do not intend to compromise their positions on the disputed issues or to make any concessions with respect to any of the disputed issues. Nothing in this Agreement shall be construed as an admission or concession as to any of the disputed issues in this action.

NOW, THEREFORE, in consideration of the execution of this Settlement Agreement and the releases, satisfactions, and promises made herein, it is hereby agreed upon by the Parties as follows:

---

[1] For purposes of this Agreement, the term "ayahuasca" is defined as a traditional Amazonian decoction with psychoactive properties made from the vine of the Banisteriopsis caapi and leaves of the Psychotria viridis bush. As relevant to this Agreement, ayahuasca can take the form of a concentrated paste or a drinkable tea.

1

## III.    GENERAL PROVISIONS

1.      This Agreement shall not be construed to bar the U.S. Government, or any of its agents or agencies, departments, components, or other subparts, from exercising any of its law enforcement authority to ensure that Plaintiffs' activities fully comply with U.S. law, except to the extent specifically provided in this Agreement.  Subject to the terms and conditions set forth in this Agreement, Defendants, their agencies, agents, employees, and those persons under their control will not apply or enforce against the Plaintiffs, the CSA or its implementing regulations governing the legal importation, manufacture, distribution, transportation, religious use, and possession of DMT, a Schedule I substance.  Nothing in this Agreement shall restrict or limit CBP's lawful authority to inspect, sample, seize, detain, or take any other action with regard to Plaintiffs' ayahuasca, once CBP determines that such activities should be undertaken in compliance with this Agreement, for a reason other than the fact that a properly registered shipment of ayahuasca contains DMT, a Schedule I controlled substance.

2.      CEC will import ayahuasca in concentrated paste form or in liquid form.  Upon receipt, CEC will combine the ayahuasca paste with water to manufacture ayahuasca tea for sacramental uses. CEC will receive the imported ayahuasca and conduct all manufacturing activities at the following address: 1220 E. Medlock Drive, #210, Phoenix, AZ 85014.

3.      This Agreement permits CEC to import, receive, manufacture, distribute, transport, securely store, and dispose of ayahuasca solely for CEC's religious purposes. CEC may not conduct any of these activities for non-religious purposes, including but not limited to recreational purposes. CEC may not use any DEA registrations subject to this Agreement to import, receive, manufacture, distribute, store, or use any other controlled substance.

4.      DEA will waive as to CEC all fees otherwise required under its regulations implementing the CSA.

5.      As set forth below, CEC will account for the ayahuasca paste and liquid they import into the U.S. until its ultimate use or disposal and will cooperate with DEA's verification efforts and procedures, as described below.

6.      As set forth below, CEC will account for the ayahuasca tea they manufacture in the U.S. until its ultimate use or disposal and will cooperate with DEA's verification efforts and procedures, as described below.

7.      CEC, through its designated ayahuasqueros, currently Plaintiffs Joseph Tafur and Benjaman Sullivan, will be responsible for the importation, receipt, secured storage, manufacture, distribution, disposal, and all applicable record keeping requirements of the ayahuasca as set forth in this Agreement. CEC will comply with any applicable DEA notification requirement relating to new ayahuasqueros who are designated in the future as set out by CEC's bylaws.

8.      The amount of ayahuasca tea to be manufactured for each individual ceremony will be based on the number of ceremony participants. Participants gather regularly as designated by CEC. Ceremonies will be held in private residences of CEC members or other locations as determined by CEC that can ensure security of the ayahuasca and the safety of the participants.  CEC ayahuasqueros will personally transport the approximate amount of ayahuasca tea needed for each ceremony.

9.      CEC requires, and will continue to require, ceremony participants to undergo a health screening for issues that could preclude participation, and shall provide participants with information related to potential health issues that could be adversely affected by participation. All ceremonies will have the presence of one person trained in basic first aid and capable of responding in an emergency. CEC shall maintain medical emergency protocols to respond to any medical needs of participants.

10.     DEA has agreed to grant CEC an importer registration for the importation of ayahuasca and a manufacturer bulk registration for ayahuasca tea, with the following listed exemptions from certain registration, security, and record keeping requirements under the CSA and its implementing regulations, provided that CEC agrees to the terms within this Agreement. DEA will provide CEC with the Certificates of Registration (COR) and COR numbers after the execution of this agreement and prior to the filing of the Notice of Settlement with the Court.

## A.  Issuance and Renewal of DEA Registration(s)

11.     The registered location of CEC will maintain the DEA registration(s) applicable to the authorized handling of the Schedule I controlled substance DMT for religious purposes.

12.     CEC will be authorized through its importer DEA registration to import ayahuasca paste or liquid, which contains the Schedule I controlled substance DMT as described in 21 C.F.R. §§ 1312.11 - 1312.19, with distribution as a coincident activity allowed as described in § 1301.13(e)(1)(viii).

13.     CEC will advise the local DEA Field Office whenever there is a change with the country of initial exportation or with its consignor shipping the ayahuasca paste or liquid to CEC through its import DEA registration. CEC will further advise the local DEA Field Office if there is a change in the form in which it imports ayahuasca.

14.     CEC will be issued a bulk manufacturer DEA registration for the receipt of the ayahuasca paste or liquid from CEC's importer DEA registration and for the manufacturing processes authorized under the terms of this Agreement, with distribution allowed as a coincident activity of both importing and manufacturing, as described in 21 C.F.R. § 1301.13(e)(1)(i) and 21 C.F.R. § 1301.13(e)(1)(viii).

15.     CEC will not be required to obtain a separate distributor DEA registration for distribution activities, including distributing ayahuasca tea for sacramental use at the specific ceremonial location(s) benefiting from that exemption, provided that CEC abides by the security requirements allowed under the terms of its registrations and this Agreement. The CEC must notify and seek approval from DEA for any further distribution as coincident activities other than those set forth in this Agreement.

16.     Except as set forth in this Agreement, CEC will submit DEA application(s) for registration(s) for each physical location where the ayahuasca will be imported, stored, manufactured, and distributed.  CEC acknowledges that, as registrants, they must apply to modify their registration before a physical location changes. *See* 21 C.F.R. § 1301.51.  CEC will also notify the local DEA Field Office of any change in location incidental to the distribution of ayahuasca as a coincident activity of a registration.

17.     As part of this Agreement, CEC is not required to file an application with the DEA's "Guidance Regarding Petitions for Religious Exemption from the Controlled Substance Act Pursuant to the Religious Freedom Restoration Act."

18.     In applying for a DEA registration and filling out DEA Form 225, pursuant to 21 C.F.R. § 1301.13(i), CEC may consider the word "business" on the relevant DEA application form to mean

"activities of a religious entity" involving controlled substances if the activities have been specified as such in the petition, or it is known at the signing of this Agreement that the connected application pertains to the import or manufacture and distribution of ayahuasca only for religious purposes.

19.     Whenever the DEA application form asks for information pertaining to any "officer, partner, stockholder or proprietor," CEC shall supply all names of its officers, as specified in the records of the state in which CEC is incorporated at the time of the application for registration.

20.     If the import or bulk manufacture registration is set to expire, and CEC has timely submitted a renewal application that is still being processed by the DEA, CEC is allowed to continue to operate on a day-by-day basis until the registration is renewed in accordance with 21 C.F.R. § 1301.36(i), subject to the provisions of this Agreement.

21.     DEA, upon receipt of a complete DEA application, will conduct the initial on-site inspection of each new location for which CEC seeks a DEA registration as soon as practicable. DEA will not deny CEC's application(s) for DEA registration, renewal of registration(s), or import permits solely on the ground that the sacramental use of ayahuasca constitutes a basis for denial. The Defendants agree not to enforce the provisions of 21 C.F.R. §§ 1301.34(a), (b)(6), (d), (e), (f), 1301.35(b), Part 1303, and 21 C.F.R. §§ 1304.33 and 1312.13(a) against CEC for the sacramental use of ayahuasca, so long as CEC remains a DEA registrant.

22.     If DEA makes, pursuant to 21 C.F.R. § 1301.15, a reasonable request for additional information that DEA needs to process CEC's DEA application(s), CEC will provide such information. Any dispute regarding requests for additional information will be handled pursuant to the dispute resolution provisions described in this Agreement.

23.     DEA will issue registration(s) for which CEC has applied within sixty (60) calendar days after receipt of a complete DEA application for registration unless justified by exceptional circumstances.

24.     Except as otherwise authorized by law, DEA shall not publish and will not voluntarily disclose the address of any registered location where CEC as registrant handles ayahuasca. DEA shall not publish any notice in the Federal Register concerning any application by CEC for registration as importer or manufacturer of a Schedule I controlled substance. DEA shall ensure that no registered location of CEC appears in the National Technical Information Service (NTIS) database.

### B.  Denial, Suspension, Or Revocation of Registration(s)

25.     Consistent with this Agreement and under existing authority, DEA may seek to deny, suspend, or revoke the registration by serving upon CEC an order to show cause pursuant to 21 C.F.R. § 1301.37, and, if requested by the registrant, by holding a hearing pursuant to 21 C.F.R. § 1301.41 before an Administrative Law Judge. In the event of an imminent danger to the public health or safety, DEA may suspend the registration without prior notice and seek administrative action by issuing an Immediate Suspension Order (ISO) pursuant to 21 U.S.C. § 824(d). Nothing in this Settlement Agreement shall be construed as a waiver by Plaintiffs of any of their rights including, without limitation, their rights under RFRA, the First Amendment, and principles of equal protection.

### C.  Importation of the Ayahuasca

26.     CEC's registered location will maintain a DEA registration to import ayahuasca, which contains the Schedule I controlled substance DMT, in accordance with 21 C.F.R. §§ 1312.11 - 1312.19, with

distribution to CEC's manufacturer/bulk manufacturer DEA registration allowed as a coincident activity, as described in 1301.13(e)(1)(viii).

27.    To facilitate Defendants' efforts to coordinate shipments, Plaintiffs have advised DEA that CEC will import ayahuasca as a concentrated paste or liquid from Peru to CEC's registered address in the U.S. through a common international carrier utilizing a tracking number. CEC initially anticipates importing up to 25 kg of ayahuasca paste per year. CEC anticipates this will be divided into several shipments of approximately 2kg to 4kg of ayahuasca paste.  CEC expects to import from Ricardo Amaringo or his authorized agents, who prepare the ayahuasca and assists in the shipping process from Peru to the United States. The quantity of imported ayahuasca for Plaintiffs' religious use shall not be limited.  However, CEC must notify DEA of any increase in the amount of ayahuasca it plans to import to meet its anticipated legitimate needs.

28.    Unless otherwise altered by future DEA registrations or required notifications, Plaintiff Tafur (currently the CEC Point of Contact) is the only individual authorized to receive imported ayahuasca paste or liquid at CEC's registered importer location and will be listed as the importer of record or consignee on all shipments. CEC will be responsible for notifying DEA of any change in or additional CEC points of contact and for all record keeping related to the importation of ayahuasca paste and will log in the receipt of each shipment with date, time, weight, and notes regarding its quality. Each shipment will receive a batch number starting with the number one (1) for the first shipment, and sequentially thereafter.

29.    CEC will submit an application as described in 21 C.F.R. § 1312.12(a) for a permit to import controlled substances on DEA Form 357 for each shipment of ayahuasca paste or liquid to be imported. DEA will not require CEC to specify in the DEA-357 the amount of the controlled substance DMT contained in each consignment, as described in 21 C.F.R. § 1312.12(b)(8). The amount of ayahuasca paste to be imported may be stated in kilograms, and the amount of liquid may be stated in liters.

30.    DEA will issue a single import permit for each shipment of ayahuasca paste (*see* 21 C.F.R. § 1312.13(e)), and such issuance should occur within thirty (30) days of receipt of a complete DEA application, unless justified by exceptional circumstances. An import permit will be void and of no effect after the expiration date specified therein, and in no event will the date be more than 180 calendar days after the date the permit is issued. An importer may request through the DEA Diversion Control Division secure network application that an import permit or permit application be amended or canceled, and request a new permit. *See* 21 C.F.R. § 1312.16.

31.    CEC, as an authorized importer, must furnish an official record of the declaration (available through the DEA Diversion Control Division secure network application after the Administration issues a transaction identification number) to the foreign shipper. CEC agrees to submit an official record of the declaration and/or required data concerning the import transaction to a customs officer at the port of entry in compliance with all import control requirements of agencies with import control authorities under the Act or statutory authority other than the Controlled Substances Import and Export Act. An official record of the declaration shall accompany the shipment to its final destination, which must only be the registered location of the importer (i.e., drop shipments are prohibited). *See* 21 C.F.R. § 1312.19.

32.     Plaintiffs shall provide at least 72 hours of advance notice to the DEA Import/Export Section Point of Contact (defined in paragraph 78 below) of the identity of the courier and the tracking number of shipment. Plaintiffs shall promptly advise the DEA Point of Contact of any changes in the itinerary. DEA will reasonably coordinate with CBP in an effort to facilitate processing and clearance of shipments through the U.S. port of entry.

33.    To facilitate Defendants' efforts to coordinate shipments, Plaintiffs have advised DEA that they intend to import CEC's sacrament through ports of entry in Los Angeles, Miami, Houston, and Atlanta. Plaintiffs' Point of Contact (currently Joseph Tafur), will inform DEA's Point of Contact of any changes in the ports of entry at least 45 days in advance of changing the port of entry in order to facilitate processing and clearance of shipments. If, through external circumstances beyond the parties' control, CEC's shipment enters through a different port of entry than those specified herein, neither party shall be considered in breach of this agreement.

34.    To facilitate the movement of shipments, Plaintiffs will ensure that their authorized couriers carry with them copies of the appropriate DEA Certificate of Registration (COR) (DEA Form 223), together with a copy of the import permit (DEA Form 357) authorizing the particular shipment. The original COR must remain at the CEC registered location at all times.

35.    If there are changes to the source of supply and means by which the ayahuasca will be imported to the U.S. and delivered to its final destination (i.e., foreign shipper, couriers or contract carriers), CEC shall promptly advise the local DEA Field Office of these changes and update any related information that may be required on DEA Form 357 for in-process and future import(s). DEA will reasonably work with CEC to facilitate processing and clearance of shipments through the U.S. port of entry.

36.    Each imported batch and container shall remain sealed and unopened from its arrival at a U.S. port of entry until its receipt at the registered import location. CEC shall take reasonable steps to ensure that the seal is tamper-resistant and tamper-evident.

37.    In the event that a shipment of ayahuasca paste or liquid has been denied release by a customs officer at the U.S. port of entry for any reason, CEC must report as described in 21 C.F.R. § 1312.12(e), within five (5) business days of the denial, that the shipment was denied and the reason for denial.

38.    Notwithstanding 21 C.F.R. § 1312.15, if a consignment of ayahuasca is detained by CBP because the amount consigned is significantly greater than the amount authorized by the import permit, DEA will work with CEC to remedy the discrepancy through the issuance of an amended import permit to facilitate the prompt clearance by CBP of the shipment upon CEC's provision to DEA of a satisfactory non-diversionary explanation as to the discrepancy. Such shipments may be detained by CBP pending a satisfactory, non-diversionary explanation by CEC as to the discrepancy. Non-compliant shipments for which no explanation is provided are subject to seizure. Plaintiffs have explained that the consigned volume of ayahuasca in liquid form may be as much as 5% greater than or less than the volume specified in the permit due to (1) the thermal contraction of ayahuasca, which is packaged at high temperatures but arrives at Port of Entry at ambient temperatures over which Plaintiffs have no control and (2) there are variable rates of precipitation of inactive dissolved solids at the bottom of containers of ayahuasca.

39.    All goods, conveyances, and persons are subject to search upon entry into the U.S. from a foreign country upon the demand of any CBP official. *See* 19 U.S.C. §§ 482, 1433, 1459, 1461, 1582; 8 U.S.C. § 1357; 19 C.F.R. Part 162; 8 C.F.R. Part 235.

40.    DEA reserves the right to spot sample any consignment of imported ayahuasca once it has arrived at the registered location for the purpose of confirming that the consignment is in fact ayahuasca which contains no controlled substance other than DMT.

   a.  DEA will notify CEC of DEA's intent to obtain a sample, which shall be taken when a sealed container, which, per above, is secured with a tamper-resistant and tamper-evident seal, is received by the registered importer at the registered location.

App-1:185

b. When requested by DEA to do so, CEC's authorized individual will extract a reasonable amount of unadulterated sample of ayahuasca under the observation of DEA personnel. The authorized individual will place the sample in a container, to be provided by DEA, which will be shipped directly to a DEA forensics laboratory for testing.

c. DEA will not return fully used portions of the sample to CEC. Storage and/or disposal of fully used samples will be solely within the discretion of DEA.

### D. Manufacture of the Ayahuasca

41. Manufacturing processes include but are not limited to the production of ayahuasca batches for ceremonial use, and any related repackaging and relabeling of ayahuasca in containers.

42. CEC must account for the amount of imported ayahuasca liquid or ayahuasca paste containing the Schedule I controlled substance DMT being used to manufacture ayahuasca tea. To account for the amount of ayahuasca liquid or ayahuasca paste used in the manufacturing of ayahuasca tea, CEC must use DEA Form 222 (U.S. Official Order Forms – Schedules I and II), in accordance with and as required by the provisions under 21 C.F.R. Part 1305. The order forms will be completed as follows:

a. CEC, on behalf of the manufacturer DEA registration (referred in the DEA Form 222 as the Purchaser) shall prepare and execute a DEA Form 222, make a copy of the original DEA Form 222 for its records and then submit the original for the importer DEA registration's records. The copy retained within the manufacturer registration's records may be in paper or electronic form.

b. CEC, on behalf of the importer DEA registration (referred in the DEA Form 222 as the Supplier) shall complete its portion of the order form in accordance with 21 C.F.R. Part 1305, fill the order for the manufacturer registration which ordered the ayahuasca and retain the original DEA Form 222 for the supplier's files in accordance with 21 C.F.R. § 1305.17(c). The importer registration shall, in accordance with 21 C.F.R. § 1305.13(d), simultaneously make and submit a copy of the original DEA Form 222 to DEA at the close of the month during which the order is filled, either by mail to the Registration Section, or by email to DEA.Orderforms@usdoj.gov.

c. CEC, on behalf of the manufacturer DEA registration must, at the receipt of the ayahuasca, record on its copy of the DEA Form 222 the number of commercial or bulk containers furnished on each item and the dates on which the containers are received by the purchaser (manufacturer registration). All executed DEA 222 order forms will be kept at the registered location for a minimum of two years. The distribution of manufactured ayahuasca, as an authorized coincident activity of the manufacturer DEA registration pursuant to 21 C.F.R. § 1301.13(e)(1)(i), will not require the use of DEA Forms 222 since DEA agrees in this Settlement Agreement to exempt CEC from separately registering with DEA as a distributor for the distribution of sacramental ayahuasca.

43. If a bulk manufacturing registration is granted to CEC, Plaintiffs Joseph Tafur and Benjaman Sullivan, the two currently authorized ayahuasqueros at CEC, are the only individuals authorized to manufacture under that registration and they are only authorized to manufacture at CEC's registered address. The CEC will notify the DEA of any additional or subsequent authorized ayahuasqueros. CEC

App-1:186

will log the date, time, and weight of the ayahuasca paste, or volume of the ayahuasca liquid that is removed from the storage refrigerator for manufacturing purposes.

44.    The ayahuasquero(s) will prepare the ayahuasca tea for ceremonial use according to CEC's practices by adding hot water to the ayahuasca paste. This process will occur under the constant supervision of at least one ayahuasquero. Plaintiffs estimate the amount of ayahuasca tea needed per ceremony to be about 30 to 45 ml on average per participant. After preparing the ceremonial tea, the ayahuasquero will note the resulting amount of liquid in milliliters, and transfer it to a secure bottle. The log will record the volume in milliliters, the time and date produced, and any notes about quality.

45.    If in liquid form, in the event it becomes necessary to decant stored ayahuasca, clear off mold and any harmful contaminants or impurities, or boil the ayahuasca to render the ayahuasca suitable for use, CEC shall measure the volume of ayahuasca before and after boiling and maintain a written record of all such processing of ayahuasca, memorializing any incidental change of volume.

46.    If ayahuasca originating from one batch is mixed with ayahuasca originating from a different batch, the resulting mix shall be stored in containers labeled with the unique identifiers of any and all originating batches and the precise volume taken from each. If ayahuasca must be boiled again, some loss of volume may occur due to evaporation; hence, a written record of the total volume after boiling should also be recorded for accuracy of records.

47.    All manufacturing activities, including processing, packaging, and labeling, shall be conducted at the location registered for said activities by an authorized person. All ayahuasca being processed, packaged, or labeled, shall be securely locked at the end of the activity [21 C.F.R. § 1301.73].

48.    This Agreement only grants CEC the authorization to manufacture ayahuasca from the concentrated ayahuasca paste or liquid that it has imported. If Plaintiffs decide to manufacture ayahuasca from plants grown in the United States, Plaintiffs will apply to DEA for registration as a bulk manufacturer. Plaintiffs will determine the amount of ayahuasca to be imported or manufactured solely for their religious use.

49.    CEC must advise the local DEA Field Office of any intended changes to its manufacturing processes that are inconsistent with this Settlement Agreement.

### E.  Distribution of the Ayahuasca

50.    DEA agrees to exempt CEC from separately registering with DEA as a distributor. DEA considers the transportation and distribution of sacramental ayahuasca tea at CEC's ceremonial location(s) to be a coincident activity of the DEA manufacturer registration, as described in 21 C.F.R. § 1301.13(e)(1)(i). This incidental transportation and distribution are permitted solely for the CEC's religious exercise under RFRA. Consequently, CEC's ceremonial location(s) in the State in which it is registered to manufacture ayahuasca under RFRA do not need a separate DEA registration as long as CEC does not store or manufacture ayahuasca at the ceremonial location(s).

51.    Plaintiffs Tafur and Sullivan, are the only individuals currently authorized to transport the ceremonial tea to the designated ceremony site(s). The ceremony locations will be at the residence of members of CEC or at other locations determined to ensure the security of the ayahuasca and the safety of participants, and such locations shall be determined by CEC. CEC accepts sole responsibility for compliance with all applicable federal, state, and local laws in determining ceremony locations.

52.    CEC may designate any individual(s) of its choice to handle ayahuasca tea when conducting religious ceremonies and performing religious functions. CEC's protocols require, and CEC will continue to require, ceremony participants consuming ayahuasca tea to undergo a health screening. CEC has developed an Emergency Response Plan in case of any medical or psychiatric needs. All ceremonies will have the presence of one person trained in basic first aid and capable of responding in an emergency. CEC will mitigate risks of ceremony participants leaving the premises while under the influence of ayahuasca.

53.    For transportation and distribution incidental to the manufacture of ayahuasca for religious ceremonies, DEA agrees not to enforce the DEA regulations applicable to distributors, except as provided by this Agreement. CEC will maintain records of the dates of each delivery or distribution event, the form of the controlled substance (liquid, paste, etc.), the approximate number of persons provided with ayahuasca doses, and the approximate amount of controlled substances (ounces, pounds, liters, gallons, etc.) delivered or distributed at each ceremony or other event where the ayahuasca will be utilized for religious purposes. CEC's authorized staff/members will provide to the DEA the initials of the ayahuasquero(s) who provided the ayahuasca to participants of the ceremony. CEC's records will also identify the ayahuasca manufactured batch(es) and container(s) from which the consumed ayahuasca is taken. CEC shall not be required to report the names or addresses of individual members or non-member ceremonial participants.

### F.  Quota

54.    To adhere to its quota obligations and the requirements set forth under the Single Convention on Narcotic Drugs, DEA may account for the total amount of the controlled substance, exempted under RFRA, authorized to be imported and/or manufactured by CEC to meet all anticipated legitimate needs. In any quota proceeding, DEA will not seek to limit the quantity of ayahuasca necessary for Plaintiffs' religious use.

### G.  Inspection

55.    DEA may inspect any location that CEC seeks to register as an import or manufacture location. *See* 21 C.F.R. § 1301.31. CEC agrees to cooperate with any such lawful inspections, and the inspection of the proposed registered location should be limited to the area used to handle all activities related to the importation or manufacture of ayahuasca. DEA agrees to avoid any burden to ayahuasqueros, and not to extend to or seek inspection of, other areas of the property as long as CEC restricts any movement of ayahuasca to those designated areas.

56.    DEA has the authority to enter registered premises and conduct administrative inspections and audits thereof at reasonable times and in a reasonable manner. *See* 21 C.F.R. § 1316.03. If representatives of the DEA arrive at a registered location unannounced and an authorized person is not present, the DEA representatives will promptly attempt to notify an authorized person of their intent to inspect the location, and the authorized person will make every reasonable effort to ensure that DEA representatives are able to inspect the location promptly. 21 C.F.R. § 1316.08. DEA will not conduct administrative inspections during CEC-authorized religious ceremonies. DEA acknowledges that the registered locations where CEC handles ayahuasca are not businesses with regular business hours, and, accordingly, that it might be necessary to make arrangements before the inspection to ensure that an authorized person, as defined by paragraph 7 of this Agreement, is available at the time the DEA seeks to conduct an inspection. If DEA personnel arrive at a registered location unannounced and an authorized person is not present, the DEA representatives will promptly attempt to notify an authorized person of their intent to inspect the location, and the authorized person will make every reasonable effort to ensure that DEA personnel are able to inspect the location promptly. DEA personnel may only enter a registered location to conduct an

administrative inspection pursuant to 21 C.F.R. § 1316.03 when an authorized person is present at the location.

57.     CEC will provide the local DEA Field Office with general information about the locations and dates of their ceremonies. CEC will notify DEA in writing of any significant changes to this information.

58.     During administrative inspections, DEA personnel may take a physical inventory of all ayahuasca on the premises. CEC's authorized individuals at each location will assist in the physical inventory by handling the containers of ayahuasca so that their labels can be read by DEA personnel without the need for DEA personnel physically to touch the containers.

59.     If DEA seeks to inspect an item or items as described in 21 C.F.R.§ 1316.03(f) and, and if CEC objects on any basis, then CEC may package the item or items in a container in the presence of DEA personnel; DEA personnel will affix a seal to the container. DEA may then submit an application for an administrative inspection warrant to a United States District Judge or Magistrate Judge as described in 21 C.F.R. § 1316.09. CEC agrees that the seal will remain unbroken and that the container will not be opened until a determination is made by a court of competent jurisdiction whether the item(s) can lawfully be inspected by DEA.

### H. Record Keeping

60.     CEC will be responsible for all record keeping related to its inventory of ayahuasca in any authorized form.  CEC's registered location shall establish and maintain on a current basis a complete and accurate written record of its importation, receipt, manufacture, distribution, and disposal of ayahuasca in accordance with 21 C.F.R. § 1304.21 *et seq.* Once a registration has been granted, in addition to an initial physical inventory, each CEC's registered location shall take a physical inventory of all ayahuasca at least once every two years.

61.     CEC shall maintain separate inventory records of all ayahuasca for a minimum of two years. Each inventory will be a physical count of all ayahuasca on hand on the date the inventory is taken, and CEC will maintain the inventory in readily retrievable form at the registered location. Each inventory will include all information listed in 21 C.F.R. § 1304.11.

62.     All distribution of ayahuasca from a DEA registration to another DEA registration, shall be documented on a DEA Form 222, Official Order Form, as described in 21 C.F.R. § 1305.

63.     CEC shall assign a unique identifier to each batch and container of ayahuasca that is received through international shipment. The DEA import permit number shall also appear on each container. Each container being imported into the U.S. shall bear a sufficiently prominent label with clear and sufficiently large symbols to enable DEA personnel to read from arm's-length distance the DEA permit number, point of origin (city, state/province, and country), batch identifier, end location, quantity, and date shipped. To facilitate maintenance of a chain of custody, the unique identifier shall follow the imported ayahuasca and shall be used in CEC's records until its ultimate use or disposal and shall also appear on any container into which imported ayahuasca from a particular batch or consignment may be decanted or repackaged.

64.     CEC shall maintain records of their distribution of ayahuasca, listing the date distributed; general location; the number of participants in the religious ceremony or event who received ayahuasca; the total amount of ayahuasca consumed during the ceremony or event; and the dispenser's initials. These records will also identify the batch(es) and container(s) from which the consumed ayahuasca is taken. *See* 21 C.F.R. § 1304.24(a).

10

App-1:189

65.    All required records shall be in readily retrievable form and available for inspection upon request by DEA for a minimum of two years. *See* 21 C.F.R. §§ 1304.04, 1304.11, 1304.21-1304.22, 1305.

## I.  Security

66.    CEC acknowledges its obligation to provide effective controls and procedures to guard against theft and diversion. CEC will store the ayahuasca at CEC's registered address. The residence is equipped with a door with a deadbolt lock. The ayahuasca will be secured inside a locked refrigerator. CEC ayahuasqueros will be the only ones with access to the storage area. Plaintiffs will maintain at the current CEC central import and storage location a 24-hour alarm system through which a report of any unauthorized access to the location will be immediately transmitted to a protection company with a duty to respond or to the appropriate local law enforcement agency. Defendants acknowledge that CEC is not required to install and maintain such alarm systems at its other non-registered locations.

67.    CEC shall designate in writing any authorized individual(s) who will have access to the ayahuasca at each registered location. CEC shall provide written notification of the names (including aliases and maiden names, where applicable), last four digits of their social security numbers and dates of birth of each authorized individual to the DEA Point of Contact, and to the local DEA Diversion Program Manager.

68.    DEA may conduct appropriate inquiries to ascertain whether an authorized individual has been convicted of a felony relating to controlled substances. If DEA discovers that an authorized individual has been convicted of such a felony, DEA will promptly so advise the CEC Point of Contact. The parties will discuss whether, based on all the facts and circumstances of the particular case, in light of CEC's religious concerns and DEA's security concerns, the authorized individual should have access to or custody of the locked safe(s) or refrigerator(s) used solely for the purpose of storing ayahuasca, or be permitted to handle ayahuasca outside the context of religious ceremonies.

69.    Whenever anyone, other than an authorized individual, or an authorized official or agent of the U.S. government, is present in the room in which ayahuasca is stored at a registered location, that person shall be accompanied at all times by an authorized individual.

70.    DEA will conduct a preregistration inspection of any location at which a DEA registration is sought. In evaluating the overall security system and the needs of each registrant, DEA will consider the factors enumerated under 21 C.F.R. § 1301.71(b) to safeguard properly the ayahuasca under the control of each registrant. The local DEA Field Office and CEC's representative at each location within the field office's jurisdiction will engage in discussions to attempt to arrive at a mutually agreeable security plan based on the security needs of each specific location and commensurate with the quantity stored.

71.    DEA agrees to enforce only the specific physical security measures described in 21 C.F.R. § 1301.72(a) and (d) as set forth in this Agreement. CEC will maintain, at CEC's expense, at the registered storage location the security system specified in paragraph 66 of this Agreement. In the event it becomes necessary to modify the security settings to ensure effective controls, CEC shall notify the local DEA Field Office. Any modification in the storage area that has not been approved by the Administration, shall not necessarily be deemed to comply substantially with the standards set forth in §§ 1301.72 and 1301.73.

72.    CEC agrees to transport manufactured ayahuasca tea to the ceremonial place for the purpose of religious exercise in a secured lockbox out of plain view in a locked vehicle. For security during any incidental transport, CEC ayahuasqueros agree to keep the ayahuasca in a lockbox and will not leave it unsupervised.  CEC will not designate anyone other than an authorized person to transport ayahuasca.

CEC will not be required to install and maintain physical security measures described in 21 C.F.R. § 1301.72 (a) through (d) at incidental locations (i.e., ceremonial places) that do not store the controlled substance(s), but CEC shall maintain adequate controls at incidental location(s) to prevent diversion as set forth in this Agreement.

73.     When importing ayahuasca paste or liquid, CEC is responsible for selecting couriers or contract carriers that provide adequate security to guard against in-transit loss, as described in 21 C.F.R. § 1301.74(e).

74.     CEC will immediately advise the local DEA Field Office of any diversion, theft, or significant loss of ayahuasca, including in-transit losses by their agent or the common or contract carrier after a shipment has been released by CBP at the port of entry. Written notification must be made within one business day of discovery of the diversion, theft, or loss. A completed and accurate DEA Form 106, Report of Theft or Loss of Controlled Substances, shall also be filed through the DEA Diversion Control Division secure network application within 45 calendar days after discovery of the theft or loss. *See* 21 C.F.R. 1301.74(c). In the event there is any diversion, theft, or significant loss of ayahuasca from a registered location, DEA will discuss with CEC what, if any, additional security measures are reasonably necessary to prevent future theft.

### J.  Disposal

75.     CEC acknowledges that any transported ayahuasca sacrament will be entirely consumed on ceremonial premises, disposed of, or returned to storage.

76.     When CEC determines that it is necessary to make final disposition of ayahuasca, the registrant shall advise the Special Agent in Charge ("SAC") of the area by submitting a DEA Form 41, listing the amount to be disposed of, identifying the batch and container from which it was taken, stating the date, time, and place at which CEC proposes to dispose of the Ayahuasca, and identifying the individuals who will take part in the ayahuasca disposal.

77.     The SAC and/or designee shall have the discretionary authority to observe the disposal of ayahuasca. Nothing herein should be construed as DEA approving or endorsing the disposal method selected by CEC. Nothing in this Agreement shall require CEC to dispose ayahuasca in a manner that violates the religious tenets of CEC, provided that CEC accepts sole responsibility for compliance with all applicable federal, state, and local laws, implicated by the disposal of ayahuasca.

## IV.     POINTS OF CONTACT

78.     Direct written communications to DEA's headquarters elements who are referred to in this Agreement should be directed to the email (preferred) and postal addresses below:

| DEA Point of Contact | Email Address | Postal Address |
| --- | --- | --- |
| Regulatory Section | DRG@dea.gov | Drug Enforcement AdministrationRegulatory Section/DRG<br>Attention: RFRA<br>8701 Morrissette Drive<br>Springfield, VA 22152 |

| Import/Export Section | ODGI@dea.gov | Drug Enforcement Administration<br>Regulatory Section<br>Attention: Import/Export (DRI)<br>8701 Morrissette Drive<br>Springfield, VA 22152 |
|---|---|---|
| Registration and Program Support Section | DRRO@dea.gov | Drug Enforcement Administration<br>Registration Section<br>Attention: RFRA<br>8701 Morrissette Drive<br>Springfield, VA 22152 |
| DEA Local Field Office | Phoenixdiversiongroup @dea.gov | DEA Phoenix Divisional Office<br>Attn: Diversion Group<br>3439 East University Drive<br>Phoenix, Arizona 85034 |

## V.    NON-LIABILITY OF THE U.S. GOVERNMENT

79.    The United States assumes no liability with respect to third party claims arising out of the performance of any religious practices by CEC, including but not limited to the quantity or quality of any sacrament distributed and ingested. The sole remedy for damages by third parties will be against CEC and not the United States.

## VI.    DURATION, AMENDMENT, AND EFFECT

80.    Execution: This Agreement may be executed in counterparts, each of which constitutes an original, and all of which constitute one and the same agreement. Copies or facsimiles of signatures will constitute acceptable, binding signatures for purposes of this Agreement. This Agreement is effective and becomes binding upon the date of the last signature below. Each person who signs this Agreement in a representative capacity warrants that he or she is fully authorized to do so. The government signatories represent that they are signing this Agreement in their official capacities.

81.    Automatic Renewal: This Agreement is effective for a one-year initial term from its effective date, subject to automatic renewal for additional one-year terms upon DEA's approval of CEC's application for renewal of its import registration and manufacture registration of DMT unless, on or before 60 days before the expiration of the current term, either party provides written email notice of its intention not to renew. The DEA may not refuse to renew for any reason other than upon a showing of diversion by CEC or upon a showing of a particularized risk to public health and safety. In accordance with 21 C.F.R. § 1301.13(e)(3), DEA will send CEC a renewal notification via email approximately 60 calendar days prior to their registration expiration date.

