No. 25-4115

UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

———————————

BRIDGER LEE JENSEN, SINGULARISM, AND PSYCHE HEALING AND BRIDGING, LLC,
*Plaintiffs - Appellees*,

v.

UTAH COUNTY, PROVO CITY, AND JEFFREY GRAY,
*Defendants- Appellants*.

———————————

On appeal from the United States District Court, District of Utah,
The Honorable Jill N. Parrish, No. 2:24-cv-00887-JNP-CMR

———————————

**APPELLANTS' APPENDIX**
**Volume 3 of 8**

———————————

Respectfully submitted,

Troy L. Booher
Caroline A. Olsen
ZIMMERMAN BOOHER
341 South Main Street, Fourth Floor
Salt Lake City, Utah 84111
tbooher@zbappeals.com
colsen@zbappeals.com
(801) 924-0200

*Attorneys for Appellants*

———————————

December 10, 2025

App-3:001

| USDC Dkt. No. | Date Filed | Description | App- |
|---|---|---|---|
| Volume 3 of 8 | | | |
| 021-05 | | Exhibit V — Supplemental Declaration of Bridger Jensen, December 11, 2024 | 3:005 |
| 022 | 12/13/24 | Minute Entry for 12/13/24 hearing | 3:021 |
| 024 | 12/16/24 | Order Granting Temporary Restraining Order | 3:023 |
| 032 | 12/18/24 | Defendants' Expedited Motion to Stay or Modify Order Requiring Return of Psilocybin | 3:026 |
| 036 | 12/19/24 | Order Temporarily Staying TRO Requiring Return of Mushrooms and Reiterating Previous Order to Notify Court of Any Request for Additional Evidentiary Hearing | 3:037 |
| 037 | 12/19/24 | Plaintiffs' Status Report and Request for Preliminary Injunction Hearing | 3:040 |
| 038 | 12/19/24 | Plaintiffs' Opposition to Defendants' Expedited Motion to Stay or Modify Order Requiring Return of Psilocybin | 3:043 |
| 039 | 12/19/24 | Plaintiffs' Motion for Anti-Suit Injunction | 3:056 |
| 039-01 | | Exhibit A — Criminal Indictment | 3:065 |
| 040 | 12/19/24 | Defendants' Motion to Dismiss | 3:069 |
| 044 | 12/20/24 | Defendants' Joint Motion for Expedited Discovery | 3:093 |

| USDC Dkt. No. | Date Filed | Description | App- |
|---|---|---|---|
| 041-01 | | Exhibit 1 — Defendants' Expedited Preliminary Injunction Discovery Requests | 3:098 |
| 047 | 12/23/24 | Plaintiffs' Opposition to Defendants' Joint Motion for Expedited Discovery | 3:106 |
| 049 | 12/27/24 | Defendants' Reply in Support of Joint Motion for Expedited Discovery | 3:117 |
| 050 | 01/02/25 | Defendants' Memorandum in Opposition to Motion for Anti-Suit Injunction | 3:130 |
| 051 | 01/02/25 | Defendants' Reply Memorandum in Support of Expedited Motion to Stay or Modify Order Requiring Return of Psilocybin | 3:151 |
| 056 | 01/07/25 | Memorandum Decision and Order Granting Defendants' Motion for Stay and Denying Defendants' Motion for Expedited Discovery | 3:161 |
| 057 | 01/07/25 | Protective Order | 3:170 |
| 058 | 01/09/25 | Plaintiffs' Reply in Support of Motion for Anti-Suit Injunction | 3:172 |
| 059 | 01/14/25 | Plaintiffs' Opposition to Defendants' Motion to Dismiss | 3:184 |
| 066 | 01/21/25 | Defendants' Supplemental Memorandum Supporting Joint Opposition to Preliminary Injunction | 3:208 |
| 067 | 01/22/25 | Stipulation of All Parties Regarding January 23-24, 2025, Hearing | 3:221 |

| USDC Dkt. No. | Date Filed | Description | App- |
|---|---|---|---|
| 069 | 01/22/25 | Defendants' Reply Memorandum in Support of Motion to Dismiss | 3:225 |
| 071 | 01/22/25 | Plaintiffs' Supplemental Brief in Support of Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction | 3:240 |
| 071-01 | | ExW — Forensic Analysis Report-Controlled Substance Analysis | 3:259 |
| 071-02 | | ExX — Second Supplemental Declaration of Bridger Jensen | 3:262 |
| 071-03 | | ExY — Claire's Voluntary Statement | 3:269 |

# EXHIBIT V

App-3:005

Tanner J. Bean (A17128)
tbean@fabianvancott.com
Anna P. Christiansen (A17518)
achristiansen@fabianvancott.com
**FABIAN VANCOTT**
95 South State Street, Suite 2300
Salt Lake City, UT 84111-23323
Telephone: (801) 531-8900
*Attorney for Plaintiffs*

---

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BRIDGER LEE JENSEN, an individual; SINGULARISM, a non-profit corporation; PSYCHE HEALING AND BRIDGING, LLC dba PSYCHEDELIC THERAPY JOURNEY; a limited liability company;<br><br>    Plaintiffs,<br>vs.<br><br>UTAH COUNTY, a political subdivision, PROVO CITY, a political subdivision; JEFFREY GRAY, an individual; TROY BEEBE, an individual; BRIAN WOLKEN, an individual; JACKSON JULIAN, an individual; JOHN DOES 1-4, individuals;<br><br>    Defendants. | **SUPPLEMENTAL DECLARATION OF BRIDGER JENSEN**<br><br>Civil No. 2:24-cv-00887-JNP<br><br>Judge Jill N. Parrish<br><br>(Removed from Fourth Judicial District Court, Utah County, State of Utah, Case No. 240406123) |

I, Bridger Jensen, declare:

1.      I am over eighteen years old and competent to testify.

2.      I have personal knowledge of the facts set forth in this declaration, and if called as a witness, I could and would testify competently to them under oath.

1

App-3:006

3.      As stated in my original declaration, I am the founder of Singularism. I am also the Supervising    Practitioner    at Singularism. As the founder and Lead Guide, I have firsthand knowledge regarding Singularism's practices, teachings, and organization.

4.      Singularism is a religion derived from profound experiences, revelations, and practices that align with the spiritual, metaphysical, and existential needs of its members. Singularism addresses the deepest questions about life through its creation story and spiritual framework.

5.      Singularism teaches that creation of existence and our place in the universe through five stages:

> **Singularity:** A state of cosmic oneness before time and space.
> **Duality:** The emergence of opposites, symbolized by the Vesica Piscis, a universal archetype.
> **The Golden Threads of Creation:** The spiritual and physical forces connecting all beings.
> **Multiplicity:** The illusion of separateness after the Big Bang, yet quantum entanglement remains.
> **Spectrum of Consciousness:** The rise of life and the progression toward higher awareness, including humanity's potential to contribute to divine creation.

6.      Among the core spiritual frameworks of Singularism are the principles described in the Octadrants. The Octadrants serve as both a religious tool for understanding the nature of existence and a map for navigating human epistemology within the religion. It captures the full range of human experience, from absolute knowledge to profound mysteries, intentional deception, and the unknowable. Each octant represents a unique intersection of these spectrums, offering a lens to examine how ideas, beliefs, and truths manifest and interact.

7.      The Octadrants framework bridges empirical knowledge and transcendent understanding. Its divisions categorize human perception, spiritual truths, and unseen forces,

App-3:007

demonstrating how material and spiritual realities coexist. It is the source of the eight epistemological Octants, namely: Knowledge / Illumination, Faith, Sacred Trust, Deep Mysteries / Eternal Enigmas, Lies / Shadowplay, Deceptions/Ignorance / Blinding Mirage, Myths / Woven Legends, and The Unimaginables / The Abyss.

8.     The Octadrants were revealed to me during sacred ceremonies involving the sacrament of psilocybin. In what is often described as a "download or singularity with source information, I experienced a vision of the Octogoddess, an ethereal entity who has been speaking to me for years in meditative and sacramental states. I have seen her and drawn her in my sleep. She entrusted me with the Octadrants as a gift for humanity to categorize and navigate the realms of knowledge, from the empirical to the metaphysical.

9.     The Octogoddess specifically commanded me to avoid claiming exclusive revelatory powers, emphasizing that everyone can access their own visions and entities. Singularism thus empowers individuals to "*write their own scripture*," fostering spiritual autonomy while providing a structured framework for understanding existence.

10.    While the Octodrants are a core spiritual framework of Singularism, I do not share the Octadrants or my visions with all voyagers before their voyages. This is intentional, as it allows participants to form their own connections with entities and receive their own revelations. I train Singularism's spiritual guides or facilitators) that telling voyagers about their personal experiences before a voyage may stunt voyagers from having their own experiences. The entire religion rests on people having their own sacred experiences after passing the screening described below. Sometimes we call the screening requirements a "Calling Confirmation." Singularism teaches that

3

each individual's spiritual purpose is discovered through ceremonies that facilitate insight and transformation.

11.    Singularism teaches and its members practice accessing the divine and transcendent through the ritual of the sacrament. Psilocybin is the central sacrament to Singularism's ceremonies, never as a recreational drug but as a sacred medium that allows voyagers to dissolve their egos, see through self-deceptions, and connect with the divine. This mystical experience transcends material reality, unlocking states of awareness that provide insights into universal truths. These ceremonies bridge the sacred and the practical, helping members address personal challenges such as career balance, family dynamics, and spiritual crises. The ceremonies are integral to fostering this growth.

12.    Singularism acknowledges the potential for voyagers to encounter spiritual entities in their journeys, including their higher selves. These interactions are not dictated by dogma but are deeply personal, enabling participants to discover their own metaphysical truths.

13.    Singularism teaches its members to abide by three core tenants for guiding their lives. These tenants are as follows:

> **Alleviating Suffering:** Singularism's mission is to alleviate suffering, starting with oneself and extending outward. Members are called to use the insights gained from ceremonies to make the world a better place.
> **Non-Offensiveness:** The principle of non-offensiveness guides all interactions, fostering respect, safety, and understanding. Members are encouraged to engage in thoughtful dialogue and stand firm in their values while respecting others.
> **Agency and Responsibility:** Through the practice of "Write Your Own Scripture," members are given the tools to define their moral compass within Singularism's framework. This unique approach combines individual agency with collective ethical principles.

App-3:009

14. The foregoing represents the structured, but evolving doctrine of Singularism. While members can add to their own personal scripture, the core principles of Singularism remain consistent. This ensures stability while allowing for personal and collective growth.

15. In order for a person to participate in a ceremony with Singularism, a person must undergo a rigorous six-criteria screening process, which we sometimes refer to as the "Calling Confirmation.". The six criteria for participation are as follows:

> **Safety:** Screening for psychological risks such as mental health issues, or suicidal ideation, mental wellness, and physical symptoms. Ensuring no medical conditions or drug interactions that could pose a risk during the ceremony.
>
> **Sincerity:** Sincerity is a cornerstone of Singularism's process, ensuring that participants feel a deep, authentic spiritual calling to engage in the ceremony. This calling transcends curiosity or external pressure; it must come from an intrinsic, heartfelt desire to connect with the divine, seek spiritual growth, and address profound personal or existential questions.
>
> **Calling and Necessity:** The voyager may only proceed into Ceremony if they truly feel called to this ceremony and must state verbally and in writing that it is a necessary part of their spiritual journey, and sincerely feel confirmation.
>
> **Efficacy:** Determining whether the ceremony will provide meaningful spiritual benefits that the voyager desires. If Singularism's ceremonies are not likely to benefit the voyager, the guide will not proceed.
>
> **Commitment:** The commitment in Singularism's screening process requires voyagers to pledge themselves to act on the religious insights they receive during the ceremony. Whether it involves apologizing to an estranged friend, rekindling a meaningful relationship, or addressing a personal task, participants affirm their dedication to integrating these revelations into their lives with sincerity and purpose.
>
> **Ethics:** The sixth criterion, ethics, reflects Singularism's deep commitment to the well-being of its voyagers by ensuring that participation does not create undue harm or hardship, nor is it unethical for the voyager in any way.

16.    The screening process is not only rooted in our deeply held religious beliefs but also serves as a vital ordinance within our ceremonies, in addition to being necessary for safety purposes.

17.    Singularism's screening process is not an anomaly. Other religious organizations use similar ways to assess and guide participants through sacred journeys, such as the screening practices of Christianity (for example, worthiness interviews conducted by leaders such as bishops in The Church of Jesus Christ of Latter-day Saints determine whether individuals are spiritually prepared to enter a temple).

18.    Singularism's six screening criteria are parallel to these practices, serving as both a preparatory and participatory element of the ceremony. By walking through this process, voyagers are spiritually prepared to engage with the sacrament, ensuring that the ceremony is conducted with reverence, alignment, and ethical clarity.

19.    On the day of a  ceremony, voyagers are instructed to dress comfortably and modestly. Additionally, we fast and meditate before each ceremony that we have with voyagers.

20.    Individuals have been screened out from participating in Singularism's ceremonies due to their failure to pass the screening criteria. There are numerous examples of people being screened out.

21.    For example, during one of Singularism's early ceremonies, a woman came to me and otherwise passed every aspect of the rigorous screening process. She was medically and mentally safe to proceed, and sincere in her desire to improve her marriage. However, during our consultation interview, it became clear that she was not there out of spiritual necessity or calling. She confided that her husband had encouraged her to attend the ceremony, and while she was open

6

App-3:011

to the idea, she did not feel an intrinsic spiritual calling to participate, and she felt some amount of pressure to do it. Her willingness to proceed was based on a sense of obligation to her husband and their relationship, rather than a heartfelt belief that the ceremony was a necessary step for her own spiritual growth. In that moment, I knew it would be unethical—and contrary to Singularism's principles—to administer the sacrament to her. I explained to her that Singularism's ceremonies are sacred and transformative but require the individual to feel a personal and genuine calling to participate. Without that calling, the ceremony would not have its intended spiritual effect and could even be counterproductive. So, I declined to proceed. She expressed her great appreciation for the information. I called her husband and explained that though she was willing to participate for him, she was not individually called to the ceremony.

22.    This experience became one of many cornerstone examples of how I train Singularism guides on screening requirement #3, "The calling/Necessity." I use this case to illustrate the importance of individuals feeling the calling and that they must feel it is spiritually necessary for them to participate. They may not be pressured into it, nor coerced. It must be a calling they feel from within. I emphasize to every practitioner that psilocybin is not a substance to be casually administered or used to meet external expectations. I have screened many people out for every one of my six criteria in the last year.

23.    In my religious training sessions, I teach that administering the sacrament to someone who does not feel the calling violates the law and Singularism's sacred principles. Necessity must always be affirmed by the individual themselves, free from external pressures. This protects not only the voyager but also the integrity of the ceremony and our religious practice.

7

App-3:012

24.     Singularism's ceremonies are practiced at its spiritual center, which also functions as a gathering place for the religious community. Singularism clergy are ordained through a rigorous training process that is focused on safety, sincerity, and spiritual efficacy, issuing clergy cards to those who have demonstrated mastery of the Bridging Model and a commitment to the religion's sacred principles. We wear white, button-up shirts with gold buttons. The white symbolizes purity and a blank slate for learning. The gold buttons are a reminder of the golden threads of creation. This dress code signifies our commitment to spiritual service.

25.     Singularism is a non-exclusive faith practice. This means that a voyager can continue to believe and practice in another belief system while also participating in Singularisms spiritual practices. Singularism's non-exclusivity is one of its greatest strengths. This reflects Singularism's core values about spirituality: openness, respect, and the recognition that people connect with the divine in unique ways. Rigid dogma closes people off from spirituality and spiritual connection. Likewise, exclusivity isolates people and creates division. In extreme cases, it fosters cult-like behaviors, where individuals are forced to abandon their relationships, beliefs, and autonomy. Requiring exclusivity to Singularism would go against everything Singularism stands for and would undermine the purpose of Singularism, which is to bring healing, insight, and connection to as many people as possible. Instead of demanding that people abandon their beliefs to participate in Singularism's sacred ceremonies, we invite people to explore their spiritual journey alongside others, integrate what they find meaningful into their own lives, and expand their religious experiences. Singularism is a place where anyone can feel welcome. Singularism's spirituality is about connection, not division. Spirituality is too important to be locked behind walls of exclusivity.

26.     Singularism does observe sacred holidays and ceremonies. Our faith observes four key holidays: the Darkness Ceremony (Winter Solstice), the Light Color Ceremony (Spring Equinox), the Lightness Ceremony (Summer Solstice), and the Dark Color Ceremony (Fall Equinox). Each holiday holds symbolic meaning and reflects different aspects of life, light, and spiritual balance. Each season is associated with unique concepts for reflection, allowing members to align their intentions with natural cycles.

27.     Additionally, Singularism has its own suggested calendar. Singularism believes in using the Human Era calendar,

28.     Singularism is not, and has never been, about business or making money for me. My decision to found Singularism was driven by a belief in its mission to help others find meaning, healing, and a connection to the divine.

29.     I left a much more profitable career to dedicate myself to this calling, knowing full well that it would be less lucrative. I hope that in disclosing the following, I will accurately convey dedication to this religion and my mission. I currently received $3,400 per month through Singularism, much less than what I previously earned. Before founding Singularism, the last corporate offer letter I received in 2017 was for a package of $116,000 per year. My job offer before that was approximately $105,000 per year. I was a highly sought after and recommended therapist in a lucrative private care industry before founding Singularism. But today I make much, much less. I have not always taken pay from Singularism myself every month. I live paycheck to paycheck and when I have any funds to spare, I use it to make my humble church even nicer and more symbolic for our religion so that I can provide an even better experience for the voyagers.

9

I believe in the cause deeply, but to assert that Singularism is primarily a money-making endeavor is not true. From a purely  financial standpoint, it has not been a profitable endeavor.

30.    Furthermore, I prioritize paying my small team of clergy and employees before Singularism pays me, I also pay my bills before I am paid. It is my personal belief that people often have an unhealthy addiction to money, and I actively avoid fostering such tendencies in myself or in Singularism.

31.    Defendants' actions alleged in the Complaint in this case have had a demonstrated effect upon Singularism's religious community and its financial resources. I have already seen Singularism's religious community dimmish and shrink through fear. I transparently let individuals know that Singularism is seeking to protect its religious free exercise in court, but this has led to some individuals stepping away from Singularism. As a result, Singularism is performing less ceremonies for voyagers, engaging in less religiously infused therapeutic tasks, and, as a result, Singularism has sustained measurable financial losses. These losses are so significant that some of I and one other member of the clergy have forgone receiving pay for the past two months. I am open and forthcoming with all of my Voyagers. I never try to deceive them, and so I have been open with them about disclosing the problems I have been having with the local municipality and they have been afraid to sign up, despite my perfect record of safety. In all of Singularism's history, we have never had one incident, nor accident. Not one trip to the hospital, nor even one person stating they were harmed by our ceremony. Quite the opposite - our voyagers are overwhelmingly ecstatic about the ceremonies and recommend it to others in eagerness. But since the search of Singularism's spiritual center, we have been severely harmed and now our future is uncertain without court intervention.

10

App-3:015

32.    Singularism's fees approximate market standards that other professional clergy charge for services, as do Singularism's clergy compensation. A significant portion of monies received go toward making Singularism's small place of worship nicer and more comfortable to further improve the quality of the voyagers' experience.

33.    Singularism frequently allows discounts and accommodations to make its ceremonies accessible. Much of the proceeds from one voyager may end up subsidizing ceremonies for other voyagers who need help doing so. .

34.    Singularism represents the culmination of decades of spiritual exploration and reflection, and it exists as an authentic expression of my commitment to making the world a better place, beginning with myself and extending outward to the community. My work is rooted in sincerity, compassion, and the unwavering belief that this mission is necessary for the spiritual and emotional growth of those who choose to participate.

35.    Any claim that Singularism was created solely to avoid legal repercussions is categorically false. My journey into spirituality began over 20 years ago, and the formation of Singularism represents a well-documented evolution of my beliefs and practices, not a reactive measure.

36.    For years, I have been deeply involved in studying entheogenic practices and their potential for addressing existential and spiritual challenges. Singularism was founded as a structured religious framework to bring these insights to others in a safe, ethical, and meaningful way. The principles of Singularism, including its creation story, Octodant's framework, and focus on alleviating suffering, were developed over years of reflection, study, and experience.

11

App-3:016

37.    This evolution is evident in the structured doctrines, policies, and procedures that govern Singularism today. The religion emphasizes preparation, informed consent, and integration, ensuring that each participant's experience is transformative and grounded in spiritual sincerity, safety and our other requirements. These elements reflect careful thought and dedication to creating a legitimate religious framework, not a hasty or opportunistic effort.

38.    I formed Singularism and set forth its doctrines prior to consulting with legal counsel, including my attorneys which represent me in this action. However, after forming Singularism, I have engaged legal counsel in order to advise Singularism of the risks associated with others' misunderstandings of Singularism's religious practices and the religious freedom protections to which Singularism is entitled. I do not represent to others that I founded Singularism through or in partnership with an attorney. However, I have represented that Singularism has consulted legal counsel regarding constitutional and statutory protections for religious free exercise following Singularism's founding.

39.    In addition to Singularism, I am an associate member of the Oklevueha Native American Church and hold a valid membership card issued by ONAC. My member number is AM-00538, and the card explicitly states my rights and qualifications as follows:

> *"The person secured with this card is a member of the Oklevueha Native American Church (ONAC) and as such is qualified to carry, possess, and/or use Native American sacraments including peyote, cannabis, San Pedro, and other recognized healing ceremonial plants. For a complete list of covered sacraments and the requirements for their use, visit NativeAmericanChurches.org. Controlled substances not mentioned there are not covered for legal or personal use during ceremony. Laws pertaining to the protection of all ONAC members' civil liberties are outlined in the First Amendment and the Bill of Rights to the United States Constitution and are more specifically described in the Religious Land Use and Institutionalized Persons Act of 2000."*

12

App-3:017

40.     I became a member of ONAC through active participation in their ceremonies, dating all the way back to 2017, which are conducted in strict adherence to the church's religious principles, which are not in contradiction to Singularism's. My membership reflects my commitment to these spiritual practices, and my possession of cannabis is solely for ceremonial and religious purposes.

41.     I am a Native American descendant, proudly a descendant of Pochontas and I am happy to provide a pedigree chart. My participation, including through the use of cannabis as a sacred sacrament, reflects my personal commitment to honoring and preserving the spiritual practices of my ancestors, and I sincerely utilize these sacraments and medicines to converse with them in ceremony, prayer and meditation.

42.     The cannabis which police found on the premises of Singularism's spiritual wellness center is for     personal religious use by me. I kept it securely locked in a safe in my office desk, separate from our other sacraments.     I used this cannabis as a sacred sacrament exclusively for my own personal religious ceremonies in accordance with the teachings and guidelines of ONAC. Cannabis of any form has never been used in any religious ceremony performed at Singularism. I conveyed all of this information to law enforcement during their search of Singularism's spiritual center.

43.     Like many clergy in different religious organizations, before I was full-time clergy with Singularism, I had a professional career, which can be seen, in part by viewing my LinkedIn profile, as well as several other sites. Several of those professional endeavors were related to mental health therapy. Since founding Singularism, I no longer engage in those professional endeavors, although there remains content online regarding them.

44.    For example, I have a personal website, briderleejensen.com. This is not a website that I actively use, but I have left it intact because it may serve as a way for interested individuals to find Singularism. It contains outdated information, including my bio, and references to my prior efforts with the organizations Mental Gurus, Reveal Myself, and a psychedelics conference. This sort of outdated information is present in different online locations, including my LinkedIn profile (for example, my bio there), and webpages for that mention or explain Metal Gurus and Reveal Myself.

45.    During the course of Singularism's existence, I have also engaged in different ways of bringing people to Singularism as part of Singularism's missionary efforts. Some of those efforts include putting out information online in different formats, and, at times, I have used different names to describe different of Singularism's religious programs or efforts. For example, while Singularism's nonprofit organization carries its name, Singularism's for-profit organization is called Psyche Healing and Bridging. Other names have included Utah Mushroom Therapy. Singularism's missionary efforts reflect modern methods like social media outreach and we aim to train people in its religious ways often manifest under the heading of Psychedelic Therapy Academy or Psychedelic Therapy Journey. However, whatever path by which individuals come to Singularism, Singularism treats them according to the same religious principles and by the same religious doctrines. For example, individuals interested in receiving Singularism's religious training are screened for religious sincerity just like voyagers.

46.    Singularism's nonprofit organization is governed by me as the founder. I work alongside two counselors and a board of directors, ensuring both spiritual guidance and organizational oversight. The for-profit side has a regular board of Directors.

14

App-3:019

47.     I made a GRAMA request to the Provo City Police Department asking for all records related to any complaints made regarding Singularism. I received a response which has been submitted as an exhibit to the Court.

48.     I declare under criminal penalty of perjury under the law of Utah that the foregoing is true and correct.

DATED this 11th day of December, 2024.

*/s/ Bridger Jensen*
Bridger Jensen

*(signed with permission granted to Tanner J. Bean on December 11, 2024)*

15

App-3:020

**From:** utd_enotice@utd.uscourts.gov

**Subject:** Activity in Case 2:24-cv-00887-JNP-CMR Jensen et al v. Utah County et al Motion Hearing

**Date:** December 13, 2024 at 5:14 PM

**To:** ecf_notice@utd.uscourts.gov

<span style="color:red">This is an automatic e-mail message generated by the CM/ECF system. If you need assistance, call the Help Desk at (801)524-6100.</span>

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record in a case to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing.**

**US District Court Electronic Case Filing System**

**District of Utah**

### Notice of Electronic Filing

The following transaction was entered on 12/13/2024 at 5:12 PM MST and filed on 12/13/2024

**Case Name:**       Jensen et al v. Utah County et al

**Case Number:**     2:24-cv-00887-JNP-CMR

**Filer:**

**Document Number:** 22(No document attached)

**Docket Text:**

<span style="color:blue">**Minute Entry for proceedings held before Judge Jill N. Parrish: Motion Hearing held on 12/13/2024 re [9] MOTION for Temporary Restraining Order and Memorandum in Support MOTION for Preliminary Injunction and Memorandum in Support filed by Singularism, Bridger Lee Jensen, Psyche Healing and Bridging.**

**The court outlined the timeframe for today's hearing and addressed preliminary matters. Each party made opening statements. Brandi Lee was sworn and testified. The Psychedelic Therapy Academy Binder was offered and admitted. Jenna DenBleyker was sworn and testified. Bridger Lee Jensen was sworn and testified on direct examination. Oklevueha Native America Church Membership Card was offered and admitted. Before Mr. Jensens cross-examination occurred, Mr. Millward made a proffer to the court regarding law enforcement witness testimony relevant to the TRO. Mr. Millward may put additional evidence on the docket and/or call these witnesses at a later-scheduled hearing prior to the resolution of the PI motion. Mr. Jensen's cross-examination was completed. Mr. Olson made a proffer to the court regarding an American Fork law enforcement witness testimony relevant to the TRO, and he may testify at a later-scheduled hearing. The court then heard additional argument from counsel from all parties. Following a short recess, the court ruled on the record and granted the TRO. A written order will follow. The court asked the parties to meet and confer regarding timing on a preliminary injunction hearing and any additional witnesses/evidence that may be submitted to the court. Additional logistics were discussed. The parties are directed to contact the court following their meet and confer efforts.**

**Attorney for Plaintiff: Tanner Bean, Anna Christiansen, Attorney for Defendant: Mitch Stephens, Dillon Olson, Gary Millward. Court Reporter: Michelle Gonsalves. Recording: Zoom.(tcs)**</span>

**2:24-cv-00887-JNP-CMR Notice has been electronically mailed to:**

Lara A. Swensen     lswensen@jdrslaw.com, administrator@jdrslaw.com

J. Brian Jones     bjones@provo.utah.gov

Mitchell A. Stephens     mstephens@jdrslaw.com, administrator@jdrslaw.com

Richard A. Roberts     rroberts@provo.org

Gary DeMott Millward     gmillward@provo.org, czarbock@provo.org, millwardlegal@gmail.com

Tanner J. Bean     tbean@fabianvancott.com, cbuhler@fabianvancott.com, knielson@fabianvancott.com

Anna Pitcher Christiansen     achristiansen@fabianvancott.com, aclark@fabianvancott.com

**2:24-cv-00887-JNP-CMR Notice has been delivered by other means to:**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BRIDGER LEE JENSEN, SINGULARISM, and PSYCHE HEALING AND BRIDGING,<br><br>Plaintiffs,<br><br>v.<br><br>UTAH COUNTY, PROVO CITY, JEFFREY GRAY, TROY BEEBE, BRIAN WOLKEN, and JACKSON JULIAN,<br><br>Defendants. | **ORDER GRANTING TEMPORARY RESTRAINING ORDER**<br><br><br>Case No. 2:24-cv-00887-JNP-CMR<br><br>District Judge Jill N. Parrish |

Plaintiffs are members and affiliates of Singularism, a new religion founded in 2023. Singularism uses psylocibin as a sacrament in its ceremonies conducted at its center in Provo, Utah. Psylocibin is a Schedule I controlled substance banned under the Utah Controlled Substances Act ("CSA") with narrow exceptions, UTAH CODE ANN. § 58-37-1 et seq.

On November 11, 2024, Provo City law enforcement executed a search warrant at Singularism's address and seized psylocibin mushrooms and records considered by Singularism to be sacred scripture. Plaintiffs then filed for a temporary restraining order and preliminary injunction, invoking the Free Exercise Clause of the First Amendment to the U.S. Constitution, the free exercise clause of the Utah constitution, and Utah's Religious Freedom Restoration Act ("RFRA"), UTAH CODE ANN. § 63G-33-201. Defendants removed the action to federal court.

Under federal law, a plaintiff moving for a temporary restraining order or preliminary injunction must show that (1) he has a substantial likelihood of success on the merits; (2) he is

likely to suffer irreparable harm absent the preliminary relief; (3) the threatened harm outweighs the harm the preliminary relief would pose to the opposing party; and (4) the preliminary relief would not adversely affect the public interest. *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 112 (10th Cir. 2024). When the government is the opposing party, the third and fourth factors merge. *Id.*

Based on the materials filed with the briefing and the testimony the court heard on December 13, the court concludes that Plaintiffs have shown a likelihood of success on their claim under the Utah RFRA. Under that law, once a plaintiff shows a substantial burden on his free exercise of religion, the government must show that the challenged regulation serves a compelling government interest and that the regulation is the least restrictive means of accomplishing that interest. UTAH CODE ANN. § 63G-33-201(3). The court credits the testimony of Plaintiffs' witnesses, finding that Plaintiffs are likely to be able to show a substantial burden on the exercise of their beliefs about psylocibin, that those beliefs are sincere, and that those beliefs are religious in the way that the law conceptualizes religion. The court also finds that the government has not shown a compelling interest in prohibiting Singularism from using psylocibin outright and accordingly has not carried its burden.

Defendants claim that the court does not have jurisdiction over the action because Plaintiffs have not satisfied the 60-day notice requirement in the Utah RFRA. *See id.* § 63G-33-201(5)(a). The court finds that Plaintiffs satisfy the requirements for the exception for "ongoing" government action, *id.* § 63G-33-201(5)(b)(i). The deprivation of their psylocibin and records is ongoing, and requiring Plaintiffs to wait until the 60-day window passes would impose an "undue hardship," *id.*

The court also finds that Plaintiffs have shown that they will suffer irreparable harm absent preliminary relief. The ongoing deprivation of their psylocibin and scripture hinders their free exercise of religion, and no amount of damages later can fully compensate for this harm.

Finally, the court also finds that the balance of the equities favors Plaintiffs. The government has identified no harm to either Plaintiffs or society more broadly from Plaintiffs' sacramental use of psylocibin.

Accordingly, the court **GRANTS** Plaintiffs' motion for a TRO. Defendants are **ORDERED** to return the psylocibin and records seized on November 11 to Plaintiffs as soon as possible. This TRO shall remain in place until the court either dissolves it or converts it into a preliminary injunction. If Defendants wish to present further evidence or argument for the court to consider in ruling on the motion for preliminary injunction, they may request the court no later than December 20 to schedule another hearing.

So ordered December 13, 2024.

BY THE COURT

Jill N. Parrish
United States District Court Judge

Mitchell A. Stephens (11775)
Justin L. James (15167)
Dillon P. Olson (16120)
JAMES DODGE RUSSELL & STEPHENS, P.C.
10 West Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: 801.363.6363
Email: mstephens@jdrslaw.com
        jjames@jdrslaw.com
        dolson@jdrslaw.com

*Attorneys for Defendants Utah County and Jeffrey Gray*

J. Brian Jones (11816)
Gary D. Millward (12170)
Richard A. Roberts (12217)
PROVO CITY ATTORNEY'S OFFICE
445 W Center St.
Provo, Utah 84601
(801) 852-6140
gmillward@provo.gov
rroberts@provo.gov

*Attorneys for Defendants Provo City, Troy Beebe, Brian Wolken, and Jackson Julian*

---

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BRIDGER LEE JENSEN; SINGULARISM; PSYCHE HEALING AND BRIDGING, LLC dba PSYCHEDELIC THERAPY JOURNEY; <br><br> *Plaintiffs*, <br><br> v. <br><br> UTAH COUNTY; PROVO CITY; JEFFREY GRAY; TROY BEEBE; BRIAN WOLKEN; JACKSON JULIAN; JOHN DOES; <br><br> *Defendants*. | **EXPEDITED MOTION TO STAY OR MODIFY ORDER REQUIRING RETURN OF PSILOCYBIN** <br><br> Civil Case No. 2:24-cv-00887-JNP <br><br> Judge Jill N. Parrish |

App-3:026

## RELIEF REQUESTED

Defendants hereby move for a ***limited*** stay or modification of this Court's December 13, 2024, Order Granting Temporary Restraining Order ("Injunction Order").[1]   [*See* Dkt. 24]. Specifically, the Court's Injunction Order directed Defendants "to return the psylocibin [sic] and records seized on November 11 to Plaintiffs." [*See id.* at 3]. Defendants do ***not*** ask the Court to stay the return of the Plaintiffs' records. Indeed, Defendants have agreed to return items that were not identified in the Court's Injunction Order but, nevertheless, were seized in response to the Fourth District Court's search warrant. [*See* Return to Warrant (Dkts. 13-15)]. However, Defendants do ask the Court to stay the portion of its Injunction Order that requires the return of the psilocybin. Defendants ask the Court to stay that return pending the resolution of criminal proceedings now pending in the Fourth District Court, State of Utah. *See State of Utah v. Jensen*, Case No. 241404407 (4th Dist. Utah).

## BACKGROUND[2]

### A.   The TRO Motion, Hearing, and Order.

"Plaintiffs are members and affiliates of Singularism, a new religion founded in 2023." [Injunction Order (Dkt. 24) at 1]. Singularism administers psilocybin to third parties at its center in Provo, Utah. [*See id.*; *see also* Dkts. 2-2, 9-1, 19-22]. Psilocybin "is a Schedule I controlled substance banned under the Utah Controlled Substances Act" ("Utah CSA") "with narrow

---

[1] The Court orally announced its decision at the conclusion of the hearing on December 13, 2023. Similarly, the written Injunction Order is dated December 13, 2023. [*See* Dkt. 24]. However, the written Injunction Order was filed and served on the parties on December 16, 2024. [*See id.* ("Filed 12/16/24")].

[2] Because of the early posture of this case, Defendants primarily rely on information from the Court's Injunction Order or Plaintiffs' filings. Defendants do not concede the accuracy of that information and reserve the right to challenge the same.

exceptions."  Utah Code § 58-37-1, *et seq*.  Psilocybin also is a Schedule I controlled substance banned under the federal CSA.  *See* 21 U.S.C. § 812.

"On November 11, 2024, Provo City law enforcement executed a search warrant at Singularism's address and seized psylocibin mushrooms and records" that Singularism contends are "sacred scripture."  [Injunction Order (Dkt. 24) at 1].  Plaintiffs filed suit and further sought a temporary restraining order and preliminary injunction.  [*Id.*].  Plaintiffs' arguments invoked "the Free Exercise Clause of the First Amendment to the U.S. Constitution, the free exercise clause of the Utah constitution, and Utah's Religious Freedom Restoration Act" (the Utah "RFRA").  [*Id.*].

On December 13, 2024, the Court held an expedited and limited evidentiary hearing on Plaintiffs' TRO Motion.  [*See id.*; *see also* Dkt. 22 (noting proffer of defendants' witnesses)].  At the conclusion of the hearing, "the court ruled on the record and granted the TRO."  [*See* Dkt. 22].  The Court's written order was subsequently filed on December 16, 2024.  [*See* Injunction Order (Dkt. 24)].

The Court's Injunction Order instructed ordered Defendants "to return the psylocibin and records seized on November 11 to Plaintiffs as soon as possible."  [*Id.* at 3].  The Court's order did not explicitly address any other items allegedly seized during the execution of the search warrant.  [*See, e.g.*, Complaint (Dkt. 2-2) ¶ 41 (additionally alleging seizure of "a black grinder, a black scale, and a gold scale")].

**B.**     **Developments After the Injunction Order.**

On December 16, 2024, Plaintiffs' counsel sent an email to the Defendants' counsel.  As part of that email, Plaintiffs asked about the "return of the black grinder, black scale, and gold

scale." [*See* 12/16/24 Email].[3]  Plaintiffs further indicated "[t]he best time for Plaintiffs to receive" the seized items "is this Wednesday, December 18, between 12:00 and 5:00 pm." [*Id.*].  In response to the email, counsel for all the parties agreed to participate in a telephone call the afternoon of December 17, 2024.  During that call, Defendants agreed to return the grinder and scales—even though those items were not part of the Court's Injunction Order.

Shortly after that call, counsel for Utah County separately informed Plaintiffs' counsel that the County intended to file criminal charges on December 18, 2024.  Plaintiffs' counsel was informed as a professional courtesy.  The County further offered to have Plaintiffs' counsel accept service instead of having law enforcement effectuate an immediate arrest and/or personally serve a criminal summons.  Those charges have now been filed.  *See State of Utah v. Jensen*, Case No. 241404407 (4th Dist. Utah).

Defendants also met/conferred with Plaintiffs concerning their position that returning the psilocybin would be inappropriate under the current circumstances.  First, the psilocybin is material evidence in the pending criminal case that must be preserved.  Second, the Court's Injunction Order did not include any provisions ensuring the psilocybin would remain secure, unaltered, and the subject of a strict chain of custody.  As-is, returning the psilocybin would likely result in the spoliation or loss of critical evidence.  As a gesture of good faith, Defendants instead offered to place $2,500 on deposit with the Court as security for the psilocybin, which amount

---

[3] The 12/16/24 Email was designated as a Rule 408 communication.  Although that rule does not prohibit the use of that communication for purposes of this Motion, these facts are undisputed.  Accordingly, Defendants have not attached the communication between counsel as a matter of professionalism and civility.  *See generally* Fed. R. Evid. 408(a) (prohibiting use of communications "to prove or disprove the validity or amount of a disputed claim"); *id.* at R. 408 (b) (allowing use when "negating a contention of undue delay")].  If Plaintiffs dispute the statements associated with the communication, Defendants will supplement this filing.

App-3:029

reflects the estimated value of the psilocybin based on Plaintiffs' prior testimony.  Alternatively, Defendants asked whether Plaintiffs had a different proposal under the circumstances to mitigate any alleged injury and prevent the spoliation or loss of key evidence.

On December 18, 2024, Counsel responded that if the psilocybin is not "returned by close of business on Thursday, December 19th, Plaintiffs will raise the matter with the Court."  [*See* 12/18/24 Email].  Accordingly, Defendants submit this expedited Motion.

## ARGUMENT

### I.   THE COURT'S ORDER WILL RESULT IN THE PERMANENT LOSS OF RELEVANT EVIDENCE.

Although the Court's Injunction Order is styled as "temporary," its impact will be permanent.  Once the psilocybin is returned to Plaintiffs and used "in [their] ceremonies," that evidence will be permanently destroyed.  [*See* Injunction Order (Dkt. 24)].  The Court cannot un-ring a bell or have Plaintiffs return psilocybin after it is distributed to voyagers.

The Court's Injunction Order would, therefore, effectively moot any future proceedings concerning the psilocybin.  *See, e.g.*, *Oklevueha Native Am. Church of Hawaii, Inc. v. Holder*, 676 F.3d 829, 840 (9th Cir. 2012) (rejecting claim for return of "religious marijuana" because it had been destroyed and "the court cannot order the government to return something it does not have").  "[T]hough a *case* may not be moot because partial relief is still available, a *specific request* for an injunction may become moot."  *Caddo Nation of Okla. v. Wichita and Affiliated Tribes*, 877 F.3d 1171, 1176 (10th Cir. 2017).  The Court's ruling on "a temporary restraining order that cannot have any present-day effect is moot."  *Id.* at 1177.  *Cf. Transeuro Amtrans Worldwide Moving & Relocations Ltd. v. Conoco, Inc.*, 95 F. App'x 288, 290 (10th Cir. 2004) ("It is firmly established

4

that an appeal from the denial of a motion for a preliminary injunction is rendered moot when the act sought to be enjoined has occurred.").

The Court's order contemplates a subsequent hearing at the preliminary injunction stage. [*See id.* at 3].  Indeed, it recognized that "Defendants [may] wish to present further evidence or argument for the court to consider."  [*Id.*].  However, that process becomes a nullity if the psilocybin already has been returned, distributed, and ingested.

## II. THE COURT'S ORDER WILL IMPAIR THE STATE CRIMINAL PROCESS AND VIOLATES MANDATORY EVIDENCE RETENTION STATUTES.

The State of Utah has criminally charged Jensen for the possession and distribution of psilocybin.  *See State of Utah v. Jensen*, Case No. 241404407 (4th Dist. Utah).  Those criminal charges are based on the evidence seized after the Fourth District Court issued its search warrant. [*See* Search Warrant (Dkt. 9-9)].  Put simply, the Court's Injunction Order would impair ongoing criminal proceedings in the Utah State Courts by forcing the State of Utah to (a) lose important evidence central to the criminal case and (b) violate Utah Code requiring the retention of evidence during a criminal prosecution.

The Court must "be slow to act where its powers are invoked to interfere by injunction with threatened criminal prosecutions in a state court." *Douglas v. City of Jeannette (Pennsylvania)*, 319 U.S. 157, 162 (1943); *see also* 28 U.S.C. § 2283 ("A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.").

Utah Code expressly requires Defendants to retain the evidence seized during the execution of the Fourth District Court's search warrant until *after* the criminal process is complete.  "[A]n

agency *shall* retain evidence of a felony offense" until "the longer of" (a) "one year after the day on which all direct appeals of the final judgment for" a conviction or (b) after the final entry of an "acquittal or dismissal." Utah Code § 77-11c-301 (emphasis added). That statutory basis is consistent with the Fourth District Court's search warrant, which "COMMANDED" that law enforcement "make a search" and further "*retain such property* in your custody subject to the direction of a prosecutor or an order of this Court." [*See* Search Warrant (Dkt. 9-9) (emphasis added)]. The Court should not place Defendants in the untenable position of either violating the Utah Code or violating the Court's Injunction Order.

Moreover, Plaintiffs have—but did not assert—an express legal remedy under the Utah Code to obtain the return of the psilocybin. "A claimant may file a petition with the court for the return of the property that is being retained as evidence . . . ." Utah Code § 77-11a-305. That petition, however, must be filed in "*the court in which criminal proceedings have commenced* regarding the offense for which the property is being retained." *Id.* (emphasis added). Notably, the same statute includes "an opportunity for an expedited hearing." *Id.* Plaintiffs' Complaint *did not* utilize the express process established by Utah Code for the return of evidence.

The Court's Injunction Order should be revised to reflect the criminal charges pending in the Utah State Court. The psilocybin is material evidence in the criminal case pending in the Utah State Court. Defendants are expressly required by the Utah Code to retain such evidence during the pendency of the criminal charges. And, Plaintiffs failed to utilize the express statutory process for seeking "the return of the property." *Id.*

6

### III.   ALTERNATIVELY, THE COURT SHOULD STAY ITS ORDER WHILE DEFENDANTS APPEAL TO THE TENTH CIRCUIT.

Plaintiffs recognize that temporary restraining orders typically cannot form the basis for a direct appeal. *See* 28 U.S.C. § 1292 (allowing appeals from "granting, continuing, modifying, refusing or dissolving injunctions). However, "the fact that an order is simply denominated as a temporary restraining order does not end our inquiry. It is the essence of the order, not its moniker, that determines our jurisdiction." *Serv. Emps. Int'l Union of Healthcare Workers v. Nat'l Union of Healthcare Workers*, 598 F.3d 1061, 1067 (9th Cir. 2010).

A TRO "may be appealed under § 1292(a)(1) if it has the 'practical effect' of an injunction and furthers the statutory purpose of permitting litigants to effectually challenge interlocutory orders of serious, perhaps irreparable, consequence." *Hope v. Warden York Cnty. Prison*, 956 F.3d 156, 161 (3rd Cir. 2020) (quoting *Carson v. Am. Brands*, 450 U.S. 79, 84 (1981)); *see also Populist Party v. Herschler*, 746 F.2d 656, 661 n.2 (10th Cir. 1984) (allowing appeal because "otherwise, [party's] rights would be irretrievably lost"); *Ross v. Rell*, 398 F.3d 203, 204 (2d Cir. 2005) (recognizing appeal from TRO with "serious, perhaps irreparable consequences" that "can be effectually challenged only by immediate appeal"); *Schindler v. Schiavo*, 403 F.3d 123, 1225 (11th Cir. 2005) ("When a grant or denial of a TRO might have a serious, perhaps irreparable, consequence, and can be effectually challenged only by immediate appeal, we may exercise appellate jurisdiction."). "These precedents make it clear that the court will look at the actual effect of the order that is issued by the district court when determining whether an appeal should be allowed." 11A Fed. Prac. & Proc. Civ. § 2962 (3d ed).

As recognized, the Court's Injunction Order that Defendants return the psilocybin is not "temporary." Instead, the Court's Injunction Order allows (in fact contemplates) Plaintiffs'

7

distribution of the psilocybin in their ongoing operations until that evidence has disappeared. Unless the Court's Injunction Order is modified or stayed, the destruction of the psilocybin would be permanent. It also would irreparably prejudice the State of Utah's criminal prosecution. As such, even if the Court were disinclined to stay its order for any other reason, it should enter a stay pending an appeal to the Tenth Circuit. *See generally* 10th Cir. R. 8.1(B)-(E).

The Court's Injunction Ruling is based solely on the Utah RFRA. [*See* Injunction Order (Dkt. 24) at 2]. Because that statute is new, the Court's ruling is the first time any tribunal has interpreted or applied the Utah RFRA. Although the Court's Injunction Order sided with Plaintiffs, Defendants have raised good faith defenses that are not precluded by any binding authority. For example, the Utah Supreme Court has not determined (a) when GIAU notice is required, (b) whether the *Meyers* factors control the Court's analysis of whether actions are "substantially motivated by a sincerely held religious belief," or (c) how the "least restrictive means" analysis should be analyzed. Although the Court initially sided with Plaintiffs at the TRO hearing, these issues of first impression deserve further attention. *See* 10th Cir. R. 8.1(B).

Defendants also face irreparable harm if the stay is not entered pending appeal. As noted, the Court's order forces Defendants to pick between violating the Utah Code or this Court's Injunction Order. That is an untenable position. Moreover, if the psilocybin is returned to Plaintiffs, that evidence will be distributed and lost for all future proceedings. *See id.* R.8.1(C).

Finally, the balance of the harms favors Defendants. The Court found that that the "records" seized pursuant to the Fourth District Court's search warrant are "considered by Singularism to be sacred scripture." [*See* Injunction Order (Dkt. 24) at 1]. Those items, along with everything except the controlled substances, are being returned to Singularism. With respect

8

to psilocybin itself, Plaintiffs' testimony at the TRO hearing was that the seizure and retention of psilocybin *was not* irreparable. Instead, Plaintiffs testified that (a) the value of the seized psilocybin was, at most, a few thousand dollars, (b) they have an established network that allows them to regularly obtain psilocybin, and (c) the loss of the psilocybin was the equivalent to a Catholic priest spilling some of the sacramental wine—frustrating but easily resolved. In short, Plaintiffs did not establish that the ongoing retention of the psilocybin—and just the psilocybin— would cause them to suffer meaningful harm. Given the evidence and the interests at stake, a stay is appropriate. *See id.* R. 8.1(D)-(E).

## IV. DEFENDANTS REMAIN WILLING TO POST A $2,500 BOND AS AN ALTERNATIVE.

Defendants remain willing to post a $2,500 bond with the Court as an alternative for the return of the psilocybin. The amount of that bond approximates Plaintiffs' testimony about the value of the psilocybin at issue.

Notably, Defendants offer is the reverse of the process required by Federal Rule of Civil Procedure 65. Under that rule, "[t]e court may issue a preliminary injunction or temporary restraining order only if the *movant* gives security in an amount that the court considers proper." Fed. R. Civ. P. 65(c) (emphasis added). The Court's Injunction Order did not address security or explain why no security was required. [*See* Injunction Order (Dkt. 24)]. Nevertheless, Defendants remain willing to reverse the ordinary course and provide $2,500 as security and as confirmation that this Motion is made in good faith.

## CONCLUSION

The Court should modify or stay its Injunction Order. While the criminal case is pending in the Utah State Courts, the Defendants should not be required to return the psilocybin. A contrary

9

requirement would result in the permanent loss of that evidence, violate a prosecutor's statutory duties under Utah law, and threaten the criminal process pending in the Utah State Courts.

Dated this 18th day of December, 2024.

JAMES DODGE RUSSELL & STEPHENS, P.C.

/s/ Mitchell A. Stephens
Mitchell A. Stephens
Justin L. James
Dillon P. Olson

*Counsel for Utah County and Jeffrey Gray*

PROVO CITY LEGAL

/s/ Richard A. Roberts
Gary D. Millward
Richard A. Roberts

*Counsel for Provo City, Troy Beebe, Brian Wolken, and Jackson Julian*

10

App-3:036

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BRIDGER LEE JENSEN, SINGULARISM, and PSYCHE HEALING AND BRIDGING, <br><br> Plaintiffs, <br><br> v. <br><br> UTAH COUNTY, PROVO CITY, JEFFREY GRAY, TROY BEEBE, BRIAN WOLKEN, and JACKSON JULIAN, <br><br> Defendants. | **ORDER TEMPORARILY STAYING TRO REQUIRING RETURN OF MUSHROOMS AND REITERATING PREVIOUS ORDER TO NOTIFY COURT OF ANY REQUEST FOR ADDITIONAL EVIDENTIARY HEARING** <br><br> Case No. 2:24-cv-00887-JNP-CMR <br><br> District Judge Jill N. Parrish |

Plaintiffs are members and affiliates of a new religion called Singularism, which relies on psylocibin mushrooms to encounter the Divine during religious ceremonies. Psylocibin is a Schedule I controlled substance. When Plaintiff Bridger Lee Jensen founded Singularism in November 2023, he notified Utah County and Provo City about his religion's sincere use of psylocibin. For one year, the government took no action. In November 2024, Provo City officers executed a search warrant at Singularism's location. During the search, Jensen forthrightly directed the officers to Singularism's stock of psylocibin mushrooms and attempted to explain how Singularism used them in religious ceremonies. The officers seized the mushrooms (along with Singularism's sacred scripture, its records of religious ceremonies), and the government threatened criminal charges against Jensen.

Plaintiffs then filed suit in Utah state court against Utah County, Provo City, and several government officials, seeking a temporary restraining order and preliminary injunction to require

return of the mushrooms and scripture. Their motion invoked the Free Exercise Clause of the First Amendment to the U.S. Constitution, the free exercise clause of the Utah constitution, and the Utah Religious Freedom Restoration Act ("RFRA"), UTAH CODE ANN. § 63G-33-201. The government Defendants removed the case to federal court on November 27.

On December 13, the court held an evidentiary hearing on Plaintiffs' motion for a temporary restraining order. At the hearing, Plaintiffs presented the testimony of several witnesses, including Jensen, to establish that they used psylocibin mushrooms for sincere, religious purposes and that the law banning psylocibin imposed a substantial burden on their religious exercise. Defendants' entire presentation challenged the sincerity of Plaintiffs' religious beliefs.

The court found Plaintiffs' witnesses credible and ruled that Plaintiffs had shown a likelihood of success on their claim under the Utah RFRA. Accordingly, the court entered a limited temporary restraining order requiring Defendants to return the psylocibin mushrooms and records as soon as practicable. The court also recognized that a one-day hearing may not have sufficed for the parties to introduce all the evidence they wished to present in connection with Plaintiffs' motion for a preliminary injunction; therefore, the court offered to hold another hearing in January before ruling on the motion for preliminary injunction and ordered the parties to notify the court by December 20 if they wished to avail themselves of this option.

Yesterday, on December 18, Defendants filed a motion asking the court to stay the portion of its order requiring them to return the psylocibin mushrooms. Their motion indicated that following the court's ruling that Plaintiffs had shown a likelihood of success on the merits of their Utah RFRA claim, the government instituted criminal charges against Jensen. Defendants' motion argued that state law requires them to retain evidence seized in good faith indicating the

2

commission of a felony offense (illegal use of psylocibin would constitute a felony) and that this court's order would interfere with the now-pending state prosecution.

The court waits to rule on this motion but orders a temporary stay of the mushrooms portion of the order until Defendants' motion is fully briefed and resolved. The court also clarifies that the parties must still notify the court by tomorrow, December 20, if they wish to present any additional evidence for the court to consider in ruling on Plaintiffs' motion for a preliminary injunction. If the court does not hear from the parties by then, the court will assume that no further evidentiary hearing is necessary and will proceed to rule on the motion for preliminary injunction. The order resolving that motion will contain the court's detailed findings of fact and legal reasoning to aid the Tenth Circuit in its review of this case should it arrive in that court.

## CONCLUSION AND ORDER

The court **STAYS** the portion of its temporary restraining order requiring the government to return the psylocibin mushrooms pending resolution of Defendants' motion to stay. The court once again **ORDERS** the parties to notify the court by tomorrow, December 20, if they wish to present any additional evidence in connection with Plaintiffs' motion for preliminary injunction.

Signed December 19, 2024.

BY THE COURT

Jill N. Parrish
United States District Court Judge

3

App-3:039

Tanner J. Bean (A17128)
tbean@fabianvancott.com
Anna P. Christiansen (A17518)
achristiansen@fabianvancott.com
**FABIAN VANCOTT**
95 South State Street, Suite 2300
Salt Lake City, UT 84111-23323
Telephone: (801) 531-8900
*Attorneys for Plaintiffs*

---

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BRIDGER LEE JENSEN, an individual; SINGULARISM, a non-profit corporation; PSYCHE HEALING AND BRIDGING, LLC dba PSYCHEDELIC THERAPY JOURNEY; a limited liability company; <br><br> Plaintiffs, <br> vs. <br><br> UTAH COUNTY, a political subdivision, PROVO CITY, a political subdivision; JEFFREY GRAY, an individual; TROY BEEBE, an individual; BRIAN WOLKEN, an individual; JACKSON JULIAN, an individual; JOHN DOES 1-4, individuals; <br><br><br> Defendants. | **PLAINTIFFS' STATUS REPORT AND REQUEST FOR PRELIMINARY INJUNCTION HEARING** <br><br> Civil No. 2:24-cv-00887-JNP <br><br> Judge Jill N. Parrish <br><br> (Removed from Fourth Judicial District Court, Utah County, State of Utah, Case No. 240406123) |

Plaintiffs Bridger Lee Jensen, Singularism, Psyche Healing and Bridging LLC (dba Psychedelic Therapy Journey) ("Plaintiffs") hereby file this Status Report and Request for Preliminary Injunction Hearing.

At the hearing on Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction on December 13, 2024, the Court was unable, simply because of time constraints, to

hear the testimony from all the witnesses the parties intended to call. Plaintiffs forewent the presentation of testimony of two of their witnesses they had planned to call, relying on those witnesses' declarations previously submitted to the Court. Defendants made proffers to the Court regarding the anticipated testimony of their three witnesses. Because of this, the Court asked the parties to meet and confer regarding whether another day of hearing was necessary for the Court to rule upon Plaintiffs' request for a preliminary injunction. As stated in the TRO, the Court ordered that if "Defendants wish to present further evidence or argument for the court to consider in ruling on the motion for preliminary injunction, they may request the court no later than December 20 to schedule another hearing." ECF 24, at 3. The Court renewed this order in ECF 36.

Based upon the parties' discussions and Defendants' actions in filing a criminal action against Mr. Jensen and moving for a stay of the Court's TRO, it is necessary for the Court to conduct the hearing it mentioned in the TRO to complete the presentation of evidence and enable the Court to rule upon Plaintiffs' request for preliminary injunction. Given Defendants' recent conduct, as explained in Plaintiffs' filings made concurrently to this filing, and the exigent circumstances Defendants' conduct imposes upon Plaintiffs, Plaintiffs respectfully ask the Court to schedule the second hearing date as soon as possible.

Defendants are available for a hearing on all dates in January besides January 7, 8, 14, and 16, 2025.

DATED December 19, 2024.

/s/ Tanner J. Bean
Tanner J. Bean
Anna P. Christiansen
*Attorneys for Plaintiffs*

App-3:041

## CERTIFICATE OF SERVICE

I hereby certify that on December 19, 2024, I caused the foregoing **PLAINTIFFS'**

**STATUS REPORT AND REQUEST FOR PRELIMINARY INJUNCTION HEARING** to

be served via the Court's electronic filing system upon the following:

> Gary DeMott Millward
> J. Brian Jones
> Provo City Attorneys Office
> 351 W Center St
> PO Box 1849
> Provo, UT 84603
> (801) 852-6141
> gmillward@provo.org
> bjones@provo.org
>
> Richard A. Roberts
> Provo City - Legal Department
> 445 W Center St Ste 300
> Provo, UT 84601
> 801-852-6140
> Email: rroberts@provo.org
>
> Mitchel A. Stephens
> Lara A. Swensen
> Dillon P. Olson
> Justin James
> James Dodge Russell & Stephens PC
> 10 W Broadway Ste 400
> Salt Lake City, UT 84101
> mstephens@jdrslaw.com
> lswensen@jdrslaw.com
> dolson@jdsrlaw.com
> jjames@jdrslaw.com

/s/ Tanner J. Bean

App-3:042

Tanner J. Bean (A17128)
tbean@fabianvancott.com
Anna P. Christiansen (A17518)
achristiansen@fabianvancott.com
**FABIAN VANCOTT**
95 South State Street, Suite 2300
Salt Lake City, UT 84111-23323
Telephone: (801) 531-8900
*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BRIDGER LEE JENSEN, an individual; SINGULARISM, a non-profit corporation; PSYCHE HEALING AND BRIDGING, LLC dba PSYCHEDELIC THERAPY JOURNEY; a limited liability company;<br><br>     Plaintiffs,<br>vs.<br><br>UTAH COUNTY, a political subdivision, PROVO CITY, a political subdivision; JEFFREY GRAY, an individual; TROY BEEBE, an individual; BRIAN WOLKEN, an individual; JACKSON JULIAN, an individual; JOHN DOES 1-4, individuals;<br><br>     Defendants. | **OPPOSITION TO DEFENDANTS' EXPEDITED MOTION TO STAY OR MODIFY ORDER REQUIRING RETURN OF PSILOCYBIN**<br><br>Civil No. 2:24-cv-00887-JNP<br><br>Judge Jill N. Parrish<br><br>(Removed from Fourth Judicial District Court, Utah County, State of Utah, Case No. 240406123) |

Plaintiffs Bridger Lee Jensen, Singularism, Psyche Healing and Bridging LLC (dba Psychedelic Therapy Journey) ("Plaintiffs") hereby file their Opposition to Defendants' Expedited Motion to Stay or Modify Order Requiring Return of Psilocybin.

1

App-3:043

## **INTRODUCTION**

Defendants refuse to comply with this Court's TRO to return Plaintiffs' religious sacrament. The Court found that "deprivation of [Plaintiffs'] ps[i]locybin . . . is ongoing," "impose[s] an 'undue hardship,'" and that Plaintiffs "will suffer irreparable harm absent preliminary relief. The ongoing deprivation of their ps[i]locybin . . . hinders their free exercise of religion, and no amount of damages later can fully compensate for this harm."

In an attempt to excuse their sanctionable behavior, Defendants have manufactured the dilemma of which they now complain. *Five days after* the TRO, Defendants filed criminal charges so they could claim the Court must stay the TRO so they can prosecute Mr. Jensen. This is not only bad faith maneuvering, but it is an escalation of Defendants' burdens upon Plaintiffs' religious free exercise, despite the Court's order that Plaintiffs are substantially likely to prevail. Plaintiffs requested injunctive relief over a month ago to prevent Defendants from prosecuting Mr. Jensen and will seek such relief at the Court's TRO/preliminary injunction hearing in January.

The Court should deny Defendants' motion immediately. Defendants do not even attempt to set forth the standard to stay a TRO, let alone meet it. Further, controlling authorities dictate that the Court should *enjoin the bad faith state court criminal proceedings*, not this Court's TRO. Defendants' crisis is manufactured and illusory. It pales in comparison to what Defendants have done to trample upon Plaintiffs' free exercise of religion.

## **ARGUMENT**

Defendants request the Court stay its TRO. But they fail to even provide the Court with the standard to consider their request. Under the applicable standard, Defendants' request fails.

App-3:044

The default rule under Rule of Civil Procedure 62(c) is that "an interlocutory or final judgment in an action for an injunction" is "not stayed after being entered, even if an appeal is taken . . ." Further, when an appeal is pending related to an injunction, the court may require a "bond or other terms that secure the opposing party's rights." Fed. R. Civ. P. 62(d). This Court evaluates a request to stay one of its orders under the following standard:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Cmty. Television of Utah, LLC v. Aereo, Inc.*, 997 F. Supp. 2d 1191, 1209 (D. Utah 2014) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)); *see e.g., Derma Pen, LLC v. 4EverYoung Ltd.*, No. 2:13-CV-00729-DN-EJF, 2014 WL 3563469, at *1 (D. Utah July 18, 2014).[1] "Importantly, a stay is not a matter of right, even if irreparable injury might otherwise result." *ESIP SERIES 1, LLC v. Doterra Int'l, LLC*, No. 215CV00779RJSDBP, 2023 WL 4206387, at *2 (D. Utah June 27, 2023) (cleaned up) (quotation omitted).

## I.   DEFENDANTS' SUPPOSED EVIDENTIARY CRISIS IS MANUFACTURED. IT FAILS TO MEET THE STAY FACTORS.

After the Court issued its TRO and counsel met and conferred, Defendants determined they would not return the psilocybin. Instead, they (1) filed criminal charges (which mentioned this action, *but not that this Court had issued a TRO*), (2) moved to stay the TRO, and (3) did not return

---

[1] This is the same standard Defendants would have to argue to the Tenth Circuit should this Court deny Defendants' request for a stay. *See* Fed. R. App. P. 8; 10th Cir. R. 8.1; *Homans v. City of Albuquerque*, 264 F.3d 1240, 1243 (10th Cir. 2001).

any items, instead requiring Plaintiffs to "retrieve those items from the police department's front counter."

This course of events shows that Defendants have, in bad faith, manufactured the evidentiary crisis of which they now complain to the Court. Additionally, Defendants fail to demonstrate the four stay factors.

*Success on the Merits.* Defendants do not even try to argue they will succeed on the merits. Indeed, the Court's TRO indicates that it is *Plaintiffs* that have a substantial likelihood of success on the merits, and on *every relevant factor* of the TRO/preliminary injunction framework and of Plaintiffs' Utah RFRA claim. *See* ECF 24. Further, the Court TRO does *not* violate Utah's evidence retention statute.

While it is true that Utah Code §§ 77-11c-201 and 77-11c-301 *generally* require the retention of evidence, there are exceptions. The most notable exception is where a "court orders [Defendants] to return the evidence that is property to a claimant" under Utah Code § 77-11a-305. *See* Utah Code §§ 77-11c-202(1)(b), 77-11c-302(1)(b). Utah Code § 77-11a-305 states that a claimant may initiate an evidence return request in *either* "the court in which the criminal proceedings have commenced" *or* "the district court with venue under Section 77-11a-102 *if there are no pending criminal proceedings*." (Emphasis added). Utah Code § 77-11a-102 specifies that for this case, a "court with venue" would be Utah's Fourth Judicial District where Plaintiffs originally filed their civil action. But because Defendants removed that action to this Court, *this* is the appropriate court.

Under Utah Code § 77-11a-305(2)-(3), upon receipt of a request for a return of evidence, the Court must hold an expedited hearing where the Court evaluates whether the claimant

4

establishes "by clear and convincing evidence that the claimant: (a) is the owner of the property; and (b) may lawfully possess the property." And where "the court orders the property to be returned to the claimant, the agency with custody of the property shall return the property to the claimant as *expeditiously as possible.*" Utah Code § 77-11a-305(4) (emphasis added). Those requirements have already been met: (1) Plaintiffs made a request for return of psilocybin; (2) this Court conducted an expedited hearing regarding Plaintiffs' lawful possession of psilocybin; and (3) the Court reviewed those elements under the similarly high TRO/preliminary injunction framework.

Utah's evidence retention statute also *permits Defendants* to return Plaintiffs' psilocybin if they, among other things, "preserve[] sufficient evidence of the . . . substance for use as evidence" including by testing and photographing the psilocybin. *See* Utah Code §§ 77-11c-202(1), (4), 77-11c-302(1), (5).  Thus, Defendants *are not* bound by statute to retain Plaintiffs' sacramental psilocybin.

*Defendants' Injury.* Defendants argue they will be irreparably harmed by returning Plaintiffs' sacramental psilocybin because they will be unable to use it to prosecute Mr. Jensen. This claim is significantly undermined by Defendants' *manufacturing* this harm by filing a criminal case against Mr. Jensen after the TRO was issued. Further, Defendants have other means, as shown above, to pursue their prosecution of Mr. Jensen than physical possession of the psilocybin, including using Mr. Jensen's testimony to this Court. There is no harm to Defendants where possession is not reasonably in question.[2] Last, there can be no harm to Defendants'

---

[2]     Defendants' motion cites to three cases to argue that returning the psilocybin will moot the need for a preliminary injunction. ECF 32, at 4. However, none of those cases say that. Further, Defendants' refusal to return Plaintiffs' sacramental psilocybin and decision to file criminal

5

prosecution where the criminal action is brought in bad faith to evade this Court's TRO and with knowledge that Mr. Jensen is substantially likely to prevail in the criminal proceeding upon his defense under the Utah RFRA for the same reasons as contained in this Court's TRO.

*Injury to Plaintiffs.* In contrast, a stay would extend and deepen the "ongoing deprivation of [Plaintiffs'] ps[i]locybin," an "irreparable harm" that "hinders [Plaintiffs'] exercise of religion" and for which "no amount of damages later can fully compensate for this harm." ECF 24, at 3. The need to enforce the TRO is even more present now that Defendants have chosen to double down on their burdens on Plaintiffs' religious free exercise.

*Public Interest.* As Plaintiffs argued in their briefing on their motion for TRO/preliminary injunction, preserving religious free exercise is in the public's interest, even if that means granting a religious exemption from Utah's Controlled Substances Act through Utah's RFRA. *See* ECF 19, at 34; *see also* ECF 24, at 3.

## II. CONTROLLING LAW DICTATES THE STATE COURT PROSECUTION BE ENJOINED.

The Court can also deny Defendants' motion because their authorities *do not* prohibit enjoining state criminal action. The All Writs Act empowers this Court to issue injunctions against state criminal proceedings and Defendants' citation to *Douglas v. City of Jeannette* does nothing to alter that power.

First, the "Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and

---

charges against Mr. Jensen ensures that all issues remain live and that a preliminary injunction is necessary.

principles of law." 28 U.S.C. § 1651(a) (the "All Writs Act"). Under the All Writs Act, federal courts possess authority to issue injunctions against state court proceedings in certain circumstances. *See, e.g.*, *Baker v. Gotz*, 415 F. Supp. 1243, 1247 (D. Del.), *aff'd*, 546 F.2d 415 (1976) (summarizing the application of the All Writs Act). The Anti-Injunction Act, 28 U.S.C. § 2283, clarifies that a federal court can issue such injunctions in three circumstances: (1) when expressly authorized by Congress, (2) "where necessary in aid of its jurisdiction," or (3) "to protect or effectuate its judgments." Both the first and second exceptions are met in this case, and it is likely that ultimately in this case the third exception will be met as well.

Congress has dictated that removal of a case to federal court acts as a stay of state court proceedings. *Vendo Co. v. Lektro-Vend Corp.*, 433 U.S. 623, 640 (1977) (plurality opinion) ("The statutory procedures for removal of a case from state court to federal court provide that the removal acts as a stay of the state-court proceedings."). After removal, the state court "shall effect the removal and the State court shall proceed no further unless and until the case is remanded." 28 U.S.C. § 1446(d). Thus, the removal statute constitutes express congressional authorization permitting federal courts to issue injunctions against state court proceedings. *See* Wright & Miller, Fed. Prac. & Proc. § 4225 Exceptions to the Act—In General—Necessary in Aid of Its Jurisdiction (3d ed. 2024) ("The removal cases can be more easily fit into the first exception, on the ground that they are an express statutory exception, and the Supreme Court has so treated them."). Under this exception, federal courts have authority to enjoin *future state court proceedings filed in an attempt to subvert the purposes of the removal statute. See, e.g.*, *Kansas Public Employees Retirement Sys. v. Reimer Kroger Assocs.*, 77 F.3d 1063, 1070-71 (8th Cir. 1996) (upholding injunction against unremoved state case under Authorized-by-Congress exception because the

7

"newly filed state suit . . . was an attempt to subvert the removal of the earlier case"); *Davis Int'l, LLC v. New Start Grp. Corp.*, 367 F. App'x 334 (3d Cir. 2010) (affirming federal court injunction where the federal court issued a stay and the party displeased with the stay refiled several claims in a new state court case). "[A] plaintiff's fraudulent attempt to subvert the removal statute implicates the expressly authorized exception to the Anti-Injunction Act and may warrant the granting of an anti-suit injunction." *Id.* at 337 (citation omitted).

The second exception to the Anti-Injunction Act was added to the statute "to make clear the recognized power of the Federal courts to stay proceedings in State cases removed to the district courts." 28 U.S.C. § 2283, Reviser's Notes (1948) (referring to 28 U.S.C. § 1651, the removal statute). This "in aid of its jurisdiction" exception is properly understood as applying in two circumstances: when either "(1) the district court has exclusive jurisdiction over the action because it had been removed from state court; or, (2) the state court entertains an *in rem* action involving a res over which the district court has been exercising jurisdiction in an *in rem* action." *Estate of Brennan ex rel. Britton v. Church of Scientology Flag Serv. Org., Inc.*, 645 F.3d 1267, 1273 (11th Cir. 2011) (quoting *In Re Ford Motor Co.*, 471 F.3d 1233, 1250-53 (11th Cir. 2006)).

This court has federal jurisdiction over this case. Defendants themselves removed this case to federal court. Via their new state court case, Defendants seek to litigate precisely the same issues before the court in this case. As in *Kansas* and *Davis*, this Court can properly exercise its authority under the Anti-Injunction Act and All Writs Act to bar such efforts. In addition, Defendants attempt to subvert this Court's federal removal jurisdiction by asking a state court to interpret and determine the application of Defendants' claims as criminal defenses in a state court action.

Second, Defendants argue that the Court must stay this proceeding, but their reliance on *Douglas v. City of Jeannette (Pennsylvania)*, 319 U.S. 157, 162 (1943), is misplaced. *Douglas* was merely one step in a line of Supreme Court cases beginning with *Ex Parte Young*, 209 U.S. 123 (1908) (establishing that federal courts have power to enjoin threatened state criminal prosecutions in certain situations) and continuing through *Younger v. Harris*, 401 U.S. 37 (1971) (clarifying when federal court injunctions against state criminal prosecutions are available). The rule articulated in *Douglas* lacks the clarity of its progeny and Defendants' citation to *Douglas* fails to analyze the exceptions to *Younger* abstention that have developed in the eighty years since *Douglas*.

*Younger* abstention is only required where (i) a federal court is asked to interfere with an *ongoing* state judicial proceeding, (ii) the issues involve important state interests, and (iii) there is an adequate opportunity afforded in the state court proceeding to raise the federal claims. *J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280, 1291 (10th Cir. 1999) (citing *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982)).

Courts decline to apply *Younger* when a federal court proceeding *predates* a state court proceeding. *See Liedel v. Juvenile Court of Madison Cnty., Ala.*, 891 F.2d 1542, 1546 n.6 (11th Cir. 1990) ("*Younger* applies if state court proceedings were pending at the time of the filing of the federal complaint."); *Federal Express Corp. v. Tennessee Public Serv. Comm'n*, 738 F. Supp. 1140, 1143 (M.D. Tenn. 1990) ("[T]he proper point of reference for determining whether state proceedings are 'ongoing' is the date the federal complaint is filed."); *Zalman v. Armstrong*, 802 F.2d 199, 204 (6th Cir. 1986) ("[T]he proper time of reference for determining the applicability of *Younger* abstention is the time that the federal complaint is filed. If a criminal prosecution is

9

pending in state court at this time, *Younger* requires federal noninterference, unless extraordinary circumstances are otherwise found to exist.").

Defendants' state court case was filed on December 18, 2024, a month after this case began. *See* ECF 2-2. Defendants removed the case to this Court on November 27, 2024. ECF 2. Because there was no ongoing state court proceeding when this case was filed in state court, nor when Defendants removed this case to federal court, *Younger* abstention is not applicable and this Court can continue to hear this case.

Although *Younger* does not apply at all, even if this Court were to consider that case, the Court need not—and should not—grant the relief Defendants seek. When *Younger* applies, there is a general rule that federal courts should not enjoin state criminal prosecutions. *Younger*, 401 U.S. at 54. However, this general rule does not apply when there is a great and immediate danger of irreparable injury. *Younger*, 401 U.S. at 45; *see also J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280, 1291 (10th Cir. 1999) (citing *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982)). Irreparable injury has been interpreted to mean (1) bad faith or harassment; (2) flagrantly unconstitutional statutes; and (3) multiple prosecutions. *Younger*, 401 U.S. at 50, 53-54.

Defendants' conduct demonstrates that the first exception for bad faith or harassment is met. Plaintiffs brought this case in state court and Defendants removed the case to federal court. Defendants then argued—despite their removal—that the federal court should not hear at least part of the case that Defendants themselves removed. ECF 13, at 18-20. In the TRO hearing, Defendants challenged every single element of Plaintiff's case, but provided no persuasive evidence that Plaintiffs' religious belief is insincere, that Plaintiffs' religious practices pose any

10

harm to any legitimate governmental interest or the public, and made no argument that there is no other way to accomplish their governmental interests, among other failings.

After losing at the TRO hearing, Defendants refused to abide by the Court's order, retaining the psilocybin they were ordered to return. And, days after the TRO hearing, Defendants brought criminal charges against Plaintiff Jensen in which they failed to notify the state criminal court of their knowledge that Plaintiffs are substantially likely to prevail upon their defense under Utah's RFRA. Now, Defendants argue that *because of their own actions* of removing this case to federal court and filing a criminal case well after this case began, the TRO issued in this case should be stayed until their new criminal case is complete. As stated above, Defendants, through their own actions, are attempting to manufacture a crisis by which they argue this Court cannot act. Such course of conduct demonstrates Defendants' bad faith, harassment, and retaliatory conduct against Plaintiffs for their free exercise of their religion and establishes the first exception to the general *Younger* abstention rule.

### III.   THE COURT SHOULD ORDER DEFENDANTS TO PAY PLAINTIFFS' ATTORNEY FEES INCURRED IN RESPONDING TO THIS MOTION.

The Court possesses inherent power to "fashion an appropriate sanction for conduct which abuses the judicial process" and "may assess attorney's freed when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *O'Rourke v. Dominion Voting Sys., Inc.*, No. 21-1442, 2022 WL 17588344, at *2 (10th Cir. Dec. 13, 2022) (quoting *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017) and *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991)). For the reasons expressed above, the Court should order Defendants to pay Plaintiffs' attorney fees incurred in responding to this motion.

### CONCLUSION

App-3:053

The Court should deny Defendants' motion and order Defendants to pay Plaintiffs' attorney fees incurred in responding to this motion.

DATED December 19, 2024.

/s/ Tanner J. Bean
Tanner J. Bean
Anna P. Christiansen
*Attorneys for Plaintiffs*

App-3:054

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 19, 2024, I caused the foregoing **OPPOSITION TO DEFENDANTS' EXPEDITED MOTION TO STAY OR MODIFY ORDER REQUIRING RETURN OF PSILOCYBIN** to be served via email and certified mail upon the following:

Gary DeMott Millward
J. Brian Jones
Provo City Attorneys Office
351 W Center St
PO Box 1849
Provo, UT 84603
(801)852-6141
gmillward@provo.org
bjones@provo.org

Richard A. Roberts
Provo City - Legal Department
445 W Center St Ste 300
Provo, UT 84601
801-852-6140
Email: rroberts@provo.org

Mitchel A. Stephens
Lara A. Swensen
James Dodge Russell & Stephens PC
10 W Broadway Ste 400
Salt Lake City, UT 84101
mstephens@jdrslaw.com
lswensen@jdrslaw.com

*/s/ Tanner J. Bean*

13

App-3:055

Tanner J. Bean (A17128)
tbean@fabianvancott.com
Anna P. Christiansen (A17518)
achristiansen@fabianvancott.com
**FABIAN VANCOTT**
95 South State Street, Suite 2300
Salt Lake City, UT 84111-23323
Telephone: (801) 531-8900
*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BRIDGER LEE JENSEN, an individual; SINGULARISM, a non-profit corporation; PSYCHE HEALING AND BRIDGING, LLC dba PSYCHEDELIC THERAPY JOURNEY; a limited liability company;<br><br>      Plaintiffs,<br>vs.<br><br>UTAH COUNTY, a political subdivision, PROVO CITY, a political subdivision; JEFFREY GRAY, an individual; TROY BEEBE, an individual; BRIAN WOLKEN, an individual; JACKSON JULIAN, an individual; JOHN DOES 1-4, individuals;<br><br>      Defendants. | **MOTION FOR ANTI-SUIT INJUNCTION**<br><br>Civil No. 2:24-cv-00887-JNP<br><br>Judge Jill N. Parrish<br><br>(Removed from Fourth Judicial District Court, Utah County, State of Utah, Case No. 240406123) |

Plaintiffs Bridger Lee Jensen, Singularism, Psyche Healing and Bridging LLC (dba Psychedelic Therapy Journey) ("Plaintiffs") respectfully request that this Court issue an Order enjoining Defendants from pursuing litigation against Plaintiffs in state court proceedings related to the same facts and law at issue in this present litigation. This case was filed on November 19,

1

App-3:056

2024, in state court, and Defendants removed the case to this court on November 27, 2024. A hearing on Plaintiffs' Motion for Temporary Restraining Order was held on December 13, 2024. At such hearing, the Court granted the TRO. Five days later, on December 18, 2024, Defendants filed a criminal case in the Fourth District for the State of Utah, *State v. Jensen*, Case No.241404407 (the "State Court Case"), to allege three criminal charges against Mr. Jensen.

The State Court Case seeks to subvert the purposes of the removal statute by asking the state court to determine the application of Plaintiffs' claims to the facts, which claims were removed to federal court by Defendants in this case. The same facts are at issue in both cases, the same law is at issue in both cases, and Defendants themselves moved this case to federal court. Accordingly, Plaintiffs request that this Court enjoin Defendants from pursuing the State Court Case and from filing any subsequent claims or cases in any court based upon the same events at issue in this case until this case is resolved.

## RELEVANT FACTS

1.      On November 19, 2024, this case was originally filed in the Fourth Judicial District Court, Utah County, Utah (Case No. 240406123). ECF No. 2-3.

2.      On November 27, 2024, Defendants removed this case to the United States District Court for the District of Utah. ECF No. 1.

3.      The federal court has exercised federal question jurisdiction over this case due to claims brought under the First and Fourth Amendments to the U.S. Constitution and 42 U.S.C. § 1983. ECF No. 2-2, at Exhibit 1 to Notice of Removal.

4.      On December 4, 2024, Plaintiffs filed a Motion for Temporary Restraining Order. ECF No. 9.

5.      The hearing on the Motion was held on December 13, 2024. ECF No. 22.

6.      At the hearing, the Court found that the "deprivation of [Plaintiffs'] ps[i]loc[y]bin . . . is ongoing, and requiring Plaintiffs to wait until [a 60-day notice of claim] window passes would impose an 'undue hardship.'" ECF 24, at 2 (the "TRO"). The Court also found that Plaintiffs "will suffer irreparable harm absent preliminary relief. The ongoing deprivation of their ps[i]loc[y]bin . . . hinders their free exercise of religion, and no amount of damages later can fully compensate for this harm." *Id.* at 3. The Court ordered Defendants to return the psilocybin to Plaintiffs "as soon as possible." *Id.* at 3.

7.      Five days after the Court issued the TRO, Defendants filed the Criminal Information in the State Court Case. State Court Case Docket, attached hereto as <u>Exhibit A</u>.

8.      That same day, Defendants refused to follow the Court's Order, filing a Motion to Stay or Modify the Court's Order, and arguing that their filing of the State Court Case requires this Court to excuse Defendants' failure to follow the TRO. ECF 32, at 5-6.

9.      The Criminal Information in the State Court Case is based upon the same facts for which Plaintiffs sought relief in this case. Criminal Information, attached hereto as <u>Exhibit B</u>.

### **<u>ARGUMENT</u>**

"The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). Under this statute, the All Writs Act, federal courts possess authority to issue injunctions against state court proceedings in certain circumstances. *See, e.g.*, *Baker v. Gotz*, 415 F. Supp. 1243, 1247 (D. Del.), *aff'd* 546 F.2d 415 (1976) (summarizing the application of the All Writs Act). The Anti-Injunction Act, 28 U.S.C. § 2283, clarifies:

App-3:058

> A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.

Under the All Writs Act and the exceptions in the Anti-Injunction Act, this Court has authority to enjoin the state court and Defendants from pursing the State Court Case.

Plaintiffs originally filed this case in state court; Defendants themselves removed this case to federal court. Only after the TRO was entered, Defendants filed the State Court Case, precisely the conduct that Plaintiffs brought sought to prevent by filing this case. Defendants attempt to subvert the removal statute by forcing Plaintiffs to litigate their claims in state court, violating the purpose of the removal statute and creating the potential for conflicting judgments. Defendants' own actions have put the Court and the parties in the current situation; this Court should not permit them to benefit from a crisis they have manufactured.

This Court has the power and authority to enjoin the State Court Case, and to prevent Defendants from subverting the purposes of the federal removal statute by filing any subsequent actions based on the facts and claims at issue in this case. All three of the Anti-Injunction Act exceptions are either presently met, or likely to be met as this case progresses.

## I. THE REMOVAL STATUTE EXPRESSLY AUTHORIZES THIS COURT TO ISSUE AN INJUNCTION.

Under the first Anti-Injunction Act exception, federal courts can enjoin state court proceedings when Congress has expressly authorized such action. As relevant here, Congress has dictated that removal of a case to federal court acts as a stay of state court proceedings. *See Vendo Co. v. Lektro-Vend Corp.*, 433 U.S. 623, 640 (1977) (plurality opinion) ("The statutory procedures for removal of a case from state court to federal court provide that the removal acts as a stay of the state-court proceedings."). Once a case has been removed to federal court, the State court "shall

4

effect the removal and the State court shall proceed no further unless and until the case is remanded." 28 U.S.C. § 1446(d). Thus, the removal statute constitutes such express congressional authorization. *See* Wright & Miller, Fed. Prac. & Proc. § 4225 Exceptions to the Act—In General—Necessary in Aid of Its Jurisdiction (3d ed. 2024) ("Although the Reviser's Note says that this exception was 'to make clear the recognized power of the Federal courts to stay proceedings in State cases removed to the district courts,' this seems an unlikely explanation. The removal cases can be more easily fit into the first exception, on the ground that they are an express statutory exception, and the Supreme Court has so treated them.").

Courts have relied upon the removal statute to conclude that federal courts have authority to enjoin future state court proceedings filed in an attempt to subvert the purposes of the removal statute. For example, in *Kansas Public Employees Retirement System v. Reimer Kroger Associates*, the Eighth Circuit held that an injunction against an unremoved state case was proper under the Authorized by Congress exception because the "newly filed state suit . . . was an attempt to subvert the removal of the earlier case." 77 F.3d 1063, 1070-71 (8th Cir. 1996).

The Third Circuit has reached a similar conclusion. *See Davis Int'l, LLC v. New Start Grp. Corp.*, 367 F. App'x 334 (3d Cir. 2010) ("*Davis II*") (affirming the district court's grant of an injunction under the All Writs Act where a case was removed, the federal court stayed discovery pending several motions, and a party displeased with the stay refiled several of those claims in a new state court case). In *Davis II*, the Third Circuit emphasized that "Courts considering the question have unanimously held that a plaintiff's fraudulent attempt to subvert the removal statute implicates the expressly authorized exception to the Anti-Injunction Act and may warrant the granting of an anti-suit injunction." *Davis II*, 367 F. App'x at 337 (quoting *Davis Int'l, LLC v. New*

5

*Start Grp. Corp.*, 448 F.3d 597, 605 (3d Cir. 2007) ("*Davis I*")). The Anti-Injunction Act's express authorization exception can properly be applied to enjoin attempts to subvert the removal statute by refiling claims in state court. *Davis II*, 367 F. App'x, at 338.

Through the State Court Case, Defendants seek to litigate the same issues before this Court, subverting the removal statute. As in *Kansas* and *Davis II*, this Court can properly exercise its authority under the Anti-Injunction Act and All Writs Act to bar such efforts. Accordingly, this Court should enjoin the State Court Case.

## II.      AN INJUNCTION WOULD AID THIS COURT'S JURISDICTION.

This Court can also issue an injunction under the second exception to the Anti-Injunction Act. "The phrase 'in aid of its jurisdiction' was added to conform to section 1651 of this title and to make clear the recognized power of the Federal courts to stay proceedings in State cases removed to the district courts." 28 U.S.C. § 2283, Reviser's Notes (1948) (referring to 28 U.S.C. § 1651, the removal statute).

As other Circuit Courts have recognized, the "in aid of its jurisdiction" exception to the current Anti-Injunction Act is properly understood as applying in two circumstances: when either "(1) the district court has exclusive jurisdiction over the action because it had been removed from state court; or, (2) the state court entertains an *in rem* action involving a res over which the district court has been exercising jurisdiction in an *in rem* action." *Estate of Brennan ex rel. Britton v. Church of Scientology Flag Serv. Org., Inc.*, 645 F.3d 1267, 173 (11th Cir. 2011) (quoting *In Re Ford Motor Co.*, 471 F.3d 1233, 1250-53 (11th Cir. 2006)).

This Court has federal question jurisdiction over this case. Defendants themselves removed this case to federal court. Defendants' attempts to now litigate the same issues in the State Court

6

Case is an attempt to subvert this Court's federal removal jurisdiction by asking a state court to interpret and determine the scope of Plaintiffs' constitutional and statutory rights. Accordingly, this Court should grant the injunction in aid of its jurisdiction over the removed claims.

### III.   THE RELITIGATION EXCEPTION TO THE ANTI-INJUNCTION ACT IS ALSO LIKELY TO APPLY IN THIS CASE.

The third exception to the Anti-Injunction Act, known as the "relitigation exception," applies where a federal court issues an injunction "to protect or effectuate its judgments." 28 U.S.C. § 2283. This exception allows federal courts to enjoin state courts to "prevent relitigation" of issues in state court. *Toucey v. New York Lif Ins. Co.*, 314 U.S. 118 (1941) (Reed, J., dissenting); 28 U.S.C. § 2283, Reviser's Note (stating that the amendment to the Anti-Injunction Act which codified the exception "to protect or effectuate its judgments" was included specifically to overrule the majority opinion in *Toucey* and to side with the "vigorous dissenting opinion"). "The congressional response to *Toucey* was the enactment in 1948 of the anti-injunction statute in its present form in 28 U.S.C. § 2283, which, as the Reviser's Note makes evident, served not only to overrule the specific holding of *Toucey*, but to restore 'the basic law as generally understood and interpreted prior to the *Toucey* decision.'" *Mitchum v. Foster*, 407 U.S. 225, 236 (1972) (quoting the Reviser's Note).

The relitigation exception applies when two requirements are met: (1) "the issue the federal court decided must be the same as the one presented in the state tribunal," and (2) the parties in both cases must be the same "or else must fall within one of a few discrete exceptions to the general rule against binding nonparties." *Smith v. Bayer Corp.*, 564 U.S. 299, 307-08 (2011).

While there is not yet a final determination on Plaintiffs' claims, Defendants' State Court Case emphasizes the likelihood that the third exception will also be met as this case progresses.

First, Defendants seek to litigate the same issues in both this case and the State Court Case. This case predates the State Court Case. Thus, any resolution of this case would necessarily cause the relitigation exception to apply. Second, Mr. Jensen is a party to both cases. Thus, the second requirement for applying the relitigation exception also applies.

### IV. THE COURT SHOULD ORDER DEFENDANTS TO PAY PLAINTIFFS' ATTORNEY FEES INCURRED IN BRINGING THIS MOTION.

The Court possesses inherent power to "fashion an appropriate sanction for conduct which abuses the judicial process" and "may assess attorney's freed when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *O'Rourke v. Dominion Voting Sys., Inc.*, No. 21-1442, 2022 WL 17588344, at *2 (10th Cir. Dec. 13, 2022) (quoting *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017) and *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991)). For the reasons expressed above, and in accordance with this standard, the Court should order Defendants to pay Plaintiffs' attorney fees to bring this motion, which was necessitated by Defendants' conduct.

### CONCLUSION

Wherefore, Plaintiffs respectfully request that this Court issue an Order enjoining Defendants from pursuing litigation against Plaintiffs in state court proceedings related to the same facts and law at issue in this present litigation. The Court should order Defendants to pay Plaintiffs' attorney fees incurred in brining this motion.

DATED December 19, 2024.

/s/ Tanner J. Bean
Tanner J. Bean
Anna P. Christiansen
*Attorneys for Plaintiffs*

8

App-3:063

## CERTIFICATE OF SERVICE

I hereby certify that on December 19, 2024, I caused the foregoing **MOTION FOR ANTI-SUIT INJUNCTION** to be served via email and certified mail upon the following:

Gary DeMott Millward
J. Brian Jones
Provo City Attorneys Office
351 W Center St
PO Box 1849
Provo, UT 84603
(801)852-6141
gmillward@provo.org
bjones@provo.org

Richard A. Roberts
Provo City - Legal Department
445 W Center St Ste 300
Provo, UT 84601
801-852-6140
Email: rroberts@provo.org

Mitchel A. Stephens
Lara A. Swensen
Dillon Olson
Justin James
James Dodge Russell & Stephens PC
10 W Broadway Ste 400
Salt Lake City, UT 84101
mstephens@jdrslaw.com
lswensen@jdrslaw.com
dolson@jdrslaw.com
jjames@jdrslaw.com

/s/ Tanner J. Bean

9

App-3:064

# EXHIBIT A

JEFFREY S. GRAY #5852
Utah County Attorney
RHONDA GIVIDEN #11893
Deputy Utah County Attorney
100 East Center, Suite 2100
Provo, Utah 84606
Email:  dcourt@utahcounty.gov
Phone: (801) 851-8026
Fax: (801) 851-8051

---

## IN THE FOURTH JUDICIAL DISTRICT COURT
## UTAH COUNTY, STATE OF UTAH

| | |
|---|---|
| **STATE OF UTAH,** | **INFORMATION** |
| **Plaintiff,** | |
| vs. | |
| **BRIDGER LEE JENSEN** <br> 1122 W 1970 SOUTH ST <br> Orem, UT 84058 <br> DOB: 9/6/1981 <br> SID: | **Case No.** <br><br> **Judge** <br><br> **OTN:** |
| **Defendant.** | **BAIL:** Summons |

The State of Utah, by and through the Utah County Attorney's Office, charges the defendant with the commission of the following offenses:

COUNT 1: Possession of Psilocyn with Intent to Distribute, a Second Degree Felony, in violation of Utah Code Ann. §58-37-8(1)(a)(iii), in that on or about 11/11/2024, in Utah County, the defendant, BRIDGER LEE JENSEN, did knowingly and intentionally possess, with intent to distribute, a controlled or counterfeit substance that was (a) classified in Schedule I or II; or (b) a controlled substance analog; namely, Psilocyn, a Schedule I controlled substance.

COUNT 2: POSSESSION OR USE OF TETRAHYDROCANNABINOL (THC), a Class B Misdemeanor, in violation of Utah Code Ann. §58-37-8(2)(d), in that on or about 11/11/2024, in Utah County, the defendant, BRIDGER LEE JENSEN, did knowingly and intentionally possess or use a controlled substance, namely, Tetrahydrocannabinol (THC).

1

COUNT 3: USE OR POSSESSION OF DRUG PARAPHERNALIA, a Class B Misdemeanor, in violation of Utah Code Ann. §58-37a-5(1), in that on or about 11/11/2024, in Utah County, the defendant, BRIDGER LEE JENSEN, did use, or to possess with intent to use, drug paraphernalia to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale or otherwise introduce a controlled substance into the human body in violation of this chapter.

PROBABLE CAUSE STATEMENT: Jackson Julian of the Provo Police Department, having probable cause to believe that the defendant committed the above-listed offenses, submitted the following evidence in support of the filing of this Information:

Defendant Bridger Lee Jensen is the founder of the "Psilocybin Treatment Center" located in Provo, Utah, and he advertises "Psilocybin treatment" on his website, Singularism.org. Defendant Jensen is not a licensed therapist and he acknowledged in federal District Court that he has not received a religious exemption from the DEA or any court. Nevertheless, Defendant Jensen advertises that he offers "safe, evidence-based psilocybin therapy through clinically informed and spiritually guided ceremonies." Continuing, the website represents that the therapy sessions are "designed to unlock new possibilities in a supportive, legal environment," whether the client is "seeking healing, personal growth, or profound spiritual insight." The website also states that "psilocybin therapy sessions are designed to help [clients] achieve profound mental wellness, spiritual insight, and personal transformation."

An undercover officer registered for a webinar conducted by the Psilocybin Treatment Center. The officer received a phone call from a person who identified himself as Defendant Jensen. Defendant Jensen told the officer that the therapy sessions come in two-, three-, or four-session packages ranging in cost from $3,900 to $6,400. Defendant Jensen stated that Singularism is supportive of other religions and that clients do not need to leave any other religion to join Singularism. During the webinar, Defendant Jensen stated that he is the founder of Singularism and explained that Singularism is not to be considered a dogmatic religion, that the use of psilocybin is the central point upon which Singularism is based, and that people do not need to leave any religion to participate in Singularism.

On November 11, 2024, officers served a search warrant at Defendant Jensen's Psilocybin Treatment Center. Officers found a large amount of mushrooms in various containers and packaging with various labels (approximately 459.8 grams). The Utah Bureau of Forensic Services identified samples of the mushrooms as Psilocyn, a Schedule I controlled substance found in Hallucinogenic mushrooms. In a black safe in Defendant Jensen's office, officers also found a bottle of THC syrup (field tested positive). Officers also found

2

App-3:067

scales and an electronic grinder used to grind the mushrooms. When the search was executed, a vehicle was parked at the site with a large sign attached to the back of the car (facing State Street). In addition to website information, the sign included the following information: "PSYCHEDELIC THERAPY JOURNEY," "Mushroom Therapy," and "HEALING · SAFE · LEGAL."

Post-Miranda, Defendant Jensen stated that he was providing psilocybin mushrooms to clients who attend the center. Defendant Jensen stated that he uses the THC personally but does not give that to clients. Defendant Jensen stated that he does not have a current medical marijuana card. Defendant Jensen stated that the mushrooms are boiled in water at a specific temperature which allows for the Psilocybin to be extracted and then the psilocybin infused tea is consumed by the client.

Based upon evidence received from Jackson Julian of the Provo Police Department, I have reason to believe the defendant committed the offenses as charged herein.

Authorized for presentment and filing this December 18, 2024.

UTAH COUNTY ATTORNEY'S OFFICE

Sworn to by:

/s/ Rhonda Gividen
RHONDA GIVIDEN
Deputy Utah County Attorney

3

J. Brian Jones (11816)
Gary D. Millward (12170)
Richard A. Roberts (12217)
PROVO CITY ATTORNEY'S OFFICE
445 W Center St.
Provo, Utah 84601
(801) 852-6140
gmillward@provo.gov
rroberts@provo.gov

*Attorneys for Defendants Provo City, Troy
Beebe, Brian Wolken, and Jackson Julian*

Mitchell A. Stephens (11775)
Justin L. James (15167)
Dillon P. Olson (16120)
JAMES DODGE RUSSEL & STEPHENS, P.C.
10 West Broadway, Ste. 400
Salt Lake City, Utah 84101
mstephens@jdrslaw.com
jjames@jdrslaw.com
dolson@jdrslaw.com

*Attorneys for Defendants Utah County and
Jeffrey Gray*

---

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BRIDGER LEE JENSEN, an individual; SINGULARISM, a non-profit corporation; PSYCHE HEALING AND BRIDGING, LLC dba PSYCHEDELIC THERAPY JOURNEY, a limited liability company;<br><br>      Plaintiffs,<br><br>v.<br><br>UTAH COUNTY, a political subdivision; PROVO CITY, a political subdivision; JEFFREY GRAY, an individual; TROY BEEBE, an individual; BRIAN WOLKEN, an individual; JACKSON JULIAN, an individual; JOHN DOES 1-4, individuals;<br><br>      Defendants. | **MOTION TO DISMISS**<br><br>Civil Case No. 2:24-cv-00887-JNP-CMR<br><br>Judge Jill N. Parrish<br><br>Magistrate Judge Cecilia M. Romero |

Pursuant to Rules 7, 12(b)(1), and 12(b)(6) of the Federal Rules of Civil Procedure,

Defendants Utah County (the "County"), Jeffrey Gray ("Gray") (collectively "Utah County") and

Provo City (the "City"), Troy Beebe ("Beebe"), Brian Wolken ("Wolken"), and Jackson Julian

1

App-3:069

("Julian") (collectively "Provo"), move to dismiss all claims in the complaint filed by Plaintiffs Bridger Lee Jensen ("Jensen"), Singularism ("Singularism"), and Psyche Healing and Bridging, LLC ("Psyche Healing") (collectively "Plaintiffs").

## RELIEF REQUESTED

Plaintiffs' federal claims fail as a matter of law. Plaintiffs' argument that the First Amendment to the United States Constitution allows them to circumvent the Utah Controlled Substances Act ("Utah CSA") repeatedly has been rejected. *See, e.g.*, *Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872 (1990). Indeed, courts have rejected similar claims as "frivolous." *See, e.g.*, *Gallagher v. Dhillion*, No. 3:18-cv-2801, 2020 WL 2737246, at *2 (N.D. Tex. May 7, 2020) (ruling plaintiff's challenges were "futile and should be dismissed as legally frivolous"); *Dee v. United States*, 241 F. Supp. 2d 50, 51 (D. Me. 2003) ("Dee's constitutional challenge is frivolous."). Plaintiffs' claim under the Fourth Amendment is equally frail. The search at issue in this case occurred because the Fourth District Court, State of Utah, issued a search warrant that expressly declared probable cause existed. "[J]ust as judges acting in their judicial capacity are absolutely immune from liability under section 1983, officials charged with the duty of executing a facially valid court order enjoy [ ] absolute immunity from liability for damages in suit challenging conduct prescribed by that order." *See Moss v. Kopp*, 559 F.3d 1155, 1163 (10th Cir. 2009) (internal quotation marks omitted).

Once Plaintiffs' federal claims are dismissed, the Court should decline to exercise jurisdiction over the remaining state-law claims, which raise novel questions under the Utah Constitution and Utah Code. *See, e.g.*, *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726-27 (1966) ("Certainly, if the federal claims are dismissed before trial . . . the state claims should

2

be dismissed as well."); *Bauchman v. West High School*, 132 F.3d 542, 549 (10th Cir 1997) (finding trial court abused discretion by exercising jurisdiction over state-law claims after dismissal of federal claims).  Regardless, Plaintiffs' state-law claims also fail on the merits.

## RELEVANT FACTS

1.    On November 4, 2024, the Fourth District Court, State of Utah "COMMANDED" "any peace officer in the State of Utah" to execute a search warrant on Bridger Lee Jensen ("Jensen") at 1969 N State Street, Provo, Utah.  [*See* Dkt. 13-14 ("Search Warrant")].[1]

2.    The Fourth District Court expressly determined "that there is probable cause to believe" that Singularism's property possessed "Psilocybin Mushrooms" in violation of Utah law. [*Id.*].

3.    On November 11, 2024, Provo executed the search warrant and seized "Psilocybin" and "THC," among other things.  [*See* Ex. C to Complaint; Dkt. 13-15].

4.    Plaintiffs emailed a Notice of Claim to Defendants on November 19, 2024. [*See* Complaint (Dkt. 2-2) ¶ 15].

5.    Plaintiffs filed their Complaint against Defendants on November 19, 2024. [*See* Utah Fourth District Court Docket (Dkt. 2-3)].

6.    Plaintiffs' first cause of action is asserted under "42 U.S.C. § 1983 and the First Amendment to the U.S. Constitution."  [*See* Complaint (Dkt. 2-2) p. 18].  Plaintiffs allege the First Amendment provides the constitutional right to "freely exercise their entheogenic religious

---

[1] The search warrant also was included as Exhibit B to the Complaint.  [*See* Complaint (Dkt. 2-2) ¶ 33]. *See also Slater v. A.G. Edwards & Sons, Inc.*, 719 F.3d 1190, 1196 (10th Cir. 2013) (on a motion to dismiss, the court "may consider, in addition to the complaint, documents incorporated by reference into the complaint.")

ceremonies" despite the provisions of the Utah CSA.  [*See id.* at ¶ 66].

7.      Plaintiffs fourth cause of action is asserted under "42 U.S.C. § 1983 and the Fourth Amendment to the U.S. Constitution." [*See id.* at p. 24].  Plaintiffs allege Defendants violated the constitutional assurance that "no warrants shall issue against [Plaintiffs] without probable cause" when Defendants sought "a search warrant without probable cause," "detain[ed] Mr. Jensen," "threatened to bring criminal charges," "search[ed] Singularism's religious center," "seize[d] Singularism's sacramental psilocybin," and "threaten[] Singularism's landlord" to evict Singularism.  [*Id.* at ¶¶ 105-108].

8.      Plaintiffs' remaining claims rely on Utah law.  [*Id.* at ¶¶ 77-89 (second cause of action asserting a claim under "Article I, Section 4 of the [Utah] Constitution"); ¶¶ 90-10 (third cause of action asserting a claim under Utah's Religious Freedom Restoration Act); ¶¶ 114–23 (fifth cause of action asserting a claim under Article I, Section 14 of the Utah Constitution); ¶¶ 124-32 (sixth cause of action seeking a declaratory judgment and injunction)].[2]

## ARGUMENT

Federal Rule of Civil Procedure 12(b)(6) permits a defendant to seek dismissal of any claim that "fail[s] to state a claim upon which relief can be granted."  *See* Fed. R. Civ. P. 12(b)(6).  A Rule 12(b)(6) motion tests the legal sufficiency of the complaint.  When considering a motion to dismiss, the court views the complaint in a light most favorable to the plaintiff.  *See Moore v. Guthrie*, 438 F.3d 1036, 1039 (10th Cir. 2006).  A claim, however, must be dismissed if the claim

---

[2] Plaintiffs also assert a sixth cause of action, however, that "claim" is for "Declaratory and Injunctive Relief." [Complaint (Dkt. 2-2) ¶¶ 124-132].  Plaintiffs sixth claim alleges a remedy, not a claim.  Furthermore, it does so based on the prior claims and allegations alleging violations "of their constitutional and statutory rights."  [*Id.* at ¶ 127].  Because this sixth claim relies upon the five prior claims, it is not separately addressed.

4

is not "plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Stated succinctly, "a claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Gallagher v. Shelton*, 587 F.3d 1063, 1068 (10th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

In determining the adequacy of a complaint in the context of a motion to dismiss, a court does not accept legal conclusions as true.  Rather, a complaint "must be supported by factual allegations" that make out a viable claim.  *Ashcroft*, 556 U.S. at 679.  Additionally, "the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for [their] claims."  *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).  The "requirement of plausibility serves not only to weed out claims that do not (in the absence of additional allegations) have a reasonable prospect of success, but also to inform the defendants of the actual grounds of the claim against them."  *Robbins v. Oklahoma*, 519 F.3d 1242, 1248 (10th Cir. 2008).

Under these standards, Plaintiffs fail to state a viable claim for relief against Defendants.

## I.   PLAINTIFFS' FIRST CAUSE OF ACTION SHOULD BE DISMISSED BECAUSE PLAINTIFFS CANNOT ESTABLISH A FIRST AMENDMENT VIOLATION.

At its core, "the Free Exercise Clause . . . 'protects religious observers against unequal treatment' and against 'laws that impose special disabilities on the basis of religious status.'"  *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 475 (2020) (quoting *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 461 (2017)).  Accordingly, the government is prevented from burdening a plaintiff's "sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable' . . . unless the government can satisfy 'strict scrutiny' by demonstrating its

course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022).

However, "laws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable." *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021) (citing *Emp. Div. v. Smith*, 494 U.S. 872, 878-82, (1990)); *see also Chiles v. Salazar*, 116 F.4th 1178, 1224 (10th Cir. 2024) (ruling Free Exercise claim not subject to strict scrutiny because law was neutral and generally applicable). "Government actions that stem from 'neutral' rules of 'general applicability' are subject to rational basis review, even if the application of the neutral rule 'has the incidental effect of burdening a particular religious practice.'" *Chiles*, 116 F.4th at 1222 (quoting *Taylor v. Rosell Indep. Sch. Dist.*, 713 F.3d 25, 52 (10th Cir. 2013)). "[W]e have never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law . . . ." *Emp. Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872, 878-89 (1990) (rejecting First Amendment claim for religious peyote use). Thus, Defendants' enforcement of relevant laws that prohibit a citizen's possession, consumption, or distribution of controlled substances is not a violation of that citizen's First Amendment rights so long as the laws that are being enforced are neutral and generally applicable.

Utah's Controlled Substances Act ("Utah CSA") is neutral and generally applicable. The objectives of the Utah CSA are not to infringe and burden religion. Certainly, they were not intended to target or burden Singularism. Indeed, Singularism was not even formed until decades after the Utah CSA was enacted. [*See* Complaint (Dkt. 2-2) ¶ 16 (Singularism was founded "[i]n the fall of 2023")]. This Court should review Defendants' enforcement of these neutral and

6

generally applicable controlled substance laws under a rational basis analysis.

Under the Utah CSA, psilocybin is identified as a Schedule I drug.  "Schedules I, II, III, IV, and V consist of the following drugs or other substances . . . : (a) Schedule I: . . . (iii) unless specifically excepted or unless listed in another schedule, any material, compound, mixture, or preparation which contains any quantity of the following hallucinogenic substances . . . : (Y) Psilocybin[.]"  Utah Code § 58-37-4(2)(a)(iii)(Y).  Utah law, like federal law, restrains the right to possess and distribute Schedule I drugs:

> Every person who manufactures, produces, distributes, prescribes, dispenses, administers, conducts research with, or performs laboratory analysis upon any controlled substance in Schedules I through V within this state, or who proposes to engage in manufacturing, producing, distributing, prescribing, dispensing, administering, conducting research with, or performing laboratory analysis upon controlled substances included in Schedules I through V within this state shall obtain a license issued by the [Division of Professional Licensing].

*Id.* at § 58-37-6(2)(i).  Furthermore, "controlled substances in Schedules I through V may be distributed only by a licensee and pursuant to an order form prepared in compliance with division rules or a lawful order under the rules and regulations of the United States."  *Id.* at § 58-37-6(6).

Similarly, the federal Controlled Substances Act ("CSA"), 21 U.S.C. §§ 801-907, makes it unlawful to possess or to "manufacture, distribute, or dispense" any controlled substance, except as authorized by the Act itself.  21 U.S.C. §§ 841(a)(1), 844(a).  In its enactment of the CSA, Congress found that "the illegal importation, manufacture, distribution, and possession and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people."  *Id.* at § 801(2).  With respect to mind-altering psychotropic substances in particular, "Congress has long recognized the danger involved in the[ir] manufacture, distribution, and use . . . for nonscientific and non-medical purposes," and has

7

concluded that "it is . . . essential that the United States cooperate with other nations in establishing effective controls over" them. *Id.* at § 801a(1). Schedule I of the CSA applies to "any material, compound, mixture, or preparation, which contains any quantity of the following hallucinogenic substances." *Id.* at § 812(c) (Schedule I(c)). One such substance is psilocybin. *Id.* at § 812(c) (Schedule I(c)(15)).

The Utah CSA, which borrows from the CSA, is neutral. The Utah CSA does not "restrict religious practices *because of their religious nature*." *Chiles*, 116 F.4th at 1223 (citing *Fulton*, 593 U.S. at 533) (emphasis in *Chiles*). There is nothing in the text of the Utah CSA or history of that act that even suggests its objective was to "infringe or restrict practices because of their religious motivation." *Id*. Controlled substance laws were not enacted with any religion as their target. They certainly were not targeting Singularism; it did not even exist when the Utah CSA was enacted.

Similarly, the Utah CSA is generally applicable. Although there are "secular" exceptions for possession and distribution of psilocybin, e.g., licensed health care providers, these laws still do not differentiate based on religion. They apply equally to all licensed health care providers and patients, "regardless of their religious beliefs or affiliations." *Id*. at 1225. Furthermore, medical exemptions exist throughout the Utah CSA and federal CSA. Indeed, that is the reason why pharmacies and doctors' prescriptions exist. *See, e.g.*, Utah Code § 58-37-8. A system that uniformly allows for medical oversight of controlled substances does not violate the First Amendment. *See, e.g.*, *Smith*, 494 U.S. at 874 (affirming CSA prohibition on religious peyote use after recognizing CSA made substances illegal "unless the substance has been prescribed by a medical practitioner"); *Olsen v. Mukasey*, 541 F.3d 827, 832 (8th Cir. 2008) (rejecting argument

8

that CSA was "not generally applicable" because it allows "certain research and medical uses of marijuana"); *Michigan Cath. Conf. & Cath. Fam. Servs. v. Burwell*, 755 F.3d 372, 394 (6th Cir. 2014) ("A law need not apply to every person or business in America to be generally applicable. A law is generally applicable if it does not make distinctions based on religion.").

Courts repeatedly have ruled that neutral and generally applicable controlled substance laws do not violate the First Amendment. *See, e.g.*, *Smith*, 494 U.S. at 875; *Multi-Denominational Ministry of Cannabis and Rastafari, Inc. v. Holder*, 365 F. App'x 817, 819 (9th Cir. 2010) ("Because drug laws are both neutral and generally applicable, they may be enforced even if doing so substantially burdens one's religion." (cleaned up)); *Peyote Way Church of God v. Thornburgh*, 922 F.2d 1210, 1213 (5th Cir. 1991) (ruling drug law "does not offend the First Amendment's free exercise clause"); *Olsen v. Drug Enforcement Agency*, 878 F.2d 1458, 1461 (D.C. Cir. 1989) (J. Bader Ginsburg) ("[F]ree exercise clause does not compel DEA to grant [plainitff] an exemption immunizing his church from prosecution for illegal use of marijuana."); *United States v. Greene*, 892 F.2d 453, 456-57 (6th Cir. 1989) ("Congress may control the use of drugs that it determines to be dangerous, even if those drugs are used for religious purposes."). The law is so well-established that courts have deemed ongoing challenges "frivolous." *See, e.g.*, *Gallagher v. Dhillion*, 2020 WL 2737246, at *2 (N.D. Tex. May 7, 2020) (ruling plaintiff's challenges were "futile and should be dismissed as legally frivolous"); *Dee v. United States*, 241 F. Supp. 2d 50, 51 (D. Maine 2003) ( "Dee's constitutional challenge is frivolous.").

The Utah CSA addresses harmful substances in a manner that is facially neutral and does not target any specific sect of religion. Defendants' enforcement of that generally applicable law does not violate Plaintiffs' First Amendment rights. Accordingly, Plaintiffs cannot maintain a

9

§ 1983 claim for alleged violations of their First Amendment rights.  The Court should dismiss Plaintiffs' first claim for relief with prejudice.

## II. DEFENDANTS ARE ENTITLED TO ABSOLUTE IMMUNITY FROM PLAINTIFFS' FOURTH AMENDMENT CLAIM.

Plaintiffs' Fourth Claim stakes its allegations on the protections offered by the Fourth Amendment of the United States Constitution.  [*See* Complaint (Dkt. 2-2) ¶¶ 105-113.  The Fourth Amendment states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend IV.

This is not a case where no warrant was issued or where a neutral magistrate did not make a finding of probable cause.  Rather, the Fourth District Court, State of Utah, determined there was probable cause to issue a search warrant.  That same court then "COMMANDED" Defendants "to make a search."  [*See* Dkt. 13-14 (search warrant)].

The Tenth Circuit has held that "just as judges acting in their judicial capacity are absolutely immune from liability under section 1983, officials charged with the duty of executing a facially valid court order enjoy [ ] absolute immunity from liability for damages in suit challenging conduct prescribed by that order."  *See Moss v. Kopp*, 559 F.3d 1155, 1163 (10th Cir. 2009) (internal quotation marks omitted).  Specifically for law enforcement officers, "the law in the Tenth Circuit has been that law enforcement officers are also entitled to absolute 'quasi-judicial' immunity for their actions in executing facially valid warrants, writs, and other court orders, such as bench warrants."  *Zamora v. City of Belen*, 383 F. Supp. 2d 1315, 1325-26 (D.N.M.

10

April 27, 2005) (string citation omitted).  Stated differently, "officers sworn to execute court orders are shielded by absolute immunity in the performance of their duty." *Valdez v. Denver*, 878 F.2d 1285, 1288 (10th Cir. 1989).

It has long been established that "a search warrant and its supporting affidavit are presumed valid and a 'magistrate's determination of probable cause should be paid great deference by reviewing courts.'" *United States v. Magers*, 123 F. App'x 344, 347 (10th Cir. Utah 2005) (unpublished; quoting *Illinois v. Gates*, 462 U.S. 213, 236 (1983)).  Thus, even law enforcement officials who "reasonably but mistakenly conclude that probable cause is present" are entitled to immunity. *Anderson v. Creighton*, 483 U.S. 635, 641 (1987).

The United States Supreme Court has set forth the parameters of searches pursuant to an issued warrant: "[I]f the apparent facts set out in the affidavit are such that a reasonably discreet and prudent man would be led to believe that there was a commission of the offense charged, there is probable cause justifying the issuance of a warrant." *Dumbra v. United States*, 268 U.S. 435, 441 (1925).  In the context of a search warrant for particular items, this includes "circumstances which would warrant a person of reasonable caution [to believe] that the articles sought are at a particular place." *United States v. Biglow*, 562 F.2d 1272, 1279 (10th Cir. 2009).  Further, the United States Supreme Court has established that "[p]robable cause exists when there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Grubbs*, 547 U.S. 90, 95 (2006) (internal quotation marks and citation omitted).

Here, Judge Sean Petersen executed a search warrant on November 4, 2024.  [*See* Complaint (Dkt. 2-2) ¶ 33, Ex. B].  The Complaint attached that warrant.  [*See id.* at ¶ 33].  The Search Warrant specifically identifies the location where the search warrant may be executed, the

person on whom the search warrant may be executed, and the suspected contraband to be discovered and retained under the warrant. *See Grubbs*, 547 U.S. at 95. Upon receipt of the Search Warrant, the law enforcement officers complied with the terms and conditions set forth in the Search Warrant. The officers executed the Search Warrant on November 11, 2024. During the execution of the Search Warrant, law enforcement discovered and seized 459.8 grams of psilocybin mushrooms, psilocybin paraphernalia, and two fluid ounces of THC liquid syrup. [*See* Return to Search Warrant, Dkt. 13-15; *see also* Complaint (Dkt. 2-2) ¶ 41 (referencing the Return to Search Warrant and alleging "law enforcement removed psilocybin . . . and . . . THC[.]")].

Defendants have absolute immunity in their execution of the Search Warrant in the manner the Fourth District Court commanded. Accordingly, this Court should dismiss Plaintiffs' fourth claim for relief.

## III. THE COURT SHOULD DECLINE TO EXERCISE SUPPLEMENTAL JURISDICTION OVER PLAINTIFFS' STATE LAW CLAIMS.

Plaintiffs' remaining claims are premised in state law. The United States Code dictates that the "district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Plaintiffs' second claim is for relief under article I, section 4 of the Utah Constitution. Plaintiffs' third claim is for relief under Utah's Religious Freedom Restoration Act. And Plaintiffs' fifth claim seeks relief under article I, section 14 of the Utah Constitution. Plaintiffs' Complaint also alleges that at all relevant times they and each of the Defendants are residents and/or located in the State of Utah. [*See* Complaint (Dkt. 2-2) ¶¶ 1-9]. There is, therefore, no allegation related to diversity jurisdiction. *See* 28 U.S.C. § 1332.

Because Plaintiffs second, third, and fifth claims are premised in state law, and there is no diversity jurisdiction issue, this Court should decline to exercise supplemental jurisdiction once the federal claims have been dismissed.

"Needless decisions of state law should be avoided . . . ." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966). "Certainly, if the federal claims are dismissed before trial . . . the state claims should be dismissed as well." *Id.* "Similarly, if it appears that the state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought, the state claims may be dismissed without prejudice and left for resolution to state tribunals." *Id.* "The beneficial effect of permitting a Utah state court to determine the private rights of action under the Utah Constitution far outweighs any negative consequences (*i.e.*, delay) of declining to exercise pendent jurisdiction." *Bauchman v. West High School*, 132 F.3d 542, 549 (10th Cir. 1997). "Notions of comity and federalism demand that a state court try its own lawsuits, absent compelling reasons to the contrary." *Ball v. Renner*, 54 F.3d 664, 669 (10th Cir. 1995)

Although district courts have discretion to evaluate pendent jurisdiction, that discretion is not boundless. For example, the Tenth Circuit determined the trial court "abused its discretion by exercising jurisdiction" over claims asserted under the Utah Constitution after the court dismissed the "federal claims on the pleadings." *Bauchman*, 143 F.3d at 549-50.

In *Bauchman,* the Tenth Circuit reversed the district court's exercise of pendant jurisdiction over state law issues that "Utah courts have never squarely addressed." *Id.* at 549. Relying on *United Mine Workers v. Gibbs*, 383 U.S. 715, the Tenth Circuit held, "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties."

13

App-3:081

*Bauchman*, 132 F.3d at 549. "If federal claims are dismissed before trial, leaving only issues of state law, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice." *Id.* (quoting *Carnegie-Mellon University v. Cohill,* 484 U.S. 343, 350 (1988)).

In *Hubbard v. Oklahoma ex. rel. Oklahoma Department of Human Services*, 759 F. App'x 693 (10th Cir. 2018), the Tenth Circuit addressed the district court's dismissal of the plaintiff's § 1983 claims as well as the plaintiff's state law claims with prejudice. *Id.* The Tenth Circuit upheld the district court's dismissal of the § 1983 claims with prejudice, but it reversed the district court's dismissal with prejudice of the state law claims. *Id.* at 714. The Tenth Circuit again held, "[w]hen, as here, a district court dismisses all federal claims, it would normally dismiss the state claims without prejudice, so that the plaintiff could pursue them in state court." *Id.* "This is especially so when, as here, the claims present potentially unsettled questions of state law." *Id.*

Indeed, the Tenth Circuit has routinely reversed a district court's ruling on state law claims when those claims are all that remain in the case. *See, e.g.*, *Sandberg v. Englewood, Colorado*, 727 F. App'x 950, 965 (10th Cir. 2018) ("[W]e conclude the district court erred by exercising jurisdiction over the state law claims after it had dismissed the federal causes of action."); *George v. Newman*, 726 F. App'x 699, 708 (10th Cir. 2018) ("Whenever a district court dismisses a state-law claim with prejudice before trial, we typically reverse and remand with instructions to dismiss without prejudice."); *Est. of Reat v. Rodriguez*, 824 F.3d 960, 967 (10th Cir. 2016) (same); *Merrifield v. Bd. of Cnty. Comm'rs for Cnty. of Santa Fe*, 654 F.3d 1073, 1086 (10th Cir. 2011) (same); *Brooks v. Gaenzle*, 614 F.3d 1213, 1230 (10th Cir. 2010) (reversing a grant of summary judgment on state claims and instructing district court to dismiss without prejudice).

Here, Plaintiffs' remaining claims are not only based on state law, but also address

14

unsettled questions of law.  At the heart of Plaintiffs' case is Utah's Religious Freedom Restoration Act.  [Complaint (Dkt. 2-2) ¶¶ 90-103; *see also* Order Granting Temporary Restraining Order (Dkt. 24) (issuing an injunction based exclusively on Plaintiff's claims under "the Utah RFRA.")].  The Utah RFRA was enacted just 8 months ago.  As of the date of this Motion, neither the Utah Court of Appeals nor the Utah Supreme Court has issued an opinion even mentioning or citing the Utah RFRA.  In short, the Utah RFRA presents several unsettled, never-before-addressed questions of state law.  "Notions of comity and federalism demand that a state court try its own lawsuits." *Hubbard,* 759 F. App'x at 714.

## IV.  EVEN IF THE COURT EXERCISES SUPPLEMENTAL JURISDICTION OVER PLAINTIFFS' STATE LAW CLAIMS, PLAINTIFFS ARE NOT ENTITLED TO RELIEF FOR ANY OF THOSE CLAIMS.

Even if the Court were to ignore Tenth Circuit precedent and exercise pendant jurisdiction over the state law claims, those claims should still be dismissed on the merits.

### A.  Plaintiffs' Claim Under the Utah Constitution's Religious Liberty Section Fails Because the Utah Constitution Does Not Legalize Hallucinogenic Drugs.

Article I, section 4 of the Utah Constitution "rests on the concept of governmental neutrality." *Soc'y of Separationists, Inc. v. Whitehead*, 870 P.2d 916, 936 (Utah 1993).  Both the language of that text and the history of its adoption "identify three complementary themes: (i) a distancing of government from involvement with religion, (ii) nonsectarianism to the extent there is government involvement with religion, and (iii) government neutrality—the maintenance of a level playing field in civil matters—as between religious and nonreligious sentiments." *Id.*  Utah's Constitution ensures "neutrality towards conscientious sentiments, religious or irreligious." *Id.*

When the government acts "in an impartial manner," any burdens and benefit "'flowing to religious worship, exercise, or instruction can be fairly characterized as indirect because the benefit

15

flows to all those who are beneficiaries of the use of government money or property, which may include, but is not limited to, those engaged in religious worship, exercise, or instruction.'" *Summum v. Pleasant Grove City*, 2015 UT 31, ¶ 8, 345 P.3d 1188 (quoting *Soc'y of Separationists, Inc.*, 870 P.2d at 937). "If a city permits groups to use city-owned facilities, that use must be permitted without regard to the belief system of the user." *Soc'y of Separationists, Inc.*, 870 P.2d at 938; *see also Carson v. Makin*, 596 U.S. 767, 778 (2022) ("[A] State violates the Free Exercise Clause when it excludes religious observers from otherwise available public benefits."). However, the Utah Constitution does not require (or allow) the alteration of an existing standard for the benefit of one religious sect.

In *Summum v. Pleasant Grove City*, 2015 UT 31, 345 P.3d 1188, the Utah Supreme Court refused "an injunction requiring Pleasant Grove to display" the plaintiff's religious text in a park. *Summum*, 2015 UT 31, ¶ 11. It was not enough for the plaintiff to establish the city had a "display of the Ten Commandments" in a public park. *Id.* at ¶ 9. Even "[a]ssuming the Ten Commandments monument amounts to religious exercise, requiring Pleasant Grove to erect a second religious monument would not" result in the type of broad religious neutrality the Utah Constitution requires. *Id.* at ¶ 11. It would instead elevate the plaintff's beliefs while ignoring "multiple religious denominations, agnosticism, or atheism." *Id.* Total neutrality is the test under Utah's Article 1, section 4.

The Utah CSA complies with the constitutional standard of neutrality. It is a uniform law that applies to everyone in the State of Utah. The Utah CSA was not enacted to impair Singularism's alleged beliefs. Singularism was not formed until decades after the Utah CSA classified psilocybin as a Schedule I drug. *See, e.g.*, Utah Code Ann. § 58-37-4 (West 2004). [*See*

16

*also* Jensen Dec. (Dkt. 9-1) at ¶ 18 (Singularism founded in "fall of 2023")].  Plaintiffs cannot

establish that a longstanding law enacted and enforced for non-religious reasons violates the

constitutional "concept of governmental neutrality." *Soc'y of Separationists, Inc.*, 870 P.2d at 937.

Utah law at the time of statehood further rebuffs Plaintiffs' constitutional arguments.  *See*

*South Salt Lake City v. Maese*, 2019 UT 58, ¶ 18, 450 P.3d 1092 ("When we intrepret

constitutional langauge, we start with the meaning of the text as understood when it was adopted.").

Ten years before the Utah Constitution was finalized, the Supreme Court of the Territory of Utah

affirmed a city ordinance that allowed only "druggists" to "sell such liquors as medicine."  *Provo*

*City v. Shurtliff*, 5 P. 302, 302-03 (Utah 1885).  Three years after the constitution was adopted, the

Utah Legislature dedicated an entire Title of the Utah Code to "Pharmacy."  *See* Revised Statutes

of Utah §§ 1711-27 (Title 51).  Among other things, the 1898 code declared, "it shall not be lawful

for any person other than a registered pharmacist to compound or dispense drugs." *Id.* at § 1711;

*see also id.* at § 42 (authorizing cities to "punish and prohibit" opium); *id.* at § 38 (allowing cities

to "license, tax, and regulate" "druggists").  Plaintiffs cannot establish that the Territory of Utah's

and  State of Utah's continuous, religiously-neutral regulation of drugs and alcohol violates the

original intent of the Utah Constitution.

B. <u>Defendants' Enforcement of the Controlled Substance Laws Does Not Violate Plaintiffs' Rights Under the Utah Religious Freedom Restoration Act.</u>

Plaintiffs' claims under the Utah RFRA should be dismissed because 1) the Utah RFRA

does not allow parties to seek monetary damages; 2) Plaintiffs did not give the appropriate notice;

and 3) Utah law does not substantially burden singularism.

*1.        Plaintiffs' Claims for Damages under the Utah RFRA Must Be Dismissed.*

Plaintiffs' attempt to collect damages under Utah's RFRA must be dismissed because that act does not allow for "damages" as a remedy. Rather, aside from an injunction, the only relief afforded by the Utah RFRA is "[a] person who prevails in an action to enforce the provisions of this section against a government entity is entitled to recover reasonable attorney fees and costs." Utah Code § 63G-33-201(6). The Utah RFRA makes no mention of damages being available as a remedy to plaintiffs relying on its provisions. The omission of damages as an available remedy is not a mere oversight; it is presumed to be purposeful. *2 Ton Plumbing, L.L.C. v. Thorgaard*, 2015 UT 29, ¶ 47 ("When faced with a question of statutory interpretation, our general rule is that we will "give effect to omissions in statutory language" by presuming them to be purposeful.").

Defendants acknowledge that in *Tanzin v. Tanvir,* 592 U.S. 43 (2020), the United States Supreme Court held that the federal RFRA allowed for damages against federal officials who violated RFRA. *Id.* at 52. However, *Tanzin* and the federal RFRA are both distinguishable and inapplicable on this issue. First, the language in the federal RFRA and the Utah RFRA is not the same:

| The Federal RFRA | The Utah RFRA |
|---|---|
| "A person whose religious exercise ***has been*** burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain ***appropriate relief*** against a government."<br>42 U.S.C.A. § 2000bb-1 | "A person whose free exercise of religion ***is*** burdened in violation of this section: (a) may assert the violation as a claim or defense in a judicial…proceeding ***to obtain relief."***<br>Utah Code § 63G-33-201 |

While the federal RFRA allows a person to seek "appropriate relief" for a violation that "has been," the Utah RFRA only allows a person to "obtain relief" when their free exercise of

18

App-3:086

religion "is" burdened. Although the textual differences are relatively minor, those differences must be presumed intentional. In addition, these minor differences have outsized meaning given the Supreme Court's analysis in *Tanzin.* In that case, the Supreme Court reasoned that the federal RFRA must have intended "appropriate relief" to include damages because that may be "the only form of relief" when a right "***has been***" burdened. *See Tanzin,* 592 U.S. at 51. Conversely, the Utah RFRA only allows a plaintiff to seek relief if their exercise of religion "***is*** burdened." Utah Code § 63G-33-201. If a right has been – but no longer is – burdened (e.g., the issue was corrected), the Utah RFRA does not allow a claim. The issue is moot.

Additionally, the Supreme Court in *Tanzin* recognized that the federal RFRA did not waive sovereign immunity for claims against state actors. *Id.* ("[T]his case features a suit against individuals who do not enjoy sovereign immunity."). Likewise, the Utah RFRA does not waive immunity. Instead, such immunity is expressly retained: "A governmental entity, its officers, and its employees are immune from suit and immunity is not waived, for any injury proximately caused by a negligent act or omission…if the injury arises out of or in connection with or results from…a violation of civil rights." Utah Code § 63G-7-201(4). "A statute does not waive sovereign immunity . . . unless that disposition is unequivocally clear." *See* Scalia & Garner, *Reading Law: The Interpretation of Legal Texts*, 281 (2012). The Utah RFRA does not unequivocally waive immunity and allow for monetary damages awards against government entities.

     2.     *Plaintiffs Did Not Give Notice Utah RFRA or Governmental Immunity Act.*

Under the Utah RFRA, "a person may not bring an action under this section against a government entity . . . unless, at least 60 days before the day on which the person brings the action, the person provides written notice to the government entity." Utah Code § 63G-33-201(5)(a).

19

Likewise, "any person having a claim against a governmental entity, or against the governmental entity's employee . . . shall file a written notice of claim with the entity before maintaining an action." *Id.* at § 63G-7-401.

It is undisputed that Plaintiffs did not provide any notice to any of Defendant in compliance with Utah Code § 63G-7-401.

> 3.    *Seeking a Criminal Conviction Does Not Constitute a Substantial Burden Under the Utah Code.*

To prevail on a claim under the Utah RFRA, Plaintiffs must establish government action that "substantially burdens" their religious beliefs.   *See* Utah Code § 63G-33-201.  They cannot do so as a matter of statutory interpretation.

The Utah RFRA defines "substantially burden." *See id.* at § 63G-33-101(6).  Initially, the code vaguely identifies action that "constrains, limits, or denies the free exercise of religion" or "compels a person to act, or fail to act."  *Id.* at § 101(6)(a).  However, the Utah Code continues with specific examples.  It clarifies that "'substantially burden' includes: . . . (A) withholding a government benefit; (B) **assessing** criminal, civil, or administrative penalties or damages; or (C) excluding a person from a government program or from access to a government facility or service." *Id.* at § 63G-33-101(6)(b) (emphasis added).

Plaintiffs' Complaint does not allege that Defendants withheld a government benefit or excluded them from a government program or facility.  *See id.*  Nor have they alleged that Defendants have assessed criminal or civil penalties or damages.  Instead, they can contend only that Defendants are **seeking** criminal penalties.

The Utah Legislature's use of "assessing" criminal penalties – instead of seeking criminal penalties – must be given meaning.  *See* Scalia & Garner, *Reading Law: The Interpretation of*

*Legal Texts*, 107 (2012) ("The expression of one thing implies the exclusion of others . . . ."). Moreover, that distinction is specifically consistent with the longstanding treatment of other religious exemptions. For example, the Utah Legislature provided a limited right to use "peyote for bona fide traditional ceremonial purposes in connection with the practice of a traditional Indian religion." Utah Code § 58-37-8(12) (preventing "[c]ivil or criminal liability"). However, the Legislature *did not* prevent or penalize a law enforcement officer or prosecutor who doubted or challenged the application of that exception to a specific party by *seeking* a criminal conviction. Instead, the Utah Legislature made the religious usage "an affirmative defense." *Id.* Similarly, the Utah RFRA does not prevent or penalize Defendants from seeking a criminal conviction – either against Singularism or a "traditional Indian religion." Instead, Plaintiffs can claim a religious exception and, if established, prevent the Fourth District Court from "assessing a criminal . . . penalt[y]." *Id.* at § 63G-33-101(6)(b)(i)(B).

This interpretation gives meaning to the specific example identified by the Utah Legislature. *See id.* It also is fully consistent with the broader, introductory portion of the statute's definition of "[s]ubstantially burden." *Id.* at § 63G-33-101(6)(A). A criminal *conviction* "compels a person to act, or fail to act" or "constrains, limits or denies" the criminal conduct. *Id.* However, an unsuccessful prosecution does not. If Plaintiffs successfully defend against the criminal charges based on the Utah RFRA and their alleged religion, they will remain free to continue their religious practices. It is the imposition of criminal penalties – not the judicial adjudication of parties' rights – that punishes and legally proscribes a party's action. Until such conviction exists, no criminal penalty has been assessed. And, of course, Plaintiffs are presumed innocent unless and until a conviction is entered.

21

Plaintiffs' claims under the Utah RFRA should be dismissed. They have not alleged a "substantial burden" under the express language of the Utah Code.

      C.      <u>Defendants Are Entitled To Immunity From Plaintiffs' Fifth Claim Alleging Violations Under the Utah Constitution's Protection from Unreasonable Searches.</u>

In alliance with the federal case law, Utah law expressly grants law enforcement officers immunity from Plaintiffs' fifth claim. Plaintiffs seeks relief under Section 14 of the Utah Constitution, which like the Fourth Amendment, states:

> The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause supported by oath or affirmation, particularly describing the place to be searched, and the person or thing to be seized.

Utah Const. art. I, sec. 14. Utah's constitutional protections to be free from unreasonable searches and seizures was not violated in this matter. A search warrant was issued by a neutral judge, who made an independent determination that there was probable cause.

Utah's Supreme Court has held that "article I, section 14 of the Utah Constitution often provides greater protections to Utah citizens than the Fourth Amendment, despite nearly identical language." *State v. Worwood*, 2007 UT 47, ¶ 16, 164 P.3d 397. However, "absent adequate briefing . . . cursory references to the state constitution within arguments otherwise dedicated to a federal constitutional claim are inadequate to raise a state constitutional issue." *Alpine Homes, Inc. v. City of W. Jordan*, 2017 UT 45, ¶ 17, 424 P.3d 95 (internal punctuation omitted) (quoting *Worwood*, 2007 UT 47, ¶ 18). Neither Plaintiffs' Complaint nor their Motion for Temporary Restraining Order and Preliminary Injunction distinguishes between the search and seizure protections of the U.S. Constitution and the Utah Constitution. Accordingly, this Court should analyze Plaintiffs' state constitutional claim under the same federal analysis above and find

22

Defendants are entitled to absolute immunity.

Utah's Governmental Immunity Act ("UGIA") also immunizes the Defendants for their respective exercise of governmental functions. The UGIA establishes: "Each governmental entity and each employee of a governmental entity are immune from suit for any injury that results from the exercise of a governmental function." Utah Code § 63G-7-201(1). In determining whether immunity under the UGIA is granted to a governmental entity and an employee, Utah's courts apply a three-part test, which assesses: "(1) whether the activity undertaken is a governmental function; (2) whether governmental immunity was waived for the particular activity; and (3) whether there is an exception to that waiver." *Van de Grift v. State*, 2013 UT 11, ¶ 18, 299 P.3d 1043 (quotation simplified).

First, there is no dispute that Defendants were all acting in their respective roles as law enforcement and prosecutors. UGIA defines government function broadly to mean "each activity, undertaking, or operation performed by a department, agency, employee, agent, or officer of a governmental entity." Utah Code § 63G-7-102(5)(b). All the complained of actions by Defendants were governmental functions. The law enforcement defendants and prosecutor defendant were acting in their official capacities when they investigated the crimes committed by Plaintiffs, sought a search warrant, executed the search warrant, and seized contraband.

Second, the UGIA is clear that a "governmental entity and an employee of a governmental entity retain immunity from suit unless that immunity has been expressly waived." *Id.* at § 63G-7-101(3); *see also id.* at § 63G-7-201(1) ("each governmental entity and each employee of a governmental entity are immune from suit for any injury that results from the exercise of a governmental function."). Section 63G-7-301 of the UGIA lists the express waivers of immunity

23

App-3:091

and none apply. *See id.* at § 63G-7-301.

Third, there is no exception. In recently explaining the effect of immunity under Utah Code § 63G-7-201(4), the Utah Court of Appeals emphasized that, "the UGIA makes clear that governmental entities and their employees are immune from suit unless immunity is expressly waived." *Graves v. Utah Cnty. Gov't*, 2024 UT App 80, ¶ 21, 551 P.3d 1029. Like the plaintiff in *Graves*, "there is no express waiver in the UGIA for the intentional torts [Plaintiffs] claim." *Id.* Defendants are entitled to immunity under Utah law. Accordingly, this Court should dismiss Plaintiffs' fifth claim for relief.

### **CONCLUSION**

Because Defendants have not violated Plaintiffs' federal or state rights of religious freedom or protection against unreasonable searches and seizures, this Court should dismiss each of Plaintiffs' claims against all Defendants.

Dated this 19th Day of December, 2024

JAMES DODGE RUSSELL & STEPHENS, P.C.

*/s/ Justin L. James*
Mitchell A. Stephens
Justin L. James
Dillon P. Olson

*Counsel for Utah County and Jeffrey Gray*

PROVO CITY LEGAL

*/s/ Gary Millward*
Gary D. Millward
Richard A. Roberts

*Counsel for Provo City, Troy Beebe, Brian Wolken, and Jackson Julian*

24

App-3:092

Mitchell A. Stephens (11775)
Justin L. James (15167)
Dillon P. Olson (16120)
JAMES DODGE RUSSELL & STEPHENS, P.C.
10 West Broadway, Ste. 400
Salt Lake City, Utah 84101
(801) 363-6363
mstephens@jdrslaw.com
jjames@jdrslaw.com
dolson@jdrslaw.com

*Attorneys for Defendants Utah County and Jeffrey Gray*

J. Brian Jones (11816)
Gary D. Millward (12170)
Richard A. Roberts (12217)
PROVO CITY ATTORNEY'S OFFICE
445 W Center St.
Provo, Utah 84601
(801) 852-6140
gmillward@provo.gov
rroberts@provo.gov

*Attorneys for Defendants Provo City, Troy Beebe, Brian Wolken, and Jackson Julian*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BRIDGER LEE JENSEN; SINGULARISM; PSYCHE HEALING AND BRIDGING, LLC dba PSYCHEDELIC THERAPY JOURNEY;<br><br>Plaintiffs,<br><br>vs.<br><br>UTAH COUNTY; PROVO CITY; JEFFREY GRAY; TROY BEEBE; BRIAN WOLKEN; JACKSON JULIAN; JOHN DOES 1-;<br><br>Defendants. | **JOINT MOTION FOR EXPEDITED DISCOVERY**<br><br>Civil Case No. 2:24-cv-00887-JNP<br><br>Judge Jill N. Parrish |

1

App-3:093

Pursuant to Rule 7 of the Federal Rules of Civil Procedure, Defendants, by and through respective counsel of record, hereby move for expedited discovery in connection with the Court's consideration of Plaintiffs' request for a preliminary injunction (the "Motion for Preliminary Injunction"). [Dkt. 9]. Defendants request the opportunity to conduct discovery in advance of the hearing on Plaintiffs' Motion for Preliminary Injunction.

## RELIEF REQUESTED AND SUPPORTING GROUNDS

"[A] court may exercise its broad discretion to alter the timing, sequence, and volume of discovery, including granting expedited discovery." *Am. Equip. Systems, LLC v. Chester*, No. 2:23-cv-00680, 2023 WL 8261427, at *2 (D. Utah Nov. 29, 2023) (cleaned up). "In many cases, good cause may" support expedited discovery where a party "seeks a preliminary injunction." *Icon Health & Fitness, Inc. v. Johnson Health Tech North America, Inc.*, No. 1:10-cv-00209, 2011 WL 13136539, at *1 (D. Utah March 1, 2011) (cleaned up). "[W]hen considering a request for expedited discovery in preparation for a preliminary injunction the Court should examine the entirety of the record to date and the reasonableness of the request in light of all the surrounding circumstances." *Id.* (cleaned up). Courts consider several factors in weighing requests for expedited discovery, including:

> (1) whether a preliminary injunction is pending; (2) the breadth of the discovery requests; (3) the purpose for requesting the expedited discovery; (4) the burden on the defendants to comply with the requests; and (5) how far in advance of the typical discovery process the request was made.

*Id.* Each of the relevant factors warrants expedited discovery in connection with Plaintiffs' Motion for Preliminary Injunction.

First, Plaintiffs' Motion for Preliminary Injunction is pending. Accordingly, "the first factor weighs in favor of granting" the request for expedited discovery. *Am. Equip. Systems, LLC*, 2023 WL 8261427, at *3.

2

App-3:094

Second, the discovery Defendants seek is centered "on the issues raised by the motion for preliminary injunction." *Icon Health & Fitness, Inc.*, 2011 WL 13136539, at *1. More specifically, Defendants' seek to depose each of the five declarants who submitted declarations in support of Plaintiffs' Motion for Preliminary Injunction, along with the "counselors and . . . board of directors" referenced in Jensen's testimony. *See id.* at *3 (permitting expedited depositions of witnesses offering testimony in connection with a motion for preliminary injunction); *see also* [Dkt. 19-22 (Supp. Jensen Dec.) at ¶ 46].

Defendants further seek written discovery related to the arguments Plaintiffs make in their Motion for Preliminary Injunction and the identity of potential witnesses. [*See* Exhibit 1 (Defendants' Expedited Preliminary Injunction Discovery Requests)]. These requests are tailored to the issues raised in the request for a preliminary injunction and should be answered by January 10, 2025. *See Am. Equip. Systems, LLC*, 2023 WL 8261427, at *6 (authorizing party to serve 20 interrogatories and 26 requests for production as part of expedited discovery and requiring responding party to respond within 15 days).[1] Finally, and upon identification of the source of Plaintiffs' psilocybin, Defendants seek leave to serve a subpoena, including to obtain the laboratory safety tests Plaintiffs' witnesses previously referenced, which relates to Defendants' compelling interests in monitoring the importation and distribution of drugs into the state of Utah and in protecting individuals from ingesting inherently dangerous—and potentially contaminated—controlled substances. *See, e.g.*, *1524948 Albert LTD. v. Doe*, No. 2:10-cv-0900, 2010 WL 3743907, at *1 (D. Utah Sept. 23, 2010) (granting motion for expedited discovery and

---

[1] Defendants understand that their 15-day request is atypical. Notwithstanding, the proposed January 10, 2025 deadline is reasonable under the assumption that the preliminary injunction hearing will be scheduled sometime in early February or later and will allow sufficient time to depose witnesses and gather additional evidence that may be discovered in response to the written requests. It is also consistent with Plaintiffs' stated availability. [Dkt. 37].

permitting party to serve subpoenas).

Third, the purpose for the expedited discovery is to obtain information and evidence that Defendants require to rebut the evidence and assertions Plaintiffs set forth in their Motion for Preliminary Injunction. During the TRO hearing, Defendants were prevented from offering the full breadth of their evidence in opposition to Plaintiffs' claims, which placed them at a disadvantage. Moreover, Defendants cannot reasonably obtain the requested information from alternative sources. Whether Plaintiffs' actions were "substantially motivated by a sincerely held religious belief" is a question of fact, and Plaintiffs alone possess many documents and other details necessary to determine those issues. Defendants should be afforded the opportunity to obtain and present the material evidence in connection with the preliminary injunction hearing. *See Icon Health & Fitness, Inc.*, 2011 WL 13136539, at *2 (authorizing expedited discovery where the purpose was "consistent with furtherance of the preliminary injunction").

Fourth, the requested discovery will not burden Plaintiffs, who will have advance notice of any depositions and discovery obligations. *See id.* at *3 (holding there was no undue burden where defendants received "adequate notice"). Furthermore, the information requested will not cause any resources to be wasted because "the requested information would need to be produced during the normal course of the litigation." *Id.* Even assuming Plaintiffs can demonstrate a modest burden, Defendants' "need for limited discovery before a preliminary injunction hearing outweighs any potential prejudice" to Plaintiffs, who will need to supply the requested discovery during the ordinary course of proceedings. *Am. Equip. Systems, LLC*, 2023 WL 8261427, at *6.

Finally, the timing of the discovery is appropriate "[g]iven the current posture of the case." *See Icon Health & Fitness, Inc.*, 2011 WL 13136539, at *3.

Therefore, this Court should grant Defendants' request for expedited discovery and require

App-3:096

Defendants to respond to the discovery set forth in Exhibit 1 within 15 days.

Dated this 20th Day of December, 2024

JAMES DODGE RUSSELL & STEPHENS, P.C.

/s/ Dillon P. Olson
Mitchell A. Stephens
Justin L. James
Dillon P. Olson

PROVO CITY LEGAL

/s/ Gary D. Millward
Gary D. Millward
Richard A. Roberts

*Counsel for Provo City, Troy Beebe, Brian Wolken, and Jackson Julian*

5

App-3:097

# EXHIBIT 1

Mitchell A. Stephens (11775)
Justin L. James (15167)
Dillon P. Olson (16120)
JAMES DODGE RUSSELL & STEPHENS, P.C.
10 West Broadway, Ste. 400
Salt Lake City, Utah 84101
(801) 363-6363
mstephens@jdrslaw.com
jjames@jdrslaw.com
dolson@jdrslaw.com

*Attorneys for Defendants Utah County and Jeffrey Gray*

J. Brian Jones (11816)
Gary D. Millward (12170)
Richard A. Roberts (12217)
PROVO CITY ATTORNEY'S OFFICE
445 W Center St.
Provo, Utah 84601
(801) 852-6140
gmillward@provo.gov
rroberts@provo.gov

*Attorneys for Defendants Provo City, Troy Beebe, Brian Wolken, and Jackson Julian*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BRIDGER LEE JENSEN; SINGULARISM; PSYCHE HEALING AND BRIDGING, LLC dba PSYCHEDELIC THERAPY JOURNEY;<br><br>    Plaintiffs,<br><br>        vs.<br><br>UTAH COUNTY; PROVO CITY; JEFFREY GRAY; TROY BEEBE; BRIAN WOLKEN; JACKSON JULIAN; JOHN DOES 1-;<br><br>    Defendants. | **DEFENDANTS' EXPEDITED PRELIMINARY INJUNCTION DISCOVERY REQUESTS**<br><br>Civil Case No. 2:24-cv-00887-JNP<br><br>Judge Jill N. Parrish |

1

Pursuant to Rules 26, 33, and 34 of the Federal Rules of Civil Procedure, Defendants, by and through respective counsel of record, hereby propounds the following Interrogatories and Requests for Production of Documents (collectively the "Requests") to be answered by Plaintiffs in writing and under oath within 15 days from the date of service.

## INSTRUCTIONS

1.      If Plaintiffs contend that the response to any Request is privileged, in whole or in part, state with appropriate particularity the reasons for such contention or objection for example by supplying a privilege log.

## DEFINITIONS

The following definitions shall be used herein absent clear indication to the contrary:

1.      The term "Jensen" shall mean and refer to Plaintiff Bridger Lee Jensen and any agents, representatives, and/or other persons acting at his behest or on his behalf.

2.      The term "Singularism" shall mean and refer to Plaintiff Singularism and any agents, representatives, and/or other persons acting at its behest or on its behalf.

3.      The term "PTJ" shall mean and refer to Plaintiff Psyche Healing and Bridging, LLC d/b/a Psychedelic Therapy Journey and any agents, representatives, and/or other persons acting at its behest or on its behalf.

4.      The term "PTA" shall mean and refer to Psychedelic Therapy Academy and any agents, representatives, and/or other persons acting at its behest or on its behalf.

5.      The term "Plaintiffs" shall collectively refer to Plaintiffs Jensen, Singularism, and PTJ.

6.      The term "County" shall mean and refer to Defendant Utah County and any agents, representatives, attorneys, and/or other persons acting at its behest or on its behalf.

2

App-3:100

7.     The term "City" shall mean and refer to Defendant Provo City and any agents, representatives, attorneys, and/or other persons acting at its behest or on its behalf.

8.     The term "Gray" shall mean and refer to Defendant Jeffrey Gray and any agents, representatives, attorneys, and/or other persons acting at his behest or on his behalf.

9.     The term "Beebe" shall mean and refer to Defendant Troy Beebe and any agents, representatives, attorneys, and/or other persons acting at his behest or on his behalf

10.    The term "Wolken" shall mean and refer to Defendant Brian Wolken and any agents, representatives, attorneys, and/or other persons acting at his behest or on his behalf.

11.    The term "Julian" shall mean and refer to Defendant Jackson Julian and any agents, representatives, attorneys, and/or other persons acting at his behest or on his behalf.

12.    The term "Defendants" shall refer collectively to Defendants Gray, Beebe, Wolken, Julian, the County, and the City.

13.    The term "Lawsuit" shall mean and refer to the above-captioned lawsuit, entitled *Bridger Lee Jensen et al. v. Utah County et al.*, Case No. 2:24-cv-00887-JNP (D. Utah).

14.    The term "Waiver" shall mean and refer to the attestation and waiver attached as Exhibit C to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction. [Dkt. 9-3].

15.    The term "Declarants" shall refer to all individuals that submitted declarations in support of Plaintiffs as part of this Lawsuit, including those filed in connection with the Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction.

16.    The term "person" shall be deemed to mean in the plural, as well as in the singular, any natural person, firm, company, association, partnership, proprietorship, corporation or other form of legal entity.

17.     The term "Identify," when used in reference to a natural person, means to state that person's full name, present or last known residential address and telephone number. The term "Identify," when used in reference to a corporate entity, company, partnership, organization or association, means to state that entity's full name, business address, and telephone number. The term "Identify," when used in reference to a document, means to state the date of the document and the author and recipient, and to describe the document, i.e., letter, pleading, memo, medical report, etc.

## INTERROGATORIES

**INTERROGATORY NO. 1**: Identify the facilitators or practitioners that have enrolled or completed training through PTA, PTJ, and/or Singularism.

**INTERROGATORY NO. 2**:  Identify the total amount of psilocybin each Plaintiff has procured (e.g., purchased, grown, received) for each year between 2015 and the present.

**INTERROGATORY NO. 3**:  Identify the total amount of psilocybin each Plaintiff has distributed or administered for each year between 2015 and the present.

**INTERROGATORY NO. 4**:  Identify the total amount of psychedelic "voyages" each Plaintiff has participated in for each year between 2015 and the present, including by (a) the number of instances each Plaintiff was personally under the effects of psilocybin, and (b) the number of instances each Plaintiff has administered to or oversaw another under the effects of psilocybin.

**INTERROGATORY NO. 5**:  Identify each location where Plaintiffs have administered psilocybin, ingested psilocybin, or overseen the use of psilocybin between 2015 and the present.

**INTERROGATORY NO. 6**:  Describe each instance where Jensen consumed drugs prohibited by the Controlled Substance Act between 2015 and the present, including by identifying

4

App-3:102

the date, location, substance, dose, and reason.

**INTERROGATORY NO. 7**: Identify each of Singularism's "counselors" and "board of directors" members since its formation.

**INTERROGATORY NO. 8**: Identify each member of PTA's "board of directors" members since its formation.

**INTERROGATORY NO. 9**: Identify each owner/member and officer for PTA, PTJ, and Singularism.

**INTERROGATORY NO. 10**: Describe in reasonable detail how Plaintiffs obtain psilocybin, including by providing contact information for any person involved in the procurement, ordering, and/or delivery of the same.

**INTERROGATORY NO. 11**: Provide the complete contact information for each individual who has provided a declaration on Plaintiffs behalf in connection with this Lawsuit and/or who Plaintiffs will or may have testify at a preliminary injunction hearing.

**INTERROGATORY NO. 12**: Describe in reasonable detail the measures taken to ensure the psylocibin that you administer to others is "safe," including by identifying the following: (1) each entity or individual from which any of the Plaintiffs have obtained psilocybin from 2019 to present, (2) for each entity or individual, identify the dates  on which the psilocybin was acquired, the amount of psilocybin that was acquired on each date, the amount paid for the psilocybin, (3) for each purchase, explain what the purchasing Plaintiff believed to be purchasing (e.g., the strand of mushroom, the concentration or potency of the mushroom purchased), and (4) what testing or quality control measures the purchasing Plaintiff took, if any, to ensure that the psilocybin the purchasing Plaintiff received was indeed the quality and potency he/it believed it to be.

**INTERROGATORY NO. 13**: Identify the total revenue Plaintiffs have generated from

5

App-3:103

the administration of psilocybin in each year from 2015 to present.

**INTERROGATORY NO. 14**: Describe in reasonable detail any efforts Plaintiffs took to obtain a religious exemption for the use of psilocybin, including identification of any applications submitted and identification of any government entities to which Plaintiffs applied.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

**REQUEST NO. 1**: Produce documents sufficient to identify each individual to whom Plaintiffs have administered psilocybin from 2019 to present.

**REQUEST NO. 2**: Produce all completed Waivers that any Plaintiff has obtained in connection with the procurement, ingestion, and/or distribution of psilocybin and/or any other substance regulated by the Controlled Substances Act since 2015.

**REQUEST NO. 3**: Produce all records (including journal pages) sufficient to identify each instance in which Jensen participated in the ingestion or distribution, and/or oversight of the ingestion or distribution of psilocybin to any third party.

**REQUEST NO. 4**: Produce all tests, records, and/or other documents that describe or verify the purity, content, and or composition of any psilocybin materials used and/or administered by Plaintiffs.

**REQUEST NO. 5**: Produce all documents that refer to a "mushroom wellness center" or refer to Plaintiffs as operating a "wellness center."

**REQUEST NO. 6**: Produce all documents that refer to Plaintiffs' offering and/or providing of "clinical supervision," "client care," "therapy," or treating any "mental illness."

**REQUEST NO. 7**: Produce all advertisements, marketing materials, or similar documents that in any way refer or relate to Plaintiffs or PTJ.

**REQUEST NO. 8**: Produce all videos or other recordings where Plaintiffs or their

App-3:104

employees/agents describe: (a) Plaintiffs' religious beliefs; (b) Plaintiffs' use of psilocybin; (c) Plaintiffs' distribution of psilocybin; and/or (d) Plaintiffs' business operations.

**REQUEST NO. 9:** To the extent Plaintiffs have or have had a set of standard documents that are/were provided to voyagers, produce the same.

**REQUEST NO. 10**: Produce all documents and communications that refer to the Declarants' participation in Singularism's sacrament and/or use of psilocybin, including completed Waiver forms, preparation forms, guided journey records, and session notes.

Dated this 20th Day of December, 2024

JAMES DODGE RUSSELL & STEPHENS, P.C.

*/s/ Dillon P. Olson*
Mitchell A. Stephens
Justin L. James
Dillon P. Olson

PROVO CITY LEGAL

*/s/ Gary D. Millward*
Gary D. Millward
Richard A. Roberts

*Counsel for Provo City, Troy Beebe, Brian Wolken, and Jackson Julian*

7

App-3:105

Tanner J. Bean (A17128)
tbean@fabianvancott.com
Anna P. Christiansen (A17518)
achristiansen@fabianvancott.com
**FABIAN VANCOTT**
95 South State Street, Suite 2300
Salt Lake City, UT 84111-23323
Telephone: (801) 531-8900
*Attorneys for Plaintiffs*

---

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BRIDGER LEE JENSEN, an individual; SINGULARISM, a non-profit corporation; PSYCHE HEALING AND BRIDGING, LLC dba PSYCHEDELIC THERAPY JOURNEY; a limited liability company;<br><br>Plaintiffs,<br>vs.<br><br>UTAH COUNTY, a political subdivision, PROVO CITY, a political subdivision; JEFFREY GRAY, an individual; TROY BEEBE, an individual; BRIAN WOLKEN, an individual; JACKSON JULIAN, an individual; JOHN DOES 1-4, individuals;<br><br>Defendants. | **OPPOSITION TO DEFENDANTS' JOINT MOTION FOR EXPEDITED DISCOVERY**<br><br>Civil No. 2:24-cv-00887-JNP<br><br>Judge Jill N. Parrish<br><br>(Removed from Fourth Judicial District Court, Utah County, State of Utah, Case No. 240406123) |

Plaintiffs Bridger Lee Jensen, Singularism, and Psyche Healing and Bridging LLC (dba Psychedelic Therapy Journey) ("Plaintiffs") hereby file their Opposition to Defendants' Joint Motion for Expedited Discovery.

1

App-3:106

## **INTRODUCTION**

Defendant's motion for expedited discovery, and the unreasonably invasive discovery requests that accompany it, are made for the purposes of intimidation, harassment, and to further burden Plaintiffs' religious free exercise. Additionally, these discovery requests are made in an attempt to justify Defendants' unreasonable request for *five days of additional hearing* prior to the Court's ruling on Plaintiffs' motion to preliminary injunction. *See* ECF 45. When the parties were last before the Court on December 13, 2024, it appeared the Court only contemplated the need for *one* additional hearing date in January for Defendants to expand upon the proffers they made about their three witnesses. But days later, Defendants now claim they have eight witnesses in addition to others they may find in discovery. The Court should deny the motion and protect Plaintiffs from Defendants' harmful discovery requests.

## **ARGUMENT**

"A party may not seek discovery from any source before the parties have conferred as required by Rule 26(f), except in a proceeding exempted from initial disclosure under Rule 26(a)(1)(B), or when authorized by these rules, by stipulation, or by court order." Fed. R. Civ. P. 26. The parties in this case have not yet conferred under Rule 26(f).

"The party seeking expedited discovery has the burden to show 'good cause for the requested departure from usual discovery procedures.'" *Am. Equip. Sys., LLC v. Chester*, No. 223CV00680DBBDBP, 2023 WL 8261427, at *2 (D. Utah Nov. 29, 2023) (quoting *Sunstate Equip. Co., LLC. v. Equip. Share*, No. 2:19-cv-00784, 2020 WL 429479, at *2 (D. Utah Jan. 28, 2020) (citation omitted)). While "good cause may exist where a party seeks a preliminary

2

injunction," a "pending injunction motion alone may not be enough to merit expedited discovery."

*Id.* (citations omitted).

> Courts typically apply several factors in determining whether to grant the request: "(1) whether a preliminary injunction is pending; (2) the breadth of the discovery requests; (3) the purpose for requesting the expedited discovery; (4) the burden on the defendants to comply with the requests; and (5) how far in advance of the typical discovery process the request was made."

*Id.* (quoting *Grayeyes v. Cox*, No. 4:18-cv-00041, 2018 WL 3421340, at *1 (D. Utah July 13, 2018).

## I.   DEFENDANTS LACK GOOD CAUSE FOR THEIR INVASIVE EXPEDITED DISCOVERY REQUESTS.

*Pendency of Preliminary Injunction.* Although the Court has not yet scheduled the preliminary injunction hearing, both parties have requested the Court to do so. Plaintiffs have requested only the single additional day the Court contemplated would be necessary on December 13, 2024.

*Breadth of Discovery Requests.* The breadth and invasive nature of Defendants' discovery request are staggering. In no uncertain terms, they require Singularism to divulge *everything* about its religion, requiring the Court to impermissibly entangle itself in religious matters. Courts regularly caution against delving into religious matters which are outside the judicial realm.[1]

---

[1]   *See, e.g., Whole Woman's Health v. Smith*, 896 F.3d 362, 368, 372 (5th Cir. 2018) (noting "repeated judicial admonitions that courts stay out of the business of weighing the sincerity of religious beliefs and practices."); *Fitzgerald v. Roncalli High Sch., Inc.*, No. 119CV04291RLYTAB, 2021 WL 4539199, at *1 (S.D. Ind. Sept. 30, 2021) ("Only by subjecting religious doctrine to discovery and, if necessary, jury trial, could the judiciary reject a church's characterization of its own theology and internal organization. Yet it is precisely to avoid such judicial entanglement in, and second-guessing of, religious matters that the Justices established the rule of *Hosanna-Tabor*." (quotation omitted)); *List Interactive, Ltd. v. Knights of Columbus*, 303 F. Supp. 3d 1065, 1084-85 (D. Colo. 2018) ("my order expressly disallows the discovery of any membership information that involves personal identifiers and instead only permits the discovery

Discovery into religious groups should not be treated like "garden variety" discovery. *Whole Woman's Health*, 896 F.3d at 369. In fact, the scope of discovery itself can give rise to protection under RFRA. *Id.* at 370. As the Fifth Circuit noted, "It is no accident that we have found no case directly on point on the issue of compelling discovery of internal communications within a religious body concerning its activities in the public square to advance and protect its position on serious moral or political issues." *Id.* After discussing the constitutional issues raised by such discovery into internal religious communications, the court concluded that "the dearth of guiding case law and the importance of context in any resolution of these issues counsel strongly in favor of the doctrine of constitutional avoidance." *Id.* Any analysis of the scope of discovery should consider "First, on what basis is the judiciary institutionally competent to discern which communications merely bear on the 'facts' and which communications interfere with a religious body's free exercise?," and, second, "whether the judiciary's actual performance of any such sorting task itself invades the religious body's integrity." *Id.* at 372. Where courts have allowed discovery, they frequently emphasize that such discovery as between a religion and the government must be careful to not delve into "state regulation of religious activities." *See, e.g.*, *In re The Bible Speaks*, 69 B.R. 643, 646 (Bankr. D. Mass. 1987) (permitting the discovery sought

---

of two datasets involving membership totals rather than specific member details. The scope of this membership-related discovery is well outside of the First Amendment association interests contemplated in *NAACP v. Alabama* and its progeny."); *Nat'l Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 463-65 (1958); *Dolquist v. Heartland Presbystery*, No. CIV.A. 032150KHVDJW, 2004 WL 624962, at *2 (D. Kan. Mar. 9, 2004) (evaluating whether discovery "would 'chill' the rights of church officials in the conduct of their religious affairs or would inhibit their church parishioners from engaging freely in the practice of their religious beliefs and activities," but concluding in a sexual harassment case, that discovery was appropriate).

"because the state is not a party to this litigation," and thus "discovery here cannot be viewed as the opening wedge in state regulation of religious activities.").

Defendants have made no attempt to take into consideration the constitutional and statutory protections against seeking such discovery. Defendants' discovery requests require identification of every clergy member, counselor, board of directors member, and *every member of the faith.* Such discovery requests are not proper. *See List Interactive, Ltd*, 303 F. Supp. 3d at 1083-84 (limiting permissible discovery to a statement of the number of members and membership cards issued, and expressly denying discovery into the identities of such members); *Nat'l Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 463-65 (1958). Additionally, the discovery requests require production of virtually *every document* the faith possesses, including Singularism's scriptural records—the same sort of records the Court ordered to be returned in the TRO, *and* Singularism's members' personal scripture (relied upon in a way akin to Latter-day Saint patriarchal blessings). The discovery requests also require Singularism to reveal the details of its sacrament, in a transparent effort to obtain information to prosecute every one of Singularism's faithful. Further, beyond written discovery, Defendants seek "to depose each of the five declarants who submitted declarations in support of Plaintiffs' Motion for Preliminary Injunction, along with the 'counselors and . . . board of directors' referenced in Jensen's testimony,'" as well as serve a subpoena upon Plaintiffs' source of sacramental psilocybin. ECF 44, at 3.

Undoubtedly, if the discovery requests and subpoena were served and depositions conducted, they would be highly objectionable. For example, much of the requested discovery is protected by Utah Rules of Evidence 503 and 506, which privilege communications from clergy

as well as communications from mental health therapists. *See also* Federal Rule of Evidence 501 ("in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision").

Moreover, the requests are *not* tailored to the issues before the Court at the upcoming preliminary injunction hearing, nor are they relevant or proportional to the needs of the case generally under Federal Rule of Civil Procedure 26(b)(1). They more closely resemble impermissible "kitchen sink" requests, *see Regan-Touhy v. Walgreen Co.*, 526 F.3d 641, 650 (10th Cir. 2008), through which Defendants hope to conduct a fishing expedition, *see US Magnesium, LLC v. ATI Titanium, LLC,* 2020 WL 12847147, at *4 (D. Utah May 22, 2020) ("Despite the relative liberality of discovery rules, they should not be misapplied to allow fishing expeditions.").

The only preliminary injunction matters Defendants specifically identify they need discovery on are (1) "Defendants' compelling interests in monitoring the importation and distribution of drugs into the state of Utah and in protecting individuals from ingesting inherently dangerous—and *potentially* contaminated—controlled substances," and (2) whether "Plaintiffs' actions were 'substantially motivated by a sincerely held religious belief' . . ." ECF 44, at 3-4 (emphasis added).

Defendants have already received substantial information regarding both topics from (1) Plaintiffs via attachments to their TRO/preliminary injunction briefing, (2) the testimony (and cross examination) of Plaintiffs' witnesses on December 13, 2024, (3) Defendants' own undercover criminal investigation, and (4) the seizure of items and records from Singularism's spiritual center. All sources indicate, as the Court has already found, that Singularism has never posed *any* harm to private or public safety and *no issues* regarding distribution of drugs. Indeed, a

App-3:111

GRAMA request of Provo's own records revealed *no reports* of any such harm. *See* ECF 21-4.

Defendants cannot try to fabricate such harm through discovery. Additionally, Defendants should

not need to take discovery *to find their own governmental interests*. That they are requesting it just

underscores the Court's holding that "the government has not shown a compelling interest in

prohibiting Singularism from using ps[i]locybin outright and accordingly has not carried its

burden." ECF 24, at 2.[2]

And as to religious sincerity, it is hard to understand why Defendants need more discovery,

especially on an expedited basis. First, Defendants' challenge to religious sincerity is solely a

litigation tactic. Detective Julian's search warrant affidavit made clear that prior to the litigation

he had full notice of Plaintiffs' religious assertions and had no evidence they were insincere. *See*

ECF 13-1. Moreover, Detective Julian told Mr. Jensen that he did not question Singularism's

sincerity during his detention of Mr. Jensen. *See* ECF 9, at SOF ¶¶ 14, 16; ECF 19, at DSOF ¶¶

13-21. Second, at the December 13, 2024 hearing, three of Singularism's members bore their souls

to the Court and recounted sacred experiences they had with the divine through Singularism.

Singularism's founder testified to various of Singularism's doctrines and beliefs and that he had

sacrificed a lucrative career to become a clergyman. Defendants scoured the internet to find some

---

[2]   Defendants request discovery regarding the source of Singularism's sacramental psilocybin and laboratory testing of that psilocybin in search of an argument that Singularism's religious ceremonies are unsafe. *See* ECF 44, at 3, ECF 44-1 at Interrog. 12, RFP 4. However, these sorts of inquiries and safety checks are *not* required of the most comparable less restrictive means that Plaintiffs have already identified to the Court. *See* ECF 9, at 22-23, 27-29; ECF 19, at 18. The Utah Psilocybin Act *does not* require Utah's largest healthcare systems to disclose their source of psilocybin or verify that they have done any laboratory testing. *See* Utah Code § 58-37-3.5. Thus, under strict scrutiny review, even if Defendants could demonstrate these requests relate to their governmental interests, they would still be irrelevant because a readily identifiable less restrictive means does not require these safety mechanisms.

modicum of religious insincerity and could find nothing of consequence. Besides, though "the sincerity inquiry is important, it must be handled with a light touch, or judicial shyness. We [courts] limit ourselves to almost exclusively a credibility assessment when determining sincerity. To examine religious convictions any more deeply would stray into the realm of religious inquiry, an area into which we are forbidden to tread." *Moussazadeh v. Texas Dep't of Crim. Just.*, 703 F.3d 781, 792 (5th Cir. 2012) (quotations omitted).

*Purpose of Expedited Discovery.* Given that further and expedited discovery into the two issues Defendants identify is unnecessary, irrelevant, and objectionable, the purpose of Defendants' requested expedited discovery must be something else. Respectfully, Plaintiffs assert that the purpose of this discovery is not to, in good faith, prepare for an upcoming preliminary injunction hearing, but, instead, to chill the religious free exercise of Singularism and its religious community, as discussed below.[3]

*Burden on Plaintiffs.* Defendants seek to require Plaintiffs to respond to the enormity of their requested discovery *in fifteen days* or by January 10, 2025. Under normal circumstances, this would be incredibly difficult, and given the intervening holidays, virtually impossible.[4] But more importantly, the burden of this expedited discovery is more than just the sudden and immense

---

[3]    Discovery is also case-specific. Any attempt by Defendants to use discovery in this civil case to build a separate criminal case is improper. Under Fed. R. Civ. P. 26(b), the scope of discovery is determined by the needs of the specific case. *See* Fed. R. Civ. P. 26(b)(1) ("[T]he scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case. . . .").

[4]    Defendants argue that this short time frame is "consistent with Plaintiffs' stated availability," citing to Plaintiffs' status report and request for hearing at ECF 37. But that Plaintiffs indicated they are *available for a hearing* on certain days does not mean each of those days are wide open for Plaintiffs or their counsel to fill solely with work related to Defendants' burdensome discovery requests.

App-3:113

devotion of time and money to respond to requests, which itself could prove devastating to this small religious organization. In this case, Defendants' discovery requests themselves are a tool of inflicting additional burdens upon Plaintiffs' religious free exercise.

Plaintiffs have already presented evidence that Defendants' actions are causing Singularism's religious adherents to distance themselves from the faith, with immediate financial consequences for Singularism and its clergy. For example, requiring Singularism to list every one of its members will do even more to trod up religious free exercise. Defendants are essentially asking Plaintiffs to create for them their prosecution hit list and to conduct their criminal investigation for them. As another example, Plaintiffs have serious concerns about outing adherents' names and producing records for individuals that have sought out Singularism not only for its religious pathway to the divine, but also for its religious healing. Such would lead these individuals, whose mental health may already been a concern, out of fear, to distance themselves from Singularism and their source of healing. This is a palpable concern. For example, the Court heard from Ms. Lee's testimony on December 13, 2024 that she believed she would have taken her own life had she not found the healing power of Singularism.

*Time in Advance of Typical Discovery.* The parties have not yet conducted a Rule 26(f) conference, so discovery has not yet begun.

The balance of these factors strongly indicates that Defendants' expedited discovery requests should not be ordered. Many of the proposed discovery requests should not be allowed at *any* time during this case. The Court should, as Plaintiffs have requested, set a one-day hearing to complete the evidentiary hearing the Court commenced on December 13, 2024, and thereafter rule

App-3:114

upon Plaintiffs' motion for preliminary injunction. *See* ECF 37. Thereafter, the parties can engage

in discovery in the normal course.

## **CONCLUSION**

For the reasons stated above, the Court should deny Defendants' motion.


DATED December 23, 2024.

> */s/ Tanner J. Bean*
> Tanner J. Bean
> Anna P. Christiansen
> *Attorneys for Plaintiffs*

10

**CERTIFICATE OF SERVICE**

I hereby certify that on December 23, 2024, I caused the foregoing **OPPOSITION TO**

**DEFENDANTS' JOINT MOTION FOR EXPEDITED DISCOVERY** to be served via the

Court's electronic filing system upon the following:

> Gary DeMott Millward
> J. Brian Jones
> Provo City Attorneys Office
> 351 W Center St
> PO Box 1849
> Provo, UT 84603
> (801)852-6141
> gmillward@provo.org
> bjones@provo.org
>
> Richard A. Roberts
> Provo City - Legal Department
> 445 W Center St Ste 300
> Provo, UT 84601
> 801-852-6140
> Email: rroberts@provo.org
>
> Mitchel A. Stephens
> Lara A. Swensen
> Dillon P. Olson
> Justin L. James
> James Dodge Russell & Stephens PC
> 10 W Broadway Ste 400
> Salt Lake City, UT 84101
> mstephens@jdrslaw.com
> lswensen@jdrslaw.com
> dolson@jdrslaw.com
> jjames@jdrslaw.com

*/s/ Tanner J. Bean*

11

App-3:116

Mitchell A. Stephens (11775)
Justin L. James (15167)
Dillon P. Olson (16120)
JAMES DODGE RUSSELL & STEPHENS, P.C.
10 West Broadway, Ste. 400
Salt Lake City, Utah 84101
(801) 363-6363
mstephens@jdrslaw.com
jjames@jdrslaw.com
dolson@jdrslaw.com

*Attorneys for Defendants Utah County and Jeffrey Gray*

J. Brian Jones (11816)
Gary D. Millward (12170)
Richard A. Roberts (12217)
PROVO CITY ATTORNEY'S OFFICE
445 W Center St.
Provo, Utah 84601
(801) 852-6140
gmillward@provo.gov
rroberts@provo.gov

*Attorneys for Defendants Provo City, Troy Beebe, Brian Wolken, and Jackson Julian*

---

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| BRIDGER LEE JENSEN; SINGULARISM; PSYCHE HEALING AND BRIDGING, LLC dba PSYCHEDELIC THERAPY JOURNEY;<br><br>Plaintiffs,<br><br>vs.<br><br>UTAH COUNTY; PROVO CITY; JEFFREY GRAY; TROY BEEBE; BRIAN WOLKEN; JACKSON JULIAN; JOHN DOES 1-;<br><br>Defendants. | **REPLY IN SUPPORT OF JOINT MOTION FOR EXPEDITED DISCOVERY**<br><br>Civil Case No. 2:24-cv-00887-JNP<br><br>Judge Jill N. Parrish |

Pursuant to Rule 7 of the Federal Rules of Civil Procedure, Defendants, by and through respective counsel of record, hereby submit this reply in support of their Joint Motion for Expedited Discovery (the "Motion"). [Dkt. 44]. Defendants respond to the arguments Plaintiffs raise in opposition to the Motion. [Dkt. 47].

1

## **INTRODUCTION**

Knowing that much of the evidence in the record consists of nothing more than their own self-serving testimony, Plaintiffs oppose Defendants' efforts to obtain obviously relevant information in advance of a hearing on Plaintiffs' request for a preliminary injunction.  However, neither Defendants nor this Court are required to accept Plaintiffs' selective testimony as gospel truth.  Defendants must be afforded the opportunity to discovery and introduce evidence as to the religiosity and sincerity of Singularism's beliefs and practices, which have wide-reaching ramifications for Utah's controlled substances laws and public safety.  Additionally, Plaintiffs are in exclusive possession of information and evidence directly relevant to Defendants' compelling government interests in protecting against illegal distribution and use of controlled substances, including how the controlled substances are acquired, the quantities of controlled substances imported into the State, and the risk the controlled substances (and possible contamination) poses to the general public. Plaintiffs offer no compelling reason why this Court should prevent Defendants from discovering material information on the claims and defenses at issue.

Instead, Plaintiffs categorize the sincerity and religiosity of their religious beliefs—which they themselves have placed at issue—as "outside the judicial realm" and beyond question.  [Opp. at 3].  Contrary to Plaintiffs' assertions, however, questioning the sincerity and religiosity of alleged religious beliefs is precisely what the law requires.  *United States v. Meyers*, 906 F. Supp. 1494, 1499 (D. Wyo. 1995) ("[W]hen an individual invokes the first amendment to shield himself or herself from otherwise legitimate state regulation, [courts] are required to make" determinations regarding religiosity and sincerity).  Otherwise, Utah's Free Exercise of Religion Act (the "RFRA") "could easily become the first refuge of scoundrels" if parties "could justify illegal

App-3:118

conduct simply by crying religion." *Id.*

The universe of relevant information is largely within the possession of Plaintiffs and its members. Defendants were at an extreme disadvantage during the hearing for temporary restraining order because they were largely limited to cross-examination of Plaintiffs' carefully-selected and prepared witnesses. Allowing this disparity to continue at the preliminary injunction stage would be an extreme miscarriage of justice. Defendants require additional information, evidence, and testimony to challenge Plaintiffs' prima facie case and to present evidence supporting their affirmative defenses. And Defendants require this information and evidence in advance of any hearing for preliminary injunction.

Thus, the Motion should be granted.

## ARGUMENT

"[A] court may exercise its broad discretion to alter the timing, sequence, and volume of discovery, including granting expedited discovery." *Am. Equip. Systems, LLC v. Chester*, No. 2:23-cv-00680, 2023 WL 8261427, at *2 (D. Utah Nov. 29, 2023) (cleaned up). Plaintiffs do not dispute this Court's wide discretion to authorize expedited discovery in the context of a preliminary injunction. [*See* Opp. at 2 (acknowledging "good cause may exist" for expedited discovery "where a party seeks a preliminary injunction")].

As Plaintiffs acknowledge, the factors to be considered as part of a request of expedited discovery include:

> (1) whether a preliminary injunction is pending; (2) the breadth of the discovery requests; (3) the purpose for requesting the expedited discovery; (4) the     on the defendants to comply with the requests; and (5) how far in advance of the typical discovery process the request was made.

*Am. Equip. Systems, LLC*, 2023 WL 8261427, at *2. Each of these factors weigh in favor of

App-3:119

expedited discovery.

### 1.      The Pendency of a Preliminary Injunction.

The record plainly shows that Plaintiffs have sought a preliminary injunction.   [Dkt. 9]. All parties have requested a hearing on Plaintiffs' request for a preliminary injunction. [Dkt. Nos. 37, 45].   Thus, there can be no dispute that "the first factor weighs in favor of granting" Defendants' Motion.  *Am. Equip. Systems, LLC*, 2023 WL 8261427, at *3.

### 2.      The Breadth of the Discovery is Proportional to the Needs of the Case.

"A person claiming that the government has placed a substantial burden on his or her practice of religion must establish that the governmental action (1) substantially burdens (2) a religious belief, not just a philosophy or way of life, (3) which belief is sincerely held."  *United States v. Quaintance*, 471 F. Supp.2d 1153, 1155 (D. N.M. 2006), *aff'd in* 315 Fed. App'x 711 (10th Cir. 2009). Plaintiffs must make this showing "by a preponderance of the evidence."  *Id.*; *see also United States v. Meyers*, 95 F.3d 1475, 1482 (10th Cir. 1996).  Thus, Plaintiffs claims under the RFRA require Plaintiffs to demonstrate both that Singularism constitutes a "bona fide" religion (not a philosophy or way of life), and a sincere belief in the religion.  *See Meyers*, 906 F. Supp. 1499.

Despite placing both the religiosity and sincerity of their beliefs in dispute, Plaintiffs oppose Defendants' efforts to discover information and evidence relating to both issues.  This is an improper attempt to tip the scales in Plaintiffs' favor and limit the vast majority of evidence concerning Plaintiffs' beliefs to their own self-serving and self-selected testimonies.  Although Plaintiffs suggest it is impermissible for this Courts "to entangle itself in religious matters," [Opp. at 3], Plaintiffs' suggestion directly contradicts controlling law.

"[W]hen an individual invokes the first amendment to shield himself or herself from otherwise legitimate state regulation," courts "are *required* to make" determinations regarding the sincerity and religiosity of the individual's beliefs. *Meyers*, 906 F. Supp. at 1499 (emphasis added); *see also Gaddy v. Corp. of Pres. Of Church of Jesus Christ of Latter-Day Saints*, 551 F. Supp.3d 1206, 1218 (D. Utah 2021) ("[C]ourts are required to evaluate the sincerity of religious beliefs as a threshold question for litigants . . . seeking to assert affirmative rights under the First Amendment and the Religious Freedom Restoration Act."). Otherwise, Utah's Free Exercise of Religion Act (the "RFRA") "could easily become the first refuge of scoundrels" if parties "could justify illegal conduct simply by crying religion." *Meyers*, 906 F. Supp. at 1499; *DeVore v. Univ. of Ky. Bd. of Trustees*, 693 F. Supp.3d 757, 763 (E.D. Ky. 2023) (warning that failing to examine the sincerity of religious beliefs "would turn the First Amendment into a limitless excuse for avoiding all unwanted legal obligations"); *Dockery v. Maryville Academy*, 379 F. Supp.3d 704, 718–19 (N.D. Ill. 2019) ("Absent the ability to inquire into the sincerity of a person's religious beliefs, all statements of belief would have to automatically accepted as sincerely held and accommodated." (cleaned up)). Put simply, even where a party claims "the name of a religion as a protective cloak," "**[n]either the government nor the court has to accept the [party's] mere say-so**." *United States v. Bauer*, 84 F.3d 1549, 1559 (9th Cir. 1996) (emphasis added).

Where, as here, religiosity and sincerity are components of Plaintiffs' prima facie case, Defendants are entitled to seek discovery aimed at both topics. For example, in *Witham v. Hershey Co.*, No. 23-cv-1563, 2024 WL 4053028 (D. Minn. Sept. 5, 2024), and like Plaintiffs in this case, the plaintiff claiming free exercise protection argued that neither the defendant "nor the Court [was] permitted to probe into the nature of his claimed religious beliefs." *Id.* at *3. In rejecting

5

App-3:121

this claim, the court noted that the existence of "a bona fide religious belief is an essential element" of the plaintiff's claim, which entitled the defendant to "discovery bearing on this element." *Id.* The court further held that even though courts generally refrain from deciding the "validity or plausibility of a belief, **_courts should decide whether the beliefs are truly held and whether they are religious_**." *Id.* at * 5 (emphasis added). Making this determination "demands a full exposition of facts and the opportunity for the factfinder to observe the claimant's demeanor during direct and cross-examination." *Id.* Indeed, a "sincerity analysis is most useful where extrinsic evidence is evaluated, as such evidence can show whether an adherent acted in a manner inconsistent with that belief or that the adherent materially gains by fraudulently hiding secular interests behind a veil of religious doctrine." *Cesare v. PACT MSO, LLC*, No. 3:23-cv-253, 2024 WL 2823193, at *4 (D. Conn. June 4, 2024) (cleaned up).

Plaintiffs' contention that the religiosity or sincerity of religious beliefs are "outside the judicial realm," [Opp. at 3], is simply wrong. *See, e.g.*, *United States v. Meyers*, 95 F.3d 1475 (10th Cir. 1996) (affirming finding that defendant's drug use was not protected as free exercise); *United States v. Quaintance*, 315 Fed. App'x 711 (10th Cir. 2009) (same); *United States v. Kuch*, 288 F. Supp. 439 (D.C. Cir. 1968) (same); *State v. Sobel*, 221 N.E.3d 44 (Ohio Ct. App. 2023) (rejecting contention that use of psilocybin mushrooms was "for religious and spiritual purposes").

Unsurprisingly, Plaintiffs fail to cite any authority prohibiting a party from conducting discovery into the religiosity and sincerity of a party's alleged religious beliefs. To the contrary, the authority Plaintiffs cite is inapposite, is not in the context of elements under RFRA, and has no bearing on the instant Motion. *See, e.g.*, *Fitzgerald v. Roncalli High Sch., Inc.*, No. 1:19-cv-04291, 2021 WL 4539199, at *2 (S.D. Ind. Sept. 30, 2021) (bifurcating discovery and allowing discovery

6

to proceed on defendant's right to terminate plaintiff under ministerial exception); *List Interactive, Ltd. v. Knights of Columbus*, 303 F. Supp.3d 1065, 1084 (D. Colo. 2018) (permitting discovery of religious membership information sought "to bolster [a] breach of contract claim"); *In re The Bible Speaks*, 69 B.R. 643, 648 (Bankr. D. Mass. 1987) (permitting discovery to proceed as "clearly relevant to the subject matter of this claim," noting that "[i]f relevant to the subject matter, information which is useful in preparation for trial may be discovered").

Plaintiffs primarily rely on *Whole Woman's Health v. Smith*, 896 F.3d 362 (5th Cir. 2018), to oppose expedited discovery. [Opp. at 3–4]. But unlike the Plaintiffs here, the church from whom discovery was sought in *Whole Woman's Health* was a *non-party*. *Id.* at 364. More specifically, the discovery in *Whole Woman's Health* concerned the propriety of a third-party subpoena to a church from "a public policy opponent." *Id.* at 373. The church filed a motion to quash, which was denied. *See id.* at 366. Thereafter, the church produced 4,321 pages of records and withheld approximately 1,700 pages as privileged under the First Amendment. *See id.* at 367. The church also submitted to a deposition. *See id.* at 366–67. The district court denied the motion to quash and compelled production of the information. *See id.*

On appeal, the Court of Appeals for the Fifth Circuit remanded but qualified its determinations as to relevancy and need based on the church's status as a third-party to the litigation. *See id.* at 375 (considering "relevancy and need" "[b]earing in mind that [church] is a third-party"). Importantly, no party in *Whole Women's Health* "challenge[d] the sincerity" of the church's religious beliefs. *Id.* at 371. And even after the district court rejected the church's privilege claims, the church produced "over 4,000 pages," sat for a deposition, and put in over "100 work hours" in responding to the subpoena. *Id.* Based on the discovery provided, the Fifth

App-3:123

Circuit noted that the party seeking discovery had already obtained the "ammunition" that it sought in discovery. *Id.* Even still, the court did "not finally resolve" the church's claims regarding privilege, which were "novel" in nature. *Id.* at 374.

Unlike the church in *Whole Women's Health*, the sincerity and religiosity of Singularism's beliefs are very much in dispute. Unlike the church in *Whole Women's Health*, Plaintiffs have not produced any documents, have not sat for a deposition, and have not provided any indication that they will cooperate in any discovery efforts. And unlike the church in *Whole Women's Health*, Plaintiffs are not third parties that received a subpoena. Plaintiffs themselves initiated this action and cannot shy away from the discovery obligations that correspond to their decision to file a lawsuit, which placed the sincerity and religiosity of their beliefs in question. *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense . . . .").[1]

Plaintiffs question "why Defendants need more discovery." [Opp. at 7]. They claim that three members "bore their souls" and testified that they have "never posed any harm to private or public safety." [*Id.* at 6–7]. However, Defendants are not obligated to accept Plaintiffs "mere say-so," *Bauer*, 84 F.3d at 1559, and are entitled to conduct discovery on the elements of Plaintiffs' prima facie case and regarding evidence and information that may challenge or undermine Plaintiffs' self-serving testimony. *See, e.g., Hershey*, 2024 WL 4053028 (ascertaining religious sincerity "demands a full exposition of facts").

Therefore, this factor weighs in favor of expedited discovery.

---

[1] Plaintiffs' invocation of potential privilege objections does not insulate them from discovery. [Opp. at 5]. Plaintiffs will be free to raise privilege objections at the appropriate time and in accordance with the Federal Rules of Civil Procedure. Fed. R. Civ. P. 26(b)(5).

App-3:124

### 3. The Purpose for Requesting the Discovery.

As explained in their Motion, Defendants seek expedited discovery "to obtain information and evidence that Defendants require to rebut the evidence and assertions Plaintiffs set forth in their Motion for Preliminary Injunction." [Mot. at 4]. Seeking expedited discovery "to probe the allegations" made in conjunction with a preliminary injunction is "consistent with furtherance of the preliminary injunction, and an appropriate advancement of the litigation." *Icon Health & Fitness, Inc. v. Johnson Health Tech North America, Inc.*, No. 1:10-cv-00209, 2011 WL 13136539, at *2 (D. Utah March 1, 2011). Plaintiffs and related third parties are primarily, if not exclusively, in possession of all material evidence regarding the sincerity and religiosity of Plaintiffs' alleged beliefs. It is improper for Plaintiffs to conceal this information merely in hopes of obtaining favorable, preliminary relief.

In a conclusory fashion, Plaintiffs conclude that Defendants' discovery is not to "prepare for an upcoming preliminary injunction hearing" but to "chill the religious free exercise of Singularism and its religious community." [Opp. at 8]. However, Plaintiffs were the parties that put the sincerity and religiosity of Singularism's and its members beliefs at issue, not Defendants. Furthermore, the discovery sought is unquestionably aimed at preparation for the preliminary injunction hearing:

| Discovery Requests | Relevant Issue for PI Hearing |
|---|---|
| Interrogatories: 1, 5–9, 14<br>RFPs: 1–2 | Religiosity of Beliefs |
| Interrogatories: 1–9, 13–14<br>RFPs: 1–3, 5–10 | Religious Sincerity |
| Interrogatories: 1–3, 10, 12–13<br>RFPs: 1, 4, 6 | Compelling Governmental Interest |
| Interrogatories: 1, 5, 10–14<br>RFPs: 1–3, 5–10 | Witness Preparation |

| Interrogatories: 1, 7–9, 10–11<br>RFPs: 1–3, 9 | Witness Identification |

Defendants should not be deprived of discovery aimed at information and evidence relating to Plaintiffs' prima facie case, let alone based on Plaintiffs' speculation surrounding the motives behind the discovery.  Indeed, to prove Defendants are not merely creating a "prosecution hit list," [Opp. at 9], Defendants will even stipulate to confidentiality designations that will limit the use of materials discovered in this matter to the "preparing for and conducting the litigation in which the information, documents, or other materials were disclosed." [Federal Standard Protective Order, § B(3).

Because the discovery is aimed at issues central to the preliminary injunction hearing, and because Plaintiffs offer nothing other than conjecture surrounding Defendants' motives, this factor weighs in favor of expedited discovery.

4.      **The Burden of Compliance with the Requested Discovery.**

Plaintiffs claim that the requested 15-day response window is "virtually impossible." [Opp. at 8].  However, the 15-day response window is necessary in light of Plaintiffs' request for a hearing date to be scheduled "as soon as possible." [Dkt. 37].  If Plaintiffs insist on a hearing in January 2025, Defendants require the information and evidence sufficiently far in advance of the preliminary injunction hearing to adequately prepare, conduct follow-up discovery, and interview relevant witnesses that may be introduced at the hearing.  Defendants are willing to accommodate additional time for Plaintiffs to respond.  Providing additional time, however, will require scheduling the preliminary injunction hearing at a later date.  Regardless, Plaintiffs should not be permitted to use the timing of the preliminary injunction hearing to avoid the discovery needed to present the necessary evidence and testimony. *See Am. Equip. Systems, LLC*, 2023 WL 8261427,

App-3:126

at *6 (recognizing that the need to expedited discovery outweighed potential prejudice).

Plaintiffs further claim that the discovery will cause individuals to "distance themselves from the faith." [Opp. at 9]. However, requiring Plaintiffs to participate in discovery over **their own claims** is not a burden "upon Plaintiffs' religious free exercise," [Opp. at 9], it is an obligation that every party bears in litigation. *Cf. United States v. Jeffs*, No. 2:16-cv-CR-82, 2016 WL 6745951, at *7–*8 (D. Utah 2016) (acknowledging that "the mere fact of prosecution" is insufficient to show "sincerely held religious beliefs were substantially burdened"). Member participation in discovery is no different than corporate representatives or ancillary witnesses that are required, under applicable rules of procedure, to offer evidence and testimony necessary to further justice and maintain the civil judicial system. Furthermore, Plaintiffs cannot rely on third parties as a shield to the discovery in question, which seeks only information from Plaintiffs themselves that is within their possession, custody, and control. [Dkt. 44-1]. In the event third party discovery ensues, and if basic interviews and document requests are enough for members to leave Singularism, this would only demonstrate the insincere nature of the beliefs and practices in question.

Additionally, Plaintiffs cannot avoid expedited discovery out of fear because "the requested information would need to be produced during the normal course of the litigation." *See Icon Health & Fitness, Inc.*, 2011 WL 13136539, at *2 (holding expedited discovery posed no burden to party who received "adequate notice" of the necessary discovery). Whether through expedited discovery or otherwise, Defendants are entitled to the requested information because the sincerity and religiosity of Singularism's practices are at the heart of the dispute. Fed. R. Civ. P. 26(b)(1).

11

App-3:127

Therefore, this factor also weighs in favor of expedited discovery. Even if Plaintiffs prevail on this factor, the satisfaction of all other factors weighs in favor of granting the Motion.

**5.    The Timing of the Requested Discovery.**

The timing of the discovery is appropriate "[g]iven the current posture of the case." *See Icon Health & Fitness, Inc.*, 2011 WL 13136539, at *3. While Plaintiffs note that the "parties have not yet conducted a Rule 26(f) conference," [Opp. at 9], that is true for most requests for expedited discovery in the context of a preliminary injunction and is not dispositive. *See, e.g., Am. Equip. Systems, LLC*, 2023 WL 8261427, at *6 (allowing expedited discovery to proceed before 26(f) conference); *Icon Health & Fitness, Inc.*, 2011 WL 13136539, at *3 (same). Given the need for evidence and witness examination at the preliminary injunction hearing, the timing of the discovery is appropriate and proportional to the needs of the case.

**CONCLUSION**

This Court should grant Defendants' request for expedited discovery and require Defendants to respond to the discovery set forth in Exhibit 1 within 15 days or, alternatively, at least 45 days before the preliminary injunction hearing.

Dated this 27th Day of December, 2024

JAMES DODGE RUSSELL & STEPHENS, P.C.

*/s/ Dillon P. Olson*
Mitchell A. Stephens
Justin L. James
Dillon P. Olson

12

PROVO CITY LEGAL
Gary D. Millward
Richard A. Roberts

*Counsel for Provo City, Troy Beebe, Brian Wolken, and Jackson Julian*

App-3:129

MITCHELL A. STEPHENS (11775)
JUSTIN L. JAMES (15167)
DILLON P. OLSON (16120)
JAMES DODGE RUSSELL & STEPHENS, P.C.
10 West Broadway, Ste. 400
Salt Lake City, Utah 84101
mstephens@jdrslaw.com
jjames@jdrslaw.com
dolson@jdrslaw.com
*Attorneys for Defendants Utah County and Jeffrey Gray*

J. BRIAN JONES (11816)
GARY D. MILLWARD (12170)
RICHARD A. ROBERTS (12217)
PROVO CITY ATTORNEY'S OFFICE
445 W Center St.
Provo, Utah 84601
(801) 852-6140
gmillward@provo.gov
rroberts@provo.gov
*Attorneys for Defendants Provo City, Troy Beebe, Brian Wolken, and Jackson Julian*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BRIDGER LEE JENSEN; SINGULARISM; PSYCHE HEALING AND BRIDGING, LLC dba PSYCHEDELIC THERAPY JOURNEY;  Plaintiffs,  vs.  UTAH COUNTY; PROVO CITY; JEFFREY GRAY; TROY BEEBE; BRIAN WOLKEN; JACKSON JULIAN; JOHN DOES;  Defendants. | **MEMORANDUM IN OPPOSITION TO MOTION FOR ANTI-SUIT INJUNCTION**  Civil Case No. 2:24-cv-00887-JNP  Judge Jill N. Parrish |

Pursuant to DUCivR 7-1(D), Defendants Utah County, Jeffrey Gray, Provo City, Troy

Beebe, Brian Wolken, and Jackson Julian ("Defendants") submit this Memorandum in Opposition

to Motion for Anti-Suit Injunction in response to the Motion (Dkt. 39) filed by Plaintiffs Bridger

Lee Jensen, Singularism, and Psyche Healing and Bridging, LLC dba Psychedelic Therapy

Journey.  Defendants ask the Court to deny Plaintiffs' Motion.

Because the pending Motion and Defendants' pending Motion to Dismiss (Dkt. 40) can – and should – be resolved without the time and expense of an evidentiary hearing, Defendants request that the Court either rule on the issues of law **before** proceeding with the evidentiary process currently scheduled for January 23, 2024, or reschedule that evidentiary hearing until after the Court rules on the legal matters set forth in the parties' filings.

## INTRODUCTION

The State of Utah – a non-party to this proceeding – has charged Bridger Jensen ("Jensen") with violating the Utah Controlled Substances Act ("Utah CSA").[1]  Those charges are consistent with Jensen's admitted distribution of psilocybin, a Schedule I drug.  Notably, Jensen has admitted to the distribution of psilocybin **before** Singularism was formed and **before** any alleged statutory right or defense existed under the Utah RFRA.  *See* Utah S.B. 150 (2024) ("This bill takes effect on May 1, 2024").  [*See, e.g.*, Dkt. 19-5 ("September 2023"); Dk t. 29 (November 2023)].  Those charges also concern Jensen's undisputed possession of THC, which the Court has found is entirely unrelated to this lawsuit.

The Court's TRO ruling did not prevent the State of Utah from filing criminal charges.  Nor do any other exceptions to the Utah CSA prevent the State of Utah from pursuing criminal charges.  Instead, other exceptions to the Utah CSA – including religious exceptions – merely provide a **defense** within the criminal process itself.  *See, e.g.*, Utah Code § 57-37-8(12)(b) (affirmative defense for peyote used "with the practice of a traditional Indian religion"); *id.* at § -8(13)(a) (affirmative defense for "medical research"); *id.* at §-8(16)(a) (affirmative defense for violators who report another's overdose).  Jensen remains free to assert his alleged defenses within

---

[1] A County Attorney prosecutes "on behalf of the state."  Utah Code § 17-18a-401.

App-3:131

the criminal process.  Indeed, that process favors Jensen because the criminal process requires the State of Utah to prove guilt beyond a reasonable doubt.  The Court should decline to interfere with the pending criminal process.  In fact, binding precedent prevents the Court from doing so.  *See Weitzel v. Div. of Occupational & Pro. Licensing Dep't of Com. of State of Utah*, 240 F.3d 871, 875 (10th Cir. 2001) ("*Younger* abstention is non-discretionary . . . ."); 28 U.S.C. § 2283 (Anti-Injunction Act).

Furthermore, the basis for the Court's jurisdiction results from plaintiffs' federal claims. [*See* Dkt. 2-2 at p. 18, 24 (asserting claims under 42 U.S.C. § 1983); Dkt. 39 at 2 (recognizing jurisdiction based on "U.S. Constitution and 42 U.S.C. § 1983")].  Defendants recognize that they removed the case to federal court.  However, this remains a civil case that should not form an end-run on the criminal process.  [*See* Dkt. 2-2 at p. 31].  Additionally, although the Court generally can exercise supplemental jurisdiction over state-law claims, those issues should be the tail and not the dog.  *See, e.g.*, *Vox Marketing Group v. Prodigy Promos*, 556 F. Supp. 3d 1280, 1291 (D. Utah 2021) (declining jurisdiction where it would "permit a small, federal-law tail to wag an enormous, state-law dog.  That is not how our dual system of state and federal courts should work.").  The Court should decline to exercise supplemental jurisdiction over state-law claims that "raise[] a novel or complex issue of State law," "substantially predominate[] over the [federal] claim," or when "there are other compelling reasons."  28 U.S.C. § 1367(c).  With respect to the current Motion, relying on an untested Utah statute to enjoin the State of Utah from proceeding with a pending criminal case in the Utah State Courts would be the epitome of allowing State law to "substantially predominate" this proceeding.

## BACKGROUND

1.      The Utah RFRA became effective May 1, 2024.  *See* Utah S.B. 150 (2024).

2.      Singularism was distributing psilocybin, a Schedule I drug, before the Utah RFRA became effective.  [*See, e.g.*, Dkt. 19-5 ("September 2023"); Dkt. 29 (November 2023)].

3.      In addition, Jensen was personally distributing psilocybin, a Schedule I drug, before he formed Singularism as a religion in the fall of 2023.  [*See* Dkt. 36 at 1 ("Jensen founded Singularism in November 2023"); Dkt. 19-1 at ¶ 18 ("I founded the religion of Singularism in the fall of 2023."); Dkt. 2-2 at ¶ 16 ("years of . . . experiences facilitated through psilocybin"); *id.* at ¶ 19 (alleging preexisting psilocybin experiences at time of Singularism's "ribbon-cutting")].

4.      Although Plaintiffs allege that enforcement of the Utah CSA is unconstitutional and initially filed their claims in the Utah State Courts, they did not provide notice to the Utah Attorney General as required by Utah law.  *See* Utah R. Civ. P. 24(d).

5.      The Court's December 13, 2024, Order Granting Temporary Restraining Order ("TRO Order") did not enjoin Defendants or the State of Utah from proceeding with criminal charges against Jensen.  [*See* Dkt. 24].

6.      The Court's TRO Order did not conclude that Plaintiffs had shown a likelihood of success on the merits of any issue arising under federal law.  Instead, it relied solely on the Utah RFRA.  [*See id.*].

7.      Defendants removed this case to federal court based on the existence of a federal question, specifically Plaintiffs' claims under 28 U.S.C. § 1983.  [*See* Dkt. 2-2 at p. 18, 24].

8.      Defendants have moved to dismiss all the federal causes of action asserted in the case.  [*See* Dkt. 40].  Defendants have further argued that, regardless of the outcome of the Motion

4

to Dismiss, the Court should decline to exercise supplemental jurisdiction over Utah claims and instead resolve the federal claims that formed the basis for removal.  [*Id.*].

9.	On November 4, 2024, the Fourth District Court, State of Utah, issued a search warrant that "commanded" "any peace officer in the State of Utah" to "make a search" of Jensen at "1969 N. State Street, Provo, UT" for "Psilocybin Mushrooms."  [*See* Dkt. 13-14].

10.	The Utah Court's search warrant was executed on November 11, 2024.  [*See* Dkt. 13-15].  Plaintiffs filed this lawsuit on November 19, 2024, because of that search warrant and an imminent prosecution.  [*See, e.g.*, Dkt. 2-2 at p. 2 ("may at any moment prosecute")].

## ARGUMENT

### I.	*YOUNGER* ABSTENTION PREVENTS THE COURT FROM STOPPING THE PENDING CRIMINAL PROCESS.

"*Younger* abstention is non-discretionary; the district court must abstain once the conditions are met . . . ."  *Weitzel v. Div. of Occupational & Pro. Licensing Dep't of Com. of State of Utah*, 240 F.3d 871, 875 (10th Cir. 2001).  Indeed, "abstention may be raised by the court sua sponte."[2]  *See Bellotti v. Baird*, 428 U.S. 132, n.10 (1976); *accord D.L. v. Unified Sch. Dist. No. 497*, 392 F.3d 1223, 1228-29 (10th Cir. 2004) ("Younger abstention is jurisdictional" and "[w]e

---

[2] For similar reasons, Defendants did "not waive the comity and federalism interests undergirding *Younger* by invoking the jurisdiction of the federal courts." *Dowden v. City of Sacramento*, 40 F. Supp. 2d 1146, 1152 n.5 (E.D. Cal. 1999);*see also Ohio Civil Rights Comm'n v. Dayton Christian Schls.*, 477 U.S. 619, 626 (1986) (declining to interpret the state's stipulation to federal court jurisdiction as a waiver of *Younger* abstention); *Barnes v. Allen*, 2019 WL 653814 at *2 n.1 (N.D. Okla. Feb. 15, 2019) (rejecting argument that "defendants waived any jurisdictional arguments by removing the case").  Moreover, Defendants did not remove the criminal case that requires *Younger* abstention. Nor do Defendants now seek the complete dismissal of the Plaintiffs' claims based on *Younger*.  Recognizing the Court's ultimate jurisdiction to adjudicate plaintiffs' damages claims under 28 U.S.C § 1983 is vastly different than consenting to the Court's adjudication of the distinct criminal case filed by the State of Utah (a non-party) in the Utah Courts.

5

address it at the outset"); *Chapman v. Barcus*, 372 F. App'x 899, 902 (10th Cir. 2010) ("[T]his court may consider *Younger* 'abstention for the first time on appeal'"). When, as here, a plaintiff's complaint seeks to recover monetary damages, *Younger* abstention means staying the claims pending resolution of the criminal proceedings. *See, e.g.*, *D.L.*, 392 F. 3d at 1228 ("The rationale for *Younger* abstention can be satisfied, however, by just staying proceedings on the federal damages claim until the state proceeding is final."); *Buck v. Myers*, 244 F. App'x 193, 197-98 (10th Cir. 2007) ("Where the plaintiff in the federal suit seeks damage relief and the *Younger* factors are met, the district court should stay federal proceedings on the damages claims, not dismiss the action altogether.").

"In *Younger*, the Supreme Court held that federal courts, except in the most exceptional circumstances," cannot grant "declaratory or injunctive relief against pending state criminal proceedings." *Phelps v. Hamilton*, 122 F.3d 885, 889 (10th Cir. 1997) (citing *Younger v. Harris*, 401 U.S. 37 (1971)). "[T]he normal thing to do when federal courts are asked to enjoin proceedings in state courts is not to issue such injunctions." *Younger*, 401 U.S. at 45. "No citizen or member of the community is immune from prosecution, in good faith, for his alleged criminal acts." *Id.* at 46. Thus, "the cost, anxiety, and inconvenience of having to defend against a single criminal prosecution, could not by themselves be considered 'irreparable' in the special legal sense of that term." *Id.*

"[A] three-part test" exists "for determining whether a federal court should abstain in favor of a state court proceeding." *Phelps*, 122 F.3d at 889. "A federal court must abstain from exercising jurisdiction when: (1) there is an ongoing state criminal . . . proceeding, (2) the state court provides an adequate forum to hear the claims raised in the federal complaint, and (3) the

state proceedings 'involve important state interests, matters which traditionally look to state law for their resolution or implicate separately articulated state policies.'" *Weitzel*, 240 F.3d at 875; *accord Phelps*, 122 F.3d at 889. "'Once these three conditions are met, *Younger* abstention is non-discretionary and, absent extraordinary circumstances, a district court is required to abstain.'"[3] *Buck*, 244 F. App'x at 197 (quoting *Crown Point I, LLC*, 319. F.3d at 1215); *accord Chapman v. Barcus*, 372 F. App'x 899, 901-02 (10th Cir. 2010) ("Tenth Circuit cases consistently state that the application of *Younger* is mandatory."). All three of the *Younger* conditions exist.

First, "there is an ongoing state criminal" proceeding. *See Weitzel*, 240 F.3d at 875. In other filings, Plaintiffs have disputed this factor by arguing this case precedes the formal filing of the criminal information. [*See, e.g.*, Dkt. 38 at 9-10]. That myopic argument disregards binding precedent; the Court must take a broader view of the criminal process. In *Younger*, the Supreme Court recognized that its longstanding precedent applied "even with respect to state criminal proceedings not yet formally instituted." *Younger*, 401 U.S. at 45 ("threatened prosecutions"); *accord Hicks v. Miranda*, 422 U.S. 332, 349-50 (1975) ("[W]here state criminal proceedings are begun against the federal plaintiffs after the federal complaint is filed but before any proceedings of substance on the merits have taken place in the federal court, the principles *of Younger v. Harris* should apply in full force."); *Morales v. TransWorld Airlines, Inc.*, 504 U.S. 374, 381 n.1 (1992) (recognizing *Younger* applies to "an already-pending or an about-to-be-pending state criminal action"). Thus, courts have applied *Younger* in circumstances similar to this case. *See, e.g.*, *Doe v. Office of Kan. Sec. Comm'r*, 2017 WL 6557431, at *2 (S.D. Fla. Nov. 28, 2017) ("[T]he issuance

---

[3] Plaintiffs' Motion does not argue that any "extraordinary circumstances" exist. *Cf. Phelps*, 122 F.3d at 889 (outlining "'heavy burden' to overcome the bar of *Younger* abstention").

of a search warrant constitutes an ongoing state judicial proceeding.”); *Nick v. Abrams*, 717 F. Supp. 1053, 1056 (S.D.N.Y. 1989) (finding "'pending state proceeding' exists when a state attorney general executes a search warrant"). Indeed, a federal court recently determined *Younger* applied even though the criminal indictment came "approximately three years" after the plaintiff "filed their complaint" because discovery "was not far advanced." *Moore v. Garnand*, 2024 WL 4534597 at *2 (D. Ariz. Sept. 17, 2024).

Second, the criminal proceedings in the Utah Court "provide[] an adequate forum." *See Weitzel*, 240 F.3d at 875. It is "beyond dispute that the Utah state judiciary provides an adequate forum for [Jensen] to assert his constitutional claims." *Weitzel*, 240 F.3d at 876; *see also Jackson v. Utah*, 2019 WL 2746609 at *3 (D. Utah June 7, 2019) ("[T]he Utah state judiciary provides an adequate forum . . . ."). "It is [Plaintiffs'] burden to establish that state law prevents [them] from presenting [their] federal claims in the state proceedings." *Morkel v. Davis*, 513 F. App'x 724, 728-29 (10th Cir. 2013); *J.B. v. Valdez*, 186 F.3d 1280, 1292 (10th Cir. 1999) (recognizing even "uncertainty" about forum "militates in favor of abstention"). Plaintiffs have "not demonstrated that Utah state courts are an inadequate forum." *Morkel*, 513 F. App'x at 728; *see also Buck*, 244 F. App'x at 196-97 (finding "[t]here can be no serious question that each of the *Younger* factors is met" given "the Utah criminal prosecution"). "[U]nless state law clearly bars the interposition of the federal statutory and constitutional claims, a plaintiff typically has an adequate opportunity to raise federal claims in state court." *Winn v. Cook*, 945 F.3d 1253, 1258 (10th Cir. 2019) (cleaned up); *accord J.B.*, 186 F.3d at 1292.

Third, the State of Utah's criminal prosecution "implicate[s] important state interests." *See Phelps*, 122 F.3d at 889. "The state of Utah has an important interest in its criminal proceedings."

8

App-3:137

*Buck*, 244 F. App'x at 197; *see also Winn*, 945 at 1258 ("For the purposes of *Younger*, state criminal proceedings are viewed as 'a traditional area of state concern.'"); *Fisher v. Whetsel*, 142 F. App'x 337, 339 (10th Cir 2005) ("Oklahoma's important interest in enforcing its criminal laws through proceedings in its state courts remains axiomatic."). "This Court has recognized that the States' interest in administering their criminal justice systems free from federal interference is one of the most powerful considerations . . . ." *Kelly v. Robinson*, 479 U.S. 36, 49 (1986).

"[T]he normal thing to do when federal courts are asked to enjoin proceedings in state courts is not to issue such injunctions." *Younger*, 401 U.S. at 45. Indeed, because the *Younger* factors exist, "abstention is non-discretionary; the district court must abstain." *Weitzel*, 240 F.3d at 875.

## II.   THE ANTI-INJUNCTION STATUTE BARS PLAINTIFFS' MOTION.

Plaintiffs' Motion fails independent of abstention. "Any analysis of the power of a federal court to enjoin a state court proceeding must begin with the Anti-Injunction Act." *Lone Star Promotions, LLC v. Abbey Lane Quilts, LLC*, 2018 WL 5808802, at *3 (D. Utah Nov. 6, 2018) (cleaned up). The Anti-Injunction Act "is an absolute prohibition against any injunction of any state-court proceedings." *Vendo Co. v. Lektro-Vend Corp.*, 433 U.S. 623, 630 (1977) (emphasis added); *see also* 28 U.S.C. § 2283 ("A court of the United States may not grant an injunction to stay proceedings in a State court . . . ."); *Lone Star*, 2018 WL 5808802, at *3 ("The Supreme Court has . . . made clear that the statute imposes an absolute ban upon the issuance of a federal injunction against a pending state court proceeding"). "The Act's purpose is to forestall the inevitable friction between the state and federal courts that ensues from the injunction of state judicial proceedings by a federal court." *Vendo Co.*, 433 U.S. at 630; *Lone Star*, 2018 WL 5808802, at *3 ("[T]he Anti-

App-3:138

Injunction Act is a necessary concomitant of a dual system of federal and state courts and a pillar of federalism reflecting the independence of the states and their courts." (cleaned up)).

The Anti-Injunction Act limits a federal court's ability to enjoin state proceedings to three situations: (1) where Congress has "expressly authorized an injunction"; (2) where an injunction "is necessary in aid of the federal district court's jurisdiction"; and (3) where an injunction is "necessary to protect or effectuate a previous judgment in federal district court." *Tooele Cty. v. United States*, 820 F.3d 1183, 1188 (10th Cir. 2016) (cleaned up); *see* 28 U.S.C. § 2283. "While the three statutory exceptions appear like they could have significant breadth, the Supreme Court has purposely kept them extremely narrow." *Lone Star*, 2018 WL 5808802, at *3; *see also Smith v. Bayer Corp.*, 564 U.S. 299, 306 (2011) (noting statutory exceptions "are narrow and are not to be enlarged by loose statutory construction" (cleaned up)). Thus, "courts should resolve doubts about the applicability of an exception in favor of allowing the state-court proceeding to continue." *Tooele Cty.*, 820 F.3d at 1188. "The Supreme Court has admonished that 'proceedings in state courts should normally be allowed to continue unimpaired by intervention of the lower federal courts, with relief from error, if any, through the state appellate courts and ultimately'" the Supreme Court. *Lone Star*, 2018 WL 5808802, at *3 (quoting *Atl. Coast Line R.R. v. Locomotive Eng'rs*, 398 U.S. 281, 282 (1970)).

Plaintiffs' Motion fails to demonstrate any exception to the Anti-Injunction Act.

A.   The Requested Injunction is Not Expressly Authorized

"To qualify as an 'expressly authorized' exception, 'an Act of Congress must have created a specific and uniquely ***federal*** right or remedy, enforceable in a federal court of equity, that could be frustrated if the federal court were not empowered to enjoin a state court proceeding.'" *Ute*

10

*Indian Tribe of Uintah and Ouray Reservation v. Lawrence*, 289 F. Supp.3d 1242, 1256 (D. Utah 2018) (quoting *Mitchum v. Foster*, 407 U.S. 225, 229 (1972)) (emphasis added). To satisfy this exception, Plaintiffs must establish that a federal right established by Congress "could be given its intended scope only by the stay of a state court proceeding." *Id.*

Plaintiffs have not made this showing. The sole "federal right" that Plaintiffs Motion invokes is the removal statute. [Mot. at 4–5]. Plaintiffs maintain that this Court is authorized to enjoin criminal prosecution in the Utah Courts because the removal statute provides that upon removal, "the State court shall proceed no further unless and until the case is remanded." [Mot. at 5 (citing 28 U.S.C. § 1446(d))]. However, this provision only applies to the "removal of a *civil* action." 28 U.S.C. § 1446(d) (emphasis added). Jensen's criminal prosecution was not the subject of removal. Nor is it a "civil action" that falls within the purview of the removal statute. Said differently, when Congress adopted the removal statute, it did not expressly authorize the Court to enjoin both civil and criminal cases pending in the state courts.

Additionally, the removal statute generally applies only to enjoin continued proceedings in "the same case in state court after its removal." *Lou v. Belzberg*, 834 F.2d 730, 740 (9th Cir. 1987); *Ackerman v. ExxonMobil Corp.*, 734 F.3d 237 (4th Cir. 2013) (confirming "§ 1446(d) invalidates post-removal actions taken in state court in the removed case, but it does not reach (and therefore does not invalidate) actions taken in cases other than the removed case"). Although the Tenth Circuit does not appear to have addressed the issue, other federal courts have concluded that new, copycat actions filed after removal may be enjoined only in situations where "fraud is found." *Frith v. Blazon-Flexible Flyer, Inc.*, 512 F.2d 899, 901 (5th Cir.1975) ("[W]here no fraud is found, the second action brought in state court should not be enjoined"). Plaintiffs' authority identifies a

11

App-3:140

potential circuit split on this issue.  However, that split is irrelevant because Plaintiffs' cases still concern ***civil*** cases filed to circumvent a federal ***civil*** case. *See, e.g.*, *Kansas Public Employees Retirement Sys. v. Reimer Kroger Assocs.*, 77 F.3d 1063, 1069 (9th Cir. 1996) ("[A]fter removal the plaintiff cannot file essentially the same case in a second state action to subvert federal jurisdiction."); *Davis Int'l, LLC v. New Start Grp. Corp.*, 367 F. App'x 334, 338 (3d Cir. 2010) (concluding that "Appellants had attempted to subvert the removal statute" by filing a new suit "in the hope of beginning merits discovery which had been stayed in federal court").

Here, the State of Utah's criminal case is not an attempt to subvert removal.  It is an attempt to enforce controlled substances laws, protect the public, and promote general welfare.  This is further evidenced by the search warrant, which forms the basis for the criminal prosecution and predates the filing of this action.  [Dkt. 13-14].  Plaintiffs cannot demonstrate that the criminal process is an effort to subvert removal because it was underway before this case was filed and consists of an entirely different case type, i.e., criminal prosecution.  Plaintiffs' argument further fails because the state court prosecution involves "different plaintiffs, additional counsel" and "only state claims."  *See Lou*, 834 F.2d at 740.  "This is not a case where the plaintiff in the removed action has flouted the federal court's removal jurisdiction by filing substantially the same complaint in state court subsequent to the removal."  *Billy Jack for Her, Inc. v. New York Coat, Suit, Dress, Rainwear and Allied Workers' Union*, 515 F. Supp. 456, 460 (S.D. N.Y. 1981).[4]

---

[4] Even though Plaintiffs wrongly contend, in a conclusory fashion, that "Defendants seek to litigate the same issues" in the state court prosecution, [Mot. at 6], this does not qualify as an exception to the Anti-Injunction Act.  *See Lone Star*, 2018 WL 5808802, at *5 ("It is well settled that the mere existence of a parallel lawsuit in state court that seeks to adjudicate the same in personam cause of action does not itself provide sufficient grounds for an injunction against a state action in favor of a pending federal action.").

Under the circumstances, this is not a situation where a federal right can only be protected "by the stay of a state court proceeding." *Lawrence*, 289 F. Supp.3d at 1256. Any protections afforded in Plaintiffs' cited removal statute do not extend to criminal prosecutions. *See* 28 U.S.C. § 1446 ( "Procedure for removal of **civil** actions" (emphasis added)). Plaintiffs have cited no authority in which a federal court has enjoined a criminal prosecution based on the removal of a separate, civil suit. This Court should not invent such authority and, instead, "resolve doubts about the applicability of an exception in favor of allowing the state-court proceeding to continue." *Tooele Cty.*, 820 F.3d at 1188.

B. The Requested Injunction is Not Necessary to Aid In Rem Jurisdiction

"The second statutory exception is limited" and applies only where: (1) "both the federal and state suits constitute in rem or quasi in rem proceedings" and (2) "the federal court was the first to take possession of the res (the property under dispute in the federal and state actions)." *Tooele Cty.*, 820 F.3d at 1188. "An action in rem is one founded upon the rights in or to property," which affects "the interests of all persons in the property." *Id.* Actions that are quasi in rem, on the other hand, affect "the interests of only some persons in the property." This exception "applies only in aid of a court's exclusive jurisdiction over a particular case." *Lone Star*, 2018 WL 5808802, at *5.

Here, the exception does not apply because the parties are "not seeking adjudication of anyone's interest in property," either in the federal or state case. *Id.* at 1189. Plaintiffs' Complaint in this case seeks declaratory judgments regarding alleged violations of Plaintiffs' alleged religious rights. [Dkt. 2-2]. As such, the federal case is not a proceeding involving "the rights in or to property." *Tooele Cty.*, 820 F.3d at 1188; *see also Pueblo of Pojoaque v. Biedscheid*, 689 F.

13

App-3:142

Supp.3d 1033, 1131 (D. N.M. 2023)(holding that federal suit for injunctive and declaratory relief was not "in rem or quasi in rem").

Similarly, the state court criminal prosecution involves three drug-related charges against Jensen.  [Dkt. 39-1].  Because this proceeding is against Jensen personally, it is in personam and does not "trigger the Anti-Injunction Act's exceptions for injuries involving two in rem or quasi in rem proceedings."  *Tooele Cty.*, 820 F.3d at 1189 ("If a court's jurisdiction is based on its authority over the defendant's person, the action and judgment are denominated 'in personam'"); *see also United States v. Alonso*, 602 F. Supp.2d 297, 302 (D. P.R. 2008) (acknowledging criminal prosecutions are proceedings "in personam").  The State of Utah's criminal prosecution does not involve "rights in or to property," which precludes application of the second exception to the Anti-Injunction Act.  *See Tooele Cty.*, 820 F.3d at 1188; *see also Pueblo*, 689 F.3d at 1130 (noting that the second exception will not apply "[i]f either the State suit or the federal suit is not in rem or quasi in rem").

Plaintiffs attempt to invoke the second exception based on "federal question jurisdiction." [Mot. at 6].  However, the Tenth Circuit has already "declined to expand the second exception beyond in rem and quasi in rem actions."  *See Pueblo*, 689 F. Supp.3d 1033.  In fact, the United States Supreme Court has gone even further and pronounced that injunctions of state proceedings are inappropriate even where it is "unmistakably clear" that those proceedings "interfere with a protected federal right" or "present[] a federal issue."  *Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 149–150 (1988).  In those circumstances, "the proper course is to seek resolution of that issue by the state court."  *Id.*

App-3:143

Because neither the federal nor case proceedings are in rem, the second exception to the Anti-Injunction Act is not satisfied.[5]

C.   The Requested Injunction Will Not Protect a Prior Federal Judgment

The final exception under the Anti-Injunction Act limits injunctions of state court proceedings to "rare cases" where they are "necessary to protect or effectuate the federal court's judgments." *Smith*, 564 U.S. at 306.  This is "known as the relitigation exception" and is "designed to implement well-recognized concepts of claim and issue preclusion."  The relitigation exception is "strict and narrow," and "issuing an injunction under the relitigation exception is resorting to heavy artillery." *Id.*

Plaintiffs cannot demonstrate entitlement to injunctive relief under the relitigation exception because there exists no "judgment" for the Court to "protect or effectuate."  22 U.S.C. § 2283.  Plaintiffs seemingly concede they have not satisfied the elements of the relitigation exception, noting that "there is not yet a final determination on Plaintiffs' claims."  [Dkt. 39 at p. 7].  Instead, they argue that – at some future point in time – the third exception "will also be met as this case progresses."  [*Id.*].  The lack of a final judgment is fatal to Plaintiffs' current Motion. *See Lone Star*, 2018 WL 5808802, at *5 (holding the relitigation exception "clearly does not apply because this court has not issued a judgment"); *Ute Indian Tribe of Uintah and Ouray Reservation v. Lawrence*, 289 F. Supp.3d 1242, 1257 (D. Utah 2018) (holding the relitigation exception "does not apply" because "there is no final judgment for the court to protect and effectuate"); *Pueblo*,

---

[5] The second exception also does not apply because the state court was the first to preside over the pertinent issues through the issuance of the search warrant. *Doe*, 2017 WL 6557431, at *2 (S.D. Fla. Nov. 28, 2017) ("[T]he issuance of a search warrant constitutes an ongoing state judicial proceeding."); *Nick*, 717 F. Supp. at 1056 (S.D.N.Y. 1989); (finding "'pending state proceeding' exists when a state attorney general executes a search warrant").

689 F. Supp.3d at  1133 (refusing to apply relitigation exception where "there is no federal judgment at issue in the State proceedings"); *Harvey Specialty & Supply, Inc. v. Anson Flowline Equip. Inc.*, 434 F.3d 320, 323 (5th Cir. 2005) ("[A]n order that is not a final judgment . . . lacks sufficient finality to be entitled to preclusive effect under the relitigation exception." (cleaned up)).

Plaintiffs cannot rely on their belief that they will subsequently prevail and obtain a final judgment to obtain relief under the relitigation exception.  *See Thayer v. Owens*, No. 2:12-cv-00170, 2012 WL 1900933, at *5 (D. Utah May 24, 2012) (declining to apply relitigation exception to "a merely prospective judgment").

### III.  THE COURT SHOULD NOT ALLOW UTAH LAW TO PREDOMINATE THIS FEDERAL CASE TO THE EXCLUSION OF THE UTAH COURTS.

Even if the Court determined that *Younger* did not apply and that Plaintiffs had established the basis for an anti-suit injunction, the Court should not rely on novel questions of Utah law as the reason for enjoining the Utah Courts.  Instead, the Court should decline to exercise supplemental jurisdiction over the Utah law issues.

"The Supreme Court has instructed us that federal courts should consider the propriety of exercising supplemental jurisdiction 'in each case and at every stage of the litigation.'"  *Roe v. Cheyenne Mtn. Conf. Resort, Inc.*, 124 F.3d 1221, 1237 (10th Cir. 1997) (reversing exercise of supplemental jurisdiction).

The Court's exercise of supplemental jurisdiction over state law claims is not unlimited.  *See id.*  Instead, the Court must consider whether: (1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the [federal] claim[s] . . ., (3) the district court has dismissed [the federal] claims . . . ., or (4) . . . other compelling reasons."  28 U.S.C. § 1367(c); *accord Mtn. States Media, LLC v. Adams Cnty.*, 389 F. App'x 829, 838 (10th Cir. 2010);

*Roe*, 124 F.3d at 1237.  Each factor demonstrates that the Court should decline to exercise supplemental jurisdiction over the Utah claims.  Because those claims are the primary basis for Plaintiffs' requested injunction, the Motion should be denied.  Instead, the state law claims should be remanded to the Utah State Court.  *See Enochs v. Lampasas Cnty.*, 641 F.3d 155, 159 (5th Cir. 2011) ("[B]alance each factor in order to determine whether a district court abused its discretion."); *De Asencio v. Tyson Foods, Inc.*, 342 F.3d 301, 309 (3d Cir. 2003) (finding court "did not exercise sound discretion" because "the state-law action substantially predominates").

First, Plaintiffs' Utah claims raise novel and complex State law issues.  No court, let alone the Utah Supreme Court, has reviewed, interpreted, or applied the Utah RFRA.  As a result, this case presents complex issues of first impression under Utah law.  Multiple examples already are apparent from the record.  For example, no Utah court has resolved how a court should analyze whether an act is "substantially motivated by a sincerely held religious belief" or what jury instructions should be given.  *See* Utah Code § 63G-33-101(2).  [*See also* Dkt. 19 (arguing Court should reject *Meyers* factors and adopt "alternative tests")].  No Utah court has resolved whether Utah RFRA allows for damages at all, let alone in conjunction with the Utah Governmental Immunity Act.  *See, e.g.*, Utah Code § 63G-7-201 (retention of immunity for "violation of civil rights").  No Utah court has applied the notice provisions of the Utah RFRA.  *See id.* at § -202(5).  In addition, Plaintiffs admit to raising novel challenges under the Utah Constitution.  [*See* Dkt. 9 at 14 (arguing "the Utah Supreme Court" has not "yet conducted a free exercise analysis")].  Plaintiffs suggested these novel issues could be sent to "the Utah Supreme Court by certification."  [*Id.*].  The novel and unsettled nature of Utah law substantially favors remand of the state issues.  "We are convinced that in such circumstances, an authoritative state court ruling . . . should be

17

permitted, instead of a guess or uncertain prediction by a federal court." *Roe*, 124 F.3d at 1237 (finding "novel and complex issue of state law" required remand).

Second, the Utah RFRA has "substantially predominate[d] over the [federal] claim[s.]" 28 U.S.C. § 1367(c). For example, the Court's TRO Order did not even analyze, let alone find, that Plaintiffs had established a likelihood of success in connection with any federal law. [*See* Dkt. 24]. Instead, the Court analyzed only "the Utah RFRA," becoming the first court to do so. [*See id.* at 2-3]. In contrast, Plaintiffs' federal claims are neither new nor complex. Plaintiffs are not the first parties to argue that the CSA violates their rights under the U.S. Constitution. Those federal theories repeatedly have been rejected. [*See generally* Dkt. 40]. *See, e.g.*, *Emp. Div. v. Smith*, 494 U.S. 872, 878-82, (1990) (rejecting First Amendment claim for religious peyote use); *Olsen v. Mukasey*, 541 F.3d 827, 832 (8th Cir. 2008) (rejecting argument that CSA was "not generally applicable" because it allows "certain research and medical uses of marijuana"); *Multi-Denominational Ministry of Cannabis and Rastafari, Inc. v. Holder*, 365 F. App'x 817, 819 (9th Cir. 2010) ("Because drug laws are both neutral and generally applicable, they may be enforced even if doing so substantially burdens one's religion." (cleaned up)). The Court should not allow novel questions of Utah law to predominate an otherwise straightforward proceeding.

Third, Defendants have moved to dismiss all of Plaintiffs' federal claims. [*See* Dkt. 40]. As detailed in the motion to dismiss, the Tenth Circuit routinely reverses a district court's ruling on state law claims when those are the only claims that remain in the case. *See, e.g.*, *Sandberg v. Englewood, Colorado*, 727 F. App'x 950, 965 (10th Cir. 2018) ("[W]e conclude the district court erred by exercising jurisdiction over the state law claims after it had dismissed the federal causes of action."); *George v. Newman*, 726 F. App'x 699, 708 (10th Cir. 2018) ("Whenever a district

App-3:147

court dismisses a state law claim with prejudice before trial, we typically reverse and remand with instructions to dismiss without prejudice"). The Court should not enjoin the State of Utah's criminal process merely because of a delay in deciding the motion to dismiss. Furthermore, even if the motion to dismiss were denied or delayed, the Court still should not exercise jurisdiction because every other factor does not support that jurisdiction. *See, e.g.*, *Vox Marketing Group*, 556 F. Supp. 3d at 1289-91; *De Asencio*, 342 F.3d at 309.

Fourth, "other compelling reasons" support leaving issues of Utah law to the Utah courts. *See* 28 U.S.C. § 1367(c). For example, the State of Utah is the plaintiff in the criminal action. [*See* Dkt. 39]. *See also* Utah Const. art. VIII, § 16 (providing for "criminal actions brought in the name of the State of Utah"); Utah Code § 17-18a-401 (declaring criminal charges filed "on behalf of the state"). However, the State of Utah is not a named party before this Court. Nor did Plaintiffs notify the Utah Attorney General when they filed this case. *See, e.g.*, Utah R. Civ. P. 24(d). Furthermore, there are "compelling reasons for declining to excise supplemental jurisdiction since this delicate [state] law is in transition." *Roe*, 124 F.3d at 1237; *see also Ball v. Renner*, 54 F.3d 664, 669 (10th Cir. 1995) ("Where a state law cause of action is thus in a process of current evolution, it is particularly appropriate for the federal courts to leave the continuing development and application of that cause of action to the state courts."). Finally, even if this factor were neutral (it is not), that would still support remand. "Notions of comity and federalism demand that a state court try its own lawsuits, absent compelling reasons to the contrary." *Ball*, 54 F.3d at 669.

The Court should not allow novel questions of Utah law to so dominate this federal case that they prevent the State of Utah from proceeding with a criminal case in the Utah Courts that would resolve those same issues.

## IV.    PLAINTIFFS' FEE DEMAND SHOULD BE REJECTED.

Plaintiffs conclude their Motion with the terse yet inflammatory assertion that the Court should award attorney fees because Defendants acted "in bad faith, vexatiously, wantonly, or for oppressive reasons." [Dkt. 39 at p. 8]. However, it is that request that approaches bad faith. At its core, Plaintiffs complain about the continuation of the criminal process in the Utah Courts. However, as explained, that process began before Plaintiffs initiated this lawsuit. Furthermore, the Utah Courts have declared there is "probable cause" to conclude that Jensen has violated the Utah CSA. [*See* Dkt. 13-14]. At the end of the TRO hearing, the Court expressly stated (in response to Defendants' inquiry) that it was not enjoining the criminal process in the Utah Courts. [*Compare* Dkt. 9-18 (asking Court to enjoin "prosecuting Plaintiffs'") *with* Dkt. 24 (TRO Order)]. Where both this Court and the Utah State Court have expressly allowed the criminal process to continue, this Court should not find that the State of Utah acted in bad faith.

## CONCLUSION

The Court should refuse to control the State of Utah's criminal prosecution of Jensen in the Utah State Courts. The criminal process began with the search warrant the Utah Courts issued before this case was filed. The Anti-Injunction Act does not provide for the requested injunction. And the Court should not allow novel issues of Utah law to so predominate this proceeding that they prevent any action within the Utah Courts. Plaintiffs' Motion should be denied – before an all-day, or multi-day evidentiary hearing.

20

App-3:149

Dated this 2nd day of January, 2024

JAMES DODGE RUSSELL & STEPHENS, P.C.

/s/ Mitchell A. Stephens
Mitchell A. Stephens
Justin L. James
Dillon P. Olson

*Counsel for Utah County and Jeffrey Gray*


PROVO CITY LEGAL

/s/ Richard A. Roberts
Gary D. Millward
Richard A. Roberts

*Counsel for Provo City, Troy Beebe, Brian Wolken, and Jackson Julian*

J. BRIAN JONES (11816)
GARY D. MILLWARD (12170)
RICHARD A. ROBERTS (12217)
PROVO CITY ATTORNEY'S OFFICE
445 W Center St.
Provo, Utah 84601
(801) 852-6140
gmillward@provo.gov
rroberts@provo.gov

*Attorneys for Defendants Provo City, Troy Beebe, Brian Wolken, and Jackson Julian*

MITCHELL A. STEPHENS (11775)
JUSTIN L. JAMES (15167)
DILLON P. OLSON (16120)
JAMES DODGE RUSSEL & STEPHENS, P.C.
10 West Broadway, Ste. 400
Salt Lake City, Utah 84101
mstephens@jdrslaw.com
lswensen@jdrslaw.com

*Attorneys for Defendants Utah County and Jeffrey Gray*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BRIDGER LEE JENSEN; SINGULARISM; PSYCHE HEALING AND BRIDGING, LLC dba PSYCHEDELIC THERAPY JOURNEY,; <br><br> Plaintiffs, <br><br> vs. <br><br> UTAH COUNTY; PROVO CITY; JEFFREY GRAY; TROY BEEBE; BRIAN WOLKEN; JACKSON JULIAN; JOHN DOES 1-4; <br><br> Defendants. | **REPLY MEMORANDUM IN SUPPORT OF EXPEDITED MOTION TO STAY OR MODIFY ORDER REQUIRING RETURN OF PSILOCYBIN** <br><br> Civil Case No. 2:24-cv-00887-JNP <br><br> Judge Jill N. Parrish |

Defendants Utah County (the "County"), Jeffrey Gray ("Gray") (collectively "Utah

1

App-3:151

County") and Provo City (the "City"), Troy Beebe ("Beebe"), Brian Wolken ("Wolken"), and Jackson Julian ("Julian") (collectively "Provo"), submit this Reply Memorandum in Support of Defendants' Expedited Motion to Stay or Modify Order Requiring Return of Psilocybin.

**ARGUMENT**

**I.    THE STATE OF UTAH'S CRIMINAL CHARGES DID NOT MANUFACTURE A CONTROVERSY REGARDING EVIDENCE RETENTION**

Plaintiffs argue that the State of Utah's criminal charges against Plaintiff, "manufactured" a crisis regarding the need to retain evidence pertaining to a criminal case. Their argument is without merit. Most fundamentally, the destruction of evidence relating to a second-degree felony that would result from enforcement of the temporary restraining order is an evidentiary crisis in and of itself. This is true irrespective of what dates the criminal charges were filed on, and would be so even if no charges had been filed at this point. Indeed, the evidence at issue was only seized because the Fourth District Court, State of Utah "commanded" as much.  [*See* Dkt. 13-14 (declaring a "peace officer" is "commanded[] to make a search . . . [and] retain such property" (capitalization altered))].  The Utah Courts issued that order after expressly concluding "that there is probable cause to believe" that Jensen possessed "Psilocybin (Schedule I Controlled Substance)" at the "Singularism" center in violation of the Utah Controlled Substances Act.  [*Id.*].  Defendants' good-faith efforts to enforce Utah law – in a manner expressly directed by the Utah Courts – is not "manufactured."

Per Plaintiff's approach, Defendants were evidently required to file criminal charges immediately upon Plaintiff's own filing of the complaint seeking a declaratory judgment, regardless of the state of Defendants' investigation or prosecutors' review of the investigation. Plaintiff's approach would improperly undermine Defendants' ability to perform its duty to

2

App-3:152

criminally prosecute alleged criminal offenders. Claims of bad faith are particularly unwarranted when the timeline is considered. The Utah Courts issued the search warrant on November 4, 2024, and the police department executed that warrant on November 11, 2024. [Injunction Order (Dkt. 24) at 1]. Plaintiff filed his complaint in the Fourth District Court on November 19, 2024. [See Complaint, Dkt. 2]. The Order Granting Temporary Restraining Order was argued and orally granted on December 13, 2024, and the written order filed on December 16, 2024. [Injunction Order (Dkt. 24) at 3].[1] Thus, per Plaintiff's analysis, Defendants were effectively required to file criminal charges within approximately one month of the execution of the initial search warrant, and likely while their TRO Motion was pending.  Otherwise, according to Plaintiffs, continuing the criminal process that began with the State Courts' search warrant is "manufacturing" a controversy. Plaintiffs' position is unfounded.

Moreover, concern for compliance with Utah's evidence retention statutes would exist even if no charges had been filed. Indeed, the period of retention would likely be even longer.

Utah Code section 77-11c-301 requires that evidence pertaining to a felony shall be maintained for "(i) *the length of the statute of limitations* for the felony offense if: (A) *charges are not filed* for the felony offense." Utah Code § 77-11c-301(1)(a).  Most saliently here, in the *State of Utah v. Jensen*, Case No. 241404407, plaintiff is charged under Utah Code section 58-37-8(1)(A)(III) with Possession with Intent to Distribute of a Schedule 1 Controlled Substance, a Class 2 Felony. The psilocybin seized during the November 11, 2024, search relates to this charge. Utah Code section 76-1-302(1) states: "a prosecution for (a) a felony or negligent homicide shall

---

[1] The criminal information was filed within three business days of this Court's oral ruling and confirmation that it was *not* enjoining the Utah Courts or the State of Utah from proceeding with the ongoing criminal process.

be commenced within four years after it is committed . . . ."  In other words, even if the State of Utah were not its criminal charges, Defendants would be required to retain the seized psilocybin for at least four years.

In short, Defendants' filing of the criminal charges did not "manufacture" a crisis over the evidence, but there is instead an irreconcilable conflict between the temporary restraining order and the Utah evidence retention statute. Even without the criminal charges, the Utah Code commands retention of the evidence from the moment it is collected for a period of four years. Therefore, the Defendants requested that the temporary restraining order be stayed or modified, to avoid releasing evidence in contradiction to the Utah Code.

## II.   PLAINTIFF HAS NOT PREVIOUSLY REQUESTED RELEASE OF THE PSILOCYBIN UNDER UTAH CODE SECTION 77-11a-305, AND THE STANDARDS OF THE STATUTE HAVE NOT BEEN SATISFIED.

Plaintiffs further argue that the return of the psilocybin is not improper because Utah Code allows for the release of evidence that relates to a felony investigation. This argument is without merit. At no point before now had Plaintiffs invoked the statutory process to seek or obtain the return of evidence seized in response to a search warrant issued by the Utah Courts.

Significantly, Plaintiffs' Complaint made no mention of Utah Code section 77-11a-305. Neither did Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction ("TRO Motion") make any mention of this section. In both instances, Plaintiff instead argued primarily in terms of Constitutional rights, both state and federal, and the Utah RFRA. Put simply, Plaintiffs wish to retroactively construe their complaint and motion as being made under a wholly different and distinct statute, unmentioned and unargued previously.  However, that claim was not made. Nor was that unmade claim removed to this Court.  Thus, even assuming, as Plaintiff argues, that

4

this Court *could* have jurisdiction to hear this claim, Plaintiff has failed to make it.  It similarly failed to request a hearing pursuant to Utah Code section 77-1a-305.

Even if this Court were inclined to retroactively deem the complaint or the TRO Motion to effectively be a request to release evidence under Utah Code section 77-11a-305, the requirements for release under the statute have not been met. Indeed, because of the different standards used for a temporary restraining order, as compared to the evidence retention statute, construing arguments made and orders issued regarding the temporary restraining order and deeming them to suffice for a hearing under the evidence retention statute is unfeasible and improper. Utah Code section 77-11a-305(3) states: "Before the court can order property be returned to a claimant, the claimant shall establish, by clear and convincing evidence, that the claimant . . . (b) may lawfully possess the property." In contrast, the Order Granting Temporary Restraining Order notes that to obtain a TRO the plaintiff must, apart from the questions of harm and the public interest, "show that (1) he has a substantial ***likelihood*** of success on the merits . . . ." [See Injunction Order (Dkt. 24) at 1]. Further, the Court made its Order based upon an analysis of the Utah RFRA, rather than any analysis relating to the Utah Code evidence retention statutes. [See *id.* at 2.]

Though the Court did conclude that all prongs for the temporary restraining order were met, this standard of proof is different from, and often irrelevant to, the requirements of Utah Code Section 77-11a-305. The latter three prongs of the temporary restraining order test are entirely irrelevant to a determination under Utah Code Section 77-11a-305. Most significantly, a "substantial likelihood of success on the merits" cannot be construed to be a final, appealable judgment that "clear and convincing evidence" establishes Plaintiffs have a right to "lawfully possess" the property. An expectation that a party is likely to succeed on the merits cannot be

5

transmute into an adjudication that the party has, in fact, already succeeded on the merits, and by a "clear and convincing evidence" standard. This Court has not made a final adjudication that defendant "may legally possess" the psilocybin under any standard or proof, much less under the more demanding "clear and convincing" evidence standard. In short, the Court's findings of law and fact within the temporary restraining order would not suffice to provide basis for release of the psilocybin pursuant to Utah Code section 77-11a-305. Consequently, the temporary restraining order remains contrary to the requirements of Utah evidence retention statutes – even if Plaintiffs had properly invoked that statute.

**III.  THE COURT'S TEMPORARY RESTRAINING ORDER DID NOT ENJOIN DEFENANTS FROM FILING CRIMINAL CHARGES.**

Plaintiff further argues that Defendants should be enjoined from filing criminal charges against Plaintiff. In addition to the following response, Defendants expressly incorporate their Memorandum in Opposition to Motion for Anti-Suit injunction.

Fundamentally, Plaintiffs' argument about the continuation of the criminal process in the Utah Courts is irrelevant to Defendants' request to have the temporary restraining order stayed or modified because the temporary restraining order does not enjoin Defendants from pursuing criminal charges against Plaintiff. [See Injunction Order (Dkt. 24*)*]. In fact, at the conclusion of the TRO hearing, the Court expressly stated that it was ***not*** enjoining the criminal process. Should this court refuse to either stay or modify the temporary restraining order, that order would still not enjoin the Defendants from pursuing the criminal charges.

However, even apart from its irrelevance to the issues at hand, Petitioner's request that the Defendants be enjoined from filing or pursuing the criminal cases is unpersuasive. Plaintiff's discussion of this case's removal to federal court is largely irrelevant. Defendants agree that "[t]he

6

statutory procedures for removal of a case from state court to federal court provide that the removal

of a case from state court to federal court acts as a stay of the state-court proceedings." on *Vendo*

*Co. v. Lektro-Vend Corp.*, 433 U.S. 623, 40 (1977). The **civil** proceedings removed to Court have

indeed been stayed.  However, that does not change the fact that the **criminal** process always was

a separate proceeding.  This was and is obvious by the Utah Courts' issuance of a search warrant

in a separate proceeding before filing this lawsuit was filed.

Plaintiff's argument that this removal should enjoin the State of Utah and Utah Courts from

continuing the criminal process ignores the distinction between the civil and criminal proceedings.

Contrary to what Petitioner may argue, the issues in criminal case are not "precisely the same

issues before the court in this case." [Opposition to Defendant's Expedited Motion (Dkt 38) at 8.]

Indeed, because this case is not a criminal case, the core issue of *State of Utah v. Jensen*, Case No.

241404407, whether or not Plaintiff is guilty beyond a reasonable doubt of having violated the

misdemeanors and the felony charged in that case, cannot be directly adjudicated in this

proceeding. Victory here for the Defendants does not result in a criminal conviction to the Plaintiff,

and should Plaintiff find no relief with this Court, he may still be acquitted in the criminal case.

Moreover, because this action is a civil case brought by the Plaintiff, rather than a criminal

case brought by the Defendants, these issues could not be fully adjudicated in any single case.

Defendants are aware of no statute that would allow the State of Utah's criminal action to be joined

with this civil action. In short, not only does the filing of criminal charges by the State of Utah in

the Utah Courts not "subvert" the removal to federal court, the removal to federal court is totally

irrelevant to the decision and to the need to bring criminal charges. Even if this case had remained

in the state court, a second case would have existed through the criminal process. Thus, this Court

does not have "exclusive jurisdiction" over the criminal charges filed in 241404407. Indeed, it does not have jurisdiction over those charges at all.

Plaintiffs also misconstrue the binding *Younger* analysis by offering out-of-jurisdiction cases, all of which resulted in the federal court concluding *Younger* abstention was required. Although those cases generally confirm the importance of a *Younger* analysis, they otherwise are not helpful. Moreover, it is notable that while Plaintiffs accuse Defendants of bad faith, they have not cited binding authority. Indeed, it is well-established that *Younger* requires a broader and more deferential view of the criminal process than Plaintiffs represent. *See, e.g.*, *Younger*, 401 U.S. at 45 (recognizing precedent applied "even with respect to state criminal proceedings not yet formally instituted"); *Hicks v. Miranda*, 422 U.S. 332, 349-50 (1975) ("[W]here state criminal proceedings are begun against the federal plaintiffs after the federal complaint is filed but before any proceedings of substance on the merits have taken place in the federal court, the principles *of Younger v. Harris* should apply in full force."); *Morales v. TransWorld Airlines, Inc.*, 504 U.S. 374, 381 n.1 (1992) (recognizing *Younger* applies to "an already-pending or an about-to-be-pending state criminal action"). *See also Doe v. Office of Kan. Sec. Comm'r*, 2017 WL 6557431, at *2 (S.D. Fla. Nov. 28, 2017) ("[T]he issuance of a search warrant constitutes an ongoing state judicial proceeding."); *Nick v. Abrams*, 717 F. Supp. 1053, 1056 (S.D.N.Y. 1989) (finding "'pending state proceeding' exists when a state attorney general executes a search warrant"); *Moore v. Garnand*, 2024 WL 4534597 at *2 (D. Ariz. Sept. 17, 2024) (applying *Younger* even though the criminal indictment came "approximately three years" after the plaintiff "filed their complaint").

In all events, as discussed above, the filing of criminal charges requires that this evidence,

8

the psilocybin, be retained under Utah Code section 77-11c-301(1)(a)(iii). Even if the Court enjoined a criminal prosecution, it would still be contrary to Utah Code to release the psilocybin at this time under Utah Code Section 77-11c-301(1)(a)(i). It would also be gravely contrary to the public interest to allow evidence relating to a second-degree felony to be destroyed before there has been a final judgment. Plaintiffs' claims that this evidentiary issue is "manufactured" are false, as this conflict would again exist regardless of whether Defendants had filed criminal charges on December 18, 2024. Thus, apart from being essentially irrelevant to the Defendants' request to stay or modify the temporary restraining order, claims that the criminal case should be enjoined do not nullify the conflict between the temporary restraining order and the requirements of the Utah Code. Consequently, Defendants request that the temporary restraining order be stayed, or be modified to come into harmony with the requirements of the Utah evidence retention statutes by allowing Defendants to retain the psilocybin at this time.

## CONCLUSION

The Court should modify or stay its Injunction Order. While the criminal case is pending in the Utah State Courts, the Defendants should not be required to return the psilocybin. A contrary requirement would result in the permanent loss of that evidence, violate a prosecutor's statutory duties under Utah law, and threaten the criminal process pending in Utah State Courts.

Dated this 2nd Day of January, 2025

9

App-3:159

PROVO CITY LEGAL

*/s/ Gary D. Millward*
Gary D. Millward
Richard A. Roberts

*Counsel for Provo City, Troy Beebe, Brian Wolken, and Jackson Julian*


JAMES DODGE RUSSELL & STEPHENS, P.C.

*/s/ Mitchell A. Stephens*
Mitchell A. Stephens
Justin L. James
Dillon P. Olson

*Counsel for Utah County and Jeffrey Gray*

App-3:160

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BRIDGER LEE JENSEN, SINGULARISM, and PSYCHE HEALING AND BRIDGING,<br><br>Plaintiffs,<br><br>v.<br><br>UTAH COUNTY, PROVO CITY, JEFFREY GRAY, TROY BEEBE, BRIAN WOLKEN, and JACKSON JULIAN,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR STAY AND DENYING DEFENDANTS' MOTION FOR EXPEDITED DISCOVERY**<br><br>Case No. 2:24-cv-00887-JNP-CMR<br><br>District Judge Jill N. Parrish |

Following entry of this court's temporary restraining order requiring Defendants to return Plaintiffs' psilocybin mushrooms and sacred scripture as soon as practicable, Defendants filed (1) a motion to stay the portion of that order requiring Defendants to return the psilocybin mushrooms, and (2) a motion seeking expedited discovery before the hearing on Plaintiffs' motion for preliminary injunction currently scheduled for January 23 and 24. The court GRANTS the motion to stay and DENIES the motion for expedited discovery.

## BACKGROUND

To recap briefly, Plaintiffs—members and affiliates of Singularism—use psilocybin (a Schedule I controlled substance) as a sacrament to encounter the Divine. When Plaintiff Bridger Lee Jensen founded Singularism in November 2023, he notified Utah County and Provo City about Singularism's religious use of the entheogen and invited officials to approach him with any questions about the religion. The government did not raise any concerns it may have had about

App-3:161

Singularism's use of psilocybin mushrooms with him. Instead, about a year later in November 2024, Provo City officers executed a search warrant at Singularism's center and seized its stock of psilocybin mushrooms along with its sacred scripture. The government also threatened criminal charges against Jensen.

Plaintiffs then filed suit in state court against Utah County, Provo City, and several government officials, seeking a temporary restraining order and preliminary injunction to require return of the mushrooms and scripture and seeking to enjoin any threatened criminal prosecution. Their motion invoked the Free Exercise Clause of the First Amendment to the U.S. Constitution, the free exercise clause of the Utah constitution, and the Utah Religious Freedom Restoration Act ("RFRA"), UTAH CODE ANN. § 63G-33-201. The government Defendants removed the case to federal court on November 27.

On December 13, the court held an evidentiary hearing on Plaintiffs' motion for a temporary restraining order. At the hearing, Plaintiffs presented the testimony of several witnesses to establish the sincerity of their religion. The court found the witnesses credible and ruled that Plaintiffs had shown a likelihood of success on their claim under the Utah RFRA. Accordingly, the court entered a limited temporary restraining order requiring Defendants to return the psylocibin mushrooms and records as soon as practicable. The State of Utah, through the Utah County Attorney's Office and Defendant Utah County Attorney Jeffrey Gray, then initiated a criminal action against Mr. Jensen in state court.

## ANALYSIS

### I.       Motion to Stay

Defendants now move for a stay of the portion of the temporary restraining order requiring them to return the mushrooms. (The court previously stayed this portion of its order pending

2

briefing on and resolution of this motion.) Ordinarily, a judgment in an action for injunction, once entered, is not stayed. FED. R. CIV. P. Rule 62(c)(1). But a court in its discretion may grant a stay to preserve the status quo based on its consideration of the following factors: (1) whether the applicant has made a strong showing of likelihood of success on the merits; (2) whether the applicant would be irreparably injured absent a stay; (3) whether issuing a stay would substantially injure the opposing party (or other parties in the proceeding); and (4) whether a stay is in the public interest. *Homans v. City of Albuquerque*, 264 F.3d 1240, 1243 (10th Cir. 2001).[1]

As to the first factor, the court's determination in its temporary restraining order that Plaintiffs have shown a likelihood of success on their Utah RFRA claim necessarily means the court has determined that Defendants have not shown a likelihood of success on the merits, at least as to the RFRA claim.

Defendants' position fares slightly better on the second factor. In their view, requiring them to return the mushrooms now would result in the permanent loss of evidence crucial to the criminal case in state court and force them to violate the state evidence-retention statute. These arguments are plausible, but the court is skeptical. For one, it is unlikely that returning the mushrooms would hamper the state criminal prosecution because Mr. Jensen's testimony in this court at the hearing on December 13, if believed, practically establishes beyond any reasonable doubt that he violated the Utah Controlled Substances Act (should his claim for a religious exemption ultimately fail). Further, under the evidence-retention statute, the state must return the seized property if a court determines that the claimant owns and may lawfully possess the property. *See* UTAH CODE § 77-

---

[1] Courts typically articulate these factors in considering a motion for a stay of an injunction pending appeal. In the present case, no appeal is on the immediate horizon, but the court concludes that these factors apply with equal force nonetheless.

11a-305(2)(b)(i), (3). Although the standards under that statute and the standards for preliminary relief differ slightly, this court's temporary restraining order essentially concluded that Plaintiffs may lawfully possess the psilocybin mushrooms, at least until the court issues a final decision. Nevertheless, the court recognizes that requiring the government to return the mushrooms now could potentially stymie its ability to prosecute the criminal case against Mr. Jensen in state court.[2] And based on Mr. Jensen's own testimony on December 13, the court finds that Plaintiffs would not be substantially injured by the government keeping the mushrooms pending resolution of the motion for preliminary injunction (factor three). Mr. Jensen indicated that it was more important to Plaintiffs that the government return their scripture (which the government promptly did) than return the mushrooms because the mushrooms are like wine in a Catholic church—a sacred sacrament but fungible in a way the scriptures are not. *See* ECF No. 53 (Transcript of Dec. 13 Hearing), at 167–68.

Finally, the court determines that the public interest (factor four) cuts both ways. On the one hand, it is in the public interest to protect constitutional and statutory free-exercise rights against intimidation and harassment from the government. On the other, the public interest also compels this court to respect the prerogative of the State of Utah to prosecute without interference a criminal case involving potentially dangerous psychedelic drugs, at least until this court resolves Plaintiffs' motion to enjoin the state-court prosecution.[3]

---

[2] Plaintiffs have filed a motion requesting this court to enjoin the state criminal prosecution. *See* ECF No. 39. The court will resolve that motion following oral argument at the upcoming hearing on January 23. Until the court resolves that motion, the court considers it proper—given considerations of comity—to interfere with the prosecution as little as possible.

[3] *See supra* note 2.

4

On balance, then, the court determines that the most prudent course is to grant Defendants' motion to stay the portion of the temporary restraining order requiring them to return the psilocybin mushrooms as soon as practicable pending resolution of Plaintiffs' motion for preliminary injunction.

## II.      Motion for Expedited Discovery

Ordinarily, "[a] party may not seek discovery from any source before the parties have conferred as required by Rule 26(f)." FED. R. CIV. P. 26(d)(1). The parties have not engaged in a Rule 26(f) conference, and none of the exceptions listed in Rule 26(d)(1) apply to this case. So, Defendants must show "good cause for the requested departure from usual discovery procedures." *Am. Equip. Sys., LLC v. Chester*, No. 2:23-cv-00680, 2023 WL 8261427, at \*2 (D. Utah 2023). Good cause may exist when a party is seeking a preliminary injunction, though the fact that a party is seeking a preliminary injunction alone does not provide good cause. *Id.* To assess whether good cause exists, courts typically consider the breadth of the discovery requests; the purpose for requesting expedited discovery; and the burden on the opposing party to comply with the requests. *Id.*

Defendants claim they need expedited discovery to adequately prepare for the upcoming preliminary-injunction hearing. Specifically, Defendants seek discovery regarding the sincerity of Plaintiffs' religion and their belief in that religion, and the government's interest in specifically regulating Plaintiffs' use of psilocybin mushrooms. Defendants have requested permission to "depose each of the five declarants who submitted declarations in support of Plaintiffs' motion for preliminary injunction, along with the counselors and . . . board of directors referenced in Jensen's testimony." ECF 44 ("Motion for Expedited Discovery"), at 3 (internal quotation marks omitted). And Defendants have attached to their motion for expedited discovery proposed interrogatories

and requests for production of various documents relating to Singularism, its corporate structure, and its psilocybin ceremonies.

The court finds that Defendants' discovery request is far broader than necessary to ensure that they may adequately prepare for the preliminary hearing; indeed, it even goes beyond the full scope of discovery they would be entitled to seek in preparation for trial (if this case gets to that stage). For example, Defendants seek discovery on "each instance where [Mr.] Jensen consumed drugs prohibited by the Controlled Substances Act between 2015 and the present" and "documents sufficient to identify each individual to whom Plaintiffs have administered psilocybin from 2019 to present." Motion for Expedited Discovery at 4, 6. Defendants' requests concern criminal conduct far in the past and effectively demand Singularism to disclose the identities of all individuals who have affiliated with the religion. It is not clear how this discovery will materially help Defendants challenge Plaintiffs' sincerity or show a compelling state interest in regulating their use of psilocybin. Rather, the sheer breadth of the requests strongly suggests that Defendants' purpose is to use discovery in this civil lawsuit to investigate Plaintiffs for the pending state criminal case—a patently improper purpose.[4] Defendants' counsel have already questioned three

---

[4] Questions by Defendants' counsel at the December 13 hearing suggested a similar purpose. For example, counsel asked witness Brandi Lee, Singularism's office manager, to disclose the name, location, and phone number of the person supplying Singularism with psilocybin mushrooms. *See* ECF No. 53 (Transcript of Dec. 13 Hearing), at 69–73. To prevent abuse of evidence, the court will enter a separate protective order limiting the use of any evidence presented in this litigation for any proceedings other than this civil action. (In refuting Plaintiffs' claims that Defendants are using discovery in this case to build a state criminal case, Defendants indicate they would stipulate to a protective order "limit[ing] the use of materials discovered in this matter to the preparing for and conducting the litigation in which the information, documents, or other materials were disclosed." ECF No. 49, at 10 (internal quotation marks omitted). The court appreciates their cooperation.)

6

of Plaintiffs' five declarants at the December 13 hearing and presumably can cross-examine any other witnesses Plaintiffs call at the preliminary-injunction hearing on January 23 and 24. Moreover, the government previously seized and therefore had access to documents regarding Singularism's psilocybin ceremonies, including those related to individual members of the faith. Defendants apparently made copies of these documents before returning them pursuant to the temporary restraining order given that they projected some of those documents during the December 13 hearing. The court therefore determines that Defendants' discovery requests are grossly disproportionate for their needs at this preliminary stage in the litigation.

Considering the breadth of Defendants' requests, particularly combined with their proposed 15-day turnaround, the court finds that granting their motion would impose an undue burden on Plaintiffs. Not only would Plaintiffs have to dig through perhaps thousands of documents over almost a decade to satisfy Defendants' requests, but satisfying those requests—particularly the ones relating to the identities of Singularism's affiliates—would also impose additional burdens on Plaintiffs' free exercise by discouraging association among Singularism's adherents. *See NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460–61 (1958) ("[T]he effect of compelled disclosure of [an organization's] membership lists will be to abridge the rights of its rank-and-file members to engage in lawful association in support of their common beliefs."). At the hearing on December 13, Plaintiffs presented evidence that some of Singularism's followers have already distanced themselves from the faith because of Defendants' actions, and these harms are only likely to multiply given that the government is now pursuing criminal charges against Mr. Jensen. This burden on Plaintiffs is especially undue given that that there exists considerable information in the public domain, including online, about Singularism and its affiliated entities that Defendants can use in preparing for the hearing.

The court recognizes that some of Defendants' discovery requests may be legitimate following a Rule 26(f) conference. But the court nevertheless denies Defendants' motion for expedited discovery in its entirety. It is counsel's responsibility, not the court's, to frame an appropriately broad discovery request. *Alsaadi v. Saulsbury Indus., Inc.*, No. 2:23-cv-291, 2024 WL 1617639, at *4 (D.N.M. Apr. 15, 2024). To conclude otherwise "would encourage attorneys to abdicate this responsibility in favor of phrasing their discovery requests in the broadest possible terms and placing the burden on the district court of coming up with an appropriately limited request." *Punt v. Kelly Servs.*, 862 F.3d 1040, 1047 (10th Cir. 2017).

The court's ruling here does not mean that Defendants will never receive discovery to prepare their case for trial. But it does mean that the court will not depart from the usual discovery procedures on the facts of this case in this procedural posture. The court is confident that the evidence requested to resolve the motion for preliminary injunction will be available at the scheduled two-day hearing. Indeed, Plaintiffs made available Singularism's founder and several of its members at the hearing on December 13, and Defendants' counsel questioned those witnesses for 132 minutes. The court expects that many of these same witnesses will reappear at the preliminary-injunction hearing.[5] Defendants remain free to cross-examine these witnesses to cast doubt on their religious sincerity and demonstrate a compelling state interest in regulating their use of psylocibin.[6]

---

[5] The court recognizes that the very real threat of criminal prosecution may dissuade at least some members of Singularism who would have testified at the preliminary-injunction hearing from testifying. But the same concerns could also dissuade them from testifying at a deposition.

[6] Defendants should not need discovery or cross-examination to establish a compelling state interest. As many courts have expressed in some form, "[d]iscovery is not intended to be a fishing expedition, but rather is meant to allow the parties to flesh out allegations for which they initially have at least a modicum of objective support." *Alsaadi v. Saulsbury Indus., Inc.*, No. 2:23-cv-291,

Finally, a word about the timing of the hearing. Defendants request the court to schedule the preliminary-injunction hearing after ruling on their motion to dismiss. *See* ECF No. 45, at 3–4. However, the court stayed the portion of its temporary restraining order requiring return of the mushrooms pending resolution of Defendants' motion to stay and now grants that motion. As such, Plaintiffs' powerful interest in the speedy resolution of their motion for preliminary injunction outweighs Defendants' interest in postponing the hearing, and the court will continue with the hearing this month as originally ordered.

## CONCLUSION AND ORDER

For the foregoing reasons, the court **GRANTS** Defendants' motion to stay the portion of the temporary restraining order requiring return of the mushrooms and **DENIES** Defendants' motion for expedited discovery.

Signed January 7, 2025.

BY THE COURT

Jill N. Parrish
United States District Court Judge

---

2024 WL 1617639, at *3 (D.N.M. Apr. 15, 2024). The government should have some evidence of complaints or problems stemming from Singularism's use of psilocybin before requesting discovery relating to its potential harms. At the upcoming hearing, the government is free to present that evidence and bring its own witnesses to testify.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BRIDGER LEE JENSEN, SINGULARISM, and PSYCHE HEALING AND BRIDGING, <br><br> Plaintiffs, <br><br> v. <br><br> UTAH COUNTY, PROVO CITY, JEFFREY GRAY, TROY BEEBE, BRIAN WOLKEN, and JACKSON JULIAN, <br><br> Defendants. | **PROTECTIVE ORDER** <br><br> Case No. 2:24-cv-00887-JNP-CMR <br><br> District Judge Jill N. Parrish |

The court held a one-day hearing on Plaintiffs' request for a temporary restraining order on December 13 (after which it granted the request) and has scheduled a two-day preliminary-injunction hearing for January 23 and 24. Based on the questioning by Defendants' counsel at the December 13 hearing and the substance of Defendants' requests for expedited discovery, the court has concerns about Defendants' use of the evidence in this case and so enters this protective order.

At the hearing on December 13, Defendants' counsel asked questions of the sort one would expect to see in a criminal investigation. For example, counsel asked witness Brandi Lee, Singularism's office manager, to disclose the name, location, and phone number of the person from whom Singularism obtains its psylocibin mushrooms. *See* ECF No. 53 (Transcript of Dec. 13 Hearing), at 69–73. And Defendants requested expedited discovery, among other things, on "each instance where [Mr.] Jensen consumed drugs prohibited by the Controlled Substances Act between 2015 and the present" and "documents sufficient to identify each individual to whom

App-3:170

Plaintiffs have administered psilocybin from 2019 to present." ECF No. 44-1, at 4, 6. The nature of counsel's questions and the intrusively overbroad discovery request (particularly the aspects concerning criminal conduct years in the past) lead the court to agree with Plaintiffs that Defendants appear to be using discovery in this civil proceeding to deploy Plaintiffs to conduct a criminal investigation of themselves for the state criminal prosecution, which was commenced after Plaintiffs prevailed on their request for a temporary restraining order on December 13. Plaintiffs have presented evidence that Singularism has already lost a number of its followers, and allowing Defendants to use evidence obtained at the preliminary-injunction hearing in their state criminal investigation and prosecution would only exacerbate those harms.

Therefore, the court **ORDERS** that Defendants may use the evidence presented during the course of this case—evidence previously presented as well as evidence that will be presented in the future—only to litigate this civil action; they may not use it directly or indirectly (i.e., derivatively) in any pending or future state criminal investigation or prosecution. This protective order shall remain in place until this civil action is fully litigated or until the court dissolves it on motion or sua sponte.

Signed January 7, 2025.

BY THE COURT

Jill N. Parrish
United States District Court Judge

2

Tanner J. Bean (A17128)
tbean@fabianvancott.com
Anna P. Christiansen (A17518)
achristiansen@fabianvancott.com
**FABIAN VANCOTT**
95 South State Street, Suite 2300
Salt Lake City, UT 84111-23323
Telephone: (801) 531-8900
*Attorneys for Plaintiffs*

---

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BRIDGER LEE JENSEN, an individual; SINGULARISM, a non-profit corporation; PSYCHE HEALING AND BRIDGING, LLC dba PSYCHEDELIC THERAPY JOURNEY; a limited liability company; <br><br>        Plaintiffs, <br><br>vs. <br><br>UTAH COUNTY, a political subdivision, PROVO CITY, a political subdivision; JEFFREY GRAY, an individual; TROY BEEBE, an individual; BRIAN WOLKEN, an individual; JACKSON JULIAN, an individual; JOHN DOES 1-4, individuals; <br><br>        Defendants. | **REPLY IN SUPPORT OF MOTION FOR ANTI-SUIT INJUNCTION** <br><br>Civil No. 2:24-cv-00887-JNP <br><br>Judge Jill N. Parrish <br><br>(Removed from Fourth Judicial District Court, Utah County, State of Utah, Case No. 240406123) |

Plaintiffs Bridger Lee Jensen, Singularism, and Psyche Healing and Bridging LLC (dba

Psychedelic Therapy Journey) ("Plaintiffs") hereby file their Reply in support of Plaintiffs' Motion

for Anti-Suit Injunction (the "Motion," ECF 39).

1

## INTRODUCTION

The Motion arises from the government's initiation of state criminal proceedings in the wake of Plaintiffs' success at the temporary restraining order stage in this civil action. Plaintiffs brought this case in state court, including to prevent irreparable harm from a criminal proceeding. *Defendants removed this case to federal court, submitting to this Court's jurisdiction.* Now, Defendants have buyer's remorse. But Defendants' removal itself is the primary reason why the Court should grant the Motion.

## ARGUMENT

### I.   *YOUNGER* ABSTENTION DOES NOT APPLY.

Defendants' briefing misapplies *Younger* from soup to nuts—from its applicability, to its elements, and to its exceptions. The Court should reject Defendants' *Younger* arguments.

### a.   *Younger* Is Inapplicable Because Defendants Submitted to the Jurisdiction of This Court by Removing the Case.

It is well established that *Younger* abstention may not be invoked by a party who has submitted to federal jurisdiction. "If the State voluntarily chooses to submit to a federal forum, principles of comity do not demand that the federal court force the case back into the State's own system." *Ohio Bureau of Emp't. Servs. v. Hodory*, 431 U.S. 471, 480 (1977).

Where the government has removed a case to federal court, *Younger* abstention does not apply. *See Ryan v. State Bd. of Elections of State of Ill.*, 661 F.2d 1130, 1136 (7th Cir. 1981) (finding removal "renders Younger abstention inapplicable"); *Blair v. Bd. of Sugarcreek Twp.*, No. 3:07-CV-056, 2008 WL 11352586, at *3, 5 (S.D. Ohio May 22, 2008); *Kenny A. ex. Rel. Winn v. Perdue*, 218 F.R.D. 277, 285 (N.D. Ga. 2003) ("State Defendants are in federal court only because of their own decision to remove the case from state court. It would be fundamentally unfair to

2

App-3:173

permit State Defendants to argue that this Court must abstain from hearing the case after they voluntarily brought the case before this Court.") ("[H]aving exercised their right to remove this action to federal court, State Defendants may not now seek to avoid the federal jurisdiction they themselves have invoked by asking the Court to abstain."); *Ash v. City of Clarksville*, No. 3:03-0380, 2004 WL 5913273, at *3 (M.D. Tenn. Sept. 3, 2004) (finding removal "waived an abstention defense"); *Cummings v. Husted*, 795 F. Supp. 2d 667, 692 (S.D. Ohio 2011) (same)*; Lapides v. Bd. of Regents of the Univ. Sys. of Ga.*, 535 U.S. 613, 624 (2002) (similar).

Like the parties in each of the cases above, Defendants removed this case to federal court. Because they submitted the case to federal jurisdiction, they are barred from claiming this Court should abstain under *Younger*. For this reason, the Court should find *Younger* inapplicable.

### b. Because the State Court Case Was Filed After Proceedings of Substance in This Case, The Elements Required for *Younger* Abstention Are Not Met.

"Abstention from the exercise of federal jurisdiction is the exception, not the rule." *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 813 (1976). *Younger* abstention applies *only* when an ongoing state judicial proceeding (1) began before the federal proceeding, or prior to any substantial progress in the federal proceeding, (2) implicates an important state interest, and (3) provides an adequate opportunity for the plaintiff to raise the claims and issues raised in the federal lawsuit. *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982).

*Younger* abstention is inapplicable when no state criminal proceeding is pending when the federal case is brought. *Steffel v. Thompson*, 415 U.S. 452, 475 (1974) ("[F]ederal declaratory relief is not precluded when no state prosecution is pending and a federal plaintiff demonstrates a genuine threat of enforcement of a disputed state criminal statute. . . ."); *Younger v. Harris*, 401

U.S. 37, 41 (1971) (noting that the state was "actually prosecuting" a state criminal action when the federal complaint was filed). Abstention is only appropriate where the state case precedes the federal case or where the state case is brought "before any legal proceedings of substance on the merits have taken place in the federal court." *Hicks v. Miranda*, 422 U.S. 332, 349 (1975). *See also Doran v. Salem Inn, Inc.*, 422 U.S. 922, 929 (1975) (noting the applicability of *Younger* if "federal litigation [is] in an embryonic stage and no contested matter [has] been decided").

"In determining whether federal proceedings would interfere with *ongoing* state proceedings, the proper point of reference is the date plaintiff filed his federal complaint." *Bettencourt v. Bd. of Registration in Medicine of Com. of Massachusetts*, 904 F.2d 772, 777 (1st Cir. 1990) (emphasis in original). *Younger* abstention does not apply when state proceedings were only threatened, not pending, at the time the federal complaint was filed. *Steffel*, 415 U.S. at 475 ("[F]ederal declaratory relief is not precluded when no state prosecution is pending and a federal plaintiff demonstrates a genuine threat of enforcement of a disputed state criminal statute. . . .").

Although the U.S. Supreme Court has not yet clarified precisely when "legal proceedings of substance on the merits" have occurred, *Hicks*, 422 U.S. at 349; *Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 238 (1984), following *Hicks*, *Doran*, and *Midkiff*, several courts have found that "proceedings of substance on the merits" have occurred when a temporary restraining order has been granted, particularly when the order was entered after a hearing and was not granted *ex parte*. *See Wal-Mart Stores, Inc. v. Rodriguez*, 236 F. Supp. 2d 200, 2011 (D.P.R. 2002) (concluding that this standard was met when "the TRO was not granted *ex parte and* both sides were given the opportunity to be heard prior to issuance of the order"); *Graham v. Breier*, 418 F. Supp. 73, 77-78 (E.D. Wis. 1976) (reaching the same conclusion after an *ex parte* TRO);

4

*Housworth v. Glisson*, 485 F. Supp. 29, 33 (N.D. Ga. 1978) (agreeing that a TRO entered shortly before a criminal complaint was filed "constitutes 'proceedings of substance on the merits' sufficient to take the instant action out of the Younger rule"); *For Your Eyes Alone, Inc. v. City of Columbus*, 281 F.3d 1209, 1217-19 (11th Cir. 2002) (same conclusion).

Plaintiffs filed this case on November 19, 2024. Defendants removed on November 27, 2024. The Motion for TRO was heard on December 13, 2024, evidence and argument were presented by both sides, and the TRO was granted that same day with a written order on December 16, 2024. Five days after the hearing, Defendants field the Criminal Information in state court. This is not a case of threatened prosecution, near-simultaneous filings, and an immediate plea to apply *Younger*. Rather, this was a state court case, removed by Defendants to federal court, in which briefing, argument and evidence has been heard, and a TRO granted. These circumstances constitute proceedings of substance such that the first element of *Younger* abstention is not met. Moreover, at the TRO hearing, Defendants argued that criminal proceedings against Jensen had not yet begun. *See* ECF 53-1 at 233:4–9 (discussing the ongoing undue hardship exception to the GIA: "A threat [of criminal prosecution] is not action. A threat is a threat of action."). Because Defendants have previously taken the position that the search warrant was not the initiation of criminal proceedings, Defendants should be judicially estopped from taking the opposite position now.

### c. Even if *Younger* Did Apply, Its Exceptions Are Met.

The "normal thing to do when federal courts are asked to enjoin proceedings in state courts is not to issue such injunctions." *Younger*, 401 U.S. at 45. However, the facts of this case are far from normal. Even if the elements of *Younger* abstention are met, it does not apply if there is a

great and immediate danger of irreparable injury, including bad faith or harassment, flagrantly unconstitutional statutes, or multiple prosecutions. *Younger*, 401 U.S. at 50, 53-54; *see also Dombrowski v. Pfister*, 380 U.S. 479 (1965) (bad faith prosecution). As argued in Plaintiffs' Opposition to Defendants' Expedited Motion to Stay, ECF 38, the exception for bad faith or harassment applies here. Defendants' removal to federal court, argument that this Court should not hear the claims that Defendants themselves removed, challenges to every element of Plaintiffs' case without persuasive evidence of religious insincerity, refusal to abide by the Court's TRO, filing of criminal charges, and failure to notify the state criminal court of their knowledge that Plaintiffs are substantially likely to prevail upon their Utah RFRA defense, taken together, demonstrate bad faith and harassment. Even if this Court were to apply *Younger* (which does not apply) and find the elements met (they are not), Defendants' conduct meets an exception to *Younger* abstention.

## II.    THE ANTI-INJUNCTION ACT PERMITS THE INJUNCTION PLAINTIFFS SEEK.

All "courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a) (the "All Writs Act"). The All Writs Act and the Anti-Injunction Act (the "AIA," 28 U.S.C. § 2283) together clarify when a federal court can act to enjoin state court proceedings.

Defendants' selective quotations omit key language recognizing that the AIA is *not* an absolute prohibition against federal court injunctions of state court proceedings. The AIA "is an absolute prohibition against any injunction of any state-court proceedings, *unless the injunction falls within one of the three specifically defined exceptions in the Act.*" *Vendo Co. v. Lektro-Vend Corp.*, 433 U.S. 623, 630 (1977) (plurality opinion) (emphasis added). The "statute imposes an

6

absolute ban upon the issuance of a federal injunction against a pending state court proceeding, *in the absence of one of the recognized exceptions.*" *Lone Star Promotions, LLC v. Abbey Lane Quilts, LLC*, No. 1:18CV73DAK, 2018 WL 5808802, at *3 (D. Utah Nov. 6, 2018) (emphasis added) (citation omitted).

The AIA identifies three situations in which a federal court can enjoin state court proceedings: (1) "as expressly authorized by Act of Congress," (2) "where necessary in aid of [the federal court's] jurisdiction," and (3) "to protect or effectuate [the federal court's] judgments." 28 U.S.C. § 2283. As detailed in the Motion, the first two exceptions presently apply. And, under the All Writs Act, this Court has authority to bind nonparties to this case, including the State of Utah.

### a. The Injunction Is Expressly Authorized Through the Removal Statute.

After a case is removed to federal court, the State court "shall effect the removal and the State court shall proceed no further unless and until the case is remanded." 28 U.S.C. § 1446(d). Removal cases "are an express statutory exception, and the Supreme Court has so treated them." Wright & Miller, Fed. Prac. & Proc. § 4225 Exceptions to the Act—In General—Necessary in Aid of Its Jurisdiction (3d ed. 2024). A "federal law need not expressly authorize an injunction of a state court proceeding" to meet this exception. *Mitchum v. Foster*, 407 U.S. 225, 237 (1972). Where a federal statutory right or remedy "could be frustrated if the federal proceeding were not empowered to enjoin a state court proceeding," the first AIA exception applies. *Id.*

Where the original case is removed, and a new state court case is then filed, if the "newly filed state suit . . . attempt[s] to subvert the removal of the earlier case," the federal court can issue an injunction against the new state court case. *Kansas Pub. Emp. Retirement Sys. v. Reimer Kroger*

*Assocs.*, 77 F.3d 1063, 1070-71 (8th Cir. 1996).[1] For example, the Third Circuit affirmed a federal court injunction that relied on the removal statute to enjoin separate state court proceedings that were filed by a party displeased with unfavorable rulings by the federal court in the removed case. *Davis Int'l, LLC v. New Start Grp. Corp.*, 367 F. App'x 334 (3d Cir. 2010). Because the state court proceedings were filed in an attempt to subvert the removal statute and the federal court's rulings in the first case, the Third Circuit upheld the injunction. *Id.* at 337-38.

Here, the state criminal proceeding is exactly that: an attempt to subvert the removal statute by taking the precise act that this case was filed to avoid—the filing of a state criminal case. Through the state criminal case, Defendants seek to litigate precisely the same issues before this Court. For example, Utah's RFRA specifically states that Plaintiffs "may assert the violation *as a claim or defense*," Utah Code § 63G-33-201(4)(a), meaning that Plaintiffs will assert their Utah RFRA claim, as well as their First Amendment and Utah Constitution claims, as defenses in the state criminal proceeding. Thus, the same matters will be placed for decision before two independent courts, inviting a race to judgment, a risk of inconsistent verdict, and issues of *res judicata*. As in *Kansas* and *Davis*, this Court can—and should—bar such efforts under the AIA.

### b.  The Injunction Is Necessary in Aid of This Court's Jurisdiction.

The second AIA exception applies when either "(1) the district court has exclusive jurisdiction over the action because it had been removed from state court; or (2) the state court entertains an *in rem* action involving a res over which the district court has been exercising jurisdiction in an *in rem* action." *Estate of Brennan ex rel. Britton v. Church of Scientology Flag*

---

[1]    This analysis is similar to the analysis above under *Younger*, in which courts have not permitted parties to remove a case to federal court and then benefit from the fact that the case is now in federal court.

8

*Serv. Org., Inc.*, 645 F.3d 1267, 1273 (11th Cir. 2011) (citation omitted). When the AIA was amended in 1948, "[t]he phrase 'in aid of its jurisdiction' was added to conform to section 1651 of this title and to make clear the recognized power of the Federal courts to stay proceedings in State cases removed to the district courts." 28 U.S.C. § 2283, Reviser's Notes (1948) (referring to 28 U.S.C. § 1651, the removal statute).

Defendants note that the Tenth Circuit has previously considered the scope of the "in aid of its jurisdiction" exception to the Anti-Injunction Act. *See Tooele Cnty. v. U.S.*, 820 F.3d 1183 (10th Cir. 2016). However, *Tooele* is distinguishable. First, that case considered whether claims were sufficiently close to *in rem* actions for the second exception to be met, never discussing the impact of removal. *See generally, id.* Second, the Tenth Circuit relied upon a pre-1948 amendment interpretation of the Anti-Injunction Act. *See Tooele Cnty.*, 820 F.3d at 1188 (citing *Mandeville v. Canterbury*, 318 U.S. 47, 48-49 (1943) (*per curiam*), for the proposition that the second AIA exception only applies to "in rem or quasi in rem proceedings"). *Mandeville*, on which the Tenth Circuit relied, was decided in 1943 and predates the current statutory Anti-Injunction Act exceptions, and the Reviser's Note that explains the basis for the second exception. With that statutory change, the rule from *Mandeville* (and repeated in *Tooele*) is incomplete. Rather, as other courts have recognized, the "in aid of its jurisdiction" exception to the current Anti-Injunction Act is properly understood as applying in both *in rem* actions and when "the district court has exclusive jurisdiction over the action because it had been removed from state court." *Estate of Brennan ex rel. Britton*, 645 F.3d at 1273.

9

App-3:180

Because of *Defendants'* removal to federal court, this Court has exclusive jurisdiction. Absent the sought injunction, the same matters will be litigated before two independent courts. An injunction is necessary to ensure the integrity of this Court's rulings.

### c. Under the All Writs Act, This Court Has Authority to Bind Nonparties, Including the State of Utah, Through an Injunction.

"The power conferred by the [All Writs] Act extends, under appropriate circumstances, to persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice." *U.S. v. New York Tel. Co.*, 434 U.S. 159, 174 (1977). As noted by this Court, the state criminal case was filed "through the Utah County Attorney's Office and Defendant Utah County Attorney Jeffrey Gray." ECF 56, at 2. Given this relationship, and the ability of the state court case to frustrate implementation of this Court's decisions, this Court can enjoin the state court proceedings notwithstanding the Defendants' argument that the state court case is brought by the County Attorney "on behalf of the state." ECF 50, at 2.

### III. THIS COURT SHOULD EXERCISE SUPPLEMENTAL JURISDICTION OVER THE UTAH LAW CLAIMS.[2]

The exercise of supplemental jurisdiction promotes "judicial economy and fairness" when "the state and federal claims . . . derive from a common nucleus of operative fact.'" *Estate of Harshman v. Jackson Hole Mountain Resort*, 379 F.3d 1161, 1165 (10th Cir. 2004) (citation omitted). The mere fact that a state court has not resolved issues "does not make those issues novel or complex." *Martin v. Pub. Serv. Co. of Colo.*, No 20-cv-00076-RBJ, 2020 WL 4193547, at *3

---

[2] Defendants' argument on this point will be addressed more fully in opposition to Defendants' Motion to Dismiss.

(D. Colo. July 21, 2020) (citation omitted). Where "[s]evering and remanding the state law claims would require the parties to litigate nearly identical matters, based on the same operative facts and involving the same case or controversy, in two separate forums," would require both state and federal courts "to expend unnecessary judicial resources on a matter that is being litigated simultaneously," and would "create[] the potential for incompatible judgments," the federal court should exercise its supplemental jurisdiction. *Mabey v. Ray*, No. 4:18-CV-00061-DN-DBP, 2019 WL 962183, at *3 (D. Utah Feb. 4, 2019), *report and recommendation adopted*, No. 4:18-CV-00061-DN-DBP, 2019 WL 955238 (D. Utah Feb. 27, 2019).

While Utah's RFRA is new, this Court is certainly equipped to interpret a state law, particularly one similar to and based upon a federal version of that law. In addition, there is complete factual overlap between the federal and state claims at issue in this case. Defendants seek to force Plaintiffs to bifurcate their causes of action which arise from the same common nucleus of operative fact. Requiring Plaintiffs to do so is inconvenient to the parties and witnesses, does not serve judicial economy, and is inappropriate given Defendants' removal of this case.

## CONCLUSION

For the reasons stated above, the Court should grant the motion for anti-suit injunction.

DATED January 9, 2025.

> */s/ Tanner J. Bean*
> Tanner J. Bean
> Anna P. Christiansen
> *Attorneys for Plaintiffs*

11

# CERTIFICATE OF SERVICE

I hereby certify that on January 9, 2025, I caused the foregoing **REPLY IN SUPPORT OF MOTION FOR ANTI-SUIT INUNCTION** to be served via the Court's electronic filing system upon the following:

Gary DeMott Millward
J. Brian Jones
Provo City Attorneys Office
351 W Center St
PO Box 1849
Provo, UT 84603
(801)852-6141
gmillward@provo.org
bjones@provo.org

Richard A. Roberts
Provo City - Legal Department
445 W Center St Ste 300
Provo, UT 84601
801-852-6140
Email: rroberts@provo.org

Mitchel A. Stephens
Lara A. Swensen
Dillon P. Olson
Justin L. James
James Dodge Russell & Stephens PC
10 W Broadway Ste 400
Salt Lake City, UT 84101
mstephens@jdrslaw.com
lswensen@jdrslaw.com
dolson@jdrslaw.com
jjames@jdrslaw.com

/s/ Tanner J. Bean

Tanner J. Bean (A17128)
tbean@fabianvancott.com
Anna P. Christiansen (A17518)
achristiansen@fabianvancott.com
**FABIAN VANCOTT**
95 South State Street, Suite 2300
Salt Lake City, UT 84111-23323
Telephone: (801) 531-8900
*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BRIDGER LEE JENSEN, an individual; SINGULARISM, a non-profit corporation; PSYCHE HEALING AND BRIDGING, LLC dba PSYCHEDELIC THERAPY JOURNEY; a limited liability company; <br><br> Plaintiffs, <br> vs. <br><br> UTAH COUNTY, a political subdivision, PROVO CITY, a political subdivision; JEFFREY GRAY, an individual; TROY BEEBE, an individual; BRIAN WOLKEN, an individual; JACKSON JULIAN, an individual; JOHN DOES 1-4, individuals; <br><br> Defendants. | **OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** <br><br> Civil No. 2:24-cv-00887-JNP <br><br> Judge Jill N. Parrish <br><br> (Removed from Fourth Judicial District Court, Utah County, State of Utah, Case No. 240406123) |

Plaintiffs Bridger Lee Jensen, Singularism, and Psyche Healing and Bridging LLC (dba Psychedelic Therapy Journey) ("Plaintiffs" or "Singularism") hereby file their Opposition to Defendants' Motion to Dismiss, ECF 40.

1

App-3:184

## INTRODUCTION

Defendants do not want *this Court* to decide this case. Even though *Defendants* removed this case to this Court, they are now making every argument they can to flee given the Court's TRO ruling that "Plaintiffs have shown a likelihood of success on their claim under the Utah RFRA." ECF 24, at 2. The Court should rebuff Defendants' efforts to avoid the consequences of their religious free exercise violations through tactical and venue maneuvering. Defendants chose this forum and the Court should hold Defendants to their choice. But as this brief indicates, the Court will not be placed in the position Defendants desire of deciding whether or not to jettison Plaintiffs' state law claims, as Plaintiffs' federal claims clear the low hurdle the motion to dismiss stage imposes. The Court should deny Defendants' motion to dismiss outright.

## STATEMENT OF FACTS

The Court is well versed in the facts of this case. Accordingly, besides the few factual statements contained in Defendants' motion to dismiss to which Singularism responds below, Singularism directs the Court to its statements of fact contained in Singularism's prior briefing, which details the well-pleaded allegations of Singularism's Complaint. *See* ECF 2-2; ECF 9, at 2-9; ECF 19, at 1-11.

Defendants' statements of fact 1-3 assert that they were commanded to execute a search warrant, implying they are absolved from responsibility from any resulting infringements on Plaintiffs' liberties. These statements of fact omit what Singularism's Complaint alleges: that despite knowing Singularism asserted religious liberty protection under the very statutory and constitutional claims now at issue in this lawsuit; despite having no information that Singularism's religious practices had resulted in any harm to public health, public safety, or drug trafficking; and

2

App-3:185

despite having no factual information indicating Singularism was religiously insincere, Defendants proceeded to apply for and execute a search warrant anyway. This resulted in violations of Singularism's religious free exercise as well as its rights to be free from unreasonable searches and seizures. *See* ECF 2-2, at ¶¶ 22-23, 32-49, 61-62, 65-132; *see also* ECF 9, at 2-8, at ¶¶ 3, 11-29.

Defendants' statements of fact 1-3 also omit allegations regarding their conduct which pre- and post-dated Defendant Julian applying for and obtaining a search warrant, such as Defendants' investigation of Singularism, Defendant Gray's unlawful directions to law enforcement, Defendant Gray's statement to media which indicated the sort of direction he was providing to law enforcement, and Defendant Wolken's delivery of the eviction letter to Singularism's landlord. *See* ECF 2-2, at ¶¶ 23, 35-36, 45-49, 61; *see also* ECF 13-1 (Defendant Julian's Affidavit for Search Warrant). As shown below, Defendants make no effort to particularize their arguments to these or other events.

## STANDARD

As this Court has stated,

> A claim is subject to dismissal if the movant shows that the plaintiff failed to "state a claim upon which relief may be granted." Fed. R. Civ. P. 12(b)(6). In ruling on a Rule 12(b)(6) motion, however, "[a]ll well-pleaded factual allegations in the complaint are accepted as true and viewed in the light most favorable to the nonmoving party." *GFF Corp. v. Assoc. Wholesale Grocers*, 130 F.3d 1381, 1384 (10th Cir. 1997) (citation omitted). "A 12(b)(6) motion should not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Davis-Warren Auctioneers, J.V. v. FDIC*, 215 F.3d 1159, 1161 (10th Cir. 2000) (quoting *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999)).

*Int'l Bridge, Inc. v. VIP Parcel, LLC*, No. 2:23-CV-00695-JNP-DAO, 2024 WL 4349161, at *4 (D. Utah Sept. 30, 2024). Further,

3

"The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's [ ] complaint alone is legally sufficient to state a claim for which relief may be granted." *Peterson v. Grisham*, 594 F.3d 723, 727 (10th Cir. 2010) (internal quotation marks omitted).

*Mason v. Ferry*, No. 2:23-CV-00901-JNP-CMR, 2024 WL 4789918, at *2 (D. Utah Nov. 14, 2024). Notably, the motion-to-dismiss standard is significantly lower than the substantial-likelihood-of-success standard a plaintiff must clear to obtain a TRO, *see Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 112 (10th Cir. 2024), which Singularism has already done in this case, *see* ECF 24.

## ARGUMENT

### I.    THIS COURT SHOULD RETAIN JURISDICTION OVER ALL CLAIMS.

"Judicial economy and fairness result from retaining jurisdiction over mixed state and federal claims where 'The state and federal claims . . . derive from a common nucleus of operative fact.'" *Estate of Harshman v. Jackson Hole Mountain Resort*, 379 F.3d 1161, 1165 (10th Cir. 2004) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966)). "By not forcing potential litigants either to avoid federal courts or to bifurcate their causes of action between state and federal courts, supplemental jurisdiction promotes the accessibility of federal courts as well as overall judicial economy." *Id.*

A court may decline to exercise supplemental jurisdiction only if "(1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c). When exercising discretion

4

to decline supplemental jurisdiction, courts must "consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendent state-law claims." *King v. Fleming*, 899 F.3d 1140, 1154 (10th Cir. 2018) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). Conversely, "unless one of the conditions of 28 U.S.C. § 1367(c) exists, courts are not free to decline jurisdiction." *SWEPI, LP v. Mora Cnty., N.M.*, 81 F. Supp. 3d 1075, 1144 (D.N.M. 2015).

The mere fact that "certain issues involved in plaintiff's state law claims have been left unresolved by [state] courts does not make those issues novel or complex." *Martin v. Pub. Serv. Co. of Colo.*, No 20-cv-00076-RBJ, 2020 WL 4193547, at *3 (D. Colo. July 21, 2020) (citation omitted). Rather "novelty requires that the legal issue in question, in the context of legal issues generally, be so unusual or difficult that analysis by a state court in the first instance is preferable." *The Arc of The Pikes Peak Region v. Nat'l Mentor Holdings, Inc.*, No. 10-CV-01144-REB-BNB, 2011 WL 1047222, at *2 (D. Colo. Mar. 18, 2011).

State claims predominate only when the federal claims are a mere "appendage" to the state claims. *Gibbs*, 383 U.S. at 727. State law claims do not predominate where "[t]here is no meaningful difference between the amount of evidence required to present Plaintiffs' state law and federal law claims, nor between the scope of the state and federal claims." *Mabey v. Ray*, No. 4:18-CV-00061-DN-DBP, 2019 WL 962183, at *3 (D. Utah Feb. 4, 2019). Where "[s]evering and remanding the state law claims would require the parties to litigate nearly identical matters, based on the same operative facts and involving the same case or controversy, in two separate forums," "would require this Court and [the state court] to expend unnecessary judicial resources on a matter

5

that is being litigated simultaneously in another court," and "severing and remanding the state law claims creates the potential for incompatible judgments from the two courts," the federal court should exercise supplemental jurisdiction over state law claims. *Id.*

This case does not raise a novel or complex issue of state law. Utah's RFRA was based upon the federal RFRA statute, which has been interpreted in a wealth of case law for over thirty years. While Utah's statute is new, this Court is certainly equipped to interpret a state law, particularly where that law is similar to and was based upon a federal law and federal constitution. In addition, there is complete factual overlap between the federal and state constitutional and statutory claims at issue in this case.

Defendants seek to force Plaintiffs to bifurcate their causes of action, which arise from the same common nucleus of operative fact. Requiring Plaintiffs to litigate highly similar issues involving the same evidence and the same facts in both state and federal court is not convenient to the parties and witnesses, does not serve judicial economy, and is particularly unfair given that Defendants themselves removed this case to federal court, as argued further in Singularism's motion for anti-suit injunction, *see* ECF 39, 58. Thus, the Court should exercise its discretion to retain jurisdiction over Singularism's state law claims. Further, for the reasons articulated below, the Court need not decide whether to send Singularism's state law claims to state court, as Singularism has pleaded plausible federal claims.

II.    **PLAINTIFFS STATE A CLAIM FOR VIOLATION OF RELIGIOUS FREE EXERCISE UNDER THE FIRST AMENDMENT, UTAH CONSTITUTION, AND UTAH'S RELIGIOUS FREEDOM RESTORATION ACT.**

   a.    **Defendants Ignore the Most Relevant and Recent First Amendment Caselaw Indicating Strict Scrutiny Review Applies.**

App-3:189

Regarding Singularism's First Amendment claim, Defendants' brief relies upon outdated caselaw that is not controlling in this jurisdiction, and in some cases, caselaw that has been fully vacated.[1] And for the controlling caselaw Defendants do cite to the Court, they omit the portions of those cases which vindicate Singularism's claims. Rather than repeat the history of First Amendment caselaw which Singularism has already set forth in its prior briefing, which Singularism incorporates here in full, *see* ECF 9, at 10-13, 26-30; ECF 19, at 18-20, Singularism highlights only the most important points which indicate that Singularism is entitled to strict scrutiny review of its First Amendment claim, and, thus, has stated a claim for relief that is plausible on its face (for the same reasons as Singularism's Utah RFRA claim, which this Court has already indicated is substantially likely to succeed).

Defendants argue that the Utah Controlled Substance Act is a neutral and generally applicable law and, thus, Singularism's First Amendment claim merits rational basis review, not strict scrutiny. *See* ECF 40, at 5-10. That is wrong. Each of the cases Defendants cite in support of that argument pre-date both U.S. Supreme Court and Tenth Circuit precedent that says otherwise.

In 2021, the U.S. Supreme Court in *Fulton v. City of Philadelphia, Pennsylvania*, 593 U.S. 522, 533-34 (2021), explained the circumstances in which a law was not neutrally or generally applicable and, thus, *did* merit strict scrutiny review. Although the Court described several ways in which a law failed neutrality or generally applicability, most important here is that the Court stated a law "lacks general applicability *if it prohibits religious conduct while permitting secular*

---

[1]     *See, e.g., Michigan Cath. Conf. & Cath. Fam. Servs. v. Burwell,* 755 F.3d 372 (6th Cir. 2014), *cert. granted, judgment vacated sub nom. Michigan Cath. Conf. v. Burwell,* 575 U.S. 981 (2015).

*conduct that undermines the government's asserted interests in a similar way*." *Id.* at 534 (emphasis added). In 2024, the Tenth Circuit, in *Chiles v. Salazar*, 116 F.4th 1178, 1224 (10th Cir. 2024), also stated that "a law is not generally applicable '*if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way*.'" (quoting *Fulton*, 593 U.S. at 534) (emphasis added). Defendants cite both *Fulton* and *Chiles* throughout their brief but fail to identify this controlling language.

As Singularism has already argued, the Utah Controlled Substances Act, as it relates to psilocybin, is not generally applicable because it prohibits Singularism's religious use of psilocybin while permitting secular use of psilocybin in a way that similarly undermines the governmental interests Defendants have tried to assert in this action. *See* ECF 9, at 27-28. As Singularism previously explained, S.B. 266 Medical Amendments, passed by the Utah Legislature in 2024, now codified at Utah Code § 58-37-3.5 ("Utah Psilocybin Act"), permits Utah's largest healthcare systems to administer psilocybin to individuals according to the healthcare systems' discretion and in a purely secular way. *See* ECF 9, at 22-23.

The healthcare systems' discretion to administer psilocybin is tempered only by precautions that Singularism itself already takes: (1) direct supervision by a qualified individual (Mr. Jensen qualifies as a mental health practitioner exempted from licensure as clergy under the appropriate title of the Utah Code, *see* ECF 9, at 9, 24-25, 28-29), (2) administration only to individuals at least eighteen years old, (3) guided by a "broad collection of scientific and medical research," a term apparently up to the healthcare system's interpretation. The only requirements of the Utah Psilocybin Act in which Singularism has not engaged are that Singularism is not a "healthcare system," meaning it does not operate at least fifteen hospitals in Utah, and Singularism

8

has not made a report to the Utah Legislature regarding its administration of psilocybin, although the Utah Psilocybin Act does not require that of healthcare systems until July 1, 2026. Notably, the Utah Psilocybin Act contains *no requirement whatsoever* regarding how a healthcare system must source its psilocybin, has no chain of custody requirements, no requirement that psilocybin must be tested, and no requirement about acceptable levels of psilocybin purity.

The Utah Psilocybin Act undermines the governmental interests Defendants have tried to state in this action, which appear to be generalized interests in regulating controlled substances for the purposes of public health, public safety, and the prevention of drug trafficking. Even if Defendants had articulated those interests with the required specificity as to Singularism in particular, which they have not, *see* ECF 19, at 12-17; ECF 24, at 2 ("The court also finds that the government has not shown a compelling interest in prohibiting Singularism from using psylocibin outright and accordingly has not carried its burden."), the Utah Psilocybin Act undermines each of those governmental interests in the same way Defendants assert Singularism does.

First, Defendants have argued that psilocybin poses a threat to public health and safety. *See, e.g.,* ECF 13, at 3, 14, 17, 34-37. Defendants dramatically argue the threat of psilocybin is so severe that psilocybin use will lead to overdose, impaired drivers, hospitalizations, suicides, self-harm, homicides, and even increased prison populations. *See* ECF 13, at 35-36. In addition to the fact that Defendants' own cited sources do not support that argument, *see* ECF 19, at 13-15, the Utah Legislature, in its enactment of the Utah Psilocybin Act, disagreed as well. The Utah Legislature disregarded such speculative harms by passing the Act. Further, nothing in the Utah Psilocybin Act prevents such speculative harms from occurring under the watch of a healthcare system any differently than under the care of a clergy mental health practitioner like Mr. Jensen,

9

whose religious mental health practice is approved by the Utah Department of Commerce's Division of Professional Licensing, *see* ECF 9, at 9. If anything, it is likely that Mr. Jensen is *more* qualified and experienced to safely administer psilocybin to individuals and prevent adverse outcomes than a healthcare system in Utah operating for the first time under the newly enacted Utah Psilocybin Act.

Second, Defendants appear to have argued that psilocybin possession leads to illegal trafficking of psilocybin, thereby affecting public safety. *See* ECF 13, at 36. Apart from Defendants' cited sources not substantiating that argument,[2] again, by enacting the Utah Psilocybin Act, the Utah Legislature disagreed. Further, nothing in the Utah Psilocybin Act prevents the speculative harm of drug trafficking from occurring under the watch of a healthcare system any differently than under the care of a religious leader like Mr. Jensen. The Utah Psilocybin Act contains no requirements regarding psilocybin sourcing, chain of custody, testing, or purity levels.

Thus, even crediting Defendants' generalized interests regarding public health, public safety, and drug trafficking, the Utah Psilocybin Act, which permits secular psilocybin usage, "undermines the government's asserted interests in a similar way," while prohibiting strikingly similar religious usage. Under both *Fulton* and *Chiles*, that unequal treatment on the basis of religion triggers strict scrutiny review under the First Amendment. Accordingly, for the very same

---

[2]    *See* ECF 13, at 36 n. 17 (acknowledging, in a National Institutes of Health publication, that "psilocybin is by no means the most dangerous drug," that some individuals seek psilocybin for "spiritual or self-exploration," that in recent years there "has been growing research interest in the potential of psychedelic and dissociative drugs to treat medical conditions, including mental health disorders," and encouraging individuals that use psilocybin to "be educated about risks associated with use.").

10

App-3:193

reasons the Court has already found that Defendants are substantially likely to fail strict scrutiny under Utah's RFRA, Defendants are also likely to do so under the First Amendment. Further, as Singularism has previously argued, Defendants have plainly less restrictive means to accomplish what governmental interests they may have, including the terms of the Utah Psilocybin Act, or simply imposing no requirements on Singularism at all, which was the course Defendants took regarding Singularism for over a year and is the action Defendants have not disputed they have taken for other similarly situated religious groups. *See* ECF 9, at 9, 22-26, 29; ECF 19, at 17-18. Notably, in prior briefing Defendants made *no argument at all* that there was no other less restrictive means of accomplishing its stated governmental interests. *See* ECF 19, at 17-18.

Thus, under the low motion to dismiss standard, Singularism has stated a claim that is plausible on its face for Defendants' violation of the First Amendment's Free Exercise Clause. On this basis alone, the Court can reject Defendants' attempted flight back to state court, as this federal claim will remain live before this Court. And as discussed in more detail below, it is possible that Singularism's First Amendment claim will not be wholly duplicative of Singularism's Utah RFRA claim, should the Court determine the Utah RFRA does not authorize damages. In other words, the Court may be required to complete a First Amendment analysis regardless of whether the Utah RFRA provides a clearer path to strict scrutiny review.

### b. Strict Scrutiny Applies Under Article I, Section 4 of the Utah Constitution.

Defendants continue to argue that Article I, Section 4 of the Utah Constitution does not require strict scrutiny review of free exercise violations, despite the clear line of reasoning through several cases that Singularism has already articulated. *See* ECF 9, at 13-17. Instead, Defendants

propose a neutrality standard. But, as Singularism has already argued, that standard relates to questions of religious *establishment*, not free exercise. *See* ECF 19, at 18-19.

Like the First Amendment, Article I, Section 4 of the Utah Constitution contains clauses related both to religious free exercise and the prohibition of religious establishment by the government. *Summum v. Pleasant Grove City*, 2015 UT 31, ¶ 7, 345 P.3d 1188, 1190 (citing *Separationists, Inc. v. Whitehead,* 870 P.2d 916, 935 (Utah 1993)). The language of Utah's free exercise clause reads similarly to the First Amendment: "The State shall make no law . . . prohibiting the free exercise [of religion] . . . ." Utah Const. art. I, § 4. However, Article I, Section 4 contains additional language beyond the similar language found in the First Amendment's Establishment Clause, adding that "There shall be no union of Church and State, nor shall any church dominate the State or interfere with its function. No public money or property shall be appropriated for or applied to any religious worship, exercise or instruction, or for the support of any ecclesiastical establishment." *Id.*

It is this establishment language that Defendants' cited cases interpret, not the free exercise content of Article I, Section 4. *See Soc'y of Separationists, Inc.*, 870 P.2d at 937-38 ("We therefore read this neutrality requirement into the 'no public money or property' language of article I, section 4.") (reviewing whether the practice of permitting prayers to be given prior to city council meetings amounted to religious establishment); *Summum*, 2015 UT 31, ¶ 7 ("Summum relies on the provision of the religious liberty clause prohibiting financial support of religion: 'No public money or property shall be appropriated for or applied to any religious worship, exercise or instruction'") (reviewing whether a city violates religious establishment principles if it permits one religious monument in a city park, but not another religion's monument).

12

The relevant pronouncements from the Utah Supreme Court indicate that free exercise claims require strict scrutiny review under the Utah Constitution. The Utah Supreme Court has, several times over, explained that First Amendment interpretation does not control analysis of Article I, Section 4. *See Soc'y of Separationists, Inc*., 870 P.2d at 930; *Snyder v. Murray City Corp*., 124 F.3d 1349, 1354 (10th Cir. 1997); *Snyder v. Murray City Corp.*, 2003 UT 13, 73 P.3d 325; *Summum*, 2015 UT 31, ¶ 7. And as explained in Singularism's prior, unrebutted briefing, the Utah Supreme Court has indicated strict scrutiny is the proper analysis. *See* ECF 9, at 14-15; *Jeffs v. Stubbs*, 970 P.2d 1234, 1249 (Utah 1998); *State v. Green*, 2004 UT 76, ¶ 70 n.1, 99 P.3d 820 (Durrant, J., concurring); *State v. Holm*, 2006 UT 31, ¶ 34 n.8, 137 P.3d 726.

This Court (Judge Parrish) should be uniquely familiar with the Utah Supreme Court's decisional development on this front, as Judge Parrish authored the Utah Supreme Court's opinion in *State v. Mooney*, 2004 UT 49, ¶ 29, 98 P.3d 420, 428, when then a member of the Utah Supreme Court. In *Mooney*, the principal question before the Court was whether the Utah Controlled Substances Act incorporated the federal Controlled Substances Act's exemption for religious peyote usage. *Mooney*, 2004 UT 49, ¶ 9, 98 P.3d 420, 424. The Utah Supreme Court found the exemption was incorporated, and also found that the exemption was not limited to members of federally recognized Native American tribes. *Id.* at ¶¶ 19, 22. In addressing an argument that permitting only members of federally recognized Native American tribes to avail themselves of the religious peyote exemption would be problematic, the Court stated that it was "unclear whether an interpretation that extended the religious peyote exemption to only some members of the Native American Church would *survive scrutiny* under article I, section 4 of the Utah Constitution . . ." *Id.* at ¶ 29 (emphasis added). This statement invokes the Utah Supreme Court's discussion of strict

13

App-3:196

scrutiny review of free exercise claims which commenced in *Jeffs* and continued just months after *Mooney* in *Green* and two years later in *Holm.* Because the Utah Supreme Court has indicated free exercise violations merit strict scrutiny review, Singularism states a plausible claim for relief under Article I, Section 4 of the Utah Constitution.

### c. Strict Scrutiny Applies Under Utah's Religious Freedom Restoration Act.

Defendants do not attempt to argue that strict scrutiny review is not required under Utah's RFRA. They can't. Utah's RFRA explicitly requires it. *See* ECF 19, at 12; Utah Code § 63G-33-201(1), (3). And this Court has already confirmed it. *See* ECF 24, at 2. Instead, they try to invalidate Singluarism's Utah RFRA claim by rearguing (1) the notice-of-claim provision of Utah's RFRA and (2) their substantial burden argument under Utah's RFRA, and by newly arguing (3) that Utah's RFRA does not permit an award of damages.

As to the first, this Court has already held that the Utah RFRA's notice-of-claim exemption applies: "The court finds that Plaintiffs satisfy the requirements for the exception for 'ongoing' governmental action, *id.* § 63G-33-201(5)(b)(i). The deprivation of their psylocibin and records is ongoing, and requiring Plaintiffs to wait until the 60-day window passes would impose an 'undue hardship,' *id.*" ECF 24, at 2. That, alone, should be enough to dispatch Defendants' notice-of-claim argument.

However, despite stating in the "Relevant Facts" section of their brief that "Plaintiffs emailed a Notice of Claim to Defendants on November 19, 2024," ECF 40, at 3, and Plaintiffs' Notice of Claim having been filed with the Court, *see* ECF 28-2, Defendants perplexingly then argue that it "is undisputed that Plaintiffs did not provide any notice to any of Defendant in compliance with Utah Code § 63G-7-401," ECF 40, at 20. Disregarding this factually erroneous

statement, even if the Utah RFRA's notice-of-claim exemption did not apply, Plaintiffs' notice of claim shows they have complied with the statute such that 60 days following November 19, 2024 (January 18, 2025) Singularism's Utah RFRA claim will be properly before this Court, several days prior to the Court's hearing of Defendants' motion to dismiss.

Defendants' second argument that Singularism's religious free exercise has not been burdened also fails. Again, the Court has already decided this question, "finding that Plaintiffs are likely to be able to show a substantial burden on the exercise of their beliefs about ps[i]loc[y]bin," including because the "deprivation of their ps[i]loc[y]bin . . . is ongoing," and "no amount of damages later can fully compensate them for this harm." ECF 24, at 2-3. Despite the Court ordering Defendants to return the psilocybin, they refused to do so, instead seeking a stay of the Court's TRO, which is presently granted pending the Court's resolution of Singularism's motion for preliminary injunction. *See* ECF 56, at 5.[3]

Although this ongoing deprivation remains, as well as Defendants' threat that they will evict Singularism from its spiritual center (a fact which, despite all the briefing submitted to the

---

[3] Just as the Court indicated, Singularism is highly "skeptical" of Defendants' assertion that they need Singularism's psilocybin to prosecute their criminal case against Mr. Jensen. *See* ECF 56, at 3. Beyond what Singularism has already raised with the Court, Defendants' *voluntary* return of "Psilocybin paraphernalia (scales, storage cups, electronic grinder)" following the Court's TRO, *see* ECF 13-15 (log of items seized by Defendants); ECF 24 (ordering return of only psilocybin and records); ECF 32, at 3 ("Defendants agreed to return the grinder and scales—even though those items were not part of the Court's Injunction Order."), undermines Defendants' claim that they would be violating Utah's evidence retention statute by returning Singularism's psilocybin. Defendants' criminal information brings claims for both possession of psilocybin *and* drug paraphernalia. Thus, under Defendants' reasoning, Defendants have violated Utah's evidence retention statute by returning what they consider to be paraphernalia. *See* Utah Code §§ 77-11c-201, 77-11c-202, 77-11a-305. That Defendants feel comfortable violating the evidence retention statute for one type of evidence but not another suggests Defendants have asserted the evidence retention statute only to justify their refusal to return Singularism's sacramental psilocybin.

Court to date, Defendants have yet to acknowledge, *see* ECF 9, at 7-8), Defendants focus on their post-TRO criminal prosecution of Mr. Jensen, arguing that it does not impose a substantial burden on his religion under Utah's RFRA. To do so, Defendants, as they have done before, *see* ECF 13, at 21-23, misconstrue the plain language of Utah's RFRA.

Singularism points the Court back to the detailed definition of "substantial burden" it already identified to the Court. *See* ECF 19, at 22-24. The fact that Utah's RFRA states that "'Substantially burden'" *includes* . . . assessing criminal . . . penalties or damages," Utah Code § 63G-33-101(6)(b)(i)(B) (emphasis added), does not mean, as Defendants argue, that government action which is not included as a specific example in the statute is *excluded* from the broader definition of "substantially burden." Plainly, the definition of "substantially burden" which proceeds this example controls: that *any* government action which "directly *or indirectly* . . . constrains, limits*, or denies the free exercise of religion . . . or *compels a person to act, or fail to act*, in a manner that is contrary to the person's free exercise of religion" amounts to a substantial burden upon religious free exercise. Utah Code § 63G-33-101(6)(a). As Singularism has previously argued, and this Court has already found, the fact of Defendants' criminal prosecution against Mr. Jensen is shrinking the body of Singularism's faithful. *See* ECF 56, at 7 ("Plaintiffs presented evidence that some of Singularism's followers have already distanced themselves from the faith because of Defendants' actions, and these harms are only likely to multiply given that the government is now pursuing criminal charges against Mr. Jensen."). Thus, Singularism easily has pleaded substantial burdens upon its religious free exercise.

Third, Defendants argue the Court should dismiss Singularism's request for damages under Utah's RFRA. Defendants' reading of Utah's RFRA would permit governmental entities to

16

perpetuate religious free exercise violations without regard for what damages, aside from costs and attorney fees, their violations would have upon religious individuals and organizations.

When faced with the question of whether the federal RFRA authorized damages, the U.S. Supreme Court first determined that the federal RFRA authorized damages to be sought against government officials. *Tanzin v. Tanvir*, 592 U.S. 43, 48 (2020). In doing so, it noted that the federal RFRA was enacted against the "legal backdrop" of 42 U.S.C. § 1983, which permits suits against government officials. *Id.* The Court then proceeded to note that in "the context of suits against government officials, damages have long been awarded as appropriate relief," culminating in the Court's interpretation of "the modern version of § 1983 to permit monetary recovery against officials . . . ." *Id.* at 49-50. The Court stated that the "availability of damages under § 1983 is particularly salient in light of RFRA's origins" which made clear that RFRA "was reinstating both the pre-*Smith* substantive protections of the First Amendment *and* the right to vindicate those protections by a claim." *Id.* at 50. Thus, given "that RFRA reinstated pre-*Smith* protections and rights, parties suing under RFRA must have at least the same avenues for relief against officials that they would have had before *Smith*. That means RFRA provides, as one avenue for relief, a right to seek damages against Government employees." *Id.* at 51. Notably, the Court explained that a "damages remedy is not just 'appropriate' relief as viewed through the lens of suits against Government employees. It is also the *only* form of relief that can remedy some RFRA violations." *Id.* Accordingly, the Court validated three Muslim plaintiffs' claim for money damages which accounted for the value of "airline tickets wasted and income from job opportunities lost" as a result of the Government's unlawful placement of the plaintiffs on the No Fly List. *Id.* at 46.

17

*Tanzin*'s reasoning is equally applicable to Utah's RFRA. As Singularism previously argued, Utah's RFRA builds upon the history of the federal RFRA. *See* ECF 9, at 17-22. Indeed, SB 150's preamble invokes this history, stating:

> (1) (a) WHEREAS, Utah has long protected and prized the religious freedom of people of all faiths in the Utah Constitution and the Utah Code;
> (b) WHEREAS, the federal Religious Freedom Restoration Act has protected religious freedom for three decades, but does not extend to state law;
> (c) WHEREAS, thirty-five states have implemented legal protections for the free exercise of religion that are similar to the protections provided in this bill; . . .[4]

SB 150's bill sponsor, Senator Todd Weiler, testified that Utah's RFRA, as compared to other state RFRAs, was intended to be "the best RFRA . . . in the country in terms of a state version . . . ."[5] Thus, permitting damages to be awarded under Utah's RFRA is consistent both with its historical derivation from the federal RFRA (which was in turn derived from the First Amendment and related to 42 U.S.C. § 1983) and the legislative intent behind Utah's RFRA.

Despite this, Defendants argue that because the language of Utah RFRA's language differs from the federal RFRA, the difference indicates the Utah Legislature's intent to bar damages. As Defendants point out in their brief, the federal RFRA uses the phrase "obtain appropriate relief," 42 U.S.C. § 2000bb-1(c), while Utah's RFRA uses the phrase "obtain relief," Utah Code § 63G-33-201(4)(a). Notably, Utah's RFRA's phrase "obtain relief" is found in Utah Code § 63G-33-201(4)(a), separate from its discussion of costs and attorney fees, found in Utah Code § 63G-33-201(6).

---

[4]    *S.B. 150 Exercise of Religion Amendments*, UTAH STATE LEGISLATURE, available at, https://le.utah.gov/~2024/bills/static/SB0150.html.

[5]    *Senate – 2024 General Session – Day 29*, at 2SB150 Exercise of Religion Amendments, Weiler, UTAH STATE LEGISLATURE, available at, https://le.utah.gov/av/floorArchive.jsp?markerID=125928.

The U.S. Supreme Court's damages analysis in *Tanzin* was anchored to the phrase "obtain appropriate relief." *Tanzin*, 592 U.S. at 46-52. Indeed, the Court conducted an analysis on the word "appropriate" itself, pointing to dictionaries that defined the word to mean "specifically fitted or suitable, proper" and "especially suitable or compatible." *Id.* at 48-49 (cleaned up). The Court found the word "appropriate" to be "open-ended on its face," meaning that "what relief is appropriate is inherently context dependent." *Id.* at 49 (cleaned up) (quotation omitted). It thereafter proceeded to engage in the historical analysis above, finding damages awards to be "appropriate" relief. *Id.*

The Utah RFRA, however, does not include the word "appropriate" as a qualifier like the federal RFRA does. Thus, unlike in *Tanzin*, the question of whether a certain form of relief is "appropriate" is not a question before this Court. Indeed, the omission of that word from Utah's RFRA indicates even *less* room for courts to second-guess religious plaintiffs' claims for relief and *more* ability for religious plaintiffs to pray for their form of desired remedy, including damages. The Utah Legislature was well aware of the backdrop of the federal RFRA and *Tanzin* when passing the Utah RFRA. Should the legislature have wanted to insert the qualifier "appropriate" to introduce the statutory ambiguity which the U.S. Supreme Court had to resolve in *Tanzin*, it knew how to do so. But the Utah Legislature chose otherwise. Thus, the Court should reject Defendants' assertion that Singularism's remedy under Utah's RFRA is limited to costs and attorney fees.

However, even if this Court determines that Utah's RFRA authorizes only costs and attorney fees, that does not invalidate Singularism's cause of action under Utah's RFRA; it only prescribes a certain remedy. Furthermore, a finding that Utah's RFRA's relief is limited to costs

19

and attorney fees would then necessitate the Court deciding either or both of Singularism's other claims for free exercise violation under the First Amendment and 42 U.S.C. § 1983, or Article I, Section 4 to the Utah Constitution, both of which authorize the award of damages, including punitive damages (Defendants have not argued otherwise), yet another reason that this Court need adjudicate all the claims before it, including the federal claims. Thus, for all the above reasons, Singularism plausibly alleges a cause of action for violation of Utah's RFRA. Defendants' motion to dismiss as to this claim, as well as Singularism's two constitutional claims for religious free exercise, should be denied.

III.   **PLAINTIFFS STATE A CLAIM FOR UNREASONABLE SEARCH AND SEIZURE UNDER THE FOURTH AMENDMENT AND UTAH CONSTITUION.**

Defendants' motion to dismiss makes no assertion that Singularism failed to adequately plead its causes of action under the Fourth Amendment or Article I, Section 14 of the Utah Constitution (although Defendants do point out those two claims are not identical, as Article I, Section 14 "provides greater protections to Utah citizens than the Fourth Amendment," *ECF* 40, at 22 (quoting *State v. Worwood*, 2007 UT 47, ¶ 16, 164 P.3d 397)). For example, Defendants make no argument about the reasonableness of the search and seizure at issue. Defendants argue only that they are absolutely immune from those two causes of action. Thus, Singularism responds only to Defendants' absolute immunity arguments, which, as shown below, fail.

a.   **Defendants Are Not Absolutely Immune from Plaintiffs' Unreasonable Search and Seizure Claims.**

First, Defendants argue they are absolutely immune from Singularism's Fourth Amendment claim because they were acting pursuant to a valid court order—the search warrant they procured. Aside from the fact that Singularism's Complaint contains allegations of

20

misconduct before and after Defendants obtained and executed the search warrant, Defendants' legal arguments do not hold water.

Courts apply a functional approach to absolute immunity, determining absolute immunity's applicability separately for each defendant and each claim. *See Buckley v. Fitzsimmons*, 509 U.S. 259 (1993) (endorsing the functional approach); *Kalina v. Fletcher*, 522 U.S. 118, 127 (1997) ("[I]n determining immunity, we examine 'the nature of the function performed, not the identity of the actor who performed it.'") (quoting *Forrester v. White*, 484 U.S. 219, 229 (1988)). Yet, Defendants have made no attempt to articulate their immunity arguments specifically regarding each Defendant or each cause of action. On this basis alone, the Court can reject Defendants' arguments.

Moreover, police officers do not generally have absolute immunity. *Pierson v. Ray*, 386 U.S. 547, 555 (1967) ("The common law has never granted police officers an absolute and unqualified immunity"). Indeed, even prosecutors' immunity must be evaluated in each particular situation. "The presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of those duties. We have been 'quite sparing' in our recognition of absolute immunity. . . ." *Burns v. Reed*, 500 U.S. 478, 486-87 (1991). For example, "prosecutors are not entitled to absolute immunity for 'investigative' or 'administrative' acts." *Id.* at 483 n.2, 486. Even "the actions of a prosecutor are not absolutely immune merely because they are performed by a prosecutor. Qualified immunity 'represents the norm' for executive officers . . . so when a prosecutor functions as an administrator rather than as an officer of the court he is entitled only to qualified immunity." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993) (cleaned up). "There is a difference between the advocate's role in evaluating evidence and interviewing

21

witnesses as he prepares for trial, on the one hand, and the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested, on the other hand." *Id.* "A prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested." *Id.*

Prosecutors do not have absolute immunity when providing police officers with legal advice, nor do police officers in following such advice. *Burns v. Reed*, 500 U.S. 478, 495-96 (1991) ("[I]t is incongruous to allow prosecutors to be absolutely immune from liability for giving advice to police, but to allow police officers only qualified immunity for following the advice.") ("[W]e conclude that respondent has not met his burden of showing that the relevant factors justify an extension of absolute immunity to the prosecutorial function of giving legal advice to the police."). *See also Harris v. Bornhorst*, 513 F.3d 503 (6th Cir. 2008) (concluding that a prosecutor was not entitled to absolute immunity when the prosecutor directed police to arrest a suspect). Where a prosecutor told officers "what to do and what not to do," provided legal advice as to when an arrest should occur, assisted in writing a search warrant, and viewed evidence together with the police prior to prosecution, and the officer sought the prosecutor's "legal opinion on whether the information in the search warrant affidavit was sufficient to establish probable cause," the prosecutor "was not performing functions that were intimately associated with the judicial phase of a criminal proceeding, nor was he engaged in an effort to obtain or preserve evidence once probable cause existed to arrest a suspect." *Coopshaw v. Figurski*, No. 06-CV-13246, 2008 WL 324103, at *9-10 (E.D. Mich. Feb. 6, 2008). In such circumstance, the prosecutor "is not entitled to absolute immunity." *Id.* at *10-11. *See also Rieves v. Town of Smyrna, Tennessee*, 959 F.3d 678,

22

App-3:205

690-94 (6th Cir. 2020) (absolute immunity did not apply to prosecutor advising police during the investigative phase, including regarding the existence of probable cause).

Neither are prosecutors or police officers entitled to absolute immunity for sworn statements in support of applications for arrest warrants. While a prosecutor's "activities in connection with the preparation and filing of . . . the information and the motion for arrest warrant[ ] are protected by absolute immunity," when the prosecutor files sworn testimony in support, such action is "the function of the witness, not of the lawyer," and is not entitled to absolute immunity. *Kalina v. Fletcher*, 522 U.S. 118, 129-31 (1997). A "police officer who secures an arrest warrant without probable cause cannot assert an absolute immunity defense." *Malley v. Briggs*, 475 U.S. 335 (1986).

Additionally, prosecutors are not entitled to absolute immunity for statements made to the media. A prosecutor's "statements to the media are not entitled to absolute immunity." *Buckley*, 509 U.S. at 277. "Comments to the media have no functional tie to the judicial process just because they are made by a prosecutor. . . . The conduct of a press conference does not involve the initiation of a prosecution, the presentation of the state's case in court, or actions preparatory for these functions. . . . in these respects, a prosecutor is in no different position than other executive officials who deal with the press, and . . . qualified immunity is the norm for them." *Id.* at 277-78.

Defendants argue that the police officers in this case were absolutely immune from suit because they were executing a facially valid search warrant. ECF 40, at 10-11. Even if that were the case (which Singularism disputes given that the search warrant was procured despite Defendants' knowledge of Singularism's bona fide claim to religious exemption), the police officers certainly lack absolute immunity for their actions *prior to the execution of the search*

23

*warrant as well as actions taken unrelated to the search warrant*, such as the service of the eviction notice on Singularism's landlord. And where Defendant Gray gave legal advice to police and made statements regarding Plaintiffs to the media, he similarly lacks absolute immunity from suit.

Second, Defendants argue that they are immune from Singularism's claim under Article I, Section 14 of the Utah Constitution pursuant to the Utah Governmental Immunity Act ("UGIA"). This argument is dispatched easily. As this Court has held, Defendants' "'argument is without merit and requires little analysis because the UGIA does not apply to claims alleging state constitutional violations.'" *Stella v. Cnty.*, No. 1:18-CV-00002-JNP, 2023 WL 5334421, at *5 (D. Utah Aug. 18, 2023) (quoting *Jensen ex rel. Jensen v. Cunningham*, 2011 UT 17, ¶ 51, 250 P.3d 465, 479) (cleaned up).[6] Thus, Defendants have no claim to immunity under the UGIA.

## CONCLUSION

For the reasons stated above, the Court should deny Defendants' motion.


DATED January 14, 2025.

> /s/ Tanner J. Bean
> Tanner J. Bean
> Anna P. Christiansen
> *Attorneys for Plaintiffs*

---

[6] Defendants' claim that Singularism inadequately briefed this issue, *see* ECF 40, at 22, is surprising given that they fail to bring this controlling authority to the Court's attention and because Defendants raise their immunity argument for the first time in their motion to dismiss, meaning that this is Singularism's first opportunity to address it.

24

J. Brian Jones (11816)
Gary D. Millward (12170)
Richard A. Roberts (12217)
PROVO CITY ATTORNEY'S OFFICE
445 W Center St.
Provo, Utah 84601
(801) 852-6140
gmillward@provo.gov
rroberts@provo.gov

*Attorneys for Defendants Provo City, Troy
Beebe, Brian Wolken, and Jackson Julian*

Mitchell A. Stephens (11775)
Justin L. James (15167)
Dillon P. Olson (16120)
JAMES DODGE RUSSEL & STEPHENS
10 West Broadway, Ste. 400
Salt Lake City, Utah 84101
mstephens@jdrslaw.com
jjames@jdrslaw.com
dolson@jdrslaw.com

*Attorneys for Defendants Utah County and
Jeffrey Gray*

---

## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BRIDGER LEE JENSEN, an individual; SINGULARISM, a non-profit corporation; PSYCHE HEALING AND BRIDGING, LLC dba PSYCHEDELIC THERAPY JOURNEY, a limited liability company;<br><br><br><br>Plaintiffs,<br><br>v.<br><br>UTAH COUNTY, a political subdivision; PROVO CITY, a political subdivision; JEFFREY GRAY, an individual; TROY BEEBE, an individual; BRIAN WOLKEN, an individual; JACKSON JULIAN, an individual; JOHN DOES 1-4, individuals;<br><br>Defendants. | **SUPPLEMENTAL MEMORANDUM SUPPORTING JOINT OPPOSITION TO PRELIMINARY INJUNCTION**<br><br>Civil Case No. 2:24-cv-00887-JNP-CMR<br><br>Judge Jill N. Parrish<br><br>Magistrate Judge Cecilia M. Romero |

Defendants Utah County (the "County"), Jeffrey Gray ("Gray") (collectively "Utah County") and Provo City (the "City"), Troy Beebe ("Beebe"), Brian Wolken ("Wolken"), and Jackson Julian ("Julian") (collectively "Provo") submit this supplemental memorandum of

1

authorities in support of their Joint Memorandum Opposing Motion for Temporary Restraining Order and Preliminary Injunction. [1]

## ARGUMENT

At the preliminary injunction stage, the burden on the moving party is substantial and clear, especially when the injunction will alter the status quo. "A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam). Preliminary injunctive relief is especially disfavored when it enjoins the enforcement of facially constitutional laws. "An injunction pending appeal barring the enforcement of an Act of Congress would be an extraordinary remedy particularly when . . . th[e] Act [is] facially constitutional." *Wis. Right to Life, Inc. v. FEC*, 542 U.S. 1305, 1305-06 (2004) (C.J. Rehnquist, in chambers).

Here, both the federal and Utah controlled substance laws are facially constitutional. *See Gonzales v. Raich*, 545 U.S. 1, 9 (2005) ("The CSA is a valid exercise of federal power, even as applied to the troubling facts of this case."). For Plaintiffs to ultimately prevail on their religious freedom claims, Plaintiffs must establish that the beliefs they espouse are "actually religious in nature" by demonstrating that Plaintiffs' beliefs are "sincerely held," and "forcing them to obey the [controlled substance laws] would impose a substantial burden on their ability to conduct themselves in accordance with those sincerely held religious beliefs." *United States v. Christie*, 825 F.3d 1048, 1056 (9th Cir. 2016). Without conceding Plaintiffs have met this hurdle, but for purposes of this preliminary injunction phase, even assuming Plaintiffs have satisfied those elements, Utah CSA's closed regulation of Schedule I drugs, including psilocybin, is the least restrictive means of

---

[1] This Supplemental Memorandum was included as Exhibit A to Defendants' Motion for Leave to File Supplemental Memorandum Supporting Joint Opposition to Preliminary Injunction ("Motion for Leave"). [*See* Dkt. 64-1]. On January 17, 2025, the Court granted Defendants' Motion for Leave. Out of an abundance of caution, Defendants formally submit this supplemental memorandum as a standalone filing. Aside from this footnote, the substance of this memorandum is the same as Dkt. 64-1.

accomplishing this compelling government interest.

**POINT I:    DEFENDANTS HAVE COMPELLING GOVERNMENT INTERESTS IN PROHIBITING PLAINTIFFS' USE AND DISTRIBUTION OF PSILOCYBIN.**

Psilocybin is a Schedule I drug under both the federal CSA and Utah's CSA. 21 U.S.C. § 812(c)(Schedule I(c)(15)); Utah Code § 58-37-4(2)(a)(iii)(Y). By placing it in Schedule I, Congress determined that psilocybin "has a high potential for abuse" and cannot be safely used. 21 U.S.C. 812(b)(1)(A) and (C). Protecting the public from threats to health and safety is a prototypical compelling government interest. *See Wisconsin v. Yoder*, 406 U.S. 205, 220 (1972); *Sherbert v. Verner*, 374 U.S. 398, 403 (1963).

Before enacting the federal CSA ("CSA"), the United States Congress stated that the CSA is a part of the legislative effort "to deal in a comprehensive fashion with the growing menace of drug abuse in the United States." H.R. Rep. No. 1444, 91st Cong., 2d Sess. Pt. 1, at 1 (1970). The CSA was enacted as a "comprehensive" and "'closed' system of drug distribution" for all scheduled controlled substances. *Id*. at 1, 6. Under the CSA, there is a strict categorization of drug transactions and uses that are permitted, as well as identifying all "other transactions outside the legitimate distribution chain illegal." *Id*. at 3. To that end, the CSA bans the import, manufacture, distribution, possession, and use of Schedule I drugs outside of those tightly controlled and regulated system. *See* 21 U.S.C. 841(a)(1).

For these same reasons, Utah adopted the Uniform Controlled Substances Act. *See, e.g.*, Utah Code § 58-37-18(3) (recognizing law's "purpose to make uniform the law of those states which enact it"). Both the Uniform Act and the prefatory note to Utah's controlled substances Act ("Utah CSA") recognize the compelling government interest in regulating controlled substances because the "drug

3

App-3:210

abuse problem has reached epidemic proportions." Utah CSA (1994) at Prefatory Note; Uniform CSA (1994) at Prefatory Note. Under Utah's CSA, the distribution of Schedule I drugs is only permitted "by a licensee," who receives an order from the Utah Division of Professional Licensing. Utah Code § 58-37-6(6). For psilocybin, specifically, the Utah CSA recently enacted a "very controlled program" to distribute and permit use of psilocybin through "reputable hospital systems" that have "develop a behavioral health treatment program" that is closely supervised "under the direct supervision and control of the healthcare system." Utah Code § 58-37-3.5(2)-(3).

Utah's closed system of regulating controlled substances, psilocybin specifically, furthers the government's compelling interests in protecting the public's health and safety. Defendants' Joint Memorandum Opposing Plaintiffs' Motion for TRO and Preliminary Injunction details continuing concerns involving psilocybin, including hospitalization, suicidal ideation, self-harm, and withdrawals. [*See* Joint Memo. Opp. at 36]. Indeed, last month the Utah Poison Control Center was "notified about a possible case of amatoxin (mushroom) induced liver failure and death." *See* Safety Alert: Death associated with eating tainted psychedelic mushrooms in Utah.[2] Like Plaintiffs in this case, the deceased patient used "mushrooms purchased on the street." *Id.*

Utah also has a compelling government interest in prohibiting and preventing illegal drug trafficking. "Much of [the] major increase in drug use and abuse is attributable to the increased mobility" of people and drugs. Uniform CSA (1994) at Prefatory Note. "Drugs clandestinely manufactured or illegally diverted from legitimate channels in one part of a State are easily transported for sale to another part of that State or even to another State." *Id.*

Even if Plaintiffs could harmlessly distribute psilocybin (they cannot), the Court cannot

---

[2] Available at https://poisoncontrol.utah.edu/news/2024/12/safety-alert-psychedelic-mushrooms-death#:~:text=The%20Utah%20Poison%20Control%20Center,mushrooms%20purchased%20on%20the%20street.

ignore that Plaintiffs are supporting an illegal drug market when they purchase drugs off the street. Indeed, Plaintiffs have not established that their drug dealers (e.g., "Inca") operate on a purely religious basis. Moreover, Plaintiffs have opposed Defendants' efforts to conduct discovery on this issue. Lacking any contrary evidence from Plaintiffs, the State of Utah must recognize that illicit drug purchases regularly support dangerous, far-reaching and widespread criminal enterprises. *See, e.g.*, U.S. Dept. of Justice, *National Drug Threat Assessment* (March 2021) (recognizing combination of "psilocybin mushroom grows," "THC extraction laboratories," and "illicit fentanyl pill press operations"); U.S. Customs & Border Protection, *Ecstasy and Psilocybin Mushrooms Discovered in Vehicle at the Port of Chaplain* (June 3, 2022) (recognizing seizure of "various narcotics, that included ecstasy, marijuana, and psilocybin"); KPCW, *UHP seizes 80 pounds of pot, thousands of pills in Sumit County traffic stop* (Oct. 29, 2024) (recognizing seizure of "bags of psilocybin mushrooms," "83 pounds of marijuana," and "4,000 MDMA or Ecstasy pills"); U.S. Dept. of Justice, *Springfield man sentenced . . .* (Dec. 11, 2024) (seizing "psilocybin, methamphetamine" "fentanyl, cocaine," and "more than 100 firearms"); U.S. Dept. of Justice, *Cuba couple arrested . . . .* (Dec. 3, 2024) (seizing "suspected psilocybin mushrooms," "475 growing marijuana plants," and "a 9mm pistol"); U.S. Dept. of Justice, *U.S. Attorney's Office, DEA and HIS announce . . .* (Nov. 7, 2024) (seizing "36 grams of psilocybin mushrooms," "842 grams of fentanyl, 1,118 grams of methamphetamine, 285 grams of cocaine," "400 grams of marijuana, and 96 grams of hydrocodone"); U.S. Dept. of Justice, *Armed fentanyl . . . trafficker pleads guilty* (Oct. 31, 2024) (seizing "44.8 grams of psilocybin mushrooms," "two kilograms of methamphetamine, 108 grams of fentanyl, 198 grams of heroin, 168 grams of cocaine, 1,183 grams of marijuana" among other drugs); U.S. Dept. of Justice, *Omaha man sentenced . . .* (Oct. 24, 2024) (seizing "psilocybin mushrooms" and "30,000 fentanyl pills"); U.S. Dept. of Justice, *Activity in the U.S. Attorney's Office*, (Oct. 9, 2024) (seizing "psilocybin

mushrooms," "2,730 fentanyl pills," and "crack cocaine").[3]  Even if Plaintiffs' intentions are pure, the State and Court should not condone a system that furthers secular criminal enterprises.

Few law enforcement tasks have proved more formidable than detecting unlawful drug usage and preventing drug abuse and diversion. Indeed, "the obstacles to detection of illegal conduct may be unmatched in any other area of law enforcement." *United States v. Mendenhall*, 446 U.S. 544, 562 (1980). "RFRA is not a 'get out of jail free card.'" *United States v. Grady*, 18 F.4th 1275, 1287 (11th Cir. 2021). If drug dealers are allowed to traffic and sell Schedule I drugs and Plaintiffs are permitted to purchase, use, and distribute psilocybin without any regulation and oversight, law enforcement is caught in an impossible position. How would law enforcement know who sincerely belongs to Singularism? How would law enforcement know if a drug trafficker and dealer is only selling "sacrament?"  How would law enforcement verify without seizure which drugs, doses, and purities are at issue?

This case is not like *Gonzales v. O Centro Espirita Beneficient Uniao do Vegetal*, 546 U.S. 418 (2006).  "As courts have repeatedly emphasized, cannabis differs critically from peyote and hoasca precisely because there is a thriving market for diverted cannabis, whereas there is no comparable demand for recreational peyote and hoasca."  *U.S. v. Christie*, 825 F.3d 1048, 1059 (9th Cir. 2016) (collecting cases); *Olsen v. DEA,* 878 F.2d 1458, 1464 (D.C. Cir. 1989) (R. Ginsburg, J.) ("[W]e rest our decision [no exemption] on the immensity of the marijuana control problem . . . .");  *see also O Centro Espirita Beneficiente Unaio Do Vegetal v. Ashcroft*, 389 F.3d 973, 1023 (10th Cir. 2004) (en banc) (McConnell, J. concurring) (recognizing "claimant's rights under RFRA could turn on whether the adherent has a religious affinity for street drugs or more esoteric ones").  Psilocybin mushrooms land far closer to marijuana than peyote or hoasca in this analysis.  Indeed, in 2024, the

---

[3] Releases from the U.S. Department of Justice can be found at https://www.justice.gov/usao/pressreleases.

National Institute on Drug Abuse reported that "seizures of 'magic mushrooms'" had "increased dramatically in the United States." *See* NIH, *Law enforcement seizures of psilocybin mushrooms rose dramatically between 2017-2022* (Feb. 6, 2024).[4]  Both the number of seizures and the total weight seized increased more than three-fold in the five years of the study.  *Id.*  Likewise, the 2023 National Survey on Drug Use indicates that "Psilocybin/Mushrooms" is ***the most*** used "Hallucinogen[]," beating out "LSD," "Ecstasy," and "PCP."[5]  In contrast, Peyote is among the least used, and hoasca use is not even registered.  In both 2022 and 2023, more minors ("Aged 12-17") used "Psilocybin/Mushrooms" than any other hallucinogen.  Indeed, minors were more than 1,300% more likely to have used "Psilocybin/Mushrooms" than peyote – again confirming the vastly different black markets for these two drugs.   Likewise, lifetime usage (age 12 or older) of "Psilocybin/Mushrooms" was three times higher than crack, five times higher than heroin, and two times higher than methamphetamine.  *Cf. O Centro*, 389 F.3d at 1023 (McConnell, J. concurring) (recognizing legal distinction despite "same religious interest in shooting heroin as in drinking hoasca").  "[T]he extent of nonreligious use is relevant to the analysis," *id.*, and psilocybin is not the same as peyote or hoasca.  At minimum, Plaintiffs' black-market purchases of psilocybin mushrooms support a dangerous yet thriving black market.  Their requested relief would dramatically impede the State's efforts to stamp out that market.

Additionally, when the use and distribution of drugs is allowed to fall outside the closed system of regulation permitted under the Utah CSA, there are related compelling concerns about use and distribution of psilocybin. There are concerns about how the psilocybin is being stored, protected, and accounted for to ensure its use is only for sacramental purposes, and not recreational use or illegal

---

[4] https://nida.nih.gov/news-events/news-releases/2024/02/law-enforcement-seizures-of-psilocybin-mushrooms-rose-dramatically-between-2017-2022
[5] *See* https://www.samhsa.gov/data/report/2023-nsduh-detailed-tables at Table 1.108B.

distribution. Existing evidence confirms these concerns – not only in general but specifically as to Plaintiffs.  Jensen testified that "less than a hundred" people have "participate[d] in a ceremony." [TRO Tran. at 150].  Voyagers generally participate in "no less than two and – no more than four" ceremonies.  [*Id.* at 77].  Doses range from 2 grams [*id.* at 99] to 3.5 grams [*id.* at 102].  For simple math purposes, if 100 members used an average of 3 grams an average of 3 times, that would equal 300 total doses or 900 total grams of mushrooms.  And that's the total across the approximately 15 months since Singularism was formed.  [*See id.* at 193 ("fall of 2023")].  In contrast, **one** search returned more half of all the psilocybin Singularism has ever needed – over 459 grams (approximately 153 doses).  [Search Warrant Return (Dkt. 13-15)].  Despite being permitted no discovery and limited questions at the TRO, the State further established the 459 seized grams are in addition to regular deliveries from "Inca" that occur as often as "once a month."  [TRO Tran. at 74].[6]  Likewise, Jensen further testified that the seizure of 150 doses was "not the end of the world" – indicating a ready source for a copious amount of psilocybin.  [*Id.* at 167].  The record further confirms that Jensen has used and distributed psilocybin unconnected from Singularism.  [*See id.* at 189 (administering in 2016-2020); *id.* at 190 (charging customers "[s]ince 2020"); *id.* at 220 ("voyaged with Brandi . . . before Singularism was open")].

Similarly, there is a compelling interest to ensure the psilocybin being consumed is not contaminated. Notwithstanding Utah's loosening of regulations concerning psilocybin for behavioral

---

[6] The Court previously questioned why Defendants sought such information as the "name, location, and phone number of the person supplying Singularism with psilocybin mushrooms." [*See, e.g.*, Dkt. at 56 n.4].  Confirming the frequency of shipments, the total amount of mushrooms purchased, and the source of the materials is directly relevant to **this** case.  For illustration purposes, it certainly would relevant to this case if "Inca" confirmed that Singularism purchased 10 kilograms of mushrooms last month alone.  Or it would be relevant to this case if "Inca" is the kingpin for a dangerous drug cartel.  Despite being prevented from fully questioning Plaintiffs' witnesses or conducting any discovery about the source, frequency, and volume of their drug purchases, the existing evidence nevertheless reveals the very substantial risk that even if Plaintiffs' alleged beliefs are sincere, they nonetheless support the recreational drug market and risk recreational diversion.

health treatment, the use and distribution of psilocybin is still closed except for behavioral health treatment that is conducted by a healthcare system. Utah Code § 58-37-3.5. This use and distribution of psilocybin, like the prescription of other controlled substances, remains highly controlled by the State.

The effectiveness of the closed system is undercut by exemptions that permit use and distribution of Schedule I drugs outside the limited clinical studies and behavioral treatment programs authorized under the CSA and Utah CSA. Defendants have a compelling government interest to enforce the enacted comprehensive controlled substance laws with a "closed system of drug distribution" in order to avert the significant dangers associated with Schedule I drugs and to combat the growing and intractable problems of drug abuse and drug trafficking.

**POINT II:    UTAH'S CLOSED SYSTEM OF REGULATING PSILOCYBIN IS THE LEAST RESTRICTIVE MEANS TO ACHIEVE ITS COMPELLING INTERESTS.**

In light of Defendants' vital governmental interest in public health and safety served by both the CSA and Utah's CSA, and the well-established findings by both federal and state legislation concerning the inherent risks of Schedule I drugs, the comprehensive and closed regulatory scheme under Utah's CSA also satisfies the least restrictive means analysis.

Plaintiffs have also failed to suggest an alternative scheme or regulation that may be less restrictive. Defendants cannot be expected to take on the Herculean burden of assessing every conceivable option. "The government should not be required to 'refute every conceivable option in order to satisfy the least restrictive prong of RFRA.'" *United States v. Wilgus*, 638 F.3d 1274, 1289 (10th Cir. 2011) (citations omitted). Rather, Defendants' "burden is two-fold: it must support its choice of regulation, and it must refute the alternative schemes offered by the challenger[.]" *Id.*; *accord United States v. Grady*, 18 F.4th 1275, 1286 (11th Cir. 2021) ("[G]overnment must refute the alterative schemes offered by the challenger."). Defendants cannot refute alternative schemes that

9

App-3:216

Plaintiffs have failed to offer.

Notwithstanding Plaintiffs' citation to a settlement agreement between the federal Drug Enforcement Agency ("DEA") and the Church of the Eagle and Condor ("CEC") [*see* Pls' Motion at 26, and Exhibit N], Plaintiffs' argument and position seem to be that no regulation or oversight of their use and distribution of psilocybin should be permitted. In the CEC case, the settlement agreement permitted CEC to import, use, and distribute ayahuasca tea for religious purposes, but also included strict requirements including, but not limited to, registration by CEC with the DEA, inspection of CEC by the DEA, permits by the DEA to import ayahuasca, record keeping by CEC of its inventory, security obligations by CEC to guard against theft and diversion of the ayahuasca, and even limitations on the agreement's duration. *See id*. Plaintiffs have not offered a similar approach in this case.

Plaintiffs previously have argued that this case is similar to *O Centro*, 546 U.S. 418, and that Court's least restrictive analysis controls.  As noted above, psilocybin and hoasca are not the same. Plaintiffs "cannot simply point to the other groups who have won accommodations for the sacramental use of peyote and hoasca and say 'we'll have what they're having' because the government has shown material differences . . . ." *Christie*, 825 F.3d at 1061.

In any event, the Utah CSA is materially different than the federal CSA.  Utah's statutory framework must be analyzed and given meaning, particularly where it departs from the federal CSA. Unlike the federal CSA, Utah law does not flatly remove Schedule I drugs for religious uses.  Instead, the Utah CSA expressly allows the State of Utah to proceed with enforcement actions.  It then places the burden of defense on the user's shoulders.

| Federal CSA | Utah CSA |
|---|---|
| "[T]he use, possession, or transportation of ***peyote by an Indian*** for bona fide traditional ceremonial purposes in connection with the practice of a traditional Indian religion ***is lawful*** . . . ." <br><br> 42 U.S.C. § 1996a. <br><br> "The listing of peyote as a controlled substance in ***Schedule I does not apply to*** the nondrug use of ***peyote in bona fide religious ceremonies*** of the Native American Church . . . ." <br><br> 21 C.F.R. § 1307.31. | "In a prosecution alleging violation of this section regarding ***peyote*** as defined in Section 58-37-4, it ***is an affirmative defense*** that the peyote was used, possessed, or transported by an Indian for bona fide traditional ceremonial purposes in connection with the practice of a traditional Indian religion." <br><br> Utah Code § 58-37-8. <br><br> "***It is not necessary for the state to negate any exemption or exception*** set forth in this act in any complaint, information, indictment or other pleading or trial, hearing, or other proceeding under this act, and ***the burden of proof*** of any exemption or exception ***is upon the person claiming its benefit.***" <br><br> Utah Code §58-37-15. |

Utah Code further declares that "***[n]o liability shall be imposed*** upon any duly authorized state or federal officer engaged in the enforcement of this act." Utah Code § 58-37-15(3) (emphasis added).

The plaintiffs in *O Centro* successfully established parity between peyote and hoasca under the federal CSA. In contrast, Plaintiffs are not seeking parity with peyote under the Utah CSA. Instead, they demand relief that substantially ***exceeds*** the existing provisions of the Utah CSA. Unlike the plaintiffs in *O Centro*, Plaintiffs cannot identify another religion that has received the relief they seek – a wholesale exception from police interaction or criminal prosecution under the Utah CSA. Indeed, the Utah CSA affirms that even medical researchers (among others) only receive an affirmative defense under the Utah CSA:

-   "It is an affirmative defense . . . if the person was [] engaged in medical research . . . ." Utah Code § 58-37-8.

-   "It is an affirmative defense" when user reports another's "overdose event." *Id.*

-   "It is a defense to a prosecution . . . that the person being prosecuted produces in court a valid prescription . . . ." *Id.* § 58-37-7.

11

App-3:218

Unlike the federal CSA, the Utah CSA ensures and allows the enforcement of the drug laws by allowing officers and prosecutors to uniformly enforce Utah's drug laws – without threat of civil claims. Officers (including defendants) do not have to first "negate any exemption or exception." *Id.* § 58-37-15. Instead, a user (like plaintiffs) must establish a defense if enforcement proceedings occur. Plaintiffs' demand for more is unprecedent in Utah law.

In sum, the compelling public health and safety interests advanced by the Utah CSA, the necessity of a comprehensive and closed regulatory scheme to control drug distribution, the complex and intractable character of drug abuse and drug trafficking problem, and the infeasibility of understanding the scope of Plaintiffs' intended use, possession, and distribution of psilocybin for religious purposes, all establish that Defendants have a compelling interest in prohibiting Plaintiffs' use of psilocybin, which cannot be served by any less restrictive means. The criminal process that began with the search warrant should move forward. At most, Plaintiffs should be allowed to assert an affirmative defense in that criminal process – just like a user relying on "a valid prescription," "medical research," or "traditional Indian religion." Utah Code §§ 58-37-7, -8.

## CONCLUSION

Because Defendants have a clear compelling government interest in enforcing the controlled substance laws, and the comprehensive and closed system of regulating the use and distribution of psilocybin is least restrictive means to accomplish those compelling interests, this Court should deny Plaintiffs' motion for a preliminary injunction and motion for anti-suit injunction.

Dated this 21ˢᵗ day of January, 2025

JAMES DODGE RUSSELL & STEPHENS, P.C.

/s/ Mitchell A. Stephens
Mitchell A. Stephens
Justin L. James
Dillon P. Olson

*Counsel for Utah County and Jeffrey Gray*


PROVO CITY LEGAL

/s/Richard A. Roberts
Gary D. Millward
Richard A. Roberts

*Counsel for Provo City, Troy Beebe, Brian Wolken, and Jackson Julian*

App-3:220

J. Brian Jones (11816)
Gary D. Millward (12170)
Richard A. Roberts (12217)
PROVO CITY ATTORNEY'S OFFICE
445 W Center St.
Provo, Utah 84601
(801) 852-6140
gmillward@provo.gov
rroberts@provo.gov

*Attorneys for Defendants Provo City, Troy Beebe, Brian Wolken, and Jackson Julian*

Mitchell A. Stephens (11775)
Justin L. James (15167)
Dillon P. Olson (16120)
JAMES DODGE RUSSEL & STEPHENS, P.C.
10 West Broadway, Ste. 400
Salt Lake City, Utah 84101
mstephens@jdrslaw.com
jjames@jdrslaw.com
dolson@jdrslaw.com

*Attorneys for Defendants Utah County and Jeffrey Gray*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BRIDGER LEE JENSEN, an individual; SINGULARISM, a non-profit corporation; PSYCHE HEALING AND BRIDGING, LLC dba PSYCHEDELIC THERAPY JOURNEY, a limited liability company;<br><br>  Plaintiffs,<br><br>v.<br><br>UTAH COUNTY, a political subdivision; PROVO CITY, a political subdivision; JEFFREY GRAY, an individual; TROY BEEBE, an individual; BRIAN WOLKEN, an individual; JACKSON JULIAN, an individual; JOHN DOES 1-4, individuals;<br><br>  Defendants. | **STIPULATION OF ALL PARTIES REGARDING JANUARY 23-24, 2025, HEARING**<br><br>Civil Case No. 2:24-cv-00887-JNP-CMR<br><br>Judge Jill N. Parrish<br><br>Magistrate Judge Cecilia M. Romero |

  Defendants Utah County and Jeffrey Gray (collectively "Utah County"), Defendants Provo City, Troy Beebe, Brian Wolken, and Jackson Julian (collectively "Provo") and Plaintiffs Bridger Lee Jensen, Singularism, and Psyche Healing and Bridging, LLC dba Psychedelic Therapy

1

App-3:221

Journey ("Plaintiffs") hereby notify the Court that they have reached the following agreement and stipulation concerning the hearing scheduled for January 23-24, 2025.  [*See* Dkt. 52].

The parties have agreed not to call any witnesses for live testimony during the hearing scheduled for January 23-24, 2025 (the "hearing").  They have further agreed as follows:

1.     The parties' briefing filed prior to the hearing, including exhibits, are admitted and may be considered by the Court for purposes of the hearing.  Notwithstanding the foregoing, Defendants reserve the right to object to any new exhibits Plaintiffs include with their supplemental reply [*see* Dkt. 65] or to cross examine any witness(es) concerning the substance of any declarations included with that supplemental reply.

2.     Testimony and exhibits from the 12/13/24 TRO Hearing are admitted and may be considered by the Court for purposes of the hearing.  Provided, however, that this stipulation is without waiver of any objections or ruling on objections made at the time of that hearing.

3.     The following additional exhibits are admitted and may be considered by the Court for purpose of the hearing:

  a. January 13, 2025, letter from Provo City, Subject: Business License Not Required for Religious Organizations.

  b. November 27, 2024, Forensic Analysis Report-CONTROLLED SUBSTANCE ANALYSIS.

  c. Provo Police, Officer Report for Incident 24PR24922 (updated copy through December 2, 2024) (some information redacted under Federal Rule of Civil Procedure 5.2).

  d. November 28, 2023, FinCEN Continuing Activity Report (some information redacted under Federal Rule of Civil Procedure 5.2).

  e. March 12, 2024, FinCEN Continuing Activity Report (some information redacted under Federal Rule of Civil Procedure 5.2).

f.  *Psychedelic Mushroom Interest Grows in Utah With Center Opening in Provo*, FOX 13 News (Nov. 2, 2023), https://www.fox13now.com/news/local-news/psychedelic-mushroom-interest-grows-in-utah-with-center-opening-in-provo (PDF copy, otherwise cited in Complaint)

g.  Body camera footage from Jan. 17, 2025.

h.  Voluntary Statement Form, 25PR01087, Jan. 17, 2025 (some information redacted under Federal Rule of Civil Procedure 5.2)

i.  Audio recording(s) from service of search warrant.

j.  Website prints for: Singularism (Ex. J1); BridgerLeeJensen (Ex. J2); PsychedelicTherapyJourney (Ex. J3); Jensen's linkedIn (Ex. J4); and PsychedelicTherapyAcademy (Ex. J5).

k.  Certificate of Organization for Psyche Healing and Bridging, LLC.

l.  Police and EMT reports from Jan. 16, 2025 (some information redacted under Federal Rule of Civil Procedure 5.2).

m.  Body camera footage from Jan. 16, 2025.

n.  911 calls from Jan. 16, 2025.

o.  Docket from Case No. 241404407.

5.  This stipulation is without waiver of any arguments either party contends can or should be determined as a matter of law.  For example, this stipulation is not intended to alter the nature of Defendants' pending Motion to Dismiss (Dkt. 40).  *See generally* Fed. R. Civ. P. 12(d).

Subject to the Court's direction, the parties anticipate beginning on January 23, 2025, by (1) arguing Defendants' Motion to Dismiss (Dkt. 40) then (2)arguing legal issues arising from Plaintiffs' Motion for Anti-Suit Injunction (Dkt. 39), and then (3) addressing Plaintiffs' Motion for Preliminary Injunction (Dkt. 9) including any factual questions or issues that arise from the additional exhibits submitted herewith.

3

Given this stipulation, the parties agree that the second day of the hearing scheduled for January 24, 2025, likely will not be necessary.

Dated this 22nd Day of January, 2025.

JAMES DODGE RUSSELL & STEPHENS, P.C.

/s/ Mitchell A. Stephens
Mitchell A. Stephens
Justin L. James

*Counsel for Utah County and Jeffrey Gray*

PROVO CITY LEGAL

/s/ Nicholas Muhlestein
Gary D. Millward
Richard A. Roberts
Nicholas Muhlestein

*Counsel for Provo City, Troy Beebe, Brian Wolken, and Jackson Julian*

FABIAN VANCOTT

/s/ Tanner J. Bean
Tanner J. Bean
Anna P. Christiansen
Jacqueline M. Rosen

*Counsel for Bridger Lee Jensen, Singularism, and Psyche Healing and Bridging, LLC dba Psychedelic Therapy Journey*

4

J. Brian Jones (11816)
Gary D. Millward (12170)
Richard A. Roberts (12217)
PROVO CITY ATTORNEY'S OFFICE
445 W Center St.
Provo, Utah 84601
(801) 852-6140
gmillward@provo.gov
rroberts@provo.gov

*Attorneys for Defendants Provo City, Troy
Beebe, Brian Wolken, and Jackson Julian*

Mitchell A. Stephens (11775)
Justin L. James (15167)
Dillon P. Olson (16120)
JAMES DODGE RUSSEL & STEPHENS, P.C.
10 West Broadway, Ste. 400
Salt Lake City, Utah 84101
mstephens@jdrslaw.com
jjames@jdrslaw.com
dolson@jdrslaw.com

*Attorneys for Defendants Utah County and
Jeffrey Gray*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BRIDGER LEE JENSEN, an individual; SINGULARISM, a non-profit corporation; PSYCHE HEALING AND BRIDGING, LLC dba PSYCHEDELIC THERAPY JOURNEY, a limited liability company;<br><br>Plaintiffs,<br><br>v.<br><br>UTAH COUNTY, a political subdivision; PROVO CITY, a political subdivision; JEFFREY GRAY, an individual; TROY BEEBE, an individual; BRIAN WOLKEN, an individual; JACKSON JULIAN, an individual; JOHN DOES 1-4, individuals;<br><br>Defendants. | **REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**<br><br>Civil Case No. 2:24-cv-00887-JNP-CMR<br><br>Judge Jill N. Parrish<br><br>Magistrate Judge Cecilia M. Romero |

Pursuant to Rules 7 and 12(b)(6) of the Federal Rules of Civil Procedure, Defendants Utah County (the "County"), Jeffrey Gray ("Gray") (collectively "Utah County") and Provo City (the "City"), Troy Beebe ("Beebe"), Brian Wolken ("Wolken"), and Jackson Julian ("Julian") (collectively "Provo"), submit this reply memorandum in support of their motion to dismiss the claims filed by Plaintiffs Bridger Lee Jensen ("Jensen"), Singularism ("Singularism"), and Psyche Healing and Bridging, LLC ("Psyche Healing") (collectively "Plaintiffs").

### INTRODUCTION

Plaintiffs are wrong; Defendants want this Court to address the federal law questions. Those are the issues over which it has original jurisdiction. And those issues can and should be decided now in Defendants' favor. Once the federal claims are dismissed, the remaining state law claims present novel and unique legal questions. Thus, while Defendants contend that Plaintiffs' state claims also fail on the merits, Defendants recognize that the Court should dismiss them for jurisdictional reasons.

This Court has recognized that "[b]oth the United States Supreme Court and the Tenth Circuit have encouraged district courts to dismiss (or remand) supplemental state claims when the claim or claims that initially gave rise to federal court jurisdiction have been dismissed before trial." *See Aus v. Salt Lake Cnty.*, No. 2:16-CV-00266-JNP, 2021 WL 4991404, at *2 (D. Utah Oct. 27, 2021) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) and *Barnett v. Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C.*, 956 F.3d 1228, 1238 (10th Cir. 2020)). Thus, the primary issue before the Court is not whether Utah's newly enacted RFRA empowers Plaintiffs to use and distribute a Schedule 1 controlled substance, but whether Defendants violated Plaintiffs' constitutional rights. As set forth below, Defendants have not.

Plaintiffs' federal claims should be dismissed.  With those federal claims dismissed, "[n]otions of comity and federalism demand that a state court try its own lawsuits," and the remaining claims should be remanded to (and then dismissed by) the state court.  *See Ball v. Renner*, 54 F.3d 664, 669 (10th Cir. 1995).

## ARGUMENT

### I.    PLAINTIFFS' FIRST CAUSE OF ACTION SHOULD BE DISMISSED BECAUSE PLAINTIFFS CANNOT ESTABLISH A FIRST AMENDMENT VIOLATION.

At its core, "the Free Exercise Clause . . . 'protects religious observers against unequal treatment' and against 'laws that impose special disabilities on the basis of religious status.'" *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 475 (2020) (quoting *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 461 (2017)).

Plaintiffs' Opposition argues that because the Utah legislature recently enacted the Utah Psilocybin Act, the Utah CSA is suddenly subject to strict scrutiny because it prohibits religious use while permitting secular conduct. [Opp. At 8]. But Plaintiffs' misconstrue what it means to "permit secular conduct" while limiting similar religious conduct.

Contrary to Plaintiffs' overly simple construction, laws that universally prohibit use of controlled substances for non-medicinal reasons repeatedly have been deemed neutral and generally applicable.  Indeed, the interplay between the Utah CSA and the newly enacted Utah Psilocybin Act is not new or unique in the context of Free Exercise cases.  Limited "secular use"— as Plaintiffs describe the Utah Psilocybin Act—was available in *Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872 (1990) when the Supreme Court denied the respondents attempt to use the Free Exercise Clause to avoid Oregon laws prohibiting the use of peyote.  There, "Oregon law prohibit[ed] the knowing or intentional possession of a 'controlled substance' ***unless the***

3

***substance ha[d] been prescribed by a medical practitioner.***"  *Id.* at 874 (citing Ore.Rev.Stat. §

475.992(4) (1987)) (emphasis added).  Despite Oregon's laws allowing a "secular" exception to

its prohibition against controlled substances, the Supreme Court repeatedly acknowledged that

Oregon's drug law was neutral and generally applicable.

Indeed, Justice Blackmun's dissent in *Smith* made arguments identical to Singularism's

current arguments.  Justice Blackmun recognized that even "Schedule I drugs have lawful"—or

secular "uses" such as "medical and research uses of marijuana."  *Id.* at 1619 (Blackmun, J.

dissenting).  His dissent then argued that the respondents "internal restrictions on, and supervision

of, its members' use of peyote [similarly] obviated the State's health and safety concerns." *Id.* at

1619 (Blackmun, J., dissenting).[1]  However, Justice Blackmun was outvoted by the majority of

the Court, which found no religious exemption under the First Amendment for peyote use despite

the law's allowance for medical uses.

Like the drug laws at issue in *Smith,* the Federal CSA, and other state CSAs, the Utah CSA

---

[1] Notably, Justice Blackmun's dissent also relied on the significant difference between peyote and more mainstream drugs.  He argued that "[p]eyote simply is not a popular drug; its distribution for use in religious rituals has nothing to do with the vast and violent traffic in illegal narcotics that plagues this country." *Id.* at 1620.  However, psilocybin very much is part of the "vast and violent traffic" of illegal drugs.  *Id.*  In 2024, the National Institute on Drug Abuse reported that "seizures of 'magic mushrooms'" had "increased dramatically in the United States." *See* NIH, *Law Enforcement Seizures of Psilocybin Mushrooms Rose Dramatically Between 2017-2022* (Feb. 6, 2024). The 2023 National Survey on Drug Use indicates that "Psilocybin/Mushrooms" is the most used "Hallucinogen[]," beating out "LSD," "Ecstasy," and "PCP."  In contrast, Peyote is among the least used.  In both 2022 and 2023, more minors ("Aged 12-17") used "Psilocybin/Mushrooms" than any other hallucinogen. Indeed, minors were more than 1,300% more likely to have used "Psilocybin/Mushrooms" than peyote – again confirming the vastly different black markets for these two drugs. Likewise, lifetime usage (age 12 or older) of "Psilocybin/Mushrooms" was three times higher than crack, five times higher than heroin, and two times higher than methamphetamine.  *See* https://www.cdc.gov/nchs/hus/sources-definitions/nsduh.htm   In other words, even Justice Blackmun's dissent in *Smith* would not save Plaintiffs' First Amendment claim.

is generally applicable despite anticipating certain medical uses.  The law applies equally to all, "regardless of their religious beliefs or affiliations." *Id*. at 1225.  Furthermore, medical exemptions have always existed in the Utah CSA and federal CSA.  Indeed, that is the reason why pharmacies and medical prescriptions exist.  *See, e.g.*, Utah Code § 58-37-8.  A system that uniformly allows for medical oversight of controlled substances does not violate the First Amendment.  *See, e.g.*, *Smith*, 494 U.S. at 874 (affirming prohibition of peyote "unless the substance has been prescribed by a medical practitioner"); *Olsen v. Mukasey*, 541 F.3d 827, 832 (8th Cir. 2008) (rejecting argument that CSA was "not generally applicable" because it allows "certain research and medical uses of marijuana"); *Michigan Cath. Conf. & Cath. Fam. Servs. v. Burwell*, 755 F.3d 372, 394 (6th Cir. 2014) ("A law need not apply to every person or business in America to be generally applicable. A law is generally applicable if it does not make distinctions based on religion.").

As previously argued, Courts repeatedly have ruled that general prohibitions against controlled substances are neutral and generally applicable despite having exemptions. *See, e.g.*, *Smith*, 494 U.S. at 875; *Multi-Denominational Ministry of Cannabis and Rastafari, Inc. v. Holder*, 365 F. App'x 817, 819 (9th Cir. 2010) ("Because drug laws are both neutral and generally applicable, they may be enforced even if doing so substantially burdens one's religion." (cleaned up)); *Peyote Way Church of God v. Thornburgh*, 922 F.2d 1210, 1213 (5th Cir. 1991) (ruling drug law "does not offend the First Amendment's free exercise clause"); *Olsen v. Drug Enforcement Agency*, 878 F.2d 1458, 1461 (D.C. Cir. 1989) (J. Bader Ginsburg) ("[F]ree exercise clause does not compel DEA to grant [plaintiff] an exemption immunizing his church from prosecution for illegal use of marijuana."); *United States v. Greene*, 892 F.2d 453, 456-57 (6th Cir. 1989) ("Congress may control the use of drugs that it determines to be dangerous, even if those drugs are

used for religious purposes.").

Plaintiffs do not cite a single case where a court has held that a CSA is subject to strict scrutiny because it is not generally applicable or neutral. Simply put, like the respondents in *Smith,* Plaintiffs "urge [this Court] to hold, quite simply, that when otherwise prohibitable conduct is accompanied by religious convictions, not only the convictions but the conduct itself must be free from governmental regulation." *Id.* at 882. The Supreme Court has "[]ever held that," and this Court should "decline to do so now." *Id.*

## II.   PLAINTIFF'S FOURTH CLAIM FOR UNREAONSBLE SEARCH AND SEIZURE SHOULD BE DISMISSED.

Plaintiffs' only other federal claim is ther Fourth Claim based on the protections offered by the Fourth Amendment of the United States Constitution. [*See* Complaint (Dkt. 2-2) ¶¶ 105-113]. It too fails as a matter of law.

The only "searches and seizures" that Plaintiffs allege occurred on November 11, 2024, when "Detective Julian…presented at Singularism's spiritual center with a warrant to search the premises and seize certain items." [Complaint (Dkt. 2-2) at ¶ 33]. Plaintiffs' claim for unreasonable search and seizure must be dismissed because the searches and seizures were done pursuant to a search warrant issued by the Fourth District Court, State of Utah. [*See, e.g.*, Complaint (Dkt. 2-2) at ¶ 2 (recognizing and attaching search warrant); Dkt. 13-14 (warrant)].

This is an issue of judicial immunity. It is not, as plaintiffs argue, a question of prosecutorial or police immunity. [*See* Opposition at 20-24 (arguing that there is no absolute immunity for prosecutors or police officers)]. Put simply, if Judge Petersen and the Fourth District Court are not liable for issuing the search warrant, Defendants cannot be held liable for following that Order. *See* Utah R. Crim. P. 40(a)(3) ("'Search warrant' is an order . . . .").

6

App-3:230

"A judge is absolutely immune from liability for his judicial acts even if his exercise of authority is flawed by the commission of grave procedural errors." *Stump v. Sparkman*, 435 U.S. 349, 359 (1978). It follows that there is "absolute immunity for officials assigned to carry out a judge's orders." *Moss v. Kopp*, 559 F.3d 1155, 1163 (10th Cir. 2009). "Just as judges acting in their judicial capacity are absolutely immune from liability under section 1983, officials charged with the duty of executing a facially valid court order enjoy absolute immunity from liability for damages in a suit challenging conduct prescribed by that order." *Turney v. O'Toole,* 898 F.2d 1470, 1472 (10th Cir. 1990) (cleaned up); *accord Welch v. Saunders*, 720 Fed. Appx. 476, 480-81 (10th Cir. 2017) (same); *Martinez v. Gonzales*, 623 Fed. Appx. 940, 941 (10th Cir. 2015) (same); *Hackett v. Artesia Police Dept.*, 379 Fed. Appx. 789, 793 (10th Cir. 2010) (applying same). To rule otherwise would require those officials charged with the duty of executing a court's order to second guess the judge's decision. "State officials 'must not be required to act as pseudo-appellate courts scrutinizing the orders of judges . . . ." *Turney*, 898 F.3d at 1472.

Plaintiffs' opposition ignores judicial and quasi-judicial immunity and instead argues a strawman. Plaintiffs contend that "police officers do not generally have absolute immunity" and neither do prosecutors. [Opp. At 20-23]. But that is not the issue. The issue is a search warrant issued by the Fourth District Court. And because Judge Petersen cannot be held liable for his order, Defendants cannot be held liable for their compliance with Judge Petersen's order.

Plaintiffs' claim also cannot be saved by arguing actions "prior to the execution of the search warrant" or "unrelated to the search warrant" because there were not any other searches or seizures. *See generally Soldal v. Cook Cnty.*, 506 U.S. 56, 61 (1992) ("A 'seizure' of property . . . occurs when 'there is some meaningful interference with an individual's possessory interests in

that property.'"). For example, Plaintiffs suggest that it was wrong for Defendants to notify Singularism's landlord of the criminal investigation. But regardless of the propriety of the Defendants' pressure, the landlord did not evict Singularism or interfere with its possession of the property. In other words, there was no search or seizure from allegedly pressuring the landlord. Without a search or seizure there can be no Fourth Amendment violation.

The Fourth Amendment protects against unreasonable searches and seizures. It does not protect against disparaging statements to landlords or the public. Because the only search and seizure occurred pursuant to a search warrant issued by the Utah Fourth District Court, Plaintiffs' Fourth Amendment claim fails and must be dismissed.

## III.   THE COURT SHOULD DECLINE TO EXERCISE SUPPLEMENTAL JURISDICTION OVER PLAINTIFFS' STATE LAW CLAIMS.

Plaintiffs' remaining claims do not present a federal question but, instead, rely on Utah law. Defendants' Motion argued that "[b]ecause Plaintiffs second, third, and fifth claims are premised in state law, and there is no diversity jurisdiction issue, this Court should decline to exercise supplemental jurisdiction once the federal claims have been dismissed." [Motion at 12]. Plaintiffs responded by arguing the case should not be bifurcated. Even if the Court accepted that argument, it misses the point. Recognizing the impact of dismissing the federal claims is not a discretionary bifurcation. It is a necessary jurisdictional analysis.

The Tenth Circuit has been clear on what should be done when the federal claims are dismissed before trial. "Certainly, if the federal claims are dismissed before trial . . . the state claims should be dismissed as well." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966). And that makes sense here.

"Notions of comity and federalism demand that a state court try its own lawsuits, absent compelling reasons to the contrary." *Ball v. Renner*, 54 F.3d 664, 669 (10th Cir. 1995). Plaintiffs have not provided the Court with any compelling reason to exercise supplemental jurisdiction other than an "alleged factual overlap between the federal and state constitutional and statutory claims." [Opp. At 6]. However, with the federal claims dismissed, Plaintiffs' only stated reason for retaining jurisdiction over the state law claims is negated. Indeed, even without dismissal the Court should decline to exercise jurisdiction over novel questions of Utah law.

## IV. EVEN IF THE COURT EXERCISES SUPPLEMENTAL JURISDICTION, PLAINTIFFS ARE NOT ENTITLED TO RELIEF ON THEIR STATE CLAIMS.

Even if the Court were to exercise supplemental jurisdiction over the state law claims, those claims still should be dismissed or significantly narrowed.

### A. Plaintiffs' Claim Under the Utah Constitution's Religious Liberty Section Fails Because the Utah Constitution Does Not Legalize Hallucinogenic Drugs.

In their Motion, Defendants argued that Plaintiffs' claims under Utah's Constitution fail because Utah's CSA is neutral and generally applicable. [Motion at 15-17]. Plaintiffs oppose dismissal of their state constitutional claims by arguing only that Article I, section 4 of the Utah Constitution requires strict scrutiny. [Opp. at 12]. Plaintiffs have not otherwise challenged the neutrality or general applicability of Utah's CSA. Thus, if Plaintiffs' argument that strict scrutiny applies is wrong, their claim under the Utah Constitution must be dismissed. As set forth below, strict scrutiny does not apply.

Plaintiffs first rely on *Jeffs v. Stubbs,* 970 P.2d 1234 (Utah 1998) to support their argument that, unlike the US Constitution that only requires neutrality, strict scrutiny applies to the Utah's Free Exercise clause. However, the *Jeffs* Court expressly recognized that the Utah Supreme Court

9

had "never determined whether the free exercise clause of article I, section 4 of the Utah Constitution provides protection over and above that provided by the First Amendment of the United States Constitution[,] *[a]nd we do not decide that question today[.]"* *Id.* at 1249 (emphasis added). At most, *Jeffs* identifies an unresolved issue of Utah law. While the Court should consider *Jeffs* when analyzing supplemental jurisdiction, that case does not save Plaintiffs' claim from dismissal.

Next, Plaintiffs rely on *State v. Green,* 2004 UT 76, 99 P.3d 820. However, the Utah Supreme Court's opinion in *Green* did not address Utah's constitution at all. Rather, as the court recognized, the plaintiff's "free exercise claim [wa]s based solely on the provision of the United States Constitution" and there was "no claim under the religious liberty provision of the Utah Constitution." *Id.* at ¶ 16, n.7. "Strict scrutiny" was referenced in Justice Durrant's concurrence. In a footnote of that dissent, Justice Durrant expressed that he personally "would apply strict scrutiny not only to free exercise claims under the United States Constitution, but to claims under the Utah Constitution as well." *Id.* ¶ 70 n.1. Again, *Green* should likely give a federal court pause when examining supplemental jurisdiction. But it does not support prevent Plaintiffs' claim from dismissal.

Finally, in *State v. Holm,* 2006 UT 31, 137 P.3d 726, the Supreme Court quoted its *Jeffs* opinion, again noting that the Utah Supreme Court "has never determined whether the free exercise clause of article I, section 4 [and related clauses] of the Utah Constitution provide protection over and above that provided by the First Amendment to the United States Constitution" and "need not address that questions here." *Id.* at ¶ 35. One dissenting opinion mentioned strict scrutiny, but even that analysis was not necessary for that minority view. *See id.* at ¶ 166 (Durahm, J.,

10

App-3:234

concurring & dissenting) (arguing act was unconstitutional regardless of "whether typical strict scrutiny is applied").

In other words, despite Plaintiffs' claiming that the Utah Supreme Court has mandated a different, more stringent standard than what applies under the United States Constitution, all of the authority Plaintiffs rely on for support expressly reject such an interpretation.

Thus, in order to reach the conclusion that Plaintiffs request, the Court would yet again need to plow new legal ground. This Court would need to rule that the Free Exercise clause under the Utah State Constitution affords protections greater than those offered by the First Amendment of the United States. The Utah Supreme Court has yet to go that far, and this Court should decline the invitation to do so now.

B.      Plaintiffs cannot Seek Damages Under the Utah RFRA

Plaintiffs' claim for damages under the Utah RFRA must be dismissed because that act does not allow for "damages" as a remedy. Predictably, Plaintiffs cite *Tanzin v. Tanvir,* 592 U.S. 43 (2020) to support their argument that they are entitled to monetary damages. And there can be no dispute that Utah's RFRA was modeled, in part, after the Federal RFRA. But that fact does not weaken Defendants arguments. Rather it strengthens it. Because, while the Utah RFRA was enacted with the federal RFRA in mind, as it relates to remedies, it did not copy exactly the Federal RFRA's language. [Motion at 18].

The omission of damages as an available remedy is not a mere oversight; it must be presumed to be purposeful. *See 2 Ton Plumbing, L.L.C. v. Thorgaard*, 2015 UT 29, ¶ 47 ("When faced with a question of statutory interpretation, our general rule is that we will 'give effect to omissions in statutory language' by presuming them to be purposeful."). Oddly, while Plaintiffs

11

App-3:235

acknowledge that the decision in *Tanzin* hinged on the word "appropriate," Plaintiffs strain to interpret Utah's RFRA's omission of "appropriate" as the Legislature's attempt to clearly establish the right to damages. But nothing in *Tanzin* suggests that "appropriate" was used to constrict the interpretation of "relief." Rather, "appropriate" was used as an expansion of "relief." *Id.*

Moreover, any ambiguity between "appropriate relief" and "relief" is relieved by looking to when a person can seek relief. Under the Federal RFRA, "appropriate relief" is available to anyone whose religious exercise "has been burdened." Thus, as the United States Supreme Court acknowledge, when a religious exercise *has been* burdened, but is no longer being burdened, as was the case in *Tanzin,* damages may be "the only form of relief." *Id.* at 492. Conversely, Utah's RFRA only applies when a person's free exercise "*is*" burdened. Utah Code § 63-33-201. Plaintiffs' opposition is silent on the "has been" verses "is" distinction. This additional distinction between the Utah RFRA and the Federal RFRA makes clear that Utah's RFRA does not allow for damages. Indeed, the Utah legislature changed every term that the *Tanzin* court relied upon to reach its conclusion that damages were available under the Federal RFRA.

Additionally, the Supreme Court in *Tanzin* recognized that the federal RFRA did not waive sovereign immunity for claims against state actors. *Id.* ("[T]his case features a suit against individuals who do not enjoy sovereign immunity."). Likewise, the Utah RFRA does not waive immunity. "A statute does not waive sovereign immunity . . . unless that disposition is unequivocally clear." *See* Scalia & Garner, *Reading Law: The Interpretation of Legal Texts*, 281 (2012). The Utah RFRA does not unequivocally waive immunity and allow for monetary damages awards against government entities. To the contrary, such immunity is expressly retained: "A governmental entity, its officers, and its employees are immune from suit and immunity is not

waived, for any injury proximately caused by a negligent act or omission…if the injury arises out of or in connection with or results from…a violation of civil rights." Utah Code § 63G-7-201(4). Likewise, the Utah CSA also retains immunity. *See* Utah Code § 58-37-15(3) ("No liability shall be imposed upon any duly authorized state or federal officer engaged in enforcement of this act[.]"). Plaintiffs' contrary arguments would contradict two express provisions of the Utah Code. *See In re E.H.,* 880 P.2d 11, 13 (Utah Ct. App. 1994) ("Utah courts have a duty to interpret statutes so that they will not be rendered meaningless.").

Plaintiffs make no argument regarding immunity from damages in their opposition. But this issue, standing alone, is fatal to Plaintiffs' claim for damages under Utah's RFRA. Even assuming the Court rejects the difference in the wording of the Utah RFRA, immunity still prevents Plaintiffs from seeking damages. For this additional reason, Plaintiffs' Utah RFRA claim should be dismissed to the extent it seeks damages.

C. <u>Defendants Are Entitled To Immunity From Plaintiffs' Fifth Claim Alleging Violations Under the Utah Constitution's Protection from Unreasonable Searches.</u>

Plaintiffs offer a single paragraph in opposition to Defendants' Motion as it relates to Plaintiffs' Fifth Claim. Plaintiffs' sole argument is that the UGIA does not apply to state constitutional violations. Again, Plaintiffs miss the point. Plaintiffs have not distinguished their unlawful search and seizure claim under the Fourth Amendment of the United States Constitution from their claim under Utah's Constitution. And because they have not distinguished their claim, the analysis is the same. As argued above, Defendants are entitled to absolute immunity because the search and seizures were performed pursuant to a court order. That same immunity applies to protect Defendants from the State constitutional claim. Accordingly, Plaintiffs' Fifth Claim should be dismissed.

App-3:237

## V.   PLAINTIFFS MUST POST A BOND IF THE COURT DOES NOT GRANT THE MOTION TO DISMISS.

If the Court denies Defendants' Motion to Dismiss and permits Plaintiffs to continue any claims against the individual law enforcement officers, Plaintiffs must post a bond.  Utah Code section 78B-3-104(1) unambiguously declares as follows:  "A person may not file an action against a law enforcement officer acting within the scope of the officer's official duties unless the person has posted a bond in an amount determined by the court." The amount of the bond is intended to cover "all estimated costs and attorney fees the officer may be expected to incur in defending the action." *Id*. at 104(2).

Utah law obligates Plaintiffs to establish and pay a bond at the time they name the individual officers. *See* Utah Code § 78B-3-104(1); *Mglej v. Garfield City*, 2014 WL 2967605 at *2 (D. Utah July 1, 2014) ("Utah case law is clear that undertakings and bonds must be filed contemporaneously with the filing of the complaint."). Accordingly, this Court should require Plaintiffs to post a bond that will cover the expected costs and attorney fees to be incurred in defending against these claims.

## CONCLUSION

Because Defendants have not violated Plaintiffs' federal rights, Plaintiffs' federal claims should be dismissed. With the claims which gave rise to jurisdiction dismissed, the Court should dismiss without prejudice the remaining state law claims so that Utah Courts can address the novel and unique state law questions.

14

Dated this 22nd Day of January, 2025.

JAMES DODGE RUSSELL & STEPHENS, P.C.

*/s/ Justin L. James*
Mitchell A. Stephens
Justin L. James

*Counsel for Utah County and Jeffrey Gray*

PROVO CITY LEGAL

*/s/ Gary Millward*
Gary D. Millward
Richard A. Roberts

*Counsel for Provo City, Troy Beebe, Brian Wolken, and Jackson Julian*

App-3:239

Tanner J. Bean (A17128)
tbean@fabianvancott.com
Anna P. Christiansen (A17518)
achristiansen@fabianvancott.com
Jacqueline M. Rosen (A18530)
jrosen@fabianvancott.com
**FABIAN VANCOTT**
95 South State Street, Suite 2300
Salt Lake City, UT 84111-23323
Telephone: (801) 531-8900
*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BRIDGER LEE JENSEN, an individual; SINGULARISM, a non-profit corporation; PSYCHE HEALING AND BRIDGING, LLC dba PSYCHEDELIC THERAPY JOURNEY; a limited liability company;<br><br>Plaintiffs,<br>vs.<br><br>UTAH COUNTY, a political subdivision, PROVO CITY, a political subdivision; JEFFREY GRAY, an individual; TROY BEEBE, an individual; BRIAN WOLKEN, an individual; JACKSON JULIAN, an individual; JOHN DOES 1-4, individuals;<br><br>Defendants. | **PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**<br><br>Civil No. 2:24-cv-00887-JNP<br><br>Judge Jill N. Parrish<br><br>(Removed from Fourth Judicial District Court, Utah County, State of Utah, Case No. 240406123) |

Pursuant to the Court's Order, *see* ECF 65, Plaintiffs Bridger Lee Jensen, Singularism, and

Psyche Healing and Bridging LLC (dba Psychedelic Therapy Journey) ("Plaintiffs" or

1

App-3:240

"Singularism") hereby file this Supplemental Brief in Support of Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction.

### INTRODUCTION

Perhaps realizing that their efforts to prevent the Court from reaching strict scrutiny review have failed, Defendants provide supplemental briefing to the Court on the two issues upon which they carry the burden of proof in that analysis: (1) whether they have compelling governmental interests in specifically denying Singularism a religious exemption and (2), for this first time in this case, whether complete prohibition of psilocybin is the least restrictive means by which they can accomplish those interests.

Defendants' supplemental briefing fails to indicate Defendants can shoulder their burden on either of these prongs of strict scrutiny. First, Defendants fail to articulate anything beyond an improperly generalized governmental interest, arguing a rationale that was specifically rejected by the U.S. Supreme Court in *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*. Second, Defendants fail to demonstrate that outright prohibition of psilocybin is the least restrictive means available to them to accomplish their interest. Singularism has proposed multiple less restrictive means and Defendants appear to have proposed one themselves. Thus, Defendants' supplemental briefing does nothing to excuse Defendants' constitutional violations.

Additional evidence obtained from Defendants indicates that Defendants' concerns regarding contaminated psilocybin are unfounded, that they have confirmed that Singularism is a religion, that Defendants knew Singularism was religiously sincere when it acted against Singularism, and that Defendants' actions caused harm even before the search and seizure, compromising Singularism's bank accounts at KeyBank. As a result of this and the other evidence

2

App-3:241

that has been presented to the Court, the Court should grant Singularism's motion for a preliminary injunction.

## ARGUMENT

### I.   DEFENDANTS LACK THE TAILORED GOVERNMENTAL INTEREST REQUIRED.

Defendants bear the burden of demonstrating they have a *particularized* compelling governmental interest, not a *generalized* one. Defendants have made no argument, across multiple briefs and before this Court, that that standard does not apply. *See* ECF 9, at 13, 19 (setting forth standard and illustrating its use in *Burwell v. Hobby Lobby Stores, Inc.*); ECF 13, at 35-37 (failing to dispute standard); ECF 19, at 12-13 (noting Defendants' failure to dispute standard); ECF 64-1, at 3-9 (again failing to dispute standard); *see also* ECF 53 (Tr. of Dec. 13, 2024 Hearing), at 22:1-14; ECF 24, at 2 ("The court also finds that the government has not shown a compelling interest in prohibiting Singularism from using psylocibin outright and accordingly has not carried its burden."). Thus, as this Court has already recognized, the question before this Court is not whether the government "has a compelling interest in enforcing its non-discrimination policies generally, but whether it has such an interest in denying an exception" to Singularism specifically. *Fulton v. City of Philadelphia, Pennsylvania*, 593 U.S. 522, 541 (2021). The Court must "scrutinize the asserted harm of granting specific exemptions" to Singularism. *Id.*

Defendants may not "rely on broadly formulated interests." *Id.* Yet, that is precisely what they continue to do. Their supplemental brief argues that generally, psilocybin is dangerous, and, thus, Defendants have an interest in regulating it without exception. But even if all the sources

3

App-3:242

Defendants newly cite to make this argument supported Defendants' assertions (and they don't[1])

they have no effect upon the Court's analysis because these sources do nothing to demonstrate that

allowing Singularism a religious exemption would contribute to any of the harms Defendants

assert. It is impossible for these sources to do so, as none of them contain factual content regarding

Singularism.

---

[1]    The new sources Defendants cite to support their claim that psilocybin is dangerous fare no better than the last batch of sources to which Defendants pointed. *See* ECF 19, at 13-15; ECF 59, at 10. For example, Defendants rely on an article by the Utah Poison Control Center to claim a connection between psilocybin use and liver failure. *See* ECF 64-1, at 4. However, Defendants' representation of this source is misleading. While the article references a "possible case of amatoxin (mushroom) induced liver failure and death," it explicitly differentiates between amatoxin-containing mushrooms and psychedelic mushrooms, stating unequivocally that "Psychedelic mushrooms (magic mushrooms) do not cause liver damage" and that it "is highly unusual for hepatotoxic mushrooms to be mistaken for psychedelic mushrooms." ECF 64-1, at 4 n.1. Moreover, the reported instance of liver failure in the article is merely a "possible" case still under investigation, and the article notes that "the poison center is not aware of any confirmed cases of amatoxin induced liver failure ever occurring in Utah." *Id.*

Defendants further allege that "illicit drug purchases regularly support dangerous, far-reaching and widespread criminal enterprise." ECF 64-1, at 5. To support this claim, Defendants provide the Court with a lengthy string cite without particularized citations, other than to instruct the Court to dig through press releases from the U.S. Department of Justice ("DOJ"). *Id.* The first cited source, a "National Drug Threat Assessment" is a DOJ publication that, across its 100 pages, mentions psilocybin only once—and only in passing in a discussion of marijuana. *See https://www.justice.gov/d9/pages/attachments/2021/08/18/2020_national_drug_threat_assessment_ndta.pdf*. The publication focuses on fentanyl, methamphetamine, cocaine, and controlled prescription drugs. Moreover, the other sources cited in Defendants' string cite fail to address psilocybin as a primary concern, instead focusing predominantly on drugs such as fentanyl and methamphetamine. In many instances, the role of psilocybin, if mentioned at all, is peripheral and lacks clarity as to its context or purpose of use. That there have been seizures of psilocybin in other contexts does nothing to indicate that Singularism's sacramental usage is unlawful. Finally, Defendants cite, for the second time, a National Institutes of Health publication which Singularism has already shown Defendants have misrepresented. *See* ECF 59, at 10 n.2.

Singularism could cite to the Court a wealth of academic research indicating the benefits of psilocybin and how to administer it safely, *see, e.g.* ECF 9-15, but dueling articles will not aid the Court in analyzing whether Defendants have met their burden to demonstrate they have an interest of the highest order in denying *Singularism specifically* a religious exemption, as Singularism is not mentioned in any of those articles.

Again, the closest Defendants have come to attempting to engage with the particularized burden they carry is by asserting *speculative* harms. *See* ECF 19, at 33-34; ECF 64-1, at 8, n.8 (arguing that available evidence shows a "very substantial *risk*" that Singularism's beliefs "*risk recreational diversion*" (emphasis added)).[2] In Defendants' supplemental briefing, Defendants attempt to argue that because Singularism obtained psilocybin, possessed a particular amount of psilocybin,[3] and gave that psilocybin to its voyagers, such actions necessarily entail Singularism's participation in a "secular criminal enterprise[]," which "support[s] a dangerous yet thriving black market." ECF 64-1, at 5, 7.[4] Of course, this argument wrongfully assumes Singularism's conduct is unlawful. It is not. Plaintiffs have demonstrated they are entitled to take these actions pursuant

---

[2]    In *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 732-33, (2014) the U.S. Supreme Court indicated speculative risks do not enter the analysis, rejecting the government's argument that permitting a religious exemption would lead to a "flood of religious objections regarding a wide variety of medical procedures and drugs" given that the government made "no effort to substantiate [its] prediction" by providing evidence. "Such speculation is insufficient to satisfy strict scrutiny . . ." *Fulton v. City of Philadelphia, Pennsylvania*, 593 U.S. 522, 542 (2021); *see also Ramirez v. Collier*, 595 U.S. 411, 430 (2022) (rejecting government's "conjecture regarding what a hypothetical spiritual advisor might do in some future case").

[3]    Regarding the amount of psilocybin that was seized by Defendants, Defendants' own statements appear to be contradictory. While Defendants argue the search warrant receipt indicate the seizure of "over 459 grams" of psilocybin, *see* ECF 64-1, at 8, Defendants' lab testing of the psilocybin indicated that the "total weight of the mushroom material" was, at most, 304 milligrams, comprising two tested items, one weighing "less than 100 milligrams" and the other 204 milligrams +/- 6 milligrams." *See* Forensic Analysis Report-CONTROLLED SUBSTANCE ANALYSIS, attached as Exhibit W. Notably, Defendants' lab testing of Singularism's sacramental psilocybin did not indicate that it contained anything other than pure psilocybin, refuting Defendants' speculative claims that Singularism could be endangering individuals by administering contaminated psilocybin. *Id.*

[4]    Defendants assert that Singularism purchases psilocybin "on the street" and rumor that it purchases from a "kingpin for a dangerous drug cartel." ECF 64-1, at 4, 8 n.5. This factual assertion is directly contrary to the testimony provided to the Court during the TRO hearing. *See, e.g.,* ECF 53 (Tr. of Dec. 13, 2024 Hearing), at 68:16–71:11 (Singularism's psilocybin originates from a "lab in Oregon"). Defendants have provided no evidence indicating Singularism obtains psilocybin from any other sources, much less from off the street.

to the First Amendment, Article I, Section 4 of the Utah Constitution, and the Utah Religious Freedom Restoration Act.

Defendants further argue, in speculative fashion, that permitting Singularism an exemption from the Utah Controlled Substances Act compromises how that Act operates as a "closed system of drug distribution." ECF 64-1, at 3, 4, 7, 9. The U.S. Supreme Court rejected a strikingly similar argument in *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006). There, the Court opened its compelling interests analysis by stating that even though "Schedule I substances . . . are exceptionally dangerous," "the Government's mere invocation of the general characteristics of Schedule I substances, as set forth in the Controlled Substances Act, cannot carry the day," and the fact that a substance is included in Schedule I "does not provide a categorical answer that relieves the Government of the obligation to shoulder its burden under RFRA." *Id.* at 432-33. Further, the Court recognized that RFRA "plainly contemplates that *courts* would recognize exceptions [from the Controlled Substances Act]—that is how the law works." *Id.* at 434 (emphasis in original).[5]

The Court proceeded to then reject the government's contention that "the Controlled Substances Act establishes a closed regulatory system that admits of no exceptions under RFRA." *Id.* The Court found this argument to echo "the classic rejoinder of bureaucrats throughout history: If I make an exception for you, I'll have to make one for everybody, so no exceptions. But RFRA operates by mandating consideration, under the compelling interests test, of exceptions to rules of

---

[5]    Indeed, "RFRA operates as a kind of super statute, displacing the normal operation of other . . . laws . . ." *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 682 (2020).

6

App-3:245

general applicability." *Id.* at 436 (cleaned up). The Court then rejected the government's "slippery-slope argument" and dismissed it as "no more than a possibility." *Id.* (cleaned up). The Court also noted that "congressional findings with respect to Schedule I substances should not carry the determinative weight, for RFRA purposes, that the Government would ascribe to them." *Id.* at 432-33.

The Court found that the government's argument that it had a compelling interest in a no-exception regulatory system was further undercut by the exceptions already present within the Controlled Substances Act. For example, the Controlled Substances Act contains a provision allowing the Attorney General to waive the Act's requirements where "consistent with the public health and safety." *Id.* at 432. Additionally, the Court noted that the Controlled Substances Act also contains an exception for religious use—the peyote exemption for the Native American Church. *Id.* at 433. The Court found this "well-established peyote exception [to] also fatally undermine[] the Government's broader contention that the Controlled Substances Act establishes a closed regulatory system that admits of no exceptions under RFRA." *Id.* at 434.

Here, Defendants' invocation of the legislative findings behind the federal and state Controlled Substances Act, their assertion of the importance of administering a closed regulatory system without exception, and other speculative arguments all fail for the same reasons the U.S. Supreme Court pronounced in *O Centro*. Just like the federal Controlled Substances Act, the Utah Controlled Substances Act permits Utah authorities to waive "the licensure requirement [if] consistent with public health and safety." *Compare* Utah Code § 58-37-6(2)(d) *with* 21 U.S.C. §

7

822(d).[6] And just like the federal Controlled Substances Act, the Utah Controlled Substances Act

also contains an exception for the religious use of peyote. *Compare* Utah Code § 58-37-8(12) *with*

42 U.S.C. § 1996a; 21 C.F.R. § 1307.31. Moreover, Utah Code § 58-37-3.5 (the "Utah Psilocybin

Act") also permits secular use of psilocybin in a very similar fashion to how Singularism uses

psilocybin.[7] Further, as clergy, Mr. Jensen is exempt from the licensure requirement to practice

mental health therapy. *See* Utah Code § 58-60-107(2)(b); ECF 9, at 24-25, 28; ECF 59, at 9-10.

Thus, just as in *O Centro*, the Court here should "determine that the Government failed to

demonstrate, at the preliminary injunction stage, a compelling interest in barring [Singularism's]

sacramental use of [psilocybin]." *O Centro*, 546 U.S. at 439.

---

[6]     In addition to undermining Defendants' assertion of a compelling governmental interest, this provision of the Utah Controlled Substances Act also further indicates that the Act is *not* a neutral or generally applicable law which would be subject to rational basis review under the First Amendment. "A law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton*, 593 U.S. at 533 (quotations omitted); *see also Chiles v. Salazar*, 116 F.4th 1178, 1224 (10th Cir. 2024) (quoting *Fulton*). In *Fulton*, the Court found that a provision which granted a municipality's commissioner the ability to provide "an exception . . . in his/her sole discretion," even where the commissioner had "no intention of granting an exception," indicated "a system of individual exemptions," such that the municipality could "not refuse to extend that exemption system to cases of religious hardship without compelling reason." 593 U.S. at 535 (cleaned up). The Utah Controlled Substances Act's discretionary waiver provision operates the same way. Thus, strict scrutiny review under the First Amendment applies, and Defendants' actions do not survive that scrutiny.

[7]     Singularism incorporates its prior briefing which demonstrates how all the same dangers Defendants speculate will occur are also posed by healthcare systems operating under the Utah Psilocybin Act, *see* ECF 59, at 6-11, which further undermines Defendants' stated governmental interests and demonstrates that strict scrutiny review under the First Amendment applies. Singularism also incorporates its previous arguments regarding how Defendants' claimed governmental interests, even at a general level, are otherwise undermined. *See* ECF 9, at 22-29; ECF 19, at 12-17.

At the preliminary injunction hearing, it is likely that Defendants will raise an incident which occurred on January 16, 2025 with one of Singularism's voyagers. It is likely Defendants will raise the incident as evidence that Singularism's religious practices harm public health or safety. However, the full picture of the incident demonstrates that Singularism remains committed to public health and safety, even in unanticipated situations.

As one of Singularism's voyagers was completing their second successful psilocybin ceremony with Singularism, they began to exhibit symptoms of a paranoia, mistrust, and anxiety and wanted to leave Singularism's spiritual center, indicating the voyager was experiencing a rare an unanticipated adverse reaction to psilocybin. Second Supp. Decl. of Bridger Jensen, attached as Exhibit X. Singularism activated its emergency protocol that it had, fortunately, never needed to follow until that day, and called the voyager's emergency contacts, including the voyager's mother. *Id.* Another of those emergency contacts, the voyager's ex-husband, came to Singularism's spiritual center and picked up the voyager. *Id.* The voyager was then taken to the hospital, was treated, and was released a few hours later. *Id.*

While the voyager was in the hospital, Singularism discovered that the voyager had likely not disclosed all known mental health issues to Singularism during Singularism's screening process. *Id.* Had the voyager disclosed those issues, Singularism likely would not have proceeded to include the individual in one of its psilocybin ceremonies. *Id.* Nonetheless, Singularism remained committed to its emergency protocol which allowed the voyager to be taken as soon as possible to the hospital to receive treatment. *Id.*

The day after the incident, the voyager called Singularism and affirmed they were okay and thanked Singularism for its efforts in coordinating the voyager's care with her emergency

9

contact. *Id.* What the voyager indicated to Singularism is consistent with what the voyager told law enforcement when they came to check in at the voyager's home that same day. In a written statement to law enforcement, the voyager said that she "went [to Singularism] of my own free will & took the treatment willingly." *See* Voluntary Statement Form, attached as <u>Exhibit Y</u>. Additionally, the body camera footage of law enforcement's visit to the voyager's home confirms that "all that happened was [she] had a bad reaction to [psilocybin]," leading to a "hysterical panic attack"; that after receiving treatment at the hospital, she was "able to think reasonably"; that she recovered from that adverse reaction; that she participated in Singularism's ceremony voluntarily ("Q: Alright, I just wanted to clarify that you took them voluntarily. A: Yeah." "Q: I just wanted to make sure that you weren't forced to take them . . ." A: "No, no, I wasn't." "I knew what I was doing."); that Singularism is "reputable" and "perfectly legal;" and that Singularism "did everything they were supposed to do, which was call my emergency contact, my ex-husband." *See* January 17, 2025 Body Camera Footage, attached as <u>Exhibit Z</u>.

This incident does not undermine Singularism's claims regarding its safety, nor does it indicate that Defendants have a compelling governmental interest in denying Singularism a religious exemption from the Utah Controlled Substances Act. Singularism acted just as a secular mental health facility would act in a similar situation: invoke its emergency procedure, contact the individual's emergency contact, and assist in ensuring the individual receives further medical care. A healthcare system operating under the Utah Psilocybin Act would be required to do no differently. Indeed, the Utah Psilocybin Act contains *no* provisions regarding what a healthcare system must do in the event a patient has an unanticipated adverse reaction to psilocybin, instead insulating from liability or guilt any "individual or entity . . . distributing . . . administering . . . or

10

App-3:249

supervising the use of" psilocybin. *See* Utah Code § 58-37-3.5. Singularism asserts that its religious healing ceremonies provide the public good of alleviating human suffering, and when unanticipated reactions to psilocybin present themselves, Singularism will continue to follow its emergency procedure to ensure the safety of all its voyagers. *See* Ex. X. All considered, this single, isolated incident does nothing to change the conclusion the Court should reach here: Defendants have failed to demonstrate a compelling interest in barring Singularism's sacramental use of psilocybin outright.

## II. DEFENDANTS HAVE SEVERAL LESS RESTRICTIVE MEANS OF BURDENING SINGULARISM'S RELIGIOUS FREE EXERCISE THAN TOTAL PROHIBITION OF PSILOCYBIN.

Defendants also bear the burden of demonstrating they have *no other means* of accomplishing their governmental interests than prohibiting Singularism's religious practices outright. As the U.S. Supreme Court has stated, the "least-restrictive-means standard is exceptionally demanding." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 728 (2014). Under the least-restrictive means standard, Defendants must show they "lack other means of achieving [their] desired goal without imposing a substantial burden on the exercise of religion by the objecting parties . . ." *Id.* If "a less restrictive means is available for the Government to achieve its goals, the Government must use it." *Holt v. Hobbs*, 574 U.S. 352, 365 (2015) (quoting *United States v. Playboy Entertainment Group, Inc.,* 529 U.S. 803, 815 (2000)). "Put another way, so long as the government can achieve its interests in a manner that does not burden religion, it must do so." *Fulton*, 593 U.S. at 541.

Despite these statements from the U.S. Supreme Court, Defendants argue that it is Plaintiffs' burden to propose less restrictive means and that Defendants need only demonstrate

11

those proposals are not viable. *See* ECF 64-1, at 9. Even assuming that were correct (and the U.S. Supreme Court's articulation of the least-restrictive means standard indicates it is not), Singularism *has* proposed several means Defendants can take to accomplish their interests that are less restrictive than an outright prohibition on Singularism's religious free exercise. Despite Singularism's inclusion of these proposals in Singularism's past briefings, *see* ECF 9, at 22-26, 29; ECF 19, at 17-18; ECF 59, at 11, Defendants feign ignorance of them.

Before Singularism again articulates those proposals, it is critical to note that despite arguing Utah's Controlled Substances Act can only function as a "closed system of drug distribution" if psilocybin usage is uniformly barred, *Defendants themselves* propose a less restrictive means than outright prohibition: the peyote exemption from the Utah Controlled Substances Act. However, this has never been one of Singularism's proposals,[8] and even if it were, it is not the *least* restrictive means at Defendants' disposal. The proposals Singularism has put before the Court are:

*Defendants Permit, Without Restriction, Singularism's Religious Practices.* Defendants have indicated the ultimate less restrictive means—imposing no restrictions on Singularism at all—was a viable path for Defendants, as they, despite being notified by Singularism of its religious practices in the fall of 2023 and receiving an unspecified "concern" from a citizen, did nothing to stop Singularism's religious practices until November 2024. Further, Defendants permit a similarly situated, but larger, religious organization—The Divine Assembly—which uses

---

[8] Singularism has only raised the peyote exemption from the Utah Controlled Substances Act for the purpose of demonstrating (1) that the Act is not a neutral and generally applicable law and (2) that Defendants' claimed compelling governmental interest in enforcing the Act without exception is undermined by exemptions like the peyote exemption.

psilocybin as part of its religious practice, to operate within their jurisdiction without prosecution, as well as other entheogenic religious groups.

*Defendants Permit Singularism's Religious Practices According to the Terms of the Utah Psilocybin Act.* The next proposal Singularism has put forth is that Singularism be subject to the applicable requirements of the Utah Psilocybin Act,[9] which permits secular usage of psilocybin in a similar manner to Singularism's religious usage. Such requirements would be that (1) Singularism's usage of psilocybin be, in addition Singularism's religious beliefs, "supported by a broad collection of scientific and medical research"; (2) Singularism administer psilocybin under the direct supervision and control of Mr. Jensen and his facilitators, who are exempted from the licensure requirement of the Utah Controlled Substances Act under the clergy exemption to the Mental Health Professional Practice Act; and (3) Singularism not administer psilocybin to any individuals under 18 years old.[10]

---

[9]     Although Defendants say little regarding the Utah Psilocybin Act in their supplemental briefing, what they do say misrepresents that Act. For example, Defendants argue that "the Utah CSA recently enacted a 'very controlled program' to distribute and permit use of psilocybin through 'reputable hospital systems,'" attributing Utah Code § 58-37-3.5(2)-(3) for those quotes. *See* ECF 64-1, at 4. However, those phrases are found nowhere within the Utah Psilocybin Act, nor anywhere in the Utah Controlled Substances Act. Instead, the actual text of the Utah Psilocybin Act demonstrates a very loose and discretionary program, and the only relevant characteristic of a hospital system is its size or affiliation with a university.

[10]     Notably, the Utah Psilocybin Act does *not* operate as an affirmative defense, as is the case for some other exemptions from the Utah Controlled Substances Act. *Compare* Utah Code § 58-37-3.5(5) ("An individual or entity that complies with this section when using, distributing, possessing, administering, or supervising the use of, a drug *is not guilty of a violation of this title.*" (emphasis added)) *with* Utah Code § 58-37-8(12)-(14), (16) (affirmative defense related to religious peyote usage available in criminal prosecution, but relief not limited to an affirmative defense; for medical research; for valid license holder; for user in medical research; for bystander of overdose event that aids overdosed individual).

*Defendants Accommodate Singularism's Religious Practices as the Government Has Accommodated Religious Organizations in Other Instances.* Singularism has demonstrated that the government has other less restrictive means to accommodate other entheogenic religious practices in similar circumstances. These circumstances are examples only, and the specifics of such an accommodation would need to be tailored to Singularism's religious practices.

Following the U.S. Supreme Court's *O Centro* decision, for example, as Defendants indicated to the Court during the TRO hearing, the government appears to have found a less restrictive means which accommodated a religious organization's need to import and use sacramental hoasca tea. *See* ECF 53 (Tr. of Dec. 13, 2024 Hearing), at 29:23—32:1 ("it looks to me like what you just showed me was a less restrictive means in a similar case"). A similar example can be found in the Ninth Circuit, where the Court issued a permanent injunction that "established guidelines for [a Church's] importation, distribution, and use of Daime tea." *Church of the Holy Light of the Queen v. Holder*, 584 F. App'x 457, 458 (9th Cir. 2014). Additionally, in April 2024, the U.S. Attorney General, Department of Homeland Security, the Drug Enforcement Administration, and U.S. Customs and Border Protection all entered a public settlement agreement with an entheogenic church regarding the "import, manufacture, distribut[ion], and possess[ion] of ayahuasca for use in religious ceremonies." *See* ECF 9-14, at 1. Each of these instances serve as an example of less restrictive means available to Defendants. Notably, each of these cases arguably pose *more* challenging religious practices to governmental interests than Singularism's do, as each involved the importation of controlled substances.

Given the various less restrictive means available to Defendants, the Court should conclude Defendants have failed to survive strict scrutiny.

### III.   DEFENDANTS HAVE CONFIRMED THAT SINGULARISM IS A RELIGION.

Although Defendants have previously attempted to avoid strict scrutiny review by arguing to this Court that Singularism is not a religion, *see* ECF 13, at 23-35, Defendants appear to have abandoned that argument. On January 13, 2025, in response to an application for renewal of a business license Singularism believed it needed to complete in order to operate, Provo City told Singularism that it considered Singularism to be a religious organization. Specifically, Provo City sent Singularism a letter stating, "This letter is to confirm that, under Provo City Code sec. 6.01.130, churches or religious organizations are not required to obtain a business license to operate. This exemption is limited to activities directly associated with religious purposes. Application . . . for Singularism has been closed." January 13, 2025 Letter from Provo City, attached as <u>Exhibit AA</u>.

That Provo City made this determination is significant given that Provo City Code § 6.01.140 specifies that with "respect to exemptions from business license requirements claimed because of charitable, religious or other nonprofit status, the person claiming the exemption shall have the burden of establishing that exemption," meaning that Provo City determined Singularism met its burden of establishing religious status. As a result, the Court should disregard Defendants' prior arguments that Singularism is not a religion. Defendants are estopped by their statements from arguing otherwise.

### IV.   DEFENDANTS' RELIGIOUS INSINCERITY ARGUMENT IS INCONSISTENT WITH THE FACTS.

Additional evidence obtained from Defendants confirms that Defendants' argument regarding Plaintiffs' religious sincerity is made only for the purposes of litigation. *See* ECF 19, at

15

App-3:254

25. Detective Julian's police report, which contains additional content beyond what he included in his search warrant affidavit, concludes that "Bridger [Jensen] fully feels that since he has founded the religion of Singularism, his use and providing of psilocybin to individuals is legal and protected under federal law as part of the Freedom of Religion." *See* Police Report, attached as Exhibit BB, at 12. The report continues and confirms that the Utah County Attorney's Office and Provo City Attorney's Office, despite Detective Julian's understanding of Singularism's religious sincerity, instructed Detective Julian to proceed against Singularism, anyway: "However, when speaking with the Utah County and Provo City Attorney Offices, it has been expressed that Singularism is not exempt from the Utah Controlled Substances Act." *Id.*

## V.    DEFENDANTS' DOCUMENTS INDICATE THE NEED FOR FURTHER INJUNCTIVE RELIEF.

Detective Julian's police report also indicates that he obtained reports from the Financial Crimes Enforcement Network ("FinCEN") regarding Singularism. *Id.* The content of those reports indicates that Provo City and the Utah County Attorney's Office's comments to the media, in which they wrongfully claimed that Singularism had no claim to religious free exercise, caused interference with Singularism's financial institution, KeyBank. *See* News Article, attached as Exhibit CC. Both reports demonstrate that KeyBank quoted Provo City and the Utah County Attorney's Office's comments to the media in KeyBank's report to FinCEN regarding Singularism. *See* FinCEN Reports, attached as Exhibit DD. As a result, KeyBank eventually closed Singularism's bank accounts.

This new evidence highlights the need for the Court to enter a preliminary injunction barring Defendants from acting in indirect ways to restrict Singularism's free exercise of religion, including efforts taken to restrict Singularism's ability to hold an account with a financial

16

institution. Because of this, and in response to Defendants' arguments that Singularism's preliminary injunction request is uninterpretable by Defendants (or law enforcement who might be tasked with following it), Singularism is submitting an updated proposed order further specifying the forms of relief it seeks. *See* Updated Proposed Order, attached as <u>Exhibit EE</u>.

## VI.   RELIGIOUS FREE EXERCISE IS A FUNDAMENTAL, INALIEANABLE RIGHT.

Defendants have previously argued that before Singularism was permitted to exercise its religious practices, it was required either to apply for a religious accommodation through the DEA or file an action for declaratory relief with a court. *See* ECF 53 (Tr. of Dec. 13, 2024 Hearing), at 183:10-16, 184:21-23, 221:13-22, 236:9-11, 237:5-24 (The Court: "So it's your position that no one can take advantage of the RFRA statute unless that religion or individual files a declaratory judgment action first to get a court order saying we quali[f]y [for] RFRA?" Mr. Millward: "In the context of a controlled substance, yes."). This argument disregards that the free exercise of religion is an inalienable and fundamental right.

James Madison explained in his Memorial and Remonstrance Against Religious Assessments that religious free exercise "is in its nature an unalienable right" because the duty owed to one's Creator "is precedent, both in order of time and in degree of obligation, to the claims of Civil Society."[11] In other words, an individual's right of religious free exercise is not bestowed upon an individual by government, but is inherent to the individual. Congress recognized this when it passed the federal RFRA, as did the Utah Legislature when it passed Utah's RFRA. *See* 42

---

[11]   James Madison, Memorial and Remonstrance Against Religious Assessments (June 20, 1785), in 5 THE FOUNDERS' CONSTITUTION 82 (Philip B. Kurland & Ralph Lerner eds., 1987).

17

U.S.C. § 2000bb(a)(1) ("the framers of the Constitution, recognizing free exercise of religion as an unalienable right, secured its protection in the First Amendment to the Constitution"); Utah Code § 63G-33-201(1) ("The free exercise of religion is a fundamental right"); *see also Korte v. Sebelius*, 735 F.3d 654, 673 (7th Cir. 2013) (Congress's protective stance in favor of religious accommodation could not be clearer. RFRA's statement of purpose explicitly reaffirms our national commitment to the 'free exercise of religion as an unalienable right'"). Therefore, when courts evaluate an individual's case regarding the free exercise of religion, the court is not evaluating whether to *grant*, in the first place, the free exercise of religion to the individual, but is only evaluating the *scope* of the preexisting right granted to the individual by statute, constitution, and natural right.

Accordingly, Defendants' argument that religious organizations or individuals must seek declaratory judgment that they have religious rights before they can exercise them is incorrect. That argument would be akin to arguing that before an individual could exercise their right to free speech, the individual would have to ask a court whether the individual had the right, a position that is patently unreasonable. And it is no more reasonable to argue that an individual may be granted the right of religious free exercise only upon application to a governmental agency. Nothing requires individuals or organizations to participate in the religious exemption application process the DEA has created. And many, like Singularism, have chosen not to engage with it, as Congress itself has determined that the DEA's process is significantly flawed.[12] Even so, although

---

[12]   *DEA Should Improve Its Religious Exemptions Petition Process for Psilocybin (Mushrooms) and Other Controlled Substances*, UNITED STATES GOVERNMENT ACCOUNTABILITY OFFICE (May 2024), available at https://www.gao.gov/assets/880/871083.pdf (noting, among other flaws, that over "an 8-year period—from fiscal year 2016 through January 2024—DEA

Provo City and Utah County do not appear to have a formalized process akin to the DEA's, Singularism practically initiated such a process with Defendants when it sent them letters describing its religious practices and inviting them to dialogue in Fall 2023.

Singularism was under no obligation to seek declaratory judgment, DEA approval, or approval from Defendants before opening its doors to practice the free exercise of religion. As Singularism has argued, the Court's evaluation of its practices indicate it is operating well within the scope of the unalienable and fundamental right which it possesses.

## **<u>CONCLUSION</u>**

For the reasons specified above, as well the reasoning and evidence presented to the Court in Singularism's prior briefing and at the TRO hearing, the Court should grant Plaintiffs' motion for a preliminary injunction.


DATED January 22, 2025.

/s/ Tanner J. Bean
Tanner J. Bean
Anna P. Christiansen
Jacqueline M. Rosen
*Attorneys for Plaintiffs*

---

reported that 24 petitioners requested a religious exemption for various controlled substances. As of January 2024, DEA reported that none of these petitions had been granted an exemption . . .").

# EXHIBIT W

11/27/2024

**Utah Bureau of Forensic Services**

**4451 South Constitution Blvd, Salt Lake City, UT 84129  (801) 965-4487**

| | | | |
|---|---|---|---|
| CL Case#: | C2024-4754 | Agency Case #: | 24PR24922 |
| Agency: | PROVO PD | Report#: | 1 |
| Agency Address: | 48 S 300 W PROVO UT 84601 | | |

## Forensic Analysis Report-CONTROLLED SUBSTANCE ANALYSIS

### Evidence Submission Information

| | |
|---|---|
| Evidence Submitted: | 11/22/2024 |
| How Received: | Hand Delivered |
| Investigating Officer: | Jackson Julian |
| Delivered By: | Scott Cardenas |
| Received By: | Tamara Harper |

### Case Names

| Type | Name | Sex | Race |
|---|---|---|---|
| Suspect | JENSEN,BRIDGER LEE | M | W |

### Crimes

POSSESSION OR USE OF A CONTROLLED SUBSTANCE

### Chain of Custody Statement

The item(s) submitted under the police agency case numbers referenced in this report were in a sealed condition at the time any examination, testing, or analysis was commenced by the undersigned, and that said examination or handling, if any, of the actual items within any such sealed containers was accomplished in a manner to preserve the integrity of the item to assure that any chance of misidentification or environmental cross-contamination would be avoided by adherence to standardized procedures within the Utah Bureau of Forensic Services appropriate to any processes applicable to the examination, analysis, or testing of said items. Any deviation from said procedures and the reasons therefore are noted in the case record. The breaking of any seal or part of the container in which the item was submitted has been followed by reinsertion of the item into its original container, whenever possible, following any examination, testing, or analysis and resealing that container with the undersigned's initials placed over such new seal.

### Forensic Analysis Report Follows

This report contains the conclusions, opinions, and/or interpretations of the laboratory analyst whose signature appears on this report. The results relate only to the items tested and/or sampled.

11/27/2024                     **Utah Bureau of Forensic Services**
        **4451 South Constitution Blvd, Salt Lake City, UT 84129  (801) 965-4487**

| | | | |
|---|---|---|---|
| CL Case#: | C2024-4754 | Agency Case #: | 24PR24922 |
| Agency: | PROVO PD | Report#: | 1 |
| Agency Address: | 48 S 300 W PROVO UT 84601 | | |

**Forensic Analysis Report-CONTROLLED SUBSTANCE ANALYSIS**

Item 1.A (Agency Item PRP147687). Psilocyn was identified in the plastic bag. The total weight of the mushroom-like material was less than 100 milligrams. The entire sample was used for analysis. A new glass vial containing the unconsumed extract of the sample was packaged with the item to be returned to the submitting agency.

Item 1.B (Agency Item PRP147687). Psilocyn was identified in the clear capsule. The total weight of the mushroom-like material was 204 milligrams +/- 6 milligrams.

Weight measurement uncertainty calculated at a coverage probability of 95.45%.

**I declare under criminal penalty of the State of Utah that the foregoing is true and correct.**

**Executed On:**  11/27/2024

*Katherine Cavazos*

Katherine Cavazos
Forensic Scientist I

Page **2** of **2**

App-3:261

# EXHIBIT X

Tanner J. Bean (A17128)
tbean@fabianvancott.com
Anna P. Christiansen (A17518)
achristiansen@fabianvancott.com
Jacqueline M. Rosen (A18530)
**FABIAN VANCOTT**
95 South State Street, Suite 2300
Salt Lake City, UT 84111-23323
Telephone: (801) 531-8900
*Attorneys for Plaintiffs*

---

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BRIDGER LEE JENSEN, an individual; SINGULARISM, a non-profit corporation; PSYCHE HEALING AND BRIDGING, LLC dba PSYCHEDELIC THERAPY JOURNEY; a limited liability company; <br><br> Plaintiffs, <br><br> vs. <br><br> UTAH COUNTY, a political subdivision, PROVO CITY, a political subdivision; JEFFREY GRAY, an individual; TROY BEEBE, an individual; BRIAN WOLKEN, an individual; JACKSON JULIAN, an individual; JOHN DOES 1-4, individuals; <br><br> Defendants. | **SECOND SUPPLEMENTAL DECLARATION OF BRIDGER JENSEN** <br><br> Civil No. 2:24-cv-00887-JNP <br><br> Judge Jill N. Parrish <br><br> (Removed from Fourth Judicial District Court, Utah County, State of Utah, Case No. 240406123) |

I, Bridger Jensen, declare:

1.     I am over eighteen years old and competent to testify.

2.     I have personal knowledge of the facts set forth in this declaration, and if called as a witness, I could and would testify competently to them under oath.

1

App-3:263

3.      As stated in my original declaration, I am the founder of Singularism. I am also the Supervising Practitioner at Singularism. As the founder and Supervising Practitioner, I have firsthand knowledge regarding Singularism's practices, teachings, and organization.

4.      On January 16, 2025 I personally oversaw one of our voyagers through Singularism's sacramental psilocybin ceremony. This individual had participated in a ceremonial voyage with us previously.  I supervised her prior ceremony and it was my observation that the voyager had a positive experience.

5.      When the voyager returned to participate in another ceremony on January 16, 2025, she requested twice the amount of psilocybin than what had been used in her previous ceremony. However, I advised her against that request, pointing out that that more was not always better. She accepted my guidance and was administered sacramental tea that contained a smaller amount of psilocybin.

6.      The voyager's second ceremony began as beautifully as her prior one, and she was having the intended outcome. From my observations, she gained greater clarity regarding her self-worth and an overwhelming feeling of love from the universe and God. From my observations and understanding of her experience, she had never felt such healing and it was the first time in years she had felt God's love and approval of her life.

7.      However, as she progressed through her second ceremony, she slowly became skeptical of her positive feelings and had a very rare, atypical reaction to the ceremony. She began showing signs of paranoia and mistrust regarding her secular therapists, others in her life including her ex-husband, other family members, and even individuals she had identified as her emergency contacts. She also began to exhibit signs of mistrust towards me and others at Singularism. She

became emotionally volatile and irate, making uncharacteristic accusations that indicated some level of temporary paranoia. For example, she began to worry that we were trying to hack into her phone somehow, even though we had not touched or even inquired about her phone.

8. While she was in this state, she became increasingly emotionally agitated. She did not show signs of physical concern (such as lack of breath or cardiovascular problems). Rather, her symptoms appeared limited to intense emotion, circular thought, and paranoia. While her thoughts were not logical, she was able to articulate well and was alert and conscious of her surroundings. Her motor and physical functions were not impaired. Even so, myself and others present at Singularism were unable to reassure her. Her condition progressed into volatility and she expressed that she wanted to leave Singularism's spiritual center.

9. As we do for all our voyagers, in Singularism's preparation sessions with this voyager, we carefully made plans with her in the event she had such a reaction. In addition to those preparations, Singularism activated its protocol for instances in which a voyager experiences an adverse reaction, which, fortunately, Singularism had never needed to follow until January 16, 2025. As her symptoms were emotional, cognitive, and not life threatening, and because she was able to use her phone, I asked her to immediately call her emergency contact, or that we would be happy to do so. She first called her ex-husband, who was also her previously arranged ride home that day and was aware that he was an emergency contact. He was ready and came immediately. Due to her paranoia and emotional volatility, she asked him not to communicate with us. She then immediately got into his car. Seeing that she was safe with him, we left her in his care, as she had previously requested.

3

10.    While we have never had to use our emergency protocol, it requires that we remain at the facility after such an incident in case the voyager needs more support, if they return to our site for any reason, or in case we are contacted by medical personnel. I stayed at Singularism's spiritual center and texted the voyager's ex-husband several times offering to support, answer questions, or otherwise provide aid.

11.    About an hour after the voyager left Singularism's spiritual center, I spoke with the voyager's mother, who was also listed as one of the voyager's emergency contacts. It was from her that I learned that the voyager had been taken to the hospital. I supported this decision and offered to go to the hospital. However, I feared that in the voyager's frantic state, I worried my presence may upset her. I explained this to her mother, who agreed that she was safe and in good hands at the hospital.

12.    I stayed at Singularism's spiritual center and remained available and in contact with the voyager's emergency contacts for several hours. During this time, I learned from phone calls with the voyager's emergency contacts that the voyager had not disclosed all her mental health issues to Singularism during the voyager's screening process. In subsequent conversations, I learned from her mother, her father, and from her ex-husband that they had observed prior mental health conditions that were not disclosed to Singularism.

13.    Had the voyager disclosed all her mental health issues, Singularism likely would not have proceeded to include her in one of its psilocybin ceremonies. Nonetheless, Singularism remained committed to its emergency protocol which allowed the voyager to be taken as soon as possible to the hospital to receive treatment.

4

14.    From my conversations with the voyager's emergency contacts, I learned that the voyager was discharged to her home a few hours after being taken to the hospital without any lasting effects.

15.    The morning after the incident, on January 17, 2025, the voyager called me and reported feeling terrible for the way she had behaved during the incident. I reassured her that our only concern was for her well-being. From our conversation, I understood that she was safe and recovering at home with her mother. I understood that she was thankful for Singularism's efforts in coordinating her care with her emergency contacts. I encouraged her to rest and recover. I reassured her that she was and is a good person and that all the good feelings and spiritual experiences she had during her first ceremony, and the beginning of her second ceremony, were valid. I hope that she continues to feel the love of God and the positive effects of her experiences.

16.    Before I was a clergyman for Singularism, I had extensive experience as a primary therapist in many inpatient settings. Clinical screenings in any voluntary settings rely accurate and complete self-disclosure from individuals. There are no standard mental health records to request or require participants to produce, even if Singularism were a large research facility like those who research psilocybin therapy. Mental health therapists are dependent on self-disclosure from patients as the primary means of gathering information, in order to make diagnosis, provide treatment, and make treatment prescriptions.

17.    At Singularism, our screening process was modeled after best practices in medical research facilities, such as Johns Hopkins and Harvard Medical School, which have both published their screening and emergency protocol, and by reviewing government sanctioned protocol in states where psilocybin may be administered under medical licensure, such as Oregon. Even large

5

App-3:267

mental health research facilities have similar incidents, on rare occasions, like Singularism experienced.

18.     Regarding this particular voyager, Singularism acted just as a secular mental health facility would act in a similar situation: invoke its emergency procedure, contact the individual's emergency contacts, and remain available to provide information or other support.

19.     One of Singularism's core missions is to alleviate human suffering by taking individuals through Singularism's healing ceremonies. While adverse reactions are extremely rare, and the above-mentioned incident is the first in Singularism's history, it remains Singularism's position that we help our voyagers avoid dangerous and harmful circumstances they might experience had they not sought out our spiritual guidance. We serve a population that feels spiritually called to the sacrament and we consider our spiritual center and religious practices a harm reduction resource to the community.

20.     I declare under criminal penalty of perjury under the law of Utah that the foregoing is true and correct.


DATED this 22nd day of January, 2025.


/s/ Bridger Jensen
Bridger Jensen



# PROVO
## POLICE

# Voluntary Statement Form

CASE #: 25PRO1087          DATE: 1-17-25          TIME: _____

FULL NAME: Claire Hart

STREET ADDRESS: ███████████          CITY: Provo          STATE: UT   ZIP: 84606

HOME PHONE: _____     CELL PHONE: ████████████     WORK PHONE: _____

DATE OF BIRTH: ██████ 1992          DRIVER LICENSE #: _____

EMPLOYER NAME: _____     OCCUPATION: _____

**NOTICE:** Pursuant to Section 76-8-504.5 Utah Code annotated, 1653 as amended, you are notified the statements you are about to make may be presented to a magistrate or judge in lieu of your sworn testimony at a preliminary examination. **Any false statement you make, that you do not believe to be true, may subject you to criminal punishment as a Class A Misdemeanor.** I give this statement of my own free will. No promises, threats or coercion of any kind have been made to me by any Provo City Police Officer.

I was recommended to this treatment facility by my licensed therapist. I went there of my own free will & took the treatment willingly. I had a severely bad reaction to the treatment & became scared & hysterical — we called my emergency contact, he came, I called the my parents & we called the police because I was so scared & hysterical. The ambulance came & took me to the hospital to give me something to calm down & I was driven home by my ex husband & sister.

SIGNED: _Claire Hart_          DATE: 1-17-25

OFFICER:_____          DATE: _____   Time:_____
(Print Name / P Number)

App-3:269


**POLICE**

# Voluntary Statement Form Continuation

CASE #: _____      PAGE #: _____

NAME: _____

_____

SIGNED: _____      DATE: _____

OFFICER:_____      DATE: _____ Time:_____
      (Print Name / P Number)

App-3:270