No. 25-4115

UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

———————————

BRIDGER LEE JENSEN, SINGULARISM, AND PSYCHE HEALING AND BRIDGING, LLC,
*Plaintiffs - Appellees*,

v.

UTAH COUNTY, PROVO CITY, AND JEFFREY GRAY,
*Defendants- Appellants*.

———————————

On appeal from the United States District Court, District of Utah,
The Honorable Jill N. Parrish, No. 2:24-cv-00887-JNP-CMR

———————————

**APPELLANTS' APPENDIX**
**Volume 4 of 8**

———————————

Respectfully submitted,

Troy L. Booher
Caroline A. Olsen
ZIMMERMAN BOOHER
341 South Main Street, Fourth Floor
Salt Lake City, Utah 84111
tbooher@zbappeals.com
colsen@zbappeals.com
(801) 924-0200

*Attorneys for Appellants*

———————————

December 10, 2025

| USDC Dkt. No. | Date Filed | Description | App- |
|---|---|---|---|
| **Volume 4 of 8** | | | |
| 071-05[4] | | ExAA — Letter from Provo City re no business license needed | 4:004 |
| 071-06 | | ExBB — Police report (updated through Dec. 2, 2024) | 4:006 |
| 071-07 | | ExCC — News article | 4:027 |
| 071-08 | | ExDD — Two FinCEN Reports | 4:033 |
| 073 | 01/22/25 | Plaintiffs' Written Consent to Filing of First Amended Verified Complaint | 4:055 |
| 073-2 | | First Amended Complaint redline | 4:058 |
| 083 | 02/05/25 | Plaintiffs' First Amended Verified Complaint | 4:098 |
| 083-01 | | Exhibit A — Singularism attestation to beliefs | 4:135 |
| 083-02 | | Exhibit B — Search Warrant | 4:145 |
| 083-03 | | Exhibit C — Property Report Utah County Major Crimes Task Force | 4:148 |
| 083-04 | | Exhibit D — Letter from Provo City Police Department to Utah Valley Foot and Ankle LLC | 4:150 |
| 083-05 | | Exhibit E — Letter from Utah Valley Foot and Ankle LLC to Provo City Police Department | 4:152 |

---

[4] 071-4 is ExZ: a slipsheet for body camera footage that is not pertinent on appeal.

| USDC Dkt. No. | Date Filed | Description | App- |
|---|---|---|---|
| 083-06 | | Exhibit F — Settlement Agreement, *CEC et al. v. Garland et al.*, 22-cv-01004-SRB (D. Ariz.) | 4:154 |
| 083-07 | | Exhibit G — USDC March 20, 2023 Order, *CEC v. Garland*, 22-cv-01004-SRB (D. Ariz.) | 4:172 |
| 083-08 | | Exhibit H — Jensen/DOPL email exchange | 4:187 |
| 083-09 | | Exhibit I — Letter from Provo 311 Customer Service to Jensen | 4:196 |
| 084 | 02/05/25 | Defendants' Supplemental Memorandum of Authorities Pursuant to Court Order | 4:198 |
| 084-01 | | Exhibit A — Declaration of Jackson Julian | 4:216 |
| 084-02 | | Exhibit B — Therapeutic Use of Psilocybin | 4:277 |

# EXHIBIT AA



January 13, 2025

Bridger Jensen
Singularism
1969 N State St.
Provo, UT 84604

**Subject: Business License Not Required for Religious Organizations**

Dear Mr. Jensen,

This letter is to confirm that, under Provo City Code sec. 6.01.130, churches or religious organizations are not required to obtain a business license to operate. This exemption is limited to activities directly associated with religious purposes. Application LCB202400923 for Singularism has been closed.

If your organization engages in activities outside the scope of religious operations, such as running a commercial enterprise or selling goods, additional regulations may apply, and compliance will be required.

If you have further questions regarding these requirements, contact our office at 801-852-6000 or licensing@provo.gov

Sincerely,

Provo 311 Customer Service
Business Licensing
801-852-6000

App-4:005

# EXHIBIT BB

App-4:006



# Provo Police

Officer Report for Incident 24PR24922

***CONFIDENTIALITY NOTICE***

The information in this document is CONFIDENTIAL and/or PRIVILEGED. It is intended to be reviewed by only the individual or organization it was disseminated to. If you are not the intended recipient, you are notified that any review, dissemination, or copying of this document and its attachments, if any, or the information contained herein, is prohibited. If you have received this document in error, advise the sender of your receipt of it and destroy and/or delete the document immediately.

***PROTECTED RECORD NOTICE***

This document is a PROTECTED RECORD under UCA 63G-2-305(10),(11) and (25). Further or secondary release would interfere with an ongoing criminal investigation or case, jeopardize the life or safety of the individual, and/or is a clearly unwarranted invasion of personal privacy, Release or dissemination of any summaries, transcripts and video/audio recordings or CJC interviews are also prohibited unless authorized by UCA 77-37-4(5) and (6).

|  |  |
|---|---|
| **Nature:** WARRANT SERVICE | **Address:** 1969 N STATE ST |
| **Location:** PR110 | Provo UT 84604 |

**Offense Codes:**

| | | |
|---|---|---|
| **Received By:** Tucker C PR | **How Received:** O | **Agency:** PRPD |

**Responding Officers:**

| | |
|---|---|
| **Responsible Officers:** Julian Jac (PR) | **Disposition:** SUM 11/21/24 |
| **When Reported:** 17:30:44 11/11/24 | **Occurred Between:** 17:30:41 11/11/24 and 17:30:41 11/11/24 |

| | | |
|---|---|---|
| **Assigned To:** | **Detail:** | **Date Assigned:** **/**/** |
| **Status:** | **Status Date:** **/**/** | **Due Date:** **/**/** |

**Complainant:**

| | | |
|---|---|---|
| **Last:** | **First:** | **Mid:** |
| **DOB:** **/**/** | **Dr Lic:** | **Address:** |
| **Race:** | **Sex:** | **Phone:** | **City:** , |

Alert Codes:

Offense Codes

| | |
|---|---|
| **Reported:** | **Observed:** CSSL CS-Sale-Manuf-Hallucinogen |

12/05/24

**Additional Offense:**   CSSL CS-Sale-Manuf-Hallucinogen
**Additional Offense:**   CSPM CS-Poss-Marijuana
**Additional Offense:**   CSPP CS-Poss Paraphernalia

## Circumstances

ASET Agcy Special Enforecment Team
BUSPV Business-private
SWGEN Search Warrant-Res/Veh
PICS Photographs-Pictures
CSLRG Large Drug Seizure
DRUG Drugs Involved
TDIST TYPE-Distributing-Selling
TPOSS TYPE-Possessing-Concealing

| **Responding Officers:** | **Unit :** |
|---|---|
| Julian Jac (PR) | 2J4342 |
| Rowberry A (PR) | 2J4264 |
| Wolfgramm L PR | 2J4329 |

| | | | |
|---|---|---|---|
| **Responsible Officer:** Julian Jac (PR) | | **Agency:** | PRPD |
| **Received By:** Tucker C PR | | **Last Radio Log:** | **:**:** **/**/** |
| **How Received:** O Officer Initiat | | **Clearance:** | DUC Disseminated to UC Attorney |
| **When Reported:** 17:30:44 11/11/24 | | **Disposition:** | SUM **Date:** 11/21/24 |
| **Judicial Status:** | | **Occurred between:** | 17:30:41 11/11/24 |
| **Misc Entry:** | | **and:** | 17:30:41 11/11/24 |

**Modus Operandi:**                **Description :**                **Method :**

## Involvements

| Date | Type | Description | |
|---|---|---|---|
| 11/11/24 | Name | JENSEN, BRIDGER LEE | Offender |
| 11/11/24 | Cad Call | 17:30:44 11/11/24 WARRANT SERVICE | Initiating Call |
| 11/21/24 | Property | WHI CS-LSD-Hallucin Psilocybin 0 | Evidence |
| 11/11/24 | Property | WHI CS-LSD-Hallucin Psilocybin 0 | Seized |
| 11/11/24 | Property | WHI CS-LSD-Hallucin Psilocybin 0 | Seized |
| 11/11/24 | Property | GRY CS-Paraphernali Cups 2 | Evidence |
| 11/11/24 | Property | BLK CS-Paraphernali Scales/Grinder 2 | Evidence |
| 11/11/24 | Property | BLU CS-Unidentified 0 | Seized |
| 11/11/24 | Property | WHI Paper-Official 5 | Evidence |
| 11/11/24 | Property | BLK CS-Marijuana Lime Tincture 0 | Seized |
| 11/22/24 | DS | COUNTY ATTORNEY | Dissemination |
| 11/21/24 | DS | COUNTY ATTORNEY | Dissemination |

12/05/24

App-4:008

## Narrative

```
Mon Nov 11 21:23:32 2024 - Julian 4342
```

On November 11, 2024, Provo Special Enforcement Team detectives served a search warrant at 1969 N. State Street, Provo, UT. Detectives seized approximately 460 grams of psilocybin mushrooms, drug paraphernalia, and documents related to the distribution of psilocybin mushrooms. Bridger Lee Jensen (DOB 09/06/1981) was found to be in possession of the mushroom and found to be operating a therapy center, with the use of psilocybin being at the center of the therapy center. Charges for Bridger will be referred to the Utah County Attorney's Office for screening.

_____

Responsible LEO:

_____

Approved by:

_____

Date

## Supplement

```
CAD Call info/comments
==================================

17:31:03 11/11/24   - Tucker C PR - From: Rowberry A (PR)
NEG CHECKS
```

## Supplement
L. Wolfgramm

Search Warrant

Contact with Bridger Jensen:
Myself and Det. Graham were doing surveillance on the business of Bridger Jensen. Bridger exited the place of business along with a female. Bridger was with the female for a short time before walking toward his vehicle. We exited our vehicle with our police vests on that were clearly marked as police. We approached him and he was advised that we were police, and that he was being detained. He had his phone out and called his attorney, and had his attorney on speaker while we were explaining the process of the search warrant. The female that walked out of the building came over after Bridger asked if he can coordinate with her about having someone watch his kids. She came over and coordinated with him about the care of his kids, he was then searched for any weapons, then we walked into his place of business with him.

While Detective Julian was explaining everything to him, the business was cleared then a search was conducted. I was the "finder" in this case and all of the items located and seized will be listed below along with its location.

Seized:

Shelf on the wall above the desk - 2 jars of psilocybin mushrooms on of which were grounded.
White safe under desk - A large amount of psilocybin mushrooms in various containers and packaging with various labels.
Left side of desk - A small blender that has some white/grey residue inside of it that was consistent with psilocybin mushrooms.
Left top drawer of desk - A black scale.
Black safe located in Bridger's office - THC syrup.
Bridging Model paperwork - His approach towards the use of psilocybin mushroom through a clergy/religious practice

Photos were taken of the evidence prior to being moved then close ups were taken of the evidence before being packaged and documented. Photos of various paperwork to show different "clients" and amounts of psilocybin mushrooms were also taken and will be included in case report.

12/05/24

App-4:011

## Supplement

Mon Nov 11 22:04:02 2024 - Julian 4342

INVOLVED PERSONS:

Offender: Bridger Lee Jensen (DOB 09/06/1981)

Tanner Bean (Bridger's Attorney)
801-323-2266
tbean@fabianvancott.com

BACKGROUND INFORMATION:

Provo Special Enforcement Team (SET) detectives received information in September of 2023 about a Facebook post advertising the opening of a "Mushroom Wellness Center" in Provo. The Facebook post listed the address for the center at a residence in Provo, and that the grand opening would be on September 6, 2023. On September 6, 2023 I went to the residence and knocked on the door. I was greeted by a male at the front door. When I inquired about the mushroom wellness center, the male stated that I must be mistaken and he had no idea what I was talking about. When I spoke with the male at the door, there was no indication that there was any nefarious activity happening there.

On November 2, 2023, a FOX 31 News story was published about a mushroom treatment center called Singularism opening its doors in Provo. The news article featured a male named Bridger Lee Jensen who claims to be the founder of the business. In the article, Bridger is quoted and audio/video recorded discussing his experiences in using psilocybin mushrooms. He also discusses how his treatment center is a place where people can "work on their lives and progress spiritually." He also discusses with the interviewer about "guided trips."

The news article discusses how Bridger pushed legislators to pass a bill to allow for the legal use of psilocybin. The bill Bridger is referencing is S.B. 200 "Psilocybin Recommendation Pilot Program Amendments". That bill's current location is found in "Senate file for bills not passed". In the news article, Governor Spencer Cox is quoted saying, "It's just not there yet. We got there with medical marijuana. I just don't believe the science is there. I don't believe we should be experimenting on 5000 people here in our state. And I think there are some serious consequences and side effects societally and as well as medically that I'm just not comfortable with."

The news interview goes on to where Bridger says the following, "When you get to the point where you have had these experiences and you've seen hundreds of people benefit and healed from it, the scary thought is NOT doing it." According to the news article, Bridger claims that his business is protected by the Religious Freedom Restoration Act of the United States Constitution.

Later in November 2023, a concerned citizen, who did not want to be named, came forward wanting to speak with detectives about Bridger and his business. I met with the citizen and they advised me that Bridger has a website promoting the

12/05/24

business and identified where the business was located. The website is Singularism.org and the business location is 1969 N. State Street, Provo, UT.

SINGULARISM WEBSITE:

I went to the website and found that it shows Bridger Jensen as the founder, Alex Koritz as the Public Relations Director, and Brandi Lee Didrickson as the administrative assistant. Mariangel Babbel as the Relations Specialist, Justin Sharp as the Chief Technical Officer, and Garett Robertson as the founder partner. The website shows a picture of Bridger appearing to provide some kind of council while a female lays on a couch and appears to be in an either unconscious or semi-conscious state. The website also includes testimonials of people who state they used psilocybin at Singularism.

The website states:
"At the heart of our spiritual practice lies the sacred tradition of Entheogenic Spiritual Guidance. We integrate the profound potency of psilocybin, a revered entheogenic substance with long standing religious use, into our own ceremonies as a means to facilitate deep spiritual connections and foster profound inner spiritual transformation. Our ceremonies are performed safely, sincerely religious, and crucial for producing the effective results from which our members reap invaluable benefits."

I found that throughout the website, there are several claims that Singluarism is a religious experience and as such it operates within the Utah State Constitution and United States Constitution. However, the website also states that Singularism charges for their "spiritual counseling services" at a rate of "approximately $180 per hour,...Participants book packages ranging from 20 to 40 hours at a time."

While Singularism claims to be religious, therefore exempt from the controlled substance act, their website states that participants "do not need to leave [their] current faith or religious beliefs to participate in Singularism's ceremonies."

I spoke with a Utah County Attorney regarding this case and was advised that their office does not feel that Singularism's claim to have religious exemption has any merit and that if there is evidence of anyone possessing, using, distributing or cultivating psilocybin, that person is subject to prosecution in the State of Utah.

TOUR OF SINGULARISM:

Over the last few months, I have continued researching Singularism to try and determine the legitimacy of their claims for the legal use of psilocybin under claims of religious exemption. While on the website, I found a link to register for a free webinar. I also found the website to promote an "academy" to become a "Certified Psychedelic Practitioner". I applied to register for the webinar under an undercover alias.

On October 14, 2024, after registering for the webinar, I received a call from

801-203-0102. When I answered, the male on the other end of the line identified himself as Bridger Jensen. He was calling to follow up on my application. We spoke for a few minutes about my interest in psychedelic therapy. I discussed my interest using a made up back story to support my undercover role. During the call, Bridger's phone disconnected. I attempted to call back several times, but it went straight to voicemail. The pre-recorded voicemail message stated that I had reached Bridger Jensen's phone. I opted not to leave a voicemail. About a minute later, I received another phone call from 435-800-1969. When I answered, I was greeted again by Bridger who explained that his phone had died and that he was now calling me from his assistant, Brandi's, phone. We continued our conversation and he explained he invited me to attend a tour of the wellness center.

I inquired about how much the therapy sessions costed and he explained that they have packages that cost between $3900-$6400. He also invited me to attend a consultation. When I asked him how much a consultation costs, he informed me that they are $49. We discussed how I was not so much interested in receiving the therapy, but rather in becoming a facilitator, he stated that I should come on the tour and then possibly schedule a consultation. During our conversation, Bridger explained that the use of psilocybin is legal in his practice due to the religion of Singularism. He explained that Singularism is supportive of other religions and that you need not leave any other religion to join Singularism, but rather it adds to your beliefs that already exist.

On October 21, 2024 I attended a tour of the Mushroom Therapy Center located at 1969 N. State Street, Provo, UT. I met with Bridger in an undercover capacity. He and I walked through the wellness center together. He showed me several rooms that he informed me is where the therapy sessions occur. Each therapy room has a large couch in it where their client sits with a large cushioned chair positioned in front of it where the staff member sits during the sessions.

Bridger and I discussed some aspects of how the center operated. He informed about psilocybin is at the core of their practice at the wellness center. He strongly asserted that their use of psilocybin at the wellness center unlocks the mind and allows for their clients to get the best therapeutic care possible. I asked him about how he knows what mushrooms are safe and he stated that the mushroom they use are "lab quality" and that they grow from grain. He also stated that the way he knows they are safe is by "becoming an expert" such as himself.

During the tour, I noticed one room in the center that the door was slightly ajar. Bridger did not take me into that room, but from what I could see through the small opening, there appeared to be lab equipment inside. I also observed just outside the front entrance, there about 7 to 10 five gallon jugs of purified water.

During the tour, Bridger also briefly explained the process of a therapy session. He definitively confirmed that they do give psilocybin to their clients in the form of a tea. He stated that the drinking of the tea was considered a "ceremony" and that it induces a psychedelic state. He said that he and his staff members are the ones who provide the psilocybin and that they are

12/05/24

App-4:014

"Certified Psychedelic Practitioners." He also said that these sessions last anywhere from 5 to 10 hours.

The tour lasted about 10 to 15 minutes and he invited me to join a webinar the following day to get more information about pricing for their services.

SINGULARISM WEBINAR:

On October 22, 2024 I attended a webinar that was hosted by Bridger. There where two other people that attended that were interested in participating in the wellness center's services. There where also two other people that attended the webinar that were members of Bridger's staff. Their names were displayed on their screen as Brandi Lee and Ryan Hightower. During the webinar, Ryan stated that he had "guided a trip" just earlier that day and had completed that session about a half hour before the webinar began at 18:00 hours.

During the webinar, Bridger discussed how he is the founder of Singularism and discussed the basis of the religion. He said that the use of psilocybin is the central point upon which Singularism is based. He said that Singularism is not to be considered a "dogmatic" religion in a sense that you do not need to leave any religion you currently associate yourself with in order to participate in Singularism. He also stated that the way that he founded the religion was by talking with his lawyer to review prior cases in which people claimed religious exemption; where those claimants won or lost; and the judges comments, and essentially created a roadmap to create his religion of Singularism. He even said the ceremonies where the psilocybin is used are his ceremonies. Bridger discussed how the guided use of psilocybin is a "mystical" and "religious" experience. He stated that their sessions are "clinically informed" even though he is "no longer a licensed clinician."

During the webinar, Bridger shared videos of people giving interviews and sharing their experiences using psilocybin. In one particular video, about 1 hour into the webinar, the person being interviewed was detailing the hallucinations he had seen during his "trip." The talk show host asks the person he is interviewing if what he was doing was legal. The person being interviewed abruptly responded with, "No." Bridger immediately paused the video and assured those of us attending the webinar that his practice of using psilocybin mushrooms in Singularism is legal. Although he did not offer any explanation as to how. Bridger also claimed that he knows that the mushrooms used at his clinic are safe because they are "lab quality" and that he had to learn through trial and error the perfect conditions for extracting the psilocybin from the mushrooms. He also stated that at his wellness center they do not use placebos.

At the conclusion of the webinar, Bridger explained the pricing and the process of how the therapy sessions work. He sells packages in "rounds" and the minimum package is a two round package.

The first step is by attended a consultation with Bridger. During the consultation, you answer various screening questions for him to determine if this is the proper course of action for you and if you would benefit from taking

psilocybin. If Bridger feels that you qualify, then you can purchase a two, three, or four round package.

The first round consists of four meetings. The first two meetings are considered preparatory meetings. Each preparatory meeting lasts about an hour where you discuss what you may encounter on your "psychedelic journey" and how to deal with those encounters and what to expect from the practitioner supervising your "trip." The third meeting is the "guided session" where you partake of the psilocybin infused tea and enter the hallucinogenic state. This session lasts anywhere from 5 to 10 hours. During this session, the staff member documents the client's behaviors and experiences. The final session of the round is a follow up where the client and staff member review the staff member's notes and they discuss the client's experiences. This session lasts about an hour. After about 2-6 weeks, the client repeats the process for a second round, except there is only one preparatory meeting, followed by a guided trip session, followed by a follow up session. The pricing for a two round package is $3900, a three round package is $5400, and a four round package is $6400.

SEARCH WARRANT:

Due to the totality of the circumstances, I feel there is Probable Cause that Bridger is running an illicit business under the guise of a religion. He is getting people to come to a location where he gets them to pay incredibly high amounts of money in exchange for psilocybin. He has admitted openly that at his "wellness center" the use of psilocybin is the foundation of their practice. He has made statements that he has intimate knowledge of where and how the mushrooms are cultivated, and that he has learned the perfect conditions for extracting psilocybin through trial and error.

On November 4, 2024 I submitted an affidavit for search warrant to the Fourth District Court, requesting for authority to search the premises of 1969 N. State Street, Provo, UT. That affidavit was reviewed and a search warrant was granted by the Honorable Judge Sean Petersen.

On November 11, 2024 Provo Special Enforcement Team (SET) detectives served that search warrant. Through my investigation, I had found that Singularism's hours of operation usually close around 17:00 hours. At around 17:00 hours, Detective Wolfgramm, Detective Graham, and I waited outside the building for Bridger to exit. A short time later, Bridger exited the building and began walking to his vehicle. Detective Graham and Detective Wolfgramm stopped Bridger in the parking lot, identified themselves as police officers, and detained him pursuant to the search warrant.

Bridger asked Detective Graham and Detective Wolfgramm if he could call his attorney, and they allowed him to do so. I then walked up to Bridger and I introduced myself. When I made contact with Bridger, he was already on speaker phone with his attorney. I provided Bridger a copy of the search warrant and asked if we could go inside the building so we could speak. Bridger complied and walked us into the business.

Once we walked inside the business, Bridger and I sat down on a couch and had a

conversation while Detective Graham, Detective Wolfgramm, and Sgt. Rowberry searched the business.

INTERVIEW:

My entire interaction with Bridger was audio recorded. The following is a summary of our conversation. For complete details about the interview, refer to the recording.

While Bridger and I spoke, he had his attorney on speaker phone the entire time. I advised Bridger of his Miranda rights and both he and his lawyer stated they understood them. I explained to Bridger that I had probable cause to support allegations that Bridger was providing psilocybin to his clients that attended his wellness center. Bridger openly stated that to be true and even showed me where he keeps the psilocybin mushrooms in the wellness center. He walked over to a desk in the middle of the room and opened a safe. Inside the safe were numerous bags filled with mushrooms, which were consistent with psilocybin mushrooms and identified as such by Bridger. He also opened another safe in his office that contained a bottle of THC syrup, which Bridger later stated he uses personally as part of his religious practices, however, he does not give that to any of his clients. I asked Bridger if he had a medical marijuana card, and he stated that he does not have a current one.

During our conversation, Bridger stated that he believes that his business is legal because of the religion that he founded. I explained that a concern that I had was how can he guarantee that the mushrooms he is providing to people are safe. He said that his record of safe experiences is evidence that the mushrooms are safe. I asked Bridger if he was cultivating the mushrooms, and he alluded that he was not cultivating them. When I pressed about where does he acquire the mushrooms, he said that he did not want to answer that question. No matter how much I pressed about where he gets the mushrooms or where are they cultivated, he did not want to answer as he did not want to self-incriminate.

I asked Bridger about his employees that are psychedelic practitioners at his wellness center. I asked him about when a practitioner conducts a ceremony at his wellness center, who is getting paid for the session, is it the practitioner, is it him, or is it both. He likened it to when a person goes to see a religious councilor. While the client is paying the center, some amount would be distributed to the practitioner. When I asked who all were the people that he employs as practitioners, he said he did not want to say their names, as he did not want to get any of them in trouble and would rather have the legal liability fall completely on his shoulders.

I asked Bridger about the ceremonies themselves and how they are conducted. He stated that the mushrooms are boiled in a water at a specific temperature, which allows for the psilocybin to be extracted and then the psilocybin infused tea is consumed by the client.

I explained to Bridger that the search warrant allows for me to search for and seize any and all psilocybin products, in addition to any records of sessions that he has. Bridger pleaded for me not to take the records as he claimed the

records of his clients' psilocybin induced "journeys" were considered scripture for his religion. I opted to honor his wish and we took photos of session records and left him with the physical copies.

There was one piece of paper that Bridger was insistent that I took with me and admit into evidence. It was a letter that was in the white safe that contained a large quantity of mushrooms. The letter was written by his attorney, address "To Whom it May Concern". The letter explains that the contents of the safe (the psilocybin mushrooms) are considered holy sacrament to the the followers of Singularism and are "integral to the practice of their faith." There was also a hand written expiration date at the bottom of the letter. The bottom of the letter states, "This is one of just 10 copies made 9/8/23 & expires 9/8/24" and is signed by Bridger Lee Jensen.

CONCLUSION:

Bridger fully feels that since he has founded the religion of Singularism, his use and providing of psilocybin to individuals is legal and protected under federal law as part of the Freedom of Religion. However, when speaking with the Utah County and Provo City Attorney Offices, it has been expressed that Singularism is not exempt from the Utah Controlled Substance Act. Bridger has openly stated that he is facilitating and providing psilocybin to numerous people. A large quantity of psilocybin was located in the business that he is responsible for. A bottle of THC syrup was also located in Bridger's business, which he admitted was for personal use. Due to these factors, this case will be referred to the Utah County Attorney's Office for screening of charges.

FinCEN REPORT:
I reached put to the Statewide Information Analysis Center (SIAC) and asked them to run a financial report for Singularism. I received a copy of the reports and they show that Singularism's KeyBank accounts had been previously flagged for suspicious activity due to the nature of the business and the transaction history that took place during to the monitoring period. I have attached those reports to this case. The reports are password protected. The password for the FinCEN reports are "SIAC2024!"

CHARGES:

Please refer the following charges for Bridger Lee Jensen (DOB 09/06/1981) to the Utah County Attorney's Office and screen for any additional charges they deem appropriate and necessary:

- Possession of a Schedule I Controlled Substance (Psilocybin) with Intent to Distribute, 58-37-8, F2
- Possession of Drug Paraphernalia, 58-37A-5, MB
- Possession of Marijuana, 58-37-8, MB

12/05/24

App-4:018

*Officer Report for Incident 24PR24922*    *Page 13 of 20*

## Supplement

Thu Nov 21 15:26:17 2024 - Julian 4342

On November 21, 2024 I received a call from a Utah County Attorney requesting that I field test the THC and the Psilocybin mushrooms. I checked out the bottle of THC syrup from evidence and field tested it, which resulted in a positive test. I then resealed the packaging and turned it back into the evidence.

I also checked out the large package of mushrooms. I cut open the package and removed one mushroom that weighs .9 grams that I will use to field test for psilocybin. I resealed the large package of mushrooms and turned them back into evidence as well. I field tested the small sample that I removed from the large package and it field tested positive for psilocybin.

I did not use the entire .9 grams for the field tests. The remainder of the sample was packaged again separately and booked into evidence at the Provo Police Station.

12/05/24

App-4:019

---

## Supplement

```
Mon Dec 2 17:50:54 2024 Julian 4342
```

On November 28, 2024 I received an email informing me that the two samples I had sent to the state crime lab had been tested for psilocybin. The report indicates that both samples contained psilocybin. I have a hard copy of the report in my possession. The report is accessible through the Crime Lab Inquiry within the UCJIS portal.

12/05/24

App-4:020

*Officer Report for Incident 24PR24922*                                                            *Page 16 of 20*

## Property

| | | | |
|---|---|---|---|
| **Property Number:** | PRP147932 | | |
| **Item:** | CS-LSD-Hallucin | **Owner Applied Nmbr:** | |
| | | | |
| **Brand:** | Psilocybin | **Model:** | |
| **Year:** | 0 | **Quantity:** | .7 |
| **Meas:** | GM | **Serial Nmbr:** | |
| **Total Value:** | $0.00 | **Color:** | WHI |
| **Owner:** | JENSEN BRIDGER LEE B117082 | | |
| **Agency:** | PRPD Provo PD | **Tag Number:** | |
| **Accum Amt Recov:** | $0.00 | **Officer:** | Julian Jac (PR) |
| **UCR:** | DNK Drug/Narc, Other Hallucinogens | **UCR Status:** | SEI |
| **Local Status:** | EIS | **Storage Location:** | Provo PD |
| **Crime Lab Number:** | | **Status Date:** | 11/11/24 |
| **Date Released:** | **/**/** | **Date Recov/Rcvd:** | **/**/** |
| **Released By:** | | **Amt Recovered:** | $0.00 |
| **Released To:** | | **Custody:** | **:**:** **/**/** |
| **Reason:** | | | |

**Comments:** Sample taken from the main package of mushrooms that was field tested positive for psilocybin - .9 grams was removed from the original package - .2 grams was consumed in the tests - .7 grams was booked back into evidence

| | | | |
|---|---|---|---|
| **Property Number:** | PRP147686 | | |
| **Item:** | CS-LSD-Hallucin | **Owner Applied Nmbr:** | |
| | | | |
| **Brand:** | Psilocybin | **Model:** | |
| **Year:** | 0 | **Quantity:** | 459.8 |
| **Meas:** | GM | **Serial Nmbr:** | |
| **Total Value:** | $0.00 | **Color:** | WHI |
| **Owner:** | JENSEN BRIDGER LEE B117082 | | |
| **Agency:** | PRPD Provo PD | **Tag Number:** | |
| **Accum Amt Recov:** | $0.00 | **Officer:** | Julian Jac (PR) |
| **UCR:** | DNK Drug/Narc, Other Hallucinogens | **UCR Status:** | SEI |
| **Local Status:** | EIS | **Storage Location:** | Provo PD |
| **Crime Lab Number:** | | **Status Date:** | 11/11/24 |
| **Date Released:** | **/**/** | **Date Recov/Rcvd:** | **/**/** |
| **Released By:** | | **Amt Recovered:** | $0.00 |
| **Released To:** | | **Custody:** | **:**:** **/**/** |
| **Reason:** | | | |
| **Comments:** | | | |

| | | | |
|---|---|---|---|
| **Property Number:** | PRP147687 | | |
| **Item:** | CS-LSD-Hallucin | **Owner Applied Nmbr:** | |

12/05/24

App-4:022

*Officer Report for Incident 24PR24922*                                                                  *Page 17 of 20*

---

|  |  |  |  |
|---|---|---|---|
| **Brand:** | Psilocybin | **Model:** | |
| **Year:** | 0 | **Quantity:** | 2 |
| **Meas:** | DU | **Serial Nmbr:** | |
| **Total Value:** | $0.00 | **Color:** | WHI |
| **Owner:** | JENSEN BRIDGER LEE B117082 | | |
| **Agency:** | PRPD Provo PD | **Tag Number:** | |
| **Accum Amt Recov:** | $0.00 | **Officer:** | Julian Jac (PR) |
| **UCR:** | DNK Drug/Narc, Other Hallucinogens | **UCR Status:** | SEI |
| **Local Status:** | EIS | **Storage Location:** | Provo PD |
| **Crime Lab Number:** | | **Status Date:** | 11/11/24 |
| **Date Released:** | **/**/** | **Date Recov/Rcvd:** | **/**/** |
| **Released By:** | | **Amt Recovered:** | $0.00 |
| **Released To:** | | **Custody:** | **:**:** **/**/** |
| **Reason:** | | | |
| **Comments:** | Please send this to the State Crime lab for testing for psilocybin | | |
| **Property Number:** | PRP147688 | | |
| **Item:** | CS-Paraphernali | **Owner Applied Nmbr:** | |

|  |  |  |  |
|---|---|---|---|
| **Brand:** | | **Model:** | Cups |
| **Year:** | 0 | **Quantity:** | 2 |
| **Meas:** | | **Serial Nmbr:** | |
| **Total Value:** | $2.00 | **Color:** | GRY |
| **Owner:** | JENSEN BRIDGER LEE B117082 | | |
| **Agency:** | PRPD Provo PD | **Tag Number:** | |
| **Accum Amt Recov:** | $0.00 | **Officer:** | Julian Jac (PR) |
| **UCR:** | DEQ Drug/Narc Equipment | **UCR Status:** | SEI |
| **Local Status:** | EIS | **Storage Location:** | Provo PD |
| **Crime Lab Number:** | | **Status Date:** | 11/11/24 |
| **Date Released:** | **/**/** | **Date Recov/Rcvd:** | **/**/** |
| **Released By:** | | **Amt Recovered:** | $0.00 |
| **Released To:** | | **Custody:** | **:**:** **/**/** |
| **Reason:** | | | |
| **Comments:** | Cups that contained mushrooms and smaller cups that held ground up mushrooms | | |
| **Property Number:** | PRP147689 | | |
| **Item:** | CS-Paraphernali | **Owner Applied Nmbr:** | |

|  |  |  |  |
|---|---|---|---|
| **Brand:** | | **Model:** | Scales/Grinder |
| **Year:** | 0 | **Quantity:** | 4 |
| **Meas:** | | **Serial Nmbr:** | |
| **Total Value:** | $2.00 | **Color:** | BLK |
| **Owner:** | JENSEN BRIDGER LEE B117082 | | |
| **Agency:** | PRPD Provo PD | **Tag Number:** | |

12/05/24

App-4:023

| | | | |
|---|---|---|---|
| **Accum Amt Recov:** | $0.00 | **Officer:** | Julian Jac (PR) |
| **UCR:** | DEQ Drug/Narc Equipment | **UCR Status:** | SEI |
| **Local Status:** | EIS | **Storage Location:** | Provo PD |
| **Crime Lab Number:** | | **Status Date:** | 11/11/24 |
| **Date Released:** | **/**/** | **Date Recov/Rcvd:** | **/**/** |
| **Released By:** | | **Amt Recovered:** | $0.00 |
| **Released To:** | | **Custody:** | **:**:** **/**/** |
| **Reason:** | | | |
| **Comments:** | Scales and an electronic grinder used for grinding up psilocybin mushrooms | | |
| **Property Number:** | PRP147690 | | |
| **Item:** | CS-Unidentified | **Owner Applied Nmbr:** | |

| | | | |
|---|---|---|---|
| **Brand:** | | **Model:** | |
| **Year:** | 0 | **Quantity:** | .01 |
| **Meas:** | GM | **Serial Nmbr:** | |
| **Total Value:** | $0.00 | **Color:** | BLU |
| **Owner:** | JENSEN BRIDGER LEE B117082 | | |
| **Agency:** | PRPD Provo PD | **Tag Number:** | |
| **Accum Amt Recov:** | $0.00 | **Officer:** | Julian Jac (PR) |
| **UCR:** | DUT Drugs-Unknown Type | **UCR Status:** | SEI |
| **Local Status:** | EIS | **Storage Location:** | Provo PD |
| **Crime Lab Number:** | | **Status Date:** | 11/11/24 |
| **Date Released:** | **/**/** | **Date Recov/Rcvd:** | **/**/** |
| **Released By:** | | **Amt Recovered:** | $0.00 |
| **Released To:** | | **Custody:** | **:**:** **/**/** |
| **Reason:** | | | |
| **Comments:** | | | |
| **Property Number:** | PRP147691 | | |
| **Item:** | Paper-Official | **Owner Applied Nmbr:** | |

| | | | |
|---|---|---|---|
| **Brand:** | | **Model:** | |
| **Year:** | 0 | **Quantity:** | 1 |
| **Meas:** | | **Serial Nmbr:** | |
| **Total Value:** | $5.00 | **Color:** | WHI |
| **Owner:** | JENSEN BRIDGER LEE B117082 | | |
| **Agency:** | PRPD Provo PD | **Tag Number:** | |
| **Accum Amt Recov:** | $0.00 | **Officer:** | Julian Jac (PR) |
| **UCR:** | DPB Documents/Personal or Business | **UCR Status:** | SEZ |
| **Local Status:** | EIS | **Storage Location:** | Provo PD |
| **Crime Lab Number:** | | **Status Date:** | 11/11/24 |
| **Date Released:** | **/**/** | **Date Recov/Rcvd:** | **/**/** |
| **Released By:** | | **Amt Recovered:** | $0.00 |

12/05/24

App-4:024

|  |  |  |  |
|---|---|---|---|
| **Released To:** |  | **Custody:** | **:**:** **/**/** |
| **Reason:** |  |  |  |
| **Comments:** | Paperwork for Singularism journeys and attorney letter |  |  |
| **Property Number:** | PRP147692 |  |  |
| **Item:** | CS-Marijuana | **Owner Applied Nmbr:** |  |
|  |  |  |  |
| **Brand:** | Lime | **Model:** | Tincture |
| **Year:** | 0 | **Quantity:** | 1000 |
| **Meas:** | MG | **Serial Nmbr:** |  |
| **Total Value:** | $0.00 | **Color:** | BLK |
| **Owner:** | JENSEN BRIDGER LEE B117082 |  |  |
| **Agency:** | PRPD Provo PD | **Tag Number:** |  |
| **Accum Amt Recov:** | $0.00 | **Officer:** | Julian Jac (PR) |
| **UCR:** | DMJ Drugs-Narc-Marijuana | **UCR Status:** | SEI |
| **Local Status:** | EIS | **Storage Location:** | Provo PD |
| **Crime Lab Number:** |  | **Status Date:** | 11/11/24 |
| **Date Released:** | **/**/** | **Date Recov/Rcvd:** | **/**/** |
| **Released By:** |  | **Amt Recovered:** | $0.00 |
| **Released To:** |  | **Custody:** | **:**:** **/**/** |
| **Reason:** |  |  |  |
| **Comments:** | THC Syrup/Tincure **-** 1000 mg Live Resin |  |  |

12/05/24

App-4:025

## Name Involvements:

**Offender :**  B117082
**Last:**  JENSEN                    **First:**  BRIDGER                **Mid:**  LEE
**DOB:**  09/06/81                   **Dr Lic:**  162491187            **Address:**  1122 W 1970 SOUTH ST
**Race:**  W          **Sex:**  M    **Phone:**  (801)203-0102         **City:**  Orem, UT 84058

12/05/24

# EXHIBIT CC

Appellate Case: 25-4115   Document 226-4   Date Filed: 12/11/2025   Page: 28

 

Menu  🔍                    FOX 13
                        SALT LAKE CITY                    🖥 Watch Now

Quick links...  ▾

NEWS > LOCAL NEWS

# Psychedelic mushroom interest grows in Utah center opening in Provo



Posted 8:56 AM, Nov 02, 2023 and last updated 12:39 PM, Nov 06, 2023

PROVO, Utah — Psilocybin, or the hallucinogenic substance found in specific mushrooms, is making headlines as more states look to decriminalize it for therapeutic purposes.

While attempts to legalize psilocybin failed in Utah earlier this year, interest in the substance's possible mental health benefits is currently growing and showing up in different ways along the Wasatch Front.

App-4:028

Case 2:24-cv-00887-JNP-CMR    Document 71-7    Filed 01/22/25    PageID.1736    Page
Appellate Case: 25-4115    Document326-6    Date Filed: 12/11/2025    Page: 29

In recent months, a mushroom treatment center, called Singularism, opened its doors in the City of Provo.

Read More

00:37                                                02:24

"Being a Utahn myself, and from Provo, I think this is the right place at the right time," said founder Bridger Lee Jensen.

Jensen has worked in the mental health field for 20 years and found psilocybin six years ago to help people in what he calls a sincere and safe way. He plans to continue that effort in his new space.

"The process needs to include preparation and proper screening," he explained. "People aren't just going to come in and suddenly be able to do this. This isn't just a place to do that. It's a place where people are working on bettering our lives and progressing spiritually."

ADVERTISEMENT

He said psychotherapy will also be used to help them process their guided experience or "trip".

"When you get to the point where you've had these experiences, and you've seen hundreds of people benefit and heal from it. The scary thought is not doing this," he said.

This isn't Jensen's first attempt to bring psilocybin to the Beehive State either. He was part of a grassroots movement earlier this year that urged state lawmakers to pass legislation

Case 2:24-cv-00887-JNP-CMR    Document 71-7    Filed 01/22/25    PageID.1737    Page

Appellate Case: 25-4115    Document: 26-4    Date Filed: 12/11/2025    Page: 30

permitting the legal use of psilocybin for clinical and academic purposes.

While he presented a petition showing public support for its passage, those efforts fizzled when Governor Spencer Cox announced he wouldn't support a bill legalizing magic mushrooms.

"It's just not there yet. We got there with medical marijuana. I just don't believe the science is there. I don't believe we should be experimenting on 5,000 people here in our state. And, I think there are some serious consequences and side effects, societally as well as medically that I am just not comfortable with," said Cox during his monthly news conference on PBS back in February.

According to the U.S. Government, psilocybin is also a Schedule I substance under the Controlled Substances Act (CSA), which means it has great potential for abuse and serves no legitimate medical purpose.

ADVERTISEMENT



Also, the National Institutes of Health (NIH) reports there's no scientific agreement on the risks of using psilocybin.

Despite that, several national universities have shown its positive effect on people with mental health disorders through their research including Huntsman Cancer Institute's Palliative Care Physician Anna Beck, MD.

Beck worked with other medical experts to publish a study that examines the effectiveness of psilocybin-assisted group therapy in cancer patients with depression.

"At least 50 percent of our small group of patients had a significant reduction in their depressive symptoms. In fact, it actually went into remission by week number two."

While they were only able to accommodate 12 people through this trial, Beck says they didn't struggle to find public interest or support for the study.

Beck hopes the findings help them fund larger studies in the future and explore the substance further.

ADVERTISEMENT

App-4:030

"I think that these are very powerful medications and very powerful drugs and I think their uses could be. I don't think we could understand all of their uses at this point," she explains.

Just this year, the FDA came out with new draft considerations for designing clinical trials for psychedelic drugs.

FOX 13 News reached out to the City of Provo about how the mushroom treatment center is allowed to operate legally, and a spokesperson issued the following statement:

"Psilocybin is a Schedule I controlled substance and under Utah law, it is illegal to possess or distribute. A recent effort to legalize psilocybin was not approved by the legislature, therefore use and distribution continue to be criminal offenses.

We have evaluated recent claims that use is protected under the Religious Freedom Restoration Act and we believe those claims to be without merit. The position of the Provo Police Department is that officers will treat psilocybin as an illegal drug and will arrest or cite users and distributors and refer charges to the Utah County Attorney's Office. We have confirmed with that office that they intend to prosecute violators."

FOX 13 News reached out to the Utah County Attorney's office for further clarification on Provo's aforementioned "position". They responded:

ADVERTISEMENT

*"Based upon research conducted by the Utah County Attorney's office, it does not appear that Singularism has Constitutional protections to either use of administer psilocybin."*

App-4:031

Case 2:24-cv-00887-JNP-CMR Document 71-7 Filed 01/22/25 PageID.1739 Page

Appellate Case: 25-4115 Document 26-4 Date Filed: 12/11/2025 Page: 32

Meanwhile, Bridger, who founded Singularism, says they're protected by the Religious Freedom Restoration Act of the U.S. Constitution.

Bridger sent the following updated statement to FOX 13 News:

*"Singularism's attorney, Tanner Bean, states that Singularism has taken every effort to accord with state and federal constitutional and statutory religious freedom authorities which would permit its religious practices. Singularism is prepared to defend its religious freedom to, as a small religious minority group, partake of its religious rites and sacraments in a closed, supervised, and secure setting."*

*"Bridger and his team also report a pleasant meeting with the state attorney general's office requesting support for forthcoming legislation and clarification of Utah's religious freedom exemption protections."*

Copyright 2023 Scripps Media, Inc. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

Sign up for the **Breaking News Newsletter** and receive up to date information.

| E-mail | Submit |

Sponsored

CURATION BY

App-4:032

# EXHIBIT DD



FinCEN | Financial Crimes Enforcement Network
United States Department of the Treasury

## BSAR Transcript
BSA: 31000266505487 and DCN:

### Filing Information

| | |
|---|---|
| Type of Report | Continuing Activity Report |
| Filing Date | 03/11/2024 |
| Received Date | 03/11/2024 |
| Entry Date | 03/12/2024 |
| Amended | Prior BSA ID: 31000259112891 |
| Submission Method | Electronic batch filing |

### Subject Information

**Subject 1 of 3 : *PSYCHE HEALING AND BRIDGING, LLC**

| | | |
|---|---|---|
| Role | Subject | |
| Individual/Organization | Organization | |
| Last(or Entity) Name | *PSYCHE HEALING AND BRIDGING, LLC | |
| EIN | 932377864 | |
| Form(s) of Identification | Identification Type | Other |
| | Identification Number | 134873940160 |
| | Other Text | SOS |
| | Issuing State Code | CT |
| | Issuing State | Connecticut |
| | Issuing Country Code | US |
| Address(es) | Address Type | Subject permanent/mailing address |
| | Street Address | 1969 N STATE STREET |
| | | 1969 N STATE ST - Enhanced |
| | City | PROVO |
| | | PROVO – Enhanced |
| | State | UT |
| | | UT - Enhanced |
| | ZIP Code | 84604 |
| | | 84604-1012 - Enhanced |
| | Country | US |
| | | US - Enhanced |
| NAICS Code | 6213 | |
| NAICS Code Text | Offices of Other Health Practitioners | |
| Email(s) | BRIDGERJENSEN@GMAIL.COM | |
| Occupation/Type of Business | Health practice | |
| Corroborative Statement to Filer | No | |
| Relationship to Reporting | Institution TIN | 340797057 |

Page 1

The enclosed information was collected and disseminated under provisions of the Bank Secrecy Act (the BSA) and U.S. Department of the Treasury regulations implementing the BSA. See 31 U.S.C. 5311, et seq., 31 CFR Chapter x. The information is sensitive in nature and is to be treated accordingly. The information may be used only for a purpose consistent with a criminal, tax, or regulatory investigation or proceeding, or in the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism. See 31 U.S.C. 5311. The information cannot be further released, disseminated, disclosed, or transmitted without prior approval of the Director of Financial Crimes Enforcement Network or his authorized delegate. Suspicious activity reports filed under the BSA must be treated with particular care given that they contain unsubstantiated allegations of possible criminal activity, akin to confidential informant tips. Unauthorized release of information collected under the BSA may result in criminal or civil sanctions.

App-4:034



**FinCEN** | Financial Crimes Enforcement Network
United States Department of the Treasury

## BSAR Transcript
## BSA: 31000266505487 and DCN:

| Subject Information | | |
|---|---|---|
| Institution(s) | Relationship of Subject | Customer: Yes |
| Affected Account(s) | Account Number | 44075100█ |
| | Financial Institution TIN | 340797057 |

| Subject 2 of 3 : *SINGULARISM | | |
|---|---|---|
| Role | Subject | |
| Individual/Organization | Organization | |
| Last(or Entity) Name | *SINGULARISM | |
| EIN | 920835772 | |
| Form(s) of Identification | Identification Type | Other |
| | Identification Number | 130076110140 |
| | Other Text | SOS |
| | Issuing State Code | CT |
| | Issuing State | Connecticut |
| | Issuing Country Code | US |
| Address(es) | Address Type | Subject permanent/mailing address |
| | Street Address | 1899 S 1030 W |
| | | 1899 S 1030 W - Enhanced |
| | City | OREM |
| | | OREM - Enhanced |
| | State | UT |
| | | UT - Enhanced |
| | ZIP Code | 84058-8141 |
| | | 84058-8141 - Enhanced |
| | Country | US |
| | | US - Enhanced |
| NAICS Code | 8133 | |
| NAICS Code Text | Social Advocacy Organizations | |
| Email(s) | BRIDGERJENSEN@GMAIL.COM | |
| Occupation/Type of Business | Religious/therapeutic services | |
| Corroborative Statement to Filer | No | |
| Relationship to Reporting Institution(s) | Institution TIN | 340797057 |
| | Relationship of Subject | Customer: Yes |
| Affected Account(s) | Account Number | 440751006121 |
| | Financial Institution TIN | 340797057 |

| Subject 3 of 3 : JENSEN | | |
|---|---|---|
| Role | Subject | |

The enclosed information was collected and disseminated under provisions of the Bank Secrecy Act (the BSA) and U.S. Department of the Treasury regulations implementing the BSA. See 31 U.S.C. 5311, et seq., 31 CFR Chapter X. The information is sensitive in nature and is to be treated accordingly. The information may be used only for a purpose consistent with a criminal, tax, or regulatory investigation or proceeding, or in the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism. See 31 U.S.C. 5311. The information cannot be further released, disseminated, disclosed, or transmitted without prior approval of the Director of Financial Crimes Enforcement Network or his authorized delegate. Suspicious activity reports filed under the BSA must be treated with particular care given that they contain unsubstantiated allegations of possible criminal activity akin to confidential informant tips. Unauthorized release of information collected under the BSA may result in criminal or civil sanctions.

App-4:035



**FinCEN** | Financial Crimes Enforcement Network
United States Department of the Treasury

## BSAR Transcript
BSA: 31000266505487 and DCN:

| Subject Information | | |
|---|---|---|
| Individual/Organization | Individual | |
| Last(or Entity) Name | JENSEN | |
| First Name | BRIDGER | |
| Middle Name | L | |
| Gender Type | Male | |
| Date of Birth | 09/06/1981 | |
| SSN/ITIN | 529896155 | |
| Form(s) of Identification | Identification Type | Driver's license/State ID |
| | Identification Number | 162491187 |
| | Issuing State Code | CT |
| | Issuing State | Connecticut |
| | Issuing Country Code | US |
| Address(es) | Address Type | Subject permanent/mailing address |
| | Street Address | 1899 S 1030 W |
| | | 1899 S 1030 W - Enhanced |
| | City | OREM |
| | | OREM - Enhanced |
| | State | UT |
| | | UT - Enhanced |
| | ZIP Code | 84058-8141 |
| | | 84058-8141 - Enhanced |
| | Country | US |
| | | US - Enhanced |
| Phone Number(s) | Type | Mobile |
| | Number | (801) 203-0102 |
| Email(s) | BRIDGERJENSEN@GMAIL.COM | |
| Occupation/Type of Business | Therapist\Life Coach | |
| Corroborative Statement to Filer | No | |
| Relationship to Reporting Institution(s) | Institution TIN | 340797057 |
| | Relationship of Subject | Customer: Yes |
| Affected Account(s) | Account 1 of 2 | |
| | Account Number | 440751006113 |
| | Financial Institution TIN | 340797057 |
| | Account 2 of 2 | |
| | Account Number | 440751006121 |
| | Financial Institution TIN | 340797057 |

Page 3

The enclosed information was collected and disseminated under provisions of the Bank Secrecy Act (the BSA) and U.S. Department of the Treasury regulations implementing the BSA. See 31 U.S.C. 5311, et seq., 31 CFR Chapter X. The information is sensitive in nature and is to be treated accordingly. The information may be used only for a purpose consistent with a criminal, tax, or regulatory investigation or proceeding, or in the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism. See 31 U.S.C. 5311. The information cannot be further released, disseminated, disclosed, or transmitted without prior approval of the Director of Financial Crimes Enforcement Network or his authorized delegate. Suspicious activity reports filed under the BSA must be treated with particular care given that they contain unsubstantiated allegations of possible criminal activity akin to confidential informant tips. Unauthorized release of information collected under the BSA may result in criminal or civil sanctions.

App-4:036



**FinCEN** | Financial Crimes Enforcement Network
United States Department of the Treasury

## BSAR Transcript
BSA: 31000266505487 and DCN:

| Suspicious Activity Information | |
|---|---|
| Amount Involved | $68,441 |
| Cumulative Amount | $279,872 |
| Date or Date Range of Activity | 11/15/2023 – 02/05/2024 |
| Money laundering | Suspicious EFT/wire transfers<br>Suspicious concerning the source of funds |
| Other suspicious activities | Other: Negative news<br>Transaction with no apparent economic, business, or lawful purpose |
| Financial instrument or payment mechanism | U.S. Currency<br>Other Financial instrument or payment mechanism: EFT/ Wire |
| Financial product | Deposit account |

## Activity Location

### Financial Institution Location 1 of 1

| Type of Financial Institution | Depository institution | |
|---|---|---|
| Primary Regulator | OCC | |
| Legal Name | KEYBANK NA | |
| EIN | 340797057 | |
| Role in Transaction | Selling/Paying Location | |
| Address | Address Type | Address where transaction occurred |
| | Street Address | 127 PUBLIC SQUARE |
| | | 127 PUBLIC SQ - Enhanced |
| | City | CLEVELAND |
| | | CLEVELAND - Enhanced |
| | State | OH |
| | | OH - Enhanced |
| | ZIP Code | 44114-1226 |
| | | 44114-1217 - Enhanced |
| | Country | US |
| | | US - Enhanced |
| Internal Control File Number | CA3295626 | |

### Branch Office Location 1 of 1

| Financial Institution Name | KEYBANK NA | |
|---|---|---|
| RSSD Number | 0939173 | |
| Address | Address Type | Address where transaction occurred |
| | Street Address | 207 NORTH UNIVERSITY AVE |
| | | 207 N UNIVERSITY AVE - Enhanced |
| | City | PROVO |
| | | PROVO - Enhanced |

Page 4

The enclosed information was collected and disseminated under provisions of the Bank Secrecy Act (the BSA) and U.S. Department of the Treasury regulations implementing the BSA. See 31 U.S.C. 5311 et seq, 31 CFR Chapter X. The information is sensitive in nature and is to be treated accordingly. The information may be used only for a purpose consistent with a criminal, tax, or regulatory investigation or proceeding, or in the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism. See 31 U.S.C. 331. The information cannot be further released, disseminated, disclosed, or transmitted without prior approval of the Director of Financial Crimes Enforcement Network or his authorized delegate. Suspicious activity reports filed under the BSA must be treated with particular care given that they contain unsubstantiated allegations of possible criminal activity, akin to confidential informant tips. Unauthorized release of information collected under the BSA may result in criminal or civil sanctions.

App-4:037



**FinCEN** | Financial Crimes Enforcement Network
United States Department of the Treasury

BSA:31000266505487

## BSAR Transcript
### BSA: 31000266505487 and DCN:

### Activity Location

|  |  |  |
|---|---|---|
| State | UT |  |
|  | UT - Enhanced |  |
| ZIP Code | 84603 |  |
|  | 84601-2836 - Enhanced |  |
| Country | US |  |
|  | US - Enhanced |  |

### Filer Information

| | | |
|---|---|---|
| Primary Regulator | OCC | |
| Filer Name | KEYBANK NA | |
| EIN | 340797057 | |
| Address | Address Type | Reporting party address |
|  | Street Address | 127 PUBLIC SQUARE |
|  |  | 127 PUBLIC SQ - Enhanced |
|  | City | CLEVELAND |
|  |  | CLEVELAND - Enhanced |
|  | State | OH |
|  |  | OH - Enhanced |
|  | ZIP Code | 44114-1226 |
|  |  | 44114-1217 - Enhanced |
|  | Country | US |
|  |  | US - Enhanced |
| Type of Financial Institution | Depository institution | |
| RSSD Number | 280110 | |
| Internal control/file number | CA3295626 | |
| Contact for Assistance | Full Name | AML UNIT |
|  | Phone Number | (216) 813-4709 |
|  | Phone Type | Work |

### Law Enforcement Information

No Law Enforcement Information Available

### Narrative

KeyBank Case Number: CA3295626

Case Name: BRIDGER L JENSEN

NTP-Drugs

The enclosed information was collected and disseminated under provisions of the Bank Secrecy Act (the BSA) and U.S. Department of the Treasury regulations implementing the BSA. See 31 U.S.C. 5311, et seq., 31 CFR Chapter X. The information is sensitive in nature and is to be treated accordingly. The information may be used only for a purpose consistent with a criminal, tax, or regulatory investigation or proceeding, or in the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism. See 31 U.S.C. 5311. The information cannot be further released, disseminated, disclosed, or transmitted without prior approval of the Director of Financial Crimes Enforcement Network or his authorized delegate. Suspicious activity reports filed under the BSA must be treated with particular care given that they contain unsubstantiated allegations of possible criminal activity akin to confidential informant tips. Unauthorized release of information collected under the BSA may result in criminal or civil sanctions.

App-4:038



FinCEN | Financial Crimes Enforcement Network
United States Department of the Treasury

## BSAR Transcript
BSA: 31000266505487 and DCN:

### Narrative

INTRODUCTION:

This supplemental review is the result of KeyBank's SAR monitoring process, involving KeyBank accounts 440751006113 and 440751006121 in the names of PSYCHE HEALING AND BRIDGING, LLC, SINGULARISM and BRIDGER L JENSEN. There was one prior investigation for this customer that resulted in one SAR filing (11/27/2023). The most recent investigation covered the timeframe of 07/14/2023 (opening) through 11/14/2023, which resulted in the SAR filing on 11/27/2023 for inbound wires from various individuals/ entity from unknown sources and merchant credits. Additional suspicious activity involved cash withdrawals as they had no clear economic purpose for the business type and CTR evasion. Furthermore, our customer was identified operating a magic mushroom therapy practice. Therefore, deposits associated as business proceeds could have been proceeds from the illicit sale of drugs. Since the last review, there were no alerts generated.

This investigation, which covers the time period of 11/15/2023 through 02/16/2024 (closure), disclosed continuing suspicious activity involving merchant service credits as they could be proceeds from the illicit sale of psilocybin, a schedule I controlled substance under Utah law. Additional suspicious activity involves cash withdrawals as there does not appear to be a clear business purposes for the activity given the nature of the business involves illegal controlled substances. The suspicious activity totals $68,441 in accounts 440751006113 and 440751006121 which occurred between 11/15/2023 through 02/05/2024 at KeyBank branch UT075. The cumulative amount of all suspicious activity being reported with this and the prior SAR which occurred between 08/02/2023 through 02/05/2024 is $279,871.66. SAR warranted.

DETAILS OF INVESTIGATION:

According to bank records BRIDGER L JENSEN, 42 is the Controlling Party of PSYCHE BRIDGING AND HEALING and SINGULARISM. The customer is listed as the 50% Beneficial Owner of PSYCHE BRIDGING AND HEALING. External research revealed he is a life coach/therapist associated with UTAH PSYCHEDELIC THERAPY, MENTAL GURUS, REVEAL MYSELF, PSYCHEDELICCON and UTAH MUSHROOM THERAPY. These entities appear to provide therapy services specializing in clinical psychedelic integration. The customer holds a BS in Therapeutic Recreation/ Psychology from BRIGHAM YOUNG UNIVERSITY and Master of Psychological Counseling from UNIVERSITY OF PHOENIX. The customer has been a KeyBank customer since

The enclosed information was collected and disseminated under provisions of the Bank Secrecy Act (the BSA) and U.S. Department of the Treasury regulations implementing the BSA. See 31 U.S.C. 5311, et seq., 31 CFR Chapter X. The information is sensitive in nature and is to be treated accordingly. The information may be used only for a purpose consistent with a criminal, tax, or regulatory investigation or proceeding, or in the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism. See 31 U.S.C. 5311. The information cannot be further released, disseminated, disclosed, or transmitted without prior approval of the Director of Financial Crimes Enforcement Network or his authorized delegate. Suspicious activity reports filed under the BSA may be treated with particular care given that they contain unsubstantiated allegations of possible criminal activity, akin to confidential informant tips. Unauthorized release of information collected under the BSA may result in criminal or civil sanctions.

App-4:039



**FinCEN** | Financial Crimes Enforcement Network
United States Department of the Treasury

BSAR Transcript
BSA: 31000266505487 and DCN:

| Narrative |
| --- |

07/14/2023 and is listed as residing in Orem, UT. According to bank records and external research PSYCHE BRIDGING AND

HEALING appears to be a therapeutic practice in Provo, UT and has been a KeyBank customer since 07/14/2023. According to

bank records and external research SINGULARISM appears to a nonprofit group which held its ribbon cutting ceremony on Sept.

6th, 2023. The business appears to be a clinically informed spiritual wellness center plans to begin sessions Oct 1st, 2023. They

have been a KeyBank customer since 08/01/2023. They are a grassroots team empowering the legal use of psychedelics for

clinical and clergy leadership. The company advertises use of magic mushrooms (psilocybin) for therapeutic services. According

to news articles in November 2023, psilocybin is a Schedule I controlled substance and under Utah law, it is illegal to possess or

distribute. A recent effort to legalize psilocybin was not approved by the legislature, therefore use and distribution continue to be

criminal offenses. JENSEN says they're protected by the Religious Freedom Restoration Act of the U.S. Constitution. The clinic

claims they has taken every effort to accord with state and federal constitutional and statutory religious freedom authorities

which would permit its religious practices. SINGULARISM is prepared to defend its religious freedom to, as a small religious

minority group, partake of its religious rites and sacraments in aclosed, supervised, and secure setting. Based upon research

conducted by the Utah County Attorney's office, it does not appear that SINGULARISM has constitutional protections to either use

of administer psilocybin. City of Provo Police Department released a statement regarding the business and how the mushroom

treatment center is allowed to operate legally, and a spokesperson issued the following statement: Psilocybin is a Schedule I

controlled substance and under Utah law, it is illegal to possess or distribute. A recent effort to legalize psilocybin was not

approved by the legislature, therefore use and distribution continue to be criminal offenses. We have evaluated recent claims that

use is protected under the Religious Freedom Restoration Act, and we believe those claims to be without merit. The position of

the Provo Police Department is that officers will treat psilocybin as an illegal drug and will arrest or cite users and distributors and

refer charges to the Utah County Attorney's Office. We have confirmed with that office that they intend to prosecute violators. A

review of public records through Lexis Nexis, World-Check did not reveal any apparent adverse information.


As this case was initiated as part of KeyBank's SAR Monitoring process, this investigation only covers accounts in which

suspicious activity was uncovered during the previous investigation. Other related accounts in which no suspicious activity was

uncovered will not be reviewed unless required due to suspicious flow of funds or alerted activity.

The enclosed information was collected and disseminated under provisions of the Bank Secrecy Act (the BSA) and U.S. Department of the Treasury regulations implementing the BSA. See 31 U.S.C 5311, et seq., 31 C.F.R. Chapter X. The information is sensitive in nature and is to be treated accordingly. The information may be used only for a purpose consistent with a criminal, tax, or regulatory investigation or proceeding, or in the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism. See 31 U.S.C. 5311. The information cannot be further disclosed, disseminated, disclosed, or transmitted without prior approval of the Director of Financial Crimes Enforcement Network or his authorized delegate. Suspicious activity reports filed under the BSA must be treated with particular care given that they contain unsubstantiated allegations of possible criminal activity, akin to confidential informant tips. Unauthorized release of information collected under the BSA may result in criminal or civil sanctions.

App-4:040



FinCEN | Financial Crimes Enforcement Network
United States Department of the Treasury

## BSAR Transcript
BSA: 31000266505487 and DCN:

| Narrative |
| --- |

The clients maintain a total of two business checking accounts.

The focus of the investigation consists of the following accounts:

Business Checking account 440751006113 was opened on 07/14/2023 and closed on 02/16/2024. The account is titled PSYCHE HEALING AND BRIDGING, LLC, and BRIDGER L JENSEN. This account was reviewed from 11/15/2023 through 02/16/2024 (closure). Credits consists of eight direct deposits from INTUIT totaling $17,026, appearing as merchant service credits. As the nature of the business involves illegal controlled substances, these deposits are considered suspicious as they could be from the illicit sale of psilocybin, a schedule I controlled substance under Utah law. Additional credits are primarily made up of transfers from internal related account 440751006121. Cash withdrawals are made up of three transactions on 11/16/2023, ranging from $950 to $3,568, totaling $7,418. While a decrease is noted, there does not appear to be a clear business purposes for the activity given the nature of the business involves illegal controlled substances. As such, cash withdrawals are deemed suspicious. Further suspicious debits include four direct withdrawals totaling $26,054 to PSYCHE HEALING. The purpose of these debits is unknown and could be related to supply purchases. Debit activity not considered unusual includes payments with entities such as ADOBE, AMAZON, DOORDASH, ASPIRE HEALTH, EMPYREAN ADVISOR, FABIAN VANCOTT (lawyer), INTUIT, GOOGLE, VONAGE BUSINESS, and XFINITY. There are two Official Bank Check (OBC) purchases on 02/08/2024 totaling $11,630, payable to BRIDGER L JENSEN, which are likely related to the account being closed. Suspicious activity identified.

Business Checking account 440751006121was opened on 08/01/2023 an closed on 02/16/2024. The account is titled SINGULARISM and BRIDGER L JENSEN. This account was reviewed from 11/15/2023 through 02/16/2024 (closure). Credits consists of four direct deposits from INTUIT totaling $17,943 appearing as merchant service credits. As the nature of the business involves illegal controlled substances, these deposits are considered suspicious as they could be from the illicit sale of psilocybin, a schedule I controlled substance under Utah law. No cash withdrawals occurred. Debits are made up of payments with entities such as AMAZON, APPLE, DOORDASH, GUSTO, INTUIT, COSTCO, WAL-MART, POSITIVEPSYCHOLOGY.COM and a $6,125 OBC on 02/08/2024, payable to BRIDGER L JENSEN, which is likely related to the account being closed. Suspicious activity identified.

The enclosed information is collected and disseminated under provisions of the Bank Secrecy Act (the BSA) and U.S. Department of the Treasury regulations implementing the BSA. See 31 U.S.C. 5311, et seq., 31 CFR Chapter X. The information is sensitive in nature and is to be treated accordingly. The information may be used only for a purpose consistent with a criminal, tax, or regulatory investigation or proceeding or in the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism. See 31 U.S.C. 331. The information cannot be further released, disseminated, disclosed, or transmitted without prior approval of the Director of Financial Crimes Enforcement Network or his authorized delegate. Suspicious activity reports filed under the BSA must be treated with particular care given that they contain unsubstantiated allegations of possible criminal activity, akin to confidential informant tips. Unauthorized release of information collected under the BSA may result in criminal or civil sanctions.

App-4:041



## BSAR Transcript
BSA: 31000266505487 and DCN:

BSA:31000266505487

### Narrative

A sampling of the suspicious activity is detailed below:

Account #440751006121

| Date | Amount | Description |
| --- | --- | --- |
| 11/15/2023 | $3,960.00 | DIRECT DEPOSIT,   INTUIT 77470515 DEPOSIT |
| 12/6/2023 | $2,985.00 | DIRECT DEPOSIT,   INTUIT 70965005 DEPOSIT |
| 1/2/2024 | $4,999.00 | DIRECT DEPOSIT,   INTUIT 65742965 DEPOSIT |

Account #440751006113

| Date | Amount | Description |
| --- | --- | --- |
| 11/16/2023 | $3,568.00 | CASH WD- UT075 |
| 11/16/2023 | $2,900.00 | CASH WD- UT075 |
| 11/16/2023 | $950.00 | CASH WD- UT075 |
| 11/27/2023 | $7,618.00 | DIRECT WITHDRAWAL, PSYCHE HEALING AKBBO ACH |
| 1/2/2024 | $1,855.00 | DIRECT DEPOSIT,   INTUIT 65661185 DEPOSIT |
| 1/10/2024 | $5,400.00 | DIRECT DEPOSIT,   INTUIT 08067655 DEPOSIT |
| 1/18/2024 | $2,700.00 | DIRECT DEPOSIT,   INTUIT 39170425 DEPOSIT |
| 2/5/2024 | $49.00 | DIRECT DEPOSIT,   INTUIT 19002505 DEPOSIT |

The suspicious activity totals $68,441 in accounts 440751006113 and 440751006121 which occurred between 11/15/2023 through 02/05/2024 at KeyBank branch UT075.

CONCLUSION:

This supplemental review is the result of KeyBank's SAR monitoring process, involving KeyBank accounts 440751006113 and

The enclosed information was collected and disseminated under provisions of the Bank Secrecy Act (the BSA) and U.S. Department of the Treasury regulations implementing the BSA. See 31 U.S.C. 531 f, et seq., 31 CFR Chapter X. The information is sensitive in nature and is to be treated accordingly. The information may be used only for a purpose consistent with a criminal, tax, or regulatory investigation or proceeding, or in the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism. See 31 U.S.C. 531 f. The information cannot be further released, disseminated, disclosed, or transmitted without prior approval of the Director of Financial Crimes Enforcement Network or his authorized delegate. Suspicious activity reports filed under the BSA must be treated with particular care given that they contain unsubstantiated allegations of possible criminal activity, akin to confidential informant tips. Unauthorized release of information collected under the BSA may result in criminal or civil sanctions.

App-4:042



BSA:31000266505487

## BSAR Transcript
### BSA: 31000266505487 and DCN:

| Narrative |
| --- |

440751006121 in the names of PSYCHE HEALING AND BRIDGING, LLC, SINGULARISM and BRIDGER L JENSEN. There was one prior investigation for this customer that resulted in one SAR filing (11/27/2023). The most recent investigation covered the timeframe of 07/14/2023 (opening) through 11/14/2023, which resulted in the SAR filing on 11/27/2023 for inbound wires from various individuals/ entity from unknown sources and merchant credits. Additional suspicious activity involved cash withdrawals as they had no clear economic purpose for the business type and CTR evasion.  Furthermore, our customer was identified operating a magic mushroom therapy practice. Therefore, deposits associated as business proceeds could have been proceeds from the illicit sale of drugs. Since the last review, there were no alerts generated.

This investigation, which covers the time period of 11/15/2023 through 02/16/2024 (closure), disclosed continuing suspicious activity involving merchant service credits as they could be proceeds from the illicit sale of psilocybin, a schedule I controlled substance under Utah law. Additional suspicious activity involves cash withdrawals as there does not appear to be a clear business purposes for the activity given the nature of the business involves illegal controlled substances. The suspicious activity totals $68,441 in accounts 440751006113 and 440751006121 which occurred between 11/15/2023 through 02/05/2024 at KeyBank branch UT075. The cumulative amount of all suspicious activity being reported with this and the prior SAR which occurred between 08/02/2023 through 02/05/2024 is $279,871.66. SAR warranted.

Contents of File:

Customer and Account Profiles

Checks, deposited items and account statements

Cash and Wire Reports

Internet Research

Analytical Spreadsheet

Law Enforcement requests for documentation can be sent to lerequest@keybank.com

The enclosed information was collected and disseminated under provisions of the Bank Secrecy Act (the BSA) and U.S. Department of the Treasury regulations implementing the BSA. See 31 U.S.C. 5311, et seq., 31 CFR Chapter X. The information is sensitive in nature and is to be treated accordingly. This information may be used only for a purpose consistent with a criminal, tax, or regulatory investigation or proceeding, or in the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism. See 31 U.S.C. 5311. The information cannot be further released, disseminated, disclosed, or transmitted without prior approval of the Director of Financial Crimes Enforcement Network or his authorized delegate. Suspicious activity reports filed under the BSA must be treated with particular care given that they contain unsubstantiated allegations of possible criminal activity, akin to confidential informant tips. Unauthorized release of information collected under the BSA may result in criminal or civil sanctions.

App-4:043



FinCEN | Financial Crimes Enforcement Network
United States Department of the Treasury

BSA:31000259112891

## BSAR Transcript
### BSA: 31000259112891 and DCN:

### Filing Information

| | |
|---|---|
| Type of Report | Initial Report |
| Filing Date | 11/27/2023 |
| Received Date | 11/27/2023 |
| Entry Date | 11/28/2023 |
| Submission Method | Electronic batch filing |

### Subject Information

**Subject 1 of 3 : *PSYCHE HEALING AND BRIDGING, LLC**

| | | |
|---|---|---|
| Role | Subject | |
| Individual/Organization | Organization | |
| Last(or Entity) Name | *PSYCHE HEALING AND BRIDGING, LLC | |
| EIN | 932377864 | |
| Form(s) of Identification | Identification Type | Other |
| | Identification Number | 134873940160 |
| | Other Text | SOS |
| | Issuing State Code | UT |
| | Issuing State | Utah |
| | Issuing Country Code | US |
| Address(es) | Address Type | Subject permanent/mailing address |
| | Street Address | 1969 N STATE STREET |
| | | 1969 N STATE ST - Enhanced |
| | City | PROVO |
| | | PROVO - Enhanced |
| | State | UT |
| | | UT - Enhanced |
| | ZIP Code | 84604 |
| | | 84604-1012 - Enhanced |
| | Country | US |
| | | US - Enhanced |
| NAICS Code | 6213 | |
| NAICS Code Text | Offices of Other Health Practitioners | |
| Email(s) | BRIDGERJENSEN@GMAIL.COM | |
| Occupation/Type of Business | Health practice | |
| Corroborative Statement to Filer | No | |
| Relationship to Reporting Institution(s) | Institution TIN | 340797057 |
| | Relationship of Subject | Customer: Yes |

The enclosed information was collected and disseminated under provisions of the Bank Secrecy Act (the BSA) and U.S. Department of the Treasury regulations implementing the BSA. See 31 U.S.C. 5311 et seq., 31 CFR Chapter X. The information is sensitive in nature and is to be treated accordingly. The information may be used only for a purpose consistent with a criminal, tax, or regulatory investigation or proceeding, or in the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism. See 31 U.S.C. 5311. The information cannot be further released, disseminated, disclosed, or transmitted without prior approval of the Director of Financial Crimes Enforcement Network or his authorized delegate. Suspicious activity reports filed under the BSA must be treated with particular care given that they contain unsubstantiated allegations of possible criminal activity, akin to confidential informant tips. Unauthorized release of information collected under the BSA may result in criminal or civil sanctions.

App-4:044



**FinCEN** | Financial Crimes Enforcement Network
United States Department of the Treasury

## BSAR Transcript
### BSA: 31000259112891 and DCN:

| Subject Information | | |
|---|---|---|
| Affected Account(s) | Account Number | 44075100▮▮ |
| | Financial Institution TIN | 340797057 |
| **Subject 2 of 3 : *SINGULARISM** | | |
| Role | Subject | |
| Individual/Organization | Organization | |
| Last(or Entity) Name | *SINGULARISM | |
| EIN | 920835772 | |
| Form(s) of Identification | Identification Type | Other |
| | Identification Number | 130076110140 |
| | Other Text | SOS |
| | Issuing State Code | UT |
| | Issuing State | Utah |
| | Issuing Country Code | US |
| Address(es) | Address Type | Subject permanent/mailing address |
| | Street Address | 1899 S 1030 W |
| | | 1899 S 1030 W - Enhanced |
| | City | OREM |
| | | OREM - Enhanced |
| | State | UT |
| | | UT - Enhanced |
| | ZIP Code | 84058-8141 |
| | | 84058-8141 - Enhanced |
| | Country | US |
| | | US - Enhanced |
| NAICS Code | 8133 | |
| NAICS Code Text | Social Advocacy Organizations | |
| Email(s) | BRIDGERJENSEN@GMAIL.COM | |
| Occupation/Type of Business | Religious/therapeutic services | |
| Corroborative Statement to Filer | No | |
| Relationship to Reporting Institution(s) | Institution TIN | 340797057 |
| | Relationship of Subject | Customer: Yes |
| Affected Account(s) | Account Number | 440751006121 |
| | Financial Institution TIN | 340797057 |
| **Subject 3 of 3 : JENSEN** | | |
| Role | Subject | |
| Individual/Organization | Individual | |

**Page 2**

The enclosed information was collected and disseminated under provisions of the Bank Secrecy Act (the BSA) and U.S. Department of the Treasury regulations implementing the BSA. See 31 U.S.C 5311, et seq. 31 CFR Chapter X. The information is sensitive in nature and is to be treated accordingly. The information may be used only for a purpose consistent with a criminal, tax, or regulatory investigation or proceeding, or in the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism. See 31 U.S.C 5311. The information cannot be further released, disseminated, disclosed, or transmitted without prior approval of the Director of Financial Crimes Enforcement Network or his authorized delegate. Suspicious activity reports filed under the BSA must be treated with particular care given that they contain unsubstantiated allegations of possible criminal activity, akin to confidential informant tips. Unauthorized release of information collected under the BSA may result in criminal or civil sanctions.

App-4:045



FinCEN | Financial Crimes Enforcement Network
United States Department of the Treasury

BSA:31000259112891

## BSAR Transcript
### BSA: 31000259112891 and DCN:

| Subject Information | | |
|---|---|---|
| Last(or Entity) Name | JENSEN | |
| First Name | BRIDGER | |
| Middle Name | L | |
| Gender Type | Male | |
| Date of Birth | 09/06/1981 | |
| SSN/ITIN | 529896155 | |
| Form(s) of Identification | Identification Type | Driver's license/State ID |
| | Identification Number | 162491187 |
| | Issuing State Code | UT |
| | Issuing State | Utah |
| | Issuing Country Code | US |
| Address(es) | Address Type | Subject permanent/mailing address |
| | Street Address | 1899 S 1030 W |
| | | 1899 S 1030 W - Enhanced |
| | City | OREM |
| | | OREM - Enhanced |
| | State | UT |
| | | UT - Enhanced |
| | ZIP Code | 84058-8141 |
| | | 84058-8141 - Enhanced |
| | Country | US |
| | | US - Enhanced |
| Phone Number(s) | Type | Mobile |
| | Number | (801) 203-0102 |
| Email(s) | BRIDGERJENSEN@GMAIL.COM | |
| Occupation/Type of Business | Therapist\Life Coach | |
| Corroborative Statement to Filer | No | |
| Relationship to Reporting Institution(s) | Institution TIN | 340797057 |
| | Relationship of Subject | Customer. Yes |
| Affected Account(s) | Account 1 of 2 | |
| | Account Number | 440751006113 |
| | Financial Institution TIN | 340797057 |
| | Account 2 of 2 | |
| | Account Number | 440751006121 |
| | Financial Institution TIN | 340797057 |

The enclosed information was collected and disseminated under provisions of the Bank Secrecy Act (the BSA) and U.S. Department of the Treasury regulations implementing the BSA. See 31 U.S.C. 5311, et seq., 31 CFR Chapter X. The information is sensitive in nature and is to be treated accordingly. The information may be used only for a purpose consistent with a criminal, tax, or regulatory investigation or proceeding, or in the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism. See 31 U.S.C 5311. The information cannot be further released, disseminated, disclosed, or transmitted without prior approval of the Director of Financial Crimes Enforcement Network or his authorized delegate. Suspicious activity reports filed under the BSA must be protected with particular care given that they contain unsubstantiated allegations of possible criminal activity, akin to confidential informant tips. Unauthorized release of information collected under the BSA may result in criminal or civil sanctions.

App-4:046



BSA:31000259112891

## BSAR Transcript
### BSA: 31000259112891 and DCN:

### Suspicious Activity Information

| | |
|---|---|
| Amount Involved | $211,431 |
| Date or Date Range of Activity | 08/02/2023 - 11/02/2023 |
| Money laundering | Suspicious EFT/wire transfers<br>Suspicious concerning the source of funds<br>Transaction out of pattern for customer(s) |
| Structuring | Alters or cancels transaction to avoid CTR requirement<br>Transaction(s) below CTR threshold |
| Other suspicious activities | Transaction with no apparent economic, business, or lawful purpose |
| Financial instrument or payment mechanism | Other Financial instrument or payment mechanism: EFT/ Wire<br>U.S. Currency |
| Financial product | Deposit account |

### Activity Location

**Financial Institution Location 1 of 1**

| Type of Financial Institution | Depository institution | |
|---|---|---|
| Primary Regulator | OCC | |
| Legal Name | KEYBANK NA | |
| EIN | 340797057 | |
| Role in Transaction | Selling/Paying Location | |
| Address | Address Type | Address where transaction occurred |
| | Street Address | 127 PUBLIC SQUARE |
| | | 127 PUBLIC SQ - Enhanced |
| | City | CLEVELAND |
| | | CLEVELAND - Enhanced |
| | State | OH |
| | | OH - Enhanced |
| | ZIP Code | 44114-1226 |
| | | 44114-1217 - Enhanced |
| | Country | US |
| | | US - Enhanced |
| Internal Control File Number | CA3255423 | |

**Branch Office Location 1 of 1**

| Financial Institution Name | KEYBANK NA | |
|---|---|---|
| RSSD Number | 0939173 | |
| Address | Address Type | Address where transaction occurred |
| | Street Address | 207 NORTH UNIVERSITY AVE |
| | | 207 N UNIVERSITY AVE - Enhanced |
| | City | PROVO |

The enclosed information was collected and disseminated under provisions of the Bank Secrecy Act (the BSA) and U.S. Department of the Treasury regulations implementing the BSA. See 31 U.S.C. 5311, et seq., 31 CFR Chapter X. The information is sensitive in nature and is to be treated accordingly. The information may be used only for a purpose consistent with a criminal, tax, or regulatory investigation or proceeding, or in the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism. See 31 U.S.C. 5311. The information cannot be further released, disseminated, disclosed, or transmitted without prior approval of the Director of Financial Crimes Enforcement Network or his authorized delegate. Suspicious activity reports filed under the BSA must be treated with particular care given that they contain unsubstantiated allegations of possible criminal activity, akin to confidential informant tips. Unauthorized release of information collected under the BSA may result in criminal or civil sanctions.

App-4:047



FinCEN | Financial Crimes Enforcement Network
United States Department of the Treasury

## BSAR Transcript
### BSA: 31000259112891 and DCN:

BSA:31000259112891

### Activity Location

|  |  | PROVO - Enhanced |
| --- | --- | --- |
|  | State | UT |
|  |  | UT - Enhanced |
|  | ZIP Code | 84603 |
|  |  | 84601-2836 - Enhanced |
|  | Country | US |
|  |  | US - Enhanced |

### Filer Information

| Primary Regulator | OCC | |
| --- | --- | --- |
| Filer Name | KEYBANK NA | |
| EIN | 340797057 | |
| Address | Address Type | Reporting party address |
|  | Street Address | 127 PUBLIC SQUARE |
|  |  | 127 PUBLIC SQ - Enhanced |
|  | City | CLEVELAND |
|  |  | CLEVELAND - Enhanced |
|  | State | OH |
|  |  | OH - Enhanced |
|  | ZIP Code | 44114-1226 |
|  |  | 44114-1217 - Enhanced |
|  | Country | US |
|  |  | US - Enhanced |
| Type of Financial Institution | Depository institution | |
| RSSD Number | 280110 | |
| Internal control/file number | CA3255423 | |
| Contact for Assistance | Full Name | AML UNIT |
|  | Phone Number | (216) 813-4709 |
|  | Phone Type | Work |

### Law Enforcement Information

No Law Enforcement Information Available

### Narrative

KeyBank Case Number: CA3255423

Case Name: BRIDGER L JENSEN

The enclosed information was collected and disseminated under provisions of the Bank Secrecy Act (the BSA) and U.S. Department of the Treasury regulations implementing the BSA. See 31 U.S.C 5311, et seq., 31 CFR Chapter X. The information is sensitive in nature and is to be treated accordingly. The information may be used only for a purpose consistent with a criminal, tax, or regulatory investigation or proceeding, or in the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism. See 31 U.S.C 5311. The information cannot be further released, disseminated, disclosed, or transmitted without prior approval of the Director of Financial Crimes Enforcement Network or his authorized delegate. Suspicious activity reports filed under the BSA must be treated with particular care given that they contain unsubstantiated allegations of possible criminal activity akin to confidential informant tips. Unauthorized release of information collected under the BSA may result in criminal or civil sanctions.

App-4:048



**FinCEN** | Financial Crimes Enforcement Network
United States Department of the Treasury

## BSAR Transcript
BSA: 31000259112891 and DCN:

| Narrative |
|---|

NTP-Drugs

INTRODUCTION:

This case was initiated upon receipt of an internal referral from KeyBank branch personnel regarding conducting cash withdrawals in a manner indicative of purposefully evading reporting requirements. The activity involves KeyBank Account 440751006113 in the name of BRIDGER L JENSEN and PSYCHE HEALING AND BRIDGING, LLC. There were no prior investigations identified.

This investigation, which covers the time period of 07/14/2023 (opening) through 11/14/2023, disclosed suspicious account activity involving inbound wires from various individuals/ entity from unknown sources and merchant credits. Additional suspicious account activity involves cash withdrawals as they have no clear economic purpose for the business type. Additionally, some approach just under the reporting threshold. Branch personnel revealed the client intentionally limits cash withdrawals to evade reporting. Furthermore, our customer was identified operating a magic mushroom therapy practice. Therefore, deposits associated as business proceeds could be proceeds from the illicit sale of psilocybin, a schedule I controlled substance and under Utah law. The suspicious activity totals $211,430.66 in accounts 440751006113 and 440751006121 which occurred between 08/02/2023 through 11/02/2023 at KeyBank branch UT075. SAR warranted.

DETAILS OF INVESTIGATION:

According to bank records BRIDGER L JENSEN, 42 is the Controlling Party of PSYCHE BRIDGING AND HEALING and SINGULARISM. The customer is listed as the 50% Beneficial Owner of PSYCHE BRIDGING AND HEALING. External research revealed he is a life coach/therapist associated with UTAH PSYCHEDELIC THERAPY, MENTAL GURUS, REVEAL MYSELF, PSYCHEDELICCON and UTAH MUSHROOM THERAPY. These entities appear to provide therapy services specializing in clinical psychedelic integration. The customer holds a BS in Therapeutic Recreation/ Psychology from BRIGHAM YOUNG UNIVERSITY and Master of Psychological Counseling from UNIVERSITY OF PHOENIX. The customer has been a KeyBank customer since 07/14/2023 and is listed as residing in Orem, UT. According to bank records and external research PSYCHE BRIDGING AND HEALING appears to be a therapeutic practice in Provo, UT and has been a KeyBank customer since 07/14/2023. According to

The enclosed information was collected and disseminated under provisions of the Bank Secrecy Act (the BSA) and U.S. Department of the Treasury regulations implementing the BSA. See 31 U.S.C. 5311, et seq, 31 CFR Chapter X. The information is sensitive in nature and is to be treated accordingly. This information may be used only for a purpose consistent with a criminal, tax, or regulatory investigation or proceeding, or in the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism. See 31 U.S.C. 5311. The information cannot be further released, copied, disclosed, or transmitted without prior approval of the Director of Financial Crimes Enforcement Network or his authorized delegate. Suspicious activity reports filed under the BSA must be protected with particular care given that they contain unsubstantiated allegations of possible criminal activity, akin to confidential informant tips. Unauthorized release of information collected under the BSA may result in criminal or civil sanctions.

App-4:049



**FinCEN** | Financial Crimes Enforcement Network
United States Department of the Treasury

## BSAR Transcript
BSA: 31000259112891 and DCN:

| Narrative |
| --- |

bank records and external research SINGULARISM appears to a nonprofit group which held its ribbon cutting ceremony on Sept. 6th, 2023. The business appears to be a clinically informed spiritual wellness center plans to begin sessions Oct 1st, 2023. They have been a KeyBank customer since 08/01/2023. They are a grassroots team empowering the legal use of psychedelics for clinical and clergy leadership. The company advertises use of magic mushrooms (psilocybin) for therapeutic services. According to news articles in November 2023, psilocybin is a Schedule I controlled substance and under Utah law, it is illegal to possess or distribute. A recent effort to legalize psilocybin was not approved by the legislature, therefore use and distribution continue to be criminal offenses. JENSEN says they're protected by the Religious Freedom Restoration Act of the U.S. Constitution. The clinic claims they has taken every effort to accord with state and federal constitutional and statutory religious freedom authorities which would permit its religious practices. SINGULARISM is prepared to defend its religious freedom to, as a small religious minority group, partake of its religious rites and sacraments in a closed, supervised, and secure setting. Based upon research conducted by the Utah County Attorney's office, it does not appear that SINGULARISM has constitutional protections to either use of administer psilocybin.City of Provo Police Department released a statement regarding the business and how the mushroom treatment center is allowed to operate legally, and a spokesperson issued the following statement: Psilocybin is a Schedule I controlledsubstance and under Utah law, it is illegal to possess or distribute. A recent effort to legalize psilocybin was not approved by the legislature, therefore use and distribution continue to be criminal offenses. We have evaluated recent claims that use is protected under the Religious Freedom Restoration Act, and we believe those claims to be without merit. The position of the Provo Police Department is that officers will treat psilocybin as an illegal drug and will arrest or cite users and distributors and refer charges to the Utah County Attorney's Office. We have confirmed with that office that they intend to prosecute violators. A review of public records through Lexis Nexis, World-Check did not reveal any apparent adverse information.

The focus of the investigation consists of the following account(s):

Business Checking account 440751006113 was opened on 07/14/2023. The account is titled BRIDGER L JENSEN and PSYCHE HEALING AND BRIDGING, LLC. This account was reviewed from 07/14/2023 (opening) through 11/14/2023. Credit activity during this review is made up of various retail return credits from entities such as AMAZON, IKEA, LOWS, and HOME GOODS. A $4,900 cash deposit is also noted on 08/01/2023. Funding is primarily made up of four wire deposits totaling $125,000 from ASPIRE

The enclosed information was collected and disseminated under provisions of the Bank Secrecy Act (the BSA) and U.S. Department of the Treasury regulations implementing the BSA. See 31 U.S.C. 5311 et seq. 31 CFR Chapter X. This information is sensitive in nature and is to be treated accordingly. The information may be used only for a purpose consistent with a criminal, tax, or regulatory investigation or proceeding, or in the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism. See 31 U.S.C. 5311. This information cannot be further released, disseminated, disclosed, or transmitted without prior approval of the Director of Financial Crimes Enforcement Network or his authorized delegate. Suspicious activity reports filed under the BSA may not be shared with particular care given that they contain sensitive and potentially allegations of possible criminal activity, akin to confidential information tips. Unauthorized release of information collected under the BSA may result in criminal or civil sanctions.

App-4:050



FinCEN | Financial Crimes Enforcement Network
United States Department of the Treasury

BSA:31000259112891

## BSAR Transcript
### BSA: 31000259112891 and DCN:

| Narrative |
| --- |

HEALTH MANAGEMENT LLC, a healthcare support business. Further wires are noted from SKYLER JED ROBERTSON and JERAMY & BECKY LUND. External research suggest SKYLER JED ROBERTSON is a mental health supporter and JERAMY LUND appears to be a business start-up investor. One wire from ASPIRE HEALTH MANAGEMENT LLC has the memo (ASPIRE BUY IN). The wires appear to be business start up investments from related health/ investment counterparties. Although it appears the purpose is for the startup of the business, there is suspicion concerning the source of funds. Additionally, the nature of the business involves illegal controlled substances. As such, all wire deposits are suspicious. Debits are made up of payments with entities such as ADOBE, AMAZON, AMERICA FIRST CREDIT UNION, ASPIRE HEALTH, EMPYREAN ADVISORS (healthcare consultants), FABIAN VANCOTT (law firm), INTUIT, GOOGLE, IKEA, METAPAY, ONTRAPORT (marketing/ sales), WAL-MART, COSTCO, ROSS STORES, RC WILLEY (furniture), U-HAUL, XFINITY, RIVERS STUDIO (design and staging) and ZOOM. One wire is noted on 08/23/2023 to KAILEY STOCCO with memo interior design. Cash withdrawals are made up 14 transactions between 08/08/2023 through 10/31/2023 ranging from $200 to $5,900 totaling $37,260. Branch contact with personnel at UT075 revealed the client is aware of the cash reporting requirements and intentionally limits cash withdrawals to evade reporting. Staff believed the business operated as a psychic service and a church. The branch found the customer unusual as he clearly articulated that he does not want the government to find out about his cash withdrawals and learned to keep cash under $10,000 from his father. The employee stated the customer is always in a hurry and only wants to conduct transactions with her. She stated she gets anxiety when he is in the branch because he is always rushing her. She finds overall cash withdrawals odd for the business type and does not know the purpose of the cash debits. The customer was in the branch yesterday wanting to open a new business account however, decided against it since he knew he would exceed $10,000 in one day. Review of cash debits revealed two cash withdrawals on 08/08/2023: $4,000 and $5,900 totaling $9,900. The debits total just below the threshold. Overall cash withdrawals are conducted for unknown purposes as they do not appear consistent with therapy services. Coupled with the client's knowledge and apparent attempt to evade reporting, all are deemed suspicious. Suspicious activity identified.

Business Checking account 440751006121was opened on 08/01/2023. The account is titled SINGULARISM and BRIDGER L JENSEN. This account was reviewed from 08/01/2023(opening) through 11/14/2023. Credits are made up of a $100 cash deposit on 08/01/2023 and direct deposits from INTUIT and STRIPE totaling $46,880.66. These deposits could be proceeds from the illicit sale of psilocybin, a schedule I controlled substance and under Utah law. As such, all direct deposits are deemed suspicious.

The enclosed information was collected and disseminated under provisions of the Bank Secrecy Act (the BSA) and U.S. Department of the Treasury regulations implementing the BSA. See 31 U.S.C. 5311, et seq. 31 CFR Chapter X. The information is sensitive in nature and is to be treated accordingly. The information may be used only for a purpose consistent with a criminal, tax, or regulatory investigation or proceeding, or in the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism. See 31 U.S.C. 5311. The information cannot be further released, disseminated, disclosed, or transmitted without prior approval of the Director of Financial Crimes Enforcement Network or his authorized delegate. Suspicious activity reports filed under the BSA must be kept with particular care given that they contain unsubstantiated allegations of possible criminal activity, akin to confidential informant tips. Unauthorized release of information collected under the BSA may result in criminal or civil sanctions.

App-4:051

FinCEN | **Financial Crimes Enforcement Network**
United States Department of the Treasury

BSA:31000259112891

## BSAR Transcript
BSA: 31000259112891 and DCN:

| Narrative |
| --- |

Debits are made up of two cash withdrawals between 09/12/2023 and 10/03/2023 ranging from $100 to $2,190 totaling $2,290.

Additional debits include payments with entities such as AMAZON, GUSTO, INTUIT, WAL-MART, UTAH INTERACTIVE LLC (website

design), and SUMMIT HEALTH, UTAH CORPORATIONS, transfers to 440751006113 and a $5,000 Official Bank Check (OBC)

purchase on 10/17/2023 made payable to CASSIE MEDURA, who appears to be a family lawyer. Suspicious activity includes cash

withdrawals as the true purpose of those debits are unknown and not consistent with business type. Suspicious activity

identified.


A sampling of the suspicious activity is detailed below:


Account #440751006113


| Date | Amount | Description |
| --- | --- | --- |
| 8/2/2023 | $25,000.00 | WIRE DEP-SKYLER JED ROBERTSON |
| 8/8/2023 | $4,000.00 | WITHDRAWAL BRANCH 0075 UTAH |
| 8/8/2023 | $5,900.00 | WITHDRAWAL BRANCH 0075 UTAH |
| 9/12/2023 | $5,900.00 | WITHDRAWAL BRANCH 0075 UTAH |
| 10/17/2023 | $3,560.00 | WITHDRAWAL BRANCH 0075 UTAH |
| 10/19/2023 | $50,000.00 | WIRE DEP-JERAMY & BECKY LUND |


Account #440751006121

| Date | Amount | Description |
| --- | --- | --- |
| 9/20/2023 | $5.00 | DIRECT DEPOSIT, INTUIT 06093985 DEPOSIT |
| 9/20/2023 | $7,179.46 | DIRECT DEPOSIT, STRIPE TRANSFER |
| 9/27/2023 | $7,600.00 | DIRECT DEPOSIT, INTUIT 10826475 DEPOSIT |
| 9/29/2023 | $6,214.10 | DIRECT DEPOSIT, STRIPE TRANSFER |
| 10/5/2023 | $6,214.10 | DIRECT DEPOSIT, STRIPE TRANSFER |

The enclosed information was collected and disseminated under provisions of the Bank Secrecy Act (the BSA) and U.S. Department of the Treasury regulations implementing the BSA. See 31 U.S.C. 5311, et seq. 31 CFR Chapter X. The information is sensitive in nature and is to be treated accordingly. The information may be used only for a purpose consistent with a criminal, tax, or regulatory nexus, law, proceeding, or in the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism. See 31 U.S.C. 5311. The information cannot be further released, disseminated, disclosed, or transmitted without prior approval of the Director of Financial Crimes Enforcement Network or his authorized delegate. Suspicious activity reports filed under the BSA must be treated with particular care given that they contain unauthorized allegations of possible criminal activity, akin to confidential informant tips. Unauthorized release of information collected under the BSA may result in criminal or civil sanctions.

App-4:052

**FinCEN** | Financial Crimes Enforcement Network
United States Department of the Treasury

BSA:31000259112891

## BSAR Transcript
BSA: 31000259112891 and DCN:

| Narrative |
|---|

10/13/2023    $4,800.00    DIRECT DEPOSIT,    INTUIT 28567785 DEPOSIT

10/17/2023    $4,800.00    DIRECT DEPOSIT,    INTUIT 48157215 DEPOSIT

10/18/2023    $6,400.00    DIRECT DEPOSIT,    INTUIT 49653875 DEPOSIT

11/2/2023    $3,668.00    DIRECT DEPOSIT,    INTUIT 22649635 DEPOSIT

The suspicious activity totals $211,430.66 in accounts 440751006113 and 440751006121 which occurred between 08/02/2023 through 11/02/2023 at KeyBank branch UT075.

CONCLUSION:

This case was initiated upon receipt of an internal referral from KeyBank branch personnel regarding conducting cash withdrawals in a manner indicative of purposefully evading reporting requirements. The activity involves KeyBank Account 440751006113 in the name of BRIDGER L JENSEN and PSYCHE HEALING AND BRIDGING, LLC. There were no prior investigations identified.

This investigation, which covers the time period of 07/14/2023 (opening) through 11/14/2023, disclosed suspicious account activity involving inbound wires from various individuals/ entity from unknown sources and merchant credits. Additional suspicious account activity involves cash withdrawals as they have no clear economic purpose for the business type. Additionally, some approach just under the reporting threshold. Branch personnel revealed the client intentionally limits cash withdrawals to evade reporting. Furthermore, our customer was identified operating a magic mushroom therapy practice. Therefore, deposits associated as business proceeds could be proceeds from the illicit sale of psilocybin, a schedule I controlled substance and under Utah law. The suspicious activity totals $211,430.66 in accounts 440751006113 and 440751006121 which occurred between 08/02/2023 through 11/02/2023 at KeyBank branch UT075. SAR warranted.

Contents of File:

Customer and Account Profiles

Checks, deposited items and account statements

The enclosed information was collected and disseminated under provisions of the Bank Secrecy Act (the BSA) and U.S. Department of the Treasury regulations implementing the BSA. See 31 U.S.C. 5311, et seq., 31 CFR Chapter X. The information is sensitive in nature and is to be treated accordingly. The information may be used only for a purpose consistent with a criminal, tax, or regulatory investigation, proceeding, or in the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism. See 31 U.S.C. 5311. The information cannot be further released, disseminated, disclosed, or transmitted without prior approval of the Director of Financial Crimes Enforcement Network or his authorized delegate. Suspicious activity reports filed under the BSA must be treated with particular care, given that they contain unsubstantiated allegations of possible criminal activity, akin to confidential informant tips. Unauthorized release of information collected under the BSA may result in criminal or civil sanctions.

App-4:053



FinCEN | Financial Crimes Enforcement Network
United States Department of the Treasury

BSA:31000259112891

## BSAR Transcript
### BSA: 31000259112891 and DCN:

| Narrative |
|---|
| Cash and Wire Reports |
| Internet Research |
| Analytical Spreadsheet |

The enclosed information was collected and disseminated under provisions of the Bank Secrecy Act (the BSA) and U.S. Department of the Treasury regulations implementing the BSA. See 31 U.S.C. 5311, et seq., 31 CFR Chapter X. The information is sensitive in nature and is to be treated accordingly. The information may be used only for a purpose consistent with a criminal, tax, or regulatory investigation or proceeding, or in the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism. See 31 U.S.C. 5311. The information cannot be further released, disseminated, disclosed, or transmitted without prior approval of the Director of Financial Crimes Enforcement Network or his authorized delegate. Suspicious activity reports filed under the BSA must be treated with particular care given that they contain unsubstantiated allegations of possible criminal activity, akin to confidential informant tips. Unauthorized release of information collected under the BSA may result in criminal or civil sanctions.

App-4:054

stipuTanner J. Bean (A17128)
tbean@fabianvancott.com
Anna P. Christiansen (A17518)
achristiansen@fabianvancott.com
Jacqueline M. Rosen (A18530)
jrosen@fabianvancott.com
**FABIAN VANCOTT**
95 South State Street, Suite 2300
Salt Lake City, UT 84111-23323
Telephone: (801) 531-8900
*Attorneys for Plaintiffs*

---

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BRIDGER LEE JENSEN, an individual; SINGULARISM, a non-profit corporation; PSYCHE HEALING AND BRIDGING, LLC dba PSYCHEDELIC THERAPY JOURNEY; a limited liability company;<br><br>　　　　　Plaintiffs,<br>vs.<br><br>UTAH COUNTY, a political subdivision, PROVO CITY, a political subdivision; JEFFREY GRAY, an individual; TROY BEEBE, an individual; BRIAN WOLKEN, an individual; JACKSON JULIAN, an individual; JOHN DOES 1-4, individuals;<br><br>　　　　　Defendants. | **WRITTEN CONSENT TO FILING OF FIRST AMENDED VERIFIED COMPLAINT**<br><br>Civil No. 2:24-cv-00887-JNP<br><br>Judge Jill N. Parrish<br><br>(Removed from Fourth Judicial District Court, Utah County, State of Utah, Case No. 240406123) |

Pursuant to Federal Rule of Civil Procedure 15(a)(2) and DUCivR 15-1, Defendants Utah

County, Provo City, Jeffrey Gray, Troy Beebe, Brian Wolken, and Jackson Julian, by and through

their respective undersigned counsel, hereby consent to Plaintiffs filing the First Amended Verified

1

App-4:055

Complaint ("Amended Complaint"). Defendants reserve all rights, claims, and defenses. Moreover, Defendants' consent is based on the express agreement by Plaintiffs that the Amended Complaint does ***not*** render the pending Motion to Dismiss (Dkt. 40) moot because Plaintiffs have not removed or added any claims for relief. The Amended Complaint and a redlined version of the Amended Complaint comparing it with the original complaint are filed herewith as <u>Exhibits A and B</u>, respectively.

DATED January 22, 2025.

> FABIAN VANCOTT
>
> */s/ Tanner J. Bean*
> Tanner J. Bean
> Anna P. Christiansen
> Jacqueline M. Rosen
>
> *Counsel for Plaintiffs*

*Approved as to form:*

> JAMES DODGE RUSSELL & STEPHENS, P.C.
>
> */s/ Mitchell A. Stephens\**
> Mitchell A. Stephens
> Justin L. James
> Dillon P. Olson
>
> *Counsel for Defendants Utah County and Jeffrey Gray*

> PROVO CITY LEGAL
>
> */s/ Rich Roberts\**
> Rich Roberts

2

App-4:056

*Counsel for Defendants Provo City, Troy Beebe, Brian Wolken, and Jackson Julian*

*Signature affixed with permission received by email.

# EXHIBIT B

Tanner J. Bean (A17128)
tbean@fabianvancott.com
Anna P. Christiansen (A17518)
achristiansen@fabianvancott.com
Jacqueline M. Rosen (A18530)
jrosen@fabianvancott.com
FABIAN VANCOTT
95 South State Street, Suite 2300
Salt Lake City, UT 84111-23323
Telephone: (801) 531-8900
*Attorneys for Plaintiffs*

IN THE ~~FOURTH JUDICIAL~~UNITED STATES DISTRICT COURT

~~UTAH COUNTY, STATE OF~~FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BRIDGER LEE JENSEN, an individual; SINGULARISM, a non-profit corporation; PSYCHE HEALING AND BRIDGING, LLC dba PSYCHEDELIC THERAPY JOURNEY; a limited liability company;<br><br>        Plaintiffs,<br>vs.<br><br>UTAH COUNTY, a political subdivision, PROVO CITY, a political subdivision; JEFFREY GRAY, an individual; ~~TROY BEEBE, an individual; BRIAN WOLKEN, an individual; JACKSON JULIAN, an individual; JOHN DOES 1-4, individuals;~~<br><br><br>        Defendants. | **FIRST AMENDED VERIFIED COMPLAINT**<br><br>Civil No. 2:24-cv-00887-JNP<br><br>Judge Jill N. Parrish<br><br>(Removed from Fourth Judicial District Court, Utah County, State of Utah, Case No. 240406123) |

Plaintiffs Bridger Lee Jensen, Singularism, and Psyche Healing and Bridging LLC dba Psychedelic Therapy Journey (collectively, "Singularism"), by and through their counsel, hereby complain against Defendants Utah County, Provo City, and Jeffrey Gray~~, Troy Beebe, Brian Wolken, Jackson Julian, and John Does 1-4~~, as alleged below.

1

App-4:059

# INTRODUCTION

"Respect for religious expressions is indispensable to life in a free and diverse Republic . . ." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 543 (2022). Indeed, "preserving the promise of the free exercise of religion enshrined in our Constitution . . . lies at the heart of our pluralistic society." *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1754 (2020). "[R]eligious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Fulton v. City of Philadelphia, Pennsylvania*, 593 U.S. 522, 532, (2021) (quoting *Thomas v. Review Bd. of Ind. Employment Security Div.*, 450 U.S. 707, 714 (1981)). "A way of life that is odd or even erratic but interferes with no rights or interests of others is not to be condemned because it is different." *Wisconsin v. Yoder*, 406 U.S. 205, 224 (1972).

Bridger Jensen is the sincere founder of a small, entheogenic minority religion known as Singularism. Like many religious organizations, it has both non-profit and for-profit entities. As part of their sincere religious exercise, Plaintiffs utilize sacramental psilocybin tea to access the divine, open spiritual pathways, and alleviate human suffering by weaving together centuries of entheogenic religious practice with what Plaintiffs view as illuminated approaches of modern mental health clinicians.

The sincerity of Plaintiffs' religious conviction is unquestionable. Mr. Jensen gave up a successful career to pursue his higher spiritual calling in Singularism. Since its founding, he, on behalf of Singularism, has publicly and transparently broadcast the faith, indicating Singularism relies upon the protections for free exercise of religion to operate, while knowing that misunderstanding authorities may at any moment prosecute Singularism for its faith. After over a year of Plaintiffs peacefully exercising their religious freedom, providing spiritual care to many

2

without incident and without a single ounce of psilocybin leaving Singularism's spiritual center, that moment has come.

Law enforcement authorities, to whom Mr. Jensen sent a letter explaining Singularism's religious practices at the opening of its religious center ~~over a year ago~~in the fall of 2023, searched Singularism's spiritual center on November 11, 2024, and, among other things, seized the sacramental psilocybin used in Singularism's ceremonies. The next day, law enforcement threatened Singularism's landlord to evict Singularism from its spiritual center. Mr. Jensen now faces ~~impending~~ criminal charges related to psilocybin, and Singularism, a small minority religious group, risks being evicted and otherwise wiped off the map by overzealous authorities. Defendants have knowingly and recklessly proceeded in defiance of the protections afforded to sincere religious believers under the U.S. Constitution, the Utah Constitution, and the Utah Religious Freedom Restoration Act.

The Court should right these wrongs. Plaintiffs request the Court enjoin Defendants from their actions burdening Plaintiffs' sincere religious free exercise, declare Defendants' actions a violation, order the payment of damages for the violation of Plaintiffs' constitutional and statutory rights, and compensate Plaintiffs for the attorney fees and costs required to defend their rights in court, despite clear legal protections for their religious exercise.

## PARTIES

1.     Plaintiff Bridger Lee Jensen is an individual who resides in Provo, Utah.

2.     Plaintiff Singularism is a non-profit organization registered under the laws of the State of Utah located in Provo, Utah.

3

3.      Plaintiff Psyche Healing and Bridging LLC dba Psychedelic Therapy Journey is a limited liability corporation registered under the laws of the State of Utah located in Provo, Utah.

4.      Defendant Utah County is a political subdivision of the State of Utah. The Utah County Attorney's Office is an agency, program, or arm of Utah County.

5.      Jeffrey Gray is, and has been, the Utah County Attorney since January 2023. Upon information and belief, Jeffrey Gray is a resident of Utah County.

6.      Defendant Provo City is a political subdivision of the State of Utah located in Utah County. The Provo City Police Department is an agency, program, or arm of Provo City. The Provo City Attorney's Office is an agency, program, or arm of Utah County. At all times relevant to this Complaint, the following persons were employed by and acting within the course and scope of their employment with Provo City Police Department:

   a.   Troy Beebe is, and was, at all times relevant to this Complaint, the Chief of the Provo City Police Department. Upon information and belief, Troy Beebe is a resident of Utah County.

   b.   Brian Wolken is, and was, at all times relevant to this Complaint, a Captain of the Provo City Police Department. Upon information and belief, Brian Wolken is a resident of Utah County.

   c.   Jackson Julian is, and was, at all times relevant to this Complaint, a Detective of the Provo City Police Department. Upon information and belief, Jackson Julian is a resident of Utah County.

   d.   Austin Rowberry is, and was, at all times relevant to this Complaint, a Sergeant of the Provo City Police Department.

4

e.   Liuaki Wolfgramm is, and was, at all times relevant to this Complaint, a Detective of the Provo City Police Department.

e.f. Cody Graham is, and was, at all times relevant to this Complaint, a Detective of the Provo City Police Department.

7.   John Does 1-4 are, and were, at all times relevant to this Complaint, Police Officers of the Provo City Police Department. Upon information and belief, John Does 1-4 are residents of Utah County.

8.7.   At all times relevant to this Complaint, Defendants Provo City, Utah County, and Jeffrey Gray, Beebe, Wolken, Julian, and Officers Does 1-4 were acting under color of state law, as were the law enforcement officers acting under their direction, Chief Beebe, Captain Wolken, Detective Julian, Sergeant Rowberry, Detective Wolfgramm, and Detective Graham.

## JURISDICTION AND VENUE

8.   This action was originally filed in the Court for the Fourth Judicial District, Utah County, State of Utah, on November 19, 2024.

9.   As originally filed, This that Court has had jurisdiction pursuant to Utah Code § 78A-5-102.

10.   As originally filed, Vvenue is was proper in this that Court under Utah Code §§ 63G-7-502 and 78B-3a-201, as the causes of action arise and Defendants reside in Utah County, Utah.

11.   As originally filed, Bbecause this the Complaint seeks recovery of damages in an amount exceeding $100,000 and non-monetary relief, it is was classified as a Tier 2 action under Utah Rule of Civil Procedure 26.

5

11.12.  Defendants removed this action pursuant to 28 U.S.C. §1441 *et seq.* to the United States District Court for the District of Utah on November 27, 2024. Defendants stated that they "base[d] their removal on federal question jurisdiction pursuant to U.S.C. §§ 1331, 1441(a), and 1446" and that the "Court has jurisdiction over the remainder of the case because all the claims form part of the same case or controversy. *See* 28 U.S.C. § 1367."

12.13.  Plaintiffs' claims are exempt from the notice-of-claim provisions of the Utah Governmental Immunity Act, according to the terms of that Act and Utah's Religious Freedom Restoration Act and because of the exigent circumstances presented herein. Even so, out of an abundance of caution, Plaintiffs' claims were included and described in a notice of claim served upon Defendants concurrently with the service of this the original Complaint on November 19, 2024.

**FACTUAL BACKGROUND**

*The Founding and Religious Practices of Singularism*

13.14.  In the fall of 2023, following years of various transcendent and spiritual experiences facilitated through psilocybin, Mr. Jensen determined to share his spiritual enlightenment with the community by founding his own religious organization, Singularism.

14.15.  Although previously licensed as a mental health therapist, Mr. Jensen allowed his license to lapse and discontinued his professional clinical practice, understanding that, as clergy, he would be exempt from licensure requirements under the Utah Mental Health Professional Practice Act, *see* Utah Code § 58-60-107(2)(b), and would transition to becoming a spiritual leader and provide religious mental health therapy.

6

App-4:064

15.16.  After much effort and coordination, Mr. Jensen was able to found Singularism as a non-profit organization and Psyche Healing and Bridging as a related for-profit corporation, and was able to locate a space to rent as a spiritual center in Provo, Utah.

16.17.  Singularism held a public ribbon-cutting ceremony for its spiritual center in the fall of 2023. It invited many individuals and organizations from all walks of life to attend the ribbon-cutting event, and many individuals attended. During the ribbon-cutting ceremony, individuals shared their profound religious and spiritually healing experiences with psilocybin. Others shared they had felt marginalized according to their unorthodox religious views regarding psilocybin and the spiritual experiences it had opened for them. Others attended merely to learn about Singularism and the potential for religious enlightenment.

17.18.  During the ribbon-cutting ceremony, Mr. Jensen discussed one of Singularism's mantras: that psilocybin permits individuals to directly access the divine and thereby be able to "write your own scripture." It was this mantra that Mr. Jensen invited all in attendance to say as he cut the ceremonial ribbon.

18.19.  Thereafter, individuals socialized, learned more about Singularism's religious beliefs, and were able to tour Singularism's spiritual center.

19.20.  As part of its efforts to become known in the community and prevent authorities' misunderstanding of Singularism, in the fall of 2023, Singularism sent letters to local government leaders and law enforcement, inviting them to come tour Singularism's spiritual center and informing them of Singularism's spiritual practices utilizing psilocybin. For example, letters were sent to the Mayor of Provo City, the Provo City Council, the Provo Police Department, as well as to the Utah County Attorney's Office. Neither None of these offices took advantage of

7

Singularism's invitation to tour its spiritual center. The letters also informed these government offices of Singularism's claims to religious free exercise and raised the constitutional and statutory bases for those claims.

21.    Following Mr. Jensen's invitations to tour Singularism's spacespiritual center, there was media coverage by FOX 13 News regarding Singularism's religious practices which included a statements from the Provo City and the Utah County Attorney's Office:

a.    A spokesperson for Provo City stated:

Psilocybin is a Schedule I controlled substance and under Utah law, it is illegal to possess or distribute. A recent effort to legalize psilocybin was not approved by the legislature, therefore use and distribution continue to be criminal offenses.
We have evaluated recent claims that use is protected under the Religious Freedom Restoration Act and we believe those claims to be without merit. The position of the Provo Police Department is that officers will treat psilocybin as an illegal drug and will arrest or cite users and distributors and refer charges to the Utah County Attorney's Office. We have confirmed with that office that they intend to prosecute violators.

a.b.    The Utah County Attorney's Office stated:

Based upon research conducted by the Utah County Attorney's office, it does not appear that Singularism has Constitutional protections to either use of administer psilocybin.[1]

20.22. Following the ribbon-cutting event, beginning in September 2023, Singularism began its ceremonial practice of ushering sincere religious believers into transcendent experiences at its spiritual center. As part of doing so, Singularism carefully prepares a diluted, sacramental psilocybin tea, offers it to what it calls its "Voyagers," and supervises the voyager in a private,

---

[1]    *Psychedelic Mushroom Interest Grows in Utah with Center Opening in Provo*, FOX13 NEWS, updated Nov. 06, 2023, https://www.fox13now.com/news/local-news/psychedelic-mushroom-interest-grows-in-utah-with-center-opening-in-provo.

8

App-4:066

controlled, safe, and comfortable environment within Singularism's spiritual center, following safety guidelines such as those published by Harvard Medical School and Johns Hopkins. Before, during, and after the ceremony, religious guides such as Mr. Jensen attend to the voyager, help guide their spiritual inquiry, and record the voyager's spiritual insights, thereby allowing the individual to write their own scripture.

21.23.  One of Singularism's principal doctrines is that the American cultural line drawn between religion and science is illusory and that the two fields are complementary and interwoven. As such, Singularism takes full advantage, for religious purposes, of the benefits and wisdoms of clinical practices used in mental health therapy. Concurrent to Singularism's religious practices and beliefs, there are active scientific bodies, including those as notable as Harvard Medical School and Johns Hopkins, which have extensively researched and published regarding the positive usages of psilocybin for a variety of physical and mental issues in the secular context.

22.24.  Before administering its ceremonial and sacramental psilocybin to its voyagers, Singularism puts interested individuals through a screening process. During this multi-stage screening process, Singularism evaluates each voyager's physical, mental, and emotional suitability and readiness to participate in a psilocybin ceremony. As part of this multi-stage screening process, Singularism also evaluates the voyager's religious sincerity and prohibits individuals attempting to ingest psilocybin solely for secular or recreational purposes from participating in its ceremonies.

23.25.  In fact, even after deeming an individual religiously sincere, Singularism requires the individual to sign an attestation of their religious sincerity before participating in a psilocybin ceremony. The document including that attestation also requires the voyagers to take or not take

9

certain actions to protect their own physical, mental, emotional, and spiritual well-being following a voyage through a Singularism ceremony. *See* Exhibit A.

24.26.  Singularism turns away individuals that it deems religiously insincere, as well as individuals for which a psilocybin ceremony could potentially be harmful to the individual's physical, mental, emotional, or spiritual well-being.

25.27.  Singularism's voyagers that are sincere and suited for the ceremonies have reported many significant and varied religious experiences during their Singularism ceremonies. As a few examples:

    a.  One voyager described his experience as "profoundly transformative," that he "experienced an overwhelming sense of unity with all things," which was a "deeply religious encounter with the sacredness of existence."

    b.  Another voyager described her experience walking "alongside Jesus," encountering deceased relatives, embracing "Heavenly Mother and Father [and] feeling their unconditional love and reassurance."

    c.  Another voyager described that she "experienced an overwhelming sense of joy, inner peace, and enlightenment," which was "nothing short of transcendent—a deeply spiritual encounter that connected me to something greater than myself."

26.28.  To participate in Singularism's therapeutic religious ceremonies via Singularism's for-profit organization, Psyche Healing and Bridging, individuals pay a fee. The fee is calculated according to the typical time spent in a ceremonial voyage and the amount of ceremonies the voyager intends to participate in, taking into consideration what a comparable secular therapeutic service might entail. In some instances where sincere individuals are seeking this religious

10

App-4:068

experience, but do not have the financial resources to contribute, Singularism has permitted voyagers to participate in ceremonies at reduced or no cost.

27.29. Because of Singularism's convictions in the correctness of its doctrines and the spiritual benefits of its practices, it openly shares about its mission and invites others to learn more about its beliefs. As part of Singularism's missionary efforts, it has begun to develop processes and procedures whereby others can become certified spiritual guides in its doctrines to expand the reach of its spiritual movement. Presently, only a handful of these guides have received Singularism's religious training. They are taught to abide by and conduct the same screening procedures discussed above.

30.    Singularism has operated peacefully and without any private or public incident or complaint related to it or any of its voyagers since it opened the doors of its spiritual center through January 2025. In January 2025, one of Singularism's voyagers had an adverse reaction during her second Singularism ceremony. The individual's reaction was exceptionally rare, not life threatening, but exhibited signs of mental distress. Singularism followed its protocol (which is similar to those in place at mental health treatment facilities), which was to have the voyager reach out to her previously identified emergency contact and otherwise assist the individual in reaching the hospital where she was treated and released within a few hours. While investigating the incident, Singularism learned that the voyager had not disclosed certain mental health indicators during Singularism's screening procedure which, if known, would likely have caused Singularism to screen the voyager out from receiving a psilocybin ceremony. The day following the voyager's adverse reaction, she contacted Singularism, stated she was safe and was recovering well, and apologized for the incident. They voyager made similar statements to law enforcement.

11

*Defendants' Statements to the Media Interfere with Singularism's Financial Accounts*

31.    In the fall of 2023, for reasons then unknown to Singularism, Singularism began to experience complications with its financial accounts at KeyBank. And in January 2024, KeyBank refused to provide banking services to Singularism and closed Singularism's accounts, causing a major disruption to Singularism's operations. KeyBank refused to explain the reason it closed Singularism's accounts.

32.    However, records obtained by Singularism a year later, maintained by the Financial Crimes Enforcement Network of the United States Department of the Treasury ("FinCEN"), indicate that KeyBank relied upon the statements Provo City and the Utah County Attorney's Office made to FOX 13 News to justify their refusal to provide banking services to Singularism and close its accounts.

33.    The FinCEN records show that KeyBank's report to FinCEN directly quoted the statements Provo City and the Utah County Attorney's Office made to FOX 13 News in KeyBank's report to FinCEN.

Thus, the incorrect statements made by Provo City and the Utah County Attorney's Office to FOX 13 News, which were made with a knowing disregard, or, at least, reckless disregard, of Singularism's religious rights, had a palpable effect upon Singularism and its financial condition.

34.

*Law Enforcement Knowingly Disregards Singularism's Religious Exemption, Seizes Singularism's Sacrament, Pursues Criminal Charges, and Threatens Eviction*

28.35.    That Singularism's peaceful religious practice was interrupted on November 11, 2024 when law enforcement from the Provo City Police Department—Detective Julian and, Sergeant Rowberry, Detective Wolfgramm, and Detective Graham Officers Does 1-4—presented

12

at Singularism's spiritual center with a warrant to search the premises and seize certain items. *See*

Exhibit B.

29.36.  For roughly two hours, law enforcement searched Singularism's spiritual center,

detained Mr. Jensen, and interrogated him regarding his and Singularism's religious practices. Mr.

Jensen is a single, divorced father, and as a result, had to instruct one of Singularism's assistants

to head to Mr. Jensen's home to care for his children, fearing that law enforcement would arrest

him and prevent him from being able to return to take care of them that night.

30.37.  From the outset, Detective Julian explained that he and Sergeant Rowberry,

Detective Wolfgramm, and Detective Graham~~Officers Does~~ had been instructed to obtain the

search warrant by Utah County Attorney, Defendant Gray. Detective Julian told Mr. Jensen that

he was fully aware of Singularism's claim to sincere religious exemption, but that the Utah County

Attorney had instructed that there does not exist, and cannot exist, any religious exemptions from

the Utah Controlled Substances Act related to psilocybin.

31.38.  Detective Julian explained that he had, undercover, posed as an individual

interested in Singularism, going through some of the initial stages of Singularism's screening

process, to obtain information regarding Singularism's usage of psilocybin.

32.39.  At no point during law enforcement's search and seizure did Detective Julian or

Sergeant Rowberry, Detective Wolfgramm, and Detective Graham ~~Officers Does~~ appear to doubt

Mr. Jensen or Singularism's religious sincerity that psilocybin ceremonies are a vital and core part

of their religious practice.

33.40.  Rather, Mr. Jensen explained in detail the integral nature of psilocybin to

Singularism's religious practices, outlining Singularism's screening mechanisms, the other

13

procedures it keeps to ensure safety for its voyagers, and that psilocybin tea or any other form of

psilocybin is never administered or distributed to anyone outside one of its ceremonies, all which

occur within the walls of Singularism's spiritual center.

34.41. During the entirety of law enforcement's presence, Mr. Jensen was wholly

cooperative with law enforcement.

35.42. At one point, Detective Julian and/or Sergeant Rowberry, Detective Wolfgramm,

and Detective Graham Officers Does indicated that in additional to sacramental psilocybin, they

would be seizing certain records kept by Singularism. When Mr. Jensen saw which records they

were referring to, it caused him immense grief, as these were the records in which Mr. Jensen and

other of Singularism's spiritual guides recorded the personalized and living scripture of

Singularism's voyagers. Mr. Jensen expressed that although the seizure of Singularism's

sacramental psilocybin was difficult to endure, seizure of this sacred scripture was even more

devastating.

36.43. In total, law enforcement removed psilocybin, a black grinder, a black scale, and a

gold scale used in preparing Singularism's sacramental psilocybin tea, THC, and "Bridging Model

Paperwork" from Singularism's religious center. *See* Exhibit C. Although not recorded on the

officers' seizure receipt, law enforcement also seized additional Psyche Bridging and Healing's

business records, as well as a significant portion of Singularism's voyager's attestations to their

religious sincerity and their religious intention statements.

37.44. At the end of the encounter, Detective Julian told Mr. Jensen that he recommended

Singularism cease all its religious practices.

14

App-4:072

38.45.  Recognizing Mr. Jensen's religious sincerity, his cooperation during the search, seizure, and interrogation, and their assessment of Mr. Jensen's low flight risk, the officers released Mr. Jensen without arrest. However, they told him to expect criminal charges. They also told Mr. Jensen they recommended he cease Singularism's operations.

39.46.  Upon law enforcement's departure, Mr. Jensen was left in a devastating state of distress, facing the reality that Defendants were placing before him an impossible choice: (1) practice his religion and continue the religious practices of Singularism, as deity had instructed him to do, under the prospect of escalated threats from law enforcement and promised prosecution or (2) give up his sincerely held religious beliefs, disband Singularism, give up his and others' livelihoods through the religious business arm of Singularism, Psyche Healing and Bridging, and turn away voyagers expecting to access the divine under Singularism's careful watch.

40.47.  This distress continues to the present and increased when, the next day, on November 12, 2024, Defendant Captain Wolken served Singularism's landlord with a letter, threatening that if he did not evict Singularism from their rented space, that law enforcement would pursue the landlord for civil abatement and forfeiture. *See* Exhibit D.

41.48.  The letter, written with a header containing Defendant Chief Beebe's name, asserted, without any basis in evidence, that Singularism was performing "illegal and dangerous activity" and that "residents in that neighborhood . . . are living in unnecessary fear and danger . . ." *Id.*

42.49.  As stated above, no incidents of any kind have ever occurred at or around Singularism's religious center related to Singularism's religious practices, apart from one voyager that did not disclose information regarding her mental health. Neither Singularism, nor its landlord,

15

are aware of any complaint to either of them regarding Singularism's spiritual practices. The business park in which Singularism's spiritual center strictly enforces rules and security of the premises and has never made any complaint.

43.50.  Singularism's landlord responded to ~~Defendant~~ Captain Wolken and the Provo City Police Department. In his letter, he asserted that he understood that Singularism was taking legal action to protect their religious rights. Because of that, he asserted that if he evicted Singularism as law enforcement desired, he would expose himself to potential liability for religious discrimination in his renting practices. *See* Exhibit E.

51.    The landlord also stated that he had not observed any behavior that would prompt any concern. He stated that his employees present in the same building have not reported feeling unsafe or threatened by Singularism's presence. Additionally, he stated that he had not seen any questionable activity nor any unsavory people coming or going from Singularism's spiritual center. He stated that, if anything, "they have been exemplary tenants."

*Criminal Charges Are Brought Against Mr. Jensen*

52.    On December 18, 2024, following the Court's issue of a temporary restraining order in this action, Defendant Utah County and Utah County Attorney Jeffrey Gray, acting on behalf of the State of Utah, filed criminal charges against Mr. Jensen related to the allegations above. The criminal Information in the matter styled as *State of Utah v. Bridger Lee Jensen*, Case No. 241404407 (Fourth District, Utah County, State of Utah), charges Mr. Jensen with (1) Possession of Psilocybin with Intent to Distribute, a Second Degree Felony; (2) Possession or Use of Tetrahydrocannabinol (THC), a Class B Misdemeanor; and (3) Use or Possession of Drug Paraphernalia, a Class B Misdemeanor.

16

*Provo City Confirms That Singularism Is a Religious Organization*

53.     On January 13, 2025, following Singularism's attempt to renew a business license Singularism understood it may need to operate, Defendant Provo City sent Singularism a letter which confirmed that Provo City deems Singularism a church or religious organization, attached here as Exhibit I:

> This letter is to confirm that, under Provo City Code sec. 6.01.130, churches or religious organizations are not required to obtain a business license to operate. This exemption is limited to activities directly associated with religious purposes. Application LCB202400923 for Singularism has been closed.
> If your organization engages in activities outside the scope of religious operations, such as running a commercial enterprise or selling goods, additional regulations may apply, and compliance will be required.

54.     Provo City Code Section 6.01.130 states

> Unless otherwise provided in this Title, the provisions of this Title shall not be construed to require a business license for an activity which is conducted, managed or carried on wholly for charitable, religious or other non-profit purposes from which profit is not derived, directly or indirectly by any person. Qualification under the federal tax laws for non-profit status shall be prima facie evidence that a person has the charitable, religious or non-profit purposes described above.

55.     Provo City Code Section 6.01.140 states

> With respect to exemptions from business license requirements claimed because of charitable, religious or other nonprofit status, the person claiming the exemption shall have the burden of establishing that exemption.

*The Utah Code Exempts Other Secular and Religious Uses of Controlled Substances*

44.56.  The Utah Code contains explicit exemptions for secular and religious uses of psilocybin and other controlled substances:

a.  First, in 2024, the Utah Legislature passed S.B. 266 Medical Amendments, now codified within the Utah Controlled Substances Act at Utah Code § 58-37-3.5 ("Utah Psilocybin Act"). The Act grants broad permission to the largest healthcare

17

App-4:075

systems in the state to develop and administer psilocybin programs for secular, medicinal usage. The Act places very few limitations on the healthcare systems' ability to determine how, when, where, to whom, and for what reason psilocybin is administered to patients and only requires the healthcare systems to report to the legislature on July 1, 2026. Through the Act, the Utah Legislature has made psilocybin accessible to the general public for secular, medical reasons.

b. Second, the Utah Controlled Substances Act also contains an exemption for secular, medicinal usage of cannabis. Utah Code § 58-37-3.7(2)-(5); *see also* Utah Code § 58-37-3.6(2)-(3); Utah Code § 58-37-3.8. Accordingly, the Utah Code also treats cannabis usage as a protected class status in the context of public employment. *See* Utah Code § 34A-5-115.

c. Third, the Utah Controlled Substances Act also contains an exemption for religious usage of peyote, but only for a single racial, ethnic, and/or religious group, Native Americans. Utah Code § 58-37-8(12); Utah Code § 58-37-2(1)(w).

c.d. Fourth, the Utah Controlled Substances Act permits Utah authorities to waive the Act's "licensure requirement [if] consistent with public health and safety." Utah Code § 58-37-6(2)(d).

45.57. Additionally, the Utah Mental Health Professional Practice Act grants exemptions from licensure in at least two contexts:

a. First, the Utah Mental Health Professional Practice Act permits "a recognized member of the clergy while functioning in a ministerial capacity" to practice mental health therapy "as long as the member of the clergy does not represent that the

18

member of the clergy is, or use the title of, a license classification" included in the Act. Utah Code § 58-60-107(2)(b).

b. Second, the Utah Mental Health Professional Practice Act permits individuals to practice hypnosis on others without a license in order to achieve mental and physical outcomes, as long as the individual (1) "induces a hypnotic state in a client for the purpose of increasing motivation or altering lifestyles or habits, such as eating or smoking, through hypnosis;" (2) "consults with a client to determine current motivation and behavior patterns;" (3) "prepares the client to enter hypnotic states by explaining how hypnosis works and what the client will experience;" (4) "tests clients to determine degrees of suggestibility;" (5) "applies hypnotic techniques based on interpretation of consultation results and analysis of client's motivation and behavior patterns;" and (6) "trains clients in self-hypnosis conditioning." Utah Code § 58-60-107(2)(d)(i).

*Utah and Other Authorities Have Permitted the Religious Usage of Psilocybin and Other Entheogenic Substances*

46.58.  Upon information and belief, other entheogenic religious organizations continue to worship in Utah without interference from Utah authorities, including Defendants.

47.59.  For example, a larger religious organization called "The Divine Assembly" appears to operate openly and without recourse under the same religious protections that should protect Singularism. It holds regular meetings with its members in Orem, Utah. On its website, The Divine Assembly discusses the legality of its worship involving psilocybin, offers church membership

19

App-4:077

cards in exchange for a $75 fee, offers certificates of ministry, offers mushroom-growing kits and instructions, and advertises an event called "Psychedelics in the Beehive."[2]

48.60. Psychedelics in the Beehive is an expansive event which, as it self-describes, "evolved from a conference and expo into a dynamic three-day festival" in downtown Salt Lake City, Utah. The event invites "attendees to explore new perspectives on psychedelics through a blend of learning and creative expression" and connects "Utah's diverse plant medicine community, bringing together experts, leaders, business owners, and newcomers to collaborate and choose their own path in exploring psychedelics."[3] The festival's next event is slated for January 24-26, 2025 and attendees will be able to choose to participate in religious psilocybin ceremonies under the same religious protections that should protect Singularism.[4]

49.61. Additional organizations, such as Oklevueha Native American Church, centered in Spanish Fork, Utah, and Temple of Hermes, in Salt Lake City, Utah, openly practice their religious rites which include entheogenic practices, including in ceremonies occurring in Heber, Utah.

50.62. On November 19, 2024, Ffollowing a complaint made to the Utah Department of Commerce's Division of Professional Licensing ("DOPL") that Mr. Jensen was practicing therapy without a license, DOPL conducted an investigation during which Mr. Jensen provided a statement asserting his practice of religious therapy under the clergy licensure exemption under the Utah Mental Health Professional Practice Act. Following DOPL's investigation, on November 19,

---

[2]    *The Divine Assembly*, THE DIVINE ASSEMBLY, available at, https://www.thedivineassembly.org/.

[3]    *About Psychedelics in the Beehive*, PSYCHEDELICS IN THE BEEHIVE, available at, https://psychedelicsinthebeehive.org/explore.

[4]    *Worship at Psychedelics in the Beehive*, PSYCHEDELICS IN THE BEEHIVE, available at, https://psychedelicsinthebeehive.org/ceremonies.

20

2024, DOPL informed Mr. Jensen that "it was decided this complaint would be closed as 'unfounded'. This means DOPL is not taking any action and [is] closing this complaint out with no further action taken at this time." *See* <u>Exhibit H</u>.

51.63.  Elsewhere in the country, authorities and courts have affirmed the religious rights of sincere individuals and organizations to conduct religious ceremonies with controlled substances.

52.64.  For example, the U.S. Supreme Court, under the federal Religious Freedom Restoration Act, famously confirmed a Christian Spiritist sect's religious exemption from the federal Controlled Substances Act for the religious consumption of hoasca, an entheogenic and sacramental tea made from plants unique to the Amazon region. *See Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 425 (2006).

53.65.  More recently, the Court of Appeals for the Ninth Circuit affirmed, under the federal Religious Freedom Restoration Act, not only (1) an entheogenic church's religious exemption from the federal Controlled Substances Act for the religious use of Daime tea, but also (2) the church's entitlement to attorney fees for the government's violation of their religious rights. *See Church of Holy Light of Queen v. Holder*, 443 F. App'x 302 (9th Cir. 2011); *Church of the Holy Light of the Queen v. Holder*, 584 F. App'x 457 (9th Cir. 2014).

54.66.  And in April 2024, several federal agencies, including the Drug Enforcement Administration, entered into a public settlement agreement with an entheogenic church regarding the importation and religious use of ayahuasca, following a federal district court's confirmation of the church's religious exemption under the federal Religious Freedom Restoration Act. *See* <u>Exhibits F and G</u>.

21

55.67. In light of these instances of agency and judicial confirmation of entheogenic religious rights, together with the open, public, and unprosecuted religious and secular usage of psilocybin and other entheogenic substances in Utah, and the various codified exemptions in the Utah Religious Freedom Restoration Act, Utah's Controlled Substances Act, and the Utah Mental Health Professional Practice Act, Provo City and Defendant Gray's instruction to ~~Defendant Detective~~ Julian and Sergeant Rowberry, Detective Wolfgramm, and Detective Graham~~Defendants Does (and their following of that instruction)~~ that no religious exemption related to psilocybin from the Utah Controlled Substances Act is possible, and to proceed to search Singularism, seize its sacramental psilocybin and scriptural records, and thereafter prosecute Mr. Jensen, amounts to knowing disregard, or, at least, reckless disregard, of Singularism's religious rights. The law has clearly established that sincere religious individuals and entheogenic organizations in the precise circumstance presented in this case have a right to their religious practice without governmental interference.

56.68. Defendants violated clearly established law when, despite knowledge of Plaintiffs' religious sincerity, they made statements to the media which caused Singularism's financial accounts to be compromised and, through law enforcement, ~~proceeded to seek~~sought a search warrant without probable cause when Defendants knew or should have known Plaintiffs' religious practices were lawful, detained Mr. Jensen, searched Singularism's religious center, seized Singularism and Psyche Healing and Bridging's sacramental psilocybin and other items, threatened Mr. Jensen with criminal prosecution and thereafter brought criminal charges against Mr. Jensen, and threatened Singularism's landlord that if he did not evict Singularism from its rented space, law enforcement would pursue the landlord for civil abatement.

22

57.69.  As a result of Defendants' statutory and constitutional violations, Plaintiffs have been deprived of the possession and usage of their sacramental psilocybin, have been deprived of precious scripture regarding Singularism's voyagers, have been placed under threat of eviction, have been placed under threat of criminal prosecution and criminal forfeiture, their livelihoods have been threatened, their financial accounts have been compromised, and they have endured substantial emotional and mental distress. It is anticipated that the course of Defendants' conduct will only deepen the present and future harms to Plaintiffs' statutory and constitutional religious rights. For example, Plaintiffs expect that Singularism's religious community will be irreparably diminished, voyagers will no longer feel safe participating in a Singularism ceremony, and Psyche Bridging and Healing, as a result, will sustain substantial financial losses to the point of closure.

58.70.  Additionally, to defend their statutory and constitutional religious rights, Plaintiffs were forced to incur substantial attorney fees and costs in bringing this Complaint and an accompanying motion for temporary restraining order and preliminary injunction.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
*42. U.S.C. § 1983 and the First Amendment to the U.S. Constitution*

59.71.  Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

60.72.  At all times relevant hereto, Plaintiffs had clearly established rights under the First Amendment of the United States Constitution to, according to their sincere religious beliefs, freely exercise their entheogenic religious ceremonies utilizing entheogenic substances such as psilocybin.

23

App-4:081

61.73. At all times relevant hereto, and in performance of the acts set forth herein, Defendants Utah County, Provo City, and Gray acted under color of state law, as were the law enforcement officers acting under their direction, Chief Beebe, Captain Wolken, Detective Julian, Sergeant Rowberry, Detective Wolfgramm, and Detective Graham. Beebe, Wolken, Julian, and Officers Does acted under color of state law.

62.74. At all times relevant hereto, and in performance of the acts set forth herein, Defendants actively and personally caused the violation of constitutional rights alleged herein.

63.75. Defendants' conduct alleged herein—including, but not limited to, making statements to the media which caused Singularism's financial accounts to be compromised and, through law enforcement, seeking a search warrant without probable cause when Defendants knew or should have known Plaintiffs' religious practices were lawful, detaining Mr. Jensen, threatening to bring criminal charges against Mr. Jensen and thereafter bringing criminal charges against Mr. Jensen, searching Singularism's religious center, seizing Singularism's sacramental psilocybin and other items, and threatening Singularism's landlord to evict Singularism from its rented space—violated Plaintiffs' constitutional rights.

64.76. Defendants' enforcement of the Utah Controlled Substances Act to specifically prohibit Plaintiffs' usage of psilocybin is not essential to furthering any compelling government interest.

65.77. Defendants possess less restrictive means of furthering any governmental interest they may have in specifically prohibiting Plaintiffs' usage of psilocybin.

66.78. The unlawful misconduct of Defendants was objectively unreasonable, flagrantly unlawful, and undertaken intentionally with willful indifference to Plaintiffs' rights.

24

67.79.  Defendants' actions violated Plaintiffs' clearly established constitutional rights of which reasonable police officers are or should be aware.

68.80.  Utah County and Provo City are liable for the actions described herein because (collectively and in the alternative):

a.  The actions were caused or directed by the Provo City Attorney's Office and/or Defendant Gray, a final decision-making authorityauthorities;

b.  The fact that multiple members of the Provo City Police Department, including the Chief, Captain, Detectives, and Sergeant, and other officers, undertook patently unlawful conduct, suggests a complete or reckless lack of training on a subject that officers will encounter on a regular basis.

69.81.  Defendants' unlawful actions caused Plaintiffs to incur costs in related to their compromised financial accounts; defending against the unlawful detention, search, and seizure, as well as the impending criminal charges,.; and other actual damages.

70.82.  Plaintiff is further entitled to attorney fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest, and costs as allowable by law.

### SECOND CLAIM FOR RELIEF
*Article I, Section 4 of the Utah Constitution*

71.83.  Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

72.84.  At all times relevant hereto, Plaintiffs had clearly established rights under Article I, Section 4 of the Constitution, which exceed the protections afforded under the First Amendment to the U.S. Constitution, to, according to their sincere religious beliefs, freely exercise their entheogenic religious ceremonies utilizing entheogenic substances such as psilocybin.

25

73.85. Since 1993, the Utah Supreme Court has stated that a free exercise analysis conducted under the First Amendment "does not control [the] analysis under the Utah Constitution," *Soc'y of Separationists, Inc. v. Whitehead*, 870 P.2d 916, 930 (Utah 1993), and has indicated strict scrutiny review likely applies. *See Snyder v. Murray City Corp.*, 124 F.3d 1349, 1354 (10th Cir. 1997); *Summum v. Pleasant Grove City*, 2015 UT 31, ¶ 7, 345 P.3d 1188; *Jeffs v. Stubbs*, 970 P.2d 1234, 1249 (Utah 1998); *State v. Green*, 2004 UT 76, ¶ 70 n.1, 99 P.3d 820 (Durrant, J., concurring); *State v. Holm*, 2006 UT 31, ¶ 34 n.8, 137 P.3d 726.

74.86. At all times relevant hereto, and in performance of the acts set forth herein, Defendants Utah County, Provo City, and Gray, acted under color of state law, as were the law enforcement officers acting under their direction, Chief Beebe, Captain Wolken, Detective Julian, Sergeant Rowberry, Detective Wolfgramm, and Detective Graham. Beebe, Wolken, Julian, and Officers Does acted under color of state law.

75.87. At all times relevant hereto, and in performance of the acts set forth herein, Defendants actively and personally caused the violation of constitutional rights alleged herein.

76.88. Defendants' conduct alleged herein—including, but not limited to, making statements to the media which caused Singularism's financial accounts to be compromised and, through law enforcement, seeking a search warrant without probable cause when Defendants knew or should have known Plaintiffs' religious practices were lawful, detaining Mr. Jensen, threatening to bring criminal charges against Mr. Jensen and thereafter bringing criminal charges against Mr. Jensen, searching Singularism's religious center, seizing Singularism's sacramental psilocybin and other items, and threatening Singularism's landlord to evict Singularism from its rented space— violated Plaintiffs' constitutional rights.

26

77.89.  Defendants' enforcement of the Utah Controlled Substances Act to specifically prohibit Plaintiffs' usage of psilocybin is not essential to furthering any compelling government interest.

78.90.  Defendants possess less restrictive means of furthering any governmental interest they may have in specifically prohibiting Plaintiffs' usage of psilocybin.

79.91.  The unlawful misconduct of Defendants was objectively unreasonable, flagrantly unlawful, and undertaken intentionally with willful indifference to Plaintiffs' rights.

80.92.  Defendants' actions violated Plaintiffs' clearly established constitutional rights of which reasonable police officers are or should be aware.

81.93.  Utah County and Provo City are liable for the actions described herein because (collectively and in the alternative):

   a. The actions were caused or directed by the Provo City Attorney's Office and/or Defendant Gray, a final decision-making authorityauthorities;

   b. The fact that multiple members of the Provo City Police Department, including the Chief, Captain, Detectives, and Sergeant, other officers, undertook patently unlawful conduct, suggests a complete or reckless lack of training on a subject that officers will encounter on a regular basis.

82.94.  Defendants' unlawful actions caused Plaintiffs to incur costs related to their compromised financial accounts; in defending against the unlawful detention, search, and seizure, as well as the impending criminal charges;, and other actual damages.

83.95.  Plaintiff is further entitled to attorney fees and costs, pre-judgment interest, and costs as allowable by law.

27

App-4:085

**THIRD CLAIM FOR RELIEF**
*Utah Religious Freedom Restoration Act*

84.96.  Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

85.97.  At all times relevant hereto, Plaintiffs had clearly established rights under the Utah Religious Freedom Restoration Act, Utah Code § 63G-33-101 *et seq*., which exceed the protections afforded under Article I, Section 4 of the Constitution and the First Amendment to the U.S. Constitution, to, according to their sincere religious beliefs, freely exercise their entheogenic religious ceremonies utilizing entheogenic substances such as psilocybin.

86.98.  At all times relevant hereto, and in performance of the acts set forth herein, Defendants Utah County, Provo City, and Gray, acted under color of state law, as were the law enforcement officers acting under their direction, Chief Beebe, Captain Wolken, Detective Julian, Sergeant Rowberry, Detective Wolfgramm, and Detective Graham.Beebe, Wolken, Julian, and Officers Does acted under color of state law.

87.99.  At all times relevant hereto, and in performance of the acts set forth herein, Defendants actively and personally caused the violation of statutory rights alleged herein.

88.100.      Defendants' conduct alleged herein—including, but not limited to, making statements to the media which caused Singularism's financial accounts to be compromised and, through law enforcement, seeking a search warrant without probable cause when Defendants knew or should have known Plaintiffs' religious practices were lawful, detaining Mr. Jensen, threatening to bring criminal charges against Mr. Jensen and thereafter bringing criminal charges against Mr. Jensen, searching Singularism's religious center, seizing Singularism's sacramental psilocybin and

28

App-4:086

other items, and threatening Singularism's landlord to evict Singularism from its rented space—violated Plaintiffs' statutory rights.

89.101.      Defendants' conduct alleged herein substantially burdened Plaintiffs' free exercise of religion by, but not limited to, constraining, limiting, and denying Plaintiffs' free exercise of religion; compelling Plaintiffs to act, or fail to act, in a manner contrary to Plaintiffs' free exercise of religion; and assessing criminal, civil, or administrative penalties or damages on Plaintiffs.

90.102.      Defendants' enforcement of the Utah Controlled Substances Act to specifically prohibit Plaintiffs' usage of psilocybin is not essential to furthering any compelling government interest.

91.103.      Defendants possess less restrictive means of furthering any governmental interest they may have in specifically prohibiting Plaintiffs' usage of psilocybin.

92.104.      The unlawful misconduct of Defendants was objectively unreasonable, flagrantly unlawful, and undertaken intentionally with willful indifference to Plaintiffs' rights.

93.105.      Defendants' actions violated Plaintiffs' clearly established statutory rights of which reasonable police officers are or should be aware.

94.106.      Utah County and Provo City are liable for the actions described herein because (collectively and in the alternative):

   a. The actions were caused or directed by the Provo City Attorney's Office and/or Defendant Gray, a final decision-making authorityauthorities;

   b. The fact that multiple members of the Provo City Police Department, including the Chief, Captain, Detectives, and Sergeantother officers, undertook patently unlawful

29

App-4:087

conduct, suggests a complete or reckless lack of training on a subject that officers will encounter on a regular basis.

95.107.      Defendants' unlawful actions caused Plaintiffs to incur costs related to their compromised financial accounts; in defending against the unlawful detention, search, and seizure, as well as the impending criminal charges, ; and other actual damages.

96.108.      Plaintiff is further entitled to attorney fees and costs pursuant to Utah Code § 63G- 33-201(6), pre-judgment interest, and costs as allowable by law.

97.109.      The notice of claim provision of Utah's Religious Freedom Restoration Act, *see* Utah Code § 63G-33-201(5), does not apply to this action. Defendants' wrongful actions are ongoing and complying with the notice of claim provision will place an undue hardship on Plaintiffs and increase the harm suffered and to be suffered by Plaintiffs. Further, the harm alleged herein is likely to occur or reoccur before the end of the 60-day period described in the notice of claim provision.

**FOURTH CLAIM FOR RELIEF**
*42. U.S.C. § 1983 and the Fourth Amendment to the U.S. Constitution*

98.110.      Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

99.111.      At all times relevant hereto, Plaintiffs had clearly established rights under the Fourth Amendment of the United States Constitution to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, and that no warrants shall issue against them without probable cause.

100.112.      At all times relevant hereto, and in performance of the acts set forth herein, Defendants Utah County, Provo City, and Gray, acted under color of state law, as were the law

30

enforcement officers acting under their direction, Chief Beebe, Captain Wolken, Detective Julian, Sergeant Rowberry, Detective Wolfgramm, and Detective Graham.Beebe, Wolken, Julian, and Officers Does acted under color of state law.

101.113.    At all times relevant hereto, and in performance of the acts set forth herein, Defendants actively and personally caused the violation of constitutional rights alleged herein.

102.114.    Defendants' conduct alleged herein—including, but not limited to, through law enforcement, seeking a search warrant without probable cause when Defendants knew or should have known Plaintiffs' religious practices were lawful, detaining Mr. Jensen, threatening to bring criminal charges against Mr. Jensen and thereafter bringing criminal charges against Mr. Jensen, searching Singularism's religious center, seizing Singularism's sacramental psilocybin and other items, and threatening Singularism's landlord that if he did not evict Singularism from their rented space then law enforcement would pursue the landlord for civil abatement and forfeiture— violated Plaintiffs' constitutional rights.

103.115.    The unlawful misconduct of Defendants—done without probable cause— was objectively unreasonable, flagrantly unlawful, and undertaken intentionally with willful indifference to Plaintiffs' rights.

104.116.    Defendants' actions violated Plaintiffs' clearly established constitutional rights of which reasonable police officers are or should be aware.

105.117.    Utah County and Provo City are liable for the actions described herein because (collectively and in the alternative):

    a.    The actions were caused or directed by the Provo City Attorney's Office and/or Defendant Gray, a final decision-making authorityauthorities;

31

b.  The fact that multiple members of the Provo City Police Department, including the Chief, Captain, Detectives, and ~~other officers~~Sergeant, undertook patently unlawful conduct, suggests a complete or reckless lack of training on a subject that officers will encounter on a regular basis.

~~106.~~118.      Defendants' unlawful actions caused Plaintiffs to incur costs in defending against the unlawful detention, search, and seizure, the ~~impending~~ criminal charges, the threatened eviction action, and other actual damages.

~~107.~~119.      Plaintiff is further entitled to attorney fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest, and costs as allowable by law.

**FIFTH CLAIM FOR RELIEF**
*Article I, Section 14 of the Utah Constitution*

~~108.~~120.      Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

~~109.~~121.      At all times relevant hereto, Plaintiffs had clearly established rights under the Article 1, Section 14 to the Utah Constitution that they shall be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause.

~~110.~~122.      At all times relevant hereto, and in performance of the acts set forth herein, Defendants Utah County, Provo City, and Gray~~,~~ acted under color of state law, as were the law enforcement officers acting under their direction, Chief Beebe, Captain Wolken, Detective Julian, Sergeant Rowberry, Detective Wolfgramm, and Detective Graham.~~Beebe, Wolken, Julian, and Officers Does acted under color of state law.~~

32

App-4:090

111.123.    At all times relevant hereto, and in performance of the acts set forth herein, Defendants actively and personally caused the violation of constitutional rights alleged herein.

112.124.    Defendants' conduct alleged herein—including, but not limited to, through law enforcement, seeking a search warrant without probable cause when Defendants knew or should have known Plaintiffs' religious practices were lawful, detaining Mr. Jensen, threatening to bring criminal charges against Mr. Jensen and thereafter bringing criminal charges against Mr. Jensen, searching Singularism's religious center, seizing Singularism's sacramental psilocybin and other items, and threatening Singularism's landlord that if he did not evict Singularism from their rented space then law enforcement would pursue the landlord for civil abatement and forfeiture—violated Plaintiffs' constitutional rights.

113.125.    The unlawful misconduct of Defendants—done without probable cause—was objectively unreasonable, flagrantly unlawful, and undertaken intentionally with willful indifference to Plaintiffs' rights.

114.126.    Defendants' actions violated Plaintiffs' clearly established constitutional rights of which reasonable police officers are or should be aware.

115.127.    Utah County and Provo City are liable for the actions described herein because (collectively and in the alternative):

    a.   The actions were caused or directed by the Provo City Attorney's Office and/or Defendant Gray, a final decision-making authorityauthorities;

    b.   The fact that multiple members of the Provo City Police Department, including the Chief, Captain, Detective, and other officersSergeant, undertook patently unlawful

33

conduct, suggests a complete or reckless lack of training on a subject that officers will encounter on a regular basis.

116.128.    Defendants' unlawful actions caused Plaintiffs to incur costs in defending against the unlawful detention, search, and seizure, the impending criminal charges, the threatened eviction action, and other actual damages.

117.129.    Plaintiff is further entitled to attorney fees and costs, pre-judgment interest, and costs as allowable by law.

## SIXTH CLAIM FOR RELIEF
### *Declaratory and Injunctive Relief*

118.130.    Plaintiffs incorporate all other allegations of this Complaint as if fully set forth herein.

119.131.    Defendants' conduct has caused and will cause Plaintiffs to suffer irreparable harm.

120.132.    Plaintiffs intend to continue their religious ceremonial usage of psilocybin. Unless this Court enjoins Defendants, Defendants will continue to cause irreparable harm to Plaintiffs through violation of their free exercise of religion.

121.133.    Plaintiffs fear that, without a court order, they will again be subjected to harassment, threats, arrest, criminal charges, forfeiture, eviction, and other retaliation and actions violative of their constitutional and statutory rights.

122.134.    Plaintiffs are likely to succeed on the merits of their constitutional claims.

123.135.    Plaintiffs are likely to suffer the same violations upon their future performance of their religious sacraments in Provo City and Utah County.

34

App-4:092

124.136.     The continued injury to Plaintiffs outweighs any damage to Defendants that could be caused by an injunction. Plaintiffs allege there is no damage to Defendants because there are no negative impacts to the community because of Singularism's private, safe, and controlled religious ceremonies.

125.137.     An injunction is in the public interest, as the U.S. Supreme Court, Utah Supreme Court, and the Utah Legislature has repeatedly recognized that religious free exercise is a fundamental right which merits protection and that there exist circumstances, both religious and secular, in which entheogenic substances are a public good.

126.138.     Plaintiffs are entitled to a declaration that Defendants have violated Plaintiffs' constitutional and statutory religious free exercise rights. The Court should enter injunctive relief against Defendants requiring that Defendants cease their unlawful violation of Plaintiffs' religious free exercise.

35

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request the entry of judgment in their favor and against Defendants as follows:

1.      A declaratory judgment, pursuant to Utah Code § 78B-6-401, declaring that Defendants' actions violated Plaintiffs' First Amendment right of religious free exercise.

2.      A declaratory judgment, pursuant to Utah Code § 78B-6-401, declaring that Defendants' actions violated Plaintiffs' right of religious free exercise under Article I, Section 4 of the Utah Constitution.

3.      A declaratory judgment, pursuant to Utah Code § 78B-6-401, declaring that Defendants' actions violated Plaintiffs' right of religious free exercise under the Utah Religious Freedom Restoration Act.

4.      A declaratory judgment, pursuant to Utah Code § 78B-6-401, declaring that Defendants' actions violated Plaintiffs' rights under the Fourth Amendment of the United States Constitution to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, and that no warrants shall issue against them without probable cause.

5.      A declaratory judgment, pursuant to Utah Code § 78B-6-401, declaring that Defendants' actions violated Plaintiffs' rights under Article 1, Section 14 to the Utah Constitution that they shall be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated, and that no warrant shall issue but upon probable cause.

6.      Injunctive relief ~~ordered~~ ordering the return of all items seized by Defendants from Singularism's spiritual center.

36

7.   Injunctive relief temporarily and permanently enjoining Defendants from prosecuting Plaintiffs' sincere free exercise of religion, threatening Singularism's eviction, or otherwise acting to interfere with Plaintiffs' sincere free exercise of religion regarding its religious entheogenic ceremonies.

8.   A judgment awarding compensation to Plaintiffs for their economic and noneconomic loss and other personal injury resulting from the violations of their constitutional and statutory rights. Although the precise value of these damages is presently unknown, will increase as Defendants' unlawful conduct continues, and will be determined by the jury at trial, it is expected the value of the damages at the time of trial will exceed $100,000.

9.   A judgment assessing punitive damages against the individual Defendants.

10.   A judgment awarding Plaintiffs their costs of suit, including reasonable attorney fees and litigation expenses, under 42 U.S.C. § 1988, Utah Code § 63G-33-201(6), and other applicable law.

11.   A judgment awarding Plaintiffs pre- and post-judgment interest to the extent permitted by law.

12.   Nominal damages to the extent a factfinder determines that a particular constitutional violation did not cause actual damages.

13.   Such other and further relief as this Court may deem just and proper.

Respectfully submitted this 22nd19th day of January, 2025November, 2024

/s/ *Tanner J. Bean*
Tanner J. Bean
Anna P. Christiansen

37

Jacqueline M. Rosen
FABIAN VANCOTT
*Attorneys for Plaintiffs*

**VERIFICATION**

I declare that the matters stated in the above Verified Complaint are within my personal knowledge or are based upon my review of the records kept in the regular course of Plaintiff's business. Based upon the information so obtained and compiled, which I believe to be accurate, I believe the facts stated in the foregoing Verified Complaint are true and correct and are based on a reasonable inquiry, and I make this verification to the best of my information and belief. I declare under criminal penalty under the laws of the State of Utah that the foregoing is true and correct.

DATED this ~~19th~~ 22nd day of ~~November~~January, ~~2024~~2025.

/s/ Bridger Lee Jensen
Bridger Lee Jensen
*(signed with permission granted to Tanner J. Bean via email on ~~November~~ January 22~~19~~, 202~~5~~4)*

39

App-4:097

Tanner J. Bean (A17128)
tbean@fabianvancott.com
Jacqueline M. Rosen (A18530)
jrosen@fabianvancott.com
**FABIAN VANCOTT**
95 South State Street, Suite 2300
Salt Lake City, UT 84111-23323
Telephone: (801) 531-8900
*Attorneys for Plaintiffs*

---

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

---

| | |
|---|---|
| BRIDGER LEE JENSEN, an individual; SINGULARISM, a non-profit corporation; PSYCHE HEALING AND BRIDGING, LLC dba PSYCHEDELIC THERAPY JOURNEY; a limited liability company;<br><br>         Plaintiffs,<br>vs.<br><br>UTAH COUNTY, a political subdivision, PROVO CITY, a political subdivision; JEFFREY GRAY, an individual;<br><br><br>         Defendants. | **FIRST AMENDED VERIFIED COMPLAINT**<br><br>Civil No. 2:24-cv-00887-JNP<br><br>Judge Jill N. Parrish<br><br>(Removed from Fourth Judicial District Court, Utah County, State of Utah, Case No. 240406123) |

---

Plaintiffs Bridger Lee Jensen, Singularism, and Psyche Healing and Bridging LLC dba Psychedelic Therapy Journey (collectively, "Singularism"), by and through their counsel, hereby complain against Defendants Utah County, Provo City, and Jeffrey Gray, as alleged below.

## INTRODUCTION

"Respect for religious expressions is indispensable to life in a free and diverse Republic . . ." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 543 (2022). Indeed, "preserving the

App-4:098

promise of the free exercise of religion enshrined in our Constitution . . . lies at the heart of our pluralistic society." *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1754 (2020). "[R]eligious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Fulton v. City of Philadelphia, Pennsylvania*, 593 U.S. 522, 532, (2021) (quoting *Thomas v. Review Bd. of Ind. Employment Security Div.*, 450 U.S. 707, 714 (1981)). "A way of life that is odd or even erratic but interferes with no rights or interests of others is not to be condemned because it is different." *Wisconsin v. Yoder*, 406 U.S. 205, 224 (1972).

Bridger Jensen is the sincere founder of a small, entheogenic minority religion known as Singularism. Like many religious organizations, it has both non-profit and for-profit entities. As part of their sincere religious exercise, Plaintiffs utilize sacramental psilocybin tea to access the divine, open spiritual pathways, and alleviate human suffering by weaving together centuries of entheogenic religious practice with what Plaintiffs view as illuminated approaches of modern mental health clinicians.

The sincerity of Plaintiffs' religious conviction is unquestionable. Mr. Jensen gave up a successful career to pursue his higher spiritual calling in Singularism. Since its founding, he, on behalf of Singularism, has publicly and transparently broadcast the faith, indicating Singularism relies upon the protections for free exercise of religion to operate, while knowing that misunderstanding authorities may at any moment prosecute Singularism for its faith. After over a year of Plaintiffs peacefully exercising their religious freedom, providing spiritual care to many without incident and without a single ounce of psilocybin leaving Singularism's spiritual center, that moment has come.

Law enforcement authorities, to whom Mr. Jensen sent a letter explaining Singularism's religious practices at the opening of its religious center in the fall of 2023, searched Singularism's spiritual center on November 11, 2024, and, among other things, seized the sacramental psilocybin used in Singularism's ceremonies. The next day, law enforcement threatened Singularism's landlord to evict Singularism from its spiritual center. Mr. Jensen now faces criminal charges related to psilocybin, and Singularism, a small minority religious group, risks being evicted and otherwise wiped off the map by overzealous authorities. Defendants have knowingly and recklessly proceeded in defiance of the protections afforded to sincere religious believers under the U.S. Constitution, the Utah Constitution, and the Utah Religious Freedom Restoration Act.

The Court should right these wrongs. Plaintiffs request the Court enjoin Defendants from their actions burdening Plaintiffs' sincere religious free exercise, declare Defendants' actions a violation, order the payment of damages for the violation of Plaintiffs' constitutional and statutory rights, and compensate Plaintiffs for the attorney fees and costs required to defend their rights in court, despite clear legal protections for their religious exercise.

## PARTIES

1.      Plaintiff Bridger Lee Jensen is an individual who resides in Provo, Utah.

2.      Plaintiff Singularism is a non-profit organization registered under the laws of the State of Utah located in Provo, Utah.

3.      Plaintiff Psyche Healing and Bridging LLC dba Psychedelic Therapy Journey is a limited liability corporation registered under the laws of the State of Utah located in Provo, Utah.

4.      Defendant Utah County is a political subdivision of the State of Utah. The Utah County Attorney's Office is an agency, program, or arm of Utah County.

5.      Jeffrey Gray is, and has been, the Utah County Attorney since January 2023. Upon information and belief, Jeffrey Gray is a resident of Utah County.

6.      Defendant Provo City is a political subdivision of the State of Utah located in Utah County. The Provo City Police Department is an agency, program, or arm of Provo City. The Provo City Attorney's Office is an agency, program, or arm of Utah County. At all times relevant to this Complaint, the following persons were employed by and acting within the course and scope of their employment with Provo City Police Department:

   a.   Troy Beebe is, and was, at all times relevant to this Complaint, the Chief of the Provo City Police Department.

   b.   Brian Wolken is, and was, at all times relevant to this Complaint, a Captain of the Provo City Police Department.

   c.   Jackson Julian is, and was, at all times relevant to this Complaint, a Detective of the Provo City Police Department.

   d.   Austin Rowberry is, and was, at all times relevant to this Complaint, a Sergeant of the Provo City Police Department.

   e.   Liuaki Wolfgramm is, and was, at all times relevant to this Complaint, a Detective of the Provo City Police Department.

   f.   Cody Graham is, and was, at all times relevant to this Complaint, a Detective of the Provo City Police Department.

7.      At all times relevant to this Complaint, Defendants Provo City, Utah County, and Jeffrey Gray were acting under color of state law, as were the law enforcement officers acting

4

App-4:101

under their direction, Chief Beebe, Captain Wolken, Detective Julian, Sergeant Rowberry, Detective Wolfgramm, and Detective Graham.

## JURISDICTION AND VENUE

8.     This action was originally filed in the Court for the Fourth Judicial District, Utah County, State of Utah, on November 19, 2024.

9.     As originally filed, that Court had jurisdiction pursuant to Utah Code § 78A-5-102.

10.    As originally filed, venue was proper in that Court under Utah Code §§ 63G-7-502 and 78B-3a-201, as the causes of action arise and Defendants reside in Utah County, Utah.

11.    As originally filed, because the Complaint seeks recovery of damages in an amount exceeding $100,000 and non-monetary relief, it was classified as a Tier 2 action under Utah Rule of Civil Procedure 26.

12.    Defendants removed this action pursuant to 28 U.S.C. §1441 *et seq.* to the United States District Court for the District of Utah on November 27, 2024. Defendants stated that they "base[d] their removal on federal question jurisdiction pursuant to U.S.C. §§ 1331, 1441(a), and 1446" and that the "Court has jurisdiction over the remainder of the case because all the claims form part of the same case or controversy. *See* 28 U.S.C. § 1367."

13.    Plaintiffs' claims are exempt from the notice-of-claim provisions of the Utah Governmental Immunity Act, according to the terms of that Act and Utah's Religious Freedom Restoration Act and because of the exigent circumstances presented herein. Even so, out of an abundance of caution, Plaintiffs' claims were included and described in a notice of claim served upon Defendants concurrently with the service of the original Complaint on November 19, 2024.

## FACTUAL BACKGROUND

5

*The Founding and Religious Practices of Singularism*

14.     In the fall of 2023, following years of various transcendent and spiritual experiences facilitated through psilocybin, Mr. Jensen determined to share his spiritual enlightenment with the community by founding his own religious organization, Singularism.

15.     Although previously licensed as a mental health therapist, Mr. Jensen allowed his license to lapse and discontinued his professional clinical practice, understanding that, as clergy, he would be exempt from licensure requirements under the Utah Mental Health Professional Practice Act, *see* Utah Code § 58-60-107(2)(b), and would transition to becoming a spiritual leader and provide religious mental health therapy.

16.     After much effort and coordination, Mr. Jensen was able to found Singularism as a non-profit organization and Psyche Healing and Bridging as a related for-profit corporation, and was able to locate a space to rent as a spiritual center in Provo, Utah.

17.     Singularism held a public ribbon-cutting ceremony for its spiritual center in the fall of 2023. It invited many individuals and organizations from all walks of life to attend the ribbon-cutting event, and many individuals attended. During the ribbon-cutting ceremony, individuals shared their profound religious and spiritually healing experiences with psilocybin. Others shared they had felt marginalized according to their unorthodox religious views regarding psilocybin and the spiritual experiences it had opened for them. Others attended merely to learn about Singularism and the potential for religious enlightenment.

18.     During the ribbon-cutting ceremony, Mr. Jensen discussed one of Singularism's mantras: that psilocybin permits individuals to directly access the divine and thereby be able to

6

App-4:103

"write your own scripture." It was this mantra that Mr. Jensen invited all in attendance to say as he cut the ceremonial ribbon.

19.     Thereafter, individuals socialized, learned more about Singularism's religious beliefs, and were able to tour Singularism's spiritual center.

20.     As part of its efforts to become known in the community and prevent authorities' misunderstanding of Singularism, in the fall of 2023, Singularism sent letters to local government leaders and law enforcement, inviting them to come tour Singularism's spiritual center and informing them of Singularism's spiritual practices utilizing psilocybin. For example, letters were sent to the Mayor of Provo City, the Provo City Council, the Provo Police Department, as well as to the Utah County Attorney's Office. None of these offices took advantage of Singularism's invitation to tour its spiritual center. The letters also informed these government offices of Singularism's claims to religious free exercise and raised the constitutional and statutory bases for those claims.

21.     Following Mr. Jensen's invitations to tour Singularism's spiritual center, there was media coverage by FOX 13 News regarding Singularism's religious practices which included statements from Provo City and the Utah County Attorney's Office:

    a.  A spokesperson for Provo City stated:

> Psilocybin is a Schedule I controlled substance and under Utah law, it is illegal to possess or distribute. A recent effort to legalize psilocybin was not approved by the legislature, therefore use and distribution continue to be criminal offenses.
> We have evaluated recent claims that use is protected under the Religious Freedom Restoration Act and we believe those claims to be without merit. The position of the Provo Police Department is that officers will treat psilocybin as an illegal drug and will arrest or cite users and distributors and refer charges to the Utah County Attorney's Office. We have confirmed with that office that they intend to prosecute violators.

7

App-4:104

     b.   The Utah County Attorney's Office stated:

Based upon research conducted by the Utah County Attorney's office, it does not appear that Singularism has Constitutional protections to either use of administer psilocybin.[1]

22.    Following the ribbon-cutting event, beginning in September 2023, Singularism began its ceremonial practice of ushering sincere religious believers into transcendent experiences at its spiritual center. As part of doing so, Singularism carefully prepares a diluted, sacramental psilocybin tea, offers it to what it calls its "Voyagers," and supervises the voyager in a private, controlled, safe, and comfortable environment within Singularism's spiritual center, following safety guidelines such as those published by Harvard Medical School and Johns Hopkins. Before, during, and after the ceremony, religious guides such as Mr. Jensen attend to the voyager, help guide their spiritual inquiry, and record the voyager's spiritual insights, thereby allowing the individual to write their own scripture.

23.    One of Singularism's principal doctrines is that the American cultural line drawn between religion and science is illusory and that the two fields are complementary and interwoven. As such, Singularism takes full advantage, for religious purposes, of the benefits and wisdoms of clinical practices used in mental health therapy. Concurrent to Singularism's religious practices and beliefs, there are active scientific bodies, including those as notable as Harvard Medical School and Johns Hopkins, which have extensively researched and published regarding the positive usages of psilocybin for a variety of physical and mental issues in the secular context.

---

[1]    *Psychedelic Mushroom Interest Grows in Utah with Center Opening in Provo*, FOX13 NEWS, updated Nov. 06, 2023, https://www.fox13now.com/news/local-news/psychedelic-mushroom-interest-grows-in-utah-with-center-opening-in-provo.

24.    Before administering its ceremonial and sacramental psilocybin to its voyagers, Singularism puts interested individuals through a screening process. During this multi-stage screening process, Singularism evaluates each voyager's physical, mental, and emotional suitability and readiness to participate in a psilocybin ceremony. As part of this multi-stage screening process, Singularism also evaluates the voyager's religious sincerity and prohibits individuals attempting to ingest psilocybin solely for secular or recreational purposes from participating in its ceremonies.

25.    In fact, even after deeming an individual religiously sincere, Singularism requires the individual to sign an attestation of their religious sincerity before participating in a psilocybin ceremony. The document including that attestation also requires the voyagers to take or not take certain actions to protect their own physical, mental, emotional, and spiritual well-being following a voyage through a Singularism ceremony. *See* Exhibit A.

26.    Singularism turns away individuals that it deems religiously insincere, as well as individuals for which a psilocybin ceremony could potentially be harmful to the individual's physical, mental, emotional, or spiritual well-being.

27.    Singularism's voyagers that are sincere and suited for the ceremonies have reported many significant and varied religious experiences during their Singularism ceremonies. As a few examples:

a.    One voyager described his experience as "profoundly transformative," that he "experienced an overwhelming sense of unity with all things," which was a "deeply religious encounter with the sacredness of existence."

9

App-4:106

b.  Another voyager described her experience walking "alongside Jesus," encountering deceased relatives, embracing "Heavenly Mother and Father [and] feeling their unconditional love and reassurance."

c.  Another voyager described that she "experienced an overwhelming sense of joy, inner peace, and enlightenment," which was "nothing short of transcendent—a deeply spiritual encounter that connected me to something greater than myself."

28.  To participate in Singularism's therapeutic religious ceremonies via Singularism's for-profit organization, Psyche Healing and Bridging, individuals pay a fee. The fee is calculated according to the typical time spent in a ceremonial voyage and the amount of ceremonies the voyager intends to participate in, taking into consideration what a comparable secular therapeutic service might entail. In some instances where sincere individuals are seeking this religious experience, but do not have the financial resources to contribute, Singularism has permitted voyagers to participate in ceremonies at reduced or no cost.

29.  Because of Singularism's convictions in the correctness of its doctrines and the spiritual benefits of its practices, it openly shares about its mission and invites others to learn more about its beliefs. As part of Singularism's missionary efforts, it has begun to develop processes and procedures whereby others can become certified spiritual guides in its doctrines to expand the reach of its spiritual movement. Presently, only a handful of these guides have received Singularism's religious training. They are taught to abide by and conduct the same screening procedures discussed above.

30.  Singularism operated peacefully and without any private or public incident or complaint related to it or any of its voyagers since it opened the doors of its spiritual center through

January 2025. In January 2025, one of Singularism's voyagers had an adverse reaction during her second Singularism ceremony. The individual's reaction was exceptionally rare, not life threatening, but exhibited signs of mental distress. Singularism followed its protocol (which is similar to those in place at mental health treatment facilities), which was to have the voyager reach out to her previously identified emergency contact and otherwise assist the individual in reaching the hospital where she was treated and released within a few hours. While investigating the incident, Singularism learned that the voyager had not disclosed certain mental health indicators during Singularism's screening procedure which, if known, would likely have caused Singularism to screen the voyager out from receiving a psilocybin ceremony. The day following the voyager's adverse reaction, she contacted Singularism, stated she was safe and was recovering well, and apologized for the incident. They voyager made similar statements to law enforcement.

*Defendants' Statements to the Media Interfere with Singularism's Financial Accounts*

31.     In the fall of 2023, for reasons then unknown to Singularism, Singularism began to experience complications with its financial accounts at KeyBank. And in January 2024, KeyBank refused to provide banking services to Singularism and closed Singularism's accounts, causing a major disruption to Singularism's operations. KeyBank refused to explain the reason it closed Singularism's accounts.

32.     However, records obtained by Singularism a year later, maintained by the Financial Crimes Enforcement Network of the United States Department of the Treasury ("FinCEN"), indicate that KeyBank relied upon the statements Provo City and the Utah County Attorney's Office made to FOX 13 News to justify their refusal to provide banking services to Singularism and close its accounts.

33.    The FinCEN records show that KeyBank's report to FinCEN directly quoted the statements Provo City and the Utah County Attorney's Office made to FOX 13 News in KeyBank's report to FinCEN.

34.    Thus, the incorrect statements made by Provo City and the Utah County Attorney's Office to FOX 13 News, which were made with a knowing disregard, or, at least, reckless disregard, of Singularism's religious rights, had a palpable effect upon Singularism and its financial condition.

*Law Enforcement Knowingly Disregards Singularism's Religious Exemption, Seizes Singularism's Sacrament, Pursues Criminal Charges, and Threatens Eviction*

35.    Singularism's peaceful religious practice was interrupted on November 11, 2024 when law enforcement from the Provo City Police Department—Detective Julian, Sergeant Rowberry, Detective Wolfgramm, and Detective Graham—presented at Singularism's spiritual center with a warrant to search the premises and seize certain items. *See* Exhibit B.

36.    For roughly two hours, law enforcement searched Singularism's spiritual center, detained Mr. Jensen, and interrogated him regarding his and Singularism's religious practices. Mr. Jensen is a single, divorced father, and as a result, had to instruct one of Singularism's assistants to head to Mr. Jensen's home to care for his children, fearing that law enforcement would arrest him and prevent him from being able to return to take care of them that night.

37.    From the outset, Detective Julian explained that he and Sergeant Rowberry, Detective Wolfgramm, and Detective Graham had been instructed to obtain the search warrant by Utah County Attorney, Defendant Gray. Detective Julian told Mr. Jensen that he was fully aware of Singularism's claim to sincere religious exemption, but that the Utah County Attorney had

12

instructed that there does not exist, and cannot exist, any religious exemptions from the Utah Controlled Substances Act related to psilocybin.

38.     Detective Julian explained that he had, undercover, posed as an individual interested in Singularism, going through some of the initial stages of Singularism's screening process, to obtain information regarding Singularism's usage of psilocybin.

39.     At no point during law enforcement's search and seizure did Detective Julian or Sergeant Rowberry, Detective Wolfgramm, and Detective Graham appear to doubt Mr. Jensen or Singularism's religious sincerity that psilocybin ceremonies are a vital and core part of their religious practice.

40.     Rather, Mr. Jensen explained in detail the integral nature of psilocybin to Singularism's religious practices, outlining Singularism's screening mechanisms, the other procedures it keeps to ensure safety for its voyagers, and that psilocybin tea or any other form of psilocybin is never administered or distributed to anyone outside one of its ceremonies, all which occur within the walls of Singularism's spiritual center.

41.     During the entirety of law enforcement's presence, Mr. Jensen was wholly cooperative with law enforcement.

42.     At one point, Detective Julian and/or Sergeant Rowberry, Detective Wolfgramm, and Detective Graham indicated that in additional to sacramental psilocybin, they would be seizing certain records kept by Singularism. When Mr. Jensen saw which records they were referring to, it caused him immense grief, as these were the records in which Mr. Jensen and other of Singularism's spiritual guides recorded the personalized and living scripture of Singularism's

voyagers. Mr. Jensen expressed that although the seizure of Singularism's sacramental psilocybin was difficult to endure, seizure of this sacred scripture was even more devastating.

43. In total, law enforcement removed psilocybin, a black grinder, a black scale, and a gold scale used in preparing Singularism's sacramental psilocybin tea, THC, and "Bridging Model Paperwork" from Singularism's religious center. *See* Exhibit C. Although not recorded on the officers' seizure receipt, law enforcement also seized additional Psyche Bridging and Healing's business records, as well as a significant portion of Singularism's voyager's attestations to their religious sincerity and their religious intention statements.

44. At the end of the encounter, Detective Julian told Mr. Jensen that he recommended Singularism cease all its religious practices.

45. Recognizing Mr. Jensen's religious sincerity, his cooperation during the search, seizure, and interrogation, and their assessment of Mr. Jensen's low flight risk, the officers released Mr. Jensen without arrest. However, they told him to expect criminal charges.

46. Upon law enforcement's departure, Mr. Jensen was left in a devastating state of distress, facing the reality that Defendants were placing before him an impossible choice: (1) practice his religion and continue the religious practices of Singularism, as deity had instructed him to do, under the prospect of escalated threats from law enforcement and promised prosecution or (2) give up his sincerely held religious beliefs, disband Singularism, give up his and others' livelihoods through the religious business arm of Singularism, Psyche Healing and Bridging, and turn away voyagers expecting to access the divine under Singularism's careful watch.

47. This distress continues to the present and increased when, the next day, on November 12, 2024, Captain Wolken served Singularism's landlord with a letter, threatening that

if he did not evict Singularism from their rented space, that law enforcement would pursue the landlord for civil abatement and forfeiture. *See* Exhibit D.

48.     The letter, written with a header containing Chief Beebe's name, asserted, without any basis in evidence, that Singularism was performing "illegal and dangerous activity" and that "residents in that neighborhood . . . are living in unnecessary fear and danger . . ." *Id.*

49.     As stated above, no incidents of any kind have ever occurred at or around Singularism's religious center related to Singularism's religious practices, apart from one voyager that did not disclose information regarding her mental health. Neither Singularism, nor its landlord, are aware of any complaint to either of them regarding Singularism's spiritual practices. The business park in which Singularism's spiritual center strictly enforces rules and security of the premises and has never made any complaint.

50.     Singularism's landlord responded to Captain Wolken and the Provo City Police Department. In his letter, he asserted that he understood that Singularism was taking legal action to protect their religious rights. Because of that, he asserted that if he evicted Singularism as law enforcement desired, he would expose himself to potential liability for religious discrimination in his renting practices. *See* Exhibit E.

51.      The landlord also stated that he had not observed any behavior that would prompt any concern. He stated that his employees present in the same building have not reported feeling unsafe or threatened by Singularism's presence. Additionally, he stated that he had not seen any questionable activity nor any unsavory people coming or going from Singularism's spiritual center. He stated that, if anything, "they have been exemplary tenants."

*Criminal Charges Are Brought Against Mr. Jensen*

15

52.     On December 18, 2024, following the Court's issue of a temporary restraining order in this action, Defendant Utah County and Utah County Attorney Jeffrey Gray, acting on behalf of the State of Utah, filed criminal charges against Mr. Jensen related to the allegations above. The criminal Information in the matter styled as *State of Utah v. Bridger Lee Jensen*, Case No. 241404407 (Fourth District, Utah County, State of Utah), charges Mr. Jensen with (1) Possession of Psilocybin with Intent to Distribute, a Second Degree Felony; (2) Possession or Use of Tetrahydrocannabinol (THC), a Class B Misdemeanor; and (3) Use or Possession of Drug Paraphernalia, a Class B Misdemeanor.

*Provo City Confirms That Singularism Is a Religious Organization*

53.     On January 13, 2025, following Singularism's attempt to renew a business license Singularism understood it may need to operate, Defendant Provo City sent Singularism a letter which confirmed that Provo City deems Singularism a church or religious organization, attached here as <u>Exhibit I</u>:

> This letter is to confirm that, under Provo City Code sec. 6.01.130, churches or religious organizations are not required to obtain a business license to operate. This exemption is limited to activities directly associated with religious purposes. Application LCB202400923 for Singularism has been closed.
> If your organization engages in activities outside the scope of religious operations, such as running a commercial enterprise or selling goods, additional regulations may apply, and compliance will be required.

54.     Provo City Code Section 6.01.130 states

> Unless otherwise provided in this Title, the provisions of this Title shall not be construed to require a business license for an activity which is conducted, managed or carried on wholly for charitable, religious or other non-profit purposes from which profit is not derived, directly or indirectly by any person. Qualification under the federal tax laws for non-profit status shall be prima facie evidence that a person has the charitable, religious or non-profit purposes described above.

55.     Provo City Code Section 6.01.140 states

16

With respect to exemptions from business license requirements claimed because of charitable, religious or other nonprofit status, the person claiming the exemption shall have the burden of establishing that exemption.

*The Utah Code Exempts Other Secular and Religious Uses of Controlled Substances*

56.    The Utah Code contains explicit exemptions for secular and religious uses of psilocybin and other controlled substances:

a.    First, in 2024, the Utah Legislature passed S.B. 266 Medical Amendments, now codified within the Utah Controlled Substances Act at Utah Code § 58-37-3.5 ("Utah Psilocybin Act"). The Act grants broad permission to the largest healthcare systems in the state to develop and administer psilocybin programs for secular, medicinal usage. The Act places very few limitations on the healthcare systems' ability to determine how, when, where, to whom, and for what reason psilocybin is administered to patients and only requires the healthcare systems to report to the legislature on July 1, 2026. Through the Act, the Utah Legislature has made psilocybin accessible to the general public for secular, medical reasons.

b.    Second, the Utah Controlled Substances Act also contains an exemption for secular, medicinal usage of cannabis. Utah Code § 58-37-3.7(2)-(5); *see also* Utah Code § 58-37-3.6(2)-(3); Utah Code § 58-37-3.8. Accordingly, the Utah Code also treats cannabis usage as a protected class status in the context of public employment. *See* Utah Code § 34A-5-115.

c.    Third, the Utah Controlled Substances Act also contains an exemption for religious usage of peyote, but only for a single racial, ethnic, and/or religious group, Native Americans. Utah Code § 58-37-8(12); Utah Code § 58-37-2(1)(w).

17

App-4:114

d.  Fourth, the Utah Controlled Substances Act permits Utah authorities to waive the Act's "licensure requirement [if] consistent with public health and safety." Utah Code § 58-37-6(2)(d).

57.  Additionally, the Utah Mental Health Professional Practice Act grants exemptions from licensure in at least two contexts:

a.  First, the Utah Mental Health Professional Practice Act permits "a recognized member of the clergy while functioning in a ministerial capacity" to practice mental health therapy "as long as the member of the clergy does not represent that the member of the clergy is, or use the title of, a license classification" included in the Act. Utah Code § 58-60-107(2)(b).

b.  Second, the Utah Mental Health Professional Practice Act permits individuals to practice hypnosis on others without a license in order to achieve mental and physical outcomes, as long as the individual (1) "induces a hypnotic state in a client for the purpose of increasing motivation or altering lifestyles or habits, such as eating or smoking, through hypnosis;" (2) "consults with a client to determine current motivation and behavior patterns;" (3) "prepares the client to enter hypnotic states by explaining how hypnosis works and what the client will experience;" (4) "tests clients to determine degrees of suggestibility;" (5) "applies hypnotic techniques based on interpretation of consultation results and analysis of client's motivation and behavior patterns;" and (6) "trains clients in self-hypnosis conditioning." Utah Code § 58-60-107(2)(d)(i).

*Utah and Other Authorities Have Permitted the Religious Usage of Psilocybin and Other Entheogenic Substances*

18

58.     Upon information and belief, other entheogenic religious organizations continue to worship in Utah without interference from Utah authorities, including Defendants.

59.     For example, a larger religious organization called "The Divine Assembly" appears to operate openly and without recourse under the same religious protections that should protect Singularism. It holds regular meetings with its members in Orem, Utah. On its website, The Divine Assembly discusses the legality of its worship involving psilocybin, offers church membership cards in exchange for a $75 fee, offers certificates of ministry, offers mushroom-growing kits and instructions, and advertises an event called "Psychedelics in the Beehive."[2]

60.     Psychedelics in the Beehive is an expansive event which, as it self-describes, "evolved from a conference and expo into a dynamic three-day festival" in downtown Salt Lake City, Utah. The event invites "attendees to explore new perspectives on psychedelics through a blend of learning and creative expression" and connects "Utah's diverse plant medicine community, bringing together experts, leaders, business owners, and newcomers to collaborate and choose their own path in exploring psychedelics."[3] The festival's next event is slated for January 24-26, 2025 and attendees will be able to choose to participate in religious psilocybin ceremonies under the same religious protections that should protect Singularism.[4]

---

[2]     *The Divine Assembly*, THE DIVINE ASSEMBLY, available at, https://www.thedivineassembly.org/.

[3]     *About Psychedelics in the Beehive*, PSYCHEDELICS IN THE BEEHIVE, available at, https://psychedelicsinthebeehive.org/explore.

[4]     *Worship at Psychedelics in the Beehive*, PSYCHEDELICS IN THE BEEHIVE, available at, https://psychedelicsinthebeehive.org/ceremonies.

19

61.     Additional organizations, such as Oklevueha Native American Church, centered in Spanish Fork, Utah, and Temple of Hermes, in Salt Lake City, Utah, openly practice their religious rites which include entheogenic practices, including in ceremonies occurring in Heber, Utah.

62.     Following a complaint made to the Utah Department of Commerce's Division of Professional Licensing ("DOPL") that Mr. Jensen was practicing therapy without a license, DOPL conducted an investigation during which Mr. Jensen provided a statement asserting his practice of religious therapy under the clergy licensure exemption under the Utah Mental Health Professional Practice Act. Following DOPL's investigation, on November 19, 2024, DOPL informed Mr. Jensen that "it was decided this complaint would be closed as 'unfounded'. This means DOPL is not taking any action and [is] closing this complaint out with no further action taken at this time." *See* Exhibit H.

63.     Elsewhere in the country, authorities and courts have affirmed the religious rights of sincere individuals and organizations to conduct religious ceremonies with controlled substances.

64.     For example, the U.S. Supreme Court, under the federal Religious Freedom Restoration Act, famously confirmed a Christian Spiritist sect's religious exemption from the federal Controlled Substances Act for the religious consumption of hoasca, an entheogenic and sacramental tea made from plants unique to the Amazon region. *See Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 425 (2006).

65.     More recently, the Court of Appeals for the Ninth Circuit affirmed, under the federal Religious Freedom Restoration Act, not only (1) an entheogenic church's religious exemption from the federal Controlled Substances Act for the religious use of Daime tea, but also

20

App-4:117

(2) the church's entitlement to attorney fees for the government's violation of their religious rights. *See Church of Holy Light of Queen v. Holder*, 443 F. App'x 302 (9th Cir. 2011); *Church of the Holy Light of the Queen v. Holder*, 584 F. App'x 457 (9th Cir. 2014).

66.     And in April 2024, several federal agencies, including the Drug Enforcement Administration, entered into a public settlement agreement with an entheogenic church regarding the importation and religious use of ayahuasca, following a federal district court's confirmation of the church's religious exemption under the federal Religious Freedom Restoration Act. *See* Exhibits F and G.

67.     In light of these instances of agency and judicial confirmation of entheogenic religious rights, together with the open, public, and unprosecuted religious and secular usage of psilocybin and other entheogenic substances in Utah, and the various codified exemptions in the Utah Religious Freedom Restoration Act, Utah's Controlled Substances Act, and the Utah Mental Health Professional Practice Act, Provo City and Defendant Gray's instruction to Detective Julian and Sergeant Rowberry, Detective Wolfgramm, and Detective Graham that no religious exemption related to psilocybin from the Utah Controlled Substances Act is possible, and to proceed to search Singularism, seize its sacramental psilocybin and scriptural records, and thereafter prosecute Mr. Jensen, amounts to knowing disregard, or, at least, reckless disregard, of Singularism's religious rights. The law has clearly established that sincere religious individuals and entheogenic organizations in the precise circumstance presented in this case have a right to their religious practice without governmental interference.

68.     Defendants violated clearly established law when, despite knowledge of Plaintiffs' religious sincerity, they made statements to the media which caused Singularism's financial

accounts to be compromised and, through law enforcement, sought a search warrant without probable cause when Defendants knew or should have known Plaintiffs' religious practices were lawful, detained Mr. Jensen, searched Singularism's religious center, seized Singularism and Psyche Healing and Bridging's sacramental psilocybin and other items, threatened Mr. Jensen with criminal prosecution and thereafter brought criminal charges against Mr. Jensen, and threatened Singularism's landlord that if he did not evict Singularism from its rented space, law enforcement would pursue the landlord for civil abatement.

69.    As a result of Defendants' statutory and constitutional violations, Plaintiffs have been deprived of the possession and usage of their sacramental psilocybin, have been deprived of precious scripture regarding Singularism's voyagers, have been placed under threat of eviction, have been placed under threat of criminal prosecution and criminal forfeiture, their livelihoods have been threatened, their financial accounts have been compromised, and they have endured substantial emotional and mental distress. It is anticipated that the course of Defendants' conduct will only deepen the present and future harms to Plaintiffs' statutory and constitutional religious rights. For example, Plaintiffs expect that Singularism's religious community will be irreparably diminished, voyagers will no longer feel safe participating in a Singularism ceremony, and Psyche Bridging and Healing, as a result, will sustain substantial financial losses to the point of closure.

70.    Additionally, to defend their statutory and constitutional religious rights, Plaintiffs were forced to incur substantial attorney fees and costs in bringing this Complaint and an accompanying motion for temporary restraining order and preliminary injunction.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
*42. U.S.C. § 1983 and the First Amendment to the U.S. Constitution*

22

71.     Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

72.     At all times relevant hereto, Plaintiffs had clearly established rights under the First Amendment of the United States Constitution to, according to their sincere religious beliefs, freely exercise their entheogenic religious ceremonies utilizing entheogenic substances such as psilocybin.

73.     At all times relevant hereto, and in performance of the acts set forth herein, Defendants Utah County, Provo City, and Gray acted under color of state law, as were the law enforcement officers acting under their direction, Chief Beebe, Captain Wolken, Detective Julian, Sergeant Rowberry, Detective Wolfgramm, and Detective Graham.

74.     At all times relevant hereto, and in performance of the acts set forth herein, Defendants actively and personally caused the violation of constitutional rights alleged herein.

75.     Defendants' conduct alleged herein—including, but not limited to, making statements to the media which caused Singularism's financial accounts to be compromised and, through law enforcement, seeking a search warrant without probable cause when Defendants knew or should have known Plaintiffs' religious practices were lawful, detaining Mr. Jensen, threatening to bring criminal charges against Mr. Jensen and thereafter bringing criminal charges against Mr. Jensen, searching Singularism's religious center, seizing Singularism's sacramental psilocybin and other items, and threatening Singularism's landlord to evict Singularism from its rented space— violated Plaintiffs' constitutional rights.

76.     Defendants' enforcement of the Utah Controlled Substances Act to specifically prohibit Plaintiffs' usage of psilocybin is not essential to furthering any compelling government interest.

77.     Defendants possess less restrictive means of furthering any governmental interest they may have in specifically prohibiting Plaintiffs' usage of psilocybin.

78.     The unlawful misconduct of Defendants was objectively unreasonable, flagrantly unlawful, and undertaken intentionally with willful indifference to Plaintiffs' rights.

79.     Defendants' actions violated Plaintiffs' clearly established constitutional rights of which reasonable police officers are or should be aware.

80.     Utah County and Provo City are liable for the actions described herein because (collectively and in the alternative):

   a. The actions were caused or directed by the Provo City Attorney's Office and/or Defendant Gray, final decision-making authorities;

   b. The fact that multiple members of the Provo City Police Department, including the Chief, Captain, Detectives, and Sergeant, undertook patently unlawful conduct, suggests a complete or reckless lack of training on a subject that officers will encounter on a regular basis.

81.     Defendants' unlawful actions caused Plaintiffs to incur costs related to their compromised financial accounts; defending against the unlawful detention, search, and seizure, as well as criminal charges; and other actual damages.

82.     Plaintiff is further entitled to attorney fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest, and costs as allowable by law.

## SECOND CLAIM FOR RELIEF
*Article I, Section 4 of the Utah Constitution*

83.     Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

84.     At all times relevant hereto, Plaintiffs had clearly established rights under Article I, Section 4 of the Constitution, which exceed the protections afforded under the First Amendment to the U.S. Constitution, to, according to their sincere religious beliefs, freely exercise their entheogenic religious ceremonies utilizing entheogenic substances such as psilocybin.

85.     Since 1993, the Utah Supreme Court has stated that a free exercise analysis conducted under the First Amendment "does not control [the] analysis under the Utah Constitution," *Soc'y of Separationists, Inc. v. Whitehead*, 870 P.2d 916, 930 (Utah 1993), and has indicated strict scrutiny review likely applies. *See Snyder v. Murray City Corp.*, 124 F.3d 1349, 1354 (10th Cir. 1997); *Summum v. Pleasant Grove City*, 2015 UT 31, ¶ 7, 345 P.3d 1188; *Jeffs v. Stubbs*, 970 P.2d 1234, 1249 (Utah 1998); *State v. Green*, 2004 UT 76, ¶ 70 n.1, 99 P.3d 820 (Durrant, J., concurring); *State v. Holm*, 2006 UT 31, ¶ 34 n.8, 137 P.3d 726.

86.     At all times relevant hereto, and in performance of the acts set forth herein, Defendants Utah County, Provo City, and Gray acted under color of state law, as were the law enforcement officers acting under their direction, Chief Beebe, Captain Wolken, Detective Julian, Sergeant Rowberry, Detective Wolfgramm, and Detective Graham.

87.     At all times relevant hereto, and in performance of the acts set forth herein, Defendants actively and personally caused the violation of constitutional rights alleged herein.

88.     Defendants' conduct alleged herein—including, but not limited to, making statements to the media which caused Singularism's financial accounts to be compromised and,

25

App-4:122

through law enforcement, seeking a search warrant without probable cause when Defendants knew or should have known Plaintiffs' religious practices were lawful, detaining Mr. Jensen, threatening to bring criminal charges against Mr. Jensen and thereafter bringing criminal charges against Mr. Jensen, searching Singularism's religious center, seizing Singularism's sacramental psilocybin and other items, and threatening Singularism's landlord to evict Singularism from its rented space—violated Plaintiffs' constitutional rights.

89.     Defendants' enforcement of the Utah Controlled Substances Act to specifically prohibit Plaintiffs' usage of psilocybin is not essential to furthering any compelling government interest.

90.     Defendants possess less restrictive means of furthering any governmental interest they may have in specifically prohibiting Plaintiffs' usage of psilocybin.

91.     The unlawful misconduct of Defendants was objectively unreasonable, flagrantly unlawful, and undertaken intentionally with willful indifference to Plaintiffs' rights.

92.     Defendants' actions violated Plaintiffs' clearly established constitutional rights of which reasonable police officers are or should be aware.

93.     Utah County and Provo City are liable for the actions described herein because (collectively and in the alternative):

a.     The actions were caused or directed by the Provo City Attorney's Office and/or Defendant Gray, final decision-making authorities;

b.     The fact that multiple members of the Provo City Police Department, including the Chief, Captain, Detectives, and Sergeant, undertook patently unlawful conduct,

26

suggests a complete or reckless lack of training on a subject that officers will encounter on a regular basis.

94.    Defendants' unlawful actions caused Plaintiffs to incur costs related to their compromised financial accounts; defending against the unlawful detention, search, and seizure, as well as criminal charges; and other actual damages.

95.    Plaintiff is further entitled to attorney fees and costs, pre-judgment interest, and costs as allowable by law.

## THIRD CLAIM FOR RELIEF
*Utah Religious Freedom Restoration Act*

96.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

97.    At all times relevant hereto, Plaintiffs had clearly established rights under the Utah Religious Freedom Restoration Act, Utah Code § 63G-33-101 *et seq.*, which exceed the protections afforded under Article I, Section 4 of the Constitution and the First Amendment to the U.S. Constitution, to, according to their sincere religious beliefs, freely exercise their entheogenic religious ceremonies utilizing entheogenic substances such as psilocybin.

98.    At all times relevant hereto, and in performance of the acts set forth herein, Defendants Utah County, Provo City, and Gray acted under color of state law, as were the law enforcement officers acting under their direction, Chief Beebe, Captain Wolken, Detective Julian, Sergeant Rowberry, Detective Wolfgramm, and Detective Graham.

99.    At all times relevant hereto, and in performance of the acts set forth herein, Defendants actively and personally caused the violation of statutory rights alleged herein.

27

100.    Defendants' conduct alleged herein—including, but not limited to, making statements to the media which caused Singularism's financial accounts to be compromised and, through law enforcement, seeking a search warrant without probable cause when Defendants knew or should have known Plaintiffs' religious practices were lawful, detaining Mr. Jensen, threatening to bring criminal charges against Mr. Jensen and thereafter bringing criminal charges against Mr. Jensen, searching Singularism's religious center, seizing Singularism's sacramental psilocybin and other items, and threatening Singularism's landlord to evict Singularism from its rented space— violated Plaintiffs' statutory rights.

101.    Defendants' conduct alleged herein substantially burdened Plaintiffs' free exercise of religion by, but not limited to, constraining, limiting, and denying Plaintiffs' free exercise of religion; compelling Plaintiffs to act, or fail to act, in a manner contrary to Plaintiffs' free exercise of religion; and assessing criminal, civil, or administrative penalties or damages on Plaintiffs.

102.    Defendants' enforcement of the Utah Controlled Substances Act to specifically prohibit Plaintiffs' usage of psilocybin is not essential to furthering any compelling government interest.

103.    Defendants possess less restrictive means of furthering any governmental interest they may have in specifically prohibiting Plaintiffs' usage of psilocybin.

104.    The unlawful misconduct of Defendants was objectively unreasonable, flagrantly unlawful, and undertaken intentionally with willful indifference to Plaintiffs' rights.

105.    Defendants' actions violated Plaintiffs' clearly established statutory rights of which reasonable police officers are or should be aware.

106.    Utah County and Provo City are liable for the actions described herein because (collectively and in the alternative):

a.    The actions were caused or directed by the Provo City Attorney's Office and/or Defendant Gray, final decision-making authorities;

b.    The fact that multiple members of the Provo City Police Department, including the Chief, Captain, Detectives, and Sergeant, undertook patently unlawful conduct, suggests a complete or reckless lack of training on a subject that officers will encounter on a regular basis.

107.    Defendants' unlawful actions caused Plaintiffs to incur costs related to their compromised financial accounts; defending against the unlawful detention, search, and seizure, as well as criminal charges; and other actual damages.

108.    Plaintiff is further entitled to attorney fees and costs pursuant to Utah Code § 63G-33-201(6), pre-judgment interest, and costs as allowable by law.

109.    The notice of claim provision of Utah's Religious Freedom Restoration Act, *see* Utah Code § 63G-33-201(5), does not apply to this action. Defendants' wrongful actions are ongoing and complying with the notice of claim provision will place an undue hardship on Plaintiffs and increase the harm suffered and to be suffered by Plaintiffs. Further, the harm alleged herein is likely to occur or reoccur before the end of the 60-day period described in the notice of claim provision.

### FOURTH CLAIM FOR RELIEF
*42. U.S.C. § 1983 and the Fourth Amendment to the U.S. Constitution*

110.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

111. At all times relevant hereto, Plaintiffs had clearly established rights under the Fourth Amendment of the United States Constitution to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, and that no warrants shall issue against them without probable cause.

112. At all times relevant hereto, and in performance of the acts set forth herein, Defendants Utah County, Provo City, and Gray acted under color of state law, as were the law enforcement officers acting under their direction, Chief Beebe, Captain Wolken, Detective Julian, Sergeant Rowberry, Detective Wolfgramm, and Detective Graham.

113. At all times relevant hereto, and in performance of the acts set forth herein, Defendants actively and personally caused the violation of constitutional rights alleged herein.

114. Defendants' conduct alleged herein—including, but not limited to, through law enforcement, seeking a search warrant without probable cause when Defendants knew or should have known Plaintiffs' religious practices were lawful, detaining Mr. Jensen, threatening to bring criminal charges against Mr. Jensen and thereafter bringing criminal charges against Mr. Jensen, searching Singularism's religious center, seizing Singularism's sacramental psilocybin and other items, and threatening Singularism's landlord that if he did not evict Singularism from their rented space then law enforcement would pursue the landlord for civil abatement and forfeiture—violated Plaintiffs' constitutional rights.

115. The unlawful misconduct of Defendants—done without probable cause—was objectively unreasonable, flagrantly unlawful, and undertaken intentionally with willful indifference to Plaintiffs' rights.

116.     Defendants' actions violated Plaintiffs' clearly established constitutional rights of which reasonable police officers are or should be aware.

117.     Utah County and Provo City are liable for the actions described herein because (collectively and in the alternative):

   a. The actions were caused or directed by the Provo City Attorney's Office and/or Defendant Gray, final decision-making authorities;

   b. The fact that multiple members of the Provo City Police Department, including the Chief, Captain, Detectives, and Sergeant, undertook patently unlawful conduct, suggests a complete or reckless lack of training on a subject that officers will encounter on a regular basis.

118.     Defendants' unlawful actions caused Plaintiffs to incur costs in defending against the unlawful detention, search, and seizure, the criminal charges, the threatened eviction action, and other actual damages.

119.     Plaintiff is further entitled to attorney fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest, and costs as allowable by law.

## FIFTH CLAIM FOR RELIEF
*Article I, Section 14 of the Utah Constitution*

120.     Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

121.     At all times relevant hereto, Plaintiffs had clearly established rights under the Article 1, Section 14 to the Utah Constitution that they shall be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause.

122.    At all times relevant hereto, and in performance of the acts set forth herein, Defendants Utah County, Provo City, and Gray acted under color of state law, as were the law enforcement officers acting under their direction, Chief Beebe, Captain Wolken, Detective Julian, Sergeant Rowberry, Detective Wolfgramm, and Detective Graham.

123.    At all times relevant hereto, and in performance of the acts set forth herein, Defendants actively and personally caused the violation of constitutional rights alleged herein.

124.    Defendants' conduct alleged herein—including, but not limited to, through law enforcement, seeking a search warrant without probable cause when Defendants knew or should have known Plaintiffs' religious practices were lawful, detaining Mr. Jensen, threatening to bring criminal charges against Mr. Jensen and thereafter bringing criminal charges against Mr. Jensen, searching Singularism's religious center, seizing Singularism's sacramental psilocybin and other items, and threatening Singularism's landlord that if he did not evict Singularism from their rented space then law enforcement would pursue the landlord for civil abatement and forfeiture— violated Plaintiffs' constitutional rights.

125.    The unlawful misconduct of Defendants—done without probable cause—was objectively unreasonable, flagrantly unlawful, and undertaken intentionally with willful indifference to Plaintiffs' rights.

126.    Defendants' actions violated Plaintiffs' clearly established constitutional rights of which reasonable police officers are or should be aware.

127.    Utah County and Provo City are liable for the actions described herein because (collectively and in the alternative):

a. The actions were caused or directed by the Provo City Attorney's Office and/or Defendant Gray, final decision-making authorities;

b. The fact that multiple members of the Provo City Police Department, including the Chief, Captain, Detective, and Sergeant, undertook patently unlawful conduct, suggests a complete or reckless lack of training on a subject that officers will encounter on a regular basis.

128. Defendants' unlawful actions caused Plaintiffs to incur costs in defending against the unlawful detention, search, and seizure, the criminal charges, the threatened eviction action, and other actual damages.

129. Plaintiff is further entitled to attorney fees and costs, pre-judgment interest, and costs as allowable by law.

**SIXTH CLAIM FOR RELIEF**
*Declaratory and Injunctive Relief*

130. Plaintiffs incorporate all other allegations of this Complaint as if fully set forth herein.

131. Defendants' conduct has caused and will cause Plaintiffs to suffer irreparable harm.

132. Plaintiffs intend to continue their religious ceremonial usage of psilocybin. Unless this Court enjoins Defendants, Defendants will continue to cause irreparable harm to Plaintiffs through violation of their free exercise of religion.

133. Plaintiffs fear that, without a court order, they will again be subjected to harassment, threats, arrest, criminal charges, forfeiture, eviction, and other retaliation and actions violative of their constitutional and statutory rights.

134. Plaintiffs are likely to succeed on the merits of their constitutional claims.

135.   Plaintiffs are likely to suffer the same violations upon their future performance of their religious sacraments in Provo City and Utah County.

136.   The continued injury to Plaintiffs outweighs any damage to Defendants that could be caused by an injunction. Plaintiffs allege there is no damage to Defendants because there are no negative impacts to the community because of Singularism's private, safe, and controlled religious ceremonies.

137.   An injunction is in the public interest, as the U.S. Supreme Court, Utah Supreme Court, and the Utah Legislature has repeatedly recognized that religious free exercise is a fundamental right which merits protection and that there exist circumstances, both religious and secular, in which entheogenic substances are a public good.

138.   Plaintiffs are entitled to a declaration that Defendants have violated Plaintiffs' constitutional and statutory religious free exercise rights. The Court should enter injunctive relief against Defendants requiring that Defendants cease their unlawful violation of Plaintiffs' religious free exercise.

App-4:131

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request the entry of judgment in their favor and against Defendants as follows:

1.      A declaratory judgment, pursuant to Utah Code § 78B-6-401, declaring that Defendants' actions violated Plaintiffs' First Amendment right of religious free exercise.

2.      A declaratory judgment, pursuant to Utah Code § 78B-6-401, declaring that Defendants' actions violated Plaintiffs' right of religious free exercise under Article I, Section 4 of the Utah Constitution.

3.      A declaratory judgment, pursuant to Utah Code § 78B-6-401, declaring that Defendants' actions violated Plaintiffs' right of religious free exercise under the Utah Religious Freedom Restoration Act.

4.      A declaratory judgment, pursuant to Utah Code § 78B-6-401, declaring that Defendants' actions violated Plaintiffs' rights under the Fourth Amendment of the United States Constitution to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, and that no warrants shall issue against them without probable cause.

5.      A declaratory judgment, pursuant to Utah Code § 78B-6-401, declaring that Defendants' actions violated Plaintiffs' rights under Article 1, Section 14 to the Utah Constitution that they shall be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated, and that no warrant shall issue but upon probable cause.

6.      Injunctive relief ordering the return of all items seized by Defendants from Singularism's spiritual center.

7.    Injunctive relief temporarily and permanently enjoining Defendants from prosecuting Plaintiffs' sincere free exercise of religion, threatening Singularism's eviction, or otherwise acting to interfere with Plaintiffs' sincere free exercise of religion regarding its religious entheogenic ceremonies.

8.    A judgment awarding compensation to Plaintiffs for their economic and noneconomic loss and other personal injury resulting from the violations of their constitutional and statutory rights. Although the precise value of these damages is presently unknown, will increase as Defendants' unlawful conduct continues, and will be determined by the jury at trial, it is expected the value of the damages at the time of trial will exceed $100,000.

9.    A judgment assessing punitive damages against the individual Defendants.

10.    A judgment awarding Plaintiffs their costs of suit, including reasonable attorney fees and litigation expenses, under 42 U.S.C. § 1988, Utah Code § 63G-33-201(6), and other applicable law.

11.    A judgment awarding Plaintiffs pre- and post-judgment interest to the extent permitted by law.

12.    Nominal damages to the extent a factfinder determines that a particular constitutional violation did not cause actual damages.

13.    Such other and further relief as this Court may deem just and proper.

Respectfully submitted this 5th day of February, 2025

/s/ *Tanner J. Bean*
Tanner J. Bean
Jacqueline M. Rosen
FABIAN VANCOTT
*Attorneys for Plaintiffs*

App-4:133

## **VERIFICATION**

I declare that the matters stated in the above Verified Complaint are within my personal knowledge or are based upon my review of the records kept in the regular course of Plaintiff's business. Based upon the information so obtained and compiled, which I believe to be accurate, I believe the facts stated in the foregoing Verified Complaint are true and correct and are based on a reasonable inquiry, and I make this verification to the best of my information and belief. I declare under criminal penalty under the laws of the State of Utah that the foregoing is true and correct.

DATED this 5th day of February, 2025.

*/s/ Bridger Lee Jensen*
Bridger Lee Jensen
*(signed with permission granted to Tanner J. Bean via email on February 5, 2025)*

# EXHIBIT A



### Participant Identification:

I, _____, hereinafter referred to as "the Participant," willingly enter into this agreement on this day, _____, in relation to my participation in the psychedelic ceremonies conducted as part of the religious practices of Singularism.

### Introduction and Purpose:

This document serves as a comprehensive informed consent and waiver for my voluntary participation in the ceremonial use of psychedelic substances within the religious context of Singularism. It is intended to ensure that I am fully informed about the nature, potential benefits, and risks associated with the use of psychedelics in these ceremonies.

This document acts as an informed consent and comprehensive waiver for individuals like myself who are engaging in Singularism's sacred ceremonies involving the use of psychedelic substances. Participation is entirely voluntary and predicated on a full understanding and acknowledgment of the ceremonial, spiritual, and religious context of this practice. This document is intended to provide complete transparency about the benefits, risks, and nature of psychedelic use in our religious ceremonies.

## DECLARATIONS:

### Legal declaration of Rights:

I declare that my participation in the psychedelic ceremonies of Singularism is protected under the United States Constitution, legal precedent, and case law, specifically under the provisions for the free exercise of religion. I understand that this right is recognized and upheld in the context of religious practices, and I assert that my participation in these ceremonies is a lawful expression of my religious freedom.

While I am aware that my participation is under the protection of the United States Constitution, I also understand that local municipalities and state governments may have differing interpretations and may mistakenly view such ceremonies as illegal. I recognize that these variations in interpretation exist and that legal protections for religious practices, especially those involving entheogenic substances, may not be uniformly recognized or applied across different jurisdictions.

### Declaration of Sincerity and Honesty:

I affirm that I have represented myself sincerely and honestly in all interactions with the facilitators of Singularism. I have been truthful in my statements during the screening and preparation process. I have disclosed all relevant information about my health, mental state, and any other factors that may impact my participation in the ceremony. This disclosure is essential to assist the guides in making informed decisions for the safety and benefit of everyone involved.



### Declaration of Personal Spiritual Necessity:

I recognize and sincerely declare that participating in this entheogenic ceremony is a vital and central component of my spiritual well-being. While I understand that not everyone will consider this path essential, I ask for understanding and respect for my personal belief in the significance of this ceremony to my personal spiritual pursuits. I assert my legal right to participate in this religious ceremony, firmly believing it to be integral to my spiritual journey. I enter this ceremony with a deep conviction, informed by thorough self-education and external research, that this experience is indispensable for my spiritual development and religious exploration. I view this ceremony as a crucial step in my ongoing quest for spiritual growth and understanding, essential to my life's spiritual journey.

### Declaration of Voluntary Participation:

By signing this document, I confirm that my decision to participate in the ceremony is made willingly and with full awareness of its nature. I acknowledge that my participation is a conscious choice, free from any external pressures or expectations. I affirm that I am over 18 years of age, in sound mind, and acting in good faith of my own volition.

### Declaration of informed Consent:

By signing this document, Participants affirm that they have received thorough information regarding the ceremony, have had the opportunity to ask questions and express concerns, and have received satisfactory responses. They acknowledge their participation is of their own free will, without any undue pressure or persuasion.

## ACKNOWLEDGMENTS:

### Acknowledgment of Religious and Spiritual Context:

Participants expressly acknowledge and understand that Singularism's use of psychedelics is a deeply religious and spiritual practice. It is conducted in a sacred, respectful manner and is central to our religious beliefs and spiritual explorations. This practice is not recreational, nor clinical whatsoever. This ceremony is a significant part of our spiritual journey and religious expression.

### Acknowledgment  Non-Clinical Nature of Ceremonial Practice:

Participants acknowledge and understand that the psychedelic ceremonies conducted under the auspices of Singularism are strictly religious and spiritual in nature and are not intended to be clinical or therapeutic interventions. Singularism and its facilitators make no clinical claims regarding the efficacy of these practices for the treatment or alleviation of any medical or psychological conditions.These ceremonies do not replace professional medical advice, diagnosis, or treatment. Participants are encouraged to continue any ongoing medical treatments and consult with healthcare professionals regarding their participation in these ceremonies.

### Acknowledgment of Non Licensure:



I understand and acknowledge that Singularism does not operate its sessions under any clinical license whatsoever. If any employee, facilitator, or individual associated with Singularism happens to hold a professional license in another field, I recognize that their licensure is entirely separate and not related to their work and activities within Singularism. The roles and activities undertaken in the context of Singularism's ceremonies are distinct from any licensed professional capacities that these individuals might hold outside of this religious setting.

### Acknowledgment of Religious Inclusivity:

I further acknowledge and respect that Singularism does not require "religious exclusivity" from its adherents. I understand that participation in Singularism's ceremonies does not necessitate forgoing or abandoning my affiliations, beliefs, or practices in other religions. Rather, Sinuglaism teaches religious inclusivity. I recognize that Singularism respects the coexistence of multiple spiritual paths and that my involvement in these ceremonies is a personal choice, made in accordance with my own spiritual and mental well-being needs. My participation in Singularism's ceremonies is a testament to my sincere commitment to exploring diverse spiritual experiences as I deem necessary for my personal growth and development.

### Preparation and Education Acknowledgement:

Participants confirm that they have undertaken adequate preparation for the ceremony. This includes self-education about the nature of psychedelic experiences and consultation with outside resources or experts as needed. Participants affirm that they have been provided with sufficient information and resources by Singularism to make an informed decision about their participation.

### Medical Advisory Acknowledgment:

I acknowledge that while Singularism's ceremonies incorporate clinical insights and prioritize safety, they operate within a religious context, not a medical one. I understand the importance of consulting with a medical professional about my participation, especially if I'm undergoing psychopharmacological treatment. The advice from Singularism's staff, despite being informed, is not a substitute for licensed and qualified professional medical advice, and we acknowledge their clinical advice supersedes our spiritual advice in medical and physical matters. Singualrsim always advises that you  seek your own medical council.  Therefore, I commit to seeking medical counsel to ensure my health and safety regarding any treatments I am receiving, or medical concerns I have.

This shortened version maintains the essential information about the importance of seeking medical advice and the non-medical nature of Singularism's ceremonies, while being more concise.

## AGREEMENTS:

### Commitment to Safety and Guidance:

I, the participant, commit to maintaining a safe environment during the ceremony and agree to follow all rules and instructions provided by the guides and facilitators. I understand that these guidelines are in



place to ensure the safety and well-being of all participants, including myself. I agree to listen attentively to my guide and adhere strictly to the established protocols throughout the ceremony.

## Ceremony Participation Agreement

As a Participant in Singularism ceremonies, I commit to following the guidance and instructions of the lead facilitator throughout the ceremony. I place my trust in the facilitator's expertise and agree to openly express any concerns or discomfort I may experience during the process. This commitment is made to ensure my physical and emotional safety, as well as to uphold the sanctity and integrity of the ceremony.

I understand the importance of communication and agree to voice my needs and concerns so that the facilitators can provide the necessary support to maintain a safe and supportive environment. By signing below, I acknowledge my understanding and agreement to the terms outlined above, committing to follow the lead facilitator's instructions and to communicate openly during Singularism ceremonies.

## Facility Stay Agreement

As a Participant in Singularism ceremonies, I agree to remain within the designated facility premises until my lead facilitator formally releases me at the conclusion of the ceremony. This agreement is in place to ensure my safety and the integrity of the ceremonial process, allowing for a fully immersive and secure experience. I understand that leaving the facility prematurely may compromise both my safety and the collective experience of all participants. **By signing below, I affirm my commitment to stay within the facility as required and to follow the release instructions provided by my lead facilitator.**

## No Driving Agreement:

I agree that I will not operate a vehicle under any circumstances on the day of the ceremony. Even if I feel capable of driving, I understand the importance of adhering to this rule for my safety and the safety of others. The effects of psychedelic substances used during the ceremony can be unpredictable, and my judgment may be impaired. I commit to arranging transportation to and from the ceremony location through a trusted friend, family member, or reliable ride service. This ensures that I do not have to drive under any circumstances, maintaining safety as a top priority.

## Audio Recording and Note Usage Policy and Consent Agreement:

By engaging in sessions with Singularism, clients acknowledge and consent to the potential audio recording of parts of their sessions and the use of handwritten notes as visuals, primarily for training purposes and occasionally for use in anonymized media clips. These recordings will be audio-only unless explicitly agreed otherwise, and any notes used will not contain identifiable personal information. Clients are assured that their confidentiality will be maintained in all materials.

## Phone Use Restriction:

I agree to not use my phone during the ceremony sessions without explicit permission from the guide. I understand that this guideline is in place for my emotional safety and to enhance the effectiveness of the sessions. Using a phone can be distracting and may disrupt the immersive and introspective nature of the



experience. I acknowledge that maintaining a phone-free environment is essential for creating a focused and conducive setting for all participants.

## DISCLOSURES:

### Potential Benefits: Transformative Potential of Psychedelic Experiences - Legal Disclosure:

As participants in this ceremony, you are embarking on a journey that has the potential to profoundly impact your personal and spiritual growth. The ceremonial use of psychedelics could lead to life-changing experiences and insights. Just a few of the many benefits include, but is not even remotely limited to:

1. Enhanced Self-Awareness: You may experience a deepening of self-understanding, peeling back layers of your consciousness to reveal a richer, more nuanced understanding of your identity and purpose.
2. Spiritual Awakening: Many participants report transformative spiritual experiences, feeling a profound connection to a greater existence beyond the physical realm. This awakening can offer new perspectives on life and existence.
3. Emotional Catharsis: The experience may facilitate a powerful release of pent-up emotions, leading to therapeutic and healing outcomes. It's not uncommon for participants to emerge with a sense of emotional renewal and resilience.
4. Deepened Connection with the Universe: You might find yourself experiencing an intense sense of unity and interconnectedness with the universe, nature, and fellow beings. This often leads to a greater sense of empathy and compassion.
5. Strengthened Sense of Interconnectedness: The feeling of being deeply connected with others and the environment around you can foster a sense of belonging and understanding, promoting harmony and empathy in your interactions.
6. Personal Development and Enlightenment: These experiences have the potential to contribute significantly to your personal development, providing insights and perspectives that can lead to a more enlightened, fulfilling life.

It is important to understand that while these experiences can be transformative and profound, they are subjective and can vary greatly from person to person. The journey you embark upon is unique to you, influenced by your personal mindset, environment, and life experiences.

### Disclosure of Risks and Side Effects:

Participants are thoroughly informed about the potential risks and side effects associated with the use of psychedelic substances, framed in an optimistic yet realistic manner. While many individuals experience positive and transformative effects, it's important to understand that reactions can vary:



1. Psychological Responses: In some rare instances, participants may experience temporary feelings of anxiety, confusion, or unpredictable emotional responses. These are typically short-lived and often contribute to a deeper understanding of personal emotions and thought processes.
2. Physical Reactions: Some individuals might encounter minor physical reactions such as mild nausea or slight dizziness. Changes in sensory perception, a common aspect of the psychedelic experience, are generally perceived as part of the journey towards greater self-awareness.
3. Worldview and Belief Systems: There's a possibility for long-term changes in personal belief systems and worldview. While this can be profound and positive, leading to a more open and inclusive perspective on life, it's important to approach this potential change with an open mind and readiness for personal growth.
4. Rare Cases: In very rare cases, more intense experiences can occur, including psychotic breaks that are impossible to screen or predict. These are usually in populations with specific predispositions and are not common in the general population.

It is important for participants to understand that these risks are inherent to the experience and can vary from person to person. This disclosure is provided not to dissuade but to ensure a fully informed, positive, and conscious decision to participate.

**<u>Health and Safety Considerations:</u>**

I affirm that I have provided a complete and honest disclosure of all relevant health information to the facilitators of Singularism. This includes a thorough account of my mental health history and any current physical health conditions. I understand the importance of this disclosure, as certain health conditions can increase the risk of adverse reactions during the ceremony.

In recognition of these risks, I commit to discussing any potential contraindications with my healthcare provider before participating in the ceremony. This discussion is a crucial step in ensuring my safety and well-being, as it helps in identifying any personal health factors that might influence my experience.

Furthermore, I acknowledge and appreciate the organization's commitment to maintaining rigorous safety protocols and providing continuous support throughout the ceremony. This commitment includes monitoring the ceremony environment, being responsive to participants' needs, and having measures in place to address any unexpected situations. I understand that this support is in place to foster a safe and nurturing space for my spiritual journey, but it does not substitute for my personal responsibility in assessing my fitness to participate.

By acknowledging this, I accept that while the organization takes extensive measures for safety, the nature of such experiences involves a degree of unpredictability, and I assume responsibility for my decision to partake in the ceremony."

This expanded statement emphasizes the participant's responsibility in disclosing their health information and consulting with healthcare providers, alongside acknowledging the organization's commitment to



safety and support.

### Recognition of Potential Risks and Assumption of Responsibility

While we at Singularism are committed to establishing and following groundbreaking best practices and standards of care in our ceremonies, it is important to recognize that, as with any human endeavor, mistakes can happen. Participants should be aware that despite our best efforts, there is an inherent risk associated with any activity involving psychedelic substances. By choosing to participate, you understand and assume all risks associated with this ceremony. This acknowledgment is not a reflection of an expectation of negative outcomes but is a standard precaution to ensure that participants are aware of their personal responsibility in choosing to partake in these ceremonies."

### Voluntary Participation and Comprehensive Informed Consent:

By signing this document, Participants affirm that they have received thorough information regarding the ceremony, have had the opportunity to ask questions and express concerns, and have received satisfactory responses. They acknowledge their participation is of their own free will, without any undue pressure or persuasion.

### Legal Release of Liability and Indemnification:

Participants agree to waive and release Singularism, its facilitators, organizers, and any associated parties from any liability or claims that may arise from their participation in the psychedelic ceremonies. They understand this waiver includes any unforeseen risks or outcomes not explicitly mentioned in this document.

### Provisions for Emergency Medical Care:
In the event of a medical emergency, Participants consent to receive necessary medical treatment and understand that the organization will take all appropriate actions to ensure their safety and well-being, including contacting emergency medical services if needed



**Supportive/Emergency Contact Authorization**

As a Participant of Singularism ceremonies, I recognize the value of having a supportive network available in times of need. I have selected three individuals with whom I feel both emotionally and physically safe. I grant Singularism unconditional permission to contact any of these individuals whenever a facilitator deems it necessary for my well-being or safety. I have informed them that they are being used as an emergency contact in this context

**Supportive/Emergency Contact 1:**

Contact Full Name:_____

Relationship to Participant:_____

Phone Number:_____

Email: _____

City of Residence:_____

**Supportive/Emergency Contact 2:**

Contact Full Name:_____

Relationship to Participant:_____

Phone Number:_____

Email: _____

City of Residence:_____

**Supportive/Emergency Contact 3:**

Contact Full Name:_____

Relationship to Participant:_____

Phone Number:_____

Email: _____

City of Residence:_____



## Intention Statement:

Participants are invited to state their intention for participating in the ceremony. This intention, while personal, plays a crucial role in shaping the individual's experience. It is understood that setting a clear and positive intention can significantly influence the nature of one's experience.

Intention (please write below):

_____

_____

## Confidentiality and Respect for Privacy:

Participants commit to respecting the privacy and confidentiality of all individuals involved in the ceremonies. They agree not to disclose sensitive information about the ceremonies or other participants without explicit permission.

## Acknowledgment and Binding Signature:

I, _____, hereby affirm that I have read, fully understand, and agree to all terms and conditions outlined in this waiver. I acknowledge that my participation in Singularism's psychedelic ceremonies is informed, voluntary, and at my own risk.

Signature: _____

Printed Name:_____

Date: _____

# EXHIBIT B

IN THE FOURTH DISTRICT COURT - ALL DEPARTMENT

IN AND FOR UTAH COUNTY, STATE OF UTAH

## SEARCH WARRANT

No. 2992661

COUNTY OF UTAH, STATE OF UTAH

To any peace officer in the State of Utah:

Proof by Affidavit made upon oath or written affirmation subscribed under criminal penalty of the State of Utah having been made to me by Detective JACKSON JULIAN of Provo Police Department, this day, I am satisfied that there is probable cause to believe

THAT

On the premises known as 1969 N State Street, Provo, UT, further described as A brown brick building located in a business complex on the west side of North State St. The numbers "1969" are displayed on a white pillar, just outside the front entrance which sits at the bottom of an outdoor stair case. The word "Singularism" is printed on the glass front entrance door.;

On the person(s) described as:

Bridger Lee Jensen (DOB 9/6/1981)

In the City of Provo, County of Utah, State of Utah, there is now certain property or evidence described as:

- Psilocybin Mushrooms
- Equipment used to ingest and/or cultivate psilocybin
- Business records which document the administering of psilocybin to clients
- Financial records which indicate transaction history of purchasing cultivation equipment, income produced by administering psilocybin to clients, and where the money garnered from this business is being kept

and that said property or evidence:

Was unlawfully acquired or is unlawfully possessed;

has been used or is possessed for the purpose of being used to commit or conceal the commission of an offense; or

is evidence of illegal conduct.

Affiant believes the property and evidence described above is evidence of the crime or crimes of - Possession of Psilocybin (Schedule I Controlled Substance) with the Intent to distribute, per UCA 58-37-8
- Possession of Drug Paraphernalia, Per UCA 58-37A-5.

YOU ARE THEREFORE COMMANDED:

to make a search in the daytimeof the above-named or described person, vehicle, item, and/or premises for the herein-above described property or evidence and if you find the same or any part thereof, retain such property in your custody subject to the direction of a prosecutor or an order of this Court.

Dated: 4th day of November, 2024 @ 05:05 PM   /s/      SEAN PETERSEN
District Court Judge

# EXHIBIT C

# PROPERTY REPORT
## UTAH COUNTY MAJOR CRIMES TASK FORCE

CASE No.

| ☐ EVIDENCE | BOOK TO ARRESTEE: WHEN THERE IS NO ARRESTEE, BOOK TO VICTIM. | ☐ IMPOUND | BOOK TO REGISTERED OWNER |
|---|---|---|---|
| ☐ FOUND EVIDENCE | BOOK TO OFFICER WHEN THERE IS NO ARRESTEE OR VICTIM | ☐ FOUND PROPERTY | BOOK TO OFFICER OR PERSON THAT FOUND THE PROPERTY |

| PROPERTY TAKEN INTO POLICE CUSTODY | DATE & TIME | | LOCATION | |
|---|---|---|---|---|
| PROPERTY BOOKED TO | | ADDRESS CITY | RESIDENCE PHONE | BUSINESS PHONE |
| ARRESTEE'S NAME | DOB | ADDRESS CITY | RESIDENCE PHONE | BUSINESS PHONE |
| ARRESTEE'S NAME | DOB | ADDRESS CITY | RESIDENCE PHONE | BUSINESS PHONE |
| ARRESTEE'S NAME | DOB | ADDRESS CITY | RESIDENCE PHONE | BUSINESS PHONE |

| TYPE OF CRIME OR PROBABLE CRIME | TYPE OF PROPERTY (If vehicle, give: make, model, year, color and license number) |
|---|---|

| CASE OFFICER | ID NUMBER | DEA NUMBER | PRESENT LOCATION OF PROPERTY |
|---|---|---|---|
| JULIAN | | | UTAH COUNTY SHERIFFS EVIDENCE ROOM |

(1) Itemize And Describe All Property. (2) Note All Damage to Property. (3) Give Ll Serial Numbers And Other Marks of Identification. (4) List Only One Article on a Line. (5) Indicate When Last Item Is Entered. (6) Give explanation of why property was seized

| ITEM NO. | QUANTITY | OFFICER | DESCRIPTION OF PROPERTY IF CASH PLEASE ID OWNER | LOCATION FOUND |
|---|---|---|---|---|
| 1 | | | PSILOCYBIN | Shelf Above Desk on wall |
| 2 | | | PSILOCYBIN | White safe under desk |
| 3 | | | Black Grinder | Left side of Desk |
| 4 | | | Black scale | Left Drawer of Desk |
| 5 | | | Gold scale | Right Drawer of Desk |
| 6 | | | THC | Black safe in main office |
| 7 | | | Bridging model paperwork | North west office |
| 8 | | | | |
| 9 | | | | |
| 10 | | | | |
| 11 | | | | |
| 12 | | | | |
| 13 | | | | |
| 14 | | | | |
| 15 | | | | |
| 16 | | | | |

| SEIZING OFFICER (S) | APPROVED BY | | RECEIVED IN EVIDENCE BY | AREA STORED |
|---|---|---|---|---|

| ITEM NO. | DATE AND TIME | RELEASED BY | RELEASED TO | REASON FOR RELEASE |
|---|---|---|---|---|
| | 11/11/24  5:34 | | | |
| ITEM NO. | DATE AND TIME | RELEASED BY | RELEASED TO | REASON FOR RELEASE |
| ITEM NO. | DATE AND TIME | RELEASED BY | RELEASED TO | REASON FOR RELEASE |

App-4:149

# EXHIBIT D



**POLICE**

CHIEF TROY BEEBE

TEL (801) 852-6257
445 West Center St
PROVO, UT 84601

Dear Utah Valley Foot and Ankle LLC,

This letter is in reference to your property located at 1969 N. State St., Provo, Utah 84604.

The Provo Police Department has obtained information regarding criminal activity, based on case number 24PR24922 (Bridger Jensen/Singularism.org), where psilocybin and THC drugs and drug paraphernalia were seized.

This evidence shows that drug distribution and use/possession is occurring. Therefore, a nuisance exists on the property that you own, in violation of 78b-6-1107, Utah Code Annotated. We hope you agree that this type of activity in the community is unacceptable. Our primary concern is for the residents in that neighborhood who are living in unnecessary fear and danger should this kind of illegal activity be allowed to continue.

As members of the Provo Police Department, we are asking for your cooperation by evicting your tenant(s) as soon as possible. We are confident that you may not have been aware of the illegal and dangerous activity that was occurring on your property, and that you will take the appropriate steps to ensure that your offending tenant is evicted.

Please be advised that if you allow your current tenants to continue to reside at this property, Provo City will have no choice but to proceed with the civil abatement process authorized by the State of Utah Code section 78b-6-1108, Utah Code Annotated. The statute mandates that you be made a party defendant and if Provo City demonstrates that a nuisance exists, Provo City can also collect its cost and attorney's fees against you.

In addition, should Provo City develop sufficient facts showing ongoing drug nuisances, Provo City may seek forfeitures of real property, automobiles and other property used for the distribution, storage or manufacture of controlled substances, pursuant to the section 58-37-8, Utah Code Annotated.

Please contact me if you have any questions or concerns.

Sincerely,

Captain Brian Wolken
Provo City Police Department
Special Operations Division
801 852 7251

POLICE.PROVO.ORG

App-4:151

# EXHIBIT E

Date 11/18/2024

**To: Captain Brian Wilkin**
Provo City Police Department
Special Operations Division

**Subject: Response to Notice Regarding Property at 1969 North State Street, Provo, Utah**

Dear Captain Wilkin,

Thank you for notifying me of the activities you referenced in your recent undated letter regarding the property at 1969 North State Street. I appreciate the opportunity to respond with transparency and cooperation.

I would like to emphasize that my position here is complicated. I find myself between conflicting obligations, as I am tasked with both respecting legal non-discrimination requirements and complying with the concerns raised in your letter. After speaking with Singularism (I was in the act of letting them know they could no longer rent), I understand they are actively working to clarify their legal standing and are pursuing a temporary restraining order (TRO) as they believe their practices are protected under the law. Singularism has expressed to me that they have a willingness to comply with law enforcement and has even extended an open invitation to Provo City officials to tour their facilities. From my perspective as a landlord, I have not observed any behavior that would typically prompt concern. I have asked my employees about Singularism's presence in the same building and they have not reported feeling unsafe or threatened by their presence. We have not seen any questionable activity nor have we had unsavory people coming and going from their facility. If anything, they have been exemplary tenants.

At this time, I intend to continue a professional distance from Singularism, maintaining a clear separation between my business and their organization. However, the situation leaves me in a challenging position: either to take action that could be perceived as unlawful discrimination based on religious grounds or to risk noncompliance with the concerns you have raised.

While I am fully prepared to comply with any direct court order regarding this matter, I respectfully request that further action be deferred until these legal questions are resolved. My role here is to ensure that I meet my responsibilities as a landlord in full compliance with applicable laws and, given the complexity of the situation, to proceed with caution.

Thank you for understanding the difficult position I am in and for considering this perspective. Please feel free to reach out with any further questions or to discuss this matter further.

**Sincerely,**

Jared Clegg
Utah Valley Foot and Ankle LLC

# EXHIBIT F

## SETTLEMENT AGREEMENT
*CEC et al. v. Garland et al.*, 22-cv-01004-SRB (D. Ariz.)

**I.      INTRODUCTION**

This action arises under the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb *et seq.* and the Freedom of Information Act ("FOIA"), 5 U.S.C. § 522(a)(4)(B).   This Settlement Agreement and Release ("Agreement"), effective as of the last date of execution below ("Effective Date"), is made by and between Plaintiffs—Church of the Eagle and the Condor ("CEC"), Joseph Tafur, Belinda Eriacho, Kewal Wright, Benjaman Sullivan, and Joseph Bellus—and Defendants—Merrick Garland, in his official capacity as Attorney General of the United States, Alejandro Mayorkas, in his official capacity as Secretary of Homeland Security, Anne Milgram, in her official capacity as Administrator of the U.S. Drug Enforcement Administration ("DEA"), and Troy Miller, in his official capacity as Acting Commissioner of U.S. Customs and Border Protection ("CBP") (together the "Government")—in Case No. 22-cv-1004-SRB (D. Ariz.). Plaintiffs and Defendants hereinafter are referred to collectively as the "Parties."

**II.     RECITALS**

Plaintiff CEC seeks to import, manufacture, distribute, and possess ayahuasca[1] for use in religious ceremonies.  Ayahuasca contains dimethyltryptamine ("DMT"), a Schedule I controlled substance under the Controlled Substances Act ("CSA"), 21 U.S.C. §§ 801 *et seq.* The CSA and its regulations are enforced by DEA.  CBP enforces certain federal laws and regulations related to the importation of controlled substances at the U.S. border.

The Parties have expended effort and resources in investigating and evaluating the allegations set forth in CEC's complaint, including initial discovery.

The Parties, through their authorized representatives, and without either adjudication of CEC's allegations and claims or admission by the Government of any alleged violation or wrongdoing, now wish to resolve and settle all disputes, obligations, and purported or actual claims or causes of action, which may exist by and between CEC and the Government, including without limitation, any disputes, obligations, claims, and/or causes of action that were or could have been asserted in or pursuant to RFRA or FOIA.

The Parties agree it is in their mutual interest to enter into this Settlement Agreement ("Agreement").  By entering into this Agreement, the parties do not intend to compromise their positions on the disputed issues or to make any concessions with respect to any of the disputed issues. Nothing in this Agreement shall be construed as an admission or concession as to any of the disputed issues in this action.

NOW, THEREFORE, in consideration of the execution of this Settlement Agreement and the releases, satisfactions, and promises made herein, it is hereby agreed upon by the Parties as follows:

---

[1] For purposes of this Agreement, the term "ayahuasca" is defined as a traditional Amazonian decoction with psychoactive properties made from the vine of the Banisteriopsis caapi and leaves of the Psychotria viridis bush. As relevant to this Agreement, ayahuasca can take the form of a concentrated paste or a drinkable tea.

App-4:155

## III.    GENERAL PROVISIONS

1.      This Agreement shall not be construed to bar the U.S. Government, or any of its agents or agencies, departments, components, or other subparts, from exercising any of its law enforcement authority to ensure that Plaintiffs' activities fully comply with U.S. law, except to the extent specifically provided in this Agreement.  Subject to the terms and conditions set forth in this Agreement, Defendants, their agencies, agents, employees, and those persons under their control will not apply or enforce against the Plaintiffs, the CSA or its implementing regulations governing the legal importation, manufacture, distribution, transportation, religious use, and possession of DMT, a Schedule I substance.  Nothing in this Agreement shall restrict or limit CBP's lawful authority to inspect, sample, seize, detain, or take any other action with regard to Plaintiffs' ayahuasca, once CBP determines that such activities should be undertaken in compliance with this Agreement, for a reason other than the fact that a properly registered shipment of ayahuasca contains DMT, a Schedule I controlled substance.

2.      CEC will import ayahuasca in concentrated paste form or in liquid form.  Upon receipt, CEC will combine the ayahuasca paste with water to manufacture ayahuasca tea for sacramental uses. CEC will receive the imported ayahuasca and conduct all manufacturing activities at the following address: 1220 E. Medlock Drive, #210, Phoenix, AZ 85014.

3.      This Agreement permits CEC to import, receive, manufacture, distribute, transport, securely store, and dispose of ayahuasca solely for CEC's religious purposes. CEC may not conduct any of these activities for non-religious purposes, including but not limited to recreational purposes. CEC may not use any DEA registrations subject to this Agreement to import, receive, manufacture, distribute, store, or use any other controlled substance.

4.      DEA will waive as to CEC all fees otherwise required under its regulations implementing the CSA.

5.      As set forth below, CEC will account for the ayahuasca paste and liquid they import into the U.S. until its ultimate use or disposal and will cooperate with DEA's verification efforts and procedures, as described below.

6.      As set forth below, CEC will account for the ayahuasca tea they manufacture in the U.S. until its ultimate use or disposal and will cooperate with DEA's verification efforts and procedures, as described below.

7.      CEC, through its designated ayahuasqueros, currently Plaintiffs Joseph Tafur and Benjaman Sullivan, will be responsible for the importation, receipt, secured storage, manufacture, distribution, disposal, and all applicable record keeping requirements of the ayahuasca as set forth in this Agreement. CEC will comply with any applicable DEA notification requirement relating to new ayahuasqueros who are designated in the future as set out by CEC's bylaws.

8.      The amount of ayahuasca tea to be manufactured for each individual ceremony will be based on the number of ceremony participants. Participants gather regularly as designated by CEC. Ceremonies will be held in private residences of CEC members or other locations as determined by CEC that can ensure security of the ayahuasca and the safety of the participants.  CEC ayahuasqueros will personally transport the approximate amount of ayahuasca tea needed for each ceremony.

9.      CEC requires, and will continue to require, ceremony participants to undergo a health screening for issues that could preclude participation, and shall provide participants with information related to potential health issues that could be adversely affected by participation. All ceremonies will have the presence of one person trained in basic first aid and capable of responding in an emergency. CEC shall maintain medical emergency protocols to respond to any medical needs of participants.

10.     DEA has agreed to grant CEC an importer registration for the importation of ayahuasca and a manufacturer bulk registration for ayahuasca tea, with the following listed exemptions from certain registration, security, and record keeping requirements under the CSA and its implementing regulations, provided that CEC agrees to the terms within this Agreement. DEA will provide CEC with the Certificates of Registration (COR) and COR numbers after the execution of this agreement and prior to the filing of the Notice of Settlement with the Court.

### A.  Issuance and Renewal of DEA Registration(s)

11.     The registered location of CEC will maintain the DEA registration(s) applicable to the authorized handling of the Schedule I controlled substance DMT for religious purposes.

12.     CEC will be authorized through its importer DEA registration to import ayahuasca paste or liquid, which contains the Schedule I controlled substance DMT as described in 21 C.F.R. §§ 1312.11 - 1312.19, with distribution as a coincident activity allowed as described in § 1301.13(e)(1)(viii).

13.     CEC will advise the local DEA Field Office whenever there is a change with the country of initial exportation or with its consignor shipping the ayahuasca paste or liquid to CEC through its import DEA registration. CEC will further advise the local DEA Field Office if there is a change in the form in which it imports ayahuasca.

14.     CEC will be issued a bulk manufacturer DEA registration for the receipt of the ayahuasca paste or liquid from CEC's importer DEA registration and for the manufacturing processes authorized under the terms of this Agreement, with distribution allowed as a coincident activity of both importing and manufacturing, as described in 21 C.F.R. § 1301.13(e)(1)(i) and 21 C.F.R. § 1301.13(e)(1)(viii).

15.     CEC will not be required to obtain a separate distributor DEA registration for distribution activities, including distributing ayahuasca tea for sacramental use at the specific ceremonial location(s) benefiting from that exemption, provided that CEC abides by the security requirements allowed under the terms of its registrations and this Agreement. The CEC must notify and seek approval from DEA for any further distribution as coincident activities other than those set forth in this Agreement.

16.     Except as set forth in this Agreement, CEC will submit DEA application(s) for registration(s) for each physical location where the ayahuasca will be imported, stored, manufactured, and distributed.  CEC acknowledges that, as registrants, they must apply to modify their registration before a physical location changes. *See* 21 C.F.R. § 1301.51.  CEC will also notify the local DEA Field Office of any change in location incidental to the distribution of ayahuasca as a coincident activity of a registration.

17.     As part of this Agreement, CEC is not required to file an application with the DEA's "Guidance Regarding Petitions for Religious Exemption from the Controlled Substance Act Pursuant to the Religious Freedom Restoration Act."

18.     In applying for a DEA registration and filling out DEA Form 225, pursuant to 21 C.F.R. § 1301.13(i), CEC may consider the word "business" on the relevant DEA application form to mean

"activities of a religious entity" involving controlled substances if the activities have been specified as such in the petition, or it is known at the signing of this Agreement that the connected application pertains to the import or manufacture and distribution of ayahuasca only for religious purposes.

19.     Whenever the DEA application form asks for information pertaining to any "officer, partner, stockholder or proprietor," CEC shall supply all names of its officers, as specified in the records of the state in which CEC is incorporated at the time of the application for registration.

20.     If the import or bulk manufacture registration is set to expire, and CEC has timely submitted a renewal application that is still being processed by the DEA, CEC is allowed to continue to operate on a day-by-day basis until the registration is renewed in accordance with 21 C.F.R. § 1301.36(i), subject to the provisions of this Agreement.

21.     DEA, upon receipt of a complete DEA application, will conduct the initial on-site inspection of each new location for which CEC seeks a DEA registration as soon as practicable. DEA will not deny CEC's application(s) for DEA registration, renewal of registration(s), or import permits solely on the ground that the sacramental use of ayahuasca constitutes a basis for denial. The Defendants agree not to enforce the provisions of 21 C.F.R. §§ 1301.34(a), (b)(6), (d), (e), (f), 1301.35(b), Part 1303, and 21 C.F.R. §§ 1304.33 and 1312.13(a) against CEC for the sacramental use of ayahuasca, so long as CEC remains a DEA registrant.

22.     If DEA makes, pursuant to 21 C.F.R. § 1301.15, a reasonable request for additional information that DEA needs to process CEC's DEA application(s), CEC will provide such information. Any dispute regarding requests for additional information will be handled pursuant to the dispute resolution provisions described in this Agreement.

23.     DEA will issue registration(s) for which CEC has applied within sixty (60) calendar days after receipt of a complete DEA application for registration unless justified by exceptional circumstances.

24.     Except as otherwise authorized by law, DEA shall not publish and will not voluntarily disclose the address of any registered location where CEC as registrant handles ayahuasca. DEA shall not publish any notice in the Federal Register concerning any application by CEC for registration as importer or manufacturer of a Schedule I controlled substance. DEA shall ensure that no registered location of CEC appears in the National Technical Information Service (NTIS) database.

## B.  Denial, Suspension, Or Revocation of Registration(s)

25.     Consistent with this Agreement and under existing authority, DEA may seek to deny, suspend, or revoke the registration by serving upon CEC an order to show cause pursuant to 21 C.F.R. § 1301.37, and, if requested by the registrant, by holding a hearing pursuant to 21 C.F.R. § 1301.41 before an Administrative Law Judge. In the event of an imminent danger to the public health or safety, DEA may suspend the registration without prior notice and seek administrative action by issuing an Immediate Suspension Order (ISO) pursuant to 21 U.S.C. § 824(d). Nothing in this Settlement Agreement shall be construed as a waiver by Plaintiffs of any of their rights including, without limitation, their rights under RFRA, the First Amendment, and principles of equal protection.

## C.  Importation of the Ayahuasca

26.     CEC's registered location will maintain a DEA registration to import ayahuasca, which contains the Schedule I controlled substance DMT, in accordance with 21 C.F.R. §§ 1312.11 - 1312.19, with

4

distribution to CEC's manufacturer/bulk manufacturer DEA registration allowed as a coincident activity, as described in 1301.13(e)(1)(viii).

27.     To facilitate Defendants' efforts to coordinate shipments, Plaintiffs have advised DEA that CEC will import ayahuasca as a concentrated paste or liquid from Peru to CEC's registered address in the U.S. through a common international carrier utilizing a tracking number. CEC initially anticipates importing up to 25 kg of ayahuasca paste per year. CEC anticipates this will be divided into several shipments of approximately 2kg to 4kg of ayahuasca paste.  CEC expects to import from Ricardo Amaringo or his authorized agents, who prepare the ayahuasca and assists in the shipping process from Peru to the United States. The quantity of imported ayahuasca for Plaintiffs' religious use shall not be limited.  However, CEC must notify DEA of any increase in the amount of ayahuasca it plans to import to meet its anticipated legitimate needs.

28.     Unless otherwise altered by future DEA registrations or required notifications, Plaintiff Tafur (currently the CEC Point of Contact) is the only individual authorized to receive imported ayahuasca paste or liquid at CEC's registered importer location and will be listed as the importer of record or consignee on all shipments. CEC will be responsible for notifying DEA of any change in or additional CEC points of contact and for all record keeping related to the importation of ayahuasca paste and will log in the receipt of each shipment with date, time, weight, and notes regarding its quality. Each shipment will receive a batch number starting with the number one (1) for the first shipment, and sequentially thereafter.

29.     CEC will submit an application as described in 21 C.F.R. § 1312.12(a) for a permit to import controlled substances on DEA Form 357 for each shipment of ayahuasca paste or liquid to be imported. DEA will not require CEC to specify in the DEA-357 the amount of the controlled substance DMT contained in each consignment, as described in 21 C.F.R. § 1312.12(b)(8). The amount of ayahuasca paste to be imported may be stated in kilograms, and the amount of liquid may be stated in liters.

30.     DEA will issue a single import permit for each shipment of ayahuasca paste (*see* 21 C.F.R. § 1312.13(e)), and such issuance should occur within thirty (30) days of receipt of a complete DEA application, unless justified by exceptional circumstances. An import permit will be void and of no effect after the expiration date specified therein, and in no event will the date be more than 180 calendar days after the date the permit is issued. An importer may request through the DEA Diversion Control Division secure network application that an import permit or permit application be amended or canceled, and request a new permit. *See* 21 C.F.R. § 1312.16.

31.     CEC, as an authorized importer, must furnish an official record of the declaration (available through the DEA Diversion Control Division secure network application after the Administration issues a transaction identification number) to the foreign shipper. CEC agrees to submit an official record of the declaration and/or required data concerning the import transaction to a customs officer at the port of entry in compliance with all import control requirements of agencies with import control authorities under the Act or statutory authority other than the Controlled Substances Import and Export Act. An official record of the declaration shall accompany the shipment to its final destination, which must only be the registered location of the importer (i.e., drop shipments are prohibited). *See* 21 C.F.R. § 1312.19.

32.      Plaintiffs shall provide at least 72 hours of advance notice to the DEA Import/Export Section Point of Contact (defined in paragraph 78 below) of the identity of the courier and the tracking number of shipment. Plaintiffs shall promptly advise the DEA Point of Contact of any changes in the itinerary. DEA will reasonably coordinate with CBP in an effort to facilitate processing and clearance of shipments through the U.S. port of entry.

33.     To facilitate Defendants' efforts to coordinate shipments, Plaintiffs have advised DEA that they intend to import CEC's sacrament through ports of entry in Los Angeles, Miami, Houston, and Atlanta. Plaintiffs' Point of Contact (currently Joseph Tafur), will inform DEA's Point of Contact of any changes in the ports of entry at least 45 days in advance of changing the port of entry in order to facilitate processing and clearance of shipments. If, through external circumstances beyond the parties' control, CEC's shipment enters through a different port of entry than those specified herein, neither party shall be considered in breach of this agreement.

34.     To facilitate the movement of shipments, Plaintiffs will ensure that their authorized couriers carry with them copies of the appropriate DEA Certificate of Registration (COR) (DEA Form 223), together with a copy of the import permit (DEA Form 357) authorizing the particular shipment. The original COR must remain at the CEC registered location at all times.

35.     If there are changes to the source of supply and means by which the ayahuasca will be imported to the U.S. and delivered to its final destination (i.e., foreign shipper, couriers or contract carriers), CEC shall promptly advise the local DEA Field Office of these changes and update any related information that may be required on DEA Form 357 for in-process and future import(s). DEA will reasonably work with CEC to facilitate processing and clearance of shipments through the U.S. port of entry.

36.     Each imported batch and container shall remain sealed and unopened from its arrival at a U.S. port of entry until its receipt at the registered import location. CEC shall take reasonable steps to ensure that the seal is tamper-resistant and tamper-evident.

37.     In the event that a shipment of ayahuasca paste or liquid has been denied release by a customs officer at the U.S. port of entry for any reason, CEC must report as described in 21 C.F.R. § 1312.12(e), within five (5) business days of the denial, that the shipment was denied and the reason for denial.

38.     Notwithstanding 21 C.F.R. § 1312.15, if a consignment of ayahuasca is detained by CBP because the amount consigned is significantly greater than the amount authorized by the import permit, DEA will work with CEC to remedy the discrepancy through the issuance of an amended import permit to facilitate the prompt clearance by CBP of the shipment upon CEC's provision to DEA of a satisfactory non-diversionary explanation as to the discrepancy. Such shipments may be detained by CBP pending a satisfactory, non-diversionary explanation by CEC as to the discrepancy. Non-compliant shipments for which no explanation is provided are subject to seizure. Plaintiffs have explained that the consigned volume of ayahuasca in liquid form may be as much as 5% greater than or less than the volume specified in the permit due to (1) the thermal contraction of ayahuasca, which is packaged at high temperatures but arrives at Port of Entry at ambient temperatures over which Plaintiffs have no control and (2) there are variable rates of precipitation of inactive dissolved solids at the bottom of containers of ayahuasca.

39.     All goods, conveyances, and persons are subject to search upon entry into the U.S. from a foreign country upon the demand of any CBP official. *See* 19 U.S.C. §§ 482, 1433, 1459, 1461, 1582; 8 U.S.C. § 1357; 19 C.F.R. Part 162; 8 C.F.R. Part 235.

40.     DEA reserves the right to spot sample any consignment of imported ayahuasca once it has arrived at the registered location for the purpose of confirming that the consignment is in fact ayahuasca which contains no controlled substance other than DMT.

  a.   DEA will notify CEC of DEA's intent to obtain a sample, which shall be taken when a sealed container, which, per above, is secured with a tamper-resistant and tamper-evident seal, is received by the registered importer at the registered location.

6

App-4:160

b. When requested by DEA to do so, CEC's authorized individual will extract a reasonable amount of unadulterated sample of ayahuasca under the observation of DEA personnel. The authorized individual will place the sample in a container, to be provided by DEA, which will be shipped directly to a DEA forensics laboratory for testing.

c. DEA will not return fully used portions of the sample to CEC. Storage and/or disposal of fully used samples will be solely within the discretion of DEA.

### D. Manufacture of the Ayahuasca

41. Manufacturing processes include but are not limited to the production of ayahuasca batches for ceremonial use, and any related repackaging and relabeling of ayahuasca in containers.

42. CEC must account for the amount of imported ayahuasca liquid or ayahuasca paste containing the Schedule I controlled substance DMT being used to manufacture ayahuasca tea. To account for the amount of ayahuasca liquid or ayahuasca paste used in the manufacturing of ayahuasca tea, CEC must use DEA Form 222 (U.S. Official Order Forms – Schedules I and II), in accordance with and as required by the provisions under 21 C.F.R. Part 1305. The order forms will be completed as follows:

a. CEC, on behalf of the manufacturer DEA registration (referred in the DEA Form 222 as the Purchaser) shall prepare and execute a DEA Form 222, make a copy of the original DEA Form 222 for its records and then submit the original for the importer DEA registration's records. The copy retained within the manufacturer registration's records may be in paper or electronic form.

b. CEC, on behalf of the importer DEA registration (referred in the DEA Form 222 as the Supplier) shall complete its portion of the order form in accordance with 21 C.F.R. Part 1305, fill the order for the manufacturer registration which ordered the ayahuasca and retain the original DEA Form 222 for the supplier's files in accordance with 21 C.F.R. § 1305.17(c). The importer registration shall, in accordance with 21 C.F.R. § 1305.13(d), simultaneously make and submit a copy of the original DEA Form 222 to DEA at the close of the month during which the order is filled, either by mail to the Registration Section, or by email to DEA.Orderforms@usdoj.gov.

c. CEC, on behalf of the manufacturer DEA registration must, at the receipt of the ayahuasca, record on its copy of the DEA Form 222 the number of commercial or bulk containers furnished on each item and the dates on which the containers are received by the purchaser (manufacturer registration). All executed DEA 222 order forms will be kept at the registered location for a minimum of two years. The distribution of manufactured ayahuasca, as an authorized coincident activity of the manufacturer DEA registration pursuant to 21 C.F.R. § 1301.13(e)(1)(i), will not require the use of DEA Forms 222 since DEA agrees in this Settlement Agreement to exempt CEC from separately registering with DEA as a distributor for the distribution of sacramental ayahuasca.

43. If a bulk manufacturing registration is granted to CEC, Plaintiffs Joseph Tafur and Benjaman Sullivan, the two currently authorized ayahuasqueros at CEC, are the only individuals authorized to manufacture under that registration and they are only authorized to manufacture at CEC's registered address. The CEC will notify the DEA of any additional or subsequent authorized ayahuasqueros. CEC

7

will log the date, time, and weight of the ayahuasca paste, or volume of the ayahuasca liquid that is removed from the storage refrigerator for manufacturing purposes.

44.     The ayahuasquero(s) will prepare the ayahuasca tea for ceremonial use according to CEC's practices by adding hot water to the ayahuasca paste. This process will occur under the constant supervision of at least one ayahuasquero. Plaintiffs estimate the amount of ayahuasca tea needed per ceremony to be about 30 to 45 ml on average per participant. After preparing the ceremonial tea, the ayahuasquero will note the resulting amount of liquid in milliliters, and transfer it to a secure bottle. The log will record the volume in milliliters, the time and date produced, and any notes about quality.

45.     If in liquid form, in the event it becomes necessary to decant stored ayahuasca, clear off mold and any harmful contaminants or impurities, or boil the ayahuasca to render the ayahuasca suitable for use, CEC shall measure the volume of ayahuasca before and after boiling and maintain a written record of all such processing of ayahuasca, memorializing any incidental change of volume.

46.     If ayahuasca originating from one batch is mixed with ayahuasca originating from a different batch, the resulting mix shall be stored in containers labeled with the unique identifiers of any and all originating batches and the precise volume taken from each. If ayahuasca must be boiled again, some loss of volume may occur due to evaporation; hence, a written record of the total volume after boiling should also be recorded for accuracy of records.

47.     All manufacturing activities, including processing, packaging, and labeling, shall be conducted at the location registered for said activities by an authorized person. All ayahuasca being processed, packaged, or labeled, shall be securely locked at the end of the activity [21 C.F.R. § 1301.73].

48.     This Agreement only grants CEC the authorization to manufacture ayahuasca from the concentrated ayahuasca paste or liquid that it has imported. If Plaintiffs decide to manufacture ayahuasca from plants grown in the United States, Plaintiffs will apply to DEA for registration as a bulk manufacturer. Plaintiffs will determine the amount of ayahuasca to be imported or manufactured solely for their religious use.

49.     CEC must advise the local DEA Field Office of any intended changes to its manufacturing processes that are inconsistent with this Settlement Agreement.

### E.   Distribution of the Ayahuasca

50.     DEA agrees to exempt CEC from separately registering with DEA as a distributor. DEA considers the transportation and distribution of sacramental ayahuasca tea at CEC's ceremonial location(s) to be a coincident activity of the DEA manufacturer registration, as described in 21 C.F.R. § 1301.13(e)(1)(i). This incidental transportation and distribution are permitted solely for the CEC's religious exercise under RFRA. Consequently, CEC's ceremonial location(s) in the State in which it is registered to manufacture ayahuasca under RFRA do not need a separate DEA registration as long as CEC does not store or manufacture ayahuasca at the ceremonial location(s).

51.     Plaintiffs Tafur and Sullivan, are the only individuals currently authorized to transport the ceremonial tea to the designated ceremony site(s). The ceremony locations will be at the residence of members of CEC or at other locations determined to ensure the security of the ayahuasca and the safety of participants, and such locations shall be determined by CEC. CEC accepts sole responsibility for compliance with all applicable federal, state, and local laws in determining ceremony locations.

App-4:162

52.     CEC may designate any individual(s) of its choice to handle ayahuasca tea when conducting religious ceremonies and performing religious functions. CEC's protocols require, and CEC will continue to require, ceremony participants consuming ayahuasca tea to undergo a health screening. CEC has developed an Emergency Response Plan in case of any medical or psychiatric needs. All ceremonies will have the presence of one person trained in basic first aid and capable of responding in an emergency. CEC will mitigate risks of ceremony participants leaving the premises while under the influence of ayahuasca.

53.     For transportation and distribution incidental to the manufacture of ayahuasca for religious ceremonies, DEA agrees not to enforce the DEA regulations applicable to distributors, except as provided by this Agreement. CEC will maintain records of the dates of each delivery or distribution event, the form of the controlled substance (liquid, paste, etc.), the approximate number of persons provided with ayahuasca doses, and the approximate amount of controlled substances (ounces, pounds, liters, gallons, etc.) delivered or distributed at each ceremony or other event where the ayahuasca will be utilized for religious purposes. CEC's authorized staff/members will provide to the DEA the initials of the ayahuasquero(s) who provided the ayahuasca to participants of the ceremony. CEC's records will also identify the ayahuasca manufactured batch(es) and container(s) from which the consumed ayahuasca is taken. CEC shall not be required to report the names or addresses of individual members or non-member ceremonial participants.

### F.  Quota

54.     To adhere to its quota obligations and the requirements set forth under the Single Convention on Narcotic Drugs, DEA may account for the total amount of the controlled substance, exempted under RFRA, authorized to be imported and/or manufactured by CEC to meet all anticipated legitimate needs. In any quota proceeding, DEA will not seek to limit the quantity of ayahuasca necessary for Plaintiffs' religious use.

### G.  Inspection

55.     DEA may inspect any location that CEC seeks to register as an import or manufacture location. *See* 21 C.F.R. § 1301.31. CEC agrees to cooperate with any such lawful inspections, and the inspection of the proposed registered location should be limited to the area used to handle all activities related to the importation or manufacture of ayahuasca. DEA agrees to avoid any burden to ayahuasqueros, and not to extend to or seek inspection of, other areas of the property as long as CEC restricts any movement of ayahuasca to those designated areas.

56.     DEA has the authority to enter registered premises and conduct administrative inspections and audits thereof at reasonable times and in a reasonable manner. *See* 21 C.F.R. § 1316.03. If representatives of the DEA arrive at a registered location unannounced and an authorized person is not present, the DEA representatives will promptly attempt to notify an authorized person of their intent to inspect the location, and the authorized person will make every reasonable effort to ensure that DEA representatives are able to inspect the location promptly. 21 C.F.R. § 1316.08. DEA will not conduct administrative inspections during CEC-authorized religious ceremonies. DEA acknowledges that the registered locations where CEC handles ayahuasca are not businesses with regular business hours, and, accordingly, that it might be necessary to make arrangements before the inspection to ensure that an authorized person, as defined by paragraph 7 of this Agreement, is available at the time the DEA seeks to conduct an inspection. If DEA personnel arrive at a registered location unannounced and an authorized person is not present, the DEA representatives will promptly attempt to notify an authorized person of their intent to inspect the location, and the authorized person will make every reasonable effort to ensure that DEA personnel are able to inspect the location promptly. DEA personnel may only enter a registered location to conduct an

App-4:163

administrative inspection pursuant to 21 C.F.R. § 1316.03 when an authorized person is present at the location.

57.     CEC will provide the local DEA Field Office with general information about the locations and dates of their ceremonies. CEC will notify DEA in writing of any significant changes to this information.

58.     During administrative inspections, DEA personnel may take a physical inventory of all ayahuasca on the premises. CEC's authorized individuals at each location will assist in the physical inventory by handling the containers of ayahuasca so that their labels can be read by DEA personnel without the need for DEA personnel physically to touch the containers.

59.     If DEA seeks to inspect an item or items as described in 21 C.F.R.§ 1316.03(f) and, and if CEC objects on any basis, then CEC may package the item or items in a container in the presence of DEA personnel; DEA personnel will affix a seal to the container. DEA may then submit an application for an administrative inspection warrant to a United States District Judge or Magistrate Judge as described in 21 C.F.R. § 1316.09. CEC agrees that the seal will remain unbroken and that the container will not be opened until a determination is made by a court of competent jurisdiction whether the item(s) can lawfully be inspected by DEA.

### H.  Record Keeping

60.     CEC will be responsible for all record keeping related to its inventory of ayahuasca in any authorized form.  CEC's registered location shall establish and maintain on a current basis a complete and accurate written record of its importation, receipt, manufacture, distribution, and disposal of ayahuasca in accordance with 21 C.F.R. § 1304.21 *et seq.* Once a registration has been granted, in addition to an initial physical inventory, each CEC's registered location shall take a physical inventory of all ayahuasca at least once every two years.

61.     CEC shall maintain separate inventory records of all ayahuasca for a minimum of two years. Each inventory will be a physical count of all ayahuasca on hand on the date the inventory is taken, and CEC will maintain the inventory in readily retrievable form at the registered location. Each inventory will include all information listed in 21 C.F.R. § 1304.11.

62.     All distribution of ayahuasca from a DEA registration to another DEA registration, shall be documented on a DEA Form 222, Official Order Form, as described in 21 C.F.R. § 1305.

63.     CEC shall assign a unique identifier to each batch and container of ayahuasca that is received through international shipment. The DEA import permit number shall also appear on each container. Each container being imported into the U.S. shall bear a sufficiently prominent label with clear and sufficiently large symbols to enable DEA personnel to read from arm's-length distance the DEA permit number, point of origin (city, state/province, and country), batch identifier, end location, quantity, and date shipped. To facilitate maintenance of a chain of custody, the unique identifier shall follow the imported ayahuasca and shall be used in CEC's records until its ultimate use or disposal and shall also appear on any container into which imported ayahuasca from a particular batch or consignment may be decanted or repackaged.

64.     CEC shall maintain records of their distribution of ayahuasca, listing the date distributed; general location; the number of participants in the religious ceremony or event who received ayahuasca; the total amount of ayahuasca consumed during the ceremony or event; and the dispenser's initials. These records will also identify the batch(es) and container(s) from which the consumed ayahuasca is taken. *See* 21 C.F.R. § 1304.24(a).

10

65.    All required records shall be in readily retrievable form and available for inspection upon request by DEA for a minimum of two years. *See* 21 C.F.R. §§ 1304.04, 1304.11, 1304.21-1304.22, 1305.

## I.   Security

66.    CEC acknowledges its obligation to provide effective controls and procedures to guard against theft and diversion. CEC will store the ayahuasca at CEC's registered address. The residence is equipped with a door with a deadbolt lock. The ayahuasca will be secured inside a locked refrigerator. CEC ayahuasqueros will be the only ones with access to the storage area. Plaintiffs will maintain at the current CEC central import and storage location a 24-hour alarm system through which a report of any unauthorized access to the location will be immediately transmitted to a protection company with a duty to respond or to the appropriate local law enforcement agency. Defendants acknowledge that CEC is not required to install and maintain such alarm systems at its other non-registered locations.

67.    CEC shall designate in writing any authorized individual(s) who will have access to the ayahuasca at each registered location. CEC shall provide written notification of the names (including aliases and maiden names, where applicable), last four digits of their social security numbers and dates of birth of each authorized individual to the DEA Point of Contact, and to the local DEA Diversion Program Manager.

68.    DEA may conduct appropriate inquiries to ascertain whether an authorized individual has been convicted of a felony relating to controlled substances. If DEA discovers that an authorized individual has been convicted of such a felony, DEA will promptly so advise the CEC Point of Contact. The parties will discuss whether, based on all the facts and circumstances of the particular case, in light of CEC's religious concerns and DEA's security concerns, the authorized individual should have access to or custody of the locked safe(s) or refrigerator(s) used solely for the purpose of storing ayahuasca, or be permitted to handle ayahuasca outside the context of religious ceremonies.

69.    Whenever anyone, other than an authorized individual, or an authorized official or agent of the U.S. government, is present in the room in which ayahuasca is stored at a registered location, that person shall be accompanied at all times by an authorized individual.

70.    DEA will conduct a preregistration inspection of any location at which a DEA registration is sought. In evaluating the overall security system and the needs of each registrant, DEA will consider the factors enumerated under 21 C.F.R. § 1301.71(b) to safeguard properly the ayahuasca under the control of each registrant. The local DEA Field Office and CEC's representative at each location within the field office's jurisdiction will engage in discussions to attempt to arrive at a mutually agreeable security plan based on the security needs of each specific location and commensurate with the quantity stored.

71.    DEA agrees to enforce only the specific physical security measures described in 21 C.F.R. § 1301.72(a) and (d) as set forth in this Agreement. CEC will maintain, at CEC's expense, at the registered storage location the security system specified in paragraph 66 of this Agreement. In the event it becomes necessary to modify the security settings to ensure effective controls, CEC shall notify the local DEA Field Office. Any modification in the storage area that has not been approved by the Administration, shall not necessarily be deemed to comply substantially with the standards set forth in §§ 1301.72 and 1301.73.

72.    CEC agrees to transport manufactured ayahuasca tea to the ceremonial place for the purpose of religious exercise in a secured lockbox out of plain view in a locked vehicle. For security during any incidental transport, CEC ayahuasqueros agree to keep the ayahuasca in a lockbox and will not leave it unsupervised.  CEC will not designate anyone other than an authorized person to transport ayahuasca.

11

App-4:165

CEC will not be required to install and maintain physical security measures described in 21 C.F.R. § 1301.72 (a) through (d) at incidental locations (i.e., ceremonial places) that do not store the controlled substance(s), but CEC shall maintain adequate controls at incidental location(s) to prevent diversion as set forth in this Agreement.

73.     When importing ayahuasca paste or liquid, CEC is responsible for selecting couriers or contract carriers that provide adequate security to guard against in-transit loss, as described in 21 C.F.R. § 1301.74(e).

74.     CEC will immediately advise the local DEA Field Office of any diversion, theft, or significant loss of ayahuasca, including in-transit losses by their agent or the common or contract carrier after a shipment has been released by CBP at the port of entry. Written notification must be made within one business day of discovery of the diversion, theft, or loss. A completed and accurate DEA Form 106, Report of Theft or Loss of Controlled Substances, shall also be filed through the DEA Diversion Control Division secure network application within 45 calendar days after discovery of the theft or loss. *See* 21 C.F.R. 1301.74(c). In the event there is any diversion, theft, or significant loss of ayahuasca from a registered location, DEA will discuss with CEC what, if any, additional security measures are reasonably necessary to prevent future theft.

### J.  Disposal

75.     CEC acknowledges that any transported ayahuasca sacrament will be entirely consumed on ceremonial premises, disposed of, or returned to storage.

76.     When CEC determines that it is necessary to make final disposition of ayahuasca, the registrant shall advise the Special Agent in Charge ("SAC") of the area by submitting a DEA Form 41, listing the amount to be disposed of, identifying the batch and container from which it was taken, stating the date, time, and place at which CEC proposes to dispose of the Ayahuasca, and identifying the individuals who will take part in the ayahuasca disposal.

77.     The SAC and/or designee shall have the discretionary authority to observe the disposal of ayahuasca. Nothing herein should be construed as DEA approving or endorsing the disposal method selected by CEC. Nothing in this Agreement shall require CEC to dispose ayahuasca in a manner that violates the religious tenets of CEC, provided that CEC accepts sole responsibility for compliance with all applicable federal, state, and local laws, implicated by the disposal of ayahuasca.

### IV.    POINTS OF CONTACT

78.     Direct written communications to DEA's headquarters elements who are referred to in this Agreement should be directed to the email (preferred) and postal addresses below:

| DEA Point of Contact | Email Address | Postal Address |
|---|---|---|
| Regulatory Section | DRG@dea.gov | Drug Enforcement AdministrationRegulatory Section/DRG Attention: RFRA 8701 Morrissette Drive Springfield, VA 22152 |

App-4:166

| Import/Export Section | ODGI@dea.gov | Drug Enforcement Administration Regulatory Section Attention: Import/Export (DRI) 8701 Morrissette Drive Springfield, VA 22152 |
| --- | --- | --- |
| Registration and Program Support Section | DRRO@dea.gov | Drug Enforcement Administration Registration Section Attention: RFRA 8701 Morrissette Drive Springfield, VA 22152 |
| DEA Local Field Office | Phoenixdiversiongroup @dea.gov | DEA Phoenix Divisional Office Attn: Diversion Group 3439 East University Drive Phoenix, Arizona 85034 |

## V.    NON-LIABILITY OF THE U.S. GOVERNMENT

79.    The United States assumes no liability with respect to third party claims arising out of the performance of any religious practices by CEC, including but not limited to the quantity or quality of any sacrament distributed and ingested. The sole remedy for damages by third parties will be against CEC and not the United States.

## VI.    DURATION, AMENDMENT, AND EFFECT

80.    Execution: This Agreement may be executed in counterparts, each of which constitutes an original, and all of which constitute one and the same agreement. Copies or facsimiles of signatures will constitute acceptable, binding signatures for purposes of this Agreement. This Agreement is effective and becomes binding upon the date of the last signature below. Each person who signs this Agreement in a representative capacity warrants that he or she is fully authorized to do so. The government signatories represent that they are signing this Agreement in their official capacities.

81.    Automatic Renewal: This Agreement is effective for a one-year initial term from its effective date, subject to automatic renewal for additional one-year terms upon DEA's approval of CEC's application for renewal of its import registration and manufacture registration of DMT unless, on or before 60 days before the expiration of the current term, either party provides written email notice of its intention not to renew. The DEA may not refuse to renew for any reason other than upon a showing of diversion by CEC or upon a showing of a particularized risk to public health and safety. In accordance with 21 C.F.R. § 1301.13(e)(3), DEA will send CEC a renewal notification via email approximately 60 calendar days prior to their registration expiration date.

If, at the time the initial term or a renewal is set to expire, CEC has submitted a renewal application that is still being processed by the DEA at the end of a one-year term, CEC is allowed to continue to operate on a day-by-day basis until the registration is renewed in accordance with 21 C.F.R. § 1301.36(i), and the term set to expire will be automatically extended until the registration is renewed.

App-4:167

82.     Severability: If any one or more of the provisions contained herein shall, for any reason, be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Agreement, but this Agreement shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein.

83.     Modification: This Agreement constitutes the full and complete Agreement between the Parties. No other promises or agreements will be binding unless placed in writing and signed by both parties to the Agreement. All material representations, understandings, and promises of the parties are contained in this Agreement, and each of the parties expressly agrees and acknowledges that, other than those statements expressly set forth in this Agreement, it is not relying on any statement, whether oral or written, of any person or entity with respect to its entry into this Agreement. Subject to the terms of this Agreement, this Agreement may be revised at any time with, and only with, the mutual written consent of the parties. Modifications to the Agreement will become effective on the date of the last signature of the authorized representatives of each party.

## VII.    ADDITIONAL TERMS AND CONDITIONS

84.     Compliance with State and Local Laws: Any importation, manufacturing, distribution, transportation, or disposal, must be lawful in the state and locality where such action takes place. Such action also must follow all applicable state and local laws, statutes, and regulations, and be otherwise permitted by all applicable state and local regulatory and law enforcement agencies.

85.     Good Faith: The terms and provisions of this Agreement shall be executed in good faith.

86.     Venue & Jurisdiction: The parties agree that any dispute arising between and among the parties to this Agreement shall be resolved pursuant to the dispute resolution procedures specified in Article IX of this Agreement. If such procedures do not resolve the dispute, the Parties agree that jurisdiction is retained by and venue is proper in the United States District Court for the District of Arizona for its resolution.

87.     Nothing in this Agreement shall be construed to prevent Defendants from taking actions or issuing rulemakings authorized by U.S. law (including the Administrative Procedure Act).

## VIII.   ATTORNEYS' FEES

88.     Once this Settlement Agreement is signed by the Parties, the Parties will file a Notice of Settlement with the Court.  After filing the Notice of Settlement, the parties have 60 days to negotiate attorneys' fees and costs. If, after 60 days, the Parties have not come to an agreement on attorneys' fees and costs, that issue will be submitted to the Court on a motion by Plaintiffs. Should such a Motion be necessary, nothing in this Agreement shall preclude either party from attaching this Settlement Agreement to the Motion.

89.     Neither this Agreement nor the payment of attorneys' fees, costs, and expenses hereunder is an admission by Defendants of the truth of any allegation or the validity of any claim asserted in this action, or of Defendants' liability therein. The provision of attorneys' fees, expenses, and costs in this Settlement Agreement is by the agreement of the parties and is not intended to serve as precedent, nor may it be cited as such, in this or any case.

90.     Compliance with all applicable federal, state, and local tax requirements shall be the sole responsibility of Plaintiffs and their attorneys, contractors, or experts.

## IX.  RESOLUTION OF DISPUTES ARISING OUT OF THIS AGREEMENT

91.     Subject to paragraph 25 of this Agreement and the Religious Freedom Restoration Act, disputes between the Parties concerning any alleged breach of this Agreement shall be subject to the following dispute resolution procedures.

   a.  The Parties shall make good faith efforts to resolve informally any alleged breach of this Agreement. If informal efforts to resolve the alleged breach are unsuccessful, the aggrieved Party shall provide written notice of the alleged breach and that Party's intent, if any, to initiate the dispute resolution procedure of this Agreement. The notice shall include a recitation of the material-facts and circumstances giving rise to the dispute, including the particular provisions of the Agreement alleged to have been breached.

   b.  If the dispute is not resolved by the Parties within thirty (30) days after such notice is given, such dispute shall be submitted to mediation before a mutually agreed-upon neutral mediator. The Parties shall each bear their own costs and attorneys' fees incurred in connection with such mediation.

   c.  If the dispute is not resolved by the Parties through mediation, either Party may apply to the U.S. District Court for relief, which shall retain jurisdiction solely for this purpose.

## X.  RELEASE, DISCHARGE, AND DISMISSAL OF PLAINTIFFS' CLAIMS

92.     Upon the execution of this Settlement Agreement, and receipt of the agreed upon payment described in paragraph 88, Plaintiffs hereby release and forever discharge Defendants and their successors, the United States of America, and any department, agency, or establishment of the United States, and any officers, employees, agents, successors, or assigns of such department, agency, or establishment, from any and all past or present claims for attorneys' fees, costs, or litigation expenses in connection with this litigation.

93.     This Agreement contains the entire agreement between the parties hereto, and Plaintiffs acknowledge that no promise or representation not contained in this Agreement has been made to them, and further acknowledge that this Agreement contains the entire understanding between the parties, and it contains all terms and conditions pertaining to the compromise and settlement of the disputes referenced herein.

94.     Within fifteen (15) days of the receipt of the payment described in paragraph 88, Plaintiffs shall dismiss this case with prejudice pursuant to Fed. R. Civ. P. 41(a) by filing a Stipulation of Dismissal with Prejudice.

95.     The undersigned represent that they are fully authorized to enter into this Agreement.

Date:   April 12, 2024

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

BRIGHAM J. BOWEN
Assistant Branch Director

*/s/ Giselle Barcia*
GISELLE BARCIA
Trial Attorney
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L Street NW
Washington, D.C. 20005
Telephone: (202) 305-1865
Fax: (202) 514-8640
E-mail: giselle.barcia@usdoj.gov

*Counsel for Defendants*


By:  *s/ Jack Silver*
Jack Silver, *pro hac vice*
Cal. Bar No. 160575
Law Office of Jack Silver
708 Gravenstein Hwy No. # 407
Sebastopol, CA 95472-2808
JsilverEnvironmental@gmail.com
Tel: (707) 528-8175
Fax: (707) 829-0934


By:  *s/ Gilbert Paul Carrasco with permission*
Gilbert Paul Carrasco, *pro hac vice*
Cal. Bar No. 90838
D.C. Bar No. 334722
Professor of Law *Emeritus*
Willamette University College of Law
900 Pacific Coast Highway
Suite # 305
Huntington Beach, California 92648-4863
carrasco@willamette.edu
Mobile: (503) 990-4879


By: *s/ Sean T. McAllister with permission*
Sean T. McAllister, Esq., *pro hac vice*
Colo. Bar No. 31350
Cal. Bar No. 310962
McAllister Law Office, P.C.
4035 E. 3rd Avenue

16

App-4:170

Denver, CO 80220
sean@mcallisterlawoffice.com
Tel: 720-448-6235

By: *s/ Martha J. Hartney with permission*
Martha J. Hartney, Esq., *pro hac vice*
Colo. Bar No. 42017
Hartney Law, LLC
4450 Arapahoe Avenue, Suite 100
Boulder, CO 80303
martha@hartneylaw.com
Tel: (303) 747-3909
Fax: (303) 835-7199

By: *s/ Ismail Lourido Ali with permission*
Ismail Lourido Ali, Esq., pro hac vice
Cal. Bar No. 312660
2134 10th Ave, A
Oakland, CA 94606
lourido.ali@gmail.com
Tel: (559) 801-7317

*Counsel for Plaintiffs*

17

# EXHIBIT G

**NOT FOR PUBLICATION**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Church of the Eagle and the Condor, et al., | No. CV-22-01004-PHX-SRB |
| Plaintiffs, | **ORDER** |
| v. | |
| Merrick Garland, et al., | |
| Defendants. | |

The Court now considers Defendants' Motion to Dismiss ("Motion") Plaintiffs'[1] Complaint. (Doc. 23, ("Mot.").) The Court will grant the Motion in part and deny the Motion in part.

## I.     BACKGROUND

This case arises out of Plaintiffs' importation and use of ayahuasca for religious purposes. (Doc. 1, Compl. ¶ 16.)

Ayahuasca is a sacramental tea brewed from the ayahuasca vine and the chacruna leaf, with spiritual significance for many indigenous tribes in South America. (*Id.* ¶ 25.) The chacruna leaf contains N,N-dimethyltryptamine ("DMT"), a Schedule I controlled substance under the Controlled Substances Act ("CSA"). (*Id.*); *see* 21 U.S.C. § 812(c)(6). Plaintiffs allege that ayahuasca produces "spiritual visions" and is not known to have wide recreational use. (*Id.* ¶ 28.) Since 2006, at least two religious organizations have received accommodations under the Religious Freedom Restoration Act ("RFRA") to use ayahuasca

---

[1] Referring collectively to the Church of the Eagle and the Condor ("Church"), Joseph Tafur, Belinda Eriacho, Kewal Wright, Benjamin Sullivan, and Joseph Bellus.

for religious purposes in the United States. (*Id.* ¶¶ 29, 33–36.)

### A. The Church's Beliefs and Ayahuasca Use

In 2017, Mr. Tafur, Ms. Eriacho, and Rodney Garcia formed the Church in Phoenix, Arizona. (*Id.* ¶¶ 37, 43.) The Church has approximately forty members and describes itself as a "faith-merging belief system" that has adopted practices from the indigenous Shipibo people of Peru and the "Native North American peoples." (*Id.* ¶¶ 30, 38, 44.) Like many indigenous tribes in South America, the Shipibo people consider ayahuasca to be a "sacred medicine" with spiritual and ceremonial significance. (*Id.* ¶¶ 25, 30, 39.) The Church conducts ayahuasca ceremonies to pursue "spiritual healing" and "wholeness," and the Church believes ayahuasca is a conscious spiritual being. (*Id.* ¶¶ 40–41, 54.) The Church and its members are "dedicated to universal spirituality in fulfillment of the Prophecy of the Eagle and the Condor" and believe ayahuasca is integral to this prophecy. (*Id.* ¶¶ 37, 39–41.) Specifically, the Church believes that the ceremonial use of ayahuasca is expanding beyond South America to merge with Native North American principles "in fulfillment of the Prophecy, to engender spiritual community across all races, ethnicities, and nationalities and to instruct its members in understanding and valuing indigenous spiritual practices, emphasizing the importance of maintaining relationships by developing pride in one's body, mind, soul, spirit and honoring all life." (*Id.* ¶ 39 (internal quotations omitted).)

Ayahuasca is the Church's only sacrament. (*Id.* ¶ 44.) The Church's ayahuasca supply is accessible only to Mr. Tafur, Ms. Eriacho, and Mr. Garcia and the Church maintains records of its ayahuasca importation and use. (*Id.* ¶ 46.) As the "ayahuasquero," Mr. Tafur oversees the Church's ayahuasca use and is the only person permitted to serve the tea during ayahuasca ceremonies. (*Id.* ¶¶ 42, 46.) The Church screens each prospective ayahuasca ceremony participant for any medical and psychological conditions that may interact with ayahuasca and provides participants with written ceremony guidelines. (*Id.* ¶ 47.) The loss of any ayahuasca is considered a sacrilege. (*Id.* ¶ 27.)

### B. CBP's Seizure of Plaintiffs' Ayahuasca

It is generally unlawful to import controlled substances into the United States. *See* 21 U.S.C. § 952. U.S. Customs and Border Protection ("CBP") is authorized to seize "[a]ll mail shipments containing articles the importation of which is prohibited, or articles imported into the United States in any manner contrary to law." 19 C.F.R. § 145.59(a); *see* 21 C.F.R. § 1312.15. However, the Attorney General may approve limited importation and transportation of Schedule I controlled substances. 21 U.S.C. §§ 954, 957, 958(a); *see* 21 C.F.R. §§ 1307.03, 1312.11(a).

In September 2020, CBP intercepted and seized a shipment of ayahuasca intended for delivery to the Church. (Compl. ¶ 50.) Plaintiffs do not allege that they ever sought approval to import the ayahuasca into the United States. (*See generally id.*) Mr. Tafur received a note bearing the Department of Homeland Security's ("DHS") seal that stated:

> Notice: Narcotics and/or other contraband prohibited from entry into the United States, have been seized and removed for appropriate action under 19CFR145.509 [sic]. You will be receiving correspondence from our Fines, Penalties and Forfeitures Branch in the near future.

(*Id.*) Plaintiffs received no further correspondence relating to CBP's seizure and Plaintiffs allege that CBP "summarily destroyed" the ayahuasca shipment. (*Id.* ¶ 52.) In March 2021, the Church submitted Freedom of Information Act ("FOIA") requests to CBP and the Drug Enforcement Administration ("DEA") inquiring about ayahuasca seizures. (*Id.* ¶ 55.) CBP allegedly indicated that it "had seized hundreds of shipments" of what Plaintiffs believe is ayahuasca. (*Id.*) CBP and the DEA have otherwise not responded to Plaintiffs' FOIA requests. (*Id.* ¶¶ 56–58.) Plaintiffs allege that the DEA has leveraged CBP's ayahuasca seizures to prosecute people using ayahuasca for religious purposes. (*Id.* ¶ 59.) Plaintiffs have continued to import and use ayahuasca after CBP's seizure despite Plaintiffs' fear that Defendants may enforce the CSA against them. (*See id.* ¶¶ 16–19, 44.)

### C. Procedural Background

Plaintiffs filed the Complaint on June 9, 2022 against the DEA, CBP, DHS, and Attorney General, seeking an accommodation for their religious use of ayahuasca under RFRA. (*Id.* ¶¶ 20–24, 63–64.) Plaintiffs also allege, *inter alia*, that Defendants have

- 3 -

violated Plaintiffs' First Amendment, due process, and equal protection rights. (*Id.* ¶¶ 65–77.) Defendants filed the Motion on November 15, 2022, arguing that Plaintiffs lack standing to bring their RFRA claim and that Plaintiffs otherwise fail to state a claim. (*See* Mot. at 6, 11.) Plaintiffs filed their Response on December 14, 2022, to which Defendants replied on January 5, 2023. (Doc. 24, Resp. in Opp'n ("Resp."); Doc. 25, Reply.)

## II.      LEGAL STANDARDS & ANALYSIS

### A.      Standing to Bring a RFRA Claim

In considering a Rule 12(b)(1) motion to dismiss for lack of jurisdiction, the Court takes the allegations in the plaintiff's complaint as true. *Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004) (citations omitted). It is the plaintiff's burden to show "that the facts alleged, if proved, would confer standing." *Warren v. Fox Fam. Worldwide, Inc.*, 328 F.3d 1136, 1140 (9th Cir. 2003). Under Article III of the Constitution, a plaintiff does not have standing unless he can show (1) an "injury in fact" that is concrete and particularized and actual or imminent (not conjectural or hypothetical); (2) that the injury is fairly traceable to the challenged action of the defendant; and (3) that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). In cases for prospective injunctive relief, "past wrongs do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy." *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983). Rather, a plaintiff's "standing to seek the injunction requested depend[s] on whether he [is] likely to suffer future injury." *Id.* at 105. "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice[.]" *Lujan*, 504 U.S. at 561.

Where plaintiffs raise a pre-enforcement claim to enjoin defendants from enforcing a law against them, the plaintiffs must "allege a 'genuine threat of imminent'" enforcement. *Oklevueha Native Am. Church of Haw., Inc. v. Holder* (*Oklevueha I*), 676 F.3d 829, 835 (9th Cir. 2012).[2] The court considers "(1) whether the plaintiffs have articulated a 'concrete

---

[2] In *Oklevueha I*, plaintiffs sought to enjoin the government from enforcing the CSA against plaintiffs for their allegedly religious use of marijuana after the DEA had seized a shipment of plaintiffs' marijuana more than two years prior. 676 F.3d at 835–36. The Ninth Circuit applied the pre-enforcement "genuine threat" analysis because plaintiffs asserted their

- 4 -

plan' to violate the law in question; (2) whether the government has communicated a specific warning or threat to initiate proceedings; and (3) the history of past prosecution or enforcement under the statute." *Id.* Plaintiffs have alleged sufficient facts to meet this standard.

A plaintiff may satisfy the "concrete plan" element where the plaintiff "actually did violate [the law at issue] on a number of occasions." *Oklevueha I* at 836 (quoting *Sacks v. Off. of Foreign Assets Control*, 466 F.3d 764, 773 (9th Cir. 2006)) (finding plaintiffs satisfied the concrete plan element where "[p]laintiffs are currently violating and plan to continue to violate the CSA by purchasing and consuming marijuana"); *see Ariz. Yage Assembly*, 595 F. Supp. 3d at 882–83 (plaintiffs failed to allege a concrete plan to violate the CSA where plaintiffs planned to use ayahuasca only if the court issued an injunction). Plaintiffs allege that they have continued to import, possess, and use ayahuasca following CBP's 2020 seizure and "are violating and intend to continue to violate" the CSA. (Compl. ¶¶ 16–19, 44.) Plaintiffs have alleged a "concrete plan" to violate the CSA. Further, because the CSA has already been enforced against Plaintiffs, they need not allege a threat of future prosecution or a history of past prosecution. *Oklevueha I*, 676 F.3d at 836–37 (*See* Mot. at 7–8; Resp. at 4–5.) "When the Government seized Plaintiffs' [ayahuasca] pursuant to the CSA, a definite and concrete dispute regarding the lawfulness of that seizure came into existence."[3] *Id.* at 836.

Defendants also contend that RFRA requires that all forty individual Church

claims "for the first time in an action for prospective relief (and not in a criminal proceeding)," and indicated that the government's prior enforcement of the CSA against plaintiffs "mitigat[ed] the relevance of a hypothetical future-enforcement." *Id.* at 835; *see Arizona Yage Assembly v. Garland*, 595 F. Supp. 3d 869, 882 n.11 (D. Ariz. 2022) (analyzing plaintiff's standing to pursue a RFRA claim under *Oklevueha I* after the government had seized four shipments of plaintiffs' ayahuasca). Plaintiffs' circumstances are factually analogous, so the Court analyzes Plaintiffs' request for injunctive relief as a pre-enforcement claim. (*See* Compl. ¶¶ 4, 6–7, 63–64, 89.)

[3] Defendants contend that *Oklevueha I* is inapposite because the DEA did not "enforce" the CSA against Plaintiffs when the CBP seized Plaintiffs' ayahuasca. (Reply at 3–4.) Defendants also argue that Plaintiffs have not alleged that Defendants have investigated Plaintiffs since the 2020 seizure. (*Id.* at 4.) In finding that the plaintiffs' fear of enforcement was not speculative after FedEx turned the plaintiffs' package of marijuana over to the DEA, the *Oklevueha I* Court emphasized that the plaintiffs should not "be forced to accept the possibility of continued seizure[s]" simply because they could not show that the Government was investigating or targeting plaintiffs. 676 F.3d at 837 n.2.

- 5 -

members' participate in this suit because the Court must assess the CSA's burden on each member's religious beliefs. (Mot. at 8–9.) In permitting the plaintiffs' RFRA claim to proceed without requiring the individual members' participation, the *Oklevueha I* Court found that, "it can reasonably be supposed that the [the church's prospective relief], if granted, will inure to the benefit of those members of the association actually injured." 676 F.3d at 839 (quoting *Warth v. Seldin*, 422 U.S. 490, 515 (1975)). The same is true for the Church in this case. Plaintiffs have standing to bring their RFRA claim.[4]

### B.    12(b)(6)

A Rule 12(b)(6) dismissal for failure to state a claim can be based on either (1) the lack of a cognizable legal theory or (2) insufficient facts to support a cognizable legal claim. *Conservation Force v. Salazar*, 646 F.3d 1240, 1242 (9th Cir. 2011). In determining whether an asserted claim can be sustained, "[a]ll of the facts alleged in the complaint are presumed true, and the pleadings are construed in the light most favorable to the nonmoving party." *Bates v. Mortg. Elec. Registration Sys., Inc.*, 694 F.3d 1076, 1080 (9th Cir. 2012). "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). However, "for a complaint to survive a motion to dismiss, the nonconclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). In other words, the complaint must contain enough factual content "to raise a reasonable expectation that discovery will reveal evidence" of the claim. *Twombly*, 550 U.S. at 556.

### 1.    RFRA

RFRA provides that the government "shall not substantially burden a person's

---

[4] The Court declines Defendants' request for the Court to dismiss or stay the case until Plaintiffs apply directly to the DEA for an exemption. (*See* Mot. at 16.) RFRA "plainly contemplates" that this Court may consider Plaintiffs' requested relief from the CSA. *Oklevueha I*, 676 F.3d at 838 (quoting *Gonzales v. O Centro Espirita Beneficente Uniao de Vegetal*, 546 U.S. 418, 434 (2006)).

- 6 -

exercise of religion" unless the government "demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. §§ 2000bb-1(a)–(b). To state a RFRA claim, Plaintiffs must allege that the CSA substantially burdens a sincere exercise of religion. *O Centro*, 546 U.S. at 428.

Defendants first argue that Plaintiffs have failed to sufficiently allege that each Plaintiff "share[s] the same religious beliefs about ayahuasca." (Mot. at 9.) Plaintiffs allege that ayahuasca is their only sacrament and is indispensable to their religious expression. (Compl. ¶¶ 39–41, 44.) Plaintiffs believe that ayahuasca is a living spiritual being and consider any diversion of ayahuasca to be a sacrilege. (*Id.* ¶¶ 27, 40, 54.) Moreover, Plaintiffs continue to practice their ayahuasca ceremonies despite the possibility that Defendants may enforce the CSA against them. (*Id.* ¶¶ 16–19, 44); *c.f. Church of the Holy Light of the Queen v. Mukasey* ("*CHLQ*"), 615 F. Supp. 2d 1210, 1219 (D. Or. 2009) (plaintiffs' use of ayahuasca in secret demonstrated plaintiffs' commitment to their religion after the government threatened plaintiffs with prosecution), vacated on other grounds, *Church of Holy Light of Queen v. Holder*, 443 F. App'x 302 (9th Cir. 2011). Construed most favorably to Plaintiffs, the Complaint sufficiently alleges the sincerity of Plaintiffs' religious beliefs. *See Multi Denominational Ministry of Cannabis and Rastafari, Inc. v. Gonzales*, 474 F. Supp. 2d 1133, 1146 (N.D. Cal. 2007) ("[P]lainly it is inappropriate to question the sincerity of plaintiffs' religious beliefs in a Rule 12(b)(6) motion.").

Plaintiffs have also alleged that complying with the CSA would substantially burden Plaintiffs' exercise of religion. "A statute burdens the free exercise of religion if it puts substantial pressure on an adherent to modify his behavior and to violate his beliefs, including when, if enforced, it results in the choice to the individual of either abandoning his religious principle or facing criminal prosecution." *Guam v. Guerrero*, 290 F.3d 1210, 1222 (9th Cir. 2002); *see Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1069–70 (2008). Plaintiffs allege that the ayahuasca ceremony is integral to fulfilling the "Prophecy of the Eagle and the Condor" and to Plaintiffs' "direct and personal connection to nature

and the Divine." (Compl. ¶¶ 39–40.) Plaintiffs allege that they are forced to choose between abandoning their use of ayahuasca—the central tenet of their religion—or face the prospect of criminal prosecution under the CSA. (*Id.* ¶¶ 60–61.) This is sufficient to state a RFRA claim. *Compare CHLQ*, 615 F. Supp. 2d at 1219 (prohibiting plaintiffs from using ayahuasca would substantially burden their exercise of religion where the ceremonial use of ayahuasca was the "sole means by which plaintiffs are able to experience their religion") (citation omitted) (cleaned up), *with Oklevueha Native Am. Church of Haw., Inc. v. Lynch*, 828 F.3d 1012, 1015–16 (9th Cir. 2016) ("*Oklevueha II*") (prohibiting plaintiffs' cannabis use was not a substantial burden because plaintiffs' essential sacrament was peyote and cannabis served no unique religious function). The Court denies the Motion as to Plaintiffs' RFRA claim.

### 2. Free Exercise of Religion

Plaintiffs allege that Defendants have violated Plaintiffs' free exercise of religion by enforcing the CSA and seizing Plaintiffs' ayahuasca. (Compl. ¶ 66.) The Free Exercise Clause "does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability.'" *Williams v. California*, 764 F.3d 1002, 1011–12 (9th Cir. 2014) (quoting *Employment Div., Dep't of Human Res. Of Or. v. Smith*, 494 U.S. 872, 879 (1990)); (*see* Mot. at 11.) A law that is not neutral and generally applicable receives strict scrutiny. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993); *Tingley v. Ferguson*, 47 F.4th 1055, 1084 (9th Cir. 2022). But a neutral and generally applicable law "need not be justified by a compelling governmental interest" even if it creates a substantial burden on "a particular religious practice." *Church of the Lukumi*, 508 U.S. at 531; *see San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1031 (9th Cir. 2004).

Plaintiffs do not challenge that the CSA is a neutral, generally applicable law, nor that Defendants' regulation of controlled substances under the CSA is rationally related to a legitimate government purpose.[5] (Resp. at 8); *Ministry of Cannabis*, 474 F. Supp. 2d at

---

[5] The Supreme Court suggested in *Smith* that if a generally applicable law implicates other constitutional protections along with the free exercise of religion, it must withstand strict

1144 (citing *Smith* 494 U.S. at 884–85) (dismissing First Amendment claim because controlled substances are proscribed by the CSA); *Oklevueha Native American Church of Hawaii, Inc. v. Holder*, 2012 WL 6738532, at *9 (D. Haw. Dec. 31, 2012); *see Taylor v. Rancho Santa Barbara*, 206 F.3d 932, 938 (9th Cir. 2000) (affirming district court's application of rational basis review on a 12(b)(6) motion to dismiss). The Court grants the Motion on Plaintiffs' Free Exercise Clause claim.

### 3. Establishment Clause

"Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I. The Establishment Clause ensures an "individual's freedom to believe, to worship, and to express himself in accordance with the dictates of his own conscience." *Freedom from Religion Found., Inc. v. Chino Valley Unified Sch. Dist. Bd. of Educ.*, 896 F.3d 1132, 1137 (9th Cir. 2018). Plaintiffs allege that Defendants' accommodation of other religions' ayahuasca use "constitutes an Establishment of Religion" because Defendants have not accommodated Plaintiffs' use. (Compl. ¶¶ 68–69.) In support of their claim, Plaintiffs point to religious sects that have received exemptions under RFRA: the Uniao de Vegetal ("UDV") and the Santo Daime Church ("Santo Daime"). (*Id.* ¶¶ 33–36, 68.)

Defendants argue that Plaintiffs "cannot simply point" to UDV's and Santo Daime's religious accommodations "and say 'we'll have what they're having'" when Plaintiffs have not alleged that they ever applied for an exemption from the CSA, let alone that the DEA denied them one. (Mot. at 9 (quoting *United States v. Christie*, 825 F.3d 1048, 1061 (9th Cir. 2016)); s*ee generally* Compl.) The Court agrees. Plaintiffs contend that the DEA may not "assess religious uses of anything" and that Defendants have "advance[d]" other religions by prohibiting Plaintiffs' use of ayahuasca. (Resp. at 10.) But Plaintiffs have not cited any authority suggesting that Defendants must assume that Plaintiffs are exempt from the CSA whenever another group seeks and receives approval to import and use ayahuasca

scrutiny. 494 U.S. at 881. Plaintiffs argue that their Complaint involves this so-called "hybrid rights" claim. (Resp. at 8; Compl. ¶ 66.) The Ninth Circuit has questioned whether such a claim exists and the Court declines to address this possibility. *Tingley*, 47 F.4th at 1089 n.5; *Parents for Privacy v. Barr*, 949 F.3d 1210, 1237 (9th Cir. 2020); *see Jacobs v. Clark Cnty. Sch. Dist.*, 526 F.3d 419, 440 n.45 (9th Cir. 2008) (discussing cases casting doubt on a "hybrid rights" analysis). Plaintiffs' hybrid rights claim is dismissed.

- 9 -

for religious purposes. (*See* Compl. ¶¶ 53, 55; Resp. at 9.)

Further, both UDV and Santo Daime received exemptions from the CSA pursuant to RFRA. (*See* Compl. ¶¶ 33–36.) RFRA expressly tasks the courts with determining whether to accommodate an alleged religious practice. 42 U.S.C. § 2000bb-1(c) (enabling a person "whose religious exercise has been burdened" to initiate judicial proceedings to obtain relief); *see O Centro*, 546 U.S. at 434. This requires courts to conduct fact-specific inquiries into the alleged religious exercise; "Congress has determined that courts should strike sensible balances, pursuant to [RFRA's] compelling interest test that requires the Government to address the *particular practice at issue*." *O Centro*, 546 U.S. at 439 (emphasis added); (Mot. at 12.) RFRA's individualized inquiry is an instance where the government must accommodate UDV and Santo Daime's ayahuasca use and "may do so without violating the Establishment Clause."[6] *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 144–45 (1987). The Court grants the Motion on Plaintiffs' Establishment Clause claim.

### 4.   Due Process Claims

#### a. Procedural Due Process

Plaintiffs allege that CBP violated Plaintiffs' rights to procedural due process because CBP "deprived Plaintiffs of their ownership, possession, and use" of ayahuasca without notice and an opportunity to be heard. (Compl. ¶ 71.) To state a procedural due process claim, a plaintiff must allege a deprivation of a protected property or liberty interest without adequate procedural protections. *See Bd. of Regents v. Roth*, 408 U.S. 564, 569–73 (1972). Defendants argue that Plaintiffs have failed to state a due process claim because Plaintiffs do not allege any cognizable property interest in the ayahuasca. (Mot. at 13.)

To allege a cognizable property interest, a plaintiff must "have a legitimate claim of

---

[6] Citing to *Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005), which held that the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA") is "compatible with the Establishment Clause" while enabling prisoners to seek religious accommodations, the *O Centro* Court emphasized RFRA's case-by-case analysis of religious practices. *O Centro*, 546 U.S. at 436. As with RLUIPA, courts may accommodate religious practices without running afoul of the Establishment Clause by applying RFRA's compelling interest test "in an appropriately balanced way." *See id.* (quoting *Cutter*, 544 U.S. at 720).

entitlement" to the property. *Roth*, 408 U.S. at 577. A person cannot have a legally protected property interest in "per se contraband," which may be "summarily forfeited without any due process protections." *Conservation Force v. Salazar*, 677 F. Supp. 2d 1203, 1210 (N.D. Cal. 2009), *aff'd*, 646 F.3d 1240 (9th Cir. 2011). "An object is contraband per se if its possession, without more, constitutes a crime; or in other words, if there is no legal purpose to which the object could be put." *United States v. Harrell*, 530 F.3d 1051, 1057 (9th Cir. 2008); *c.f. Gonzales v. Raich*, 545 U.S. 1, 27 (2005) ("The CSA designates marijuana as contraband for *any* purpose" by listing it as a Schedule I substance). Because it is illegal for any civilian to possess DMT for any purpose under the CSA, Plaintiffs' ayahuasca was subject to summary forfeiture. 21 U.S.C. §§ 812(c)(6), 881. Though Plaintiffs contend that they had a property interest in the ayahuasca because it "is a protected substance" under RFRA, Plaintiffs point to no authority indicating that they had a legitimate property interest in the ayahuasca without first receiving an accommodation under RFRA or registering to import controlled substances.[7] (Resp. at 11); *See e.g.* 21 C.F.R. §§ 1301.11, 1312.11(a), 1312.15. The Court grants the Motion on Plaintiffs' procedural due process claim.

### b. Substantive Due Process

Plaintiffs also allege that CBP's seizure of ayahuasca and threat of prosecution "violate Plaintiffs' right to worship God according to the dictates of their own conscience and deprive them of their liberty in violation" of due process. (Compl. ¶ 73; Resp. at 12 (quoting *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923)).) Defendants counter that Plaintiffs cannot raise a generalized substantive due process claim when Plaintiffs' claim is

---

[7] Plaintiffs argue they had a "right to receive mail." (Resp. at 11 (citing *Parratt v. Taylor*, 451 U.S. 527 (1981)).) Unlike Plaintiffs' package, the prisoner's mail in *Parratt* did not contain contraband. 451 U.S. at 531. Attempting to circumvent ayahuasca's status as contraband, Plaintiffs also contend that CBP deprived Plaintiffs of their liberty interest in using ayahuasca for religious purposes. (Resp. at 10–11 (a person has a liberty interest in "worship[ping] God according to the dictates of his own conscience" (quoting *Roth*, 408 U.S. at 572)).) Plaintiffs cite no authority that would support Plaintiffs' due process claim when Plaintiffs have not followed the very procedures designed to prevent summary forfeiture of the ayahuasca. *See* 21 U.S.C. § 958(d) (procedural protections for an applicant seeking registration under the CSA); (*See* Compl. ¶ 25 (acknowledging that DMT is regulated by the CSA); Mot. at 13 (explaining that a permit is required to import any controlled substances).)

- 11 -

"grounded in the First Amendment's right to free exercise." (Mot. at 14.) The Court agrees with Defendants.

"Substantive due process analysis must begin with a careful description of the asserted right . . . ." *Reno v. Flores*, 507 U.S. 292, 302 (1993). "[W]here another provision of the Constitution provides an explicit textual source of constitutional protection, a court must assess a plaintiff's claims under that explicit provision and 'not the more generalized notion of substantive due process." *Conn v. Gabbert*, 526 U.S. 286, 293 (1999) (quotations and citation omitted) (holding that challenges to unreasonable government searches are analyzed under the Fourth Amendment instead of the Fourteenth Amendment). Plaintiffs' due process claim reiterates their free exercise claim—CBP allegedly interfered with Plaintiffs' ayahuasca use, thereby violating a central tenet of Plaintiffs' religious beliefs and practices. (*See* Compl. ¶¶ 66, 73.) Because the First Amendment provides Plaintiffs an "explicit textual source of constitutional protection," the Court dismisses Plaintiffs' substantive due process claim.[8]

### 5. Equal Protection

Plaintiffs allege that Defendants have denied Plaintiffs the equal protection of the laws by accommodating "similarly situated" religions' ayahuasca use. (Compl. ¶¶ 48, 75 (referencing UDV and Santo Daime).) Defendants respond that Plaintiffs have not stated an equal protection claim, as Plaintiffs have not plausibly alleged that Defendants discriminated against Plaintiffs because of Plaintiffs' religion. (Mot. at 14.) The Court agrees with Defendants.

The Equal Protection Clause demands that "all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985);

---

[8] The Court also dismisses Plaintiffs' Ninth Amendment claim. The Ninth Amendment does not "independently secur[e] any constitutional rights for purposes of making out a constitutional violation," but works "in tandem" with the Fifth Amendment to protect fundamental rights. *San Diego Cnty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1125 (9th Cir. 1996) (holding that "the Ninth Amendment does not encompass an unenumerated, fundamental, individual right to bear firearms") (quoting *Schowengerdt v. United States*, 944 F.2d 483, 490 (9th Cir. 1991)); *Marin All. For Med. Marijuana v. Holder*, 866 F. Supp. 2d 1142, 1156 (N.D. Cal. 2011) (citing *Raich v. Gonzales*, 500 F.3d 850, 862 (9th Cir. 2007)).

- 12 -

*Bolling v. Sharpe*, 347 U.S. 497, 499 (1954). To state an equal protection claim, a plaintiff may allege "that defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class." *Lee v. City of Los Angeles*, 250 F.3d 668, 686 (9th Cir. 2001). Plaintiffs do not claim that Defendants discriminated against Plaintiffs by seizing Plaintiffs' ayahuasca or denying Plaintiffs the right to use ayahuasca because of their religion.[9] (Mot. at 14–15; *see generally* Compl.) Rather, Plaintiffs allege only that CBP seized a package containing a Schedule I controlled substance that Plaintiffs attempted to illegally import into the United States. (Compl. ¶ 50.) The Court grants the Motion on Plaintiffs' Equal Protection Claim.

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

---

[9] Plaintiffs relatedly argue that Defendants must demonstrate a compelling interest to enforce the CSA and deprive Plaintiffs of their right to use ayahuasca. (Resp. at 13 (citing *Johnson v. Robison*, 415 U.S. 361, 375 n.14 (1974)).) Because the CSA does not violate the First Amendment, it need only survive rational basis review for Plaintiffs' equal protection claim. *Locke v. Davey*, 540 U.S. 712, 720 n.3 (2004); *Johnson*, 415 U.S. at 375 n.14. Plaintiffs do not allege any facts to support a plausible claim that Defendants lack a legitimate interest in enforcing the CSA except against persons who have complied with procedures such as RFRA.

- 13 -

## III. CONCLUSION

The Court grants Defendants' Motion to Dismiss Plaintiffs' constitutional claims for failure to state a claim. Because Plaintiffs have standing to bring a RFRA claim and have alleged that the CSA substantially burdens Plaintiffs' sincere religious practice, the Court denies Defendants' Motion as to Plaintiffs' RFRA claim.

**IT IS ORDERED** denying Defendants' Motion to Dismiss Count 1 of the Complaint (Doc. 23).

**IT IS FURTHER ORDERED** granting Defendants' Motion to Dismiss Counts 2, 3, 4, 5, 6 and 7 of the Complaint (Doc. 23).

Dated this 20th day of March, 2023.

Susan R. Bolton
United States District Judge

- 14 -

# EXHIBIT H

| From: | Russell Godfrey |
|---|---|
| To: | Bridger Jensen |
| Cc: | Tanner J Bean |
| Subject: | Re: DOPL Investigation 155999 |
| Date: | Tuesday, November 19, 2024 12:26:04 PM |

Mr. Jensen and Mr. Bean,

I spoke with my supervisor about closing this case and it was decided this complaint would be closed as "unfounded". This means DOPL is not taking any action and closing this complaint out with no further action taken at this time. I want to thank you for your cooperation in this matter and wish you all the best in the future. If you have any questions, please let me know.

Thanks,

Russ Godfrey

## Russ Godfrey | Investigator

**Email: rgodfrey@utah.gov**
**Cell: 385-622-1583 | Fax: 801-530-6301**
**Heber M. Wells Bldg.**
**160 E 300 S**
**Salt Lake City, UT 84114**

The information contained in this e-mail message is privileged and/or confidential information intended only for the receipt by and use of the individual or entity to whom or which it is addressed If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this message in error, please immediately notify us by telephone or by reply to this message. Also, please delete the original message. Thank you.

On Tue, Nov 12, 2024 at 9:56 AM Bridger Jensen <bridgerjensen@gmail.com> wrote:
Please see attached.

I wish to also express that I am in full compliance with the law, and that I am absolutely willing to speak openly with you and even have you come for a tour anytime. :) Just let me know.

Thank you,

Bridger Jensen

On Mon, Nov 11, 2024 at 12:44 AM Bridger Jensen <bridgerjensen@gmail.com> wrote:
Russ-

I have prepared a statement for you and I will send it by the end of the business day Monday. I got delayed a little bit over the weekend.

App-4:188

Thank you for your patience and know that I fully intend to comply with your investigation. After you've received the statement, I am open to speak in person or on the phone at your request.


Thank you,

**Bridger Jensen**
<u>Utah Psychedelic Therapy</u>, Founder


On Wed, Oct 30, 2024 at 1:17 PM Russell Godfrey <<u>rgodfrey@utah.gov</u>> wrote:

Mr. Jensen,

My name is Russ Godfrey and I am an investigator with the Division of Professional Licensing (DOPL). I have been assigned to follow up on a complaint made to our Division regarding Singularism and your State-issued license. The complaint stated you were practicing therapy without a license (your State-issued license expired in 2019) and the business license was about to expire (which it did at the end of September 2024). I want you to write me a statement responding to this complaint. I would like you to address your role at Singularism and what function(s) you perform for the company. Can you also address the reason the company license has expired, yet your website still shows active with an address in Provo, Utah. Once I get your statement I would like to follow up with you either in person or over the phone if necessary.

Thank you and I look forward to hearing from you,

Russ Godfrey

**Russ Godfrey | Investigator**



**Email: rgodfrey@utah.gov**
**Cell: 385-622-1583 | Fax: 801-530-6301**
**Heber M. Wells Bldg.**
**160 E 300 S**
**Salt Lake City, UT 84114**

The information contained in this e-mail message is privileged and/or confidential information intended only for the receipt by and use of the individual or entity to whom or which it is addressed If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this message in error, please immediately notify us by telephone or by reply to this message. Also, please delete the original message. Thank you.

# FABIAN VANCOTT

Tanner J. Bean
**Attorney**
Tel. 801-323-2266
tbean@fabianvancott.com

November 11, 2024

**VIA EMAIL**

Division of Professional Licensing
State of Utah Department of Commerce
Attn: Russell Godfrey
P.O. Box 146741
Salt Lake City, UT 84114-6741
rgodfrey@utah.gov

**Re: Clarification of Religious Exemption – Bridger Lee Jensen**

Mr. Godfrey,

I am writing on behalf of my client, Bridger Lee Jensen, regarding the recent inquiry from the Division of Professional Licensing regarding his organization, Singularism, and his religious work in the state of Utah.

As you are aware, Utah's Mental Health Professional Practice Act governs the licensure and practices of individuals engaging in the practice of mental health therapy. Utah Code § 58-60-101 *et seq*. Although generally an individual must be licensed to engage in the practice of mental health therapy, Utah Code § 58-60-107 includes a list of individuals who are exempted from licensure. Relevant here, this list includes "a recognized member of the clergy while functioning in a ministerial capacity as long as the member of the clergy does not represent that the member of the clergy is, or use the title of, a license classification in Subsection 58-60-102(5)." Utah Code § 58-60-107(2)(b) (due to a clerical error in the statute, the reference should be to subsection 58-60-102(15), not 58-60-102(5)).

As further attested to in Mr. Jensen's declaration attached hereto, Mr. Jensen was previously licensed as a therapist in the state of Utah, but he voluntarily surrendered his licensure to pursue his sincere religious beliefs associated with Singularism. We have worked at great length with Mr. Jensen to ensure that he understands the religious exemptions provided to him under state and federal law, and he has exerted substantial effort to ensure his compliance with and transparency regarding such exemptions.

We understand the unique nature of our client's religious practices as a minority religion in the state of Utah, and we appreciate the Division of Professional Licensing's efforts to ensure that individuals are complying with Utah law. Based on the statutes

95 South State, Suite 2300
Salt Lake City, UT 84111

ATTORNEYS AT LAW
www.fabianvancott.com

App-4:190

above and Mr. Jensen's declaration attached hereto, we respectfully request the Division recognize Mr. Jensen's religious exemption and conclude its investigation.

Please do not hesitate to contact me at the phone number or email set forth above if you need any further information or clarification regarding my client's activities or to ensure compliance with Utah's professional practice standards.

Sincerely,

Tanner J. Bean
FABIAN VANCOTT

## DECLARATION OF BRIDGER LEE JENSEN

I, Bridger Lee Jensen, declare and state as follows:

**Regarding the allegation of practicing therapy without a license:**

1.      I was previously licensed as a mental health professional in the state of Utah.

2.      I no longer practice under that licensure, having voluntarily surrendered such licensure in 2019 in order to pursue my sincerely held religious beliefs associated with a religious organization known as Singularism.

3.      Singularism is a contemporary religion of which I am the founder.

4.      As explained on Singularism's website, singularism.org, Singularism "provide[s] a sacred space where science and spirituality united, offering a holistic path to healing, growth, and self-discovery. Through this unique synergy, [Singularism] guides individuals toward profound insights, authentic connections, and lasting change."

5.       At "the heart of [Singularism's] spiritual practice lies the sacred tradition of Entheogenic Spiritual Guidance. [Singularism] integrate[s] the profound potency of psilocybin, a revered entheogenic substance with long standing religious use into our own ceremonies as a means to facilitate deep spiritual connections and foster profound inner spiritual transformation. [Singularism's] ceremonies are performed safely, sincerely religious, and crucial for producing the effective results from which our members reap invaluable benefits."

6.      My current activities related to Singularism are strictly religious in nature. I provide services that are limited to guided psilocybin sessions and spiritual exploration, all of which are grounded in the belief that psilocybin is a sacred sacrament that can serve as a conduit to profound spiritual experiences, informed by the tenets and sacred tradition of Entheogenic Spiritual

Guidance. These services are intended solely for the spiritual and religious guidance of individuals

and are delivered within a religious framework.

7.     I understand that Utah Code § 58-60-107(2)(b) provides an exemption from

licensure requirements for individuals who offer counseling or guidance in a religious context. It

states, "In addition to the exemptions from licensure in Section 58-1-307, the following may

engage in acts included within the definition of practice as a mental health therapist, subject to the

stated circumstances and limitations, without being licensed . . . (b) a recognized member of the

clergy while functioning in a ministerial capacity as long as the member of the clergy does not

represent that the member of the clergy is, or use the title of, a license classification in Subsection

58-60-102(5)."

8.     In accordance with this law, I go to great lengths not represent myself as a license

classification from Subsection 58-60-102(5). I have taken extensive steps to comply with the

religious exemption from licensure, including:

a.   Contacting the Division of Professional Licensing in 2022 to confirm my

understanding of the legal exemptions. At this time, I spoke and emailed with Julie Pulsipher, a

Division Board Secretary, seeking guidance on the Mental Health Professional Practice Act.

b.   Clarifying in consultations, webinars, and conversations that I am not operating

under a license.

c.   Engaging legal counsel to ensure my interpretation of Utah law was and continues

to be accurate.

d.   Requiring participants to sign a waiver before participating in our spiritual guidance

in which they explicitly acknowledge that:

App-4:193

i.  Singularism's use of psychedelics is intended solely for religious and spiritual reasons, not recreational or non-religious purposes.

ii.  Singularism operates without clinical licensure, and to the extent that any facilitators of Singularism's practices hold licenses or other professional credentials, those licenses and professional credentials are unrelated to the facilitator's work with Singularism.

9.  I hold a sincere belief in Singularism and its practices. I founded Singularism as a legitimate, sincerely practiced religion, with a clear mission centered around mental wellness in a religious and spiritual context.

10.  I have taken extensive measures to adhere to the legal and religious exemption requirements by refraining from presenting myself as a licensed professional and by refraining from referring to myself by any of the titles listed in Utah Code § 58-60-109(1)(c) or § 58-60-102(15) (due to a clerical error, although the statute for religious exemption from licensure in Utah Code § 58-60-107(2)(b) references Subsection 58-60-102(5), the reference should be to Subsection 58-60-102(15)).

11.  I have committed to being transparent about Singularism's religious practices and my involvement in those practices, both with the public, individual participants, and government entities.

12.  I reserve all rights and privileges afforded by this exemption. I intend to follow the law dutifully.

**Regarding the allegation of operating a business without a license:**

13.  Due to moving this year, and due to some unforeseen complications with our businesses mailboxes, much of my business mail has been mailed to the wrong address and then returned. Included in this was the notice reminders to update our business registration. As a result,

I had an expired license for approximately a month. I updated said registration on Oct, 31st 2024,

as soon as it came to my attention, and it is currently active.

I declare under criminal penalty under the laws of the State of Utah that the foregoing is

true and correct.

EXECUTED on the 11th day of November, 2024

Bridger Lee Jensen, Founder of Singularism and Psychedelic Therapy Journey

# EXHIBIT I



January 13, 2025


Bridger Jensen
Singularism
1969 N State St.
Provo, UT 84604


**Subject: Business License Not Required for Religious Organizations**

Dear Mr. Jensen,

This letter is to confirm that, under Provo City Code sec. 6.01.130, churches or religious organizations are not required to obtain a business license to operate. This exemption is limited to activities directly associated with religious purposes. Application LCB202400923 for Singularism has been closed.

If your organization engages in activities outside the scope of religious operations, such as running a commercial enterprise or selling goods, additional regulations may apply, and compliance will be required.

If you have further questions regarding these requirements, contact our office at 801-852-6000 or licensing@provo.gov

Sincerely,

Provo 311 Customer Service
Business Licensing
801-852-6000

MITCHELL A. STEPHENS (11775)
JUSTIN L. JAMES (15167)
DILLON P. OLSON (16120)
JAMES DODGE RUSSELL & STEPHENS, P.C.
10 West Broadway, Ste. 400
Salt Lake City, Utah 84101
mstephens@jdrslaw.com
jjames@jdrslaw.com
dolson@jdrslaw.com
*Attorneys for Defendants Utah County
and Jeffrey Gray*

J. BRIAN JONES (11816)
GARY D. MILLWARD (12170)
RICHARD A. ROBERTS (12217)
PROVO CITY ATTORNEY'S OFFICE
445 W Center St.
Provo, Utah 84601
gmillward@provo.gov
rroberts@provo.gov

*Attorneys for Defendants Provo City*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BRIDGER LEE JENSEN; SINGULARISM; PSYCHE HEALING AND BRIDGING, LLC dba PSYCHEDELIC THERAPY JOURNEY; <br><br> Plaintiffs, <br><br> vs. <br><br> UTAH COUNTY; PROVO CITY; JEFFREY GRAY; <br><br> Defendants. | **SUPPLEMENTAL MEMORANDUM OF AUTHORITIES PURSUANT TO COURT ORDER** <br><br> Civil Case No. 2:24-cv-00887-JNP <br><br> Judge Jill N. Parrish |

Defendants Utah County (the "County"), Jeffrey Gray ("Gray") (collectively "Utah County") and Provo City (the "Provo"), jointly submit this Supplemental Memorandum of Authorities Pursuant to Court Order.  [*See* Order Requesting Supplemental Briefing (Dkt. 77)].

## ARGUMENT

**ISSUE 1:** **What is the best argument that the law at issue here is neutral and generally applicable?[1]**

"General applicability does not mean absolute universality.  Exceptions do not negate that the CSAs are generally applicable." *Olsen v. Mukasey*, 541 F.3d 827, 832 (8th Cir. 2008).  A law is generally applicable if it does not, "in a selective manner impose burdens only on conduct motivated by religious belief[.]"  *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah.*, 508 U.S. 520, 543 (1993); *Eternal Word Television Network, Inc. v. Sec'y of U.S. Dep't of Health & Hum. Servs.*, 818 F.3d 1122, 1164 (11th Cir. 2016) (same); *Michigan Cath. Conf. & Cath. Fam. Servs. v. Burwell*, 755 F.3d 372, 394 (6th Cir. 2014) ("A law is generally applicable if it does not make distinctions based on religion.").

One guiding case on this principle is *Church of Lukumi,* 508 U.S. 520.  There, the plaintiff challenged a law that prohibited animal sacrifices as a violation of the Free Exercise Clause.  *Id.* The Supreme Court held that the "general applicability" standard meant "that government, in the pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief[.]"  *Id.* at 545.  Ultimately, the Supreme Court found that the laws at issue were not generally applicable because "each of [the] ordinances pursues the city's governmental interests *only* against conduct motivated by religious belief."  *Id.; accord State v. Green*, 2004 UT 76, ¶ 21, 99 P.3d 820 (addressing *Church of Lukumi* and recognizing "ordinances were written in such a way as to target only those animal killings that occurred attendant to Santeria religious worship").  Said differently, the case concerned a clear "religious gerrymander." *See Church of Lukumi*, 508 U.S at 535.

---

[1] The Court's Order asked: "What is the best argument that the law at issue here is legally indistinguishable from that at issue in *Smith*?"  Defendants have slightly altered the issue to address the standards set by *Smith.*

The Utah CSA does not impermissibly target Plaintiffs. *See id.* at 534 (recognizing city code was "improper targeting of the Santeria religion"). Nor do the exemptions and exceptions in the Utah CSA mean it is not a law of general applicability. Indeed, no court has ever declared that CSAs are anything but neutral laws of general applicability, and dozens have rejected the type of arguments Plaintiffs make.

"The Uniform Controlled Substance Act, first promulgated in 1970, has been the basic law pertaining to control of narcotic drugs in forty-six (46) states." *See* Richard L. Braun, *Uniform Controlled Substances Act of 1990*, 13 Campbell L. Rev. 365, 365 (1991). Before that, there were other uniform drug laws. *See* Uniform CSA (1970), Prefatory Note. These CSAs have always had various exceptions. *See, e.g.*, Uniform CSA § 508(e) (1970) (allowing for "research"); *id.* § 308 ("prescriptions"); Uniform CSA § 301 (agency "may adopt rules . . . relating to registration and control of . . . controlled substances"); *Id.* § 308 ("prescriptions"); *Id.* § 607 ("education and research"). Utah has adopted the uniform code. *See* Utah Code § 58-37-18 (calling for uniform construction). And Utah law has long distinguished between authorized and unauthorized uses of controlled substances. *See, e.g.*, 1898 Revised Statutes of Utah § 1711.

Courts repeatedly have upheld CSA as uniform laws of general applicability despite the presence of potential exceptions. *See Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872, 874 (1990) ("Oregon law prohibits the knowing or intentional possession of a controlled substance unless the substance has been prescribed by a medical practitioner.").

In *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 436 (2006), the Supreme Court recognized that the federal CSA was a "generally applicable law." *See id.* at 436 ("[T]here may be instances in which a need for uniformity precludes the recognition of exceptions to generally applicable laws under RFRA.").

Initially, in *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 282 F. Supp. 2d 1236 (D.N.M. 2002), the plaintiff argued that the federal controlled substances act was not generally applicable because the statute "provide[d] a wide variety of exceptions, exemptions and licenses permitting the use of controlled substances in non-religious settings." *Id.* at 1242. Notably, the CSA at issue included exemptions for religious peyote use.[2] The district court rejected the constitutional challenge. It noted that the "exceptions specified in the CSA do not implicate the purposes of the law" because the exceptions did not undermine the public health concerns associated with recreational and unregulated use, distribution, and manufacturing of controlled substances. *Id.* at 1246.

Courts throughout the country agree. In *United States v. Meyers*, 95 F.3d 1475 (10th Cir. 1996), the Tenth Circuit held that the Federal CSA was "a valid neutral law of general applicability." *Id.* at 1481. This was true even though the Federal CSA exempted religious peyote use.[3] *Compare* 42 U.S.C. § 1996; 21 C.F.R. § 1307.31; *with* Utah Code § 58-37-8(12)(a). The Federal CSA further allowed for administrative rulemaking and oversight. *Compare* 21 U.S.C. § 822(d) (allowing Attorney General to waive "consistent with the public health and safety"); *with* Utah Code 58-37-6(2)(d) (allowing division to waive "consistent with public health and safety"). *See also* 21 U.S.C. §§ 821, 871(b) (allowing "rules and regulations"); Uniform

---

[2] *See generally* 42 U.S.C. § 1996a(b)(1) ("[T]he use . . . of peyote by an Indian for bona fide traditional ceremonial purposes in connection with the practice of a traditional Indian religion is lawful, and shall not be prohibited by the United States or any State.").

[3] The exception to the Federal CSA was first enacted in March 1966 with apparent congressional approval. *See* 31 Fed.Reg. 4679 (1966); *see also United States v. Warner,* 595 F.Supp. 595, 598 (D.N.D.1984) (Congress intended to exempt religious use of peyote only by NAC members); *Native American Church of New York v. United* States, 468 F.Supp. 1247, 1249, 1251 (S.D.N.Y.1979) (Congress meant to exempt all bona fide religious peyote use); *Peyote Way Church of God, Inc. v. Thornburgh*, 922 F.2d 1210, 1214 (5th Cir. 1991) (same).

CSA § 301 1990 ("The [appropriate person or agency] may adopt rules . . . ." (brackets in original)); *Id.* at § 302(d) ("The [appropriate person or agency] by rule may waive . . . consistent with the public health and safety.").

In *Olsen v. Mukasey*, 541 F.3d 827 (8th Cir. 2008), the Eighth Circuit held that Iowa's CSA was a law of general applicability despite exceptions for "alcohol[,] tobacco, certain research and medical uses of marijuana, and the sacramental use of peyote." *Id.* at 832. Notably, both Utah and Iowa have adopted the Uniform CSA. Citing *Myers,* the Eight Circuit repeated: "[e]xceptions to not negate that the CSAs are generally applicable." *Id.; see also United States v. Christie*, 825 F.3d 1048, 1052 n.3 (9th Cir. 2016) (recognizing challenge to Federal CSA is "doomed" because the law is "a valid and neutral law of general applicability."); *Oklevueha Native Am. Church of Hawaii, Inc. v. Holder*, No. CIV. 09-00336 SOM, 2012 WL 6738532, at *9 (D. Haw. Dec. 31, 2012) ("[T]he Controlled Substances Act is a valid and neutral law of general applicability."); *Loop v. United States*, No. 05-575 (JRT/FLN), 2006 WL 1851140, at *2 (D. Minn. June 30, 2006) ("The Controlled Substances Act…is a religiously neutral law of general applicability.").

Here, the Utah CSA is not distinguishable from other states' CSAs or the Federal CSA. And neither the exceptions for peyote use or psilocybin use (or any other exceptions) render Utah's CSA no longer a law of general applicability.

Utah's religious exceptions for peyote use are substantially the same as the exceptions under the Federal CSA that have existed since 1966. Indeed, Utah's peyote exception is mandated by federal law. *See* 42 U.S.C. § 1996a(b)(1) ("[T]he use . . . of peyote by an Indian for bona fide traditional ceremonial purposes in connection with the practice of a traditional Indian religion is lawful, and shall not be prohibited by the United States or any State."). Thus every

4

CSA in the nation has a peyote exception, either expressly or by way of federal preemption. And yet, no court has declared CSA unconstitutional or denied that they are laws of general applicability.

The recent enactment of Utah Code § 58-37-3.5, which allows limited use of "Drugs for behavioral health treatment" does not undermine the purposes of the CSA. To begin with, CSAs have long allowed for medical research, education, and drug development. *See, e.g.*, Uniform CSA § 607 (1990) ("Education and Research"). Utah's new statute is consistent with these established government purposes. Section 58-37-3.5 is limited to forms of "psilocybin" and "methylenedioxymethamphetamine" that have been approved by the "Food and Drug Administration" for "Phase 3 testing" in accordance with "21 C.F.R. Part 312." *See* Utah Code 58-37-3.5(a)(1). Part 312 does not allow for the uncontrolled, unregulated use, distribution, or possession of otherwise controlled substances. Instead, Part 312 consists of approximately sixty different, detailed subsections spanning more than 50 pages. *See* 21 C.F.R. § 312.1 to §312.320. The purpose of Part 312 is to detail "procedures and requirements governing the use of investigational new drugs," *see* 21 C.F.R. § 312.1(a), while still protecting "the rights, safety, and well-being of human subjects," *id.* § 312.3. The addition to the Utah Code is consistent with this research and safety driven process. Not only does the Utah Code incorporate "21 C.F.R. Part 312," but it further limits use to large medical facilities accustomed to investigational medical treatments and associated research. *See* Utah Code § 58-37-3.5(1)(a)-(b). Utah further requires that the resulting research be reported "to the Health and Human Services Interim Committee" so that the Legislature may "evaluate the medicinal value of any drugs." *Id.* at § -3.5(4).

In short, Utah's recent exception allowing for psylocibin use in limited, controlled, monitored, and regulated channels so that the Utah Legislature can "evaluate the medicinal value"

5

does undermine the public health concerns associated with recreational, unregulated use of psychedelic substances.  Utah's CSA, like the general CSA, remains a neutral law of general applicability.  "[A]llowing certain uses of drugs in controlled scientific, research, and medical environments does not run counter the to government's interest in promoting health."  *O Centro,* 282 F. Supp. 2d at 1246.

**ISSUE 2:     If the court determines that Plaintiffs' federal constitutional claims survive the motion to dismiss, does § 1983 authorize the court to enjoin the state prosecution against Mr. Jensen on the facts of this case? If so, would it be a proper exercise of the court's authority to enjoin the prosecution?**

Absent an exception, the Anti-Injunction Act "is an absolute prohibition against any injunction of any state-court proceedings."  *Vendo Co. v. Lektro-Ven Corp.*, 433 U.S. 623, 630 (1977); *see also* 28 U.S.C. § 2283 ("A court of the United States may not grant an injunction to stay proceedings in a State court . . . ."); *Lone Star Promotions, LLC v. Abbey Lane Quilts, LLC*, 2018 WL 5808802, at *3 (D. Utah Nov. 6, 2018) ("The Supreme Court has . . . made clear that the statute imposes an absolute ban of the issuance of a federal injunction against a state court proceeding").  The Anti-Injunction Act avoids "the inevitable friction between state and federal courts that ensures from the injunction of state judicial proceedings by a federal court."  *Vendo Co.*, 433 U.S. at 630; *Lone Star*, 2018 WL 580880, at *3 ("[T]he Anti-Injunction Act is a necessary concomitant of a dual system of federal and state courts and a pillar of federalism reflecting the independence of the states and their courts").

Enjoining the pending criminal prosecution would be improper because: (A) Plaintiffs did not seek injunctive relief under § 1983, (B) an injunction of the criminal proceeding is not the only means of preserving Plaintiffs' alleged rights, (C) the issues has not been certified to the Utah Attorney General.

App-4:204

A. <u>An injunction based on § 1983 must arise from exceptional circumstances that do not exist here, and Plaintiffs waived their right to seek an injunction under § 1983.</u>

The United States Supreme Court has recognized that § 1983 claims can serve as an exception to the Anti-Injunction Act when there are "exceptional circumstances." *See, e.g.*, *Mitchum v. Foster*, 407 U.S. 225, 242–43 (1972).  However, that federal statute cannot form the basis for an injunction based on the Utah RFRA or the Utah Constitution.  *See, e.g. Kilman v. Co. Dept. Corrections*, 772 Fed. Appx. 774, 746 n.2  (10th Cir. 2019) ("§ 1983 does not encompass violations of state law"); *Love v. McKune*, 33 Fed. Appx. 369, 371 (10th Cir. 2002) (same); *McQuillion v. Schwarzenegger*, 369 F.3d 1091, 1098 (9th Cir. 2004) (rejecting § 1983 as means to "enjoin defendants from violating state law and the California Constitution").  *See generally Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984) ("A federal court's grant of relief against state officials on the basis of state law . . . does not vindicate the supreme authority of federal law.").  Even when the allegations concern a violation of federal rights, "the normal thing to do when federal courts are asked to enjoin pending proceedings in state courts is not to issue such injunctions." *Younger v. Harris*, 401 U.S. 37, 45 (1971).

Plaintiffs bear the heavy burden of demonstrating both the applicability of an exception to the Anti-Injunction Act and the basis for an injunction that alters the status quo.  *See, e.g.*, 19 Fed. Proc., L. Ed. § 47:127 ("A party claiming that one of the exceptions to the Anti-Injunction Act applies has the burden . . . ."); *Schrier v. Univ. of Co.*, 427 F.3d 1253, 1258 (10th Cir. 2005) (confirming moving party has burden); *Stewart v. Dameron*, 448 F.2d 396, 397 (5th Cir. 1971) (reversing §1983 injunctive relief because court "placed the burden on the State to prove the good faith of its prosecution"); *Peters v. United Sates*, 2024 WL 2274079 at *6 (D. Colo. May 20, 2024) (recognizing "this burden as 'almost insurmountable' and 'an all but impossible task'").  Plaintiffs did not even attempt to meet that burden through 42 U.S.C. § 1983.

7

On December 2, 2024, the Court ordered Plaintiffs to "address the federal standard for granting injunctive relief." [*See* Dkt. 5]. The Plaintiffs' resulting motion asked the Court to enjoin Defendants "from prosecuting Plaintiffs" [Dkt. 9-18], but Plaintiffs did not rely on § 1983 as a basis for their request. [*See generally* Dkt. 9 (Motion) (no reference to § 1983); Dkt. 19 (Reply) (no reference to § 1983)]. This was true even though Defendants' Opposition raised the Anti-Injunction Act. [*See* Dkt. 13 at 12 (quoting 28 U.S.C. § 2283)]. Plaintiffs subsequent "Motion for Anti-Suit Injunction" likewise did not assert § 1983 as a basis for action. [*See* Dkt. 39]. Instead, Plaintiffs only argued that 28 U.S.C. §1446(d), the removal statute, authorized the requested injunction. [*See id.* at 4-6]. Plaintiffs' reply was the same. [*See* Dkt. 58 (no reference to § 1983)]. Plaintiffs then filed their *fifth* memorandum in support of their requested injunction on January 22, 2025 – the day before oral argument. [*See* Dkt. 71]. Plaintiffs' fifth filing on this issue yet again did not argue that an injunction should issue based on § 1983. [*See id.* (no reference to § 1983)]. Plaintiffs have not sought an injunction pursuant to § 1983.

"Issues not raised" by a party "are deemed abandoned or waived." *Tran v. Trustees of State Colleges in Co.*, 355 F.3d 1263, 1266 (10th Cir. 2004); *accord Uckerman v. O'Malley*, 2024 WL 4028229 at *2 (D. Utah Sept. 3, 2024) ("Plaintiff waived his arguments . . . made for the first time in his reply brief."); *Klein v. Plaskolite, LLC*, 2024 WL 4253010 at *20 (D. Utah Sept. 20, 2024) ("Arguments that are underdeveloped and inadequately briefed are deemed waived."); *Utah Physicians for a Healthy Environment, Inc. v. Harley-Davidson of Salt Lake City, LLC*, 2024 WL 3276844 at *11 n.137 (D. Utah July 1, 2024) ("Defendants have waived this issue by failing to adequately brief it."); *Tracy J. v. Kijakazi*, 2022 WL 2080137 at *5 (D. Utah May 20, 2022) ("Plaintiff waived this issue . . . ."). "[A] litigant who fails to press a point by supporting it with pertinent authority . . . forfeits the point." *Tran*, 355 F.3d at 1266.

Plaintiffs made no request for an injunction pursuant to § 1983, let alone satisfy the extraordinarily high burden required for that relief. Regardless of whether § 1983 *could have* supported Plaintiffs' position, the Plaintiffs did not make that argument. The Court should not make it for them. Nor should it render the extensive briefing and all-day hearings pointless by moving the target to an issue Plaintiffs repeatedly eschewed.

B. Regardless, Section 1983 does not support an injunction in this case.

"Even though an action brought under § 1983" can be an exception the Anti-Injunction Act, "the underlying notions of federalism which Congress has recognized in dealing with the relationship between federal and state courts still have weight." *Rizzo v. Goode*, 423 U.S 362, 378 (1976). Such an injunction must "be used sparingly, and only in a clear and plain case." *Id.* The Court must "abide by standards that go well beyond those of private equity jurisprudence." *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 604 (1975). Although the Supreme Court concluded that § 1983 may serve as an exception to the Anti-Injunction Act under "exceptional circumstances," the Supreme Court also declared that its decision did "not question or qualify in any way the principles of equity, comity, and federalism that must restrain a federal court when asked to enjoin a state court proceeding." *Mitchum*, 407 U.S. at 243. Indeed, the Supreme Court "emphatically" acknowledged "the fundamental policy against federal interference with state criminal prosecutions." *Id.* at 230.

Injunctions under § 1983 are, therefore, limited to the "exceptional circumstances" where it is "essential to prevent great, immediate, and irreparable loss of a person's constitutional rights." *Id.* at 230, 242. No such loss exists in this case. Plaintiffs have not even established an irreparable injury. "If there is no injury other than that incidental to every criminal proceeding brought lawfully and in good faith, there is no irreparable injury." *Winn v. Cook*, 945 F.3d 1253,

9

1259 (10th Cir. 2019); *accord Gordon v. Utah*, 2009 WL 2984039 at *3 (D. Utah Sept. 16, 2009)

("[T]he fact that Plaintiff must appear on criminal charges in state court is insufficient to establish

such an injury."). "[O]nly in cases of proven harassment or prosecutions undertaken by state

officials in bad faith without hope of obtaining a valid conviction . . . is federal injunctive relief

against pending sate prosecutions appropriate." *Mitchum*, 407 U.S. at 230-31.

Here, the criminal prosecution does not represent a loss of Plaintiffs' constitutional rights.

*See, e.g.*, *Kugler v. Helfant*, 421 U.S. 117, 124 (1975) (affirming a district court's refusal to enjoin

criminal proceeding, recognizing that "a pending state prosecution provides the accused a fair

and sufficient opportunity for vindication of federal constitutional rights"). To the contrary, the

criminal process is the embodiment of Plaintiffs' constitutional rights. *See* Utah Const. Art. I,

§§ 10, 12; U.S. Const. Am. V, VI. Plaintiffs will have the opportunity to challenge their charges

and call and confront witnesses, including through the presentation of evidence concerning their

purported religious practices.

Nor can Plaintiffs establish that an injunction of the criminal prosecution is the "***only***"

means of safeguarding their federal rights. *See, e.g.*, *Moore*, 442 U.S. at 430 (reversing injunction

of criminal proceedings pending a determination of the constitutionality of a statute, noting that

"the only pertinent inquiry" when considering whether to enjoin state criminal proceedings is

"whether the state proceedings afford an adequate opportunity to raise the constitutional claims").

The United States Supreme Court has limited federal intervention under § 1983 to "exceptional

circumstances" where it is the only means to "prevent great, immediate, and irreparable loss of a

person's constitutional rights." *Mitchum*, 407 U.S. at 42.

"Any doubt as to the application of the Act's three exceptions must be resolved in favor

of permitting the state court to proceed." *See Lone Star*, 2018 WL 5808802, at *2. Because

Plaintiffs have not proven that the criminal prosecution will result in a permanent loss of their constitutional rights, a federal injunction of the state court prosecution is not warranted.

C. <u>It would be an improper to rely on § 1983 and enjoin the pending criminal case without first certifying the alleged constitutional issue to the Utah Attorney General.</u>

The State of Utah is prosecuting Plaintiffs. And, Plaintiffs are challenging the validity of the Utah Code – specifically the Utah CSA. [*See also* Order Re: Supplemental Briefing (Dkt. 77) at Question 1]. However, the State of Utah is not before the Court. Nor did Plaintiffs notify the Utah Attorney General. Their failure violates the Utah Code. *See* Utah Code § 78B-6-403 ("If a statute . . . is alleged to be invalid, **the attorney general shall** be served with a copy of the proceeding and be entitled to be heard."). Plaintiffs also violated the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 5.1. "A party that files a pleading, written motion, or other paper drawing into question the constitutionality of a federal or state statute must promptly: (1) file a notice of the constitutional question . . . and (2) serve the notice and paper . . . on the state attorney general if a state statute is questioned . . . ." *Id.* R. 5.1(a); *see also id.* at Notes (2006) (broadening notice provisions "to better assure . . . that the attorney general is able to determine whether to seek intervention"); DUCiv. R. 5.1-1(b).

Additionally, this Court "must, under 28 U.S.C. § 2403, certify to the appropriate attorney general that a statute has been questioned." Fed. R. Civ. P. 5.1(b). "In any action, suit, or proceeding in a court of the United States to which a State or any agency, officer, or employee thereof is not a party, wherein the constitutionality of any statute of that State affecting the public interest is drawn into question, the court shall certify such fact to the attorney general of the State, and shall permit the State to intervene . . . ." 28 U.S.C. § 2403(b) (emphasis added); *see generally Oklahoma v. Pope*, 516 F.3d 1214, 1216 (10th Cir. 2008) (remanding because of failure to comply with §2403(a)). "In cases in which neither the parties nor the district court notifies the appropriate

11

official of the constitutional challenge, any orders of the court must be stayed or vacated . . . ."  4B

Fed. Prac. & Proc. Civ. § 1154 (4th ed.).  That said, "where the constitutionality of the statute has

been upheld," failure to certify is harmless because "there is 'no practical purpose to be served.'"

*Merrill v. Town of Addison*, 763 F.2d 80, 83 (2d Cir. 1985).

Plaintiffs ***did not*** assert § 1983 and the alleged unconstitutionality of Utah's CSA as a basis

for their requested injunction.  Instead, they largely focused on the Utah RFRA.  Perhaps that

explains why the Utah Attorney General was not notified that the Utah CSA has been challenged

as unconstitutional.  Regardless, the Court should not now utilize § 1983 as a basis for enjoining

the continued enforcement of the Utah CSA because the mechanisms and protections set forth in

Rule 5.1(b) and 28 U.S.C. § 2403(b) have not been followed.

**ISSUE 3:**   **If the court determines that Plaintiffs' federal constitutional claims do not survive the motion to dismiss and remands the remaining claims to the state court, will the temporary restraining order stay in place or be dissolved? Is this an issue to be decided by this court or by the state court on remand?**

The Tenth Circuit has consistently held that once a federal court remands a case to state

court, it no longer has jurisdiction over any part of the case, including a temporary restraining

order. "It is long-settled that a remand order renders the district court 'without jurisdiction' over

remanded claims, such that any continued litigation over those claims becomes a 'futile thing.'"

*C&M Props., L.L.C. v. Burbidge*, 563 F.3d 1156, 1162 (10th Cir. 2009) (quoting *In re Bear River*

*Drainage Dist.*, 267 F.2d 849, 851 (10th Cir. 1959) (citing *Hammond Hotel & Improv. Co. v.*

*Finlayson*, 6 F.2d 446, 447 (7th Cir. 1925)).  Similarly stated, "a remand order 'takes precedence'

and district court should not take action on pending motions before or after remand." *Id*. (quoting

*Kromer v. McNabb*, 308 F.2d 863, 865 (10th Cir. 1962)).

In *Hammond Hotel & Improv. Co. v. Finlayson*, the Seventh Circuit dismissed an appeal

seeking to reinstate a temporary restraining order after the federal district court had remanded the

12

case to the state court. 6 F.2d 446, 447 (7th Cir. 1925). "Neither the restraining order nor a temporary injunction would have served any purpose after the cause was remanded to the state court, since by the very act of remandment the further jurisdiction of the [federal] District Court over the action ceased." *Id*. In other words, "the remandment itself operated to vacate any injunctive order[.]" *Id*.

Here, upon remand to the state court, this Court's jurisdiction would be terminated, and any injunctive orders would similarly be vacated. This stands to reason because the primary hurdle a petitioner must overcome in a motion for a preliminary injunction is to establish that the petitioner "has a substantial likelihood of success on the merits of its claims." If all of the petitioner's federal claims have been dismissed, and the federal court declines to exercise supplemental jurisdiction over the remaining state claims, Plaintiff's motion for temporary restraining order and preliminary relief fails because Plaintiff can no longer succeed on the merits before this Court.

Finally, as a practical matter, Defendants have returned to Plaintiffs all items requested by Plaintiffs and ordered by this Court except for the psilocybin mushrooms. The Court's TRO is effectively moot.

**ISSUE 4:     What quantity of psilocybin was seized at Singularism's spiritual center on November 11?**

Pursuant to the Search Warrant, Provo City police "located psilocybin mushrooms [at Singularism] in various forms, including dried whole mushrooms, ground or powder mushroom material, and capsules containing mushroom material." [*See* Declaration of Jackson Julian at ¶ 13, attached here as Exhibit A.] Officers found the psilocybin mushrooms in various containers, including "glass bowl for whole mushrooms, glass bowl for mushroom powder, various paper cups with handwritten lettering with mushrooms, capsules, and several sealed bags containing

mushrooms." [Julian Dec. at ¶ 14.] After seizing the mushrooms, officers placed the mushrooms, powder and capsules of mushroom material, and the sealed mushroom packages into evidence bags. [*Id.* at ¶ 15.] The weight of all the mushrooms and mushroom-like material, including the evidence bags, was 459.8 grams. [*Id.* at ¶ 18; *see also* Return to Search Warrant, attached as Exhibit 5 to Jullian Dec.]



14

Photographs of the seized psilocybin mushrooms, powders, and pills show the variety of mushrooms and various containers used to store mushrooms and mushroom-like materials. [*See* Julian Dec.at ¶¶ 13-14; the photos are attached as Exhibit 4 to Detective Julian's declaration.] According to Detective Julian, "this is the greatest quantity of psilocybin mushrooms that [he] has seized." [*Id*. at ¶ 16.] Due to the nature and condition of the psilocybin mushrooms and mushroom-material, there were concerns by law enforcement about "potential exposure to psilocybin, especially from the mushroom-like material in the powder form and any spores from the whole mushrooms." [*Id*. at ¶ 17.] Based on those concerns and efforts to minimize exposure and potential contamination from the psilocybin mushrooms and powders, Detective Julian has limited removal of mushrooms from the sealed packages. [*Id*. at ¶ 17, 19-20.]

Following Provo City police department's seizure of the psilocybin mushrooms, a portion of single mushroom weighing .9 grams was field tested by Detective Jackson Julian. [*See* Julian Dec. at ¶ 20.] Det. Julian returned the unused portion of the tested mushroom – .7 grams – to the police department's evidence locker. [*Id*.; *see also* Provo Police Evidence Custody History Report at pg. 2, attached as Exhibit 7 to Dec. of Julian.]

In addition, Provo Police sent two samples of the seized mushroom-like material to the Utah Bureau of Forensic Services – the State Lab – to test and analyze the samples for controlled substances. Both samples tested positive for psilocyn. The first sample of mushroom-like material weighed less than 100 milligrams and tested positive for psilocyn. [*See* Dec. of Julian at ¶ 19.] The entire first sample was used in the test, but a glass vial containing the extract from the sample was returned to Provo police. [*Id*. (citing Forensic Analysis Report at pg. 2, attached as Exhibit 6 to Dec. of Julian).] The second sample of mushroom-like material weighed 204 milligrams +/- 6 milligrams and also tested positive for psilocyn. [*Id*.]

Based on a conversion of 1% psilocybin per 1 gram of dried Psilocybe cubenisis mushroom, the standard dose of psilocybin is 25 milligrams or 2.5 grams of dried Psilocybe cubensis mushroom: "Current clinical trial protocols . . . us[e] a fixed psilocybin dose, most commonly 25 mg[.]" [MacCallum et al., "Therapeutic use of psilocybin: Practical considerations for dosing and administration," *Frontiers in Psychiatry* (Dec. 2022) at pgs. 4-5, Table 2 (last visited on January 30, 2025), a copy is attached as Exhibit B.]

This analysis is consistent with studies or clinical trials involving psilocybin that are being regulated through the Food and Drug Administration, which Utah's Drugs For Behavioral Health Treatment Act (commonly referred to as the "Psilocybin Act") cited when defining "psilocybin" as a drug "that is in federal Food and Drug Administration Phase 3 testing for an investigational drug described in 21 C.F.R. Part 312." Utah Code § 58-37-3.5 (1)(a). For example, in a currently pending study, "Psilocybin-Assisted Therapy in Treatment-Resistant Depression," the study plan notes that "[p]articipants will be administered one dose of a 25mg capsule of psilocybin." [*See* McClure M.D., Robert K et al., "Psilocybin-Assisted Therapy in Treatment-Resistant Depression," Sponsor: Univ. of North Carolina, Clinical Trials ID: NCT06303739. https://clinicaltrials.gov/study/NCT06303739?intr=psilocybin&locStr=United%20States&country=United%20States&aggFilters=phase:3&rank=1&tab=table National Library of Medicine (last visited on February 3, 2025), attached as Exhibit C.]

Testimony from Singularism's representative, Brandi Lee, indicated that the dose of psilocybin used for Voyagers varied. [*See* TRO Transcript at 99:8-20, excerpts attached as Exhibit D.] Lee further confirmed the evidence that Singularism had provided doses to some Voyagers between 2 grams and others 3.5 grams. [*Id*. at 99:12-14; 102:16-21.] Plaintiffs had well over 100 times that amount. [*See* Julian Dec. at ¶ 18; Return to Search Warrant (Ex. 5 to Julian Dec.)]. It

16

remains the "greatest quantity of psilocybin mushrooms" Detective Julian has ever seized.  [Julian Dec. at ¶ 16].[4].

Dated this 5th day of February 2025

JAMES DODGE RUSSELL & STEPHENS, P.C.

*/s/ Mitchell A. Stephens (signed with permission)*
Mitchell A. Stephens
Justin L. James
Dillon P. Olson

*Counsel for Utah County and Jeffrey Gray*

PROVO CITY LEGAL

*/s/ Richard A. Roberts*
Gary D. Millward
Richard A. Roberts

*Counsel for Provo City*

---

[4] Defendants referenced various documents during oral argument on January 23, 2025.  Those additional exhibits also are filed with this memorandum as Exhibit E-I.

17

App-4:215

# EXHIBIT A

J. BRIAN JONES (11816)
GARY D. MILLWARD (12170)
RICHARD A. ROBERTS (12217)
NICHOLAS MUHLESTEIN (15686)
PROVO CITY ATTORNEY'S OFFICE
445 W Center St.
Provo, Utah 84601
(801) 852-6140
gmillward@provo.gov
rroberts@provo.gov
nmuhlestein@provo.gov

*Attorneys for Defendants Provo City*

---

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BRIDGER LEE JENSEN, an individual; SINGULARISM, a non-profit corporation; PSYCHE HEALING AND BRIDGING, LLC dba PSYCHEDELIC THERAPY JOURNEY, a limited liability company;<br><br>    Plaintiffs,<br><br>    vs.<br><br>UTAH COUNTY, a political subdivision; PROVO CITY, a political subdivision; and, JEFFREY GRAY, an individual;<br><br>    Defendants. | **DECLARATION OF JACKSON JULIAN**<br><br>Civil Case No. 2:24-cv-00887-JNP<br><br>Judge Jill N. Parrish<br><br>Magistrate Judge Cecilia M. Romero |

I, Jackson Julian, declare:

1. I am over eighteen years old and competent to testify.

2. I have personal knowledge of the facts set forth in this declaration.

3. I am currently a detective with Provo City's Police Department.

1

App-4:217

4.  I graduated from Utah POST in May 2018, and I have been a law enforcement officer with the Provo City Police Department since May 2018.

5.  As a law enforcement officer, I am a member of the Provo Bomb Squad and Special Weapons and Tactics Team (SWAT), as well as Provo's Special Enforcement Team (SET), which specifically investigates major crimes, including narcotics distribution.

6.  I have extensive experience investigating the use, possession, and distribution of narcotics.

7.  Since the fall of 2023, I have been investigating the potential use, possession, and distribution of psilocybin at Singularism, which is located at 1969 N. State Street, Provo, Utah. *See* Affidavit for Search Warrant at pg. 2, attached as Exhibit 1.

8.  In the fall of 2024, using an undercover alias, I communicated with the owner of Singularism, Bridger Jensen, I toured Singularism with Mr. Jensen, and I attended a webinar that was hosted by Mr. Jensen, which also included two other members of Singularism's staff. *Id.* at pgs. 3-4.

9.  In my communications with the representatives of Singularism, it was emphasized that psilocybin is at the core of their practice and that they provide psilocybin to clients in the form of tea. *Id.*

10. On November 4, 2024, based on the information gathered from my investigation, I executed and submitted an Affidavit for Search Warrant, which Search Warrant was signed by Judge Sean Petersen, Fourth District Court of Utah. *See* Search Warrant, attached as Exhibit 2.

11. The Search Warrant authorized law enforcement to serve the warrant at Singularism's property at 1969 N. State Street, Provo, Utah. The Search Warrant specifically sought

App-4:218

to find and retain evidence of psilocybin mushrooms, equipment used to ingest and/or cultivate psilocybin, business records documenting administering of psilocybin to clients, and financial records documenting transactions related to the purchase of psilocybin. *Id.*

12. On November 11, 2024, I served the Search Warrant on the premises of Singularism located at 1969 N. State Street, Provo, Utah. *See* Police Report at pgs. 4, 11-13, attached as Exhibit 3.

13. During the search of Singularism, I and other members of the Provo Police Department located psilocybin mushrooms in various forms, including dried whole mushrooms, ground or powder mushroom material, and capsules containing mushroom material. *See* Photos, attached as Exhibit 4.

14. The psilocybin mushroom material was stored at Singularism in various containers, such as a glass bowl for whole mushrooms, a glass bowl for powder, various paper cups with handwritten lettering with mushrooms, capsules, and several sealed bags containing mushrooms. *See* Police Report at pg. 12, Ex. 3; *see also* Photos, Ex. 4.

15. Per Provo City Police Department policy, we transferred all opened mushrooms, mushroom-like materials (powder and capsules), and sealed mushrooms into plastic evidence bags.

16. In my law enforcement career, this is the greatest quantity of psilocybin mushrooms that I have seized.

17. When we transferred the mushroom material from the various containers at Singularism, we had concerns about potential exposure to psilocybin, especially from the mushroom-like material in the powder form and any spores from the whole

3

App-4:219

mushrooms. In an effort to minimize exposure and potential contamination from the psilocybin mushrooms and mushroom powders, I have limited removal of mushrooms from the sealed evidence packages as best as reasonably possible. For those reasons, I have not unsealed the mushrooms that were already in sealed packaging when seized from Singularism, nor have I unsealed the powder that we placed in evidence bags.

18. The weight of all mushrooms and mushroom-like material, including the plastic evidence bags, was 459.8 grams. *See* Return to Search Warrant, attached as Exhibit 5.

19. Following the seizure of the psilocybin mushrooms, I directed that a portion of a single mushroom and a capsule containing the powder mushroom-like material be sent to the Utah Bureau of Forensic Services (the State Lab) to be tested for psilocybin. Both samples received by the State Lab tested positive for psilocybin. *See* Forensic Analysis Report at pg. 2, attached as Exhibit 6; *see also* Police Report at pg. 15, Ex. 3.

20. On November 21, 2024, I was directed to field test one of the whole mushrooms. I removed one mushroom from the collected evidence that weighed .9 grams. I cut off a small portion of the mushroom to test. Using a field test kit, the mushroom portion tested positive for psilocybin. I returned the remaining .7 grams to be held in evidence. *See* Police Report at pg. 14, Ex. 3; *see also* Provo Police Evidence Custody History Report at pg. 2, attached as Exhibit 7.

4

App-4:220

21. I declare under criminal penalty of perjury under the law of Utah that the foregoing is true and correct.

DATED this 5th day of February 2025.

_____

Jackson Julian

App-4:221

# EXHIBIT 1

IN THE FOURTH DISTRICT COURT - ALL DEPARTMENT

IN AND FOR UTAH COUNTY, STATE OF UTAH

**AFFIDAVIT FOR SEARCH WARRANT**

STATE OF UTAH )

              :ss

County of Utah )

The undersigned affiant, Detective JACKSON JULIAN of Provo Police Department, upon an oath or written affidavit subscribed under criminal penalty, declares:

That your affiant has reason to believe:

THAT

On the premises known as 1969 N State Street, Provo, UT, further described as A brown brick building located in a business complex on the west side of North State St. The numbers "1969" are displayed on a white pillar, just outside the front entrance which sits at the bottom of an outdoor stair case. The word "Singularism" is printed on the glass front entrance door.;

On the person(s) described as:

Bridger Lee Jensen (DOB 9/6/1981)

In the City of Provo, County of Utah, State of Utah, there is now certain property or evidence described as:

- Psilocybin Mushrooms
- Equipment used to ingest and/or cultivate psilocybin
- Business records which document the administering of psilocybin to clients
- Financial records which indicate transaction history of purchasing cultivation equipment, income produced by administering psilocybin to clients, and where the money garnered from this business is being kept

and that said property or evidence:

Was unlawfully acquired or is unlawfully possessed;

has been used or is possessed for the purpose of being used to commit or conceal the commission of an offense; or

is evidence of illegal conduct.

Affiant believes the property and evidence described above is evidence of the crime or crimes of
- Possession of Psilocybin (Schedule I Controlled Substance) with the Intent to distribute, per UCA 58-37-8
- Possession of Drug Paraphernalia, Per UCA 58-37A-5.

The facts to establish the grounds for issuance of a Search Warrant are:

I graduated Utah POST in May of 2018 and have been a law enforcement officer with Provo City Police Department since May of 2018. I have investigated numerous cases involving the use, possession, and/or distribution of illegal narcotics in the course of my duties as a sworn police officer. I am a member of the Provo Bomb Squad and Special Weapons and Tactics (SWAT) Team, a member of the Provo Special Enforcement Team, and a Field Training Officer. I have attended training on Advanced Search and Seizure, Advanced Traffic Stops, and the Utah Narcotics Officers Association. I have written, served, and/or assisted on hundreds of search warrants which have lead to successful prosecution throughout my career.

Provo Special Enforcement Team (SET) detectives received information in September of 2023 about a Facebook post advertising the opening of a "Mushroom Wellness Center" in Provo. The Facebook post listed the address for the center at a residence in Provo and that the grand opening would be on September 6, 2023. On September 6, 2023 I went to the residence and knocked on the door, I was greeted by a male at the front door. When I inquired about the mushroom wellness center, the male stated that I must be mistaken and he had no idea what I was talking about. When I spoke with the male at the door, there was no indication that there was any nefarious activity happening there.

On November 2, 2023, a FOX 31 News story was published about a mushroom treatment center called Singluarism opening its doors in Provo. The news article featured a male named Bridger Lee Jensen who claims to be the founder of the business. In the article, Bridger is quoted and audio/video recorded discussing his experiences in using psilocybin mushrooms. He also discusses how his treatment center is a place where people can "work on their lives and progress spiritually". He also discusses with the interviewer about "guided trips".

The news article discusses how Bridger pushed legislators to pass a bill to allow for the legal use of psilocybin. The bill Bridger is referencing is S.B. 200 "Psilocybin Recommendation Pilot Program Amendments". That bill's current location is found in "Senate file for bills not passed". In the news article, Governor Spencer Cox is quoted saying, "It's just not there yet. We got there with medical marijuana. I just don't believe the science is there. I don't believe we should be experimenting on 5000 people here in our state. And I think there are some serious consequences and side effects societally and as well as medically that I'm just not comfortable with."

The news interview goes on to where Bridger says the following, "When you get to the point where you have had these experiences and you've seen hundreds of people benefit and heeled from it, the scary thought is NOT doing it." According to the news article,

- Page 2 of 6 Search Warrant No. 2992661 -

App-4:224

Bridger claims that his business is protected by the Religious Freedom Restoration Act of the United States Constitution.

Later in November 2023 a concerned citizen, who did not want to be named, came forward wanting to speak with detectives about Bridger and his business. I met with the citizen and they advised me that Bridger has a website promoting the business and identified where the business was located. The website is Singularism.org and the business location is 1969 N State St, Provo, UT.

I went to the website and found that it shows Bridger Jensen as the founder, Alex Koritz as the Public Relations Director, Brandi Lee Didrickson as the administrative assistant. Mariangel Babbel as the Relations Specialist, Justin Sharp as the Chief Technical Officer, and Garett Robertson as the founder partner. The website shows a picture of Bridger appearing to provide some kind of council while a female lays on a couch and appears to be in an either unconscious or semi-conscious state. The website also includes testimonials of people who state they used psilocybin at Singularism.

The website states:
"At the heart of our spiritual practice lies the sacred tradition of Entheogenic Spiritual Guidance. We integrate the profound potency of psilocybin, a revered entheogenic substance with long standing religious use, into our own ceremonies as a means to facilitate deep spiritual connections and foster profound inner spiritual transformation. Our ceremonies are performed safely, sincerely religious, and crucial for producing the effective results from which our members reap invaluable benefits."

I found that throughout the website, there are several claims that Singluarism is a religious experience and as such it operates within the Utah State Constitution and United States Constitution. However, the website also states that Singularism charges for their "spiritual counseling services" at a rate of "approximately $180 per hour,...Participants book packages ranging from 20 to 40 hours at a time."

While Singularism claims to be religious, therefore exempt from the controlled substance act, their website states that participants "do not need to leave [their] current faith or religious beliefs to participate in Singularism's ceremonies."

I spoke with a Utah County Attorney regarding this case and was advised that their office does not feel that Singularism's claim to have religious exemption has any merit and that if there is evidence of anyone possessing, using, distributing, or cultivating psilocybin, that person is subject to prosecution in the state of Utah.

Over the last few months I have continued researching Singularism to try and determine the legitimacy of their claims for the legal use of psilocybin under claims of religious exemption. While on the website, I found a link to register for a free webinar. I also found the website to promote an "academy" to become a "Certified Psychedelic Practitioner". I applied to register for the webinar under an undercover alias.

On October 14, 2024, after registering for the webinar, I received a call from 801-203-0102. When I answered, the male on the other end of the line identified himself as Bridger Jensen. He was calling to follow-up on my application. We spoke for a few minutes about my interest in psychedelic therapy. I discussed my interest using a made up backstory to support my undercover role. During the call, Bridger's phone disconnected. I attempted to call back several times, but it went straight to voicemail. The pre-recorded voicemail

message stated that I had reached Bridger Jensen's phone. I opted not to leave a voicemail. About a minute later, I received another phone call from 435-800-1969. When I answered, I was greeted again by Bridger who explained that his phone had died and that he was now calling me from his assistant, Brandi's, phone. We continued our conversation and he explained he invited me to attend a tour of the wellness center.

I inquired about how much the therapy sessions costed and he explained that they have packages that cost between $3900 - $6400. He also invited me to attend a consultation. When I asked him how much a consultation costs, he informed me that they are $49. We discussed how I was not so much interested in receiving the therapy, but rather in becoming a facilitator, he stated that I should come on the tour and then possibly schedule a consultation.

During our conversation, Bridger explained that the use of psilocybin is legal in his practice due to the religion of Singularism. He explained that Singularism is supportive of other religions and that you need not leave any other religion to join Singularism, but rather it adds to your beliefs that already exist.

On Oct 21, 2024 I attended a tour of the Mushroom Therapy Center located at 1969 N State St, Provo, UT. I met with Bridger in an undercover capacity. He and I walked through the wellness center together. He showed me several rooms that he informed me is where the therapy sessions occur. Each therapy room has a large couch in it where their client sits with a large cushioned chair positioned in front of it where the staff member sits during the sessions.

Bridger and I discussed some aspects of how the center operated. He informed about psilocybin is at the core of their practice at the wellness center. He strongly asserted that their use of psilocybin at the wellness center unlocks the mind and allows for their clients to get the best therapeutic care possible. I asked him about how he knows what mushrooms are safe and he stated that the mushroom they use are "lab quality" and that they grow from grain. He also stated that the way he knows they are safe is by "becoming and expert" such as himself.

During the tour, I noticed one room in the center that the door was slightly ajar. Bridger did not take me into that room, but from what I could see through the small opening, there appeared to be lab equipment inside. I also observed just outside the front entrance, there were about 7 to 10 five-gallon jugs of purified water.

During the tour Bridger also briefly explained the process of a therapy session. He definitively confirmed that they do give psilocybin to their clients in the form of a tea. He stated that the drinking of the tea was considered a "ceremony" and that it induces a psychedelic state. He said that he and his staff members are the ones who provide the psilocybin and that they are "Certified Psychedelic Practitioners." He also said that these sessions last anywhere from 5 to 10 hours.

The tour lasted about 10 to 15 minutes and he invited me to join a webinar the following day to get more information about pricing for their services.

On Oct 22, 2024 I attended a webinar that was hosted by Bridger. There where two other people that attended that were interested in participating in the wellness center's services. There where also two other people that attended the webinar that were members of Bridger's staff. Their names were displayed on their screen as Brandi Lee and Ryan Hightower. During the webinar, Ryan stated that he had "guided a trip" just earlier that day

and had completed that session about a half hour before the webinar began at 1800 hours.

During the webinar, Bridger discussed how he is the founder of Singularism and discussed the basis of the religion. He said that the use of psilocybin is the central point upon which Singularism is based. He said that Singularism is not to be considered a "dogmatic" religion in a sense that you do not need to leave any religion you currently associate yourself with in order to participate in Singularism. He also stated that the way that he founded the religion was by talking with his lawyer to review prior cases in which people claimed religious exemption; where those claimants won or lost; and the judges comments, and essentially created a roadmap to create his religion of Singularism. He even said the ceremonies where the psilocybin is used are his ceremonies. Bridger discussed how the guided use of psilocybin is a "mystical" and "religious" experience. He stated that their sessions are "clinically informed" even though he is "no longer a licensed clinician".

During the webinar, Bridger shared videos of people giving interviews and sharing their experiences using psilocybin. In one particular video, about 1 hour into the webinar, the person being interviewed was detailing the hallucinations he had seen during his "trip". The talk show host asks the person he is interviewing if what he was doing was legal. The Person being interviewed abruptly responded with, "No." Bridger immediately paused the video and assured those of us attending the webinar that his practice of using psilocybin mushrooms in Singularism is legal. Although he did not offer any explanation as to how. Bridger also claimed that he knows that the mushrooms used at his clinic are safe because they are "lab quality" and that he had to learn through trial and error the perfect conditions for extracting the psilocybin from the mushrooms. He also stated that at his wellness center they do not use placebos.

At the conclusion of the webinar, Bridger explained the pricing and the process of how the therapy sessions work. He sells packages in "rounds" and the minimum package is a two round package.

The first step is by attended a consultation with Bridger. During the consultation you answer various screening questions for him to determine if this is the proper course of action for you and if you would benefit from taking psilocybin. If Bridger feels that you qualify, then you can purchase a two, three, or four round package.

The first round consists of four meetings. The first two meetings are considered preparatory meetings. Each preparatory meeting lasts about an hour where you discuss what you may encounter on your "psychedelic journey" and how to deal with those encounters and what to expect from the practitioner supervising your "trip". The third meeting is the "guided session" where you partake of the psilocybin infused tea and enter the hallucinogenic state. This session lasts anywhere from 5 to 10 hours. During this session the staff member documents the client's behaviors and experiences. The final session of the round is a follow up where the client and staff member review the staff member's notes and they discuss the client's experiences. This session lasts about an hour. After about 2-6 weeks, the client repeats the process for a second round, except there is only one preparatory meeting, followed by a guided trip session, followed by a follow up session. The pricing for a two round package is $3900, a three round package is $5400, and a four round package is $6400.

Due to the totality of the circumstances, I feel there is Probable Cause that Bridger is running an illicit business under the guise of a religion. He is getting people to come to a location where he gets them to pay incredibly high amounts of money in exchange for

App-4:227

psilocybin. He has admitted openly that at his "wellness center" the use of psilocybin is the foundation of their practice. He has made statements that he has intimate knowledge of where and how the mushrooms are cultivated and that he has learned the perfect conditions for extracting psilocybin through trial and error.

I am requesting authority to search the Mushroom Wellness Center to seize any illegal psilocybin mushrooms; any equipment used to cultivate the mushrooms or extract the psilocybin; and records, whether physical or electronic, that are kept within the wellness center that is evidence of to whom the wellness center has distributed psilocybin.

This affidavit has been reviewed by Pete Reichman of the Utah County Attorney Office, and it has been approved for presentation to the court.

WHEREFORE, your affiant prays that a Search Warrant be issued for the seizure of said items in the daytime.

**I declare under criminal penalty of the State of Utah that the foregoing is true and correct.**

Executed on: 4th day of November, 2024 @ 04:55 PM by  /s/ JACKSON JULIAN

App-4:228

## RETURN TO SEARCH WARRANT

### NO. 2992661

The personal property listed below or set out on the inventory attached hereto was taken from the person of Bridger Lee Jensen (DOB 9/6/1981), by virtue of a search warrant dated the 4th day of November, 2024, and issued by Magistrate SEAN PETERSEN of the FOURTH DISTRICT COURT - ALL DEPARTMENT:

- 459.8 grams psilocybin mushrooms
- Psilocybin paraphernalia (scales, storage cups, electronic grinder)
- 1 vial of unidentified liquid
- 2 fluid ounces of THC liquid syrup
- Paperwork for mushroom wellness center therapy sessions and attorney letter

I, Detective JACKSON JULIAN of Provo Police Department, by whom this warrant was executed, do swear that the above listed or below attached inventory contains a true and detailed account of all the property taken by me under the warrant, on the 11th day of November, 2024.

All of the property taken by virtue of said warrant will be retained in my custody subject to the order of this Court or of any other court in which the offense in respect to which the property, or things taken, is triable.

**I declare under criminal penalty of the State of Utah that the foregoing is true and correct.**

Executed on: 11th day of November, 2024 @ 09:50 PM by   /s/ JACKSON JULIAN

# EXHIBIT 2

_____

IN THE FOURTH DISTRICT COURT - ALL DEPARTMENT

IN AND FOR UTAH COUNTY, STATE OF UTAH

_____

## SEARCH WARRANT

No. 2992661

COUNTY OF UTAH, STATE OF UTAH

To any peace officer in the State of Utah:

Proof by Affidavit made upon oath or written affirmation subscribed under criminal penalty of the State of Utah having been made to me by Detective JACKSON JULIAN of Provo Police Department, this day, I am satisfied that there is probable cause to believe

THAT

On the premises known as 1969 N State Street, Provo, UT,further described as A brown brick building located in a business complex on the west side of North State St. The numbers "1969" are displayed on a white pillar, just outside the front entrance which sits at the bottom of an outdoor stair case. The word "Singularism" is printed on the glass front entrance door.;

On the person(s) described as:

Bridger Lee Jensen (DOB 9/6/1981)

In the City of Provo, County of Utah, State of Utah, there is now certain property or evidence described as:

- Psilocybin Mushrooms
- Equipment used to ingest and/or cultivate psilocybin
- Business records which document the administering of psilocybin to clients
- Financial records which indicate transaction history of purchasing cultivation equipment, income produced by administering psilocybin to clients, and where the money garnered from this business is being kept

and that said property or evidence:

- Page 1 of Search Warrant No. 2992661 -

App-4:231

Was unlawfully acquired or is unlawfully possessed;

has been used or is possessed for the purpose of being used to commit or conceal the commission of an offense; or

is evidence of illegal conduct.

Affiant believes the property and evidence described above is evidence of the crime or crimes of - Possession of Psilocybin (Schedule I Controlled Substance) with the Intent to distribute, per UCA 58-37-8
- Possession of Drug Paraphernalia, Per UCA 58-37A-5.

YOU ARE THEREFORE COMMANDED:

to make a search in the daytimeof the above-named or described person, vehicle, item, and/or premises for the herein-above described property or evidence and if you find the same or any part thereof, retain such property in your custody subject to the direction of a prosecutor or an order of this Court.

Dated: 4th day of November, 2024 @ 05:05 PM   /s/

SEAN PETERSEN
District Court Judge

- Page 2 of Search Warrant No. 2992661 -

App-4:232

# EXHIBIT 3



# Provo Police

Officer Report for Incident 24PR24922

***CONFIDENTIALITY NOTICE***

The information in this document is CONFIDENTIAL and/or PRIVILEGED. It is intended to be reviewed by only the individual or organization it was disseminated to. If you are not the intended recipient, you are notified that any review, dissemination, or copying of this document and its attachments, if any, or the information contained herein, is prohibited. If you have received this document in error, advise the sender of your receipt of it and destroy and/or delete the document immediately.

***PROTECTED RECORD NOTICE***

This document is a PROTECTED RECORD under UCA 63G-2-305(10),(11) and (25). Further or secondary release would interfere with an ongoing criminal investigation or case, jeopardize the life or safety of the individual, and/or is a clearly unwarranted invasion of personal privacy, Release or dissemination of any summaries, transcripts and video/audio recordings or CJC interviews are also prohibited unless authorized by UCA 77-37-4(5) and (6).

**Nature:** WARRANT SERVICE          **Address:** 1969 N STATE ST
**Location:** PR110                                        Provo UT 84604

**Offense Codes:**
  **Received By:** Tucker C PR          **How Received:** O          **Agency:** PRPD
**Responding Officers:**
**Responsible Officers:** Julian Jac (PR)          **Disposition:** SUM 11/21/24
  **When Reported:** 17:30:44 11/11/24          **Occurred Between:** 17:30:41 11/11/24 and 17:30:41 11/11/24

**Assigned To:**                    **Detail:**                    **Date Assigned:** **/**/**
  **Status:**                    **Status Date:** **/**/**          **Due Date:** **/**/**

**Complainant:**
  **Last:**          **First:**          **Mid:**
  **DOB:** **/**/**          **Dr Lic:**          **Address:**
  **Race:**          **Sex:**          **Phone:**          **City:** ,
Alert Codes:

Offense Codes
  **Reported:**                                        **Observed:** CSSL CS-Sale-Manuf-Hallucinogen

12/12/24

App-4:234

**Additional Offense:** CSSL CS-Sale-Manuf-Hallucinogen
**Additional Offense:** CSPM CS-Poss-Marijuana
**Additional Offense:** CSPP CS-Poss Paraphernalia

## Circumstances

ASET Agcy Special Enforecment Team
BUSPV Business-private
SWGEN Search Warrant-Res/Veh
PICS Photographs-Pictures
CSLRG Large Drug Seizure
DRUG Drugs Involved
TDIST TYPE-Distributing-Selling
TPOSS TYPE-Possessing-Concealing

| Responding Officers: | Unit : |
|---|---|
| Julian Jac (PR) | 2J4342 |
| Rowberry A (PR) | 2J4264 |
| Wolfgramm L PR | 2J4329 |

| | | | |
|---|---|---|---|
| **Responsible Officer:** | Julian Jac (PR) | **Agency:** | PRPD |
| **Received By:** | Tucker C PR | **Last Radio Log:** | **:**:** **/**/** |
| **How Received:** | O Officer Initiat | **Clearance:** | DUC Disseminated to UC Attorney |
| **When Reported:** | 17:30:44 11/11/24 | **Disposition:** | SUM **Date:** 11/21/24 |
| **Judicial Status:** | IBRV | **Occurred between:** | 17:30:41 11/11/24 |
| **Misc Entry:** | c211 | **and:** | 17:30:41 11/11/24 |

| **Modus Operandi:** | **Description :** | **Method :** |
|---|---|---|

## Involvements

| Date | Type | Description | |
|---|---|---|---|
| 11/11/24 | Name | JENSEN, BRIDGER LEE | Offender |
| 11/11/24 | Cad Call | 17:30:44 11/11/24 WARRANT SERVICE | Initiating Call |
| 11/21/24 | Property | WHI CS-LSD-Hallucin Psilocybin 0 | Evidence |
| 11/11/24 | Property | WHI CS-LSD-Hallucin Psilocybin 0 | Seized |
| 11/11/24 | Property | WHI CS-LSD-Hallucin Psilocybin 0 | Seized |
| 11/11/24 | Property | GRY CS-Paraphernali Cups 2 | Evidence |
| 11/11/24 | Property | BLK CS-Paraphernali Scales/Grinder 2 | Evidence |
| 11/11/24 | Property | BLU CS-Unidentified 0 | Seized |
| 11/11/24 | Property | WHI Paper-Official 0 | Evidence |
| 11/11/24 | Property | BLK CS-Marijuana Lime Tincture 0 | Seized |
| 11/22/24 | Evidence | | Evidence Incident |
| 11/12/24 | Evidence | | Evidence Incident |
| 11/12/24 | Evidence | | Evidence Incident |
| 11/12/24 | Evidence | | Evidence Incident |

12/12/24

| 11/12/24 | Evidence | | Evidence Incident |
|---|---|---|---|
| 11/12/24 | Evidence | | Evidence Incident |
| 11/12/24 | Evidence | | Evidence Incident |
| 11/12/24 | Evidence | | Evidence Incident |
| 12/05/24 | DS | UCAO | Dissemination |
| 11/22/24 | DS | COUNTY ATTORNEY | Dissemination |
| 11/21/24 | DS | COUNTY ATTORNEY | Dissemination |

12/12/24

## Narrative
```
Mon Nov 11 21:23:32 2024 - Julian 4342
```

On November 11, 2024, Provo Special Enforcement Team detectives served a search warrant at 1969 N. State Street, Provo, UT. Detectives seized approximately 460 grams of psilocybin mushrooms, drug paraphernalia, and documents related to the distribution of psilocybin mushrooms. Bridger Lee Jensen (DOB ▓▓▓▓▓▓▓) was found to be in possession of the mushroom and found to be operating a therapy center, with the use of psilocybin being at the center of the therapy center. Charges for Bridger will be referred to the Utah County Attorney's Office for screening.


_____

Responsible LEO:



_____

Approved by:



_____

Date

## Supplement

```
CAD Call info/comments
==================================

17:31:03 11/11/24   - Tucker C PR - From: Rowberry A (PR)
NEG CHECKS
```

12/12/24

## Supplement

L. Wolfgramm

Search Warrant

Contact with Bridger Jensen:
Myself and Det. Graham were doing surveillance on the business of Bridger Jensen. Bridger exited the place of business along with a female. Bridger was with the female for a short time before walking toward his vehicle. We exited our vehicle with our police vests on that were clearly marked as police. We approached him and he was advised that we were police, and that he was being detained. He had his phone out and called his attorney, and had his attorney on speaker while we were explaining the process of the search warrant. The female that walked out of the building came over after Bridger asked if he can coordinate with her about having someone watch his kids. She came over and coordinated with him about the care of his kids, he was then searched for any weapons, then we walked into his place of business with him.

While Detective Julian was explaining everything to him, the business was cleared then a search was conducted. I was the "finder" in this case and all of the items located and seized will be listed below along with its location.

Seized:

Shelf on the wall above the desk - 2 jars of psilocybin mushrooms on of which were grounded.
White safe under desk - A large amount of psilocybin mushrooms in various containers and packaging with various labels.
Left side of desk - A small blender that has some white/grey residue inside of it that was consistent with psilocybin mushrooms.
Left top drawer of desk - A black scale.
Black safe located in Bridger's office - THC syrup.
Bridging Model paperwork - His approach towards the use of psilocybin mushroom through a clergy/religious practice

Photos were taken of the evidence prior to being moved then close ups were taken of the evidence before being packaged and documented. Photos of various paperwork to show different "clients" and amounts of psilocybin mushrooms were also taken and will be included in case report.

12/12/24

App-4:239

## Supplement

Mon Nov 11 22:04:02 2024 - Julian 4342

INVOLVED PERSONS:

Offender: Bridger Lee Jensen (DOB ████████████ )

Tanner Bean (Bridger's Attorney)
████████████
████████████████████

BACKGROUND INFORMATION:

Provo Special Enforcement Team (SET) detectives received information in
September of 2023 about a Facebook post advertising the opening of a "Mushroom
Wellness Center" in Provo. The Facebook post listed the address for the center
at a residence in Provo, and that the grand opening would be on September 6,
2023. On September 6, 2023 I went to the residence and knocked on the door. I
was greeted by a male at the front door. When I inquired about the mushroom
wellness center, the male stated that I must be mistaken and he had no idea what
I was talking about. When I spoke with the male at the door, there was no
indication that there was any nefarious activity happening there.

On November 2, 2023, a FOX 31 News story was published about a mushroom
treatment center called Singularism opening its doors in Provo. The news article
featured a male named Bridger Lee Jensen who claims to be the founder of the
business. In the article, Bridger is quoted and audio/video recorded discussing
his experiences in using psilocybin mushrooms. He also discusses how his
treatment center is a place where people can "work on their lives and progress
spiritually." He also discusses with the interviewer about "guided trips."

The news article discusses how Bridger pushed legislators to pass a bill to
allow for the legal use of psilocybin. The bill Bridger is referencing is S.B.
200 "Psilocybin Recommendation Pilot Program Amendments". That bill's current
location is found in "Senate file for bills not passed". In the news article,
Governor Spencer Cox is quoted saying, "It's just not there yet. We got there
with medical marijuana. I just don't believe the science is there. I don't
believe we should be experimenting on 5000 people here in our state. And I think
there are some serious consequences and side effects societally and as well as
medically that I'm just not comfortable with."

The news interview goes on to where Bridger says the following, "When you get to
the point where you have had these experiences and you've seen hundreds of
people benefit and healed from it, the scary thought is NOT doing it." According
to the news article, Bridger claims that his business is protected by the
Religious Freedom Restoration Act of the United States Constitution.

Later in November 2023, a concerned citizen, who did not want to be named, came
forward wanting to speak with detectives about Bridger and his business. I met
with the citizen and they advised me that Bridger has a website promoting the

12/12/24

business and identified where the business was located. The website is Singularism.org and the business location is 1969 N. State Street, Provo, UT.

SINGULARISM WEBSITE:

I went to the website and found that it shows Bridger Jensen as the founder, Alex Koritz as the Public Relations Director, and Brandi Lee Didrickson as the administrative assistant. Mariangel Babbel as the Relations Specialist, Justin Sharp as the Chief Technical Officer, and Garett Robertson as the founder partner. The website shows a picture of Bridger appearing to provide some kind of council while a female lays on a couch and appears to be in an either unconscious or semi-conscious state. The website also includes testimonials of people who state they used psilocybin at Singularism.

The website states:
"At the heart of our spiritual practice lies the sacred tradition of Entheogenic Spiritual Guidance. We integrate the profound potency of psilocybin, a revered entheogenic substance with long standing religious use, into our own ceremonies as a means to facilitate deep spiritual connections and foster profound inner spiritual transformation. Our ceremonies are performed safely, sincerely religious, and crucial for producing the effective results from which our members reap invaluable benefits."

I found that throughout the website, there are several claims that Singluarism is a religious experience and as such it operates within the Utah State Constitution and United States Constitution. However, the website also states that Singularism charges for their "spiritual counseling services" at a rate of "approximately $180 per hour,...Participants book packages ranging from 20 to 40 hours at a time."

While Singularism claims to be religious, therefore exempt from the controlled substance act, their website states that participants "do not need to leave [their] current faith or religious beliefs to participate in Singularism's ceremonies."

I spoke with a Utah County Attorney regarding this case and was advised that their office does not feel that Singularism's claim to have religious exemption has any merit and that if there is evidence of anyone possessing, using, distributing or cultivating psilocybin, that person is subject to prosecution in the State of Utah.

TOUR OF SINGULARISM:

Over the last few months, I have continued researching Singularism to try and determine the legitimacy of their claims for the legal use of psilocybin under claims of religious exemption. While on the website, I found a link to register for a free webinar. I also found the website to promote an "academy" to become a "Certified Psychedelic Practitioner". I applied to register for the webinar under an undercover alias.

On October 14, 2024, after registering for the webinar, I received a call from

████████, When I answered, the male on the other end of the line identified himself as Bridger Jensen. He was calling to follow up on my application. We spoke for a few minutes about my interest in psychedelic therapy. I discussed my interest using a made up back story to support my undercover role. During the call, Bridger's phone disconnected. I attempted to call back several times, but it went straight to voicemail. The pre-recorded voicemail message stated that I had reached Bridger Jensen's phone. I opted not to leave a voicemail. About a minute later, I received another phone call from ████████. When I answered, I was greeted again by Bridger who explained that his phone had died and that he was now calling me from his assistant, Brandi's, phone. We continued our conversation and he explained he invited me to attend a tour of the wellness center.

I inquired about how much the therapy sessions costed and he explained that they have packages that cost between $3900-$6400. He also invited me to attend a consultation. When I asked him how much a consultation costs, he informed me that they are $49. We discussed how I was not so much interested in receiving the therapy, but rather in becoming a facilitator, he stated that I should come on the tour and then possibly schedule a consultation. During our conversation, Bridger explained that the use of psilocybin is legal in his practice due to the religion of Singularism. He explained that Singularism is supportive of other religions and that you need not leave any other religion to join Singularism, but rather it adds to your beliefs that already exist.

On October 21, 2024 I attended a tour of the Mushroom Therapy Center located at 1969 N. State Street, Provo, UT. I met with Bridger in an undercover capacity. He and I walked through the wellness center together. He showed me several rooms that he informed me is where the therapy sessions occur. Each therapy room has a large couch in it where their client sits with a large cushioned chair positioned in front of it where the staff member sits during the sessions.

Bridger and I discussed some aspects of how the center operated. He informed about psilocybin is at the core of their practice at the wellness center. He strongly asserted that their use of psilocybin at the wellness center unlocks the mind and allows for their clients to get the best therapeutic care possible. I asked him about how he knows what mushrooms are safe and he stated that the mushroom they use are "lab quality" and that they grow from grain. He also stated that the way he knows they are safe is by "becoming an expert" such as himself.

During the tour, I noticed one room in the center that the door was slightly ajar. Bridger did not take me into that room, but from what I could see through the small opening, there appeared to be lab equipment inside. I also observed just outside the front entrance, there were about 7 to 10 five gallon jugs of purified water.

During the tour, Bridger also briefly explained the process of a therapy session. He definitively confirmed that they do give psilocybin to their clients in the form of a tea. He stated that the drinking of the tea was considered a "ceremony" and that it induces a psychedelic state. He said that he and his staff members are the ones who provide the psilocybin and that they are

12/12/24

App-4:242

"Certified Psychedelic Practitioners." He also said that these sessions last anywhere from 5 to 10 hours.

The tour lasted about 10 to 15 minutes and he invited me to join a webinar the following day to get more information about pricing for their services.

SINGULARISM WEBINAR:

On October 22, 2024 I attended a webinar that was hosted by Bridger. There where two other people that attended that were interested in participating in the wellness center's services. There where also two other people that attended the webinar that were members of Bridger's staff. Their names were displayed on their screen as ████████ and ██████████████. During the webinar, Ryan stated that he had "guided a trip" just earlier that day and had completed that session about a half hour before the webinar began at 18:00 hours.

During the webinar, Bridger discussed how he is the founder of Singularism and discussed the basis of the religion. He said that the use of psilocybin is the central point upon which Singularism is based. He said that Singularism is not to be considered a "dogmatic" religion in a sense that you do not need to leave any religion you currently associate yourself with in order to participate in Singularism. He also stated that the way that he founded the religion was by talking with his lawyer to review prior cases in which people claimed religious exemption; where those claimants won or lost; and the judges comments, and essentially created a roadmap to create his religion of Singularism. He even said the ceremonies where the psilocybin is used are his ceremonies. Bridger discussed how the guided use of psilocybin is a "mystical" and "religious" experience. He stated that their sessions are "clinically informed" even though he is "no longer a licensed clinician."

During the webinar, Bridger shared videos of people giving interviews and sharing their experiences using psilocybin. In one particular video, about 1 hour into the webinar, the person being interviewed was detailing the hallucinations he had seen during his "trip." The talk show host asks the person he is interviewing if what he was doing was legal. The person being interviewed abruptly responded with, "No." Bridger immediately paused the video and assured those of us attending the webinar that his practice of using psilocybin mushrooms in Singularism is legal. Although he did not offer any explanation as to how. Bridger also claimed that he knows that the mushrooms used at his clinic are safe because they are "lab quality" and that he had to learn through trial and error the perfect conditions for extracting the psilocybin from the mushrooms. He also stated that at his wellness center they do not use placebos.

At the conclusion of the webinar, Bridger explained the pricing and the process of how the therapy sessions work. He sells packages in "rounds" and the minimum package is a two round package.

The first step is by attended a consultation with Bridger. During the consultation, you answer various screening questions for him to determine if this is the proper course of action for you and if you would benefit from taking

psilocybin. If Bridger feels that you qualify, then you can purchase a two, three, or four round package.

The first round consists of four meetings. The first two meetings are considered preparatory meetings. Each preparatory meeting lasts about an hour where you discuss what you may encounter on your "psychedelic journey" and how to deal with those encounters and what to expect from the practitioner supervising your "trip." The third meeting is the "guided session" where you partake of the psilocybin infused tea and enter the hallucinogenic state. This session lasts anywhere from 5 to 10 hours. During this session, the staff member documents the client's behaviors and experiences. The final session of the round is a follow up where the client and staff member review the staff member's notes and they discuss the client's experiences. This session lasts about an hour. After about 2-6 weeks, the client repeats the process for a second round, except there is only one preparatory meeting, followed by a guided trip session, followed by a follow up session. The pricing for a two round package is $3900, a three round package is $5400, and a four round package is $6400.

SEARCH WARRANT:

Due to the totality of the circumstances, I feel there is Probable Cause that Bridger is running an illicit business under the guise of a religion. He is getting people to come to a location where he gets them to pay incredibly high amounts of money in exchange for psilocybin. He has admitted openly that at his "wellness center" the use of psilocybin is the foundation of their practice. He has made statements that he has intimate knowledge of where and how the mushrooms are cultivated, and that he has learned the perfect conditions for extracting psilocybin through trial and error.

On November 4, 2024 I submitted an affidavit for search warrant to the Fourth District Court, requesting for authority to search the premises of 1969 N. State Street, Provo, UT. That affidavit was reviewed and a search warrant was granted by the Honorable Judge Sean Petersen.

On November 11, 2024 Provo Special Enforcement Team (SET) detectives served that search warrant. Through my investigation, I had found that Singularism's hours of operation usually close around 17:00 hours. At around 17:00 hours, Detective Wolfgramm, Detective Graham, and I waited outside the building for Bridger to exit. A short time later, Bridger exited the building and began walking to his vehicle. Detective Graham and Detective Wolfgramm stopped Bridger in the parking lot, identified themselves as police officers, and detained him pursuant to the search warrant.

Bridger asked Detective Graham and Detective Wolfgramm if he could call his attorney, and they allowed him to do so. I then walked up to Bridger and I introduced myself. When I made contact with Bridger, he was already on speaker phone with his attorney. I provided Bridger a copy of the search warrant and asked if we could go inside the building so we could speak. Bridger complied and walked us into the business.

Once we walked inside the business, Bridger and I sat down on a couch and had a

conversation while Detective Graham, Detective Wolfgramm, and Sgt. Rowberry searched the business.

INTERVIEW:

My entire interaction with Bridger was audio recorded. The following is a summary of our conversation. For complete details about the interview, refer to the recording.

While Bridger and I spoke, he had his attorney on speaker phone the entire time. I advised Bridger of his Miranda rights and both he and his lawyer stated they understood them. I explained to Bridger that I had probable cause to support allegations that Bridger was providing psilocybin to his clients that attended his wellness center. Bridger openly stated that to be true and even showed me where he keeps the psilocybin mushrooms in the wellness center. He walked over to a desk in the middle of the room and opened a safe. Inside the safe were numerous bags filled with mushrooms, which were consistent with psilocybin mushrooms and identified as such by Bridger. He also opened another safe in his office that contained a bottle of THC syrup, which Bridger later stated he uses personally as part of his religious practices, however, he does not give that to any of his clients. I asked Bridger if he had a medical marijuana card, and he stated that he does not have a current one.

During our conversation, Bridger stated that he believes that his business is legal because of the religion that he founded. I explained that a concern that I had was how can he guarantee that the mushrooms he is providing to people are safe. He said that his record of safe experiences is evidence that the mushrooms are safe. I asked Bridger if he was cultivating the mushrooms, and he alluded that he was not cultivating them. When I pressed about where does he acquire the mushrooms, he said that he did not want to answer that question. No matter how much I pressed about where he gets the mushrooms or where are they cultivated, he did not want to answer as he did not want to self-incriminate.

I asked Bridger about his employees that are psychedelic practitioners at his wellness center. I asked him about when a practitioner conducts a ceremony at his wellness center, who is getting paid for the session, is it the practitioner, is it him, or is it both. He likened it to when a person goes to see a religious councilor. While the client is paying the center, some amount would be distributed to the practitioner. When I asked who all were the people that he employs as practitioners, he said he did not want to say their names, as he did not want to get any of them in trouble and would rather have the legal liability fall completely on his shoulders.

I asked Bridger about the ceremonies themselves and how they are conducted. He stated that the mushrooms are boiled in a water at a specific temperature, which allows for the psilocybin to be extracted and then the psilocybin infused tea is consumed by the client.

I explained to Bridger that the search warrant allows for me to search for and seize any and all psilocybin products, in addition to any records of sessions that he has. Bridger pleaded for me not to take the records as he claimed the

records of his clients' psilocybin induced "journeys" were considered scripture for his religion. I opted to honor his wish and we took photos of session records and left him with the physical copies.

There was one piece of paper that Bridger was insistent that I took with me and admit into evidence. It was a letter that was in the white safe that contained a large quantity of mushrooms. The letter was written by his attorney, address "To Whom it May Concern". The letter explains that the contents of the safe (the psilocybin mushrooms) are considered holy sacrament to the the followers of Singularism and are "integral to the practice of their faith." There was also a hand written expiration date at the bottom of the letter. The bottom of the letter states, "This is one of just 10 copies made 9/8/23 & expires 9/8/24" and is signed by Bridger Lee Jensen.

CONCLUSION:

Bridger fully feels that since he has founded the religion of Singularism, his use and providing of psilocybin to individuals is legal and protected under federal law as part of the Freedom of Religion. However, when speaking with the Utah County and Provo City Attorney Offices, it has been expressed that Singularism is not exempt from the Utah Controlled Substance Act. Bridger has openly stated that he is facilitating and providing psilocybin to numerous people. A large quantity of psilocybin was located in the business that he is responsible for. A bottle of THC syrup was also located in Bridger's business, which he admitted was for personal use. Due to these factors, this case will be referred to the Utah County Attorney's Office for screening of charges.

FinCEN REPORT:
I reached put to the Statewide Information Analysis Center (SIAC) and asked them to run a financial report for Singularism. I received a copy of the reports and they show that Singularism's KeyBank accounts had been previously flagged for suspicious activity due to the nature of the business and the transaction history that took place during to the monitoring period. I have attached those reports to this case. The reports are password protected. The password for the FinCEN reports are "████████"

CHARGES:

Please refer the following charges for Bridger Lee Jensen (████████████) to the Utah County Attorney's Office and screen for any additional charges they deem appropriate and necessary:

- Possession of a Schedule I Controlled Substance (Psilocybin) with Intent to Distribute, 58-37-8, F2
- Possession of Drug Paraphernalia, 58-37A-5, MB
- Possession of Marijuana, 58-37-8, MB

## Supplement

Thu Nov 21 15:26:17 2024 - Julian 4342

On November 21, 2024 I received a call from a Utah County Attorney requesting that I field test the THC and the Psilocybin mushrooms. I checked out the bottle of THC syrup from evidence and field tested it, which resulted in a positive test. I then resealed the packaging and turned it back into the evidence.

I also checked out the large package of mushrooms. I cut open the package and removed one mushroom that weighs .9 grams that I will use to field test for psilocybin. I resealed the large package of mushrooms and turned them back into evidence as well. I field tested the small sample that I removed from the large package and it field tested positive for psilocybin.

I did not use the entire .9 grams for the field tests. The remainder of the sample was packaged again separately and booked into evidence at the Provo Police Station.

12/12/24

## Supplement
```
Mon Dec 2 17:50:54 2024 Julian 4342
```

On November 28, 2024 I received an email informing me that the two samples I had sent to the state crime lab had been tested for psilocybin. The report indicates that both samples contained psilocybin. I have a hard copy of the report in my possession. The report is accessible through the Crime Lab Inquiry within the UCJIS portal.

*Officer Report for Incident 24PR24922*                                                     *Page 17 of 21*

## Property

| | | | |
|---|---|---|---|
| **Property Number:** | PRP147932 | | |
| **Item:** | CS-LSD-Hallucin | **Owner Applied Nmbr:** | |
| | | | |
| **Brand:** | Psilocybin | **Model:** | |
| **Year:** | 0 | **Quantity:** | .7 |
| **Meas:** | GM | **Serial Nmbr:** | |
| **Total Value:** | $0.00 | **Color:** | WHI |
| **Owner:** | JENSEN BRIDGER LEE B117082 | | |
| **Agency:** | PRPD Provo PD | **Tag Number:** | |
| **Accum Amt Recov:** | $0.00 | **Officer:** | Julian Jac (PR) |
| **UCR:** | DNK Drug/Narc, Other Hallucinogens | **UCR Status:** | SEI |
| **Local Status:** | EIS | **Storage Location:** | Provo PD |
| **Crime Lab Number:** | | **Status Date:** | 11/11/24 |
| **Date Released:** | **/**/** | **Date Recov/Rcvd:** | **/**/** |
| **Released By:** | | **Amt Recovered:** | $0.00 |
| **Released To:** | | **Custody:** | **:**:** **/**/** |
| **Reason:** | | | |
| **Comments:** | Sample taken from the main package of mushrooms that was field tested positive for psilocybin - .9 grams was removed from the original package - .2 grams was consumed in the tests - .7 grams was booked back into evidence | | |
| **Property Number:** | PRP147686 | | |
| **Item:** | CS-LSD-Hallucin | **Owner Applied Nmbr:** | |
| | | | |
| **Brand:** | Psilocybin | **Model:** | |
| **Year:** | 0 | **Quantity:** | 459.8 |
| **Meas:** | GM | **Serial Nmbr:** | |
| **Total Value:** | $0.00 | **Color:** | WHI |
| **Owner:** | JENSEN BRIDGER LEE B117082 | | |
| **Agency:** | PRPD Provo PD | **Tag Number:** | |
| **Accum Amt Recov:** | $0.00 | **Officer:** | Julian Jac (PR) |
| **UCR:** | DNK Drug/Narc, Other Hallucinogens | **UCR Status:** | SEI |
| **Local Status:** | EIS | **Storage Location:** | Provo PD |
| **Crime Lab Number:** | | **Status Date:** | 11/11/24 |
| **Date Released:** | **/**/** | **Date Recov/Rcvd:** | **/**/** |
| **Released By:** | | **Amt Recovered:** | $0.00 |
| **Released To:** | | **Custody:** | **:**:** **/**/** |
| **Reason:** | | | |
| **Comments:** | | | |
| **Property Number:** | PRP147687 | | |
| **Item:** | CS-LSD-Hallucin | **Owner Applied Nmbr:** | |

12/12/24

*Officer Report for Incident 24PR24922*                                        *Page 18 of 21*

---

| | | | |
|---|---|---|---|
| **Brand:** | Psilocybin | **Model:** | |
| **Year:** | 0 | **Quantity:** | .05 |
| **Meas:** | GM | **Serial Nmbr:** | |
| **Total Value:** | $0.00 | **Color:** | WHI |
| **Owner:** | JENSEN BRIDGER LEE B117082 | | |
| **Agency:** | PRPD Provo PD | **Tag Number:** | |
| **Accum Amt Recov:** | $0.00 | **Officer:** | Julian Jac (PR) |
| **UCR:** | DNK Drug/Narc, Other Hallucinogens | **UCR Status:** | SEI |
| **Local Status:** | EIS | **Storage Location:** | Provo PD |
| **Crime Lab Number:** | | **Status Date:** | 11/11/24 |
| **Date Released:** | **/**/** | **Date Recov/Rcvd:** | **/**/** |
| **Released By:** | | **Amt Recovered:** | $0.00 |
| **Released To:** | | **Custody:** | **:**:** **/**/** |
| **Reason:** | | | |
| **Comments:** | Please send this to the State Crime lab for testing for psilocybin | | |
| **Property Number:** | PRP147688 | | |
| **Item:** | CS-Paraphernali | **Owner Applied Nmbr:** | |

| | | | |
|---|---|---|---|
| **Brand:** | | **Model:** | Cups |
| **Year:** | 0 | **Quantity:** | 2 |
| **Meas:** | | **Serial Nmbr:** | |
| **Total Value:** | $2.00 | **Color:** | GRY |
| **Owner:** | JENSEN BRIDGER LEE B117082 | | |
| **Agency:** | PRPD Provo PD | **Tag Number:** | |
| **Accum Amt Recov:** | $0.00 | **Officer:** | Julian Jac (PR) |
| **UCR:** | DEQ Drug/Narc Equipment | **UCR Status:** | SEI |
| **Local Status:** | EIS | **Storage Location:** | Provo PD |
| **Crime Lab Number:** | | **Status Date:** | 11/11/24 |
| **Date Released:** | **/**/** | **Date Recov/Rcvd:** | **/**/** |
| **Released By:** | | **Amt Recovered:** | $0.00 |
| **Released To:** | | **Custody:** | **:**:** **/**/** |
| **Reason:** | | | |
| **Comments:** | Cups that contained mushrooms and smaller cups that held ground up mushrooms | | |
| **Property Number:** | PRP147689 | | |
| **Item:** | CS-Paraphernali | **Owner Applied Nmbr:** | |

| | | | |
|---|---|---|---|
| **Brand:** | | **Model:** | Scales/Grinder |
| **Year:** | 0 | **Quantity:** | 4 |
| **Meas:** | | **Serial Nmbr:** | |
| **Total Value:** | $2.00 | **Color:** | BLK |
| **Owner:** | JENSEN BRIDGER LEE B117082 | | |
| **Agency:** | PRPD Provo PD | **Tag Number:** | |

12/12/24

App-4:251

*Officer Report for Incident 24PR24922*                                                    *Page 19 of 21*

---

|  |  |  |  |
|---|---|---|---|
| **Accum Amt Recov:** | $0.00 | **Officer:** | Julian Jac (PR) |
| **UCR:** | DEQ Drug/Narc Equipment | **UCR Status:** | SEI |
| **Local Status:** | EIS | **Storage Location:** | Provo PD |
| **Crime Lab Number:** |  | **Status Date:** | 11/11/24 |
| **Date Released:** | **/**/** | **Date Recov/Rcvd:** | **/**/** |
| **Released By:** |  | **Amt Recovered:** | $0.00 |
| **Released To:** |  | **Custody:** | **:**:** **/**/** |
| **Reason:** |  |  |  |
| **Comments:** | Scales and an electronic grinder used for grinding up psilocybin mushrooms |  |  |
| **Property Number:** | PRP147690 |  |  |
| **Item:** | CS-Unidentified | **Owner Applied Nmbr:** |  |

|  |  |  |  |
|---|---|---|---|
| **Brand:** |  | **Model:** |  |
| **Year:** | 0 | **Quantity:** | .01 |
| **Meas:** | GM | **Serial Nmbr:** |  |
| **Total Value:** | $0.00 | **Color:** | BLU |
| **Owner:** | JENSEN BRIDGER LEE B117082 |  |  |
| **Agency:** | PRPD Provo PD | **Tag Number:** |  |
| **Accum Amt Recov:** | $0.00 | **Officer:** | Julian Jac (PR) |
| **UCR:** | DUT Drugs-Unknown Type | **UCR Status:** | SEZ |
| **Local Status:** | EIS | **Storage Location:** | Provo PD |
| **Crime Lab Number:** |  | **Status Date:** | 11/11/24 |
| **Date Released:** | **/**/** | **Date Recov/Rcvd:** | **/**/** |
| **Released By:** |  | **Amt Recovered:** | $0.00 |
| **Released To:** |  | **Custody:** | **:**:** **/**/** |
| **Reason:** |  |  |  |
| **Comments:** |  |  |  |
| **Property Number:** | PRP147691 |  |  |
| **Item:** | Paper-Official | **Owner Applied Nmbr:** |  |

|  |  |  |  |
|---|---|---|---|
| **Brand:** |  | **Model:** |  |
| **Year:** | 0 | **Quantity:** | 1 |
| **Meas:** |  | **Serial Nmbr:** |  |
| **Total Value:** | $0.00 | **Color:** | WHI |
| **Owner:** | JENSEN BRIDGER LEE B117082 |  |  |
| **Agency:** | PRPD Provo PD | **Tag Number:** |  |
| **Accum Amt Recov:** | $0.00 | **Officer:** | Julian Jac (PR) |
| **UCR:** | DPB Documents/Personal or Business | **UCR Status:** | SEZ |
| **Local Status:** | EIS | **Storage Location:** | Provo PD |
| **Crime Lab Number:** |  | **Status Date:** | 11/11/24 |
| **Date Released:** | **/**/** | **Date Recov/Rcvd:** | **/**/** |
| **Released By:** |  | **Amt Recovered:** | $0.00 |

12/12/24

App-4:252

**Released To:**                                                           **Custody:**  \*\*:\*\*:\*\* \*\*/\*\*/\*\*
**Reason:**
**Comments:**  Paperwork for Singularism journeys and attorney letter
**Property Number:**  PRP147692
**Item:**  CS-Marijuana                                  **Owner Applied Nmbr:**

**Brand:**  Lime                                                 **Model:**  Tincture
**Year:**  0                                                     **Quantity:**  1
**Meas:**  GM                                                    **Serial Nmbr:**
**Total Value:**  $0.00                                          **Color:**  BLK
**Owner:**  JENSEN BRIDGER LEE B117082
**Agency:**  PRPD Provo PD                                       **Tag Number:**
**Accum Amt Recov:**  $0.00                                      **Officer:**  Julian Jac (PR)
**UCR:**  DMJ Drugs-Narc-Marijuana                               **UCR Status:**  SEI
**Local Status:**  EIS                                           **Storage Location:**  Provo PD
**Crime Lab Number:**                                            **Status Date:**  11/11/24
**Date Released:**  \*\*/\*\*/\*\*                                **Date Recov/Rcvd:**  \*\*/\*\*/\*\*
**Released By:**                                                 **Amt Recovered:**  $0.00
**Released To:**                                                 **Custody:**  \*\*:\*\*:\*\* \*\*/\*\*/\*\*
**Reason:**
**Comments:**  THC Syrup/Tincure - 1000 mg Live Resin

12/12/24

App-4:253

## Name Involvements:

**Offender :** B117082

| | | | |
|---|---|---|---|
| **Last:** JENSEN | **First:** BRIDGER | **Mid:** LEE | |
| **DOB:** ▮▮▮▮ | **Dr Lic:** ▮▮▮▮ | **Address:** ▮▮▮▮ | |
| **Race:** W    **Sex:** M | **Phone:** ▮▮▮▮ | **City:** ▮▮▮▮ | |

12/12/24

# EXHIBIT 4









September 8, 2023

Appellate Case: 25-4115   Document: 26-4   Date Filed: 12/11/2025   Page: 261

Appellate Case: 25-4115    Document: 26-4    Date Filed: 12/11/2025    Page: 262



Appellate Case: 25-4115   Document: 26-4   Date Filed: 12/11/2025   Page: 263



Appellate Case: 25-4115     Document: 26-4     Date Filed: 12/11/2025     Page: 264



Appellate Case: 25-4115     Document: 26-4     Date Filed: 12/11/2025     Page: 265





Appellate Case: 25-4115    Document: 26-4    Date Filed: 12/11/2025    Page: 267



Appellate Case: 25-4115    Document: 26-4    Date Filed: 12/11/2025    Page: 268

App-4:268

# EXHIBIT 5

## RETURN TO SEARCH WARRANT

### NO. 2992661

The personal property listed below or set out on the inventory attached hereto was taken from the person of Bridger Lee Jensen (DOB 9/6/1981), by virtue of a search warrant dated the 4th day of November, 2024, and issued by Magistrate SEAN PETERSEN of the FOURTH DISTRICT COURT - ALL DEPARTMENT:

- 459.8 grams psilocybin mushrooms
- Psilocybin paraphernalia (scales, storage cups, electronic grinder)
- 1 vial of unidentified liquid
- 2 fluid ounces of THC liquid syrup
- Paperwork for mushroom wellness center therapy sessions and attorney letter

I, Detective JACKSON JULIAN of Provo Police Department, by whom this warrant was executed, do swear that the above listed or below attached inventory contains a true and detailed account of all the property taken by me under the warrant, on the 11th day of November, 2024.

All of the property taken by virtue of said warrant will be retained in my custody subject to the order of this Court or of any other court in which the offense in respect to which the property, or things taken, is triable.

**I declare under criminal penalty of the State of Utah that the foregoing is true and correct.**

Executed on: 11th day of November, 2024 @ 09:50 PM by   /s/ JACKSON JULIAN

# EXHIBIT 6

11/27/2024

**Utah Bureau of Forensic Services**
**4451 South Constitution Blvd, Salt Lake City, UT 84129  (801) 965-4487**

| | | | |
|---|---|---|---|
| CL Case#: | C2024-4754 | Agency Case #: | 24PR24922 |
| Agency: | PROVO PD | Report#: | 1 |
| Agency Address: | 48 S 300 W PROVO UT 84601 | | |

**Forensic Analysis Report-CONTROLLED SUBSTANCE ANALYSIS**

### Evidence Submission Information

| | |
|---|---|
| Evidence Submitted: | 11/22/2024 |
| How Received: | Hand Delivered |
| Investigating Officer: | Jackson Julian |
| Delivered By: | Scott Cardenas |
| Received By: | Tamara Harper |

### Case Names

| Type | Name | Sex | Race |
|---|---|---|---|
| Suspect | JENSEN,BRIDGER LEE | M | W |

### Crimes

POSSESSION OR USE OF A CONTROLLED SUBSTANCE

### Chain of Custody Statement

The item(s) submitted under the police agency case numbers referenced in this report were in a sealed condition at the time any examination, testing, or analysis was commenced by the undersigned, and that said examination or handling, if any, of the actual items within any such sealed containers was accomplished in a manner to preserve the integrity of the item to assure that any chance of misidentification or environmental cross-contamination would be avoided by adherence to standardized procedures within the Utah Bureau of Forensic Services appropriate to any processes applicable to the examination, analysis, or testing of said items. Any deviation from said procedures and the reasons therefore are noted in the case record. The breaking of any seal or part of the container in which the item was submitted has been followed by reinsertion of the item into its original container, whenever possible, following any examination, testing, or analysis and resealing that container with the undersigned's initials placed over such new seal.

### Forensic Analysis Report Follows

This report contains the conclusions, opinions, and/or interpretations of the laboratory analyst whose signature appears on this report. The results relate only to the items tested and/or sampled.

Page **1** of **2**

11/27/2024
**Utah Bureau of Forensic Services**
**4451 South Constitution Blvd, Salt Lake City, UT 84129  (801) 965-4487**

| | | | |
|---|---|---|---|
| CL Case#: | C2024-4754 | Agency Case #: | 24PR24922 |
| Agency: | PROVO PD | Report#: | 1 |
| Agency Address: | 48 S 300 W PROVO UT 84601 | | |

**Forensic Analysis Report-CONTROLLED SUBSTANCE ANALYSIS**

Item 1.A (Agency Item PRP147687). Psilocyn was identified in the plastic bag. The total weight of the mushroom-like material was less than 100 milligrams. The entire sample was used for analysis. A new glass vial containing the unconsumed extract of the sample was packaged with the item to be returned to the submitting agency.

Item 1.B (Agency Item PRP147687). Psilocyn was identified in the clear capsule. The total weight of the mushroom-like material was 204 milligrams +/- 6 milligrams.

Weight measurement uncertainty calculated at a coverage probability of 95.45%.

**I declare under criminal penalty of the State of Utah that the foregoing is true and correct.**

**Executed On:**  11/27/2024

*Katherine Cavazos*

Katherine Cavazos
Forensic Scientist I

# EXHIBIT 7

```
02/03/25                            Provo Police                                42024
11:10                   Evidence Custody History Report              Page:      1

Case/Incident No. : 24PR24922

Evidence No. :   24PRE4999   Propno : PRP147686   Location : PRDRUGBIN
        Item: CS-LSD-Hallucin  Brand: psilocybin      Quantity: 459. GM
        Description: psilocybin mushrooms

Transaction  Who to/from  Custodian    Time     Date
-----------  -----------  -----------  -------  -------
Trans: EVID Reason: returned from investigation     Location: PRDRUGBIN
        Julian Jac ( Orndorff C ( 07:25:45 11/22/24
Trans: PROP Reason: evidence                        Location: PRDRUGBIN
        locker 28    Bohnet L (PR 08:10:49 11/12/24
Trans: RTOF Reason: released for testing            Location: PRRELINVES
        Julian Jac ( Bohnet L (PR 14:59:14 11/21/24

Evidence No. :   24PRE5000   Propno : PRP147687   Location : PRDRUGBIN
        Item: CS-LSD-Hallucin  Brand: psilocybin      Quantity: 2    DU
        Description: psilocybin mushrooms

Transaction  Who to/from  Custodian    Time     Date
-----------  -----------  -----------  -------  -------
Trans: EVID Reason: evidence returned               Location: PRDRUGBIN
        state crime  Bohnet L (PR 14:26:53 12/10/24
Trans: PROP Reason: evidence                        Location: PRDRUGBIN
        locker 28    Bohnet L (PR 08:10:49 11/12/24
Trans: RTOT Reason: taken to UT crime lab           Location: PRRELUTLAB
        prdrugbin    Orndorff C ( 08:41:13 11/22/24

Evidence No. :   24PRE5001   Propno : PRP147688   Location : PRRELOWNER
        Item: CS-Paraphernali  Brand: psilocybin      Quantity: 2
        Description: paraphernalia

Transaction  Who to/from  Custodian    Time     Date
-----------  -----------  -----------  -------  -------
Trans: RTO  Reason: returned to owner               Location: PRRELOWNER
        bridger jens Grant D (PR) 14:04:01 12/19/24
Trans: PROP Reason: evidence                        Location: PRQ03
        locker 28    Bohnet L (PR 08:10:49 11/12/24

Evidence No. :   24PRE5002   Propno : PRP147689   Location : PRRELOWNER
        Item: CS-Paraphernali  Brand: psilocybin      Quantity: 4
        Description: paraphernalia

Transaction  Who to/from  Custodian    Time     Date
-----------  -----------  -----------  -------  -------
Trans: RTO  Reason: returned to owner               Location: PRRELOWNER
        bridger jens Grant D (PR) 14:04:01 12/19/24
Trans: PROP Reason: evidence                        Location: PRQ03
        locker 28    Bohnet L (PR 08:10:49 11/12/24
```

App-4:275

```
02/03/25                           Provo Police                              42024
11:10                    Evidence Custody History Report        Page:        2

Case/Incident No. : 24PR24922

Evidence No. :   24PRE5003   Propno : PRP147690   Location : PRDRUGBIN
         Item: CS-Unidentified  Brand:              Quantity: 1
         Description: unidentfied substance

Transaction  Who to/from  Custodian     Time     Date
-----------  -----------  -----------   -------- --------
Trans: PROP Reason: evidence                      Location: PRDRUGBIN
         locker 28    Bohnet L (PR 08:10:49 11/12/24

Evidence No. :   24PRE5004   Propno : PRP147691   Location : PRRELOWNER
         Item: Paper-Official  Brand:             Quantity: 1
         Description: papers

Transaction  Who to/from  Custodian     Time     Date
-----------  -----------  -----------   -------- --------
Trans: RTO  Reason: returned to owner            Location: PRRELOWNER
         bridger jens Grant D (PR) 14:04:01 12/19/24
Trans: PROP Reason: evidence                     Location: PRQ03
         locker 28    Bohnet L (PR 08:10:49 11/12/24

Evidence No. :   24PRE5005   Propno : PRP147692   Location : PRDRUGBIN
         Item: CS-Marijuana    Brand: Lime        Quantity: 2     FO
         Description: marijuana

Transaction  Who to/from  Custodian     Time     Date
-----------  -----------  -----------   -------- --------
Trans: EVID Reason: returned from investigation  Location: PRDRUGBIN
         Julian Jac ( Orndorff C ( 07:23:36 11/22/24
Trans: PROP Reason: evidence                     Location: PRDRUGBIN
         locker 28    Bohnet L (PR 08:10:49 11/12/24
Trans: RTOF Reason: release for testing          Location: PRRELINVES
         Julian Jac ( Bohnet L (PR 14:40:26 11/21/24

Evidence No. :   24PRE5129   Propno : PRP147932   Location : PRDRUGBIN
         Item: CS-LSD-Hallucin  Brand: Psilocybin   Quantity: 0.7   GM
         Description: mushrooms

Transaction  Who to/from  Custodian     Time     Date
-----------  -----------  -----------   -------- --------
Trans: EVID Reason: evidence                     Location: PRDRUGBIN
         locker 32    Orndorff C ( 07:30:03 11/22/24

-----------------------------------------------------------------------------
Report Includes:
All Incident Numbers matching `24PR24922`
All Inventory Record Numbers
All Evidence Status
All Evidence Location
-----------------------------------------------------------------------------
          *** End of Report /tmp/rptzvwnUq-rpevchr.r0_2 ***
```

# EXHIBIT B

🔅 frontiers | Frontiers in Psychiatry

TYPE Review
PUBLISHED 01 December 2022
DOI 10.3389/fpsyt.2022.1040217



Check for updates

OPEN ACCESS

EDITED BY
Grace Blest-Hopley,
King's College London,
United Kingdom

REVIEWED BY
Hugo Bottemanne,
INSERM U1127 Institut du Cerveau et
de la Moelle Épinière (ICM), France
Sara de la Salle,
University of Ottawa, Canada

*CORRESPONDENCE
Caroline A. MacCallum
info@drcarolinemaccallum.com

†These authors share first authorship

SPECIALTY SECTION
This article was submitted to
Addictive Disorders,
a section of the journal
Frontiers in Psychiatry

RECEIVED 09 September 2022
ACCEPTED 08 November 2022
PUBLISHED 01 December 2022

CITATION
MacCallum CA, Lo LA, Pistawka CA
and Deol JK (2022) Therapeutic use
of psilocybin: Practical considerations
for dosing and administration.
Front. Psychiatry 13:1040217.
doi: 10.3389/fpsyt.2022.1040217

COPYRIGHT

© 2022 MacCallum, Lo, Pistawka and
Deol. This is an open-access article
distributed under the terms of the
Creative Commons Attribution License
(CC BY). The use, distribution or
reproduction in other forums is
permitted, provided the original
author(s) and the copyright owner(s)
are credited and that the original
publication in this journal is cited, in
accordance with accepted academic
practice. No use, distribution or
reproduction is permitted which does
not comply with these terms.

# Therapeutic use of psilocybin: Practical considerations for dosing and administration

Caroline A. MacCallum[1*†], Lindsay A. Lo[2†], Carly A. Pistawka[3] and Jagpaul Kaur Deol[4]

[1]Department of Medicine, Faculty of Medicine, University of British Columbia, Vancouver, BC, Canada, [2]Department of Public Health Sciences, Dalla Lana School of Public Health, University of Toronto, Toronto, ON, Canada, [3]Faculty of Science, University of British Columbia, Vancouver, BC, Canada, [4]Faculty of Pharmaceutical Sciences, University of British Columbia, Vancouver, BC, Canada

The interest in psilocybin as a therapeutic approach has grown exponentially in recent years. Despite increasing access, there remains a lack of practical guidance on the topic for health care professionals. This is particularly concerning given the medical complexity and vulnerable nature of patients for whom psilocybin-assisted psychotherapy may be considered. This article aims to provide health care professionals with an overview of practical considerations for psilocybin therapy, rooted in a patient safety focus. Within this piece we will review basic psilocybin pharmacology and pharmacokinetics, indications, practical therapeutic strategies (e.g., dosing, administration, monitoring) and safety considerations (e.g., contraindications, adverse events, and drug interactions). With this information, our goal is to increase the knowledge and comfort of health care professionals to discuss and counsel their patients on psilocybin therapy, ultimately improving patient care and safety.

KEYWORDS

psilocybin, psilocybin-assisted psychotherapy, psychedelics, psilocin, magic mushrooms, patient safety

## Introduction

The interest in psilocybin as a therapeutic approach has grown exponentially in recent years. Primarily originating from fungal species within the genus *Psilocybe*, psilocybin is an indole alkaloid that is the main psychedelic ingredient in psychedelic mushrooms (1). *Psilocybe* mushroom species are pan-tropical, growing around the globe, including in the regions of the southeastern United States, Central and South America, South East Asia, and parts of Africa (2, 3). Although interest in psychedelics, and more specifically psilocybin, has emerged relatively recently within western culture, the traditional and ancestral use of psychedelic mushrooms originated generations ago in Mesoamerica (1, 4, 5). Civilizations such as the Aztec, Maya, Olmec, and Zapotec have documented use of psilocybin to evoke altered states of consciousness for healing rituals and religious ceremonies (4). In recent years, psilocybin has gained traction as a potential

App-4:278

MacCallum et al.    10.3389/fpsyt.2022.1040217

therapeutic agent within western health care. Several high profile trials have shown promising results for end of life distress and treatment-resistant depression (6–10).

Access to psilocybin worldwide has been largely restricted since the 1960's (11). Richard Nixon's "war on drugs" combined with tighter regulation of pharmaceutical research is largely responsible for the halting of psychedelic research and subsequent restricted access for therapeutic purposes in North America (11, 12). Despite support for the safety and efficacy of psilocybin and other psychedelics (13), research and exploration of psilocybin as a therapeutic has not re-emerged until recently.

The US Food and Drug Administration granted breakthrough therapy status to psilocybin in 2018 for treatment-resistant depression, and in 2019 for major depressive disorder. At a state-level, Oregon has more recently passed Ballot Measure 109 allowing for the manufacture, delivery, and administration of psilocybin within a to-be-developed state-run program – an initiative is being paralleled by efforts at other local jurisdictions (e.g., Denver).

In Canada, psilocybin possession is illegal except through Health Canada-approved pathways: research (including clinical trials), Section 56 exemption, and the Special Access Program (SAP). Both Section 56 exemptions and SAP allow for limited medical use of psilocybin outside of research settings if it is believed to be necessary for medical purposes (14, 15). Prior to 2022, Section 56 exemptions were the sole option, but this route was flawed due to: no access to legal/safe supply of psilocybin (patients had to source non-good manufacturing practice (GMP) psilocybin themselves through illicit sources), limited approvals being granted, lack of transparency on denials from Health Canada, long wait times of up to 300 days for approvals, and many exemption requests left unanswered (15). A primary pathway was created following a 2022 SAP amendment, where SAP submissions receive responses within 24–48 h and, if approved, patients can procure regulated psilocybin from Health Canada licensed dealers. Section 56 exemptions have now become a secondary pathway to be used after a denial is received for a SAP request (16).

As access and public awareness to psilocybin increases, it is prudent for all health care professionals (HCP) to have a baseline pharmacotherapy knowledge of this treatment option. Understanding and applying patient specific safety considerations is essential in assessing psilocybin eligibility and appropriately managing patient care, even if a HCP is involved indirectly. Furthermore, due to the movement of global jurisdictions toward decriminalization of various psychedelic substances, discussions on personal use (with or without therapeutic intent) may also become a part of primary care, similar to what has happened with cannabis.

There remains a lack of practical clinical guidance for HCPs on Psilocybin-assisted psychotherapy (PAP). This is particularly concerning given the complex and medically vulnerable nature of patients who may qualify for this treatment modality. As such, this article aims to provide HCPs with an overview of the practical considerations for PAP that can be utilized when considering, counseling, prescribing, or monitoring psilocybin use in a patient. Although this paper focuses on the medical use and access channels to psilocybin, we acknowledge and support that non-medical model access needs to be established as there exists a spectrum of use that extends beyond prescriptive medical access.

## Pharmacology in brief

Psilocybin (4-phosphoryloxy-N,N-dimethyltryptamine) and its pharmacologically active metabolite psilocin (4-hydroxy-N,N-dimethyltryptamine) are the major psychoactive alkaloids in several species of "magic" mushrooms (17, 18). They are tryptamine/indolamine hallucinogens, structurally related to serotonin (17). Psilocybin and psilocin both display non-specific partial agonist activity on the serotonergic neurotransmitter system, with varying binding affinities at several serotonergic receptor sites (19, 20).

Psilocin, being highly lipophilic, is able to cross the blood-brain barrier and bind to several serotonergic receptors with a particularly high binding affinity to 5-hydroxytryptamine 2A ($5\text{-HT}_{2A}$) receptor as compared to psilocybin which is hydrophilic and cannot readily cross the blood-brain barrier (17, 21–23). As with all classical tryptamine psychedelics, the subjective effects of psilocin are mediated by biased (functionally selective) agonism of $5\text{-HT}_{2A}$ receptors (24). Psilocin binding to the $5\text{-HT}_{2A}$ receptor creates functional selectivity which favors the psychedelic signaling pathway over the default serotonin pathway (22, 24–26). The downstream signaling bias, as a result of functional selectivity, leads to increased glutamate release which also likely contributes to the psychedelic effects of psilocin (24, 27). Additionally, it is proposed that psilocin's neurobiological signaling pathways induce changes in neuroplasticity through (but not limited to) increased expression of glutamate and brain-derived neurotrophic factor (BDNF) (28, 29). The potential connection between BDNF and depression (30, 31) is one suggested mechanism for psilocin's therapeutic effect (28, 29).

$5\text{-HT}_{2A}$ receptors are also highly expressed in the visual cortex, contributing to the visual hallucinations associated with psilocin (27, 32). Antagonism of these receptors using the $5\text{-HT}_{2A}$ receptor blocker ketanserin has shown attenuation of hallucinatory effects, supporting the underlying psychedelic mechanism of action through $5\text{-HT}_{2A}$ receptors (33–35). Additional binding sites, including $5\text{-HT}_{1A}$ and $5\text{-HT}_{2C}$, may potentially play a role in some of the psychedelic effects of psilocin, but further studies are needed to determine the extent of this contribution (20, 22, 24).

App-4:279

MacCallum et al.                                                                    10.3389/fpsyt.2022.1040217

## Pharmacokinetics

Psilocybin is a prodrug and must be converted to its metabolite psilocin in order to cross the blood-brain barrier and elicit its neurological effects. Following oral ingestion, psilocybin is rapidly dephosphorylated via the acidic environment of the stomach into psilocin. Any remaining psilocybin is then converted in the intestines, blood, and kidneys through alkaline phosphatase to produce the active, lipophilic form, psilocin (17, 23). It is important to note that the majority of psilocybin efficacy and pharmacokinetic studies are based on patients fasting for an average of 2-4 h (except water). In order to ensure more predictable kinetics, good clinical practice should include instructions for consuming psilocybin on an empty stomach.

The bioavailability of psilocybin is approximately 50% following oral ingestion (17). Psilocybin is a water-soluble compound detectable in plasma within 20–40 min (**Figure 1**) (17). Psilocin is extensively distributed through the bloodstream to all tissues, including crossing the blood-brain barrier to elicit central nervous system effects (23). Psilocin is detectable in plasma after 30 min (17) and displays linear pharmacokinetics (36).

In earlier studies, the half-life ($T_{1/2}$) of psilocin was found to be 50 min and $T_{1/2}$ of psilocybin being 160 min (17) whereas newer studies using a fixed 25 mg psilocybin dose and specifically measuring unconjugated psilocin found its $T_{1/2}$ to be 108 min (range: 66–132 min) (**Figure 1**) (28). The dose response curve correlates to a session experience with an onset

of action at 20-40 min, peak subjective effects at 60–90 min and an active duration of 4–6 h (**Figure 1**) (18). A dose-escalating study of oral psilocybin found an average psilocin $T_{1/2}$ of 3 h, but also found minor variability (standard deviation 1.1) between participants (**Figure 1**) (36). Variability was not predicted by body weight, and may instead be due to less or more hydrolysis of the psilocin glucuronide metabolite (36). After a 25 mg fixed oral dose of psilocybin, one study reported a maximal psilocin plasma concentration at 120 min (Tmax) of 20 ng/mL (Cmax) (28) and similarly, another study reported a Cmax of 18.7 ng/mL (37).

A recent study shows that ∼80% of all circulating psilocin is metabolized by hepatic phase II glucuronidation (conjugation) through UGT 1A10 and UGT 1A9 enzymes into psilocin-O-glucuronide (23). This inactive secondary metabolite is renally cleared, along with ∼2% of combined unconjugated psilocin and unmetabolized psilocybin (36). The remaining ∼20% of circulating psilocin is metabolized through several pathways (including MAO, ALDH, cytochrome oxidase, etc.) and excreted through the bile into the stool (23). Complete psilocin excretion occurs within 24 h, with the majority occurring in the first 8 h (17, 23).

## Therapeutic uses

The strongest evidence for psilocybin is from clinical trials in cancer-related depression and anxiety and treatment-resistant



**FIGURE 1**

Psilocin concentration to session time curve using a standard psilocybin dose. Information gathered from (17, 18, 23, 28, 36, 37).

App-4:280

MacCallum et al.                                                          10.3389/fpsyt.2022.1040217

depression (Table 1) (7–10, 38–41). Alcohol use disorder and tobacco addiction have been found to have moderate-level evidence from several clinical trials (42–45).

Preliminary research (e.g., proof-of-concept, open label trials, or case series) suggests there may also be utility for psilocybin in obsessive compulsive disorder (OCD) (46), cluster headaches (47, 48), migraines (49), and demoralization with an AIDS diagnosis (50). Currently, clinical trials are being conducted on a wide range of conditions including migraines, addiction (tobacco, alcohol, cocaine), anorexia, bipolar disorder, chronic pain, major depressive disorder, and OCD (51).

## Dosing and administration strategies

Many earlier psilocybin trials initially dosed using body weight, with doses generally ranging from 0.2–0.4 mg/kg of psilocybin per session. Protocols consisted of either a single dose or two doses separated by an average 3–4 week washout period. Current clinical trial protocols have switched to using a fixed psilocybin dose, most commonly 25 mg, which is consistent with the previous 0.3 mg/kg weight-based dosing (36). The fixed 25 mg dose approach has been validated in a recent secondary analysis of prior trial data, which found no significant differences for psychedelic effects compared to weight-based doses of 0.29 mg/kg and 0.43 mg/kg (52). As the renally cleared secondary metabolite (psilocin-O-glucuronide) is inactive, it suggests that patients with mild-moderate renal impairment do not require a dose reduction (36). Table 2 compares several dosing ranges for both psilocybin and dried *Psilocybe cubensis* mushroom (a common research species) based on the above studies that can inform dosing guidelines.

Outside of research or medical access settings (such as Health Canada SAP), a common source of psilocybin is from dried "magic" mushrooms. This requires a conversion to determine the estimated weight of dried mushrooms to consume in order to arrive at the intended psilocybin dose. Based on several studies, the average psilocybin content is ∼1% psilocybin per one gram of dried *Psilocybe cubensis* mushroom; therefore, a 25 mg psilocybin fixed dose is approximately 2.5 grams of dried *Psilocybe cubensis* mushroom. However, it is important to note, there is intra- and inter-species variability of psilocybin content

(53, 54). In psilocybin-naive patients using dried mushrooms, it is good clinical practice to start at a lower dried mushroom weight in the event that the actual psilocybin content is higher in any given batch. The variability in psilocybin content can range on average from 0.5–2% dried mushroom weight based on species (53, 54).

Underlying causes for varying sensitivities to psilocybin effects are not fully understood. Lab research in cells points to differences in $5\text{-HT}_{2A}$ receptors through single nucleotide polymorphism variants, such as Ala230Thr, as one factor (55). Clinically, these varying sensitivities are observed with a lack of fasting and certain conditions such as reduced gastric acid, altered gastric motility, or liver dysfunction.

The administration of psilocybin should be accompanied with assisted psychotherapy to maximize potential benefits. Psilocybin-assisted psychotherapy focuses on three stages: pretreatment, treatment, and posttreatment (56). Pre-treatment heavily focuses on building therapeutic rapport and trust (56). One fundamental therapeutic concept is that of "set and setting" which refers to appropriate patient preparation so that they are informed on what to expect during their session both from a mindset and environmental perspective. Treatment sessions are generally conducted in a non-directive, supportive setting and utilize a variety of tools such as a music playlist, meditation, and breath work (56, 57). Posttreatment focuses on supporting the integration of experiences (56). Detailed practical guidance on assisted-psychotherapy is out of scope for the present manuscript, however, it has been noted in a variety of other publications [e.g., (56–60)].

## Contraindications

Most contraindications are due to increased risk for *psychological* distress, including the rare, but potential, serious adverse event of psychosis (6–8, 38, 39, 61). History of schizophrenia, psychosis, bipolar disorder, and borderline personality disorder are generally contraindicated for psilocybin (6–8, 38, 39, 61); however, future observational data in these conditions may provide a more detailed risk-benefit. Pregnancy and breastfeeding are also contraindicated given insufficient scientific evidence to assess risk.

TABLE 1  Evidence for psilocybin-assisted psychotherapy.

| Least evidence[a] | Some evidence[b] | Most evidence[c] |
|---|---|---|
| Obsessive Compulsive Disorder (46) | Alcohol Use Disorder/Dependence (42–44) | Cancer-related depression (8–10) |
| Cluster Headaches/Migraines (47, 48) | | Cancer-related anxiety (8–10) |
| Demoralization with AIDS Diagnosis (50) | Tobacco Addiction (45) | Treatment-resistant depression (7, 38, 39) |

Evidence definitions:
[a]Least Evidence: case reports, case series, lack of clinically significant results.
[b]Some Evidence: single group, open label trials, proof-of-concept trials.
[c]Most Evidence: multiple clinical randomized controlled trials (RCTs).

App-4:281

MacCallum et al.                                                                10.3389/fpsyt.2022.1040217

**TABLE 2**  Psilocybin dosing and considerations.

|  | Standard dose | High dose | Supra-therapeutic dose |
|---|---|---|---|
| Psilocybin (extracted isolate or synthetic) | 25 mg | 35 mg | 50–60 mg |
| Dried *Psilocybe cubensis* mushroom (whole or powdered) equivalent | 2.5 gram* | 3.5 gram* | 5–6 gram* |

*Conversions assume a **1% psilocybin per 1 gram** of dried *Psilocybe cubensis* mushroom. Psilocybin content between species and strains can range from 0.5–2% per gram. Information gathered from (36, 52, 73, 74).

The primary *physical* concerns are due to transient increases in heart rate and blood pressure following psilocybin ingestion (8, 62). Thus, serious or uncontrolled cardiovascular conditions are often considered to be relative contraindications (39, 61).

## Drug interactions

The concurrent use of psychotropic medications, especially antidepressants and antipsychotics, may introduce risks (safety concerns) or alter benefits (efficacy concerns). Many of these medications modulate the serotonin system including 5-HT$_{2A}$ receptors (61). As psilocybin and psilocin mainly interact with the serotonergic system, particularly 5-HT$_{2A}$, there is a risk for pharmacodynamic drug interactions (17).

The most common pharmacodynamic interaction may result in a heightened or blunted psychedelic experience. For example, tricyclic antidepressants (TCAs) may increase the intensity, while monoamine oxidase inhibitors (MAOIs) and selective serotonin reuptake inhibitors (SSRIs) may decrease the intensity (61, 63–67).

Drug interactions between serotonergic drugs may lead to a rare, but serious, condition called serotonin syndrome in which excessive serotonin signaling can lead to a potentially life-threatening adverse drug reaction (68, 69).

Clinical trial protocols often require the tapering and washout of these medications due to the concern of serotonin syndrome, however, there is a lack of published serotonin toxicity cases. A recent standard dose psilocybin study of patients on a concurrent SSRI were found to have no additional

safety concerns such as QT prolongation (an abnormally extended interval between heart contracting and relaxing), serotonin syndrome and no reduction in efficacy such as impact to positive mood (28). This continues to be an area of further investigation.

In addition, potential pharmacokinetic drug interactions exist for phase II UGT substrates. As psilocin is primarily metabolized by UGT 1A10 and 1A9 (23), medications that can inhibit or induce these enzymes must be held or tapered prior to administration of psilocybin. Some examples of UGT 1A10/1A9 inhibitors include diclofenac (a Non-steroidal anti-inflammatory drug) and probenecid (a uric acid reducer).

A detailed medication screening should be completed, especially for antidepressants, antipsychotics, psychostimulants, lithium, and other dopaminergic or serotonergic agents (39, 42, 61). If there is concern for drug-drug interactions, an individualized risk-benefit assessment should be conducted with an appropriate drug taper schedule if warranted. Health care professionals should be aware of potential discontinuation syndrome and monitor for signs of distress if tapering psychotropic medications prior to psilocybin administration.

## Adverse events

Due to psilocybin's large therapeutic index (1:1000) and a typically unattainable lethal dose, psilocybin has a favorable safety profile (6, 9, 10, 42, 61, 62, 70, 71). Relative to other psychedelics (such as MDMA, DMT, etc.), psilocybin has lower occurrence of seizures, hospital admissions and other serious adverse effects, and lacks addictive or reinforcing properties (62, 72). Several dose-escalating studies have tested the subjective psychedelic effects in supratherapeutic doses, e.g., 50–60 mg or 5–6 grams, and found positive results with little-to-no safety concerns (36, 37, 73).

The primary risk for psilocybin is psychological safety, not physiological safety as it is for most classic drugs (e.g., opioids, sedatives, stimulants) (61, 69). Properly conducted PAP aims to minimize the potential for psychological harms through appropriate patient preparation and close patient monitoring. Despite this, the acute psychotomimetic effects associated with psilocybin may still pose a risk for psychological distress, and in rare cases, psychosis (61, 69). Physical and psychological adverse events are reported in **Table 3**. Many of these are transient

**TABLE 3**  Psilocybin-associated adverse events.

| Physical | Psychological |
|---|---|
| **Commonly reported adverse events** | |
| Increase in Blood Pressure and Heart Rate | Anxiety |
| | Confusion |
| Headache | |
| Nausea | |
| **Less commonly reported adverse events** | |
| Fatigue | Strong or Extreme fear |
| Migraine | Paranoia |
| Vomiting | Psychotic-like symptoms |
| Physical Discomfort | Psychological discomfort |

Information gathered from (6, 10, 38, 39, 42, 45, 46, 69, 71).

App-4:282

MacCallum et al.                                                                                                    10.3389/fpsyt.2022.1040217

in nature and related to the therapeutic nature of emotional processing in session (blood pressure, heart rate, anxiety). Transient headaches may also arise the day after treatment. Data from clinical trials, in which proper screening is completed and consumption is monitored, report no serious adverse events (6, 9, 10, 38, 39, 42, 46, 71).

## Conclusion

As interest and access to psilocybin as a therapeutic option grows, HCPs require sufficient information to navigate potential psilocybin use in their patients. At a time where the use of psilocybin is becoming more common, it is imperative for HCPs to have a base-level understanding of psilocybin, its indications, and key safety considerations in order to guide and counsel their patients. These factors also play an important role in informing policymakers as they create regulations and guidance for psilocybin use. Development of health care education in order to equip HCPs with the necessary knowledge to ensure patient safety are worthwhile goals.

## Author contributions

CM contributed to conception of manuscript. All authors wrote sections of the manuscript, contributed to manuscript revision, read, and approved the submitted version.

## Acknowledgments

We would like to acknowledge Dr. Justin C. Strickland and Dr. Houman Farzin for their assistance in reviewing and finalizing this manuscript. **Figure 1** was created with BioRender.com.

## Conflict of interest

LL had received compensation for consulting with Dimensions Health Centres. JD had received compensation for consulting and advisory work with TheraPsil, Roots to Thrive, and Numinus Wellness.

The remaining authors declare that the research was conducted in the absence of any commercial or financial relationships that could be construed as a potential conflict of interest.

## Publisher's note

All claims expressed in this article are solely those of the authors and do not necessarily represent those of their affiliated organizations, or those of the publisher, the editors and the reviewers. Any product that may be evaluated in this article, or claim that may be made by its manufacturer, is not guaranteed or endorsed by the publisher.

## References

1. Van Court RC, Wiseman MS, Meyer KW, Ballhorn DJ, Amses KR, Slot JC, et al. Diversity, biology, and history of psilocybin-containing fungi: Suggestions for research and technological development. *Fungal Biol.* (2022) 126:308–19. doi: 10.1016/j.funbio.2022.01.003

2. Guzmán G. The hallucinogenic mushrooms: diversity, traditions, use and abuse with special reference to the genus psilocybe. In *Fungi from Different Environments*. Boca Raton, FL: CRC Press (2009).

3. Guzmán, G, Allen JW, Gartz J. A worldwide geographical distribution of the neurotropic fungi, an analysis and discussion. *Ann Mus Civ Rovereto*. (1998) 14:92.

4. Carod-Artal FJ. Hallucinogenic drugs in pre-Columbian Mesoamerican cultures. *Neurología (English Edition)*. (2015) 30:42–9. doi: 10.1016/j.nrl.2011.07.003

5. Santiago FH, Moreno JP, Cázares BX, Suárez JJA, Trejo EO, de Oca GMM, et al. Traditional knowledge and use of wild mushrooms by Mixtecs or Ñuu savi, the people of the rain, from Southeastern Mexico. *J Ethnobiol Ethnomed*. (2016) 12:35. doi: 10.1186/s13002-016-0108-9

6. Carhart-Harris RL, Bolstridge M, Rucker J, Day CMJ, Erritzoe D, Kaelen M, et al. Psilocybin with psychological support for treatment-resistant depression: an open-label feasibility study. *Lancet Psychiatry*. (2016) 3: 619–27.

7. Carhart-Harris RL, Bolstridge M, Day CMJ, Rucker J, Watts R, Erritzoe DE, et al. Psilocybin with psychological support for treatment-resistant depression: six-month follow-up. *Psychopharmacology*. (2018) 235:399–408. doi: 10.1007/s00213-017-4771-x

8. Griffiths RR, Johnson MW, Carducci MA, Umbricht A, Richards WA, Richards BD, et al. Psilocybin produces substantial and sustained decreases in depression and anxiety in patients with life-threatening cancer: A randomized double-blind trial. *J Psychopharmacol*. (2016) 30:1181–97. doi: 10.1177/0269881116675513

9. Grob CS, Danforth AL, Chopra GS, Hagerty M, McKay CR, Halberstadt AL, et al. Pilot study of psilocybin treatment for anxiety in patients with advanced-stage cancer. *Arch Gen Psychiatry*. (2011) 68:71–8.

10. Ross S, Bossis A, Guss J, Agin-Liebes G, Malone T, Cohen B, et al. Rapid and sustained symptom reduction following psilocybin treatment for anxiety and depression in patients with life-threatening cancer: a randomized controlled trial. *J Psychopharmacol*. (2016) 30:1165–80. doi: 10.1177/0269881116675512

11. Hall, W. Why was early therapeutic research on psychedelic drugs abandoned? *Psychol Med*. (2021):1–6. doi: 10.1017/S0033291721004207

12. Shortall S. Psychedelic drugs and the problem of experience *. *Past Present*. (2014) 222(suppl_9) 52:187–206.

13. Rucker JJ, Jelen LA, Flynn S, Frowde KD, Young AH. Psychedelics in the treatment of unipolar mood disorders: a systematic review. *J Psychopharmacol*. (2016) 30:1220–9.

14. Government of Canada. *Subsection 56(1) class exemption for practitioners, agents, pharmacists, persons in charge of a hospital, hospital employees, and licensed dealers to conduct activities with psilocybin and MDMA in relation to a special access program authorization*. (2022). Available online at: https://www.canada.ca/en/health-canada/services/health-concerns/controlled-substances-precursor-chemicals/policy-regulations/policy-documents/subsection-56-1-class-exemption-conducting-activities-psilocybin-mdma-special-access-program-authorization.html (accessed November 3, 2022).

App-4:283

Case 2:24-cv-00887-JNP-CMR   Document 84-2   Filed 02/05/25   PageID.2270   Page
Appellate Case: 25-4115   Document: 26-9   Date Filed: 12/11/2025   Page: 284

MacCallum et al.                                                                         10.3389/fpsyt.2022.1040217

15. City of Vancouver. *Request for an exemption from the Controlled Drugs and Substances Act (CDSA) pursuant to section 56(1) that would decriminalize personal possession of illicit substances within the City of Vancouver.* (2021). Available online at: https://vancouver.ca/files/cov/request-for-exemption-from-controlled-drugs-and-substances-act.pdf (accessed August 19, 2022).

16. Government of Canada. *Regulations Amending Certain Regulations Relating to Restricted Drugs (Special Access Program) [Internet]. Government of Canada, Public Works and Government Services Canada, Integrated Services Branch, Canada Gazette.* (Vol. 156). (2022). Available online at: https://www.gazette.gc.ca/rp-pr/p2/2022/2022-01-05/html/sor-dors271-eng.html (accessed August 19, 2022).

17. Passie T, Seifert J, Schneider U, Emrich HM. The pharmacology of psilocybin. *Addict Biol.* (2002) 7:357–64.

18. Tylš F, Páleníček T, Horáček J. Psilocybin – Summary of knowledge and new perspectives. *Eur Neuropsychopharmacol.* (2014) 24:342–56. doi: 10.1016/j.euroneuro.2013.12.006

19. Halberstadt AL, Geyer MA. Multiple receptors contribute to the behavioral effects of indoleamine hallucinogens. *Neuropharmacology.* (2011) 61:364–81. doi: 10.1016/j.neuropharm.2011.01.017

20. Rickli A, Moning OD, Hoener MC, Liechti ME. Receptor interaction profiles of novel psychoactive tryptamines compared with classic hallucinogens. *Eur Neuropsychopharmacol.* (2016) 26:1327–37.

21. Besnard J, Ruda GF, Setola V, Abecassis K, Rodriguiz RM, Huang XP, et al. Automated design of ligands to polypharmacological profiles. *Nature.* (2012) 492:215–20.

22. Blough BE, Landavazo A, Decker AM, Partilla JS, Baumann MH, Rothman RB. Interaction of psychoactive tryptamines with biogenic amine transporters and serotonin receptor subtypes. *Psychopharmacology (Berl).* (2014) 231:4135–44. doi: 10.1007/s00213-014-3557-7

23. Dinis-Oliveira RJ. Metabolism of psilocybin and psilocin: clinical and forensic toxicological relevance. *Drug Metab Rev.* (2017) 49:84–91. doi: 10.1080/03602532.2016.1278228

24. López-Giménez JF, González-Maeso J. Hallucinogens and Serotonin 5-HT2A Receptor-Mediated Signaling Pathways. *Curr Top Behav Neurosci.* (2018) 36:45–73.

25. McKenna DJ, Repke DB, Lo L, Peroutka SJ. Differential interactions of indolealkylamines with 5-hydroxytryptamine receptor subtypes. *Neuropharmacology.* (1990) 29:193–8.

26. Mertens LJ, Wall MB, Roseman L, Demetriou L, Nutt DJ, Carhart-Harris RL. Therapeutic mechanisms of psilocybin: Changes in amygdala and prefrontal functional connectivity during emotional processing after psilocybin for treatment-resistant depression. *J Psychopharmacol.* (2020) 34:167–80. doi: 10.1177/0269881119895520

27. Ling S, Ceban F, Lui LMW, Lee Y, Teopiz KM, Rodrigues NB, et al. Molecular mechanisms of psilocybin and implications for the treatment of depression. *CNS Drugs.* (2022) 36:17–30. doi: 10.1007/s40263-021-00877-y

28. Becker AM, Holze F, Grandinetti T, Klaiber A, Toedtli VE, Kolaczynska KE, et al. Acute effects of psilocybin after escitalopram or placebo pretreatment in a randomized, double-blind, placebo-controlled, crossover study in healthy subjects. *Clin Pharmacol Ther.* (2022) 111:886–95.

29. de Vos CMH, Mason NL, Kuypers KPC. Psychedelics and neuroplasticity: A systematic review unraveling the biological underpinnings of psychedelics. *Front Psychiatry.* (2021) 12:724606. doi: 10.3389/fpsyt.2021.724606

30. Arosio B, Guerini FR, Voshaar RCO, Aprahamian I. Blood Brain-Derived Neurotrophic Factor (BDNF) and Major Depression: Do We Have a Translational Perspective? *Front Behav Neurosci.* (2021) 15:626906. doi: 10.3389/fnbeh.2021.626906

31. Yang T, Nie Z, Shu H, Kuang Y, Chen X, Cheng J, et al. The Role of BDNF on Neural Plasticity in Depression. *Front Cell Neurosci.* (2020) 14:82. doi: 10.3389/fncel.2020.00082

32. Mahapatra A, Gupta R. Role of psilocybin in the treatment of depression. *Ther Adv Psychopharmacol.* (2017) 7:54–6.

33. Batman AM, Munzar P, Beardsley PM. Attenuation of nicotine's discriminative stimulus effects in rats and its locomotor activity effects in mice by serotonergic 5-HT2A/2C receptor agonists. *Psychopharmacology.* (2005) 179:393–401. doi: 10.1007/s00213-004-2035-z

34. Lee HM, Roth BL. Hallucinogen actions on human brain revealed. *Proc Natl Acad Sci USA.* (2012) 109:1820–1.

35. Vollenweider FX, Kometer M. The neurobiology of psychedelic drugs: implications for the treatment of mood disorders. *Nat Rev Neurosci.* (2010) 11:642–51.

36. Brown RT, Nicholas CR, Cozzi NV, Gassman MC, Cooper KM, Muller D, et al. Pharmacokinetics of escalating doses of oral psilocybin in healthy adults. *Clin Pharmacokinet.* (2017) 56:1543–54.

37. Dahmane E, Hutson PR, Gobburu JVS. Exposure-Response analysis to assess the concentration-qtc relationship of psilocybin/psilocin. *Clin Pharmacol Drug Dev.* (2021) 10:78–85. doi: 10.1002/cpdd.796

38. Carhart-Harris RL, Giribaldi B, Watts R, Baker-Jones M, Murphy-Beiner A, Murphy R, et al. Trial of psilocybin versus escitalopram for depression. *New Engl J Med.* (2021) 384:1402–11.

39. Davis AK, Barrett FS, May DG, Cosimano MP, Sepeda ND, Johnson MW, et al. Effects of psilocybin-assisted therapy on major depressive disorder: A randomized clinical trial. *JAMA Psychiatry.* (2021) 78:481–9. doi: 10.1001/jamapsychiatry.2020.3285

40. Johnson MW, Griffiths RR. Potential therapeutic effects of psilocybin. *Neurotherapeutics.* (2017) 14:734–40.

41. Shore RJ, Ioudovski P, McKeown S, Dumont E, Goldie C. Mapping psilocybin-assisted therapies: a scoping review. *medRxiv* [Preprint]. (2019) doi: 10.1101/2019.12.04.19013896

42. Bogenschutz MP, Forcehimes AA, Pommy JA, Wilcox CE, Barbosa PCR, Strassman RJ. Psilocybin-assisted treatment for alcohol dependence: a proof-of-concept study. *J Psychopharmacol.* (2015) 29:289–99.

43. Bogenschutz MP, Podrebarac SK, Duane JH, Amegadzie SS, Malone TC, Owens LT, et al. Clinical interpretations of patient experience in a trial of psilocybin-assisted psychotherapy for alcohol use disorder. *Front Pharmacol.* (2018) 9:100. doi: 10.3389/fphar.2018.00100

44. Bogenschutz MP, Ross S, Bhatt S, Baron T, Forcehimes AA, Laska E, et al. Percentage of heavy drinking days following psilocybin-assisted psychotherapy vs placebo in the treatment of adult patients with alcohol use disorder: a randomized clinical trial. *JAMA Psychiatry.* (2022) 79:953–62. doi: 10.1001/jamapsychiatry.2022.2096

45. Johnson MW, Garcia-Romeu A, Cosimano MP, Griffiths RR. Pilot Study of the 5-HT2AR agonist psilocybin in the treatment of tobacco addiction. *J Psychopharmacol.* (2014) 28:983–92. doi: 10.1177/0269881114548296

46. Moreno FA, Wiegand CB, Taitano EK, Delgado PL. Safety, tolerability, and efficacy of psilocybin in 9 patients with obsessive-compulsive disorder. *J Clin Psychiatry.* (2006) 67:1735–40.

47. Schindler EAD, Gottschalk CH, Weil MJ, Shapiro RE, Wright DA, Sewell RA. Indoleamine hallucinogens in cluster headache: Results of the clusterbusters medication use survey. *J Psychoact Drugs.* (2015) 47:372–81. doi: 10.1080/02791072.2015.1107664

48. Sewell RA, Halpern JH, Pope HG. Response of cluster headache to psilocybin and LSD. *Neurology.* (2006) 66:1920–2.

49. Schindler EAD, Sewell RA, Gottschalk CH, Luddy C, Flynn LT, Lindsey H, et al. Exploratory controlled study of the migraine-suppressing effects of psilocybin. *Neurotherapeutics.* (2021) 18:534–43. doi: 10.1007/s13311-020-00962-y

50. Anderson BT, Danforth A, Daroff PR, Stauffer C, Ekman E, Agin-Liebes G, et al. Psilocybin-assisted group therapy for demoralized older long-term AIDS survivor men: An open-label safety and feasibility pilot study. *EClinicalMedicine.* (2020) 27:100538. doi: 10.1016/j.eclinm.2020.100538

51. National Institute of Health. *ClinicalTrials.gov*. Bethesda, MD: National Institute of Health (2022).

52. Garcia-Romeu A, Barrett FS, Carbonaro TM, Johnson MW, Griffiths RR. Optimal dosing for psilocybin pharmacotherapy: Considering weight-adjusted and fixed dosing approaches. *J Psychopharmacol.* (2021) 35:353–61. doi: 10.1177/0269881121991822

53. Beug MW, Bigwood J. Psilocybin and psilocin levels in twenty species from seven genera of wild mushrooms in the Pacific Northwest, U.S.A. *J Ethnopharmacol.* (1982) 5:271–85. doi: 10.1016/0378-8741(82)90013-7

54. Bigwood J, Beug MW. Variation of psilocybin and psilocin levels with repeated flushes (harvests) of mature sporocarps of Psilocybe cubensis (earle) singer. *J Ethnopharmacol.* (1982) 5:287–91. doi: 10.1016/0378-8741(82)90014-9

55. Schmitz GP, Jain MK, Slocum ST, Roth BL. 5-HT2A SNPs Alter the pharmacological signaling of potentially therapeutic psychedelics. *ACS Chem Neurosci.* (2022) 13:2386–98. doi: 10.1021/acschemneuro.1c00815

56. Horton DM, Morrison B, Schmidt J. Systematized review of psychotherapeutic components of psilocybin-assisted psychotherapy. *APT.* (2021) 74:140–9. doi: 10.1176/appi.psychotherapy.20200055

57. Phelps J. Developing guidelines and competencies for the training of psychedelic therapists. *J Hum Psychol.* (2017) 57:450–87.

App-4:284

MacCallum et al.                                                                                                          10.3389/fpsyt.2022.1040217

58. Timmermann, C, Watts R, Dupuis D. Towards psychedelic apprenticeship: Developing a gentle touch for the mediation and validation of psychedelic-induced insights and revelations. *Transcult Psychiatry.* (2022) 59:13634615221082796. doi: 10.1177/13634615221082796

59. Penn AD, Phelps J, Rosa WE, Watson J. Psychedelic-Assisted psychotherapy practices and human caring science: Toward a care-informed model of treatment. *J Hum Psychol.* (2021). doi: 10.1177/00221678211011013

60. Sloshower J, Guss J, Krause R, Wallace RM, Williams MT, Reed S, et al. Psilocybin-assisted therapy of major depressive disorder using Acceptance and Commitment Therapy as a therapeutic frame. *J Contextual Behav Sci.* (2020) 15:12–9.

61. O'Donnell KC, Mennenga SE, Bogenschutz MP. Psilocybin for depression: Considerations for clinical trial design. *J Psychedelic Stud.* (2019) 3:269–79.

62. Leonard JB, Anderson B, Klein-Schwartz W. Does getting high hurt? Characterization of cases of LSD and psilocybin-containing mushroom exposures to national poison centers between 2000 and 2016. *J Psychopharmacol.* (2018) 32:1286–94. doi: 10.1177/0269881118793086

63. Bonson KR, Buckholtz JW, Murphy DL. Chronic administration of serotonergic antidepressants attenuates the subjective effects of LSD in humans. *Neuropsychopharmacology.* (1996) 14:425–36. doi: 10.1016/0893-133X(95)00145-4

64. Bonson KR, Murphy DL. Alterations in responses to LSD in humans associated with chronic administration of tricyclic antidepressants, monoamine oxidase inhibitors or lithium. *Behav Brain Res.* (1996) 73:229–33.

65. Gómez-Gil E, Gastó C, Carretero M, Díaz-Ricart M, Salamero M, Navinés R, et al. Decrease of the platelet 5-HT2A receptor function by long-term imipramine treatment in endogenous depression. *Hum Psychopharmacol.* (2004) 19:251–8. doi: 10.1002/hup.583

66. Meyer JH, Kapur S, Eisfeld B, Brown GM, Houle S, DaSilva J, et al. The effect of paroxetine on 5-HT(2A) receptors in depression: an [(18)F]setoperone PET imaging study. *Am J Psychiatry.* (2001) 158:78–85.

67. Yamauchi M, Miyara T, Matsushima T, Imanishi T. Desensitization of 5-HT2A receptor function by chronic administration of selective serotonin reuptake inhibitors. *Brain Res.* (2006) 1067:164–9.

68. Callaway JC, Grob CS. Ayahuasca preparations and serotonin reuptake inhibitors: a potential combination for severe adverse interactions. *J Psychoactive Drugs.* (1998) 30:367–9. doi: 10.1080/02791072.1998.10399712

69. Johnson MW, Richards W, Griffiths RR. Human hallucinogen research: guidelines for safety. *J Psychopharmacol.* (2008) 22: 603–20.

70. Gable RS. The toxicity of recreational drugs. *Am Sci.* (2006) 94:206.

71. Griffiths RR, Johnson MW, Richards WA, Richards BD, McCann U, Jesse R. Psilocybin occasioned mystical-type experiences: immediate and persisting dose-related effects. *Psychopharmacology (Berl).* (2011) 218:649–65. doi: 10.1007/s00213-011-2358-5

72. Leary T, Metzner R, Alpert R. *The Psychedelic Experience: a Manual Based on the Tibetan Book of the Dead.* Galle: Citadel (1964).

73. Nicholas CR, Henriquez KM, Gassman MC, Cooper KM, Muller D, Hetzel S, et al. High dose psilocybin is associated with positive subjective effects in healthy volunteers. *J Psychopharmacol.* (2018) 32:770–8. doi: 10.1177/0269881118780713

74. Dahlgren MK, Sagar KA, Smith RT, Lambros AM, Kuppe MK, Gruber SA. Recreational cannabis use impairs driving performance in the absence of acute intoxication. *Drug Alcohol Depend.* (2020) 208:107771.

App-4:285