No. 25-4115

UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

BRIDGER LEE JENSEN, SINGULARISM, AND PSYCHE HEALING AND BRIDGING, LLC,
*Plaintiffs - Appellees*,

v.

UTAH COUNTY, PROVO CITY, AND JEFFREY GRAY,
*Defendants- Appellants*.

On appeal from the United States District Court, District of Utah,
The Honorable Jill N. Parrish, No. 2:24-cv-00887-JNP-CMR

**APPELLANTS' APPENDIX**
**Volume 5 of 8**

Respectfully submitted,

Troy L. Booher
Caroline A. Olsen
ZIMMERMAN BOOHER
341 South Main Street, Fourth Floor
Salt Lake City, Utah 84111
tbooher@zbappeals.com
colsen@zbappeals.com
(801) 924-0200

*Attorneys for Appellants*

December 10, 2025

App-5:001

| USDC Dkt. No. | Date Filed | Description | App- |
|---|---|---|---|
| **Volume 5 of 8** | | | |
| 084-03 | | Exhibit C — Psilocybin Assisted Therapy | 5:004 |
| 084-04 | | Exhibit D — TRO Transcript Excerpts | 5:024 |
| 084-05 | | Exhibit E — Psyche Healing Business License | 5:029 |
| 084-06 | | Exhibit F — Singularism Business Application | 5:031 |
| 084-07 | | Exhibit G — Divine Assembly Utah Business Registration | 5:034 |
| 084-08 | | Exhibit H — Divine Assembly Articles of Incorporation | 5:038 |
| 084-09 | | Exhibit I — Divine Assembly Facebook Page | 5:043 |
| 085 | 02/05/25 | Plaintiffs' Second Supplemental Brief in Support of Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction | 5:045 |
| 085-01 | | Exhibit FF — Third Supplemental Declaration of Bridger Jensen | 5:067 |
| 085-02 | | Exhibit GG — Divine Assembly | 5:079 |
| 085-03 | | Exhibit HH — Claire Hart Waiver (redacted) | 5:083 |
| 085-04 | | Exhibit II — Oregon CSA | 5:094 |
| 088 | 02/10/25 | Certification Under 28 U.S.C. § 2403 | 5:115 |

| USDC Dkt. No. | Date Filed | Description | App- |
|---|---|---|---|
| 092 | 02/20/25 | Order Granting Motion for Preliminary Injunction | 5:118 |
| 096 | 04/11/25 | Utah Attorney General's Response to Certification of Plaintiffs' as Applied Constitutional Challenge to the Utah Controlled Substances Act Under 28 U.S.C. § 2403 | 5:156 |
| 099 | 06/03/25 | Stipulated Motion to Stay Proceedings | 5:159 |
| 101 | 06/03/25 | Order Granting Stipulated Motion for Stay | 5:161 |
| 102 | 08/04/25 | Memorandum Decision and Order Denying Defendants' Motion to Dismiss and Granting Plaintiffs' Motion for Anti-Suit Injunction | 5:162 |
| 105 | 08/29/25 | Defendants' Notice of Appeal | 5:194 |
| 106 | 09/02/25 | Defendants' Answer to First Amended Verified Complaint | 5:196 |

# EXHIBIT C

App-5:004

Case 2:24-cv-00887-JNR-CMR Document 84-3 Filed 02/05/25 PageID 2373 Page
Appellate Case: 25-4115 Document: 36-5 Date Filed: 12/11/2025 Page: 5

# ClinicalTrials.gov

**National Library of Medicine**
National Center for Biotechnology Information

**Record 1 of 8**



**The U.S. government does not review or approve the safety and science of all studies listed on this website.**

Read our full disclaimer (https://clinicaltrials.gov/about-site/disclaimer) for details.

ClinicalTrials.gov is a website and online database of clinical research studies and information about their results. The National Library of Medicine (NLM) maintains the website. **The study sponsor or investigator submits information** about their study to ClinicalTrials.gov and **is responsible for the safety, science, and accuracy** of any study they list.

Before joining a study, talk to your health care professional about possible risks and benefits. To learn more about taking part in studies, read Learn About Studies (https://clinicaltrials.gov/study-basics/learn-about-studies)

Recruiting

## Psilocybin-Assisted Therapy in Treatment-Resistant Depression

**ClinicalTrials.gov ID** ⓘ NCT06303739

**Sponsor** ⓘ University of North Carolina, Chapel Hill

**Information provided by** ⓘ University of North Carolina, Chapel Hill (Responsible Party)

**Last Update Posted** ⓘ 2024-07-23

# Study Details Tab

Feedback

## Study Overview

### Brief Summary

The goal of this clinical trial is to test how well psilocybin-assisted therapy works in treating people with depression. The main questions this study aims to answer are:

App-5:005

Case 2:24-cv-00887-JNR-CMR   Document 84-3   Filed 02/05/25   PageID 2274   Page
Appellate Case: 25-4115    Document: 325    Date Filed: 12/11/2025    Page: 6

- Does psilocybin with assisted therapy help improve symptoms for people with depression?
- How long do the effects of this treatment last?

Participants will:

- Take part in a couple of screening and preparation visits.
- Be given psilocybin in one or two treatment sessions.
- Attend a series of follow-up sessions over the following year.
- Complete forms and surveys to test how their symptoms have changed and what they thought of their experience.

Researchers will also compare whether one treatment or two treatments help improve symptoms more for participants.

**Detailed Description**

Major depressive disorder (MDD) ranks fourth in global disease burden and has significant morbidity, mortality, societal and financial costs. However, few adequate and effective treatments exist with 60% of MDD patients not responding sufficiently to an initial oral antidepressant treatment. These patients who experience treatment resistant depression (TRD), defined as an intolerance or lack of response to two antidepressants of different classes, have limited treatment options beyond the antidepressant treatments that often yield insufficient results or relapse. Psilocybin, a novel treatment, has been found to relieve symptoms of TRD, but there are limited studies on specific dosing and long term treatment follow-up. In this study, the investigators will look closer at the effectiveness of one treatment with psilocybin versus two treatments with psilocybin, as well as the long term effectiveness over the first 12 months after treatment.

**Official Title**

Induction Protocol for Psilocybin-Assisted Therapy in Treatment-Resistant Depression (TRD): A Pilot Study

**Conditions ⓘ**

Refractory Depression      Treatment Resistant Depression

**Intervention / Treatment ⓘ**

- Drug: psilocybin

**Other Study ID Numbers ⓘ**

- 22-1421

App-5:006

**Study Start (Actual)** ⓘ

2024-04-19

**Primary Completion (Estimated)** ⓘ

2025-09

**Study Completion (Estimated)** ⓘ

2026-09

**Enrollment (Estimated)** ⓘ

20

**Study Type** ⓘ

Interventional

**Phase** ⓘ

Phase 3

---

### Resource links provided by the National Library of Medicine

MedlinePlus Genetics (https://medlineplus.gov/genetics/) related topics: Depression (https://medlineplus.gov/genetics/condition/depression)

FDA Drug and Device Resources (https://clinicaltrials.gov/fda-links)

---

## Contacts and Locations

This section provides contact details for people who can answer questions about joining this study, and information on where this study is taking place.

To learn more, please see the Contacts and Locations section in How to Read a Study Record (https://clinicaltrials.gov/study-basics/how-to-read-study-record#contacts-and-locations).

**Study Contact** ⓘ

**Name:** Brittania Ricketts

**Phone Number:**

**Study Contact Backup**

**Name:** Robert K McClure, MD

**Phone Number:**

9199286381

App-5:007

9849741004

**Email:** PilotPAT_study@med.unc.edu

**Email:** robert_mcclure@med.unc.edu

This study has 1 location

## United States

### North Carolina Locations

📍 **Chapel Hill, North Carolina, United States, 27514**

**Recruiting**

UNC Chapel Hill Medical Center

Contact:   Brittania Ricketts, BA

Principal Investigator:   Robert K McClure, MD

Sub-Investigator:   Amanda Tow, MD, PhD

Sub-Investigator:   Lindley Reynolds, MSW

## Participation Criteria

Researchers look for people who fit a certain description, called eligibility criteria. Some examples of these criteria are a person's general health condition or prior treatments.

For general information about clinical research, read Learn About Studies (https://clinicaltrials.gov/study-basics/learn-about-studies).

## Eligibility Criteria

**Description**

Inclusion Criteria:

- Provision of signed and dated informed consent form.
- Willingness to comply with all study procedures and availability for the study.
- Diagnostic and Statistical Manual of Mental Disorders 5 (DSM-V) diagnosis of major depressive disorder.
- Currently experiencing a major depressive episode, lasting at least 3 months
- Failure to respond or inability to tolerate at least 2 guideline-concordant pharmacological treatments from different pharmacologic classes during the current major depressive episode
- Good health evidenced by medical history and routine lab tests
- No central nervous system (CNS) or neurocognitive impairment
- Ability to take oral medication and to follow to the psilocybin-assisted therapy protocol
- Identified support person to accompany patient home after dosing
- Use of effective contraception throughout the study by those with child-bearing potential
- Use of condoms or other effective contraceptive methods by males with reproductive potential
- Fully vaccinated and up to date on vaccination against COVID-19, as defined by Center for Disease Control guidelines
- Following Lifestyle Considerations throughout study (no nicotine containing products in clinical unit, refrain from operating heavy machinery for the duration of treatment day, no more than two servings 8 hours prior to treatment, no psychoactive drugs 72 hours before treatment, refrain from consuming foods that would interfere with drug absorption, minimize interaction with household immunocompromised contacts)

Exclusion Criteria:

- Family history (first- or second-degree relatives) or diagnosis of bipolar disorder with psychotic features, schizophrenia, schizoaffective disorder, hallucinogen-induced psychosis, anti-social personality disorder, or other psychotic disorder.
- Borderline personality disorder, defined by DSM-V criteria, that in the judgement of the Investigator is likely to complicate the assessment of clinical response to study treatments or limits the patient's ability to comply with study procedures.
- Alcohol or other substance use disorder (except tobacco/nicotine) that has been active within the 6 months prior to enrollment.
- Recent use (within past 6 months) of esketamine, ketamine or classic hallucinogens (psilocybin-containing mushrooms or LSD) or use of psychedelics more than 10 times in lifetime.
- Participants with active suicidal ideation or plan with a Columbia Suicide Severity Rating Scale (C-SSRS) score greater than or equal to 4.

App-5:009

Case 2:24-cv-00887-JNR-CMR Document 84-3 Filed 02/05/25 PageID.2278 Page
Appellate Case: 25-4115 Document 7-2625 Date Filed: 12/11/2025 Page: 10

- Current active self-injurious behavior, requiring medical attention or per investigator discretion.
- Diagnosis of Obsessive-compulsive disorder or post-traumatic stress disorder.
- Within 72 hours of psilocybin administration, use of nicotine, alcohol, or other controlled substances.
- Current delirium, dementia, amnestic disorder, or other cognitive disorders.
- Any current or past medical or neurological illness (including chronic pain syndromes and/or history of cerebrovascular event (excluding migraine)) that, in the opinion of the investigator, may confound the interpretation of study assessments
- Known allergic reactions to components of psilocybin.
- Medically instability at screening, including hepatic, renal, circulatory, cardiac (arrhythmia, uncontrolled hypertension, systolic BP > 140 mmHg or diastolic BP > 90 mmHg, abnormal QTc), pulmonary or CNS (seizure disorder or treatment with antiepileptic drugs) impairment.
- Current pregnancy or lactation.
- Febrile illness in last 3 weeks.
- Current use or use within 4 weeks of psilocybin administration of Monoamine oxidase inhibitors (MAOIs), alcohol dehydrogenase inhibitors and antipsychotics (concomitant medications will be allowed per investigator discretion).
- Current treatment with buproprion greater than 300mg/day.
- Current use of tramadol.
- Prior participation in psilocybin-assisted therapy trial and or regular use of hallucinogens
- Treatment with another investigational drug or other intervention during study period.

**Ages Eligible for Study** ⓘ

18 Years to 70 Years (Adult, Older Adult )

**Sexes Eligible for Study** ⓘ

All

**Accepts Healthy Volunteers** ⓘ

No

## Study Plan

This section provides details of the study plan, including how the study is designed and what the study is measuring.

### How is the study designed?

App-5:010

Case 2:24-cv-00887-JNR-CMR  Document 84-3  Filed 02/05/25  PageID 2279  Page
Appellate Case: 25-4115     Document 3620     Date Filed: 12/11/2025     Page: 11

## Design Details

**Primary Purpose** 🛈 : Treatment

**Allocation** 🛈 : Randomized

**Interventional Model** 🛈 : Parallel Assignment

**Interventional Model Description:** Participants are randomized into one of two groups and will receive either one single treatment of psilocybin-assisted therapy with follow-up therapy and assessments or two treatments spaced two weeks apart with follow-up therapy and assessments.

**Masking** 🛈 : Single (Outcomes Assessor)

**Masking Description:** Due to the nature of the study and limitations of study staffing, only those conducting assessments and ratings throughout the study will be masked to the treatments. All others, including participants, therapists, investigators, and study coordinator, will not be masked to the number of treatments a participant receives.

App-5:011

Arms and Interventions

| Participant Group/Arm ℹ | Intervention/Treatment ℹ |
|---|---|
| Experimental: Single Psilocybin Treatment<br><br>Participants will be administered one dose of a 25mg capsule of psilocybin. This will be administered one time. | Drug: psilocybin<br><br>• 25mg of psilocybin administered during treatment session, accompanied by preparation before, integration after, and assistive therapy during the session. |
| Active Comparator: Two Psilocybin Treatments<br><br>Participants will be administered one dose of a 25mg capsule of psilocybin. Two weeks later, the participant will be administered one more dose of a 25mg capsule of psilocybin. | Drug: psilocybin<br><br>• 25mg of psilocybin administered during treatment session, accompanied by preparation before, integration after, and assistive therapy during the session. |

## What is the study measuring?

Primary Outcome Measures ℹ

| Outcome Measure | Measure Description | Time Frame |
|---|---|---|
| Change in HAM-D-17 Scores between | The change in Hamilton Depression Rating Scale 17 item (HAM-D-17) scores between baseline and 2 weeks after treatment | Baseline, 2 weeks |

App-5:012

Case 2:24-cv-00887-JNR-CMR   Document 84-3   Filed 02/05/25   PageID 2281   Page

Appellate Case: 25-4115   Document: 026-20   Date Filed: 12/11/2025   Page: 13

| Baseline and 2 Weeks after Treatment | The HAM-D-17 is a 17-item questionnaire used to measure severity of depression. The score ranges from 0 to 52. Higher scores indicate more severe depression. | |
|---|---|---|
| Change in QIDS SR-16 Scores between Baseline and 2 Weeks after Treatment | The change between depression scores as reported by Quick Inventory of Depressive Symptomatology Short Response-16 (QIDS SR-16) scores between baseline and 2 weeks after treatment<br><br>The QIDS SR-16 is a 16-item questionnaire used to measure severity of depression. The scores range from 0 to 45. Higher scores indicate more severe depression. | Baseline, 2 weeks |
| Number of Participants Achieving Remission 2 Weeks after Treatment | Number of participants achieving remission (defined as a HAM-D-17 score less than 10) 2 weeks after treatment | up to 2 weeks |
| Number of Participants Achieving Response 2 weeks after treatment | Number of participants achieving response (defined as a HAM-D-17 score that has decreased by greater than or equal to 50 percent compared to baseline) 2 weeks after treatment | up to 2 weeks |

**Secondary Outcome Measures** ⓘ

| Outcome Measure | Measure Description | Time Frame |
|---|---|---|

App-5:013

Case 2:24-cv-00887-JNR-CMR   Document 84-3   Filed 02/05/25   PageID 2282   Page
Appellate Case: 25-4115     Document 126-20     Date Filed: 12/11/2025     Page: 14
                                          11 of 20

| Number of Participants Achieving Remission at 6 Weeks | Number of participants achieving remission (defined as a HAM-D-17 score less than 10) 6 weeks after treatment | up to 6 weeks |
|---|---|---|
| Number of Participants Achieving Response at 6 Weeks | Estimate the number of participants achieving response (defined as a HAM-D-17 score that has decreased by greater than or equal to 50 percent compared to baseline) at 6 weeks after treatment | up to 6 weeks |
| Number of Participants Achieving Remission at 3 Months | Number of participants achieving remission (defined as a HAM-D-17 score less than 10) 3 months after treatment | up to 3 months |
| Number of Participants Achieving Response at 3 Months | Estimate the number of participants achieving response (defined as a HAM-D-17 score that has decreased by greater than or equal to 50 percent compared to baseline) at 3 months after treatment | up to 3 months |
| Number of Participants Achieving Remission at 6 Months | Number of participants achieving remission (defined as a HAM-D-17 score less than 10) 6 months after treatment | up to 6 months |
| Number of Participants Achieving Response at 6 Months | Estimate the number of participants achieving response (defined as a HAM-D-17 score that has decreased by greater than or equal to 50 percent compared to baseline) at 6 months after treatment | up to 6 months |

App-5:014

| | | |
|---|---|---|
| Number of Participants Achieving Remission at 9 Months | Number of participants achieving remission (defined as a HAM-D-17 score less than 10) 9 months after treatment | up to 9 months |
| Number of Participants Achieving Response at 9 Months | Estimate the number of participants achieving response (defined as a HAM-D-17 score that has decreased by greater than or equal to 50 percent compared to baseline) at 9 months after treatment | up to 9 months |
| Number of Participants Achieving Remission at 12 Months | Number of participants achieving remission (defined as a HAM-D-17 score less than 10) 12 months after treatment | up to 12 months |
| Number of Participants Achieving Response at 12 Months | Estimate the number of participants achieving response (defined as a HAM-D-17 score that has decreased by greater than or equal to 50 percent compared to baseline) at 12 months after treatment | up to 12 months |
| Time to Relapse in Participants Who Showed Remission at 2 weeks | Of the number of participants achieving remission (defined as a HAM-D-17 score less than 10) 2 weeks after treatment, the amount of time until a relapse occurring thereafter occurs.  Relapse is defined as a HAM-D-17 score greater than or equal to 17 and will be measured up to the study follow-up visit at 1 year. | up to 1 year after treatment |

App-5:015

Case 2:24-cv-00887-JNR-CMR    Document 84-3    Filed 02/05/25    PageID 2284    Page

Appellate Case: 25-4115      Document: 26-5    Date Filed: 12/11/2025    Page: 16
13 of 20

| Time to Relapse in Participants Who Showed Response at 2 Weeks | Of the number of participants achieving remission (defined as a HAM-D-17 score that has decreased by greater than or equal to 50 percent compared to baseline) 2 weeks after treatment, the amount of time until a relapse occurring thereafter occurs.<br><br>Relapse is defined as a HAM-D-17 score greater than or equal to 17 and will be measured up to the study follow-up visit at 1 year. | up to 1 year after treatment |
|---|---|---|
| Change in HAM-D-17 Scores between Baseline and 6 Weeks after Treatment | The change in HAM-D-17 scores between baseline and 2 weeks after treatment<br><br>The HAM-D-17 is a 17-item questionnaire used to measure severity of depression. The score ranges from 0 to 52. Higher scores indicate more severe depression. | Baseline, 6 weeks |
| Change in HAM-D-17 Scores between Baseline and 3 Months after Treatment | The change in HAM-D-17 scores between baseline and 2 weeks after treatment<br><br>The HAM-D-17 is a 17-item questionnaire used to measure severity of depression. The score ranges from 0 to 52. Higher scores indicate more severe depression. | Baseline, 3 Months |
| Change in HAM-D-17 Scores between Baseline and 6 | The change in HAM-D-17 scores between baseline and 2 weeks after treatment<br><br>The HAM-D-17 is a 17-item questionnaire used to measure severity of depression. The | Baseline, 6 Months |

App-5:016

Case 2:24-cv-00887-JNR-CMR    Document 84-3    Filed 02/05/25    PageID 2285    Page

| | | |
|---|---|---|
| Months after Treatment | score ranges from 0 to 52. Higher scores indicate more severe depression. | |
| Change in HAM-D-17 Scores between Baseline and 9 Months after Treatment | The change in HAM-D-17 scores between baseline and 2 weeks after treatment<br><br>The HAM-D-17 is a 17-item questionnaire used to measure severity of depression. The score ranges from 0 to 52. Higher scores indicate more severe depression. | Baseline, 9 Months |
| Change in HAM-D-17 Scores between Baseline and 12 Months after Treatment | The change in HAM-D-17 scores between baseline and 2 weeks after treatment<br><br>The HAM-D-17 is a 17-item questionnaire used to measure severity of depression. The score ranges from 0 to 52. Higher scores indicate more severe depression. | Baseline, 12 months |
| Change in QIDS SR-16 Scores between Baseline and 6 Weeks after Treatment | The change between depression scores as reported by QIDS SR-16 scores between baseline and 2 weeks after treatment<br><br>The QIDS SR-16 is a 16-item questionnaire used to measure severity of depression. The scores range from 0 to 45. Higher scores indicate more severe depression. | Baseline, 6 weeks |

App-5:017

| | | |
|---|---|---|
| Change in QIDS SR-16 Scores between Baseline and 3 Months after Treatment | The change between depression scores as reported by QIDS SR-16 scores between baseline and 2 weeks after treatment<br><br>The QIDS SR-16 is a 16-item questionnaire used to measure severity of depression. The scores range from 0 to 45. Higher scores indicate more severe depression. | Baseline, 3 Months |
| Change in QIDS SR-16 Scores between Baseline and 6 Months after Treatment | The change between depression scores as reported by QIDS SR-16 scores between baseline and 2 weeks after treatment<br><br>The QIDS SR-16 is a 16-item questionnaire used to measure severity of depression. The scores range from 0 to 45. Higher scores indicate more severe depression. | Baseline, 6 Months |
| Change in QIDS SR-16 Scores between Baseline and 9 Months after Treatment | The change between depression scores as reported by QIDS SR-16 scores between baseline and 2 weeks after treatment<br><br>The QIDS SR-16 is a 16-item questionnaire used to measure severity of depression. The scores range from 0 to 45. Higher scores indicate more severe depression. | Baseline, 9 Months |
| Change in QIDS SR-16 Scores between Baseline and 12 Months after Treatment | The change between depression scores as reported by QIDS SR-16 scores between baseline and 2 weeks after treatment<br><br>The QIDS SR-16 is a 16-item questionnaire used to measure severity of depression. The | Baseline, 12 Months |

App-5:018

Appellate Case: 25-4115        Document: 26-20        Date Filed: 12/11/2025        Page: 19

scores range from 0 to 45. Higher scores
indicate more severe depression.

## Collaborators and Investigators

This is where you will find people and organizations involved with this study.

#### Sponsor ⓘ

**University of North Carolina, Chapel Hill**

#### Collaborators ⓘ

- Foundation of Hope, North Carolina

#### Investigators ⓘ

- Principal Investigator: Robert K McClure, MD   Director of Interventional Psychiatry

## Publications

#### General

These publications are provided voluntarily by the person who enters information about the study and may be about anything related to the study.

- Demyttenaere K, Van Duppen Z. The Impact of (the Concept of) Treatment-Resistant Depression: An Opinion Review. Int J Neuropsychopharmacol. 2019 Feb 1;22(2):85-92. doi: 10.1093/ijnp/pyy052. (https://pubmed.ncbi.nlm.nih.gov/29961822)

- Dold M, Kasper S. Evidence-based pharmacotherapy of treatment-resistant unipolar depression. Int J Psychiatry Clin Pract. 2017 Mar;21(1):13-23. doi: 10.1080/13651501.2016.1248852. Epub 2016 Nov 16. (https://pubmed.ncbi.nlm.nih.gov/27848269)

- Ross S, Bossis A, Guss J, Agin-Liebes G, Malone T, Cohen B, Mennenga SE, Belser A, Kalliontzi K, Babb J, Su Z, Corby P, Schmidt BL. Rapid and sustained symptom reduction following psilocybin treatment for anxiety and depression in patients with life-threatening cancer: a randomized controlled trial. J Psychopharmacol. 2016 Dec;30(12):1165-1180. doi: 10.1177/0269881116675512. (https://pubmed.ncbi.nlm.nih.gov/27909164)

App-5:019

2/3/25, 12:36 PM    Study Details | Psilocybin-Assisted Therapy in Treatment-Resistant Depression | ClinicalTrials.gov    Page

Case 2:24-cv-00887-JNP-CMR    Document 84-3    Filed 02/05/25    PageID.2288    Page

Appellate Case: 25-4115    Document: 726-50    Date Filed: 12/11/2025    Page: 20

- Rush AJ, Trivedi MH, Wisniewski SR, Nierenberg AA, Stewart JW, Warden D, Niederehe G, Thase ME, Lavori PW, Lebowitz BD, McGrath PJ, Rosenbaum JF, Sackeim HA, Kupfer DJ, Luther J, Fava M. Acute and longer-term outcomes in depressed outpatients requiring one or several treatment steps: a STAR*D report. Am J Psychiatry. 2006 Nov;163(11):1905-17. doi: 10.1176/ajp.2006.163.11.1905. (https://pubmed.ncbi.nlm.nih.gov/17074942)

- Keller MB, Shapiro RW, Lavori PW, Wolfe N. Recovery in major depressive disorder: analysis with the life table and regression models. Arch Gen Psychiatry. 1982 Aug;39(8):905-10. doi: 10.1001/archpsyc.1982.04290080025004. (https://pubmed.ncbi.nlm.nih.gov/7103679)

- Griffiths RR, Johnson MW, Carducci MA, Umbricht A, Richards WA, Richards BD, Cosimano MP, Klinedinst MA. Psilocybin produces substantial and sustained decreases in depression and anxiety in patients with life-threatening cancer: A randomized double-blind trial. J Psychopharmacol. 2016 Dec;30(12):1181-1197. doi: 10.1177/0269881116675513. (https://pubmed.ncbi.nlm.nih.gov/27909165)

- Carhart-Harris R, Giribaldi B, Watts R, Baker-Jones M, Murphy-Beiner A, Murphy R, Martell J, Blemings A, Erritzoe D, Nutt DJ. Trial of Psilocybin versus Escitalopram for Depression. N Engl J Med. 2021 Apr 15;384(15):1402-1411. doi: 10.1056/NEJMoa2032994. (https://pubmed.ncbi.nlm.nih.gov/33852780)

- Carhart-Harris RL, Bolstridge M, Rucker J, Day CM, Erritzoe D, Kaelen M, Bloomfield M, Rickard JA, Forbes B, Feilding A, Taylor D, Pilling S, Curran VH, Nutt DJ. Psilocybin with psychological support for treatment-resistant depression: an open-label feasibility study. Lancet Psychiatry. 2016 Jul;3(7):619-27. doi: 10.1016/S2215-0366(16)30065-7. Epub 2016 May 17. (https://pubmed.ncbi.nlm.nih.gov/27210031)

- Carhart-Harris RL, Bolstridge M, Day CMJ, Rucker J, Watts R, Erritzoe DE, Kaelen M, Giribaldi B, Bloomfield M, Pilling S, Rickard JA, Forbes B, Feilding A, Taylor D, Curran HV, Nutt DJ. Psilocybin with psychological support for treatment-resistant depression: six-month follow-up. Psychopharmacology (Berl). 2018 Feb;235(2):399-408. doi: 10.1007/s00213-017-4771-x. Epub 2017 Nov 8. (https://pubmed.ncbi.nlm.nih.gov/29119217)

- Davis AK, Barrett FS, May DG, Cosimano MP, Sepeda ND, Johnson MW, Finan PH, Griffiths RR. Effects of Psilocybin-Assisted Therapy on Major Depressive Disorder: A Randomized Clinical Trial. JAMA Psychiatry. 2021 May 1;78(5):481-489. doi: 10.1001/jamapsychiatry.2020.3285. Erratum In: JAMA Psychiatry. 2021 Feb 10:569. doi: 10.1001/jamapsychiatry.2020.4714. (https://pubmed.ncbi.nlm.nih.gov/33146667)

- Gukasyan N, Davis AK, Barrett FS, Cosimano MP, Sepeda ND, Johnson MW, Griffiths RR. Efficacy and safety of psilocybin-assisted treatment for major depressive disorder: Prospective 12-month follow-up. J Psychopharmacol. 2022 Feb;36(2):151-158. doi: 10.1177/02698811211073759. (https://pubmed.ncbi.nlm.nih.gov/35166158)

App-5:020

Case 2:24-cv-00887-JNR-CMR    Document 84-3    Filed 02/05/25    PageID 2289    Page

Appellate Case: 25-4115    Document 826-50    Date Filed: 12/11/2025    Page: 21

- Barrett FS, Johnson MW, Griffiths RR. Validation of the revised Mystical Experience Questionnaire in experimental sessions with psilocybin. J Psychopharmacol. 2015 Nov;29(11):1182-90. doi: 10.1177/0269881115609019 Epub 2015 Oct 6.    (https://pubmed.ncbi.nlm.nih.gov/26442957).

- Maclean KA, Leoutsakos JM, Johnson MW, Griffiths RR. Factor Analysis of the Mystical Experience Questionnaire: A Study of Experiences Occasioned by the Hallucinogen Psilocybin. J Sci Study Relig. 2012 Dec;51(4):721-737. doi: 10.1111/j.1468-5906.2012.01685.x.    (https://pubmed.ncbi.nlh.gov/23316089)

- Murphy R, Kettner H, Zeifman R, Giribaldi B, Kartner L, Martell J, Read T, Murphy-Beiner A, Baker-Jones M, Nutt D, Erritzoe D, Watts R, Carhart-Harris R. Therapeutic Alliance and Rapport Modulate Responses to Psilocybin Assisted Therapy for Depression. Front Pharmacol. 2022 Mar 31;12:788155. doi: 10.3389/fphar.2021.788155. eCollection 2021.    (https://pubmed.ncbi.nlm.nih.gov/35431912)

- Bond FW, Hayes SC, Baer RA, Carpenter KM, Guenole N, Orcutt HK, Waltz T, Zettle RD. Preliminary psychometric properties of the Acceptance and Action Questionnaire-II: a revised measure of psychological inflexibility and experiential avoidance. Behav Ther. 2011 Dec;42(4):676-88. doi: 10.1016/j.beth.2011.03.007. Epub 2011 May 25.    (https://pubmed.ncbi.nlm.nih.gov/22035996)

## Study Record Dates

These dates track the progress of study record and summary results submissions to ClinicalTrials.gov. Study records and reported results are reviewed by the National Library of Medicine (NLM) to make sure they meet specific quality control standards before being posted on the public website.

### Study Registration Dates

**First Submitted** ⓘ

2024-02-27

**First Submitted that Met QC Criteria** ⓘ

2024-03-04

**First Posted** ⓘ

2024-03-12

### Study Record Updates

**Last Update Submitted that met QC Criteria** ⓘ

2024-07-19

App-5:021

**Last Update Posted** ⓘ

2024-07-23

**Last Verified** ⓘ

2024-07

# More Information

## Terms related to this study

**Keywords Provided by University of North Carolina, Chapel Hill**

psilocybin

psychedelic

refractory depression

psychedelic-assisted therapy

treatment-resistant depression

TRD

depression

**Additional Relevant MeSH Terms**

Behavioral Symptoms

Mood Disorders

Mental Disorders

Depression

Depressive Disorder

Depressive Disorder, Treatment-Resistant

Hallucinogens

Physiological Effects of Drugs

Psychotropic Drugs

Psilocybin

## Plan for Individual Participant Data (IPD)

**Plan to Share Individual Participant Data (IPD)?**

Yes

App-5:022

**IPD Plan Description**

Deidentified individual data that supports the results will be shared beginning 9 to 36 months following publication provided the investigator who proposes to use the data has approval from an Institutional Review Board (IRB), Independent Ethics Committee (IEC), or Research Ethics Board (REB), as applicable, and executes a data use/sharing agreement with UNC.

**IPD Sharing Access Criteria**

Investigator has approved IRB, IEC, or REB and an executed data use/sharing agreement with UNC.

**IPD Sharing Time Frame**

Data will be provided beginning 9 and continuing for 36 months following publication.

**IPD Sharing Supporting Information Type**

Study Protocol
Statistical Analysis Plan (SAP)
Informed Consent Form (ICF)

## Drug and device information, study documents, and helpful links

**Studies a U.S. FDA-Regulated Drug Product**

Yes

**Studies a U.S. FDA-Regulated Device Product**

No

App-5:023

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

_____
                                )
BRIDGER LEE JENSEN,             )
SINGULARISM                     )
PSYCHE HEALING AND              )
BRIDGING, LLC dba               )
PSYCHEDELIC THERAPY JOURNEY,    )
                                )
            Plaintiffs,         )
                                )
vs.                             ) Case No. 2:24-cv-00887-JNP-CMR
                                )
UTAH COUNTY, PROVO CITY,        )
JEFFREY GRAY, TROY BEEBE,       )
BRIAN WOLKEN, JACKSON           )
JULIAN, JOHN DOES 1-4,          )
                                )
            Defendants.         )
_____)

MOTION FOR TEMPORARY RESTRAINING ORDER

MOTION FOR PRELIMINARY INJUNCTION

BEFORE THE HONORABLE JUDGE JILL N. PARRISH

DECEMBER 13, 2024

10:04 a.m. to 5:10 p.m.

** ALL PARTIES ATTENDED VIA TELECONFERENCING **

CORRECTED

Reported by Michelle B. Gonsalves, RPR, CRR, CBC, CSR
Orrin G. Hatch United States Courthouse
351 South West Temple, Room 7.431 Salt Lake City, Utah 84101
801.783.8657  michelle_gonsalves@utd.uscourts.gov

## I N D E X

**WITNESS**                                                          PAGE


**BRANDI LEE**
  Direct Examination by Mr. Bean                                     37
  Cross-Examination by Mr. Olson                                     64
  Cross-Examination resumes by Mr. Olson                            89
  Redirect Examination by Mr. Bean                                  106
  Cross-Examination by Mr. Millward                                 106
  Redirect Examination by Mr. Bean                                  107
  Recross-Examination by Mr. Olson                                  113


**JENNIFER JANE DENBLEYKER**
  Direct Examination by Ms. Christiansen                            116
  Cross-Examination by Mr. Stephens                                 126
  Cross-Examination by Mr. Millward                                 138
  Redirect Examination by Ms. Christiansen                          139


**BRIDGER LEE JENSEN**
  Direct Examination by Mr. Bean                                    141
  Cross-Examination by Mr. Stephens                                 187
  Cross-Examination by Mr. Millward                                 221
  Redirect Examination by Mr. Bean                                  222
  Recross-Examination by Mr. Stephens                               222

result in a bad journey?

A.   A difficult journey, yes.

Q.   And here there's no stress level that's noted; is that right?

A.   Nope.

Q.   Is that typical?

A.   It can be.

Q.   If you go down to the next box, there's one titled "dose," do you see that?  Ms. Lee, on the left-hand side, do you see the reference to dose?

A.   Yes.

Q.   And here it indicates that the dose was 2 grams; is that right?

A.   Yes.  Yes.

Q.   Is a uniform dosage given to Voyagers?

A.   No.

Q.   So some Voyagers are given more?

A.   Yes.

Q.   And some Voyagers are given less?

A.   Yes.

Q.   How is that determined?

A.   It is determined on a couple of factors.  And that is what we talk about in their screening, and it could be there's certain medications that make you, you know, not as sensitive to the psilocybin.  We take into consideration weight.  We take

Q.   What is it?

A.   Isn't it a concentrate of a liquid?

Q.   I'm not sure.  I'll defer to you on that.  So for this one other member that took a capsule, is that something that members of Singularism are free to elect?

A.   Not usually.

Q.   I understand it's uncommon, but in theory any member of Singularism, could they request to participate in a ceremony through a capsule?

A.   Yes, they could.

Q.   Do you see the image now referring to Guided Journey No. 2?

A.   Yes.

Q.   And that's also with Becky?

A.   Yes.

Q.   And if we look at the journey record here, there's now a reference to 3.5 grams in the dose section; is that right?

A.   Yes.

Q.   And this is a higher dose than what was administered previously?

A.   Yes.

Q.   So the sacrament that Singularism administers isn't always the same even for the same individuals; is that right?

A.   Right.

Q.   And the additives are also different this time?

**102**

App-5:028

# EXHIBIT E



# PROVO CITY LICENSING

── A FUNCTION OF PROVO 311 ──

**?** (801) 852-6000 || PROVO.ORG/LICENSING
445 WEST CENTER ST | PROVO, UT 84601

NOT TRANSFERABLE

| KIND | NUMBER |
|---|---|
| **BUSINESS LICENSE** | **LCB202300523** |

| BUSINESS NAME | BUSINESS ADDRESS |
|---|---|
| PSYCHE HEALING AND BRIDGING, LLC | 1969 N STATE ST, PROVO, UT 84604 |

| START DATE | EXPIRATION DATE |
|---|---|
| JULY 24, 2023 | SEPTEMBER 30, 2025 |

ATTN

BRIDGER LEE JENSEN
1969 N State St.
Provo, UT 84604

# SEPTEMBER

## 2025

MAYOR

POST IN A CONSPICOUS PLACE

NOT TRANSFERABLE

App-5:030

# EXHIBIT F





# EXHIBIT G

Utah Business Registration

Case 2:24-cv-00887-JNP-CMR    Document 84-7    Filed 02/05/25    PageID.2303    Page
Appellate Case: 25-4115    Document 26-5    Date Filed: 12/11/2025    Page: 35

2/5/25, 8:47 AM

## ENTITY INFORMATION

### ENTITY INFORMATION

| | | | |
|---|---|---|---|
| **Entity Name:** | DIVINE ASSEMBLY THE | **Assumed Name:** | N/A |
| **Entity Type:** | Domestic Nonprofit Corporation | **Entity Number:** | 11798960-0140 |
| **Entity Subtype:** | Domestic Nonprofit Corporation | **Entity Status:** | Active |
| **Profession:** | N/A | **Entity Status Details:** | Current |
| | | **Status Date:** | 09/26/2024 |
| **Formation Date:** | 06/03/2020 | **Renew By Date:** | 06/30/2025 |
| **Formation Effective Date:** | 06/03/2020 | **Last Renewed Date:** | 06/14/2024 |

### REGISTERED AGENT INFORMATION

**Name:** NEXT STEP ADVISORS, LLC

App-5:035

**Registered Agent Type:** Entity

**Entity Number:** 0 (/BusinessSearch/BusinessInformation?businessId=0&Source=fromFormation)

**Status:** Active

**Street Address:** 437 S BLUFF ST STE 301, ST GEORGE, UT, 84791, USA

**Last Updated:** 9/13/2024 9:22:44 PM

## PRINCIPAL INFORMATION

| Title | Name | Address | Last Updated |
|---|---|---|---|
| Director | Marcie Hanson Collett | 1430 W 500N, Salt Lake City, UT, 84116, USA | 09/19/2024 |
| Director | Sara Stanley Urquhart | 48 W Broadway 2005, Salt Lake City, UT, 84101, USA | 09/19/2024 |
| Director | Stephen Harold Urquhart | 48 W Broadway 2005, Salt Lake City, UT, 84101, USA | 09/13/2024 |
| Incorporator | Stephen Harold Urquhart | 48 W Broadway 2005, Salt Lake City, UT, 84101, USA | 09/19/2024 |

Page 1 of 1, records 1 to 4 of 4

## ADDRESS INFORMATION

**Physical Address:** 48 W Broadway 2005, Salt Lake City, UT, 84101, USA    **Updated Date:** 9/13/2024 8:42:59 PM

**Mailing Address:**    **Updated Date:**

App-5:036

## SERVICE OF PROCESS INFORMATION

**Service of Process Name:** DIVINE ASSEMBLY THE

**Last Updated:** 9/13/2024 8:42:59 PM:

**Service of Process Address:** 48 W Broadway 2005, Salt Lake City, UT, 84101, USA

Filing History    Name History    Mergers/Conversions

Return to Search    Return to Results

App-5:037

# EXHIBIT H

App-5:038

File Number: 11798960

## Non-Profit Corporation Articles

# ARTICLES OF INCORPORATION
# OF
# The Divine Assembly

**We, the undersigned natural persons all being of the age of eighteen years or more, acting as incorporators under the Utah Revised Nonprofit Corporation Act, adopt the following Articles of Incorporation for such Corporation:**

## Article I
## Name

**The name of the corporation is** The Divine Assembly

## Article II
## Purpose

The Divine Assembly is a church. We worship God, believing that each person may receive guidance and peace through direct communion with the Divine.

To engage in any and all other lawful purposes, activities and pursuits, which are substantially similar to the foregoing and which are or may hereafter be authorized by Section 501(c)(3) of the Internal Revenue Code and are consistent with those powers described in the Utah Nonprofit Corporation and Cooperation Association Act, as amended and supplemented.

## Article III
## Name and Address of Registered Agent

**The address of the corporation's initial registered office shall be:**

48 W Broadway 2005
Salt Lake City, UT 84101

**The corporation's initial registered agent at such address shall be:**

Stephen Harold Urquhart



State of Utah
Department of Commerce
Division of Corporations & Commercial Code

This certifies that this registration has been filed and approved on 3, June 2020 in the office of the Division and hereby issues this Certification thereof.

JASON STERZER
Division Director

App-5:039

App-5:040

# Article IV
## Names and Addresses of Incorporators

**The name(s) and address(es) of the incorporators are:**

> Incorporator #1
> Stephen Harold Urquhart
> 48 W Broadway 2005
> Salt Lake City, UT 84101
> Stephen Urquhart (POA or AIF)
> Signature

**In Witness Whereof I / We have executed these Articles of Incorporation on** 3    June,    2020 **and say:**

**That they are all incorporators herein; that they have read the above and foregoing Articles of Incorporation; know the contents thereof and that the same is true to the best of their knowledge and belief, excepting as to matters herein alleged upon information and belief and as to those matters they believe to be true.**

# Article V
## Members

**The nonprofit corporation will have voting members**

# Article VI
## Shares

**The nonprofit corporation will not issue shares evidencing membership or interests in water or other property rights.**

# Article VII

## Directors/Trustees/Officers

**The name(s), address(es) and signature(s) of the director(s)/trustee(s)/officer(s) are:**

> Director #1
> Stephen Harold Urquhart
> 48 W Broadway 2005
> Salt Lake City, UT 84101
> Stephen Urquhart (POA or AIF)
> Signature

> Director #2
> Sara Stanley Urquhart
> 48 W Broadway 2005
> Salt Lake City, UT 84101

Stephen Urquhart (POA or AIF)
Signature

Director #3
Marcie Hanson Collett
1430 W 500N
Salt Lake City, UT 84116
Stephen Urquhart (POA or AIF)
Signature

# Article VIII

**The period of duration of this corporation is**    Perpetual

# Article IX
## Principal Place of Business

**The street address of the principal place of the business is:**

48 W Broadway 2005
Salt Lake City, UT, 84101

**Under GRAMA {63-2-201}, all registration information maintained by the Division is classified as public record. For confidentiality purposes, the business entity physical address may be provided rather than the residential or private address of any individual affiliated with the entity.**

App-5:042

# EXHIBIT I



Appellate Case: 25-4115    Document: 26-5    Date Filed: 12/11/2025    Page: 44

App-5:044

Tanner J. Bean (A17128)
tbean@fabianvancott.com
Jacqueline M. Rosen (A18530)
jrosen@fabianvancott.com
**FABIAN VANCOTT**
95 South State Street, Suite 2300
Salt Lake City, UT 84111-23323
Telephone: (801) 531-8900
*Attorneys for Plaintiffs*

---

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BRIDGER LEE JENSEN, an individual; SINGULARISM, a non-profit corporation; PSYCHE HEALING AND BRIDGING, LLC dba PSYCHEDELIC THERAPY JOURNEY; a limited liability company;<br><br>Plaintiffs,<br>vs.<br><br>UTAH COUNTY, a political subdivision, PROVO CITY, a political subdivision; JEFFREY GRAY, an individual; TROY BEEBE, an individual; BRIAN WOLKEN, an individual; JACKSON JULIAN, an individual; JOHN DOES 1-4, individuals;<br><br>Defendants. | **PLAINTIFFS' SECOND SUPPLEMENTAL BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**<br><br>Civil No. 2:24-cv-00887-JNP<br><br>Judge Jill N. Parrish<br><br>(Removed from Fourth Judicial District Court, Utah County, State of Utah, Case No. 240406123) |

Pursuant to the Court's Order Requesting Supplemental Briefing and Order Regarding Supplemental Exhibits, *see* ECF 77, Plaintiffs Bridger Lee Jensen, Singularism, and Psyche Healing and Bridging LLC (dba Psychedelic Therapy Journey) ("Plaintiffs" or "Singularism")

1

hereby file this Second Supplemental Brief in Support of Plaintiffs' Motion for Temporary

Restraining Order and Preliminary Injunction.

**QUESTION 1:** The parties agree that the rule from *Employment Division v. Smith*, 494 U.S. 872 (1990)—that neutral laws of general applicability do not trigger strict scrutiny under the Free Exercise Clause, no matter the burden they impose on sincere religious exercise—controls this case. Later cases, notably *Fulton v. City Philadelphia*, 593 U.S. 522 (2021), elaborate on what it means for a law to be generally applicable. *Fulton* explains, "A law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Id.* at 533 (cleaned up). It continues, "A law also lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Id.* at 534.

The Utah Controlled Substances Act contains various exemptions. For example, it provides that "[c]ivil or criminal liability may not be imposed . . . on any Indian . . . who uses, possesses, or transports peyote for bona fide traditional ceremonial purposes in connection with the practice of a traditional Indian religion." UTAH CODE § 58-37-8(12)(a). It also provides that "[a] healthcare system may develop a behavioral health treatment program that includes a treatment based on [psilocybin]." *Id.* § 58-37-3.5(2). And it allows the State to "enact rules waiving the license requirement . . . if waiving the license requirement is consistent with public health and safety." *Id.* § 58-37-6(2)(d).

As noted during the hearing, the law at issue in *Smith* also contained exemptions, yet the Court found that law to be neutral and generally applicable. **What is the best argument that the law at issue here is legally indistinguishable from that at issue in *Smith* (for Defendants)? What is the best argument that the law at issue here is legally distinguishable (for Plaintiffs)?**

**RESPONSE**: The law at issue here, the Utah Controlled Substances Act ("Utah CSA"), is

strikingly different than the law at issue in *Employment Division v. Smith*, 494 U.S. 872 (1990),

the 1987 version of the Oregon Controlled Substances Act ("Oregon CSA"). Whether the Oregon

CSA is reviewed at the 10,000-foot level, as the U.S. Supreme Court did, or at the granular level

examining its text, it is far more uniform than the Utah CSA. The various exemptions contained

in the Utah CSA, including the exemption regarding secular psilocybin usage, indicate the Utah

CSA is not generally applicable. Thus, strict scrutiny review is required.

I.      *Smith*'s Review of the Oregon CSA Was Cursory.

For a decision which upended the U.S. Supreme Court's interpretation of the First Amendment's Free Exercise clause upon the basis that the law at issue was neutral and generally applicable, *Smith* contains very little discussion about the law at issue. The law that was first presented to the Court was Oregon's unemployment benefits act, specifically its provision disqualifying unemployed individuals from benefits if they had been terminated for "misconduct." *See Smith*, 494 U.S. 872, at 874-76; Or. Rev. Stat. § 657.176 (1986). But when the case returned to the Court for a second time, the Court evaluated the religious free exercise argument against the Oregon CSA. *Id.* at 876.

However, the Court did not spend time analyzing the Oregon CSA's language, stating only that "Oregon law prohibits the knowing or intentional possession of a 'controlled substance' unless the substance has been prescribed by a medical practitioner. Ore. Rev. Stat. § 475.992(4) (1987)." *Id.* at 874. The Court appears to have undertaken no further analysis because that was the determination of the Oregon Supreme Court: "the Oregon Supreme Court held that respondents' religiously inspired use of peyote fell within the prohibition of the Oregon statute, which 'makes no exception for the sacramental use' of the drug." *Id.* at 876 (quoting *Smith v. Emp. Div.*, 307 Or. 68, 72, 763 P.2d 146, 147 (1988)); *see also id.* at 891-92 (O'Connor, J., concurring) ("As the case comes to us today, however, the Oregon Supreme Court has plainly ruled that Oregon's prohibition against possession of controlled substances does not contain an exemption for the religious use of peyote.").

However, even the Oregon Supreme Court's decision did not walk through the text of the Oregon CSA, simply concluding "that the Oregon statute against possession of controlled

substances, which includes peyote, makes no exception for the sacramental use of peyote," explaining further in a footnote that

> ORS 475.992(4)(a) prohibits possession of controlled substances listed on a schedule adopted by the State Board of Pharmacy. Peyote is listed on the schedule. OAR 855-80-021(3)(s). Neither the statute nor the regulation make an exception for religious use of peyote, nor do they by reference adopt the [religious peyote] exemption found in federal law, *see* 21 CFR § 1307.31 (1987).

*Smith*, 307 Or. at 72, 72 n.2. The Oregon Supreme Court noted, however, that "other states link their exemptions to those under federal law," including Utah through Utah Code § 58-37-3(3) (1986). *Smith*, 307 Or. at 72 n.2. That issue was later at play in *State v. Mooney*, 2004 UT 49, 98 P.3d 420 which, in turn, influenced the Utah Legislature's adoption of an express religious peyote exemption in the Utah Controlled Substances Act ("Utah CSA"), *see* Utah Code §§ 58-37-2(1)(w), 58-37-8(12).

All considered, in *Smith*, the U.S. Supreme Court appears to have taken the Oregon Supreme Court's statement at face value: on the issue presented—peyote consumption—the Oregon CSA "makes no exception." Thus, it is unsurprising that *Smith* contains little analysis regarding why the Oregon CSA was or was not generally applicable. The Court's baseline assumption was that the issue had been settled by the Oregon Supreme Court. The U.S. Supreme Court's focus in *Smith* was, rather, what to do when presented with a neutral and generally applicable law that burdens religious free exercise.

## II.    Since *Smith*, the U.S. Supreme Court Has Developed "General Applicability" With More Clarity.

Since *Smith*, the U.S. Supreme Court has been presented with several cases in which the question of general applicability had not already been answered. In *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah.*, 508 U.S. 520, 542-46 (1993), the Court found a municipality's ordinances

4

that had the effect of prohibiting Santeria animal sacrifices to lack general applicability. In doing

so, it explained that all "laws are selective to some extent, but categories of selection are of

paramount concern when a law has the incidental effect of burdening religious practice. The Free

Exercise Clause protects religious observers against unequal treatment and inequality results when

a legislature decides that the governmental interests it seeks to advance are worthy of being

pursued only against conduct with a religious motivation." *Church of Lukumi Babalu Aye, Inc.*,

508 U.S. at 542-43 (cleaned up and quotation omitted). The Court continued, stating that the

"principle that government, in pursuit of legitimate interests, cannot in a selective manner impose

burdens only on conduct motivated by religious belief is essential to the protection of the rights

guaranteed by the Free Exercise Clause." *Id.* at 543.

Beyond, this, however, the Court declined to "define with precision the standard used to

evaluate whether a prohibition is of general application," as the ordinances before it fell "well

below the minimum standard necessary to protect First Amendment rights." *Id.* The Court then

went on to evaluate the underinclusive nature of the ordinances given the municipality's stated

interests of "protecting public health and preventing cruelty to animals." *Id.* In that endeavor, the

Court held the ordinances failed "to prohibit nonreligious conduct that endangers these interests in

a similar or greater degree than Santeria sacrifice does." *Id.* The municipality's arguments failed

to "explain why religion alone must bear the burden of the ordinances, when many of these secular

killings fall within the city's interest in preventing the cruel treatment of animals." *Id.* at 544.

Concluding, the Court held that each of the ordinances "pursues the city's governmental interests

only against conduct motivated by religious belief. The ordinances have every appearance of a

prohibition that society is prepared to impose upon Santeria worshippers but not upon itself. This

precise evil is what the requirement of general applicability is designed to prevent." *Id.* at 545-46 (cleaned up and quotations omitted).

The Court defined a more precise test for general applicability in *Fulton v. City of Philadelphia, Pennsylvania*, 593 U.S. 522, 533 (2021).[1] There, it stated two ways in which a law could fail general applicability. **First**, a "law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton*, 593 U.S. at 533 (cleaned up) (quoting *Smith*, 494 U.S. at 884). The Court pointed to *Sherbert v. Verner*, 374 U.S. 398 (1963), to illustrate this principle. In *Sherbert*, at issue was a Seventh-day Adventist whose religious beliefs prohibited work on Saturdays and an unemployment benefits statute which allowed for individualized exemptions through discretionary interpretation of its standard that a claimant had "failed without good cause . . . to accept available suitable work." *Id.* at 533. The Court explained the government's denial of unemployment benefits through application of this individualized exemption "infringed [the individual's] free exercise rights and could be justified only by a compelling interest." *Id.* at 534.

As for the matter before it in *Fulton*, the Court found that a provision which granted a municipality's commissioner the ability to provide "an exception . . . in his/her sole discretion" to a non-discrimination requirement, even where the commissioner had "no intention of granting an exception," indicated "a system of individual exemptions," such that the municipality could "not

---

[1] It bears noting that three sitting justices of the U.S. Supreme Court think *Smith* was wrongly decided and should have been overturned in *Fulton*. *See Fulton v. City of Philadelphia, Pennsylvania*, 593 U.S. 522, 545-627 (2021) (Alito, Thomas, and Gorsuch, J., concurring). Two more sitting justices may consider it in a case where they believe the question is more squarely presented. *Id.* at 543-44 (Barrett, Kavanaugh, and Breyer, J., concurring). Although not necessary for the Court to reach a decision in this case given the Utah CSA's lack of general applicability, Singularism also asserts that *Smith* was wrongly decided and should be overturned.

6

refuse to extend that exemption system to cases of religious hardship without compelling reason." *Id.* at 535 (cleaned up). The "inclusion of a formal system of entirely discretionary exemptions . . . render[ed] the contractual non-discrimination requirement [at issue] not generally applicable." *Id.* at 536. That was so because a "formal mechanism for granting exceptions renders a policy not generally applicable, regardless whether any exceptions have been given, because it invites the government to decide which reasons for complying with the policy are worthy of solicitude." *Id.* at 537 (cleaned up and quotation omitted).

**Second**, the Court in *Fulton* explained that a "law also lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Id.* at 534 (citing *Church of Lukumi Babalu Aye, Inc.*, 508 U.S. at 542-46). To illustrate this principle, the Court pointed to *Church of Lukumi Babalu Aye, Inc.*, as described above, and the Court's underinclusivity analysis in that case. *Id.*

Following *Fulton*, the Court decided *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507 (2022). There, the Court confirmed that a "government policy will fail the general applicability requirement if it 'prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way,' or if it provides 'a mechanism for individualized exemptions.'" *Kennedy*, 597 U.S. at 526 (quoting *Fulton*, 593 U.S. at 533-34). The Court found that, in that case, a school district's challenged policies failed the general applicability test. *Id.* The school district asserted that a football coach had "failed to supervise student-athletes after games" when he knelt in prayer following football games. *Id.* The Court found that this was not a generally applicable requirement, given that the school district "permitted other members of the coaching staff to forgo supervising students briefly after the game to do things like visit with friends or take

7

personal phone calls." *Id.* at 527. The Court called the school district's alleged policy a "bespoke requirement specifically addressed to [the coach's] religious exercise." *Id.* at 526-27. "Thus, any sort of postgame supervisory requirement was not applied in an evenhanded, across-the-board way." *Id.* at 527.

A common fact pattern from all the cases discussed above is that they arose from the actions of state, not federal, government actors. Where burdens on religious free exercise are imposed by federal actors, they are subject to the federal Religious Freedom Restoration Act. *See City of Boerne v. Flores*, 521 U.S. 507, 532-36 (1997). Many of the U.S. Supreme Court's religious free exercise decisions which postdate *Smith* are decided under RFRA, under which the Court is never faced with the question of whether the law at issue is generally applicable because RFRA mandates strict scrutiny review regardless of a law's general applicability (indicating Congress' rejection of the Court's free exercise analysis in *Smith*. *See* 42 U.S.C. § 2000bb-1(a); *Tanzin v. Tanvir*, 592 U.S. 43, 45-46 (2020)). However, the Court's analysis of the compelling interest prong of strict scrutiny in RFRA cases is highly similar to the Court's analysis of a law's lack of general applicability in First Amendment cases when a law "invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton*, 593 U.S. at 533 (cleaned up). Thus, the U.S. Supreme Court's RFRA cases provide further illustration of when a law lacks general applicability.

For example, in *Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418 (2006), the Court evaluated whether the federal government had a compelling interest in denying a religious exemption to a Christian Spiritist sect to receive communion through hoasca, a Schedule I substance prohibited by the federal Controlled Substances Act ("Federal CSA").

There, the government argued that the dangerous nature of hoasca, as a Schedule I substance, "by itself precludes any consideration of individualized exceptions such as that sought" by the Christian Spiritist sect. *Gonzales*, 546 U.S. at 430. The Court rejected this as a sufficient assertion of compelling government interest. In doing so, the Court identified a provision of the Federal CSA that "authorize[s] the Attorney General to 'waive the requirement for registration of certain manufacturers, distributors, or dispensers if he finds it consistent with the public health and safety.' 21 U.S.C. § 822(d)." *Id.* at 432. The Court found this provision to undermine the government's reliance on general statements found in the Federal CSA that Schedule I substances were so dangerous that no religious exemption could be provided. *Id.* at 432-33.

The Court also pointed to another part of the Federal CSA, highlighting that "an exception has been made to the Schedule I ban for religious use. For the past 35 years, there has been a regulatory exemption for use of peyote—a Schedule I substance—by the Native American Church." *Id.* at 433. The Court continued:

> Everything the Government says about the DMT in *hoasca*—that, as a Schedule I substance, Congress has determined that it "has a high potential for abuse," "has no currently accepted medical use," and has "a lack of accepted safety for use . . . under medical supervision," 21 U.S.C. § 812(b)(1)—applies in equal measure to the mescaline in peyote, yet both the Executive and Congress itself have decreed an exception from the Controlled Substances Act for Native American religious use of peyote. If such use is permitted in the face of the congressional findings in § 812(b)(1) for hundreds of thousands of Native Americans practicing their faith, it is difficult to see how those same findings alone can preclude any consideration of a similar exception for the 130 or so American members of the UDV who want to practice theirs.

*Id.* The Court found this "well-established peyote exemption" to "fatally undermine[] the Government's broader contention that the Controlled Substances Act establishes a closed regulatory system that admits of no exceptions under RFRA" and that there was no evidence that

9

the peyote exception "has 'undercut' the Government's ability to enforce the ban on peyote use by non-Indians." *Id.* at 434-35. Singularism asserts that, had *Gonzales* been brought before the Court on First Amendment, instead of RFRA grounds, this analysis regarding the Federal CSA's exemptions would have been relevant to the Court's general applicability analysis.

Similarly, in the Court's compelling interest analysis in *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014), the Court evaluated exemptions from the contraceptive mandate at issue in that case. It pointed out that (1) the contraceptive mandate did not apply to employers with less than 50 full-time employees (some "34 million workers"), *Hobby Lobby Stores, Inc.*, 573 U.S. at 697, 699-700, (2) the implementing agency was authorized "to establish exemptions from the contraceptive mandate for 'religious employers'" which the agency defined to include "'churches, their integrated auxiliaries, and conventions or associations of churches,' as well as 'the exclusively religious activities of any religious order,'" *id.* at 698, (3) "certain religious nonprofit organizations" were exempt, *id.*, and (4) there were exempted "a great many employers from most of its coverage requirements" because they provided "grandfathered health plans" (for example, "[o]ver one-third of the 149 million nonelderly people in America"), *id.* at 699-700. The Court stated that "[a]ll told, the contraceptive mandate presently does not apply to tens of millions of people." *Id.* at 700 (quotation omitted).

With this background, the Court evaluated the government's asserted interests "such as promoting 'public health' and 'gender equality,'" and "ensuring that all women have access to all FDA-approved contraceptives without cost sharing." *Id.* at 726-27. It continued:

> The objecting parties contend that HHS has not shown that the mandate serves a compelling government interest, and it is arguable that there are features of ACA that support that view. As we have noted, many employees—those covered by

10

grandfathered plans and those who work for employers with fewer than 50 employees—may have no contraceptive coverage without cost sharing at all.

HHS responds that many legal requirements have exceptions and the existence of exceptions does not in itself indicate that the principal interest served by a law is not compelling. Even a compelling interest may be outweighed in some circumstances by another even weightier consideration. In these cases, however, the interest served by one of the biggest exceptions, the exception for grandfathered plans, is simply the interest of employers in avoiding the inconvenience of amending an existing plan. Grandfathered plans are required "to comply with a subset of the Affordable Care Act's health reform provisions" that provide what HHS has described as "particularly significant protections." 75 Fed. Reg. 34540 (2010). But the contraceptive mandate is expressly excluded from this subset. *Ibid*.

*Id.* at 727. Although the Court decided to skip the rest of the compelling interest analysis in favor of resolving the case on the least restrictive means analysis, *id.* at 728, Singularism asserts that the Court's analysis would have been relevant in determining whether the contraceptive mandate was a generally applicable law had the case been brought under the First Amendment.

## III.    The Utah CSA Is Highly Distinguishable from the Oregon CSA.

Taking into consideration the above, a comparison of the Utah CSA and the Oregon CSA shows they are highly distinguishable. First, a high-level analysis like that engaged in by the Court in *Smith* shows they are distinguishable. The *Smith* decision appears to have concluded the Oregon CSA was generally applicable because the Oregon Supreme Court said it did not contain an exception for use of peyote, even without analyzing the text of the statute. Even at this high level of analysis, the Utah CSA is distinguishable. The Utah CSA *does* contain an exception for use of psilocybin, as Singularism has explained in its prior briefing. *See, e.g.,* ECF 9, at 22-23. Thus, had the Utah CSA been before the *Smith* court, it is likely the Court would have determined it was not generally applicable and that the case merited strict scrutiny review.

11

App-5:055

Second, more appropriate than this high-level, cursory analysis, is the two-part analysis that the U.S. Supreme Court has indicated (in *Church of Lukumi Babalu Aye, Inc.*, *Fulton*, and *Kennedy*) is required to determine whether a law is generally applicable. This analysis confirms that the Utah CSA is not generally applicable and is highly distinguishable from the Oregon CSA.

In considering whether a law lacks general applicability because "it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions," the Court has provided several examples, indicating that a law that is riddled with exemptions cannot be generally applicable. To start, the Utah CSA contains a provision allowing Utah authorities (the "division") to waive "the licensure requirement [if] consistent with public health and safety." Utah Code § 58-37-6(2)(d); Utah Code § 58-37-2 (defining "Division" to mean "the Division of Professional Licensing" ("DOPL")). The U.S. Supreme Court found the federal version of that exemption to indicate a lack of the government's compelling interest. *Gonzales*, 546 U.S. at 430-35.

Further, this exemption is highly similar to the examples of "mechanism[s] for individual exemptions" provided in *Sherbert* (discretionarily interpreting "good cause") and *Fulton* (granting exceptions in government's "sole discretion"). It also fits the U.S. Supreme Court's qualitative definition of "mechanism[s] for individual exemptions" by allowing Utah authorities "to decide which reasons for complying with the policy are worthy of solicitude," here meaning the reasons for licensure exemption Utah authorities find are consistent with public health and safety. Even if Utah authorities have "no intention of granting an exception" to Singularism under this provision, the fact that they *could*, under this provision, determine that Singularism's religious practices are "consistent with public health and safety," renders the Utah CSA "not generally applicable,

regardless whether any exceptions have been given . . ." *See Fulton*, 593 U.S. at 537. Moreover, Utah's authorities *have* granted Mr. Jensen a very similar exemption. DOPL confirmed Mr. Jensen's right to practice mental health therapy without licensure under the clergy exemption. *See* ECF 9, at 9, 28-29.

Although the *Smith* court did not evaluate the text of the Oregon CSA, had it done so, it would have discovered that it, too, contains a similar exemption, allowing Oregon authorities to "waive by rule the requirement for registration of certain manufacturers or dispensers if it finds it consistent with public health and safety." Or. Rev. Stat. § 475.125(4) (1987) (Oregon CSA attached in full as <u>Exhibit II</u>). On this basis alone, were the *Smith* case heard again today after *Church of Lukumi Babalu Aye, Inc.*, *Fulton*, and *Kennedy*, it is doubtful the U.S. Supreme Court would find the Oregon CSA to have been generally applicable.

Even if that exemption would not have altered the *Smith* decision, the Utah CSA contains many other exemptions that further undermine its general applicability in ways not demonstrated in the Oregon CSA. As Singularism has previously argued, the Utah CSA exempts secular medical cannabis usage, Native American religious peyote usage, and, most importantly, secular psilocybin usage, with additional exemptions provided under the same title for clergy mental health practitioners from licensure, as well as practitioners of hypnosis. *See* ECF 9, at 22-25.[2] None of these exemptions are present in the Oregon CSA. Defendants cannot credibly argue the Utah CSA

---

[2]    Although not contained in the Utah CSA, it is worth noting that elsewhere in the Utah Code, there is an exemption for the religious consumption of wine. *See* Utah Code § 32B-10-605(1)(a) ("A religious organization that provides or allows to be provided an alcoholic product to a person as part of the religious organization's religious services: (a) does not violate this title by providing or allowing the provision of an alcoholic product as part of a religious service; and (b) is not required to hold a license or special use permit to provide or allow the provision of an alcoholic product for religious services.").

is generally applicable as compared to the Oregon CSA. If the use of controlled substances for thousands of Utahns, including "Native Americans practicing their faith" is permitted by the Utah CSA, "it is difficult to see how" Defendants "can preclude any consideration of a similar exemption" for Singularism's small religious community. *See Gonzales*, 546 U.S. at 433. These are precisely the sort of equal protection concerns that underpin the general applicability requirement and here, require strict scrutiny review.

In considering whether a law lacks general applicability because the law "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way," the Court can look to the underinclusivity analysis in *Church of Lukumi Babalu Aye, Inc.* and the analysis in *Kennedy*. Similar to both of those analyses is the analysis that Singularism has included in prior briefing, which indicates that the Utah Psilocybin Act, found within the Utah CSA, undermines Defendants' claimed interests of public health, public safety, and drug trafficking in all the same ways as Defendants speculate Singularism's religious practices would.[3] *See* ECF 59, at 7-11. This analysis explicitly evaluates equal protection concerns that

---

[3] Not only are Defendants' alleged harms regarding psilocybin speculative, but they also flatly contradict the legislative history behind the Utah Psilocybin Act. Although the Court need not go beyond the text of the Utah Psilocybin Act to find the Utah CSA is not generally applicable, statements in legislative hearings prior to the Utah Psilocybin Act's passage include various supportive statements for psilocybin's beneficial usage to the community, especially for those experiencing PTSD, anxiety, and treatment-resistant depression. The Utah Psilocybin Act passed *unanimously* out of both chambers of the Utah Legislature, and, as the legislative history shows, followed a multi-year task force the legislature had convened to study the beneficial uses of psilocybin (although the legislature does not appear to have adopted many of the taskforce's detailed proposals in the Utah Psilocybin Act). *See generally S.B. 266 Medical Amendments,* Utah State Legislature (2024), available at https://le.utah.gov/~2024/bills/static/SB0266.html (Committee Hearings and Floor Debates). *See also Utah Mental Illness Psychotherapy Drug Task Force Report to the Utah Legislature* (Oct. 2022), available at https://le.utah.gov/interim/2022/pdf/00004231.pdf ("The published clinical trial data also suggest that psilocybin-assisted psychotherapy, employing a carefully specified intervention, may be more

14

undergird the general applicability requirement which here require strict scrutiny review. The

Oregon CSA contained no exemption for secular (or religious) peyote usage, so it would have been

impossible for the *Smith* court to evaluate the Oregon CSA's general applicability on this basis.

According to the above, the Court should find the Utah CSA is not generally applicable

and proceed to strict scrutiny review of Singularism's First Amendment claim.

**QUESTION 2:** The cause of action for Plaintiffs' federal constitutional claims is § 1983, which is an "Act of Congress that falls within the 'expressly authorized' exception [to the Anti-Injunction Act]." *Mitchum v. Foster*, 407 U.S. 225 (1972). **If the court determines that Plaintiffs' federal constitutional claims survive the motion to dismiss, does § 1983 authorize the court to enjoin the state prosecution against Mr. Jensen on the facts of this case? If so, would it be a proper exercise of the court's authority to enjoin the prosecution?**

**RESPONSE**: The Court should exercise its authority to enjoin the state court proceeding against

Mr. Jensen because (1) 42 U.S.C. § 1983 falls within the express authorization to the Anti-

Injunction Act ("AIA"), as established in *Mitchum v. Foster*, 407 U.S. 225 (1972), and (2) exercise

of such authority is proper because *Younger* abstention is not applicable to this case.

The Third Circuit has explained the interaction between *Mitchum* and *Younger*, clarifying

that *Mitchum* determines whether a federal court has the statutory authority to issue an injunction

under the AIA, while *Younger* addresses whether the court should nevertheless decline to exercise

such authority. *See Ivy Club v. Edwards*, 943 F.2d 270, 277-78 (3d Cir. 1991). Here, both elements

---

effective than placebo-assisted psychotherapy in acute treatment trials for treatment resistant depression (TRD) and in care at the end of life for patients with symptoms of depression and anxiety.") (recommending that the Utah Legislature allow the FDA's approval process to be the means of proceeding with legalization of psilocybin); *H.B. 167 Mental Illness Psychotherapy Drug Task Force*, Utah State Legislature (2022), available at https://le.utah.gov/%7E2022/bills/static/HB0167.html.

15

weigh in favor of issuing the injunction: this Court has clear statutory authority under the AIA, as clarified in *Mitchum*, and *Younger* does not require the Court to decline to exercise such authority.

**I.   Section 1983 Meets the Express Authorization Exception to the AIA.**

The AIA generally prohibits federal courts from enjoining state court proceedings, subject to three exceptions, one of which is when Congress has expressly authorized such injunctions. 28 U.S.C. § 2283. The Supreme Court in *Mitchum* definitively held that § 1983 falls within this exception, permitting a federal court to enjoin state court proceedings in § 1983 actions.

In *Mitchum*, the Supreme Court examined the legislative history of § 1983, tracing its origins to the Civil Rights Act of 1866 and the Reconstruction-era congressional debates. 407 U.S. at 239-42. The Court concluded that "Congress clearly conceived that it was altering the relationship between the States and the Nation with respect to the protection of federally created rights; it was concerned that state instrumentalities could not protect those rights; it realized that state officers might, in fact, be antipathetic to the vindication of those rights; and it believed that these failings extended to the state courts." *Id.* at 242. The Court further emphasized that Congress plainly authorized federal courts to issue injunctions in § 1983 by permitting a "suit in equity" as a form of redress. *Id.* Thus, the Court held that "§ 1983 is an Act of Congress that falls within the 'expressly authorized' exception" to the AIA. *Id.* at 242-43.

This understanding was reemphasized in *Vendo Co. v. Lektro-Vend Corp.*, 433 U.S. 623, 633 (1977) (plurality opinion), where the Court recognized that "one of the clear congressional concerns underlying the enactment of § 1983 was the possibility that state courts, as well as other branches of state government, might be used as instruments to deny citizens of their rights under the Federal Constitution." Under *Mitchum* and *Vendo Co.*, § 1983 meets the express authorization

exception of the AIA, granting this Court the authority to enjoin the state criminal proceeding against Mr. Jensen.

## II. Because *Younger* Abstention Does Not Apply, the Court Should Exercise Its Authority to Issue an Injunction.

Although § 1983 provides the Court with authority to enjoin a state court proceeding, there are certain circumstances where a federal court should nonetheless refrain from doing so—when the principles of comity and federalism require abstention, as explained in *Younger v. Harris*, 401 U.S. 37 (1971), and its progeny. However, *Younger* abstention does not apply here for three independent reasons[4]: (1) Defendants removed the case to federal court, (2) there were already proceedings on the merits in federal court before the state court case was filed, and (3) the bad faith/harassment exception to *Younger* is met.

First, *Younger* is inapplicable where government defendants themselves remove the case to federal court, submitting to federal jurisdiction over the case. *See, e.g.*, *Ohio Bureau of Emp't. Servs. v. Hodory*, 431 U.S. 471, 480 (1977) ("If the State voluntarily chooses to submit to a federal forum, principles of comity do not demand that the federal court force the case back into the State's own system."); *Ryan v. State Bd. of Elections of State of Ill.*, 661 F.2d 1130, 1136 (7th Cir. 1981) (finding removal "renders Younger abstention inapplicable"); *Blair v. Bd. Of Sugarcreek Twp.*, No. 3:07-CV-056, 2008 WL 11352586, at *3, 5 (S.D. Ohio May 22, 2008) (concluding that *Younger* did not apply because "Defendants are 'state' actors who voluntarily submitted to a

---

[4]   These reasons are briefed in detail in Plaintiff's Reply in Support of the Motion for Anti-Suit Injunction. *See* ECF  58. Thus, this argument is limited to only the main points from that briefing.

federal forum and cannot now demand that the federal court dismiss the case or force the case back into the state's own system pursuant to the *Younger* Abstention Doctrine.").

Second, *Younger* is also inapplicable as the state court case against Mr. Jensen was filed after proceedings of substance in this case (namely, the Court's grant of a temporary restraining order against Defendants). *See Steffel v. Thompson*, 415 U.S. 452, 475 (1974) ("[F]ederal declaratory relief is not precluded when no state prosecution is pending and a federal plaintiff demonstrates a genuine threat of enforcement of a disputed state criminal statute."); *For Your Eyes Alone, Inc. v. City of Columbus*, 281 F.3d 1209, 1217-20 (11th Cir. 2002) ("if we define too narrowly what constitutes proceedings of substance on the merits, . . . we would risk creating an expansive '*reverse removal power*' in that state prosecutors, in effect, would have broad discretion to remove federal civil rights actions to state criminal court on a routine basis, even after the plaintiff had invested precious time and resources to bringing the federal litigation."); *Graham v. Breier*, 418 F. Supp. 73, 77-78 (E.D. Wis. 1976) (finding that an *ex parte* TRO constituted a proceeding of substance on the merits in federal court); *Wal-Mart Stores, Inc. v. Rodriguez*, 236 F. Supp. 2d 200, 209-10 (D.P.R. 2002) (same where the TRO was granted after "both sides were given the opportunity to be heard prior to issuance of the order").

Finally, *Younger* is also inapplicable because there is great and immediate danger of irreparable injury, including bad faith or harassment. As detailed in Plaintiffs' Opposition to Defendants' Expedited Motion to Stay, ECF 38, the exception for bad faith or harassment applies here. Defendants' removal of the case to federal court, argument that this Court should not hear the claims that Defendants removed, challenges to every element of Plaintiffs' case without persuasive evidence, refusal to abide by the TRO, filing of criminal charges against Mr. Jensen

after the TRO was issued, and failure to notify the state court of the TRO decision, taken together, demonstrate bad faith and harassment.

Because (1) the federal court has authority to issue an injunction pursuant to the express congressional authorization exception to the AIA (clarified in *Mitchum*) and (2) *Younger* does not prohibit the Court from exercising such authority, this Court should exercise such authority and enjoin the state court criminal proceeding against Mr. Jensen.

**QUESTION 3**: **If the court determines that Plaintiffs' federal constitutional claims do not survive the motion to dismiss and remands the remaining claims to the state court, will the temporary restraining order stay in place or be dissolved? Is this an issue to be decided by this court or by the state court on remand?**

**RESPONSE**: Rule 65 clarifies that TROs expire after 14 days unless extended by the Court. Fed. R. Civ. P. 65(b)(2). Utah's rule follows the same 14-day timeline. Utah R. Civ. P. 65A(b)(2). Here, the Court did extent the TRO, stating that the "TRO shall remain in place until the court either dissolves it or converts it into a preliminary injunction." ECF 24, at 3.

When a TRO is issued in a state court case, which is subsequently removed to federal court, "such state court orders remain in effect" but "after removal, the federal court merely takes up where the state court left off," meaning that a TRO "issued by a state court prior to removal remains in force after removal no longer than it would have remained in effect under state law, but in no event does it remain in force longer than the time limitations imposed by Rule 65(b), measured from the date of removal." *Flying Cross Check, L.L.C. v. Central Hockey League, Inc.*, 153 F. Supp. 2d 1253, 1256 (D. Kan. 2001) (internal citations and quotation marks omitted).

Applying the logic of *Flying Cross Check* to the inverse scenario, remand, if a case is sent from federal court back to state court, the federal TRO would similarly remain in effect upon

19

remand and would expire under the terms of the order unless the state court affirmatively modified those terms. *See Chang v. Buffington*, 256 P.3d 694, 701 (Haw. 2011) (orders issued by a federal court after removal but before remand "would ordinarily remain in effect, following the remand, until the state court took appropriate action to modify or set them aside") (citation omitted); *In re C & M Properties, L.L.C.*, 563 F.3d 1156, 1166 (10th Cir. 2009) ("Interlocutory decisions in remanded claims made by the district court prior to remand remain open to review and revision in state court; such orders carry no persuasive effect. . . . The state court is free to revisit any issue decided by the federal court in a remanded claim prior to remand, and is 'perfectly free to reject the remanding court's reasoning.'") (quoting *Kircher v. Putnam Funds Trust*, 547 U.S. 633, 647 (2006)). Thus, here, should the Court remand the state law claims to state court without deciding Plaintiffs' motion for a preliminary injunction (which, as Plaintiffs have argued elsewhere, the Court should not do), the TRO would remain in effect until the state court decided to dissolve the TRO, convert it into a preliminary injunction, or otherwise alter the TRO order.

**QUESTION 4: What quantity of psilocybin was seized at Singularism's spiritual center on November 11?** The parties should cite to record evidence to support their position. If the record is unclear, the parties should submit additional exhibits to support their position.

**RESPONSE**: Plaintiffs are skeptical of the statement made in the Return to Search Warrant, signed by Detective Julian, that "459.8 grams psilocybin mushrooms" were seized from Singularism's spiritual center. *See* ECF 13-15. As stated in the Third Supplemental Declaration of Bridger Jensen, filed herewith, Singularism estimates only 1/3 the amount that Detective Julian described, or approximately 153.26 grams, was seized from Singularism's spiritual center. Exhibit FF, at ¶¶ 3-11. One possible explanation for why Detective Julian's statement is inaccurate is that

he may have weighed the psilocybin in the storage cups in which they were kept, which were thereafter returned to Singularism. *Id.* Defendants' lab report of Singularism's psilocybin also raises the question of the accuracy of Detective Julian's statement, as between the two items of psilocybin tested, it contained at most 304 milligrams, yet stated that was the total weight of the mushroom-like material. *Id.* Because Defendants remain in possession of Singularism's sacramental psilocybin, it is impossible for Singularism to know with certainty how much psilocybin law enforcement seized. *Id.*

Whatever the precise amount, Defendants have provided no factual evidence to the Court that Singularism, after opening its spiritual center, ever provided psilocybin to any of its voyagers outside of its spiritual center. Defendants have also provided no factual evidence that any Singularism voyager, or any other individual, has ever been permitted to take psilocybin out of the spiritual center. Defendants have provided no evidence that Singularism has ever provided any individual psilocybin for non-religious purposes. And Defendants have provided no evidence that Singularism stores psilocybin in a way that makes it likely to be subject to theft. Absent this evidence, the mere amount of psilocybin in Singularism's possession cannot support Defendants' claimed compelling interests in the promotion of public safety and public health or prevention of drug trafficking.

**ADDITIONAL EVIDENCE**: In addition to the documents Singularism has already filed with the Court, Singularism adds the following for consideration on Singularism's request for a preliminary injunction:

- Third Supplemental Declaration of Bridger Jensen, attached as Exhibit FF;

21

- Instagram and Facebook posts from The Divine Assembly, indicating its activity in Utah County, attached as Exhibit GG;

- Waiver form of Singularism voyager that experienced an adverse reaction to psilocybin, indicating the individual's religious attestations and motivations for participating in Singularism's ceremonies, attached as Exhibit HH.

Plaintiffs have met and conferred with Defendants regarding additional documents Defendants will be submitting in support of their supplemental briefing. Plaintiffs do not object to the documentary evidence that Defendants have indicated to Plaintiffs they will file as attachments to their supplemental brief. Plaintiffs reserve the right to object to the content of any declarations Defendants may file and the right to seek cross examination regarding the content of any declarations.

DATED February 5, 2025.

/s/ Tanner J. Bean
Tanner J. Bean
Jacqueline M. Rosen
*Attorneys for Plaintiffs*

# EXHIBIT FF

Tanner J. Bean (A17128)
tbean@fabianvancott.com
Jacqueline M. Rosen (A18530)
jrosen@fabianvancott.com
**FABIAN VANCOTT**
95 South State Street, Suite 2300
Salt Lake City, UT 84111-23323
Telephone: (801) 531-8900
*Attorneys for Plaintiffs*

---

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| BRIDGER LEE JENSEN, an individual; SINGULARISM, a non-profit corporation; PSYCHE HEALING AND BRIDGING, LLC dba PSYCHEDELIC THERAPY JOURNEY; a limited liability company;<br><br>                   Plaintiffs,<br>vs.<br><br>UTAH COUNTY, a political subdivision, PROVO CITY, a political subdivision; JEFFREY GRAY, an individual;<br><br>                   Defendants. | **THIRD SUPPLEMENTAL DECLARATION OF BRIDGER JENSEN**<br><br>Case No. 2:24-cv-00887-JNP<br><br>Judge Jill N. Parrish<br><br>(Removed from Fourth Judicial District Court, Utah County, State of Utah, Case No. 240406123) |

I, Bridger Jensen, declare:

1.      I am over eighteen years old and competent to testify.

2.      I have personal knowledge of the facts set forth in this declaration, and if called as a witness, I could and would testify competently to them under oath.

3.      Following the search of Singularism's spiritual center on November 11, 2024, law enforcement seized Singularism's sacramental psilocybin. I have come to understand, based upon

1

App-5:068

the document ECF 13-15 which Defendants filed in this action, that Detective Julian recorded the

seized psilocybin as "459.8 grams psilocybin mushrooms." In this document, Detective Julian also

recorded that psilocybin paraphernalia, including "storage cups" were seized.

4.      Based upon my understanding of the amount of psilocybin that was present at

Singularism's spiritual center at the time of the search, as well as how the psilocybin was stored in

storage cups, Detective Julian's record of the amount of psilocybin seized is incorrect.

5.      If I were to estimate the weight of the psilocybin seized, I would say that it was

approximately 1/3 the amount that Detective Julian described, or approximately 153.26 grams.

6.      One possible explanation for why Detective Julian's report is inaccurate is that he

may have weighed the psilocybin in the three storage cups in which they were kept. My

understanding is each of those cups weighed approximately 20 grams. Another explanation might

be that the psilocybin could have been weighed in the vacuum sealed bags in which some of the

psilocybin was kept.

7.      Although Defendants have not returned Singularism's sacramental psilocybin, they

have returned the storage cups in which it was kept.

8.      I have come to understand, based upon the lab report which Defendants provided,

filed as ECF 71-1 in this action, that on or around November 22, 2024, Defendants caused

Singularism's sacramental psilocybin to be tested.

9.      The lab report states that two "items" of psilocybin were delivered and tested.

     a.   For the first, the lab report states that "Psilocyn was identified in the plastic bag.

The total weight of the mushroom-like material was less than 100 milligrams.

The entire sample was used for analysis. A new glass vial containing the

2

unconsumed extract of the sample was packaged with the item to be returned to the submitting agency."

b.  For the second, the lab report states that "Psilocyn was identified in the clear capsule. The total weight of the mushroom-like material was 204 milligrams and +/- 6 milligrams."

10.  The amounts discussed in the lab report further lead to my belief that law enforcement did not seize 459.8 grams of psilocybin from Singularism's spiritual center on November 11, 2024.

11.  Because Defendants remain in possession of Singularism's sacramental psilocybin, it is impossible for Singularism to know with certainty how much psilocybin law enforcement seized.

12.  I am familiar with another entheogenic religious organization in Utah that utilizes psilocybin as a sacramental substance, The Divine Assembly.

13.  Although I have no affiliation with the Divine Assembly, for informational purposes, I "follow" The Divine Assembly's social media account on Instagram and Facebook. The Divine Assembly's username on Instagram is "mushroomsacrament." That is evident on The Divine Assembly's profile page on Instagram, a screenshot of which is submitted concurrently with this declaration as part of Exhibit GG. On that profile page, The Divine Assembly's photo contains its initials, "TDA," as well as hyperlinks to its website, www.thedivineassembly.org.

14.  While following The Divine Assembly's Instagram and Facebook page, I have seen multiple posts indicating that it conducts religious activities and operations in Orem City, Utah County. A few example posts which indicate such are attached as Exhibit GG. They indicate The

3

App-5:070

Divine Assembly conducts church at 532 East 800 North, Orem, Utah. The Divine Assembly's

Facebook page contains similar posts, also attached as part of Exhibit GG.

15.     In a previous declaration I submitted in this case, I discussed one of Singularism's

voyagers that had an adverse reaction to psilocybin on January 16, 2025. *See* ECF 71-2.

16.     At the hearing on Singularism's request for a preliminary injunction on January 23,

2025, Defendants asserted that this voyager was an example of someone that had come to

Singularism solely for secular purposes and that Singularism provided the individual psilocybin

despite her lack of religious calling.

17.     Defendants' assertion is incorrect. Singularism vetted this individual, through its

screening procedure, for religious sincerity before she participated in a ceremony. She also

confirmed her religious sincerity in a document, where she acknowledged, among other things,

that:

     a.  Her "voluntary participation in the ceremonial use of psychedelic substances
within the religious context of Singularism" and that her participation was
"entirely voluntary and predicated on a full understanding and acknowledgment
of the ceremonial, spiritual, and religious context of this practice."

     b.  That she "recognize[d] and sincerely declare[d] that participating in this
entheogenic ceremony is a vital and central component of my spiritual well-
being" and that she "firmly believe[d] it to be integral to my spiritual journey,"
entering the "ceremony with a deep conviction . . . that this experience is
indispensable for my spiritual development and religious exploration."

4

App-5:071

      c.   That "the psychedelic ceremonies conducted under the auspices of Singularism are strictly religious and spiritual in nature and not intended to be clinical or therapeutic interventions."

*See* <u>Exhibit HH</u>.

18.     Further, she wrote, in her own handwriting, that her specific religious reason for coming to Singularism and wishing to participate in its ceremonies was to "heal spiritually & connect with God." Ex. HH.

19.     At the hearing on Singularism's request for a preliminary injunction on January 23, 2025, Defendants asserted, as they have before, that Singularism is not a religion, including by wrongly comparing, for the first time in this case, Singularism to the organization at issue in *State v. Cordingley*, 154 Idaho 762, 302 P.3d 730 (Ct. App. 2013). As I have explained in a previous declaration, Singularism is a profound, nuanced, and structured religion, *see* ECF 9-1, at 5-7; ECF 21-5, at 2-9, 11-12, 14, and it is significantly different than the organization at issue in *Cordingley*.

20.     Rather than rehearsing my past declaration or past arguments, *see* ECF 19, at 27-31 (including a dispute as to the application of *Meyers*), I would simply like to reference for the Court's benefit examples of where Singularism has already provided evidence of its religious nature.

      a.   Ultimate Ideas.

         i.   *See* ECF 9-16, at 3-5; ECF 21-1; ECF 21-5, at ¶¶ 4-5, 36; ECF 53, at 151:19—153:9 (creation story)

5

     ii. *See* ECF 9-16, at 5; ECF 21-1, at 13-16 (belief that humanity is creating, and has an obligation to create, Gods that will, in turn, create humanity in the past);

     iii. *See* ECF 21-1, at 12 (divine cosmology)

     iv. *See* ECF 53, at 111:14-19; ECF 21-2, at 16-22, 26-29 (the singularity and golden threads of creation)

     v. *See* ECF 9-1, at ¶¶ 18, 23 (religious beliefs and practices drawn from ancient traditions)

b. Metaphysical Beliefs.

     i. *See* ECF 21-2, at 22-26 (psilocybin's necessity to evolution of humankind)

     ii. *See* 21-2, at 25; ECF 21-5, at ¶ 11; ECF 53, at 152:9—153:8 (essential role of psilocybin in reconnecting with truth, restoring balance, and promoting healing)

     iii. *See* ECF 9-1, at ¶ 25; ECF 9-16, at 1 (existence of a great spirit/God)

c. Moral or Ethical System.

     i. *See* ECF 9-1, at ¶¶ 18, 21-22; ECF 9-16, at 1; ECF 21-5, at ¶¶ 13, 36; ECF 53, at 91:7-23, 203:6-9, 213:12-17; ECF 71-2, at ¶ 19 (purpose and obligation to alleviate human suffering and reduce harm)

     ii. *See* ECF 9-16, at 3-4; ECF 21-5, at ¶ 13 (non-offensiveness)

     iii. *See* ECF 21-5, at ¶ 13 (agency and responsibility)

    iv. *See* ECF 9-16, at 3; ECF 53, at 154:17-18 (opposition to cultish behavior)

    v. *See* ECF 21-5, at ¶ 15 (commitment to act on religious insights)

    vi. *See* ECF 9-16, at 3-4; ECF 21-2, at 31, 42-43; ECF 21-5, at ¶ 15 (family responsibilities and relationships)

d. Comprehensiveness of Beliefs.

    i. *See* ECF 9-16, 9-17, 21-1, 21-2 (compiled doctrinal statements)

    ii. *See* ECF 9-16, at 2; ECF 9-17; ECF 21-5, at ¶¶ 6-8, 10, 36; ECF 53, at 111:16, 155:4—157:14; 214:3-6 (the "Octodrant," an epistemological framework for understanding all things, revealed by the "Octogoddess" and regarded as scripture)

    iii. *See* ECF 9-1, at ¶¶ 20, 23, 26-27; ECF 9-16, at 2; ECF 21-5, at ¶¶ 9, 13-14; ECF 53, at 65:24-25, 66:2-6, 108:1—109:3 , 144:22—145:6, 168:1-5 (personalized revelation and scripture scribed by clergy during psilocybin ceremonies, but which contributes to collective scriptural records, which Singularism stores, which are reviewed for overarching insight and evidence of the singularity of all things and the golden threads)

e. Accoutrements of Religion.

    i. Founder, Prophet, or Teacher.

        1. *See* ECF 9-1, at ¶¶ 3-18; ECF 21-5, at ¶¶ 36-37 (founder's religious journey)

7

    2. *See* ECF 21-5, at ¶¶ 8-9; ECF 53, at 111:16, 143:16—144:7, 145:7-21, 157:13 (deity, the "Octogoddess," instructed founder to form Singularism and revealed Singularism doctrine)

    3. *See* ECF 53, at 110:21—111:4, 139:11-20, 151:4-14 (founder is responsible for setting forth doctrines of Singularism)

ii. Important Writings.

    1. *See* ECF 9-16, 9-17, 21-1, 21-2 (extensive written doctrinal statements)

    2. *See* ECF 9-16, at 2; ECF 9-17; ECF 21-5, at ¶¶ 6-8, 10, 36; ECF 53, at 111:16, 214:3-6 (the "Octodrant," an epistemological framework for understanding all things, revealed by the "Octogoddess" and regarded as scripture)

    3. *See* ECF 9-1, at ¶¶ 20, 23, 26-27; ECF 9-16, at 2; ECF 21-5, at ¶¶ 9, 13-14; ECF 53, at 65:24-25, 66:2-6, 108:1—109:3 , 144:22—145:6, 168:1-5 (personalized revelation and scripture scribed by clergy during psilocybin ceremonies, but which contributes to collective scriptural records, which Singularism stores, which are reviewed for overarching insight and evidence of the singularity of all things and the golden threads)

iii. Gathering Places.

    1. *See* ECF 21-5, at ¶¶ 24, 32; ECF 53, at 109:4-10, 147:13, 147:25, 163:18-20 (Singularism's physical spiritual center)

8

    iv.  Keepers of Knowledge.

       1.  *See* ECF 53, at 110:21—111:4, 151:4-14 (founder is responsible for setting forth doctrines of Singularism)

       2.  *See* ECF 9-1, at ¶¶ 20, 23, 26-27; ECF 9-16, at 2; ECF 21-5, at ¶¶ 9, 13-14; ECF 53, at 65:24-25, 66:2-6, 108:1—109:3 , 144:22—145:6, 168:1-5 (personalized scripture scribed by clergy during psilocybin ceremonies, but which contributes to collective scriptural records, which Singularism stores, which are reviewed for overarching insight and evidence of the singularity of all things and the golden threads)

       3.  *See* ECF 53, at 48:18-21, 49:5-11 (facilitators are clergy and scriptural guides)

   v.  Ceremonies and Rituals.

       1.  *See* ECF 21-5, at ¶ 16; *see also* ECF 21-5, at ¶¶ 10, 15-18, 22 (screening ordinance)

       2.  *See* ECF 53, at 43:2-6, 90:14-17, 97:15-19 (intention ceremony)

       3.  *See* ECF 21-5, at ¶ 11 (psilocybin ceremony)

       4.  *See* ECF 53, at 89:16—90:13 (solstice ceremonies)

  vi.  Structure or Organization.

       1.  *See* ECF 9-1, at ¶¶ 3-18; ECF 21-5, at ¶¶ 8-9, 46; ECF 53, at 110:21—111:4, 111:16, 143:16—144:7, 145:7-21, 151:4-14, 157:13 (founder is Mr. Jensen)

9

2. *See* ECF 21-5, at ¶ 46 (two counselors, board of directors)

vii.  Holidays.

1. *See* ECF 21-5, at ¶ 26; ECF 53, at 89:16—90:13 (solstice holidays)

viii.  Diet or Fasting.

1. *See* ECF 21-5, at ¶ 19; ECF 53, at 96:8—97:2, 98:14-15 (healthy foods, fasting before psilocybin ceremony)

ix.  Appearance and Clothing.

1. *See* ECF 21-5, at ¶ 24 (symbolic white shirts with symbolic gold buttons)

2. *See* ECF 21-5, at ¶ 19; ECF 53, at 96:8-13 (comfortable dress for psilocybin ceremonies)

x.  Propagation.

1. *See* ECF 53, at 93:18—94:8, 161:18—162:4 (training of facilitators to continue and expand the faith)

2. *See* ECF 21-5, at ¶ 45 (modern missionary efforts)

21.  With this declaration, I wish to submit my solemn testimony of my deeply held, unwavering faith in Singularism, a religion revealed to me through divine experiences, sacred visions, and the Octogoddess. At times, I have wished I had not been given this calling, but I have learned that I cannot deny it. My faith is not a pretext, philosophy, or convenience. It is a sacred truth that was revealed to me beyond the veil of ordinary perception, through the dissolving of ego

10

App-5:077

and the revelation of the golden threads—the luminous, interconnected fibers of existence that form the fabric of reality.

22. I declare under criminal penalty of perjury under the law of Utah that the foregoing is true and correct.

DATED this 5th day of February, 2025.

*/s/ Bridger Jensen*
Bridger Jensen
*(signed with permission granted to Tanner J. Bean on February 5, 2025)*

11

# EXHIBIT GG









Search Facebook

## The Divine Assembly

info@thedivineassembly.org

thedivineassembly.org

Always open ⌄

Not yet rated (4 Reviews)

### Photos

See all photos



**The Divine Assembly**
January 17 at 10:37 AM · 🌐

Join us at this Sunday in SLC! We will have networking (mingle and get to know), integration with Sara, and a special Exercising your Mental Health breakout with Micha... **See more**

⬆️❤️ 5

1 share

👍 Like      💬 Comment      📞 Send      ↪ Share

Privacy · Consumer Health Privacy · Terms · Advertising · Ad Choices ▷ · Cookies · More · Meta © 2025

App-5:082

# EXHIBIT HH

# SINGULARISM
## EXPERIENCE A BREAKTHROUGH

## Participant Identification:

I, _Claire Hart_, hereinafter referred to as "the Participant," willingly enter into this agreement on this day, _11-22-24_, in relation to my participation in the psychedelic ceremonies conducted as part of the religious practices of Singularism.

## Introduction and Purpose:

This document serves as a comprehensive informed consent and waiver for my voluntary participation in the ceremonial use of psychedelic substances within the religious context of Singularism. It is intended to ensure that I am fully informed about the nature, potential benefits, and risks associated with the use of psychedelics in these ceremonies.

This document acts as an informed consent and comprehensive waiver for individuals like myself who are engaging in Singularism's sacred ceremonies involving the use of psychedelic substances. Participation is entirely voluntary and predicated on a full understanding and acknowledgment of the ceremonial, spiritual, and religious context of this practice. This document is intended to provide complete transparency about the benefits, risks, and nature of psychedelic use in our religious ceremonies.

## DECLARATIONS:

### Legal declaration of Rights:

I declare that my participation in the psychedelic ceremonies of Singularism is protected under the United States Constitution, legal precedent, and case law, specifically under the provisions for the free exercise of religion. I understand that this right is recognized and upheld in the context of religious practices, and I assert that my participation in these ceremonies is a lawful expression of my religious freedom.

While I am aware that my participation is under the protection of the United States Constitution, I also understand that local municipalities and state governments may have differing interpretations and may mistakenly view such ceremonies as illegal. I recognize that these variations in interpretation exist and that legal protections for religious practices, especially those involving entheogenic substances, may not be uniformly recognized or applied across different jurisdictions.

### Declaration of Sincerity and Honesty:

I affirm that I have represented myself sincerely and honestly in all interactions with the facilitators of Singularism. I have been truthful in my statements during the screening and preparation process. I have disclosed all relevant information about my health, mental state, and any other factors that may impact my participation in the ceremony. This disclosure is essential to assist the guides in making informed decisions for the safety and benefit of everyone involved.



**SINGULARISM**
EXPERIENCE A BREAKTHROUGH

## Participant Identification:

I, _Claire Hart_, hereinafter referred to as "the Participant," willingly enter into this agreement on this day, _11-22-24_, in relation to my participation in the psychedelic ceremonies conducted as part of the religious practices of Singularism.

## Introduction and Purpose:

This document serves as a comprehensive informed consent and waiver for my voluntary participation in the ceremonial use of psychedelic substances within the religious context of Singularism. It is intended to ensure that I am fully informed about the nature, potential benefits, and risks associated with the use of psychedelics in these ceremonies.

This document acts as an informed consent and comprehensive waiver for individuals like myself who are engaging in Singularism's sacred ceremonies involving the use of psychedelic substances. Participation is entirely voluntary and predicated on a full understanding and acknowledgment of the ceremonial, spiritual, and religious context of this practice. This document is intended to provide complete transparency about the benefits, risks, and nature of psychedelic use in our religious ceremonies.

## DECLARATIONS:

### Legal declaration of Rights:

I declare that my participation in the psychedelic ceremonies of Singularism is protected under the United States Constitution, legal precedent, and case law, specifically under the provisions for the free exercise of religion. I understand that this right is recognized and upheld in the context of religious practices, and I assert that my participation in these ceremonies is a lawful expression of my religious freedom.

While I am aware that my participation is under the protection of the United States Constitution, I also understand that local municipalities and state governments may have differing interpretations and may mistakenly view such ceremonies as illegal. I recognize that these variations in interpretation exist and that legal protections for religious practices, especially those involving entheogenic substances, may not be uniformly recognized or applied across different jurisdictions.

### Declaration of Sincerity and Honesty:

I affirm that I have represented myself sincerely and honestly in all interactions with the facilitators of Singularism. I have been truthful in my statements during the screening and preparation process. I have disclosed all relevant information about my health, mental state, and any other factors that may impact my participation in the ceremony. This disclosure is essential to assist the guides in making informed decisions for the safety and benefit of everyone involved.

**SINGULARISM**
EXPERINCE A BREAKTHROUGH

## Declaration of Personal Spiritual Necessity:

I recognize and sincerely declare that participating in this entheogenic ceremony is a vital and central component of my spiritual well-being. While I understand that not everyone will consider this path essential, I ask for understanding and respect for my personal belief in the significance of this ceremony to my personal spiritual pursuits. I assert my legal right to participate in this religious ceremony, firmly believing it to be integral to my spiritual journey. I enter this ceremony with a deep conviction, informed by thorough self-education and external research, that this experience is indispensable for my spiritual development and religious exploration. I view this ceremony as a crucial step in my ongoing quest for spiritual growth and understanding, essential to my life's spiritual journey.

## Declaration of Voluntary Participation:

By signing this document, I confirm that my decision to participate in the ceremony is made willingly and with full awareness of its nature. I acknowledge that my participation is a conscious choice, free from any external pressures or expectations. I affirm that I am over 18 years of age, in sound mind, and acting in good faith of my own volition.

## Declaration of informed Consent:

By signing this document, Participants affirm that they have received thorough information regarding the ceremony, have had the opportunity to ask questions and express concerns, and have received satisfactory responses. They acknowledge their participation is of their own free will, without any undue pressure or persuasion.

# ACKNOWLEDGMENTS:

## Acknowledgment of Religious and Spiritual Context:

Participants expressly acknowledge and understand that Singularism's use of psychedelics is a deeply religious and spiritual practice. It is conducted in a sacred, respectful manner and is central to our religious beliefs and spiritual explorations. This practice is not recreational, nor clinical whatsoever. This ceremony is a significant part of our spiritual journey and religious expression.

## Acknowledgment Non-Clinical Nature of Ceremonial Practice:

Participants acknowledge and understand that the psychedelic ceremonies conducted under the auspices of Singularism are strictly religious and spiritual in nature and are not intended to be clinical or therapeutic interventions. Singularism and its facilitators make no clinical claims regarding the efficacy of these practices for the treatment or alleviation of any medical or psychological conditions. These ceremonies do not replace professional medical advice, diagnosis, or treatment. Participants are encouraged to continue any ongoing medical treatments and consult with healthcare professionals regarding their participation in these ceremonies.

## Acknowledgment of Non Licensure:

App-5.086



I understand and acknowledge that Singularism does not operate its sessions under any clinical license whatsoever. If any employee, facilitator, or individual associated with Singularism happens to hold a professional license in another field, I recognize that their licensure is entirely separate and not related to their work and activities within Singularism. The roles and activities undertaken in the context of Singularism's ceremonies are distinct from any licensed professional capacities that these individuals might hold outside of this religious setting.

## Acknowledgment of Religious Inclusivity:

I further acknowledge and respect that Singularism does not require "religious exclusivity" from its adherents. I understand that participation in Singularism's ceremonies does not necessitate forgoing or abandoning my affiliations, beliefs, or practices in other religions. Rather, Sinuglaism teaches religious inclusivity. I recognize that Singularism respects the coexistence of multiple spiritual paths and that my involvement in these ceremonies is a personal choice, made in accordance with my own spiritual and mental well-being needs. My participation in Singularism's ceremonies is a testament to my sincere commitment to exploring diverse spiritual experiences as I deem necessary for my personal growth and development.

## Preparation and Education Acknowledgement:

Participants confirm that they have undertaken adequate preparation for the ceremony. This includes self-education about the nature of psychedelic experiences and consultation with outside resources or experts as needed. Participants affirm that they have been provided with sufficient information and resources by Singularism to make an informed decision about their participation.

## Medical Advisory Acknowledgment:

I acknowledge that while Singularism's ceremonies incorporate clinical insights and prioritize safety, they operate within a religious context, not a medical one. I understand the importance of consulting with a medical professional about my participation, especially if I'm undergoing psychopharmacological treatment. The advice from Singularism's staff, despite being informed, is not a substitute for licensed and qualified professional medical advice, and we acknowledge their clinical advice supersedes our spiritual advice in medical and physical matters. Singualrsim always advises that you seek your own medical council. Therefore, I commit to seeking medical counsel to ensure my health and safety regarding any treatments I am receiving, or medical concerns I have.

This shortened version maintains the essential information about the importance of seeking medical advice and the non-medical nature of Singularism's ceremonies, while being more concise.

# AGREEMENTS:

## Commitment to Safety and Guidance:

I, the participant, commit to maintaining a safe environment during the ceremony and agree to follow all rules and instructions provided by the guides and facilitators. I understand that these guidelines are in

SINGULARISM
EXPERINCE A BREAKTHROUGH

place to ensure the safety and well-being of all participants, including myself. I agree to listen attentively to my guide and adhere strictly to the established protocols throughout the ceremony.

## Ceremony Participation Agreement

As a Participant in Singularism ceremonies, I commit to following the guidance and instructions of the lead facilitator throughout the ceremony. I place my trust in the facilitator's expertise and agree to openly express any concerns or discomfort I may experience during the process. This commitment is made to ensure my physical and emotional safety, as well as to uphold the sanctity and integrity of the ceremony.

I understand the importance of communication and agree to voice my needs and concerns so that the facilitators can provide the necessary support to maintain a safe and supportive environment. By signing below, I acknowledge my understanding and agreement to the terms outlined above, committing to follow the lead facilitator's instructions and to communicate openly during Singularism ceremonies.

## Facility Stay Agreement

As a Participant in Singularism ceremonies, I agree to remain within the designated facility premises until my lead facilitator formally releases me at the conclusion of the ceremony. This agreement is in place to ensure my safety and the integrity of the ceremonial process, allowing for a fully immersive and secure experience. I understand that leaving the facility prematurely may compromise both my safety and the collective experience of all participants. **By signing below, I affirm my commitment to stay within the facility as required and to follow the release instructions provided by my lead facilitator.**

## No Driving Agreement:

I agree that I will not operate a vehicle under any circumstances on the day of the ceremony. Even if I feel capable of driving, I understand the importance of adhering to this rule for my safety and the safety of others. The effects of psychedelic substances used during the ceremony can be unpredictable, and my judgment may be impaired. I commit to arranging transportation to and from the ceremony location through a trusted friend, family member, or reliable ride service. This ensures that I do not have to drive under any circumstances, maintaining safety as a top priority.

## Audio Recording and Note Usage Policy and Consent Agreement:

By engaging in sessions with Singularism, clients acknowledge and consent to the potential audio recording of parts of their sessions and the use of handwritten notes as visuals, primarily for training purposes and occasionally for use in anonymized media clips. These recordings will be audio-only unless explicitly agreed otherwise, and any notes used will not contain identifiable personal information. Clients are assured that their confidentiality will be maintained in all materials.

## Phone Use Restriction:

I agree to not use my phone during the ceremony sessions without explicit permission from the guide. I understand that this guideline is in place for my emotional safety and to enhance the effectiveness of the sessions. Using a phone can be distracting and may disrupt the immersive and introspective nature of the



experience. I acknowledge that maintaining a phone-free environment is essential for creating a focused and conducive setting for all participants.

## DISCLOSURES:

### Potential Benefits: Transformative Potential of Psychedelic Experiences - Legal Disclosure:

As participants in this ceremony, you are embarking on a journey that has the potential to profoundly impact your personal and spiritual growth. The ceremonial use of psychedelics could lead to life-changing experiences and insights. Just a few of the many benefits include, but is not even remotely limited to:

1. Enhanced Self-Awareness: You may experience a deepening of self-understanding, peeling back layers of your consciousness to reveal a richer, more nuanced understanding of your identity and purpose.
2. Spiritual Awakening: Many participants report transformative spiritual experiences, feeling a profound connection to a greater existence beyond the physical realm. This awakening can offer new perspectives on life and existence.
3. Emotional Catharsis: The experience may facilitate a powerful release of pent-up emotions, leading to therapeutic and healing outcomes. It's not uncommon for participants to emerge with a sense of emotional renewal and resilience.
4. Deepened Connection with the Universe: You might find yourself experiencing an intense sense of unity and interconnectedness with the universe, nature, and fellow beings. This often leads to a greater sense of empathy and compassion.
5. Strengthened Sense of Interconnectedness: The feeling of being deeply connected with others and the environment around you can foster a sense of belonging and understanding, promoting harmony and empathy in your interactions.
6. Personal Development and Enlightenment: These experiences have the potential to contribute significantly to your personal development, providing insights and perspectives that can lead to a more enlightened, fulfilling life.

It is important to understand that while these experiences can be transformative and profound, they are subjective and can vary greatly from person to person. The journey you embark upon is unique to you, influenced by your personal mindset, environment, and life experiences.

### Disclosure of Risks and Side Effects:

Participants are thoroughly informed about the potential risks and side effects associated with the use of psychedelic substances, framed in an optimistic yet realistic manner. While many individuals experience positive and transformative effects, it's important to understand that reactions can vary:

SINGULARISM
EXPERIENCE A BREAKTHROUGH

1. Psychological Responses: In some rare instances, participants may experience temporary feelings of anxiety, confusion, or unpredictable emotional responses. These are typically short-lived and often contribute to a deeper understanding of personal emotions and thought processes.

2. Physical Reactions: Some individuals might encounter minor physical reactions such as mild nausea or slight dizziness. Changes in sensory perception, a common aspect of the psychedelic experience, are generally perceived as part of the journey towards greater self-awareness.

3. Worldview and Belief Systems: There's a possibility for long-term changes in personal belief systems and worldview. While this can be profound and positive, leading to a more open and inclusive perspective on life, it's important to approach this potential change with an open mind and readiness for personal growth.

4. Rare Cases: In very rare cases, more intense experiences can occur, including psychotic breaks that are impossible to screen or predict. These are usually in populations with specific predispositions and are not common in the general population.

It is important for participants to understand that these risks are inherent to the experience and can vary from person to person. This disclosure is provided not to dissuade but to ensure a fully informed, positive, and conscious decision to participate.

## Health and Safety Considerations:

I affirm that I have provided a complete and honest disclosure of all relevant health information to the facilitators of Singularism. This includes a thorough account of my mental health history and any current physical health conditions. I understand the importance of this disclosure, as certain health conditions can increase the risk of adverse reactions during the ceremony.

In recognition of these risks, I commit to discussing any potential contraindications with my healthcare provider before participating in the ceremony. This discussion is a crucial step in ensuring my safety and well-being, as it helps in identifying any personal health factors that might influence my experience.

Furthermore, I acknowledge and appreciate the organization's commitment to maintaining rigorous safety protocols and providing continuous support throughout the ceremony. This commitment includes monitoring the ceremony environment, being responsive to participants' needs, and having measures in place to address any unexpected situations. I understand that this support is in place to foster a safe and nurturing space for my spiritual journey, but it does not substitute for my personal responsibility in assessing my fitness to participate.

By acknowledging this, I accept that while the organization takes extensive measures for safety, the nature of such experiences involves a degree of unpredictability, and I assume responsibility for my decision to partake in the ceremony."

This expanded statement emphasizes the participant's responsibility in disclosing their health information and consulting with healthcare providers, alongside acknowledging the organization's commitment to

**Page 6 of 9**

App-5:090



safety and support.

## Recognition of Potential Risks and Assumption of Responsibility

While we at Singularism are committed to establishing and following groundbreaking best practices and standards of care in our ceremonies, it is important to recognize that, as with any human endeavor, mistakes can happen. Participants should be aware that despite our best efforts, there is an inherent risk associated with any activity involving psychedelic substances. By choosing to participate, you understand and assume all risks associated with this ceremony. This acknowledgment is not a reflection of an expectation of negative outcomes but is a standard precaution to ensure that participants are aware of their personal responsibility in choosing to partake in these ceremonies."

## Voluntary Participation and Comprehensive Informed Consent:

By signing this document, Participants affirm that they have received thorough information regarding the ceremony, have had the opportunity to ask questions and express concerns, and have received satisfactory responses. They acknowledge their participation is of their own free will, without any undue pressure or persuasion.

## Legal Release of Liability and Indemnification:

Participants agree to waive and release Singularism, its facilitators, organizers, and any associated parties from any liability or claims that may arise from their participation in the psychedelic ceremonies. They understand this waiver includes any unforeseen risks or outcomes not explicitly mentioned in this document.

## Provisions for Emergency Medical Care: In the event of a medical emergency, Participants consent to receive necessary medical treatment and understand that the organization will take all appropriate actions to ensure their safety and well-being, including contacting emergency medical services if needed

**SINGULARISM**
EXPERIENCE A BREAKTHROUGH

## Supportive/Emergency Contact Authorization

As a Participant of Singularism ceremonies, I recognize the value of having a supportive network available in times of need. I have selected three individuals with whom I feel both emotionally and physically safe. I grant Singularism unconditional permission to contact any of these individuals whenever a facilitator deems it necessary for my well-being or safety. I have informed them that they are being used as an emergency contact in this context

### Supportive/Emergency Contact 1:

Contact Full Name: Bonnie Hart

Relationship to Participant: Mother

Phone Number: ███████████

Email: ███████████

City of Residence: Wray, CO

### Supportive/Emergency Contact 2:

Contact Full Name: Kheng Lim

Relationship to Participant: ex-husband

Phone Number: ███████████

Email: ███████████

City of Residence: Provo, UT

### Supportive/Emergency Contact 3:

Contact Full Name: ~~████~~ Seretta Hart

Relationship to Participant: sister

Phone Number: ███████████

Email: _____

City of Residence: Taylorsville, UT

**Page 8 of 9**

App-5:092

**SINGULARISM**
EXPERINCE A BREAKTHROUGH

## Intention Statement:

Participants are invited to state their intention for participating in the ceremony. This intention, while personal, plays a crucial role in shaping the individual's experience. It is understood that setting a clear and positive intention can significantly influence the nature of one's experience.

Intention (please write below):

To heal spiritually & connect with God.

## Confidentiality and Respect for Privacy:

Participants commit to respecting the privacy and confidentiality of all individuals involved in the ceremonies. They agree not to disclose sensitive information about the ceremonies or other participants without explicit permission.

## Acknowledgment and Binding Signature:

I, __Claire Hart__, hereby affirm that I have read, fully understand, and agree to all terms and conditions outlined in this waiver. I acknowledge that my participation in Singularism's psychedelic ceremonies is informed, voluntary, and at my own risk.

Signature: _Claire Hart_

Printed Name: _Claire Hart_

Date: _11-22-24_

App-5:093

# EXHIBIT II

App-5:094

# Chapter 475

## 1987 REPLACEMENT PART

# Controlled Substances; Experimental Drugs; Illegal Drug Cleanup; Precursors

**UNIFORM CONTROLLED SUBSTANCES ACT**
(Generally)

475 005    Definitions for ORS 475 005 to 475 285 and 475 940 to 475 965

475 035    Authority to control schedule

475 045    Exclusions

475 055    Publishing of schedules

475 095    Rules, fees

(Registration)

475 125    Registration requirements

475 135    Grounds to grant or deny registration, scope of registration, effect of federal registration

175 145    Revocation and suspension of registration

475 155    Order to show cause

475 165    Records of registrants

(Records)

475 175    When order forms required

475 185    When prescriptions required

475 190    Exception to prescription requirement

(Miscellaneous)

475 215    Cooperative arrangements

475 225    Education and research

(Enforcement)

475 235    Burden of proof, liabilities

475 245    Conditional discharge for possession as first offense

475 255    Status of penalties

475 265    When prosecution barred

(Interpretations, Title)

475 275    Uniformity of interpretation

475 285    Short title

**EXPERIMENTAL DRUGS**

475 305    "Experimental drug" defined

475 315    Consent to prescribe or administer experimental drug required

475 325    Who may give consent

475 335    Information to be given to consenting person and relatives

475 345    Revocation of consent

475 355    Appraisal of patient condition to be given, other information

475 360    When person prohibited from prescribing experimental drug

475 365    When certain requirements waived

475 375    Persons required to comply with ORS 475 305 to 475 375

**ILLEGAL DRUG CLEANUP**

475 405    Definitions for ORS 475 405 to 475 495

475 415    Request for cleanup

475 425    Environmental Quality Commission rules, designation of chemicals

475 435    Authority of director

475 445    Site entry, purposes

475 455    Liability of certain persons for cleanup costs

475 465    Liability of state for cleanup

475 475    Department record of costs, collection of costs

475 485    Costs and penalties as lien, enforcement of lien

475 495    Illegal Drug Cleanup Fund, sources, uses

**HYPODERMIC DEVICES**

475 805    Providing hypodermic device to minor prohibited, exception

**PRECURSOR SUBSTANCES**

475 940    Precursor substances described, certain compounds containing ephedrine exempted

475 945    Authority and duties of Department of State Police

**PENALTIES**

475 950    Penalty for failure to report precursor substance

475 955    Penalty for failure to report missing precursor substances

475 960    Penalty for illegally selling drug equipment

475 965    Penalty for providing false information on precursor substances report

475 991    Penalty for unlawful delivery of imitation controlled substance

475 992    Prohibited acts generally, penalties

475 993    Prohibited acts for registrants, penalties

475 994    Prohibited acts involving records and fraud, penalties

475 995    Penalties for distribution to minors

475 997    Penalty for violation of ORS 475 305 to 475 375

**CROSS REFERENCES**

Airplane operating while under influence  493 160

App-5:095

## LIQUOR, DRUGS

Alcohol narcotics and drugs publicity educational and other programs on effect of use and abuse 430 270 430 425

Boats, operating while under influence, 488 160

Commitment of addicts Ch 426

Conservator appointment for person incapacitated by chronic use of controlled substances 126 157

Crime reporting for criminal justice agencies Ch 181

Deaths or injuries to be reported, Ch 146

Drugs, dangerous criminal offenses 167 203 to 167 252

Intercepted telecommunications use 165 540

Juvenile court jurisdiction over certain children 419 476

Local mental health services 430 610 to 430 700

Narcotics criminal offenses 167 203 to 167 252

Pharmacists and pharmacies Ch 689

Prevention of drug abuse Mental Health Division functions treatment and rehabilitation 4 30 405 to 430 425

Publicizing effects of narcotic drugs 430 270

Seizure and sale of vehicle used in violation 471 665

Teaching certificate revocation or refusal to issue for narcotic violation 342 175

Treatment of alcoholism and drug dependence 430 260 to 430 375

Water skiing or surfboarding while under influence 488 144

App-5:096

## UNIFORM CONTROLLED SUBSTANCES ACT
### (Generally)

**475.005 Definitions for ORS 475.005 to 475 285 and 475.940 to 475.965.** As used in ORS 475 005 to 475 285, 475 940 to 475 965 and 475 991 to 475 995, unless the context requires otherwise

(1) "Abuse" means the repetitive excessive use of a drug short of dependence, without legal or medical supervision, which may have a detrimental effect on the individual or society

(2) "Administer" means the direct application of a controlled substance, whether by injection, inhalation, ingestion or any other means, to the body of a patient or research subject by

(a) A practitioner or an authorized agent thereof, or

(b) The patient or research subject at the direction of the practitioner

(3) "Administration" means the Drug Enforcement Administration of the United States Department of Justice, or its successor agency

(4) "Agent" means an authorized person who acts on behalf of or at the direction of a manufacturer, distributor or dispenser It does not include a common or contract carrier, public warehouseman or employe of the carrier or warehouseman

(5) 'Board" means the State Board of Pharmacy

(6) "Controlled substance" means a drug or its immediate precursor classified in Schedules I through V under the Federal Controlled Substances Act, 21 U S C §§ 811 to 812, as modified under ORS 475 035 The use of the term "precursor" in this subsection does not control and is not controlled by the use of the term "precursor" in ORS 475 940, 475 950 and 475 955

(7) "Counterfeit substance" means a controlled substance or its container or labeling, which, without authorization, bears the trademark, trade name, or other identifying mark, imprint, number or device, or any likeness thereof, of a manufacturer, distributor or dispenser other than the person who in fact manufactured, delivered or dispensed the substance

(8) "Deliver" or "delivery" means the actual, constructive or attempted transfer, other than by administering or dispensing, from one person to another of a controlled substance, whether or not there is an agency relationship

(9) "Device" means instruments, apparatus or contrivances, including their components, parts or accessories, intended

(a) For use in the diagnosis, cure, mitigation, treatment or prevention of disease in humans or animals, or

(b) To affect the structure of any function of the body of humans or animals

(10) "Dispense" means to deliver a controlled substance to an ultimate user or research subject by or pursuant to the lawful order of a practitioner, and includes the prescribing, administering, packaging, labeling or compounding necessary to prepare the substance for that delivery

(11) "Dispenser" means a practitioner who dispenses

(12) "Distributor" means a person who delivers

(13) "Drug" means

(a) Substances recognized as drugs in the official United States Pharmacopoeia, official Homeopathic Pharmacopoeia of the United States or official National Formulary or any supplement to any of them,

(b) Substances intended for use in the diagnosis, cure, mitigation, treatment or prevention of disease in humans or animals,

(c) Substances (other than food) intended to affect the structure or any function of the body of humans or animals, and

(d) Substances intended for use as a component of any article specified in paragraph (a), (b) or (c) of this subsection, however, the term does not include devices or their components, parts or accessories

(14) "Manufacture" means the production, preparation, propagation, compounding, conversion or processing of a controlled substance, either directly or indirectly by extraction from substances of natural origin, or independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis, and includes any packaging or repackaging of the substance or labeling or relabeling of its container, except that this term does not include the preparation or compounding of a controlled substance

(a) By a practitioner as an incident to administering or dispensing of a controlled substance in the course of professional practice, or

(b) By a practitioner, or by an authorized agent under the practitioner's supervision, for the

1073

App-5:097

**475.035**                                LIQUOR; DRUGS

purpose of, or as an incident to, research, teaching or chemical analysis and not for sale

(15) "Marijuana" means all parts of the plant Cannabis family Moraceae, whether growing or not, the resin extracted from any part of the plant, and every compound, manufacture, salt, derivative, mixture, or preparation of the plant or its resin It does not include the mature stalks of the plant, fiber produced from the stalks, oil or cake made from the seeds of the plant, any other compound, manufacture, salt, derivative, mixture, or preparation of the mature stalks (except the resin extracted therefrom), fiber, oil, or cake, or the sterilized seed of the plant which is incapable of germination

(16) "Person" includes a government subdivision or agency, business trust, estate, trust or any other legal entity

(17) "Practitioner" means physician, dentist, veterinarian, scientific investigator, certified nurse practitioner, physician's assistant or other person licensed, registered or otherwise permitted by law to dispense, conduct research with respect to or to administer a controlled substance in the course of professional practice or research in this state but does not include a pharmacist or a pharmacy

(18) "Prescription" means a written or oral direction, given by a practitioner for the preparation and use of a drug When the context requires, "prescription" also means the drug prepared under such written or oral direction Any label affixed to a drug prepared under written or oral direction shall prominently display a warning that the removal thereof is prohibited by law

(19) "Production" includes the manufacture, planting, cultivation, growing or harvesting of a controlled substance

(20) "Research" means an activity conducted by the person registered with the federal Drug Enforcement Administration pursuant to a protocol approved by the United States Food and Drug Administration

(21) "Ultimate user" means a person who lawfully possesses a controlled substance for the use of the person or for the use of a member of the household of the person or for administering to an animal owned by the person or by a member of the household of the person [1977 c 745 §1, 1979 c 777 §49 1979 c 785 §5 1981 c 220 §1 1981 c 666 §1 1987 c 657 §8]

475 010 [Amended by 1953 c 342 §3 1957 c 587 §6, 1965 c 545 §1, 1971 c 743 §378, 1973 c 697 §9, 1974 s s c 67 §5, repealed by 1977 c 745 §54]

475 015 [1977 c 745 §3, 1979 c 777 §50, repealed by 1981 c 666 §11]

475 020 [Repealed by 1957 c 587 §12]

475 025 [1977 c 745 §4 repealed by 1981 c 666 §11]

475 030 [Repealed by 1957 c 587 §12]

**475.035 Authority to control schedule.** (1) In arriving at any decision on changes in or addition to classification when changes or additions are proposed by the federal Drug Enforcement Administration or by any other reliable source, the board shall review the scientific knowledge available regarding the substance, its pharmacological effects, patterns of use and misuse, and potential consequences of abuse, and consider the judgment of individuals with training and experience with the substance

(2) Whenever the board determines that a change in or an addition to the schedule of a controlled substance is justified, the board by rule may order the change and fix the effective date thereof

(3) If a substance is an ingredient of a controlled substance, the ingredient shall be considered to be in the same schedule as that controlled substance Substances which are precursors of the ingredient shall not be subject to control solely because they are precursors of the ingredient The use of the term "precursor" in this subsection does not control and is not controlled by the use of the term "precursor" in ORS 475 940, 475.950 and 475 955

(4) The board shall administer ORS 475 005 to 475 285 and 475 940 to 475 965 in accordance with ORS 183 310 to 183 550

(5) Authority to control under this section does not extend to tobacco or to alcoholic liquor, distilled spirits, wine or malt beverages as those terms are defined or used in ORS chapters 471 and 472 [1977 c 745 §5, 1981 c 666 §2, 1987 c 657 §9]

475 040 [Repealed by 1957 c 587 §12]

**475.045 Exclusions** The board shall exclude any nonnarcotic substance from a schedule if such substance may, under the Federal Food, Drug, and Cosmetic Act and the law of this state, be lawfully sold over the counter without a prescription [1977 c 745 §7a]

475 050 [Repealed by 1957 c 587 §12]

**475 055 Publishing of schedules.** The board shall publish the classification of controlled substances within 30 days following revision of any classification or reclassification of a controlled substance [1977 c 745 §6 1981 c 666 §3]

475 060 [Repealed by 1957 c 587 §12]

475 070 [Amended by 1961 c 648 §12, repealed by 1971 c 743 §432]

App-5:098

Case 2:24-cv-00887-JNP-CMR    Document 85-4    Filed 02/05/25    PageID.2367    Page
Appellate Case: 25-4115    Document 6 of 21    Date Filed: 12/11/2025    Page: 99

CONTROLLED SUBSTANCES; EXPERIMENTAL DRUGS; CLEANUP  475.135

475 075  [1977 c 745 §2  1979 c 777 §51  repealed by 1981 c 666 §11]

175 080  [Repealed by 1959 c 411 §22]

175 085  [1977 c 745 §55, 1979 c 777 §52, repealed by 1981 c 666 §11]

475 090  [Amended by 1953 c 543 §3  1957 c 587 §7 repealed by 1971 c 743 §432]

**475.095 Rules; fees** The board may adopt rules relating to fees and charge reasonable fees in addition to any other fees required by statute or rule, relating to the registration and control of the manufacture, delivery and dispensing of controlled substances within this state  [1977 c 745 §7 1981 c 666 §4]

475 100  [Amended by  1953 c 396 §2, 1957 c 587 §8 1963 c 229 §1  1965 c 15 §1, 1965 c 545 §2  1971 c 743 §379 repealed by 1977 c 745 §54]

475 110  [Amended by 1953 c 396 §2  1965 c 545 §3, 1971 c 743 §379a  repealed by 1977 c 745 §54]

475 120  [Repealed by 1971 c 743 §432]

### (Registration)

**475.125 Registration requirements.** (1) Every person who manufactures, delivers or dispenses any controlled substance within this state or who proposes to engage in the manufacture, delivery or dispensing of any controlled substance within this state, must obtain annually a registration issued by the board in accordance with its rules

(2) Persons registered by the board under ORS 475 005 to 475 285, 475 940 to 475 965 and 475 991 to 475 995 to manufacture, deliver, dispense or conduct research with controlled substances may possess, manufacture, deliver, dispense or conduct research with those substances to the extent authorized by their registration and in conformity with the other provisions of ORS 475 045, 475 095 and 475 125 to 475 185 and other applicable laws of this state

(3) The following persons need not register and may lawfully possess controlled substances under ORS 475 005 to 475 285, 475 940 to 475 965 and 475 991 to 475 995

(a) An agent or employe of any registered manufacturer, distributor or dispenser of any controlled substance if the agent or employe is acting in the usual course of business or employment

(b) A common or contract carrier or warehouseman, or an employe thereof, whose possession of any controlled substance is in the usual course of business or employment

(c) An ultimate user or a person in possession of any controlled substance pursuant to a lawful order of a practitioner or in lawful possession of a Schedule V substance, unless otherwise prohibited

(d) A practitioner otherwise licensed under the laws of this state and authorized to dispense or administer a controlled substance by the licensing authority

(4) The board may waive by rule the requirement for registration of certain manufacturers or dispensers if it finds it consistent with the public health and safety

(5) A separate registration is required at each principal place of business or professional practice where the applicant manufactures, delivers or dispenses controlled substances

(6) The board may inspect the establishment of a registrant or applicant for registration in accordance with the rules of the board  [1977 c 745 §8]

475 130  [Repealed by 1957 c 587 §12]

**475.135 Grounds to grant or deny registration; scope of registration; effect of federal registration.** (1) The board shall register or renew the registration of an applicant to manufacture or dispense controlled substances included in schedules under procedures defined in ORS 475 035, unless it determines that the issuance of that registration would be inconsistent with the public interest  In determining the public interest, the board shall consider the following factors

(a) Failure to maintain effective controls against diversion of controlled substances into other than legitimate medical, scientific or industrial channels;

(b) Failure to comply with applicable state or local laws,

(c) Any convictions of the applicant under any federal or state laws relating to any controlled substance,

(d) Past experience in the manufacture, delivery or dispensing of controlled substances and the existence in the applicant's establishment of effective controls against diversion,

(e) Furnishing by the applicant of false or fraudulent material in any application filed under ORS 475 005 to 475 285 and 475 940 to 475 965,

(f) Suspension or revocation of the applicant's federal registration to manufacture, deliver or dispense controlled substances as authorized by federal law, or

(g) Any other factors relevant to and consistent with the public health and safety

App-5:099

**475.145**                                     **LIQUOR; DRUGS**

(2) Registration under subsection (1) of this section does not entitle a registrant to manufacture, deliver or dispense controlled substances in Schedule I or II other than those specified in the registration

(3) Practitioners must be registered to conduct research with controlled substances in Schedules I through V if they are authorized to conduct research under the law of this state  The board need not require separate registration under ORS 475 045, 475 095 and 475 125 to 475 185 for practitioners engaging in research with controlled substances in Schedules I through V where the registrant is already registered under ORS 475 045, 475 095 and 475 125 to 475 185 in another capacity  Persons with valid registration from the Drug Enforcement Administration for research on controlled substances may conduct research within this state in compliance with other state law upon furnishing the board evidence of that federal registration, and are exempt from state prosecution for possession and distribution of controlled substances to the extent of the registration  Registration under ORS 475 005 to 475 285 and 475 940 to 475 965 does not exempt the registrant from compliance with any other relevant law of this state or the United States, unless such exemption is expressly provided under ORS 475 005 to 475 285 and 475 940 to 475 965

(4) Notwithstanding this section, the manufacture, delivery or dispensing of any controlled substance excluded from any medical use by federal law is prohibited, except

(a) For research authorized under subsection (3) of this section and ORS 475 225, or

(b) As otherwise provided by state or federal law

(5) Compliance by manufacturers and distributors with the provisions of the federal law respecting registration, excluding fees, entitles them to be registered under ORS 475 045, 475 095 and 475 125 to 475 185  [1977 c 745 §9  1979 c 777 §53, 1981 c 666 §5]

**475 140**  [Repealed by 1957 c 587 §12]

**475.145 Revocation and suspension of registration.**  (1) A registration under ORS 475 135 to manufacture, deliver or dispense a controlled substance may be suspended or revoked by the board upon a finding that

(a) The registrant has furnished false or fraudulent material information in any application filed under ORS 475 005 to 475 285 and 475 940 to 475 965,

(b) The registrant has been convicted of a felony under any state or federal law relating to any controlled substance,

(c) The registrant has had the federal registration suspended or revoked to manufacture, deliver or dispense controlled substances,

(d) The registrant has violated any rule of the board under ORS 475 005 to 475 285 and 475 940 to 475 965,

(e) The registrant has failed to maintain proper records or has failed to follow proper refill procedures, or

(f) Continuance of registration would be inconsistent with the public interest under any factor stated in ORS 475 135

(2) The board may limit revocation or suspension of a registration to the particular controlled substance with respect to which grounds for revocation or suspension exist

(3) If the board suspends or revokes a registration, all controlled substances owned or possessed by the registrant at the time of suspension or the effective date of the revocation order may be placed under seal  No disposition may be made of substances under seal until the time for taking an appeal has elapsed or until all appeals have been concluded unless a court, upon application therefor, orders the sale of perishable substances and the deposit of the proceeds of the sale with the court  Upon a revocation order becoming final, all controlled substances may be forfeited to the state

(4) The board shall promptly notify the administration of all orders suspending or revoking registration and all forfeitures of controlled substances  [1977 c 745 §10  1981 c 666 §6]

**475 150**  [Amended by 1959 c 411 §1, 1971 c 418 §14 repealed by 1977 c 745 §54]

**475.155 Order to show cause**  (1) Before denying, suspending or revoking a registration, or refusing a renewal of registration, the board shall serve upon the applicant or registrant an order to show cause why registration should not be denied, revoked or suspended, or why the renewal should not be refused  The order to show cause shall contain a statement of the basis therefor and shall call upon the applicant or registrant to appear before the board at a time and place not less than 30 days after the date of service of the order  These proceedings shall be conducted in accordance with ORS 183 310 to 183 550 without regard to any criminal prosecution or other proceeding  Proceedings to refuse renewal of registration shall not abate the existing registration which shall remain in effect pending the outcome of the administrative hearing

(2) The board may suspend, without an order to show cause, any registration simultaneously

## CONTROLLED SUBSTANCES, EXPERIMENTAL DRUGS; CLEANUP 475.215

with the institution of proceedings under ORS 475.145 or where renewal of registration is refused, if it finds that there is an imminent danger to the public health or safety which warrants this action. The suspension shall continue in effect until the conclusion of the proceedings, including judicial review thereof, unless sooner withdrawn by the board or dissolved by a court of competent jurisdiction. [1977 c.745 §11]

475.160 [Repealed by 1977 c.745 §54]

**475.165 Records of registrants.** Persons registered to manufacture, deliver or dispense controlled substances under ORS 475.005 to 475.285, 475.940 to 475.965 and 475.991 to 475.995 shall keep records and maintain inventories in conformance with the recordkeeping and inventory requirements of federal law and with any additional rules the board issues. [1977 c.745 §12]

### (Records)

**475.175 When order forms required.** Controlled substances in Schedules I and II shall be distributed by a registrant to another registrant only pursuant to an order form. Compliance with the provisions of federal law respecting order forms shall be deemed compliance with this section. [1977 c.745 §13]

**475.185 When prescriptions required.** (1) Except when dispensed directly by a practitioner to an ultimate user, no controlled substance in Schedule II may be dispensed without the written prescription of a practitioner.

(2) In emergency situations, as defined by rule of the board, Schedule II drugs may be dispensed upon oral prescription of a practitioner, reduced promptly to writing and filed by the pharmacy. Prescriptions shall be retained in conformity with the requirements of ORS 475.165. No prescription for a Schedule II substance may be refilled.

(3) Except when dispensed directly by a practitioner to an ultimate user, a controlled substance included in Schedule III, IV or V, which is a prescription drug, shall not be dispensed without a written or oral prescription of a practitioner. The prescription shall not be filled or refilled more than six months after the date on which it was issued and no prescription authorized to be refilled may be refilled more than five times. Additional quantities of the controlled substances listed in Schedule III, IV or V may only be authorized by a practitioner through issuance of a new prescription.

(4) A controlled substance shall not be delivered or dispensed other than for a medical purpose.

(5) Except in good faith and in the course of professional practice only, a practitioner or a pharmacist may not dispense controlled substances.

(6) Any oral prescription authorized by statute or rule shall be reduced promptly to writing and filed by the pharmacy.

(7) Issuance, preparation, labeling, dispensing, recordkeeping and filing of prescriptions or medication orders shall be in conformance with the requirements of the federal law and rules of the board. [1977 c.745 §14, 1979 c.777 §54, 1981 c.666 §7]

**475.190 Exception to prescription requirement.** (1) Notwithstanding the provisions of ORS 475.185, upon registration with the State Board of Pharmacy, a humane society or animal control agency may purchase, possess and, subject to subsection (4) of this section, administer sodium pentobarbital to euthanize injured, sick, homeless or unwanted domestic pets and other animals.

(2) The State Board of Pharmacy, after consultation with the Oregon State Veterinary Medical Examining Board, shall adopt rules according to ORS 183.325 to 183.410 establishing requirements for registration, renewal of registration and revocation or suspension of registration under subsection (1) of this section. Those rules shall include a provision that the State Board of Pharmacy will suspend or revoke the registration of any humane society or animal control agency that allows a person who is not certified under subsection (4) of this section to administer sodium pentobarbital.

(3) Any person who is registered under ORS 475.005 to 475.285, 475.940 to 475.965 and 475.991 to 475.995 to deliver or dispense controlled substances may deliver or dispense sodium pentobarbital to a humane society or animal control agency registered under subsections (1) and (2) of this section.

(4) The Oregon State Veterinary Medical Examining Board, after consultation with the State Board of Pharmacy, shall adopt rules establishing requirements for certification of persons to administer sodium pentobarbital. Those rules may require that a person complete certain educational or training programs in order to be certified. No person shall administer sodium pentobarbital unless the person is certified by the Oregon State Veterinary Medical Examining Board. [1983 c.342 §2]

475.205 [1977 c.745 §24, repealed by 1981 c.666 §11]

### (Miscellaneous)

**475.215 Cooperative arrangements.** The board shall cooperate with federal and other

1077

**475.225**                                    **LIQUOR; DRUGS**

state agencies in discharging its responsibilities concerning traffic in controlled substances and in suppressing the abuse of controlled substances To this end, it may

(1) Arrange for the exchange of information among governmental officials concerning the use and abuse of controlled substances, and

(2) Cooperate in training programs concerning controlled substance law enforcement at local and state levels [1977 c 745 §22]

**475.225 Education and research.** (1) The Mental Health Division of the Department of Human Resources shall carry out educational programs designed to prevent and deter misuse and abuse of controlled substances In connection with these programs it may

(a) Promote better recognition of the problems of misuse and abuse of controlled substances within the regulated industry and among interested groups and organizations,

(b) Assist the regulated industry and interested groups and organizations in contributing to the reduction of misuse and abuse of controlled substances,

(c) Consult with interested groups and organizations to aid them in solving administrative and organizational problems,

(d) Evaluate procedures, projects, techniques and controls conducted or proposed as part of educational programs on misuse or abuse of controlled substances,

(e) Disseminate the results of research on misuse and abuse of controlled substances to promote a better public understanding of what problems exist and what can be done to combat them, and

(f) Assist in the education and training of state and local law enforcement officials in their efforts to control misuse and abuse of controlled substances

(2) The division shall encourage research on the medical use, misuse and abuse of controlled substances In connection with the research, and in furtherance of the enforcement of ORS 475 005 to 475 285, 475 940 to 475 965 and 475 991 to 475 995, it may

(a) Establish methods to assess accurately the physiological, psychological and social effects of controlled substances and identify their medical uses, relative hazard potential, and potential for abuse,

(b) Make studies and undertake programs of research to

(A) Develop new or improved approaches, techniques, systems, equipment and devices to strengthen the enforcement of ORS 475 005 to 475 285, 475 940 to 475 965 and 475 991 to 475 995,

(B) Determine patterns of use, misuse and abuse of controlled substances and the social effects thereof, and

(C) Improve methods for preventing, predicting, understanding and dealing with the misuse and abuse of controlled substances, or

(c) Enter into contracts with public agencies institutions of higher education, and private organizations or individuals for the purpose of conducting research, demonstrations or special projects which bear directly on misuse and abuse of controlled substances

(3) The division may enter into contracts for educational and research activities without performance bonds and without regard to ORS 279 710 to 279 746 [1977 c 745 §25, 1981 c 666 §8]

**(Enforcement)**

**475.235 Burden of proof; liabilities** (1) It is not necessary for the state to negate any exemption or exception in ORS 475 005 to 475 285, 475 940 to 475 965 and 475 991 to 475 995 in any complaint, information, indictment or other pleading or in any trial, hearing or other proceeding under ORS 475 005 to 475 285 475 940 to 475 965 and 475 991 to 475 995 The burden of proof of any exemption or exception is upon the person claiming it

(2) In the absence of proof that a person is the duly authorized holder of an appropriate registration or order form issued under ORS 475 005 to 475 285, 475 940 to 475 965 and 475 991 to 475 995, the person is presumed not to be the holder of the registration or form The burden of proof is upon the person to rebut the presumption [1977 c 745 §23]

**475.245 Conditional discharge for possession as first offense.** Whenever any person who has not previously been convicted of any offense under ORS 475 005 to 475 285, 475 940 to 475 965 and 475 991 to 475 995 or under any statute of the United States or of any state relating to narcotic drugs, marijuana, stimulant, depressant or hallucinogenic drugs, pleads guilty to or is found guilty of possession of a controlled substance under ORS 475 992 (4), the court, without entering a judgment of guilt and with the consent of the accused, may defer further proceedings and place the person on probation Upon violation of a term or condition of probation, the

Case 2:24-cv-00887-JNP-CMR    Document 85-4    Filed 02/05/25    PageID.2371    Page
Appellate Case: 25-4115    Document 26 of 21    Date Filed: 12/11/2025    Page: 103

CONTROLLED SUBSTANCES; EXPERIMENTAL DRUGS; CLEANUP 475.325

court may enter an adjudication of guilt and proceed as otherwise provided Upon fulfillment of the terms and conditions, the court shall discharge the person and dismiss the proceedings against the person Discharge and dismissal under this section shall be without adjudication of guilt and is not a conviction for purposes of this section or for purposes of disqualifications or disabilities imposed by law upon conviction of a crime There may be only one discharge and dismissal under this section with respect to any person [1977 c 745 §21]

**475.255 Status of penalties.** Any penalty imposed for violation of ORS 475 005 to 475 285, 475 940 to 475 965 and 475 991 to 475 995 is in addition to, and not in lieu of, any civil or administrative penalty or sanction otherwise authorized by law [1977 c 745 §18]

**475.265 When prosecution barred.** If a violation of ORS 475 005 to 475 285, 475 940 to 475 965 and 475 991 to 475 995 is a violation of a federal law or the law of another state, a conviction or acquittal under federal law or the law of another state for the same act is a bar to prosecution in this state [1977 c 745 §19]

### (Interpretation; Title)

**475.275 Uniformity of interpretation.** ORS 475 005 to 475 285, 475 940 to 475 965 and 475 991 to 475 995 shall be so applied and construed as to effectuate its general purpose to make uniform the law with respect to the subject of ORS 475 005 to 475 285, 475 940 to 475 965 and 475 991 to 475 995 among those states which enact similar laws [1977 c 745 §28]

**475.285 Short title.** ORS 475 005 to 475 285, 475 940 to 475 965 and 475 991 to 475 995 may be cited as the Uniform Controlled Substances Act [1977 c 745 §29]

### EXPERIMENTAL DRUGS

**475 305 "Experimental drug" defined.** As used in ORS 475 305 to 475 375, "experimental drug" means any drug identified by United States Food and Drug Administration as an investigational new drug except new drug experimentation involving toothpaste, mouthwash, antiperspirant or shampoo [1977 c 636 §1, 1979 c 674 §1]

**475.315 Consent to prescribe or administer experimental drug required.** (1) No person shall prescribe or knowingly administer an experimental drug to another person unless that person obtains prior written consent as provided in ORS 475 325 Written consent shall be indicated on forms prescribed and furnished or approved by the State Board of Pharmacy, provided each form meets the requirements of ORS 475 305 to 475 375

(2) A copy of the signed consent form and any supplemental form shall be sent to the State Board of Pharmacy The board shall keep the copies on file and shall permit examination only by the patient, the physician supervising the administration of the experimental drug and if not specified to the contrary in writing by the patient in so far as the supplemental forms are concerned, to persons acting on behalf of the patient or the physician [1977 c 636 §2 1979 c 674 §2]

**475.325 Who may give consent.** (1) An adult patient may give informed written consent if

(a) No guardian has been appointed for the patient, and

(b) A physician licensed to practice in this state, other than the person proposing to prescribe the experimental drug, certifies that the patient is competent to give informed written consent to the administration of the experimental drug

(2) If an adult patient is not able to give informed written consent under subsection (1) of this section, consent may be given jointly by the guardian and any of the following available relatives of the patient in the order listed

(a) The spouse

(b) A son or daughter who is not a minor

(c) Either parent

(d) A brother or sister who is not a minor

(e) A grandson or granddaughter who is not a minor

(3) If no guardian has been appointed, the available relative in the order listed in subsection (2) of this section alone may provide the written consent required by subsection (2) of this section for the adult patient

(4) If none of the persons specified in subsection (2) of this section can be located after exercise of due diligence, the guardian alone may provide the written consent required by subsection (2) of this section for the adult patient

(5) If the patient is a minor, written consent may be provided by a parent or the guardian of the patient

(6) If a patient is unable to give informed consent personally, and consent is obtained as provided in subsections (2) to (5) of this section, experimental drugs may be administered to the

475.335 LIQUOR; DRUGS

patient only for the purpose of diagnosing, treating or mitigating a disease or injury of the patient [1977 c 636 §3, 1979 c 674 §3]

**475.335 Information to be given to consenting person and relatives.** (1) The patient or any other person providing written consent pursuant to ORS 475 325, before signing the consent form, shall be apprised of the names of manufacturers of the experimental drug and the physician who will supervise its administration and shall be advised of all known medical risks attendant to the use of the experimental drug

(2) If the patient is to sign the consent form personally, the closest available relative of the patient shall be notified of the proposed use of the experimental drug and provided the information required in subsection (1) of this section unless the patient specifically requests by a supplemental form in writing that the relative not be advised of the patient's consent to the proposed use If there is no written objection by the patient to the contrary, the relative shall be given opportunity to consult with the patient before the patient signs the consent form, unless none of the persons specified in ORS 475 325 (2) can be located after the exercise of due diligence

(3) Failure to comply with the provisions of this section shall nullify any consent given pursuant to ORS 475 325 [1977 c 636 §4 1979 c 674 §4]

**475.345 Revocation of consent.** Consent given under ORS 475 325 and any supplemental form filed under ORS 475 335 may be revoked at any time by written communication to the physician supervising the administration of the experimental drug [1977 c 636 §5 1979 c 674 §5]

**475.355 Appraisal of patient condition to be given; other information.** (1) Upon request, the physician supervising the administration of the experimental drug shall provide the patient, if the patient is not a minor, or a parent or the guardian of the patient, if the patient is a minor, with an appraisal of the patient's condition and the effects of the experimental drug upon the patient The physician supervising the administration of the experimental drug shall also provide such information, upon request, to the guardian of an adult patient and to any person having a relationship to the adult patient specified in ORS 475 325 (2) unless the patient has specifically directed in writing that such persons not be notified

(2) Upon request of a patient or a person who provides consent for a patient pursuant to ORS 475 325, any person designated by the patient or person who provides consent shall be notified of the use of the experimental drug and shall be

provided with the information required under ORS 475 335 and subsection (1) of this section [1977 c 636 §6, 1979 c 674 §6]

**475.360 When person prohibited from prescribing experimental drug** A person having any ownership interest in a skilled nursing facility or an intermediate care facility is not authorized to prescribe an experimental drug for a patient in the facility in which the person has the ownership interest [1979 c 674 §10]

**475.365 When certain requirements waived.** The State Board of Pharmacy may waive the disclosure of information requirements set forth in ORS 475 315 (2), 475 335 (2), or ORS 475 355 to a guardian or relative or other person or ORS 475 375 upon a detailed and specific showing by an applicant that compliance therewith would violate specific provisions of the laws or regulations of the United States Nothing in this section is intended to relieve any person of responsibility under ORS 475 315 [1977 c 636 §7 1979 c 674 §7]

**475.375 Persons required to comply with ORS 475.305 to 475.375.** A person who prescribes or administers any new drug labeled by the Federal Drug Administration as being tested for safety solely for investigational use by persons qualified by scientific training and experience to investigate the safety and effectiveness of drugs on humans shall comply with ORS 475 305 to 475 375 which relate to written consent and disclosure of information [1977 c 636 §8 1979 c 674 §8]

### ILLEGAL DRUG CLEANUP

**475.405 Definitions for ORS 475.405 to 475.495.** As used in ORS 475 405 to 475 495

(1) "Chemical" means

(a) Any material defined as a controlled substance or precursor substance as defined by this chapter

(b) Any substance used in the manufacture of a controlled substance as defined by this chapter

(c) Any material or substance designated by the Environmental Quality Commission under ORS 475 425

(2) "Cleanup" includes any action the Department of Environmental Quality, or a person acting on behalf of the department, is required to take pursuant to a request ORS 475 415

(3) "Cleanup costs" means reasonable costs that are attributable to or associated with cleanup at an alleged illegal drug manufacturing site, including but not limited to the costs of administration, investigation, legal or enforcement activities, contracts and health studies

App-5:104

**CONTROLLED SUBSTANCES; EXPERIMENTAL DRUGS; CLEANUP  475.445**

(4) "Commission" means the Environmental Quality Commission

(5) "Department" means the Department of Environmental Quality

(6) "Director" means the Director of the Department of Environmental Quality

(7) "Fund" means the Illegal Drug Cleanup Fund established under ORS 475 495

(8) "Owner or operator" means any person who owns, leases, operates or controls an alleged illegal drug manufacturing site "Owner or operator" does not include a person, who, without participating in the management of an alleged illegal drug manufacturing site, holds indicia of ownership primarily to protect a security interest in the site

(9) "Site" means an illegal drug manufacturing site  [1987 c 699 §1]

Note   475 405 to 475 495 were enacted into law by the Legislative Assembly but were not added to or made a part of ORS chapter 475 or any series therein by legislative action See Preface to Oregon Revised Statutes for further explanation

**475.415 Request for cleanup.** Upon the request of a law enforcement agency, the Department of Environmental Quality may identify, cleanup, store and dispose of chemicals located at an alleged illegal drug manufacturing site  [1987 c 699 §2]

Note   See note under 475 405

**475.425 Environmental Quality Commission rules; designation of chemicals.** (1) The Environmental Quality Commission shall consult with the law enforcement agencies in adopting rules necessary for the Department of Environmental Quality to carry out its responsibilities under ORS 475 415

(2) By rule, the commission may designate as chemical for the purposes of ORS 475 405 to 475 495 any element, compound, mixture or solution that may be a controlled substance or precursor substance as defined by this chapter or used to illegally manufacture drugs  [1987 c 699 §3]

Note   See note under 475 405

**475.435 Authority of director.** (1) Upon request of a law enforcement agency, the director

(a) May undertake directly or by contract any cleanup action necessary to protect the public health, safety, welfare and the environment, or

(b) May authorize any person to carry out any cleanup action in accordance with any requirements of or directions from the director, if the director determines that the person will commence and complete the cleanup action properly

and in a timely manner  However, the director in most circumstances shall not require the law enforcement agency to be responsible for carrying out the cleanup action

(2) Nothing in ORS 475 415 to 475 455, 475 475 and 475 485 shall prevent the director from taking any emergency cleanup action necessary to protect public health, safety, welfare or the environment

(3) The director may require a person liable under ORS 475 455 to conduct any cleanup action or related actions necessary to protect the public health, safety, welfare and the environment  The director's action under this subsection may include but need not be limited to issuing an order specifying the cleanup action the person must take

(4) The director may request the Attorney General to bring an action or proceeding for legal or equitable relief, in the circuit court of the county in which the site is located or in Marion County, as may be necessary

(a) To enforce an order issued under subsection (3) of this section, or

(b) To abate any imminent and substantial danger to the public health, safety, welfare or the environment related to a release

(5) Notwithstanding any provision of ORS 183 310 to 183 550, any order issued by the director under subsection (3) of this section shall not be appealable to the commission or subject to judicial review

(6) If any person who is liable under ORS 475 455 fails without sufficient cause to conduct a cleanup action as required by an order of the director, the person shall be liable to the department for the state's cleanup costs and for punitive damages not to exceed three times the amount of the state's cleanup costs

(7) Nothing in this section is intended to interfere with, limit or abridge the authority of the State Fire Marshal or any other state agency or local unit of government relating to an emergency that presents a combustion or explosion hazard  [1987 c 699 §6]

Note·  See note under 475 405

**475.445 Site entry; purposes.** (1) Upon request of a law enforcement agency under ORS 475 415, the department or its authorized representative may enter any alleged illegal drug manufacturing site at any reasonable time to

(a) Sample, inspect, examine and investigate,

(b) Examine and copy records and other information, or

App-5:105

(c) Carry out cleanup action authorized by ORS 475 415 to 475 455, 475 475 and 475 485

(2) If any person refuses to provide information, documents, records or to allow entry under subsection (1) of this section, the department may request the Attorney General to seek from a court of competent jurisdiction an order requiring the person to provide such information, documents, records or to allow entry [1987 c 699 §4]

Note  See note under 475 405

**475.455 Liability of certain persons for cleanup costs.** (1) The following persons shall be strictly liable for those cleanup costs incurred by the state or any other person that are attributable to or associated with an alleged illegal drug manufacturing site and for damages for injury to or destruction of any natural resources caused by chemicals at the site

(a) Any owner or operator at or during the time of the acts or omissions that resulted in a site being created or damage to natural resources

(b) Any owner or operator who became the owner or operator after the time of the acts or omissions that resulted in a site being created or damages, and who knew or reasonably should have known of the site or damages when the person first became the owner or operator

(c) Any owner or operator who obtained actual knowledge of the site or damages during the time the person was the owner or operator of the site and then subsequently transferred ownership or operation of the site to another person without disclosing such knowledge

(d) Any person who, by any acts or omissions, caused, contributed to or exacerbated the site or damage, unless the acts or omissions were in material compliance with applicable laws, standards, regulations, licenses or permits

(e) Any person who unlawfully hinders or delays entry to, investigation of or cleanup action at a site

(2) Except as provided in paragraphs (b) to (e) of subsection (1) of this section and subsection (4) of this section, the following persons shall not be liable for cleanup costs incurred by the state or any other person that are attributable to or associated with a site, or for damages for injury to or destruction of any natural resources caused by chemicals at the site

(a) Any owner or operator who became the owner or operator after the time of the acts or omissions that resulted in the site being created or damages, and who did not know and reasonably should not have known of the damages when the person first became the owner or operator

(b) Any owner or operator of property that was contaminated by the migration of chemicals from real property not owned or operated by the person

(c) Any owner or operator at or during the time of the acts or omissions that resulted in the site or damages, if the site or damage at the site was caused solely by one or a combination of the following

(A) An act of God "Act of God" means an unanticipated grave natural disaster or other natural phenomenon of an exceptional, inevitable and irresistible character, the effects of which could not have been prevented or avoided by the exercise of due care or foresight

(B) An act of war

(C) Acts or omissions of a third party, other than an employe or agent of the person asserting this defense, or other than a person whose acts or omissions occur in connection with a contractual relationship, existing directly or indirectly, with the person asserting this defense  As used in this subparagraph, "contractual relationship" includes but is not limited to land contracts, deeds or other instruments transferring title or possession

(3) Except as provided in paragraphs (c) to (e) of subsection (1) of this section or subsection (4) of this section, the following persons shall not be liable for cleanup costs incurred by the state or any other person that are attributable to or associated with an alleged illegal drug manufacturing site, or for damages for injury to or destruction of any natural resources caused by chemicals at the site

(a) A unit of state or local government that acquired ownership or control of a site in the following ways

(A) Involuntarily by virtue of its function as sovereign, including but not limited to escheat, bankruptcy, tax delinquency or abandonment, or

(B) Through the exercise of eminent domain authority by purchase or condemnation

(b) A person who acquired a site by inheritance or bequest

(4) Notwithstanding the exclusions from liability provided for specified persons in subsections (2) and (3) of this section, such persons shall be liable for cleanup costs incurred by the state or any other person that are attributable to or associated with a site, and for damages for injury to or destruction of any natural resources caused by chemicals at a site, to the extent that the person's acts or omissions contribute to such costs or damages, if the person

(a) Obtained actual knowledge of the chemicals at a site or damages and then failed to promptly notify the department and exercise due care with respect to the chemicals concerned taking into consideration the characteristics of the chemicals in light of all relevant facts and circumstances or

(b) Failed to take reasonable precautions against the reasonably foreseeable acts or omissions of a third party and the reasonably foreseeable consequences of such acts or omissions

(5)(a) No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer from any person who may be liable under this section, to any other person, the liability imposed under this section Nothing in this section shall bar any agreement to insure, hold harmless or indemnify a party to such agreement for any liability under this section

(b) A person who is liable under this section shall not be barred from seeking contribution from any other person for liability under this section

(c) Nothing in ORS 475 415 to 475 455 475 475 and 475 485 shall bar a cause of action that a person liable under this section or a guarantor has or would have by reason of subrogation or otherwise against any person

(d) Nothing in this section shall restrict any right that the state or any person might have under federal statute, common law or other state statute to recover cleanup costs or to seek any other relief related to the cleanup of an alleged illegal drug manufacturing site

(6) To establish, for purposes of paragraph (b) of subsection (1) of this section or paragraph (a) of subsection (2) of this section, that the person did or did not have reason to know, the person must have undertaken, at the time of acquisition, all appropriate inquiry into the previous ownership and uses of the property consistent with good commercial or customary practice in an effort to minimize liability

(7)(a) Except as provided in paragraph (b) of this subsection, no person shall be liable under ORS 475 415 to 475 455, 475 475 and 475 485 for costs or damages as a result of actions taken or omitted in the course of rendering care, assistance or advice in accordance with rules adopted by the commission or at the direction of the department or its authorized representative, with respect to an incident creating a danger to public health, safety, welfare or the environment as a result of any cleanup of a site This paragraph shall not preclude liability for costs or damages as

the result of negligence on the part of such person

(b) No state or local government shall be liable under this section for costs or damages as a result of actions taken in response to an emergency created by the chemicals at or generated by or from a site owned by another person This paragraph shall not preclude liability for costs or damages as a result of gross negligence or intentional misconduct by the state or local government For the purpose of this paragraph, reckless, wilful or wanton misconduct shall constitute gross negligence

(c) This subsection shall not alter the liability of any person covered by subsection (1) of this section  [1987 c 699 §5]

Note  See note under 475 405

**475.465 Liability of state for cleanup.** Notwithstanding any other provision of law, the State of Oregon, the Environmental Quality Commission and the Department of Environmental Quality and their officers, employes and agents shall not be liable to a person possessing or owning chemicals located at an alleged illegal drug manufacturing site for any claims or actions arising from the identification, cleanup, storage or disposal of such chemicals by the Department of Environmental Quality  [1987 c 699 §10]

Note  See note under 475 405

**475.475 Department record of costs; collection of costs.** (1) The department shall keep a record of the state's cleanup costs

(2) Based on the record compiled by the department under subsection (1) of this section, the department shall require any person liable under ORS 475 435 or 475 455 to pay the amount of the state's cleanup costs and, if applicable, punitive damages

(3) If the state's cleanup costs and punitive damages are not paid by the liable person to the department within 45 days after receipt of notice that such costs and damages are due and owing, the Attorney General, at the request of the director, shall bring an action in the name of the State of Oregon in a court of competent jurisdiction to recover the amount owed, plus reasonable legal expenses

(4) All moneys received by the department under this section shall be deposited in the Illegal Drug Cleanup Fund established under ORS 475 495  [1987 c 699 §7]

Note  See note under 475 405

**475.485 Costs and penalties as lien; enforcement of lien.** (1) All of the state's

App-5:107

cleanup costs, penalties and punitive damages for which a person is liable to the state under ORS 475 435 or 475 455 shall constitute a lien upon any real and personal property owned by the person

(2) At the department's discretion, the department may file a claim of lien on real property or a claim of lien on personal property The department shall file a claim of lien on real property to be charged with a lien under this section with the recording officer of each county in which the real property is located and shall file a claim of lien on personal property to be charged with a lien under this section with the Secretary of State The lien shall attach and become enforceable on the day of such filing The lien claim shall contain

(a) A statement of the demand,

(b) The name of the person against whose property the lien attaches,

(c) A description of the property charged with the lien sufficient for identification, and

(d) A statement of the failure of the person to conduct cleanup action and pay penalties and damages as required

(3) The lien created by this section may be foreclosed by a suit on real and personal property in the circuit court in the manner provided by law for the foreclosure of other liens

(4) Nothing in this section shall affect the right of the state to bring an action against any person to recover all costs and damages for which the person is liable under ORS 475 435 or 475 455

(5) A lien created under this section shall have priority over any claim of the state under ORS 166 715 to 166 735 or any local government forfeiture ordinance or regulation [1987 c 699 §8]

Note  See note under 475 405

**475.495 Illegal Drug Cleanup Fund; sources; uses** (1) The Illegal Drug Cleanup Fund is established separate and distinct from the General Fund in the State Treasury

(2) The following moneys shall be deposited into the State Treasury and credited to the Illegal Drug Cleanup Fund

(a) Moneys recovered or otherwise received from responsible parties for cleanup costs,

(b) Moneys received from a state agency, local government unit or any agency of a local government unit for cleanup of illegal drug manufacturing sites,

(c) Moneys received from the federal government for cleanup of illegal drug manufacturing sites, and

(d) Any penalty, fine or punitive damages recovered under ORS 475 435, 475 455 or 475 485

(3) The State Treasurer may invest and reinvest moneys in the Illegal Drug Cleanup Fund in the manner provided by law

(4) The moneys in the Illegal Drug Cleanup Fund are appropriated continuously to the department to be used as provided for in subsection (5) of this section

(5) Moneys in the Illegal Drug Cleanup Fund may be used for the following purposes

(a) Payment of the state's cleanup costs, and

(b) Funding any action or activity authorized by ORS 475 415 to 475 455, 475 475 and 475 485 [1987 c 699 §9]

Note  See note under 475 405

475 505 [1979 c 253 §1  repealed by 1987 c 75 §1]

475 510 [1979 c 253 §2  repealed by 1987 c 75 §1]

475 515 [1979 c 253 §3  repealed by 1987 c 75 §1]

475 610  [1955 c 573 §2  1957 c 587 §9  repealed by 1959 c 411 §2 (475 615 enacted in lieu of 475 610)]

475 615 [1959 c 411 §3 (enacted in lieu of 475 610) repealed by 1977 c 745 §54]

475 620  [1955 c 573 §3  1957 c 587 §10  repealed by 1959 c 411 §4 (475 625 enacted in lieu of 475 620)]

475 625  [1959 c 411 §5 (enacted in lieu of 475 620) 1963 c 137 §2, 1969 c 310 §2  repealed by 1971 c 743 §432]

475 630  [1955 c 573 §4, repealed by 1959 c 411 §6 (475 655 enacted in lieu of 475 630)]

475 635  [1959 c 411 §11 (enacted in lieu of 475 650), 1969 c 310 §3  repealed by 1971 c 743 §432]

475 640  [1955 c 573 §5, repealed by 1959 c 411 §8 (475 665 enacted in lieu of 475 640)]

475 645 [1959 c 411 §21 (enacted in lieu of 475 700), 1969 c 391 §15  1971 c 743 §380  1973 c 697 §20  1977 c 745 §41, repealed by 1977 c 871 §29]

475 650  [1955 c 573 §6  repealed by 1959 c 411 §10 (475 635 enacted in lieu of 475 650)]

475 655  [1959 c 411 §7 (enacted in lieu of 475 630) 1963 c 137 §3  1971 c 743 §381  repealed by 1973 c 697 §21]

475 660  [1955 c 573 §7  repealed by 1959 c 411 §12 (475 675 enacted in lieu of 475 660)]

475 665 [1959 c 411 §9 (enacted in lieu of 475 640) 1971 c 743 §382, 1973 c 697 §17, 1977 c 745 §42  repealed by 1977 c 871 §29]

475 670  [1955 c 573 §8  repealed by 1959 c 411 §14 (475 705 enacted in lieu of 475 670)]

475 675 [1959 c 411 §13 (enacted in lieu of 475 660), 1969 c 638 §2  1973 c 697 §18  repealed by 1977 c 871 §29]

475 680  [1955 c 573 §§9 13  repealed by 1959 c 411 §16 (475 685 enacted in lieu of 475 680)]

475 685 [1959 c 411 §17 (enacted in lieu of 475 680) 1973 c 697 §15 repealed by 1977 c 871 §29]

475 690 [1955 c 573 §9 repealed by 1959 c 411 §18 (475 695 enacted in lieu of 475 690)]

475 695 [1959 c 411 §19 (enacted in lieu of 475 690) 1973 c 697 §16 1977 c 745 §48 repealed by 1977 c 871 §29]

475 700 [1955 c 573 §10 repealed by 1959 c 411 §20 (475 645 enacted in lieu of 475 700)]

475 705 [1959 c 411 §15 (enacted in lieu of 475 670), 1969 c 638 §3, 1973 c 697 §19 1977 c 745 §49 repealed by 1977 c 871 §29]

475 710 [1955 c 573 §11 repealed by 1959 c 411 §22]

475 715 [1969 c 442 §1, renumbered 430 560]

475 720 [1955 c 573 §12 repealed by 1959 c 411 §22]

475 725 [1969 c 442 §2 renumbered 430 565]

475 730 [1955 c 573 §13 repealed by 1959 c 411 §22]

475 732 [1973 c 697 §12 repealed by 1977 c 745 §54 and 1977 c 871 §29]

475 740 [1955 c 573 §1, repealed by 1959 c 411 §22]

475 742 [1973 c 697 §14, repealed by 1977 c 871 §29]

475 750 [1955 c 573 §3, repealed by 1959 c 411 §22]

## HYPODERMIC DEVICES

**475.805 Providing hypodermic device to minor prohibited; exception.** (1) No person shall sell or give a hypodermic device to a minor unless the minor demonstrates a lawful need therefor by authorization of a physician, parent or legal guardian or by other means acceptable to the seller or donor

(2) As used in this section, "hypodermic device" means a hypodermic needle or syringe or medication packaged in a hypodermic syringe or any instrument adapted for the subcutaneous injection of a controlled substance as defined in ORS 475 005 [1983 c 738 §1]

## PRECURSOR SUBSTANCES

**475.940 Precursor substances described; certain compounds containing ephedrine exempted.** This section establishes, for purposes of ORS 475 950 and 475 955, substances that are precursor substances The following are precursor substances

(a) Phenyl-2-propanone. Phenylacetone

(b) Methylamine in either gas or water solution

(c) D-lysergic acid

(d) Ergotamine tartrate

(e) Diethyl Malonate

(f) Malonic acid

(g) Ethyl Malonate

(h) Barbituric acid

(i) Piperidine

(j) N-acetylanthranilic acid

(k) Ethylamine

(L) Pyrolidine

(m) Phenylacetic acid

(n) Anthranilic acid

(o) Morpholine

(p) L-Ephedrine

(q) DL-Ephedrine

(r) Any substance established as a precursor substance by rule under authority granted in ORS 475 945

(2) Any combination or compound containing ephedrine, or any of its salts or isomers, which is prepared for over-the-counter sale not otherwise prohibited by law is not a precursor substance for the purpose of subsection (1) of this section [1987 c 657 §§3, 3a]

**475 945 Authority and duties of Department of State Police.** This section grants authority to and establishes duties of the Department of State Police in relation to the requirements concerning precursor substances under ORS 475 940 (1), 475 950 and 475 955 The following are applicable as described

(1) The department may adopt rules in accordance with ORS 183 310 to 183 550 that add substances to those specifically enumerated in ORS 475 940 (1) if the substance is a precursor to a controlled substance Similarly, the department may delete such substances as it has added by administrative rule

(2) Notwithstanding the time period established for reporting under ORS 475 950, the department may authorize the submission of such reports on a monthly basis with respect to repeated, regular transactions between the furnisher and recipient involving the same substance if the department determines that all of the following exist

(a) A pattern of regular supply of such substance exists as between the manufacturer, wholesaler, retailer or other person who sells, transfers or otherwise furnishes such substance and the recipient of the substance

(b) The recipient has established a record of use of the substance for lawful purposes

(3) The department shall establish a common reporting form for purposes of ORS 475 950 The department may include as information required

475.950                               LIQUOR, DRUGS

to be reported on the form any information the department determines will be convenient or useful to police agencies in finding potentially illegal uses of precursor substances. The reporting form shall require at least the following information

(a) The name of the substance

(b) The quantity of the substance sold transferred or furnished

(c) The date the substance was sold, transferred or furnished

(d) The name and address of the person buying or receiving the substance accompanied by a verification of the person's identification by means the department requires by rule

(e) The name and address of the person selling, transferring or furnishing the substance accompanied by a verification of the person's identification by means the department requires by rule

(f) The name of any agent acting on behalf of any party to the transaction accompanied by a verification of the person's identification by means the department requires by rule

(4) The department shall establish a common reporting form for purposes of ORS 475 955 The department may include as information required to be reported on the form any information the department determines will be convenient or useful to police agencies in finding potentially illegal uses of precursor substances The reporting form shall require at least the following information

(a) The name of the person making the report

(b) The name of the common carrier or person who transports the substance and date of shipment of the substance

(c) The date and circumstances of discovering the loss, theft or discrepancy

(5) The department shall furnish a copy of the report to the local law enforcement agency in whose jurisdiction the transaction occurred [1987 c 657 §6]

### PENALTIES

**475.950 Penalty for failure to report precursor substance.** (1) A person commits the offense of failure to report a precursor substances transaction if the person does any of the following

(a) Sells, transfers or otherwise furnishes any precursor substance described in ORS 475 940 (1)

and does not, at least three days before delivery of the substance, submit to the Department of State Police a report that meets the reporting requirements established by rule under ORS 475 945

(b) Receives any precursor substance described in ORS 475 940 (1) and does not, within 10 days after receipt of the substance, submit to the Department of State Police a report that meets the reporting requirements established by rule under ORS 475 945

(2) This section does not apply to any of the following

(a) Any pharmacist or other authorized person who sells or furnishes a substance described under ORS 475 940 (1) upon the prescription of a physician, dentist, podiatrist or veterinarian

(b) Any practitioner, as defined in ORS 475 005, who administers or furnishes a substance described under ORS 475 940 (1) to patients upon prescription

(c) Any person licensed by the Board of Pharmacy who sells, transfers or otherwise furnishes a substance described under ORS 475 940 (1) to a licensed pharmacy, physician, dentist, podiatrist or veterinarian for distribution to patients upon prescription

(d) Any person who is authorized by rule under ORS 475 945 to report in an alternate manner if the person complies with the alternate reporting requirements

(e) Any patient of a practitioner, as defined in ORS 475 005, who obtains a substance described under ORS 475 940 (1) from a licensed pharmacist, physician, dentist, podiatrist or veterinarian pursuant to a prescription

(3) Penalties related to providing false information on a report required under this section are provided under ORS 475 965

(4) The offense described in this section, failure to report a precursor substances transaction, is a Class A misdemeanor [1987 c 657 §2]

**475.955 Penalty for failure to report missing precursor substances** (1) A person commits the offense of failure to report missing precursor substances if the person

(a) Is a licensee or other person regulated by the provisions of ORS 475 005 to 475 285 and 475 940 to 475 965,

(b) Discovers any theft or loss of any precursor substance described under ORS 475 940 (1) or any difference between the quantity received and the quantity shipped, and

(c) Within three days after discovery of the theft or loss or actual knowledge of the discrep-

App-5:110

ancy, does not report the theft, loss or discrepancy to the Department of State Police in the manner provided by rule adopted under ORS 475 945

(2) Penalties for providing false information on any report required under this section are provided under ORS 465 965

(3) The offense described in this section, failure to report missing precursor substances, is a Class A misdemeanor [1987 c 657 §4]

**475.960 Penalty for illegally selling drug equipment.** (1) A person commits the offense of illegally selling drug equipment if the person sells any substance, article, apparatus or device with knowledge that the substance, article, apparatus or device will be used to manufacture, compound, convert, process or prepare a controlled substance for unlawful sale or distribution

(2) The offense described in this section, illegally selling drug equipment, is a Class A misdemeanor [1987 c 657 §5]

**475.965 Penalty for providing false information on precursor substances report** (1) A person commits the offense of providing false information on a precursor substances report if the person knowingly provides false information in any report required under ORS 475 950 or 475 955

(2) The offense described in this section, providing false information on a precursor substances report, is a Class A misdemeanor [1987 c 657 §7]

475 990 [1957 c 587 §11  1969 c 310 §4, repealed by 1977 c 745 §45]

**475.991 Penalty for unlawful delivery of imitation controlled substance.** (1) A person commits the crime of unlawful delivery of an imitation controlled substance if the person knowingly

(a) Delivers, other than by administering or dispensing, a substance that is not a controlled substance upon the express or implied representation that the substance is a controlled substance, or

(b) Delivers a substance that is not a controlled substance upon the express or implied representation that the substance is of such nature or appearance that the recipient of the delivery will be able to distribute the substance as a controlled substance

(2) As used in this section, "deliver" or "delivery" means the actual or constructive transfer, or offer or agreement to transfer, from one person to another of a substance, whether or not there is an agency relationship

(3) Unlawful delivery of an imitation controlled substance is a Class A misdemeanor [1981 c 859 §2]

**475 992 Prohibited acts generally, penalties.** (1) Except as authorized by ORS 475 005 to 475 285, 475 940 to 475 965 and 475 991 to 475 995, it is unlawful for any person to manufacture or deliver a controlled substance Any person who violates this subsection with respect to

(a) A controlled substance in Schedule I, is guilty of a Class A felony

(b) A controlled substance in Schedule II, is guilty of a Class B felony

(c) A controlled substance in Schedule III, is guilty of a Class C felony

(d) A controlled substance in Schedule IV, is guilty of a Class B misdemeanor

(e) A controlled substance in Schedule V, is guilty of a Class C misdemeanor

(2) Notwithstanding the placement of marijuana in a schedule of controlled substances under ORS 475 005 to 475 285 and 475 940 to 475 965

(a) Any person who delivers marijuana for consideration is guilty of a Class B felony

(b) Any person who delivers, for no consideration, less than one avoirdupois ounce of the dried leaves, stems and flowers of the plant Cannabis family Moraceae is guilty of a Class A misdemeanor, except that any person who delivers, for no consideration, less than five grams of the dried leaves, stems and flowers of the plant Cannabis family Moraceae is guilty of a violation, punishable by a fine of not more than $100

(3) Except as authorized in ORS 475 005 to 475 285, 475 940 to 475 965 and 475 991 to 475 995, it is unlawful for any person to create or deliver a counterfeit substance Any person who violates this subsection with respect to

(a) A counterfeit substance in Schedule I, is guilty of a Class A felony

(b) A counterfeit substance in Schedule II, is guilty of a Class B felony

(c) A counterfeit substance in Schedule III, is guilty of a Class C felony

(d) A counterfeit substance in Schedule IV, is guilty of a Class B misdemeanor

(e) A counterfeit substance in Schedule V, is guilty of a Class C misdemeanor

(4) It is unlawful for any person knowingly or intentionally to possess a controlled substance unless the substance was obtained directly from, or pursuant to, a valid prescription or order of a

App-5:111

475 993                                     LIQUOR; DRUGS

practitioner while acting in the course of professional practice, or except as otherwise authorized by ORS 475 005 to 475 285, 475 940 to 475 965 and 475 991 to 475 995  Any person who violates this subsection with respect to

(a) A controlled substance in Schedule I, is guilty of a Class B felony

(b) A controlled substance in Schedule II, is guilty of a Class C felony

(c) A controlled substance in Schedule III, is guilty of a Class A misdemeanor

(d) A controlled substance in Schedule IV, is guilty of a Class C misdemeanor

(e) A controlled substance in Schedule V, is guilty of a violation

(f) Notwithstanding the placement of marijuana in a schedule of controlled substances under ORS 475 005 to 475 285 and 475 940 to 475 965, any person who knowingly or intentionally is in unlawful possession of less than one avoirdupois ounce of the dried leaves, stems and flowers of the plant Cannabis family Moraceae is guilty of a violation, punishable by a fine of not more than $100  [1977 c 745 §15  1979 c 777 §55]

**475.993 Prohibited acts for registrants, penalties.** (1) It is unlawful for any person

(a) Who is subject to ORS 475 045, 475 095 and 475 125 to 475 185 to deliver or dispense a controlled substance in violation of ORS 475 185,

(b) Who is a registrant, to manufacture a controlled substance not authorized by this registration, or to deliver or dispense a controlled substance not authorized by the registration to another registrant or other authorized person,

(c) To refuse or fail to make, keep or furnish any record, notification, order form, statement, invoice or information required under ORS 475 005 to 475 285, 475 940 to 475 965 and 475 991 to 475 995,

(d) To refuse an entry into any premises for any inspection authorized by ORS 475 005 to 475 285, 475 940 to 475 965 and 475 991 to 475 995, or

(e) To keep or maintain any store, shop, warehouse, dwelling, building, vehicle, boat, aircraft or other structure or place, while knowingly permitting persons to use controlled substances in such places in violation of ORS 475 005 to 475 285, 475 940 to 475 965 and 475 991 to 475 995, or which is used for keeping or selling them in violation of ORS 475 005 to 475 285, 475 940 to 475 965 and 475 991 to 475 995

(2) Any person who violates this section with respect to

(a) A controlled substance in Schedule I, is guilty of a Class C felony

(b) A controlled substance in Schedule II, is guilty of a Class A misdemeanor

(c) A controlled substance in Schedule III, is guilty of a Class B misdemeanor

(d) A controlled substance in Schedule IV or V, is guilty of a Class C misdemeanor  [1977 c 745 §16]

**475.994 Prohibited acts involving records and fraud; penalties.** (1) It is unlawful for any person knowingly or intentionally

(a) To deliver as a registrant a controlled substance classified in Schedule I or II, except pursuant to an order form as required by ORS 475 175,

(b) To use in the course of manufacture or delivery of a controlled substance a registration number which is fictitious, revoked, suspended or issued to another person,

(c) To acquire or obtain possession of a controlled substance by misrepresentation, fraud, forgery, deception or subterfuge,

(d) To furnish false or fraudulent material information in, or omit any material information from, any application, report, record or other document required to be kept or filed under ORS 475 005 to 475 285, 475 940 to 475 965 and 475 991 to 475 995, or

(e) To make, deliver or possess any punch, die, plate, stone or other thing designed to print, imprint or reproduce the trademark, trade name or other identifying mark, imprint or device of another or any likeness of any of the foregoing upon any drug or container or labeling thereof so as to render the drug a counterfeit substance

(2) Any person who violates this section is guilty of a Class A misdemeanor  [1977 c 745 §17]

**475.995 Penalties for distribution to minors.** Except as authorized by ORS 475 005 to 475 285, 475 940 to 475 965 and 475 991 to 475 995, it is unlawful for any person to deliver a controlled substance to a person under 18 years of age  Any person who violates this section with respect to

(1) A controlled substance in Schedule I or II, is guilty of a Class A felony

(2) A controlled substance in Schedule III, is guilty of a Class B felony

1088

App-5:112

CONTROLLED SUBSTANCES; EXPERIMENTAL DRUGS; CLEANUP 475.997

(3) A controlled substance in Schedule IV, is guilty of a Class A misdemeanor

(4) A controlled substance in Schedule V, is guilty of a Class B misdemeanor

(5) Notwithstanding the placement of marijuana in a schedule of controlled substances under ORS 475 005 to 475 285 and 475 940 to 475 965, and notwithstanding ORS 475 992 (2), delivery of marijuana to a minor is a Class A felony if

(a) The defendant is 18 years of age or over, and

(b) The conviction is for delivery of marijuana to a person under 18 years of age who is at least three years younger than the defendant [1977 c 745 §20  1979 c 777 §56]

**475.997 Penalty for violation of ORS 475.305 to 475.375.** Any intentional violation of any provision of ORS 475 305 to 475 375 is a Class A misdemeanor  [1977 c 636 §9]

1089

App-5:113

LIQUOR; DRUGS

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BRIDGER LEE JENSEN, SINGULARISM, and PSYCHE HEALING AND BRIDGING,<br><br>Plaintiffs,<br><br>v.<br><br>UTAH COUNTY, PROVO CITY, JEFFREY GRAY, TROY BEEBE, BRIAN WOLKEN, and JACKSON JULIAN,<br><br>Defendants. | **CERTIFICATION UNDER 28 U.S.C. § 2403**<br><br>Case No. 2:24-cv-00887-JNP-CMR<br><br>District Judge Jill N. Parrish |

As required by 28 U.S.C. § 2403, the court certifies to the Attorney General of Utah the fact that the constitutionality of the Utah Controlled Substances Act as applied to Plaintiffs Bridger Lee Jensen, Singularism, and Psyche Healing and Bridging has been challenged in this action.

To provide some background, Plaintiffs are members and affiliates of a new religion called Singularism, which relies on psylocibin mushrooms to encounter the Divine during religious ceremonies. Psylocibin is a Schedule I controlled substance. When Plaintiff Bridger Lee Jensen founded Singularism in November 2023, he notified Utah County and Provo City about his religion's sincere use of psylocibin. For one year, the government took no action. In November 2024, Provo City officers executed a search warrant at Singularism's location. During the search, Jensen forthrightly directed the officers to Singularism's stock of psylocibin mushrooms and attempted to explain how Singularism used them in religious ceremonies. The officers seized the

mushrooms (along with Singularism's sacred scripture, its records of religious ceremonies), and the government threatened criminal charges against Jensen.

Plaintiffs then filed suit in Utah state court against Utah County, Provo City, and several government officials, seeking a temporary restraining order and preliminary injunction to require return of the mushrooms and scripture. Their motion invoked the Free Exercise Clause of the First Amendment to the U.S. Constitution, the free exercise clause of the Utah constitution, and the Utah Religious Freedom Restoration Act ("RFRA"), UTAH CODE ANN. § 63G-33-201. The government Defendants removed the case to federal court on November 27.

On December 13, the court held an evidentiary hearing on Plaintiffs' motion for a temporary restraining order. At the hearing, Plaintiffs presented the testimony of several witnesses, including Jensen, to establish that they used psylocibin mushrooms for sincere, religious purposes and that the law banning psylocibin imposed a substantial burden on their religious exercise. Defendants' entire presentation challenged the sincerity of Plaintiffs' religious beliefs.

The court found Plaintiffs' witnesses credible and ruled that Plaintiffs had shown a likelihood of success on their claim under the Utah RFRA. Accordingly, the court entered a limited temporary restraining order requiring Defendants to return the psylocibin mushrooms and records as soon as practicable (though the court ended up staying the portion of the order requiring return of the mushrooms). Five days later, the government instituted criminal charges against Mr. Jensen in state court for violation of the Controlled Substances Act, and Defendants filed a motion to dismiss Plaintiffs' claims. Plaintiffs filed a motion for anti-suit injunction against the state-court prosecution.

On January 23, the court heard argument on Defendants' motion to dismiss, Plaintiffs' pending motion for preliminary injunction, and Plaintiffs' motion for anti-suit injunction. The

court ordered supplemental briefing on several legal and factual questions. In their supplemental brief, Defendants observed that neither Plaintiffs nor the court had provided the Attorney General notice of Plaintiffs' constitutional challenge to the Utah Controlled Substances Act as required by Rule 5.1 of the Federal Rules of Civil Procedure and 28 U.S.C. § 2403. The court ordered Plaintiffs to provide notice under Rule 5.1(a), and the court now provides this notice under Rule 5.1(b) and § 2403.

If the Attorney General wishes to intervene to present evidence or argument, he must do so no later than **60 days** from the date of this certification. The clerk of court is **ORDERED** to send this certification to the Attorney General.


Signed February 10, 2025.

BY THE COURT

Jill N. Parrish
United States District Court Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BRIDGER LEE JENSEN, SINGULARISM, and PSYCHE HEALING AND BRIDGING,<br><br>Plaintiffs,<br><br>v.<br><br>UTAH COUNTY, PROVO CITY, and JEFFREY GRAY,<br><br>Defendants. | **ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**<br><br>Case No. 2:24-cv-00887-JNP-CMR<br><br>District Judge Jill N. Parrish |

Our nation was built on an "essential commitment to religious freedom." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 524 (1993). As the Supreme Court has repeatedly recognized, this guarantee of religious liberty "lies at the heart of our pluralistic society." *Bostock v. Clayton County*, 590 U.S. 644, 681 (2020). The Religion Clauses of the First Amendment provide the basic guarantee of religious freedom for our nation. U.S. CONST. amend. I ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."). Many States have enacted special laws modeled on the federal Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb et seq., to provide additional protections for religious exercise. *See* Christopher C. Lund, *Religious Liberty After* Gonzales*: A Look at State RFRAs*, 55 S.D. L. REV. 466, 469–79 (2010) (summarizing the history of the enactment of these laws). Utah passed its version of RFRA just last year. UTAH CODE ANN. § 63G-33-201; *see* Katie McKellar, *Utah Legislature Passes Bill to Codify State Version of Religious Freedom Restoration Act*, UTAH NEWS DISPATCH (Feb. 22, 2024), https://utahnewsdispatch.com/briefs/utah-religious-

App-5:118

freedom-restoration-act-rfra. Laws like these further instantiate the guarantee of religious freedom so central to our republic. But for that guarantee of religious liberty to mean anything, the laws must protect unfamiliar religions equally with familiar ones, both in design and in practice. In this litigation, the religious-exercise claims of a minority entheogenic religion put the State of Utah's commitment to religious freedom to the test.

Plaintiffs are members and associates of a new religious group called Singularism that uses psilocybin mushrooms in its religious ceremonies. After the government raided their spiritual center in November 2024 and seized their mushrooms and scripture, Plaintiffs filed for a temporary restraining order and preliminary injunction in state court, claiming that the Utah RFRA, Utah constitution, and Federal Constitution protect their use of psilocybin, a psychedelic substance otherwise illegal under the Utah Controlled Substances Act. Defendants then removed the case to federal court.

In December, the court held a full-day evidentiary hearing, determined that Plaintiffs were likely to succeed on the merits of their RFRA claim, and issued a temporary restraining order requiring the government to return the mushrooms and scripture.[1] Five days later, the government filed criminal charges against Plaintiff Bridger Lee Jensen, the founder of Singularism, for possession of psilocybin with intent to distribute, possession of THC, and use or possession of drug paraphernalia. Defendants then moved to dismiss Plaintiffs' federal claims, and Plaintiffs moved for an anti-suit injunction against the state prosecution. Plaintiffs' request for a preliminary injunction remained pending.

---

[1] At Defendants' request, the court stayed the portion of its order requiring return of the psilocybin mushrooms. *See infra* pages 15–16.

The court set aside time in January for a further evidentiary hearing, but the parties stipulated to have the motion for preliminary injunction decided without further live testimony. The court then heard argument on the three pending motions and ordered supplemental briefing on several legal and factual questions. Defendants observed in their supplemental brief that the Attorney General of Utah must be notified when, as here, a litigant challenges the constitutionality of a state statute, but that the Attorney General in this case had not been notified of Plaintiffs' constitutional challenges to the Utah Controlled Substances Act. Accordingly, the court ordered Plaintiffs to send the Attorney General appropriate notice, and the court submitted its own certification of Plaintiffs' constitutional claims to him shortly thereafter. The Attorney General has until April 11, 2025 (60 days from the date of the court's certification), to present evidence or argument on the constitutional questions should he wish to do so.

In the meantime, the court has considered Plaintiffs' claim under the Utah RFRA and now GRANTS Plaintiffs' motion for preliminary injunction. The court will rule on Defendants' motion to dismiss and Plaintiffs' motion for anti-suit injunction in due course.

## FINDINGS OF FACT AND PROCEDURAL BACKGROUND

The following findings of fact are based on the live testimony that the court heard in December, the allegations of the First Amendment Verified Complaint, the declarations, and the several dozen exhibits that the parties have submitted since the case was filed.

### I.    Singularism, Its Origins, Its Beliefs, and Its Practices

Singularism is a religious organization based in Provo City, Utah, whose core mission is alleviating human suffering. Singularism was founded in fall 2023 by Mr. Jensen after years of exploration convinced him that entheogens, specifically psilocybin, could help spiritual seekers more effectively access the Divine. As a clergyman for Singularism, Mr. Jensen makes

entheogenic spiritual experiences accessible to those in Provo and surrounding communities by facilitating psilocybin ceremonies for participants to connect more deeply with themselves and with God. To best understand Singularism's beliefs and religious practices, it first helps to know a little about Mr. Jensen's spiritual journey.

A.    Mr. Jensen's Spiritual Journey

Mr. Jensen grew up in Provo in a devout family belonging to The Church of Jesus Christ of Latter-day Saints. From an early age, he was taught to revere faith and truth and to seek his own spiritual path. This foundation inspired him to explore and question religion and spirituality more deeply, and he yearned for a personal connection with the Divine. During high school, he immersed himself in the religious and intellectual tradition of his upbringing, competing (and winning) in scripture-mastery competitions, attending seminary classes with dedication, and spending long hours conversing with seminary teachers. His experience serving as a missionary for the Church of Jesus Christ of Latter-day Saints helped him develop his spiritual orientation as he found himself gravitating toward leaders who emphasized love, charity, and devotion over discipline and rigidity. Through his father, Mr. Jensen was also introduced to the works of renowned psychologists and philosophers, and found deep connection with ideas like Carl Jung's that strove to integrate science and spirituality. His exploration of other faith traditions like Buddhism, Taoism, and Hinduism further inspired him to bridge mental health and spirituality in his own life. In his mid-20s, he entered a period of agnosticism and stepped away from the faith of his childhood, but his commitment to bridging the two often-separated spheres of science and religion remained strong.

During that period of agnosticism, Mr. Jensen encountered psychedelics for the first time in Peru when he consumed a sacred drink (likely ayahuasca) with Sherpas speaking an ancient Incan language. That night, he experienced a profound vision of unity, love, and divine

connection—precisely the kind of transcendent experience he had wished for as a young boy. Although this experience was transformative, he kept it private and did not use psychedelics for spiritual purposes for almost a decade. His second entheogenic experience came in Hawaii, and this time too he felt an overwhelming sense of unity with the earth, stars, and all of creation. As he described it, "It was as if God's love enveloped me completely, and I wept for the time I had spent in my twenties dismissing religion as a potential human construct." This experience rekindled his faith in God and his desire to fill his life with meaning and purpose.

Around 2019, after more than 16 years as a successful child and family therapist with referrals from across the world, Mr. Jensen found himself disenchanted with traditional therapy and decided to explore entheogenic practices and the academic literature examining them more deeply. He allowed his therapist license to expire because he worried that his spiritual use of psychedelics might conflict with his work as a licensed therapist. The research from institutions like Johns Hopkins University and Harvard Medical School further convinced him that when approached with care and reverence, entheogens could reveal deep spiritual truths and facilitate healing.

Through his own experiences with entheogens, Mr. Jensen perceived an entity he calls the OctoGoddess calling him to help others connect with God. In response to that call, Mr. Jensen founded Singularism in September 2023, combining ancient, mystical traditions with modern, empirically supported methods. He also established the Psychedelic Therapy Academy, a center for training Singularism's prospective facilitators and interested non-affiliates in psychedelic harm reduction.

B.     Singularism's Beliefs

Singularism's central teaching is that we are all one, we are all connected, and we came from a higher power (hence the name Singularism, which suggests a unity with all things). The expectation is that each participant (whom it calls a voyager) will emerge from a psilocybin ceremony feeling a sense of unity with all things, feeling deeply connected with even his enemies and those who have harmed him. That said, Singularism does not itself claim special access to divine truths but instead considers itself religiously inclusive. One does not need to give up any prior religious affiliation to become a voyager or member of Singularism. Unlike religions that prescribe a core set of beliefs or practices for their members, Singularism encourages each voyager to connect with his own beliefs and experience his own spirituality, whether it is walking with Jesus, praying to Allah, or hearing a call from the OctoGoddess. In Singularism's view, everyone can connect with the Divine and receive equally valid revelation because the great spirit of the universe loves everyone equally.

Although one need not participate in the psilocybin ceremonies to be a member of Singularism, the religion does consider psilocybin to play an essential role. As Singularism sees it, we humans are now profoundly deceived about who we are, what our purpose is, and what we desire and need. Psilocybin allows voyagers to temporarily disengage from those deceptions, desires, and needs, and experience sheer consciousness without the burden of their bodies. Although one could perhaps get the same experience through years of dedicated meditation, most people do not have that luxury of time, so psilocybin makes that transformative experience accessible to the average seeker.

Although Mr. Jensen founded Singularism, he is not the prophet of the religion, at least not in the typical sense. Rather, his role is to assist others to access their own spiritual insights through

the psilocybin ceremonies. In a sense, then, each voyager is his own prophet, and the facilitator (the one overseeing the voyager's tea ceremony) serves as a scribe by recording the voyager's insights during the ceremony. These recordings become Singularism's core scripture, primarily for the individual voyager but also collectively insofar as different voyagers' insights reveal common truths about human existence and humanity's place in the world (such as the singularity of the universe). Because Singularism believes that each person can receive divine truths, its leaders generally keep their beliefs and spiritualities private to avoid interfering with other voyagers' understandings of their own journeys.

One scripture included in the religion's articles of belief, though, does come from a revelation that Mr. Jensen received through the OctoGoddess during a voyage. That scripture, called the Octadrant, is an epistemological framework for understanding truth, a resource for ongoing discovery rather than a source of eternal truth. It divides knowledge into eight interconnected perspectives (called octants) by the spectrums of Truth, Verifiability, and Awareness. (Imagine a 3D graph where the x-, y-, and z- axes divide the space into eight regions. Each region is an octant, and each axis is a spectrum.) The eight octants are Knowledge, Faith, Discoverables, Deep Mysteries, Lies, Deceptions, Myths, and the Unimaginables. Knowledge is true, verifiable, and aware (i.e., truth is both provable and consciously understood); Faith is true and aware but unverifiable (i.e., truth resonates deeply with intuition but cannot be empirically validated); and so on. Singularism uses the Octadrant to guide voyagers during their psilocybin ceremonies and explain humanity's place within the cosmic structure.

C.    Singularism's Practices

Singularism's central, most distinctive practice is the psilocybin tea ceremony. Participating in a tea ceremony with Singularism is a multistep process beginning with a rigorous

screening. During the screening, which can last up to two hours, Mr. Jensen (or whoever happens to be conducting the screening) asks detailed questions about the prospective participant's objectives, mental-health history, and medical history. The goal is ensuring physical and psychological readiness—making sure that voyagers participate because of their own sincere desire for a deep spiritual experience and screening them for preexisting conditions or ongoing medications that could interfere with the psilocybin.

Once a prospective voyager has passed the screening, he is ready for a prep session. During a prep session, the voyager discusses his goals for the ceremony, and the facilitator explains what to bring, what to wear, what to eat, and when to fast. The facilitator also asks the voyager to sign a waiver form and then invites him to set out an intention statement for the ceremony. It could something as simple as "acceptance of the unknown" or "reconnection with God." Finally, the voyager "commit[s] to using the wisdom and insights revealed to [hi]m through the sacred ceremonies . . . to create a more enlightened world."

A tea ceremony typically begins late morning, around 9:30 or 10:00. The facilitator brews the tea using psilocybin mushrooms in front of the participant, who then drinks the tea and begins his voyage. A voyage lasts between five and eight hours, and during that time, the facilitator guides the voyager, now playing the role of his own prophet, to discover spiritual insights and records them on a notepad. For example, one voyager revealed, "Why don't I listen to my body. I need to start listening. Why don't you?" These notes then become sacred scripture, and the facilitator meets with the participant post-voyage to reflect on the notes and discuss how he can strengthen the spiritual gifts received during that session. A voyager typically engages in two to four tea ceremonies. (Mr. Jensen himself participates in about four per year.)

8

Other than the tea ceremonies, Singularism's practice includes observing holidays on the solstices. The ceremonies performed on the solstices are meant to call in the spirits of the season, and they do not include the use of entheogens. Singularism also recognizes Christian holidays like Christmas and Easter.

D.      Singularism's Safety Protocols

For Singularism, safety is paramount, and the organization and its leaders have always striven for full transparency with facilitators, participants, and outside entities (including the government). Singularism has never sought to conceal its use of psilocybin, instead viewing its mission as educating a broader audience about the spiritual power of entheogens and making transformative spiritual experiences more accessible to those in the community.

To do so securely, Singularism has implemented several safety measures, beginning with the treatment of its psilocybin mushrooms, which arrive freeze dried from a lab in Oregon after being tested for contaminants. (Psilocybin is legal for therapeutic uses in Oregon.) The mushrooms are used only as a sacrament; they are never sold or otherwise distributed to non-affiliates for recreational purposes. The mushrooms are stored in a locked safe in Singularism's spiritual center, and only Singularism's facilitators have access to them. As mentioned above, each prospective voyager must pass through a rigorous screening process to ensure psychological and physiological fitness for the psilocybin ceremony. The medical portion of the screening is conducted by two or more facilitators, at least one of whom has a medical degree or background in clinical therapy. And the facilitators always brew the tea in front of the voyagers so that the voyagers can rest assured that no other substances go into the tea. Finally, voyagers must agree not to drive themselves on the day of their voyage. Mr. Jensen is present at the center for each voyage even if he is not himself facilitating it.

Even the best safety protocols, however, cannot entirely eliminate the risk of an accident or unexpected reaction. In Singularism's history, one voyager has had an adverse reaction. This particular voyager had successfully participated in one psilocybin ceremony with Singularism, but as she was completing her second one in January 2025, she began to display symptoms of paranoia and mistrust, and demanded to leave Singularism's spiritual center. Singularism deployed its emergency protocol, calling the voyager's emergency contacts (her mother and ex-husband) and ensuring that she received the treatment she needed at the hospital. Mr. Jensen also remained at the spiritual center until the end of the day as required by the protocol in case the voyager returned. While the voyager was in the hospital, Singularism discovered that she had an undisclosed mental-health issue. According to Mr. Jensen, if that issue had been disclosed during the screening process, Singularism likely would not have included the voyager in a psilocybin ceremony. Throughout this process, Singularism maintained its commitment to transparency and safety, and the voyager called the next day to thank Singularism for coordinating her care with her emergency contacts. At no point was the voyager (or anyone else) in physical danger because of the adverse reaction.

E.      Singularism's Impact on Its Participants

Singularism's participants often come to the religion after exhausting conventional treatments like medication or therapy, partly because they seek healing along both the physical and spiritual dimensions. Based on the record in this case so far, voyagers and facilitators describe their experience at Singularism in uniformly positive terms.

Several witnesses testified that Singularism saved their life—literally. For example, Singularism's office manager, Brandi Lee (who is also a facilitator), found Singularism at a time when she was seriously contemplating suicide; she was suffering from an eating disorder, had recently lost her father, lost a brother to suicide, and then learned that her then-husband wanted to

divorce her. She wanted to "find out who [she was], and who [her] highest self [wa]s." She "wanted to find out and connect with God, and . . . the spirits, and [her] ancestors."

The night before her first voyage, Mr. Jensen (who was facilitating the voyage) told her to meditate and read her patriarchal blessing. During that voyage, she found herself laughing for several hours and thereby rediscovered the funny part of herself that she had pushed to the side during her marriage because her husband was supposed to be the funny one. She summarized her spiritual insight as "There you are, Brandi." In subsequent voyages, she found her father and brother at peace, walked alongside Jesus, and embraced Heavenly Mother and Father. In those encounters, Jesus taught her that true spirituality resides within all of us, and Heavenly Mother and Father assured her that they were with her every step of the way in her life journey. As she described her takeaway from these experiences, "[S]pirituality isn't just in a box, in a . . . religious organization . . . . Spirituality is so broad, and I was able to take away that I am special, and that everyone is special, and that we all just need to love each other. That was the answer from Jesus[—]love, just love."

Other witnesses expressed that Singularism had helped them rediscover a faith that they thought they had lost, possibly forever. For instance, Jenna DenBleyker, a facilitator in training, explained that she found Singularism after she grew increasingly disconnected from God and some of the people closest to her. Try as she did, she could not rekindle her faith. That is, until she experienced a psilocybin ceremony. The entheogen "facilitated [the] renewed spiritual connection [that she] had been seeking for decades." She continued, "I was able to experience God not by traveling through space to where I imagined that He resided, but by having him show up in the very air molecules that surrounded me . . . , always near and available to me."

F.        Government Recognition of Singularism's Religious Practices

Two government bodies—the Utah Division of Professional Licensing and Provo City—have already recognized Singularism's religious use of psilocybin. After Mr. Jensen's therapist license had expired, the Division received a complaint that Mr. Jensen was practicing mental-health therapy without a license. Mr. Jensen explained the basics of Singularism and his role in the religion to the Division and asserted that he qualified for the clergy exemption to the licensing requirement. (The clergy exemption allows "a recognized member of the clergy" to provide mental-health therapy, among other kinds of treatment, without a license "while functioning in a ministerial capacity." UTAH CODE ANN. § 58-60-107(2)(b).) The Division's investigator then closed the complaint as unfounded.

Separately, Singularism applied to Provo City for a business license to operate its spiritual center. Religious organizations and non-profit organizations are not required to obtain a license if they conduct their activities wholly for charitable, religious, or non-profit purposes, and the burden rests on the organization claiming the exemption to establish that it is entitled to the exemption. PROVO CITY, UTAH, CITY CODE §§ 6.01.130, .140. Provo City responded to Singularism's application with a letter stating that "churches or religious organizations are not required to obtain a business license to operate . . . for activities directly associated with religious purposes" and closed Singularism's application accordingly.

## II.        Procedural History of This Action

When he founded Singularism and opened the spiritual center in September 2023, Mr. Jensen sent the Provo City Council and Provo City Mayor Michelle Kaufusi a letter "to establish an open line of communication." The letter explained what Singularism is, disclosed its entheogenic religious practices, and invited local government officials to ask any questions they

may have had and to tour Singularism's spiritual center. It concluded, "Singularism is optimistic that through partnership and dialogue, it can foster an environment that respects diversity and upholds individual rights."

The government did not take Singularism up on its invitation. Instead, over a year later on November 11, 2024, officials arrived at the spiritual center to execute a search warrant based largely on the affidavit of an undercover officer who had posed as a prospective Singularism facilitator. The officers came by around five pm so as not to disturb any religious ceremonies and proceeded to search the premises for over an hour and a half. Mr. Jensen, maintaining his stance of full transparency, showed the officers the safe where Singularism kept its psilocybin. They seized the psilocybin, psilocybin paraphernalia, sacred scripture, and a small amount of THC that Mr. Jensen kept there for his own use (Mr. Jensen is also affiliated with the Church of the Native Americans, which uses marijuana as a sacrament). During the search, the officers recommended that Singularism cease its religious practices and told Mr. Jensen to expect criminal charges. Two days later, the Provo City Police Department sent a letter to the landlord of Singularism's spiritual center claiming that Singularism was a drug-distributing nuisance, instructing the landlord to evict Singularism as soon as possible, and threatening civil abatement if the landlord did not comply. The landlord responded saying that Singularism has been an "exemplary tenant[]" and requesting that further action be deferred until Singularism's legal status had been finally adjudicated in the courts. In January 2025, at the hearing on the various motions resolved in this order, Defendant Provo City expressed that it did not intend to follow through on the threat of eviction.

Singularism's leaders were deeply dismayed by the government's response to their new religion—first silence, then a criminal investigation. Mr. Jensen, who is himself from Provo, testified that it was extremely difficult "to be accused of being a nuisance to a city [he]

13

love[s], . . . in a country [he] really love[s]" because of "an involuntary spiritual calling." Although the seizure of the psilocybin sacrament was frustrating, he was "much more concerned" when the officers started taking the scripture—"scripture that [he and others] ha[d] written and worked for years on." Ms. Lee described a "feeling of obviously betrayal and fear, . . . fear [for] all of us[,] . . . [fear] of not being able to practice what [she] believe[s] is a way to help better humanity." Unsurprisingly, the government's actions took a toll on Singularism's strength as a religious organization. Singularism could not pay its employees for at least one month, and Mr. Jensen's disclosures to voyagers about Singularism's legal troubles reduced participation overall.

Given these developments, Singularism (along with Psyche Bridging and Healing, the LLC through which Singularism runs its business operations) and Mr. Jensen filed suit in the Utah County Fourth District Court on November 19, 2024, against Utah County, Provo City, and several individuals, seeking, among other things, (1) a declaratory judgment that Defendants' actions violated their right to free exercise under the First Amendment to the U.S. Constitution; right to be free from unreasonable searches and seizures under the Fourth Amendment to the U.S. Constitution; right to free exercise under article I, section 4 of the Utah constitution; right to be free from unreasonable searches and seizures under article I, section 14 of the Utah constitution; and right to free exercise under the Utah RFRA; and (2) an injunction ordering the government to return the psilocybin, paraphernalia, and sacred scripture, and forbidding the government from interfering with their religious exercise.[2] A few days later, on November 27, Defendants removed the case to this court under 28 U.S.C. §§ 1331, 1441, 1446.

---

[2] Plaintiffs originally sued the following individuals: Jeffrey Gray, the Utah County Attorney; Troy Beebe, the chief of the Provo City Police Department; Brian Wolken, a captain of the Police Department; Jackson Julian, a detective of the Police Department who served as the undercover

On December 13, the court held a full-day evidentiary hearing on Plaintiffs' request for a temporary restraining order and concluded that Plaintiffs were likely to succeed on the merits of their claim that Defendants' actions violated their rights under the Utah RFRA. Under that statute, once a plaintiff shows a substantial burden on sincere religious exercise, the burden shifts to the government to show that the challenged law furthers a compelling state interest using the least restrictive means. UTAH CODE ANN. § 63G-33-201(2), (3). The court found that Plaintiffs were "likely to be able to show a substantial burden on the exercise of their beliefs about ps[i]loc[y]bin, that those beliefs [we]re sincere, and that those beliefs [we]re religious in the way that the law conceptualizes religion." ECF No. 24 ("TRO"), at 2. It also found that "the government ha[d] not shown a compelling interest in prohibiting Singularism from using ps[i]loc[y]bin outright and accordingly ha[d] not carried its burden." *Id.* The court found the other preliminary-relief factors satisfied (irreparable harm and balance of the equities) and therefore issued a temporary restraining order requiring the government to return the seized materials as soon as possible. *Id.* at 3.

Five days later, on December 18, the government filed criminal charges against Mr. Jensen and moved to stay the portion of the temporary restraining order requiring return of the mushrooms. The government argued that it was obligated to retain possession of the mushrooms for the criminal case under Utah's evidence-retention laws. The court, although skeptical of Defendants' argument, granted the motion for a partial stay, reasoning that "the most prudent course" was to err on the side of avoiding premature interference with the pending state

---

officer investigating Singularism; and John Does 1–4, police officers with the Police Department. At the hearing on January 23, 2025, Plaintiffs stated that they did not wish to proceed against any of the individual Defendants except for Jeffrey Gray. *See* ECF No. 83 (First Amended Verified Complaint).

15

prosecution. ECF No. 56 (Order Granting Motion to Stay and Denying Motion for Expedited Discovery), at 5.

Shortly after the government filed criminal charges against Mr. Jensen, Plaintiffs moved for an anti-suit injunction against the state-court prosecution, and Defendants moved to dismiss Plaintiffs' claims. According to Plaintiffs, the criminal case—initiated after this court had issued a temporary restraining order in Plaintiffs' favor—is the government's effort to relitigate in a more favorable forum the same issues presented in this action; so, they request that this court enjoin further proceedings in the state criminal case until the issues in this civil action have been finally resolved. In Defendants' view, the federal claims in Plaintiffs' complaint fail; accordingly, they request the court to dismiss the federal claims and thereafter decline to exercise supplemental jurisdiction over Plaintiffs' state-law claims and remand them to the state court. This court scheduled a two-day evidentiary hearing in January 2025 to hear additional evidence and argument regarding these two motions and Plaintiffs' then-still-pending motion for preliminary injunction.

Soon after Plaintiffs filed their motion for anti-suit injunction and Defendants filed their motion to dismiss, Defendants moved for expedited discovery, claiming that they needed discovery to prepare for the preliminary-injunction portion of the hearing in January. Although their argument was not in theory unreasonable, the court found their discovery requests offensively overbroad. For example, Defendants sought discovery on "each instance where [Mr.] Jensen consumed drugs prohibited by the Controlled Substances Act between 2015 and the present" and "documents sufficient to identify each individual to whom Plaintiffs have administered psilocybin from 2019 to present." ECF No. 4 (Motion for Expedited Discovery), at 4, 6. That is, Defendants' requests concerned criminal conduct far in the past and effectively demanded Singularism to disclose the identities of all individuals who had affiliated with the religion. In the court's view, "the sheer

breadth of the requests strongly suggest[ed] that Defendants' purpose [wa]s to use discovery in this civil lawsuit to investigate Plaintiffs for the pending state criminal case—a patently improper purpose." Order Granting Motion to Stay and Denying Motion for Expedited Discovery at 6. Accordingly, the court denied Defendants' motion for expedited discovery.

On January 22, the day before the scheduled two-day hearing, the parties stipulated that they would present only argument, no additional evidence, at the hearing. The court heard argument on the three motions and ordered supplemental briefing. As Defendants noted in their supplemental brief, the Attorney General of Utah was not notified of the constitutional challenges in this action even though he was supposed to be so notified. The court ordered Plaintiffs to notify the Attorney General accordingly, and the court sent him its own certification of the constitutional questions. The court cannot to rule on Defendants' motion to dismiss and Plaintiffs' motion for anti-suit injunction until the Attorney General has had an opportunity to present evidence or argument on the constitutional questions underlying those motions. In the meantime, the court resolves Plaintiffs' motion for preliminary injunction based on their claim under the Utah RFRA.

## ANALYSIS

Plaintiffs seek a preliminary injunction barring enforcement of the Utah Controlled Substances Act as applied to their psilocybin ceremonies. To succeed on their motion, Plaintiffs "must establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Because the government is the opposing party, the third and fourth factors merge. *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 112 (10th Cir. 2024). And "[i]n the First Amendment context," or quasi–First Amendment context as here, "the likelihood of success

on the merits will often be the determinative factor because of the seminal importance of the interests at stake." *Verlo v. Martinez*, 820 F.3d 1113, 1126 (10th Cir. 2016) (internal quotation marks omitted).

In this order, the court considers only Plaintiffs' Utah RFRA claim because the Attorney General is entitled to respond to their constitutional claims and his deadline for doing so has yet to expire. As noted previously, Utah passed its version of RFRA last year. Under the Utah RFRA, "a government entity may not substantially burden the free exercise of religion of a person, regardless of whether the burden results from a rule of general applicability," unless "the government entity . . . demonstrates that the burden on the person's free exercise of religion is: (a) essential to furthering a compelling governmental interest; and (b) the least restrictive means of furthering the compelling governmental interest"—that is, unless the government satisfies strict scrutiny. UTAH CODE ANN. § 63G-33-201(2)(a), (3). The Utah RFRA, like its federal counterpart, is a quasi-constitutional statute, meaning that it protects a fundamental constitutional right (namely, the right to free exercise of religion) and supersedes other conflicting statutes unless those other statutes are explicitly exempted. *See id.* § 63G-33-101(6)(b)(ii)(A) (defining substantial burden to include burdens imposed by "law, statute, ordinary, rule, policy, order, or other assertion of governmental authority"); Bethany Ao, Comment, *Achieving Appropriate Relief for Religious Freedom Violations in Prisons After* Tanzin, 90 U. CHI. L. REV. 1967, 1971 (2023); Douglas Laycock, *The Religious Freedom Restoration Act*, 1993 BYU L. REV. 221, 254. And courts interpreting the federal RFRA have looked to constitutional cases for guidance in applying RFRA, whose compelling-interest test was expressly adopted from constitutional caselaw predating *Employment Division v. Smith*, 494 U.S. 872 (1990). *See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006); *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693–95

(2014). So, both federal RFRA and federal constitutional cases inform the court's analysis here under the Utah RFRA.

As a threshold matter, Defendants argue that Plaintiffs cannot seek relief under the Utah RFRA because they did not satisfy its notice requirement. Under the statute, "a person may not bring an action against a government entity unless, at least 60 days before the day on which the person brings the action, the person provides written notice to the government entity." UTAH CODE ANN. § 63G-33-201(5)(a). That notice must "(i) state[] that the person intends to bring an action against the entity for a violation of [RFRA]; (ii) describe[] the government action that has burdened . . . the person's free exercise of religion; and (iii) describe[] the manner in which the government action burdens . . . the person's free exercise of religion." *Id.* Plaintiffs do not claim that they satisfied this requirement but point to an exception: the notice requirement "does not apply if the government action alleged . . . (i) is ongoing, and complying with [the requirement] will place an undue hardship on the person or increase the harm suffered by the person." *Id.* § 63G-33-201(5)(b).

The court concludes that Plaintiffs' case falls under the exception for ongoing government action. Plaintiffs have established that psilocybin mushrooms are used as a sacrament in Singularism, so each day that Plaintiffs are deprived of their sacrament they suffer harm to their religious exercise. The Utah Controlled Substances Act prohibits Plaintiffs from using psilocybin, and the government still possesses the mushrooms that the officers seized in November. The court recognizes that the reason the government still possesses the mushrooms is that the court granted Defendants' request to keep the mushrooms pending resolution of Plaintiffs' motion for preliminary injunction on the finding that the potential harm to the government of having to return the mushrooms outweighed the harm to Plaintiffs of being deprived of the mushrooms in the

meantime. But that finding does not mean that Plaintiffs do not suffer any harm from the deprivation of their mushrooms. Even if the ongoing-action exception did not apply, however, Defendants concede that Plaintiffs emailed them a notice of claim on November 19, 2024, and because 60 days have passed since that time, Plaintiffs' Utah RFRA claim is properly before the court.[3]

Onto the merits of the claim then. The plain text of the statute requires the plaintiff to demonstrate a substantial burden on sincere religious exercise. Based on the evidence in this case, Plaintiffs have established that the government has substantially burdened their sincere religious exercise. Simply put, Plaintiffs offer a sacramental psilocybin tea to their voyagers, who then embark on a spiritual journey by which they write their own scripture. A law that categorically prohibits the possession and use of the psilocybin sacrament—thereby preventing Singularism's adherents from pursuing their spiritual voyages and hindering them from producing their sacred scripture—substantially burdens the free exercise of Singularism and its adherents. *Church of the Holy Light of the Queen*, 615 F. Supp. 2d 1210.

Defendants argue that complying with the Utah Controlled Substances Act does not substantially burden Plaintiffs' religious exercise for three reasons apart from the sincerity and character of their beliefs: Singularism values compliance with governmental laws (like the Controlled Substances Act); it does not require the use of psilocybin mushrooms; and it expressly

---

[3] One could potentially argue, though the court would be skeptical of this argument, that if a Utah RFRA plaintiff fails to provide a notice of claim at least 60 days before filing suit and the notice exception does not apply, then the court must dismiss the case entirely once the defendant points out the plaintiff's failure to comply with the notice provision. Even under this argument, however, Plaintiffs' RFRA claim would be properly before the court because Plaintiffs filed an amended complaint (which operates as a new complaint) on February 5, 2025—more than 60 days after they emailed their notice of claim.

defers to medical providers. But these arguments amount to an assertion that Singularism is not what its adherents claim it is—in other words, that the government is best situated to interpret Singularism and its teachings. The government's claimed ability to interpret Singularism and its teachings contrary to the way in which Singularism and its adherents do runs headlong into the long-established principle that "it is not within the judicial function [or] judicial competence to inquire whether the [plaintiff] . . . correctly perceive[s] the commands of [his] . . . faith." *Thomas v. Rev. Bd.*, 450 U.S. 707, 716 (1981). Even if psilocybin were not essential to Singularism's practice, the Utah Controlled Substances Act would still be vulnerable to Plaintiffs' challenge. After all, the Utah RFRA, building on basic First Amendment principles, protects not just practices mandated by the claimant's religion or practices common to all members of that religion but rather any practices motivated by sincere religious belief. UTAH CODE ANN. § 63G-33-101(2); *LaFevers v. Saffle*, 936 F.2d 1117, 1119 (10th Cir. 1991).

Having failed to challenge Plaintiffs' interpretation of their own religion, Defendants then challenge the sincerity and character of Plaintiffs' beliefs. To prevail on their motion for preliminary injunction, Plaintiffs must establish that their beliefs underlying their psilocybin use are sincere and religious. *See Hobby Lobby*, 573 U.S. at 717–18 & n.28. Pretextual beliefs or beliefs rooted in nonreligious considerations do not qualify for protection under RFRA. *See United States v. Christie*, 825 F.3d 1048, 1055–56 (9th Cir. 2016). The sincerity inquiry is important for eliminating sham free-exercise claims, but "it must be handled with a light touch, or judicial shyness." *Moussazadeh v. Tex. Dep't of Crim. Just.*, 703 F.3d 781, 792 (5th Cir. 2012). So, "the inquiry into the sincerity of [the] plaintiff's religious beliefs is almost exclusively a credibility assessment." *Kay v. Bemis*, 500 F.3d 1214, 1219 (10th Cir. 2007) (cleaned up).

As for assessing the character of the beliefs underlying the conduct for which the plaintiff claims an exemption, district courts in the Tenth Circuit consider the following factors, known as the *Meyers* factors after the leading case: (1) *Ultimate ideas*—"Religious beliefs often address fundamental questions about life, purpose, and death." (2) *Metaphysical beliefs*—"Religious beliefs often are 'metaphysical,' that is, they address a reality which transcends the physical and immediately apparent world." (3) *Moral or ethical system*—"Religious beliefs often prescribe a particular manner of acting, or way of life, that is 'moral' or 'ethical.'" (4) *Comprehensiveness of beliefs*—"Another hallmark of 'religious' ideas is that they are comprehensive[,] . . . provid[ing] the believer with answers to many, if not most, of the problems and concerns that confront humans." (5) *Accoutrements of religion*—The presence of "external signs" like a founder or prophet, important writings, gathering places, keepers of knowledge, ceremonies and rituals, structure or organization, holidays, diet, clothing, and propagation to non-believers "may indicate that a particular set of beliefs is 'religious.'" *United States v. Meyers*, 95 F.3d 1475, 1483–84 (10th Cir. 1996). No one factor is dispositive.[4] *Id.*

Based on all the evidence in the record, the court has no difficulty concluding that Plaintiffs are sincere in their beliefs and that those beliefs are religious in nature. Begin with the government's own recognition that Singularism is a religion. As described earlier, when Mr.

---

[4] Defining what religion is in a way that accommodates the vast diversity of religious beliefs, practices, and traditions across time and space is no small feat, and social scientists have dedicated entire books, if not entire careers, to the question. *See, e.g.*, CHRISTIAN SMITH, RELIGION: WHAT IT IS, HOW IT WORKS, AND WHY IT MATTERS (2017). The caselaw attempts not to answer comprehensively what makes a religion—a question best left to those social scientists—but rather to identify what qualifies an individual or organization for religious protections under the law. So, in saying here that Singularism is a religion, the court is saying simply that the court finds Singularism to be the kind of entity that qualifies for legal religious protections.

Jensen was investigated by the Utah Division of Professional Licensing for practicing mental-health therapy without a license, he explained his belief that as a facilitator at Singularism, he qualified for the exemption for "recognized member[s] of the clergy." UTAH CODE ANN. § 58-60-107(2)(b). The Division agreed with him and closed the complaint as unfounded. And when Singularism applied to Provo City for a business license to operate its spiritual center, the City responded by saying that Singularism did not need a license to conduct its religious activities. Although these statements and actions from the Division and the City do not estop Defendants from challenging Plaintiffs' religious sincerity, they are nonetheless persuasive evidence that Singularism is a legitimate religion and that its adherents are sincere in their practices.

Next, all of Singularism's witnesses connected their practice of Singularism to their faith journeys, expressing that the tea ceremonies had helped them rediscover their religious faith. Mr. Jensen, for example, stated that he founded Singularism after psychedelics helped him experience "an overwhelming sense of unity with the Earth, the stars, and all of creation . . . [,] as if God's love enveloped [him] completely" and thereby "awakened in [him] a renewed faith in God." As he further explored entheogenic spiritual practice, he encountered the OctoGoddess, a spiritual entity, who revealed to him the Octadrant, an epistemological framework for processing truth in its different dimensions. Ms. Lee testified that her voyages, during which she met Jesus and her Heavenly Parents, "opened up a lot of spiritual gifts that [she] didn't quite realize [she] had," such as "communicat[ing] with angels and spirits." And Ms. DenBleyker, for her part, testified that Singularism "helped facilitate [the] renewed spiritual connection [that she] had been seeking for decades" by allowing her to "experience God . . . in the very air molecules that surrounded [her,] . . . always near and available to [her]." These witnesses, whom the court finds very credible, show that Singularism's entheogenic practice is intimately connected with fundamental questions

about life and addresses a reality that transcends the physical world. Indeed, as Mr. Jensen explained, "[W]e are profoundly deceived about who we are and what we are, and what our purpose is, about what our desires are, . . . [a]nd the essential role of psilocybin is that for a few moments you can disengage from some of those temporal real deceptions . . . [and] experience she[e]r consciousness without the burden of our bodies."

Moreover, Singularism features several "accoutrements" of religion, as the caselaw calls it. Most simply, it has prophets and a scripture. As Mr. Jensen explained, during a tea ceremony, the voyager is a prophet receiving spiritual insight, and the facilitator serves as a scribe to record those insights; thus, the recordings from every voyage individually and collectively become Singularism's sacred scripture. On top of that, the tea ceremony is a carefully organized and guarded ritual. The voyager must first pass a screening to ensure his sincerity, and during the prep session, he sets an intention for the voyage. Other preparations for the tea ceremony could include something more familiar from larger religions, such as fasting and reading and internalizing one's patriarchal blessing.

Defendants observe that Singularism "does not claim special access to divine truths," instead encouraging its practitioners to more deeply "discover and define their own beliefs," and explicitly states that "no organization, including [it], has all the answers to life's most difficult questions." In Defendants' view, these features weaken Singularism's claim to be a religion because they show that Singularism's beliefs are not comprehensive. *See United States v. Quaintance*, 471 F. Supp. 2d 1153, 1162 (D.N.M. 2006) (holding that a religious belief is comprehensive if it includes "multiple beliefs" and is "uniform" across members). As the court sees it, however, these features less so detract from Singularism's religious nature than they illustrate Singularism's commitment to existential humility. Existential humility means holding

24

cherished beliefs regarding the meaning of life and death loosely enough to revise them with more evidence, data, and experiences—that is, holding profound beliefs alongside a recognition of the limits of our knowledge and our fallibility. *See* Jeffrey D. Green, W. Keith Campbell & Daryl R. Van Tongeren, *Existential Humility: Strong Tests of Intellectual Humility*, 18 J. POSITIVE PSYCHOLOGY 259 (2022); Alberto R. Coll, *"That Vast External Realm": The Limits of Love and Law in International Politics, in* AGAPE, JUSTICE, AND LAW: HOW MIGHT CHRISTIAN LOVE SHAPE LAW? 291, 308 (Robert F. Cochran, Jr., & Zachary R. Calo eds., 2017). As Mr. Jensen put it, "I think that people do too much pretending about what [they] know. So I want to very sincerely guide people into what they truly believe and help them find their purest religion . . . ."

To be sure, a commitment to existential humility need not foreclose prescribing certain beliefs to define the boundaries of a religious community. But in the context of the full record here, including the statements and testimony referenced just above, Singularism's expressions of existential humility appear more to be sincere invitations for its members to discover religious truth through its psilocybin ceremonies than a neglect of religious beliefs altogether. Considering that existential humility is important for enabling and supporting the smooth functioning of a pluralistic society like ours, it would be inappropriate to hold Singularism's existential humility against it. *See* David Robson, *Why 'Existential Humility' May Be the Answer to Today's Culture Wars*, NEWSCIENTIST (Nov. 15, 2023), https://www.newscientist.com/article/mg26034652-700-why-existential-humility-may-be-the-answer-to-todays-culture-wars; David French, *Pope Francis is Turning Certainty on Its Head*, N.Y. TIMES (Sept. 19, 2024), https://www.nytimes.com/2024/09/19/opinion/pope-francis-god-election.html.

Defendants also observe that Singularism does not offer a moral or ethical system for its adherents. On this point, the court agrees—Singularism's ethical teaching appears to be simply

25

that its members should love others because love is "humanity's ultimate purpose in life." *See Quaintance*, 471 F. Supp. 2d at 1161 ("A simple phrase may sum up a morality, but the phrase alone cannot be the extent of the morality."). The court's agreement with Defendants on this point is not to suggest that love is anything less than a noble ethical lodestar; indeed, the world could always use more love. Rather, all it means is that Singularism lacks the kind of systematized concepts of right and wrong behavior that the *Meyers* factor refers to. But the absence of a moral or ethical system does not mean that Singularism is not a religion because this factor is simply one of several non-dispositive factors. *Meyers*, 95 F.3d at 1484.

Finally, Defendants point to several other pieces of evidence that in their view undermine Singularism's claim to be a religion entitled to protection under the law: Singularism's citations to scientific and medical research on the therapeutic potential of psilocybin; Mr. Jensen's testimony that he sought a safer way of using psychedelic drugs after observing unethical behaviors within the underground psychedelic community; Mr. Jensen's testimony that he has been using psychedelic drugs for several years now (i.e., that his drug use predates Singularism's founding); and Singularism's financial interest in administering psilocybin. Although some of this evidence may raise eyebrows at first glance, on closer examination the court is not convinced that it detracts from Singularism's claim of religious sincerity.

Singularism's citations to scientific and medical research on psilocybin hardly undermine its claims. An overlap between scientific and religious reasons for a practice "cannot render th[ose] actions . . . any less religious." *University of Great Falls v. NLRB*, 278 F.3d 1335, 1346 (D.C. Cir. 2002). Indeed, many religious practices in more common religions, such as gathering in community for music, prayer, and fellowship, can be justified by a litany of nonreligious reasons and scientific research. *See, e.g.*, Sandra Feder, *Religious Faith Can Lead to Positive Mental*

*Benefits, Writes Stanford Anthropologist*, STANFORD REPORT (Nov. 13, 2020), https://news.stanford.edu/stories/2020/11/deep-faith-beneficial-health (describing recent anthropology research finding that "religious involvement . . . is better for [the] body in terms of immune functions and reducing loneliness"). Those nonreligious justifications do not make the practice of communal worship any less religious, and the same goes for Singularism's practice of psilocybin tea ceremonies.

Mr. Jensen's testimony about his past use of psychedelic drugs and desire to find safer ways of using them may at first support the inference that he conveniently founded Singularism as a religion to bypass the law and engage in otherwise-illegal drug use. However, the evidence as a whole weighs against this inference. For example, he testified at great length about his spiritual revelations from his voyages and his conviction that psilocybin is nearly essential for ordinary people to be able to access spiritual experiences and wisdom. He further testified that he engages in only about four voyages a year, and a typical package for a new voyager consists of two to four voyages. This evidence cuts against a finding that Mr. Jensen's beliefs about psilocybin are insincere or that Singularism is no more than a drug-distribution operation masquerading as religion. *Compare with United States v. Meyers*, 906 F. Supp. 1494, 1504 (D. Wyo. 1995) (claimant seeking religious exemption for marijuana explained that his religion "[wa]s to grow, possess, and distribute marijuana" and that he "smoke[d] between 10 and 12 joints per day").

As for Singularism's financial motivation, it admittedly looks suspicious at first that Singularism charges about $1,600 per tea ceremony (so given that two to four ceremonies is a standard package, members pay anywhere from $3,200 to $6,400 for participation). This fact looks even more problematic for Singularism's claims considering Mr. Jensen's testimony that the marginal cost of the psilocybin used in each voyage ranges from $50 to $150 depending on the

dose. Once again, however, the full context strongly suggests that Singularism is driven by religious rather than purely financial considerations. Mr. Jensen testified that he was making over $120,000 a year as a licensed mental-health practitioner before founding Singularism; now, he makes considerably less—$3,400 per month, or $40,800 per year. (Defendants did not introduce any evidence to challenge his testimony on this point.) He also testified that he was asked by the OctoGoddess to found Singularism to make transformative spiritual experiences more accessible. If Mr. Jensen were actually motivated by the promise of large profits, he would not have given up a stable six-figure salary to found Singularism and receive a monthly payment that barely puts him past the poverty line.[5]

But even if Mr. Jensen made more money at Singularism than he previously did as a therapist, or even if the evidence suggested that Singularism made considerable profits on facilitating psilocybin voyages, the court's finding would not change. To begin, for-profit businesses can claim religious-liberty protections because "[b]usiness practices [may be] compelled or limited by the tenets of a religious doctrine." *Hobby Lobby*, 573 U.S. at 710. So, a religious claimant's for-profit status—or by extension evidence that the claimant makes large sums of money from its religious activities—does not necessarily mean that its free-exercise claims are disingenuous. Religious protections, after all, are not only for the destitute. *See* Lukas Hund, *The Finances Behind Vatican City*, MICH. J. ECON. (May 24, 2022), https://sites.lsa.umich.edu/

---

[5] Mr. Jensen is divorced with four children. The federal poverty line for a family of five in 2025 is $37,650. *See* Office of the Assistant Sec'y for Planning and Eval., *Poverty Guidelines*, U.S. DEP'T OF HEALTH & HUM. SERVS., https://aspe.hhs.gov/topics/poverty-economic-mobility/poverty-guidelines (2025). Although he is now in a relationship with Ms. Lee, who works 20 to 30 hours earning $40 an hour at Singularism, Ms. Lee also has four children of her own. In any event, based on the evidence presented, the court finds that Mr. Jensen gave up a significantly more remunerative career to follow his religious calling to found Singularism.

mje/2022/05/24/the-finances-behind-vatican-city ("[T]he Roman Catholic Church[, which certainly qualifies for religious protections, is] one of the largest and wealthiest organizations in the world."). Moreover, prominent religions like the Church of Jesus Christ of Latter-day Saints, which no one would doubt qualifies for religious-liberty protections under the law, require payment of tithes for good-standing membership. *See* Peggy Fletcher Stack, *Does Tithing Requirement for Entry into LDS Temples Amount to Mormons Buying Their Way into Heaven?*, SALT LAKE TRIB. (Mar. 26, 2018), https://www.sltrib.com/religion/2018/03/26/does-tithing-requirement-for-entry-into-lds-temples-amount-to-mormons-buying-their-way-into-heaven ("[T]o gain access to the sacred spaces and saving rituals of a Mormon temple, LDS believers must donate 10 percent of their income to the church."). Singularism's payment expectation for its tea ceremonies is analogous and similarly does not negate its free-exercise claims.[6]

From all the evidence in the record, the court is hard-pressed to find, as Defendants urge, that Singularism is essentially a drug-dealing business cloaked in a minister's robe. To the contrary, the court is convinced that Singularism is a legitimate religion and that Plaintiffs are sincere practitioners of it. This is not a case where a group of people claim a religious right to do little more than use and distribute large quantities of drugs. *Compare with, e.g.*, *Quaintance*, 471 F. Supp. 2d at 1172 (officers seized enough marijuana for 229,000 joints, suggesting an illegal commercial rather than legitimate religious purpose); *Meyers*, 906 F. Supp. 2d at 1504 (marijuana church's "only ceremony revolve[d] around one act: the smoking and passing of joints"). By establishing the sincerity of their religious beliefs, Plaintiffs have fulfilled their responsibility of

---

[6] The court also heard evidence that Singularism has on occasion given discounts or performed ceremonies for free.

29

establishing a prima facie case under the Utah RFRA, shifting the burden to the government to demonstrate that the Utah Controlled Substances Act accomplishes a compelling state interest using the least restrictive means.

Defendants initially argue that the psilocybin ban serves the government's interests in preventing abuse, preventing possible harms from drug use such as suicidal ideation, and protecting the public from illicit drug trafficking. The court does not doubt that these interests are compelling in the abstract, but the government must go beyond "broadly formulated interests" like these to satisfy its burden. *Fulton*, 593 U.S. at 541 (quoting *O Centro*, 546 U.S. at 431). That is, "[t]he question . . . is not whether the [government] has a compelling interest in enforcing its [psilocybin laws] generally, but whether it has such an interest in denying an exception to [Plaintiffs]." *Id.* On this front, Defendants have cited studies showing that psilocybin is one of the most commonly used hallucinogens, that psilocybin trafficking is closely linked with trafficking for other drugs like fentanyl and marijuana, and that psilocybin mushrooms may be tainted and therefore cause harm to even sincere users. They also claim that the single search of Singularism's spiritual center in November yielded about 150 doses of psilocybin, a quantity that in their view is suspicious because it represents about half of all doses Singularism has administered in its 15-plus-month history.[7]

---

[7] Defendants base their calculations on the testimony of Plaintiffs' witnesses at the December 13 hearing. According to Mr. Jensen, about 100 voyagers have participated in a psilocybin ceremony through Singularism, each voyager participates in 2 to 4 ceremonies total, and the dose for each ceremony is anywhere between 2 and 3.5 grams of psilocybin mushrooms. Assuming that 100 voyagers have participated in 3 voyages each using 3 grams of psilocybin for each voyage, Singularism has administered 900 grams of psilocybin mushrooms total.

The parties disagree about the quantity of psilocybin mushrooms seized in November. According to Defendants, the single search in November yielded over 450 grams of mushrooms and mushroom-like material—half, if not more than half, of the total that Singularism has presumably

On the one hand, the evidence suggests that Plaintiffs ensure a high level of safety for Singularism's voyagers and the surrounding community. The mushrooms are tested at the lab in Oregon for contaminants before being freeze dried for transportation to Singularism's spiritual center, only facilitators have access to the mushrooms (which are never used other than in the sacramental tea ceremonies), and every voyager must undergo a careful screening process with two or more facilitators, at least one of whom has a background in medicine or clinical therapy. And when a voyager has a rare adverse reaction to the psilocybin (as has happened once in Singularism's history), Singularism and Mr. Jensen follow the safety protocol, which includes calling the voyager's emergency contacts, remaining at the facility in case the voyager returns, and getting the voyager treatment in the hospital if necessary.[8]

On the other hand, Singularism itself does not seem to have a rigorous method to test for contamination, and diversion to non-affiliates in theory could be occurring based on the quantity of psilocybin Singularism appears to keep on hand. That said, the government has not shown evidence of actual contamination or actual diversion in Plaintiffs' case. To be sure, the government can establish a compelling interest in denying Plaintiffs an exemption even without proof of actual diversion by pointing to evidence suggesting a real risk of diversion. *Christie*, 825 F.3d at 1057–

administered over 15 months. Plaintiffs speculate that the actual amount was closer to one-third of this amount, but because the mushrooms have been in the government's custody, Plaintiffs have not been able to ascertain the quantity. The court finds Defendants credible on this point and therefore takes 450 grams to be the quantity of mushrooms seized in November.

[8] As noted above, one voyager showed signs of paranoia and mistrust during a voyage, and Singularism coordinated her care with her emergency contacts and supported her receiving treatment in the hospital. The next day, she expressed gratitude to Singularism for ensuring her safety throughout her episode. The court finds that at no point during that episode did the voyager threaten her own or anyone else's physical safety.

58 (upholding a finding that the plaintiffs' assumedly religious use of cannabis created a real risk of diversion in part because of "lax enforcement of [their] distribution protocols"). But the evidence here fails to show that Plaintiffs' controlled, sincerely religious use of psilocybin more likely than not creates a meaningful risk of compromising the government's compelling interests. *See O Centro Espirita Beneficiente Uniao do Vegetal v. Ashcroft*, 282 F. Supp. 2d 1236, 1262 (D.N.M. 2002) (holding that the government had failed to show a compelling interest when the evidence as to the health risks of plaintiffs' sacramental use of hoasca was "in equipoise").

Even if the evidence supported a finding that the government had a compelling interest in denying Plaintiffs an exemption, the government must still show that its approach is the least restrictive means of accomplishing that interest. On this front too, the court concludes that the government has not met its burden. "The least-restrictive-means standard is exceptionally demanding, and it requires the government to show that it lacks other means of achieving its desired goal without imposing a substantial burden on the [plaintiff's] exercise of religion . . . ." *Holt v. Hobbs*, 574 U.S. 352, 364 (2015). Although the government need not "refute every conceivable option in order to satisfy the least restrictive means prong," it must "refute the alternative schemes offered by the challenger . . . through the evidence presented in the record." *United States v. Wilgus*, 638 F.3d 1274, 1289 (10th Cir. 2011). And it must "explain why obvious and available alternatives are not workable . . . , especially those that have been proven to work in analogous circumstances." *Singh v. Berger*, 56 F.4th 88, 104 (D.C. Cir. 2022); *see also Hobby Lobby*, 573 U.S. at 692 (noting that the government had already devised a less restrictive scheme for religious nonprofits and putting the burden on the government to explain why a similar scheme could not work for religious for-profit corporations).

Defendants argue that the burden rests on Plaintiffs to suggest alternative schemes. Although a religious plaintiff may sometimes be required to suggest an alternative regulation that lessens the burden on his religious exercise while still accomplishing the government's compelling interest, the burden of satisfying the least-restrictive-means prong ultimately rests on the government, which "must at a minimum explain why . . . [it] reject[s a] readily at hand alternative[]." *Singh*, 56 F.4th at 104. Here, the most obvious alternative at hand is for the government to simply do nothing. After all, the government waited over a year after Singularism opened its spiritual center—at which time Mr. Jensen had fully disclosed Singularism's practices—to perform its criminal investigation. Defendants have pointed to zero evidence that this do-nothing period threatened its interests in public safety.[9]

But assuming that some form of regulation is necessary for the government to protect the public, an alternative is readily at hand in the Utah Controlled Substances Act itself. Two alternatives, in truth. First, the Act creates an exemption for psylocibin administered as part of behavioral health treatment programs developed by certain healthcare systems and imposes relatively few restrictions on how covered healthcare systems may use psilocybin.[10] UTAH CODE ANN. § 58-37-3.5. The main restrictions are that the drug must be in phase 3 testing by the U.S.

---

[9] Plaintiffs have also submitted evidence that the Divine Assembly, a far larger self-described magic-mushroom church based in Salt Lake County with a possible presence in Utah County, has never been investigated or threatened, despite that the Divine Assembly even sells home-growing mushroom kits and membership cards. *See Are You Ready to Grow Mushrooms?*, THE DIVINE ASSEMBLY, https://www.thedivineassembly.org/grow-kits.

[10] The exemption applies to private, non-profit healthcare systems that operate at least 15 hospitals in the state and healthcare systems affiliated with public institutions of higher education. It thus appears that the exemption is essentially private legislation for Intermountain Healthcare (the only private healthcare system operating at least 15 hospitals in the state) and University of Utah Health Care (the only healthcare system affiliated with a public institution of higher education in the state).

Food and Drug Administration, that it must be used under the supervision of a "licensed" provider, and that it may not be used by minors. *Id.* § 58-37-3.5(1), (3). Other than that, it appears that healthcare systems have wide discretion to determine how to administer psilocybin. Defendants do not attempt to explain why the government could not implement an analogous system of oversight for Singularism's sincere religious practices. The evidence in the record suggests it would not be particularly difficult to do so. Singularism already does not administer the drug to minors, and the Utah Department of Commerce Division of Professional Licensing recently determined that Mr. Jensen qualifies for a clergy exemption to the licensing requirement for mental-health practitioners. It also likely would not be difficult for Plaintiffs to ensure that their psilocybin is of the same variety allowed by the behavioral-treatment exemption.

Second, the Act creates a religious exemption for peyote. That exemption provides, "Civil or criminal liability may not be imposed under this section on any Indian . . . who uses, possesses, or transports peyote for bona fide traditional ceremonial purposes in connection with the practice of a traditional Indian religion . . . ." UTAH CODE ANN. § 58-37-8(12)(a). The Act requires no more of the claimant than that the claimant use (or possess or transport) the peyote for sincere religious purposes connected with a Native American religion, and the exemption provides the claimant an affirmative defense (established by a preponderance of the evidence) in a prosecution alleging a violation of the Act regarding peyote. *Id.* § 58-37-8(12)(b). Peyote, like psilocybin, is a Schedule I controlled substance. *Id.* § 58-37-4(2)(a)(iii)(V), (Y). Defendants do not attempt to explain why the government could not create a similar exemption for sincere religious use of psilocybin. Defendants thus have not satisfied the least-restrictive-means component of strict scrutiny, so Plaintiffs have shown a likelihood of success on the merits of their statutory free-exercise claim.

Although the likelihood of success on the merits often controls the outcome in a case like this one where the motion for preliminary injunction is based on a quasi–First Amendment claim, the court must still consider irreparable harm and the public interest. Plaintiffs have satisfied the court that they will be irreparably harmed absent preliminary relief. Defendants' enforcement of the Utah Controlled Substances Act against Plaintiffs and Defendants' continued possession of the psilocybin mushrooms seized in November deprive Plaintiffs of their religious sacrament. And Plaintiffs have introduced evidence that Singularism is losing adherents because of Defendants' actions. No amount of damages later can compensate Plaintiffs for these injuries. As to the public interest, it "favors [P]laintiffs' assertion of their [quasi–]First Amendment rights," particularly because Defendants have not shown that Plaintiffs' actions have threatened public safety. *Elam Constr., Inc. v. Reg'l Transp. Dist.*, 129 F.3d 1343, 1347 (10th Cir. 1997).

"[S]o long as the government can achieve its interests in a manner that does not burden religion, it must do so." *Fulton*, 593 U.S. at 541. The government has not done so here, and the court accordingly grants Plaintiffs' motion for a preliminary injunction. Defendants are ordered to return the psilocybin mushrooms seized in November along with any other items seized and not yet returned. Moving forward, Defendants are also ordered not to interfere with Plaintiffs' sincere religious use of psilocybin until this litigation is complete. That means Defendants may not treat Plaintiffs' sincere religious use of psilocybin from the date of this order as unlawful under the Utah Controlled Substances Act. Note that this injunction does not prevent the government from

35

continuing to prosecute Mr. Jensen in the pending state criminal case.[11] Indeed, the court lacks

authority at this point to enjoin or interfere with any proceedings in state court.[12]

---

[11] In their motion to stay a portion of the court's temporary restraining order, Defendants argued that requiring immediate return of the mushrooms would jeopardize the state prosecution and force the government to violate evidence-retention laws. Out of an abundance of caution, the court granted Defendants' motion for a partial stay, although the court expressed skepticism about these arguments. Now, having had the opportunity to consider these arguments in greater depth, the court finds them unconvincing and deems it appropriate to require the government to return the mushrooms.

As for the first contention, requiring return of the mushrooms will not stymie the state criminal case because that case turns entirely on the purely legal question of whether Mr. Jensen is entitled to a religious exemption under the Utah RFRA. After all, Mr. Jensen admitted in open court during the December 13 hearing that he possessed, used, and administered psilocybin. The government may use his testimony to establish the elements of a Controlled Substances Act violation should Mr. Jensen put the government to its proof; the government will not need the physical mushrooms.

Regarding the second contention, it is true that the government is ordinarily required to "retain evidence of a felony offense" while a criminal case is pending (and Mr. Jensen's prima facie violation of the Controlled Substances Act is a felony offense). UTAH CODE ANN. § 77-11C-301(1). But the claimant of the property "may file a petition . . . for the return of the property that is being retained as evidence" in "the court in which criminal proceedings have commenced" or in "the district court with [proper] venue . . . if there are no pending criminal proceedings." *Id.* § 77-11a-305(1)(a), (b). If the claimant establishes "by clear and convincing evidence" that he "may lawfully possess the property," then "the court may order that the property [be] . . . returned to the claimant." *Id.* § 77-11a-305(2)(b)(i), (3)(b).

When Plaintiffs first filed for a temporary restraining order and preliminary injunction requiring return of the mushrooms, no criminal proceedings were pending. Plaintiffs filed their complaint in the Utah County Fourth District Court, the same court where the criminal proceedings against Mr. Jensen are now pending. Before that court could assess Plaintiffs' claim for return of the mushrooms, Defendants removed the action to this court. Given the factual findings and legal analysis above, this court finds by clear and convincing evidence that Plaintiffs have established that they may lawfully possess the mushrooms. Utah law requires then that "the agency with custody of the [mushrooms] . . . return [them] to [Plaintiffs] as expeditiously as possible." *Id.* § 77-11a-305(4).

[12] The Anti-Injunction Act, 28 U.S.C. § 2283, prohibits federal courts from granting injunctions to stay proceedings in a state court except in three limited circumstances. One of these is when an Act of Congress has "expressly authorized" the federal court to grant the injunction, *id.* Section 1983, under which Plaintiffs have brought their constitutional claims, "is an Act of Congress that falls within the 'expressly authorized' exception." *Mitchum v. Foster*, 407 U.S. 225, 243 (1972). But enjoining the state-court prosecution under § 1983 would require the court to evaluate

\*        \*        \*

"Religious liberty is one of America's great contributions to the world." Douglas Laycock, *Religious Liberty and the Culture Wars*, 2014 Univ. Ill. L.R. 839, 840. But a commitment to religious liberty in the abstract does not dictate one way or another whether a religious group like Singularism should receive an exemption from a State's controlled-substances law. Abstract commitments must be instantiated through concrete legal regimes, and different societies claiming fealty to the same abstract religious-liberty principle may choose different legal regimes. Whatever legal regime a society chooses, however, it must apply its protections equally to unpopular or unfamiliar religious groups as to popular or familiar ones if that commitment to religious liberty is to mean anything. As sang Jonas Gwangwa, a South African jazz musician who was exiled by the apartheid government, "Freedom for some is freedom for none." Indeed, the very founding of the State of Utah reflects the lived experience of that truth by members of the Church of Jesus Christ of Latter-day Saints. Perhaps it is ironic then that not long after enacting its RFRA to provide special protections for religious exercise, the State of Utah should so vigorously deploy its resources, particularly the coercive power of its criminal-justice system, to harass and shut down a new religion it finds offensive practically without any evidence that that religion's practices have imposed any harms on its own practitioners or anyone else.

---

Plaintiffs' constitutional claims, which the court may not do until the Attorney General of Utah has had an opportunity to present evidence or argument on those claims.

37

## CONCLUSION AND ORDER

The court **ORDERS** Defendants to return any items seized from Singularism's spiritual center not yet returned as soon as possible but no later than 14 days from the date of this order. The court also **ORDERS** Defendants to not interfere with Plaintiffs' sincere religious use of psilocybin from the date of this order until this litigation is complete.

Signed February 20, 2025.

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge

DAVID N. WOLF (6688)
Assistant Utah Attorney General
Office of the Utah Attorney General
160 E. 300 S., 5th Floor
P.O. Box 140856
Salt Lake City, Utah 84114-0856
Telephone: (385) 584-6509
dnwolf@agutah.gov
*Counsel for Utah Attorney General*

---

**IN THE THIRD JUDICIAL DISTRICT COURT
IN AND FOR SALT LAKE COUNTY, STATE OF UTAH**

| | |
|---|---|
| BRIDGER LEE JENSEN, an individual; SINGULARISM, a non-profit corporation; PSYCHE HEALING AND BRIDGING, LLC. dba PSYCHEDELIC THERAPY JOURNEY, a limited liability company, <br><br> Plaintiffs, <br><br> v. <br><br> UTAH COUNTY, a political subdivision; PROVO CITY, a political subdivision; and JEFFREY GRAY, an individual, <br><br> Defendants. | **UTAH ATTORNEY GENERAL'S RESPONSE TO CERTIFICATION OF PLAINTIFFS' AS APPLIED CONSTITUTIONAL CHALLENGE TO THE UTAH CONTROLLED SUBSTANCES ACT UNDER 28 U.S.C. § 2403** <br><br> Case No. 2:24-cv-00887-JNP <br><br> Judge Jill N. Parrish |

Having received proper notice under Fed. R Civ. P. 5.1(a), Utah Attorney General Derek Brown ("Attorney General Brown"), by and through counsel, responds to the Court's Order (Doc. 88) certifying the question of the constitutionality of the Utah Controlled Substances Act, as applied to Plaintiffs Bridger Lee Jense, Singularism, and Psyche Healing and Bridging in this case.

Attorney General Brown joins in and adopts the arguments made in Defendants' Motion to Dismiss (Doc. 40) and Reply Memorandum in Support of that Motion (Doc. 59.) Attorney

General Brown believes additional briefing on these issues is unnecessary and would be largely

redundant and duplicative.

DATED: April 11, 2025.

OFFICE OF THE UTAH ATTORNEY GENERAL

/s/ David N. Wolf
DAVID N. WOLF
Assistant Utah Attorney General
*Counsel for Utah Attorney General*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on April 11, 2025, I served the foregoing, *Response to Certification*

*Under 28 U.S.C. § 2403,* using the Court's electronic filing system, which gave notice to the

following:

Tanner J. Bean
Jacqueline M. Rosen
FABIAN VANCOTT
95 South State Street, Suite 2300
Salt Lake City, UT 84111-23323
tbean@fabianvancott.com
jrosen@fabianvancott.com
*Counsel for Plaintiffs*

<u>*/s/ Lily Egginton*</u>
LILY EGGINTON
Legal Secretary

App-5:158

MITCHELL A. STEPHENS (11775)
JUSTIN L. JAMES (15167)
DILLON P. OLSON (16120)
JAMES DODGE RUSSEL & STEPHENS, P.C.
10 West Broadway, Ste. 400
Salt Lake City, Utah 84101
mstephens@jdrslaw.com
lswensen@jdrslaw.com

*Attorneys for Defendants Utah County and Jeffrey Gray*

J. BRIAN JONES (11816)
GARY D. MILLWARD (12170)
RICHARD A. ROBERTS (12217)
PROVO CITY ATTORNEY'S OFFICE
445 W Center St.
Provo, Utah 84601
(801) 852-6140
gmillward@provo.gov
rroberts@provo.gov

*Attorneys for Defendants Provo City*

---

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BRIDGER LEE JENSEN; SINGULARISM; PSYCHE HEALING AND BRIDGING, LLC dba PSYCHEDELIC THERAPY JOURNEY;<br><br>    Plaintiffs,<br><br>    vs.<br><br>UTAH COUNTY; PROVO CITY; JEFFREY GRAY; TROY BEEBE; BRIAN WOLKEN; JACKSON JULIAN; JOHN DOES 1-;<br><br>    Defendants. | **STIPULATED MOTION TO STAY PROCEEDINGS**<br><br>Civil Case No. 2:24-cv-00887-JNP<br><br>Judge Jill N. Parrish |

App-5:159

Defendants Utah County and Jeffrey Gray, Defendant Provo City, and Plaintiffs Bridger

Lee Jensen, Singularism, Psyche Healing and Bridging, LLC, collectively the Parties, move this

Court to stay all proceedings in this case for sixty days. The Parties have exchanged settlement

offers and counteroffers. Based on those preliminary negotiations, the Parties feel it is in the best

interests of their respective clients to pursue resolution through mediation.

Consistent with Alternative Dispute Resolution under the Local Rules of Civil Practice

DUCivR 16-2, and this Court's inherent authority to manage the cases before it, the Parties request

that this Court stay all proceedings and rulings for sixty days in this case to allow the Parties to

conduct mediation.

Dated this 3rd day of June, 2025

JAMES DODGE RUSSELL & STEPHENS, P.C.

/s/ Justin Jones (signed with permission)
Mitchell A. Stephens
Justin L. James
*Counsel for Utah County and Jeffrey Gray*

PROVO CITY LEGAL

/s/ Richard A. Roberts
Gary D. Millward
Richard A. Roberts
*Counsel for Provo City, Troy Beebe, Brian Wolken, and
Jackson Julian*

FABIAN VANCOTT

/s/ Tanner J. Bean (signed with permission)
Tanner J. Bean
Jacqueline M. Rosen
*Counsel for Bridger Lee Jensen, Singularism, Psyche
Healing and Bridging, LLC*

2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BRIDGER LEE JENSEN, SINGULARISM, and PSYCHE HEALING AND BRIDGING,<br><br>Plaintiffs,<br><br>v.<br><br>UTAH COUNTY, PROVO CITY, JEFFREY GRAY, TROY BEEBE, BRIAN WOLKEN, and JACKSON JULIAN,<br><br>Defendants. | **ORDER GRANTING STIPULATED MOTION FOR STAY**<br><br>Case No. 2:24-cv-00887-JNP-CMR<br><br>District Judge Jill N. Parrish |

The parties have filed a stipulated motion to stay proceedings in this case for 60 days to allow them an opportunity to pursue resolution of their dispute through mediation.

The court GRANTS the stay. However, no further stays will be granted. If the court does not receive notice that all claims are fully resolved by Monday, August 4, 2025, it will proceed to issue its order resolving Defendants' motion to dismiss and Plaintiffs' motion for anti-suit injunction.

Signed June 3, 2025.

BY THE COURT

Jill N. Parrish
United States District Court Judge

App-5:161

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BRIDGER LEE JENSEN, SINGULARISM, and PSYCHE HEALING AND BRIDGING, <br><br> Plaintiffs, <br><br> v. <br><br> UTAH COUNTY, PROVO CITY, and JEFFREY GRAY, <br><br> Defendants. | **MEMORANDUM DECISION AND ORDER DENYING DEFENDANTS' MOTION TO DISMISS AND GRANTING PLAINTIFFS' MOTION FOR ANTI-SUIT INJUNCTION** <br><br><br> Case No. 2:24-cv-00887-JNP-CMR <br><br> District Judge Jill N. Parrish |

In February, the court issued an order granting Plaintiffs' motion for preliminary injunction under the Utah Religious Freedom Restoration Act ("RFRA"). ECF No. 92; *Jensen v. Utah County*, No. 2:24-cv-00887, 2025 WL 582812 (D. Utah Feb. 20, 2025). That left Defendants' motion to dismiss and Plaintiffs' motion for anti-suit injunction. The court could not rule on these motions at that time because they required resolving Plaintiffs' constitutional claims, which the court could not consider until the Attorney General of Utah had had an adequate opportunity to weigh in with evidence or argument on Plaintiffs' constitutional challenges. The court sent notice to the Attorney General of Plaintiffs' constitutional claims and gave him until April 11 to present evidence or argument. On April 11, the Attorney General notified the court that he joined in and adopted the arguments made in Defendants' briefing on their motion to dismiss. Before the court issued a decision resolving the two pending motions, the parties requested a 60-day stay because they were engaged in settlement discussions. The stay has now expired, the court has not received notice of settlement, and the remaining two motions are ready for resolution. For the reasons

below, the court DENIES Defendants' motion to dismiss and GRANTS Plaintiffs' motion for anti-

suit injunction.

## ANALYSIS

The court's previous order thoroughly laid out the factual and procedural background of

this case. *Jensen*, 2025 WL 582812, at *2–8. Nothing noteworthy has occurred since. The court

assumes familiarity with this background and proceeds directly to the legal analysis.

### I.  Defendants' Motion to Dismiss

When considering a motion to dismiss, the court must "accept all well-pled allegations in

the complaint as true and view them in the light most favorable to the nonmoving party." *Davis-*

*Warren Auctioneers, J.V. v. FDIC*, 215 F.3d 1159, 1161 (10th Cir. 2000). The court should not

grant the motion "unless it appears beyond doubt that the plaintiff can prove no set of facts in

support of [its] claim which would entitle [it] to relief." *Id.* (internal quotation marks omitted).

Defendants move to dismiss all claims in Plaintiffs' complaint. The court first addresses

the claims under the Federal Constitution, then the claims under the Utah constitution, and finally

the claims under the Utah RFRA.

#### A.  Federal Constitution First Amendment Claim

The Free Exercise Clause of the First Amendment to the U.S. Constitution, incorporated

against the States through the Fourteenth, forbids the States from making any law "prohibiting the

free exercise [of religion]." U.S. CONST. amend. I; *Cantwell v. Connecticut*, 310 U.S. 296 (1940)

(incorporating the Clause against the States). Under the so-called *Smith* rule after the Supreme

Court's decision in *Employment Division v. Smith*, 494 U.S. 872 (1990), "laws incidentally

burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so

long as they are neutral and generally applicable." *Fulton v. City of Philadelphia*, 593 U.S. 522,

533 (2021). A law fails to be "neutral" when it "discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." *Lukumi*, 508 U.S. at 532. And a law fails to be "generally applicable" when it "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 593 U.S. at 534. If a law burdens sincere religious exercise and is either not neutral or not generally applicable, it is subject to strict scrutiny.[1] *Id.* at 533.

---

[1] Courts debate whether the Free Exercise Clause protects only against "substantial" burdens on religious exercise (as opposed to simply burdens, whatever the degree). Before *Employment Division v. Smith*, 494 U.S. 872 (1990), free-exercise claims were often analyzed under *Sherbert v. Verner*, 374 U.S. 398 (1963). *Smith* summarized the *Sherbert* test as follows: "governmental actions that *substantially* burden a religious practice must be justified by a compelling governmental interest." *Smith*, 494 U.S. at 883 (emphasis added). In rejecting the *Sherbert* test, the *Smith* Court stated, "It is no more appropriate for judges to determine the 'centrality' of religious beliefs before applying a 'compelling interest' test in the free exercise field, than it would be for them to determine the 'importance' of ideas before applying the 'compelling interest' test in the free speech field." *Smith*, 494 U.S. at 886–87.

Some judges have read this language from *Smith* to suggest that courts may not constitutionally require that litigants demonstrate a substantial burden on free exercise before claiming protection under the Free Exercise Clause. *See, e.g.*, *Wiggins v. Griffin*, 86 F.4th 987, 1000 (2d Cir. 2023) (Menashi, J., concurring) ("The substantial burden test . . . is constitutionally offensive. It conflicts with the reasoning . . . in *Smith*."). Some circuits do not require litigants to show a substantial burden; others still do. *Compare Williams v. Morton*, 343 F.3d 212, 217 (3d Cir. 2003) ("There is no support for th[e] assertion [that the plaintiff must show a substantial burden]."), *with Levitan v. Ashcroft*, 281 F.3d 1313, 1320 (D.C. Cir. 2002) ("[T]he First Amendment is implicated when a law or regulation imposes a substantial, as opposed to inconsequential, burden on the litigant's religious practice.").

Although it has not squarely addressed the issue, the Tenth Circuit appears not to require that a burden on religious exercise be substantial to trigger First Amendment protections. *See Ashaheed v. Currington*, 7 F.4th 1236, 1243 (10th Cir. 2021) ("The Supreme Court's free exercise cases primarily address *laws that burden religious exercise*." (emphasis added)). And recent Supreme Court cases have relied on the sincerity of the plaintiff's claim, not substantiality of the burden. *See, e.g.*, *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022).

In line with recent circuit and Supreme Court decisions, this court declines to require Plaintiffs to show a substantial burden for their federal constitutional claims. However, the analysis would

When a law is subject to strict scrutiny, the government must show that the law "advances interests of the highest order" (i.e., that it advances compelling interests) and "is narrowly tailored to achieve those interests" (i.e., that it is the least restrictive means of achieving those interests). *Id.* at 541. The government may not couch its compelling interests in broad terms, such as promoting the public safety or ensuring equal treatment of protected groups; rather, it must articulate the "harm of granting specific exemptions to particular religious claimants." *Id.*

Plaintiffs' allegations, if proven, would establish that the government has burdened their sincere religious exercise. Plaintiffs allege, for example, that they "administer[] . . . ceremonial and sacramental psilocybin to [their] voyagers [i.e., spiritual followers]" during their ceremonies and that the Utah Controlled Substances Act categorically prohibits this conduct. ECF No. 2-2 (Complaint), at 9. Being deprived of a sacrament undoubtedly constitutes a burden on religious exercise. *Church of the Holy Light of the Queen v. Mukasey*, 615 F. Supp. 2d 1210, 1219 (D. Or. 2009), *vacated on other grounds*, 443 F. App'x 302 (9th Cir. 2011).

The more difficult question is the appropriate level of scrutiny. Defendants argue that the Act is neutral and generally applicable and that it therefore triggers only rational-basis review (which, the court agrees, it would undoubtedly pass). As they see it, the broad prohibition on possession or distribution of psilocybin does not target religion, either in its history or in its text, and any secular exceptions for psilocybin apply regardless of religious beliefs or affiliations. On the other hand, Plaintiffs argue that the law is not generally applicable, and therefore triggers strict scrutiny, because it allows certain healthcare systems to administer psilocybin in specific

---

proceed no differently even under the alternative formulation because the court finds the burden of Defendants' actions on Plaintiffs' religious exercise to be substantial. *See infra* Section I.E.

nonreligious situations—that is, it provides exemptions for secular use but not for religious use. Although the issue is close, the court agrees with Plaintiffs.

The Utah Controlled Substances Act generally makes it unlawful to knowingly and intentionally possess, use, or dispense a controlled substance. UTAH CODE ANN. § 58-37-8(1)(a)(i), (2)(a)(i). Psilocybin is listed as a Schedule I controlled substance. *Id.* § 58-37-4(2)(a)(iii)(Y). A separate provision of the Act creates an exception for "[d]rugs [used] for behavioral health treatment." *Id.* § 58-37-3.5. This provision allows certain healthcare systems to "develop a behavioral health treatment program that includes a treatment based on a drug that the healthcare system determines is supported by a broad collection of scientific and medical research." *Id.* § 58-37-3.5(2). And it defines "drug" to include "any form of psilocybin . . . that is in federal Food and Drug Administration Phase 3 testing for an investigational drug." *Id.* § 58-37-3.5(1)(a). As long as the healthcare system "ensure[s] that [the psilocybin] . . . is used by a patient [who is at least 18 years old] only under the direct supervision and control of the healthcare system and [its licensed] providers," it may distribute, possess, and administer the drug without penalty. *Id.* § 58-37-3.5(3), (5). But the Act creates no exceptions for sincere religious use of psilocybin.

Plaintiffs do not argue, and the court sees no reason to doubt, that the Act is neutral: nothing in its text or history suggests that it was enacted to target any particular religious practice. Nevertheless, the law creates an exemption for secular psilocybin use without also creating an exemption for religious psilocybin use. Whether the secular exemption causes the law to no longer be generally applicable turns on the extent to which the secular use and Plaintiffs' sincere religious use undermine the government's stated interests. If the secular use undermines the stated interests to the same or greater degree than Plaintiffs' religious use does, then the law is not generally applicable. *See Fulton*, 593 U.S. at 534.

The governmental interest behind the Act, at least according to Defendants, is preventing harm from and abuse of substances that are dangerous or addictive. A religious exemption for Plaintiffs risks undermining these interests, they claim: the psilocybin used for a voyage may be tainted, a facilitator may fail to recognize a contraindicating drug, or a recreational user may pose as a religious practitioner to obtain psilocybin for illegal, nonreligious purposes. But these same risks inhere in the secular exemption, too, especially since the medical exemption imposes no sourcing, testing, or chain-of-custody requirements for the psilocybin administered by healthcare systems. For example, a hospital may source its psilocybin from a disreputable source or accidentally administer psilocybin while the patient is on a contraindicating drug. Or a recreational-user patient may feign certain symptoms to be put on a treatment plan involving psilocybin. A religious exemption for Plaintiffs would not necessarily undermine the government's interest any more than the secular exemption does. And Defendants have provided no evidence so far that Plaintiffs' psilocybin use in practice undermines the government's interest. *See Jensen*, 2025 WL 582812, at *14 ("[T]he evidence here fails to show that Plaintiffs' controlled, sincerely religious use of psilocybin . . . creates a meaningful risk of compromising the government's . . . interests [in preventing abuse, possible harms from drug use, and drug trafficking]."). Therefore, the Act is not generally applicable.

Defendants resist this conclusion, observing that the medical psilocybin exemption does not differentiate based on religion because it applies to all licensed healthcare providers regardless of their religious beliefs or affiliations. Their observation, although correct, misses the point. The Free Exercise Clause is concerned not just with evenhandedness among religions but also evenhandedness between religion and nonreligion. *McCreary County v. Am. C.L. Union of Ky.*, 545 U.S. 844, 860 (2005) (internal quotation marks omitted). A specific, secular exemption for

6

psilocybin without an accompanying religious exemption indicates that the law is not evenhanded as between religion and nonreligion because it "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 593 U.S. at 534. In doctrinal terms, this feature means that the law is not generally applicable.

Defendants also argue that the Utah Controlled Substances Act with its medical exemption for psilocybin mirrors the law at issue in *Smith* and its medical exemption; since *Smith* found that law to be neutral and generally applicable and upheld it on rational-basis review, Defendants urge the court to do the same here. In the court's view, the medical exemption in *Smith* is distinguishable from the medical exemption for psilocybin here because the medical exemption here is specifically directed at psilocybin—indicating a legislative judgment that the restriction on psilocybin can admit of certain exemptions—whereas the medical exemption in *Smith* was merely a general medical exemption.

The plaintiffs in *Smith* sought a religious exemption for peyote, a controlled substance. The Oregon law at issue in *Smith* prohibited the knowing or intentional possession of a controlled substance "unless the substance ha[d] been prescribed by a medical practitioner." *Smith*, 494 U.S. at 874. That state law created a general medical exemption so that controlled substances with legitimate medical uses would not be subject to the law's restrictions; the exemption was not directed toward any particular substance. Accordingly, the law did not by its text create a secular exemption for peyote, the specific drug that the plaintiffs sought to use in their religious practice; the letter of the law prohibited all uses of peyote, secular and religious alike. (It does not appear that peyote was used for medical purposes under the exception.)

7

The medical exemption Plaintiffs rely on here, by contrast, explicitly creates a secular exemption for psilocybin administered in the context of certain behavioral-health treatment programs. That means that the Utah legislature, unlike the Oregon legislature at the time of *Smith*, specifically considered the risks, harms, and benefits of the drug at issue and decided to legalize certain secular uses of it. And as explained above, the risks and harms resulting from the legal secular use of psilocybin are comparable to the risks and harms that would result from Plaintiffs' religious use of psilocybin. So, under the Free Exercise Clause, the State may not provide the secular exemption without also providing a comparable religious exemption. *See Fulton v. City of Philadelphia*, 593 U.S. 522, 534 (2021) (explaining that the government may not "prohibit[] religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way"). Since the law fails to provide a comparable religious exemption, it triggers strict-scrutiny review.

On strict scrutiny, the government bears the burden of showing that the law accomplishes a compelling interest using the least restrictive means. Whether the government can meet this burden depends on the strength of its evidence, an issue typically ill-suited for resolution on a motion to dismiss. Because Plaintiffs' allegations support a prima facie case under the First Amendment, the court denies Defendants' motion to dismiss the First Amendment claim.[2]

---

[2] As it happens, the court has already held an evidentiary hearing in this case and determined that the government is unlikely to meet its burden on strict scrutiny. *See Jensen v. Utah County*, No. 2:24-cv-00887, 2025 WL 582812, at *13–16 (D. Utah Feb. 20, 2025). Although the basis for the court's decision was the Utah RFRA, the strict-scrutiny analysis is identical under the Utah RFRA and the First Amendment. *See* UTAH CODE ANN. § 63G-33-201(3); *Fulton v. City of Philadelphia*, 593 U.S. 522, 541 (2021).

B.    Federal Constitution Fourth Amendment Claim

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. CONST. amend. IV. Plaintiffs' complaint alleges that the officers executing the search warrant on Singularism's spiritual center lacked probable cause to do so because they should have known that Singularism was entitled to a religious exemption for psilocybin. As remedy, Plaintiffs seek damages from Utah County Attorney Jeffrey Gray personally and from the municipalities (Provo City and Utah County). Defendants provide no basis for dismissing these claims.[3] Accordingly, the court denies the motion to dismiss the Fourth Amendment claims.

C.    Utah Constitution Free Exercise Claim

The Utah constitution contains a clause protecting the free exercise of religion similar to that in the Federal Constitution: "The State shall make no law respecting an establishment of religion or prohibiting the free exercise thereof . . . ." UTAH CONST. art. I, § 4. This clause, however, has never been authoritatively interpreted, at least not in the context of a claim for a religious exemption from a criminal law, so it remains unclear how far its protections extend. *See State v. Holm*, 137 P.3d 726, 738 (Utah 2006) ("[O]ur state constitution may well provide greater protection for the free exercise of religion in some respects than the federal constitution . . . ."); *Jeffs v. Stubbs*, 970 P.2d 1234, 1249 (Utah 1998) ("We have never determined whether the free

---

[3] Plaintiffs originally sued the individual officers executing the search warrant as well, and Defendants invoked absolute immunity for public officers but provided no basis for dismissing the claims against Mr. Gray or the municipalities. Plaintiffs subsequently removed the individual officers as Defendants.

exercise clause . . . of the Utah Constitution provides protection over and above that provided by the First Amendment to the United States Constitution.").

Given the "novel [and] complex issue" that Plaintiffs' state-constitution free-exercise claim raises, Defendants urge the court to decline to exercise supplemental jurisdiction over this claim and remand it to state court. 28 U.S.C. § 1367(c). When considering whether to decline to exercise supplemental jurisdiction, "a federal court should consider and weigh . . . the values of judicial economy, convenience, fairness, and comity." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988), *superseded on other grounds by* 28 U.S.C. § 1447(c) (1988). "When the balance of these factors indicates that a case properly belongs in state court . . . , the federal court should decline the exercise of jurisdiction . . . ." *Id.* Although Plaintiffs' state free-exercise-clause claim raises novel and complex issues, the court finds that the balance of the factors weighs toward exercising supplemental jurisdiction. That claim "[is] largely identical" to and "require[s] the same evidence" as Plaintiffs' First Amendment claim (which as explained above survives Defendants' motion to dismiss), and Plaintiffs would ordinarily be expected to try both claims in a single proceeding. *Mabey v. Ray*, No. 4:18-cv-00061, 2019 WL 962183, at * 3 (D. Utah Feb. 4, 2019). "Severing and remanding the state law claims would require the parties to litigate nearly identical matters, based on the same operative facts . . . , in two separate forums . . . [,] expend[ing] unnecessary judicial resources." *Id.* The court therefore rejects Defendants' invitation to decline to exercise supplemental jurisdiction.

When as here a federal court is asked to pass on the meaning of a state law that has not yet been authoritatively interpreted, the court "must make an *Erie*-guess as to how the [state s]upreme [c]ourt would rule" based on "all resources available." *Pehle v. Farm Bureau Life Ins. Co.*, 397 F.3d 897, 901–02 (10th Cir. 2005) (internal quotation marks omitted). The Utah Supreme Court

has indicated in other areas of constitutional law that when a state constitutional provision mirrors

a federal one, the state provision must be analyzed independently with "no presumption that federal

construction of similar language is correct." *State v. Tiedemann*, 162 P.3d 1106, 1114–15 (Utah

2007). When analyzing a question of first impression under the Utah constitution, the Utah

Supreme Court "exmain[es] the historical background against which [that clause] . . . was drafted,"

among other things. *West v. Thomson Newspapers*, 872 P.2d 999, 1013 (Utah 1994). Here, the

court has received minimal briefing on the historical background against which article I, section 4

was adopted, making an *Erie*-guess especially difficult.

Plaintiffs ask the court to interpret this clause to require strict scrutiny for any laws

burdening free exercise.[4] Defendants on the other hand propose that this clause stands for a

principle of strict neutrality and therefore does not protect against free-exercise burdens stemming

from neutral laws. In essence, the parties propose the following two doctrinal formulations: (1) if

a litigant can show a burden on his sincere religious exercise, the government must satisfy strict

scrutiny for the challenged law to stand; and (2) if a law is entirely neutral toward religion generally

and neutral among religions, then the law stands no matter how great a burden it incidentally

imposes on the religious litigant. The former resembles the Supreme Court's jurisprudence before

*Employment Division v. Smith* (except that the Court's pre-*Smith* doctrine first required the

plaintiff to show a *substantial* burden, *see Smith*, 494 U.S. at 883; *supra* note 1); the latter, the

Court's current jurisprudence.

---

[4] Plaintiffs propose strict scrutiny for any free-exercise violation, but they do not explain what should constitute a free-exercise violation. By violation, they most likely mean burden. So, their proposed interpretation would subject a law to strict scrutiny anytime it burdens a litigant's religious exercise.

In choosing between these proposals for the state free-exercise clause, the court is aware of the lively debate surrounding the interpretation of the Federal Free Exercise Clause. Jurists and commentators of all stripes have long criticized the Court's rule under *Smith* (which echoes Defendants' proposal) as insufficiently protective of religious liberty. *See, e.g.*, *Rader v. Johnston*, 924 F. Supp. 1540, 1549 (D. Neb. 1996) ("[T]he majority opinion in *Smith* has been harshly criticized by virtually every legal scholar and commentator addressing the decision, and various members of the Court have demanded reconsideration of the *Smith* holding at the first opportunity." (citation omitted)). Despite the broad consensus, however, the Court has not overruled *Smith*, in part because it is not obvious what a workable alternative doctrine would be. *See Fulton*, 593 U.S. at 543 (Barrett, J., concurring) ("[W]hat should replace *Smith*? The prevailing assumption seems to be that strict scrutiny would apply whenever a neutral and generally applicable law burdens religious exercise. But I am skeptical about swapping *Smith*'s categorical antidiscrimination approach for an equally categorical strict scrutiny regime, particularly when this Court's resolution of conflicts between generally applicable laws and other First Amendment rights . . . has been much more nuanced."). Plaintiffs' proposal, which closely resembles the leading alternative, would raise all sorts of difficult questions. To name just a couple, "Should there be a distinction between indirect and direct burdens on religious exercise?" *Id.* at 544. Or what threshold showing must the religious claimant make to shift the burden to the government to satisfy strict scrutiny?

The court is also aware that most States, about 35, provide greater free-exercise protections than the Federal Constitution does (often in response to the perceived deficiencies in the *Smith* rule). In about 10 of them, those greater protections have come through judicial interpretation of the state constitutions' counterparts to the Free Exercise Clause. *See, e.g.*, *Coulee Cath. Schs. v.*

12

*Lab. & Indus. Rev. Comm'n*, 768 N.W.2d 868, 886 (Wis. 2009) (Wisconsin); *Cath. Charities of Diocese of Albany v. Serio*, 859 N.E.2d 459, 466 (N.Y. 2006) (New York). By contrast, in the remaining 25 or so (including Utah), those greater protections have come through state RFRAs enacted by the state legislatures. *See, e.g.*, 775 ILL. COMP. STAT. 35/1 et seq. (Illinois); TENN. CODE ANN. § 4-1-407 (Tennessee). Finally, the court considers the reality that in this litigation, any relief the state constitution could provide Plaintiffs would overlap with the relief they are already likely to receive under the Federal Constitution and the Utah RFRA.[5]

These considerations at this procedural juncture counsel that it would be wisest to assume—without deciding—that the Utah constitution's free exercise clause provides protections equal to those of the Federal Constitution's Free Exercise Clause. Doing so adheres to "the general rule that courts should avoid reaching constitutional issues if the case can be decided on other grounds." *West*, 872 P.2d at 1004. And it leaves the state court "free and unfettered . . . in interpreting [its] state constitution[]." *Michigan v. Long*, 463 U.S. 1032, 1041 (1983).

Assuming a lockstep interpretation of Utah's free exercise clause, then, the court's analysis of Plaintiffs' federal Free Exercise Clause claims above also controls the resolution of Plaintiffs' state free-exercise-clause claims. Under that analysis, the Utah Controlled Substances Act's restrictions on psilocybin possession and use, though neutral, are not generally applicable due to the secular exemption for behavioral-health treatment by certain healthcare systems and accordingly trigger strict scrutiny if a plaintiff can show that the restrictions burden its religious exercise. And Plaintiffs' complaint alleges facts sufficient for the court to conclude that Plaintiffs

---

[5] Plaintiffs could potentially obtain a declaratory judgment and injunction under the Federal Constitution and the Utah RFRA, and damages under the Federal Constitution (through § 1983). The Utah constitution would not provide any additional remedies.

have alleged a burden on their free exercise. At this stage, then, the court denies Defendants'

motion to dismiss Plaintiffs' state free-exercise-clause claim.

      D.      Utah Constitution Search and Seizure Claim

Much like its federal counterpart, the Utah constitution protects against "unreasonable

searches and seizures" and provides that "no warrant shall issue but upon probable cause supported

by oath or affirmation." UTAH CONST. art. I, § 14. As with their Fourth Amendment claim,

Plaintiffs allege that the officers who executed the search warrant and seized the mushrooms and

scripture lacked probable cause to do so. Defendants invoke the Utah Governmental Immunity

Act.

Utah's Governmental Immunity Act immunizes governmental entities and their employees

"from suit for any injury that results from the exercise of a governmental function," UTAH CODE

ANN. § 63G-7-201(1), unless immunity is waived, *id.* § 63G-7-301 (setting out various waivers of

immunity). The Act defines governmental function broadly to include "each activity, undertaking,

or operation performed by a department, agency, employee, agent, or officer of a governmental

entity." *Id.* § 63G-7-102(5)(b). However, the Act "does not apply to claims alleging state

constitutional violations." *Jensen ex rel. Jensen v. Cunningham*, 250 P.3d 465, 479 (Utah 2011).

Because Plaintiffs' claim is based in the Utah constitution, under binding Utah Supreme Court

law, immunity under the Act does not attach. Accordingly, the court denies Defendants' motion to

dismiss as to this claim.

      E.      Utah RFRA Claim

As noted previously, Utah passed its version of RFRA last year. Under the Utah RFRA, "a

government entity may not substantially burden the free exercise of religion of a person, regardless

of whether the burden results from a rule of general applicability," unless "the government

14

entity . . . demonstrates that the burden on the person's free exercise of religion is: (a) essential to furthering a compelling governmental interest; and (b) the least restrictive means of furthering the compelling governmental interest"—that is, unless the government satisfies strict scrutiny. UTAH CODE ANN. § 63G-33-201(2)(a), (3).

As a threshold matter, Defendants argue that Plaintiffs cannot seek relief under the Utah RFRA because they did not satisfy its notice requirement. Under the statute, "a person may not bring an action against a government entity unless, at least 60 days before the day on which the person brings the action, the person provides written notice to the government entity." UTAH CODE ANN. § 63G-33-201(5)(a). That notice must "(i) state[] that the person intends to bring an action against the entity for a violation of [RFRA]; (ii) describe[] the government action that has burdened . . . the person's free exercise of religion; and (iii) describe[] the manner in which the government action burdens . . . the person's free exercise of religion." *Id.* Defendants concede that Plaintiffs emailed them a notice of claim on November 19, 2024—more than 60 days before Plaintiffs filed an amended complaint on January 22, 2025.[6] Plaintiffs' Utah RFRA claim is therefore properly before the court.

Onto the merits of the claim then. The plain text of the statute requires the plaintiff to demonstrate not just a burden but a *substantial* burden on sincere religious exercise.[7] This language is nearly identical to that in the federal RFRA on which the Utah RFRA was modeled,

---

[6] Plaintiffs originally filed their amended complaint as an exhibit to the document containing the parties' stipulation concerning the amended complaint. ECF No. 73-1. On February 4, 2025, the court ordered Plaintiffs to file their amended complaint as a separate entry on the docket, which Plaintiffs did the next day. ECF No. 83.

[7] It is unsettled whether the Free Exercise Clause also contains this requirement under recent case law, though the Tenth Circuit appears to have indicated that it does not. *See supra* note 1.

42 U.S.C. § 2000bb–1(a), and the federal RFRA drew this language from pre-*Smith* case law, *see id.* § 2000bb(b). How courts should assess whether a burden on religious exercise is substantial in a principled manner without wading into questions of theology is a subject of ongoing debate. *See, e.g.*, Michael A. Helfand, *Substantial Burdens as Civil Penalties*, 108 IOWA L. REV. 2189 (2023) (encouraging courts to consider the burdens of civil penalties for noncompliance); Sherif Girgis, *Defining "Substantial Burdens" on Religion and Other Liberties*, 108 VA. L. REV. 1759 (2022) (encouraging courts to consider whether a challenged law leaves adequate alternative ways to exercise religious rights). The court need not begin to resolve this issue, however, because by any measure, Plaintiffs' allegations, if proven, would establish that the government has substantially burdened their sincere religious exercise. Plaintiffs allege that they offer a "sacramental psilocybin tea" to their voyagers, who then embark on a spiritual journey by which they "write their own scripture." Complaint at 8. A law that categorically prohibits the possession and use of the psilocybin sacrament—thereby preventing Singularism's adherents from pursuing their spiritual voyages and hindering them from producing their sacred scripture—not only burdens but substantially burdens the free exercise of Singularism and its adherents.[8] *Church of the Holy Light of the Queen*, 615 F. Supp. 2d 1210.

Defendants challenge this commonsense conclusion by arguing that Plaintiffs cannot allege a substantial burden as that term is defined in the Utah RFRA. As they see it, Defendants' actions of seeking a criminal penalty, as opposed to assessing a criminal penalty, do not count as a

---

[8] Although it does not matter for deciding the motion to dismiss, this court has also found that Plaintiffs' allegations are supported by evidence. *See Jensen*, 2025 WL 582812, at *9.

substantial burden. *See* UTAH CODE ANN. § 63G-33-101(6)(b)(i)(B) (noting that "substantially

burden" includes "*assessing* criminal, civil, or administrative penalties" (emphasis added)).

This challenge entirely misses the mark and borders on the disingenuous. Most

fundamentally, Defendants fixate on their criminal prosecution as the source of the burden on

Plaintiffs' religious exercise when the root of the burden is the Utah Controlled Substances Act

and its direct prohibitions on psilocybin use. If the statute did not prohibit Plaintiffs' psilocybin

use, Defendants would have no basis for prosecuting Mr. Jensen. And to state the obvious, a statute

can substantially burden religious exercise. *See id.* § 63G-33-101(6)(b)(ii)(A)(I).

Even if the court focused narrowly on Defendants' prosecution as the source of the burden,

the prosecution still fits comfortably within the statute's expansive definition of substantially

burden. *See id.* (recognizing that an "assertion of governmental authority" can substantially burden

religious exercise). In pressing their argument about seeking versus assessing criminal penalties,

Defendants grossly misconstrue the text they cite. The subsection Defendants point to says that

"'substantially burden' *includes* . . . assessing criminal . . . penalties." *Id.* (emphasis added). The

word "includes" indicates that what follows is not an exhaustive list, and nothing in the statute

excludes a criminal prosecution from the definition of substantial burden. Rather, the subsection

consistently uses very broad language to define substantial burden. *See, e.g.*, § 63G-33-101(6)

(recognizing that substantial burdens could be imposed "directly" or "indirectly" and could stem

from "law, statute, ordinance, rule, policy, order, or other assertion of governmental authority" or

"any other means").

Finally, the implications of Defendants' argument are breathtaking. Suppose the State of

Utah decided to give Prohibition another try and passed a law banning the possession, use, or

distribution of alcoholic beverages with a limited exception for red wine administered by a

17

healthcare system for medical reasons. Then suppose that Catholic priests in Provo, believing themselves to be protected by the Utah RFRA, distributed wine during Mass and consequently faced criminal prosecution by Utah County. According to Defendants' theory, as long as no criminal penalties were actually imposed on the priests, their religious exercise would not be substantially burdened, either by the law banning alcoholic beverages or by the criminal prosecution. The ludicrousness of Defendants' argument here needs no explanation. In any event, the court concludes that Plaintiffs have alleged a substantial burden on their free exercise and consequently established their prima facie case. It accordingly denies Defendants' motion to dismiss the state RFRA claim as well.

## II.    Plaintiffs' Motion for Anti-Suit Injunction

After the government filed criminal charges against Mr. Jensen, Plaintiffs also moved for an anti-suit injunction against the state criminal prosecution. In their view, the state-court prosecution—brought by the same government Defendants that removed this civil case to federal court in the first place—subverts the purposes of the removal statute by giving the government a second opportunity to litigate the issues on which the government appears poised to lose in this court. Plaintiffs accordingly urge this court to exercise its authority under the All Writs Act, 28 U.S.C. § 1651, to enjoin the state-court prosecution pending final judgment in this court. Defendants' opposition invokes abstention and the Anti-Injunction Act, 28 U.S.C. § 2283, to argue that it would be improper for the court, at least at this preliminary stage in the proceedings, to enjoin the prosecution. The court begins by addressing abstention.

In our system of federalism, "when federal courts are asked to enjoin pending proceedings in state court[]," the "normal thing to do . . . is not to issue such injunctions." *Younger v. Harris*, 401 U.S. 37, 45 (1971). This abstention principle is grounded in comity—a proper respect for state

18

functions—and applies even more powerfully when the state proceeding is criminal in nature

because state officers "are charged with the duty of prosecuting offenders against the laws of the

state." *Fenner v. Boykin*, 271 U.S. 240, 243 (1926).

The doctrine guiding federal courts in determining whether to proceed in a federal case that

would interfere with a pending state case is called *Younger* abstention after the Supreme Court's

decision in *Younger v. Harris*. Although *Younger* abstention sometimes applies even when the

pending state case is civil in nature, it primarily protects state criminal cases from federal

interference. *See Huffman v. Pursue*, 420 U.S. 592, 604 (1975). Under *Younger*, a federal court

should abstain from hearing the merits in a federal case challenging a state prosecution when (1)

the state proceeding is "ongoing"; (2) the state forum provides an adequate opportunity to raise

the relevant federal claims; and (3) the state proceeding implicates an important state interest.

*Graff v. Aberdeen Enterprizes, II, Inc.*, 65 F.4th 500, 523 (2023). Because *Younger* abstention is a

doctrine based on comity, not jurisdiction, a defense based on *Younger* can be waived. *Ohio C.R.

Comm'n v. Dayton Christian Schs., Inc.*, 477 U.S. 619, 626 (1986). Moreover, the doctrine

recognizes certain narrow exceptions, such as in cases where the state prosecution is brought in

bad faith or the plaintiff faces irreparable harm. *Younger*, 401 U.S. at 49.

Defendants urge this court to deny Plaintiffs' motion for anti-suit injunction on the grounds

that a state criminal case is now proceeding against Mr. Jensen that allows him a full and fair

opportunity to raise his constitutional and statutory claims in defense. The court sees no reason

why Mr. Jensen could not raise his various claims in defense in the state criminal case (the second

*Younger* condition). And it is beyond debate that the state criminal case implicates the State of

Utah's important interests in prosecuting those who violate its controlled-substances laws (the

19

third *Younger* condition). Whether the state criminal case is "ongoing" within the *Younger*

analysis, however, is a more difficult issue.

In assessing whether a state proceeding is ongoing at the time the federal case begins, the

federal court may not simply compare the filing dates of the two cases. Rather, the court must

examine whether "state criminal proceedings are begun . . . before any proceedings of substance

on the merits have taken place in the federal court." *Hicks v. Miranda*, 422 U.S. 332, 349 (1975).

Even if the state proceeding commences after the federal case is filed, the federal court must

abstain if the federal case was still in in an "embryonic stage and no contested matter had been

decided" when the state proceeding began. *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 929 (1975).

What counts as a state proceeding in this analysis is not settled: "[c]ircuits are split on the

issue of whether *Younger* abstention applies in the pre-indictment stages of a criminal proceeding."

*Pawelsky v. County of Nassau*, 684 F. Supp. 3d 73, 82 (E.D.N.Y. 2023). The Supreme Court has

hinted that *Younger* abstention should apply to "about-to-be-pending state criminal action[s]."

*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 n.1 (1992). And as relevant to the facts

here, many courts have determined that a state criminal proceeding for *Younger* purposes begins

with the execution of a search warrant. *See, e.g.*, *Kingston v. Utah County*, No. 97-4000, 1998 WL

614462, at *4 (10th Cir. 1998); *Pawelsky*, 684 F. Supp. 3d at 83 ("[J]udicial authorization of a

search warrant is part of a criminal proceeding because it occurs in a criminal court and is related

to a prospective criminal action or involves a criminal investigation." (internal quotation marks

omitted)); *Nick v. Abrams*, 717 F. Supp. 1053, 1056 (S.D.N.Y. 1989) ("[C]ommon sense dictates

that a criminal investigation is an integral part of a criminal proceeding."). *But see Moore v.*

*Garland*, No. CV 19-00290, 2024 WL 4534597, at *3 (D. Ariz. 2024) (implying that the state-

court proceeding was initiated when the indictment was returned, not when the search warrants were executed).

The Tenth Circuit appears not to have published a binding decision on the matter yet. If the execution of a search warrant begins a state criminal proceeding for *Younger* purposes—as the weight of the authority appears to indicate—then the conditions for *Younger* abstention would be satisfied here because the search warrants were executed even before Plaintiffs filed their action in state court seeking declaratory judgment and preliminary relief. (That Plaintiffs filed the action in state court and Defendants subsequently removed it to federal court does not affect the analysis here. The court considers this procedural feature in its discussion of waiver and bad faith below.) Ultimately, however, the court determines that it need not decide whether a state criminal proceeding was ongoing when this federal case began because it can resolve the issue of *Younger* abstention on waiver and the bad-faith and irreparable-harm exceptions.[9]

As noted above, a state can waive a *Younger* abstention defense. The court finds that Defendants have waived their *Younger* defense by removing to federal court the civil action Plaintiffs originally filed in Utah state court. The weight of the case law "support[s] . . . the principle that the *Younger* abstention defense is waived when an action is removed from state court

---

[9] The court also notes that Defendants appear to have taken inconsistent positions on whether state proceedings had begun when the federal case began. At the December 13 hearing on Plaintiffs' motion for a temporary restraining order, Defendants argued that the mere threat of criminal prosecution at the time of the federal case did not constitute government action as part of their attempt to persuade the court that the ongoing-harm exception to the Utah RFRA notice requirement did not apply. *See* ECF No. 53-1 ("TRO Hearing Transcript"), at 233. Now, in their opposition to Plaintiffs' motion for anti-suit injunction, Defendants urge the court to take a broader view of the criminal process and find that a state criminal proceeding was ongoing at the time the federal case began because the government had executed search warrants and threatened prosecution. If nothing else, this shift in position simply underscores the court's finding of bad faith, *infra*.

and federal jurisdiction is thereby invoked by the defendant." *Cummings v. Husted*, 795 F. Supp. 2d 677, 692 (S.D. Ohio 2011); *see also Ryan v. State Bd. of Elections*, 661 F.2d 1130, 1136 (7th Cir. 1981) ("[When a] state defendant affirmatively remove[s a] case from state to federal court[, i]ts submission to a federal forum . . . renders *Younger* abstention inapplicable."). As one district court explained by analogy to Eleventh Amendment immunity, "*Younger* abstention is a doctrine of federal-state comity that limits the extent to which state defendants may be sued in federal court." *Kenny A. ex rel. Winn v. Perdue*, 218 F.R.D. 277, 285 (N.D. Ga. 2003). When state defendants "are in federal court only because of their own decision to remove the case from state court[, i]t would be fundamentally unfair to permit [them] to argue that th[e federal c]ourt must abstain from hearing the case." *Id.* "To do so would permit [state] defendants effectively to prevent [the] plaintiffs from pursuing their federal claims in *any* forum." *Id.*

To avoid the straightforward consequences of their own decision to remove this case, Defendants point to *Dowden v. City of Sacramento*, 40 F. Supp. 2d 1146 (E.D. Cal. 1999), which stated in a footnote that "a state does not waive the comity and federalism interests undergirding *Younger* by invoking the jurisdiction of the federal courts." *Id.* at 1152 n.5. In this court's view, *Dowden* incorrectly interpreted a passage from the Supreme Court's opinion in *Ohio Civil Rights Commission v. Dayton Christian Schools, Inc.*, to mean that a state defendant does not waive its *Younger* abstention defense by removing an action to federal court.

In *Ohio Civil Rights Commission*, the plaintiffs, a private school system and various individuals, sued in federal court to enjoin a pending state civil-rights administrative proceeding against the private school system. *Ohio C.R. Comm'n*, 477 U.S. at 622. The state defendant stipulated in the federal district court that the court had jurisdiction of the action but urged the court to abstain under *Younger*. *Id.* at 626. The plaintiffs then argued that the defendants had

22

App-5:183

waived their *Younger* defense by stipulating to the federal court's jurisdiction, but the Supreme Court disagreed: since *Younger* abstention is based in considerations of comity, not jurisdiction, the defendants' stipulation to jurisdiction did not waive their *Younger* defense. *Id.* To waive their *Younger* defense, the defendant would have had to "voluntarily submit to federal jurisdiction." *Id.* The *Dowden* case appears to have conflated stipulating to federal jurisdiction on the one hand with voluntarily submitting to federal jurisdiction on the other.

A state defendant's decision to remove an action to federal court is perhaps the most straightforward way for it to voluntarily submit to federal jurisdiction and thereby waive its *Younger* defense. *See Kenny A.*, 218 F.R.D. at 285; *see also Ohio Bureau of Emp. Servs. v. Hodory*, 431 U.S. 471, 480 (1977) ("If the State voluntarily chooses to submit to a federal forum, principles of comity do not demand that the federal court force the case back into the State's own system."). A finding of waiver is particularly warranted where, as here, "the [state] defendant seek[s] to manipulate the forum in order to . . . hedge its bet on the merits." *Adibi v. Cal. State Bd. of Pharmacy*, 461 F. Supp. 2d 1103, 1111 (N.D. Cal. 2006).

Recall that Plaintiffs filed their civil action in state court on November 19 (eight days after state officers executed a search warrant at Singularism's spiritual center and seized their mushrooms and scripture). Defendants then removed the action to federal court on November 27, and the court held a hearing on Plaintiffs' request for a temporary restraining order on December 13. Only after this court determined that Plaintiffs were likely to prevail on the merits of their state RFRA claim did Defendants institute criminal proceedings against Mr. Jensen and invoke *Younger* abstention. From this sequence of events, the court finds that Defendants commenced the state criminal action (the basis for their abstention argument now) in order to relitigate the RFRA issue on which they appear to be poised to lose in this court—in other words, to get a second bite at the

23

apple. The court will not allow the shield of the *Younger* doctrine to be used as a gamesmanship sword.

Even if Defendants had not waived their *Younger* abstention defense by voluntarily invoking federal jurisdiction, the court finds that the bad-faith and irreparable-injury exceptions apply. In the Supreme Court's formulation, *Younger* does not prevent a federal court from granting injunctive relief against pending state criminal proceedings "in cases of proven harassment or prosecutions undertaken by state officials in bad faith without hope of obtaining a valid conviction and perhaps in other extraordinary circumstances where irreparable injury can be shown." *Perez v. Ledesma*, 401 U.S. 82, 85 (1971).

In assessing whether a state prosecution was commenced in bad faith, courts consider the following factors: "(1) whether it was frivolous or undertaken with no reasonably objective hope of success; (2) whether it was motivated by the defendant's suspect class or in retaliation for the defendant's exercise of constitutional rights; and (3) whether it was conducted in such a way as to constitute harassment and an abuse of prosecutorial discretion." *Phelps v. Hamilton*, 122 F.3d 885, 889 (10th Cir. 1997). The court finds that the balance of the factors weighs strongly in favor of finding that the state prosecution was commenced in bad faith.[10] The government filed its criminal

---

[10] The court expresses no view on whether the issuance and execution of the search warrants was done in bad faith. The court also recognizes that earlier in this opinion, it declined to settle the issue of when state criminal proceedings began for *Younger* purposes—whether they began with the execution of the search warrants or whether they began with the commencement of the prosecution against Mr. Jensen—but recognized that the weight of the authority suggested the former. One could plausibly argue that if the execution of the search warrant marked the start of the state criminal proceedings and if the search warrant was issued and executed in good faith (as it may well have been here), then the bad-faith exception cannot apply, regardless of the circumstances surrounding the subsequent prosecution. But this argument would potentially allow a state to insulate a bad-faith prosecution from federal-court review by pointing to the initial good-faith issuance and execution of a search warrant. Given that "the issue of *Younger* abstention can

24

charges five days after this court had already issued a temporary restraining order concluding that

Plaintiffs were likely to succeed on the merits of their claim that their use of psilocybin for religious

purposes is protected. As explained above, this fact in context suggests that the government, having

preliminarily lost in this court, is attempting to get a favorable ruling from a more sympathetic

court. Although this court does not find the prosecution to be objectively frivolous (after all, if

Plaintiffs' religious-exercise claims do not ultimately succeed, they will have admitted to violating

the State's criminal drug laws), the court does find that the prosecution is grounded in the

government's refusal to recognize the sincerity of a religion that to it appears foreign, strange, or

illogical. And in the context of the intrusive, offensive questioning from Defendants' counsel

during the December 13 hearing and the vastly overbroad expedited discovery requests, the court

has no hesitation finding that the government pursued the prosecution primarily to harass Plaintiffs

into ceasing their sincere religious practices.

Separately, the threat to a plaintiff's federally protected rights is irreparable within the

meaning of the *Younger* doctrine "only . . . if it 'cannot be eliminated by his defense against a

single criminal prosecution.'" *Id.* (quoting *Younger*, 401 U.S. at 46). Even before the prosecution

commenced against Mr. Jensen, Defendants pressured the landlord of Singularism's spiritual

center to evict Singularism. Plaintiffs also presented evidence that Singularism was losing

adherents due to Defendants' raid, and the very real threat of criminal prosecution against more of

Singularism's members and affiliates will only continue to shrink its ranks. Mr. Jensen's defense

---

be addressed by a federal court at any time," not just "at the onset of a case," *Adibi v. Cal. State Bd. of Pharmacy*, 461 F. Supp. 2d 1103, 1109 (N.D. Cal. 2006), the court finds it proper to assess whether the subsequent prosecution was brought in bad faith even if the relevant state proceeding triggering *Younger* abstention was the initial execution of the search warrant.

in state court, even if successful, cannot remedy these associational harms to Singularism and its adherents. *See Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975) ("[A]bsent preliminary relief [enjoining a state-court prosecution], [the federal plaintiffs] would suffer substantial loss of business and perhaps even bankruptcy.").

In sum, Defendants have waived their defense of *Younger* abstention by removing the action to federal court, but even if removal did not constitute waiver, this case falls into the bad-faith and irreparable-injury exceptions to *Younger* abstention. Having resolved the threshold issue of abstention, the court now considers its authority to issue the injunction Plaintiffs request. To do so, it must examine the All Writs Act and the Anti-Injunction Act.

The All Writs Act, which traces its origins to the Judiciary Act of 1789 organizing the federal judiciary, authorizes federal courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651. This authority is limited by the Anti-Injunction Act, adopted just a few years later in 1793, which prohibits federal courts from granting injunctions to stay proceedings in a state court except in three limited situations: "as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283. The purpose of the Anti-Injunction Act is to "forestall the inevitable friction between the state and federal courts that ensues from the injunction of state judicial proceedings by a federal court." *Vendo Co. v. Lektro-Vend Corp.*, 433 U.S. 623, 630 (1977). It acts as an "absolute prohibition enjoining state court proceedings, unless the injunction falls within one of the specific[] . . . exceptions." *Atl. Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 286 (1970). Plaintiffs argue that this case falls into both of the first two exceptions and is likely to fall into the third exception as well.

26

The third exception, known as the relitigation exception, is easy to reject here. This "strict and narrow" exception applies only when "the claims or issues which the federal injunction insulates from litigation in state proceedings *actually have been decided* by the federal court." *Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 148 (1988) (emphasis added). Since the current action is in a preliminary stage, no claims or issues have been actually decided by this court, and the relitigation exception cannot prevent a parallel state-court action.

The second exception, "in aid of" the federal court's jurisdiction, is also simple to reject here because it applies only to actions in rem—that is, actions concerning ownership of a specific piece of property. In those actions, "the effect of [a parallel state] action would be to defeat or impair the jurisdiction of the federal court" because the federal court deciding the claims must exercise "possession or control, actual or potential, of the res [i.e., piece of property]." *Kline v. Burke Constr. Co.*, 260 U.S. 226, 229 (1922). But "a controversy over a mere question of personal [or governmental] liability does not involve the possession or control of a thing, and an action brought to enforce such liability does not tend to defeat the jurisdiction of the court in which a prior action for the same cause is pending." *Id.* This case concerns Defendants' alleged liability for violating Plaintiffs' constitutional and statutory free-exercise rights, not a specific piece of property, so the second exception is inapplicable.[11]

---

[11] Plaintiffs point to more recent cases to argue that this second exception should not be construed so narrowly as to apply only to in rem actions; rather, they urge, it also applies to actions removed from state to federal court. *See, e.g.*, *Est. of Brennan ex rel. Britton v. Church of Scientology Flag Serv. Org., Inc.*, 645 F.3d 1267, 1273 (11th Cir. 2011). Even if so, the exception would apply only to the action that is removed, not to a closely related separate action. "*[N]ecessity* is required to invoke this exception; 'it is not enough that the requested injunction is related to th[e exercise of federal] jurisdiction.'" *Id.* (quoting *Atl. Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 295 (1970)).

The first exception, as "expressly authorized" by Congress, though, does support issuing an anti-suit injunction insofar as it is based on Plaintiffs' First Amendment claims. For this first exception to apply, "an Act of Congress must have created a specific and uniquely federal right or remedy . . . that could be frustrated if the federal court were not empowered to enjoin a state court proceeding." *Mitchum v. Foster*, 407 U.S. 225, 237 (1972).

Initially, Plaintiffs argue that the removal provisions, 28 U.S.C. § 1441, 1446, under which Defendants brought this civil case from state court to federal court, constitute an express authorization from Congress to enjoin the state prosecution here. Under Supreme Court precedent, "[t]he statutory procedures for removal of a case from state court to federal court provide that the removal acts as a stay of the state-court proceedings," explicitly authorizing the federal court to enjoin further litigation of the removed action in state court. *Vendo Co.*, 433 U.S. at 640. Whether those provisions also permit the federal court to enjoin a separate state action filed to litigate the same issues between the same parties in state court is the subject of a longstanding circuit split.

Several appellate courts have concluded that "[a]lthough the removal statute . . . commands the state court to stay [only] the case that was actually removed, it [also] . . . authorize[s] courts to enjoin later filed state cases that were filed for the purpose of subverting federal removal jurisdiction." *Kan. Pub. Emps. Retirement Sys. v. Reimer & Koger Assocs., Inc.*, 77 F.3d 1063 (8th Cir. 1996); *see also Lou v. Belzberg*, 834 F.2d 730, 741 (9th Cir. 1987) ("It would be of little value to enjoin continuance of a state case after removal and then permit the refiling of essentially the same suit in state court."); *Frith v. Blazon-Flexible Flyer, Inc.*, 512 F.2d 899, 901 (5th Cir. 1975) ("[W]here a district court finds that a second suit filed in state court is an attempt to subvert the purposes of the removal statute, it is justified and authorized by § 1446(e) in enjoining proceedings in the state court."). *But see Ackerman v. ExxonMobil Corp.*, 734 F.3d 237, 252 (4th Cir. 2013)

28

("[Section] 1446(d) invalidates post-removal actions taken in state court in the removed case, but it does not reach (and therefore does not invalidate) actions taken in cases other than the removed case."). These cases followed a similar pattern: a plaintiff filed an action in state court, the defendant removed the action to federal court, then the plaintiff filed a nearly identical action again in state court but without the federal jurisdictional hook (i.e., a federal claim if the defendant's removal was based on federal-question jurisdiction, or complete diversity of parties if the defendant's removal was based on diversity jurisdiction) to preclude removal a second time.

The Tenth Circuit has yet to resolve the question, and the court finds the Fourth Circuit's view more persuasive than that of the other three appellate courts cited above. Crucially, the text of the removal statute appears to cover only the action removed from the state system. 28 U.S.C. § 1446(d) ("[T]he clerk of [the] State court . . . shall effect the removal[,] and the State court shall proceed no further unless and until *the case* is remanded." (emphasis added)). Courts should hesitate to read the removal statute more expansively given the Supreme Court's repeated admonition that "[a]ny doubts as to the propriety of a federal injunction against state court proceedings should be resolved in favor of permitting the state courts to proceed in an orderly fashion to finally determine the controversy." *Vendo Co.*, 433 U.S. at 630 (alteration in original) (quoting *Atl. Coast Line*, 398 U.S. at 297)).

But even if this court interpreted the removal statute to permit injunctions against copycat state-court actions, it still would not permit an injunction against the criminal prosecution here. As noted above, "in order to qualify as an 'expressly authorized' exception to the anti-injunction statute, an Act of Congress must have created a specific and uniquely federal right or remedy, enforceable in a federal court of equity, that could be frustrated if the federal court were not empowered to enjoin a state court proceeding." *Mitchum*, 407 U.S. at 237. That is, this exception

29

may be invoked only to protect a specific federal right created by Congress. The federal removal statute provides the defendant a specific and uniquely federal right to have the claims against it heard in federal court. So, any injunction authorized by the removal statute must be directed toward protecting the defendant's right to be heard in a federal forum (for example, an injunction against the plaintiff's copycat state-court action). An injunction against the state government's own criminal prosecution here, by contrast, would do nothing to protect Defendants' right to be heard in a federal forum because that prosecution does not threaten Defendants' removal rights in the first place. Indeed, it is *Plaintiffs* here, not Defendants, who request the court to enjoin the separate state-court proceeding.

Although the federal removal statute does not expressly authorize the court to enjoin the state prosecution, it is well settled that "§ 1983 is an Act of Congress that [does] fall[] within the 'expressly authorized' exception." *Mitchum*, 407 U.S. at 242–43. Thus, the court may enjoin the state prosecution insofar as the prosecution "subjects . . . [Plaintiffs] to the deprivation of . . . rights . . . secured by the [Federal] Constitution." 42 U.S.C. § 1983. To be sure, an injunction against a state prosecution is an exceptionally extraordinary remedy given the "general rule" that a federal court "has no jurisdiction to enjoin criminal proceedings . . . under the state law." *Ex Parte Young*, 209 U.S. 123, 161 (1908). That rule, however, does not apply in "situation[s] in which defense of the State's criminal prosecution will not assure adequate vindication of constitutional rights." *Dombrowski v. Pfister*, 380 U.S. 479, 485 (1965).

Based on a thorough review of the evidence, the court concludes "that a substantial loss or impairment of freedoms of expression will occur if appellants must await the state court's disposition and ultimate review in [the Supreme] Court of any adverse determination." *Id.* at 486. As explained above, Plaintiffs have alleged a prima facie case under the Free Exercise Clause—

that is, the Utah Controlled Substances Act is subject to strict scrutiny insofar as it restricts

Plaintiffs' religious use of psilocybin—and this court has already found that the government is

unlikely to meet its burden on strict scrutiny. That means that Plaintiffs are likely to succeed on

the merits of their Free Exercise Clause claim. And "religious freedom . . . has classically been

one of the highest values of our society." *Braunfeld v. Brown*, 366 U.S. 599, 612 (1961). So, the

loss of Plaintiffs' religious freedom pending the conclusion of the state criminal prosecution

"unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592

U.S. 14, 19 (2020) (internal quotation marks omitted).

The irreparable injury to Plaintiffs is not merely theoretical. Based on the record in this

case, the court notes once again its finding that the prosecution was brought in bad faith as part of

a larger effort to harass Plaintiffs for their entheogenic religious practices and in hopes of giving

the government a second opportunity to litigate the free-exercise issues presented squarely in this

case. The prosecution has already caused Singularism to lose many of its practitioners and

affiliates, and forcing Plaintiffs to wait until the conclusion of the criminal proceedings to secure

their free-exercise rights would be the equivalent of issuing a death warrant for their nascent

religion. For these reasons, the court grants Plaintiffs' motion for an anti-suit injunction pending

final judgment in this court enjoining further proceedings in the state criminal case against Mr.

Jensen insofar as that case prosecutes him for violating the Utah Controlled Substances Act's

prohibitions on psilocybin.[12]

---

[12] The state criminal case, *State v. Jensen*, Case No. 241404407 (4th Dist. Utah), also prosecutes
him for possession and use of THC. Mr. Jensen represents that he is a member of the Church of
the Native Americans and possesses a membership card indicating that he is qualified to carry,
possess, and use Native American Church sacraments like cannabis. However, he has not made

## CONCLUSION AND ORDER

The court **DENIES** Defendants' motion to dismiss and **GRANTS** Plaintiffs' motion for

anti-suit injunction restraining the state criminal case against Mr. Jensen. Defendants Utah County

and Utah County Attorney Jeffrey Gray are **ORDERED** to cease further proceedings in *State v.*

*Jensen*, Case No. 241404407 (4th Dist. Utah), pending final judgment in this court.

Signed August 4, 2025.

BY THE COURT

_____

Jill N. Parrish
United States District Court Judge

---

any argument in this court for enjoining the prosecution against him for THC possession and use,
so the court does not disturb the prosecution insofar as it concerns THC.

32

Mitchell A. Stephens (11775)
Justin L. James (15167)
Dillon P. Olson (16120)
JAMES DODGE RUSSELL & STEPHENS, P.C.
545 East 300 South
Salt Lake City, Utah 84102
801.363.6363
mjames@jdrslaw.com
mstephens@jdrslaw.com
jjames@jdrslaw.com

*Attorneys Utah County and Jeffrey Gray*

J. Brian Jones (11816)
Gary D. Millward (12170)
Richard A. Roberts (12217)
PROVO CITY ATTORNEY'S OFFICE
445 W Center St.
Provo, Utah 84601
801.852.6140
gmillward@provo.gov
rroberts@provo.gov

*Attorneys for Provo City*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BRIDGER LEE JENSEN, SINGULARISM and PSYCHE HEALING AND BRIDGING, <br><br> *Plaintiffs,* <br><br> vs. <br><br> UTAH COUNTY, PROVO CITY, and JEFFREY GRAY, <br><br> *Defendants*. | **NOTICE OF APPEAL** <br><br> Case No: 2:24-cv-00887-JNP-CMR <br><br> District Judge Jill N. Parrish |

Pursuant to 28 U.S.C. §§ 1291, 1292(a), and Rules 3 and 4 of the Federal Rules of Appellate Procedure, Defendants Utah County, Jeffrey Gray, and Provo City appeal to the United States Court of Appeals for the Tenth Circuit from the Memorandum Decision and Order Denying Defendants' Motion to Dismiss and Granting Plaintiffs' Motion for Anti-Suit Injunction (the "Order"), entered by the United States District Court for the District of Utah on August 4, 2025. The appeal shall address the portions of the Order that enjoined the State of Utah's criminal prosecution in the State of Utah's Fourth District Court, *State v. Jensen*, Case No. 241404407 (4th Dist. Utah) (the "State Criminal Case") and the denial of Defendants' immunity claims. This

App-5:194

Notice of Appeal also incorporates all prior proceedings, pleadings, motions and orders to the extent they are incorporated within or were relied upon in connection with the Order and the injunction of the State Criminal Case or the denial of Defendants' immunity claims.

DATED this 29th day of August, 2025.

JAMES DODGE RUSSELL & STEPHENS, P.C.

/s/ Mitchell A. Stephens
Mitchell A. Stephens
Justin L. James
Dillon P. Olson

*Attorneys for Utah County and Jeffrey Gray*

PROVO CITY ATTORNEY'S OFFICE

/s/ Richard A. Roberts
J. Brian Jones
Gary D. Millward
Richard A. Roberts

2

MITCHELL A. STEPHENS (11775)
JUSTIN L. JAMES (15167)
DILLON P. OLSON (16120)
JAMES DODGE RUSSELL & STEPHENS, P.C.
10 West Broadway, Ste. 400
Salt Lake City, Utah 84101
mstephens@jdrslaw.com
jjames@jdrslaw.com
dolson@jdrslaw.com
*Attorneys for Defendants Utah County
and Jeffrey Gray*

J. BRIAN JONES (11816)
GARY D. MILLWARD (12170)
RICHARD A. ROBERTS (12217)
PROVO CITY ATTORNEY'S OFFICE
445 W Center St.
Provo, Utah 84601
gmillward@provo.gov
rroberts@provo.gov

*Attorneys for Defendants Provo City*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BRIDGER LEE JENSEN, SINGULARISM, and PSYCHE HEALING AND BRIDGING, LLC,<br><br>    Plaintiffs,<br><br>    vs.<br><br>UTAH COUNTY, PROVO CITY, and JEFFREY GRAY,<br><br>    Defendants. | **ANSWER TO FIRST AMENDED VERIFIED COMPLAINT**<br><br>Civil Case No. 2:24-cv-00887-JNP<br><br>Judge Jill N. Parrish |

Defendants Utah County (the "County"), Jeffrey Gray ("Gray") (collectively "Utah County") and Provo City ("Provo"), (all Defendants collectively referred to as "Defendants"), jointly answer the allegations set forth in the First Amended Verified Complaint [Dkt. No. 83] filed by Plaintiffs Bridger Lee Jensen, Singularism, and Psyche Healing and Bridging, LLC, (collectively referred to as "Plaintiffs") as follows:

## FIRST DEFENSE

Plaintiffs' First Amended Verified Complaint (the "Complaint") fails to state certain claims and causes of action upon which relief may be granted against Defendants.

1

App-5:196

**SECOND DEFENSE**

With respect to the specific allegations of Plaintiffs' Complaint, Defendants respond as follows:

**INTRODUCTION**

No admission or denial is required in response to Plaintiffs' "Introduction," which is predominantly a narrative and statement of legal conclusions. To the extent a response is required, Defendants deny the allegations of the Introduction.

**PARTIES**

1.    Based on information and understanding, Defendants admit that Plaintiff Bridger Lee Jensen is a resident of Provo, Utah.

2.    Based on information and understanding, Defendants admit that Plaintiff Singularism is located in Provo, Utah, and is a registered nonprofit corporation with the State of Utah.

3.    Based on information and understanding, Defendants admit that Plaintiff Psyche Healing and Bridging LLC is a registered entity with the State of Utah with a listed physical address in Orem, Utah.

4.    Admit.

5.    Admit.

6.    Admit that Provo City is a political subdivision of the State of Utah located in Utah County, that the Provo City Police Department is an agency, program, or arm of Provo City, and that the specified individuals in subparagraphs a.-f. held the specified titles during all relevant times. Deny that Provo City Attorney's Office is an agency, program, or arm of Utah

2

App-5:197

County. The remaining allegations in paragraph 6 consist of a legal conclusion to which no response is required.

7.      The allegations of paragraph 7 consist of a legal conclusion to which no response is required.

## JURISDICTION AND VENUE

8.      Admit.

9.      The allegations of paragraph 9 consist of a legal conclusion to which no response is required.

10.     The allegations of paragraph 10 consist of a legal conclusion to which no response is required.

11.     The allegations of paragraph 11 consist of a legal conclusion to which no response is required.

12.     Defendants admit that the action was removed. The remaining allegations in paragraph 12 contain characterizations of a written document, which speaks for itself. Defendants deny all allegations inconsistent with the referenced document.

13.     Defendants admit that Plaintiffs served a notice-of-claim on the same day it filed its original complaint.  The remaining allegations in paragraph 13 consist of a legal conclusion to which no response is required. To the extent a response is required, Defendants deny that Plaintiffs' claims are exempt from the notice-of-claim provisions of the Utah Governmental Immunity Act.

## FACTUAL BACKGROUND

14.     Defendants lack sufficient information and knowledge to form opinions about the truthfulness of the allegations and on that basis deny the same.

3

15.     Defendants lack sufficient information and knowledge to form opinions about the truthfulness of the allegations and on that basis deny the same.

16.     Defendants lack sufficient information and knowledge to form opinions about the truthfulness of the allegations and on that basis deny the same.

17.     Defendants lack sufficient information and knowledge to form opinions about the truthfulness of the allegations and on that basis deny the same.

18.     Defendants lack sufficient information and knowledge to form opinions about the truthfulness of the allegations and on that basis deny the same.

19.     Defendants lack sufficient information and knowledge to form opinions about the truthfulness of the allegations and on that basis deny the same.

20.     Defendants admit that Singularism sent letters to them and their respective departments. Defendants lack sufficient information and knowledge to form opinions about the intended purpose of the letters or the alleged misunderstanding of Singularism, and on that basis deny the other allegations of paragraph 20.

21.     Paragraph 21 contains references to statements from Provo City and the Utah County Attorney's Offices, which speak for themselves. Defendants deny all allegations inconsistent with the referenced statements.

22.     Defendants lack sufficient information and knowledge to form opinions about the truthfulness of the allegations and on that basis deny the same.

23.     Defendants lack sufficient information and knowledge to form opinions about Singularism's doctrine and clinical practices and on that basis deny the same. The allegations in paragraph 23 further contain characterizations of written documents, which speak for themselves. Defendants deny all allegations inconsistent with the referenced documents.

24. Defendants lack sufficient information and knowledge to form opinions about the truthfulness of the allegations and on that basis deny the same.

25. Defendants lack sufficient information and knowledge to form opinions about the truthfulness of the allegations and on that basis deny the same. The allegations in paragraph 25 further contain characterizations of written documents, which speak for themselves. Defendants deny all allegations inconsistent with the referenced documents.

26. Defendants lack sufficient information and knowledge to form opinions about the truthfulness of the allegations and on that basis deny the same.

27. Defendants lack sufficient information and knowledge to form opinions about the truthfulness of the allegations of paragraph 27 and all its subparts, and on that basis deny the same.

28. Defendants lack sufficient information and knowledge to form opinions about the truthfulness of the allegations and on that basis deny the same.

29. Defendants lack sufficient information and knowledge to form opinions about the truthfulness of the allegations and on that basis deny the same.

30. Defendants admit a participant at Singularism experienced a medical incident to which emergency medical personnel were called to respond to and treat in January 2025. Defendants lack sufficient information and knowledge to form opinions about the truthfulness of the remaining allegations and on that basis deny the same.

31. Defendants lack sufficient information and knowledge to form opinions about the truthfulness of the allegations and on that basis deny the same.

32. Defendants lack sufficient information and knowledge to form opinions about the truthfulness of the allegations and on that basis deny the same.

App-5:200

33.     Defendants lack sufficient information and knowledge to form opinions about the truthfulness of the allegations and on that basis deny the same.

34.     Defendants lack sufficient information and knowledge to form opinions about the truthfulness of the allegations and on that basis deny the same.

35.     Defendants admit that a search warrant, signed by Fourth District Court Judge Sean M. Petersen, was executed at Singularism on November 11, 2024.

36.     Defendants admit that they executed the search warrant in compliance with the order from Judge Petersen. Defendants admit they questioned Plaintiff Bridger Jensen. Defendants lack sufficient information and knowledge to form opinions about the truthfulness of the remaining allegations and on that basis deny the same.

37.      The allegations in paragraph 37 contain characterizations of statements, which statements speak for themselves. Defendants deny all allegations inconsistent with the referenced statements. Defendants further lack sufficient information and knowledge to form opinions about the truthfulness of the remaining allegations and on that basis deny the same.

38.     Admit.

39.     Deny.

40.     Admit.

41.     Admit.

42.     Defendants admit law enforcement informed Jensen they would also seize records from Singularism. Defendants lack sufficient information and knowledge to form opinions about the truthfulness of the remaining allegations and on that basis deny the same.

43.     Admit.

App-5:201

44.    The allegations in paragraph 44 contain characterizations of oral statements, which oral statements speak for themselves. Defendants assert Detective Julian also advised Mr. Jensen to speak with his legal counsel regarding the continued practice of Singularism. Defendants deny all allegations inconsistent with the referenced oral statements.

45.    Defendants admit that Jensen was released without arrest and that they informed him he should expect criminal charges. Defendants deny all remaining allegations in paragraph 45.

46.    Defendants lack sufficient information and knowledge to form opinions about the truthfulness of the allegations and on that basis deny the same.

47.    The allegations in paragraph 47 contain characterizations of a written document, which speaks for itself. Defendants deny all allegations inconsistent with the referenced document. Defendants further lack sufficient information and knowledge to form opinions about Plaintiffs' alleged distress and on that basis deny the same.

48.    The allegations in paragraph 48 contain characterizations of a written document, which speaks for itself. Defendants deny all allegations inconsistent with the referenced document.

49.    Defendants lack sufficient information and knowledge to form opinions about the truthfulness of the allegations and on that basis deny the same. Defendants assert that there was a medical emergency incident with a participant at Singularism in January 2025.

50.    The allegations in paragraph 50 contain characterizations of a written document, which speaks for itself. Defendants deny all allegations inconsistent with the referenced document.

App-5:202

51.    The allegations in paragraph 51 contain characterizations of a written document, which speaks for itself. Defendants deny all allegations inconsistent with the referenced document.

52.    Admit.

53.    The allegations in paragraph 53 contain characterizations of a written document, which speaks for itself. Defendants deny all allegations inconsistent with the referenced document.

54.    Paragraph 54 is a statement of law which requires no answer. To the extent an answer is required and the law is accurately stated, Defendants admit Provo City Code speaks for itself.

55.    Paragraph 55 is a statement of law which requires no answer. To the extent an answer is required and the law is accurately stated, Defendants admit Provo City Code speaks for itself.

56.    Paragraph 56 is a statement of law which requires no answer. To the extent an answer is required and the law is accurately stated, Defendants admit Utah Code speaks for itself.

57.    Paragraph 57 is a statement of law which requires no answer. To the extent an answer is required and the law is accurately stated, Defendants admit Utah Code speaks for itself.

58.    Defendants lack sufficient information and knowledge to form opinions about the truthfulness of the allegations and on that basis deny the same.

59.    Defendants lack sufficient information and knowledge to form opinions about the truthfulness of the allegations and on that basis deny the same.

60.     Defendants lack sufficient information and knowledge to form opinions about the truthfulness of the allegations and on that basis deny the same.

61.     Defendants lack sufficient information and knowledge to form opinions about the truthfulness of the allegations and on that basis deny the same.

62.     The allegations in paragraph 62 contain characterizations of a written document, which speaks for itself. Defendants deny all allegations inconsistent with the referenced document.

63.     Admit that courts have permitted individuals and organizations to conduct religious ceremonies with some controlled substances, but Defendants lack sufficient information and knowledge to form opinions about the truthfulness of the remaining allegations and on that basis deny the same.

64.     Paragraph 64 is a statement of law which requires no answer. To the extent an answer is required and the law is accurately stated, Defendants admit *Gonzales v. O Centro Espirita Beneficiente Uniao do Vegetal*, 546 U.S. 418 (2006) speaks for itself.

65.     Paragraph 65 is a statement of law which requires no answer. To the extent an answer is required and the law is accurately stated, Defendants admit the Ninth Circuit cases speak for themselves.

66.     Paragraph 66 is a statement of law which requires no answer. The allegations in paragraph 66 further contain characterizations of written documents, which speak for themselves. Defendants deny all allegations inconsistent with the referenced documents.

67.     Deny.

68.     Deny.

69.     Deny.

9

70.     Defendants lack sufficient information and knowledge to form opinions about the truthfulness of the allegations and on that basis deny the same.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
*42 U.S.C. § 1983 and the First Amendment to the U.S. Constitution*

71.     Defendants incorporate by reference their prior responses to the allegations set forth in the preceding paragraphs.

72.     Deny.

73.     Admit.

74.     Deny.

75.     Defendants admit making statements to media, obtaining a search warrant, executing the search warrant, seizing items pursuant to the search warrant, filing criminal charges against Plaintiff Jensen, and sending a letter to Singularism's landlord. Defendants deny all other statements and implied statements that Defendants harmed or violated Plaintiffs' constitutional rights.

76.     Deny.

77.     Deny.

78.     Deny.

79.     Deny.

80.     Defendants deny paragraph 80 and all its subparts.

81.     Deny.

82.     Deny.

App-5:205

## SECOND CLAIM FOR RELIEF
*Article I, Section 4 of the Utah Constitution*

83.    Defendants incorporate by reference their prior responses to the allegations set forth in the preceding paragraphs.

84.    Deny.

85.    The allegations in paragraph 85 contain characterizations of written decisions, which speak for themselves. Defendants deny all allegations inconsistent with the referenced decisions.

86.    Admit.

87.    Deny.

88.    Defendants admit making statements to media, obtaining a search warrant, executing the search warrant, seizing items pursuant to the search warrant, filing criminal charges against Plaintiff Jensen, and sending a letter to Singularism's landlord. Defendants deny all other statements and implied statements that Defendants harmed or violated Plaintiffs' constitutional rights.

89.    Deny.

90.    Deny.

91.    Deny.

92.    Deny.

93.    Defendants deny paragraph 93 and all its subparts.

94.    Deny.

95.    Deny.

11

App-5:206

## THIRD CLAIM FOR RELIEF
*Utah Religious Freedom Restoration Act*

96.     Defendants incorporate by reference their prior responses to the allegations set forth in the preceding paragraphs.

97.     Deny.

98.     Admit.

99.     Deny.

100.    Defendants admit making statements to media, obtaining a search warrant, executing the search warrant, seizing items pursuant to the search warrant, filing criminal charges against Plaintiff Jensen, and sending a letter to Singularism's landlord. Defendants deny all other statements and implied statements that Defendants harmed or violated Plaintiffs' constitutional rights.

101.    Deny.

102.    Deny.

103.    Deny.

104.    Deny.

105.    Deny.

106.    Defendants deny paragraph 106 and all its subparts

107.    Deny.

108.    Deny.

109.    Deny.

## FOURTH CLAIM FOR RELIEF
*42 U.S.C. § 1983 and the Fourth Amendment to the U.S. Constitution*

110.    Defendants incorporate by reference their prior responses to the allegations set forth in the preceding paragraphs.

111.    Defendants admit that the Fourth Amendment applied to Plaintiffs, but Defendants deny they violated Plaintiffs' rights under the Fourth Amendment.

112.    Admit.

113.    Deny.

114.    Defendants admit making statements to media, obtaining a search warrant, executing the search warrant, seizing items pursuant to the search warrant, filing criminal charges against Plaintiff Jensen, and sending a letter to Singularism's landlord. Defendants deny all other statements and implied statements that Defendants harmed or violated Plaintiffs' constitutional rights.

115.    Deny.

116.     Deny.

117.    Defendants deny paragraph 117 and all its subparts

118.    Deny.

119.    Deny.

## FIFTH CLAIM FOR RELIEF
*Article I, Section 14 of the Utah Constitution*

120.    Defendants incorporate by reference their prior responses to the allegations set forth in the preceding paragraphs.

121.    Defendants admit that Article I, Section 14 of the Utah Constitution applied to Plaintiffs, but Defendants deny they violated Plaintiffs' rights under Article I, Section 14 of the Utah Constitution.

122.    Admit.

123.    Deny.

124.    Defendants admit making statements to media, obtaining a search warrant, executing the search warrant, seizing items pursuant to the search warrant, filing criminal charges against Plaintiff Jensen, and sending a letter to Singularism's landlord. Defendants deny all other statements and implied statements that Defendants harmed or violated Plaintiffs' constitutional rights.

125.    Deny.

126.    Deny.

127.    Defendants deny paragraph 127 and all its subparts.

128.    Deny.

129.    Deny.

**SIXTH CLAIM FOR RELIEF**
*Declaratory and Injunctive Relief*

130.    Defendants incorporate by reference their prior responses to the allegations set forth in the preceding paragraphs.

131.    Deny.

132.    Defendants deny they will continue to cause irreparable harm to Plaintiffs.

133.    Defendants lack sufficient information and knowledge to form opinions about the truthfulness of the allegations and on that basis deny the same.

134.    Deny.

14

135.   Deny.

136.   Deny.

137.   Deny.

138.   Deny.

## PRAYER FOR RELIEF

Defendants deny Plaintiffs are entitled to the relief requested or to any relief whatsoever.

## ADDITIONAL AFFIRMATIVE DEFENSES

### THIRD DEFENSE

Defendants deny every allegation contained in Plaintiff's First Amended Complaint not specifically admitted.

### FOURTH DEFENSE

Plaintiffs' claims are barred because Defendants have a compelling governmental interest in protecting public health and safety from Schedule I drugs.

### FIFTH DEFENSE

Plaintiffs' claims are barred because the controlled substances acts are neutral and generally applicable.

### SIXTH DEFENSE

Plaintiffs' claims are barred because compliance with Utah law does not substantially burden Plaintiffs' religious beliefs.

### SEVENTH DEFENSE

Plaintiffs' claims are barred because they cannot establish that their use of psilocybin is substantially motivated by a sincerely held religious belief.

## EIGHTH DEFENSE

Plaintiffs' claims are barred because their alleged religious beliefs do not constitute actual or sincerely held religious beliefs and otherwise fail to satisfy the *Meyers* factors.

## NINTH DEFENSE

Plaintiffs' claims for damages are barred under sovereign immunity.

## TENTH DEFENSE

Defendants are entitled to absolute immunity from Plaintiffs' claims alleging violations of the U.S. Constitution's Fourth Amendment and Utah Constitution's Article I, Section 14.

## ELEVENTH DEFENSE

Assuming Plaintiffs could show violations of their constitutional rights, Plaintiffs' damages, if any, resulted in whole or in part from Plaintiffs' actions, inaction, conduct, or performance, and any potential recovery should be barred or reduced.

## TWELTH DEFENSE

Plaintiffs cannot demonstrate they have sustained any damages recoverable under any legal or equitable doctrine.

## THIRTEENTH DEFENSE

Defendant Jeff Gray is entitled to absolute immunity in his individual-capacity as a prosecutor for those activities intimately associated with the judicial process.

## FOURTEENTH DEFENSE

Plaintiffs' claims against Defendants and their agents fail because there is no official policy or custom giving rise to Plaintiffs' alleged constitutional injuries.

**FIFTEENTH DEFENSE**

Plaintiffs' claims are barred and/or limited because all acts or omissions attributed to Defendants and their agents were objectively reasonable and did not violate clearly established law, thus entitling Defendants to qualified immunity.

**SIXTEENTH DEFENSE**

Plaintiffs' claims are barred and/or limited because no act or omission attributed to Defendants and their agents constitutes behavior that shocks the conscience or evinces deliberate indifference.

**SEVENTEENTH DEFENSE**

This Court lacks subject matter jurisdiction because neither Defendants nor any of their respective employees or officials violated Plaintiffs' constitutional rights.

**EIGHTEENTH DEFENSE**

Defendants acted in good faith, without malice, and their acts were justified and reasonable under the circumstances.

**NINETEENTH DEFENSE**

Plaintiffs failed to exhaust their constitutional, administrative, and/or judicial remedies.

**TWENTIETH DEFENSE**

Defendants are not liable under 42 U.S.C. § 1983 based on respondeat superior or any other theory of supervisory or derivative liability.

**TWENTY-FIRST DEFENSE**

Defendants cannot be held liable for any wrongful conduct committed by individuals or entities over which Defendants had no control.

## TWENTY-SECOND DEFENSE

Plaintiffs' claimed injuries are the result of an independent intervening and/or superseding cause(s).

## TWENTY-THIRD DEFENSE

Defendants' potential liability for any state law claims is limited to the maximum sum provided by Utah Code § 63G-7-604.

## TWENTY-FOURTH DEFENSE

Plaintiffs' punitive damages claim is barred by, inter alia, the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, federal common law, Article I, Sections 7, 9, 10, 11, 12, 13, 18, 22, and 24 of the Utah Constitution, and the Governmental Immunity Act of Utah under Utah Code § 63G-7-603.

## TWENTY-FIFTH DEFENSE

Plaintiffs' claims are barred by the public duty doctrine as well as the doctrines of waiver, laches, unclean hands, estoppel, consent, acquiescence, ratification, and release.

## JOINDER IN JURY DEMAND

Defendants hereby join in Plaintiffs' request that a trial by jury be held on all issues of fact raised herein.

Based on the above, Defendants Utah County, Jeff Gray, and Provo City deny that Plaintiffs are entitled to any of the relief sought in their First Amended Complaint and dispute the existence and amount of their claimed damages. In addition, Defendants pray the Court will dismiss all Plaintiffs' causes of action with prejudice, award Defendants their fees and costs incurred in defending this action, and grant them such other relief as the Court deems just under the circumstances.

DATED this 2nd day of September 2025

        PROVO CITY


        */s/ Richard A. Roberts*_____
        Gary D. Millward
        Richard A. Roberts
        Attorneys for Provo City

        JAMES DODGE RUSSELL & STEPHENS


        */s/ Dillon P. Olson (signed with permission)*
        Mitchell A. Stephens
        Justin L. James
        Dillon P. Olson
        Attorneys for Utah County and Jeffrey Gray


**CERTIFICATE OF SERVICE**

I certify that on the 2nd day of September 2025, I caused a true and accurate copy of the foregoing Answer to be filed using the Court's CM/ECF filing system which provides service to all counsel of record.

        */s Richard A. Roberts*_____