No. 25-4115

UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

———————————

BRIDGER LEE JENSEN, SINGULARISM, AND PSYCHE HEALING AND BRIDGING, LLC,
*Plaintiffs - Appellees*,

v.

UTAH COUNTY, PROVO CITY, AND JEFFREY GRAY,
*Defendants- Appellants*.

———————————

On appeal from the United States District Court, District of Utah,
The Honorable Jill N. Parrish, No. 2:24-cv-00887-JNP-CMR

———————————

**APPELLANTS' APPENDIX**
**Volume 8 of 8**

———————————

Respectfully submitted,

Troy L. Booher
Caroline A. Olsen
ZIMMERMAN BOOHER
341 South Main Street, Fourth Floor
Salt Lake City, Utah 84111
tbooher@zbappeals.com
colsen@zbappeals.com
(801) 924-0200

*Attorneys for Appellants*

———————————

December 10, 2025

| USDC Dkt. No. | Date Filed | Description | App- |
|---|---|---|---|
| | | **Volume 8 of 8 — Transcript** | |
| 090 | 01/23/25 | Hearing transcript — Motion for Anti-Suit Injunction and Motion to Dismiss | 8:003 |

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

CENTRAL DIVISION


In re:                          )
                                )
BRIDGER LEE JENSEN an           )
individual, SINGULARISM         )
a non-profit                    )
corporation, PSYCHE             )
HEALING AND BRIDGING            )
LLC,                            )
                                )
          Plaintiffs,           )
                                )
vs.                             )   Case No.
                                )   2:24-CV-00887JNP
UTAH COUNTY, a political        )
subdivision, PROVO CITY         )
a political subdivision,        )
et al,                          )
                                )
          Defendants.           )
                                )
_____   )


BEFORE THE HONORABLE JILL N. PARRISH

January 23, 2025


Zoom Motion for Anti-Suit Injunction
and Motion to Dismiss

**Appearances of Counsel:**

For the Plaintiffs:           Tanner J. Bean
                              Jaqueline Rosen
                              Anna Christiansen
                              Attorneys at Law
                              Fabian VanCott
                              95 S. State Street
                              Suite 2300
                              Salt Lake City, Utah 84111-2323

For Utah County:              Mitchell A. Stephens
                              Justin L. James
                              Attorneys at Law
                              James Dodge Russell & Stephens PC
                              10 W Broadway
                              Suite 400
                              Salt Lake City, Utah 84101

For Provo City:               Nicholas Muhlestein
                              Attorney at Law
                              Provo City Attorney's Office
                              445 W Center Street
                              Provo, Utah 84601

Court Reporter:

              Laura W. Robinson, RPR, FCRR, CSR, CP
                      351 South West Temple
                      3.303 U.S. Courthouse
                  Salt Lake City, Utah 84101
                        (801)201-9731

App-8:004

**Salt Lake City, Utah**                                    **January 23, 2025**

                              **(9:07 a.m.)**

          THE COURT:  Do we have everyone we're expecting, Ms. Hola?

          THE CLERK:  I believe so, Your Honor.

          THE COURT:  All right.  Then let's go ahead and go on the record in the matter of *Bridger Lee Jensen and others versus Utah County and others.*  The case number is 2:24-CV-887.  My name is Jill Parrish, I'm the trial judge assigned to preside over this matter.  We are here today to entertain oral argument on three motions that are pending before the court.

          I should indicate for the record, that we're holding the hearing virtually through the use of Zoom video technology.  Let me introduce the members of our court team who are joining us, and then I'll have counsel enter their appearances for the record.  We're joined by Lindsay Hola, my courtroom deputy, and Laura Robinson, my court reporter. We're also joined by my three law clerks, Mr. Eshan Dabak, Ms. Mikaela Cardillo and Mr. Kris Bahr.

          Let me now turn the time over to counsel.

          MR. STEPHENS:  Good morning, Your Honor.  Mitch Stephens for Utah County and Jeffrey Grey.  Nice to see the court again.  I am also joined by Justin James.  We did this last time where we're in the same conference room so we will

3

try very hard to make sure one of us is always muted and we don't get any feedback.  So if there is a slight delay in between the two of us, that's why.

THE COURT:  All right.  Thank you.

MR. BEAN:  And for plaintiffs, Your Honor, Tanner Bean, Jackie Rosen and Anna Christiansen.  We are similarly all in the same conference room and trying to do about the same technology set up.

THE COURT:  All right.  Well, counsel, I have --

MR. MUHLESTEIN:  I'm so sorry, Your Honor.

THE COURT:  I'm sorry.

MR. MUHLESTEIN:  This is Nick Muhlestein for Provo City, the Provo defendants.

THE COURT:  All right.  I apologize.  I was lumping folks into groups, and that was not correct.  Do we have everyone before I move on?  All right.

I had originally set this hearing for two days and I had given the parties the opportunity to present two days of evidence if they chose.  Yesterday, I received a stipulation, agreed to by all parties, indicating that the parties had no intention, or I guess they had agreed, that they would not submit any live testimony during this, what had been scheduled as a two-day hearing, and that they intended instead to argue the three motions orally and then likely finish today.

4

The parties indicated that they want to begin with arguing the motion to dismiss, then the issues that come into play with plaintiffs' motion for an Anti-Suit Injunction and then finally plaintiffs' motion for a preliminary injunction.  Is that still the desire of the parties?

MR. BEAN:  Yes, Your Honor.

MR. STEPHENS:  That is, Your Honor.  And with that stipulation, there were several exhibits identified.  Those were filed a little bit later in the day mostly because logistically it took more time to put those together and we wanted to make sure the Court was aware of the stipulation as early as we could.

THE COURT:  Okay.  Well, I am here to hear whatever it is that all of you want to present to me for my consideration.  So I am -- I am certainly not going to force anyone to put on evidence that they don't intend to present.

So let's turn then to oral argument on defendants' motion to dismiss.  That's number 40 on the docket.  Then we'll move to the Anti-Suit Injunction issue, Docket No. 39, and then finally, the motion for preliminary injunction, which was Docket Entry 9.  I know there has been much supplemental briefing that's come in.  I did have an opportunity to carefully review everything that was filed through close of business yesterday.  I have to confess I

App-8:007

don't know if there has been anything else put on the docket this morning.  Has there been?

MR. BEAN:  No, Your Honor.

MR. STEPHENS:  No, Your Honor.

THE COURT:  Okay.  So in any event, you can assume for purposes of your argument that I have reviewed your written memoranda.  So if we start with the motion to dismiss, Mr. Stephens, that was your motion, so you will have the floor.  Then we'll hear a response from Mr. Bean and then you will have an opportunity to reply on that motion before we move to the next one.  You may proceed.

MR. STEPHENS:  Thank you, Your Honor, and give us just a few seconds because this is one of those handoffs that's going to go to Mr. James here.

THE COURT:  Okay.

MR. JAMES:  Good morning, judge.

THE COURT:  Good morning.

MR. JAMES:  I think this is the first time I have been in front of you so it is nice to meet you.  Although I remember being at your desk as a little kid.

THE COURT:  Well, I have to say, I don't know in if it qualifies to meet someone over Zoom.  I -- I am not sure that I'm into the technology, but that's the world that we're in post-COVID.  Although I'm always happy to have folks in the courtroom if they want to come.  But lawyers

6

most often don't want to come.

Anyway, you have the floor.  I guess it's better to say you have the screen.

MR. JAMES:  Thank you.  I wanted to start with the motion to dismiss because my hope is that today can be very short.  You have seen in our briefing that we want to address the federal claims and those claims should be dismissed and with those claims dismissed, the Tenth Circuit law is pretty clear on this that the remaining state claims should be dismissed without prejudice and go back to state court.

And so I'm going to focus my arguments today on the two federal claims.  I'm happy to answer any questions you have about the state law claims, but as we have argued strenuously in our briefing, those claims should be dismissed if the federal claims are dismissed.

THE COURT:  And I understand that.  And I believe that you are correct.  If the federal claims go, the whole case needs to be remanded.

What is your position with respect to what I should do if the federal claim or claims survive?  Are you suggesting that I do a partial remand of the state law claims and have those proceed in state court while the surviving federal claims proceed here, or what is your position?

7

MR. JAMES: Yeah, those should be remanded. And because the standard is that if they present unique or uncharted issues of law, generally issues of federalism and comity suggest that the state court system should handle those. And we're dealing with the state constitution and a newly enacted Utah RFRA statute that has no case law developed on it. And those issues --

THE COURT: Well that -- I mean with respect to the state RFRA claim, I think we all acknowledge, do we not, that it is modeled after the federal act and there are many other state acts and the language is pretty clear. Is it really novel just because it hasn't been interpreted?

MR. JAMES: There are, and we briefed this in our motion to dismiss, there are distinctions between the federal RFRA and the Utah RFRA. Aside from the damages issues that we have kind of focused in on on our motion, there is also questions of what is the relief you get under the Utah RFRA and we have argued again that the relief you get is an affirmative defense and that's it.

THE COURT: Okay.

MR. JAMES: And those are unique issues that Utah courts again should address and that's why even if you were to exercise jurisdiction over the federal claims and keep those, the state claims should be remanded back to state court.

8

THE COURT:  I guess that leads me to ask, why did you remove this case in the first place?  You seem very intent on the fact that you want state courts deciding the state claims, and state courts have concurrent jurisdiction with federal courts over federal claims.  And state courts often decide federal constitutional claims.  I guess I'm just mystified, given what you identified as these very unique issues of state law and what you're arguing are well settled principles of federal law, as to why you removed this in the first place.  It seems like you've just created a lot of complicated factors, or issues, for your client by your removal decision.

MR. JAMES:  So we removed so the federal court could address the federal claims.  Of course, state courts are able to address the federal claims.  The First Amendment claim and the Fourth Amendment claim are probably among the most common claims addressed in the federal courts.

THE COURT:  Well, they are addressed in the federal courts, but I mean I spent 13 years on the state appellate bench and we had absolutely the same ability there in state court to adjudicate federal claims, and it seems to me that with all the complicated issues that it gives rise to with respect to abstention and the anti-injunction/anti-suit act, it just -- I'm mystified as to why you moved it here.  And frankly, what it suggests to

9

me, is you -- you came here and then when there wasn't a good outcome on the TRO motion, you decided you wanted a second bite at the apple.  So you're second guessing your removal decision and you want to get back to state court where you can find a more favorable forum.

MR. JAMES:  So we're not forum shopping if that was, I guess, the implication.

THE COURT:  Well, I mean -- I think that -- I think that is an inference that a very reasonable inference that could be drawn by the removal and now the request to remand certain claims even if I keep control of a federal claim.

MR. JAMES:  Sure.  And I can understand and appreciate how you see that.  I hope -- I guess Your Honor can appreciate that when a case comes in on a TRO, you act very quickly and you don't always have the benefit of thinking through and analyzing all of the outcomes.  You have to act quick.  And there was a lot going on, and we're still in the view that the federal court is in the best position to address these federal claims.

The Utah State Court claims, or the state law claims, have proved to be, in our view, much more nuanced and complex than initially had been looked at.  And that's ferreted out in a lot of the briefing.  So that is why I appreciate though that we have potentially created a little

10

bit of a procedural headache for everybody.  That was not the intention.

So I guess as I started, I will focus on the federal claims and why they should be dismissed.  And there are two of them.  There is a First Amendment claim and a Fourth Amendment claim.  Plaintiffs' first claim seeks relief under 1983 for alleged violations of their First Amendment.  In briefing this and reading the cases, this is, in my view, the *Smith* case.  The *Smith* court set the standard for First Amendment claims and the --

THE COURT:  Well, and I -- I mean I think I understand the analogies to the *Smith* case.  But there has been further development by the United States Supreme Court, even though *Smith* hasn't been overruled there, there has been further development with respect to what constitutes a law of general applicability, has there not?

MR. JAMES:  I think there has -- that standard, general applicability, has been fleshed out further.  But as you have recognized, *Smith* has never been overturned and I am unaware of any case that has gone and said a Controlled Substances Act is not a law of general applicability.

THE COURT:  And maybe I am wrong about this, and I have to confess there is a lot of case law here.  I have not had the opportunity to review all of the applicable case law, but there is an exemption under the Federal Controlled

Substances Act for Peyote now.  Am I right about that?  And there is also one under the state Controlled Substances Act for Peyote, correct?

MR. JAMES:  I believe there are certain exceptions, yes.

THE COURT:  Okay.  And that was not the case at the time of *Smith.*  Is that also correct?

MR. JAMES:  No, that is not correct.

THE COURT:  That's not correct?

MR. JAMES:  So at least there may have not been under the Oregon Controlled Substances Laws a religious exemption for Peyote.

THE COURT:  Okay.  I guess what I'm struggling with is, is there not now an exemption under the Utah Controlled Substances Act for Peyote?  I mean wasn't that the issue that the Utah Supreme Court decided back in 2004 or whenever the *Mooney* case was?

MR. JAMES:  I believe that was the decision that the, and I'm sure you're familiar with it, that the Federal Controlled Substances Act applied to the Utah Controlled Substances Act and made Peyote an exception to.

THE COURT:  Okay.  So I guess then, does the fact that there is an exception under the Utah Controlled Substances Act for one religious organization to use a particular controlled substance then remove this case from

12

the *Smith* analysis because we now don't have a law with general applicability.  There are exceptions there.

MR. JAMES:  There were exceptions in the *Smith* case.  And so I guess the answer to your question, no, it doesn't remove it from the *Smith* standard which is if a law is neutral or generally applicable, it's not subject to strict scrutiny.  It's only if it violates one of those two standards that it becomes subject to strict scrutiny.

So the *Smith* case still sets, I think, kind of the standard we analyze it.  And what I understand the question is is essentially are we now applying strict scrutiny because there appears to be some secular or religious exemptions to the Controlled Substances Act.

THE COURT:  Right.  And that's the question is what constitutes a law of general applicability and what exemptions remove it from that analysis so that we enter the world of strict scrutiny.  And that's -- frankly, there are a lot of questions there with respect to levels of generality and specific exemptions that I think maybe are a bit tricky.

MR. JAMES:  I think that's fair that saying, you know, what general applicability is is still being fleshed out and developed.  But I also think that it is a gross oversimplification to say that because there is some use of a controlled substance, there is some exceptions to the

13

otherwise prohibition, that it then is subject to strict scrutiny.  And that's why I say that is the *Smith* case.  In *Smith,* you know, it is in the opinion, it is a sentence of the second paragraph of the opinion, that there are secular exceptions to the Oregon state law express and there always has been.  That's why you have, for example, opioids generally prohibited.  But if a doctor prescribes them, allowed.  That's an exception to the Controlled Substances Act.

THE COURT:  Right.  But here we have not just a general exception for prescriptions written by medical doctors, we have something created by the Utah legislature that frankly is, I think, quite shocking in its lack of regulation of something that you're claiming is so dangerous where it simply says, you know what, if you're a secular hospital system, then the psilocybin prohibitions don't apply to you and you have only three simple things you have to do.  You can't give it to someone under 18, you have to report back to the legislature.  I mean it really is quite a shocking exemption made to one type of secular organization.  And then we also have the Peyote exemption.

So at some point do we have sufficient exemptions that we can say this crosses the line, it's no longer a neutral law of general applicability.

MR. JAMES:  I suppose I could create a

14

hypothetical that would get you to that point to say this law is no longer neutral, it is no longer generally applicable.  With what we have today, we're not there.  And none of the case law cited by the plaintiffs would suggest that we're there.

And as I started, I'm unaware of a single case that has come down and said that a Controlled Substances Act is not a law of general applicability.  The case law I have seen has all suggested that Controlled Substances Act, just as the *Smith* court ceded, remain a generally applicable law.  And there was exemptions, like I said, in the *Smith* case.  To your point and concern about the Psilocybin Act, it hasn't been briefed, and it hasn't been litigated in any other case that I'm aware of, but I don't think -- I don't think it is as simple as you have interpreted it.

One of the first sections of that act require that the psilocybin that is used be FDA approved and subject to several FDA regulations under the -- I won't get you to the cite but it is in the statute that it is not as simple as hey, if you are a medical provider and they're not 18 and you do a couple of other little things, you can use psilocybin.  It's still subject to, I think, strict control pursuant to the FDA standards.

THE COURT:  Right.  But clearly, just by creating a special rule for a hospital organization, it's not a

15

generally applicable law, is it?

MR. JAMES:  It has to be.  Because that was *Smith.*  I mean otherwise going back --

THE COURT:  But *Smith* didn't have an exemption that the law issue in *Smith* didn't have an exemption for certain secular organizations to use the Controlled Substance at issue.

MR. JAMES:  I guess I would say of course it did. Because a doctor can prescribe opioids that was otherwise a controlled substance but because it could have been used to control pain.  That was at issue in Smith.

THE COURT:  Okay.  But then we get to the Peyote exception and that's an exemption that has no medical strings attached to it, but it applies to a particular religion.  That to me seems like that's also a problem.

MR. JAMES:  I tend to agree.  But we're not talking about Peyote.

THE COURT:  But we're talking about the Controlled Substances Act.

MR. JAMES:  Yes.

THE COURT:  And so are we now going to get down to a level of specificity with respect to every single aspect of the Act in determining what level of scrutiny applies?  Can we say, well, we could have exceptions for, you know, every drug in the Act, but as long as there is no

16

exception for Peyote, I mean for psilocybin, then that's not subject to strict scrutiny even though the Act as a whole is riddled with exemptions.

MR. JAMES:  Well, I will I guess start with saying because there is a religious exemption for Peyote in the Federal Controlled Substances Act, I'm still unaware of a single case that has come down that has says that the Federal Controlled Substances Act is not or is no longer a law of general applicability.

Everything I have seen and everything we've cited to you suggests that the Federal Controlled Substances Act remains a general -- a law of general applicability despite having a Peyote exception under it.

And I -- the point, again, is that has always been the case.  There has always been exemptions.  The case law cited by Mr. Bean in his briefing, the *Fulton* -- *Philadelphia versus Fulton* or *Fulton versus City of Philadelphia*, I suppose, the Supreme Court case, doesn't suggest that because there are in certain circumstances exemptions, that the law is no longer generally applicable.

Rather, the exemption at issue there, and in the cases I have read, suggest that when the exemption is given to a governmental official in their sole discretion, that that then becomes and takes the law away from being one that is generally applicable.  But otherwise, to say if there are

17

secular uses or exemptions from the law, the law is no longer generally applicable.  As I have said, that is a gross oversimplification because there were exemptions in the *Smith* case.  There was secular use allowed for otherwise controlled substances prescribed by a medical provider.  And so if the law is as Mr. Bean has suggested, which is if you allow any secular use, you now are subject to strict scrutiny.  I think *Smith* would have failed from the start because it failed that test.  There was secular exemptions in *Smith* for certain controlled substances to be used.  That's why I say there always has been.

I'm unaware of any Controlled Substances Act that just says you can't use any of these substances period, end of story.  They have always allowed for medical practitioners to prescribe.  They have always allowed for research to be done on those drugs.  So there has always been otherwise exceptions to this law.  That doesn't make them so they're not generally applicable.

Again, case law suggests that the generally applicable standard becomes -- is violated when you start giving governmental officials sole discretion on when or when not to apply it.  That also hasn't been cited, but that's also the *Board of Regents* case that came out, I think, last year from the Tenth Circuit and the exemption at issue there.

18

Conversely, you have the *Chiles* case that they have cited to support this notion where we're talking there about medical -- mental practitioners being allowed to use conversion therapy in Colorado and whether or not that violated the law. And because there was no subjective exemptions allowed, the United States -- or sorry, the Tenth Circuit said that that was a law of general applicability. So I agree that the *Smith* case law has been further developed. I don't think it has gone as far as Mr. Bean has suggested. And for that reason, it remains -- *Smith* remains good law. It has not been overturned. The Controlled Substances Act remains a law of general applicability. There hasn't been any argument, by the way, that it is not neutral, and I'm assuming that that is accepted, that the Controlled Substances Act is a neutral law.

THE COURT: So I think the issue we have been focusing on is critical. I can tell the sun is in your eyes and I'm sorry about that. My blinds do the same thing in the afternoon, so I may be doing the same thing this afternoon. But in any event, I guess the question is if you -- if you lose on this argument and strict scrutiny applies, is it over for you?

MR. JAMES: No.

THE COURT: Okay. Explain to me why not?

MR. JAMES: Because even if you fail the strict

19

App-8:021

scrutiny argument, we still then go to qualified immunity. And qualified immunity would require a violation of clearly established law.  And the law on this, if you don't accept my argument, is anything but clearly established.

THE COURT:  Well, but qualified immunity might apply to claims against individual defendants.  It doesn't apply to claims against municipalities.

MR. JAMES:  I would have to go into that further. The claims I've read and as pled, is against the individuals for them violating under 1983.  I don't -- I don't recall seeing a *Monell* liability claim asserted.

THE COURT:  Well, I guess I can look.  I know there is a recently amended complaint that was just filed, and I guess we could ask Mr. Bean about that because I -- I scanned the changes to the complaint, but let's see, I am looking at the first claim for relief under 1983 in the First Amendment and it clearly, in Paragraph 73, is pled against defendants Utah County and Provo City and I don't believe qualified immunity applies to those defendants.

MR. JAMES:  I would have to review the amended complaint.  But I would not concede that if you find strict scrutiny applies that we are, I guess, dead as we stand as you say.  And Mr. Stephens will perhaps argue this later if we get to it and that is we meet the strict scrutiny standard.

20

And so even if strict scrutiny -- and now we're under the Utah RFRA kind of analysis, I suppose. And so even if strict scrutiny were to apply, we have met that standard. Mr. Stephens will be arguing that. But I would again, I guess, caution and I would find great hesitation to say that the Controlled Substances Act has been amended such that it is not generally applicable because that opens the door to a lot of potentially dangerous uses. You would then be allowing use of opioids and fentanyl as potentially a religious exercise and make that subject to strict scrutiny and allow a whole host of conduct that, like I said, has never been allowed under any case that I'm aware of. And it would significantly change the First Amendment analysis under 30 years of case law. And *Smith* came out, I think, nearly 35 years ago. And as I have said, to this day I'm unaware of a single case that has come out and said that the Controlled Substances Act, federal or in a state, is not a law of general applicability. And so that would be a, I think, a first as far as I have read the case law. And like I said, they have not cited any case law that would suggest to you otherwise that the Controlled Substances Act has become one that is not generally applicable.

So that is the First Amendment claim. I'm happy to address any other questions you have, but I would turn now to the Fourth Amendment claim otherwise.

21

App-8:023

THE COURT: Okay.

MR. JAMES: This is the only remaining federal claim. I guess I would start with saying that it follows, I think, logically that if the First Amendment claim is dismissed, there can be no Fourth Amendment violation because it is conceded they have violated or at least potentially violated the law. Sorry. And so naturally, if the First Amendment claim is dismissed, the Fourth Amendment claim should be dismissed. But even if you don't buy my argument on the First Amendment, and we're looking solely at a Fourth Amendment claim, that claim is still subject to dismissal and we have argued that that is because of absolute immunity.

Now, the opposition I think gets that argument and conflates it a bit. We have not argued and I do not contend that the police officers or prosecutors are always subject to and protected by absolute immunity. This issue, rather, is one of, I see, as judicial immunity. Where most cases I assume you're familiar with they have dealt with deal with a warrantless search or seizure. In this case, the search and seizure was done pursuant to a warrant, a warrant issued by the Fourth District Court. And the case law is clear on this that when an officer or an official is carrying out a court's order, they are protected by that judge's absolute immunity which has then kind of been

22

described in the case law as quasi, absolute or judicial immunity.  And that would apply here.  The only search and seizure that has been alleged and identified is the execution of the search warrant.

There is mention in the opposition of conduct that has occurred before the execution of the search warrant or conduct that occurred after the execution of the search warrant, but that conduct making statements to, for example, a landlord where there is no eviction, there is no seizure pursuant to those statements.  Making statements to the media, same thing.  There is no seizure, there is no search.  And so regardless of the propriety of that conduct, the Fourth Amendment is limited to search and seizures.  And the only search or seizure is the execution of the search warrant in this case.

THE COURT:  So I understand your absolute immunity argument and I think it's quite persuasive.

MR. JAMES:  Thank you.

THE COURT:  But absolute immunity applies to the officers and the prosecutor.  But what is the law with respect to municipalities and absolute immunity?  I don't see any argument in your briefing with respect to why the Fourth Amendment claims against Utah County and Provo City should be dismissed, and I -- and I'm assuming you're moving to dismiss the Fourth Amendment claims against the

23

municipalities as well as the claims against the individuals. But I saw no analysis, other than the absolute immunity analysis, which I don't think applies to municipalities.

MR. JAMES: And I guess what is -- I don't understand, I suppose, if the police officers are protected in their search and seizure of the property in November. What is the search and seizure conducted by the municipalities other than that search and seizure? Because as I see it, what has happened is the municipality would have a concern about the potential drug use. They go to a judge and say judge, here is the evidence, is there probable cause? The judge says yes, there is probable cause, go and execute the search warrant.

And so I don't understand how that could be a violation of somebody's Fourth Amendment rights in this case while saying, although the judiciary has said there is probable cause, municipalities you should have second guessed the judiciary on that and you knew or should have known that the judge got that wrong and stopped. And, yeah, and interfered, I suppose, then with the police officers carrying out the court 's order. I mean it seems to be a little bit of a slippery slope that, you know, a city is not subject to a court's order I suppose is what the analysis would have to be, correct?

24

And so for all of those same reasons, they should be -- the Fourth Amendment claim should be dismissed.  I don't see how you have an unlawful or an unreasonable search and seizure where it has been ordered by a court.  And so it would apply I would think equally to a municipality.  I guess to rule otherwise, like I said, would create a potentially dangerous -- dangerous precedent where cities are second guessing a judiciaries opinions and orders.

THE COURT:  Okay.

MR. JAMES:  The plaintiffs', I think, best argument on this issue is that the newly enacted Utah RFRA somehow implicates or changes the analysis there.  I don't think it changes absolute immunity.  This is just an even if type argument.  But I have mentioned qualified immunity and that would apply equally to the extent that the plaintiffs are persuasive in saying that the Utah RFRA has somehow amended or changed the analysis that the police officers knew or should have known that they were violating clearly established law in following a court's order because of a newly enacted statute.

I'm happy to get into the state law claims that we have discussed, but like I have said at the outset, I intended to limit my argument and focus in on the state or on the federal claims because with those claims dismissed, the state law claims should be remanded.

25

THE COURT:  And I understand where you're coming from.  I can tell you -- I can tell you that I think there are enough are tricky issues here that I'm going to take this under advisement at the end of the hearing today.  So you may prevail on your motion to dismiss the federal claims, but you're not going to know that now.

So I guess if you want to argue the state claims, you can.  If you choose to not argue those orally and submit those on the briefing, you're free to do that as well.

MR. JAMES:  All told, may as well hit them quickly.

THE COURT:  Okay.

MR. JAMES:  So let's be quick.  So we have moved to dismiss the RFRA claim at least to the extent it seeks monetary damages.  And you may have seen, I like the charts that we do, it makes it easy for me to understand the differences between the federal and the state laws and the nuances in the opinions there.  The plaintiffs have come back and argued that hey, this *Tanzin* case that allowed damages under the federal RFRA, the analysis, same analysis, should apply to the Utah RFRA.

THE COURT:  Right.  But the language -- well and you can make your arguments on the language, but the list -- and maybe I'm confusing it with something else, I'll let you go ahead and make your argument and I won't interrupt.

26

MR. JAMES:  I welcome the interruption.  I think I do better answering questions than just rambling.  At least it sounds better to me.

But the federal RFRA and the *Tanzin* opinion focused in when they awarded damages on this word "appropriate."  The federal RFRA says, quote, "A person whose religious exercise has been burdened in violation of the section, may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government."

The Utah RFRA has similar language.  But true I think important and key differences.  First, is that it changes the "has been burdened" language to "is burdened."

THE COURT:  Right.  And then the second is that the word "appropriate" is removed, right?

MR. JAMES:  Correct.

THE COURT:  So I guess the question is appropriate to me as it seems to be an adjective which would further qualify or limit the term relief.  So I'm trying to understand how you think that the removal of a qualifying term narrows the available relief as opposed to broadens it.

MR. JAMES:  And I would say perhaps correct but different which is the *Tanzin* opinion which hinged on that use of the word "appropriate" not on the word "relief."  Makes the *Tanzin* opinion inapplicable here.

27

And so, you know, the Supreme Court in analyzing *Tanzin,* focused in on what appropriate relief would be.

THE COURT:  Right.  But if -- I guess putting that aside, if I'm just then interpreting what is relief, why would relief be limited?  I suppose your argument then is, well, if it is a present tense, then it's only injunctive relief.  But we all know that something that a state is committing now, by the time it gets adjudicated because courts are very slow, it may no longer be happening. Why does that mean that no monetary relief is available?

