Case No. 25-4115

# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

BRIDGER LEE JENSEN, SINGULARISM, AND PSYCHE HEALING AND
BRIDGING, LLC,

*Plaintiffs-Appellees,*

v.

UTAH COUNTY, PROVO CITY, AND JEFFREY GRAY,

*Defendants-Appellants,*

*On appeal from the United States District Court for the District of Utah
Case No. 2:24-cv-00887-JNP-CMR, the Honorable Judge N. Parrish*

## APPELLEES' BRIEF
Oral Argument Requested

Tanner J. Bean
Jacqueline M. Rosen
FABIAN VANCOTT
95 South State Street, Suite 2300
Salt Lake City, Utah 84111
(801) 531-8900
tbean@fabianvancott.com
FEBRUARY 11, 2026                   jrosen@fabianvancott.com
*Counsel for Plaintiffs - Appellees*

1

# TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................... 2

TABLE OF AUTHORITIES.................................................................4

STATEMENT OF RELATED CASES.................................................11

GLOSSARY OF TERMS....................................................................12

JURISDICTIONAL STATEMENT.....................................................13

STATEMENT OF THE ISSUES.........................................................14

INTRODUCTION...............................................................................16

STATEMENT OF THE CASE.............................................................18

SUMMARY OF THE ARGUMENT...................................................34

ARGUMENT......................................................................................36

   I. This Court Lacks Jurisdiction ................................................36

      A. The Government Waived Its Anti-suit Injunction Arguments by Abandoning the State Criminal Case Against Mr. Jensen. ....36

      B. The Motion to Dismiss Denial Is Not Appealable....................38

   II. The District Court Properly Enjoined the State Court...............41

      A. Anti-suit Injunction Standard of Review. .................................42

      B. The District Court's Anti-Suit Injunction Analysis Was Proper.........................................................................................42

         i. Exceptions to the Anti-Injunction Act Provided the District Court Authority to Enjoin..................................................43

         ii. *Younger* Does Not Apply..............................................45

         iii. Even if *Younger* Applies, Two Exceptions Are Met. .......49

   III. The District Court Correctly Denied the Motion to Dismiss. 52

      A. Motion to Dismiss Standard of Review. ...................................52

      B. The District Court Correctly Held Singularism's First Amendment Claim Merits Strict Scrutiny Review...................53

         i. The Utah CSA Is Not Generally Applicable......................53

ii. The Utah CSA Treats Secular Activity More Favorably Than Singularism's Religious Exercise. .............................. 59

iii. The Utah CSA Contains a Formal Mechanism for Granting Individual Exemptions. ......................................... 67

C. The District Court Correctly Held the Government Advanced No Relevant Immunity Argument on Singularism's Fourth Amendment Claim. ................................................................. 70

CONCLUSION. ............................................................................. 79

STATEMENT REGARDING ORAL ARGUMENT. ........................... 79

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT. ... 80

CERTIFICATE OF DIGITAL SUBMISSION. ................................... 81

# TABLE OF AUTHORITIES

Pages

Cases

*ACORN v. Municipality of Golden,*
  744 F.2d 739 (10th Cir. 1984) ..................................................................46

*Amantullah v. Colo. Bd. of Med.,*
  *Exams.*, 187 F.3d 1160 (10th Cir. 1999) ...............................................42

*Armco, Inc. v. United Steelworkers of America,*
  280 F.3d 669 (6th Cir. 2002) ...................................................................48

*Berg v. State,*
  2004 UT App 337, 100 P.3d 261 ..............................................................48

*Brock v. Flowers Foods, Inc.,*
  121 F.4th 753 (10th Cir. 2024) .................................................39, 40, 41

*Buckley v. Fitzsimmons,*
  509 U.S. 259 (1993) ..................................................................................70

*Burwell v. Hobby Lobby Stores, Inc.,*
  573 U.S. 682 (2014) ..................................................................................58

*California v. Trippet,*
  56 Cal. App. 4th 1532 (Cal. Ct. App. 1997) ...........................................63

*Chick Kam Choo v. Exxon Corp.,*
  486 U.S. 140 (1988) ..................................................................................43

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah.,*
  508 U.S. 520 (1993) .............................................................................55, 56

*Cradle of Liberty Council, Inc. v. City of Philadelphia,*
  No. CIV.A.08-2429, 2009 WL 3921140 (E.D. Pa. Nov. 18, 2009)...46, 47

*Crowson v. Washington Cnty. Utah,*
  983 F.3d 1166 (10th Cir. 2020) ..........................................................73, 77

*Davis Int'l, LLC v. New Start Grp. Corp.,*
  367 F. App'x 334 (3d Cir. 2010) ..............................................................44

*Do No Harm v. Pfizer Inc.,*
  126 F.4th 109 (2d Cir. 2025) ....................................................................38

4

*Doe v. Weiser,*
No. 25-1057, 2025 WL 2306635 (10th Cir. Mar. 13, 2025) .................39

*Does 1-11 v. Bd. of Regents of Univ. of Colorado,*
100 F.4th 1251 (10th Cir. 2024) ....................... 55, 57, 62, 63, 65, 67, 69

*Employment Division, Department of Human Resources of Oregon v. Smith,*
494 U.S. 872 (1990).................................................................................53

*Fenn v. City of Truth or Consequences,*
983 F.3d 1143 (10th Cir. 2020)....................................................72, 73

*Fulton v. City of Philadelphia, Pennsylvania,*
593 U.S. 522 (2021).........................54, 56, 57, 58, 61, 62, 63, 68, 69, 70

*Garcia v. Salt Lake Cty.,*
768 F.2d 303 (10th Cir. 1985)...........................................................73

*Gonzales v. O Centro Espírita Beneficente União do Vegetal,*
546 U.S. 418 (2006)......................................................................58, 63

*Grace United Methodist Church v. Cheyenne,*
451 F.3d 643 (10th Cir. 2006)......................................................55, 57

*Grays v. Munn,*
No. 24-1253, 2025 WL 1924231 (10th Cir. July 14, 2025)...................73

*Guttman v. New Mexico,*
325 F. App'x 687 (10th Cir. 2009)......................................................46

*Hansen Found., Inc. v. City of Atl. City,*
No. 121CV20392NLHEAP, 2023 WL 2583458 (D.N.J. Mar. 21, 2023)
.................................................................................................................47

*Hatten-Gonzales v. Hyde,*
579 F.3d 1159 (10th Cir. 2009).........................................................39

*Hawaii v. Sunderland,*
168 P.3d 526 (Haw. 2007)...................................................................63

*In re Syngenta AG MIR 162 Corn Litig.*,
   61 F.4th 1126 (10th Cir. 2023) ................................... 36, 37, 38, 53, 74

*Johnson v. Smith,*
   104 F.4th 153 (10th Cir. 2024) .........................................................52

*Kansas Pub. Emp. Retirement Sys. v. Reimer Kroger Assocs.*,
   77 F.3d 1063 (8th Cir. 1996)......................................................44, 45

*Kennedy v. Bremerton Sch. Dist.*,
   597 U.S. 507 (2022)...........................................................54, 62, 63

*Lapides v. Bd. of Regents of the Univ. Sys. of Ga.*,
   535 U.S. 613 (2002)..........................................................................46

*Lucas v. Bd. of Cnty. Commissioners of Cnty. for Larimer Cnty.*
   *Colorado,*
   No. 22-1259, 2023 WL 8271988 (10th Cir. Nov. 30, 2023)...................78

*Mahmoud v. Taylor,*
   606 U.S. 522 (2025)..........................................................54 58, 59

*McRae & Deland v. Feltch,*
   669 P.2d 404 (Utah 1983) .................................................................48

*Melton v. City of Oklahoma City,*
   879 F.2d 706 (10th Cir.1989)............................................................71

*Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n,*
   457 U.S. 423 (1982)..........................................................................49

*Mitchum v. Foster,*
   407 U.S. 225 (1972).....................................................................44, 45

*Moss v. Kopp,*
   559 F.3d 1155 (10th Cir. 2009).......................................71, 72, 76, 77

*Multi Denominational Ministry of Cannabis & Rastafari, Inc. v.*
   *Gonzales,*
   474 F. Supp. 2d 1133 (N.D. Cal. 2007) .............................................63

*Munaf v. Geren,*
   553 U.S. 674 (2008)..........................................................................38

*O Centro Espirita Beneficiente Espírita Beneficente União v. Ashcroft,*
   282 F. Supp. 2d 1236 (D.N.M. 2002) .................................................63

*Ohio Bureau of Employment Servs. v. Dayton Christian Schools, Inc.*,
477 U.S. 61 (1986)......................................................................46

*Ohio v. Cook*,
No. 5-19-26, 2020 WL 615076 (Ohio Ct. App. Feb. 10, 2020) ..............63

*Oklevueha Native Am. Church of Haw., Inc. v. Holder*,
No. 09-cv-00336, 2012 WL 6738532 (D. Haw. Dec. 31, 2012).............63

*Olsen v. Mukasey*,
541 F.3d 827 (8th Cir. 2008)......................................................63

*Peyote Way Church of God, Inc. v. Thornburgh*,
922 F.2d 1210 (5th Cir. 1991)....................................................63

*Phelps v. Hamilton*,
122 F.3d 885 (10th Cir. 1997)....................................................50

*Quintana v. Santa Fe Cnty. Bd. of Commissioners*,
973 F.3d 1022 (10th Cir. 2020)..................................................73

*Renteria v. New Mexico Off. of Superintendent of Ins.*,
No. 23-2123, 2025 WL 635754 (10th Cir. Feb. 27, 2025)...54, 55, 62, 64

*Rocky Mountain Gun Owners v. Williams*,
671 F. App'x 1021 (10th Cir. 2016)..............................................42

*S. Bay United Pentecostal Church v. Newsom*,
141 S. Ct. 716 (2021)...............................................................56

*Sherbert v. Verner*,
374 U.S. 398 (1963).................................................................68

*St. Mary Cath. Par. in Littleton v. Roy*,
154 F.4th 752 (10th Cir. 2025) .........................................54, 57, 62, 63

*Tandon v. Newsom*,
593 U.S. 61 (2021)..................................55, 56, 57, 60, 61, 62, 63, 64, 65

*Texas Ass'n of Bus. v. Earle*,
388 F.3d 515 (5th Cir. 2004).....................................................42

*Tooele Cnty. v. U.S.*,
820 F.3d 1183 (10th Cir. 2016)..................................................42

*Transcon. Gas Pipe Line Co., LLC v. Pennsylvania Env't Hearing Bd.*,
108 F.4th 144 (3d Cir.)............................................................38

*Trujillo v. Wyoming,*
  2 P.3d 567 (Wyo. 2000) ...................................................................63

*United States v. Boyll,*
  774 F. Supp. 1333 (D.N.M. 1991) .......................................................64

*United States v. Christie,*
  825 F.3d 1048 (9th Cir. 2016) ..........................................................62