If, at the time the initial term or a renewal is set to expire, CEC has submitted a renewal application that is still being processed by the DEA at the end of a one-year term, CEC is allowed to continue to operate on a day-by-day basis until the registration is renewed in accordance with 21 C.F.R. § 1301.36(i), and the term set to expire will be automatically extended until the registration is renewed.

13

82.     Severability: If any one or more of the provisions contained herein shall, for any reason, be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Agreement, but this Agreement shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein.

83.     Modification: This Agreement constitutes the full and complete Agreement between the Parties. No other promises or agreements will be binding unless placed in writing and signed by both parties to the Agreement. All material representations, understandings, and promises of the parties are contained in this Agreement, and each of the parties expressly agrees and acknowledges that, other than those statements expressly set forth in this Agreement, it is not relying on any statement, whether oral or written, of any person or entity with respect to its entry into this Agreement. Subject to the terms of this Agreement, this Agreement may be revised at any time with, and only with, the mutual written consent of the parties. Modifications to the Agreement will become effective on the date of the last signature of the authorized representatives of each party.

## VII.    ADDITIONAL TERMS AND CONDITIONS

84.     Compliance with State and Local Laws: Any importation, manufacturing, distribution, transportation, or disposal, must be lawful in the state and locality where such action takes place. Such action also must follow all applicable state and local laws, statutes, and regulations, and be otherwise permitted by all applicable state and local regulatory and law enforcement agencies.

85.     Good Faith: The terms and provisions of this Agreement shall be executed in good faith.

86.     Venue & Jurisdiction: The parties agree that any dispute arising between and among the parties to this Agreement shall be resolved pursuant to the dispute resolution procedures specified in Article IX of this Agreement. If such procedures do not resolve the dispute, the Parties agree that jurisdiction is retained by and venue is proper in the United States District Court for the District of Arizona for its resolution.

87.     Nothing in this Agreement shall be construed to prevent Defendants from taking actions or issuing rulemakings authorized by U.S. law (including the Administrative Procedure Act).

## VIII.   ATTORNEYS' FEES

88.     Once this Settlement Agreement is signed by the Parties, the Parties will file a Notice of Settlement with the Court.  After filing the Notice of Settlement, the parties have 60 days to negotiate attorneys' fees and costs. If, after 60 days, the Parties have not come to an agreement on attorneys' fees and costs, that issue will be submitted to the Court on a motion by Plaintiffs. Should such a Motion be necessary, nothing in this Agreement shall preclude either party from attaching this Settlement Agreement to the Motion.

89.     Neither this Agreement nor the payment of attorneys' fees, costs, and expenses hereunder is an admission by Defendants of the truth of any allegation or the validity of any claim asserted in this action, or of Defendants' liability therein. The provision of attorneys' fees, expenses, and costs in this Settlement Agreement is by the agreement of the parties and is not intended to serve as precedent, nor may it be cited as such, in this or any case.

90.     Compliance with all applicable federal, state, and local tax requirements shall be the sole responsibility of Plaintiffs and their attorneys, contractors, or experts.

14

## IX.    RESOLUTION OF DISPUTES ARISING OUT OF THIS AGREEMENT

91.    Subject to paragraph 25 of this Agreement and the Religious Freedom Restoration Act, disputes between the Parties concerning any alleged breach of this Agreement shall be subject to the following dispute resolution procedures.

      a.    The Parties shall make good faith efforts to resolve informally any alleged breach of this Agreement. If informal efforts to resolve the alleged breach are unsuccessful, the aggrieved Party shall provide written notice of the alleged breach and that Party's intent, if any, to initiate the dispute resolution procedure of this Agreement. The notice shall include a recitation of the material-facts and circumstances giving rise to the dispute, including the particular provisions of the Agreement alleged to have been breached.

      b.    If the dispute is not resolved by the Parties within thirty (30) days after such notice is given, such dispute shall be submitted to mediation before a mutually agreed-upon neutral mediator. The Parties shall each bear their own costs and attorneys' fees incurred in connection with such mediation.

      c.    If the dispute is not resolved by the Parties through mediation, either Party may apply to the U.S. District Court for relief, which shall retain jurisdiction solely for this purpose.

## X.    RELEASE, DISCHARGE, AND DISMISSAL OF PLAINTIFFS' CLAIMS

92.    Upon the execution of this Settlement Agreement, and receipt of the agreed upon payment described in paragraph 88, Plaintiffs hereby release and forever discharge Defendants and their successors, the United States of America, and any department, agency, or establishment of the United States, and any officers, employees, agents, successors, or assigns of such department, agency, or establishment, from any and all past or present claims for attorneys' fees, costs, or litigation expenses in connection with this litigation.

93.    This Agreement contains the entire agreement between the parties hereto, and Plaintiffs acknowledge that no promise or representation not contained in this Agreement has been made to them, and further acknowledge that this Agreement contains the entire understanding between the parties, and it contains all terms and conditions pertaining to the compromise and settlement of the disputes referenced herein.

94.    Within fifteen (15) days of the receipt of the payment described in paragraph 88, Plaintiffs shall dismiss this case with prejudice pursuant to Fed. R. Civ. P. 41(a) by filing a Stipulation of Dismissal with Prejudice.

95.    The undersigned represent that they are fully authorized to enter into this Agreement.

Date:    April 12, 2024

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

BRIGHAM J. BOWEN
Assistant Branch Director

*/s/ Giselle Barcia*
GISELLE BARCIA
Trial Attorney
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L Street NW
Washington, D.C. 20005
Telephone: (202) 305-1865
Fax: (202) 514-8640
E-mail: giselle.barcia@usdoj.gov

*Counsel for Defendants*


By:  *s/ Jack Silver*
Jack Silver, *pro hac vice*
Cal. Bar No. 160575
Law Office of Jack Silver
708 Gravenstein Hwy No. # 407
Sebastopol, CA 95472-2808
JsilverEnvironmental@gmail.com
Tel: (707) 528-8175
Fax: (707) 829-0934

By:  *s/ Gilbert Paul Carrasco with permission*
Gilbert Paul Carrasco, *pro hac vice*
Cal. Bar No. 90838
D.C. Bar No. 334722
Professor of Law *Emeritus*
Willamette University College of Law
900 Pacific Coast Highway
Suite # 305
Huntington Beach, California 92648-4863
carrasco@willamette.edu
Mobile: (503) 990-4879

By: *s/ Sean T. McAllister with permission*
Sean T. McAllister, Esq., *pro hac vice*
Colo. Bar No. 31350
Cal. Bar No. 310962
McAllister Law Office, P.C.
4035 E. 3rd Avenue

16

Denver, CO 80220
sean@mcallisterlawoffice.com
Tel: 720-448-6235

By: *s/ Martha J. Hartney with permission*
Martha J. Hartney, Esq., *pro hac vice*
Colo. Bar No. 42017
Hartney Law, LLC
4450 Arapahoe Avenue, Suite 100
Boulder, CO 80303
martha@hartneylaw.com
Tel: (303) 747-3909
Fax: (303) 835-7199

By: *s/ Ismail Lourido Ali with permission*
Ismail Lourido Ali, Esq., pro hac vice
Cal. Bar No. 312660
2134 10th Ave, A
Oakland, CA 94606
lourido.ali@gmail.com
Tel: (559) 801-7317

*Counsel for Plaintiffs*

17

NOT FOR PUBLICATION

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Church of the Eagle and the Condor, et al., | No. CV-22-01004-PHX-SRB |
| Plaintiffs, | **ORDER** |
| v. | |
| Merrick Garland, et al., | |
| Defendants. | |

The Court now considers Defendants' Motion to Dismiss ("Motion") Plaintiffs'[1] Complaint. (Doc. 23, ("Mot.").) The Court will grant the Motion in part and deny the Motion in part.

## I.     BACKGROUND

This case arises out of Plaintiffs' importation and use of ayahuasca for religious purposes. (Doc. 1, Compl. ¶ 16.)

Ayahuasca is a sacramental tea brewed from the ayahuasca vine and the chacruna leaf, with spiritual significance for many indigenous tribes in South America. (*Id.* ¶ 25.) The chacruna leaf contains N,N-dimethyltryptamine ("DMT"), a Schedule I controlled substance under the Controlled Substances Act ("CSA"). (*Id.*); *see* 21 U.S.C. § 812(c)(6). Plaintiffs allege that ayahuasca produces "spiritual visions" and is not known to have wide recreational use. (*Id.* ¶ 28.) Since 2006, at least two religious organizations have received accommodations under the Religious Freedom Restoration Act ("RFRA") to use ayahuasca

---

[1]  Referring collectively to the Church of the Eagle and the Condor ("Church"), Joseph Tafur, Belinda Eriacho, Kewal Wright, Benjamin Sullivan, and Joseph Bellus.

for religious purposes in the United States. (*Id.* ¶¶ 29, 33–36.)

## A.     The Church's Beliefs and Ayahuasca Use

In 2017, Mr. Tafur, Ms. Eriacho, and Rodney Garcia formed the Church in Phoenix, Arizona. (*Id.* ¶¶ 37, 43.) The Church has approximately forty members and describes itself as a "faith-merging belief system" that has adopted practices from the indigenous Shipibo people of Peru and the "Native North American peoples." (*Id.* ¶¶ 30, 38, 44.) Like many indigenous tribes in South America, the Shipibo people consider ayahuasca to be a "sacred medicine" with spiritual and ceremonial significance. (*Id.* ¶¶ 25, 30, 39.) The Church conducts ayahuasca ceremonies to pursue "spiritual healing" and "wholeness," and the Church believes ayahuasca is a conscious spiritual being. (*Id.* ¶¶ 40–41, 54.) The Church and its members are "dedicated to universal spirituality in fulfillment of the Prophecy of the Eagle and the Condor" and believe ayahuasca is integral to this prophecy. (*Id.* ¶¶ 37, 39–41.) Specifically, the Church believes that the ceremonial use of ayahuasca is expanding beyond South America to merge with Native North American principles "in fulfillment of the Prophecy, to engender spiritual community across all races, ethnicities, and nationalities and to instruct its members in understanding and valuing indigenous spiritual practices, emphasizing the importance of maintaining relationships by developing pride in one's body, mind, soul, spirit and honoring all life." (*Id.* ¶ 39 (internal quotations omitted).)

Ayahuasca is the Church's only sacrament. (*Id.* ¶ 44.) The Church's ayahuasca supply is accessible only to Mr. Tafur, Ms. Eriacho, and Mr. Garcia and the Church maintains records of its ayahuasca importation and use. (*Id.* ¶ 46.) As the "ayahuasquero," Mr. Tafur oversees the Church's ayahuasca use and is the only person permitted to serve the tea during ayahuasca ceremonies. (*Id.* ¶¶ 42, 46.) The Church screens each prospective ayahuasca ceremony participant for any medical and psychological conditions that may interact with ayahuasca and provides participants with written ceremony guidelines. (*Id.* ¶ 47.) The loss of any ayahuasca is considered a sacrilege. (*Id.* ¶ 27.)

- 2 -

**B.    CBP's Seizure of Plaintiffs' Ayahuasca**

It is generally unlawful to import controlled substances into the United States. *See* 21 U.S.C. § 952. U.S. Customs and Border Protection ("CBP") is authorized to seize "[a]ll mail shipments containing articles the importation of which is prohibited, or articles imported into the United States in any manner contrary to law." 19 C.F.R. § 145.59(a); *see* 21 C.F.R. § 1312.15. However, the Attorney General may approve limited importation and transportation of Schedule I controlled substances. 21 U.S.C. §§ 954, 957, 958(a); *see* 21 C.F.R. §§ 1307.03, 1312.11(a).

In September 2020, CBP intercepted and seized a shipment of ayahuasca intended for delivery to the Church. (Compl. ¶ 50.) Plaintiffs do not allege that they ever sought approval to import the ayahuasca into the United States. (*See generally id.*) Mr. Tafur received a note bearing the Department of Homeland Security's ("DHS") seal that stated:

> Notice: Narcotics and/or other contraband prohibited from entry into the United States, have been seized and removed for appropriate action under 19CFR145.509 [sic]. You will be receiving correspondence from our Fines, Penalties and Forfeitures Branch in the near future.

(*Id.*) Plaintiffs received no further correspondence relating to CBP's seizure and Plaintiffs allege that CBP "summarily destroyed" the ayahuasca shipment. (*Id.* ¶ 52.) In March 2021, the Church submitted Freedom of Information Act ("FOIA") requests to CBP and the Drug Enforcement Administration ("DEA") inquiring about ayahuasca seizures. (*Id.* ¶ 55.) CBP allegedly indicated that it "had seized hundreds of shipments" of what Plaintiffs believe is ayahuasca. (*Id.*) CBP and the DEA have otherwise not responded to Plaintiffs' FOIA requests. (*Id.* ¶¶ 56–58.) Plaintiffs allege that the DEA has leveraged CBP's ayahuasca seizures to prosecute people using ayahuasca for religious purposes. (*Id.* ¶ 59.) Plaintiffs have continued to import and use ayahuasca after CBP's seizure despite Plaintiffs' fear that Defendants may enforce the CSA against them. (*See id.* ¶¶ 16–19, 44.)

**C.    Procedural Background**

Plaintiffs filed the Complaint on June 9, 2022 against the DEA, CBP, DHS, and Attorney General, seeking an accommodation for their religious use of ayahuasca under RFRA. (*Id.* ¶¶ 20–24, 63–64.) Plaintiffs also allege, *inter alia*, that Defendants have

- 3 -

violated Plaintiffs' First Amendment, due process, and equal protection rights. (*Id.* ¶¶ 65–77.) Defendants filed the Motion on November 15, 2022, arguing that Plaintiffs lack standing to bring their RFRA claim and that Plaintiffs otherwise fail to state a claim. (*See* Mot. at 6, 11.) Plaintiffs filed their Response on December 14, 2022, to which Defendants replied on January 5, 2023. (Doc. 24, Resp. in Opp'n ("Resp."); Doc. 25, Reply.)

## II.     LEGAL STANDARDS & ANALYSIS

### A.     Standing to Bring a RFRA Claim

In considering a Rule 12(b)(1) motion to dismiss for lack of jurisdiction, the Court takes the allegations in the plaintiff's complaint as true. *Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004) (citations omitted). It is the plaintiff's burden to show "that the facts alleged, if proved, would confer standing." *Warren v. Fox Fam. Worldwide, Inc.*, 328 F.3d 1136, 1140 (9th Cir. 2003). Under Article III of the Constitution, a plaintiff does not have standing unless he can show (1) an "injury in fact" that is concrete and particularized and actual or imminent (not conjectural or hypothetical); (2) that the injury is fairly traceable to the challenged action of the defendant; and (3) that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). In cases for prospective injunctive relief, "past wrongs do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy." *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983). Rather, a plaintiff's "standing to seek the injunction requested depend[s] on whether he [is] likely to suffer future injury." *Id.* at 105. "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice[.]" *Lujan*, 504 U.S. at 561.

Where plaintiffs raise a pre-enforcement claim to enjoin defendants from enforcing a law against them, the plaintiffs must "allege a 'genuine threat of imminent'" enforcement. *Oklevueha Native Am. Church of Haw., Inc. v. Holder* (*Oklevueha I*), 676 F.3d 829, 835 (9th Cir. 2012).[2] The court considers "(1) whether the plaintiffs have articulated a 'concrete

[2] In *Oklevueha I*, plaintiffs sought to enjoin the government from enforcing the CSA against plaintiffs for their allegedly religious use of marijuana after the DEA had seized a shipment of plaintiffs' marijuana more than two years prior. 676 F.3d at 835–36. The Ninth Circuit applied the pre-enforcement "genuine threat" analysis because plaintiffs asserted their

- 4 -

plan' to violate the law in question; (2) whether the government has communicated a specific warning or threat to initiate proceedings; and (3) the history of past prosecution or enforcement under the statute." *Id.* Plaintiffs have alleged sufficient facts to meet this standard.

A plaintiff may satisfy the "concrete plan" element where the plaintiff "actually did violate [the law at issue] on a number of occasions." *Oklevueha I* at 836 (quoting *Sacks v. Off. of Foreign Assets Control*, 466 F.3d 764, 773 (9th Cir. 2006)) (finding plaintiffs satisfied the concrete plan element where "[p]laintiffs are currently violating and plan to continue to violate the CSA by purchasing and consuming marijuana"); *see Ariz. Yage Assembly*, 595 F. Supp. 3d at 882–83 (plaintiffs failed to allege a concrete plan to violate the CSA where plaintiffs planned to use ayahuasca only if the court issued an injunction). Plaintiffs allege that they have continued to import, possess, and use ayahuasca following CBP's 2020 seizure and "are violating and intend to continue to violate" the CSA. (Compl. ¶¶ 16–19, 44.) Plaintiffs have alleged a "concrete plan" to violate the CSA. Further, because the CSA has already been enforced against Plaintiffs, they need not allege a threat of future prosecution or a history of past prosecution. *Oklevueha I*, 676 F.3d at 836–37 (*See* Mot. at 7–8; Resp. at 4–5.) "When the Government seized Plaintiffs' [ayahuasca] pursuant to the CSA, a definite and concrete dispute regarding the lawfulness of that seizure came into existence."[3] *Id.* at 836.

Defendants also contend that RFRA requires that all forty individual Church claims "for the first time in an action for prospective relief (and not in a criminal proceeding)," and indicated that the government's prior enforcement of the CSA against plaintiffs "mitigat[ed] the relevance of a hypothetical future-enforcement." *Id.* at 835; *see Arizona Yage Assembly v. Garland*, 595 F. Supp. 3d 869, 882 n.11 (D. Ariz. 2022) (analyzing plaintiff's standing to pursue a RFRA claim under *Oklevueha I* after the government had seized four shipments of plaintiffs' ayahuasca). Plaintiffs' circumstances are factually analogous, so the Court analyzes Plaintiffs' request for injunctive relief as a pre-enforcement claim. (*See* Compl. ¶¶ 4, 6–7, 63–64, 89.)

[3] Defendants contend that *Oklevueha I* is inapposite because the DEA did not "enforce" the CSA against Plaintiffs when the CBP seized Plaintiffs' ayahuasca. (Reply at 3–4.) Defendants also argue that Plaintiffs have not alleged that Defendants have investigated Plaintiffs since the 2020 seizure. (*Id.* at 4.) In finding that the plaintiffs' fear of enforcement was not speculative after FedEx turned the plaintiffs' package of marijuana over to the DEA, the *Oklevueha I* Court emphasized that the plaintiffs should not "be forced to accept the possibility of continued seizure[s]" simply because they could not show that the Government was investigating or targeting plaintiffs. 676 F.3d at 837 n.2.

- 5 -

members' participate in this suit because the Court must assess the CSA's burden on each member's religious beliefs. (Mot. at 8–9.) In permitting the plaintiffs' RFRA claim to proceed without requiring the individual members' participation, the *Oklevueha I* Court found that, "it can reasonably be supposed that the [the church's prospective relief], if granted, will inure to the benefit of those members of the association actually injured." 676 F.3d at 839 (quoting *Warth v. Seldin*, 422 U.S. 490, 515 (1975)). The same is true for the Church in this case. Plaintiffs have standing to bring their RFRA claim.[4]

**B.    12(b)(6)**

A Rule 12(b)(6) dismissal for failure to state a claim can be based on either (1) the lack of a cognizable legal theory or (2) insufficient facts to support a cognizable legal claim. *Conservation Force v. Salazar*, 646 F.3d 1240, 1242 (9th Cir. 2011). In determining whether an asserted claim can be sustained, "[a]ll of the facts alleged in the complaint are presumed true, and the pleadings are construed in the light most favorable to the nonmoving party." *Bates v. Mortg. Elec. Registration Sys., Inc.*, 694 F.3d 1076, 1080 (9th Cir. 2012). "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). However, "for a complaint to survive a motion to dismiss, the nonconclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). In other words, the complaint must contain enough factual content "to raise a reasonable expectation that discovery will reveal evidence" of the claim. *Twombly*, 550 U.S. at 556.

**1.    RFRA**

RFRA provides that the government "shall not substantially burden a person's

---

[4] The Court declines Defendants' request for the Court to dismiss or stay the case until Plaintiffs apply directly to the DEA for an exemption. (*See* Mot. at 16.) RFRA "plainly contemplates" that this Court may consider Plaintiffs' requested relief from the CSA. *Oklevueha I*, 676 F.3d at 838 (quoting *Gonzales v. O Centro Espirita Beneficente Uniao de Vegetal*, 546 U.S. 418, 434 (2006)).

exercise of religion" unless the government "demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. §§ 2000bb-1(a)–(b). To state a RFRA claim, Plaintiffs must allege that the CSA substantially burdens a sincere exercise of religion. *O Centro*, 546 U.S. at 428.

Defendants first argue that Plaintiffs have failed to sufficiently allege that each Plaintiff "share[s] the same religious beliefs about ayahuasca." (Mot. at 9.) Plaintiffs allege that ayahuasca is their only sacrament and is indispensable to their religious expression. (Compl. ¶¶ 39–41, 44.) Plaintiffs believe that ayahuasca is a living spiritual being and consider any diversion of ayahuasca to be a sacrilege. (*Id.* ¶¶ 27, 40, 54.) Moreover, Plaintiffs continue to practice their ayahuasca ceremonies despite the possibility that Defendants may enforce the CSA against them. (*Id.* ¶¶ 16–19, 44); *c.f. Church of the Holy Light of the Queen v. Mukasey* ("*CHLQ*"), 615 F. Supp. 2d 1210, 1219 (D. Or. 2009) (plaintiffs' use of ayahuasca in secret demonstrated plaintiffs' commitment to their religion after the government threatened plaintiffs with prosecution), vacated on other grounds, *Church of Holy Light of Queen v. Holder*, 443 F. App'x 302 (9th Cir. 2011). Construed most favorably to Plaintiffs, the Complaint sufficiently alleges the sincerity of Plaintiffs' religious beliefs. *See Multi Denominational Ministry of Cannabis and Rastafari, Inc. v. Gonzales*, 474 F. Supp. 2d 1133, 1146 (N.D. Cal. 2007) ("[P]lainly it is inappropriate to question the sincerity of plaintiffs' religious beliefs in a Rule 12(b)(6) motion.").

Plaintiffs have also alleged that complying with the CSA would substantially burden Plaintiffs' exercise of religion. "A statute burdens the free exercise of religion if it puts substantial pressure on an adherent to modify his behavior and to violate his beliefs, including when, if enforced, it results in the choice to the individual of either abandoning his religious principle or facing criminal prosecution." *Guam v. Guerrero*, 290 F.3d 1210, 1222 (9th Cir. 2002); *see Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1069–70 (2008). Plaintiffs allege that the ayahuasca ceremony is integral to fulfilling the "Prophecy of the Eagle and the Condor" and to Plaintiffs' "direct and personal connection to nature

and the Divine." (Compl. ¶¶ 39–40.) Plaintiffs allege that they are forced to choose between abandoning their use of ayahuasca—the central tenet of their religion—or face the prospect of criminal prosecution under the CSA. (*Id.* ¶¶ 60–61.) This is sufficient to state a RFRA claim. *Compare CHLQ*, 615 F. Supp. 2d at 1219 (prohibiting plaintiffs from using ayahuasca would substantially burden their exercise of religion where the ceremonial use of ayahuasca was the "sole means by which plaintiffs are able to experience their religion") (citation omitted) (cleaned up), *with Oklevueha Native Am. Church of Haw., Inc. v. Lynch*, 828 F.3d 1012, 1015–16 (9th Cir. 2016) ("*Oklevueha II*") (prohibiting plaintiffs' cannabis use was not a substantial burden because plaintiffs' essential sacrament was peyote and cannabis served no unique religious function). The Court denies the Motion as to Plaintiffs' RFRA claim.

### 2.    Free Exercise of Religion

Plaintiffs allege that Defendants have violated Plaintiffs' free exercise of religion by enforcing the CSA and seizing Plaintiffs' ayahuasca. (Compl. ¶ 66.) The Free Exercise Clause "does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability.'" *Williams v. California*, 764 F.3d 1002, 1011–12 (9th Cir. 2014) (quoting *Employment Div., Dep't of Human Res. Of Or. v. Smith*, 494 U.S. 872, 879 (1990)); (*see* Mot. at 11.) A law that is not neutral and generally applicable receives strict scrutiny. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993); *Tingley v. Ferguson*, 47 F.4th 1055, 1084 (9th Cir. 2022). But a neutral and generally applicable law "need not be justified by a compelling governmental interest" even if it creates a substantial burden on "a particular religious practice." *Church of the Lukumi*, 508 U.S. at 531; *see San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1031 (9th Cir. 2004).

Plaintiffs do not challenge that the CSA is a neutral, generally applicable law, nor that Defendants' regulation of controlled substances under the CSA is rationally related to a legitimate government purpose.[5] (Resp. at 8); *Ministry of Cannabis*, 474 F. Supp. 2d at

---

[5] The Supreme Court suggested in *Smith* that if a generally applicable law implicates other constitutional protections along with the free exercise of religion, it must withstand strict

1144 (citing *Smith* 494 U.S. at 884–85) (dismissing First Amendment claim because controlled substances are proscribed by the CSA); *Oklevueha Native American Church of Hawaii, Inc. v. Holder*, 2012 WL 6738532, at \*9 (D. Haw. Dec. 31, 2012); *see Taylor v. Rancho Santa Barbara*, 206 F.3d 932, 938 (9th Cir. 2000) (affirming district court's application of rational basis review on a 12(b)(6) motion to dismiss). The Court grants the Motion on Plaintiffs' Free Exercise Clause claim.

### 3.      Establishment Clause

"Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I. The Establishment Clause ensures an "individual's freedom to believe, to worship, and to express himself in accordance with the dictates of his own conscience." *Freedom from Religion Found., Inc. v. Chino Valley Unified Sch. Dist. Bd. of Educ.*, 896 F.3d 1132, 1137 (9th Cir. 2018). Plaintiffs allege that Defendants' accommodation of other religions' ayahuasca use "constitutes an Establishment of Religion" because Defendants have not accommodated Plaintiffs' use. (Compl. ¶¶ 68–69.) In support of their claim, Plaintiffs point to religious sects that have received exemptions under RFRA: the Uniao de Vegetal ("UDV") and the Santo Daime Church ("Santo Daime"). (*Id.* ¶¶ 33–36, 68.)

Defendants argue that Plaintiffs "cannot simply point" to UDV's and Santo Daime's religious accommodations "and say 'we'll have what they're having'" when Plaintiffs have not alleged that they ever applied for an exemption from the CSA, let alone that the DEA denied them one. (Mot. at 9 (quoting *United States v. Christie*, 825 F.3d 1048, 1061 (9th Cir. 2016)); s*ee generally* Compl.) The Court agrees. Plaintiffs contend that the DEA may not "assess religious uses of anything" and that Defendants have "advance[d]" other religions by prohibiting Plaintiffs' use of ayahuasca. (Resp. at 10.) But Plaintiffs have not cited any authority suggesting that Defendants must assume that Plaintiffs are exempt from the CSA whenever another group seeks and receives approval to import and use ayahuasca

---

scrutiny. 494 U.S. at 881. Plaintiffs argue that their Complaint involves this so-called "hybrid rights" claim. (Resp. at 8; Compl. ¶ 66.) The Ninth Circuit has questioned whether such a claim exists and the Court declines to address this possibility. *Tingley*, 47 F.4th at 1089 n.5; *Parents for Privacy v. Barr*, 949 F.3d 1210, 1237 (9th Cir. 2020); *see Jacobs v. Clark Cnty. Sch. Dist.*, 526 F.3d 419, 440 n.45 (9th Cir. 2008) (discussing cases casting doubt on a "hybrid rights" analysis). Plaintiffs' hybrid rights claim is dismissed.

- 9 -

for religious purposes. (*See* Compl. ¶¶ 53, 55; Resp. at 9.)

Further, both UDV and Santo Daime received exemptions from the CSA pursuant to RFRA. (*See* Compl. ¶¶ 33–36.) RFRA expressly tasks the courts with determining whether to accommodate an alleged religious practice. 42 U.S.C. § 2000bb-1(c) (enabling a person "whose religious exercise has been burdened" to initiate judicial proceedings to obtain relief); *see O Centro*, 546 U.S. at 434. This requires courts to conduct fact-specific inquiries into the alleged religious exercise; "Congress has determined that courts should strike sensible balances, pursuant to [RFRA's] compelling interest test that requires the Government to address the *particular practice at issue*." *O Centro*, 546 U.S. at 439 (emphasis added); (Mot. at 12.) RFRA's individualized inquiry is an instance where the government must accommodate UDV and Santo Daime's ayahuasca use and "may do so without violating the Establishment Clause."[6] *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 144–45 (1987). The Court grants the Motion on Plaintiffs' Establishment Clause claim.

### 4. Due Process Claims

#### a. Procedural Due Process

Plaintiffs allege that CBP violated Plaintiffs' rights to procedural due process because CBP "deprived Plaintiffs of their ownership, possession, and use" of ayahuasca without notice and an opportunity to be heard. (Compl. ¶ 71.) To state a procedural due process claim, a plaintiff must allege a deprivation of a protected property or liberty interest without adequate procedural protections. *See Bd. of Regents v. Roth*, 408 U.S. 564, 569–73 (1972). Defendants argue that Plaintiffs have failed to state a due process claim because Plaintiffs do not allege any cognizable property interest in the ayahuasca. (Mot. at 13.)

To allege a cognizable property interest, a plaintiff must "have a legitimate claim of

---

[6] Citing to *Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005), which held that the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA") is "compatible with the Establishment Clause" while enabling prisoners to seek religious accommodations, the *O Centro* Court emphasized RFRA's case-by-case analysis of religious practices. *O Centro*, 546 U.S. at 436. As with RLUIPA, courts may accommodate religious practices without running afoul of the Establishment Clause by applying RFRA's compelling interest test "in an appropriately balanced way." *See id.* (quoting *Cutter*, 544 U.S. at 720).

entitlement" to the property. *Roth*, 408 U.S. at 577. A person cannot have a legally protected property interest in "per se contraband," which may be "summarily forfeited without any due process protections." *Conservation Force v. Salazar*, 677 F. Supp. 2d 1203, 1210 (N.D. Cal. 2009), *aff'd*, 646 F.3d 1240 (9th Cir. 2011). "An object is contraband per se if its possession, without more, constitutes a crime; or in other words, if there is no legal purpose to which the object could be put." *United States v. Harrell*, 530 F.3d 1051, 1057 (9th Cir. 2008); *c.f. Gonzales v. Raich*, 545 U.S. 1, 27 (2005) ("The CSA designates marijuana as contraband for *any* purpose" by listing it as a Schedule I substance). Because it is illegal for any civilian to possess DMT for any purpose under the CSA, Plaintiffs' ayahuasca was subject to summary forfeiture. 21 U.S.C. §§ 812(c)(6), 881. Though Plaintiffs contend that they had a property interest in the ayahuasca because it "is a protected substance" under RFRA, Plaintiffs point to no authority indicating that they had a legitimate property interest in the ayahuasca without first receiving an accommodation under RFRA or registering to import controlled substances.[7] (Resp. at 11); *See e.g.* 21 C.F.R. §§ 1301.11, 1312.11(a), 1312.15. The Court grants the Motion on Plaintiffs' procedural due process claim.

### b. Substantive Due Process

Plaintiffs also allege that CBP's seizure of ayahuasca and threat of prosecution "violate Plaintiffs' right to worship God according to the dictates of their own conscience and deprive them of their liberty in violation" of due process. (Compl. ¶ 73; Resp. at 12 (quoting *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923)).) Defendants counter that Plaintiffs cannot raise a generalized substantive due process claim when Plaintiffs' claim is

---

[7] Plaintiffs argue they had a "right to receive mail." (Resp. at 11 (citing *Parratt v. Taylor*, 451 U.S. 527 (1981)).) Unlike Plaintiffs' package, the prisoner's mail in *Parratt* did not contain contraband. 451 U.S. at 531. Attempting to circumvent ayahuasca's status as contraband, Plaintiffs also contend that CBP deprived Plaintiffs of their liberty interest in using ayahuasca for religious purposes. (Resp. at 10–11 (a person has a liberty interest in "worship[ping] God according to the dictates of his own conscience" (quoting *Roth*, 408 U.S. at 572)).) Plaintiffs cite no authority that would support Plaintiffs' due process claim when Plaintiffs have not followed the very procedures designed to prevent summary forfeiture of the ayahuasca. *See* 21 U.S.C. § 958(d) (procedural protections for an applicant seeking registration under the CSA); (*See* Compl. ¶ 25 (acknowledging that DMT is regulated by the CSA); Mot. at 13 (explaining that a permit is required to import any controlled substances).)

- 11 -

"grounded in the First Amendment's right to free exercise." (Mot. at 14.) The Court agrees with Defendants.

"Substantive due process analysis must begin with a careful description of the asserted right . . . ." *Reno v. Flores*, 507 U.S. 292, 302 (1993). "[W]here another provision of the Constitution provides an explicit textual source of constitutional protection, a court must assess a plaintiff's claims under that explicit provision and 'not the more generalized notion of substantive due process." *Conn v. Gabbert*, 526 U.S. 286, 293 (1999) (quotations and citation omitted) (holding that challenges to unreasonable government searches are analyzed under the Fourth Amendment instead of the Fourteenth Amendment). Plaintiffs' due process claim reiterates their free exercise claim—CBP allegedly interfered with Plaintiffs' ayahuasca use, thereby violating a central tenet of Plaintiffs' religious beliefs and practices. (*See* Compl. ¶¶ 66, 73.) Because the First Amendment provides Plaintiffs an "explicit textual source of constitutional protection," the Court dismisses Plaintiffs' substantive due process claim.[8]

### 5.    Equal Protection

Plaintiffs allege that Defendants have denied Plaintiffs the equal protection of the laws by accommodating "similarly situated" religions' ayahuasca use. (Compl. ¶¶ 48, 75 (referencing UDV and Santo Daime).) Defendants respond that Plaintiffs have not stated an equal protection claim, as Plaintiffs have not plausibly alleged that Defendants discriminated against Plaintiffs because of Plaintiffs' religion. (Mot. at 14.) The Court agrees with Defendants.

The Equal Protection Clause demands that "all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985);

---

[8] The Court also dismisses Plaintiffs' Ninth Amendment claim. The Ninth Amendment does not "independently secur[e] any constitutional rights for purposes of making out a constitutional violation," but works "in tandem" with the Fifth Amendment to protect fundamental rights. *San Diego Cnty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1125 (9th Cir. 1996) (holding that "the Ninth Amendment does not encompass an unenumerated, fundamental, individual right to bear firearms") (quoting *Schowengerdt v. United States*, 944 F.2d 483, 490 (9th Cir. 1991)); *Marin All. For Med. Marijuana v. Holder*, 866 F. Supp. 2d 1142, 1156 (N.D. Cal. 2011) (citing *Raich v. Gonzales*, 500 F.3d 850, 862 (9th Cir. 2007)).

*Bolling v. Sharpe*, 347 U.S. 497, 499 (1954). To state an equal protection claim, a plaintiff may allege "that defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class." *Lee v. City of Los Angeles*, 250 F.3d 668, 686 (9th Cir. 2001). Plaintiffs do not claim that Defendants discriminated against Plaintiffs by seizing Plaintiffs' ayahuasca or denying Plaintiffs the right to use ayahuasca because of their religion.[9] (Mot. at 14–15; *see generally* Compl.) Rather, Plaintiffs allege only that CBP seized a package containing a Schedule I controlled substance that Plaintiffs attempted to illegally import into the United States. (Compl. ¶ 50.) The Court grants the Motion on Plaintiffs' Equal Protection Claim.

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

---

[9] Plaintiffs relatedly argue that Defendants must demonstrate a compelling interest to enforce the CSA and deprive Plaintiffs of their right to use ayahuasca. (Resp. at 13 (citing *Johnson v. Robison*, 415 U.S. 361, 375 n.14 (1974)).) Because the CSA does not violate the First Amendment, it need only survive rational basis review for Plaintiffs' equal protection claim. *Locke v. Davey*, 540 U.S. 712, 720 n.3 (2004); *Johnson*, 415 U.S. at 375 n.14. Plaintiffs do not allege any facts to support a plausible claim that Defendants lack a legitimate interest in enforcing the CSA except against persons who have complied with procedures such as RFRA.