MR. JAMES:  I think because --

THE COURT:  For past behavior.

MR. JAMES:  Because the person's religious -- the exercise of religion is no longer being burdened.  And the Utah RFRA is expressly limited to those religious exercises that I'm going to say is being burdened but are presently being burdened.  So because it doesn't allow for, you know, retroactive relief, it's just, you know, present relief. And that's expressed in the statute.  And that's a key difference from *Tanzin*, or sorry, from the federal RFRA, which the Utah RFRA states is expressly kind of modeled after.  And so given the mandates and the rules of statutory interpretation, it's presumed that the omission of the word "appropriate" is intentional and it is supposed to be given meaning.

28

THE COURT:  But again, "appropriate" is a limiting term.  Removing it can't limit anything because it was a limitation, it wasn't an expansive term, it was a limiting term.

MR. JAMES:  I understand why you say that.  I disagree.  And I look to the *Tanzin* opinion for that because the court in *Tanzin*, they didn't focus on the word relief and say well, relief means this whole host of things and it is an expansive term and the word appropriate before that that limits it to monetary relief.  The *Tanzin* court focused on "appropriate."  And their whole opinion was based on that word.  Was not based on relief, but appropriate.  And so the *Tanzin* court interpreted appropriate would be an expansive term rather than a limiting term.  Otherwise, why talk about appropriate at all?  They would just talk about relief and say, well, relief means this and therefore monetary relief is included in that and you're allowed damages because it says relief.

THE COURT:  Well, maybe they felt the need to discuss what appropriate meant because the fact that it was an adjective would have limited relief and they wanted to make clear why they didn't believe it should be construed as a limitation.

MR. JAMES:  I read *Tanzin* as focusing on the two words we have heard, the two phrases we have highlighted.

29

You know, the court says, well, otherwise if we didn't allow monetary relief the *Tanzin* court how could we remedy these lost plane tickets based on this religious exercise that has been burdened but is not presently being burdened.  So that's how the *Tanzin* court came out with and came to the conclusion that monetary damages have to be awarded because there will be instances where somebody's religious exercise has been burdened.  And in that instance, appropriate relief is always allowed which is monetary relief.  The Utah legislature changed those two words that the Tanzin opinion hinged on and said, no, it is not "has been" but only religious exercise that "is burdened" suggesting that it is going to only be injunctive relief and allow them to obtain relief.

I will concede they could have drafted it much better.  But I think you have to take the omission of appropriate and the change of has been to is as an intentional use and purposeful and give it meaning.  And the only backdrop we have to analyze this, and discuss it against, is the *Tanzin* opinion where it follows logically, I think, that if you have taken the two clauses that the *Tanzin* opinion hinged on to find that monetary damages were allowed under the federal RFRA, that the Utah legislature intentionally limited it to injunctive relief only and not monetary relief.

30

And so the RFRA claim, to the extent it seeks monetary damages, should be dismissed for that reason.

THE COURT: Okay.

MR. JAMES: Again, highlighting, I think, why even if the federal claims remain, this should go back to state court to be decided because it is a, like I said, a fairly novel and nuanced question of law that's unsettled.

THE COURT: Okay. Any other state law claims you wish to address?

MR. JAMES: They assert a state law claim that is kind of a corollary between the First Amendment and the Utah State Constitution. They argue that the free exercise clause under Utah Constitution is going to be subject to strict scrutiny even though the federal First Amendment clause may not be.

And so this assumes that you accept our argument, of course, on the First Amendment claim and that it is a law of general applicability and neutral. All of the cases they have cited to suggest to you that the analysis under Utah's free exercise clause is now different and subject to strict scrutiny as opposed to the same analysis under the *Smith* case is wrong. They cite to you three opinions. Each of those opinions expressly recognize that the Utah Supreme Court, quote, "Never determined whether the free exercise clause in Article 1, Section 4 of the Utah Constitution

31

provides protection over and above that provided by the First Amendment of the United States Constitution and we do not decide that question today."

And so there has never been an opinion issued from the Utah Supreme Court that would suggest that the free exercise clause under the Utah Constitution offers or affords protections above and beyond what's offered under the free exercise clause of the federal constitution.

And so for all of the reasons that the federal First Amendment claim should be dismissed, that they apply equally to why the First Amendment or the free exercise clause under the Utah Constitution should be dismissed.

Sorry, I'm scrolling through here. That summary of, you know, the argument that the analysis applied to the First Amendment federal claim applies to the analysis for the Utah Constitution claim applies also to the Utah Constitution claim as it relates to an unlawful seizure. They haven't distinguished or otherwise articulated why the analysis should be any different under the Utah Constitution as opposed to the Federal Constitution. So for all of those same reasons, their Utah Constitution claim for an unlawful search and seizure should also be dismissed.

THE COURT: All right. Anything else?

MR. JAMES: No, I think I have talked long enough. I appreciate your time.

32

THE COURT:  All right.  Mr. Bean, who will be arguing this motion on behalf of the plaintiffs?

MR. BEAN:  I will, Your Honor.

THE COURT:  All right.  You may proceed.

MR. BEAN:  Thank you.  Just at the outset, I think it's good as we are here both on a motion to dismiss and a motion for preliminary injunction to recognize that defendants' motion, of course, is subject to a far different standard than, you know, plaintiffs' motion for a preliminary injunction where we're evaluating plausibility in terms of what is pleaded in the complaint versus the likelihood of success on the merits which this court has already indicated that at least for the Utah RFRA claim that plaintiffs have demonstrated substantial likelihood of success on the merits which just sensitizing to, you know, the court to, you know, the unique perhaps posture we're here.  I first want to speak --

THE COURT:  I was just going to say I -- I understand that, but I suppose the bigger question is if there is not a basis to get past the motion to dismiss stage with respect to the federal claim, aren't you back in state court and what I think won't matter anyway?

MR. BEAN:  Yeah.  And that goes right to the next point I was going to raise which is the issue of the supplemental jurisdiction and whether the court should

33

retain or not.  And of course we think the court should retain jurisdiction over the state law claims.  The primary reason for that is that supplemental jurisdiction statute itself which is 28 U.S.C. 1367 which says that district courts may decline to exercise supplemental jurisdiction.

(Reporter asks Mr. Bean to slow down.)

MR. BEAN:  Yes, thank you.  So let me back up there.  So speaking to the supplemental jurisdiction and specifically to 28 U.S.C. Section 1367, what I was pointing out was that it includes the term "may decline to exercise supplemental jurisdiction" meaning that the court does have discretion to make that decision.  Of course, that discretion is guided by several factors in that statute including, you know, the novelty of the complexity of the issue of state law, whether that piece of state law predominates over the other claims as well as whether there is factual, legal, and overlap, and whether there is going to be a risk of inconsistent judgments created by remanding the state law claims to the state courts.

Of course here, plaintiffs feel that this is an issue which should be resolved together.  There is very significant overlap between the First Amendment claim, the Utah RFRA claim, the Utah constitutional claim.  And we don't think the issues are so novel especially with, you know, the 30 plus years of First Amendment and Federal RFRA

34

case law that we have on hand that would necessitate remanding back to state court.

THE COURT:  Although if I dismiss the federal constitutional claim, do you concede then that the rest goes back to the state system?

MR. BEAN:  I would concede that it is up to Your Honor's discretion.  That's not the --

THE COURT:  You know, the Tenth Circuit case law is pretty tough on that point.  At least I'm hard-pressed to think of any Tenth Circuit authority that suggests that when the federal claim goes this early in a case, that I should hang on to it or that I could even hang on to it.  I think -- I think that unless we have invested years in discovery and we have got a pending trial, I'm -- the Tenth Circuit has been pretty clear that the default is to remand it.  But maybe there is a Tenth Circuit case out there that I'm not aware of.  But --

MR. BEAN:  I'm not going to point you to an additional one today, so we'll just rest on that specific point on our briefs.  Of course, we think Your Honor is never going to have to reach this question of deciding whether or not to, you know, remand the state claims because we believe that the First Amendment claim and the Fourth Amendment claim have been stated, you know, to a perfectly acceptable level of plausibility.

It is certainly concerning to hear from our perspective that defendants would like even if the court retains jurisdiction over the First and Fourth Amendment claims to still remand the state law claims.  That's where it gets into issues of inconsistent verdict risks that we think are pretty substantial as well as the issues of judicial efficiency having two courts litigate in addition to the criminal case that we have going on essentially the same issues, whether they be as affirmative claims or defenses would be an issue for us.  But that's our primary supplemental jurisdiction.

Certainly we understand that, you know, if the court does decide to dismiss the First or Fourth Amendment claims, you know, our position is that the court does have some discretion subject to those Tenth Circuit cases that Your Honor has identified.

The last thing on that point, obviously, we will argue this more in the Anti-Suit Injunction motion, but it has been concerning to us essentially that it seems to us and Your Honor said there was an inference that the defendants are essentially trying to flee this venue because they didn't have a successful outcome at the temporary restraining order stage.  And we'll put that more into context in the Anti-Suit Injunction motion and what that removal means and how it might be more preventative in

36

App-8:038

allowing the criminal case to proceed but wanted to add that to this statement here.

With that, I did want to go over the plausibility of first the free exercise claims. We'll start with the federal claim, and then go over the reasonable search and seizure claims and we'll start with the federal claim there unless the court would like to direct me somewhere first.

THE COURT: No, that sounds good. And let's just jump into what I think is the most significant issue, or I guess the hardest or trickiest, I don't know how I want to describe it, issue in front of me, and that is whether or not the Utah Controlled Substances Act is a neutral law of general applicability. And frankly, I mean I think Mr. James clearly articulated their position which is why is this not *Smith*? *Smith* had medical exemptions and the court nonetheless found the law neutral and generally applicable. Why is that not binding on me here? Should I not just follow *Smith* and conclude that the Utah Controlled Substances Law is neutral and generally applicable and that the medical exemption for psilocybin doesn't change that any more than the medical exemptions changed the analysis in *Smith*?

MR. BEAN: Yes. Let me speak specifically to Smith first, and then I want to talk about *Smith* as it has been extended in the *Fulton* case and the *Chiles* case in the

37

Tenth Circuit, and as those rules indicate whether something is or is not generally applicable. So first, as to the *Smith* case, I think the significant distinction there is while there may have been a medical exception, you know, for example, prescriptions or licensure for certain controlled substances, although not typically Schedule I substances, there was not what we have here. There was not a secular exemption for the usage of Peyote, but a concurrent prohibition of the religious usage of Peyote by the government.

So I think that's a very significant point why this case is quite significantly different than *Smith*. And then as Your Honor has indicated, you know, the developments in *Smith* are pretty significant. The first one I want to talk about is actually rooted in *Smith's* actual language.

So in the *Fulton versus Philadelphia* case from 2021, from the Utah Supreme Court, and the Tenth Circuit's adoption of those standards in the *Chiles versus Salazar* case from 2024, they explained when a law is not neutral or generally applicable, and they discuss, you know, several modes and instances where that can be possible. And I just want to raise two for this court that are applicable here. The first one is where the law at issue had a system of individualized exemptions.

Now, that language from *Fulton* and *Chiles*

38

actually comes directly from *Smith* itself.  And essentially *Fulton* illustrates this for us.  In *Fulton,* there was a system of individual exemptions that the court found unanimously.  The City of Philadelphia had entered a -- or had a contract with, you know, adoption or foster care entities that included a nondiscrimination provision something that typically applied across the board.

However, that clause reserved, to the commissioner of that particular agency, the discretion to issue exemptions based upon what he saw.  Specifically, and we have pointed out that language to the court in our briefing.  Now even the commissioner in that case said that the commissioner never intended to use that exemption.  However, the Supreme Court said that the mere fact that an exemption was included in the government's provision indicated it was a system of individualized exemption.  So --

THE COURT:  Right.  But -- but that -- in that case, the legislature had delegated the individual exemption to the commissioner.  Here, it's a legislature that created the psilocybin exemption for healthcare institutions which to me, I think, distinguishes it from *Fulton*.

MR. BEAN:  And the reason I wanted to continue on this, is that's -- the Utah Psilocybin Act certainly is an exemption which I would say supports the system of

39

individual exceptions.  But the more specific provision that I want to point to in the Utah Controlled Substances Act is Utah Code 58-37-6 subsection 2d.  And this is a very similar section to that that was discussed at issue in the *Gonzales versus O Centro* case and has kind of a sister statute that's in federal law at 21 U.S.C. Section 822 subsection D.  And what that section of the Utah code allows the Division of Professional Licensing to do is quote, "Waive the licensure requirement of the Utah Controlled Substances Act if," return to quotes, "consistent -- if it is consistent with public health and safety."

That, Your Honor, is precisely the same sort of exemption and discretionary power that the agency here, DOPL, and, you know, there in *Fulton,* the commissioner, right, has to grant the exemptions subject to their determination of public health and safety which I would say is highly discretionary and up to DOPL's sole discretion.

So that conclusion of the piece in the Utah Controlled Substances Act alone, I think, is indicative of a lack of general applicability here.  I think we aid to that, the Utah psilocybin Act, which, you know, the court has indicated has the truly broad scope and that we add to that the other exemptions that are also found within the Utah Controlled Substances Act including the Peyote exception, including the Cannibis exception.  And this really builds to

App-8:042

a place where we have a very unique Controlled Substances Act unlike any other states or the Federal Substances Act and we have truly a system of individualized exemptions and additional exemptions which undermine the general applicability.

MR. JAMES:  Your Honor, very quickly, could you tell me that cite again?  I'm trying find it but I feel --

THE COURT:  It was 58-37-6(2)(d).  Did I get that right, Mr. Bean?

MR. BEAN:  You did.  And that is also contained, I believe, in a footnote to our motion, a supplemental brief, I believe.  I'm trying to remember all of the briefing that we have done here, Your Honor, and where it lives, but that is the correct cite.  Thank you.

MR. JAMES:  Thank you.  Sorry, Tanner.

MR. BEAN:  The only other thing I was going to mention in regards to this type of, you know, lack of general applicability that the court identified in *Fulton* and *Chiles*, is this Peyote exemption that we have in the Utah CSA which extends only to, you know, Native Americans, essentially those practicing Native American religion. Which we just want to raise, you know, the equal protection concerns with that.  Plaintiffs have not brought an equal protection claim but certainly, you know, that lends, in some sense, to, you know, the government's position on

41

general applicability, and later on, as we'll talk about, compelling state interest.

The second part of *Fulton* and *Chiles* that I wanted to talk about is where a law prohibits religious conduct while permitting secular conduct that undermines the government's asserted interest in a similar way.  This is a separate and independent way of demonstrating a lack of general applicability.  And in *Fulton,* the court gave an example of a past case that it had had involving the Santeria faith which practices animal sacrifice.  And they -- that faith group was practicing in Florida and the municipality there passed an ordinance prohibiting them from, you know, keeping animal carcasses out in public places or disposing of them in public places.

And the court found that that law was not generally applicable because it did not prohibit very similar conduct which, you know, posed all of the same risks, you know, public health risks perhaps which was that ordinance still allowed hunters to dispose of their kill at home or a different place.  It allowed restaurants to dispose of animal waste in a place that was open and obvious.  And so that's the sort of juxtaposition we have there.  It's an inequality in treatment even if the law might be facially neutral.  Inequality in treatment between a secular instance and a religious instance.  And that is

42

what we have here, Your Honor, and most clearly demonstrated through the Utah Psilocybin Act, as we call it, that portion of the Utah Controlled Substances Act.

It is a strikingly broad law and allows these large healthcare systems in the state to administer psilocybin to individuals, largely up to their discretion, subject to just a few different requirements which the court has already talked about.  Frankly, we believe that it poses all of the same dangers that defendants claim that psilocybin would pose to public safety, to public health, to drug trafficking.  There aren't really guardrails erected in that statute for -- to prevent the sorts of things.

THE COURT:  But is it though -- is it more just sort of a piggyback on this generalized notion that all of the Controlled Substances Act allow, I suppose, personalized exemptions based on a prescription by a healthcare provider and this is just a more systemic way to allow hospital systems to essentially fulfill the role of a prescribing medical practitioner for these substances?  I mean all of the Controlled Substances Act allow for physician prescriptions for certain substances.

MR. BEAN:  That's true.  And generally I would say not in regard to Schedule I substances, but, you know, if there was a reference in the Utah psilocybin Act to you know and this should be interpreted consistent with, you

43

know, how prescriptions are to be provided or something like that, I might agree with the court but that's just simply not in there.  It is just pretty barren how it interacts with the rest of the Utah Controlled Substances Act.  And I would say, you know, it interacts far less with that and at the end, of course, it immunizes, you know, individuals, administering, overseeing, you know, participating in any sort of program erected by a healthcare organization from liability, right?  It's not even an affirmative defense which is most typical under the Controlled Substances Act where there might be some sort of other step-off exemptions.

THE COURT:  So at what level of generality do we look at the legislation that's involved to determine if we have got a neutral law of general applicability?  Do we look at the Controlled Substances Act as a whole, or do we drill down and only look at how the Controlled Substances Act applies to the particular controlled substance that is at issue in our litigation?  In other words, is it fair ground to look at the Peyote exemption or are we cabined to looking at what the Act does with respect to psilocybin?

MR. BEAN:  I think my answer would be different depending on the type of lack of general applicability the court has indicated in *Fulton* and *Chiles* under the first which we began with the system of individualized exemptions. I do think it is appropriate for the court to review the

44

entirety of the Utah Controlled Substances Act including all of the exemptions because the idea here is, you know, that at some point it just becomes so unreasonable that the Act has so many other exemptions for others that the government's position in not providing it to a religious organization becomes unjustified, right?

You know, when the law becomes more Swiss cheese than not, right, how can the government not allow a religious organization to receive the same sort of similar exemptions.  It kind of begins to raise the equal protection issues or those concepts, right?

So I think under that provision of *Fulton* and *Chiles,* I think that it's appropriate for the court to consider all those pieces.  However, when we are looking to this other mechanism of evaluating whether the law prohibits religious conduct while permitting secular conduct that undermines the government in a very similar way, that is a place where I think the court hones in a little bit more specifically on the substance at issue.  And here, of course, it is psilocybin.  And so the natural comparator under the Utah Controlled Substances Acts is the Utah Psilocybin Act prohibitions within that act.  Does that answer Your Honor's question?

THE COURT:  I think so.

MR. BEAN:  Okay.  That is what I would like to

45

share with the court as far as general applicability goes with the First Amendment.  Just briefly, I'll comment on, you know, getting to strict scrutiny otherwise.  I don't think anyone disagrees here that the Utah RFRA, Religious Freedom Restoration Act, requires -- or excuse me, review.  It's certainly a similar disagreement about whether article Section IV of the Utah Constitution requires strict scrutiny review.  We certainly pointed the court to cases which indicate the Utah Supreme Court's development and thinking on that matter.  We're not here to say that there is a case that has firmly decided the matter, you know, as a matter of something that could be other than dicta but just --

THE COURT:  Well, and I guess the question is, assuming that -- I suppose if I disagree with you on the Federal First Amendment claim, again, what I think about the Utah Constitutional Free Exercise claim it becomes irrelevant because the case isn't in front of me any more.  But assuming that the Federal First Amendment claim survives a motion to dismiss, is the motion to dismiss procedural stage the appropriate place for this court to get into a full blown analysis of the contours of that Utah Constitutional Free Exercise Claim given the -- I mean I know we have some briefing here, but it seems like it certainly is not the kind of exhaustive exploration of the issue that I would hope to have if I were actually trying to

46

define the contours of that right.

MR. BEAN:  Yeah.  And certainly we think it would require some substantial additional briefing if we were to go all the way through that.  I think it is something that would be better left probably for another day.  It's very possible, of course, that this court could decide that it doesn't even reach that analysis because of the Utah RFRA analysis or the First Amendment analysis.

THE COURT:  But it's kind of tricky here though because I mean I have a motion to dismiss that's pending in front of me.  And while I may not -- while the outcome of the Utah Constitutional Free Exercise claim may have no bearing with respect to the outcome of the motion for a preliminary injunction, and, in fact, I think is unlikely to have any bearing on the outcome of that motion, I still have a motion to dismiss in front of me and I think I have to decide that claim.  But as you've just indicated, I'm being asked to decide to throw it out or keep it in based on very limited and what I think is inadequate briefing.

MR. BEAN:  The only thing I would add to that, Your Honor, is that the defense proposed, you know, that cases in Utah Supreme Court essentially indicate a neutrality standard.  We have taken the court through that in our briefing and we think that neutrality standard is simply inapplicable to the free exercise claims that we have

47

here.  Those provisions about neutrality relate to more establishment clause type concerns in the Utah Constitution than they do here.

So certainly, you know, of course we would if the court feels like it needs to decide it, our position is that the Utah court has indicated the way, and to -- where it is most likely to land on what analysis applies to strict scrutiny analysis applies.  But, of course, you know, lots of briefing going on here.  Plaintiffs felt the need to emphasize the First Amendment claim and that Utah RFRA claim first before proceeding there.

THE COURT:  Okay.

MR. BEAN:  All right.  Let's see.  I think what we will do is we will save our discussion about the two strict scrutiny prongs as defendants appear to have done, the compelling governmental interest and the least restrictive means for discussion on the preliminary injunction although I do think they have some application here for the motion to dismiss because if plaintiffs in their pleadings having demonstrated a substantial burden on their religious free exercise, the burden then shifts to the government to indicate that it does have a specific compelling interest as to denying an exemption to the plaintiffs here, and then must also show that there is no other less restrictive means they could employ other than

48

outright prohibition of psilocybin to accomplish the

government's means.  So I will just note that and bookmark

that for the court and we can talk about that more

specifically unless the court would like to hear that

presently.

THE COURT:  I'm happy to let you defer.

MR. BEAN:  Okay.  Let me move over to the search

and seizure claims.

THE COURT:  Wait.  And I have to say, I'm

somewhat skeptical of these claims.  If -- if we -- if the

search hadn't been based on a warrant issued by a judicial

officer with absolute immunity, you could have some

traction.  But I am just -- I am really struggling to see

why those Fourth Amendment claims don't go out the window

based on the warrant?

MR. BEAN:  Yeah.  And I can see why Your Honor

would have that impression.  Essentially our argument is,

you know, beyond some of these arguments about immunity

related to and flowing from an issued search warrant that

the search warrant was essentially procured under, you know,

means that should have indicated to the court that probable

cause was not present.  You know the officer did include

information to the court about some of the claims that

Singularism was making as to religious free exercise, but

notably absent from that search warrant affidavit were, you

49

know, indications of religious sincerity or --

THE COURT:  Well, so do I understand that you're not making a claim that the search was unconstitutional, you're making a claim essentially that the procuring officer committed fraud on the court and therefore that officer ought to be liable for committing fraud on the court and obtaining a warrant.  I mean that's a very different issue than saying that the search was invalid.  I mean if you were going to bring a claim against an -- and I -- against the officer, it wouldn't be for conducting a search, it would be for basically filing a false affidavit to obtain the warrant.

MR. BEAN:  Yes.  And we recognize those distinctions.  The case I would point the court to is the U.S. Supreme Court case called *Malley versus Briggs,* that's 475 U.S. 335.  And the quote that I just want to highlight for the court there is that a police officer who secures an arrest warrant without probable cause cannot assert an absolute immunity defense.

I know we have a lot of other authorities that both parties have cited as to, you know, prosecutorial immunity and issues of the before and after the search warrant issue, but that -- it is almost like a fruit of the poisonous tree type argument, Your Honor, in the sense that, you know, our position is that defendants especially you

50

know the entity level defendants and the final

decision-makers here, should have at least instructed or the

individual defendants should have included in that search

warrant affidavit information about, you know, the bona fide

defense that Singularism has, for example, did not include

any information that Singularism had had a, you know, record

of safety that was untouched at least at the time of the

search warrant being procured.  It didn't have any

statements about the government's compelling interest in

denying Singularism specifically an interest or an

exemption, right, such that it would compromise their issue.

So there was just some information that wasn't

present and we can never second guess this because, of

course, the court issued the search warrant.  But had those

issues been present, perhaps we would have had a different

situation and prevented the search altogether.

And I could see how the court might, you know,

understand that some of those, you know, pre-search warrant

or post-search warrant activities fall a little bit better

underneath the free exercise claims rather than the Fourth

Amendment claims, but there includes the extent they

contribute to what we think is a search without probable

cause and thus, you know, obtaining, you know, a detention

and obtaining evidence that was not supported by probable

cause.

51

Practically, talking about issues of immunity, as the court has reviewed, we have filed an amended complaint and that was something we discussed back and forth with defendants over the past week or so, the past few days. And, you know, there was the decision made to remove these law enforcement officers as defendants. Of course, we have the present motion to dismiss before you. That was not a decision made because of the immunity arguments but rather the argument I'll talk about in a moment about the bond.

Before we leave the immunity issues, beyond what we have put into the briefs, I did want to highlight for the court an issue from a case in the Tenth Circuit about the municipal liability -- or municipal immunity. And that case is *Hennessey versus University of Kansas Hospital Authority.* That's 53 F.4th 516 at 527. It's from the Tenth Circuit in 2022. I'm going to state in terms of scope Eleventh Amendment --

THE COURT: Slow down for a minute.

MR. BEAN: Sorry I get quoting here.

THE COURT: Yeah. When you read you speed up.

MR. BEAN: That must be some leftover trauma from fourth grade read-aloud or something like that. But, let's start again. In terms of scope, Eleventh Amendment immunity extends to states and state entities, but not to counties, municipalities, or other local governmental entities.

52

Now, we don't think that the issue of municipal liability was particularly raised in the motion to dismiss, so we really haven't had too much time to address that. And if the court is interested in receiving supplemental briefing, we're happy to do that, but we just wanted to kind of bookmark that for the court in that we do believe that even if the law enforcement officers were entitled to some level of immunity, the municipalities at issue would not be.

Last, let's go to the bond issue. And the only reason I'm raising the bond issue is just to indicate why the law enforcement officers are being removed. I think the plaintiffs have some decent arguments about that statute which requires essentially a bond in the amount of attorney's fees that the government would need to expend to prevail in the case. We have, you know, some issues about that, you know, perhaps even, you know, constitutionally or that it would apply in the case in a First Amendment violation or religious free exercise violation.

But frankly, rather than, you know, bringing that fight and expending the time and effort to fight over constitutionality of one of Utah's statutes kind of as a collateral issue in this case, plaintiffs at least at this time have decided to remove the law enforcement defendants and pursue the claims principally against the municipalities and Utah County Attorney Jeffrey Gray. Of course, if facts

53

indicate to us that, you know, the law enforcement officers fall outside the scope of their official duties such that that statute no longer is applicable, plaintiffs would like to reserve the right to amend their complaint again to add those individuals as to those particular issues.

As to the Utah constitutional reasonable search and seizure claim, I don't think I heard counsel argue for immunity here either, but other than what was stated as to the Fourth Amendment, but we would just repoint the court back to the *Stella versus County and the Jensen ex rel, Jensen versus Cunningham* cases which indicate that the Utah Governmental Immunity Act does not apply to Utah constitutional claims.

I think the only thing I have left over to discuss on this is the issue regarding the Utah Religious Restoration Act damages.  I don't have much more to say than what the court has already kind of questioned plaintiffs about and is included in our briefing.  Simply we think, you know, the removal of the word "appropriate" in the federal version to the Utah version, if anything, just allows even greater relief.

THE COURT:  What about the tense change from present tense to past tense?  I think that's -- if we're doing a linguistic analysis here, I think that's a tougher argument for you than the -- than the word "appropriate."  I

54

mean the whole tense thing doesn't suggest relief for past i.e. non-continuing conduct, does it?

MR. BEAN:  I think it does.  I don't find much meaning frankly in the change between the tenses here.  I would be very surprised to hear if Utah legislature was attuned to that level.  Of course, we'll take them at their word, but I'll put that in the context of what we have also included in our brief which is statements from the legislature of course indicating that they intended this RFRA to be, you know, the best, most potent.

THE COURT:  Well, I understand that.  But absent an ambiguity, I can't look at that stuff.  I'm confined to the language the legislature actually used and I have to interpret what that means.  I can't look at what Senator Weiler said to the Deseret News.

MR. BEAN:  True.  And, you know, my understanding and this is something that we could supplement with if necessary, but it sounds like that the Utah legislative, you know, the drafting manual advises the legislature to place things in present tense.  So that may be a reason for the explanation of the tense change and it could be something in additional.  Whatever the case is, I don't think it really has significant impact in this case in removing the type of relief that plaintiffs could obtain.  Because in any event, plaintiffs have both been, you know, sustained substantial

55

burdens in the past, and they expect to in the future and have ongoing burdens.  For example, we have indicated to the court that, you know, in the past, some of defendants statements have caused an issue with plaintiffs' bank accounts.  Of course, the search and seizure is in the past, right?  And then we also, you know, recognize the active burdens that are ongoing such as the failure to return the psilocybin, the threat of eviction, which has not been lifted, the criminal ongoing prosecution and, of course, all of those substantial burdens impact on diminishing the faith membership and ability of those individuals to participate in the religious free exercise in community with Singularism.