*United States v. Meyers,*
  95 F.3d 1475 (10th Cir. 1996) ..........................................................62

*Waller v. City & Cnty. of Denver,*
  932 F.3d 1277 (10th Cir. 2019) .........................................................72

*Wilson v. Thompson,*
  593 F.2d 1375 (5th Cir. 1979) .....................................................42, 50

*Younger v. Harris,*
  401 U.S. 37 (1971) ..........................30, 42, 43, 45, 46, 47, 48, 49, 50, 52

Statutes

21 U.S.C. § 811 ...............................................................................12

28 U.S.C. § 1292 ..................................................................... 13, 14, 36

28 U.S.C. § 1331.............................................................................13

28 U.S.C. § 1367 ............................................................................13

28 U.S.C. § 1441 ............................................................................13

28 U.S.C. § 1446 ...................................................................... 13, 44

28 U.S.C. § 2283 ...................................................................... 12, 43

42 U.S.C. § 1983 ...................................................................... 29, 43

42 U.S.C. § 2000bb-1 ......................................................................12

Utah Code § 58-37-1 ......................................................................12

Utah Code § 58-37-3.5 ........................................ 12, 18, 19, 59, 60, 62

Utah Code § 58-37-6 ................................................................ 19, 67

Utah Code § 58-37-8 ....................................................................................19

Utah Code § 58-60-107 ................................................................ 12, 19, 68

Utah Code § 63G-33-101 ...........................................................................12


Rules


10th Cir. R. 25.5 .........................................................................................81

10th Cir. R. 32 ............................................................................................80

Fed. R. App. P. 32 ......................................................................................80

Utah R. Civ. P. 42 ......................................................................................48


Other Authorities


Docket, *State of Utah v. Bridger Lee Jensen*, Case No. 241404407
   (Fourth Judicial District Court, Utah County, State of
   Utah)...............................................................................................32

*H.B. 167 Mental Illness Psychotherapy Drug Task Force*, Utah State
   Legislature (2022) ................................................................... 19, 62

Minutes Waiver Hearing/Order of Dismissal, *State of Utah v. Bridger
   Lee Jensen*, Case No. 241404407 (Fourth Judicial District Court,
   Utah County, State of
   Utah).........................................................................................31, 32

Stephanie H. Barclay, *Replacing* Smith,
   133 Yale L.J. Forum 436 (2023) ......................................................54

*S.B. 150 Exercise of Religion Amendments*, Utah State Legislature
   (2024)................................................................................................12

*S.B. 266 Medical Amendments,* Utah State Legislature (2024) ...... 12, 18

*Utah Mental Illness Psychotherapy Drug Task Force Report to the Utah
   Legislature*, Utah State Legislature (2022)....................................19

Wright & Miller, Fed. Prac. & Proc. § 4225 Exceptions to the Act—In General—Necessary in Aid of Its Jurisdiction (3d ed. 2024)...............44

## STATEMENT OF RELATED CASES

(1)    *Bridger Lee Jensen et. al. v. Utah County et. al.*, Case No. 240406123 (Fourth Judicial District Court, Utah County, State of Utah)

(2)    *State of Utah v. Bridger Lee Jensen*, Case No. 241404407 (Fourth Judicial District Court, Utah County, State of Utah)

## GLOSSARY OF TERMS

**AIA**: Anti-Injunction Act, codified as 28 U.S.C. § 2283.

**Clergy Exemption**: A section of the Utah Mental Health Professional Practice Act exempting clergy from the medical licensure requirement for the practice of mental health therapy, codified as Utah Code § 58-60-107(2)(b).

**CSA**: A controlled substances act.

**Federal CSA**: The federal Controlled Substances Act, codified as 21 U.S.C. § 811 *et seq.*

**The FDA**: The United States Food and Drug Administration.

**The government**: Used to collectively represent Defendants-Appellees Utah County, Provo City, and Jeffrey Gray.

**RFRA**: The federal Religious Freedom Restoration Act, codified as 42 U.S.C. § 2000bb-1 *et seq.*

**Singularism**: Used to collectively represent Plaintiffs-Appellants Bridger Lee Jensen, Singularism, and Psyche Healing and Bridging, LLC.

**TRO**: Temporary restraining order.

**Utah CSA**: Utah Controlled Substances Act, codified as Utah Code § 58-37-1 *et seq.*

**Psilocybin**: A naturally occurring compound found in many species of mushrooms with hallucinogenic and serotonergic effects.

**Psilocybin Act**: S.B. 266 Medical Amendments (2024), now codified as a section within the Utah Controlled Substances Act as Utah Code § 58-37-3.5.

**URFRA**: Utah Religious Freedom Restoration Act, otherwise known as S.B. 150 Exercise of Religion Amendments (2024), now codified as Utah Code § 63G-33-101 *et seq.*

12

## <u>JURISDICTIONAL STATEMENT</u>

Singularism filed its case in Utah state court. App-1:040-75.[1] The government removed under 28 U.S.C. §§ 1441, 1446. App-1:035-38. The district court possessed jurisdiction under 28 U.S.C. §§ 1331, 1367. App-4:119-31.

This Court should dismiss the government's entire appeal for lack of jurisdiction. While an anti-suit injunction is generally appealable on an interlocutory basis under 28 U.S.C. § 1292(a)(1), the government forfeited and waived its anti-suit injunction arguments. Denials of motions to dismiss are not generally appealable on an interlocutory basis, and here, the denial of the government's motion to dismiss does not qualify for pendent jurisdiction, even if the Court asserts jurisdiction over the anti-suit injunction order. Otherwise, the government's appeal was timely. App-5:162-95.

---

[1]    Citations to the appendix will be formatted as "App-[Volume Number]:[Bates Number]."

## STATEMENT OF THE ISSUES

1.       Whether the Court has jurisdiction to review the two orders giving rise to this appeal where (1) interlocutory review of an anti-suit injunction is generally permitted under 28 U.S.C. § 1292(a)(1), but where the government waived its anti-suit injunction arguments and where (2) interlocutory review of a denial of a motion to dismiss is generally not permitted and the motion-to-dismiss analysis is not interwoven with the anti-suit-injunction analysis?

2.       Whether the district court was authorized to enjoin a state criminal proceeding where the government concedes the Anti-suit Injunction Act did not prohibit the injunction and where *Younger* abstention does not apply because of the government's removal to federal court and its bad faith?

3.       Whether the district court erred when, under recent First Amendment caselaw governing when a law is "generally applicable," the district court held strict scrutiny review applies to Singularism's religious freedom claim where (1) a secular exception exists which the government refuses to extend to Singularism's comparable religious

practice and (2) a system of other exceptions exist which the government refuses to extend to Singularism's religious practice?

4.      Whether the district court erred when it held the government provided no basis for dismissing Singularism's Fourth Amendment claim where the government only advanced arguments regarding dismissed police officer defendants, but failed to argue immunity for the remaining municipal defendants?

## INTRODUCTION

The government regrets its removal from state to federal court. Following a string of unfavorable decisions, it now attempts to flee. The Court should not permit it.

Having failed to appeal the TRO and preliminary injunction which held Singularism is likely to succeed on the merits of its state statutory religious freedom claim, the government tries to strap an unappealable order—a denial of a motion to dismiss—onto an appealable order—an anti-suit injunction. But this fails. The government forfeited and waived its arguments against the anti-suit injunction and this Court lacks pendent jurisdiction over the motion to dismiss. The Court should dismiss the entire appeal.

Even if the Court proceeds to the merits, it should stop the government's gamesmanship, hold the government to its chosen forum, and prevent the government from capitalizing on bad faith tactics.

The Court should confirm that where the government creates a secular exception to a law, it cannot refuse to provide a similar exception for religious practice. That inequality amounts to secular preference and merits strict scrutiny review under the First Amendment. And on

16

Singularism's Fourth Amendment claim, the Court should hold the government has failed to advance any immunity argument for the municipal entities.

## STATEMENT OF THE CASE

*Utah's Legalization of Secular Psilocybin Use*

In 2024, in the same session where the Utah Religious Freedom Restoration Act was passed, the Utah Legislature legalized secular psilocybin use. Utah Code § 58-37-3.5, referred to here as the Psilocybin Act, created an exemption to the Utah Controlled Substances Act for Intermountain Health and University of Utah Health.[2]

The Psilocybin Act grants broad discretion to the two healthcare systems to "develop a behavioral health treatment program" using psilocybin and ecstasy. Utah Code § 58-37-3.5(2). Limits on that discretion are few: the healthcare systems should determine treatment "is supported by a broad collection of scientific and medical research," use the type of psilocybin the FDA is investigating, ensure treatment is "under the direct supervision and control of the healthcare system" and its "health care providers who are licensed" under Title 58 of the Utah Code, provide psilocybin only to those eighteen or older, and make a report to the Utah Legislature in July 2026. Utah Code § 58-37-3.5(2)-(4).

---

[2]   *See S.B. 266 Medical Amendments,* Utah State Legislature (2024), attached as Ex. A to Singularism's concurrently filed Request for Judicial Notice; Appellants' Br., at 8; App-5:150.

Under the Psilocybin Act, the healthcare systems and any participating individual are immunized from guilt under the Utah CSA. Utah Code § 58-37-3.5(5).

The Psilocybin Act follows the Utah Legislature's investigation into the beneficial uses of psilocybin. The legislature created a task force, which, in 2022, issued a favorable report back to the legislature.[3]

The Utah CSA contains other exemptions beyond the Psilocybin Act. First, it grants the Utah Division of Professional Licensing the discretion to "enact rules waiving the [medical] license requirement" if doing so "is consistent with public health and safety." Utah Code § 58-37-6(2)(d). Second, a section under the same title exempts from licensure for mental health therapy "a recognized member of the clergy while functioning in a ministerial capacity," referred to here as the Clergy Exemption. Utah Code § 58-60-107(2)(b). Third, the Utah CSA immunizes religious use of peyote from civil or criminal liability. Utah Code § 58-37-8(12).

---

[3] *See H.B. 167 Mental Illness Psychotherapy Drug Task Force*, Utah State Legislature (2022); *Utah Mental Illness Psychotherapy Drug Task Force Report to the Utah Legislature*, Utah Dep't of Health & Human Services (Oct. 2022). These documents are attached to Singularism's concurrently filed Request for Judicial Notice as Ex. B and C.

*Singularism's Religious Practice*

Singularism is a "small, entheogenic minority religion" which uses "sacramental psilocybin tea to access the divine, open spiritual pathways, and alleviate human suffering . . ." App-4:099; *see also* App-7:067. Provo City has confirmed Singularism is a religious organization. App-4:113-14, 197.