- 13 -

## III.    CONCLUSION

The Court grants Defendants' Motion to Dismiss Plaintiffs' constitutional claims for failure to state a claim. Because Plaintiffs have standing to bring a RFRA claim and have alleged that the CSA substantially burdens Plaintiffs' sincere religious practice, the Court denies Defendants' Motion as to Plaintiffs' RFRA claim.

**IT IS ORDERED** denying Defendants' Motion to Dismiss Count 1 of the Complaint (Doc. 23).

**IT IS FURTHER ORDERED** granting Defendants' Motion to Dismiss Counts 2, 3, 4, 5, 6 and 7 of the Complaint (Doc. 23).

Dated this 20th day of March, 2023.

Susan R. Bolton
United States District Judge

- 14 -

# EXHIBIT O

**Original Papers**

Psychopharm

# Human hallucinogen research: guidelines for safety

*Journal of Psychopharmacology*
22(6) (2008) 603–620
© 2008 British Association
for Psychopharmacology
ISSN 0269-8811
SAGE Publications Ltd,
Los Angeles, London,
New Delhi and Singapore
10.1177/0269881108093587

**MW Johnson** *Department of Psychiatry and Behavioral Sciences, Johns Hopkins University, School of Medicine, Baltimore, MD, USA.*

**WA Richards** *Johns Hopkins Bayview Medical Center, Baltimore, MD, USA.*

**RR Griffiths** *Department of Psychiatry and Behavioral Sciences, Johns Hopkins University, School of Medicine, Baltimore, MD, USA; Department of Neuroscience, Johns Hopkins University, School of Medicine, Baltimore, MD, USA.*

## Abstract

There has recently been a renewal of human research with classical hallucinogens (psychedelics). This paper first briefly discusses the unique history of human hallucinogen research, and then reviews the risks of hallucinogen administration and safeguards for minimizing these risks. Although hallucinogens are relatively safe physiologically and are not considered drugs of dependence, their administration involves unique psychological risks. The most likely risk is overwhelming distress during drug action ('bad trip'), which could lead to potentially dangerous behaviour such as leaving the study site. Less common are prolonged psychoses triggered by hallucinogens. Safeguards against these risks include the exclusion of volunteers with personal or family history of psychotic disorders or other severe psychiatric disorders, establishing trust and rapport between session monitors and volunteer before the session, careful volunteer preparation, a safe physical session environment and interpersonal support from at least two study monitors during the session. Investigators should probe for the relatively rare hallucinogen persisting perception disorder in follow-up contact. Persisting adverse reactions are rare when research is conducted along these guidelines. Incautious research may jeopardize participant safety and future research. However, carefully conducted research may inform the treatment of psychiatric disorders, and may lead to advances in basic science.

### Key words

5-HT$_{2A}$ agonists; adverse reactions; DMT; entheogens; hallucinogens; human research; LSD; mescaline; psilocybin; psychedelics; safety guidelines

## Introduction

After several decades of dormancy, research involving the administration of classical hallucinogens to humans has been recently renewed (Sessa, 2005; Frecska and Luna, 2006; Harvard Mental Health Letter, 2006; Lancet, 2006; Morris, 2006; Winkelman and Roberts, 2007). Although nonhuman animal research during the intervening decades has substantially advanced our understanding of underlying neuropharmacological mechanisms of the hallucinogens, the fact that human research with this historically important and widely used class of compounds remained inactive is remarkable (Nichols, 2004). Renewed human administration research began with the work of Rick Strassman, who initiated research on the effects of N,N-dimethyltryptamine (DMT) at the University of New Mexico in the early 1990s (Strassman, 1991, 1996, 2001; Strassman and Qualls, 1994; Strassman, *et al.*, 1994, 1996). Subsequently, investigators both in the USA and in Europe have developed human research programmes with hallucinogens. This new research has included basic science studies that have administered hallucinogens as tools for investigating cognitive neuroscience and perception (Gouzoulis-Mayfrank, *et al.*, 1998a; Gouzoulis-Mayfrank, *et al.*, 2002; Umbricht, *et al.*, 2003; Carter, *et al.*, 2004; Carter, *et al.*, 2005a,b), time perception (Wittmann, *et al.*, 2007), hallucinogen pharmacokinetics and metabolism (Hasler, *et al.*, 1997, 2002), model psychosis (Vollenweider, *et al.*, 1997, 1998, 1999, 2007; Gouzoulis-Mayfrank, *et al.*, 1998a; Vollenweider and Geyer, 2001; Gouzoulis-Mayfrank, *et al.*, 2005, 2006), and, recently in our laboratory, hallucinogens' reported facilitation of experiences having enduring personal meaning and spiritual significance (Griffiths, *et al.*, 2006). Recent clinical studies have administered hallucinogens to evaluate their safety and efficacy in the treatment of psychiatric disorders: specifically, anxiety related to advanced-stage cancer (Grob, 2005) and obsessive-compulsive disorder (Moreno, *et al.*, 2006). In addition, several studies have examined the effects of

*Corresponding author:* Roland Griffiths, Department of Psychiatry and Behavioral Sciences, Johns Hopkins University, School of Medicine, 5510 Nathan Shock Drive, Baltimore, MD, USA. Email: rgriff@jhmi.edu

604    *Hallucinogen safety*

*ayahuasca* (also known as *hoasca* or *yagé*; an admixture containing DMT) in human volunteers outside of the USA (Grob, *et al.*, 1996; Riba, *et al.*, 2001). Because the United States Supreme Court has recently ruled in favour of the União do Vegetal (UDV; a syncretic Brazilian church that uses *ayahuasca* in the context of religious ceremonies) in their claim that the UDV's use of *ayahuasca* is protected under the Religious Freedom Restoration Act (Gonzales v. O Centro Espirita Beneficiente União do Vegetal, 2006), *ayahuasca* use within this church setting may receive increased scientific investigation within the USA.

We use the word 'hallucinogen' herein to refer to the classical hallucinogens, sometimes called 'psychedelics', 'psychotomimetics' or 'entheogens' (Grinspoon and Bakalar, 1979; Ruck, *et al.*, 1979; Ott, 1996; Metzner, 2004). Admittedly, the term 'hallucinogen' is not ideal for these substances, because perceptual changes are only one domain of their effects, and the typical perceptual changes engendered by hallucinogens at typical doses rarely include frank hallucinations (Grinspoon and Bakalar, 1979; Nichols, 2004; O'Brien, 2006). However, we use this term because it is the most widely used in the scientific literature. Although the term 'psychedelic' is widely used, it has the disadvantage of carrying considerable cultural connotation (i.e. its use as a descriptor of a style of music or art associated with Western counter-culture of the 1960s). The terms 'psychotomimetic' (emphasizing model psychosis) and 'entheogen' (emphasizing mystical-type experiences, i.e. phenomenologically indistinguishable from classically described mystical experiences) highlight only a single aspect (which may not occur reliably) of the much broader range of hallucinogen effects.

Hallucinogens can be divided structurally into two classes of alkaloids: the tryptamines, including psilocybin (prodrug constituent of *Psilocybe* and several other mushroom genera), the semi-synthetic d-lysergic acid diethylamide (LSD), and DMT; and the phenethylamines, including mescaline (principle active constituent of peyote) and certain synthetic compounds (Grinspoon and Bakalar, 1979; Shulgin and Shulgin, 1991, 1997; Metzner, 2004, Nichols, 2004). The effects of these substances are primarily mediated by agonist action at 5-HT$_{2A}$ receptors (Glennon, *et al.*, 1984; Nichols, 2004; González-Maeso, *et al.*, 2007) and produce a generally similar profile of subjective effects (Hidalgo, 1960; Hollister and Hartman, 1962; Wolbach, *et al.*, 1962a,b; Shulgin and Shulgin, 1991, 1997). Other classes of substances have sometimes been identified as 'hallucinogens', including 3,4-methylenedioxymethamphetamine or MDMA [perhaps more appropriately labelled an entactogen (Nichols, *et al.*, 1986) or empathogen (Metzner, 1985)]; dissociative anaesthetics such as ketamine, phencyclidine and dextromethorphan; and anticholinergic agents such as scopolamine and atropine (Nichols, 2004). However, this paper uses the term 'hallucinogen' to refer specifically to classical hallucinogens.

The purpose of this paper is to provide guidance in the safe administration of high doses of hallucinogens (e.g. ≥25 mg psilocybin or 200 µg LSD). Some aspects of these recommendations may also apply to studies employing lower doses, although, as with other drug classes, the likelihood of potential adverse effects will be related to dose. Similarly, some aspects of these recommendations may also apply to studies administering the other drug classes mentioned in the preceding paragraph: entactogens, dissociative anaesthetics and anticholinergic agents. However, the clinical effects and mechanisms of action of these agents are sufficiently different from the classical hallucinogens that safety recommendations concerning their administration are beyond the scope of this manuscript.

First, so that the historical context in which current human hallucinogen studies are conducted will be clear, we will briefly discuss the history of sacramental hallucinogen use by indigenous cultures, and the history of human hallucinogen research before it became dormant in the 1970s. The decades-long virtual dormancy of human hallucinogen research stands as a unique case in the history of modern clinical pharmacology. It is important for researchers going forward to understand the role that safety factors, as well as sociological and political factors, played in the history and cessation of human hallucinogen research. Moreover, because of the historical legacy of sensationalism surrounding hallucinogens, researchers should appreciate the precarious position of current human hallucinogen research, and recognize that very high safety standards will help to ensure that human research continues into the decades to come. Next, we will provide a detailed description of the unique risks of hallucinogen administration. We will then present the proposed guidelines for conducting high-dose hallucinogen research in each of several domains, including volunteer selection, study personnel, physical environment, preparation of volunteers, conduct of sessions, and post-session procedures.

## Relevant history

### Hallucinogen use by indigenous cultures

Hallucinogens have been used by indigenous cultures for millennia (Schultes, 1969; Lowy, 1971; Schultes, *et al.*, 2001). These cultures have restricted hallucinogen use to sacramental and healing contexts, with these two often being inseparably intertwined. Remarkably, apparently without exception, such cultures view hallucinogenic plants and fungi as being of divine origin (Schultes, *et al.*, 2001). Given this orientation, it is not surprising that their ingestion is often tightly restricted, with use controlled by ceremonial guidelines, including taboos against improper use (Schultes, *et al.*, 2001; Weil, 2004). Indigenous cultures restrict use of hallucinogens to highly ritualized, sacred ceremonies such as those designed to serve as rites of passage, or to set the occasion for divination and spiritual or physical healing. Even in cases in which certain use extends beyond the shaman and may be more recreational in nature (e.g. use of the DMT-containing *epená* by the Waiká cultures of Brazil and Venezuela), the hallucinogen is prepared and taken in a highly ritualized context (Grinspoon and Bakalar, 1979; Schultes, *et al.* 2001; Weil, 2004). Modern, urban syncretic religions, such as the UDV, which have developed in South America and have been influenced by indigenous use of *ayahuasca*, also incorporate a high degree of structure and

guidance into their *ayahuasca* use, which may minimize adverse reactions (Gonzales v. O Centro Espirita Beneficiente União do Vegetal, 2006).

However, indigenous cultures should not be regarded as absolute role models in the clinical use of hallucinogens for at least two reasons. First, some of these cultures also engaged in practices considered unethical in our culture. For example, the Aztecs, who used psilocybin mushrooms and morning glory seeds (containing LSD-related agents), practiced human sacrifice, and even incorporated hallucinogen use into sacrificial rituals (Ott, 1996). As another example, the Jivaro in Ecuador who use *ayahuasca* practice sacramental headhunting, and *ayahuasca* may be used by the shaman in that society for malevolent intent (i.e. bewitching) as well as for healing (Harner, 1962, 1968; Grof, 1977). Second, risk/benefit tradeoffs that may be acceptable in various religious contexts may fall short of what is expected in the domain of contemporary scientific research with human participants.

Nonetheless, some important themes have emerged in the use of hallucinogens by indigenous cultures that may have bearing on the appropriate use of hallucinogens in clinical research. Indeed, some of the safeguards developed for clinical hallucinogen research and expressed in the guidelines presented herein are similar to important aspects of hallucinogen use by indigenous cultures. These common themes are structured use (expressed as ritual in indigenous use), restrictions on use including the need for guidance and appreciation of hallucinogens' powerful psychological effects (expressed as reverence in indigenous use). We believe that these commonalities are more than coincidence. The unique pharmacology of classical hallucinogens may have shaped convergent practices across independent cultures. Likewise, the guidelines expressed herein for human clinical research with hallucinogens may also be viewed as having been developed in reaction to these same aspects of hallucinogen pharmacology. As an example, some of the unique effects and safety concerns for hallucinogens may be related to their ability to set the occasion for deeply meaningful, even spiritual experiences (Richards, 2003, 2005). Novak (1997) hypothesized that Western intellectuals in the mid 1950s such as Aldous Huxley and Gerald Heard merely redefined the subjective effects resulting from hallucinogen administration as a spiritual experience, thereby popularizing such an association in western culture. However, the observation that indigenous cultures that ingest classical hallucinogens almost invariably do so under sacramental contexts (Schultes, *et al.*, 2001), along with the findings from double-blind clinical studies demonstrating that under supportive conditions, hallucinogens occasion mystical-type experiences with high frequency (Pahnke, 1963; Griffiths, *et al.*, 2006) suggests that the association of hallucinogens with spiritual experience relates to the pharmacology of these agents rather than being based entirely on cultural suggestion.

### Early clinical research

In the 1950s and 1960s, thousands of research participants were administered hallucinogens in the context of basic clinical research or therapeutic clinical research, resulting in hundreds of publications (Grinspoon and Bakalar, 1979; Grob, *et al.*, 1998; Strassman, 2001; Nichols, 2004). During this time, the United States Army investigated classical hallucinogens as incapacitating agents in soldiers, and the United States Central Intelligence Agency conducted clandestine research investigating classical hallucinogens as interrogation agents in which civilians were administered hallucinogens without knowledge or consent. Eventually, both groups ceased to focus on classical hallucinogens in favour of non-classical 'hallucinogens' such as the synthetic anticholinergic compound quinuclidinyl benzilate (BZ), which showed greater promise as a warfare agent than LSD because its effects were marked by greater immobility, delirium, amnesia and duration (Lee and Shlain, 1992). Very early academic research on classical hallucinogens was designed without considering the powerful influences of set (psychological state) and setting (environment) (Malitz, *et al.*, 1960; Rinkel, *et al.*, 1960; Hollister, 1961; Rümmele and Gnirss, 1961; Leuner, 1962). Subsequent research, which included more preparation and interpersonal support during the period of drug action, found fewer adverse psychological reactions, such as panic reactions and paranoid episodes, and increased reports of positively valued experiences (Chwelos, *et al.*, 1959; Leary, 1964; Leary, *et al.*, 1963, 1964; Metzner, *et al.*, 1965; Pahnke, 1969).

One major area of early research focused on the comparison of hallucinogen effects with the symptoms of psychosis (e.g. Stockings, 1940; Hoch, *et al.*, 1953; Hoffer and Callbeck, 1960; Leuner, 1962; Kuramochi and Takahashi, 1964). Although the study of hallucinogens as models for the psychosis observed in schizophrenia eventually fell out of favour in psychiatry (Grinspoon and Bakalar, 1979; Snyder, 1988; Strassman, 2001), a renewed interest in this area is emerging, in part due to modern brain imaging techniques and neuropharmacological findings that have supported hallucinogens as a model of at least certain aspects of acute psychosis (Vollenweider, *et al.*, 1997; Gouzoulis-Mayfrank, *et al.*, 1998a; Vollenweider and Geyer, 2001; Gouzoulis-Mayfrank, *et al.*, 2005, 2006).

Other areas of early human research included investigations of therapeutic applications of hallucinogens in treatment of psychological suffering associated with cancer and in the treatment of substance dependence. Anecdotal observations and non-blind studies in cancer patients suffering from anxiety and depression suggested that LSD administration resulted in an ability to openly discuss existential fears and be at peace with approaching death, and that this reorientation often outlasted the acute drug effects (Kast and Collins, 1964; Cohen, 1965; Kast, 1967). Follow-up investigations involved the administration of a high dose of a hallucinogen to carefully prepared patients under highly supportive interpersonal conditions, with the patient wearing eyeshades and listening to classical music through headphones during the course of pharmacological action, a model known as 'psychedelic peak therapy' or 'psychedelic therapy' (Kurland, *et al.*, 1969; Pahnke, *et al.*, 1969; Richards, *et al*, 1972; Grof, *et al.*, 1973;

Kurland, *et al.*, 1973; Grof and Halifax, 1977; Richards, *et al.*, 1977, 1979; Grof, 1980; Richards, 1980; Kurland, 1985). Unfortunately, these early studies did not include the stringent control conditions or groups that now have become standard in modern clinical psychopharmacology research. The results suggest, however, that these compounds may have improved psychological well-being in the face of anxiety and depression secondary to cancer.

Another focus of study was hallucinogen-facilitated therapy in the treatment of alcoholism and other forms of substance dependence (e.g. Smart, *et al.*, 1966; Hollister, *et al.*, 1969; Ludwig, *et al.*, 1969; Kurland, *et al.*, 1971; Savage and McCabe, 1973). While some studies prepared patients and utilized supportive conditions (e.g. Kurland, *et al.*, 1971; Savage and McCabe, 1973), others drastically departed from the 'psychedelic therapy' model (and from the guidelines herein), and involved the administration of high doses to unprepared, restrained patients (e.g. Smart, *et al.*, 1966). Results across studies were ultimately inconclusive due to such variations in methods and a lack of modern controls and experimental rigour (Abuzzahab and Anderson, 1971; McGlothlin and Arnold, 1971; Halpern, 1996; Mangini, 1998). Similarly, some therapists reported that hallucinogens administered under supportive contexts could accelerate psychotherapy for a variety of psychological disorders (e.g. Abramson, 1960, 1963; Crochet, *et al.*, 1963; Mogar and Aldrich, 1969; Rhead, 1977). However, these reports were largely based on anecdotal clinical accounts rather than controlled studies.

Escalation in recreational hallucinogen use, primarily LSD, in the 1960s, led to considerable sensationalism concerning these drugs in media coverage. Adding to the controversy was the publicized departure and termination of Timothy Leary and Richard Alpert from Harvard University in 1963 following charges of unorthodox methods in hallucinogen research (Grinspoon and Bakalar, 1979; Lee and Shlain, 1992; Novak, 1997; Strassman, 2001). Leary's subsequent irresponsible advocacy of hallucinogen use by youth further undermined an objective scientific approach to studying these compounds. The growing controversy and sensationalism resulted in increasing restrictions on access to hallucinogens throughout the 1960s (ultimately resulting in the placement of the most popular hallucinogens into Schedule I of the 1970 Controlled Substances Act in the United States), creating substantially greater regulatory barriers for researchers to conduct human trials. The negative publicity also resulted in withdrawal of federal research funds, which had previously supported much of the human research, and in the professional marginalization of clinical investigators interested in pursuing research with hallucinogens. Human research with hallucinogens in the USA became virtually dormant when the last trials were published in the early 1970s. Commenting on the unusual evolution of psychiatric research with hallucinogens, Strassman (2001) mused, "They began as 'wonder drugs,' turned into 'horror drugs,' then became nothing" (p. 28).

## Unique risks of human hallucinogen research

Hallucinogen administration in humans results in a unique profile of effects and potential adverse reactions that need to be appropriately addressed to maximize safety. Different risks are associated with different drug classes, and human research with each class requires procedures to be in place to address those particular risks. For example, because high doses of certain opioids and sedative/hypnotics can cause respiratory depression (Gutstein and Akil, 2006; Charney, *et al.*, 2006), when conducting research with high doses of these drugs, respiration rate and/or blood oxygen are monitored, and mechanical breathing assistance and appropriate rescue medications are readily available. As another example, administration of high doses of psychomotor stimulants, such as cocaine, can cause cardiac stress (O'Brien, 2006). Therefore, electrocardiogram (ECG) readings taken at screening are scrutinized carefully, pulse and blood pressure are monitored during sessions, and rescue medication for acute hypertension is immediately available. Similarly, human hallucinogen administration entails its own unique risk profile. Unlike opioids, sedative/hypnotics or psychomotor stimulants, the primary safety concerns with hallucinogens are largely psychological rather than physiological in nature.

### Physiological toxicity

Hallucinogens generally possess relatively low physiological toxicity, and have not been shown to result in organ damage or neuropsychological deficits (Strassman, 1984; Gable, 1993, 2004; Halpern and Pope, 1999; Hasler, *et al.*, 2004; Nichols, 2004; Halpern, *et al.*, 2005). Nonhuman animal studies have shown MDMA (structurally similar to some classical hallucinogens, but with a substantially different pharmacological mechanism of action) to have neurotoxic effects at high doses, although MDMA has been judged to be safe for human administration in the context of several therapeutic and basic human research studies. In contrast, there is no evidence of such potential neurotoxic effects with the prototypical classical hallucinogens (i.e. LSD, mescaline and psilocybin). Some physiological symptoms may occur during hallucinogen action, such as dizziness, weakness, tremors, nausea, drowsiness, paraesthesia, blurred vision, dilated pupils and increased tendon reflexes (Isbell, 1959; Hollister, 1961; Nichols, 2004). In addition, hallucinogens can moderately increase pulse and both systolic and diastolic blood pressure (Isbell, 1959; Wolbach, *et al.*, 1962b; Strassman and Qualls, 1994; Gouzoulis-Mayfrank, *et al.*, 1999; Passie, *et al.*, 2000; Griffiths, *et al.*, 2006). However, these somatic effects vary and are relatively unimpressive even at doses yielding powerful psychological effects (perceptual, cognitive and affective) (Metzner, *et al.*, 1965; Passie, *et al.*, 2000; Metzner, 2004).

Although a full discussion of special physiological toxicity concerns for medical patient populations is beyond the scope of this manuscript, a few observations are worthy of note. The

early literature examining hallucinogens in the treatment of anxiety and depression secondary to cancer indicated that the classical hallucinogens LSD and N,N-dipropyltryptamine (DPT) were physiologically well-tolerated. The physical adverse effects of these agents observed in cancer patients were manageable and similar to effects observed in physically healthy individuals. These researchers noted that any other symptoms experienced during sessions with cancer patients were symptoms already associated with their existing illness (Richards, *et al*., 1972; Kurland, *et al*., 1973; Kurland, 1985). Early clinical research also safely administered LSD to chronic alcoholics and cancer patients with 'considerable liver damage', suggesting hepatic concerns are 'negligible unless the dysfunction is of a critical degree' (Grof, 1980, p. 164).

Participants and review committees may be concerned that LSD or other hallucinogens are associated with chromosomal damage. These concerns stem from an anti-LSD media campaign by the USA government in the late 1960s that was based on and followed soon after initial reports (Cohen, *et al*., 1967a,b; Irwin and Egozcue, 1967), suggesting that LSD caused chromosomal damage in human leucocytes (Ott, 1996; Weil, 2004). This campaign included pictures of deformed children (Grinspoon and Bakalar, 1979) at a time when the thalidomide tragedies of a decade earlier were relatively fresh in the public's memory (Ott, 1996). However, many follow-up investigations soon squarely refuted the hypothesis that LSD use in humans was a significant risk for chromosomal damage or carcinogenic, mutagenic or teratogenic effects (e.g. Bender and Siva Sankar, 1968; Tjio, *et al*., 1969; Dishotsky, *et al*., 1971; Long, 1972).

### Abuse and dependence

Like many classes of psychoactive drugs, hallucinogens are sometimes used in a manner that jeopardizes the safety or well-being of the individual or others (e.g. driving while impaired; a pattern of use that interferes with work, school or relationships). Under such circumstances, hallucinogens are said to be 'abused'. However, hallucinogens are not typically considered drugs of dependence in that they do not engender compulsive drug seeking (National Institute on Drug Abuse, 2001, 2006; O'Brien, 2006), consistent with the observation that they are not reliably self-administered in nonhuman animals (Poling and Bryceland, 1979; Griffiths, *et al*., 1980; Fantegrossi, *et al*., 2004). Furthermore, they are not associated with a known withdrawal syndrome (O'Brien, 2006). Therefore, there is little risk that exposing human volunteers to hallucinogens will leave participants physically or psychologically dependent on these compounds. This low dependence potential allows for the possibility of administering these compounds to hallucinogen-naïve volunteers when blinding issues are critical (e.g. Griffiths, *et al*., 2006). However, in certain situations it may be advantageous to study hallucinogen-experienced participants (e.g. brain imaging studies requiring the participant to remain immobile).

### Acute psychological distress and dangerous behaviour during hallucinogen action

Although hallucinogens have relatively low physiological toxicity and are not associated with compulsive drug seeking, there is still concern that they may pose other psychological risks. The most likely risk associated with hallucinogen administration is commonly known as a 'bad trip' and is characterized by anxiety, fear/panic, dysphoria, and/or paranoia. Distressing effects may be experienced in a variety of modalities: sensory (e.g. frightening illusions), somatic (e.g. disturbing hyperawareness of physiological processes), personal psychological (e.g. troubling thoughts or feelings concerning one's life) and metaphysical (e.g. troubling thoughts or feelings about ultimate evil forces) (McCabe, 1977; Grinspoon and Bakalar, 1979; Strassman, 1984). Because emotional experience is often intensified when under the influence of a hallucinogen, in unprepared individuals or uncontrolled situations any of these effects may potentially escalate to dangerous behaviour. For example, fear and paranoid delusions may lead to erratic and potentially dangerous behaviours, including aggression against self or others (Strassman, 1984). Although very rare, in hazardous and unsupervised conditions, individuals under the influence of hallucinogens have ended their lives by such acts as jumping from buildings (Keeler and Reifler, 1967; Reynolds and Jindrich, 1985; Reitman and Vasilakis, 2004; O'Brien, 2006). We recognize that even under unsupervised and unprepared conditions, reactions to hallucinogens involving violence and self-destructive behaviour are rare, and our intention is not to create an unrealistic account of the dangers of hallucinogens. Nonetheless, even infrequent reports of such dangers require that investigators take seriously such risks and take steps to avoid their occurrence.

### Prolonged psychosis

Another potential risk of hallucinogen administration is provoking the onset of prolonged psychosis, lasting days or even months (Strassman, 1984). Although determining causation is difficult, it appears that individuals who experience such reactions have premorbid mental illness before taking hallucinogens. However, it is unknown whether the precipitation of psychosis in such susceptible individuals represents a psychotic reaction that would have never occurred in the absence of hallucinogen use, or whether it represents an earlier onset of a psychotic break that would have inevitably occurred (Grinspoon and Bakalar, 1979; Strassman, 1984). Unlike acute psychological distress, these cases will be extremely rare in well-selected and well-prepared participants. In a survey of investigators who had administered LSD or mescaline, Cohen (1960) reported that only a single case of a psychotic reaction lasting more than 48 h occurred in 1200 experimental (non-patient) research participants (a rate of 0.8 per 1000). Notably, the individual was an identical twin of a schizophrenic patient and thus would have been excluded under the proposed guidelines. Prolonged reactions over 48 h were slightly more frequent

in patients undergoing psychotherapy than in experimental non-patient participants, but still relatively rare, occurring at a rate of 1.8 prolonged reactions per 1000 patients. Cohen (1960) also reported that suicide attempts and completed suicides occurred at a rate of 1.2 and 0.4, respectively, per 1000 patients. The causal link between hallucinogen exposure and suicide or suicide attempt was only clear for a portion of these cases in patients, and no suicides or suicide attempts were noted for the 1200 non-patient, experimental participants. However, it is important when evaluating these data to consider that only 44 of the 62 researchers queried by Cohen returned survey results (Cohen, 1960; Novak, 1997). Although Cohen and Ditman (1962) subsequently expressed misgivings over the increased incidence of adverse effects due to the increasing recreational use of LSD and some questionable clinical practices, they maintained that when used under the proper guidelines, LSD was an important tool for use in human research (cf. Novak, 1997). McGlothlin and Arnold (1971) reported one case out of 247 individuals who received LSD in either experimental or psychotherapeutic studies in which an LSD-related psychotic reaction lasting more than 48 h occurred. That single case was a patient who received repeated LSD administrations in a psychotherapeutic context. Although very rare, care must be taken to minimize the risks of such an episode. The volunteer selection guidelines, addressed in a later section, will be the key factor in minimizing the risk of prolonged psychosis in human hallucinogen research studies.

Some clinical observations suggest the possibility that unconscious psychological material may be activated during hallucinogen sessions, and that such material, if not properly worked through and psychologically integrated, may lead to psychological difficulties of a non-psychotic nature, such as negative emotions and psychosomatic symptoms, lasting beyond the session (e.g. McCabe, 1977; Grof, 1980). Although these observations have not been examined experimentally, they deserve consideration. As suggested in our subsequent discussion of volunteer-monitor interactions, we believe that the strong interpersonal support from session monitors before, during and following sessions will minimize any enduring untoward psychological effects.

### Lasting perceptual abnormalities

Another potential risk of hallucinogen administration is hallucinogen persisting perception disorder (HPPD). In order to meet DSM-IV-TR criteria for this disorder, a hallucinogen user must re-experience perceptual effects similar to those experienced under acute hallucinogen action after cessation of hallucinogen use, these effects must be clinically distressing or impair functioning, and the effects must not be caused by a medical condition or be better explained by another psychiatric disorder or hypnopompic hallucinations (American Psychiatric Association, 2000). The incidence of HPPD is unknown, although it is thought to be very uncommon given the relatively few cases reported out of the millions of hallucinogen

doses consumed since the 1960s (Halpern and Pope, 2003). Although the term 'flashback' is sometimes used interchangeably with HPPD, the former term is often used to describe any brief perceptual effects reminiscent of acute hallucinogen effects but occurring beyond acute hallucinogen use, usually in the absence of clinical distress or impairment (Lerner, *et al.*, 2002). Indeed, many illicit hallucinogen users report some brief visual abnormalities occurring after acute hallucinogen effects, but only for a small minority of users are these effects troubling or impairing enough to be considered clinically significant or warrant the diagnosis of HPPD (Lerner, *et al.*, 2002; Baggott, *et al.*, 2006). Many illicit users regard such sub-clinical effects as benign and pleasurable (Strassman, 1984; Lerner, *et al.*, 2002; Frecska and Luna, 2006). Importantly, the incidence of HPPD or other perceptual abnormalities appears to be much lower in therapeutic or research contexts with careful screening and preparation than in the context of illicit recreational use, which may include the confounds of polydrug use and unscreened psychiatric disorders (Cohen, 1960; McGlothlin and Arnold, 1971; Strassman, 1984; Halpern and Pope, 2003). Because such perceptual abnormalities are poorly understood, researchers administering hallucinogens to human volunteers should probe for perceptual disturbances in follow-up contact.

## Guidelines for safety

The guidelines that follow are intended to support the safe administration of high doses of hallucinogens to human volunteers while minimizing potential adverse reactions. Although a previous paper outlined methodological issues relevant to the study of hallucinogens in humans (Gouzoulis-Mayfrank, *et al.*, 1998b), safety issues were not the primary focus of that paper. The present paper substantially complements this previous work by providing a more detailed discussion of safety concerns. Issues relevant to the conduct of human research with drugs of abuse in general have been well described (Fischman and Johanson, 1998). The present guidelines extend and complement the recommendations of Fischman and Johanson (1998) for high-dose hallucinogen research. For some domains, such as volunteer selection, volunteer preparation, and the interactions between the volunteer and study personnel, the proposed criteria are substantially more extensive than those presented by Fischman and Johanson (1998) and those routinely used in human behavioural pharmacology because these domains appear to require even greater attention for hallucinogens than for other classes of psychoactive drugs. Although particular aspects of the proposed guidelines may be debatable, it is hoped that this paper will encourage such discussion while conveying the general themes and major domains of concern in human hallucinogen research. The proposed guidelines may serve as a helpful starting point for investigators planning to conduct human hallucinogen research.

## Selection of volunteers

There are two main domains of consideration for volunteer selection. First, selection criteria may be methodological in nature and involve the specific research questions being explored. Second, which is the focus of this manuscript, is safety-related selection criteria. In our studies at Johns Hopkins, participants must be in good general health as assessed by detailed medical history, physical examination, 12-lead ECG, blood chemistry profile, haematology and urinalysis. Pregnant women or those not practicing effective means of birth control are excluded. Relevant to general medical screening, classical hallucinogens moderately increase pulse and both systolic and diastolic blood pressure (Isbell, 1959; Wolbach, *et al.*, 1962b; Strassman and Qualls, 1994; Gouzoulis-Mayfrank, *et al.*, 1999; Passie, *et al.*, 2000; Griffiths, *et al.*, 2006). Therefore in our studies of psilocybin to date, volunteers have been excluded if resting blood pressure exceeded 140 systolic and 90 diastolic (mmHg), averaged across four assessments on at least two separate days. Using these screening parameters with 54 participants to date, no psilocybin session has resulted in blood pressure increases considered medically dangerous, and we have never needed to administer an anti-hypertensive medication in response to psilocybin effects. Modification of these limits may be considered in future studies if safety continues to be observed under these parameters.

Certain medications may alter the effects of a hallucinogen and, therefore, individuals taking these medications should be excluded from participation. Specifically, chronic administration of tricyclic antidepressants and lithium (Bonson and Murphy, 1996), and acute administration of serotonin reuptake inhibitors (Fiorella, *et al.*, 1996) and the antipsychotic medication haloperidol (Vollenweider, *et al.*, 1998) have been shown to potentiate hallucinogen effects, and therefore participants' use of these represents a safety concern. Chronic administration of serotonin reuptake inhibitors (Stolz, *et al.*, 1983; Strassman, 1992; Bonson, *et al.*, 1996) and monoamine oxidase inhibitors (Bonson and Murphy, 1996) have been shown to decrease sensitivity to hallucinogens, and therefore participants' use of these represents a scientific concern. We also advise investigators to include questions concerning over-the-counter dietary supplements in addition to prescription medications when probing medication history, and to exclude those taking potentially problematic substances (e.g. 5-hydroxytryptophan and St John's Wort may affect serotonergic function, and, therefore, it is appropriate to exclude individuals currently or recently taking these products). It should also be noted that administration of *ayahuasca* (which contains monoamine oxidase inhibitors in addition to DMT) to individuals taking serotonin reuptake inhibitors may lead to a severe serotonin syndrome reaction (Callaway and Grob, 1998).

Psychiatric screening criteria are important for minimizing the already low chances of precipitating a longer term psychotic reaction by hallucinogen administration. Thorough psychiatric interviews (e.g. SCID; First, *et al.*, 2001) should be conducted to identify contraindicated psychological functioning or history. In our research, individuals are excluded who have a current or

past history of meeting DSM-IV criteria for schizophrenia or other psychotic disorders (unless substance-induced or due to a medical condition), or bipolar I or II disorder, which are the most important conditions to exclude for ensuring safety. We also exclude those with a first or second-degree relative with these disorders. There is considerable evidence from family, twin and adoptive studies that genetic factors make a robust contribution to the aetiology of schizophrenia, with genetic factors established as relevant to some, perhaps all cases (Buchanan and Carpenter, 2005). In fact, data indicate that there is approximately a six-fold greater chance of developing schizophrenia in second-degree relatives of individuals with schizophrenia (Patel, *et al.*, 2003). Other investigators have also excluded individuals scoring high on the personality traits of rigidity and emotional lability on the grounds that these have been significantly associated with negative experiences during hallucinogen action and during non-pharmacologically induced altered states of consciousness (Dittrich, 1993; Hasler, *et al.*, 2004).