So for that reason, we think damages are clearly a form of relief available under RFRA in Utah's RFRA.  We think it's consistent with what happened in the *Tanzin* case. We think it's consistent with what is drafted.  And the last thing I'll point you to is if the court -- or if the legislature had intended relief to be limited only to attorney's fees and costs, it would likely have said that in the provision where it discusses attorney's fees and costs. And, of course, that provision is several lines down in the statute and it's a separate subsection.

All right.  Well, I think, with that, I don't think I have anything further for Your Honor unless you have

56

questions for me.

THE COURT:  All right.  I do not.  I'll turn the time back over to Mr. James to reply.

MR. BEAN:  Thank you.

MR. JAMES:  All right.  I will be quick and hit on a couple of things and try to field any questions Your Honor may have.  So I'll start with the First Amendment claim and this general applicability which seems to be probably the issue for the day.

I quickly tried to do some more research on this. I found a case out of the Eighth Circuit I think is applicable to this analysis and to my argument.  The cite is *Olsen versus Mukasey*, M-U-K-A-S-E-Y.  The cite is 541 F.3d 827.  I'll see if I can get you a pincite really quick. Starting at 832 is the pincite.

It's the Eighth Circuit going through and discussing and addressing frankly the exact arguments I think that Mr. Bean has made, which is that the Controlled Substances Act of that state violated and was not -- violated the First Amendment and was not generally applicable because he contended, the petitioner contended, that the Controlled Substances Act exempted the use of alcohol, tobacco, certain research and medical uses of marijuana and the sacramental use of Peyote.  The Eighth Circuit rejected that argument saying, quote, "General

applicability does not mean absolute universality."  I can't even talk.  Exceptions do not negate that the Controlled Substances Act are generally applicable.  And then they cite, and I think this is helpful, the *O Centro* case that everyone is familiar with, and also *United States versus Meyers,* which is a Tenth Circuit case.  The cite is 95 F.3d 1475.  But in short, it, I guess, reenforces the argument that I have made which is that just because exceptions exist to a Controlled Substances Act does not make that law generally applicable or does not make it so it is not generally applicable.  There has always been exemptions and every case that I have seen has still held that the Controlled Substances Act are generally applicable.

We discussed in my first argument about whether or not qualified immunity would extend to the municipalities.  And I have another case for you that would suggest that at least part of the analysis does.  And this is *Fenn versus City of Truth or Consequences,* 983 F.3d 1143.  And it's a Tenth Circuit case from 2020 that suggests that, and I'm quoting, "Because Fenn cannot establish a violation of a clearly established constitutional right, his Monell and supervisory liability claims also fail."  Which suggests that in order to have a claim against the municipalities, in order to have a Monell liability type of claim, you have to have a violation of a clearly established constitutional

58

right which is still the same analysis as the qualified immunity analysis.  And where you don't have any case law that has fleshed out and essentially rebutted or overturned *Smith,* and a plethora of case law that says otherwise, it cannot be held that the city has violated the plaintiffs' First Amendment -- clearly established First Amendment rights in enforcing a Controlled Substances Act that has been enforced since its enactment without question.

THE COURT:  So and maybe I'm -- I'm looking at the first claim for relief of the Amended Complaint and it talks about 42 U.S.C. Section 1983 and then the First Amendment claim.  Do we analyze this only through the lens of a 1983 violation dependent upon the First Amendment, or is there an independent First Amendment claim separate and apart from the 1983 claim to which -- and if so, then would the free standing constitutional claim implicate these notions of clearly established law and immunity?  I mean it seems that if we -- if there is going to ever be any development in the first amendment law itself, we can't impose a requirement that the law be clearly established or we would be frozen in time with respect to the First Amendment claim.

MR. JAMES:  Oh, gees, Judge, that is a never-ending lunch conversation we have here when we talk about our qualified immunity and the personal issues I have

59

with that analysis, but that's the analysis.  That happens all of the time.  Regularly, cases are dismissed because there is not in the context of a 1983 claim, because it is not a violation of clearly established law and the case is dismissed.

THE COURT:  Right.  But that -- I guess what I'm trying to ask, and maybe this was more appropriately addressed to Mr. Bean, is the first claim for relief of this newly filed amended complaint, which as I said I haven't read cover to cover because it was just filed last night, is it -- is it a 1983 claim seeking, you know, money damages, or is it a free-standing First Amendment claim that's just trying to enforce the rights under the First Amendment that isn't dependent on the 1983 qualified immunity analysis?  I'm not sure.

MR. JAMES:  And I guess I would say, and this happened to me in front of Judge Barlow, I was arguing a qualified immunity argument and I won but he ruled that it didn't satisfy *Iqbal*, *Twombly* standards which was an argument that I didn't even think to make.  And I think that your struggling with that question would highlight the answer to it which I think you've got to take it first as pled which it's pled as a 1983 claim.

THE COURT:  Well, it says, 42 U.S.C. 1983 and the First Amendment to the U.S. Constitution.  I guess maybe

there are two claims within the claim.

MR. JAMES:  I understand 1983 to not -- it doesn't give you your owner set of independent rights other than to assert a constitutional violation claim so they have to be married together.

THE COURT:  So how is there ever any development with respect to constitutional law if all of the claims get thrown out they aren't based on clearly established law.  I mean we would be stuck in whatever year 42 U.S.C. 1983 was adopted.

MR. JAMES:  I guess to your point, and to the conclusion we have come to here, which the issue you're touching on is an issue that exists not just in this case in the First Amendment, but as to qualified immunity.  And that is the qualified immunity analysis is if you don't violate clearly established law and recent Supreme Court decisions from 2022 suggest that it has to be a case law almost exactly on point, then there is no constitutional violation. And then that presents the problem you're worried about or you're addressing which is fair, but is frankly an issue for the Supreme Court to overturn its qualified immunity analysis.  Because the analysis is that and the concern of developing case law is, like I said, that's something that the Supreme Court would have to change its decisions on on qualified immunity.

61

THE COURT:  But it's interesting because the clearly established law prong of the 1983 analysis is not limited to only Supreme Court opinions, it has also been, as I understand it, interpreted to include circuit case law on point and perhaps even lower court opinions if there are a sufficient number of them.

MR. JAMES:  And I suppose the pragmatic answer to your question, although judges rarely do this although I have invited them to, is you could find a violation, but nevertheless dismiss the claim because it wasn't clearly established prior to your decision.  Thereby, you know, kind of fleshing out and fleshing out --

THE COURT:  What would happen if I find a violation but don't find liability, monetary, the potential for monetary liability based on that.  What does that do to the dispute on the ground i.e., whether or not Mr. Jensen could continue to use psilocybin in his religious ceremonies?  In other words, because I guess I could declare that it is a violation of the First Amendment, but that there is no potential for a 1983 claim.  But then does it become clearly established so if there are further enforcement efforts, then there is a new claim for 1983 liability based on the specific ruling that I have entered in this case meaning it seems like that while there may not be a monetary damages claim, there is certainly an

62

injunctive relief possibility that can't be ignored.

MR. JAMES:  I don't see how you square what you said with what the I guess the precedent of the case law is which is that absent the violation of clearly established constitutional rights, there is no claim.  And so while I understand that you would struggle with how on earth do you ever develop this case law, I go back to yes, you're right, that's an issue that I think the Supreme Court has wrong because regularly cases are dismissed without developing the case law.  But that's an issue that the Supreme Court has to change.  You can't, because, you know, there is a practical problem with the qualified immunity analysis finding a loophole through the standards and the law that's been espoused by the Tenth Circuit and the Supreme Court.  And that's the standards that govern the decision, and the decision then has to be absent a finding that there is a violation of clearly established constitutional rights, there is no claim whether against --

THE COURT:  And I just -- I'm trying to think and frankly this is not an issue I focused on in terms of the case law that we have been talking about, but when the Supreme Court issues, for example, the *Fulton* opinion and they changed the law, or they extend the analysis to make something more clear or clearer that wasn't clear before, what happens to the underlying claims in those cases?  Are

63

they thrown out on the basis that this is what we're deciding now, but it wasn't clearly established before?

MR. JAMES:  Oh, gees, I don't know what happened to the underlying claims in those cases.  As we have even seen today, there are arguments that can be made that sometimes they're not made or are not made clearly.  You know, for example, I -- so the answer is I don't know what has happened to those claims.

THE COURT:  I mean I guess I need to read those cases with that in mind which is something that I confess I hadn't focused on until we started entertaining this discussion.  But --

MR. JAMES:  And I guess I would say that's fine, but it is -- I think unless that argument is squarely made and addressed, that it is not there does not indicate that you can follow a different precedent, right?  The court is silent on an issue doesn't mean that the issue -- that the standard has been changed.  So if the standard is for *Monell* liability, and it's the *Truth or Consequence* case, that absent a finding of a violation of a clearly established constitutional right there is no *Monell* liability.  But even if the *Fulton* case is silent on that issue and those claims remain, that could be because the arguments weren't made.  And if the arguments weren't made, I would have loved for judges to make the arguments for me, but that's not their

64

job and I guess I would be out of a job.  So maybe I wouldn't love them to make it for me.

But my point is, I would guess, if you go read those cases and those claims remain, check and make sure that the reason they've remained is they've addressed the *Monell* liability issue and this question of was there a clearly established constitutional right and were the claims still retained.  Because my suspicion is, although I haven't read them with that in mind either, that if those claims remained, it's not because they have analyzed the issue of clearly established constitutional rights and found that the law has changed on them.

THE COURT:  Okay.

MR. JAMES:  But I would circle back and say we are way down in the weeds on that.  I don't think you have to get there because this law is one that's generally applicable.  And because it's generally applicable, there is no First Amendment violation.

The final argument I will make goes back to RFRA and damages.  We've talked about a lot of the language of the RFRA, but one of the ones, one additional argument that Mr. Stephens has kind of beat me on the head over is there is still governmental immunity for damages.  And absent the Utah Governmental Immunity Act expressly waiving damages, immunity is retained and it hasn't been waived.  Nothing in

the RFRA would suggest that the municipalities or the state has waived immunity for a RFRA violation. And so for that additional reason, the governmental immunity damages are not available either.

I will give you supplemental briefing on who can maintain a constitutional violation and who it can be maintained against. I'm going back now to common law and *Bivens* actions in the 1983 and immunity. And if we're way down in the weeds on that, I would request that we could give you some supplemental briefing. Again, the First Amendment claim should be dismissed because the law is generally applicable. The Eighth Circuit has said, "General applicability does not mean universal applicability." There has always existed exemptions for the Controlled Substances Act, even since *Smith*, even the cases before *Smith* that had the stricter standard still recognize that there can be exemptions without there being taken away from a generally applicable case or law. And so for those reasons, the First Amendment claim should be dismissed. The Fourth Amendment claim I haven't heard strong arguments on. That one should be dismissed as well and that leaves us going back to state court with the rest of the claims. Thank you, Your Honor.

THE COURT: All right. Before we jump to the next motion, I want to give Mr. Bean the opportunity to address this issue that you and I have been batting around

66

which you indicated you may want to do supplemental briefing on just with respect to the clearly established law and what Mr. Bean intended in his first claim for relief to be in the newly filed complaint.  I know it is your motion to dismiss so you'll get a chance to respond after I hear from him, but I'm just interested in hearing his reaction to --

MR. JAMES:  That's fine.  One, I guess, one other thing is that Mr. Muhlestein is on, he, of course, is a joint movant.

THE COURT:  That's right.

MR. JAMES:  I don't know if he wants to present arguments.

THE COURT:  And that was terrible of me to not -- so you need to jump in and I am happy to -- let's turn the time over to Mr. Muhlestein to let him add anything that he wants to and I sincerely apologize, Mr. Muhlestein, that I didn't let you have an opportunity to address me before we heard from Mr. Bean.  So let's give you that opportunity now, then we will give Mr. Bean an opportunity, and then Mr. Muhlestein and Mr. James, you will have the last opportunity to reply.

MR. MUHLESTEIN:  Your Honor, on this particular topic I had just intended to join with the arguments from co-counsel.  So that's part of the reason I didn't jump in so I wasn't offended because I wasn't intending to on this

67

particular issue.  But thank you, and we'll submit on what they have said.

THE COURT:  Okay.  Well, then let's hear briefly from Mr. Bean on that last issue that Mr. James and I engaged on and then we'll turn it back to Mr. James who gets the final word on this motion.

MR. BEAN:  Thank you, Your Honor.  Let's look first at the 1983 claim for relief.  This difference, there is not a difference in what I'm about to say in the original complaint and the amended complaint but it is alleged, for the purposes of injunctive relief and damages.  You can see that very end, last, let's see, what is now going to be -- what is now Paragraph 82, asked for attorney's fees, 81 talks about the unlawful events and, of course, we go to prayer for relief at the very end of the complaint, the first paragraph of that prayer for relief asks for a declaratory judgment.  The sixth paragraph through the seventh paragraph asks for injunctive relief, and then the eighth paragraph asks for money damages, you know, compensatory damages, then we have a request for punitive damages, and then a request for attorney's fees and litigation expenses.  So it really is both that is being asked for in both the First Amendment Claim as well as the other claims free exercise and other claims pleaded.

Now, as to the issue of qualified immunity and

68

App-8:070

the conversation we have been having here today on that, I do think it is a good idea if the court thinks it is going to be an issue that it needs to reach, for the parties to perform supplemental briefing.  From my perspective I don't think issue of qualified immunity -- well, I don't understand it to be a raised at all in the original brief in the motion to dismiss.

THE COURT:  Right.  And so in your view, does this issue of qualified immunity and whether an action violated a clearly established constitutional right go at all to the declaratory judgment and injunctive relief claims, or is that argument simply limited to the money damages claim.

MR. BEAN:  My understanding is that it is far more limited to the money damages claim.  For example, if the court were to find a violation, then a secondary question would be, all right, are damages permitted for this violation.  And to prove that, we would have to go through an analysis about damages.  And my understanding is that one of those elements on that analysis is whether -- what the law was clearly established.  And then of course --

THE COURT:  And so your view is that that analysis has no place in determination of your claim for injunctive relief or declaratory judgment?

MR. BEAN:  And by extension, you know, on a

69

motion to dismiss, you know, the court could perhaps decide the issue of whether damages should be awarded. But the other issue about damages under 1983 are issues of flagrancy of the violation which I think are factual issues that are held off until a later date besides the motion to dismiss. But from our perspective, you know, if the Court was just looking at it and for some reason the claim was limited to injunctive relief, the only request I think we could get through the door at least at a motion to dismiss stage. Again, I'm speaking, you know, from my limited engagement with the qualified immunity cases and the clearly established law cases, as I think if qualified immunity was raised at all in the briefing it wasn't in the reply brief, but I don't think we even heard the words "clearly established law" even in the briefing at all. We're certainly willing and happy to engage further in that in supplemental briefing if it is beneficial for the court.

THE COURT: Okay. Back to you, Mr. James. And again, I could just be completely off base, but my understanding of that clearly established inquiry is that it applies to qualified immunity which applies to damages claims, not claims for injunctive relief. But I could be wrong on that. And so I suppose if you and Mr. Bean want to file supplemental briefing in the next five days, limited to ten or fewer pages, simultaneous filings on that particular

70

issue, I'm happy to entertain that.

MR. JAMES:  Okay.  I'm happy to do what the court, I guess, would like.  My preference if I was king for a day would be, as I have said from the beginning, I don't think we need to get down that far into the weeds on qualified immunity because we have to first to get there find that what has happened is a constitutional violation. And to get there you have to find that the Controlled Substances Act is not a law of general applicability.

THE COURT:  All right.  But do I have to find that that was clearly established, or do I just need to find that it's not a law of general applicability?  I mean that is the question.  And I seem to be hearing you argue that because there is not a court that has ever declared that before, because there is no court that has declared the Utah Controlled Substances Act to be other than a neutral law of general applicability, I can't make that finding.  Now maybe that is not what you were arguing, but that's my understanding of what you were arguing.

MR. JAMES:  So you're right on my arguments.  I'm -- I wish you wouldn't focus so much on them because the first argument is much better and easier which is that it is a law of general applicability.  But you're right, and that is my argument.  That if you are inclined to find or if you were to find that the Utah Controlled Substances Act is not

71

a law of general applicability, and therefore subject to strict scrutiny, the next step would then need to be, and it doesn't pass the strict scrutiny analysis, and then the final step that I can think of, there is probably more, but the final step would then be can they still be held liable even though I found against them on one and two because the law is not clearly established.  So we're three --

THE COURT:  Well, I understand that.  But, and I mean, again, I haven't decided steps one and two yet, and so I guess the question is, if I get past steps one and two, and find myself at step three, I would be interested in knowing if it truly is your position then that I can't allow the claim to go forward.  I have got to dismiss it because there is no clearly established law that says that the Utah Controlled Substances Act is not or is something other than a general -- a neutral law of general applicability.

MR. JAMES:  So I go back to -- I am happy to do what the court requests.  My practical approach would say I would like to see the ruling on one and two and save the clients some money on both sides.

THE COURT:  Well, I hope we're saving folks money.  So let's do this, I'm not going to order any supplemental briefing.  If I reach a point in trying to resolve this case where I feel like I need supplemental briefing I will issue a docket text order and ask for it.

72

Absent that, you won't need to worry about it.

MR. JAMES:  Okay.  Thank you.

THE COURT:  All right.  Anything else that you want to say on this motion?

MR. JAMES:  One last thing, as a challenge to Mr. Stephens, and that is that I have nothing against mushrooms, I'm a fungi.

THE COURT:  What?  Okay, it took me a minute -- fungi.  Okay, I get it.

MR. JAMES:  We have all been under a lot of pressure on this so a little levity helps, I think.

THE COURT:  And obviously, I'm slow to get the joke.

MR. JAMES:  So was I.

THE COURT:  Okay.  So let's talk.  So I think now we're ready to move to the next motion.  As I have indicated, I have got more work to do before I can resolve this motion.  So just in terms of the schedule for the day, I do have a judge's meeting that I have to attend between 12 and 1.  So I'm suggesting that we maybe take a lunch break between, you know, 5 to 12 and I don't know, maybe 1:15.  But I think it probably makes sense to jump in to motion number two right now, but I don't know if we need to take a five minute restroom break and give our court reporter a chance to take a break as well.  Then we can come back and

73

work for another 45 minutes before we break for lunch.  But I am interested in counsel's input on those issues.

MR. BEAN:  We would be happy to have a short five minute break.

THE COURT:  Okay.

MR. BEAN:  Otherwise, the schedule sounds great.

THE COURT:  Okay.  And back over to the defense side?

MR. STEPHENS:  Back to me.  Happy to take a quick restroom break, Your Honor.

THE COURT:  Okay.  Let's come back at 10 minutes after the hour and then go to about 5 minutes to 12, and then we'll break until 1:15.  I'm just going to turn off my camera and mic and I will be back in 5 minutes.

MR. BEAN:  Okay.  Thank you.

MR. STEPHENS:  Thank you.

(Recess.)

THE COURT:  All right.  Do we have everyone back?

MR. STEPHENS:  Yes, Your Honor.

THE COURT:  All right.  I believe, parties, that the next matter you indicated you wanted to argue were the legal issues arising from plaintiffs' motion for Anti-Suit Injunction, which is number 39 on the docket.  That motion was filed by Mr. Bean so I think Mr. Bean we are going to reverse the order and let you go first on that motion and

74

then we'll hear a response from defendants.

MS. ROSEN:  Your Honor, you're stuck with me on this one instead of Mr. Bean.

THE COURT:  Okay.  No, that's fine.  I'm just making assumptions here which I shouldn't make.  But I'm happy to let you be the one to articulate your position on this, so you may proceed.

MS. ROSEN:  Great.  Thank you, Your Honor.  In short, this court should not permit defendants to benefit from the crisis that they created by removing this case into federal court.

Pursuant to federal statute and case law, this court can and should grant the Anti-Suit Injunction that we are seeking.  The All Writs Act and the Anti-Injunction Act are two federal statutes that really work together.  So the All Writs Act on the one hand says that federal courts can give any necessary and appropriate relief in aid of their respective jurisdictions.  And then the Anti-Injunction Act, on the other hand, states that a court of the United States may not grant an injunction to stay proceedings in a state court except as expressly authorized by act of congress, or were necessary in aid of its jurisdiction, or to protect or effectuate its judgment.  And the interplay between these two acts led congress to add those three exceptions to the Anti-Injunction Act in 1948.  So that's where the baseline

75

of where -- where this court's jurisdiction and where the remedy we're looking for is found.

The three exceptions explain how these two acts work together, how they're applied, and they really go to the heart of this case and what we are seeking.  Both the first and second Anti-Injunction Act exceptions are met here and the third is likely to be met in the near future and so I'll just run by each of them very quickly.

So first is the expressly authorized by congress exception.  And this exception applies when a federal right or remedy could be frustrated including when the state court case attempt to subvert removal.  That comes from *Mitchum v Foster, a* U.S. Supreme Court case from 1972.  And that case said, "A federal law need not expressly authorize an injunction of a state court proceeding to meet this exception."  And in briefing, the defendants argued that because the removal statute doesn't specifically say the court can authorize an injunction against state criminal proceedings that this exception is not met.  But that is not the proper standard under *Mitchum v Foster.*

Importantly, Wright & Miller has looked at this as well and has noted that removal cases implicate this first exception to the anti-injunction act.  It's not necessary that the case be the exact same case number.  The inquiry is really whether the federal right or remedy could

App-8:078

be frustrated by the state court proceeding.  And in this case -- Your Honor, I am sorry I can't hear you.

THE COURT:  Sorry.  I coughed so I muted myself and forgot to undo it.  As I understand it, those cases relying on the removal statute to enjoin a separate state proceeding all involved a situation where the courts were trying to protect the defendant's right to a federal forum. And I think that logic doesn't help you here since it was the defendants who removed and the defendants who want it back in state court.

And so it seems to me that there is no need to protect the defendants' right to a federal forum here.  They don't want the federal forum.  And, in fact, you were okay with the state forum because that's where you initially filed the lawsuit and you got dragged here against your will.  So I'm just really struggling to see how the logic in any of those cases with respect to the removal statute helps you.

MS. ROSEN:  Yes, I'm happy to address that. Admittedly, we could not find any cases where the party that asked for removal was then asking for the Anti-Injunction Act to bar the relief that was sought in state court. Essentially what defendants are seeking, is for this court to be barred from exercising the same type of authority that a state court pre-removal could have exercised.  And that is

the problem that we have with their arguments essentially is that they have created this crisis, and now are asking for the benefit of the statute that was not intended to protect them as the party that removed the case.

THE COURT:  Well, and I understand it smacks of forum shopping.  It smacks of unfairness.  But I don't know what the principle -- I mean at least this principle -- I just don't see any authority suggesting that the removal statute gives you the hook that you need given the way this case arose.

MS. ROSEN:  And if this -- if you're inclined to not want to step into a state criminal proceeding I understand that inclination certainly.  I think that gets us into the *Younger* argument that the defendants made.

THE COURT:  Well, I mean I think you have a much better argument that they have simply waived their -- their *Younger* defense.  So I mean it seems to me that what we really have to look at here is what is my authority under, you know, the All Writs Act and Anti-Injunction Statute to do what you're asking me to do.  And maybe they'll have some thoughts on why their removal didn't constitute a waiver of their *Younger* rights, but just putting that issue aside, I still have got to have authority to do what you're asking me to do or I can't do it.

MS. ROSEN:  Yes.  And that leads us to the second

78

Anti-Injunction Act exception for actions that are necessary in aid of this court's jurisdiction.  The defendants seem to be asking for my clients to litigate their case in three separate forums by bifurcating this case, sending the state claims back to state court, keeping the federal claims here if they survive the motion to dismiss, and then also proceeding in the state criminal action.  And that approach would implicate the necessary in aid of jurisdiction exception to the Anti-Injunction Act because this court does have jurisdiction over this case pursuant to the removal statute, and therefore requiring litigation and separate cases in state court that involve the exact same issues here would necessarily implicate this court's jurisdiction and its ability to protect against inconsistent judgments.  And going forward, as we flagged in our initial briefing, this would also implicate the third exception to the Anti-Injunction Act which permits this court to protect or effectuate its judgment.

THE COURT:  Well, but that may be the case at some point, but that's not the case now.  There is no judgment in this case.  And I think the language is clear that there has to be a judgment, it can't be a potential judgment.

MS. ROSEN:  Certainly.  But we think the same argument, the same policy basis behind that third exception

79

also support the second necessary in aid of its jurisdiction exception here.  I would like to turn the court to *Steffel v Thompson*, which is 415 U.S. 452.  And that case talks about the distinction between injunctive relief and declaratory relief.  So if the court is not inclined to find the injunctive relief barring the state criminal proceedings from continuing is warranted, or if the court is more hesitant to fit this case within the Anti-Injunction Act exception, the court is entirely clear, *Steffel* is entirely clear, that the court can still grant declaratory relief advising that there is a constitutional violation and using that declaratory basis is outside of the Anti-Injunction Act and that brings us into the *Younger* doctrine.

THE COURT:  Okay.  But so let's stop before we get to *Younger.*  Assume that I'm uncomfortable with enjoining the state court proceeding in a preliminary context because what we have here is a motion for preliminary injunction.  And I'm assuming the Anti-Suit Injunction is part of that request for preliminary relief, it's not a request for final relief.  I think what you have just suggested is, well, if I'm not comfortable with the preliminary injunctive relief I can just issue a declaratory judgment.  But how do I do that in a preliminary fashion?  Don't we have to litigate this case to the end before I would be in a position to enter a declaratory judgment and I

80

am not sure how that would help you in the interim.

MS. ROSEN:  Yes.  So we -- I am sure that you saw that we filed a proposed order that clarified the relief that we're seeking for the preliminary injunction.  And this is one of the points in that preliminary injunction request.  But even if the court is not inclined to grant this injunctive relief and bar the criminal case from proceeding at this time at the preliminary injunction stage, the court can advise through its injunctive relief, essentially advise the state criminal court about the likelihood of success on the merits of my clients case.

THE COURT:  So just flesh out a little bit more exactly what you're asking me to do.  To just say to -- assuming that I don't want to go all the way to enjoin the state criminal proceeding, what does this look like, what you're asking me to do?  And what's the basis for doing it at this procedural point in the case?

MS. ROSEN:  Of course, just as a -- just to cover my basis, we still take the position that you can and should grant the injunctive relief that we're seeking.  But if you're not inclined to do so, I think the *Younger* analysis, even though the analysis and the removal is a separate issue, that line of cases really demonstrates the federal court's ability to stop or to intervene into the state criminal proceedings.  In the cases in which *Younger* did not

apply, those are state criminal proceedings or pending state criminal proceedings in which the federal court still granted either injunctive relief enjoining the state criminal proceedings from happening, or when the court as in *Steffel* granted declaratory relief.

THE COURT:  Did that *Steffel* court grant that before an answer was even filed or was that at the end of the case when judgment was issued?

MS. ROSEN:  I would need to read *Steffel* with that in mind I'm afraid.

THE COURT:  Okay.

MS. ROSEN:  In short, our case is that the -- the same basis and the same policy that prohibits a party from or the state from removing a case from state to federal court under *Younger* also applies under the Anti-Injunction Act.  The Anti-Injunction Act does not require that the federal law that is implicated specifically state that the injunctive relief being sought is available.  All that it requires is that the federal right or remedy could be frustrated including when the state court case attempts to subvert removal.  And that's what we have here.  We have a state court case that was filed before a state criminal case was filed.  The case is then removed by the defendants and that removal of the state court case could be frustrated by the state court case itself.

App-8:084

THE COURT:  So I guess -- I mean that raises a couple of issues.  One is, did the state court criminal proceeding actually begin with the search warrant application, that's one issue.  And I guess I'll let you -- I'll let you tackle that one first before I throw any more out.

MS. ROSEN:  Perfect.  Okay.  So I'll turn -- that was mostly addressed in our reply because, of course, *Younger* was raised on the opposition.  And *Younger* has these -- the elements of *Younger* are presupposing that there is indeed an ongoing state criminal proceeding.  And *Younger* talks about, or excuse me, I'm finding my notes, so in *Hicks* the U.S. Supreme Court talked about whether there are ongoing state court proceedings.  And the point of reference other courts have determined, is the date that the plaintiff filed the federal complaint.  Meaning that the court determines whether *Younger* applies based upon the date that this case was filed not the date of the criminal proceeding.  Abstention is only appropriate where the federal case, excuse me, abstention is only appropriate where the state case precedes the federal case, or where the state case is brought before any legal proceedings of substance on the merits has taken place in federal court.  Of course here, we have the TRO hearing and a decision on the TRO before the state court case was ever filed.  Indeed, essentially what

83

defendants are asking for is that because of their removal of this case, this court cannot grant the same relief that a state court could have granted. They're saying that if -- if there was a state court case, which this was, that saw injunctive relief based on an impending criminal proceeding, based on a search warrant that has been issued, that once you remove that case to federal court, the federal court can no longer intervene in that state court case. But this case was filed in state court and so their analysis under *Younger*, the entirety of *Younger* including when it applies, is inapplicable precisely because they are the party that removed the case into federal court bringing this case into the jurisdiction of this court.