Singularism supervises its "voyagers" in "a private, controlled, safe, and comfortable environment within Singularism's spiritual center, following safety guidelines such as those published by Harvard Medical School and Johns Hopkins." App-4:105. "Before, during, and after the ceremony, religious guides such as Mr. Jensen attend to the voyager, help guide their spiritual inquiry, and record the voyager's spiritual insights, thereby allowing the individual to write their own scripture." App-4:105. This includes placing all voyagers through a "multi-stage screening process" where "each voyager's physical, mental, and emotional suitability and readiness to participate in a psilocybin ceremony" are evaluated, along with the voyager's "religious sincerity," prohibiting individuals "attempting to ingest psilocybin solely for secular or recreational purposes . . . ." App-4:106. Voyagers are required to "sign an

20

attestation of their religious sincerity before participating in a psilocybin ceremony." App-4:106.

Only one of Singularism's voyagers has experienced an adverse reaction to a psilocybin ceremony. App-4:107-08, 112. Even then, it was the result of the voyager failing to disclose "certain mental health indicators during Singularism's screening procedure . . . ." App-4:108. Singularism followed its emergency protocol, "which is similar to those in place at mental health treatment facilities," the voyager was treated, and the voyager reported to Singularism that she was "safe and was recovering well," even "apologiz[ing] for the incident." App-4:108.

Singularism opened its spiritual center in September 2023. App-4:100, 103-05. "Singularism sent letters to local government leaders and law enforcement," including "the Mayor of Provo City, the Provo City Council, the Provo Police Department, [and] the Utah County Attorney's Office," "inviting them to come tour Singularism's spiritual center and informing them of Singularism's spiritual practices utilizing psilocybin." App-4:104. None took up the offer. App-4:104. Instead, Provo City and the Utah County Attorney's Office contributed to a news article, stating

that Singularism had no protection for its religious exercise. App-4:28-32, 104-05.

*The Government's Raid*

Even so, the government took no action. Singularism conducted its religious ceremonies without interference for over a year. App-4:104-05. But on November 11, 2024, four Provo City police officers "presented at Singularism's spiritual center with a warrant . . . ." App-4:109, 146-47. The officers searched Singularism's spiritual center, detained and interrogated Mr. Jensen, and seized sacramental psilocybin. App-4:109-11; App-4:017-18. They warned Singularism to "cease all its religious practices" and that Mr. Jensen should expect criminal charges. App-4:111. The next day, a Provo City police captain, in a letter on the Provo City Police Chief's letterhead, threatened Singularism's landlord to evict Singularism from its leased space or else Provo City would "pursue the landlord for civil abatement and forfeiture." App-1:167; App-4:111-12. Provo City's counsel later explained the city had a policy of serving eviction threat letters "as a matter of course" whenever "there's distribution in a structure . . . ." App-7:185-86; App-8:122-23, 164.

22

Singularism learned that a Provo City detective had posed as someone interested in participating in a Singularism ceremony. App-1:295-96; App-4:110. The warrant application indicates the detective understood Singularism's religious sincerity. App-1:293-98; App-4:007-26. He recorded that (1) Mr. Jensen had reported to the press that Singularism enjoyed religious liberty protections and exists so people can "work on their lives and progress spiritually," App-1:294-95; App-4:012; (2) Singularism's website stated that at "the heart of [Singularism's] spiritual practice lies the sacred tradition of Entheogenic Spiritual Guidance" which Singularism uses in its "ceremonies as a means to facilitate deep spiritual connections and foster profound inner spiritual transformation," App-1:295; App-4:013; (3) the website contained "several claims that Singularism is a religious experience," App-1:295; App-4:013; (4) Mr. Jensen explained the legality of the religious practice in an interview, App-1:296; App-4:014; and (5) during a webinar, Mr. Jensen "discussed how he is the founder of Singularism and discussed the basis of the religion," App-1:297; App-4:015.

Despite this evidence of religious sincerity, the detective stated, "I feel there is Probable Cause that [Mr. Jensen] is running an illicit

business under the guise of religion." App-1:297; App-4:016. He explained that he "spoke with a Utah County Attorney regarding this case and was advised that their office does not feel that Singularism's claim to have religious exemption has any merit and that if there is evidence of anyone possessing, using, distributing, or cultivating psilocybin, that person is subject to prosecution in the state of Utah." App-1:295; App-4:013.

The detective told Mr. Jensen that "he was fully aware of Singularism's claim to sincere religious exemption, but that the Utah County Attorney had instructed that there does not exist, and cannot exist, any religious exemptions from the Utah Controlled Substances Act related to psilocybin." App-4:109-10. At no point during the search did the officers "appear to doubt Mr. Jensen or Singularism's religious sincerity . . . ." App-4:110. Following the search, the detective concluded Mr. Jensen "fully feels that since he has founded the religion of Singularism, his use and providing of psilocybin to individuals is legal and protected under federal law as part of the Freedom of Religion." App-4:018. Yet, he stated "when speaking with the Utah County and Provo City Attorney Offices, it has been expressed that Singularism is not exempt from the Utah Controlled Substance Act." App-4:018. Despite the

24

government's raid of Singularism's spiritual center, other entheogenic religious organizations operate without interference in Utah. App-4:115-17; App-5:035-37, 39-42, 44, 80-82; App-8:141-42.

*Procedural History*

On November 19, 2024, Singularism sued, seeking a TRO and preliminary injunction and filing its action in Utah state court. App-4:102. The government removed, App-4:102, preferring the federal court's expertise on the federal constitutional claims, App-8:011-13.

The government's litigation tactics included (1) accusing Singularism of "for-profit drug dealing"; (2) calling Singularism's religious beliefs "undecipherable"; (3) asserting Singularism was merely seeking a "constitutional right to get high or distribute drugs," App-1:251, 253, to "justify illegal drug use through the guise of religion," App-1:278, and to brand "secular, philosophical concepts . . . as religious excuses for illegal drug use," App-1:283; (4) decrying Singularism's beliefs as "poetic descriptions of drug-induced hallucinations," App-1:279; (5) accusing Singularism of "supporting an illegal drug market" by purchasing "drugs off the street," App-3:212, (6) asking Mr. Jensen whether a "member of the Klu Klux Klan" could be a member of Singularism, App-7:090; and

25

(7) making a joke related to Singularism's religion during oral argument, App-8:075.

*The District Court's TRO Order*

The district court held a TRO hearing on December 13, 2024. App-7:003-250. Singularism presented testimony and documents but, pressed for time, the government agreed to proffer its witness testimony. App-7:181-86. The district court granted the TRO, concluding that Singularism had "shown a likelihood of success on [its] claim under the Utah RFRA," and ordered the government "to return the ps[i]loc[y]bin and records seized on November 11 to Plaintiffs as soon as possible." App-3:023-25.

Five days later, the government filed criminal charges against Mr. Jensen in Utah state court. App-3:066-68; App-4:113. The Utah County Attorney, Jeffrey Gray, appeared as a prosecuting attorney on the charges. App-3:066-68. The government also refused to return Singularism's sacramental psilocybin, instead moving to stay the TRO. App-3:026-36. Although the district court was "skeptical" of the government's argument, it temporarily granted the stay. App-3:037-39, 162-65; App-5:132-33.

Two days later, the government sought expedited discovery. App-3:093-105. The district court disallowed it, finding the discovery was "far broader than necessary" and "grossly disproportionate," demanded "Singularism to disclose the identities of all individuals who have affiliated with the religion," and stated its "sheer breadth . . . strongly suggest[ed] that Defendants' purpose is to use discovery in this civil lawsuit to investigate Plaintiffs for the pending state criminal case—a patently improper purpose," a point reinforced by the nature of the government's cross-examination during the TRO hearing. App-3:165-66.

The government also filed a motion to dismiss aimed at dismissing the federal claims and sending the case back to state court. App-3:069-92. Singularism moved for an anti-suit injunction to bar the state criminal prosecution of Mr. Jensen. App-3:056-68. Subsequently, Singularism removed the police officers as defendants from its complaint, leaving only municipal defendants Provo City, Utah County, and Mr. Gray. *Compare* App-1:039-71, *with* App-4:098-134; *see also* App-4:055-56.

*The District Court's Preliminary Injunction Order*

On February 20, 2025, the district court granted the motion for preliminary injunction, App-5:118-55, ordering the government to return

27

"any items seized from Singularism's spiritual center" and to "not interfere with Plaintiffs' sincere religious use of psilocybin," App-5:152, basing its order upon the Utah Religious Freedom Restoration Act, App-5:135. The district court had "no difficulty concluding that Plaintiffs are sincere in their beliefs and that those beliefs are religious in nature" and found the government substantially burdened Singularism's religious exercise. App-5:137-39. The district court stated it was "hard-pressed to find, as Defendants urge, that Singularism is essentially a drug-dealing business cloaked in a minister's robe. To the contrary, the court is convinced that Singularism is a legitimate religion and that Plaintiffs are sincere practitioners of it." App-5:146.

Under URFRA's strict scrutiny analysis, the district court held Singularism's religious exercise created no "meaningful risk of compromising the government's compelling interests," and the government failed to show that prohibition of Singularism's religious exercise was "the least restrictive means of accomplishing [its] interest[s]." App-5:149. The district court identified several less restrictive means, including "for the government to simply do nothing," as it had for "over a year after Singularism opened its spiritual center,"

28

the provisions of the Psilocybin Act, and the Utah CSA's exemption for religious peyote use. App-5:150-51. The district court stated the government's actions amounted to "harass[ing] and shut[ting] down a new religion it finds offensive practically without any evidence that that religion's practices have imposed any harms on its own practitioners or anyone else." App-5:154.

The government did not appeal the TRO or preliminary injunction. Following certification, App-5:115-17, the Utah Attorney General summarily joined the government's motion-to-dismiss briefing, but did not seek to intervene, App-5:156-58.

*The District Court's Anti-suit-Injunction and Motion-to-Dismiss Order*

On August 4, 2025, the district court granted Singularism's motion for an anti-suit injunction and denied the government's motion to dismiss. App-5:162-93. Regarding the anti-suit injunction, the district court found 42 U.S.C. § 1983, under which Singularism's First Amendment claim was brought, fell under the "expressly authorized" exception to the Anti-Injunction Act, thereby providing the district court with injunctive authority. App-5:191.

The district court also found the government waived its "*Younger* defense by removing to federal court the civil action Plaintiffs originally filed in Utah state court." App-5:182. After recounting the procedural history of the case, the district court found the government "commenced the state criminal action . . . in order to relitigate the [U]RFRA issue on which [the government] appear[s] to be poised to lose in this court—in other words, to get a second bite at the apple," and stated it would not permit "the *Younger* doctrine to be used as a gamesmanship sword." App-5:184-85. Forcing Singularism "to wait until the conclusion of the criminal proceedings to secure [its] free-exercise rights," the district court held, "would be the equivalent of issuing a death warrant for their nascent religion." App-5:192.

As alternative reasons for granting the anti-suit injunction, the district court found "that the bad-faith and irreparable-injury exceptions" applied. App-5:185. The district court found the balance of the bad-faith factors weighed "strongly in favor of finding that the state prosecution was commenced in bad faith," including because the criminal charges against Mr. Jensen were filed only five days after the TRO, the "intrusive, offensive questioning" by the government at the TRO hearing, the "vastly

overbroad expedited discovery requests," and the government's inconsistent litigation positions. App-5:182, 185-86. The district court had "no hesitation finding that the government pursued the prosecution primarily to harass Plaintiffs into ceasing their sincere religious practices." App-5:186.