Depending on the nature of the study, it may be appropriate to exclude those with other psychiatric disorders as well. Unless the research study is designed to specifically address a question relevant to a specific psychiatric disorder, our advice is to select a population that is psychiatrically healthy. This strategy is warranted because the effects of hallucinogens may potentially interact with various psychiatric disorders. Furthermore, including volunteers with psychiatric disorders may increase the chances that symptoms from such disorders may inadvertently be misattributed to hallucinogen action. For example, our recent studies with healthy volunteers have excluded volunteers with a current or a recent past history (e.g. within the last 5 years) of alcohol or drug dependence (excluding caffeine and nicotine) or major depression, and volunteers with current obsessive-compulsive disorder, dysthymic disorder, panic disorder, dissociative disorder, anorexia nervosa or bulimia nervosa.

Recent and current studies have investigated therapeutic applications of psilocybin for psychiatric disorders (Grob, 2005; Moreno, *et al.*, 2006). Because preliminary reports have suggested safety, studies examining therapeutic indications are likely to continue. These studies target for participation volunteers with disorders that would normally be excluded from non-treatment studies. Therefore, additional considerations are appropriate for such studies. For example, in a study of hallucinogen-assisted therapy for depression or anxiety, individuals should be excluded whose symptoms of depression or anxiety are sufficiently severe to warrant immediate treatment with medication (e.g. due to suicidal ideation). In addition, clinical treatment studies may choose to lift restrictions on relatively minor non-target psychiatric disorders that would be excluded in studies with healthy volunteers. For example, a study of hallucinogens in the treatment of anxiety related to cancer might choose to allow the inclusion those with comorbid dysthymic disorder or mild obsessive-compulsive disorder. Investigators should examine the relevant evidence when considering lifting specific exclusions, proceed cautiously, and implement any supplemental safeguards that might be appropriate for such exceptions.

*Study personnel*

It is difficult to overemphasize the importance of the interpersonal atmosphere created by study staff in influencing a volunteer's response to a hallucinogen. Most critically, this applies to the interpersonal environment created by the actual session monitors (Leary, *et al.*, 1964; Masters and Houston, 1966). We use the term 'monitor' to refer to the staff members, who will be with the participant in the session room during the course of hallucinogen action. The monitors should be knowledgeable about the medical and psychological markers of potential adverse reactions to the drug. Furthermore, monitors should have significant human relation skills and be familiar with descriptions of altered states of consciousness induced by hallucinogens. Personal experience with techniques such as meditation, yoga or breathing exercises may also prove to be helpful in facilitating empathy for volunteers who experience altered states of consciousness during hallucinogen action. The lead monitor for each participant in the Johns Hopkins studies to date has been a clinical psychologist or a clinical social worker. However, we believe that clinical sensitivity (e.g. empathy, respect) is likely more important than formal degrees when considering monitor qualifications.

We recommend the presence of at least two monitors during hallucinogen administration sessions so that the volunteer will never be alone should one monitor need to briefly leave the session room (e.g. to the restroom). For each participant in the Johns Hopkins studies, we have specified a primary monitor (who takes the lead in participant interactions) and an assistant monitor, with differing required levels of involvement for the two monitors during volunteer preparation (see Preparation of volunteers section below). In prior research into potential treatment applications of hallucinogens, the presence of both genders in the monitoring team has been recommended (Grof and Halifax, 1977; Grof, 1980; Kurland, 1985). Having both genders present may foster feelings of security. In the Johns Hopkins studies, we have followed this recommendation when possible, but also have conducted sessions in which the primary and assistant monitors were of the same gender as the volunteer. We would counsel against both members of the monitoring team being the opposite gender of a volunteer, unless there is a staff member of volunteer's gender who has established some rapport with the volunteer in advance, and who can quickly be summoned to assist should support be needed in the restroom. For studies that are intended to maximize the potential for mystical-type experience during hallucinogen administration, an additional valuable monitor characteristic may be her or his ability to interact with and relate to the participant concerning spiritual issues (e.g. Moss and Dobson, 2006; Council on Spiritual Practices, 2001).

Although the volunteer's interactions with the monitors are of paramount importance, all individuals at the study site having contact with the volunteer on or before the session day may influence a volunteer's reaction to a hallucinogen. Pre-session negative mood consisting of anxiety or depression has been shown to significantly predict anxious or other negative experiences during the session (Metzner, *et al.*, 1965). Strassman (2001) reported that a visiting medical student's unexpected interaction with a volunteer before the session may have contributed to an adverse event resulting in the volunteer leaving the study site under the influence of psilocybin. To the degree possible, investigators should work with all personnel that the volunteer may encounter (e.g. receptionist, building security, nurses) to ensure that volunteers are treated with courtesy and respect. For example, in the Johns Hopkins studies, a research staff member other than the study monitors meets with the volunteer in the morning and administers a few pre-session questionnaires and manages other logistics. This staff member should be friendly, welcoming and compassionate, as he or she inquires as to the volunteer's current emotional and physical well-being (e.g. recent sleeping history, interpersonal or work stressors, anticipation of session, adherence to study dietary and medication/drug restrictions). The staff member should maintain a positive social rapport with the volunteer to reduce the likelihood of adverse psychological reactions during the session and to gain accurate information on the volunteer's condition so that other study staff may be notified if there is any potential reason to postpone or cancel the session (e.g. if the volunteer is experiencing a particularly stressful life event or is feeling ill). If any staff member treats the volunteer disrespectfully or coldly (i.e. 'like a guinea pig'), this may negatively influence the volunteer's psychological state and subsequent hallucinogen experience. We recognize that treating volunteers respectfully is an ethical imperative for all human research. However, with hallucinogen administration research, the importance of this mandate is even more compelling given the powerful influence of set and setting on hallucinogen effects. Therefore, we recommend providing additional attention to volunteer rapport beyond what is customary in general human behavioural pharmacology practice.

*Physical environment*

The physical environment during hallucinogen sessions is extremely important for ensuring safety for volunteers in two respects. First, an aesthetically pleasing environment may decrease the probability of acute psychological distress. The Johns Hopkins hallucinogen research projects use a living room-like setting (Figure 1). The furniture is comfortable and is atypical for a research laboratory or medical office setting. An overly 'clinical' environment with an 'antiseptic' look (e.g. white walls, extraneous medical equipment, personnel in white lab coats) may increase anxious reactions. Strassman (2001) noted that the medically oriented environment in which his DMT studies were conducted may have contributed to volunteers having unpleasant subjective experiences. For example, some volunteers reported vivid and realistic experiences of being medically examined by extraterrestrials. It has also been noted that many of the potentially unpleasant physical reactions to hallucinogens (e.g. subjective changes in temperature, difficulty in breathing, various bodily sensations) might be in part psychosomatic in nature (Blewett and Chwelos, 1959),





**Figure 1** The living room-like session room used in the Johns Hopkins hallucinogen research studies. Aesthetically pleasing environments such as this, free of extraneous medical or research equipment, in combination with careful volunteer screening, volunteer preparation and interpersonal support from two or more trained monitors, may help to minimize the probability of acute psychological distress during hallucinogen studies. For studies that investigate potential therapeutic effects or the phenomenology of introspective hallucinogen experiences, the use of eyeshades and headphones (through which supportive music is played) may contribute to safety by reducing the distractions of environmental stimuli and social pressures to verbally interact with research personnel.

and therefore possibly more likely in settings evocative of medical conditions (Masters and Houston, 1966). Some protocols may require videotaping of sessions for scientific purposes. Although there might be concern that videotaping could increase self-consciousness or paranoia, we have no evidence that this has occurred in the Johns Hopkins studies, in which videotaping of sessions is routine.

Beyond the psychological importance of a comfortable, relaxing environment, attention must be paid to the physical safety of the environment. The environment should be designed keeping in mind the perceptual changes and disorientation that can occur under the influence of hallucinogens. Thus, any potentially dangerous objects (e.g. furniture with sharp corners; glass lamps) should be avoided. If there is a window in the room, the investigators need to be confident that the volunteer could not exit the window if in a delusional state. Additionally, the session room should not have a telephone, and the participant should surrender her or his cellular telephone before the session. Not only may an incoming telephone call be distracting or alarming while under the influence of a hallucinogen, but it may also represent a safety risk, as Strassman (2001) has reported a case in which a participant used a session room telephone to call a companion, which culminated in the two fleeing the study site. Having a private restroom located near the session room would be ideal for volunteer use during the session. A shared restroom may be used if the monitors ensure that the volunteer does not interact with non-study personnel while going to the restroom (more details under the section: *Conduct of hallucinogen administration sessions*). Of course, most research laboratories do not provide the ideal physical environment. Thus, resourcefulness and ingenuity may be necessary to convert a less than ideal location into a relaxing and secure environment.

## Preparation of volunteers

As with any human research with psychoactive drugs, volunteer preparation at the earliest stages must include a thorough review of the consent form, which should include in plain language the range of experiences that may result from hallucinogen administration, including changes in perception, sense of time and space, and emotion (possibly including anxiety, fear, panic and paranoia). Relative to other drug classes, the subjective effects of hallucinogens are likely more difficult to describe to a naïve volunteer; therefore, additional time may be necessary to fully discuss these potential effects with volunteers. The consent form should also include the approximate timecourse of the drug, the state of knowledge concerning its toxicity profile, and its status as an experimental drug. In addition, the consent form should state that there is a relatively small risk of adverse effects that last for hours to days after the hallucinogen session. These include mood disorders (such as depression), psychotic disorders and anxiety disorders. It should also state that there are rare reports in which hallucinogen exposure appears to cause, accelerate or precipitate the onset of significant or lasting psychiatric illnesses such as psychoses and intermittent or persisting visual perceptual abnormalities ('flashbacks', HPPD).

The next step in volunteer preparation is to conduct a series of meetings between the monitors and volunteer to build rapport and trust. The relationship between the monitors and the volunteers should be well established by the time of the first session (Masters and Houston, 1966). In the Johns Hopkins studies, there are at least eight contact hours over the course of at least four meetings, usually over a 1-month period. One

612    *Hallucinogen safety*

of these preparatory meetings should be conducted in the room in which the hallucinogen is to be administered, to familiarize the participant with the physical environment. The primary monitor meets with the volunteer during all of these meetings, while the assistant monitor is required to be present on at least one occasion. It is important that the assistant monitor, in addition to the primary monitor, has developed a trusting relationship with the volunteer because this assistant monitor will be the only person in the session room with the volunteer if the primary monitor needs to leave briefly.

During these preparatory meetings, the monitors discuss meaningful aspects of the volunteer's life. The main purpose of the participant monitor meetings is to develop rapport and trust, which we believe helps minimize the risk of fear or anxiety reactions during the hallucinogen session. This typically includes discussions of the volunteer's childhood, romantic life, current relationships with family and friends, and the volunteer's philosophical and/or spiritual beliefs. Reviewing personal history and feelings may be important for two reasons. First, this discussion helps establish a significant level of trust. The interaction should convey that all aspects of the person are welcome, from the petty to the noble, from embarrassments to achievements and from sorrow to joy. By the time of the hallucinogen session day, the volunteer will ideally feel completely comfortable with the monitors, reducing the likelihood of paranoia (e.g. feeling that the monitors are trying to control her or his mind, or have deceived the volunteer about the nature of the study). Second, related personal material may 'emerge' under the effects of the hallucinogen. That is, the volunteer may experience intense thoughts, feelings and visions related to his or her personal history or world-view. Knowing about the volunteer's life will allow the monitors to better understand her or his session experience and help the monitors in providing interpersonal support should strong emotions arise. If it is felt that sufficient rapport and trust have not developed during these monitor meetings, then either additional contact hours should be provided, or the volunteer's participation should be cancelled. A high dose of a hallucinogen should not be administered to a volunteer if sufficient trust has not been established. As with other forms of human research involving the development of rapport and trust (e.g. clinical trials involving psychotherapy), investigators should be careful that this rapport and trust does not create a situation in which the volunteer feels obligated to remain in the study. Volunteers and monitors should be clear that participation is voluntary, and that the participant will be fully supported if her or his decision is to quit the study.

At some point during preparatory meetings, time must be devoted to explain the study logistics. These should include the timing of the session (e.g. what time to arrive at the laboratory if an outpatient study, what time the session is likely to end), any restrictions on diet or contraindicated medicines, drugs or nutritional supplements (e.g. if fasting or a low-fat diet is required the morning before session), and any requirements of other people (e.g. if a family member or friend is to pick up the participant at the end of the session).

This discussion should also include thorough descriptions of study procedures, to the degree allowable by blinding issues. For example, if cognitive or memory tests are to be performed, or questionnaires are to be answered, the participants should be aware of these requirements. If physiological measures, such as blood pressure, are to be taken during the time of drug action, this also should be explained. The activities during hallucinogen action will naturally depend on the scientific questions under investigation. Whatever the nature of the experiment after hallucinogen administration, the scenario should be thoroughly discussed with the volunteer in preparation. In some cases, such as with brain imaging research, it may be helpful for volunteers to be run through a preliminary research session to familiarize them with the equipment and procedures. Some studies have conducted an initial non-blind hallucinogen administration session in which safety measures are assessed before subsequent blinded sessions to, among other reasons, acquaint volunteers with the effects of the drug before the introduction of additional, potentially anxiety provoking measures (e.g. blood draws) (Strassman and Qualls, 1994; Strassman, *et al.*, 1994, 1996).

The preparation of the volunteer should involve a detailed discussion of the possible range of experiences that may be encountered after hallucinogen administration. This includes the typical onset and duration of the drug(s) under investigation. Preparation involves discussion of the various potential physical sensations, such as nausea or heightened awareness of physiological processes, such as breathing and heartbeat. Volunteers are encouraged to trust that their bodies will continue to function properly regardless of such sensations, and that these bodily processes will continue without the volunteers' volitional control.

The major categories of potential psychological experiences during hallucinogen action should be discussed with the participant. The range of subjective experience under hallucinogens can be remarkably broad (Blewett and Chwelos, 1959; Richards, 1980; Masters and Houston, 1966; Strassman, 2001; Nichols, 2004; Stolaroff, 2004). This range of experiences includes perceptual changes, such as visual illusions, intensification of colours, proprioceptive changes (e.g. one's body may feel gigantic or tiny), and synesthesia (e.g. seeing sounds or hearing colours). Another type of possible experience is the alteration of emotions, such that emotions of either a positive or negative nature may be greatly intensified, yielding experiences that may range from euphoria to despair. Another category of possible effects involves changes in the sense of time and space. At the extremes, time and/or space may be experienced as infinite or nonexistent. Other experiences may include thoughts, feelings or insights concerning one's personal history (e.g. revisiting childhood memories) or current life circumstances (e.g. relations with loved ones), highly symbolic experiences (e.g. involving religious symbols, animals, etc.), and experiences described by some to be of a mystical or spiritual nature. Importantly, it should be emphasized that these experiences may consist of much more than the participant subjectively observing internal and external events. Rather, the effects

may involve a profound change in one's sense of self, such that one feels as if he or she is merging into the surrounding environment or the entire universe (Schultes, *et al.*, 2001). The individual may temporarily experience a complete loss of subjective self-identity, a phenomenon sometimes referred to as 'ego loss' or 'ego death' (e.g. Leary, *et al.*, 1964; Grof and Halifax, 1977; Grof, 1980). While a detailed discussion concerning the range of possible hallucinogen effects will enhance safety by psychologically preparing the participant for the unique and often intense effects of a hallucinogen, it may also serve to undermine the blind. That is, such preparation may train the participant on how to identify a hallucinogen by its effects. Nonetheless, the primary concern must be the participant's safety. Therefore, researchers must minimize the potential for unblinding by manipulating other aspects of the experimental design, such using hallucinogen-naïve participants or the use of an active placebo (e.g. Griffiths, *et al.*, 2006).

The volunteers should be given guidance on how to handle difficult hallucinogen experiences. Whether the disturbance consists of frightening illusions or internal imagery, difficult thoughts and feelings about some past or present personal issue, or anxiety related to a radical change in sense of self (e.g. temporary loss of self-identity), the volunteer is encouraged to mentally surrender to the experience, trusting that her or his usual state of consciousness will return when the drug effects resolve (Blewett and Chwelos, 1959; Masters and Houston, 1966; McCabe, 1977). For example, if the participant experiences disturbing internal imagery of a demon or monster, he or she is encouraged to mentally approach the figure and interact with it (e.g. imagine asking the figure why it has appeared), rather than attempt to flee from the disturbing imagery. The participant should be alerted that sometimes people experience extremely convincing sensations of dissolving, melting, exploding and so forth, and that the best way to deal with all such situations is to surrender to the experience, subjectively allowing oneself to dissolve, melt or explode. Similar advice applies to physical symptoms such as nausea; for example, participants may be encouraged to 'dive in' to their stomachs, which may alleviate the nausea, as it has been suggested anecdotally that nausea and other somatic discomforts may in part be of a psychosomatic nature (Blewett and Chwelos, 1959; Masters and Houston, 1966).

The preparation of volunteers for hallucinogen administration will require balancing the ethical requirements to prepare the volunteer for the potentially powerful psychological effects of hallucinogens, with the scientific concern not to bias the volunteer with respect to the dependent variables. This is especially true because classical hallucinogens have been shown to increase suggestibility in an experimental model involving body sway (Sjoberg and Hollister, 1965; Middlefell, 1967), and suggestibility has been proposed as a potential mechanism of the possible therapeutic efficacy of hallucinogens (Dobkin de Rios, *et al.*, 2002; Barbosa, *et al.*, 2005). That is, one could argue that examples conveyed during preparation are then experienced during the session only due to an increased level of suggestibility during hallucinogen action.

Increased suggestibility would seem to be of greatest concern as a confound when investigating the phenomenology of subjective hallucinogen-occasioned experience (e.g. the study by Griffiths, *et al.* (2006), demonstrating that psilocybin can occasion mystical-type experiences under supportive conditions). In the study by Griffiths, *et al.* (2006), although experiences of a spiritual variety were included among the range of possible effects conveyed in preparation, the monitors emphasized that these experiences were not the only variety of interesting or valuable effects that might occur. Specific categories of mystical-type experience to be assessed in measures were not discussed. In the Johns Hopkins studies, we have not encouraged participants to read the diverse and widely varying published accounts of hallucinogen effects as part of their preparation, because this may introduce compelling idiosyncratic expectations. Our research has proceeded safely by delivering all such preparatory information to participants verbally during pre-session meetings with monitors. Researchers will need to design studies such that a maximum amount of preparation is provided for safety reasons, while not confounding the particular hypotheses being studied. Furthermore, controlled studies should ensure that the unique preparation methods and research environment qualities described herein are in place, under double-blind conditions, for both hallucinogen and placebo groups (or conditions). For example, in the study by Griffiths, *et al.* (2006), the use of identical procedures under double-blind conditions for psilocybin sessions and the active placebo (a high dose of methylphenidate) sessions permitted a reasonable degree of control over suggestibility.

### Conduct of hallucinogen administration sessions

As with research with many other psychoactive drugs, a physician should be available during hallucinogen sessions, should any untoward medical complications arise. Furthermore, medication for the treatment of acute hypertension (e.g. intravenous labetalol) should be immediately available in the event that blood pressure exceeds predetermined safety parameters.

Adverse psychological reactions to hallucinogens will be minimized when studies are conducted under conditions that provide strong interpersonal support to the participants (Blewett and Chwelos, 1959; Chwelos, *et al.*, 1959; Pahnke, 1969; Masters and Houston, 1966). The monitors should carefully observe the participant and be vigilant for signs of psychological distress. If the volunteer needs to walk to complete study tasks or to go to the rest room, the monitors should stand close by to assist by gently holding an arm or shoulder. Even with high doses of hallucinogens, individuals do not typically show substantial motor impairment, and will likely be able to ambulate without considerable difficulty (with the exception of hallucinogens such as parenteral DMT with abrupt effects and short duration of action). However, perceptual and proprioceptive effects may make walking disorienting, which is why gentle guidance may be helpful. One of the monitors should always be present in the session room with the participant. Because the session monitors will have developed rapport and

trust with the participant, they should be the only people to interact with the volunteer during the course of hallucinogen action, barring any non-routine event (e.g. fire alarm, medical intervention by a specialist). Individuals who are anticipated to have contact with the volunteer during the course of hallucinogen action (e.g. nurse, physician) should have at least met with the volunteer once prior to session to develop some degree of rapport and trust.

For all but the shortest acting hallucinogens (e.g. parenteral DMT), the participant is likely to need to use the restroom at some point while experiencing hallucinogen effects. If a private restroom is not available, then study staff should escort the volunteer to assure that no one is in the restroom. Either the restroom door needs to have no lock, or study staff should have a key readily available if needed. Cohen (1960) reported a case in which a depressed patient who had been administered LSD barricaded himself into a room to attempt suicide. In the Johns Hopkins studies, sessions are conducted in a room located on the third floor of a research facility. The session room itself has a private restroom just outside of the session room. During sessions, the volunteer is closely escorted to the restroom and a session monitor waits just outside the restroom to be available if the volunteer should encounter any difficulties. Furthermore, waiting in this area outside the restroom allows the monitors to ensure that the volunteer does not exit the research site. Any attempt by a disoriented volunteer to leave the session area would be met with compassionate but firm direction to return to the session room.

Serious attention must be devoted to the possibility of volunteers trying to leave the study site under the influence of a hallucinogen. Walter Pahnke's (1963) dissertation study (known as the 'Good Friday Experiment') examined the ability of a high dose of psilocybin to occasion mystical experiences by administering either psilocybin or placebo (randomly assigned) to seminary students in a small, basement chapel into which a Good Friday service from the main sanctuary was broadcast. A retrospective investigation conducted over 25 years after the original experiment revealed that two volunteers left the chapel under the influence of psilocybin (Doblin, 1991). One of these volunteers reported feeling imprisoned in the chapel and left the chapel during a portion of the experiment. The other volunteer abruptly left the chapel believing that God had chosen him to immediately announce to the world the dawning of an age of peace (Roberts and Jesse, 1997; Smith, 2000). This volunteer was apprehended by the research staff and administered the antipsychotic agent chlorpromazine after efforts to calm him were unsuccessful (Doblin, 1991; Roberts and Jesse, 1997; Smith, 2000). Strassman (2001) also reported an incident in which a participant experiencing the full effects of a high dose of psilocybin evaded the research staff and left the research site. Fortunately, the participant's spouse monitored the participant and no one was injured.

The risks of allowing a research volunteer experiencing the effects of a hallucinogen to leave the study site are significant. For example, in a bewildered or delusional state, the person might walk into traffic or attempt to drive. Although many hallucinogen users maintain reasonable control while under the influence of hallucinogens, panic or delusional reactions to hallucinogens have in rare circumstances resulted in tragic consequences, such as jumping out of windows (Keeler and Reifler, 1967; Reynolds and Jindrich, 1985; Reitman and Vasilakis, 2004; O'Brien, 2006). Interestingly, the volunteer who fled Strassman's (2001) study site on psilocybin was a carefully screened, experienced LSD user. Therefore, it is imperative for safety reasons that the study site environment, session procedures and participant preparation all minimize the chance of a volunteer leaving the study site.

Strategies for handling non-routine scenarios should be considered. For example, how are study monitors and the volunteer expected to respond in the event of a fire alarm or fire? On the single occasion at Johns Hopkins in which a fire alarm sounded during a session, the two study monitors closely escorted the volunteer outside, making sure to minimize contact with other individuals. The three of them walked to a nearby quiet area with an attractive landscape and enjoyed the scenery until the volunteer and monitors could return to the building. The monitors encouraged the participant to view the occasion as an opportunity to enjoy the natural world outdoors (something normally unavailable during sessions), rather than as an impediment to having a successful session. If any non-routine events occur, the monitors should maintain contact with the volunteer throughout.

If participants become anxious during the course of hallucinogen action, it is now widely recognized that the appropriate first response is to provide strong personal support and reassurance (O'Brien, 2006). This primarily includes interacting with the volunteer in a comforting and reassuring manner. If the volunteer is behaving anxiously and a negative psychological reaction seems to be escalating, the monitors should convey a solid sense of security and calm, while empathizing with what may be an incredibly intense and unpleasant experience. Attempts to 'talk down' the participant (i.e. the use of reality-defining techniques to distract the participant from or attenuate the altered state of consciousness) may be counterproductive and aggravate a difficult reaction (McCabe, 1977). Instead, participants should be reminded to surrender to the experience. Appropriate forms of reassurance may include a supportive touch to the arm or shoulder with verbal reminders that the participant is in a research study, has taken the hallucinogen, and that he or she will return to normal consciousness in 'a few minutes' or 'a few hours' (or whatever the appropriate estimate may be, depending on the specific drug under study and when it was administered). During an intense hallucinogen-occasioned experience when verbal interactions may be of limited help, a powerful form of reassurance (sometimes called 'interpersonal grounding') is simply holding the hand of the participant (McCabe, 1977). Many volunteers report that during such experiences, a reassuring hand provides an incredible sense of stability and connection. Monitors should demonstrate this practice during preparation to normalize hand holding during sessions.

If volunteers have been appropriately screened and the guidelines herein followed, reassurance should be sufficient to diffuse acute psychological distress in the vast majority of cases. For example, in recent studies in our laboratory, in which we have administered high doses of psilocybin to 54 volunteers, reassurance has been sufficient to handle all cases of acute psychological distress that have arisen. Although pharmacological intervention is a last resort and should rarely, if ever, be needed, medications should be readily available for use if the need arise. For cases in which acute psychological distress is insufficiently managed with reassurance alone, treatment with a benzodiazepine anxiolytic is the pharmacological intervention of choice (Abraham and Aldridge, 1993; Frecska and Luna, 2006; O'Brien, 2006). In these cases, we recommend a 10 mg oral dose of diazepam (Grinspoon and Bakalar, 1979), although oral doses of 15  30 mg per hour or every few hours as needed have been recommended for pharmacological treatment of 'bad trips' that do not respond to reassurance in emergency department settings (Ungerleider and Frank, 1976). Because of its high lipid solubility, diazepam has a more rapid onset, a shorter time until peak plasma concentration and a shorter duration of therapeutic action than many other benzodiazepines including lorazepam, despite the fact that lorazepam has a shorter elimination half-life (Greenblatt and Shader, 1985; Funderburk, *et al.*, 1988). Although the intravenous route may be considered, the oral route is preferable because intravenous injection procedures may further exacerbate the participant's anxiety. Moreover, antipsychotic medications (e.g. risperidone, olanzapine) should be available in the event that an adverse reaction escalates to unmanageable psychosis. However, experienced clinicians have suggested that although antipsychotic medications may reduce psychotic behaviour through sedation, their use may be problematic because the effects may be abrupt, unpleasant and intense and their use may result in subsequent psychological problems (McCabe, 1977; Grinspoon and Bakalar, 1979; Grof, 1980). Furthermore, pretreatment with the antipsychotic haloperidol has been shown to exacerbate the psychosis-like effects of psilocybin (Vollenweider, *et al.*, 1998), suggesting that haloperidol should not be used as a rescue medication. Although not approved for use in the USA, ketanserin (a $5\text{-HT}_{2A}$ antagonist) pretreatment has been shown to attenuate psilocybin effects (Vollenweider, *et al.*, 1998), suggesting possible use as a rescue medication for hallucinogen administration. Ultimately the decision to medicate will depend on whether the monitors and responsible physician judge that they are capable of maintaining the safety of the volunteer and others without medical intervention. Bringing the participant to the emergency department represents an ultimate 'last resort' in the treatment of a very difficult (i.e. psychotic) reaction. However, medical evaluation by well-meaning emergency department personnel, who are inexperienced with hallucinogen effects can readily escalate and prolong an adverse reaction. Therefore, all possible efforts should be made to treat a difficult experience in the session context, even if pharmacological intervention is required.

The conduct of the session will largely be based on the particular research topics being studied. The research requirements of many types of studies will require the participants to adhere to regimented testing conditions (e.g. cognitive tests, memory tests, brain scans). In such investigations, interference with procedures may be minimized by judiciously selecting dose and the hallucinogen experience level required of volunteers. Adverse reactions will generally be more likely at higher hallucinogen doses; however, adverse reactions can potentially occur at any dose level. Experienced hallucinogen users may be particularly appropriate participants for studies involving challenging conditions, such as remaining immobile for long periods in a confining brain imaging scanner. Regardless of experience level and dose, however, the possibility of psychological adverse reactions exists whenever a hallucinogen is administered. To the degree possible, investigators should attempt to implement their scientific protocols as planned. However, monitors should always be vigilant for potential adverse psychological reactions. In the event of a significant adverse psychological reaction, interpersonal support should be provided even if it interferes with data collection. Clearly, volunteer safety must take priority over scientific procedures. In studies such as ours, in which participants are encouraged to focus their attention inward by wearing eyeshades and listening to music through headphones, our advice is for monitors to occasionally probe the volunteer's psychological well-being (e.g. ask the volunteer, 'Would you like to describe where you find yourself?') to ensure that the volunteer is not experiencing significant anxiety and is in need of support.

For studies that investigate potential therapeutic effects or the phenomenology of hallucinogen experiences (i.e. studies that do not require participants to engage in research tasks during the session), the employment of eyeshades and headphones (through which supportive music is played) may contribute to safety by reducing the distractions of environmental stimuli and social pressures to verbally interact with research personnel. This may be especially important for volunteers who are experiencing the effects of a hallucinogen for the first time. Typically, we have kept eyeshades and headphones in place for most of the session. In the latter hours of the session some time is spent with the volunteer sitting on the couch, interacting without eyeshades and headphones, although music may still be played through speakers to provide nonverbal structure and continuity. As a whole, we encourage our participants to 'collect experiences' to discuss after the drug effects have abated, and discourage attempts to analyse material or communicate excessively while the atypical states of consciousness are still occurring.

After the effects of the hallucinogen have resolved, the participant should either be released into the care of a friend or family member or required to stay overnight at the research site for monitoring. If participants are released from the study site after the session, they should be instructed not to drive an automobile or engage in any other potentially dangerous activity for the remainder of the day. At Johns Hopkins, volunteers are released into the care of a friend or family

616    *Hallucinogen safety*

member, who has been appropriately oriented by our staff to be available to emotionally support the participant, but also to provide space (i.e. be in another room) if the participant feels the need to be alone. We have also given the participant the primary monitor's pager number to call if he or she feels the need for support that evening. Of the 54 volunteers tested at a high psilocybin dose to date, no one has paged the monitor, although volunteers do seem to appreciate this opportunity for additional support.

### Post-session procedures

After the session, safety monitoring should continue in the form of one or more post-session meetings (typically the next day) between the primary monitor and participant to ensure psychological stability and provide an opportunity for the volunteer to discuss thoughts or feelings from the session. As with any acute, intense positive or negative emotional experience, participants often feel the need for, and seem to benefit from, additional time for reflecting on the novel thoughts and feelings that may have arisen in the session. Given the potentially intense and unusual psychological nature of hallucinogen effects, the volunteer may have difficulty discussing the experience with others in her or his life. Because the monitors were present during the session when the hallucinogen effects were experienced and have knowledge of a broad range of reported phenomena during drug action, the volunteer may feel more comfortable discussing her or his experience with the monitors than with others. This follow-up contact also allows the assessment of any potentially persisting adverse effects, including perceptual abnormalities. More than one post-session meeting may be necessary if the volunteer is experiencing psychological difficulty concerning thoughts and feelings encountered during the session. Of the 54 volunteers tested with a high dose of psilocybin at Johns Hopkins to date, none has shown evidence of persisting psychosis or psychological problems related to their sessions, and all have returned to their normal daily activities. If the primary session monitor is not a clinically trained psychologist or psychiatrist, it is prudent for research teams to have available for consultation a clinically trained psychologist or psychiatrist familiar with altered states of consciousness, who can work with patients who appear to have developed psychological difficulties stemming from hallucinogen administration.

### Concluding remarks

After a decades-long period of dormancy in response to the sensationalism surrounding the nonmedical use of hallucinogens during the 1960s, human hallucinogen research has resumed in the USA and Europe, and is now beginning to address a variety of important basic research questions as well as potential therapeutic applications (Nichols, 2004). In light of the unusual history of restriction on human research with this class of compounds, it is critical for investigators to implement

appropriate and conservative safeguards. With such safeguards this class of compounds can be studied safely in humans. Careless research that lacks attention to the unique risk profile of hallucinogens may not only endanger the safety and well-being of the research participants, but may also jeopardize future human research with these scientifically fascinating compounds. On the other hand, carefully conducted research that respects hallucinogens' unique and often powerful psychological effects may potentially inform the treatment of various psychiatric disorders, as well as lead to significant advances in our understanding of perception, cognition, behaviour, the psychology of religion and the biological underpinnings of consciousness.

### Acknowledgements

Support for preparation of this manuscript was provided by grants from NIH (R01 DA03889), the Council on Spiritual Practices and the Heffter Research Institute. We thank George Greer, MD, Charles Grob, MD, Robert Jesse, Annie Umbricht, MD and Franz Vollenweider, MD for helpful comments on previous versions of this manuscript. We also thank the staff of the Johns Hopkins psilocybin research studies, whose insights have contributed to these guidelines, including Mary P. Cosimano, MSW and Brian D. Richards, Psy.D. for their roles in screening volunteers and monitoring sessions, and Lawrence P. Carter, PhD, Ryan K. Lanier, PhD, Benjamin McKay, Chad J. Reissig, PhD, and Ryan G. Vandrey, PhD for their assistance in monitoring sessions.

### References

Abraham, HD, Aldridge, AM (1993) Adverse consequences of lysergic acid diethylamide. Addiction *88*: 1327–1334.

Abramson, HA (ed) (1960) The Use of LSD in Psychotherapy. New York: Josiah Macy Jr. Foundation Publications.

Abramson, HA (ed) (1963) The Use of LSD in Psychotherapy and Alcoholism. New York: Bobbs-Merrill.

Abuzzahab, FS, Anderson, BJ (1971) A review of LSD treatment in alcoholism. Int Pharmacopsychiatry *6*: 223–235.

American Psychiatric Association (2000) DSM-IV-TR: Diagnostic and Statistical Manual of Mental Disorders, Text Revision. Fourth ed. Washington, DC: American Psychiatric Association.

Baggott, MJ, Erowid, E, Erowid, F, Robertson, LC (2006) Chronic visual changes in hallucinogen users: a web-based questionnaire. Poster presented at the 2006 meeting of the College on Problems of Drug Dependence, Scottsdale, AZ.

Barbosa, PC, Giglio, JS, Dalgalarrondo, P (2005) Altered states of consciousness and short-term psychological after-effects induced by the first time ritual use of *ayahuasca* in an urban context in Brazil. J Psychoactive Drugs *37*: 193–201.

Bender, L, Siva Sankar, DV (1968) Chromosome damage not found in leukocytes of children treated with LSD-25. Science *159*: 749.

Blewett, DB, Chwelos, N (1959) Handbook for the Therapeutic Use of Lysergic Acid Diethylamide-25: Individual and Group Procedures. http://www.erowid.org/psychoactives/guides/handbook_lsd25.shtml [accessed 9.10.07].

Bonson, KR, Buckholtz, JW, Murphy, DL (1996) Chronic administration of serotonergic antidepressants attenuates the subjective effects of LSD in humans. Neuropsychopharmacology *14*: 425–436.

Bonson, KR, Murphy, DL (1996) Alterations in responses to LSD in humans associated with chronic administration of tricyclic

antidepressants, monoamine oxidase inhibitors or lithium. Behav Brain Res *73*: 229–233.

Buchanan, RW, Carpenter, WT (2005) Concept of Schizophrenia. In: Sadock, RJ, Sadock, VA (eds), Kaplan and Sadock's Comprehensive Textbook of Psychiatry, vol. 1, eighth ed. Philadelphia: Lippincott, William, Wilkins, pp. 1329–1345.

Callaway, JC, Grob, CS (1998) *Ayahuasca* preparations and serotonin reuptake inhibitors: a potential combination for severe adverse interactions. J Psychoactive Drugs *30*: 367–369.

Carter, OL, Burr, DC, Pettigrew, JD, Wallis, GM, Hasler, F, Vollenweider, FX (2005a) Using psilocybin to investigate the relationship between attention, working memory, and the serotonin 1A and 2A receptors. J Cogn Neurosci *17*: 1497–1508.