THE COURT: Okay.

MS. ROSEN: I'm happy to get into the exceptions of *Younger.* Our -- there is just a load of cases that we have included the string cite in our reply about how *Younger* is inapplicable because defendants submit to the jurisdiction of the court by removing the case. We really think the court need not go any further than that. But if the court is inclined, we then look to whether there are proceedings of substance on the merits in the federal case before the filing of the state criminal case. Again, in this case there were because there was a TRO decision that granted the TRO before the state court case was filed.

84

App-8:086

And then finally, as we argue, even if the removal doesn't get us there, the proceedings on the merits doesn't get us there and we're left to *Younger* and its exceptions, we also believe that the exceptions are met. Defendants' actions, in removing the state -- the court case from state court to federal court, implicate the bad faith exception to *Younger.* They seem to be trying to litigate this case in three separate forums. They would like the case bifurcated so that our clients have to proceed in a state criminal case, a state civil case, and a federal civil case. They removed the case, then they have argued that the case shouldn't be removed and that the court should not exercise supplemental jurisdiction. They failed to comply with the TRO after it was issued. They filed criminal proceedings notwithstanding that they knew that the injunction against criminal proceedings was specifically sought in this ongoing case. They failed to inform the state criminal proceedings about the injunctive relief that was granted at the TRO stage. We think that just demonstrates a whole host of bad faith sufficient to meet the *Younger* exception if we even get there which we do not think we should.

THE COURT: Okay. Anything else?

MS. ROSEN: No. Happy to answer any questions, but otherwise I'm done.

85

THE COURT:  All right.  Let's turn it over to hear a response and then we will turn it back to you for a reply.

MR. STEPHENS:  Thank you, Your Honor, I appreciate your patience.  Mitch Stephens on behalf of Utah County and Jeffrey Gray.  I want to take off and just clarify that there are, as we see it, three different reasons why the motion for Anti-Suit Injunction should be denied.  Any one of them is enough for the denial.

THE COURT:  Okay.  So let's start with *Younger* because I'm -- I think there is ample authority to suggest that you waived *Younger* as a defense.

MR. STEPHENS:  If I understand that argument, there is a split of authority as to whether or not removal constitutes waiver of *Younger.*  We cited authority that supports our position in the opposition, it's in footnote one or two, I believe.  It was in a footnote because this waiver argument hadn't been made yet.  And then the plaintiffs responded with their authority out of circuit.  They rely -- their lead case, best case, is a Seventh Circuit case.  There is another Seventh Circuit case that had a strong dissent that came out the other way when talking about *Younger* removal, but it is an unsettled question, certainly in the Tenth Circuit and in other federal courts, whether or not removal is a waiver of

86

*Younger.*  And even then you have to sort of carefully parse out the basis for removal because there is potentially a difference or distinction between a removal based on a partial federal question in which case there is still a question as to whether or not the court can or should exercise supplemental jurisdiction over the state law claims.  First, just as an example, removal on a diversity issue where now you're expecting that all of the claims have to stay in front of that court because there is no basis to parse them out.

If I can share the screen, Your Honor, I want to just talk to you about the case that the plaintiffs haven't focused on, that is, I think helpful.  Although I will concede it is only helpful because it still leaves some questions.  Can you see my screen okay?

THE COURT:  I can.  It's the *Ohio Civil Rights Commission* case.

MR. STEPHENS:  Correct.  And this is a case where the United States Supreme Court is talking about waiver of *Younger.*  I'm trying to zoom in and somehow it keeps zooming out.  So you can see what happened here in this case.  The Commission, so it goes to the United States Supreme Court.  The Commission, the government entity, had argued abstention in the district court and oral argument to the Supreme Court.  And by the way, remember, when we're talking about

87

*Younger* waiver, one of the interesting things that we do know from the Tenth Circuit is that the issue can be raised sua sponte. So at least in that respect, the waiver has to be stronger or more clear than, for example, an arbitration waiver, right? An arbitration waiver, if a party doesn't raise it in the court, the court doesn't raise that sua sponte. *Younger* does get raised sua sponte. In other words, silence is not enough to constitute waiver because it is going to be brought up sua sponte by the court. And then in the Supreme Court, the other side of the case responded, they filed a post argument brief, urging that the Commission had waived any claim to abstention because it had stipulated in the district court that that court had jurisdiction of the action. That's the same thing effectively as putting the case in front of the court and recognizing that you have jurisdiction over the action.

THE COURT: Well, does recognizing that I have jurisdiction equate to making a decision to give me jurisdiction when I otherwise wouldn't have it.

MR. STEPHENS: And that's why I say this case is helpful, admittedly not dispositive.

THE COURT: I mean I guess I can go back to the questions that I was asking Mr. James. Why did you remove it when the state -- you want it in state court and the state courts have concurrent jurisdiction over the federal

88

App-8:090

claims, and you're taking the position now that the state law claims raised such nuanced and unsettled areas of law that they have no business being here anyway. I mean given that that is your position, the only explanation I have as to why you don't want to continue in federal court is that you didn't like my ruling on the TRO.

MR. STEPHENS: And let me try and respond to that. So why did we remove to federal court? You're correct, the 1983 claims could be litigated in state court. You also have, given your unique experience, probably some recognition that they are far more often litigated in the federal courts. I did, for example, a search for 1983 and I think in the last five years there is one published case from the Utah Appellate Courts.

THE COURT: But I spent 13 years on the Utah Supreme Court and I firmly believed then and I believe now that state courts are equally capable of and should decide issues of federal law when they are packaged with issues that state courts, as you put it here, are uniquely able to decide. There is nothing -- I'm not sure that there is anything about the federal claims that would suggest that I would be better at deciding them than the state court judge who drew this case initially.

MR. STEPHENS: Yeah. And I mean no disrespect to the state courts or the state court judges. Obviously,

89

we also respect those courts.  It was removed because of the federal claims.  That's the answer to the question.  It was removed because of the federal claims.  I do want to hopefully respond to this idea that really now what we're talking about is forum shopping.  Because that's -- that's not the intention.  In fact, if you go back to the opposition to the TRO/Preliminary Injunction which, of course, was filed before the court's ruling, we recognize in that opposition that it may be appropriate and suggest that perhaps these claims should be split out.

THE COURT:  Of course because you could hedge your bet.  I mean, what you knew at that point is that if I -- if I would have ruled in your favor on the TRO, you never would have requested that anything be split out and sent back to the state court.  And but --

MR. STEPHENS:  I don't think that's accurate, in fairness, Your Honor, because we still would have been moving to dismiss the federal claims and would have recognized that on dismissal the state claims would have been remanded back to the state court because that's the Tenth Circuit's analysis.

We expected, still expect, that the state claims are going to be back in the state court and the federal claims are going to be prosecuted in the federal court.  And that happens all of the time.  And that's why when you go

90

back to this analysis of is it a waiver?  Have we clearly given up the idea that state issues can and should be decided in the state --

THE COURT:  Well, but I -- the question of whether you wanted state issues to be decided in the state is an issue that's distinct from whether or not you made an affirmative decision to submit yourself to the jurisdiction of this court by removing the entire action when I would have had nothing to do with this case but for that decision on your part.

MR. STEPHENS:  I understand the court's position there.  I guess the only thing I can say back is, again, if we're talking about a waiver, the case law is not resolved and certainly not resolved in the Tenth Circuit.  And indeed, if the motion to dismiss is granted as we contend it should be, we have always anticipated that these state issues would be back.  And accept this or not, what we have anticipated from the beginning, is that the process of removal would resolve in this court handling the federal 1983 claims that form the basis for the court's jurisdiction.  That we would prevail on those and that the state court claims would then be allowed to pursue and in fact would have to be pursued in the state court.  And that's why I recognize and I can see the court's perspective that how this may feel to the court.  But that is not what

91

in fact we were trying to do in any sense.  Instead, what we were trying to do is allow the federal claims to go forward in the federal court and anticipated and seek that the state claims proceed in the state court.

THE COURT:  But I guess I'm still struggling with why was it helpful or beneficial, necessary, advisable, to have federal claims proceed in federal court when you anticipated that the state claims would be decided in the state court, and the state court was perfectly capable of deciding the federal claims?  I mean I just don't understand the why we wanted to set up what has turned out to be frankly a complicated mess.

It would have just been so easy to let the state court decide these issues in the first place.  Now we have the prospect if -- I mean I guess you took a gamble that you were certain to win on a motion to dismiss the federal claims.  But what you were also doing was taking a calculated risk that we would have three separate proceedings going on because you've taken the position now that even if I don't dismiss the federal claims, the state claims need to be split off and remanded and we have got a state criminal prosecution going on and if I deny the motion to dismiss, then a federal 1983 action going on which gives rise to no judicial economy, the prospects of very -- of inconsistent judgments.  I mean it's just -- it's frankly

not the way that the case should have been resolved.

MR. STEPHENS:  And I appreciate that and, you know, the benefit of hindsight is sometimes different than what happens on an expedited basis over Thanksgiving with a -- with briefing.  Given where we are, we still contend that that is the outcome that should -- that should occur.

Now, does that mean that all three cases are going to be all handled and the same thing simultaneously?  No, not necessarily.  For example, *Younger.*  If we're talking about *Younger,* what does that mean?  Well, the -- and we briefed this and presented this, when there are damages claims associated with *Younger* that relate to what is happening in the state court case, and in particular state court criminal case, this case is stayed pending the resolution of the state criminal case and then based on that outcome the court can determine what to do with the damages theories.  So is that the plaintiffs' preference?  No.  Does that result in some wild inefficiency?  Also no.  Quoting --

THE COURT:  Well, I mean what it results in though is that my determination if I don't dismiss the federal claims and I find a likelihood of success on the merits on the First Amendment or RFRA claims, what that then I mean I guess that's great for you because then you don't have to do anything on the federal front.  And in the meantime, all the plaintiffs are off in state court having

93

to defend a criminal proceeding.  I mean I understand why this looks good for you, but I think that the question was, was that a decision you made when you decided to ask me to exercise jurisdiction over this case?

MR. STEPHENS:  And I guess I would say I'm not sure let's say the case, civil case, had remained in the state court.  I think the scenario that you just described where in theory the civil judge could have said hey, this is what I think is likely to happen.  But in a nonfinal judgment, the criminal case would still remain pending and that criminal judge is going to have to determine what to do with the criminal case whether it's this civil court or a different state civil court that's issuing a nonfinal opinion on an injunction, right?

So, again, the efficiency is, I would say, driven by the fact that the criminal process is inherently separate from the civil process.

THE COURT:  And what about inconsistent judgments?  I think what you're suggesting is that I would essentially have to abdicate any ability to provide effective relief to a state court judge because I can't do anything even though you -- you were the ones who brought it here.

MR. STEPHENS:  Well, I would say I think that is the *Younger* analysis is that when the case is pending, that

94

it gets stayed.

THE COURT:  Well, but again, I guess we're back to whether or not you waived the *Younger* abstention right that you had by making a decision to bring it here.

MR. STEPHENS:  Understood.  And again, our position is no, that stipulating to jurisdiction, that even if you failed the *Younger,* to argue *Younger,* that that is not enough to constitute a waiver.  And when you look at going back to the Supreme Court case, when you look at the distinction, right, and what the court has said they recognize that states may, of course, voluntarily submit to federal jurisdiction even though it might have had a tenable claim for abstention and then they cite some cases.  But they say that in each of those cases the state expressly urged the court or the district court to proceed to an adjudication on the constitutional merits.  And I pulled those cases to try to get examples of what they're talking about there.

So, for example, in the *Ohio Bureau versus Hodory* case, right, there the Supreme Court recognized that the government, quote, "Had not argued *Younger*."  Well, that wasn't enough, that's the sua sponte issue.  Had not argued that *Younger* requires a remand.  But then moreover, at oral argument they resisted the suggestion of such a remand.  In *Brown,* the New Jersey attorney general pushed for a

95

jurisdiction, quote, "To obtain a more expeditious and final resolution of the merits of the constitutional issue."  In other words, in those instances, the government entity expressly not only failed to raise *Younger,* but expressly said that they were not wanting to implement *Younger*.

And here, again, from the first filing, we recognize that in cases similar to this one, where cases have involved religious rights, religious freedom, and I believe the *Summum* case, the case that we specifically cited, where there were questions about both the First Amendment and the Utah Constitution that they were split and the federal issues were adjudicated in the federal court and the state issues were adjudicated in the state court.  And we made that request from the beginning which was consistent with what could happen and we contend should happen under a jurisdictional -- supplemental jurisdiction analysis.  Even putting *Younger* aside, if you just think I'm wrong about *Younger,* I get it, open split, open question.  If you just say, "Mitch, you're wrong."  You still should deny the motion because the Anti-Injunction Act prevents you from granting the relief that they seek.  And the parties don't really disagree on at least the starting point for the Anti-Injunction Act.  In fact, plaintiffs reply and I believe they're quoting the Tenth Circuit they say as follows:  The Anti-Injunction Act, quote, "Is an absolute

prohibition against any injunction of state court proceedings unless one of the three exceptions applies."

The exceptions don't apply and the plaintiffs haven't and can't establish that the exceptions apply, right? The in aid of -- or there is the argument that they make that it is expressly authorized by statute and then they cite the removal statute. But the removal statute is talking about jurisdiction over claims that are removed, the civil claims, and the civil process removed to the federal court. They haven't cited a single case from any court that has relied on the removal of civil claims statute to enjoin a criminal case that is always a separate proceeding. Instead, they're talking about, and the case they cite, it was one from Delaware, cases removed involved state and federal claims. The plaintiff gets upset, files an amended complaint that cuts out the state court claims and then files just that those claims copy and paste and files them in a new case in the state court. And the federal judge says that doesn't work.

That's the type of situation that they're citing. Or a situation where the case is removed but the plaintiff keeps filing with the state court anyway. Or the state court judge says hey, don't care, I'm going to keep this one and keep working on it. In that instance, of course the court can say this case is in front of me, state court

97

doesn't have jurisdiction any more over this civil issue. They don't have anything that extends that into this framework.

The next argument they make then is the argument that it's necessary for the court's jurisdiction. The problem that they have is that the Tenth Circuit disagrees. We cited this case. This is the *Tooele County versus United States* case, 2016, Tenth Circuit. This appeal concerns two suits in state and federal court and statutory limitations on the power of the federal court to enjoin the state court case. The court then analyzes the exception to the Anti-Injunction Act. In fact, it says, the district court violated the Anti-Injunction Act, recognizes that injunctions are narrow, the court has to resolve any doubts in favor of allowing the state court proceedings to continue. And then it expressly talks about the second exception.

The second statutory exception is limited. It applies only when both the federal and state suits constitute in rem or quasi in rem proceedings, and the federal court was the first to take possession of the property, the rem. We're not talking about in rem jurisdiction. And even if we were, even if you say the mushrooms themselves are in rem, they're the property. Number one, that would be very, very narrow; and number two,

the state court was the first to take possession because the state court issued the search warrant.  They tried in their reply to say, well, yeah, that's what the Tenth Circuit says, but, you know, maybe -- maybe that's wrong because the Tenth Circuit is citing an old case from the Supreme Court.  It's the law in the Tenth Circuit.  In fact, if there is any question, we can look at other cases that have applied -- have applied this.  If you shepardize Tooele County, you will see that this continues to be relied on including as recently as 2023, 2024.  If you want to see an example, District of New Mexico applied it in 2023, 689 F.Supp.3d 1033.  It's the standard in the Tenth Circuit.  And outside of the Tenth Circuit it is not even clear the cases that they're relying on that they would apply anyway.

Going back to *Younger*, there was a question which case actually came first.  Is it the search warrant, is that the criminal process, or is it the filing of the criminal information.  There is an answer to that as well.  It's actually in another Utah county case, *Kingston versus Utah County*, this is the Tenth Circuit from 1998.  Ms. Kingston appeals the district court's denial of her motion for preliminary injunction restraining officials in Utah County from initiating any criminal proceedings based on allegedly improperly seized evidence.  The court then goes on, recognizes the standard that we put in, the Supreme Court's

99

recognition that *Younger* can apply even when criminal process is contemplated.  In this case, defendants began an investigation and executed a search warrant to obtain the evidence that they considered necessary to support criminal charges.  Ms. Kingston then filed her federal complaint with likely knowledge that criminal charges were imminent.  She requested a temporary restraining order to prevent them from filing those charges.  The court says, well, why don't you hold off filing charges until I can determine what to do.  Defense initiated criminal charges three days after the district court's decision.  We conclude these facts are sufficient to establish the existence of the pending state proceeding, criminal proceeding.  Although Ms. Kingston had not been charged, the allegedly illegal activity had already taken place.  The investigation had been conducted, the search warrant had been executed, the necessary evidence had been obtained, and you can go on from there.  The outcome --

THE COURT:  Mr. Stephens, I hate to interrupt you, but my meeting is starting in two minutes.

MR. STEPHENS:  I'm sorry, Your Honor.

THE COURT:  That's okay.  So just remember where you are in your argument.  We'll reconvene at 1:15 and you can pick up where you left off.

MR. STEPHENS:  Thank you.

THE COURT:  All right.  And I think I am just

going to, again, mute myself and turn my camera off.  I suppose you can do that or you can re-login, whatever you prefer.

MR. STEPHENS:  Great.  Thank you.

(Recess.)

THE COURT:  Do we have Mr. Bean back and Mr. Stephens back?  I'm getting some feedback.  I don't know.  I think we're okay.  I apologize that my meeting went a bit longer than I anticipated, but Mr. Stephens, you have the floor and I'll turn the time back over to you to pick up where you left off.

MR. STEPHENS:  Thank you, Your Honor.  I think we had more or less covered *Younger,* we had more or less covered the Anti-Injunction Act.  Again, if either one of those applies, it results in the Anti-Suit Injunction, the motion for Anti-Suit Injunction being denied.

The only other argument that we had made in the briefing, you have heard some of this already, is the issue of supplemental jurisdiction.  I don't intend to address what you have already heard.  I suppose the only thing that I would add is maybe two clarifications.  One, that we contend that analysis needs to be done and supports remanding the state claims back to the state court regardless of whether the motion to dismiss is granted.  It is a simpler analysis, of course, if the motion to dismiss

101

is granted but we think it is an analysis that has to happen either way. And then the other thing I would add that I want to make sure is not lost as the court considers the request and the issues, is that while there is some overlap between the criminal case in the state court and issues that are in front of this court, we have talked about the time, we've talked about the state court case came first. But on top of that, it is not a complete overlap. We talked last time about the fact that there are marijuana charges that are not in front of this court, that are in front of the state court, that arise from facts that the judge and the prosecutor and the police and the jury are going to have to be determining in that criminal case regardless of what happens in this proceeding.

THE COURT: So could I just simply, if I chose or decided that it was appropriate to enjoin the state court proceeding, could I just enjoin the prosecution on the psilocybin and limit it to that charge?

MR. STEPHENS: Assuming I have lost on *Younger*, assuming I've lost on the Anti-Injunction Act, I'm not aware of anything that would say as a pure matter of law you absolutely cannot. What I would say is that it would be wildly inefficient and certainly would, I think, trigger the type of supplemental jurisdiction analysis that the court should be performing among probably other analysis that

102

should happen.  Because again, to explain the circumstances to go forward with the criminal prosecution of the marijuana case, it arose from the same search warrant.  Let's just go through one, for example --

THE COURT:  But it also strikes me, I mean the marijuana charge and the drug paraphernalia charges are misdemeanors.  The only felony at issues is the psilocybin charge.  I suspect that, who knows, maybe that results in some kind of a plea deal, I don't know.  But it is certainly of a whole different magnitude than a felony charge for the psilocybin.

MR. STEPHENS:  I think that's right.  But even if only the marijuana charge went forward and the paraphernalia charge went forward, for example, we -- and to be clear, and I said this last time, I don't have anything to do with the criminal case, nor candidly do I know enough about criminal law to be very eloquent about those proceedings.  But let's just invent a scenario to see how it would be difficult for the court to parse out the two.

If, for example, there were a challenge to the search warrant, and an argument that the marijuana charge should be dismissed or suppressed because it resulted from the search warrant that has RFRA implications, I don't know how you would parse that out, the way that you just suggested, without staying either the marijuana case or

103

having the type of duplication that I think is behind the court's question of could he have paused on half of it.  Or if the detectives on the stand in explaining the circumstances that lead to the seizure and why they were there, right, like because this all happened at the same time, I think it wouldn't be simple to just okay, this part goes forward and that part doesn't.

THE COURT:  So before I let you finish up, I'm interested in hearing your response to Ms. Rosen's suggestion that somehow even if the state criminal proceeding was not enjoined there is something that I could do in way of a declaratory judgment that would have potentially preclusive effects on the pending state criminal proceeding.  What are your thoughts on that?

MR. STEPHENS:  I don't think that works and I will give two reasons why.  One, you're not being asked to make a final judgment or enter a final judgment and I think that's really what they're talking about.  Two, if you look at the case that they cite for that argument, the *Steffel versus Thompson* case from the Supreme Court, I'm just going to read the last paragraph of that opinion because I don't think it provides the support that they're hoping.  Supreme Court's last paragraph, majority opinion, "We therefore hold that regardless of whether injunctive relief may be appropriate, federal declaratory relief is not precluded

104

when no state prosecution is pending and a federal plaintiff demonstrates a genuine threat of enforcement of a disputed state criminal statute whether an attack is on the constitutionality of the face or as applied."  That's not the scenario that's in front of this court quite obviously.

THE COURT:  Okay.  All right.  Anything else that you want to say with respect to the Anti-Suit Injunction issue?

MR. STEPHENS:  No, Your Honor, unless you have any further questions for me.

THE COURT:  I do not.  Ms. Rosen, you may reply.

MS. ROSEN:  Thank you.  A few points to hit so I'll start with the *Younger* removal versus waiver just to clarify something.  Here, we are not talking about a waiver of asserting that *Younger* applies, we're talking about submitting to the court's jurisdiction via removal.  So the line of cases that discuss waiver and whether *Younger* has been waived is a different line of cases than the cases saying that by removing a case to federal court the defendants have submitted to jurisdiction via that removal. And that goes to *Younger* itself which is based upon comity as the doctrine that applies.  Rather, it's *Younger*'s non-application to cases removed by the government is a fundamental fairness analysis.  It's not about whether there has been a waiver of raising *Younger,* it's about whether

*Younger* is even applicable in the first place.  So that's kind of a distinction in the case law that I wanted to draw.

Second, looking to supplemental jurisdiction, just off the bat, I don't think this is entirely relevant to this motion and I know that Mr. Bean addressed it a bit earlier today.  But in any case, removal allows the defendant to decide where the case should be brought and where it should be heard.  The defendant gets to weigh that.  They get to consider whether it's more advantageous for them, whether there is a reason to proceed in state court, or if they want to make a change to federal court.  Removal is not intended to allow defendants to choose both options.  They get to choose one option, not both.  And defendants' actions here, which seek to set up a scenario where if the federal law claims are not dismissed, my clients are potentially in three different forums, is not the scenario that removal was created to enact.  The rule of removal is really to give the defendants the opportunity to weigh in on what forum.  It's not to give them every opportunity to choose every forum.

Moving on to the Anti-Injunction Act, the express authorization exception, that first exception applies.  And for this we cited *Davis International* which is a Third Circuit case from 2010 to talk about applicability of that first exception in cases where there -- it is not the same

106

App-8:108

case number in state court or federal court.  So it is not a new filing in the state court case that was removed, it's a separate case.  And there the Third Circuit affirmed the federal court injunction that relied on the removal statute to enjoin a separate state court proceeding which were filed after a party was displaced with an unfavorable ruling in the federal court.

THE COURT:  So has this ever been applied in the context of a civil case in federal court enjoining a criminal case in the state court?

MS. ROSEN:  So I could not find any case law where we have the same sort of defense, defense being raised in a criminal case and relief sought under that same analysis affirmatively as plaintiff.  However, the cases in *Younger,* in the *Younger* line of cases where the court found *Younger* inapplicable, allow a federal court to enjoin a state court proceeding.  The distinction -- sorry.

THE COURT:  Well, I was just going to say though I mean *Younger* is a waivable issue.  That seems to me to be a completely different issue than whether or not I have the authority in the first place to even do what you're asking me to do.  I mean the one is a defense, I suppose, assuming that I have the authority in the first place.  I mean the Anti-Injunction Act goes to the existence of that authority.

MS. ROSEN:  Yes.  And I think even though the

107

App-8:109

cases are dealing under the Anti-Injunction Act that we could find with a removal scenario we're dealing with multiple civil cases instead of criminal cases. None of the cases discuss that distinction. They look to whether the claims in the state court action bar litigating the same claims in the federal court action. And that's exactly what we have here. The defendants are unhappy with the TRO that was granted. After that TRO, they filed a state criminal proceeding and that state criminal proceeding is looking to litigate the same claims at issue here.

So even though that distinction hasn't been drawn out by case law, and there is not a lot of case law discussing this particular scenario, in fact they couldn't find any nor have defendants cited any with this particular scenario, the reasoning of those cases, particularly of *Davis* and the Third Circuit, continue to apply given this scenario.

As far as the Anti-Injunction Act second exception, or the necessary in aid of jurisdiction exception to the Anti-Injunction Act, defendants have focused a lot on Tooele County and understandably so. It is Tenth Circuit law. But we are not asking the court to overrule the Tenth Circuit nor could we.

Before the court in the Tenth Circuit there was not an issue of removal. The Tenth Circuit was only looking

at whether a case was sufficiently close to an in rem action that under the in rem portion of the second exception to the Anti-Injunction Act, the court could enjoin the state court proceeding.  And there the court said no.  But it made sense there in Tooele County for the court to cite to pre-1948 Amendment Anti-Injunction Act case law because the in rem exception had existed since then.

In the 1948 amendment which added to statutes these three exceptions that were developing case law previously, the revisor's notes specifically clarify that the second exception applies where cases are removed to federal court.  So because *Tooele County* was in rem, and it made sense to apply that pre-amendment interpretation that this case presented a different issue that was not an issue at all in *Tooele County* which is the second exception for a necessary in aid of this court's jurisdiction and is an application to a removed case, which was not the case there.

THE COURT:  So it seems like these *Younger* cases that recognize the ability of a federal court to grant injunctions against state prosecutions have relied on basically Section 1983 claims as the basis for that.  Is that the claim you're making here, or I mean it seems like we're spending a lot of time talking about in rem proceedings.  But I am just wondering if the presence of a 1983 claim in this court could provide a basis under that

second prong of the Anti-Injunction Act in aid of my jurisdiction to allow the injunction.

MS. ROSEN: Yes. I think that could. To be frank, I think that would fit better under the first analysis which is the expressly authorized by congress analysis because that first exception was created when a federal right or remedy could be frustrated including when the state court attempts to subvert removal.

And I think the 1983 claims that we have made and these constitutional claims that we have made could be frustrated by the state court criminal proceedings. So I would place that more so under that first exception than the second.

THE COURT: Okay.

MS. ROSEN: Yup.

THE COURT: So -- all right. I think I understand. I was trying to shoehorn it into the wrong exemption.

MS. ROSEN: We're happy to take whichever one you shoehorn it into. But I do think it fits more cleanly under the first.

I would also like to address the issue of when *Younger* applies, which case came first, was the search warrant sufficient to find that *Younger* applies. How does this work with the removal. And I think it's a two-step

110

analysis.  The first step is was the case removed?  And we can stop there.  The case was removed so *Younger* is inapplicable.  We don't need to go into which case began first.  But even if we do get there, in the TRO hearing, the defendants challenged the admittance of the harm to my client by arguing that the warrant and search were not evidence of imminent harm.  And that really undercuts their argument that this criminal proceeding filed days after the TRO hearing actually began before the TRO hearing.  I don't think that's -- because *Younger* is based upon comity and fairness, I don't think the application of *Younger* would be proper.

And then finally, just to clarify a statement I made earlier that I don't think was sufficiently clear, if this court decides that the Anti-Injunction Act doesn't allow the relief that we have requested, the injunction of the state court criminal proceeding which to be abundantly clear we believe it does allow that remedy, but if the court decides not to follow us there, the declaratory judgment that we would be seeking is essentially the declaratory judgment declaring that the plaintiffs are likely to succeed on their claim that defendants' actions violated plaintiffs' First Amendment right of religious free exercise.