As to the irreparable-injury exception, the district court pointed to the government's threat against Singularism's landlord, Singularism's loss of adherents because of the government's raid, and the shrinking of additional adherents because of the threat of criminal prosecution against them. App-5:186. The district court concluded these injuries could not be remedied even if Mr. Jensen successfully defended against the state criminal action. App-5:186-87.

In its motion-to-dismiss analysis of Singularism's First Amendment claim, the district court held strict scrutiny review applied because the Utah CSA, with its inclusion of the Psilocybin Act, was not generally applicable. App-5:165-69. The district court found similar risks to the government's claimed interests were apparent in the secular exemption created by the Psilocybin Act as might be posed by Singularism's religious practice. App-5:166-67. The district court also noted the

31

Psilocybin Act "indicat[es] a legislative judgment that the restriction on psilocybin can admit of certain exemptions," App-5:168, under which the Utah Legislature "specifically considered the risks, harms, and benefits of the drug at issue and decided to legalize certain secular uses of it," App-5:169. The district court held that strict scrutiny analysis under the First Amendment "is identical" to the strict scrutiny analysis it had previously conducted under URFRA in its preliminary injunction order. App-5:169.

On Singularism's Fourth Amendment claim, the district court concluded the government "provide[d] no basis for dismissing the[] claims" against Provo City, Utah County, or Mr. Gray, as the government had only "invoked absolute immunity" for the police officers, which Singularism had removed as defendants. App-5:170.

Under the anti-suit injunction order, Mr. Jensen subsequently moved to dismiss the state criminal charges. The government never filed an opposition brief. Accordingly, on September 22, 2025, the state court dismissed all charges. The government did not appeal.[4]

---

[4] *See* docket of *State of Utah v. Bridger Lee Jensen*, Case No. 241404407 (Fourth Judicial District Court, Utah County, State of Utah), and Minutes Waiver Hearing/Order of Dismissal in the same case,

On August 29, 2025, the government appealed the anti-suit-injunction and motion-to-dismiss order. App-5:194-95.

---

attached as Ex. D and E to Singularism's concurrently filed Request for Judicial Notice.

## SUMMARY OF THE ARGUMENT

This Court should not review any portion of the government's appeal. By failing to oppose implementation of the anti-suit injunction in the state criminal action, the government forfeited and waived its anti-suit-injunction arguments. And without an appealable order, the denial of the government's motion to dismiss should also be dismissed. Pendent jurisdiction analysis, too, indicates review of the motion to dismiss is improper.

Should the Court reach the merits, it should affirm the anti-suit injunction. The government concedes the district court was authorized to enjoin the state criminal court under the Anti-Injunction Act. And *Younger* does not restrict the district court's injunctive authority.

The Court should also affirm the district court's denial of the government's motion to dismiss. Strict scrutiny applies under the First Amendment where, as here, the government creates a secular exception but refuses to provide a similar exception to a religious organization. So, too, for a law that contains a system of exemptions which the government refuses to extend to religion. And on Singularism's Fourth Amendment

34

claim, the government repeats its error below, failing to advance any

immunity argument relevant to the municipal defendants.

## ARGUMENT

### I.    THIS COURT LACKS JURISDICTION.

The Court should not review this appeal. The government abandoned its basis for interlocutory review and the remainder of the appeal arises from a denial of a motion to dismiss, which is not immediately appealable.

> #### A.    The Government Waived Its Anti-suit Injunction Arguments by Abandoning the State Criminal Case Against Mr. Jensen.

Singularism agrees that, generally, this Court may review an anti-suit injunction under 28 U.S.C. § 1292(a)(1). However, the government has forfeited and waived its anti-suit injunction arguments by failing to oppose dismissal of the criminal charges it brought against Mr. Jensen.

An appellant waives an issue when, "charged with knowledge or awareness," it has relinquished or abandoned a known right. *In re Syngenta AG MIR 162 Corn Litig.*, 61 F.4th 1126, 1180 (10th Cir. 2023). A "party that has waived an issue is precluded entirely from appellate relief." *Id.* (quotation omitted).

An appellant forfeits an issue when, as a matter of neglect, it fails to "make the timely assertion of a right." *Id.* (quotation omitted). An

36

appellant advancing a forfeited issue "may only secure review" under the Court's "rigorous plain-error test." *Id.* (quotation omitted). That test requires a showing of "(1) an error, (2) that is plain, which means clear or obvious under current law, and (3) that affects substantial rights." *Id.* (quotation omitted). If those elements are shown, the Court has discretion to correct the error "if it seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* If an appellant fails to argue plain error, the forfeiture is converted into a waiver and the appellant "lose[s] their right to any review at all." *Id.* at 1181.

Here, relying upon the district court's anti-suit injunction order, Mr. Jensen moved to dismiss the criminal charges against him. The government filed no opposition. It made no appeal. Thus, it abandoned its anti-suit-injunction arguments, even though it was "charged with knowledge or awareness," *id.* at 1180, of the anti-suit injunction and Mr. Jensen's motion to dismiss the criminal charges, as both were filed in the respective actions.[5] Yet, the government intentionally took no action.

---

[5] The State of Utah appears on the district court's service list as a result of the Utah Attorney General's response to certification. App-5:115-17, 156-58.

Even presuming the government's failure was inadvertent, such neglect amounts to forfeiture. *See id.* But the government's opening brief fails to argue plain error. Thus, the government's forfeiture is converted into a waiver. *Id.* at 1181. The Court should dismiss the government's entire appeal of the anti-suit injunction.

## B.    The Motion to Dismiss Denial Is Not Appealable.

The government's brief concedes that, generally, denials of motions to dismiss are not immediately appealable. Appellants' Br., at 24. But it argues the Court should review the denial anyway because the motion-to-dismiss analysis is closely related to the anti-suit injunction analysis.[6] *Id.* at 24-25. Not so.

Because the government waived its anti-suit injunction arguments, the Court should apply its standard rule prohibiting interlocutory

---

[6]    To the extent the government's citation to *Munaf v. Geren*, 553 U.S. 674, 689-92 (2008) represents an argument separate from the pendent jurisdiction analysis below, it is inapposite, presenting a one-of-a-kind situation involving foreign affairs. This Court has never cited *Munaf*. And the circuit courts which have indicate it stands for the proposition that an appellate court has discretion to review district court rulings or theories which would make review of a *preliminary* injunction unnecessary. *See, e.g., Do No Harm v. Pfizer Inc.*, 126 F.4th 109, 121 (2d Cir. 2025); *Transcon. Gas Pipe Line Co., LLC v. Pennsylvania Env't Hearing Bd.*, 108 F.4th 144, 151 (3d Cir.), *amended on denial of reh'g*, 110 F.4th 612 (3d Cir. 2024).

appeals of denials of motions to dismiss. *See Hatten-Gonzales v. Hyde*, 579 F.3d 1159, 1166 (10th Cir. 2009). And even if the Court chooses to review the anti-suit injunction, the motion-to-dismiss issues are independent. They do not qualify for pendent jurisdiction. "Pendent appellate jurisdiction is a matter of discretion, not of right," *Brock v. Flowers Foods, Inc.*, 121 F.4th 753, 771 (10th Cir. 2024) (quotation omitted), and is disfavored, *Doe v. Weiser*, No. 25-1057, 2025 WL 2306635, at *1 (10th Cir. Mar. 13, 2025) (unpublished).

This Court's exercise of pendent jurisdiction is appropriate in only two circumstances. First, "when the otherwise nonappealable decision is inextricably intertwined with the appealable decision." *Brock*, 121 F.4th at 771. "Inextricably intertwined" means that "a ruling on the merits of the interlocutory appeal resolves *all of the remaining issues* presented by the pendent appeal." *Id.* (citation modified) (emphasis in original). Review of the nonappealable decision must "not require the consideration of legal or factual matters distinct from those raised by the claims over which [the Court] unquestionably ha[s] jurisdiction." *Id.* (quotation omitted).

39

Second, the Court may exercise pendent jurisdiction "where review of the nonappealable decision is necessary to ensure meaningful review of the appealable one." *Id.* (quotation omitted). This means the Court is "required to decide the core issues implicated in [an] ostensibly pendent matter to resolve the appealable one." *Id.* (citation modified). Neither circumstance applies here.

The issues presented by the district court's anti-suit injunction ruling are not inextricably connected with the district court's motion-to-dismiss ruling. Even if this Court were to reverse the anti-suit injunction, that ruling would not resolve whether Singularism's First and Fourth Amendment claims should be dismissed. They involve wholly separate analyses. The anti-suit injunction involves a multi-layer analysis of the district court's power to enjoin a state court and abstention. The motion to dismiss involves, on the First Amendment claim, an analysis of whether strict or rational basis scrutiny applies, and on the Fourth Amendment claim, whether the government is immune. There is no crossover. Instead, resolution of the First and Fourth Amendment claims require extensive "consideration of legal [and] factual matters distinct

from those raised" by the anti-suit injunction. *See id.* Thus, the government cannot rest on this premise for pendent jurisdiction.

Similarly, review of the First and Fourth Amendment issues are also not "necessary to ensure meaningful review" of the anti-suit injunction. *See id.* The Court can review the anti-suit injunction without deciding *any* issue of Singularism's First and Fourth Amendment claims, much less a "core" issue. *See id.* Further, interlocutory review of Singularism's First Amendment claim unnecessarily spends judicial resources. The question the government raises—whether strict scrutiny review applies—is settled under URFRA. URFRA requires strict scrutiny review of all burdens on religious exercise. But the government has chosen not to appeal the district court's URFRA rulings. Because the government cannot rest on either premise for pendent jurisdiction, the Court should dismiss.

## II.   THE DISTRICT COURT PROPERLY ENJOINED THE STATE COURT.

Because the Court lacks jurisdiction, it should proceed no further. However, should the Court reach the merits, it should affirm the anti-suit injunction.

### A.    Anti-suit Injunction Standard of Review.

This Court reviews de novo whether an Anti-Injunction Act exception is met, *Tooele Cnty. v. U.S.*, 820 F.3d 1183, 1187 (10th Cir. 2016), and whether conditions for *Younger* abstention are met, *Amantullah v. Colo. Bd. of Med. Exams.*, 187 F.3d 1160, 1163 (10th Cir. 1999). Where the conditions of *Younger* abstention are met, the Court "review[s] a district court's decision to abstain for abuse of discretion." *Texas Ass'n of Bus. v. Earle*, 388 F.3d 515, 518 (5th Cir. 2004). Underlying findings of fact, such as those involving bad faith, are reviewed for clear error. *Rocky Mountain Gun Owners v. Williams*, 671 F. App'x 1021, 1024 (10th Cir. 2016); *Wilson v. Thompson*, 593 F.2d 1375, 1388-89 (5th Cir. 1979).