Carter, OL, Pettigrew, JD, Burr, DC, Alais, D, Hasler, F, Vollenweider, FX (2004) Psilocybin impairs high-level but not low-level motion perception. Neuroreport *15*: 1947–1951.

Charney, DS, Mihic, SJ, Harris, RA (2006) Hypnotics and sedatives. In: Brunton, LL, Lazo, JS, Parker, KL (eds), Goodman & Gilman's The Pharmacological Basis of Therapeutics, eleventh edition. New York: McGraw-Hill, pp. 401–427.

Chwelos, N, Blewett, DB, Smith, CM, Hoffer, A (1959) Use of d-lysergic acid diethylamide in the treatment of alcoholism. Quart, J Stud Alcohol *20*: 577–590.

Cohen, MM, Hirschhorn, K, Frosch, WA (1967a) In vivo in vitro chromosomal damage induced by LSD-25. N Engl J Med *277*: 1043–1049.

Cohen, MM, Marinello, MJ, Back, N (1967b) Chromosomal damage in human leukocytes induced by lysergic acid diethylamide. Science *155*: 1417–1419.

Cohen, S (1960) Lysergic acid diethylamide: side effects and complications. J Nerv Ment Dis *130*: 30–40.

Cohen, S (1965) LSD and the anguish of dying. Harpers Mag *231*: 69–78.

Cohen, S, Ditman, KS (1962) Complications associated with lysergic acid diethylamid (LSD-25). JAMA *181*: 161–162.

Council on Spiritual Practices (2001) Code of ethics for spiritual guides (appendix B). In: Roberts, TB (ed), Psychoactive Sacramentals: Essays on Entheogens and Religion. San Francisco: Council on Spiritual Practices, pp. 250–251.

Crochet, R, Sandison, R, Walk, A (eds) (1963) Hallucinogenic Drugs and Their Psychotherapeutic Use. Springfield, IL: Thomas.

Dishotsky, NI, Loughman, WD, Mogar, RE, Lipscomb, WR (1971) LSD and genetic damage. Is LSD chromosome damaging, carcinogenic, mutagenic, or teratogenic? Science *172*: 431–440.

Dittrich, A (1993) Psychological aspects of altered states of consciousness of the LSD type: measurement of their basic dimensions and prediction of individual differences. In: Pletscher, A, Ladewig, D (eds), Fifty years of LSD Concurrent status and perspectives of hallucinogens. New York: Parthenon, pp. 101–118.

Dobkin de Rios, M, Grob, CS, Baker, JR (2002) Hallucinogens and redemption. J Psychoactive Drugs *34*: 239–248.

Doblin, R (1991) Pahnke's "Good Friday Experiment": a long-term follow-up and methodological critique. J Transpers Psychol *23*: 1–28.

Fabing, HD (1955) New blocking agent against the development of LSD-25 psychosis. Science *121*: 208–210.

Fantegrossi, WE, Woods, JH, Winger, G (2004) Transient reinforcing effects of phenylisopropylamine and indolealkylamine hallucinogens in rhesus monkeys. Behav Pharmacol *15*: 149–157.

Fiorella, D, Helsley, S, Rabin, RA, Winter, JC (1996) Potentiation of LSD-induced stimulus control by fluoxetine in the rat. Life Sci *59*: PL283–PL287.

First, MB, Spitzer, RL, Gibbon, M, Williams, JBW (2001) Structured clinical interview for DSM-IV-TR Axis 1 Disorders Research Version Patient Edition (SCID-I/P) Biometrics Research. New York: New York State Psychiatric Institute.

Fischman, MW, Johanson, CE (1998) Ethical and practical issues involved in behavioral pharmacology research that administers drugs of abuse to human volunteers. Behav Pharmacol *9*: 479–498.

Frecska, E, Luna, LE (2006) The adverse effects of hallucinogens from intramural perspective. Neuropsychopharmacol Hung *8*: 189–200.

Funderburk, FR, Griffiths, RR, McLeod, DR, Bigelow, GE, Mackenzie, A, Liebson, IA, *et al.* (1988) Relative abuse liability of lorazepam and diazepam: an evaluation in 'recreational' drug users. Drug Alcohol Depend *22*: 215–222.

Gable, RS (1993) Toward a comparative overview of dependence potential and acute toxicity of psychoactive substances used nonmedically. Am JDrug Alcohol Abuse *19*: 263–281.

Gable, RS (2004) Comparison of acute lethal toxicity of commonly abused psychoactive substances. Addiction *99*: 686–696.

Glennon, RA, Titeler, M, McKenney, JD (1984) Evidence for 5-HT2 involvement in the mechanism of action of hallucinogenic agents. Life Sci *35*: 2505–2511.

Gonzales, VO Centro Espirita Beneficente União do Vegetal 546 US (2006). US Supreme Court, no 04–1084, decided 21 February 2006.

González-Maeso, J, Weisstaub, NV, Zhou, M, Chan, P, Ivic, L, Ang, R, *et al.* (2007) Hallucinogens recruit specific cortical 5-HT(2A) receptor-mediated signaling pathways to affect behavior. Neuron *53*: 439–452.

Gouzoulis-Mayfrank, E, Heekeren, K, Neukirch, A, Stoll, M, Stock, C, Daumann, J, *et al.* (2006) Inhibition of return in the human 5HT$_{2A}$ agonist and NMDA antagonist model of psychosis. Neuropsychopharmacology *31*: 431–441.

Gouzoulis-Mayfrank, E, Heekeren, K, Neukirch, A, Stoll, M, Stock, C, Obradovic, M, *et al.* (2005) Psychological effects of (S)-ketamine and N,N-dimethyltryptamine (DMT): a double-blind, cross-over study in healthy volunteers. Pharmacopsychiatry *38*: 301–311.

Gouzoulis-Mayfrank, E, Heekeren, K, Thelen, B, Lindenblatt, H, Kovar, KA, Sass, H, *et al.* (1998a) Effects of the hallucinogen psilocybin on habituation and prepulse inhibition of the startle reflex in humans. Behav Pharmacol *9*: 561–566.

Gouzoulis-Mayfrank, E, Schneider, F, Friedrich, J, Spitzer, M, Thelen, B, Sass, H (1998b) Methodological issues of human experimental research with hallucinogens. Pharmacopsychiatry *31*: 114–118.

Gouzoulis-Mayfrank, E, Thelen, B, Habermeyer, E, Kunert, HJ, Kovar, KA, Lindenblatt, H, *et al.* (1999) Psychopathological, neuroendocrine and autonomic effects of 3,4-methylenedioxyethyl amphetamine (MDE), psilocybin and d-methamphetamine in healthy volunteers Results of an experimental double-blind placebo-controlled study. Psychopharmacology (Berl) *142*: 41–50.

Gouzoulis-Mayfrank, E, Thelen, B, Maier, S, Heekeren, K, Kovar, KA, Sass, H, *et al.* (2002) Effects of the hallucinogen psilocybin on covert orienting of visual attention in humans. Neuropsychobiology *45*: 205–212.

Greenblatt, DJ, Shader, RI (1985) Clinical pharmacokinetics of the benzodiazepines. In: Smith, DE, Wesson, DR (eds), The Benzodiazepines: Current Standards for Medical Practice. Lancaster, PA: MTP Press, pp. 43–58.

Griffiths, RR, Bigelow, GE, Henningfield, JE (1980) Similarities in animal and human drug-taking behavior. Adv Subst Abuse *1*: 1–90.

618   *Hallucinogen safety*

Griffiths, RR, Richards, WA, McCann, U, Jesse, R (2006) Psilocybin can occasion mystical-type experiences having substantial and sustained personal meaning and spiritual significance. Psychopharmacology *187*: 268–283.

Grinspoon, L, Bakalar, JB (1979) Psychedelic Drugs Reconsidered. New York: Basic Books.

Grob, CS (2005) Psilocybin research with advanced-stage cancer patients. Multidisciplinary Association for Psychedelic Studies (MAPS) Bulletin *15(3)*: 8.

Grob, CS, Greer, GR, Mangini, M (1998) Hallucinogens at the turn of the century: an introduction. J Psychoactive Drugs *30*: 315–319.

Grob, CS, McKenna, DJ, Callaway, JC, Brito, GS, Neves, ES, Oberlaender, G, *et al.* (1996) Human psychopharmacology of hoasca, a plant hallucinogen used in ritual context in Brazil. J Nerv Ment Dis *184*: 86–94.

Grof, S (1977) Perinatal roots of wars, totalitarianism, and revolutions: observations from LSD research. J Psychohist *4*: 269–308.

Grof, S (1980) LSD Psychotherapy. Pomona, CA: Hunter House.

Grof, S, Goodman, LE, Richards, WA, Kurland, AA (1973) LSD-assisted psychotherapy in patients with terminal cancer. Int Pharmacopsychiatry *8*: 129–144.

Grof, S, Halifax, J (1977) The Human Encounter with Death. New York: EP Dutton.

Gutstein, HB, Akil, H (2006) Opioid analgesics. In: Brunton, LL, Lazo, JS, Parker, KL (eds), Goodman & Gilman's The Pharmacological Basis of Therapeutics, eleventh ed. New York: McGraw-Hill, pp. 547–590.

Halpern, JH (1996) The use of hallucinogens in the treatment of addiction. Addict Res *4*: 177–189.

Halpern, JH, Pope, HG (1999) Do hallucinogens cause residual neuropsychological toxicity. Drug Alcohol Depend *53*: 247–256.

Halpern, JH, Pope, HG (2003) Hallucinogen persisting perception disorder: what do we know after 50 years. Drug Alcohol Depend *69*: 109–119.

Halpern, JH, Sherwood, AR, Hudson, JI, Yurgelun-Todd, D, Pope, HG (2005) Psychological and cognitive effects of long-term peyote use among Native Americans. Biol Psychiatry *58*: 624–631.

Harner, MJ (1962) Jivaro Souls. Am Anthropol *64*: 258–272.

Harner, MJ (1968) The sound of rushing water. Natural History Magazine, *77*: 28–33, 60–61.

Harvard Mental Health Letter (2006) Reviving the study of hallucinogens (editorial). Harv Ment Health Lett *23*: 5.

Hasler, F, Bourquin, D, Brenneisen, R, Bär, T, Vollenweider, FX (1997) Determination of psilocin and 4-hydroxyindole-3-acetic acid in plasma by HPLC-ECD and pharmacokinetic profiles of oral and intravenous psilocybin in man. Pharm Acta Helv *72*: 175–184.

Hasler, F, Bourquin, D, Brenneisen, R, Vollenweider, FX (2002) Renal excretion profiles of psilocin following oral administration of psilocybin: a controlled study in man. J Pharm Biomed Anal *30*: 331–339.

Hasler, F, Grimberg, U, Benz, MA, Huber, T, Vollenweider, FX (2004) Acute psychological and physiological effects of psilocybin in healthy humans: a double-blind, placebo-controlled dose-effect study. Psychopharmacology *172*: 145–156.

Hidalgo, WT (1960) Estudio comparativo psicofisiologico de la mescalina, dietilamida del acido D-lisérgico y psilocybina. Acta Med Venez *8*: 56–62.

Hoch, PH, Pennes, HH, Cattell, JP (1953) Psychoses produced by administration of drugs. Res Publ Assoc Res Nerv Ment Dis *32*: 287–296.

Hoffer, A, Callbeck, MJ (1960) Drug-induced schizophrenia. J Ment Sci *106*: 138–159.

Hollister, LE (1961) Clinical, biochemical and psychologic effects of psilocybin. Arch Int Pharmacodyn Ther *130*: 42–52.

Hollister, LE, Hartman, AM (1962) Mescaline, lysergic acid diethylamide and psilocybin: comparison of clinical syndromes, effects on color perception and biochemical measures. Compr Psychiatry *3*: 235–241.

Hollister, LE, Shelton, J, Krieger, G (1969) A controlled comparison of lysergic acid diethylamide (LSD) and dextroamphetamine in alcoholics. Am J Psychiatry *125*: 1352–1357.

Irwin, S, Egozcue, J (1967) Chromosomal abnormalities in leukocytes from LSD-25 user. Science *157*: 313–314.

Isbell, H (1959) Comparison of the reactions induced by psilocybin and LSD-25 in man. Psychopharmacologia *1*: 29–38.

Kast, E (1967) Attenuation of anticipation: a therapeutic use of lysergic acid diethylamide. Psychiatr Q *41*: 646–657.

Kast, EC, Collins, VJ (1964) Lysergic acid diethylamide as an analgesic agent. Anesth Analg *43*: 285–291.

Keeler, MH, Reifler, CB (1967) Suicide during an LSD reaction. Am J Psychiatry *123*: 884–885.

Kuramochi, H, Takahashi, R (1964) Psychopathology of LSD intoxication; Study of experimental psychosis induced by LSD-25: description of LSD symptoms in normal oriental subjects. Arch Gen Psychiatry *11*: 151–161.

Kurland, AA (1985) LSD in the supportive care of the terminally ill cancer patient. J Psychoactive Drugs *17*: 279–290.

Kurland, A, Savage, C, Pahnke, WN, Grof, S, Olsson, JE (1971) LSD in the treatment of alcoholics. Pharmakopsychiatr Neuropsychopharmakol *4*: 83–94.

Kurland, AA, Grof, S, Pahnke, WN, Goodman, LE (1973) Psychedelic drug assisted psychotherapy. In: Goldberg, IK, Malitz, S, Kutscher, AH (eds), Patients With Terminal Cancer Psychotheramacological Agents for the Terminally Ill and Bereaved. New York: Columbia University Press, pp. 86–133.

Kurland, AA, Pahnke, WN, Unger, S, Savage, C, Goodman, E (1969) Psychedelic psychotherapy (LSD) in the treatment of the patient with a malignancy. In: Cerletti, A, Bove, FJ (eds), The Present Status of Psychotropic Drugs: Pharmacological and Clinical Aspects. Amsterdam, Holland: Excerpta Medica, pp. 432–434.

Lancet (2006) Reviving research into psychedelic drugs (editorial). Lancet *367*: 1214.

Leary, T (1964) The religious experience: Its production and interpretation. Psychedelic Rev *1*: 324–346.

Leary, T, Litwin, GH, Metzner, R (1963) Reactions to psilocybin administered in a supportive environment. J Nerv Ment Dis *137*: 561–573.

Leary, T, Metzner, R, Alpert, R (1964) The Psychedelic Experience: A Manual Based on the Tibetan Book of the Dead. New York: Citadel Press.

Lee, MA, Shlain, B (1992) Acid dreams: The Complete Social History of LSD: The CIA, the Sixties, and Beyond, Revised Edition. New York: Grove Press.

Lerner, AG, Gelkopf, M, Skladman, I, Oyffe, I, Finkel, B, Sigal, M, *et al.* (2002) Flashback and hallucinogen persisting perception disorder: clinical aspects and pharmacological treatment approach. Isr JPsychiatry Relat Sci *39*: 92–99.

Leuner, H (1962) Die Experimentelle Psychose. Berlin: Springer.

Long, SY (1972) Does LSD induce chromosomal damage and malformations? a review of the literature. Teratology *6*: 75–90.

Lowy, B (1971) New records of mushroom stones from Guatemala. Mycologia *63*: 983–993.

Ludwig, A, Levine, J, Stark, L, Lazar, R (1969) A clinical study of LSD treatment in alcoholism. Am J Psychiatry *126*: 59–69.

Malitz, S, Esecover, H, Wilkens, B, Hoch, H (1960) Some observations on psilocybin: a new hallucinogen in volunteer subjects. Compr Psychiatry *1*: 8–17.

Mangini, M (1998) Treatment of alcoholism using psychedelic drugs: a review of the program of research. J Psychoactive Drugs *30*: 381–418.

Masters, REL, Houston, J (1966) The Varieties of Psychedelic Experience. New York: Holt, Rinehart & Winston.

McCabe, OL (1977) Psychedelic drug crises: toxicity and therapeutics. J Psychedelic Drugs *9*: 107–121.

McGlothlin, WH, Arnold, DO (1971) LSD revisited A ten-year follow-up of medical LSD use. Arch Gen Psychiatry *24*: 35–49.

Metzner, R (1985) Forward. In: Adamson, S (ed). Through the Gateway of the Heart: Accounts of Experiences with MDMA and other Empathogenic Substances. San Francisco: Four Trees Press.

Metzner, R (2004) Introduction: visionary mushrooms of the Americas. In: Metzner, R, Darling, DC (eds), Teonanácatl: Sacred Mushroom of Visions. El Verano, CA: Four Trees Press, pp. 1–48.

Metzner, R, Litwin, G, Weil, G (1965) The relation of expectation and mood to psilocybin reactions: a questionnaire study. Psychedelic Rev *5*: 3–39.

Middlefell, R (1967) The effects of LSD on body sway suggestibility in a group of hospital patients. Br J Psychiatry *113*: 277–280.

Mogar, RE, Aldrich, RW (1969) The use of psychedelic agents with autistic schizophrenic children. Psychedelic Rev *10*: 5–13.

Moreno, FA, Wiegand, CB, Taitano, EK, Delgado, PL (2006) Safety, tolerability, and efficacy of psilocybin in 9 patients with obsessive-compulsive disorder. J Clin Psychiatry *67*: 1735–1740.

Morris, K (2006) Hallucinogen research inspires "neurotheology". Lancet Neurol *5*: 732.

Moss, EL, Dobson, KS (2006) Psychology, spirituality, and end-of-life care: an ethical integration? Can Psychol *47*: 284–299.

National Institute on Drug Abuse (2001) Hallucinogens and dissociative drugs. National Institute on Drug Abuse, Research Report Series NIH Publication No 01-4209.

National Institute on Drug Abuse (2006) LSD, NIDA Infofacts. Rockville, MD: National Institute on Drug Abuse.

Nichols, DE (2004) Hallucinogens. Pharmacol Ther *101*: 131–181.

Nichols, DE, Hoffman, AJ, Oberlender, RA, Jacob, P, Shulgin, AT (1986) Derivatives of 1-(1,3-benzodioxol-5-yl)-2-butanamine: representatives of a novel therapeutic class. J Med Chem *29*: 2009–2015.

Novak, SJ (1997) LSD before Leary: Sidney Cohen's critique of 1950s psychedelic drug research. Isis *88*: 87–110.

Ott, J (1996) Pharmacotheon: Entheogenic Drugs, their Plant Sources and History. Kennewick, WA: Natural Products Co.

O'Brien, CP (2006) Drug addiction and drug abuse. In: Brunton, LL, Lazo, JS, Parker, KL (eds), Goodman & Gilman's The Pharmacological Basis of Therapeutics, eleventh ed. New York: McGraw-Hill, pp. 607–627.

Pahnke, W (1963) Drugs and mysticism: an analysis of the relationship between psychedelic drugs and the mystical consciousness. Thesis presented to the President and Fellows of Harvard University for the PhD in Religion and Society.

Pahnke, WN (1969) Psychedelic drugs and mystical experience. Int Psychiatry Clin *5*: 149–162.

Pahnke, WN, Kurland, AA, Goodman, LE, Richards, WA (1969) LSD-assisted psychotherapy with terminal cancer patients. In: Hicks, RE, Fink, PJ (eds), Psychedelic Drugs: Proceedings of a Hahnemann Medical College and Hospital Symposium. New York: Grune & Stratton, pp. 33–42.

Passie, T, Seifert, J, Schneider, U, Emrich, HM (2000) The pharmacology of psilocybin. Addict Biol *7*: 357–364.

Patel, JK, Pinals, DA, Breier, A (2003) Schizophrenia and other psychoses. In: Tasman, A, Kay, J, Lieberman, JA (eds), Psychiatry, Vol. 2. Second ed. New Jersey: John Wiley & Sons, Ltd, pp. 1131–1206.

Poling, A, Bryceland, J (1979) Voluntary drug self-administration by nonhumans: a review. J Psychedelic Drugs *11*: 185–190.

Reitman, J, Vasilakis, A (2004) The lost freshman. Rolling Stone Magazine, *944*: 62–66.

Reynolds, PC, Jindrich, EJ (1985) A mescaline associated fatality. J Anal Toxicol *9*: 183–184.

Rhead, JC (1977) The use of psychedelic drugs in the treatment of severely disturbed children: a review. J Psychedelic Drugs *9*: 93–101.

Riba, J, Rodriguez-Fornells, A, Urbano, G, Morte, A, Antonijoan, R, Montero, M, *et al.* (2001) Subjective effects and tolerability of the South American psychoactive beverage *Ayahuasca* in healthy volunteers. Psychopharmacology *154*: 85–95.

Richards, WA (1980) Psychedelic Drug-assisted psychotherapy with persons suffering from terminal cancer. J Altered States Conscious *5*: 309–319.

Richards, WA (2003) Entheogens in the study of mystical and archetypal experiences: Research in the Social Scientific Study of Religion. Brill *13*: 143–155.

Richards, WA (2005) Entheogens in the study of religious experiences: current status. J Religion Health *44*: 377–389.

Richards, WA, Grof, S, Goodman, LE, Kurland, AA (1972) LSD-Assisted psychotherapy and the human encounter with death. J Transpers Psychol *4*: 121–150.

Richards, WA, Rhead, JC, DiLeo, FB, Yensen, R, Kurland, AA (1977) The peak experience variable in DPT-assisted psychotherapy with cancer patients. J Psychedelic Drugs *9*: 1–10.

Richards, WA, Rhead, JC, Grof, S, Goodman, LE, Di Leo, F, Rush, L (1979) DPT as an adjunct in brief psychotherapy with cancer patients. Omega *10*: 9–26.

Rinkel, M, Atwell, CR, DiMascio, A, Brown, J (1960) Experimental Psychiatry, VPsilocybine: A New Psychotogenic Drug. N Engl J Med *262*: 295–299.

Roberts, TB, Jesse, RN (1997) Recollections of the Good Friday Experiment: an interview with Huston Smith. J Transpers Psychol *29*: 99–104.

Ruck, CA, Bigwood, J, Staples, D, Ott, J, Wasson, RG (1979) Entheogens. J Psychedelic Drugs *11*: 145–146.

Rümmele, W, Gnirss, F (1961) Untersuchungen mit Psilocybin, ein psychotropen Substanz aus Psilocybe Mexicana. Schweiz Arch Neurol Neurochir Psychiatr *87*: 365–385.

Savage, C, McCabe, OL (1973) Residential psychedelic (LSD) therapy for the narcotic addict: a controlled study. Arch Gen Psychiatry *28*: 808–814.

Schultes, RE (1969) Hallucinogens of plant origin. Science *163*: 245–254.

Schultes, RE, Hoffman, A, Rätsch, C (2001) Plants of the Gods: Their Sacred, Healing, and Hallucinogenic Powers, Revised Edition. Rochester, VT: Healing Arts Press.

Sessa, B (2005) Can psychedelics have a role in psychiatry once again. Br J Psychiatry *186*: 457–458.

620   *Hallucinogen safety*

Shulgin, AT, Shulgin, A (1991) Pihkal: A Chemical Love Story. Berkeley, CA: Transform Press.

Shulgin, AT, Shulgin, A (1997) Tihkal: The Continuation. Berkeley, CA: Transform Press.

Sjoberg, BM, Hollister, LE (1965) The effects of psychotomimetic drugs on primary suggestibility. Psychopharmacologia *8*: 251–262.

Smart, RG, Storm, T, Baker, EFW, Solursh, L (1966) A controlled study of lysergid in the treatment of alcoholism: The effects on drinking behavior. Quart J Stud Alcohol *27*: 469–485.

Smith, H (2000) Cleansing the Doors of Perceptions: The Religious Significance of Entheogenic Plants and Chemicals. New York: Penguin Putnam Inc.

Snyder, SH (1988) Psychotogenic drugs as models for schizophrenia. Neuropsychopharmcology *1*: 197–199.

Stockings, GT (1940) A clinical study of the mescaline psychosis, with special reference to the mechanism of the genesis of schizophrenia and other psychotic states. J Mental Sciences *86*: 29–47.

Stolaroff, MJ (2004) The Secret Chief Revealed: Conversations with Leo Zeff, Pioneer in the Underground Psychedelic Therapy Movement. Multidisciplinary Association for Psychedelic Studies (MAPS), Sarasota, FL.

Stolz, J, Marsden, C, Middlemiss, D (1983) Effect of chronic antidepressant treatment and subsequent withdrawal on [$^3$H]-5-hydroxytryptamine and [$^3$H]-spiperone binding in rat frontal cortex and serotonin receptor mediated behaviour. Psychopharmacology *80*: 150–155.

Strassman, RJ (1984) Adverse reactions to psychedelic drugs: a review of the literature. J Nerv Ment Dis *172*: 577–595.

Strassman, RJ (1991) Human hallucinogenic drug research in the United States: a present-day case history and review of the process. J Psychoactive Drugs *23*: 29–38.

Strassman, RJ (1992) Human hallucinogen interactions with drugs affecting serotonergic neurotransmission. Neuropsychopharmacology *7*: 241–243.

Strassman, RJ (1996) Human psychopharmacology of N,N-dimethyltryptamine. Behav Brain Res *73*: 121–124.

Strassman, RJ (2001) DMT: The Spirit Molecule. Rochester, VT: Park Street Press.

Strassman, RJ, Qualls, CR (1994) Dose-response study of N,N-dimethyltryptamine in humans: neuroendocrine, autonomic, and cardiovascular effects. Arch Gen Psychiatry *51*: 85–97.

Strassman, RJ, Qualls, CR, Berg, LM (1996) Differential tolerance to biological and subjective effects of four closely spaced doses of N,N-dimethyltryptamine in humans. Biol Psychiatry *39*: 784–795.

Strassman, RJ, Qualls, CR, Uhlenhuth, EH, Kellner, R (1994) Dose-response study of N,N-dimethyltryptamine in humans II: subjective effects and preliminary results of a new rating scale. Arch Gen Psychiatry *51*: 98–108.

Umbricht, D, Vollenweider, FX, Schmid, L, Grubel, C, Skrabo, A, Huber, T, *et al*. (2003) Effects of the 5-HT$_{2A}$ agonist psilocybin on mismatch negativity generation and AX-continuous performance task: implications for the neuropharmacology of cognitive deficits in schizophrenia. Neuropsychopharmacology *28*: 170–181.

Ungerleider, JT, Frank, IM (1976) Management of acute panic reactions and drug flashbacks resulting from LSD ingestion. In: Bourne, P (ed), Acute Drug Emergencies. New York: Academic Press, pp. 133–138.

Tjio, JH, Pahnke, WN, Kurland, AA (1969) LSD and chromosomes, A controlled experiment. JAMA *210*: 849–856.

Vollenweider, FX, Csomor, PA, Knappe, B, Geyer, MA, Quednow, BB (2007) The effects of preferential 5-HT$_{2A}$ agonist psilocybin on prepulse inhibition of startle in healthy human volunteers depend on interstimulus interval. Neuropsychopharmacology *32*: 1876–1887.

Vollenweider, FX, Geyer, MA (2001) A systems model of altered consciousness: integrating natural and drug-induced psychoses. Brain Res Bull *56*: 495–507.

Vollenweider, FX, Leenders, KL, Scharfetter, C, Maguire, P, Stadelmann, O, Angst, J (1997) Positron emission tomography and fluorodeoxyglucose studies of metabolic hyperfrontality and psychopathology in the psilocybin model of psychosis. Neuropsychopharmacology *16*: 357–372.

Vollenweider, FX, Vollenweider-Scherpenhuyzen, MFI, Bäbler, A, Vogel, H, Hell, D (1998) Psilocybin induces schizophrenia-like psychosis in humans via serotonin-2 agonist action. Neuroreport *8*: 3897–3902.

Vollenweider, FX, Vontobel, P, Hell, D, Leenders, KL (1999) 5-HT modulation of dopamine release in basal ganglia in psilocybin-induced psychosis in man – a PET study with [$^{11}$C]raclopride. Neuropsychopharmacology *20*: 424–433.

Weil, A (2004) The Natural Mind: A Revolutionary Approach to the Drug Problem, Revised Edition. Boston, MA: Houghton Mifflin Co.

Winkelman, MJ, Roberts, TB (eds) (2007) Psychedelic Medicine: New Evidence for Hallucinogenic Substances as Treatments. Westport, CT: Praeger.

Wittmann, M, Carter, O, Hasler, F, Cahn, BR, Grimberg, U, Spring, P, *et al*. (2007) Effects of psilocybin on time perception and temporal control of behaviour in humans. J Psychopharmacol *21*: 50–64.

Wolbach, AB, Isbell, H, Miner, EJ (1962a) Cross tolerance between mescaline and LSD-25 with a comparison of the mescaline and LSD reactions. Psychopharmacologia *3*: 1–14.

Wolbach, AB, Miner, EJ, Isbell, H (1962b) Comparison of psilocin with psilocybin, mescaline and LSD-25. Psychopharmacologia *3*: 219–223.

# EXHIBIT P



**Singularism: Articles of Belief and Governance**

1. **Entheogenic Enlightenment:** We believe in the necessary use of entheogenic practices as a pathway to enlightenment for adults who feel naturally called to it, provided it is safe, consensual, and appropriate for them. For those whom it calls to, our ceremonies serve as a gateway to the singularity—the oneness of all existence. By adhering to sound protocols, thorough screening, and safety measures, we create voyages that testify to the transformative power of these practices, helping participants understand themselves, the universe, and improve their mental and spiritual well-being.
   a. See our Doctrines Document, Ethics, and Family Values,
   b. See our documents of Necessity 01
   c. See our documents of Necessity 02
   d. See our Statements of Sincerity 01
   e. See the Founders Statement of Sincerity

2. **The Singularity:** We believe in the oneness of all existence, cosmically and quantumly. Singularism emphasizes the interconnectedness of all life and matter, recognizing the illusion of separateness as a temporary condition of the physical world. This belief underpins our commitment to unity, empathy, and compassion. Our God is a god of systems, and God of creation and mere existence that extends beyond our mortal understand, but is accessible by merely meditation in our ceremonies.
   a. See our Document about the Singularity and the Separation

3. **Commitment to Alleviate Suffering:** We commit to using the wisdom and insights gained through our ceremonies to make the world a more enlightened place and to alleviate suffering. This begins with transforming ourselves, extends to understanding our shared history and creation story, and fosters hope for a brighter future.
   a. This is the main, most important agreement that voyagers make:
      "I commit to using the wisdom and insights revealed to me through the sacred ceremonies of Singularism to create a more enlightened world. I will strive to alleviate suffering wherever I encounter it, beginning with myself and radiating outward to others."
   b. See the Creed, Mission and Vision of Singularism

4. **Every Voyager a Wisdomkeeper:** Practitioners act as scribes for voyages. Together, we contribute to a living scripture through the shared wisdom revealed in our ceremonies. Every voyager has equal access to the divine, and no voyager, practitioner or leader is more of a prophet than another. We recognize that the universe can speak through any voyager. No single person, group, religion, philosophy, or ideology holds all the truth.



Singularism recognizes that no organization, including ours, has all the answers to life's most difficult questions. While we share unifying tenets, individuals are empowered to voyage within our safe and sincere ceremonies to discover and define their own beliefs.

5. **Write your own scripture:** Singularism is built upon aphorisms—simple yet profound truths that emerge from individual voyagers and collective experiences. These aphorisms form the foundation of our evolving scripture, uniting us in our shared belief in the singularity of all things. Members are free to contribute their insights, helping to create a dynamic and adaptable religion that reflects the oneness and wisdom we uncover together. We believe in the sincere pursuit of truth in all its forms, especially in the messages our voyagers receive in ceremony.
   a. *See accompanying document for sample aphorisms.*

6. **The Octadorant as Our Epistemological Compass:** The Octadrant is the guiding framework for understanding truth within Singularism. It divides knowledge into eight interconnected perspectives, called octants, offering a structured yet adaptable tool to navigate personal and collective insights. This framework fosters self-reflection and dialogue, helping individuals form their beliefs while contributing to the collective wisdom of Singularism. While foundational, the Octadrant is not dogmatic; only inviting to seekers of truth. It serves as a resource for discovery rather than a source of absolute answers. By embracing the Octadrant, we honor complexity, explore diverse truths, and move closer to the singularity—the oneness of all existence.
   a. *See accompanying document for our creation story*

7. **The Creation:** Our mission is to help individuals discover their true selves and build their identity through the lens of the singularity. Singularism's creation story bridges the metaphysical and physical realms, offering insight into our shared origins and the principles of natural living that foster mental and spiritual wellness. It reveals how the oneness of existence gave rise to the illusion of separateness—a deception created by our bodies and senses. This story guides us to see beyond division, embrace unity, and recognize ourselves as integral parts of a vast and interconnected whole, aligning with the truth of oneness.
   a. *See accompanying document for our creation story*

8. **The Hierarchy of Consciousness:** The Hierarchy of Consciousness represents the progressive unfolding of awareness, from simple biological processes to the highest levels of self-reflection and unity. Singularism views consciousness as a spectrum, beginning with the basic replication of life forms and evolving into complex thought, empathy, and the capacity to perceive oneness. Understanding this hierarchy is vital for



exploring our identity, as it shows how each level builds upon the previous, connecting us to the larger web of existence. By recognizing our place in this continuum, we see ourselves as both individual and collective, constantly evolving toward greater self-awareness and harmony.

    a. *See accompanying document for our creation story*

9. **The Balance Between Entropy and Order:** Singularism recognizes entropy and order as foundational forces of creation, driving change and stability in the universe. Humanity has evolved to thrive within this balance, with our minds uniquely attuned to the duality shaping how we connect with the world and each other.

Entropy pushes us to grow, adapt, and transcend limitations, while order grounds us in harmony and structure. By embracing both, we align with the natural laws of the universe, fostering personal growth, meaningful relationships, and collective evolution. This balance is essential to our identity, guiding us toward unity and the oneness of all existence.

    *See accompanying document for our creation story*

10. **Opposition to Corruption and Cultish Behavior**
We recognize that religious institutions often drift into corruption over time. Singularism is committed to principles and governance that prevent it from becoming a controlling organization. We abhor cultlike behaviors, such as the removal of individuality, authoritarianism, and black-and-white thinking. Our focus is on acceptance, support, and the elevation of the human condition.
    a. See our statement on Rejecting Cultlike Behaviors and Ensuring Emotional Safety

11. **Family, Society, and Law**
Our values are family- and individually-oriented, supporting society and compliance with governmental laws. We live in gratitude for the freedom of religion afforded to us and extend that right to others, so long as their practices are safe, sincere, and bring them closer to the divine and harmony with others.

12. **Adaptability and Growth**
Singularism is an adaptable and evolving body of individuals. Through our ceremonies, we write our collective scripture and continue to grow as a community of enlightened beings, contributing to a better world.

13. **Non-Offensiveness, Emotional Safety, and  and Authentic Communication**



a. Non-offensiveness is a core value, promoting respect and consideration in all interactions. This principle extends to the courage to challenge harmful norms when necessary, balancing authenticity with kindness and integrity.

b. Emotional safety is fundamental to our practices and community. We prioritize creating spaces free of judgment, coercion, and harm, where individuals feel secure exploring their deepest selves. Emotional safety ensures that growth and enlightenment are achieved with integrity and respect for others.

14. **Family, Society, and Law**

Our values are family- and individually-oriented, supporting society and compliance with governmental laws. We live in gratitude for the freedom of religion afforded to us and extend that right to others, so long as their practices are safe, sincere, and bring them closer to the divine and harmony with others.

15. **Commitment to Integrity, Transparency, and self improvement:** We commit to organizational integrity, fostering a culture of reasonable transparency, accountability, and inclusivity. Our governance reflects the principles we hold sacred, ensuring Singularism remains a supportive and uplifting movement for generations to come.

16. Singularism is a living religion, evolving through the shared wisdom and experiences of its members. We embrace adaptability, ensuring our beliefs and practices grow alongside the needs of our community while staying true to our core values.