So it would be a declaratory relief specific to the point of the case at which we're at now.  It would not

be a finding on the final merits of this case, if that makes sense.

THE COURT:  All right.  I would like to just turn the time back over for a minute to Mr. Stephens to get your take, Mr. Stephens, on whether the 1983 claim would give me the authority to grant an injunction against state prosecutions.  It seems that 1983 has been cited by courts who have issued such injunctions and I didn't ask you about that while you were on, but I would be interested in hearing your take on that and then I will let Ms. Rosen have the last word on it.

MR. STEPHENS:  I guess what I would say is, candidly, Your Honor, I'm caught a little flatfooted on this because it was not something that the plaintiffs had argued as a basis for an Anti-Suit Injunction in their motion.  In fact, 1983 is cited one time as part of the statement of facts recognizing that they had filed a claim for 1983, and then in the reply it is not cited at all.  So I'm answering this without the full benefit of the circumstances in which a 1983 injunction could be appropriate.

I'll tell you I'm aware that there is at least some case law out there suggesting that in certain instances 1983 can be the basis for an injunction, but neither side has briefed, presented, argued, whether that type of relief is appropriate here or whether -- what the limits are either

112

from the Supreme Court or the Tenth Circuit.  And so I apologize.  I don't have all those answers.  They weren't presented or requested.

THE COURT:  Right.  And that's why we have these dialogues is because I sometimes think of things during the course of this that don't occur to me as I'm -- as I'm just reading briefs.  So I appreciate your take on that.

Ms. Rosen, I don't know if you have anything else to say on that specific issue?

MS. ROSEN:  I do not, Your Honor.  Thank you.

THE COURT:  Okay.  Thank you.

All right then, I believe that means we're ready to move on to the final motion which is the motion for a preliminary injunction.  That also is a motion that was filed by or on behalf of your client.  Mr. Bean, who will be arguing that?  And you're on mute.  And while you're unmuting yourself, I'm sorry, Mr. Muhlestein, I neglected to ask you if there was anything you wanted to weigh in on that last motion, and please do not be afraid to jump in, at any point, if there is something that you would like to add. But before I turn it over to Mr. Bean, I should ask you about the anti-suit part of the case.

MR. MUHLESTEIN:  No, Your Honor.  I intended just to join with the county representatives on this.  And I will note that the court overrides the issue of the filing of the

criminal lawsuit.  That is not something that the City, you know, has the ability to do anyway so it is less stress, regardless.  But I'm just -- I align with the county representatives.  But I do -- I will be intending to, I believe Mr. Stephens will be doing the response on the upcoming issue and I will intend to follow him so we'll be prepared for that.  If I get missed, I'll jump in that time because I definitely am intending to have a substantive statement there.  Thank you.

THE COURT:  Okay.  And Mr. Stephens, you need to remind me at the end of your presentation then to turn it over to Mr. Muhlestein.  Sometimes people's boxes drop off my screen and then I neglect to see them.  So don't be afraid to speak up.  And it looks like, Mr. Bean, you are back on and you are still muted however.

MR. BEAN:  Yes, I fixed that.

THE COURT:  Okay.  You have the floor.

MR. BEAN:  Thank you.  We have already discussed some of the issues that I would like to raise regarding the preliminary injunction in the context of the motion to dismiss discussion.  Principally, those are the issues that, you know, general applicability as it relates to the First Amendment and otherwise, you know, the paths for strict scrutiny and how to get there.  So I am not going to repeat those unless the court has more specific questions to this.

114

But we will be looking more into the rest of the factors of the strict scrutiny analysis in the context of the overall likelihood of success on the merits argument and that is where I should start. Of course, our motion for preliminary injunction is in the context of the four factors for injunctive relief which in the context with the government defendants, defendants that we do have, the third and fourth factors merge, so I will just talk about those three factors today.

As to the --

THE COURT: Before you jump in on those factors, I think there has been a fair amount that has transpired since we had the TRO hearing, and we had the TRO and you got the scripture back, I stayed the part of the TRO that related to the mushrooms. You've now also moved for an Anti-Suit Injunction. I'm just wondering if you could clarify for me, before we start talking about entitlement to the injunction, what relief are you specifically seeking with respect to the preliminary injunction separate from the relief that you're seeking in the Anti-Suit Injunction?

MR. BEAN: Yes. Let me pull that up just quickly, if I can. Okay. So to that point, and anticipating Your Honor might, you know, ask this question, you know, and address some of the specificity questions that were raised by the defendants at the TRO hearing previously

about how to practically go about enforcing whatever injunctive relief is ordered, we did submit as exhibit I believe it is marked EE to our supplemental briefing in support.

THE COURT:  Let me see if I can -- oh, okay, let's see.

MR. BEAN:  Docket No. 71 dash --

THE COURT:  Docket No. 71.  I just -- I am just trying to call that up.  It was -- so I just wanted to see if it is an attachment to the -- well, here's the problem.  I'm not sure that I actually received that because when I -- when I click on and I know you've mentioned earlier that you had included that, but when I go to the electronic document, which let's see, what number is it again?

MR. BEAN:  It is 71-9.  I believe we also e-mailed the court.

THE COURT:  Okay.  So I was looking for a hot link that said Exhibit EE but it's actually number 9?

MR. BEAN:  Yes, probably has the ECF Number would be 71-9.

THE COURT:  I see it now.  I have it on my screen.

MR. BEAN:  Okay, great.  If you scroll to Page 5 that is where the specific forms of relief are requested.  As far as the, you know, what might be considered overlap

goes between the request for Anti-Suit Injunction and, you know, request for that relief or similar relief and through the preliminary injunction context, that is contained at Paragraph 4 on that page.  Essentially -- well, it says, "Defendants are prohibited from criminally prosecuting Mr. Jensen related to psilocybin or the results of the November 11th, 2024 search."  And then after they have kind of specified the case.

THE COURT:  So are you also seeking to enjoin the marijuana prosecution?

MR. BEAN:  Yes, we are.  That is, you know, it's kind of that fruit of that poisonous tree arguments.  I know even counsel raised issues of potential suppression that perhaps could be raised more specifically in the criminal action.  That is what the request is.  We do think that the THC issue, however, is quite severable.  We're not asking for relief related to the return of THC, for example.

THE COURT:  What about the paraphernalia misdemeanor charge?  Does the paraphernalia relate to the psilocybin or to the marijuana?

MR. BEAN:  My understanding is that it relates to the psilocybin.  That has already been returned all of the items that related to that.  So there was like a grinder and a scale.  Those have all -- those have been voluntarily returned by defendants which we, of course, appreciate, even

117

though that was not ordered in the TRO relief.  So that's not an issue that's quite as present or requested.

THE COURT:  But I'm still asking about whether or not -- I guess you're seeking to enjoin the marijuana prosecution, but you indicate that may be severable.  I'm trying to figure out where the paraphernalia charge fits in.

MR. BEAN:  Yes.  I think it attached to the psilocybin charge.  So where we say in Paragraph 4 here, "criminally prosecuting Mr. Jensen relating to psilocybin," that would extend, in our view, to the psilocybin paraphernalia charge.  Perhaps, you know, defendants think otherwise, and again, I'm not going to speak to the exact of the criminal charging document, and just, you know, from the context of a civil counsel here but that would be our request.

THE COURT:  Okay.

MR. BEAN:  Any other questions on the proposed order?

THE COURT:  You want me to enjoin them from making statements to third parties?

MR. BEAN:  Yes.  And I can --

THE COURT:  And what's the authority for that?

MR. BEAN:  The factual basis behind this is this is new information since we last met at the TRO hearing.

THE COURT:  Well, I understand the new

information, I have seen the FINRA references.  I'm asking what is the legal authority for prohibiting them from making statements to third parties.  That sounds like a gag order and a violation of the First Amendment, a different part of the First Amendment.

MR. BEAN:  Right, so many parts.  It's just relying on the same authorities that we are asking for the rest of this relief simply under the Rule 65.  We understand that there are, you know, some attendant First Amendment issues there.  We attempt to narrow that request to statements that are intended to impact directly or indirectly Singularism's ability to freely exercise its religious practices, to address that issue.  But, of course, you know, this proposed order is up for Your Honor's interpretation, revision.  But that is a request to simply avoid, you know, something like that occurring again, you know, whether that be because, you know, some license is not provided that the government says is needed or whether, you know, a financial institution hears a similar statement or receives a similar statement that would, you know, cause them to effect practical verdicts on the organization's right just to exist as the organization even separate from its religious nature.

THE COURT:  Okay.  I am looking at number three. "Defendants are prohibited from threatening to evict or

taking direct or indirect action to evict."  I mean, I don't think defendants have the ability to evict your client.

MR. BEAN:  So that is what they have threatened in the eviction letter.

THE COURT:  They have threatened third parties, right?

MR. BEAN:  That's -- that is true.  And essentially what will happen under the eviction statute is they would either -- and I will have to think back on this a little bit further, but my understanding of the eviction statute is that either municipality, Provo City or Utah County, could bring an eviction action, eviction by abatement action.  And it could be my understanding against landlord but it could also be directly against Singularism. And in that action, you know, should the -- should the government prevail in that action, you know, they would be entitled perhaps to fees.

Interestingly enough though, in that action the government would have to prove essentially the opposite of the preliminary injunction framework that we're going to discuss right now in order to prevail.  And if they do not, then, you know, the landlord or whomever else the civil abatement action is against also has the ability to obtain attorney's fees from the government.  So I'm not sure they're going to do that, I think we heard in the proffer

from the TRO hearing last time that Provo City essentially said that the eviction letter was an empty threat and that they send these letters to individuals or landlords which they know or have reason to suspect have had some nuisance in a rented leased space.  But despite doing that, they have not really had any follow through with that.

Now, I don't know if that is true or not, there hasn't been a civil abatement action filed yet, but there has also not been any sort of retraction of this letter that they will not move forward with eviction proceedings.  So that's what this direct or indirect action to effect Singularism is about.  Whether that's a direct action against Singularism or whether it is taken through other means via a landlord or some how else.

MR. MUHLESTEIN:  Pardon me, but now that I see things are clarified as well in the earlier meetings, we did want to get on the record that Provo City is not intending to move forward with the sort of eviction threats, you know, motion actions discussed and so I am not sure exactly how clearly that was stated in the TRO, but it is not our intention to continue with that.

THE COURT:  Okay.  Thank you.

MR. BEAN:  All right.  If you don't have any other further questions about the proposed order, I'm happy to jump back in and begin with likelihood of success.

THE COURT:  Okay.

MR. BEAN:  All right.  So up front, just as far as the likelihood of success standard goes, it appears that parties are in agreement on what this likelihood of success on the merits standard requires.  First, defendants haven't disputed the citation to *Harmon versus city of Norman Oklahoma*, that's a Tenth Circuit case from 2020, which says that the likelihood of success on the merits factor is the most important factor in this preliminary injunction analysis.  Nor do I understand defendants to have challenged that same case in its explanation that to demonstrate a likelihood of success on the merit, plaintiffs need only to make a prima facie case of their claims.

And so proceeding with those standards, looking towards each of the causes of action.  Now, we have already talked about, you know, the certain paths to strict scrutiny that we believe are available very clearly under the Utah RFRA, under the First Amendment, and under the Utah Constitutions free exercise claims so I will not rehash those.

What I do want to do is go to the two prongs of strict scrutiny to determine whether based on the assertions or evidence presented from defendants and that they have shouldered their burden.  And it is their burden, even on a preliminary injunction hearing, to shoulder the burden of

proof here on these two prongs, the strict scrutiny.

The first is compelling government interest, and the second is least restrictive means.  Now, as to the compelling government interest, I also do not understand defendants to dispute the standard for what sort of compelling interest we have to have here.  That compelling interest is not just a generalized compelling interest.  It must be specific.  So specific that it must be specific to the particular claimants at issue which are here are Singularism.  So in effect the question before this court is not whether there might be a generalized interest in enforcing the Controlled Substances Act, but instead whether defendants have an interest at the highest order in prohibiting Singularism outright from practicing its faith and having an exemption from the Controlled Substances Act.

Now, all of defense arguments so far to this point have rested on generalized assertions of government interest.  What they have pointed to are various sources from different indications, maybe studies, maybe reports about certain seizures of psilocybin that might be involved in other seizures or drugs, et cetera.  And while I appreciate, you know, the marshalling of those sources, the fact of the matter is they just don't really impact the analysis here where the compelling interest burden is so specific to Singularism.  And they really can't.  They are

123

App-8:125

not capable of doing so because those sources just don't contain information factually about Singularism.  If there had been done perhaps a study on Singularism's religious practices and what occurred, et cetera, et cetera, that could be relevant.  But we don't have that here.  And so what we're really evaluating is what factual sources does the government have to indicate that advancing an exception to Singularism specifically will impact its stated interests to the public safety, public health, or drug trafficking, as I understand them.

Now, certainly there are some events that transpired last week which I'll get into in a moment, but previous to that event, the government has not asserted literally any evidence of any issue about public safety, public health, or drug trafficking.

THE COURT:  What do we make about the amount of psilocybin that was seized?  I mean the quantity, based on -- and I'm no expert on drug quantities and how much it would take for a singular or Singularism voyage, but it seems like it is a much larger quantity than Singularism's historical voyages would have required.

MR. BEAN:  Yeah, I'm not one to engage in math if I don't have to, but I think it is important to talk about that here.  There is some discrepancy about the amount of psilocybin that was actually seized.  Plaintiffs understand

that, you know, as phrased in the initial seizure reports that it seems like far more than what was actually seized from their perspective and that is further supported by the lab reports document which was attached as an exhibit to our supplemental briefing as Exhibit W, which would be ECF 71-1.

In that lab report, it talks about things in terms of milligrams. At first -- and I can be corrected as perhaps defendants have some different information here, at first I thought maybe that's just the testing amount, right, that they're testing just a portion of the psilocybin seized. However, if you look to the content, for example, it talks about there are two items of psilocybin. And the first says the total weight of the mushroom-like material was less than 100 milligrams, and then continues to say, the entire sample was used for analysis.

And then for the item B it also says, the total weight of the mushroom-like material was 204 milligrams plus or minus six milligrams. And then gives like a certainty level about the weight as to about 95 percent.

So there is some factual, not sure confusion is the best way to say that, psilocybin that has been obtained. So --

THE COURT: So remind me, I think, and I'm sure Mr. Stephens can correct us when he gets to his argument, but the initial number that the government relied on was a

125

number of grams as opposed to milligrams but maybe I'm misremembering.

MR. BEAN:  I believe that's true and I think that's in the 400 number, something like that.  I don't have that off the top of my head.  Let's see.  I can certainly find that for the court.  Yeah, I think it is something like 458 grams is what was stated.  But then, you know, that seems like that might be a factual issue that we have here. But even assuming there wasn't a factual issue, and know there was, let's just say, a large amount of psilocybin that was seized, I don't think that's necessarily dispositive or really indicative of a particular issue here.  I think the idea would be, you know, if psilocybin had a very large amount of -- if Singularism had a large amount of psilocybin the implication could perhaps be drawn that in addition to whatever performed ceremonies with psilocybin, they're distributing it or something to their members, or by some other means.  And there hasn't been any evidence presented that there has been any sort of distribution.  Rather, the evidence has been that the ceremonies and the psilocybin occur only at the spiritual center and no individual member or voyager gets to walk out of the spiritual center, you know, with a bag of psilocybin or anything like that.

THE COURT:  So how many -- how much does the evidence indicate is used on a standard voyage?

MR. BEAN:  That appears to vary depending upon the individual voyager, as well as perhaps the individual voyage that they're on, if they have done it previously.

THE COURT:  What's the range?

MR. BEAN:  My understanding is about one to seven-ish grams or something like that the evidence I think we have before the court.

THE COURT:  One to 7 grams or milligrams?

MR. BEAN:  I believe grams.

THE COURT:  So maybe I'm just completely confused, but according to the Google conversion, 300 milligrams equals .3 of a gram.  So that would suggest, and again maybe Mr. Stephens can help when it's his turn, but if they -- if the lab report said there were approximately 300 milligrams, that would be less than one gram.  That wouldn't even be enough for one voyage.

MR. BEAN:  Yeah, and that's why I kind of bring that discrepancy to the court.  I did precisely the same thing.  I got on Google and put it into a conversion because anything related to the metric system frankly I'm hesitant to approach with confidence.  But, you know, that's my understanding that's the discrepancy so it could be a very, very small amount.  So they do not have a practice of maintaining a lot of psilocybin onsite for the very point of, you know, perhaps if the spiritual center is breached in

127

a robbery, or something like that, they wouldn't want to have, you know, a significant amount that would cause some sort of adverse effect by it, you know, leaking to the community.

The other precaution they take is they also include a letter, you know, we question the effectiveness of this, stating to an individual that does, you know, reach the source of psilocybin that it is intended solely for religious use, and that taking it out, you know, and using it in any sort of context, recreational or otherwise, is prohibited, you know, not allowed and could subject the individual, you know, to criminal or civil consequences as well.

THE COURT:  Okay.

MR. BEAN:  Speaking -- and maybe that's just the finishing point on what I was saying as far as evidence sources that the government might have to indicate some sort of particularized interest in preventing Singularism from moving forward, I don't think that shows any sort of problem to drug trafficking.  Certainly there is no evidence that any particular individual was able to obtain psilocybin from Singularism and remove it from the spiritual center for any reason.

Now, I do want to address head-on an incident that occurred in fact just last week.  This is the first

128

incident of any sort of adverse reaction that any voyager

has had at the Singularism Spiritual Center.

It is not something that is, you know, unheard

of.  Of course, there are very rare instances of adverse

reactions happening.  These sorts of adverse reactions

happen also in other contexts, in other medical research

facilities, the same sort of things.  And because that is a

possibility, excuse me, Singularism plans for and has an

emergency protocol for such events which it employed in this

instance.  And I don't know how much Your Honor has been

able to go through of that information.

THE COURT:  I read the allegations in the amended

complaint with respect to that but I didn't go into the

medical records.

MR. BEAN:  Okay, yeah.  Well, let me just apprise

the court briefly.  I'm sure the defendants will go into

this in more detail.  But essentially there was an

individual, you know, she had an adverse reaction on her

second instance in which she was partaking in a Singularism

ceremony.  She received more psilocybin in that ceremony

than she received in the first, which is typical to happen

for voyagers, and she had an adverse reaction to it

leaving --

THE COURT:  I would say an adverse reaction.  I

take it it was not so much a physical reaction as paranoia.

Is that -- is that a fair assessment?

MR. BEAN:  That's a completely fair assessment. It was a localized mental and emotional reaction.  The supplemental declaration of Mr. Jensen goes into that and his observations as to what symptoms she was experiencing. So from his observation, there were no sorts of physical symptoms that would have caused him to, you know, take her and to be hospitalized immediately rather than being released to her designated emergency contact which she was.

So there is -- there is context about that.  The individual left in a vehicle with her emergency contact, but the paranoia was such that even with her emergency contact she felt the need to contact law enforcement who did respond and then eventually took her to the hospital which is just about, I think, like a two minute drive in a car away from the location of Singularism.

She proceeded to receive treatment and was released that same evening, my understanding is.  And the next day law enforcement did follow-up with her to see how she was.  They did bodycam footage that day as well when she has returned back to her rational state, not in the state of paranoia any longer.  And in that bodycam footage, she explains that yes, she went to Singularism willingly.  She wanted to do it.  She understood that the word she used for Singularism was reputable and perfectly legal and that she

had simply a bad adverse reaction to it and explained that to the officer. She also, you know, during that visit with law enforcement, wrote a voluntary statement. That doesn't address everything she says in the bodycam footage, but she does speak to the voluntary nature of her participation with Singularism.

But there is, of course, some other -- some bodycam footage of her while she is in a paranoid state which, you know, I think to any individual who is not experienced or have experience with someone who is undergoing something would be very alarming so it's helpful to view that bodycam footage from the day after just to understand her rational, her reasoning, and her understanding and her feelings towards Singularism after she returned to that state.

And, you know, defense might have the opportunity today. That's the kind of limited area of fact inquiry and testimony that we're speaking of today. Mr. Jensen's supplemental declaration is limited to that incident. So if defendants choose to do some examination, that's what we expect it to be limited to.

But the overall picture, Your Honor, and the reason for raising and discussing this, is we don't think this indicates a significant change in any of the arguments about public safety or public health. Singularism followed

all of the same sorts of emergency protocols as other leading institutions, secular institutions even would, such as John Hopkins or Harvard who publish their emergency protocols that Singularism models after.

And certainly, those risks, to the extent there are risks in handling individuals who have unanticipated issues, is one that is shared by organizations like secular organizations under the Utah Psilocybin Act that might administer psilocybin to individuals.

Factually, the last piece I wanted to talk about that event is it appears, based on Mr. Jensen's observations and some communications that he had with the individual's emergency contacts, that some mental health issues likely were not disclosed in Singularism's screening process. And had they been disclosed, it is unlikely that Singularism would have proceeded to allow her to participate in the ceremony.

And while unfortunate, that is likely also something that happens in comparable secular contexts where an individual does not disclose certain, you know, pre-conditions to some sort of treatment or something and some adverse reaction results and is dealt with.

So for all that said, that really is the sum, in our view, of any factual information that relates or could relate to the government's shouldering of their burden to

demonstrate a compelling interest in denying Singularism specifically a religious exemption.  The case law, this particular piece that I think is most relevant for the court's analysis, and really does merit a full read if the court hasn't had the opportunity, is the *Gonzales versus O Centro* case.  And the reason I raise that is because in the government's supplemental brief, they raise this concept about needing to enforce a closed regulatory system which is the Utah Controlled Substances Act.  And if that is not allowed and we allow exemptions, then the whole system essentially will be compromised and First Amendment nor RFRA should be allowed to compromise such a system.  But that is the precise argument that the government made in *O Centro* that the U.S. Supreme Court rejected.  And it goes on for pages about this, but the U.S. Supreme Court begins saying that, you know, just the fact that the Controlled Substances Act at the federal level contain certain congressional findings but the dangers of any particular controlled substance doesn't do anything to justify the compelling interest here.

Notably, the defendants have cited there are similar congressional findings from the Federal Controlled Substances Act as well as legislative findings from the Utah legislators in position of the Controlled Substances Act in Utah.  Now, we similarly think those things just don't meet

133

the level of compelling interest justification here.

Additionally, as something raised in *O Centro* and the other cases that went to -- well, let me speak to *O Centro* just slightly more.  The other issue *O Centro* raised was the issue of lack of compelling interest demonstrated by exemptions in the Controlled Substances Act.  So to the extent the court is looking for some exemption analysis related to the Controlled Substances Act, it certainly can be found in *O Centro*.  It says that the Peyote exemption, as well as that individualized sort of discretionary exemption to grant exemptions from licensure we talked about previously, those two exemptions together indicated that this is a system that can bear, that can brook some departures from a uniformed closed system, right?  In that sense, the U.S. Supreme Court found that that undermined the government's assertion of the compelling interest in the fact that exemptions for others, including on a religious basis, were present within the Federal Controlled Substances Act.  And we think the same is even more true when we look to the Utah Controlled Substances Act which contains further exemptions and, of course, the more specific and very broad exemption related and shown in the Utah Psilocybin Act.

But the other thing that the controlling cases from the Supreme Court identify is that courts should reject slippery-slope type arguments or speculative or hypothetical

134

harm type arguments.  They have done this again and again, first in *Hobby Lobby,* in the *Fulton* case, and also the *Ramirez versus Collier* case.

Essentially, the concept is that the government can't just say, well, if I grant this exemption, then I'm going to get a flood of other problems, right?  And we heard some similar analysis about this earlier today like if we grant this exemption to the Utah Controlled Substances Act, we're going to have all sorts of opioid problems, right?  The government in this burden is -- has to have evidence that something like that would, in fact, occur because of this particular religious claimant's actions.  And there is just nothing like that here present.  Absent evidence and the speculative issues or harms should be disregarded and there are several that are pointed out in our briefings, you know, about defendants arguing about potential risks or hypothetical harms.  We think none of those contribute to shouldering their burden.

Now, last, let's even assume that this compelling interest prong is not so specified and it could just be shouldered at a general level.  We think there are various issues that undermine the government's assertion of public safety, public health, drug trafficking concerns even at that higher level.  First, and most critically, it seems that the government's assertion that psilocybin is just an

inherently dangerous drug likely to lead to all sorts of horrible such as suicide, interference with traffic, et cetera, et cetera, those are all very credibly undermined. But the legislature's passage of the Utah Psilocybin Act last year part of that decision by the legislature must have been that psilocybin is not so dangerous that it can't be given to anyone as the government is asserting here and now.

Certainly, the government has decided that it has some beneficial uses in the secular context here and that those uses are so beneficial that it doesn't need to be subject to very intense monitoring or very intense strict procedures as the Utah Psilocybin Act is to avoid a lot of controls that you might have expected from an act like this. For example, it doesn't contain any issues about sourcing of psilocybin. It doesn't contain any --

THE COURT: But I thought I heard an argument to the contrary on that issue this morning that it had to come from some kind of specialized lab. That was something that Mr. James, I believe, indicated this morning.

MR. BEAN: Yeah. I believe what he might be referring to is the act defines the word drug, and it defines the word drug to include psilocybin of the type that, you know, the FDA has approved. But beyond that, where that psilocybin comes from is not specified. It is further not specified in the issues about purity level or

136

App-8:138

testing requirements or how, you know, it is delivered to the agency, what happens after it is delivered, that sort of thing.

THE COURT:  Other than the very vague testimonial evidence we had in the last hearing about your client's source of the psilocybin, is there evidence in the record that sheds light on that?

MR. BEAN:  We pointed the court to this because in supplemental briefing defendants argued that Singularism was getting it off the street.  That is simply not true.  We pointed the court to a transcript cite in the TRO hearing in which I believe Ms. Lee said they got it from a lab in Oregon.  We didn't get further into it because, you know, frankly, we don't think it is relevant, as if she were evaluating a substantial burden, and certainly where the Utah Psilocybin Act does not require that the source of any particular location, we don't think it has relevance here either.

THE COURT:  Just so I'm clear though, the only evidence that we have is that it was delivered by a woman, I forgot her name, who got it from a lab in Oregon.  That's the sum total evidence on the record?

MR. BEAN:  That's what I understand, yup.

And as far as, you know, other factual information, I mean the evidence, we introduced the lab

137

App-8:139

report which I was quoting from earlier.  One important thing to note is that the psilocybin was seized.  It was identified as psilocybin.  The report doesn't say anything about any other sort of contaminates contained in there.  So to the extent the argument is that there is a potential for contaminants, the only evidence we have is that it was pure psilocybin.

As to other issues that undermine even generalized interests in the assertion of compelling government interest, we do think it is -- the assertions of these interest are certainly undermined by defendants inaction meaning after Singularism put the defendants on notice nearly without keeping more than a year before the search and seizure happened, defendants did nothing for, you know, essentially a year to stop that.  If they were truly so concerned about public safety and public health and drug trafficking to the point they claim in their briefing, one would have expected them to act earlier especially when as they show in, I believe it is Detective Julian's search warrant affidavit, there was some unspecified, unnamed individual who lodged some concern.  Still not a lot of details on what the concern was in the fall of 2023, but still, nothing was done and additionally nothing was done after Utah County and Provo City determined to make statements to the media that they did not believe that

Singularism had any sort of protection for their religious practices. It just goes to say if those concerns were so present in their mind, why didn't they act. Similarly and related, we have -- Singularism has provided allegations that the complaint and some citations to the website of these organizations that are similar Entheogenic religious groups. One just I will note in specific --

THE COURT: And I -- I mean that is an interesting question because those other religious groups, as I understand it, reside in Tooele County or Salt Lake County. So they are different defendants than we have present here. I mean as I look over the list of defendants in this particular case, it's Utah County, Provo City, and Jeffrey Gray, who is the county attorney, I don't know how we can make some kind of -- I mean how we can say well it can't be a serious problem because some prosecutor in a different jurisdiction isn't doing anything about it.

MR. BEAN: Yeah, I understand that. And certainly some of those organizations might be centered in different places in Utah.

THE COURT: Are any -- I guess the relevant question is are any centered in Utah County?

MR. BEAN: Yes. And that is one I was going to point out. Divine Assembly, we understand, to be centered in Orem, for example. And they are a far larger

organization than Singularism. From my perspective, if I were to remove my, you know, religious eyes about the merits of religious protections, you know, and just view this as a secular angle about safety issues, they seem far more dangerous. For example, if you get on their website, they sell religious exemption cards, they literally sell mushroom growing kits that you can do at home. That sort of stuff that would be surprising, far more surprising from a public safety and health angle, than we have seen in Singularism where it is a very controlled environment, you know, where emergency protocols are involved, following, you know, reputable secular or medical emergency protocols. And so that is just -- that is to the point.