### B.    The District Court's Anti-Suit Injunction Analysis Was Proper.

Whether a federal court may enjoin a state court is a three-layer question. First, the Court addresses whether an exception from the Anti-Injunction Act applies. If one applies, the federal court possesses authority to enjoin. Second, the Court then reviews whether *Younger* requires the federal court to abstain out of concerns for federalism and comity, asking whether *Younger* applies. If it does, third, the Court asks

42

whether a *Younger* exception applies. If *Younger* does not apply, or an exception to *Younger* is shown, the federal court possesses authority to enjoin a state court proceeding and is not constrained by abstention principles.

i.      *Exceptions to the Anti-Injunction Act Provided the District Court Authority to Enjoin.*

The Anti-Injunction Act "generally prohibits the federal courts from interfering with proceedings in state courts." *Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 145 (1988). "Congress, however, has permitted injunctions in certain, specific circumstances, namely, when [1] expressly authorized by statute, [2] necessary in aid of the court's jurisdiction, or [3] necessary to protect or effectuate the court's judgment." *Id.* at 146; *see also* 28 U.S.C. § 2283. The AIA is based upon federalism concerns: "the Framers' decision to authorize, and Congress' decision to implement, a dual system of federal and state courts." *Chick Kam Choo*, 486 U.S. at 146.

Here, two AIA exceptions apply. First, the government concedes the expressly authorized exception to the AIA applies because Singularism's First and Fourth Amendment claims are brought under 42 U.S.C. § 1983.

Appellants' Br., at 38; *see also* App-5:191; *Mitchum v. Foster*, 407 U.S. 225, 242-43 (1972).

Second, the removal statute provides an independent basis for the AIA's expressly authorized exception. It explains the state court "shall effect the removal and the State court shall proceed no further unless and until the case is remanded." 28 U.S.C. § 1446(d). *See* Wright & Miller, Fed. Prac. & Proc. § 4225 Exceptions to the Act—In General—Necessary in Aid of Its Jurisdiction (3d ed. 2024) (noting that removal cases "are an express statutory exception, and the Supreme Court has so treated them"). A "federal law need not expressly authorize an injunction of a state court proceeding" to meet this exception. *Mitchum*, 407 U.S. at 237. Where a federal statutory right or remedy "could be frustrated if the federal court were not empowered to enjoin a state court proceeding," the expressly authorized AIA exception applies. *Id. See also Davis Int'l, LLC v. New Start Grp. Corp.*, 367 F. App'x 334, 337-38 (3d Cir. 2010); *Kansas Pub. Emp. Retirement Sys. v. Reimer Kroger Assocs.*, 77 F.3d 1063, 1069-71 (8th Cir. 1996).

Here, the case removed to federal court was a civil case and the subsequently filed state case was a criminal case. But because that

criminal case was filed by the State of Utah through Mr. Gray, App-3:065-68, who is a party to the removed civil case, the filing of the state suit demonstrates that the state criminal case was filed in an "attempt to subvert the removal" of this case. *Kansas Pub. Emp. Retirement Sys.*, 77 F.3d at 1070. It was subversive because the state criminal case was filed after an unfavorable TRO decision and because the state criminal case would require adjudication of identical issues. *See id.*

### ii.    Younger *Does Not Apply.*

If one of the AIA exceptions is met, "in the context of state criminal prosecutions," the Court turns next to *Younger* abstention. *Mitchum*, 407 U.S. at 243 (citing *Younger v. Harris*, 401 U.S. 37 (1971)). *Younger* is based upon similar concerns as those underlying the AIA: "a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways." *Younger*, 401 U.S. at 44. *Younger* is based on the "strong policy" of federalism "counseling against the exercise" of jurisdiction, rather than a "lack of jurisdiction in the District

Court." *Ohio Bureau of Employment Servs. v. Dayton Christian Schools, Inc.*, 477 U.S. 619, 626 (1986).

Younger abstention does not apply when federalism concerns are absent, including where the government "has voluntarily submitted to a federal forum." *ACORN v. Municipality of Golden*, 744 F.2d 739, 742 n.2 (10th Cir. 1984) (quotation omitted). When the government removes a case to federal court and then asks the federal court to "proceed to an adjudication of the constitutional merits," the government has consented to federal jurisdiction and waived its ability to raise abstention. *Dayton Christian Schools, Inc.*, 477 U.S., at 626. Removal "is a form of voluntary invocation of a federal court's jurisdiction sufficient to waive the State's otherwise valid objection to litigation of a matter . . . in a federal forum." *Lapides v. Bd. of Regents of the Univ. Sys. of Ga.*, 535 U.S. 613, 624 (2002). This consent to federal jurisdiction applies in the *Younger* context. *See Guttman v. New Mexico*, 325 F. App'x 687, 693 (10th Cir. 2009) (concluding that through case filings, the government had "voluntarily submitted this case to a federal forum and thus waived the *Younger* question"); *Cradle of Liberty Council, Inc. v. City of Philadelphia*, No. CIV.A.08-2429, 2009 WL 3921140, at *4 (E.D. Pa. Nov. 18, 2009)

46

(unpublished) (concluding case filings demonstrated "the City's intention to submit this case for federal consideration"); *Hansen Found., Inc. v. City of Atl. City*, No. 121CV20392NLHEAP, 2023 WL 2583458, at \*6 (D.N.J. Mar. 21, 2023) (unpublished) (The "City Defendants have waived application of any abstention doctrine, by virtue of removing *Hansen I* from state court. Clearly, Plaintiffs were satisfied to be in state court, where they filed *Hansen I* initially and where both their federal and state claims could be heard. For City Defendants to seek that result now smacks of gamesmanship. . . .").

The government argues that it waived *Younger* only to the extent it could rely on *Younger* to request remand, but not as a basis to oppose the anti-suit injunction. Appellants' Br., at 58-59. But by removing this case to federal court, failing to raise *Younger* abstention in the context of the TRO or preliminary injunction, filing a motion for expedited discovery, filing a motion to stay the district court's TRO, and asking the district court to determine the constitutional merits by filing a motion to dismiss, the government voluntarily submitted to the federal forum, waiving any ability to raise abstention. Further, the government did not appeal the TRO or preliminary injunction or raise *Younger* in related briefing. App-

47

5:194-95; App-1:245-91. The government is not concerned with keeping state issues in state court hands.

The government relies on *Armco, Inc. v. United Steelworkers of America*, 280 F.3d 669, 681 (6th Cir. 2002), for the proposition that removal does not make *Younger* abstention inappropriate. Appellants' Br., at 58. But that case is inapposite. That case focused on how orders in simultaneous state and federal court cases involving the same parties should be understood. *Id.* at 682. It did not address how removal of a case to federal court impacts the scope of relief available in that same case post-removal. *Id.* at 681-83.

Here, not only did the government waive *Younger* through removal, but the government's actions emphasize that the purpose of *Younger* abstention is not served in this case. The state civil court in which this case was initially filed could have entered declaratory judgment for Singularism and enjoined the state criminal proceeding. *See* Utah R. Civ. P. 42(a); *McRae & Deland v. Feltch*, 669 P.2d 404, 405-06 (Utah 1983); *Berg v. State*, 2004 UT App 337, ¶ 10, 100 P.3d 261. And seeking an injunction in state court is precisely what Singularism did. Thus, the government would have this Court apply *Younger* to prohibit

48

Singularism from receiving relief that was available in state court where Singularism filed, purely as a result of the government's unilateral removal. The government's argument does not serve the purpose of *Younger*. The Court should conclude *Younger* does not restrain the district court's injunctive authority.

### iii.    *Even if* Younger *Applies, Two Exceptions Are Met.*

Even if the Court reaches *Younger*, the district court's injunctive authority was not restrained because two *Younger* exceptions apply. Generally, *Younger* applies only when state proceedings are (1) ongoing, (2) implicate "important state interests," and (3) provide an adequate opportunity to raise the federal claims. *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982). Here, Singularism does not contest that these elements were met. *See also* App-5:180-82.

But even when all three *Younger* conditions are met, a federal court may reject *Younger* abstention upon a showing of "bad faith, harassment, or any other unusual circumstance that would call for relief." *Younger*, 401 U.S. at 54. To determine whether the bad faith exception is met, courts consider "(1) whether [the prosecution] was frivolous or undertaken with no reasonably objective hope of success; (2) whether it

was motivated by the defendants' suspect class or in retaliation for the defendant's exercise of constitutional rights; and (3) whether it was conducted in such a way as to constitute harassment and an abuse of prosecutorial discretion, typically through the unjustified and oppressive use of multiple prosecutions." *Phelps v. Hamilton*, 122 F.3d 885, 889 (10th Cir. 1997).[7] Similarly, *Younger*'s irreparable harm exception is met if a threat to federally protected rights "cannot be eliminated by [the plaintiff's] defense against a single criminal prosecution." *Phelps*, 122 F.3d at 889 (quotation omitted).

The district court found two *Younger* exceptions were demonstrated: bad faith and irreparable harm. App-5:184-87. This was correct.

Record evidence of bad faith is plentiful. After Singularism invited the government to dialogue and tour its spiritual center, the government declined the invitation, instead waiting a year to conduct an undercover investigation. *See* App-1:294-98; App-3:161-62; App-4:104-05, 110. It

---

[7] The government argues that multiple prosecutions must be shown for the bad faith exception to apply. Appellants' Br., at 49, 55-56. But no single fact, such as the number of prosecutions, is dispositive. *See Wilson v. Thompson*, 593 F.2d 1375, 1381, 1383 (5th Cir. 1979).

made negative comments to the media, asserting Singularism lacked religious liberty protection. App-4:028-32, 104-05. The government sought a warrant when Singularism's religious sincerity was apparent. App-1:293-98; App-4:007-26. The government sent a threat to Singularism's landlord. App-1:167; App-4:111-12. And following Singularism's state-court suit, the government removed. *See* App-3:162. After a string of unfavorable decisions, the government now seeks remand. In briefing and arguments, the government has advanced inflammatory accusations. App-1:251, 253, 278-79, 283; App-3:212; App-7:090. And the government's questioning at the TRO hearing suggested an improper purpose. App-3:166 n.4; App-5:182, 185-86. The government refused to abide by the TRO, once issued. App-3:026-36. After the TRO was issued, it filed criminal charges against Mr. Jensen in state court. App-3:162; App-5:185-86. The government served overbroad discovery requests, the "sheer breadth" of which caused the district court to conclude the government's intent was "to use discovery in this civil lawsuit to investigate Plaintiffs for the pending state criminal case—a patently improper purpose." App-3:166; *see also* App-5:186. The district

51

court made similar factual findings demonstrating irreparable harm. App-5:186-87.

With this factual record, the district court's conclusion that *Younger*'s bad faith and irreparable harm exceptions applied does not indicate an abuse of discretion or clear error. This Court should affirm.