17. **We Will Create the Gods that will Create us**

Singularism teaches that humanity holds a sacred responsibility to shape the future with care and foresight. Simultaneously we are creating the Gods of the future that will in turn create us in the past. We stand at the crossroads of advancing mental health, genetic modification, medicine extending life, and (most importantly) artificial intelligence. Our actions today will influence the consciousness and beings of tomorrow.

We envision a future where humanity collectively creates the very God-like beings that we worship so dutifully, who then transcend the illusion of separateness and embody unity, wisdom, and creative potential. If we live according to the insights we have from our highest selves, these future beings will honor the cycle of existence, becoming the architects of the past, just as we are their creators. This belief inspires peace, humility, ethical progress, and alignment with the oneness of all existence.

a. *See accompanying document for our creation story* (last principle)

App-1:234

# EXHIBIT Q



## The Octadrant

Part 1: What is the Octodrant and the Octants?
Part 2: How is the Octodrant scripture and not just ideas, theory or philosophy?

### Singularism's Revealed Epistemology

Traditional Cartesian coordinate system:

In mathematics, a 3D Cartesian coordinate system divides space into eight regions called octants, which are the 3D analogs of quadrants in 2D space. The three axes ($xxx$, $yyy$, and $zzz$) intersect at the origin $(0,0,0)(0, 0, 0)(0,0,0)$, splitting the space based on the sign of the coordinates $(+,-)(+, -)(+,-)$ along each axis.



**Singularism's Octadrant method of Epistemology:**

The Octadrant is an original conceptual framework that was revealed to Singularism's founder Bridger Lee Jensen over multiple ceremonies by a specific entity that instructed him to study it. The Octrant divides perceived reality into eight distinct octants, defined by the interplay of three intersecting spectrums,: Truth (True/False), Verifiability (Verifiable/Unverifiable), and Awareness (Aware/Unaware). These dimensions create a multidimensional space that categorizes all knowledge, beliefs, and perceptions according to their relationship to reality, evidence, and consciousness.

App-1:236



The Octadrant serves as both a religious tool for understanding the nature of existence and a map for navigating human epistemology within the religion. It captures the full range of human experience, from absolute knowledge to profound mysteries, intentional deception, and the unknowable. Each octant represents a unique intersection of these spectrums, offering a lens to examine how ideas, beliefs, and truths manifest and interact.



*"The above is part of Singularism's scripture, handwritten/drawn, that was revealed in ceremony by a specific entity"*

**1. Knowledge / Illumination:**  True, Verifiable, Aware

1. **Definition:** The realm of certainty where truth is both provable and consciously understood. It represents the light of awareness, where evidence transforms belief into knowledge and guides human progress.
2. **Examples:**
    1. The Earth is spherical (observable fact through satellite imagery).
    2. Gravity causes objects to fall toward the ground (empirical observation).
    3. The boiling point of water depends on atmospheric pressure (scientific principle).



**SINGULARISM**
Know Your Inner Universe

**2. Faith / Sacred Trust** True, Unverifiable, Aware

1. **Definition:** The sacred domain of belief in truths that cannot be empirically validated but resonate deeply with intuition and spiritual understanding. It bridges the gap between the seen and unseen, empowering meaning beyond the tangible.

2. **Examples:**
    1. Belief in the existence of a higher power or God.
    2. Trusting in the inherent goodness of humanity.
    3. Believing love transcends time and space.
    4. The belief that life has an ultimate purpose.
    5. Trust in the idea that love endures beyond death.
    6. Faith in the inherent interconnectedness of all life.

| The 8 Octants of the Octradrant: | True or False | Verifiable/Unverifiable | Aware/Unaware |
|---|---|---|---|
| Knowledge / Illumination | TRUE | Verifiable | Aware |
| Faith | TRUE | Unverifiable | Aware |
| Faith / Sacred Trust | TRUE | Verifiable | Unaware |
| Deep Mysteries / Eternal Enigmas | TRUE | Unverifiable | Unaware |
| Lies / Shadowplay | FALSE | Verifiable | Aware |
| Deceptions/Ignorance / Blinding Mirage | FALSE | Verifiable | Unaware |
| Myths / Woven Legends | FALSE | Unverifiable | Aware |
| The Unimaginables / The Abyss | FALSE | Unverifiable | Unaware |

**3. Discoverables / Hidden Veil:** True, Verifiable, Unaware

1. **Definition:** The domain of truths that are real and provable but not yet known or recognized. It symbolizes the hidden potential of discovery, awaiting exploration and the awakening of awareness.

2. **Examples:**
    1. A new species in the deep ocean, yet to be discovered.
    2. A mathematical theorem awaiting proof.
    3. An uncharted planet in a distant solar system.
    4. The existence of uncontacted cultures in remote regions of the universe.
    5. Undiscovered elements or particles in physics (e.g., dark matter).
    6. Microbial life beneath the surface of other planets like Mars.





*The above is another scripture example from Singularism. This depiction is of how consciousness perceives and accepts information.*

**4. Deep Mysteries, Eternal Enigmas:** True, Unverifiable, Unaware

1. **Definition:**
   The profound and unknowable truths that exist beyond human comprehension. This is the sacred mystery of existence, a cosmic enigma that inspires awe and humility in the face of the infinite.
2. **Examples:**
   1. The true nature of consciousness.
   2. The origin of the universe before the Big Bang.
   3. The ultimate purpose of existence.

5. **Lies / Illusioncraft:** (False, Verifiable, Aware)

1. **Definition:** The realm of intentional falsehoods, where deception thrives in plain sight, manipulating truth through awareness. It is the theater of distortion, where falsity is crafted to appear credible.
2. **Examples:**
   1. A scam email claiming you've won a lottery.
   2. Propaganda spreading false political narratives.
   3. Fake news stories deliberately crafted to mislead.





6. **Deceptions/Ignorance / Blinding Mirage:** False, Verifiable, Unaware:
   1. **Definition:** The unseen falsehoods that operate in the shadows of unawareness. These deceptions mislead by appearing real, influencing perceptions and actions without conscious recognition.
   2. **Examples:**
      1. Misinterpreting a placebo effect as a real cure.
      2. Believing in outdated scientific models, like geocentrism.
      3. Following superstition without questioning its validity



**7. Myths / Woven Legends:** False, Unverifiable, Aware

1. **Definition:** The imaginative stories and narratives that bring meaning to existence, even if they are not empirically true. These myths weave together culture, belief, and identity, serving as vessels for symbolic truths.

2. **Examples:**
   1. The myth of Icarus, symbolizing human hubris.
   2. Stories of Atlantis as a lost civilization.
   3. Folklore about dragons as guardians of treasure.

---

**8. The Unimaginables / The Abyss:** False, Unverifiable, Unaware

1. **Definition:** The formless void of incomprehensibility, where falsehoods remain beyond proof and awareness. It is the edge of understanding, a chaotic abyss where meaning dissolves into obscurity and the unimaginable takes root.

2. **Examples:**
   1. The possibility of parallel universes without interaction.
   2. Philosophical thought experiments, like solipsism.
      3. An alien language so complex it defies human comprehension.

## Part 2:  How is the Octodrant scripture and not just ideas, theory or philosophy?

### 1. Sacred Origin

- The **Octadrant** has its roots in **entheogenic experiences**, which, in Singularism, are considered sacred and revelatory. These experiences connect directly to the divine or to the ultimate truths of existence, granting the framework a spiritual authority that goes beyond intellectual constructs. It was revealed to SIngularism's founder by a sacred feminine entity during a ceremony.
- In this sense, the Octadrant serves as a **revelation** that arose from moments of profound insight, making it among religion's founding principles.

### 2. Moral and Ethical Guideline

- Scripture provides **ethical and moral direction**, and the Octadrant fulfills this by categorizing truths, falsehoods, and mysteries in a way that can guide actions, decisions, and spiritual practices.
- For example:



## Consolidated Summary of the Octadrant's Moral and Ethical Guidelines

The **Octadrant** serves as a comprehensive framework for guiding ethical actions, spiritual growth, and intellectual exploration by categorizing truths, falsehoods, and mysteries. It promotes:

1. **Self-Reflection and Growth**: Encourages individuals to evaluate beliefs and decisions based on truth, awareness, and verifiability, fostering accountability and personal development.
2. **Ethical Decision-Making**: Discourages reliance on lies or myths and emphasizes actions rooted in knowledge, integrity, and respect for others.
3. **Integrity and Discernment**: Guides individuals to reject deception, critically evaluate evidence, and act with honesty.
4. **Balance of Certainty and Mystery**: Cultivates humility before the unknown while affirming the importance of pursuing verifiable truths.
5. **Faith and Hope**: Validates trust in the unseen as essential to spiritual journeys, fostering resilience and belief in greater purpose.
6. **Intellectual Exploration**: Frames the pursuit of hidden truths and knowledge as sacred, promoting curiosity and collaboration.
7. **Community and Compassion**: Encourages understanding and empathy by validating diverse perspectives and fostering open dialogue.
8. **Leadership and Mentorship**: Inspires ethical leadership and the guidance of others toward awareness and understanding.
9. **Wonder and Humility**: Instills reverence for the mysteries of existence while honoring human limitations.

The Octadrant integrates these principles into a cohesive structure, serving as a moral compass for Singularism adherents in both practical and spiritual contexts.

---

### 3. Universal Framework

- The Octadrant functions as a **comprehensive map of existence**, categorizing all beliefs, knowledge, and perceptions. Its universal applicability elevates it beyond a mere intellectual exercise, making it a sacred schema for understanding and navigating reality.
- As scripture, it becomes the tool by which adherents of Singularism interpret their experiences and situate their lives within a broader cosmic context.

---

### 4. Spiritual Practice and Integration

- The Octadrant is not just theoretical—it has practical applications in spiritual life:



- ○ It can guide **entheogenic ceremonies**, where participants explore different octants during their journeys.
- ○ It provides a structure for **integration practices**, helping individuals categorize their insights and align them with the sacred truths of Singularism.
- ○ It serves as a reflection tool for ethical living, fostering intentionality in thought, belief, and action.

As scripture, the Octadrant becomes a **living text**, not merely something to be read or understood but something to be lived and practiced.

### 5. Divine Cosmology

- Singularism emphasizes the interconnectedness of all things and the illusion of separateness, both cosmically and quantumly. The Octadrant reflects this by uniting truths, falsehoods, and mysteries into a single, coherent framework.
- This cosmological nature ties the Octadrant to Singularism's ultimate purpose: the alleviation of suffering and the understanding of existence through entheogenic insight.
- As scripture, it provides the **cosmic structure** by which Singularism explains the universe and humanity's place within it.

### 6. Authority in Singularism

- For Singularism, the Octadrant serves as one of the **primary texts of scripture**:
  - ○ It defines the key dimensions of truth, belief, and awareness that adherents use to understand themselves and the world.
  - ○ It formalizes the teachings and revelations of Singularism, giving adherents a clear and consistent framework to follow.
- Like other religious scriptures, it transcends mere theory by being treated as divinely inspired and essential to the faith.

### 7. Binding Covenant

- Singularism already has a foundational tenet: "*I will use all insights obtained in the ceremonies of Singularism to make the world a better place through efforts to alleviate the suffering of mankind, beginning with my own.*"
- The Octadrant serves as a **binding extension of this covenant**, categorizing these insights and situating them within the sacred dimensions of truth, verifiability, and awareness. It is the structure that makes the tenet actionable and universal.



### 8. Role in Singularism's Rituals

- Scripture often plays a central role in rituals, and the Octadrant could be similarly integrated:
  - **Ceremonial Readings**: The Octadrant's principles may be recited or meditated upon during ceremonies to guide participants.
  - **Sacred Study**: Adherents may engage in collective study or discussion of the Octadrant's octants and their implications.
  - **Symbols and Artifacts**: Visual representations of the Octadrant will someday serve as sacred symbols or artifacts within Singularism, much like mandalas in other spiritual traditions.

---

### 9. Living Scripture

- Unlike static texts, the Octadrant evolves with insights gained through Singularism's ceremonies and adherents' lived experiences. It becomes a **living scripture**, continuously validated and expanded by the community's spiritual practices and revelations.

---

### Summary: Why the Octadrant is Scripture

The Octadrant transcends the boundaries of theory and philosophy by:

- **Deriving from sacred entheogenic insight**, aligning it with Singularism's spiritual mission.
- Providing **ethical guidance**, a **cosmic framework**, and **practical applications** for adherents.
- Serving as the **definitive text** of Singularism, central to its rituals, teachings, and cosmology.
- Embodying the **living and evolving nature** of the religion's understanding of truth and existence.

By meeting these criteria, the Octadrant stands as Singularism's scripture—its sacred map of reality, truth, and the divine

Mitchell A. Stephens (11775)
Justin L. James (15167)
Dillon P. Olson (16120)
JAMES DODGE RUSSELL & STEPHENS, P.C.
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Email: mstephens@jdrslaw.com
      jjames@jdrslaw.com
      dolson@jdrslaw.com

*Counsel for Utah County and Jeffrey Gray*

---

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BRIDGER LEE JENSEN, SINGULARISM, PSYCHE HEALING AND BRIDGING, LLC dba PSYCHEDELIC THERAPY JOURNEY<br><br>Plaintiffs,<br><br>vs.<br><br>UTAH COUNTY, PROVO CITY, JEFFREY GRAY, TROY BEEBE, BRIAN WOLKEN, JACKSON JULIAN, JOHN DOES 1-4,<br><br>Defendants. | **JOINT MEMORANDUM OPPOSING MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**<br><br>Case No. 2:24-cv-00887-JNP<br><br>Judge Jill N. Parrish |

Defendants Utah County and Jeffrey Gray (collectively, "Utah County") and Provo City, Troy Beebe, Brian Wolken, and Jackson Julian (collectively, "Provo") (collectively, "Defendants"), submit this Memorandum in Opposition to the Plaintiffs' (collectively, "Singularism" or "Plaintiffs") Motion for Temporary Restraining Order and Preliminary Injunction (the "Motion"). [*See* Motion (Dkt. 9)].

**Table of Contents**

INTRODUCTION ................................................................................................................ 1

STATEMENT OF FACTS................................................................................................... 4

   I.   **Bridger Lee Jensen's Admitted History of Drug Use Predates His New "Religion.".** 4
   II.   **Jensen Markets "Psychedelic Therapy" Separate From Singularism.**........................ 4
   III.   **Jensen Admitted To The Provo Police That Singularism Was Formed to Avoid Criminal Prosecution.**........................................................................................ 9
   IV.   **The Search Warrant.**................................................................................ 10

ARGUMENT ..................................................................................................................... 11

   I.   **Plaintiffs Cannot Succeed on the Merits.**.................................................... 12
     A.   **Utah's Controlled Substances Act Does Not Violate the U.S. Constitution.** ......... 13
     B.   **The Utah Constitution Does Not Legalize Hallucinogenic Drugs.** .......................... 15
     C.   **The Court Lacks Jurisdiction Over Plaintiffs' Statutory Claim, Which Also Fails on the Merits.** .................................................................................. 18
       1.   **The Court lacks jurisdiction over Plaintiffs' claims because they failed to provide notice under the GIAU.** .......................................................... 18
       2.   **Plaintiffs have not established that they satisfy the provisions of the Utah RFRA.** ...................................................................................... 21
         A.   Compliance with Utah law does not substantially burden singularism. .............. 21
         B.   Plaintiffs cannot establish that their psilocybin use is "substantially motivated by a sincerely held religious belief." ............................................... 23
         C.   Meyers Factors............................................................................. 28
           i.   Ultimate Ideas. .................................................................28
           ii.   Metaphysical Beliefs. ........................................................29
           iii.   Moral and Ethical System. .................................................30
           iv.   Comprehensiveness. ..........................................................31
           v.   Accoutrements...................................................................33
         D.   Other Considerations Weigh Against a Finding of a Sincerely Held Religious Belief.................................................................................. 34
       3.   **Regardless, the State has a compelling interest in regulating controlled substances.** ................................................................................... 35
   II.   **Plaintiffs Have Not Established Irreparable Injury.**....................................... 38
   III.   **Plaintiffs Have Not Established That the Threatened Injury Outweighs the Public Interests.**........................................................................................... 39
   IV.   **If the Motion is Granted, Plaintiffs Should Post Security.**.......................... 40

CONCLUSION ................................................................................................................. 40

**Table of Authorities**

**Cases**

*Africa v. Com. of Pa.*,
   662 F.2d 1025 (3d Cir. 1981).................................................................................. 24

*Am. Bush v. City of S. Salt Lake*,
   2006 UT 40, 140 P.3d 1235 ................................................................................... 18

*Carson v. Makin*,
   596 U.S. 767 (2022)............................................................................................... 16

*Chiles v. Salazar*,
   116 F.4th 1178 (10th Cir. 2024) ............................................................ 11, 13, 14, 39

*Dee v. United States*,
   241 F. Supp. 2d 50 (D. Me. 2003) ........................................................................ 15

*Douglas v. City of Jeannette (Pennsylvania)*,
   319 U.S. 157 (1943)............................................................................................... 12

*DTC Energy Grp., Inc. v. Hirschfeld*,
   912 F.3d 1263 (10th Cir. 2018) ............................................................................. 11

*Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*,
   494 U.S. 872 (1990)...................................................................................... 13, 14, 15

*Founding Church of Scientology of Washington, D.C. v. United States*,
   409 F.2d 1146 (D.C. Cir. 1969)............................................................................. 23

*Gallagher v. Dhillion*,
   No. 3:18-cv-2801, 2020 WL 2737246 (N.D. Tex. May 7, 2020)........................... 14

*Harmon v. City of Norman, Oklahoma*,
   981 F.3d 1141 (10th Cir. 2020) ............................................................................. 13

*Heideman v. S. Salt Lake City*,
   348 F.3d 1182 (10th Cir. 2003) ...................................................................... 38, 39

*Hobby Lobby Stores, Inc, v. Sebelius*,
   723 F.3d 1114 (10th Cir. 2013) ............................................................................. 21

*Jeffs v. Stubbs*,
   970 P.2d 1234 (Utah 1998)......................................................................... 17, 18

*Madruga v. Utah High Sch. Activities Ass'n Inc.*,
   No. 4:21-CV-00089, 2021 WL 4748493 (D. Utah Oct. 12, 2021).......................................... 38

*Mecham v. Frazier*,
   2008 UT 60, 193 P.3d 630 ............................................................................ 20

*Mendoza v. Thompson*,
   No. 1:15-cv-00090, 2015 WL 5693705 (D. Utah Sept. 28, 2015) .................................... 38, 39

*Michigan Cath. Conf. & Cath. Fam. Servs. v. Burwell*,
   755 F.3d 372 (6th Cir. 2014) ......................................................................... 15

*Multi Denominational Ministry of Cannabis & Rastafari, Inc. v. Gonzales*,
   474 F. Supp. 2d 1133 (N.D. Cal. 2007) ............................................................... 39

*Multi-Denominational Ministry of Cannabis and Rastafari, Inc. v. Holder*,
   365 F. App'x 817 (9th Cir. 2010) ..................................................................... 14

*Olsen v. Drug Enf't Admin.*,
   878 F.2d 1458 (D.C. Cir. 1989 .................................................................... 3, 14

*Olsen v. Mukasey*,
   541 F.3d 827 (8th Cir. 2008) ......................................................................... 15

*Patterson v. Am. Fork City*,
   2003 UT 7, 67 P.3d 466................................................................................ 19

*Peyote Way Church of God v. Thornburgh*,
   922 F.2d 1210 (5th Cir. 1991) ........................................................................ 14

*Provo City v. Shurtliff*,
   4 Utah 15, 5 P. 302 (Utah 1885)...................................................................... 17

*S. Salt Lake City v. Maese*,
   2019 UT 58, 450 P.3d 1092............................................................................ 17

*Schrier v. Univ. of Co.*,
   427 F.3d 1253 (10th Cir. 2005) ................................................................... 11, 12

*Soc'y of Separationists, Inc. v. Whitehead*,
   870 P.2d 916 (Utah 1993).......................................................................... 15, 16, 17

iv

*State v. Balzer*,
   954 P.2d 931 (Wash. Ct. App. 1998) ...................................................................... 28

*State v. Brashear*,
   593 P.2d 63 (N.M. Ct. App. 1979) ......................................................................... 27

*State v. Cook*,
   2020-Ohio-432, 2020 WL 615076 (Ohio Ct. App. 2020) ........................................ 3

*State v. Green*,
   2004 UT 76, 99 P.3d 820 ....................................................................................... 14

*State v. Hardesty*,
   214 P.3d 1004 (Ariz. 2009).................................................................................... 27

*State v. Sobel*,
   221 N.E.3d 44 (Ohio Ct. App. 2023) ..................................................... 2, 27, 29, 30

*State v. White*,
   271 P.3d 1217 (Idaho Ct. App. 2011) ............................................................... 22, 27

*Strope v. Cummings*,
   381 F. App'x 878 (10th Cir. 2010) ......................................................................... 23

*Summum v. Pleasant Grove City*,
   2015 UT 31, 345 P.3d 1188 .................................................................................... 16

*Summum v. Pleasant Grove City*,
   No. 2:05-cv-638, 2010 WL 2330336 (D. Utah June 3, 2010) ................................. 15

*United States v. Greene*,
   892 F.2d 453 (6th Cir. 1989) ................................................................................. 14

*United States v. Meyers*,
   906 F. Supp. 1494 (D. Wyo. 1995)............................................. 3, 23, 24, 25, 30, 31

*United States v. Jeffs*,
   No. 2:16-cr-82, 2016 WL 6745951 (D. Utah Nov. 15, 2016) ...................... 21, 22, 38

*United States v. Kuch*,
   288 F. Supp. 439 (D.C. Cir. 1968).......................................................... 26, 27, 30

*United States v. Meyers*,
   95 F.3d 1475 (10th Cir. 1996) .............................. 23, 24, 25, 28, 29, 30, 31, 32, 33

v

*United States v. Quaintance*,
315 F. App'x 711 (10th Cir. 2009) ........................................................................... 25

*United States v. Quaintance*,
471 F. Supp. 2d 1153 (D.N.M. 2006) .............................................. 3, 25, 26, 31, 32, 33, 34, 35

*Wisconsin Gas Co. v. FERC*,
758 F.2d 669 (D.C. Cir. 1985) ................................................................................ 38

**Statutes**
21 U.S.C. § 812 ........................................................................................................ 1, 36
28 U.S.C. § 1367 ........................................................................................................... 15
28 U.S.C. § 2283 ........................................................................................................... 12
28 U.S.C. § 1446 ........................................................................................................... 15
42 U.S.C. § 2000bb ....................................................................................................... 23
Uniform Controlled Substances Act (1994) ............................................................... 36
Utah Code § 17-18a-202 ............................................................................................... 20
Utah Code § 58-37-3.5 ......................................................................................... 2, 22, 37
Utah Code § 58-37-4 ..................................................................................................... 1, 4
Utah Code § 63G-33-101 .................................................................... 18, 21, 23, 35
Utah Code § 63G-33-201 .................................................................... 19, 21, 23, 35
Utah Code § 63G-7-401 ............................................................................. 18, 20
Utah Code Ann. § 58-37-4 (West 2004) ............................................................ 17

**Other Authorities**
11A Fed. Prac. & Proc. Civ. § 2942 (3d ed.) ........................................................ 21, 38
11A Fed. Prac. & Proc. Civ. § 2946 (3d ed.) ............................................................ 20
1898 Revised Statutes of Utah §§ 1711-27, 38, 41 (Title 51) ...................................... 17
Immanuel Kant, *Critique of Pure Reason* (1971) ..................................................... 32
Laws & Ordinances of the State of Deseret, Compilation 1851 (Shepard Book 1919) ............... 35
Max M. Houck, Jay A. Siegel, *Fundamentals of Forensic Science* (3rd) (2015) ......................... 11
T.K. Seung, *Kant's Conception of the Categories*, THE REVIEW OF METAPHYSICS 43 No. 1 (1989)
.................................................................................................................... 32
Uniform CSA at § 203 ................................................................................................. 36
Uniform Law Commission, Controlled Substances Act .............................................. 35
Utah Constitutional Convention Day 25, p. 437 ......................................................... 18
Utah Department of Environmental Quality, *Our Mission, Vision, and Values*, available at
https://deq.utah.gov/general/mission-vision-values ........................................ 31
Utah Senate 2024 General Session – Day 45 (Sen. Cullimore, Sponsor) ................................. 37
Utah State Treasurer, *Mission & Core Values*, available at
https://treasurer.utah.gov/about/mission-and-core-values/ .............................. 31

**Rules**
Fed. R. Civ. P. 65 ....................................................................................................... 40

**INTRODUCTION**

Singularism's Motion seeks judicial permission to sell illegal drugs for a profit. As Singularism's Complaint openly concedes, a search warrant – authorized by Judge Sean Petersen – resulted in the seizure of both psilocybin and THC. [*See* Complaint at ¶ 41; *see also* Ex. C to Complaint]. Both are Schedule I substances under state and federal law, and Plaintiffs' Motion does not even attempt to rationalize their possession of THC. *See, e.g.*, 21 U.S.C. § 812 (listing "Psilocybin" and "Tetrahydrocannabinols" as "Schedule I" controlled substances); Utah Code § 58-37-4 (same). "[I]ndividuals pay a fee" that is thousands of dollars to "Singularism's for-profit organization" in exchange for Plaintiffs' "therapeutic" drug "ceremonies." [Complaint at ¶ 30; *see also* Jackson Julian Aff. (Ex. A) (testifying fees range from $3,900 to $6,400)].

Plaintiffs nevertheless seek to excuse their for-profit drug dealing by alleging their "religious conviction is unquestionable." [*Id.* at p. 2]. "Undecipherable" more aptly describes their alleged "religion." Indeed, the following comes from the liability waiver (Plaintiffs call it an "attestation") that Plaintiffs have their customers sign before a deal:

> **Acknowledgment of Religious Inclusivity:**
> I further acknowledge and respect that Singularism does not require "religious exclusivity" from its adherents. I understand that participation in Singularism's ceremonies does not necessitate forgoing or abandoning my affiliations, beliefs, or practices in other religions. Rather, Sinuglaism teaches religious inclusivity. I recognize that Singularism respects the coexistence of multiple spiritual paths and that my involvement in these ceremonies is a personal choice, made in accordance with my own spiritual and mental well-being needs. My participation in Singularism's ceremonies is a testament to my sincere commitment to exploring diverse spiritual experiences as I deem necessary for my personal growth and development.

[Dkt. 9-3 at p. 3 (emphasis added); *see generally id.* at 7 ("Participants agree to waive and release Singularism . . . from any liability or claims . . . .")]. Plaintiffs' website confirms that their "facilitators" guide "participants through experiences that aim to unlock and affirm their highest

selves . . . *without seeking to change their foundational beliefs*."[1]    Put simply, Singularism's "core belief appears to be allowing people to believe whatever he or she wants to believe."  *See State v. Sobel*, 221 N.E.3d 44, 50 (Ohio Ct. App. 2023) (affirming criminal restriction of psilocybin).  That falls short of constitutional protection.  In addition, Plaintiffs cannot establish that the longstanding criminalization of one hallucinogenic drug substantially interferes with a "religion" that incorporates all other "spiritual paths."  [Dkt. 9-3].

Similarly, Plaintiffs' liability waiver demonstrates the compelling distinction between FDA-approved investigational psilocybin treatment conducted by "the largest healthcare systems in the state" and Plaintiffs' non-licensed drug dealing.  [*See* Motion at 28].  *See also* Utah Code § 58-37-3.5.  Plaintiffs advise all "voyagers" that *"advice from Singularism*'s staff . . . *is not a substitute for licensed and qualified medical advice*, and we acknowledge their *clinical advice supersedes our spiritual advice* in medical and physical matters."  [Dkt. 9-3 at p. 3 (emphasis added)].  "Singularism always advises that you seek your own medical council [sic]."  [*Id.*].  In short, medical oversight of controlled substances is consistent with compelling government interests and Singularism itself.  The State has ensured Singularism's followers can obtain "qualified medical advice," including potential prescriptions for psilocybin under the care of licensed professionals.  *See* Utah Code § 58-37-3.5.  Plaintiffs' only injury is that they are "not a substitute for licensed and qualified medical advice."  [Dkt. 9-3 at p. 3].

But even if Plaintiffs could establish a religious right to possess and sell hallucinogenic mushrooms (they cannot), their current Motion still fails.  Plaintiffs have not even attempted to defend their undisputed possession of *THC*.  [*See* Complaint at ¶ 41 (admitting "law enforcement

---

[1] *See* https://psychedelictherapyjourney.com/frequently_asked_questions.

removed . . . THC . . . from Singularism's religious center")].  There is zero basis for the Court to enjoin a criminal investigation and prosecution when Plaintiffs have not even attempted to justify half of their criminal conduct.  [*See, e.g.*, Proposed Order (Dkt. 9-18)].  Their possession of multiple illegal drugs suggests a scheme to use and sell drugs, not a solemn sacrament.

Finally, even if Plaintiffs could establish their "religion" is impinged by longstanding criminal codes, they still lose.  Each of Plaintiffs' claims is subject to dismissal for multiple reasons.  And their claims all fail for the common reason that "there is certainly a compelling state interest in regulating the use of Schedule I controlled substances." *State v. Cook*, 2020-Ohio-432, 2020 WL 615076, at *6 (Ohio Ct. App. 2020); *see also Olsen v. Drug Enf't Admin.*, 878 F.2d 1458, 1462 (D.C. Cir. 1989) ("[E]very federal court that has considered the matter, so far as we are aware, has accepted the congressional determination that marijuana in fact poses a real threat to individual health and social welfare.").

Hallucinogenic drugs might cause a user to "feel as though the boundaries between myself and the universe dissolved," begin "laughing uncontrollably," or visualize "the very air molecules that surrounded me."  [*See* Dkts. 9-1; 9-4 – 9-8].  That is not enough to establish a constitutional right to get high or distribute drugs. *See, e.g.*, *United States v. Quaintance*, 471 F. Supp. 2d 1153, 1159 (D.N.M. 2006) ("If marijuana use results in expanded mental capabilities, such as increased focus or awareness, this result occurs simply because of the physical (and not spiritual or religious) interaction between the mind-altering substance and the user.").  The First Amendment would "easily become the first refuge of scoundrels if defendants could justify illegal conduct simply by crying 'religion.'" *United States v. Meyers*, 906 F. Supp. 1494, 1498 (D. Wyo. 1995).  Plaintiffs'

3

civil efforts to avoid criminal accountability for the laws they knowingly violated should be rejected.

## STATEMENT OF FACTS

**I.    BRIDGER LEE JENSEN'S ADMITTED HISTORY OF DRUG USE PREDATES HIS NEW "RELIGION."**

1.    Bridger Lee Jensen ("Jensen") was using drugs before he founded Singularism in the fall of 2023.

2.    For example, during his "mid-twenties during a hiking trip in Peru," Jensen consumed what he believes was ayahuasca.  [*See* Jensen Dec. (Dkt. 9-1) ¶ 11].  The active ingredient in ayahuasca is a Schedule I drug.  *See* Utah Code § 58-37-4 (listing "dimethyltryptamine" or "DMT").  Notably, Jensen disclaims any religious affiliation that supported his drug use.  He was in "a period of agnosticism."  [Jensen Dec. (Dkt. 9-1) ¶ 9].

3.    A decade later, Jensen got high "on a beach in Hawaii."  [*Id.* at ¶ 13].  Again, Jensen had not yet started Singularism.  Nor does he identify any religious affiliation or ceremony.  He was "alone on a beach," celebrating his "32nd birthday."  [*Id.*].

4.    In 2019, Jensen decided not to "continu[e] as a licensed therapist" because that "might conflict with his" continued "use of psychedelics."  [*Id.* at ¶ 5].  That was four years *before* Jensen "founded . . . Singularism in the fall of 2023."  [*See id.* at ¶ 18].

**II.    JENSEN MARKETS "PSYCHEDELIC THERAPY" SEPARATE FROM SINGULARISM.**

5.    Singularism's operation as a religious entity – as opposed a facility for "psychedelic therapy" – is contradicted by the reviews of its own customers.  For example, Singularism has a 5.0 Google review rating.  However, the reviews refer to Singularism as a "clinic," substitute for

App-1:254

"medication," and "much safer than having to find it on the street from illegal sources." [*See* Google Reviews, Ex. B].

6.      Moreover, Plaintiffs ***do not*** assert that their use of illicit drugs is limited to Singularism's churches or worship services (if those exist).  Nor could they.  Singularism has not identified any "religious" use of THC.  And Singularism's founder, Jensen, actively markets "Psychedelic Therapy" without referencing Singularism.

7.      For example, "bridgerleejsensen.com" offers viewers a chance to "schedule a 30 minute consultation" without any disclaimer (or suggestion) that Jensen's invitation to "experience another breakthrough! 😃" is religious:



[*See* bridgerleejsensen.com, Ex. C].  Notably, Jensen's email address is ***not*** associated with Singularism.  Instead, it is "bridger@utahmushroomtherapy.org." [*Id.* (emphasis added)].

8.      Jensen's website includes an "About Bridger" section.  In addition to "psychedelic[s]," Jensen references everything from "suicide" to "dance" and his "four children."

5

App-1:255

[*See id.*].    Tellingly, he does not reference religion, spirituality, or Singularism.    Instead, he describes his psychedelic therapy as "clinical":

## About Bridger

Bridger's career in mental health began in 2002, when he worked as a guide for a prominent outdoor behavioral healthcare clinic for youth. Bridger facilitated over 400 seminars and presented in dozens of conferences before earning his undergraduate degree in therapeutic recreation and his master's degree in counseling psychology.

Having gained a national reputation as a therapist, Bridger conceptualized Mental Gurus in response to losing several youthful clients to suicide. His dedication to his work and his passion for human consciousness led him to see the potential for artificial intelligence to improve psychotherapy and psychometrics.

Bridger's passion for alleviating human suffering led him to utilize technology in creating a powerful psychometrics engine, which is now widely used for personality and mental wellness.

Today Bridger is an active advisor and consultant to well known companies and high profile individuals. Specializing in clinical psycedelic integration, Bridger embodies leadership and passion, which has brought his multiple teams together.

When not working, Bridger enjoys spending time with his family, including four children in the outdoors. Bridger is also an accomplished artist with a love for sculpting, poetry, dance, and photography, having received several grants and awards for his work, which has been displayed nationally in various exhibitions.

[*Id.* (emphasis added)].

 9. Jensen's LinkedIn profile provides yet another example.  [*See* LinkedIn Profile, Ex. D].  Jensen's background image advertises a non-party to this lawsuit – "Psychedelic Therapy Academy."  Jensen's commitment to psychedelics, or perhaps psychedelic therapy, is evident.  Again, however, that commitment has no connection to religion.  Jensen focuses on "therapy":

6



[*See id.*].  Jensen's LinkedIn profile also includes another "About" section.  In that section, Jensen refers to himself as a "therapist," "visionary," "innovator," and "entrepreneur."  [*Id.*].  He does not reference religion, spirituality, or Singularism.  [*Id.*].

10.    As another example, Jensen is the "Founder and Lead Instructor" at "Psychedelic Therapy Academy."  [*See* PsychedelicTherapyAcademy.com, Ex. E].  That entity markets an "immersive course" and promises enrollees the chance to join the "expanding field of psychedelic-assisted therapy."  It promises enrollees will become "a True Practitioner" of "psychedelic therapy" – not a "true believer" in Singularism:

Are you ready to be at the forefront of a revolutionary approach to healing?

# Skills of a True Practitioner

Embrace a transformative journey of learning and personal growth as you delve into the art of facilitating psychedelic therapy. Gain comprehensive knowledge and practical skills to guide individuals safely through profound healing experiences. Join us on this immersive course and become a trusted facilitator in the expanding field of psychedelic-assisted therapy.

[*Id.*].

11.    Clicking "Apply Now" produces another screen that describes the therapy program. It aptly summarizes the "common goal" behind Jensen's personal drug use and his various enterprises – "exploring the incredible world of psychedelics":



## Facilitator Course Application form

Welcome to a transformative journey that sets the benchmark in the world of psychedelic facilitation. We're thrilled that you're applying to join our exclusive course and training program, designed for those who aspire to be the best in this field.