So I recognize, Your Honor, you know, that some of them may be headquartered or perhaps performed some of their religious ceremonies in places other than Provo or Utah County, but at least one and the most critical one, Devine Assembly, does have presence, significant presence, in Utah County.

The last two things about undermining just a general level of the government interest is one, defendants have not said really anything about the clergy exemption that the Department of Occupational -- Department of Occupational and Professional Licensing, DOPL, I don't know if I'm saying that acronym correctly, but that they have

granted to Mr. Jensen, you might recall, Your Honor, from our last hearing, essentially around the same time negated by a few weeks of the search and seizure, some individual unknown at this point, made some sort of a complaint about Mr. Jensen's lack of licensure to DOPL.  And they determined, following their investigation, that he was entitled to continue practicing under the clergy exception to the Mental Health Practices Licensure Act, that he could continue practicing as a mental health therapy.  Meaning, you know, actually practicing that therapy, not just, you know, practicing some sort of therapy but practicing that therapy with all of the same rights and privileges as a licensed individual.

THE COURT:  Well, I mean, I thought that, and maybe I need to take a closer look at that, I thought that what they said was to the extent that he is giving advice to parishioners and serving as a -- in a religious role, he could counsel people.  I mean did they really imbue him with all of the same rights as someone who was licensed as a mental health therapist because, for example, did he even have to have the psychology degrees or the clinical experience that would be required to be a licensed mental health therapist to qualify for this clergy exemption?  Or is that available to anyone regardless of training or lack of training who wants to counsel people in a religious

setting?

MR. BEAN: Yes, it really is quite broad and allows them to do other things. The primary restriction for folks under the clergy exemption is just they cannot represent themselves to the public or their parishioners as having a certain title. So there is a list of certain titles in the statute which says you can't say those things for the public.

THE COURT: But I guess what I'm asking is, can anyone, who makes a claim to hold an ecclesiastical position, qualify for that exemption even though they have zero training in clinical practice or mental health?

MR. BEAN: Yes, that's my understanding. I think probably the most common application of the clergy exemption is to Latter-day Saint Bishops who are providing spiritual counseling, many of whom I expect don't have that sort of training.

THE COURT: Okay.

MR. BEAN: So that goes to that point. And then the last point we want to just point out is that, you know, defense counsel short cited many sources about the dangers of psilocybin. I think we have been pretty thorough in our briefing in pointing out that we don't think those sources really say what they say. We could certainly get into a war of articles here about, you know, the articles supporting

benefits and then against, but we don't think it is really relevant to the court's analysis so we haven't done that other to point to maybe one article that was previously introduced before the court, because the really relevant inquiry is the factual evidence related to Singularism itself as to compelling government interest.

And so for all those reasons, for the specificity reasons and even if, you know, the interests are non-specific, we still don't think they make the -- they shoulder their burden under that first prong, the strict scrutiny analysis.

Now, as to least restrictive means, let's assume for a moment that the government has an interest. And this is some times what, you know, Utah or the U.S. Supreme Court will do is it will assume for the purposes of argument that there is a governmental interest and then move to least restrictive means and find that least restrictive means is not satisfied. That, I believe, is what happened in the *Hobby Lobby* decision, for example.

Now, just from the outset, defendants argue that they only need to respond to least restrictive means proposals that plaintiffs put forward. I don't see that reflected in the Supreme Court cases that touch least restrictive means specifically *Hobby Lobby,* Holt, and Cobbs, *Fulton.* Those cases really say if there is any other way

for the government to achieve its objective, that it is less restrictive and outright prohibition and permits some level of religious free exercise, it must do so.  And under that standard, we think that the defendant -- defense do have to prove that.  However, even if it is correct that plaintiffs have to put forth proposals that the defendants get an opportunity to kind of shoot down, they have done that and they have done that from the start of the briefing in this case.

So I just want to walk through those proposals.  And the key here is we're looking for the least restrictive proposal, right?  That's what the government has to do.  And if there is a least restrictive proposal proposed by us or maybe even defendants, that should indicate to the court that the defendants have not met their burden of less restricted means brief here.

So the first, and this is the most least restrictive, I would say, is that the least restrictive means is simply for defendants to do nothing and allow Singularism to continue on its practices as it has been practicing for the past year plus, just as defendants allowed Singularism to do even after receiving information about it opening from Singularism from a concern from some citizen, and even after their media statements to the public that Singularism didn't have religious freedom protections.

144

Amid all those things, it still did nothing. Similarly, also it has done nothing from our understanding of any prosecutions of any Divine Assembly member. Defendants have produced no evidence that any Devine Assembly member or any other member of an Entheogenic religion have been prosecuted to indicate some uniform application on this issue as to all sorts of religious organizations. So that simply is least restrictive means we seek here. Allow Singularism to continue its practices as it has.

Now defense, I imagine, will not be very satisfied with that proposal because, you know, of concerns they might have for the public interest. But we have also set forth additional proposals. The next least restrictive means would be to simply allow Singularism to practice its religious practices under the terms of Utah Psilocybin Act. And essentially that would be in addition to kind of the religious practices that inform Singularism, Singularism would also be required to administer its psilocybin ceremonies supported by a broad collection of scientific and medical research which the term that the secular healthcare organizations have to make that determination, right? And that's certainly something that Singularism can do and already does do, based upon research from Harvard Medical School, John Hopkins, et cetera. So that would not be a difficult item for Singularism to meet.

Similarly, it would require Singularism to administer psilocybin under the supervision of, you know, clergy, mental health practitioners like is already being done with Mr. Jensen under that sort of clergy exception from DOPL.

Now, the Psilocybin Act talks about licensed individuals, but that mental health or excuse me that clergy exemption for mental health practitioners lives also under the same title as the Utah Controlled Substances Act. And the Utah Psilocybin Act says that any individual licensed under the title is one that can supervise. And through that interplay, Mr. Jensen, of course, is a perfect candidate. And frankly, you know, he may very well be able to administer some sort of psilocybin program with better efficacy and more safety than a health organization in Utah doing it for the first time without experience under the Utah Psilocybin Act.

Now, the last requirement under that proposal would be a requirement that Singularism only administer its ceremonies to individuals above 18 years old. And that is already a rule that it follows.

So all of those things are met. I don't think it would be reasonable to impose a requirement that Singularism somehow purchased 15 hospitals in order to be qualified for that least restrictive means. I just don't think that is

146

possible or reasonable.  And so those are the applicable portions in the Utah Psilocybin Act.  We could also talk about whether --

THE COURT:  Well, just out of curiosity, how many healthcare systems in the state qualify under that Psilocybin Act or was this actually just an invitation to IHC to do this?

MR. BEAN:  I really do consider that to be the case.  It does also interpret it in terms of relation to University Healthcare systems, so the U's healthcare system.

THE COURT:  So it was basically a private statute for IHC and the University of Utah?

MR. BEAN:  Correct.  And then the last thing I was going to say is there also is a requirement for those health organizations to report to the legislature, and I think in July of 2026, basically say, how did it go?  Tell us what happened?  And now, you know, those health organizations are not under that obligation until, of course, that time.  Perhaps, you know, defendants would be interested, or plaintiffs would be interested in coming up with some sort of reporting mechanism about safety, but I'm not sure that makes complete sense here or not even an issue for the healthcare systems.

THE COURT:  Now this morning an argument was made that the Utah Psilocybin Act not only authorized the studies

147

to go on but immunized, I suppose, the two hospital systems from any liability.  Is it your claim that your client would also be entitled to that same immunity from potential liability that those institutions enjoy under the act?

MR. BEAN:  I think that's a strong claim to make but I do think it is supported by the text of the statute, right?  For example, if the healthcare organizations encountered an adverse consequence, for example, that they maybe weren't equipped to handle and it resulted in some sort of like compensable injury, it is very possible that that immunity would immunize them somehow from that some sort of injury or would immunize them from prosecution, you know, when the individual complaints to law enforcement about what had been done to them.

THE COURT:  Right.  But so that's my question is if your claim is that you need to be treated similarly, is it also your claim that your client should be immunized from any potential liability for things that go awry?

MR. BEAN:  I doubt my client would insist on that but I am going to assert that here because that is the face of the statute.  And so I think it is important for us to put forth that as the least restrictive means.  Again, you know, perhaps the Utah legislature can question the wisdom of putting in such a broad grant of immunity to the healthcare systems there but if we're going to talk about

parity between secular and religious practices that have the same comparable features, I do think that makes sense to include.

Note the third kind of category of proposal that plaintiffs have put forward is basically just pointing to other instances where the government has made it work in some fashion. And these instances are not perfectly analogous to what we have here and frankly I think they are more difficult situations to handle. But they are instances of, you know, showing how there is a less restrictive means by which this could be done with the government than an outright prohibition of psilocybin.

And the first is demonstrated by the *O Centro* case. If you might recall during the TRO hearing last time, we were able to look over the preliminary injunction order that was issued upon remand from the Supreme Court's decision in *O Centro.* And it did list several conditions about how to do things including, you know, things related to the importation of the controlled substance into the United States. There are a lot of detailed considerations in there, detailed possibilities. And so as an example, a very similar example, is Ninth Circuit's decision in *Church of the Holy Light of the Queen versus Holder*, you know, where similar Daime tea and importation of controlled substances, religious use, possession. The best and

149

probably most public example of the government finding a way to do this is last year the DEA and a variety of other federal agencies came together with, I believe, a 15-page settlement agreement which we have included as an attachment I believe to our initial brief, which indicated that they also found a way to do this.  And there are lots of terms in there, of course, about, you know, reporting and this is how the controlled substance is going to be imported and there are even requirements about who can take it to what setting. And notably, I think it is interesting, that that settlement agreement allows the sacramental substance there to be taken and the ceremony performed in any location as long as the identified individual is the one that tranports it there and takes control of it during the situation, which, you know, is not an issue for Singularism because it only performs its ceremonies at its spiritual center.

So I don't want to go through all of the specifics of those possibilities but they just are all examples of the least restrictive means that the government could take here besides an outright prohibition.

THE COURT:  How do the Peyote exemptions work?

MR. BEAN:  Under the Utah Controlled Substances Act?

THE COURT:  Yes.

MR. BEAN:  Yeah.  So that is the last point I

wanted to make here.  You're probably anticipating my outline.  That is not a proposal that I anticipated putting forward.  The reason we raised it is to identify, you know, lack of general applicability, or lack of a compelling interest because the Utah Controlled Substances Act contain so many exemptions.  However, they do function in two different ways.  For example, it can be asserted as an affirmative defense, Peyote exception, in a criminal action. And they -- it also contains a provision above the affirmative defense provision I don't have at the top of my mind, but it also allows for a more general liability perhaps, you know, could also raise it in a similar way as RFRA was raised here in another civil action.

Now, this is interesting.  The defendants actually identify this.  And I will say I really haven't seen an engagement with the least restrictive means prong under the strict scrutiny analysis until the government's supplemental brief from last Friday.  And it's interesting to me that they include the discussion of the Peyote exemption.  For my part, it is an identification on their part that there is a less restrictive means.  Now, is that the least restrictive means and is that the means I think the court should take, you know, in fashioning maybe preliminary injunction relief or maybe some sort of final injunctive relief on the terms that Singularism should

exercise its religious practice?  No, I don't think that. But the fact of and mere identification of a less restrictive means from the government itself should indicate that it has failed to carry its burden.  That there is no other less restrictive means possible.  So that's why I think that is interesting.

Does Your Honor have further questions about the operation of the Peyote exception?

THE COURT:  I do not.

MR. BEAN:  Okay.  For all those reasons, you know, those three, I guess I would say categories of proposals of less restrictive means, the government really hasn't carried its burden of demonstration here.  And because it fails on that prong, it also fails on the compelling interest prong, there is significant likelihood of success for plaintiffs here on that prong of the preliminary injunction analysis.

Now, defendants don't want the court to reach strict scrutiny review understandably because it is a hard burden for them to bear and as for the reasons we have said they don't bear that burden.  And so what they're attempting to do is basically breakdown plaintiffs initial burden which is to demonstrate a substantial burden on sincere religious free exercise.

The most significant attempts defendants have

made in this regard are that argument about Singularism not being a religion or if it is a religion that it is not sincere and its religion is a front for some drug operation.

Certainly we disagree with that and the weight of evidence we don't think supports that finding at all.  The court found in its previous TRO order that Singularism was a religion as contemplated by the law, and there was a lot of discussion about the *Meyers* case, the *Meyers* factor in previous briefing.

But before we get there, I do want to raise one of the new documents that was submitted to Your Honor.  It is ECF Document 71-5.  And this is also a recent development.  So this is a letter from Provo City that was sent to Singularism on January 13th, 2025.  The context for this letter is that Mr. Jensen understood that to continue operations to exist in the space, et cetera, in Provo City, he would need to have some sort of business licensure.  Following that discussion, it eventually led to this letter in which Provo City tells Mr. Jensen/Singularism, that it does not need a license to operate and says, quote, "Under Provo City Code Section 6.01.130, churches or religious organizations are not required to obtain a business license to operate.  This exemption is limited to activities directly associate with religious purposes.  An application, application number, for Singularism has been closed."

153

Now, this is a representation from one of the defendants that, in fact, Singularism is a religious organization. And this representation is particularly significant --

THE COURT: Just quickly, I mean it does go on to say that, "If your organization engages in activities outside the scope of religious operations, such as running a commercial enterprise or selling goods," I guess arguments could be made that your client does both of those.

MR. BEAN: I think arguments could be made as to that as far as perhaps a licensure issue. But as to the matter of, you know, whether Provo City has made a statement regarding the religious status of Singularism, we don't think that is disputable. And, of course, I would also point the court to the *Hobby Lobby* decision which discussed religious organizations that do have any sort of commercial components. There, the court went as far as to say that even if the only reason for the organization's existence is to produce a profit, as long as it is still a religion, that organization doesn't lose its religious rights.

The other reason I think this letter is significant is actually the following section in the Provo City Code which is Section 6.01.140 and that actually defines kind of the burden that a religious organization would need to prove their religiosity to Provo City. And it

154

App-8:156

is very interesting because that means that Provo City in its determination review of this business application, licensure, made the determination that Singularism had met its burden of proving religiosity.  Now, the point of all of this, Your Honor, is simply to say that there has been a lot of discussion about whether Singularism is a religion and now we have a statement from Provo City that says they in fact are.  From our perspective, that means that defendant should be stopped from asserting further that Singularism is not a religion.

Now, even if Your Honor was not inclined to, you know, use that as evidence of estoppel for the defendants' arguments about the religious nature of Singularism, the next thing we would look to is the Utah RFRA definition of free exercise of religion.  I don't even think we need to get into *Meyers* at all, because Utah RFRA contains a very capacious definition of free exercise of religion.  This is in Utah Code 63g-33-101 subsection 2.  It defines free exercise of religion to mean the right to act, to refuse to act, in a manner substantially motivated by a sincerely held religious belief regardless of whether the exercise is compulsory or central to a larger system of religious belief.

And that last piece is particularly relevant here because a lot of these factors that we're seeing in *Meyer*

155

App-8:157

are factors which, you know, are trying to say that there is this large cohesive or some other, you know, centralized hierarchal organization that looks religious according to maybe traditional terms of what a religion looks like.  But the Utah RFRA does not speak in those terms or those factors of *Meyers.*  It says, you know, something -- a religious practice that is compulsory or central to a larger system of religious belief or practices a religious belief regardless of whether that it exercises compulsory or central to a larger system of belief, whether that larger system of belief be an organized religion or something different.  So under that definition we think that the religiosity issue is resolved here.

Now, even if we get to the *Meyers* factors, Your Honor, and I won't take you through all of the *Meyers* factors because we have done that, I think, well in the briefing, but, you know, there are some criticisms of that case, of course, as it relates to defining what a religion is.  There are several other jurisdictions in the country that take far different approaches to finding what a religion is.  But even if we're taking the *Meyers* factors, you know, at face value, and there has been really substantial amount of evidence adduced to the court both in terms of Mr. Jensen's declarations about his religious history and the reason for the formation, his kind of

encounter with the Devine which instructed him to form Singularism. The various declarations by other Singularism members attesting to their participation in the religious nature of Singularism. The testimony that we had from those individuals -- some of those individuals at the last hearing that was particularly compelling, as well as all of the doctrinal statements, pages and pages of doctrinal statements that Singularism has produced which go to all of these different *Meyers* factors.

For all those reasons, we think that Singularism has plainly proven that it is a religion as far as the law contemplates. It's a religion and the defendants have appeared to have agreed as well and that should not be any bar for the court reaching the strict scrutiny analysis.

Now, the second portion of that discussion is assuming it is a religion then are they truly sincere? And the court already found that Singularism was sincere in its TRO order and we would encourage the court to maintain that order here. This is just purely a factual issue. It's just a weight of the evidence issue, I think, for the court. We would assert that all those same sources that I have just talked to you go very strongly to the sincerity of religious practices at issue, but also that the sources produced by defendants show that they too understood that Singularism was sincere. For example, what I point to is Detective

Julian he executed a search warrant affidavit.  But in the documents that were submitted to the court most recently, and this was 71.6 to the supplemental brief, and this is an updated police report through December 2002.  And toward the bottom, Mr. -- or Detective Julian makes a conclusion. There is a header conclusion, I believe it is on Page 13 of the PDF, but he essentially says, "Bridger fully feels that since he has founded the religion of Singularism, his use and providing of psilocybin to individuals is legal and protected under federal law as part of the Freedom of Religion."

And this statement is consistent with statements found throughout the rest of the police report indicating that there were multiple moments where Julian and investigators found evidence of uniform assertions of religious sincerity.  And despite that, there was some sort of skepticism and more predominantly that in fact the Utah County and Provo City Attorneys Offices instructed Mr. -- Detective Julian, after relaying that information, to proceed anyway.

So the next sentence, after the one I just quoted says, "However, when speaking with the Utah County and Provo City Attorney Offices, it has been expressed that Singularism is not exempt from the Utah Controlled Substances Act."  And then he proceeds and finishes the

paragraph and says, "Due to these factors, this case will be referred to the Utah County Attorney's Office for screening of charges."

THE COURT:  Of course, that doesn't suggest that he is not sincere.  It just suggests that he is not exempt from the Utah Controlled Substances Act.  Those are two different things.

MR. BEAN:  Certainly, Your Honor.  And my point of raising this is it appears that Detective Julian essentially told, you know, his prosecuting superiors his understanding of their assertions of religious sincerity. And so that now we're here in litigation, there are some significant arguments made about religious sincerity and the investigator doesn't seem to have had that position.

Let's see.  The other evidence that defense appeared to assert against religious sincerity is a lot of quoted conduct from like LinkedIn profiles, Mr. Jensen's past secular, you know, entities that he might have had a website that lingered on, or something like that.  We just don't think those are persuasive and it also appears that there is kind of an implication that because Singularism accepts money in relationship to religious practices, that that in and of itself indicates some sort of insincerity.

And in response to that argument I would just point again the court back to the *Hobby Lobby* decision which

talked about religious rights being completely maintained for any sorts of religious organizations even those that are seeking to exist solely for profit which Singularism is not, but it does have a financial interchange component for some, at least for most, perhaps, of the Singularism members.

For all those reasons we don't think there is a legitimate challenge to the sincerity piece of this analysis.

Last, as to this initial kind of threshold decisions before we get into the strict scrutiny, there is an argument that Singularism's religion was not substantially burdened.  Again, this is an issue that Your Honor has already spoken to, at least in part in your TRO order and we would encourage the court to maintain that decision.

Most importantly, looking to the Utah RFRA's definition of substantially burdened, it is very, very broad about what constitutes a substantial burden.  And this is at 63G dot -- or -33-101 subsection (6).  It begins with the broad definition of what substantially burden means and then in another smaller subsection it says, and here are some examples.

So substantially burden means that government action, directly or indirectly, can be anything that constrains, limits, or denies, compels a person to act, or

fail to act, in relation to religious practices.  Including direct or indirect really opens the scope of what a substantial burden can be.  And even if that weren't broad enough and clear enough to include the sort of conduct that is at issue in this case, those examples, you know, where it says that substantially burden includes and then it lists any of the following, some of the things that are included there are a burden regardless of whether that burden is imposed by, law, statute, ordinance, rule, policy, order or other assertion of governmental authority, or any other means.  And also, the government's actions to apply or enforce an act against an individual, organization, or enforce a law, statute, ordinance, rule, policy, order, or other assertion of governmental authority.  And one take away there is that it is really not a huge and significant bar or substantial burden because the definition of substantial burden is so significant.  I think defendants' primary argument in this substantial burden area is that the criminal prosecution or at least threatened criminal prosecution before it actually proceeded is a threat.  From their perspective, simply defending an action in a judicial proceeding can't possibly amount to substantial burden.  But looking at the definition under Utah's RFRA, there is just simply no room for that and that definition of substantial burden is just so broad.

161

And of course, Your Honor we think there is significant substantial burdens here both in relation to the, you know, impact that the media statements had upon plaintiffs' financial accounts.  We think that there is burden related to, of course, the search and seizure, the deprivation for any period of time for any of those items seized and the continuing deprivation of the psilocybin.  The continuing threat of eviction.  Although we did hear today, you know, that perhaps there is no interest in pursuing that.  But that's the first time I have heard that.  So, you know, that is something that has been a concern.  And then also, just the impact of the criminal case, of course, and the impact of all those things combined really leads to a substantial diminishing in the body of the faithful for Singularism who feel comfortable enough to participate in ceremonies despite the consequences they're seeing could be taken against them.  And for that reason, you know, we do think there is a substantial burden here.

If Your Honor doesn't have any other questions about substantial likelihood of success, if not I will move onto just irreparable harm and kind of the last two prongs of the analysis here.

THE COURT:  All right.  And I'm happy to let you move on if you think it will be fairly brief.  Otherwise --

MR. BEAN:  I do, just a page.

162

THE COURT: I was going to say we have been going for about an hour-forty-five and I'm sensitive to giving our court reporter a break.

MR. BEAN: Of course, yes.

THE COURT: So I don't know how much more you have. If it is under five minutes, I'll let you go.

MR. BEAN: I'll try to do one or two, that's what I'm aiming to do here. But like I said from the beginning, I think the issue really does hinge on the likelihood of success here, that's the most important TRO factor.

The irreparable harm issue I don't think is a big disputed issue. The defendants haven't disputed the First Amendment or RFRA violations amount to irreparable harm. That's contained in the *Heidemann versus South Salt Lake* cases from the Tenth Circuit as well as the District of New Mexico decision in *O Centro* which cites some other Tenth Circuit authority. The court already found irreparable harm here and we would encourage the court to maintain that. And I already went through the harms that they're under.

And then the last is the harm balancing essentially here. We would assert that the harms to the plaintiffs far outweigh the harms to defendants in this action especially where there really isn't a significant compelling interest for the government to assert here for the reasons we have stated previously. And that's all.

Thank you.

THE COURT:  All right.  Well, let's take our afternoon break at this point.  It's about 3:00.  Let's come -- let's take 15 minutes and come back at what, 13 minutes after the hour and we'll turn the time over to Mr. Stephens to respond to the presentation you have just made.

MR. BEAN:  Thank you.

(Recess.)

THE COURT:  All right.  Do we have everyone back?

MR. STEPHENS:  Yes.

THE COURT:  All right.  Mr. Stephens, you have the floor.

MR. STEPHENS:  Thank you, Your Honor.  I'm going to try to move fast given the time of day and there is a lot of substance to cover.  I want to just start by quickly responding to some of the arguments that Mr. Bean made and in particular about some of the documents.

One of the last points that he had discussed was the police report.  And he argued that that established that the conduct at issue was substantially motivated by a sincerely held religious belief.  But let me just call out some of the language that Mr. Bean did not point out.

This comes from the detectives report, a lot of this is also in the declaration affidavit that was submitted

164

with the search warrant.  The detective explained that he had been told Singularism's support of other religions.  You don't have to leave one religion to join Singularism.  Instead, it adds to whatever beliefs you already have.  What do the wellness center --

THE COURT:  I mean not to belabor the point, but is there some authority to suggest that for a religious belief to be sincere it must be exclusive and include rejection of other -- other religious beliefs?

MR. STEPHENS:  I'm glad you asked that.  Let me maybe pull up and start slightly different, to just get straight to that point.  We talked last time about the *Meyers* factors.  And I think that certainly is an analysis in the *Meyers* factors and falls within those factors.

Mr. Bean has contested that that's not the right analysis and he argued that this is a state RFRA act and he told you today that some of the language of the Utah RFRA is slightly different.  So let's look at a state RFRA, this is Idaho, 2013, *State versus Cordingley*.  Appeals from denial involved marijuana paraphernalia charges and he argued that he had a RFRA right.  Here's the exercise of religion that Mr. Bean told you makes this case so that *Meyers* doesn't really apply.  You are going to recognize that language. Substantially motivated by religious belief whether or not the exercise is compulsory or central to a larger system of

religious belief. That's the point that Mr. Bean emphasized. And then the Idaho Court had to determine whether or not this individual's claims work. And they determined it did not. And the court relied on the following type of factors. "The COCT," that was the name of the church abbreviated, "is a community with an emphasis on spirituality rather than am emphasis on any particular religious belief. The goal is to obtain enlightenment and it can be had by Catholics, Jews, and even Atheists. The only connecting fiber among the various members is their use of marijuana" and here we could insert psilocybin, "to help them in this pursuit. Despite some of the trappings of religion, this is nothing more than a basic philosophical belief that such use will help with enlightenment." It goes on, another set of facts. There the leader of the church acknowledged that the church is not so much as a religion as it is a companion to religion. The church presents itself as an ideology or a philosophical belief as to how people can become enlightened, but it does not have a comprehensive belief system with the trappings of religion. Instead, it provides a sacrament, a drug, that is to be used as an accompaniment to other religious beliefs. The court goes on. They're limited in addressing the ultimate ideas. The founder testified that it was established as a means of taking negatives and changing them into positives with the

166

help of the sacrament, that the purpose was helping people through marijuana get back in touch with their spiritual selves so that they could connect. They do not believe in the concept of a singular God or singular issue but rather they believe in the universe. Put another way, aside from an abstract belief that marijuana or mushrooms placed one in touch with their spiritual self, the church did not address the fundamental questions answered by most religions.

Other factors. That the focus is on the consumption of marijuana. That's the common factor in that case. Here, it is mushrooms. The church is a companion to whatever individual faith structures each member, using the examples of Buddhists and members of the LDS Church, where each member pursues his own faith, but members are united. And how are they united? Through their use of the drug.

No other beliefs, practices, or sacrament, or the like, that did not pertain to the use of the drug. The singular focus insufficient as a matter of law to constitute a comprehensive set of religious beliefs. Most glaringly, the church is focused on the use of marijuana, here mushrooms, to a degree that has consistently been found not to be in indicative of statutory recognized for religious practice. And then they go on and say, so what is it about, this is quoting, I believe, from the district court, "It is about teaching people that they are spiritual human beings

167

and it is a companion to religion whatever religion you are."  It would be, you know, a means of discovering your spirituality.

So in answer to your question, yes, yes.  Saying it is just a spiritual accompaniment, or something that unites everybody, doesn't work.  It is not enough to say that you believe in mushrooms and mushrooms help every other belief that everybody else might have.  That's just legalizing mushrooms.

Going back to the police report because counsel emphasized this and I want to make sure that the -- that the record here is clear about what the detective was told and what the detective believed.  The detective was told that Singularism is supportive of other religions.  You don't have to leave any other religion to join, it adds to the beliefs that already exist.  That's pretty much the same language that we just read from Idaho.  Their use of psilocybin at the Wellness Center unlocks the mind and allow the clients to get the best therapeutic care possible.  Not a spiritual, not a religious focus, instead that is now blurring the line with medical care and that is a point that I'm going to emphasize again later.  Then he goes on and the detective was told by Mr. Jensen that the way Mr. Jensen founded the religion was by talking to his lawyer to review prior cases in which people claimed religious exemption,

where those claimants won or lost, the judge's comments, and used that to create a roadmap to create his religion of Singularism.

So what was the officers, the detectives conclusion? It wasn't what Mr. Bean argued that this was a substantially motivated by a sincerely held religious belief. Instead, the conclusion was that there was probable cause that Mr. Jensen was running an illicit business under the guise of a religion. That's what the police report said in context.

Now, what else do we have that goes to this issue? Sorry, I'm switching between screens here, Your Honor. That's the wrong one. Apologies. What else do we have? And this is evidence from the last hearing and I'll go through it quickly because I know Your Honor heard it. Singularism takes no position on the existence of God? Exactly. Yes. Doesn't take a position on what God consists of? Yes. Does Singularism declare what the ultimate origin of the universe is? No. You say those who believe in God, I believe your testimony earlier was that Atheists could be members of Singularism, is that correct? Yes. You also mentioned those who believe in an afterlife, is it true that you could be a member of Singularism without believing in an afterlife? Yes. This was Ms. Lee, you testified regarding the overarching belief is that all is one and we're

169

connected by a golden thread.  Is that fair?  Yes.  Again, that sounds like the Idaho case, Universalism.  But even then, do Singularism's members actually have to hold any of those beliefs to participate in a ceremony?  No.  Is there a scripture that Singularism promotes?  Not that I'm aware of.  I'm told it's faith affirming, it's a way for me to connect with my sense of the divine.