## III. THE DISTRICT COURT CORRECTLY DENIED THE MOTION TO DISMISS.

The Court need proceed no further than sustaining the anti-suit injunction. Denial of the government's motion to dismiss is not an appealable order and the Court lacks pendent jurisdiction over it. Should the Court proceed, it should affirm the denial of the government's motion to dismiss.

### A. Motion to Dismiss Standard of Review.

The government's appeal proceeds with disregard for the deferential motion-to-dismiss standard. This Court reviews a "district court's ruling on a motion to dismiss . . . de novo, accepting all well-pleaded allegations of the complaint as true and considering them in the light most favorable to the nonmoving party." *Johnson v. Smith*, 104 F.4th 153, 167 (10th Cir. 2024) (quotation omitted). Yet, the government's brief improperly cites to record material outside

Singularism's complaint. *See, e.g.,* Appellants' Br., at 8-15, 32-33. The Court should disregard these citations and related argument.

### B. The District Court Correctly Held Singularism's First Amendment Claim Merits Strict Scrutiny Review.

The government appeals only a single, narrow issue on Singularism's First Amendment claim. The government does not argue that Singularism is not sufficiently religious or sincere to receive First Amendment protection. And it does not argue that if strict scrutiny review is merited, that the government could survive the strict scrutiny analysis the district court found identical to the strict scrutiny analysis it conducted under URFRA. In failing to argue any of these issues in its opening brief, the government has waived them. *See In re Syngenta AG MIR 162 Corn Litig.*, 61 F.4th at 1181. The only argument the government makes is that strict scrutiny review is not required, only rational basis review. But that is wrong.

### i. *The Utah CSA Is Not Generally Applicable.*

The parties agree that following the U.S. Supreme Court's decision in *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990), "the government is generally free to place incidental burdens on religious exercise so long as it does so pursuant to

a neutral policy that is generally applicable." *Mahmoud v. Taylor*, 606 U.S. 522, 564 (2025); *see also Fulton v. City of Philadelphia, Pennsylvania*, 593 U.S. 522, 533 (2021).[8] Such merits only rational basis review. *See St. Mary Cath. Par. in Littleton v. Roy*, 154 F.4th 752, 776-77 (10th Cir. 2025); *Renteria v. New Mexico Off. of Superintendent of Ins.*, No. 23-2123, 2025 WL 635754, at *6 (10th Cir. Feb. 27, 2025) (unpublished). However, failing "either the neutrality or general applicability test is sufficient to trigger strict scrutiny." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 526 (2022).

Relevant here is general applicability. A law may lack general applicability in two ways. *First*, a law lacks "general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 593 U.S. at 534; *see also St. Mary Cath. Par. in Littleton*, 154

---

[8]    Three sitting justices of the U.S. Supreme Court have indicated *Smith* was wrongly decided. *See Fulton v. City of Philadelphia, Pennsylvania*, 593 U.S. 522, 545-627 (2021) (Alito, Thomas, and Gorsuch, J., concurring). Two more sitting justices are considering it. *Id.* at 543-44 (Barrett, Kavanaugh, and Breyer, J., concurring). *See also* Stephanie H. Barclay, *Replacing* Smith, 133 Yale L.J. Forum 436, 436-37 (2023). Singularism asserts that *Smith* was wrongly decided, unconstitutionally infringes religious free exercise, and should be overturned.

F.4th at 766. Stated another way, laws lack general applicability "whenever they treat *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (emphasis in original); *Renteria*, No. 23-2123, 2025 WL 635754, at *8. When a law "makes a 'value judgment in favor of secular motivations, but not religious motivations,' it is not generally applicable." *Does 1-11 v. Bd. of Regents of Univ. of Colorado*, 100 F.4th 1251, 1277 (10th Cir. 2024) (quoting *Grace United Methodist Church v. Cheyenne*, 451 F.3d 643, 654 (10th Cir. 2006)); *see also Church of Lukumi Babalu Aye, Inc. v. City of Hialeah.*, 508 U.S. 520, 542-43 (1993) ("All laws are selective to some extent, but categories of selection are of paramount concern when a law has the incidental effect of burdening religious practice. The Free Exercise Clause protects religious observers against unequal treatment and inequality results when a legislature decides that the governmental interests it seeks to advance are worthy of being pursued only against conduct with a religious motivation." (quotation modified) (citation omitted)).

Whether "two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest

that justifies the regulation at issue" and "the risks various activities pose" to that interest. *Tandon*, 593 U.S. at 62; *see also Church of Lukumi Babalu Aye, Inc*, 508 U.S. at 544 (a law is not generally applicable if it was adopted to protect certain interests but "fail[s] to prohibit nonreligious conduct that endangers these interests in a similar or greater degree"). Given that the government shoulders the burden of satisfying strict scrutiny, "it must do more than assert that certain risk factors 'are always present in worship, or always absent from the other secular activities' the government may allow." *Tandon*, 593 U.S. at 63 (quoting *S. Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716, 718 (2021) (statement of Gorsuch, J.)). Government "cannot assume the worst when people go to worship but assume the best when people go to work" or another secular activity. *Id.* at 64 (quotation omitted). These commands are consistent with the claimant-specific inquiry required in First Amendment analysis. *See Fulton*, 593 U.S. at 541 ("Rather than rely on broadly formulated interests, courts must scrutinize the asserted harm of granting specific exemptions to particular religious claimants." (citation modified)).

56

"Where the government permits other activities to proceed with precautions, it must show that the religious exercise at issue is more dangerous than those activities *even when the same precautions are applied*. Otherwise, precautions that suffice for other activities suffice for religious exercise too." *Tandon*, 593 U.S. at 63 (emphasis added). For example, "a government policy that grants an exemption 'for medical reasons' but denies the same exemption 'for religious reasons' is not generally applicable, as it 'devalues religious reasons by judging them to be of lesser import than nonreligious reasons.'" *Does 1-11*, 100 F.4th at 1277 (quoting *Grace United Methodist Church*, 451 F.3d at 654) (citation modified).

*Second*, a "law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton*, 593 U.S. at 523 (citation modified); *see also St. Mary Cath. Par. in Littleton*, 154 F.4th at 766. Thus, where "the government [may] grant exemptions [from a law] based on the circumstances" of each case before it, the law is not generally applicable. *Fulton*, 593 U.S. at 534. In such instances "where the State has in place a system of individual exemptions, it may not

refuse to extend that system to cases of religious hardship without compelling reason." *Id.* (citation modified). "The creation of a formal mechanism for granting exceptions renders a policy not generally applicable, regardless whether any exceptions have been given, because it invites the government to decide which reasons for not complying with the policy are worthy of solicitude . . . ." *Id.* at 537. The "creation of a system of exemptions" undermines government contentions that its laws "can brook no departures." *Id.* at 542.

The U.S. Supreme Court's decisions in RFRA cases are also instructive, given the similarity between general-applicability and compelling-government-interest analyses. *See Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 430-35 (2006) (rejecting the government's contention that no religious exemptions for hoasca could be granted and pointing to the federal CSA's religious peyote and public-health-and-safety exemptions, comparable to Utah Code §§ 58-37-6(2)(d), 58-37-8(12)); *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 698-700 (2014) (noting statutory exemptions in contraceptive mandate undermined the government's argument against permitting religious exemptions); *Mahmoud*, 606 U.S. at 567 (a "robust

58

system of exceptions undermines the Board's contention that the provision of opt outs to religious parents would be infeasible or unworkable." (quotation omitted)).

    ii.    *The Utah CSA Treats Secular Activity More Favorably Than Singularism's Religious Exercise*.

The Utah Controlled Substances Act fails both general applicability tests. *First*, the Utah CSA treats secular activity more favorably than Singularism's religious exercise. The Utah CSA's embedded Psilocybin Act grants secular healthcare systems broad discretion to "develop a behavioral health treatment program that includes a treatment based on [psilocybin] that the healthcare system[9] determines is supported by a broad collection of scientific and medical research." Utah Code § 58-37-3.5(2). That discretion is tempered only by a handful of limitations: that (1) psilocybin be administered "under the direct supervision and control of the healthcare system," (2) psilocybin not be administered to individuals under eighteen years old, (3) the psilocybin be of the sort that is in "federal Food and Drug Administration Phase 3 testing for an

---

[9]    The practical effect of the act's definition of "healthcare system" is to authorize only Utah's largest two healthcare systems, Intermountain Healthcare and University of Utah Health, to administer psilocybin. *See* Utah Code § 58-37-3.5(1)(b); Appellants' Br., at 30; App-5:150.

investigational drug," and (4) before July 1, 2026, the healthcare systems provide a written report to the Utah Legislature. Utah Code § 58-37-3.5(1)(a), (3)-(4). Further, the Psilocybin Act insulates individuals administering or participating in the psilocybin program from a violation of the Utah CSA. Utah Code § 58-37-3.5(5).

The administration of psilocybin to secular individuals under the Psilocybin Act is comparable to Singularism's administration of psilocybin as a religious sacrament. The Psilocybin Act poses similar risks to the government's interests in advancing the Utah CSA's general prohibition on psilocybin usage which the government argues are posed by Singularism's sacramental usage. These risks do not need to be identical to be comparable—"*any* comparable secular activity" will do. *See Tandon*, 593 U.S. at 62 (emphasis in original).

Although not precisely clear from the government's brief, it appears the interests the government believes should be compared in this analysis include preventing (1) psilocybin distribution and (2) "detrimental effect on the health and general welfare" and "public health." *See* Appellants' Br., at 29-30. That the government's interests are unclear presents analytical problems as the analysis here is specific

to "the government's *asserted* interests . . ." *Fulton,* 593 U.S. at 534

(emphasis added); *Tandon,* 593 U.S. at 62. If the Court wishes to ignore

this inadequacy, the government explained in more detail below. The

government argued that psilocybin possession leads to illegal trafficking

of psilocybin, thereby affecting public safety. App-1:285-86. The

government also argued that psilocybin is so dangerous that it leads to

overdose, impaired drivers, hospitalizations, suicides, self-harm,

homicides, liver failure, and even increased prison populations. App-

1:285-86; App-3:211; *see also* App-5:167.

However, these alleged risks are not supported by the sources the

government used to advance them before the district court. *Compare*

App-1:285-86 *with* App-2:170-72; *compare* App-3:211-14 *with* App-3:242-

43; *see also* Appellants' Br., at 6 n.2. Nor does the Utah Legislature

appear to share these concerns. App-5:168-69 (the Psilocybin Act

indicates "a legislative judgment that the restriction on psilocybin can

admit of certain exemptions") ("the Utah legislature . . . specifically

considered the risks, harms, and benefits of the drug at issue and decided to legalize certain secular uses of it.").[10]

The government's principal argument on appeal appears to be that the risks of administering psilocybin in the secular medical context are not comparable to those present when psilocybin is administered in Singularism's religious context, largely because the healthcare systems operating under the Psilocybin Act are required to comply with other regulatory precautions typical of a medical office. *See* Appellants' Br., at 29-33.[11] But this argument runs headlong into the U.S. Supreme Court's

---

[10]    *See also H.B. 167 Mental Illness Psychotherapy Drug Task Force*, Utah State Legislature (2022), attached to Singularism's concurrently filed Request for Judicial Notice, as Ex. B.