Our course isn't just another training; it's a pathway to excellence, curated for individuals who are passionate about guiding others through profound experiences and facilitating personal growth.

You're invited to be part of a select group of individuals who share a common goal: to create a safer, more supportive, and more enlightening space for those exploring the incredible world of psychedelics. While we maintain high standards, we are committed to fostering a warm and welcoming community. Your journey begins here, and we're eager to have you on board.

Please be aware that we place little emphasis on perfect spelling, punctuation, or formal qualifications. No need to spend hours filling out this form. We prioritize individuals who are dedicated to safety, authenticity, and the creation of a nurturing and enriching experience for their clients.

We are also NOT exclusively looking for people with lots of experience as a psychedelic guide. We are open and receptive to all experience levels.

8

[Facilitator Course Application (Ex. F)].  The application form does not require commitment to any religious precepts.  It does require a financial commitment: "I understand that tuition is $1,800, and I can pay in full . . . ."  [*Id.*].

12.    Jensen is known to be involved with the following businesses or websites that market "training," "therapy," and/or psychedelics:

- Psychedelic Therapy Academy [*see* Exs. E-F];

- Mental Gurus [Ex. G];

- UtahMushroomTherapy.org [*see* Ex. C];

- RevealMyself.com [*see* Facebook profile (Ex. H); Ex. J];

- UtahPsychedelicTherapy.org [*see* Instagram profile (Ex. I)];

- Psyche Healing and Bridging, LLC [*see* Utah Dept. of Corp. (Ex. K); Provo Business License (Ex. L)];

- Psychedeliccon.org [*see* Ex. M]; and

- PsychedelicTherapyJourney.com.  [*See* Ex. N].

## III.    JENSEN ADMITTED TO THE PROVO POLICE THAT SINGULARISM WAS FORMED TO AVOID CRIMINAL PROSECUTION.

13.    In connection with Defendants' criminal investigation, Detective Jackson Julian of the Provo Police Department met with Jensen undercover "to obtain information regarding" his "usage of psilocybin."  [*See* Complaint at ¶ 36].

14.    After applying to become a "Certified Psychedelic Practitioner," Detective Julian received a call from Jensen.  [Julian Aff. (Ex. A) at p. 3].  During that call, Jensen explained that they have "therapy session . . . packages that cost between $3900 -$6400."  [*Id.* at 4].

9

15.     Jensen further informed Detective Julian that "Singularism is supportive of other religions." [*Id.*].  "[Y]ou need not leave any other religion to join Singularism, but rather it adds to your beliefs that already exist." [*Id.*].

16.     On October 22, 2024, Detective Julian "attended a webinar that was hosted by Bridger" and two of his staff members.  [*Id.*].

17.     During that webinar, Jensen "explained the pricing and the process of how the therapy sessions work." [*Id.*].  "He sells packages in 'rounds' and the minimum package is a two round package." [*Id.*].  "The pricing for a two round package is $3900, a three round package is $5400, and a four round package is $6400." [*Id.*].

18.     Jensen also confirmed that "the way that ***he founded the religion*** was ***by talking with his lawyer*** to review prior cases in which people claimed religious exemption; where those claimants won or lost." [*Id.* at 5 (emphasis added)].

## IV.     THE SEARCH WARRANT.

19.     On November 4, 2024, Defendants asked the Fourth District Court, State of Utah to authorize a search warrant on "Bridger Lee Jensen." [*See* Search Warrant (Ex. O)].

20.     That same day, District Court Judge Sean Petersen issued the search warrant. [*See id.*].  Judge Petersen determined "that there is probable cause" supporting the search. [*See id.*].

21.     On November 11, 2024, police officers executed the search warrant as authorized by Judge Petersen and the Utah Courts.  [*See* Return to Search Warrant (Ex. P)].  The search warrant resulted in the seizure of "***459.8 grams*** psilocybin mushrooms" and "2 fluid ounces of THC liquid syrup," among other things.  [*See id.*].

22.     "The most effective dose seems to be about 5 mg [of mushrooms], with higher doses causing some unpleasant effects."  Max M. Houck, Jay A. Siegel, *Fundamentals of Forensic Science* (3rd) (2015) (recognizing "psilocybe mushrooms" also "resemble highly toxic" mushrooms and "poisonings are reported every year").  Using that number, Plaintiffs possessed enough psilocybin mushrooms to distribute 92 doses.

## ARGUMENT

"A preliminary injunction is an extraordinary remedy, the exception rather than the rule."  *Chiles v. Salazar*, 116 F.4th 1178, 1199 (10th Cir. 2024) (affirming denial of preliminary injunction to prevent Colorado prohibition on "conversion therapy" despite alleged First Amendment violations).  "It is an extraordinary remedy never awarded as of right.  A party may be granted a preliminary injunction only when monetary or other traditional legal remedies are inadequate, and the right to relief is clear and unequivocal."  *DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1269 (10th Cir. 2018) (cleaned up); *accord Schrier v. Univ. of Co.*, 427 F.3d 1253, 1258 (10th Cir. 2005).

"To prevail on a preliminary injunction motion," a Plaintiff typically must prove: (1) they are "substantially likely to succeed on the merits"; (2) they will "suffer irreparable injury if the court denies the injunction"; (3) the "threatened injury (without the injunction) outweighs the opposing party's" interests; and (4) the "injunction isn't adverse to the public interest."  *Chiles*, 116 F.4th at 1199 (cleaned up).  That said, "[t]he final two factors merge when the Government is the opposing party."  *Id.* (cleaned up).

The injunctive relief Plaintiffs demand from this case is additionally and more "specifically disfavored."  *See Schrier*, 427 F.3d at 1259.  Plaintiffs demand that this Court – via a civil

injunction – should effectively determine the outcome of a criminal proceeding that began with the search warrant in the Utah State Courts. Their proposed order includes the following demands:

- "Defendants are ordered to ***return all items they seized***" pursuant to the Search Warrant;

- "Defendants are ***prohibited from prosecuting Plaintiffs'*** sincere free exercise of religion."

[*See* Proposed Order (Dkt. 9-18) (emphasis added)]. Plaintiffs want this Court to preemptively paralyze the criminal process and destroy the evidence so that subsequent prosecution becomes impossible. A "preliminary injunction[] that" effectively grants Jensen "all the relief that [he] could recover at the conclusion of a full [criminal] trial on the merits" is "specifically disfavored." *See Schrier*, 427 F.3d at 1259. The Court should "be slow to act where its powers are invoked to interfere by injunction with threatened criminal prosecutions in a state court." *Douglas v. City of Jeannette (Pennsylvania)*, 319 U.S. 157, 162 (1943); *see also* 28 U.S.C. § 2283 ("A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.").

## I. PLAINTIFFS CANNOT SUCCEED ON THE MERITS.

Plaintiffs' Motion argues likelihood of success with only vague reference to the actual claims for relief alleged in the Complaint. As Defendants' forthcoming Motion to Dismiss will detail, each of Plaintiffs' claims fails as a matter of law. Without any claims, there is no basis for Plaintiffs to seek or obtain any relief from the Court. Accordingly, the Court should postpone ruling on the instant Motion until the Motion to Dismiss has been resolved.

Even if the Court were inclined to tackle the merits of two different constitutions on an expedited basis and without a full record, Plaintiffs' Motion still fails. Plaintiffs must "make a

prima facie case showing a reasonable probability that they will ultimately be entitled to the relief sought." *Harmon v. City of Norman, Oklahoma*, 981 F.3d 1141, 1146 (10th Cir. 2020) (cleaned up). Plaintiffs cannot make that showing.

## A.    Utah's Controlled Substances Act Does Not Violate the U.S. Constitution.

Three months ago, the Tenth Circuit reaffirmed that "[l]aws incidentally burdening religion . . . are ordinarily not subject to strict scrutiny under the Free Exercise Clause [of the First Amendment] so long as they are neutral and generally applicable." *Chiles*, 116 F.4th at 1221. That court then refused to enjoin a Colorado statute that prohibited the plaintiff from offering "conversion therapy," even though she was "a practicing Christian" and treated clients who "believe their faith and their relationships with God supersede romantic attractions." *See generally id.* at 1193, 1221-25. The plaintiff lost because she could not show that Colorado's law "lacks neutrality and general applicability." *Id.* at 1225.

The Tenth Circuit's ruling was consistent with established law. "[T]he right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." *Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872, 879 (1990) (cleaned up). The Supreme Court offered an explanatory example before it rejected an argument that the First Amendment superseded Oregon's criminalization of peyote:

> It is no more necessary to regard the collection of a general tax, for example, as "prohibiting the free exercise [of religion]" by those citizens who believe support of organized government to be sinful, than it is to regard the same tax as "abridging the freedom . . . of the press" of those publishing companies that must pay the tax as a condition of staying in business. . . . [I]f prohibiting the exercise of religion (or burdening the activity of printing) is not the object of the tax but merely the incidental effect of a generally applicable and otherwise valid provision, the First Amendment has not been offended.

13

*Id*. at 878.   "[W]e have never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law . . . ."  *Id.* at 878-79.

"[A]s the party seeking a preliminary injunction, [Plaintiffs] must show the" Utah Controlled Substances Act ("Utah CSA") "is not neutral or generally applicable."  *Chiles*, 116 F.4th at 1221; *accord State v. Green*, 2004 UT 76, ¶¶ 20-22, 99 P.3d 820 (applying same standard and finding bigamy statute constitutional).  Plaintiffs cannot meet that burden.

Courts repeatedly have ruled that controlled substance laws do not violate the First Amendment.  *See, e.g.*, *Smith*, 494 U.S. at 875; *Multi-Denominational Ministry of Cannabis and Rastafari, Inc. v. Holder*, 365 F. App'x 817, 819 (9th Cir. 2010) ("Because drug laws are both neutral and generally applicable, they may be enforced even if doing so substantially burdens one's religion." (cleaned up)); *Peyote Way Church of God v. Thornburgh*, 922 F.2d 1210, 1213 (5th Cir. 1991) (ruling drug law "does not offend the First Amendment's free exercise clause"); *Olsen*, 878 F.2d at 1463 (D.C. Cir. 1989) (J. Bader Ginsburg) ("[F]ree exercise clause does not compel the DEA to grant [plainitff] an exemption immunizing his church from prosecution for illegal use of marijuana."); *United States v. Greene*, 892 F.2d 453, 456 (6th Cir. 1989) ("Congress may control the use of drugs that it determines to be dangerous, even if those drugs are used for religious purposes.").   The law is so well-established that courts have deemed ongoing challenges "frivolous."  *See, e.g.*, *Gallagher v. Dhillion*, No. 3:18-cv-2801, 2020 WL 2737246, at *2 (N.D. Tex. May 7, 2020) (ruling plaintiff's challenges were "futile and should be dismissed as legally

14

frivolous"); *Dee v. United States*, 241 F. Supp. 2d 50, 51 (D. Me. 2003) ("Dee's constitutional challenge is frivolous.").[2]

Utah's controlled substances laws are narrowly tailored, facially religion-neutral, and do not target any specific sect of religion. Utah's neutral drug laws with general applicability do not violate Plaintiffs' First Amendment rights.

**B.      The Utah Constitution Does Not Legalize Hallucinogenic Drugs.[3]**

Article I, section 4 of the Utah Constitution "rests on the concept of governmental neutrality." *Soc'y of Separationists, Inc. v. Whitehead*, 870 P.2d 916, 937 (Utah 1993). Both the language of that text and the history of its adoption "identify three complementary themes: (i) a distancing of government from involvement with religion, (ii) nonsectarianism to the extent there is government involvement with religion, and (iii) government neutrality—the maintenance of a level playing field in civil matters—as between religious and nonreligious sentiments." *Id.* at 936.

---

[2] To the extent Plaintiffs intended the argument on page 22-25 of their Motion about "Various Exemptions" to the Utah CSA to apply here, that argument is equally meritless. In fact, the Supreme Court began its opinion in *Smith* by recognizing controlled substances were illegal "unless the substance has been prescribed by a medical practitioner." *Smith*, 494 U.S. at 874; *see also Olsen v. Mukasey*, 541 F.3d 827, 832 (8th Cir. 2008) (rejecting argument that CSA was "not generally applicable" because it allows "certain research and medical uses of marijuana"); *Michigan Cath. Conf. & Cath. Fam. Servs. v. Burwell*, 755 F.3d 372, 394 (6th Cir. 2014) ("A law need not apply to every person or business in America to be generally applicable. A law is generally applicable if it does not make distinctions based on religion.").

[3] Defendants removed this action to federal court because Plaintiffs asserted multiple federal claims. Pursuant to 28 U.S.C. § 1446, that removal applied to the "civil action" that was pending in the Utah State Court. *See* 28 U.S.C. § 1446(a). The Court has supplemental jurisdiction over the additional claims involving state law. *See* 28 U.S.C. § 1367. However, Defendants recognize that the Court "may decline to exercise supplemental jurisdiction" over those claims if they "raise a novel or complex issue of State law." *Id.* at § 1367(c); *cf. Summum v. Pleasant Grove City*, No. 2:05-cv-638, 2010 WL 2330336, at *4 (D. Utah June 3, 2010) (declining to exercise supplemental jurisdiction for claims involving the Utah Constitution).

Utah's Constitution ensures "neutrality toward conscientious sentiments, religious or irreligious." *Id.* at 937.

When the government acts "in an impartial manner," any burdens and benefit "'flowing to religious worship, exercise, or instruction can be fairly characterized as indirect because the benefit flows to all those who are beneficiaries of the use of government money or property, which may include, but is not limited to, those engaged in religious worship, exercise, or instruction.'" *Summum v. Pleasant Grove City*, 2015 UT 31, ¶ 8, 345 P.3d 1188 (quoting *Soc'y of Separationists, Inc.*, 870 P.2d at 937). For example, "[i]f a city permits groups to use city-owned facilities, that use must be permitted without regard to the belief system of the user." *Soc'y of Separationists, Inc.*, 870 P.2d at 938; *see also Carson v. Makin*, 596 U.S. 767, 778 (2022) ("[A] State violates the Free Exercise Clause when it excludes religious observers from otherwise available public benefits."). However, the Utah Constitution does not require (or allow) the alteration of an existing standard for the benefit of one religious sect. For example, in *Summum v Pleasant Grove City*, the Utah Supreme Court refused "an injunction requiring Pleasant Grove to display" the plaintiff's religious text in a park. *Summum*, 2015 UT 31, ¶ 11. It was not enough for the plaintiff to establish the city had a "display of the Ten Commandments" in a public park. *Id.* at ¶ 9. Even "[a]ssuming that the Ten Commandments monument amounts to religious exercise or instruction, requiring Pleasant Grove to erect a second religious monument would not" result in the type of broad religious neutrality the Utah Constitution requires. *Id.* at ¶ 11. It would instead elevate Summum's beliefs while ignoring "multiple religious denominations, agnosticism, or atheism." *Id.* Total neutrality is the test under Utah's article 1, section 4.

The Utah CSA complies with the constitutional standard of neutrality. It is a uniform law that applies to everyone in the State of Utah. The Utah CSA certainly was not enacted to impair Singularism's alleged beliefs. Singularism was not formed until decades after the Utah CSA classified psilocybin as a Schedule I drug. *See, e.g.*, Utah Code Ann. § 58-37-4 (West 2004). [*See also* Jensen Dec. (Dkt. 9-1) at ¶ 18 (Singularism founded in "fall of 2023")]. Plaintiffs cannot establish that a longstanding law enacted and enforced for non-religious reasons violates the constitutional "concept of governmental neutrality." *Soc'y of Separationists, Inc.*, 870 P.2d at 937.

Utah law at the time of statehood further rebuffs Plaintiffs' constitutional arguments. *See S. Salt Lake City v. Maese*, 2019 UT 58, ¶ 18, 450 P.3d 1092 (evaluating "the meaning of the text as understood when it was adopted"). Ten years before the Utah Constitution was finalized, the Supreme Court of the Territory of Utah affirmed a city ordinance that allowed only "druggists" to "sell such liquors as a medicine." *Provo City v. Shurtliff*, 4 Utah 15, 5 P. 302, 302-03 (Utah 1885). Three years after the constitution was adopted, the Utah Legislature dedicated an entire Title of the Utah Code to "Pharmacy." *See* 1898 Revised Statutes of Utah §§ 1711-27 (Title 51). Among other things, the 1898 code declared, "it shall not be lawful for any person other than a registered pharmacist to compound or dispense drugs." *Id.* § 1711; *see also id.* § 42 (authorizing cities to "punish and prohibit" opium); *id.* § 38 (allowing cities to "license, tax, and regulate" "druggists").

Plaintiffs' Motion fails to seriously engage with the Utah Constitution or its history. Instead, it leaps to the conclusion that "strict scrutiny . . . applies under Article I, Section 4 of the Utah Constitution." [Motion at 27]. "This proposed test does not come from the language of the [Utah] constitution or from our case law . . . ." *Jeffs v. Stubbs*, 970 P.2d 1234, 1249 (Utah 1998); *see also id.* ("We have never determined whether the free exercise clause of article 1, section 4 of

the Utah Constitution provides protection over and above that provided by the First Amendment to the United States Constitution."); *Am. Bush v. City of S. Salt Lake*, 2006 UT 40, ¶ 11, 140 P.3d 1235 ("In light of the fact that the Utah Constitution was adopted against the background of over a century of experience under the United States Constitution, an understanding of the First Amendment contemporary to its adoption is also instructive." (cleaned up)); Utah Constitutional Convention Day 25, p. 437 ("A constitutional convention, such as we are now holding, has its sphere largely determined by the overshadowing Constitution of the United States, which we have already adopted as a condition precedent to framing a Constitution for the prospective State of Utah.").

The Court should refuse Plaintiffs' efforts to adopt a new meaning of the Utah Constitution.

### C. The Court Lacks Jurisdiction Over Plaintiffs' Statutory Claim, Which Also Fails on the Merits.

Plaintiffs' affirmative claim under Utah Code Chapter 33, ("Utah RFRA") also must be rejected. *See* Utah Code § 63G-33-101. Initially, the Court lacks jurisdiction to adjudicate that claim because Plaintiffs failed to provide notice as required by the Utah RFRA and the Governmental Immunity Act of Utah ("GIAU"). Even if that failure were overlooked, Plaintiffs' arguments fail as a matter of fact and law.

#### 1. *The Court lacks jurisdiction over Plaintiffs' claims because they failed to provide notice under the GIAU.*

"Any person having a claim against a governmental entity, or against the governmental entity's employee . . . shall file a written notice of claim with the entity before maintaining an action . . . ." Utah Code § 63G-7-401(2). "A plaintiff's failure to comply with the [GIAU's] notice of claim provisions deprives the trial court of subject matter jurisdiction." *Patterson v. Am. Fork*

*City*, 2003 UT 7, ¶ 10, 67 P.3d 466.  The Legislature incorporated this notice requirement within the Utah RFRA.  "[A] person may not bring an action . . . unless, at least 60 days before the day on which the person brings the action, the person provides written notice to the government entity, in accordance with" the GIAU.  Utah Code § 63G-33-201(5)(a).

Plaintiffs did not provide the notice required by the GIAU and the Utah RFRA.  Instead, they rely on an exception that does not apply.  The Utah RFRA excepts the requirement of a GIAU notice only if the "government action alleged in the action": (a) "is ongoing" and providing GIAU notice "will place an undue hardship on the person" or (b) "is likely to occur or reoccur before the end of the 60-day period."  Utah Code § 63G-33-201(5)(b).  Plaintiffs' Motion does not establish that exception.  Instead, merely quotes it without further analysis.  [Motion at 22].

The statutory notice exception might not apply if this Court were presiding over a criminal case and Plaintiffs were asserting a "defense" in response to pending criminal charges.  *See id.* at § 63G-33-201(4) (confirming Utah RFRA may be asserted "as a claim or defense").  At least under those circumstances, the government's prosecution would be "ongoing."  That is not the circumstance before this Court.  Nor does the notice exception justify Plaintiffs' rushed initiation of an affirmative civil case.  Plaintiffs cannot show "ongoing" government action.  The search warrant issued November 4, 2024.  [*See* Dkt. 9-9].  Plaintiffs have not alleged any ongoing warrants or searches, or that additional searches are "likely to occur" within 60 days.[4]  Finally, any alleged threat of criminal prosecution cannot form the basis for expedited resolution because that threat has been apparent for more than 12 months.  [*See* Complaint at ¶ 23].

---

[4] The hearing on Plaintiffs' Motion is scheduled to occur 39 days after the warrant issued.

Recognizing the criminal nature of Plaintiffs' conduct, "letters were sent to . . . the Provo Police Department, as well as the Utah County Attorney's Office" when Singularism opened in September 2023. [Complaint (Dkt. 2-2) ¶ 22]. Plaintiffs' litigation counsel sent those letters. [*See* Dkt. 9-2]. The letters argued Plaintiffs' "practices are conducted consistent with the protections granted by the First Amendment . . . [and] the Utah Constitution." [*Id.*]. Plaintiffs, and their lawyers, could have drafted those letters to comply with the GIAU notice provisions. They did not. *See* Utah Code § 63G-7-401(2). Nor do Plaintiffs allege otherwise.

After Singluarism opened, "there was media coverage" concerning its illegal practices. [*See* Complaint (Dkt. 2-2) ¶ 23]. That coverage "included a statement from the Utah County Attorney's Office." By November 3, 2023, the "public prosecutor for the county," *see* Utah Code § 17-18a-202, had declared "it does not appear that Singularism has Constitutional protections to either use [or] administer psilocybin." [*Id.*]. Again, Plaintiffs did not respond with a timely GIAU notice that set forth Plaintiffs' arguments.

The purpose of a GIAU notice is to allow the government to evaluate a party's position and, where appropriate, take corrective action to avoid a lawsuit. *See Mecham v. Frazier*, 2008 UT 60, ¶ 17, 193 P.3d 630. That purpose is eviscerated if Plaintiffs' approach is accepted; a private party could sit in wait, confident that the exception would swallow the rule.

At the very minimum, Plaintiffs' decision to sit still is enough to deny their demand for an emergency injunction. "[E]quity aids the vigilant, not those who slumber on their rights . . . ." 11A Fed. Prac. & Proc. Civ. § 2946 (3d ed.). Additionally, because Plaintiffs' alleged injuries all stem from another judicial process (the criminal process that began with the search warrant), they could seek to dismiss any future criminal prosecution on essentially the same bases they assert

20

here. "[I]f the party seeking the injunction could raise the same issues in the other proceeding, the court typically will take the position that the party has an adequate alternative remedy and does not need injunctive relief." 11A Fed. Prac. & Proc. Civ. § 2942 (3d ed.).

**2. *Plaintiffs have not established that they satisfy the provisions of the Utah RFRA.***

Even if Plaintiffs provided timely notice of their Utah RFRA claim, that claim still fails.

A. <u>Compliance with Utah law does not substantially burden singularism.</u>

To prevail on a claim under the Utah RFRA, Plaintiffs must establish government action that "substantially burdens" their religious beliefs. *See* Utah Code § 63G-33-201. "A government act imposes a 'substantial burden' on religious exercise if it . . . prevents participation in conduct motivated by a sincerely held religious belief, or . . . places substantial pressure on an adherent to engage in conduct contrary to a sincerely held religious belief." *United States v. Jeffs*, No. 2:16-cr-82, 2016 WL 6745951, at *6 (D. Utah Nov. 15, 2016) (quoting *Hobby Lobby Stores, Inc, v. Sebelius*, 723 F.3d 1114, 1138 (10th Cir. 2013)); *see* Utah Code § 63G-33-101.

Jensen claims he must choose between "giv[ing] up his sincerely held religious beliefs" or facing "the prospect of escalated threats from law enforcement and promised prosecution." [Motion at 14]. However, Plaintiffs have failed to establish that complying with the Utah CSA substantially burdens their ability to practice Singularism. On the contrary, members who violate the law expressly ***do not*** act in accordance with Singularism's values. [Dkt. 9-16 at 4 (expressing "compliance with governmental laws" as a value)].

Additionally, Plaintiffs have not demonstrated that the use of psilocybin mushrooms is mandatory or critical to Singularism. [Dkt. 9-16 (indicating the experience is available only to

21

"adults who feel naturally called to it"); Dkt. 9-3 (restricting minors from using psilocybin)]. There is nothing in the record that indicates the total number of Singularism's members, nor the frequency with which they ingest psychedelic drugs. There is nothing that restricts Singularism's beliefs to those who pay Jensen to supply them with psilocybin, nor is there anything that prevents its members from experiencing "oneness of all existence" through other means. [Dkt. 9-16 at 3 (encouraging members to "discover and define their own beliefs" and "[w]rite [their] own scripture")]. Indeed, Singularism's materials suggest that it can be experienced "by merely [sic] meditation in our ceremonies." [*Id.* at 2]. Thus, Plaintiffs have failed to establish a substantial burden. *See Jeffs*, 2016 WL 6745951, at *6–*10 (concluding no substantial burden was present where prosecution still permitted members to believe in and practice their religion); *see also State v. White*, 271 P.3d 1217, 1225-26 (Idaho Ct. App. 2011) (finding no burden where member could obtain spiritual experiences through tai chi and yoga).

Moreover, Singularism expressly defers to medical providers. "Singularism always advises that you seek your own medical council . . . ." [Dkt. 9-2 at 3]. That medical advice "***supersedes [Singularism's] spiritual advice*** in medical and physical matters." [*Id.* (emphasis added)]. Singularism ***does not*** mandate or limit who can administer psilocybin to its members. And Plaintiffs argue that Utah's Psilocybin Act now allows medical providers to "determine how, when, where, to whom, and for what reason psilocybin is administered to their patients." [Motion at 30 (citing Utah Code § 58-37-3.5 *et seq.*)]. If medical providers offer psilocybin treatment to Singularism's followers, there is no religious impingement; psilocybin remains available. If medical providers determine a Singularism adherent ***does not*** qualify for psilocybin therapy, that medical determination "supersedes spiritual advice." [Dkt. 9-2 at 3]. This alone defeats

22

Singularism's Free Exercise Claim.  *See Strope v. Cummings*, 381 F. App'x 878, 882 (10th Cir. 2010) ("At a minimum the substantial burden test requires more than an inconvenience to one's religious practice." (cleaned up)).

Because Singularism does not mandate the use of psilocybin, and because its members apparently can obtain psilocybin through supervised regulatory channels, Singularism has failed to establish a substantial burden on its self-declared religion.

> B.    <u>Plaintiffs cannot establish that their psilocybin use is "substantially motivated by a sincerely held religious belief."</u>

Utah's RFRA states, "a government entity may not substantially burden the free exercise of religion."  Utah Code § 63G-33-201(2)(a).  "Free exercise of religion" is defined as acting "in a manner ***substantially motivated by a sincerely held religious belief***."  *Id.* at § 63G-33-101(2) (emphasis added).  That definition further assumes or requires "a larger system of religious belief," not merely a belief in one otherwise illegal act.  *Id.*

Although Utah courts have not yet interpreted the Utah RFRA, the statute is modeled after the federal Religious Freedom Restoration Act.  *See* 42 U.S.C. § 2000bb, *et seq.*  Courts have restricted RFRA protections to situations where a party demonstrates the existence of "a bona fide religion."  *See, e.g.*, *United States v. Meyers*, 906 F. Supp. 1494, 1499 (D. Wyo. 1995) ("*Meyers I*"), *aff'd in* 95 F.3d 1475 (10th Cir. 1996) ("*Meyers II*").  Unless this threshold is met, Utah's RFRA "could easily become the first refuge of scoundrels if defendants could justify illegal conduct simply by crying 'religion.'"  *Meyers I*, 906 F. Supp. at 1498; *see also Founding Church of Scientology of Washington, D.C. v. United States*, 409 F.2d 1146, 1161 (D.C. Cir. 1969) ("When otherwise proscribed substances are permitted to be used for purposes of worship, worship must be defined.").

23

"Though the sensitivity of this task has caused courts to tread lightly on the waters of religion, they have not feared to tread there" because "when an individual invokes the first amendment to shield himself or herself from otherwise legitimate state regulation, [courts] are required to make such uneasy differentiations." *Meyers I*, 906 F. Supp. at 1501 (quoting *Africa v. Com. of Pa.*, 662 F.2d 1025, 1031 (3d Cir. 1981)).

In *Meyers II*, the Tenth Circuit adopted five factors to consider in the search for a "sincerely held religious belief." *See Meyers II*, 95 F.3d at 1484. These "indicia of religion" consist of the following: (1) ultimate ideas, (2) metaphysical beliefs, (3) moral or ethical systems, (4) comprehensiveness of beliefs, and (5) accouterments of religion, which includes ten separate subfactors. *Id.* at 1483–84. The subfactors under the fifth factor consider whether the religion has: (a) a founder, prophet, or teacher, (b) important writings, (c) gathering places, (d) keepers of knowledge, (e) ceremonies and rituals, (f) structure or organization, (g) holidays, (h) diet or fasting, and (j) propagation or missionary work. *See id.*

The *Meyers I* and *Meyers II* cases involve two charges from the United States against Meyers relating to marijuana possession and distribution. *See id.* at 1479. Meyers sought dismissal of the charges "based on religious freedom under the First Amendment and the Religious Freedom Restoration Act." *Id.* Meyers "founded the 'Church of Marijuana,'" a church with "800 members and one designated meeting spot." *Meyers I*, 906 F. Supp. at 1504. According to Meyers, the church's religion was "to grow, possess, and distribute marijuana." *Id.* "The church's only ceremony revolves around one act: the smoking and passing of joints," which "apparently results in a sort of 'peaceful awareness'" and "plays a role in social bonding." *Id.* The Tenth Circuit agreed that Meyers' beliefs did not "rise to the level of a 'religion.'" *Id.* at 1508; *Meyers II*, 95

24

F.3d at 1484. Although the court noted that smoking marijuana "can engender or induce different mental states of being, this does not mean that deliberately altered physical states of being are themselves 'religious.'" *Id.*; *accord id.* ("Were the Court to recognize Meyers' beliefs as religious, it might soon find itself on a slippery slope where anyone who was cured of an ailment by a 'medicine' that had pleasant side-effects could claim that they had founded a constitutionally or statutorily protected religion based on the beneficial 'medicine.'"). The Tenth Circuit declined to extend RFRA to "professed beliefs" that had "an ad hoc quality that neatly justif[ied] [Meyers'] desire to smoke marijuana." *Meyers II*, 95 F.3d at 1484.

In another similar case, the Tenth Circuit evaluated the drug-related views of the "Church of Cognizance." *United States v. Quaintance*, 471 F. Supp. 2d 1153 (D.N.M. 2006) ("*Quaintance I*"), *aff'd in* 315 F. App'x 711 (10th Cir. 2009) ("*Quaintance II*"). Like *Meyers*, the defendants in *Quaintance* were charged with possession of marijuana with intent to distribute. *Quaintance I*, 471 F. Supp. 2d at 1154. Quaintance was "the founder of the Church of Cognizance," which maintains "that marijuana is a sacrament and deity and that the consumption of marijuana is a means of worship." *Id.* at 1155. The defendants cited RFRA and sought dismissal of the criminal charges. *Id.* Applying the *Meyers* factors, the Tenth Circuit "determined that the Quaintances' beliefs did not qualify as a religion" and that "the Quaintances' beliefs were not sincere." *Quaintance II*, 315 F. App'x at 713.

In addition to the *Meyers* factors, other considerations demonstrated the Church of Cognizance's beliefs were not religious. For example, beliefs about the "medical, physical, and social" benefits of marijuana were "secular and not religious." *Quaintance I*, 417 F. Supp. 2d at 1171. The court recognized the "Church of Cognizance excludes minors from participating in the

App-1:275

sacrament of marijuana (unlike other religions which allow minors to consume sacramental wine)." *Id.* at 1171 n.18. The court found the defendants "adopted their 'religious' belief in cannabis as a sacrament and deity in order to justify their lifestyle choice to use marijuana." *Id.* at 1171. The court further concluded that "[e]vidence of Defendants' commercial involvement with marijuana" demonstrated a "monetary, as opposed to religious" motive. *Id.* at 1173. Finally, the Court found that the possession of other controlled substances (cocaine) undermined "Defendants' assertion that they consume marijuana for religious, as opposed to secular, purposes." *Id.* at 1174.

In *United States v. Kuch*, 288 F. Supp. 439 (D.C. Cir. 1968), the court considered whether the New-American Church's use of psychedelic drugs (LSD) was protectable as a religious exercise. *Kuch*, 288 F. Supp. at 442. Kuch was an ordained minister of the Neo-American Church, which had a "nationwide membership of about 20,000." *Id.* at 442–43. Members of the church subscribed to several principles, including that "[e]veryone has the right to expand his consciousness" and that "psychedelic substances, such as LSD, are the true Host of the Church, . . . are sacramental foods, manifestations of the Grace of God, of the infinite imagination of the Self, and therefore belong to everyone." *Id.* at 443. Kuch contended that "ingestion of psychedelic drugs brings about a religious awareness and sharpens religious instincts." *Id.* at 444.

Although the D.C. Circuit recognized that the "dividing line between what is, and what is not, a religion is difficult to draw," the court concluded that the church's members were not "motivated by or associated because of any common religious concern." *Id.* There was no evidence "of a belief in a supreme being, a religious discipline, a ritual, or tenets to guide one's daily existence." *Id.* Rather, the court found that "the desire to use drugs and to enjoy drugs for their own sake, regardless of religious experience, is the coagulant of this organization and the

reason for its existence." *Id.* It was not enough "that some . . . persons using LSD . . . may have what some users report to be religious or mystical experiences." *Id.*

Recently, the Ohio Court of Appeals reached the same conclusion concerning psilocybin mushrooms. *Sobel*, 221 N.E.3d 44. After being arrested, Sobel maintained "that he used psilocybin mushrooms for 'religious and spiritual purposes'" as part of the Church of Freewater. *Id.* at 47. The church used psilocybin as "a holy sacrament . . . that helps . . . tap into the divine knowledge that is only accessible with the aid of these divine teachers." *Id.* at 47–48. According to the Church of Freewater, there was "not a one size fits all approach" to religion; "[e]very being deserves to be free and make the best decision for their mind, body and spirit." *Id.* at 48.

The court determined that "Sobel failed to establish that he uses psilocybin mushrooms in connection with a sincerely held religious belief." *Id.* at 50. The court found that Sobel did "not describe any particular religious beliefs or tenets of the organization, other than to help people 'be themselves, through mind, body, and spirit.'" *Id.* Essentially, the "core belief" of the Church of Freewater was to allow "people to believe whatever he or she wants to believe." *Id.* Under these circumstances, Sobel's belief was more "accurately characterized as a personal preference, rather than as a deeply held religious conviction." *Id.* Sobel's beliefs did not fill "a place in the life of its possessor parallel to that filled by the orthodox belief in god." *Id.*

Courts throughout the country have reached similar conclusions. *See, e.g.*, *State v. Hardesty*, 214 P.3d 1004 (Ariz. 2009) (en banc) (rejecting argument based on "sacrament[al]" use of marijuana); *State v. White*, 271 P.3d 1217, 1222 (Idaho Ct. App. 2011) (rejecting defense because White "borrowed the ideology of many different religions . . . to meld into a justification for his use of marijuana"); *State v. Brashear*, 593 P.2d 63 (N.M. Ct. App. 1979) (ruling defendant's

27

drug use was not excused by "a principle, tenet, or dogma of any organization of which he was a member," considering factors such as the length and nature of defendant's beliefs); *State v. Balzer*, 954 P.2d 931 (Wash. Ct. App. 1998) (rejecting defense and recognizing that a contrary ruling would result in drug users "seek[ing] membership in these religions to invoke protection for their use that would otherwise be unlawful").