All right.  So let me see if I can confirm and rephrase this.  It takes whatever you believe, like the Idaho case, it takes whatever you believe and adds a little bit of a multiplier.  It takes whatever you believe and adds mushrooms or marijuana.  Is that what you're saying?  Yeah.  That's probably it.  It enables one's relationship with the divine exactly the argument in the case that we just looked at.  Do you ever join for celebrations of holidays?  No.  Are there any holidays?  Not that I'm aware of.  Have you ever heard of the Ten Commandments?  Yes.  Does Singularism have something familiar?  No.  Does Singularism answer where you go when you die?  No.  What about where you were before you were born?  No.  When life begins?  No.  Other than psilocybin, have you participated in any other religious ceremony?  No.  Why?  Because psilocybin is the religion just like marijuana was in Idaho.

Again, Mr. Jensen in this case confirming you don't have to forego any other religious belief, practices,

170

ideas, you can believe whatever you want.  Can you be a member of Singularism without using psilocybin, right, because that would indicate that hey, maybe there is more to this than just we believe in mushrooms.  The answer Mr. Jensen gave, I haven't thought about that, it hasn't come up.  No one has ever asked me that before.  Because the only common factor that exists for Singularism is the use of mushrooms.  Just like in Idaho, the only common factor was the use of marijuana.  That was the core belief.

Again, we can go on.  Everyone is empowered to define their own beliefs?  Yes.  Does it answer all of life's most difficult questions?  No.  Can it teach that members -- does it teach members are empowered to discover their own truths?  Yes.  Does not claim access to divine truths?  No more than anyone.  Singularism helps people to be themselves?  True?  Free to believe whatever they believe so long as it doesn't harm mankind.  In fact, that's similar to the hypocratic oath.  Yeah.  The hypocratic oath is enough to establish a religion where beyond -- were beyond the protections of RFRA.

Now, we can also look at their own website.  What does it mean that our practice is faith affirming?  We welcome everyone, all faith backgrounds.  We are trained in helping people unlock themselves.  Inclusive.  It allows participants from any faith.  Explores spiritual experiments

171

to compliment and enhance their own faith.  It is indistinguishable from the Idaho case and frankly from *Meyers* as well.

Now, on top of that, right, on top of that when we're talking about is it substantially motivated by sincerely held religious belief and also when we start talking about government interests and restrictive means.  On both sides of this we have to recognize that these plaintiffs are consistently blurring the line between any alleged religious belief and the practice of medicine or mental health therapy.  And we see this again and again from their own materials where they describe it as legal psilocybin therapy.  The nation's largest psilocybin treatment center.  Again, treatment center.  Legal mushroom therapy.  Treatment center.  Psychedelic therapy journey provides a structured professional and legal approach to psilocybin therapy that distinguishes us from informal and recreational practices.  Skills of a true practitioner psychedelic therapy.  In fact, certificate of organization for Psyche Healing & Bridging, one of the named plaintiffs, what's their business purpose?  Market, sell products, materials and services in the field of mental wellness and healing.  Like a business dealing with therapy.

They reference the bank records, or I should say, the Department of the Treasury's flagging of bank records as

though that was something that my clients or the defendants had done that was inappropriate and a cause for injunction. Let's just be clear about this, right. This comes from the United States Department of the Treasury. The entry date was November 2023 for investigation between July and November 2023. Why do I emphasize those dates? Utah RFRA was not even adopted, let alone enacted, nor was the Utah Psilocybin Act. So already there is some question there. But then what was the investigation as found? Well, what the treasury found was that plaintiffs had received wires from individuals who were known mental health supporters, startup investors. One wire had the memo "buy-in." They appear to be business start-up investments for purpose of starting up a business. That doesn't seem like a religion. On top of that, on top of that, this is then what the Department of Treasury found and why they had flagged this, in addition to their own research which discovered the news article with the statements from the defendants. The branch found the customer unusual as he clearly articulated that he does not want the government to find out about his cash withdrawals and learned to keep cash under ten grand from his father. The employee stated the customer is always in a hurry and only wants to conduct transactions with her. She gets anxiety when he is in the branch because he is rushing her. She finds overall cash withdrawals odd for the type of

173

App-8:175

business and does not know the purpose.  He was in the branch yesterday, again to open an account.  Decided against it because it would exceed the $10,000 flag.  Cash withdrawals are conducted for unknown purposes.  Coupled with the client's knowledge and apparent attempt to evade reporting, suspicious activity identified.

That's right, that's what we're talking about before the RFRA was enacted, before the Utah Psilocybin Act was enacted, and it's true in connection with this and because of this flag they do investigation and find the statements that were made that the defendants didn't see a religious right.  And frankly, based on plaintiffs' arguments, there wasn't a religious right at that time because the acts hadn't been passed.

But again, you're talking about business buy-ins in connection with a mental health clinic that's advertised as a mental health clinic.  And what that leads to is the -- the fact that the plaintiffs can't establish that the use is limited to religious users.  And let's look at this.  This is the Ninth Circuit's opinion in *United States versus Christie*.  The Tenth Circuit is not typically know as being a very conservative court.  And there, they're being asked whether the federal court can criminally prosecute two ministers of the Hawaii Cannibis Ministry who admit to using and distributing large quantities of Cannibis by claiming --

174

but who claim they were doing so for religious purposes.

The government argues that it has a compelling interest in mitigating the risk that Cannibis from the church will be diverted to recreational users.  The facts of this case demonstrate that mandating full compliance with the CSA will help to advance this compelling interest to a meaningful degree.  We agree.  The defendants in this case have argued that there is a compelling interest in mitigating the risk that mushrooms from Singularism will be diverted to recreational users.

THE COURT:  So how do you respond then to Mr. Bean's argument regarding the Divine Assembly or Magic Mushroom Church which operates within your client's jurisdiction.  I mean they are passing out mushroom kits to everyone, it appears they're not engaging in the same kind of careful supervision and control.  They're a much larger organization and apparently, Mr. Urquhart and his followers have not had the same issues with your clients that Mr. Jensen had.

MR. STEPHENS:  I will say, Your Honor, it is not clear to me, and in fact I think it is inaccurate to say, that the Divine Assembly is operating in Utah County and based in Utah County.  I say that for a few different reasons.  Let me walk through them.  The Divine Assembly, this is their State of Utah registration, their address is

Salt Lake City, Utah.  The Facebook page, and I'm happy to submit this to the court if you would like, indicates that they're operating in Salt Lake City, Utah.  Let me also read to you from the transcript where Mr. Jensen was asked about this at the TRO hearing because Mr. Bean made this argument previously and through this questioning.  Mr. Jensen testified, the answer is that the founder of the Divine Assembly communicated with me recently that he has never had one interaction.  When I told him about that raid, he said he is just not afraid of it happening to him and that this seems -- that this problem seems to be unique to Utah Valley or to me.

In other words, the testimony last time was seemed to distinguish Divine Assembly from Utah Valley. Even putting all of that aside, if the plaintiffs had presented this, had proven this, had established it, and they haven't, right, again, we get back to distinguishing factors.  Certainly they haven't established that the alleged religious beliefs of the Divine Assembly are comparable to Singularism, nor have they established that the Divine Assembly markets, represents, holds itself out as providing medical therapy the way that plaintiffs do.  And even if all of that were true, it is still a bit like saying because you haven't caught everybody speeding on I-15, you can't issue a ticket to anybody speeding on I-15.

THE COURT:  Well, it does go though to your claim of this compelling government interest and the danger in allowing the plaintiffs to continue to operate.

MR. STEPHENS:  And I understand that to a degree. But what I would say back is if that's really the standard, then the only way that any mushroom user or alleged religious mushroom user could be prosecuted is if all of them were being prosecuted at exactly the same time.  If they had started with Divine Assembly, Divine Assembly would be saying aha Singularism.  If they start with Singularism, they say aha Divine Assembly, right?

That doesn't -- that doesn't work and they certainly haven't provided cases that say unless everybody is being prosecuted at once, unless you stranglehold the black market, unless you prosecuted everybody who has claimed a religious exemption, you can't prosecute anybody.

And, again, even with all of that, I would still turn back to and take you back to the analysis in -- sorry, I need get this back up, the court's analysis -- can you see that again, Your Honor?

THE COURT:  I can.

MR. STEPHENS:  The *Christie* case.  In the *Christie* case, all right.  Where the government argued they had a compelling interest in mitigating the risk that it will be diverted.  Ninth Circuit, we have little trouble

177

concluding that the government had the compelling interest in preventing drugs set aside for sacramental use from being diverted to nonreligious recreational users.  A risk of diversion, after all, simply means the threat that Cannibis, mushrooms, an illegal Schedule I controlled substance, will wind up in the hands of people whose use is disconnected from any sincere religious practice.

THE COURT:  Well, although I mean that quote that you just read doesn't suggest that the government's interest is in a complete ban.  I mean it says the government's interest is in making sure that there is not diversion.  And I don't know if you've cleared the hurdle of least restrictive means.  There certainly has to be a less restrictive means to preventing diversion than just shutting the church down.

MR. STEPHENS:  That same argument was made in *Christie*, and the response was, where diversion has been established, where that risk is manifest, then it is the least restrictive means.  In fact, here is the conclusion, right.  The record in this case exceeds where the record in *O Centro* fell short because the district court concluded there is specific evidence that the distribution methods created a realistic possibility the Cannibis intended for the members of the ministry would be distributed instead to outsiders who are merely feigning membership in the ministry

178

and adherence to its religious tenets.

THE COURT:  Tell me what facts you have to suggest that you met that here?

MR. STEPHENS:  Yeah.  So in addition to their advertisements and their direct marketing for mental therapy for medical therapy, let me take you to a specific, a very specific evidence, specific instance, that we know about because of a call that happened last week.  Because this is not a hypothetical concern or a mere thought or potential of confusion.  Even without this -- even without discovery, without depositions, without knowing who all is purported to take this, we do know this is an existing problem.  And I am going to play for Your Honor a few different things beginning with a 911 call from last week.

(Audio played.)

MR. STEPHENS:  Pause there.  Are you able to hear that, Your Honor?

THE COURT:  I did.  I couldn't make out anything but I heard it.

MR. STEPHENS:  Okay.  Well, I paused it quickly because I didn't want to just keep going if you couldn't.

(Audio played.)

MR. STEPHENS:  I will pause there.  That is Exhibit G to the exhibits that were filed yesterday.  And let me turn to, the officer responds with a body camera.

179

And I'm going to play a few clips here and let me see if it is possible to share this screen. These clips will confirm what you heard already in the 911 call that this person, this woman, understood that she was there for therapy and had been referred for therapy.

THE COURT: Where are we physically at the beginning of the bodycam footage?

MR. STEPHENS: We are in the parking lot of Singularism.

THE COURT: Okay.

(Audio played.)

MR. STEPHENS: And I'm sorry to interrupt. There is some foul language here. I apologize I don't know how to do anything about that, I assume it's not the first time for the court, but I just note it.

THE COURT: Okay.

(Audio played.)

THE COURT: It's muted. I don't know what happened to the sound.

MR. STEPHENS: Hmm.

THE COURT: It was there for -- until you -- it was there, then when you paused it, the sound didn't come back.

MR. STEPHENS: Let me then maybe try this again. I'll just re-share and not interrupt again.

180

(Audio played.)

THE COURT:  I have lost sound again.  I can see her lips moving but no sound.  Are you hearing sound?

MR. STEPHENS:  I'm hearing sound.

THE COURT:  Okay.  So the court reporter, Mr. Bean and I are not hearing sound.

MR. STEPHENS:  Here's what I'm going to do.  I'm going to mute my microphone and we'll try to have the sound come through Mr. Justin's -- or Mr. James's video if that works.

THE COURT:  Okay.

(Audio played.)

THE COURT:  The sound went away again.

MR. STEPHENS:  I don't know what is happening there.

THE COURT:  Well, I suppose you submitted this as an exhibit, I can watch it independently.  But why don't you give me your commentary analysis of what it was that we would have heard.

MR. STEPHENS:  What you would have heard, this Exhibit M, there are two body camera footages in Exhibit M.  What you would have heard is a very distraught woman who had taken drugs at Singularism and who repeatedly said that she did so because her therapist referred her.  And that she was there for treatment and that she was there for therapy.  She

does not mention, at any point, any connection to the church, religion, spirituality, the OctoGoddess, the universe, or anything that is in anyway connected to the argument that the plaintiffs are making about their alleged constitutional or RFRA right to do this.

Instead, she says clearly and repeatedly that she is there because she was being treated.  And the next day, this woman, the police officers follow-up in Exhibit G that was submitted yesterday, and these were filed with the court, the videos and the audio was filed with the court conventionally, because they couldn't be filed electronically so you should have a thumb drive with these. The next day the police officers interview her at her house, make sure she is okay and check in on her.  She again confirms that she was there because she had been referred by a therapist for PTSD treatment.

THE COURT:  So do you -- can we try that video and see if the sound problems persist.

MR. STEPHENS:  Let me try that again, or a different one here.  And I suppose if I can't share the video, we can maybe hear the audio through my microphone but I'll start with the video.

(Audio of Exhibit G played.)

MR. STEPHENS:  It goes on from there, Your Honor, it is about 13 minutes total.  I'm happy to play all of it

if Your Honor would like.

THE COURT:  That's okay.  I think I get the gist and I can watch it myself.

MR. STEPHENS:  And there is also a statement that she ultimately provided to the -- to the officers that has been attached.  Let me just share that.  All right.  Indicates, "I was recommended to the treatment facility by my licensed therapist.  I went there of my own free will and took the treatment willingly."  And she does clarify this in that final video, it was when she was under the influence she was unclear, scam, tricked, she didn't know what she was taking.  Here she clarifies that she was there on her free will, took the treatment willingly, had a severely bad reaction, became scared and hysterical.  It goes on from there.

But the point that I'm emphasizing here is exactly this first part and what's not said anywhere in any of the videos or in any of the written statement or even in the supplemental declaration of Mr. Jensen filed yesterday.  Nobody, nobody has said that Claire Hart was there to take sacrament or to worship the OctoGoddess.  Nobody has said that she was there because she wanted access to the universe or because she is a sincere believer or follower of Singularism.  Nobody has said that this was a religious experience for her, that this was about connecting to her

religious beliefs or that she was there to see God. Instead, the evidence is she was there to receive therapy for her PTSD because an arsonist had burned down her house previously and she thought it was legal. All right. Her therapist couldn't prescribe it herself and instead referred her to the plaintiffs so that she could get medical treatment that a licensed therapist wouldn't provide.

Again, we go back to that Ninth Circuit case and the government interest in the Ninth Circuit case and the discussion in that case. And that's what we have. We don't have just the risk or the concept that this is going to be used by nonreligious individuals. We know that that's happening because we have seen that even without going and asking other people why they have done it and we know that this is going to be a problem in the community because it has been a problem in the community, right? In the months since the court's ruling, the police officers have had to respond, the paramedics have had to respond, the fire department has had to respond.

THE COURT: Okay. So beyond this incident that you have just described, tell me about the rest.

MR. STEPHENS: So, again, we have -- well, I guess what I would say, Your Honor, is we shouldn't have to and I don't think need to show that there is a thousand incidents of abuse before we get --

184

App-8:186

THE COURT:  Well, and that's not what I asked. But you just threw out that in the month or so since our last hearing we have had fire departments and paramedics and police respond and you have just shown me one response by the police.  So tell me about the rest?  You just can't throw it out there and then tell me you don't need to tell me about it.

MR. STEPHENS:  No, I am sorry, Your Honor, I misunderstood what you're asking.  So to be clear, and this probably would have been clarified had the video played, the police initially respond, two officers.  The fire department responds so that they have an emergency response and then she is taken by ambulance to the hospital at the emergency room.  That followup that you were able to see was the next day after she had been released for medical treatment.  So all three responded.  We have included the fire department's notes as one of the exhibits that were submitted yesterday. The police report is Exhibit L.  I believe the fire departments notes are also included in Exhibit L.  And when you watch that body camera footage you also see the interaction with the fire department as well.

And again, that is consistent with how the plaintiffs themselves market when you describe yourself as a mushroom wellness center providing mental therapy and medical therapy, it is not surprising that you're going to

get people who are there not because they're there to worship, but because they are there to recover from PTSD or some other -- some other medical issue. And on that note, I find it interesting that one of the pushes that they have made, and one of the orders that they want from the court is that they should be allowed to act just like they fall within the Psilocybin Act.

In other words, they want the ability to treat the way that a medical provider would at the University of Utah Hospital or Intermountain Healthcare. And that's the relief that they're telling you is the -- is the least restrictive means that should be adopted. And that is not the purpose of a religious freedom. The purpose of religious freedom is not to allow unlicensed practice of medicine which is what has clearly happened.

Focusing also on the Psilocybin Act, it is not this broad catchall that I think plaintiffs have tried to make it out to be that just opens the floodgates of psilocybin. When you look at Utah Code 58-37-3.5, drug is clearly defined as a form of psilocybin that is in FDA phase three testing for an investigational drug described in 21 CFR part 312. Part 312 is its own federal regulation that spans about 60 pages. They have not identified whether there even is a form of psilocybin that is in phase three testing, let alone that the form of psilocybin that they're

providing is that same form.  So it's not that there has just been some floodgate and they're falling within the flood gate, they certainly have not established that.  And then on top of that, that statute goes on to identify that the healthcare system has to provide the psilocybin under the direct care of the licensed medical providers at a licensed medical facility.  And again, that's not what we have here and that's why when something went wrong they didn't take Ms. Hart around the corner to be treated at the medical facility, they called an ambulance so she could be taken to a medical facility.

THE COURT:  Does the act require all of this to occur in a hospital or could it occur at a clinical psychologist's office who is employed by IHC?

MR. STEPHENS:  The act says used by a patient only under the direct supervision and control of the healthcare system and the healthcare systems care providers who are licensed under this title.  Now, the healthcare system is defined as a --

THE COURT:  Right.  But presumably a clinical psychologist employed by IHC could -- would be under the supervision of her employer and providing this in an office that's not located in a hospital.

MR. STEPHENS:  Yeah.  And potentially a clinical psychiatrist would also have the ability to then prescribe

187

other medication if and when there was an adverse incident.

THE COURT:  IHC employs clinical psychologists who don't have prescribing authority.

MR. STEPHENS:  And they also have to implement a system to ensure that this is a safe system.  And on that note, the supplemental declaration that you got from Mr. Jensen yesterday, we object to that declaration in part because he speculates about whether or not his practices are consistent with healthcare practices under the Psilocybin Act.  He hasn't even established that either IHC or the University of Utah has yet to actually adopt or administer psilocybin under the Psilocybin Act.  Because before they may do so, they have to develop a healthcare treatment program that includes certain conditions.  We don't have and he hasn't presented any evidence of what those healthcare treatment programs look like.  He doesn't have any personal knowledge of what those healthcare program treatments look like and he can't say that his is consistent with that. Certainly he can't say that it is consistent with a phase three FDA approved drug that he is buying off of the black market.  They push back and said well, it's not really the black market they get it from a lab.  Let me hit that head on by quoting the testimony from again that TRO hearing.  At that TRO they were asked about the lab and the answer was they didn't know what the lab was.  That they couldn't say

who the lab was, they couldn't say who the grower was, they were just told.

THE COURT:  I mean I think it is more accurate you're saying "they," you asked the office manager --

MR. STEPHENS:  Right.

THE COURT:  You asked Mr. Jensen.  And it's also the case that when your own lab tested the psilocybin that was seized, it wasn't tainted.

MR. STEPHENS:  It wasn't tainted, it also wasn't psilocybin, it was psilocin.  But you're right, it wasn't tainted, this batch.  All right.  But that doesn't mean that every other batch is safe.  That doesn't mean that there aren't problems with trafficking illegal drugs across state lines and that doesn't mean that it's an FDA approved Class 3 investigational drug, in any instance, let alone in every instance.

THE COURT:  Explain to me the distinction between psilocybin and psilocin.

MR. STEPHENS:  I'm not an expert, so I --

THE COURT:  So you know more than I do.

MR. STEPHENS:  I will tell you my understanding is that at some point psilocybin breaks down and I don't know if it degrades into psilocybin or psilocin or is processed into psilocin.  They're closely related.  The reaction, the same thing, you can test for both separately,

189

I can't give you much beyond that.  I know they're in the same family together.

THE COURT:  Okay.  Well, while we're talking about that, talk to me about the quantities that were seized.

MR. STEPHENS:  Yeah.  So the quantities that were seized, you have -- so you have the sworn return from the affidavit that is included in the docket.  I'm looking through my notes to get you an exact docket number.  Let me just -- maybe I can do it quicker by pulling up that docket.  This is included with our opposition to the TRO.  The search warrant return is Docket 13-5.  Verified under penalty of perjury by officer -- Detective Julian.  But it was 459.8 grams of psilocybin mushrooms.

The report that they have made reference to today I had not seen this argument until late last night, but I assume the answer, and this is a bit of an assumption I will admit is the difference between testing and talking about the portion of an active ingredient which would be a percentage or fraction of the overall product.  So when they're administering three grams of mushrooms, the mushroom is not 100 percent psilocybin or psilocin, that's going to be a portion of the active ingredient.  I assume that's the difference between milligrams and grams.

THE COURT:  Well, it seems to me you have the

mushrooms, you seized them, you still have them.  I think that I would like you to submit something from whoever analyzed them and clarify this.  Because I think this is a significant issue.  It is a significant issue as to whether they have got 90 doses of this stuff or a third of a dose.

MR. STEPHENS:  Yeah.  Yeah, I'm happy to do that.

THE COURT:  I don't know that the plaintiffs are in a position to answer it because you have got the mushrooms and you are the one who -- it was your officer who filled out the return of the warrant and it was your lab report that created the discrepancy.

MR. STEPHENS:  Well, the lab report did not come from either of the defendants.

THE COURT:  Well, I mean you had control of the substances so you sent it somewhere and asked somebody to analyze it.

MR. STEPHENS:  Understood.  I'm happy to have or ask Provo and have their officer confirm that it was 459 that was stated under oath.  If we need another declaration confirming that.

THE COURT:  Well, I want to know -- I want to know if -- based on what Mr. Bean argued, it looks like two items were sent to the lab and then we had an analysis as to those items.  We need to know were there other mushrooms that were sent to the lab or was the -- were the two

191

mushrooms sent to the lab it?  And how do we -- I mean I appreciate your effort to think of a way to explain the discrepancy, but I don't think it is evidence.

MR. STEPHENS:  Yeah.  And what I would say is what we know is evidence is the sworn declaration from the officer that seized these and -- but I'm happy to go and ask.  Again, if they had raised this at the TRO I would have the answer ready.  It came up briefly in the filing yesterday and again today.  And also --

THE COURT:  That's because they didn't have your lab report until more recently, correct?

MR. STEPHENS:  I don't know when they received the lab report, but I believe they can answer that.  I'm also happy to put Mr. Jensen under oath and ask him whether he had less than half of an ounce of mushrooms or more than half of an ounce mushrooms.  The plaintiffs are certainly going to know how often they buy these, where they're buying them, whether it was a third of a dose or whether it was many doses.  Because, again, certainly they had the ability to do that and when they submit supplemental declarations they --

THE COURT:  Well, they did.  But you now have the mushrooms in your exclusive possession.  You didn't return them.  And so at this point they're handcuffed with respect to telling me -- I mean they don't know what you analyzed,

what you sent out, and what went into the lab report.

MR. STEPHENS: Understood. And I am happy to clarify how much went to the lab and whether that was all of it, right? But the evidence that has not been disputed is regardless of what the lab received, what was seized, was 459.8 grams of mushrooms. And again, I'll give you the answer of whether some of that was sent to the lab or whether the milligrams is reflective of the active ingredient. I understand the court's question, I'll get it.

THE COURT: Okay.

MR. STEPHENS: In contrast to the fact that 459.8 grams were seized when the search warrant was executed, and given that, we also know that they have fewer than 100 voyagers. You heard at the TRO the dosage, you heard again representations from counsel the dosage. We're talking about somewhere in the order of 150 doses that were seized at one time which again is consistent with the concern that we're not -- that this is not an instance where we can safely say this is only being used by the occasional religious observer. Instead, the government can show, has shown, and has played video showing, that it is being diverted to those who haven't been established as religious observers just like in that Ninth Circuit case.

THE COURT: So one other question that I think you have raised with respect to this incident of the woman

193

App-8:195

who had the difficulty was -- does -- and maybe a better way

to ask it is this.  Clearly, she said she went there because

she was referred by her therapist.  But I suppose that

someone who goes to a Catholic shelter for dinner and a

place to sleep wouldn't necessarily be going there for

worship or to engage in religious activities.  So does that

mean then that, you know, the shelter, the Catholic shelter

then is not doing something religious?  I mean is everything

-- I mean I go to the congregation or to a Christmas party

at my church.  That's probably not religious, maybe it's

more social, but it doesn't mean that my church isn't a

religious organization.

MR. STEPHENS:  I understand that point.  But when

we're talking about what's the government interest, it's not

that we need to prevent Christmas parties, it's what's the

government interest and the concern is that just like in

that Ninth Circuit case, *Christie*, that we know people are

going and receiving a Schedule I drug for nonreligious

reasons.  Now, does that mean that Mr. Bridger -- or sorry,

Mr. Jensen isn't sincere?  I think we can say it certainly

calls that into question, but it doesn't matter, right.

Just like in the Ninth Circuit did they, did the church in

that case, the Hawaii Cannibis Ministry, did they sincerely

believe?  Maybe, maybe not.  But when it's going to people

who don't sincerely believe and the church doesn't have

194

mechanisms in place to prevent that or to ensure that's not the case, then the government interest is present and does need to be protected to enforcement of the Controlled Substances Act.  Because otherwise, if Mr. Jensen's belief is enough, why couldn't you just throw open the door and say I believe in mushrooms so strongly that you can get them even if you don't believe.  And then the mushrooms law, the Schedule I drugs, the CSA, has just been blown apart because one person -- one person's belief is enough.

THE COURT:  Okay.

MR. STEPHENS:  I appreciate the court's time.  If you have more questions, I'm happy to address them.  If not, I will let Provo, I know that their counsel wanted to speak to this issue and I am happy to give some time to him.

THE COURT:  All right.  Mr. Muhlestein, we didn't forget you.

MR. MUHLESTEIN:  As a preliminary issue, plaintiffs' counsel did bring up a question of the letter relating to the business license.  And unfortunately, I didn't realize about this until quite recently.  I was able to pull some of the forms used for plan for the business license they have not been filed with the court.  But if you would allow me to bring them up on the screen and show them, then we can explain some of the what I think the significance of that letter is.

THE COURT:  Well, I'm happy to let you bring them up and put them on the screen, but I would ask that after the hearing today you file copies of them on the electronic docket or we won't --

MR. MUHLESTEIN:  Sure.

THE COURT:  -- we won't have a record.

MR. MUHLESTEIN:  Sure.  Yeah, so let me see if I can.  Sorry, I don't use a lot of zoom so I'm not -- it will take me a minute to get.

THE COURT:  That's okay.  I use Zoom a lot and I would not be capable of showing documents.

MR. MUHLESTEIN:  There are two that I'm going to want to show, I think, but we'll start.  So I mean I think the key point here this says one of the pages of the license request this is when they fill it out online and here under the activity description it said, "Singularism is a contemporary church and religion dedicated to fostering mental wellness, spiritual growth, and relief from existential suffering."  It is not a matter of saying, you're a religion, it's saying you say you're a religion, this is a business license, therefore, as it later says in it, if your organization engages in activities outside of the scope of the listed operation, such as running a commercial enterprise or selling goods --

THE COURT:  Sir, you need to slow down.  Sir,

196

when you read you go really fast, so if you can --

MR. MUHLESTEIN:  Yeah, like I said I was warned about that.  I apologize.

THE COURT:  All right.

MR. MUHLESTEIN:  I apologize for speaking over Your Honor.  I'm --

THE COURT:  That's okay.  I'm just trying to help out our court reporter because she is fast, but she's not as fast as you were going.