[11]    The government contends medical research exceptions in a CSA do not indicate a lack of general applicability and that the Psilocybin Act is a "narrow research exception" which only permits the use of psilocybin in "a *controlled and highly regulated medical environment . . .*" Appellants' Br., at 30-31 (emphasis in original). That is not correct.

*First*, the Psilocybin Act authorizes a "behavioral health *treatment program*" of indeterminate size and scope, Utah Code § 58-37-3.5(2) (emphasis added), not merely a research exception. Further, the act says nothing about the *environment* in which psilocybin can be administered.

*Second*, every case the government cites to argue CSAs are generally applicable predates the U.S. Supreme Court's updated general applicability analysis in *Fulton*, *Tandon*, and *Kennedy* and this Court's subsequent decisions in *Does 1-11*, *St. Mary Cath. Par. in Littleton*, and *Renteria* and are otherwise distinguishable. *See United States v. Christie*, 825 F.3d 1048, 1054 n.3 (9th Cir. 2016) (conducting no general

applicability analysis because the case was brought under RFRA, not the First Amendment, amid cannabis prosecution under federal CSA); *Olsen v. Mukasey*, 541 F.3d 827, 832 (8th Cir. 2008) (concluding some exceptions to CSAs do not impact general applicability but conducting no analysis similar to *Fulton*, *Tandon*, or similar caselaw amid civil case regarding cannabis); *United States v. Meyers*, 95 F.3d 1475, 1479, 1481 (10th Cir. 1996) (holding federal CSA was generally applicable without analysis amid cannabis prosecution); *Peyote Way Church of God, Inc. v. Thornburgh*, 922 F.2d 1210, 1213 (5th Cir. 1991) (holding federal and Texas CSAs were generally applicable without analysis amid civil case involving peyote); *Oklevueha Native Am. Church of Haw., Inc. v. Holder*, No. 09-cv-00336, 2012 WL 6738532, at *9 (D. Haw. Dec. 31, 2012) (unpublished) (holding federal CSA was generally applicable without analysis amid civil case involving cannabis); *Multi Denominational Ministry of Cannabis & Rastafari, Inc. v. Gonzales*, 474 F. Supp. 2d 1133, 1143-44 (N.D. Cal. 2007) (holding federal CSA was generally applicable without analysis amid civil case involving cannabis); *O Centro Espirita Beneficiente Espírita Beneficente União v. Ashcroft*, 282 F. Supp. 2d 1236, 1246 (D.N.M. 2002) (decision superseded by *Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418 (2006) which affirmed right to religious use of hoasca); *Ohio v. Cook*, No. 5-19-26, 2020 WL 615076, at *6 (Ohio Ct. App. Feb. 10, 2020) (unpublished) (holding Ohio CSA was generally applicable without analysis amid prosecution for psilocybin); *Hawaii v. Sunderland*, 168 P.3d 526, 533-34 (Haw. 2007) (holding Hawaii CSA generally applicable because it prohibited "without exception, the possession of marijuana" and was "an across-the-board prohibition on specific conduct deemed to be socially harmful by the legislature" amid prosecution involving cannabis); *Trujillo v. Wyoming*, 2 P.3d 567, 576-77 (Wyo. 2000) (holding Wyoming CSA was generally applicable where party failed to argue lack of general applicability amid prosecution of cannabis and psilocybin); *California v. Trippet*, 56 Cal. App. 4th 1532, 1541-42 (Cal. Ct. App. 1997) (reaching only an implicit general applicability holding regarding California's CSA without analysis amid prosecution of cannabis).

*Third*, even presuming the government's cited cases have any vitality after *Fulton*, *Tandon*, and *Kennedy* and this Court's decisions in *Does 1-11*, *St. Mary Cath. Par. in Littleton*, and *Renteria*, they do not

63

statement in *Tandon*: "Where the government permits other activities to proceed with precautions, it must show that the religious exercise at issue is more dangerous than those activities even when the same precautions are applied." 593 U.S. at 63. The government must show that even if Singularism followed all the precautions the healthcare systems take in their psilocybin treatment programs, Singularism still poses a materially greater risk to psilocybin distribution and public health. But the government has not shown and cannot show this.

That is because the government ignores the allegations from Singularism's complaint. But the Court cannot. It must regard Singularism's allegations as true in this claimant-specific motion-to-dismiss analysis. As alleged, Singularism already takes many of the precautions required of the healthcare systems under the Psilocybin Act, including (1) direct supervision by Mr. Jensen, an individual exempt from medical licensure under Title 58 of the Utah Code per the Clergy Exemption; (2) prohibition of administration to individuals under

---

establish a per se rule that CSAs are always generally applicable. Indeed, even the government admits cases exist where CSAs are held to lack general applicability. *See* Appellants' Br., at 28 n.9 (citing *United States v. Boyll*, 774 F. Supp. 1333, 1341 (D.N.M. 1991)).

eighteen years old; and (3) various safety precautions modeled upon guidelines published by Harvard Medical School, Johns Hopkins, and others. App-4:105-08, 110, 112, 136-137. Since opening its spiritual center, only one of Singularism's voyagers has ever experienced an adverse reaction and Singularism followed its emergency protocol to get the voyager to medical treatment and recovery. App-4:107-08, 112. Singularism's landlord never observed "any behavior [at Singularism] that would prompt any concern." App-4:112.

It is hard to imagine a faith group more comparable to a healthcare system administering a psilocybin treatment program for the purposes of general applicability analysis. And even if Singularism does not currently follow every precaution a healthcare system might, the government "must show that the religious exercise at issue is more dangerous than those activities *even when the same precautions are applied.*" *See Tandon*, 593 U.S. at 63 (emphasis added). The government may not grant Intermountain Health and University of Utah Health "an exemption for medical reasons" but deny Singularism "the same exemption for religious reasons . . ." *Does 1-11*, 100 F.4th at 1277 (citation modified).

As to the government's interests that the Utah CSA prevents drug distribution and promotes public health, the risks the Psilocybin Act poses to those interests are comparable to the risks posed by Singularism's religious exercise. Notably, the Psilocybin Act contains no requirement regarding how a healthcare system must source its psilocybin, other than it be of a certain variety, has no chain-of-custody requirements, no storage requirements, no testing requirement, or any other requirement about the psilocybin's quality or purity level. Nothing in the act requires special procedures to ensure psilocybin does not produce unintended effects. Thus, the speculative risk of drug distribution is not eliminated and the risk to individuals' health remains. As the district court found, "a hospital may source its psilocybin from a disreputable source or accidentally administer psilocybin while the patient is on a contraindicating drug. Or a recreational-user patient may feign certain symptoms to be put on a treatment plan involving psilocybin." App-5:167. Just because the Psilocybin Act is run by two healthcare systems does not mean it operates without risk.

There is nothing in Singularism's complaint which indicates Singularism poses materially larger risks to the government's asserted

66

interests in drug distribution or public health. The complaint contains no evidence whatsoever of any drug distribution to the public. App-4:105. And the only relevant allegations regarding public health indicate Singularism follows protocols developed in the medical field and used them for an unexpected reaction, facilitating an individual's treatment by an appropriate medical provider like a healthcare system would. App-4:105-08, 112.

In sum, the government's application of the Utah CSA is not generally applicable, as it "devalues religious reasons [for psilocybin use] by judging them to be of lesser import than nonreligious reasons." *See Does 1-11*, 100 F.4th at 1277. That inequality requires strict scrutiny review.

### iii.   *The Utah CSA Contains a Formal Mechanism for Granting Individual Exemptions.*

*Second*, the Utah CSA contains a formal mechanism for granting individual exemptions. It contains a provision allowing the Utah Division of Professional Licensing to waive the Utah CSA's medical "licensure requirement [if] consistent with public health and safety." Utah Code § 58-37-6(2)(d). And in relevant instance here, the division has done so, confirming Mr. Jensen is exempt from the requirement to hold a license

to practice mental health therapy under the Clergy Exemption. Utah Code § 58-60-107(2)(b); App-4:117.

This public-health-and-safety exemption resembles the "mechanism[s] for individual exemptions" courts have found to indicate a lack of general applicability. In *Sherbert v. Verner*, 374 U.S. 398 (1963), at issue was an unemployment benefits statute which allowed for individualized exemptions through interpretation of its standard about "fail[ing] without good cause . . . to accept available suitable work." *Fulton*, 593 U.S. at 533. The U.S. Supreme Court explained the government's denial of unemployment benefits through application of this individualized exemption to a Seventh-day Adventist claimant whose beliefs prohibited him from working on Saturday "infringed [the claimant's] free exercise rights and could be justified only by a compelling interest." *Id.* at 534.

Similarly, in *Fulton*, the U.S. Supreme Court held that a provision which granted a municipality's commissioner the ability to provide "an exception . . . in his/her sole discretion" to a non-discrimination requirement, even where the commissioner had "no intention of granting an exception," indicated "a system of individual exemptions," such that

68

the municipality could "not refuse to extend that exemption system to cases of religious hardship without compelling reason." *Id.* at 535 (citation modified). The "inclusion of a formal system of entirely discretionary exemptions . . . render[ed] the contractual non-discrimination requirement [at issue] not generally applicable." *Id.* at 536. And in *Does 1-11*, this Court concluded a university's vaccine policy lacked general applicability because it "invited the Administration to evaluate the religious beliefs of employees and students on a case-by-case basis." 100 F.4th at 1272.

Additionally, the Utah CSA's public-health-and-safety exemption also fits the U.S. Supreme Court's qualitative definition of "mechanism[s] for individual exemptions" by permitting the division "to decide which reasons for complying with the policy are worthy of solicitude," here meaning the reasons for licensure exemption the division finds are consistent with public health and safety. *See Fulton*, 593 U.S. at 537. Even pretending the division had "no intention of granting an exception" to Mr. Jensen or another Singularism adherent under this provision (despite the division blessing Mr. Jensen's activities under the Clergy Exemption), the fact that it *could*, under this provision, determine that

69

Singularism's religious practices are "consistent with public health and safety," renders the Utah CSA "not generally applicable, regardless whether any exceptions have been given . . ." *See id.*

Refusing to extend this system of exemptions to Singularism produces an inequality that requires strict scrutiny review. The Court should affirm the district court's conclusion that strict scrutiny governs Singularism's First Amendment claim.

## C.    The District Court Correctly Held the Government Advanced No Relevant Immunity Argument on Singularism's Fourth Amendment Claim.

The government advances just over a page of argument regarding Singularism's Fourth Amendment claim, Appellant's Br., at 34-35, even though it carries the burden of proving absolute immunity from suit, *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993). This is even less briefing than the government advanced below which led the district court to conclude the government had "provide[d] no basis for dismissing the[] claims" against Provo City, Utah County, and Mr. Gray. App-5:170.