As these cases show, Plaintiffs are not the first parties to try and justify illegal drug use through the guise of religion. This Court should reject Plaintiffs' arguments because: (1) Singularism does not satisfy the *Meyers* factors, and (2) other considerations establish a lack of action substantially motivated by a sincerely held religious belief.[5]

C.       *Meyers Factors.*

Plaintiffs fail the five *Meyers* factors. *See* They cannot establish that their illegal drug use is substantially motivated by a sincerely held religious belief because Singularism: (i) lacks any non-secular ultimate ideas, (ii) does not express any non-secular metaphysical beliefs, (iii) prescribes no system of morals or ethics, (iv) does not represent a comprehensive system of beliefs, and (v) lacks many of the accoutrements that typically accompany bona fide religions.

i.       Ultimate Ideas.

"[A] religion addresses fundamental and ultimate questions having to do with deep and imponderable matters." *Meyers II*, 95 F.3d at 1483. These matters often extend to "existential

---

[5] At minimum, the sincerity of Plaintiffs' religious beliefs and the classification of Singularism as a bona fide religion involve factual questions that would be prematurely resolved absent an evidentiary hearing or discovery. *See United States v. Jeffs*, No. 2:16-cv-82, 2016 WL 6745951, at *3 (D. Utah Nov. 15, 2016) ("The issue of sincerity is a factual matter.").

matters, such as man's sense of being; teleological matters, such as man's purpose in life; and cosmological matters, such as man's place in the universe." *Id.*

Singularism does not answer "fundamental and unique questions." According to Jensen's declaration, Singularism "does not claim special access to divine truths or elevate itself above others." [Dkt. 9-1 at ¶ 20]. Instead, individuals are encouraged "to find their own spiritual revelations and solutions." [*Id.*; *see also* Dkt. 9-16 at 3 ("[I]ndividuals . . . define their own beliefs.")]. A doctrine of allowing "people to believe whatever he or she wants to believe" or to help people "be themselves, through mind, body, and spirit" are personal opinions, not "a deeply held religious conviction." *Sobel*, 221 N.E.3d at 47.

Additionally, Singularism does "not claim any special or unique access to God that is unavailable to others." [Dkt. 9-3 at 4]. On the contrary, it holds "that all people are capable of connecting with the Divine and receiving equally valid and transformative revelations." [*Id.*]. Finally, Singularism expressly acknowledges that it does not answer ultimate questions of teleological matters, *i.e.*, "a man's purpose in life" or the "origin of the universe," instead claiming that "the ultimate purpose of existence" and "origin of the universe before the Big Bang" is "beyond human comprehension." [Dkt. 9-17 at 5; *see also* Dkt. 9-16 ("[N]o organization, including ours, has all the answers to life's most difficult questions.")].

ii.    Metaphysical Beliefs.

Singularism claims that "entheogenic experiences . . . connect directly to the divine and ultimate truths of existence." [Dkt. 9-17 at 7; *id.* at 4 (indicating psilocybin allows voyagers "to see beyond the narrow constructs of our senses" and "awaken[] awareness")]. However, legal precedent confirms that poetic descriptions of drug-induced hallucinations are not the same as

29

sincere religious beliefs. "There is nothing metaphysical" about halogenic drugs causing "altered physical states of being"; that is a "psycho-pharmacological effect." *Meyers I*, 906 F. Supp. at 1505. Even though "certain physical states of being can engender or induce different mental states of being," including states of "peaceful awareness," "this does not mean that deliberately altered physical states of being are themselves 'religious.'" *Id.* Thus, the *Sobel* court rejected the contention that psilocybin mushrooms enabled the defendant to "tap into the divine knowledge that is only accessible with the aid of these divine teachers." *Sobel*, 221 N.E.3d at 48. In *Kuch*, the D.C. Circuit rejected the contention that LSD enabled users to "expand . . . consciousness," experience "the infinite imagination of the Self," and bring about "religious awareness and sharpens religious instincts." *Kuch*, 288 F. Supp. at 443–44.

### iii.    Moral and Ethical System.

"Religious beliefs often prescribe a particular manner of acting, or way of life, that is 'moral' or 'ethical.'" *Meyers II*, 95 F.3d at 1483. These beliefs "often describe certain acts in normative terms, such as 'right and wrong,' 'good and evil,' or 'just and unjust.'" *Id.* "A moral or ethical belief structure also may create duties—duties often imposed by some higher power, force, or spirit—that require the believer to abnegate elemental self-interest." *Id.*

Singularism does not offer an objective moral or ethical system. *See id.* Singularism's members instead are free to "discover and define their own beliefs." [Dkt. 9-16 at 3]. While Singularism aims "to make the world a more enlightened place and to alleviate suffering," [Dkt. 9-16 at 2], there are no actual directives or framework for accomplishing either. Instead, Singularism

30

vaguely suggests that its members "strive to alleviate suffering whenever [they] encounter it, beginning with [themselves] and radiating outward to others."[6]  [*Id.*].

"A spiritual or ethical system is not comprised of simply one vague and unspecific motto." *Quaintance I*, 471 F. Supp. 2d at 1161.  Singularism's references to "empathy," "compassion," "growth," "integrity," "hope," and "humility" do not constitute a religion.  [*See* Dkts. 9-16 – 9-17].  In fact, the same types of buzzwords can be found, for example, in government mission and values statements.  *See, e.g.*, Utah State Treasurer, *Mission & Core Values* ("ethical," "honest," "responsibility," "empathy," "compassion")[7]; Utah Department of Environmental Quality, *Our Mission, Vision, and Values* ("integrity," "reliable," "professional," "prosperous," "fair").[8]

Nothing in the record establishes that this alleged "system" "has a religious, as opposed to secular or philosophical, connotation." *Quaintance I*, 471 F. Supp. 2d at 1161.  Nothing "require[s] believers to abandon base or elemental self-interest." *Meyers I*, 906 F. Supp. at 1505.  Nor is there any explication of "precisely what" actions would be considered "good" versus "bad." *Quaintance I*, 471 F. Supp. 2d at 1161.  Nothing "restrains members from doing that which they should not do, or binds them to do that which they should do." *Meyers I*, 906 F. Supp. at 1505.

iv.    <u>Comprehensiveness.</u>

Religions "provide a *telos*, an overreaching array of beliefs that coalesce to provide the believer with answers to many, if not most, of the problems and concerns that confront humans." *Meyers II*, 95 F.3d at 1483.  "The Tenth Circuit's definition of comprehensiveness requires

---

[6] Singularism further touts one of its values to be "compliance with governmental laws." [Dkt. 9-16 at 4].  This is ironic given Singularism's possession and distribution of illegal drugs.

[7] https://treasurer.utah.gov/about/mission-and-core-values/

[8] https://deq.utah.gov/general/mission-vision-values

31

multiple beliefs." *Quaintance I*, 471 F. Supp. 2d at 1162 (citing *Meyers II*, 95 F.3d at 1483); *see also id*. (concluding "Defendants' beliefs are not comprehensive because they are not uniform" where "[e]ach member of the Church of Cognizance is entitled to adopt his or her own individual beliefs").

Singularism does not offer "answers to many, if not most, of the problems and concerns that confront humans." *Meyers II*, 95 F.3d at 1483. Instead, Singularism's members "discover and define their own beliefs." [Dkt. 9-16 at 3]. Singularism's members are free to believe in ***any*** comprehensive belief from ***any*** religion. [*See* Dkt. 9-3 at 4 ("Singularism does not require 'religious exclusivity' and permits members to maintain "affiliations, beliefs, [and] practices in other religions.")]. Seemingly, the only "common goal" shared by Singularism's followers is "the incredible world of psychedelics." [*See* SOF ¶ 11].

Singularism may argue that its "Octadrant functions as a comprehensive map of existence." [Dkt. 9-17 at 8]. However, the Octadrant "categorizes" knowledge and serves as a framework for "navigating human epistemology." [Dkt. 9-17 at 2–3]. For example, the Octadrant distinguishes between "provable" truths and beliefs "that cannot be empirically validated." [Dkt. 9-17 at 3–4]. Additionally, the Octadrant recognizes that some empirical truths are "not yet known" and that some truths are "beyond human comprehension." [*Id.* at 4–5]. Generalities about human knowledge do not "provide the believer with answers to many, if not most, of the problems and concerns that confront humans." *Meyers II*, 95 F.3d at 1483. Nor are they religious. Philosophers have long recognized the limits of human perception independent of religious beliefs.[9]

---

[9] *See, e.g.*, Immanuel Kant, *Critique of Pure Reason*, 70–81 (1971); T.K. Seung, *Kant's Conception of the Categories*, THE REVIEW OF METAPHYSICS 43 No. 1 (1989).

Singularism cannot simply borrow longstanding secular, philosophical concepts and brand them as religious excuses for illegal drug use.

v.      <u>Accoutrements</u>

Finally, courts look to analogous traits of "established or recognized religions" to establish whether "a particular set of beliefs [are] 'religious.'" *Meyers II*, 95 F.3d at 1483. The corresponding subfactors demonstrate that the Court is not faced with sincerely held religious beliefs:

a. Singularism has no prophet. [Dkt. 9-16 ("[N]o voyager, practitioner or leader is more of a prophet than another."); *see also* Dkt. 9-1 ¶ 23 ("I do not see myself as a prophet")];

b. Singularism's "scripture" is a "conceptual framework," consisting of secular knowledge classifications. [*See supra*]. The scripture also is "constantly evolving," which undermines its place as scripture in Singularism. *Quaintance I*, 471 F. Supp. 2d at 1165. [Dkt. 9-16 at 2 (referring to "a living scripture"); *id.* (encouraging members to "Write your own scripture.")];

c. The record does not indicate that Singularism has any "sacred, holy, or significant" gathering place. *Quaintance I*, 471 F. Supp. 2d at 1166. Instead, Singularism's street address is at a townhome, [*see supra*], and it appears to rent commercial space from Utah Valley Foot and Ankle. [Dkt. 9-11];

d. Singularism does not have organized leadership or keepers of knowledge. [Dkt. 9-16 ("[N]o voyager, practitioner or leader is more of a prophet than another.")]. Indeed, there is "no uniform set of knowledge to keep." *Quaintance I*, 471 F. Supp. 2d at 1167;

e. Despite claiming ingestion of psilocybin as a "sacrament," [*see* Dkt. 9-18]*,* there is no mandate to participate, [Dkt. 9-16 (applying only to "adults who feel naturally called to it")], no specified "services," "prayers," liturgies, or "blessings," and no dictate that the sacrament "be performed at a certain time or a certain day, or even a certain frequency." *Quaintance I,* 471 F. Supp. 2d at 1167–68 (cleaned up) ; and

f. Nothing in the record suggests that Singularism has any holidays, specialized diet or restrictions, required clothing, or missionary work and proselytizing. *Id.* at 1169–1170.

33

D.    *Other Considerations Weigh Against a Finding of a Sincerely Held Religious Belief.*

In addition to the *Meyers* factors, courts have considered other criteria when assessing the sincerity of an alleged religious belief.  *See Quaintance I*, 471 F. Supp. 2d at 1170.   For example, the defendants in *Quaintance I* defended their drug use not only on religious grounds but also based on "their belief in marijuana's medicinal and therapeutic effects." *Id.*  Similarly, the record before the Court confirms that Singularism's defense of psilocybin is not religious.  Instead, they cite "scientific and medical research" studying "clinical practices used in mental health therapy." [Motion at 10; *see also* Dkt. 9-15].

Health effects aside, Jensen also warns of "unethical behaviors within the underground psychedelic community" and the desire to find a "safer" way of using psychedelic drugs.  [Dkt. 9-1, ¶ 16].  Singularism's secular justification of psilocybin undermines its position that its actions are religiously motivated.  *Quaintance I*, 471 F. Supp. 2d at 1170–71.

The ad hoc nature of Plaintiffs' beliefs also indicates that they "adopted their 'religious' belief" to justify their prior decision to use psilocybin.  *Id.* at 1171.  Jensen's use of psychedelic drugs predates Singularism's "founding" by more than twenty years.   [Dkt. 9-1, ¶¶ 11, 13]. Jensen's use of psychedelic drugs "played a significant role in [his] marriage ending" before Singularism was formed.  [*Id.* at ¶ 14].  Jensen's use of psychedelic drugs caused him to abandon his professional career in 2019.  [*Id.* at ¶ 15].  Jensen did not claim to have establish the religion until years later, "in the fall of 2023," [*id.* at ¶ 18], when he worked with his lawyer to structure a religion based on "prior cases in which people claimed religious exemption; where those claimants won or lost."  [Julian Aff. (Ex. A) at p.4].  Singularism's conveniently-founded religion, which

34

just so happens to match Jensen's longstanding consumption of psychedelic drugs, undermines Plaintiffs' position. *Quaintance I*, 471 F. Supp. 2d at 1171–72.

Further, Singularism's commercial enterprise confirms that they have a financial motive to shield the use of psilocybin mushrooms, which they sell to third parties for thousands of dollars. [*See supra* at SOF § III]. Moreover, Singularism's use of illegal drugs does not end at psilocybin—the police also seized THC. [*See supra* at SOF § 4]. In addition to the *Meyers* factors, these considerations weigh against finding that Plaintiffs' beliefs are sincerely held and that Singularism is a bona fide religion. *Quaintance I*, 471 F. Supp. 2d at 1173–74.

### 3. *Regardless, the State has a compelling interest in regulating controlled substances.*

Even if Plaintiffs could establish the CSA would "substantially burden" an act "substantially motivated by a sincerely held religious belief," Plaintiffs still lose. *See* Utah Code § 63G-33-101. "A government entity . . . may substantially burden a person's free exercise of religion" if the government narrowly acts pursuant to a compelling governmental interest." *Id.* at § 63G-33-201(3).

Plaintiffs cannot seriously dispute the legitimacy of a government interest in defining and regulating the use of drugs. Drug laws have existed in Utah since at least 1851. *See* Laws & Ordinances of the State of Deseret, Compilation 1851 at p. 25-26 (Shepard Book 1919) (regulating "quicksilver, arsenic, antimony . . . night-shade, henbane, opium" and other "drugs, medicines, and other preparations"). In 1971, Utah adopted the Uniform Controlled Substances Act. *See* Uniform Law Commission, Controlled Substances Act.[10] The current prefatory note to the

---

[10] https://www.uniformlaws.org/committees/community-home?CommunityKey=9873a9bf-7335-4be7-855d-b17c9e8ff3dd#LegBillTrackingAnchor

Uniform Act recognizes that the "drug abuse problem has reached epidemic proportions." Uniform Controlled Substances Act (1994) at prefatory note. This remains true in Utah. The Center for Disease Control reported that Utah had 627 drug overdose deaths in 2022, the latest year reported.[11] That same year, "174 individuals died on Utah roads due to an impaired driver."[12] Approximately 68% of all homicide victims in Utah "tested positive for any drug."[13] The Department of Justice reports that there are "more federal prisoners . . . serving time for a drug offense than for any other type of offense."[14]

Plaintiffs incorrectly suggest that, unlike other Schedule I drugs, psilocybin and the illegal trafficking of psilocybin produce no "effect on public safety." [*See* Motion at 1]. That is wrong. Psilocybin is a Schedule I drug because it "has no currently accepted medical use" and "has high potential for abuse." *See* Uniform CSA at § 203; 21 U.S.C. § 812(b). Locally, clinical tests involving psilocybin have resulted in serious adverse effects, including "hospitalization, intentional self-injury," "suicidal ideation," "depression, drug withdrawal syndrome, intentional self-injury, suicidal behavior," and "self harm."[15] Moreover, the illegal trafficking of and market for magic mushrooms directly impacts public safety. Utah has several High-Intensity Drug Trafficking Areas, including Utah County.[16] The illicit trafficking of psilocybin is rapidly increasing, with the number of seizures and total weight tripling over the past five reported years.[17]

---

[11] https://www.cdc.gov/nchs/pressroom/sosmap/drug_poisoning_mortality/drug_poisoning.htm
[12] https://highwaysafety.utah.gov/drive-sober/impaired-driving/
[13] https://le.utah.gov/interim/2023/pdf/00004015.pdf
[14] https://bjs.ojp.gov/document/fjs22.pdf
[15] https://www.utah.gov/pmn/files/903929.pdf
[16] https://www.hidtaprogram.org/index.php
[17] https://www.nih.gov/news-events/news-releases/law-enforcement-seizures-psilocybin-mushrooms-rose-dramatically-between-2017-

App-1:286

Plaintiffs try to minimize these legitimate and substantial government interests by arguing the "Utah Psilocybin Act" allows for licensed medical facilities to participate in "[FDA] Phase 3 testing for an investigational drug." [Motion at 28]. Plaintiffs then discount the obvious distinctions between limited, medically supervised, and FDA-approved clinical treatment and their unsupervised mushroom voyages. First, Plaintiffs have made *zero* attempt to establish that their mushrooms are (a) the same material as the FDA-approved Phase 3 tests; (b) given in the same dose; or (c) obtained from clinical sources that ensure purity, efficacy, and precise dosage. Second, Plaintiffs ignore that the FDA has issued detailed "Considerations for Clinical Investigations" involving psychedelics.[18]

Utah Code section 58-37-3.5 does not create a free market for psilocybin. Instead, it is a "very controlled program" limited to "reputable hospital systems." *See* Utah Senate 2024 General Session – Day 45 (Sen. Cullimore, Sponsor). Each healthcare system must "develop a behavioral health treatment program" that remains "under the direct supervision and control of the healthcare system." Utah Code § 58-37-3.5(2)-(3). The drugs administered by these large, licensed medical facilities must also be approved by the FDA as Phase 3 investigational drugs. *See id.* at § 58-37-3.5(1)(a).

There is zero evidence that Plaintiffs' "psychedelic therapy" even approximates the type of highly-regulated, FDA-approved clinical treatment allowed by the Utah Code.

---

2022#:~:text=The%20number%20of%20law%20enforcement,(1%2C861%20lbs)%20in%20202
2
[18] https://www.fda.gov/regulatory-information/search-fda-guidance-documents/psychedelic-drugs-considerations-clinical-investigations

**II.      Plaintiffs Have Not Established Irreparable Injury.**

"To constitute irreparable harm, an injury must be certain, great, actual 'and not theoretical.'" *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (quoting *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).

Plaintiffs have not proven that irreparable harm will occur absent the issuance of extraordinary, injunctive relief.  Even if Plaintiffs could establish that prosecution will occur with a certainty, "the mere fact" of prosecution is not, by itself, sufficient to establish that "sincerely held religious beliefs [are] substantially burdened."  *Jeffs*, 2016 WL 6745951, at *8.

More importantly, the proper operation of the judicial system is not irreparable harm.  If criminal charges are filed, Plaintiffs can present their Free Exercise arguments as a defense, where Singularism will "be represented by counsel during the state court trial" and will "have the right to appeal" any conviction.  *See Mendoza v. Thompson*, No. 1:15-cv-00090, 2015 WL 5693705, at *2 (D. Utah Sept. 28, 2015) (holding no irreparable harm existed where party could present defense as part of separate, state court prosecution).  If Singularism prevails on that defense, then no harm, let alone irreparable harm, will ensue.  *See* 11A Fed. Prac. & Proc. Civ. § 2942 (3d ed.) (recognizing that where a party can raise defenses in another proceeding, "the court typically will take the position that the party has an adequate alternative remedy and does not need injunctive relief").  There is no need for this Court to preemptively insert itself to any criminal proceedings.

Further, Plaintiffs' delay in seeking injunctive relief demonstrates the lack of irreparable harm.  *See Madruga v. Utah High Sch. Activities Ass'n Inc.*, No. 4:21-CV-00089, 2021 WL 4748493, at *8 (D. Utah Oct. 12, 2021) ("[E]quity aids the vigilant, not those who slumber on their rights.").  Plaintiffs are required to "complain of injuries promptly."  *Id.* (holding a one-month

delay "seriously undermine[d]" request for injunctive relief) (cleaned up).  Here, Plaintiffs were on notice that Singularism did not have "Constitutional protections to either use o[r] administer psilocybin," [Complaint (Dkt. 2-2) ¶ 23], for more than a year before it sought injunctive relief. Rather than file an action for declaratory judgment, Singularism did nothing.  Singularism cannot manufacture an emergency through inaction.  *See, e.g., Multi Denominational Ministry of Cannabis & Rastafari, Inc. v. Gonzales*, 474 F. Supp. 2d 1133, 1147 (N.D. Cal. 2007) (denying injunctive relief where "[n]othing before the court explain[ed] why the asserted sacraments of the Rastafari faith require complete immunity from the federal government's drug laws").

**III.    Plaintiffs Have Not Established That the Threatened Injury Outweighs the Public Interests.**

Where "Government is the opposing party," the Court considers the parties' interests and the public's interests together.  *See Chiles*, 116 F.4th at 1199; *see also Heideman*, 348 F.3d at 1191.

As noted above, Singularism has not suffered, and will not suffer, any irreparable harm because it may present its Free Exercise defense should any criminal proceedings arise.  In contrast, Defendants have an interest in being "permitted to enforce . . . criminal laws," and the public has "an interest in seeing that its duly enacted legislation is enforced."  *Mendoza*, 2015 WL 5693705, at *3–*4; *see also Heideman*, 348 F.3d at 1191 (recognizing the interest "to enact and enforce measures [deemed] to be in the public interest").

If the Court inaccurately denies this Motion, Plaintiffs face the potential prospect of making the same arguments in connection with a criminal case in connection with a motion to dismiss. That change of forum is not a substantial harm.  Indeed, Plaintiffs may benefit from the different burdens that exist in a criminal proceeding.  In contrast, if the Court improperly grants this Motion,

the public faces the prospect of unlicensed, unsupervised, and unstoppable use of illegal, halogenic substances in the community.  As noted, the potential harms range from improper dosage, unintended poisonings, illegal trafficking, and impaired driving.

The public interest favors the continued enforcement of Utah's long-standing drug laws, at least so long as any unresolved question of law or fact remains.

**IV.      If the Motion is Granted, Plaintiffs Should Post Security.**

Plaintiffs have not posted or offered to provide any security whatsoever for the requested injunction.  Under Rule 65, "the court may issue a preliminary injunction or a temporary restraining order *only* if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c) (emphasis added).  At a minimum, Plaintiffs should be required to post a bond of $100,000.  Given the price of Plaintiffs' "psychedelic therapy" and the cost of litigation, that amount is both achievable and warranted.

**CONCLUSION**

The definition of "Singularism" is "any philosophy that derives the universe from a single principle."  *See https://www.merriam-webster.com/dictionary/singularism.*  In this case, the "single principle" is Plaintiffs' desire to engage in unlicensed "psychedelic therapy."  That

principle is not enough to establish a constitutional or statutory basis to violate the Utah CSA.

Plaintiffs' Motion should be denied.

DATED this 9th day of December, 2024

JAMES DODGE RUSSELL & STEPHENS, P.C.

/s/ Mitchell A. Stephens
Mitchell A. Stephens
Justin L. James
Dillon P. Olson

*Counsel for Utah County and Jeffrey Gray*

PROVO CITY LEGAL

/s/ Rich Roberts
Rich Roberts

*Counsel for Provo City, Troy Beebe, Brian Wolken, and Jackson Julian*

41

# EXHIBIT A

_____

IN THE FOURTH DISTRICT COURT - ALL DEPARTMENT

IN AND FOR UTAH COUNTY, STATE OF UTAH

_____

**AFFIDAVIT FOR SEARCH WARRANT**

STATE OF UTAH )

                       :ss

County of Utah )

The undersigned affiant, Detective JACKSON JULIAN of Provo Police Department, upon an oath or written affidavit subscribed under criminal penalty, declares:

That your affiant has reason to believe:

THAT

On the premises known as 1969 N State Street, Provo, UT,further described as A brown brick building located in a business complex on the west side of North State St. The numbers "1969" are displayed on a white pillar, just outside the front entrance which sits at the bottom of an outdoor stair case. The word "Singularism" is printed on the glass front entrance door.;

On the person(s) described as:

    Bridger Lee Jensen (DOB 9/6/1981)

In the City of Provo, County of Utah, State of Utah, there is now certain property or evidence described as:

- Psilocybin Mushrooms
- Equipment used to ingest and/or cultivate psilocybin
- Business records which document the administering of psilocybin to clients
- Financial records which indicate transaction history of purchasing cultivation equipment, income produced by administering psilocybin to clients, and where the money garnered from this business is being kept

and that said property or evidence:

Was unlawfully acquired or is unlawfully possessed;

- Page 1 of 6 Search Warrant No. 2992661 -

has been used or is possessed for the purpose of being used to commit or conceal the commission of an offense; or

is evidence of illegal conduct.

Affiant believes the property and evidence described above is evidence of the crime or crimes of - Possession of Psilocybin (Schedule I Controlled Substance) with the Intent to distribute, per UCA 58-37-8
- Possession of Drug Paraphernalia, Per UCA 58-37A-5.

The facts to establish the grounds for issuance of a Search Warrant are:

I graduated Utah POST in May of 2018 and have been a law enforcement officer with Provo City Police Department since May of 2018. I have investigated numerous cases involving the use, possession, and/or distribution of illegal narcotics in the course of my duties as a sworn police officer. I am a member of the Provo Bomb Squad and Special Weapons and Tactics (SWAT) Team, a member of the Provo Special Enforcement Team, and a Field Training Officer. I have attended training on Advanced Search and Seizure, Advanced Traffic Stops, and the Utah Narcotics Officers Association. I have written, served, and/or assisted on hundreds of search warrants which have lead to successful prosecution throughout my career.

Provo Special Enforcement Team (SET) detectives received information in September of 2023 about a Facebook post advertising the opening of a "Mushroom Wellness Center" in Provo. The Facebook post listed the address for the center at a residence in Provo and that the grand opening would be on September 6, 2023. On September 6, 2023 I went to the residence and knocked on the door, I was greeted by a male at the front door. When I inquired about the mushroom wellness center, the male stated that I must be mistaken and he had no idea what I was talking about. When I spoke with the male at the door, there was no indication that there was any nefarious activity happening there.

On November 2, 2023, a FOX 31 News story was published about a mushroom treatment center called Singluarism opening its doors in Provo. The news article featured a male named Bridger Lee Jensen who claims to be the founder of the business. In the article, Bridger is quoted and audio/video recorded discussing his experiences in using psilocybin mushrooms. He also discusses how his treatment center is a place where people can "work on their lives and progress spiritually". He also discusses with the interviewer about "guided trips".

The news article discusses how Bridger pushed legislators to pass a bill to allow for the legal use of psilocybin. The bill Bridger is referencing is S.B. 200
"Psilocybin Recommendation Pilot Program Amendments". That bill's current location is found in "Senate file for bills not passed". In the news article, Governor Spencer Cox is quoted saying, "It's just not there yet. We got there with medical marijuana. I just don't believe the science is there. I don't believe we should be experimenting on 5000 people here in our state. And I think there are some serious consequences and side effects societally and as well as medically that I'm just not comfortable with."

The news interview goes on to where Bridger says the following, "When you get to the point where you have had these experiences and you've seen hundreds of people benefit and heeled from it, the scary thought is NOT doing it." According to the news article,

- Page 2 of 6 Search Warrant No. 2992661 -

Bridger claims that his business is protected by the Religious Freedom Restoration Act of the United States Constitution.

Later in November 2023 a concerned citizen, who did not want to be named, came forward wanting to speak with detectives about Bridger and his business. I met with the citizen and they advised me that Bridger has a website promoting the business and identified where the business was located. The website is Singularism.org and the business location is 1969 N State St, Provo, UT.

I went to the website and found that it shows Bridger Jensen as the founder, Alex Koritz as the Public Relations Director, Brandi Lee Didrickson as the administrative assistant. Mariangel Babbel as the Relations Specialist, Justin Sharp as the Chief Technical Officer, and Garett Robertson as the founder partner. The website shows a picture of Bridger appearing to provide some kind of council while a female lays on a couch and appears to be in an either unconscious or semi-conscious state. The website also includes testimonials of people who state they used psilocybin at Singularism.

The website states:
"At the heart of our spiritual practice lies the sacred tradition of Entheogenic Spiritual Guidance. We integrate the profound potency of psilocybin, a revered entheogenic substance with long standing religious use, into our own ceremonies as a means to facilitate deep spiritual connections and foster profound inner spiritual transformation. Our ceremonies are performed safely, sincerely religious, and crucial for producing the effective results from which our members reap invaluable benefits."

I found that throughout the website, there are several claims that Singluarism is a religious experience and as such it operates within the Utah State Constitution and United States Constitution. However, the website also states that Singularism charges for their "spiritual counseling services" at a rate of "approximately $180 per hour,...Participants book packages ranging from 20 to 40 hours at a time."

While Singularism claims to be religious, therefore exempt from the controlled substance act, their website states that participants "do not need to leave [their] current faith or religious beliefs to participate in Singularism's ceremonies."

I spoke with a Utah County Attorney regarding this case and was advised that their office does not feel that Singularism's claim to have religious exemption has any merit and that if there is evidence of anyone possessing, using, distributing, or cultivating psilocybin, that person is subject to prosecution in the state of Utah.

Over the last few months I have continued researching Singularism to try and determine the legitimacy of their claims for the legal use of psilocybin under claims of religious exemption. While on the website, I found a link to register for a free webinar. I also found the website to promote an "academy" to become a "Certified Psychedelic Practitioner". I applied to register for the webinar under an undercover alias.

On October 14, 2024, after registering for the webinar, I received a call from 801-203-0102. When I answered, the male on the other end of the line identified himself as Bridger Jensen. He was calling to follow-up on my application. We spoke for a few minutes about my interest in psychedelic therapy. I discussed my interest using a made up backstory to support my undercover role. During the call, Bridger's phone disconnected. I attempted to call back several times, but it went straight to voicemail. The pre-recorded voicemail

- Page 3 of 6 Search Warrant No. 2992661 -

message stated that I had reached Bridger Jensen's phone. I opted not to leave a voicemail. About a minute later, I received another phone call from 435-800-1969. When I answered, I was greeted again by Bridger who explained that his phone had died and that he was now calling me from his assistant, Brandi's, phone. We continued our conversation and he explained he invited me to attend a tour of the wellness center.

I inquired about how much the therapy sessions costed and he explained that they have packages that cost between $3900 - $6400. He also invited me to attend a consultation. When I asked him how much a consultation costs, he informed me that they are $49. We discussed how I was not so much interested in receiving the therapy, but rather in becoming a facilitator, he stated that I should come on the tour and then possibly schedule a consultation.

During our conversation, Bridger explained that the use of psilocybin is legal in his practice due to the religion of Singularism. He explained that Singularism is supportive of other religions and that you need not leave any other religion to join Singularism, but rather it adds to your beliefs that already exist.

On Oct 21, 2024 I attended a tour of the Mushroom Therapy Center located at 1969 N State St, Provo, UT. I met with Bridger in an undercover capacity. He and I walked through the wellness center together. He showed me several rooms that he informed me is where the therapy sessions occur. Each therapy room has a large couch in it where their client sits with a large cushioned chair positioned in front of it where the staff member sits during the sessions.

Bridger and I discussed some aspects of how the center operated. He informed about psilocybin is at the core of their practice at the wellness center. He strongly asserted that their use of psilocybin at the wellness center unlocks the mind and allows for their clients to get the best therapeutic care possible. I asked him about how he knows what mushrooms are safe and he stated that the mushroom they use are "lab quality" and that they grow from grain. He also stated that the way he knows they are safe is by "becoming and expert" such as himself.

During the tour, I noticed one room in the center that the door was slightly ajar. Bridger did not take me into that room, but from what I could see through the small opening, there appeared to be lab equipment inside. I also observed just outside the front entrance, there were about 7 to 10 five-gallon jugs of purified water.

During the tour Bridger also briefly explained the process of a therapy session. He definitely confirmed that they do give psilocybin to their clients in the form of a tea. He stated that the drinking of the tea was considered a "ceremony" and that it induces a psychedelic state. He said that he and his staff members are the ones who provide the psilocybin and that they are "Certified Psychedelic Practitioners." He also said that these sessions last anywhere from 5 to 10 hours.

The tour lasted about 10 to 15 minutes and he invited me to join a webinar the following day to get more information about pricing for their services.

On Oct 22, 2024 I attended a webinar that was hosted by Bridger. There where two other people that attended that were interested in participating in the wellness center's services. There where also two other people that attended the webinar that were members of Bridger's staff. Their names were displayed on their screen as Brandi Lee and Ryan Hightower. During the webinar, Ryan stated that he had "guided a trip" just earlier that day

- Page 4 of 6 Search Warrant No. 2992661 -

and had completed that session about a half hour before the webinar began at 1800 hours.

During the webinar, Bridger discussed how he is the founder of Singularism and discussed the basis of the religion. He said that the use of psilocybin is the central point upon which Singularism is based. He said that Singularism is not to be considered a "dogmatic" religion in a sense that you do not need to leave any religion you currently associate yourself with in order to participate in Singularism. He also stated that the way that he founded the religion was by talking with his lawyer to review prior cases in which people claimed religious exemption; where those claimants won or lost; and the judges comments, and essentially created a roadmap to create his religion of Singularism. He even said the ceremonies where the psilocybin is used are his ceremonies. Bridger discussed how the guided use of psilocybin is a "mystical" and "religious" experience. He stated that their sessions are "clinically informed" even though he is "no longer a licensed clinician".

During the webinar, Bridger shared videos of people giving interviews and sharing their experiences using psilocybin. In one particular video, about 1 hour into the webinar, the person being interviewed was detailing the hallucinations he had seen during his "trip". The talk show host asks the person he is interviewing if what he was doing was legal. The Person being interviewed abruptly responded with, "No." Bridger immediately paused the video and assured those of us attending the webinar that his practice of using psilocybin mushrooms in Singularism is legal. Although he did not offer any explanation as to how. Bridger also claimed that he knows that the mushrooms used at his clinic are safe because they are "lab quality" and that he had to learn through trial and error the perfect conditions for extracting the psilocybin from the mushrooms. He also stated that at his wellness center they do not use placebos.

At the conclusion of the webinar, Bridger explained the pricing and the process of how the therapy sessions work. He sells packages in "rounds" and the minimum package is a two round package.

The first step is by attended a consultation with Bridger. During the consultation you answer various screening questions for him to determine if this is the proper course of action for you and if you would benefit from taking psilocybin. If Bridger feels that you qualify, then you can purchase a two, three, or four round package.

The first round consists of four meetings. The first two meetings are considered preparatory meetings. Each preparatory meeting lasts about an hour where you discuss what you may encounter on your "psychedelic journey" and how to deal with those encounters and what to expect from the practitioner supervising your "trip". The third meeting is the "guided session" where you partake of the psilocybin infused tea and enter the hallucinogenic state. This session lasts anywhere from 5 to 10 hours. During this session the staff member documents the client's behaviors and experiences. The final session of the round is a follow up where the client and staff member review the staff member's notes and they discuss the client's experiences. This session lasts about an hour. After about 2-6 weeks, the client repeats the process for a second round, except there is only one preparatory meeting, followed by a guided trip session, followed by a follow up session. The pricing for a two round package is $3900, a three round package is $5400, and a four round package is $6400.

Due to the totality of the circumstances, I feel there is Probable Cause that Bridger is running an illicit business under the guise of a religion. He is getting people to come to a location where he gets them to pay incredibly high amounts of money in exchange for

- Page 5 of 6 Search Warrant No. 2992661 -

psilocybin. He has admitted openly that at his "wellness center" the use of psilocybin is the foundation of their practice. He has made statements that he has intimate knowledge of where and how the mushrooms are cultivated and that he has learned the perfect conditions for extracting psilocybin through trial and error.

I am requesting authority to search the Mushroom Wellness Center to seize any illegal psilocybin mushrooms; any equipment used to cultivate the mushrooms or extract the psilocybin; and records, whether physical or electronic, that are kept within the wellness center that is evidence of to whom the wellness center has distributed psilocybin.

This affidavit has been reviewed by Pete Reichman of the Utah County Attorney Office, and it has been approved for presentation to the court.

WHEREFORE, your affiant prays that a Search Warrant be issued for the seizure of said items in the daytime.

**I declare under criminal penalty of the State of Utah that the foregoing is true and correct.**

Executed on: 4th day of November, 2024 @ 04:55 PM by  /s/ JACKSON JULIAN