MR. MUHLESTEIN:  Yeah, so a little slower then.  This is just what is in the letter sent January 13th.  It says, "If your organization engages in activities outside of the scope of religious operations such as running a commercial enterprise or selling goods, additional regulations may apply and compliance will be required."  So the way, from my looking into these things and what I have been able to observe, is that in responding to this application this way, it's not saying we affirm, we believe that you're, you know, authentic religion on top of it.  I think even this is not really the same question is whether or not A, a religious exemption might apply, but I think it is more just the whatever employer viewed Singularism on this place says it is a church, it's asking for a business license.  You don't get a business license for a church so they denied that and said if you're doing business, then you

197

App-8:199

still -- then you still need to go through the process of that. But when you are just simply saying I'm a contemporary church and religion instruction on spiritual wellness and spiritual growth, well, and fundamental growth, et cetera, that is not -- that is a church not a business per se.

And then let me see if I can -- and I suppose -- I mean as far as the filing goes, given everything that we have for it but I think that line just saying that is we are a church and elsewhere in the document does again say religious organization, that that is how it is interpreted, not it is not a we believe you're a church per the RFRA standards. I think ultimately there are different standards as well, but that's just not even saying business license is not required for religious organizations. That's not saying we've determined you have an exemption, it's saying if you need a business license apply for the business license, but the religious organization in and of itself doesn't need a business license.

And as far as what I was going to address is somewhat different from what Mr. Stephens said which is that though I certainly join with his arguments regarding the questions over sincerity and questions of the, you know, whether or not drugs can be used and indeed have been used by people not seeking those efforts there, I also sort of

198

wanted to dive a little more into the specific incident here. And given our issues with the video, I guess I won't try and repeat it, maybe it will work better, but I think just discussing a little bit of what you would be able to review a little bit later. You have the basic idea that Ms. Hart, she goes there and she receives the mushrooms. At some point I think later on in the journey she, you know, becomes very paranoid, hysterical, believes she is being kidnapped. You also see, if you watch the whole video, she becomes very hostile to her ex-husband bringing up sort of generic recriminations from the past. Yeah, with the officer, again, I'm not trying to repudiate her character in saying this, but clearly this is an extremely unpleasant situation for her at the end of her interview with the officer when he says, you know, it's is not up to me what you do if you go back, she shakes her head quite vigorously. And this sort of experience, and I guess I should just continue, apart from her, the personal sort of stress she had, there are dangers, you know, beyond just the feelings given her paranoia, some are experiencing bad or potentially injure themselves or injure someone else they believe they're causing, you know, danger to them and preventing these sorts of, you know, extreme, you know, episodes of mental distress and paranoia. That is an interest we have both in terms of the -- that the state has or the city,

anyway, I suppose, both in terms of the -- gees, my mind has gone blank.  But for our purposes, I'm most interested in terms of the public interest with regards to the preliminary injunction which is what we're discussing now.  Having that happen to people is against the public interest.  And when we look at the record overall, I think we can say that or it appears, anyway, that this is not some remote once in a blue moon possibility.  It happens.

As was noted in the TRO hearing, Mr. Jensen said that at that time, and this was December 13th of last month, so obviously there would be more now, there have been fewer than 100 voyagers and they couldn't say exactly how many, I don't think that even necessarily implied there were close to that, that is how we could ballpark it.  I believe Brandi Lee, who is not the founder but who is someone who has had extensive, you know, experience there, said she observed, I think, about 30.

So given the limited number of these that acknowledge to have happened, one of them, if it continues, again, we can't say, oh, there is the one in a hundred chance this is happening, but the fact that given that this is very small organization, hasn't, you know, hasn't sort of reached only has possibly still only had within the two figures of voyagers nevertheless, at least one of them has this sort of extreme experience which one, caused them great

200

pain, caused a risk that others would be injured, or that therapy injured -- or that she would injure herself.  And finally yeah, it does impact others.  It requires response from police and fire and things like that.  And even just the impact on the husband, you know, of having been put in a situation where he is the emergency contact, he is told you have got to go get help for her, he is not a mental health expert, as far as we know.  We only have the background on him, but I think he was someone close to them.  But this sort of event is against the public interest.  And we have, given that it has happened here, there is no reason to believe it won't happen again if the actions continue unabated.

And it also concerns me that plaintiffs don't seem to think that there is anything that they can do to make it safer.  They say basically, they insist, in fact, that they're, you know, following protocols that are used with, you know, other organizations.  But I think that there -- so we can't create a system it is going to prevent this from happening.  They have just got to say, well, the best we can do is keep a close watch on them, we observe them, and we send them to their emergency contact when this happens and then screen them.

THE COURT:  But I suppose, and maybe this isn't a perfect analogy, but anybody taking a prescription might

201

have an adverse reaction.  Now, some of them might manifest in terms of -- I mean I have seen cases where certain mental health medications can cause suicidal ideation in some people.  Those are frequent warnings that we see on a lot of prescription medications.  We've got folks who might take an antibiotic and have a terrible adverse reaction that puts their life at risk.  But I guess that the point is, there is never going to be any system that is going to have a 100 percent guarantee of no adverse reactions, and so we're always engaging in some kind of a balancing test with respect to various interests, are we not?

MR. MUHLESTEIN:  I guess I would say that.  And I think that when we turn to the Psilocybin Act, I think that's sort of comparing them, counsel has already done this to some degree to show sort of the limitations here, which is that Psilocybin Act which again psilocybin is broadly illegal in Utah, but can be used by, you know, certain major health systems.  And granted, they do only have, you know, it's not an extremely detailed act to say very carefully determine what the best safety protocols are, but I think the reason that exists is because they don't know, that's why they have limited this to major health systems which have the resources, and, you know, the sort of general experience with implementing new drugs or just treatments generally.  So there is -- there is a great -- there is more

plausible --

THE COURT:  Right.  I guess I'm just -- the test is if we get that far is least restrictive means.  And I suppose maybe there are some more restrictions that would help in a -- with responding to someone who has an adverse reaction.  But I mean I'm even thinking about, you know, what has happened in the Cannibis industry.

We now have Cannibis that's hitting the market that is 100 or 200 times more powerful than it was back in the '70s and '80s when people were smoking weed.  And I have heard of some terrible psychiatric or physical reactions to that kind of Cannibis, but we still allow people to get medical marijuana cards and to use it relatively unsupervised.

MR. MUHLESTEIN:  And, again, I guess, if we were to that point with psilocybin, even though perhaps from a practical standpoint that might not be a good thing, we wouldn't be having this argument.  Right now it's still in this fairly experimental stage where now plaintiffs here are basically -- even setting aside the religious angles, they certainly they present it as being a combination, right, of both religion and, you know, it is that therapy underlying religion.  But they want to take something which is currently limited to, again, major healthcare systems who will then provide a report to, you know, the Health and

Human Services which may well, you know, that could result in psilocybin becoming, you know, restrictions loosened or it could result in them being tightened.  We just don't know yet.

And I think there is a strong public interest against sort of having an informal quasi-therapeutic system for this.  I mean that's sort of why I think this is so peculiar about plaintiffs wanting to be covered under the Psilocybin Act with another comparison they talked about which is that most of the people under that exception regarding, you know, clergy how they can be a -- how they can be healthcare therapists, LDS bishops are the most common ones.  So, you know, when you combine these thoughts, since if you're under the Psilocybin Act, you don't necessarily need a religious belief in it.  So then when we take their, you know, reasoning to its end, any LDS bishop, I guess, can become his own personal psilocybin therapist because why should he not fit under the exception that is being requested of the plaintiffs here.  And I think the reason why it shouldn't be is that one, the experiences here have shown that there are significant dangers with this drug.  Again, we have at least one major incident that we know of in what had only -- had been in double digits of users, users is not proper, or patients, I suppose, if you want to be a more neutral one.  You have had one of those

and what they're asking is basically to be able to continue to do this, continue to provide this treatment basically without any sort of oversight from anyone that maybe we could hypothetically come up with something, I guess, but they're asking for a -- they're asking for a preliminary injunction based on that we haven't immediately created some sort of a system to make psilocybin completely safe when we -- we've seen the dangers from them even if -- even if we assume that they were to convert to, you know, somehow we can show that everyone was a real true religious believer.

The dangers to the people taking the psilocybin still exist and they're still interested in preventing it. And to clarify, I mean like I say, they relate to one another similar language, but I was more discussing the preliminary injunction in terms of the I think once we actually have full discovery, a full, you know, fuller understanding of all of the circumstances here, then you can make a clearer decision as to what the risks are. But now that we have, again, one significant incident and not a lot of certainty about how this church works, then I'm -- we would be taking grave risks by saying yes, you get to just do it openly without any real oversight and without any hope of prosecution at this stage without knowing more.

THE COURT:  All right.

MR. MUHLESTEIN:  And just briefly, there is also

the -- this came up somewhat in the briefing, I think somewhat in the TRO, still does leave law enforcement in a some untenable position, particularly some of the more broad ones where they say, no -- no searches, no interference. I mean, given that we don't know where these mushrooms come from, we know that they come from Oregon, if they say, as I think was brought up in some of the, I don't know, briefing, what if we stopped a van, an Inge van that has the mushrooms in it? Are we interfering with them? How do we know that Inca or Inge, I'm not sure which it is, is only working with them, only working legitimately. Where are the limits of creating sort of an exception for this particular organization. It is very hard to know at this point. And while it doesn't seem like there is a good way to create one that doesn't, as Mitch Stephens has suggested, it doesn't create this inherent hole in the regulation system which allows for people to use them regardless if they have the religious interest.

THE COURT: All right. Anything else?

MR. MUHLESTEIN: I don't think so, Your Honor. Thank you.

THE COURT: Okay. I'll turn it back over to you, Mr. Bean, for a reply.

MR. BEAN: All right. I will try to do the best I can to get through this concept before five, because I

206

know we're come up with that deadline.  I would just like to start with some of the standards that we talked about applying to the strict scrutiny analysis prongs.  For example, I didn't hear any arguments from defendants here about the specificity of the compelling interest required that needs to be factual evidence regarding Singularism.  So I take it defendants agree with that.

I also didn't hear any arguments against the Supreme Court statement about rejecting the speculative nature of claims, although I think we just heard plenty, especially from Provo City, regarding some speculative claims that have no basis in fact.

THE COURT:  What do we do with -- I mean we do now have at least one documented case where it appears that the administration of the psilocybin had not anything to do with a religious experience and everything to do with a referral from a mental health practitioner who believed in psilocybin as a mental health drug but not necessarily a religion so she sent a client to see Mr. Jensen?

MR. BEAN:  Yes.  And I know you --

THE COURT:  That's a -- let's just say that is -- that puts a significant -- I guess it sheds a significantly different light on what's going on here than what was presented at the TRO.

MR. BEAN:  Yes.  And let me clear up that

207

confusion.  I know since it looks like we're exceeding

somewhat our stipulation about what evidence is going to

come in here, I do want to share two things.

What I'm currently sharing on my screen is a

document that has already been admitted, excuse me, let me

see if I can take that over.  Oh, boy, Zoom is interfering

my view.  One moment, please.  Okay.  Can the court see that

now?

THE COURT:  Yes.

MR. BEAN:  So what this document is, it has been

filed as 9. -- or 9-3 ECF.  This is a blank waiver form that

Singularism uses for every single one of its Voyagers.  I

won't go through it in detail, but it frequently talks about

the religious context of Singularism and that these

individuals are coming to this space for that in particular.

I'll just kind of look at this paragraph here,

Declaration of Personal Spiritual Necessity.  It begins, "I

recognize and sincerely declare that participating in this

Entheogenic ceremony is vital and central" and it just

continues to talk about how it is integral to spiritual

journey.

THE COURT:  Well, I mean I understand that, but I

suppose if everyone who went to the marijuana church that

was the subject of one of the cases that we have been

talking about had signed a paper that said, you know, I'm

declaring my personal spiritual necessity through pot, I don't know that it would have changed nor should it have changed the outcome.  I mean I guess the question is, if we're looking at the potential for having this psilocybin be distributed to folks who don't have a sincere religious belief, maybe the sincerity of Mr. Jensen's religious belief is not the issue.  The issue is whether others are taking advantage of him in order to just get the drug.

MR. BEAN:  Yes, Your Honor.  And in response to that, you know, I can certainly see in other cases, perhaps in the *Christie* case, for example, the facts indicating that there were individuals who were in fact, you know, essentially, you know, committing fraud or something upon the organization to induce them to provide them information.

But the fact of the matter is we don't have any evidence here that that has happened or that any of -- any factual individual has presented, has got past the gate for some reason other than a secular nature.  And I know that defenses counsel has kind of raised those videos of Ms. Hart to indicate that.  And for that reason, I want to show you just the last page of her particular waiver form.  And I'm happy to, after maybe doing some redactions on this document, provide the full document, it needs to be under seal, but this is the last page where she said her intention statement.  And here she says that, "Her intention is to

heal spiritually and connect with God."  So we do have specific evidence about Ms. Hart that she came to Singularism for this particular purpose.  She may not have mentioned that and, you know, by happenstance in her voluntary statement she just puts it in writing, or when they were there in the law enforcement capacity but that's what was indicated to Singularism and has no other reason to suggest otherwise.

THE COURT:  Is that in the record?

MR. BEAN:  It is not in the record, so I will file it.

MR. STEPHENS:  I'm going to object, Your Honor. This isn't in the record, it hasn't been provided to me, and it's not part of the stipulation that's in front of us.

THE COURT:  Well, it sounds like maybe you presented something that wasn't part of the stipulation either.  Why don't the two of you get together, and if there is relevant evidence regarding this point, why don't you agree that it can all be submitted within three days from -- three business days from today, and let's get it on the record.

MR. BEAN:  We have no objection to that, Your Honor.

MR. STEPHENS:  And I am happy to meet and confer with counsel.  I just, without knowing what else they have,

210

App-8:212

it's hard for me to say that we wouldn't have changed witnesses or subpoenas or things.

THE COURT:  Well, if that's the case, then let me know that.  We'll convene a very short hearing.  I mean I -- I want to decide this case on the available facts, and I don't think it behooves anyone to keep certain things from me based on technicalities.

MR. STEPHENS:  I agree with that, Your Honor.

THE COURT:  Okay.

MR. BEAN:  Your Honor, we wouldn't have exceeded the stipulation, you know, for example the information about the Divine Assembly, its location, that was not part of the stipulation, nor was the information that Provo City shared about, you know, some documents behind the Provo City, you know, statement about the religious exemption from business licensure.  So that's why I bring this up.

THE COURT:  That is a fluid process.  I'm asking questions, you're responding.  I think everything is operating in good faith.  If there is relevant evidence, I want to see it.

MR. BEAN:  Certainly.  Well, along that point, I mean so we have -- we have Ms. Hart's statement there regarding what her spiritual intention was.  I do think we have to stick to what the Supreme Court has said issuing a sort of speculative argument.  And I fear, and I haven't

211

App-8:213

seen any evidence presented, other than this idea that

perhaps, you know, Ms. Hart is an exemplar of some sort of

distribution of drugs which I haven't seen any example of in

the documents.

The other thing I want to say in regard to

Ms. Hart is, you know, I certainly encourage the court to

review the rest of the videos.  On Page 10 of our

supplemental brief, you know, we took some of the statements

from the video where she meets with law enforcement the next

day.  You could tell from the video that she was, you know,

significantly different, she had retained coherency.  And so

I'm just going to point the court to that section of our

brief, I won't rehearse the statements for you, but they're

certainly significant in indicating how she felt about the

event even after enduring such a difficult experience that

that was.

Before I get into just a few minute points, I did

also want to point out that defense has not spent any time

discussing the *O Centro* case and how it indicates that just

assertions about governmental uniformity in application of

the Controlled Substances Act don't win the day.  And so

again, I refer the court back to that for pretty lengthy

discussion in both *O Centro* that is directly relevant here.

As far as the religiosity issue, I'll just point

the court back to the Provo City letter first.  I think it's

pretty significant what's contained in there.  I didn't hear an argument that somehow, you know, Provo City or, you know, all defendants for that matter, are not estopped from arguing under, you know, *Meyers* or other issues.

THE COURT:  You know, that's an interesting question because I think, and maybe I'm wrong, but when someone comes in and applies for a business license and then they say they're a church, I would suspect you've got some clerk who is checking boxes and not really thinking about things.  And I'm not sure that it's tantamount to a reasoned decision by the municipal authorities that this is a legitimate church.  I mean it's -- it's a reaction to a checked box kind of a thing and I -- I just I'm really struggling with how much weight to give that.

MR. BEAN:  Yeah.  And I would tend to agree in the absence of that specific Provo City Code Section I cited earlier which is 6.01.140 which I would just like to quote. It says that, quote, "With respect to the exemptions from business license requirements claimed because of charitable, religious, or other nonprofit status, the person claiming the exemption shall have the burden of establishing that exemption."  And for what I take from that is they're placing the burden of establishing an exemption on the applicant.  But however, and they are making as Provo City, a determination whether that showing has been made.  And we

213

have seen here that Provo essentially took the information received, it said that it passed the burden, passed that information back to Singularism.  So I do think it is a pretty significant judgment call that they did in fact make.

THE COURT:  So I guess then we get back to maybe the flip side of the question that I asked Mr. Stephens which is legitimate religious organizations can engage in nonreligious activities, I suppose, and it doesn't mean that they're not a church or a religious organization, just like my congregation can throw a Christmas party as a social function.  So then I guess it comes down to is in fact the psilocybin really the lynchpin of this religion, or is this religion just which based on Mr. Stephens argument doesn't really have, I suppose, any kind of -- well, as he put it, you can believe whatever you want and believe it in -- at the same time that you believe in Catholicism or Judaism or Hinduism, it is just additive.  Then I guess you're to the point of deciding is the psilocybin just simply something that's not essential or is the religious organization a front for distribution of psilocybin.  I mean I think that's the argument he's making.

MR. BEAN:  Right.  And so let me start on that with referring the court back to the *Hobby Lobby* decision. I wanted to quote the specific portion that I have been referring to about how money enters the fray here.  In that

decision, the court explained that faith infused businesses don't lose religious protections just because they seek, quote, "To make a profit as a retail merchant," end quote, or because, quote, "The purpose of such corporations is simply to make money."

And Singularism is not asserting that that is its purpose. But if it were, it appears the U.S. Supreme Court has said that that would be a perfectly legitimate purpose allowing for RFRA protections.

And in that case, at issue, there was a gigantic arts and craft store that was making the argument, for example, which didn't even provide particular religious services to anyone for which it was doing business.

THE COURT: But didn't that have to do with whether or not they had to contribute to a healthcare plan that they found objectionable on religious grounds? And I think that's a different context than a claim that this organization really doesn't have any sincerely held beliefs and exist only to facilitate distribution of a Schedule I Controlled Substance.

MR. BEAN: Yeah. And I understand how you might draw some distinction like that. The next thing I wanted to point the court to, which is also cited at Page 26 of one of our briefs which is ECF Document 9-18, is identifying specifically what you said, Your Honor. Other organizations

215

that are of religious character but are providing services to the public even for cost.  Now, we have provided an example of Christian Therapy Services, for example, that are providing therapeutic services to others.  Or Catholic Social Services providing services, you know, to others.

And again, you know, Singularism is not the type that is asserting that what it is doing -- it is religious, but it serves all comers of no religious character and doesn't mind their religious character.  Because it does make a religious requirement and asks of them as a critical step in their screening procedure as indicated by the waiver I showed the court.

Now, let's see, I'm cognizant of time, Your Honor.  What would you like me to --

THE COURT:  Well, I mean -- I don't want to cut you off if there are things that you really want to say.  I mean 5:00 doesn't cause the Zoom screen to blow up although I am sensitive to everyone's schedules.  If folks have another 10 or 15 minutes to get this wrapped up, we can do that.  If they don't, I guess we could come back at nine in the morning because that day was set aside as well.  So I'm amenable to counsel's desires on this point.

MR. BEAN:  Certainly.  I think I could get through what we need to in 10, 15 minutes assuming we don't have a lot of questions here.  But I'll try to do that if

216

that is amenable.

THE COURT:  Well, let's see what Mr. Muhlestein and Mr. Stephens think and what our court reporter thinks.

MR. STEPHENS:  If there is no objection from the court reporter and the court staff, I'm happy to get this wrapped up.  I think that makes the most sense.

THE COURT:  Ms. Robinson?

COURT REPORTER:  I'm fine, Judge, however long you want to stay.

THE COURT:  Okay.  Mr. Muhlestein?

MR. MUHLESTEIN:  Yes.  My normal hours are until six, so certainly it's definitely more than 15 more minutes.

THE COURT:  Okay.  Mr. Bean, back to you.

MR. BEAN:  Okay, thank you.  I'll do my best here.

As far as other elements of, you know, spirituality here and whether this is a religion or not, I'm not going to take the court through the whole TRO transcript again.  I will just cite the court back to Plaintiffs' Exhibits R, P, Q and S.  It's pages and pages and pages of doctrinal statements.  It includes information about creation stories, different connections, you know, that golden thread concept is mentioned, it's explained in extensive detail.  The necessity of psilocybin to essentially the existence of the human and the access to the

217

App-8:219

divine self and the divine itself.  So there is a lot, lot there.  I'm not going to spend all of the time there, it will take us a long time to do that, but the weight of the evidence, we think, certainly weighs in favor of the religiosity there even if we need to go factor by factor through some test to indicate that.

Which as I have said, I do not think the Utah RFRA requires with its definition saying that religious exercise of religion is protected even if it is not compulsory or central to a larger system of religious belief.

Now, just a very brief point as to the issue of Divine Assembly.  And this is something that I will have to file after with the court.  And let's see if I can actually share it.  What I'm sharing is just a screenshot of an Instagram social media post.  And the reason we're sharing this is for the content in the comment which says, 2-Healing Collective, 532 East 800 North, Orem, of about the -- up at the top you can see mushroom sacrament and to the left of that you have a circle with T-D-A inside of it.  TDA is The Divine Assembly.  And I'll indicate to the court, and we could certainly lay foundation further for this and testimony, but indicating that, in fact, The Divine Assembly is operating in Orem and below it, it says, "We call it church, but don't let that trigger you.  It's just a place

to meet other like-minded community members and take advantage of learning, growing, more into the space of mushroom healing."

THE COURT:  Well, I guess what that doesn't say is whether they just have a group of like-minded people meeting in Orem talking about mushrooms, or whether they're actually having mushroom experiences in Orem, or passing out mushroom kits or selling mushrooms.  I mean maybe -- maybe it's a support group in Orem, but the mushroom distribution goes on in Salt Lake County.

MR. BEAN:  Certainly.  And we're not asserting it says more than what it does.  So that just raised some evidence of activity in Utah County with The Divine Assembly.

I did want to speak to the *Christie* decision that was talked about.  And we think, you know, the facts of that case are really significantly distinguishable from what we have here.  I won't take the court through, you know, line-by-line with that, but it is worth noting, for example, it looks like in that case the website of that organization assured that members would not be subject to arrest or prosecution or conviction on marijuana charges as soon as they sign up.  That signing up was very easy with the reverend even boasting about, you know, people enrolling, enrolling people who came to Hawaii on cruise ships, for

219

example.  Similar to The Devine Assembly, sanctuary kits were available for purchase through the website.  It doesn't appear that there were any minimum age requirements and members could be -- and minors could be members.  The ministry had never recalled rejecting anyone from acceptance of the faith at all.

The Cannibis there at issue was obtained from various sources including the black market, and was consumed either during, on-site at the location, or members could pick up from the location Cannibis and take it to wherever they wanted to consume it.  And essentially, the distribution that allowed people to show up and receive it without even having to meet with the spiritual leader at all including where there was a line out the door for the individuals lining up to, you know, grab a bag of Cannibis and head out with distributing half a pound of Cannibis a day to 60 or 70 people.

So I could go on about that, but the facts are just so substantially different than the case at issue indicating that there was a lot of factual indications of governmental interest in that case, but those factual indications are absent from what we have here.  What I have heard is just largely speculative evidence or there is a risk or there is a potential for what could happen, right?  And I think that even if we, you know, tested those risk

applications, the same are all true in the context of the Utah Psilocybin Act under the healthcare systems watch.

THE COURT:  How much -- how many doses of voyager mushrooms does your client contend were seized?

MR. BEAN:  What my understanding is, what Mr. Jensen would say, would be a third or so of what was represented.

THE COURT:  So about 30 doses?

MR. BEAN:  Um, probably so, yeah.

THE COURT:  30 to 40 doses?

MR. BEAN:  Yeah.  Again, calling on my math here, but a third of some sort.

Okay.  I'm just checking my notes here.  And last, there were some assertions about, you know, just general assertions about, you know, adverse effects for people experiencing psilocybin are against the public good. And I think, you know, that could be an argument if the Utah Controlled Substance Act bans psilocybin in all instances. But where the Utah legislature has acted to allow psilocybin to be administered in healthcare organizations with, you know, no particular provisions regarding what happens in the event of adverse event.  I don't think that the legislature has indicated that it is against the public good to, you know, or it is against the public good to prevent any adverse effects.

221

App-8:223

Let's see here.  Okay.  I think that is all I have for now, Your Honor, unless you have any further questions?

THE COURT:  All right.  I can't think of any questions now, but it sounds like there may be some loose evidentiary ends that counsel would need to wrap up.  And what I would like to do is reflect on this this evening and just decide whether there are any issues or cases that I would like to see supplemental briefing on.  If there are, I will issue a docket text order tomorrow asking you to file simultaneous briefs on those issues by the end of next week.  Hopefully you can work out any evidentiary issues or concerns that you have by then as well.  If you need my help in resolving any of those, you can let Ms. Hola know and we can set up a brief virtual hearing to address those things.

And then I will, once I have all of that information, I will quickly, to the best of my ability, get an order out.  And in the interim, I'll leave in place the very limited TRO with the portion relating to the mushrooms stayed.  So we'll just maintain the status quo for another week or so while I get the rest of the information that I need to issue a ruling on the three motions that are in front of the court.

If anyone has any objection to that procedure, please let me know.  I'm happy to entertain any objections.

222

MR. STEPHENS:  I don't have an objection, Your Honor, I have maybe a personal request.

THE COURT:  Okay.

MR. STEPHENS:  If you want supplemental briefing, can I get a few extra days only because I have four summary judgment replies that are -- have been extended and now due next Friday given the hearing.

THE COURT:  I think that's fair.  I mean I -- I mean I am sensitive to the fact that we have, I think, very legitimate claims on both sides with respect to the injunction issue.  We're trying to balance, you know, the government interest against a claim of infringement on religion, but I also think it's important to get this right and to not issue something without adequate briefing on all of it.  I think there are some tricky legal issues, as well as factual issues, that are embedded in this dispute.  And so how many additional days do you need, Mr. Stephens?

MR. STEPHENS:  Not many.  I agree with you that it is important to get this resolved quickly.  And I know the court has moved things around to get us here.  If I could have Wednesday instead of -- the following Wednesday, that would be great.

THE COURT:  Okay.  Is that okay with you Mr. Muhlestein and Mr. Bean?

MR. BEAN:  Yes.  I'm just checking my calendar.

One moment.  So that looks like it would be February the 5th; is that right?

THE COURT:  I guess I need to pull up a calendar. Let's see, today's the -- so I believe that you are correct, it would be February 5th.

MR. BEAN:  That looks doable for us.  Thank you.

THE COURT:  Okay.  So like I said, I will get an order out tomorrow and let you know if there is anything I need supplemental briefing on.  I think you can just file simultaneous briefs.  We don't need to let you respond to each other.  Give me your best arguments on whatever issues that I might identify.  Maybe I won't identify any, but I do want to go back over my notes and if there are questions that I am unclear on, for example, one of the questions that struck me is something maybe needing supplemental briefing would be the question of 1983 and how that plays in with the Anti-Injunction Act and aiding the court's jurisdiction which Mr. Stephens pointed out really hadn't been briefed.

So that's one issue, but I'll try and formulate that in a coherent -- into a coherent issue or question. There may be others.  I just want to think about it overnight.  I'll get something out tomorrow, and then I suppose that would give us everything we need to get an opinion out once we have an opportunity to digest what you file on February 5th.

Is there anything else we need to address before we adjourn?

MR. BEAN:  Not from our side, Your Honor.  Thank you.

MR. STEPHENS:  No, Your Honor.  Thank you for your time.

THE COURT:  All right.  And Mr. Muhlestein, anything else?

MR. MUHLESTEIN:  Nothing else, Your Honor.  Thank you.

THE COURT:  Okay.  That sounds good.  I'll look forward to hearing from you.  And good luck with all of the work you have pushed to the side while you have been working on this.

MR. STEPHENS:  Thank you, Your Honor.

(Court adjourned at 5:20 p.m.)

**REPORTER'S CERTIFICATE**

I, Laura W. Robinson, Certified Shorthand Reporter, Registered Professional Reporter and Notary Public within and for the County of Salt Lake, State of Utah, do hereby certify:

That the foregoing proceedings were taken before me at the time and place set forth herein and were taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

That the foregoing pages contain a true and correct transcription of my said shorthand notes so taken.

In witness whereof I have subscribed my name this 11th day of February, 2025.


___*Laura W. Robinson*_____

Laura W. Robinson

RPR, FCRR, CSR, CP