Further, the government repeats its error below, making argument applicable only to the dismissed police officer defendants, but making no argument as to the municipal defendants who bring this appeal. It is

70

generally true, as the government argues, that "officials charged with the duty of executing a facially valid court order enjoy absolute immunity from liability for damages in a suit challenging conduct prescribed by that order." *Moss v. Kopp,* 559 F.3d 1155, 1163 (10th Cir. 2009). And while that analysis itself has further layers the government does not address, *see id.*, it is not the proper immunity analysis for the municipal defendants.

Provo City, Utah County, and Mr. Gray as "[m]unicipal entities and local governing bodies," are not "entitled to the traditional common law immunities for § 1983 claims," like quasi-judicial immunity. *See Moss*, 559 F.3d at 1168. Singularism may establish a municipal liability claim against the government by demonstrating the government (1) "executed a policy or custom (2) that caused [Singularism] to suffer deprivation of constitutional or other federal rights." *Id.* In this analysis, this Court has "recognized that a municipality can be liable under § 1983 if the 'final policymaker' takes the unconstitutional action." *Id.* at 1168-69 (quoting *Melton v. City of Oklahoma City,* 879 F.2d 706, 724 (10th Cir.1989)).

Further, there are situations in which this Court has recognized municipal liability "even though the action is taken by an individual

71

other than the final policymaker." *Id.* at 1169. Those include (1) "egregious attempts by local government to insulate themselves from liability for unconstitutional policies" where there is a "widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law," and (2) where "a subordinate's position is subject to review by the municipality's authorized policymakers and the authorized policymakers approve a subordinate's decision and the basis for it, their ratification will be chargeable to the municipality." *Id.* Even more, this Court has clarified that a single incident of unconstitutional activity is sufficient to demonstrate liability where "the particular illegal course of action was taken pursuant to a decision made by a person with authority to make policy decisions on behalf of the entity being sued." *Id.* Municipal liability may also follow from a municipality's failure to train police officers regarding constitutional violations. *See Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1283-84 (10th Cir. 2019).

The government's brief, attempting to sidestep municipal liability analysis, cites a line from *Fenn v. City of Truth or Consequences*, 983 F.3d

72

1143, 1150 (10th Cir. 2020): that a "municipality may not be held liable where there was no underlying constitutional violation by any of its officers." Appellants' Br., at 35. The government argues that because the police officers here were protected by quasi-judicial immunity, the municipal defendants cannot be held liable. But that "blanket justification does not square with circuit precedent holding that municipal liability under *Monell* may exist without individual liability." *Quintana v. Santa Fe Cnty. Bd. of Commissioners*, 973 F.3d 1022, 1033 (10th Cir. 2020).

In *Garcia v. Salt Lake Cty.*, 768 F.2d 303, 310 (10th Cir. 1985), this Court concluded that even where "the acts or omissions of no one employee may violate an individual's constitutional rights, the combined acts or omissions of several employees acting under a governmental policy or custom may violate an individual's constitutional rights." This Court reinforced that rule in *Crowson v. Washington Cnty. Utah*, 983 F.3d 1166, 1191 (10th Cir. 2020). *See also Grays v. Munn*, No. 24-1253, 2025 WL 1924231, at *5 n.5 (10th Cir. July 14, 2025) (unpublished).

Here, the allegations of Singularism's complaint, which this Court must take as true and view in the light most favorable to Singularism,

73

indicate the government is subject to municipal liability. Further, the government's failure to make any municipal liability argument in its opening brief, despite the district court raising the issue, *see* App-8:022, 25-27, 52-53, 60-61, 66-67, indicates the government has waived any municipal liability argument it might possess, *see In re Syngenta AG MIR 162 Corn Litig.*, 61 F.4th at 1181.

Singularism's complaint states a claim for municipal liability. It alleges that a variety of individuals participated in the violative actions, including a county attorney, additional individuals within the county and city attorney's offices, a police chief, a police captain, three detectives, and a police sergeant. App-4:100-02, 104-05, 109-12. The complaint alleges that during the search of Singularism's spiritual center, the lead detective explained that he and the other officers "had been instructed to obtain the search warrant by Utah County Attorney, Defendant Gray," and that the detective "told Mr. Jensen that he was fully aware of Singularism's claim to sincere religious exemption, but that the Utah County Attorney had instructed that there does not exist, and cannot exist, any religious exemptions from the Utah Controlled Substances Act related to psilocybin." App-4:109-10. Roughly a year before the search,

74

Appellate Case: 25-4115    Document: 30    Date Filed: 02/11/2026    Page: 75

Provo City and the Utah County Attorney's Office made consistent statements to the press. App-4:104-05.

The complaint also indicates the supervisory and subordinate relationships between the municipal defendants and the police officers. App-4:100-02, 120-30. Further, the complaint alleges the government's deliberate indifference, stating the government "knowingly and recklessly proceeded in defiance of the protections afforded to sincere religious believers," App-4:100; that Mr. Gray's violative directions to officers "amount[] to knowing disregard, or, at least, reckless disregard, of Singularism's religious rights," App-4:118-19; and that the government's unlawful conduct "was objectively unreasonable, flagrantly unlawful, and undertaken intentionally with willful indifference," App-4:121, 123, 125, 127, 129. The complaint alleges a failure-to-train theory of municipal liability, stating that because "multiple members of the Provo City Police Department, including the Chief, Captain, Detectives, and Sergeant, undertook patently unlawful conduct," it "suggests a complete or reckless lack of training on a subject that officers will encounter on a regular basis." App-4:121, 123-24, 126, 128, 130.

75

These allegations are sufficient to state a claim that the government maintained and was executing a policy or custom of refusing to recognize valid religious exemptions from the Utah CSA, leading to Singularism suffering a deprivation of constitutional and statutory religious liberty rights. *See Moss*, 559 F.3d at 1168. The allegations indicate that a policy, custom, or practice existed or was created at the time of Provo City and the Utah County Attorney's Office's statements to the press and continued at least to the time of the search of Singularism's spiritual center. Moreover, the complaint's allegations identify Mr. Gray and the Provo City Attorney's Office as "final decision-making authorities." *See id.* at 1168-69; App-4:121, 123, 126, 128, 130.

Even if the violative acts were taken by someone besides Mr. Gray or the Provo City Attorney's Office, municipal liability still attaches because Singularism's complaint alleges an egregious practice that, although it may not have been "authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law." *See Moss*, 59 F.3d at 1169. Additionally, the complaint alleges that the detective and the other officers' course of action was "subject to review" by Mr. Gray, the Utah

76

County Attorney's Office, and the Provo City Attorney's Office which approved their subordinates' decision to search Singularism's spiritual center and seize its sacraments, thereby ratifying the violative acts. *See id.*

Even though the search and seizure could be construed as a single incident of unconstitutional activity, that "illegal course of action was taken pursuant to a decision" by Mr. Gray and/or the Provo City Attorney's Office, "a person with authority to make policy decisions on behalf" of Utah County and Provo City and its police officers. *See id.* Even more, that the violative acts occurred at the hands of at least nine different individuals grounds Singularism's municipal liability claim, even if the Court were to determine the police officers were eligible for quasi-judicial immunity. *See Crowson*, 983 F.3d at 1191. Thus, the Court should reject the government's arguments, join the district court's conclusion that the government has advanced no relevant immunity argument as to the municipal defendants, and affirm that Singularism has stated a Fourth Amendment violation.

Even if this Court were to find the allegations of Singularism's complaint insufficient to presently allege municipal liability,

Singularism's Fourth Amendment claim should be dismissed without prejudice, allowing Singularism to seek leave to amend. *See Lucas v. Bd. of Cnty. Commissioners of Cnty. for Larimer Cnty. Colorado*, No. 22-1259, 2023 WL 8271988, at *3 (10th Cir. Nov. 30, 2023) (unpublished); *Quintana*, 973 F.3d at 1033-34 (granting leave to allege a municipal liability claim). The government has made no argument that amendment would be futile. And it would be unable to do so.

Facts contained in the record at this preliminary stage of the case already indicate additional evidence capable of being converted into additional allegations. Such includes Provo City's admission that, "as a matter of course," it issues eviction threat letters to landlords whose tenants utilize controlled substances, in apparent disregard for their religious fee exercise. App-7:185-86; App-8:122-23, 164; Appellants' Br., at 47-48 n.14. Further, after the search of Singularism's spiritual center, the detective indicated he was instructed to disregard Singularism's religious sincerity. He stated that Mr. Jensen "fully feels that since he has founded the religion of Singularism, his use and providing of psilocybin to individuals is legal and protected under federal law as part of the Freedom of Religion. However, when speaking with the Utah

County and Provo City Attorney Offices, it has been expressed that Singularism is not exempt from the Utah Controlled Substances Act." App-4:018; *see also* App-1:293-98; App-4:007-26.

## CONCLUSION

The Court should dismiss the entire appeal for lack of jurisdiction. Should the Court proceed to the merits, it should affirm the district court's anti-suit-injunction and motion-to-dismiss order.

## STATEMENT REGARDING ORAL ARGUMENT

Should the Court not dismiss the entire appeal for lack of jurisdiction, Singularism believes that oral argument will aid the Court's decision-making process and, thus, respectfully requests oral argument.

Dated: February 11, 2026　　　Respectfully submitted,

/s/ *Tanner J. Bean*
Tanner J. Bean
Jacqueline M. Rosen
FABIAN VANCOTT
95 South State Street, Suite 2300
Salt Lake City, Utah 84111
(801) 531-8900
tbean@fabianvancott.com
jrosen@fabianvancott.com

*Counsel for Plaintiffs-Appellees*

79

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT</u>

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7) because, excluding the parts of the documents exempted by Fed. R. App. P. 32(f) and by 10th Cir. Rule 32(B), this document contains 12,122 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), and 10th Cir. R. 32(A) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.


Dated: February 11, 2026   Respectfully submitted,

/s/ *Tanner J. Bean*
Tanner J. Bean
Jacqueline M. Rosen
FABIAN VANCOTT
95 South State Street, Suite 2300
Salt Lake City, Utah 84111
(801) 531-8900
tbean@fabianvancott.com
jrosen@fabianvancott.com

*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF DIGITAL SUBMISSION

I certify that with respect to the foregoing:

(1)    All required privacy redactions have been made per 10th Cir. R. 25.5;

(2)    If required to file additional hard copies, that the ECF submission is an exact copy of those documents;

(3)    The digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program Microsoft Defender Antivirus, Version 1.443.1087.0, last updated February 9, 2026, and according to the program, they are free of viruses.


Dated: February 11, 2026    Respectfully submitted,

/s/ *Tanner J. Bean*
Tanner J. Bean
Jacqueline M. Rosen
FABIAN VANCOTT
95 South State Street, Suite 2300
Salt Lake City, Utah 84111
(801) 531-8900
tbean@fabianvancott.com
jrosen@fabianvancott.com

*Counsel for Plaintiffs-Appellees*