CASE NO. 25-4115

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

BRIDGER LEE JENSEN, SINGULARISM, AND PSYCHE HEALING AND
BRIDGING, LLC,

PLAINTIFFS-APPELLEES

V.

UTAH COUNTY, PROVO CITY, AND JEFFREY GRAY,

DEFENDANTS-APPELLANTS

On Appeal from the United States District Court for the District of Utah Case No.
2:24-cv-00887-JNP-CMR, the Honorable Judge N. Parrish

**BRIEF OF AMICUS CURIAE CHURCH OF DIRECT EXPERIENCE, INC.
IN SUPPORT OF PLAINTIFFS-APPELLEES**

MELISSA E. DEAN
Florida Bar No. 1031982
The Law Office of Melissa Dean, PLLC
322 E Central Blvd., Unit 515
Orlando, FL 32801
Phone: (772) 919-2748
Email: melissadeanesq@gmail.com

DAVID A. CARN
Alabama Bar No. 2418A58C
430 George Wallace Dr., No. 104
Gadsden, AL 35903

Phone: (256) 399-8599
Email: david@davidcarn.com

RONALD W. MCNUTT
TN BPR No. 010804
1822 Primrose Avenue
Nashville, TN 37212
Phone: (615) 298-1735
Email: ronaldwmcnutt@gmail.com

*Counsel for Amicus Curiae*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, the undersigned certifies that Church of Direct Experience, Inc. is a Virginia nonstock corporation, has no parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

Dated: February 18, 2026

Respectfully submitted,

/s/  *Melissa E. Dean*
MELISSA E. DEAN
Florida Bar No. 1031982
The Law Office of Melissa Dean, PLLC
322 E Central Blvd., Unit 515
Orlando, FL 32801
Phone: (772) 919-2748
Email: melissadeanesq@gmail.com

/s/  *David A. Carn*
DAVID A. CARN
Alabama Bar No. 2418A58C
430 George Wallace Dr., No. 104
Gadsden, AL 35903
Phone: (256) 399-8599
Email: david@davidcarn.com

/s/  *Ronald W. McNutt*
RONALD W. MCNUTT
TN BPR No. 010804
1822 Primrose Avenue
Nashville, TN 37212
Phone: (615) 298-1735
Email: ronaldwmcnutt@gmail.com

*Counsel for Amicus Curiae*

ii

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ......................................................... ii

TABLE OF CONTENTS ................................................................................... iii

TABLE OF AUTHORITIES.............................................................................. iv

STATEMENT OF INTEREST AND SUMMARY OF ARGUMENT ...................... 1

INTRODUCTION ............................................................................................. 3

NOVEL PSYCHEDELIC SPIRITUAL CHURCHES .......................................... 8

ARGUMENT ................................................................................................. 11

　I.　Protecting Sacred Space and Associational Privacy Requires Limits on Worship-Surveillance, Seizure of Sacrament, and Identity Exposure ................ 11

　　A.　Undercover Infiltration of Worship is Not Neutral Policing and Requires Good-Faith and Strict Adherence to the Scope of Consent ........................... 12

　　B.　Religion-Targeted Surveillance and Identity Exposure Are Cognizable First Amendment Harms ................................................................................. 18

　II.　Even if Federal Claims Are Dismissed, the Lower Court Should Retain Supplemental Jurisdiction Over Related State Claims ....................................... 21

　　A.　Substantial Time and Energy Has Been Expended ............................... 22

　　B.　Concerns Over Forum Manipulation .................................................... 25

　　C.　Utah's RFRA Is Not Novel or Complex—and Comity Favors Federal Review of RFRA Claims ................................................................................. 26

CONCLUSION .............................................................................................. 29

STATEMENT PURSUANT TO Fed. R. App. P. 29(a) & 10th Cir. R. 29.2 ........... 30

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT .................. 32

CERTIFICATE OF DIGITAL SUBMISSION ................................................... 34

## TABLE OF AUTHORITIES

**Federal Cases** **Pages**

*Anglemyer v. Hamilton Cnty. Hosp.*,
   58 F.3d 533 (10th Cir. 1995) ....................................................... 22, 23, 26

*Ashaheed v. Currington*,
   7 F.4th 1236 (10th Cir. 2021) ................................................................ 12

*Camfield v. City of Okla. City*,
   248 F.3d 1214 (10th Cir. 2001) .............................................................. 15

*Carnegie-Mellon Univ. v. Cohill*,
   484 U.S. 343 (1988) ............................................................................... 25

*Chiles v. Salazar*,
   116 F.4th 1178 (10th Cir. 2024) ............................................................. 27

*Church of the Celestial Heart v. Garland*,
   (E.D. Cal. January 9, 2024) .................................................................... 28

*Church of the Eagle and Condor v. Garland*,
   (D. Ariz. April 22, 2024) ........................................................................ 28

*Church of the Holy Light of Queen v. Holder*,
   443 F. App'x 302 (9th Cir. 2011) ........................................................... 28

*Church of the Holy Light of the Queen v. Mukasey*,
   615 F. Supp. 2d 1210 (D. Or. 2009) .................................................. 13, 28

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
   508 U.S. 520 (1993) .......................................................................... 12, 13

*Citizens Against Rent Control v. City of Berkeley*,
   454 U.S. 290 (1981) ............................................................................... 19

*City of Boerne v. Flores*,
   521 U.S. 507 (1997) ................................................................................. 6

iv

*Dr. A. v. Hochul*,
142 S. Ct. 552 (2021) ............................................................ 3

*Emp. Div. v. Smith*,
494 U.S. 872 (1990) ................................................ 67, 12, 27

*Fulton v. City of Philadelphia*,
141 S. Ct. 1868 (2021) ......................................................... 12

*Franks v. Delaware,*
*438 U.S. 154, 155–56 (1978)* ............................................ 17

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
546 U.S. 418 (2006) ....................................................... 7, 27

*Grace United Methodist Church v. City of Cheyenne*,
451 F.3d 643 (10th Cir. 2006) ............................................. 7

*Hagans v. Lavine*,
415 U.S. 528 (1974) .............................................................. 2

*Hassan v. City of N.Y.*,
804 F.3d 277 (3d Cir. 2015) .............................................. 19

*In re Motor Fuel Temperature Sales Practices Litig.*,
641 F.3d 470 (10th Cir. 2011) ........................................... 19

*Janny v. Gamez*,
8 F.4th 883 (10th Cir. 2021) .................................. 12, 15, 16

*Jones v. Intermountain Power Project*,
794 F.2d 546 (10th Cir. 1986) .................................. 22, 23, 24

*Laird v. Tatum*,
408 U.S. 1 (1972) ............................................................... 19

*Lau v. Cnty. of L.A.*, No. 2:25-cv-04766-SPG-BFM, 2025 U.S. Dist. LEXIS
264794 (C.D. Cal. Sept. 30, 2025) ..................................... 15

*Maryland v. Macon*,
472 U.S. 463 (1985) ........................................................... 15

v

*Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rights Comm'n,*
    584 U.S. 617 (2018) ............................................................... 12, 13

*Mockaitis v. Harcleroad,*
    104 F.3d 1522 (9th Cir. 1997) ................................................ 14

*NAACP v. Ala.,*
    357 U.S. 449 (1958) ............................................................... 19

*Philadelphia Yearly Meeting of the Religious Society of Friends v. U.S. Dep't of Homeland Sec.,*
    767 F. Supp. 3d 293 (D. Md. 2025) ......................................... 19

*Pleasant v. Lovell,*
    876 F.2d 787 (10th Cir. 1989) ................................................ 15

*Presbyterian Church (USA) v. U.S.,*
    752 F. Supp. 1505 (D. Ariz. 1990) ......................................... 13

*Presbyterian Church (USA) v. U.S.,*
    870 F.2d 518 (9th Cir. 1989) .................................................. 19

*Riggs v. Albuquerque,*
    916 F.2d 582 (10th Cir. 1990) ................................................ 19

*Roe v. Cheyenne Mt. Conf. Resort,*
    124 F.3d 1221 (10th Cir. 1997) .............................................. 26

*Salmon v. Schwarz,*
    *948 F.2d 1131, 1137 (10th Cir. 1991)* .................................... 17

*Shook v. U.S.,*
    No. 1:2017mc00024 (D.N.M. 2021) ....................................... 26

*Shrum v. City of Coweta,*
    449 F.3d 1132 (10th Cir. 2006) ................................ 12, 15, 16

*St. Mary Cath. Par. in Littleton v. Roy,*
    154 F.4th 752 (10th Cir. 2025) ............................................... 27

*Stanford v. Texas,*
    379 U.S. 476 (1965) ............................................................... 15

vi

*Thatcher Enters. v. Cache Cnty. Corp.*,
 902 F.2d 1472 (10th Cir. 1990) .................................................. 22, 23, 24

*United Mine Workers v. Gibbs*,
 383 U.S. 715 (1966) ...................................................................... 22

*U.S. v. Aguilar*,
 883 F.2d 662 (9th Cir. 1989) ........................................................ 13

*Wagenmann v. Adams*,
 829 F.2d 196 (1st Cir. 1987) ........................................................ 16

## United States Constitution

U.S. Const. amend. I ...................................................................... 12

## Federal Statutes

21 U.S.C. §§ 801–971 ...................................................................... 6

28 U.S.C. § 1367(c)(1) .................................................................. 24, 26

42 U.S.C. §§ 2000bb–2000bb-4 ...................................................... 6

## State Statutes

UTAH CODE ANN. § 63-G-33-201 ...................................................... 6

## Other Authorities

A. van der Braak, *Multiple Religious Belonging and Comparative Theology,* in A
 COMPANION TO COMPARATIVE THEOLOGY 531, 531–47 (Paul Valkenberg ed.,
 Brill 2022) [10.1163/9789004388390_030]. ......................................9

Brad Stoddard, Entheogens: Psychedelic Religion in the United States, Part One, 17 Religion Compass e12474 (2023), https://doi.org/10.1111/rec3.12474. ..........9

Brad Stoddard, Entheogens: Psychedelic Religion in the United States, Part Two, 17 *Religion Compass* e12477 (2023), https://doi.org/10.1111/rec3.12477. ..........9

Catherine Cornille, *Multiple Religious Belonging and Christian Identity* (2012), https://scholarcommons.scu.edu/sc_lectures/1 ......................................................9

Charles M. Stang, *Psychedelic Futures and Altered States in the Religions of the Ancient Mediterranean*, 117 HARV. THEOLOGICAL REV. 864, 864–65 (2024) [10.1017/S0017816024000373].. ...............................................................................3

CHURCH OF DIRECT EXPERIENCE, ABOUT US, https://directexperience.org/#about (last visited Feb. 18, 2026). ..................................................................................1

CHURCH OF GAIA, LEGAL INFORMATION, https://www.churchgaia.org/about-us/legal-information (last visited Feb. 12, 2026). .......................................................8

Corinne M. Hazel & Daniel G. Panaccione, *A New Species of Periglandula Symbiotic with the Morning Glory* Ipomoea tricolor, 117 MYCOLOGIA 602, 602–14 (2025) [10.1080/00275514.2025.2483634]. ...................................................4

Drug Enf't Admin., Diversion Control Div., *Guidance Document* (Nov. 20, 2020), https://www.deadiversion.usdoj.gov/GDP/(DEA-DC-5)(EO-DEA-007)(Version2)RFRA_Guidance_(Final)_11-20-2020.pdf (last visited Feb. 12, 2026). ................................................................................................................7

F.J. Carod-Artal, *Alucinógenos en las Culturas Precolombinas Mesoamericanas*, 30 NEUROLOGÍA 42, 42–49 [10.1016/j.nrleng.2011.07.010]. ..........................3, 4

Jeffrey Breau, *Charting Novel Psychedelic Spiritual Communities*, Research Reflections Series, Ctr. for the Study of World Religions (Harv. Divinity Sch.) (Mar. 17, 2025), https://dash.harvard.edu/handle/1/42720243 .........................8, 9

Jeffrey Breau, *What a Psychedelic Church Reveals about Religion and the Law*, *Bill of Health* (Petrie-Flom Ctr., Harv. L. Sch.) (Nov. 28, 2025), https://petrieflom.law.harvard.edu/2025/11/28/what-a-psychedelic-church-reveals-about-religion-and-the-law/.................................................................10

Jeffrey Breau, *What Makes Psychedelic Experiences Sacred?*, Ctr. for the Study of World Religions (Harv. Divinity Sch.) (Oct. 21, 2025), https://cswr.hds.harvard.edu/news/2025/10/21/what-makes-psychedelic-experiences-sacred. ..............................................................................................9

JUAN DE CÁRDENAS, PROBLEMAS Y SECRETOS MARAVILLOSOS DE LAS INDIAS 11 (2d ed., Imp. Del Museo N. de Arqueología 1913) (1591) (translated from original Spanish)..............................................................................................................4

PATRICK E. MCGOVERN, UNCORKING THE PAST: THE QUEST FOR WINE, BEER, AND OTHER ALCOHOLIC BEVERAGES 89 (Univ. of Calif. Press 2009); MICHAEL A. RINELLA, PHARMAKON: PLATO, DRUG CULTURE, AND IDENTITY IN ANCIENT ATHENS 3–10 (Lexington Books, 2010). ............................................................3

Pew Research Ctr., Pew Forum on Religion & Pub. Life, *Eastern, New Age Beliefs Widespread: Many Americans Mix Multiple Faiths* (Dec. 2009), https://www.pewresearch.org/religion/2009/12/09/many-americans-mix-multiple-faiths/. ...................................................................................................10

RICHARD EVANS SCHULTES & ALBERT HOFMANN, PLANTS OF THE GODS: ORIGINS OF HALLUCINOGENIC USE 9 (Alfred van der Marck Editions 1987)..........................5

**STATEMENT OF INTEREST AND SUMMARY OF ARGUMENT**

*Amicus curiae* Church of Direct Experience, Inc. ("CODE") is a nonprofit, volunteer-run entheogenic church that has operated for over a decade. CODE's mission is to protect the ability of individuals and faith communities to engage in sincere sacramental practices involving sacred plants without undue government interference. As CODE's mission statement explains, "everyone deserves the right to explore their own religious path through direct experiences with sacred plants," and CODE seeks to ensure such practices are "protected, safe, and recognized by law, honoring the ancient traditions that have guided humanity for millennia."[1]

CODE's interest here is existential and best understood through a specific lens. It is a structured, governance-driven religious institution that prioritizes safety, legal compliance, and pursuing lawful religious freedom accommodation. CODE respects neutral enforcement, and does not claim categorical immunity from neutral laws—it seeks structured, lawful accommodation under religious freedom laws and constitutional guardrails that remain practically meaningful, and avoid investigatory practices that uniquely burden emerging sacramental religious communities, causing dreaded "chilling effects." In addition, CODE clarifies that its sacramental practices are religious in purpose and distinct from commercial or medical models. It operates

---

[1] CHURCH OF DIRECT EXPERIENCE, ABOUT US, https://directexperience.org/#about (last visited Feb. 18, 2026).

through documented screening and pastoral oversight structures and does not function as a retail or commercial enterprise.

Like other entheogenic faith communities, CODE's religious exercise depends on trust, confidentiality, and structured safety practices, including governance oversight, screening protocols, and supervised ceremonies. Participants share sensitive spiritual and personal information for safety screening and pastoral support. When the government uses covert participation, seizes or copies sacred writings or religious records, or pressures disclosure of member identity, the chilling effects are concrete: members withdraw, participation drops, and the community's ability to worship and associate is impaired before merits adjudication.

CODE files this brief in support of Plaintiffs-Appellees. CODE seeks to provide context on (1) the deep history of entheogenic religious traditions—particularly in the pre-Columbian Americas—with patterns of repression that persist in modern forms today; (2) the First and Fourth Amendment interests implicated when investigations and warrant execution intrude on sincere religious exercise, sacred materials, and associational privacy; and (3) why the lower court's exercise of supplemental jurisdiction over state-law claims that are not novel or complex, should be upheld under considerations of judicial economy, convenience, fairness, and comity.

## INTRODUCTION

The idea that psychoactive sacraments have historically been used in sincere religious practices is inarguable. Even wine—a sacrament in Christianity—and other alcoholic beverages were likely more powerful in the past, with the addition of psychoactive ingredients other than alcohol.[2] So-called psychedelics, in particular, are considered "*one among many* practices of transcendence and transformation . . . part of a broad array of practices that help occasion altered states, that help us transcend and transform."[3]

The history of psychedelic use in Western culture is a more complicated picture, but the religious use of psychedelics or hallucinogens in the pre-Columbian Americas is very well documented. Several sixteenth-century historians described indigenous cultures using hallucinogenic plants, fungi, and even animal venom during their religious ceremonies.[4] Franciscan friar and pioneering ethnographer,

---

[2] PATRICK E. MCGOVERN, UNCORKING THE PAST: THE QUEST FOR WINE, BEER, AND OTHER ALCOHOLIC BEVERAGES 89 (Univ. of Calif. Press 2009); MICHAEL A. RINELLA, PHARMAKON: PLATO, DRUG CULTURE, AND IDENTITY IN ANCIENT ATHENS 3–10 (Lexington Books, 2010).

[3] Charles M. Stang, *Psychedelic Futures and Altered States in the Religions of the Ancient Mediterranean*, 117 HARV. THEOLOGICAL REV. 864, 864–65 (2024) [10.1017/S0017816024000373] (emphasis in original).

[4] F.J. Carod-Artal, *Alucinógenos en las Culturas Precolombinas Mesoamericanas*, 30 NEUROLOGÍA 42, 42–49 [10.1016/j.nrleng.2011.07.010].

Bernardino de Sahagún, documented the use of *teonanácatl* (psilocybin mushrooms), *peiotl* (peyote), and *ololiuquj* seeds from morning glory plants (now known to be symbiotic with a newly identified hallucinogenic fungus),[5] to name just a few examples.[6] Unfortunately, "The conquistadors soon associated these trance states and the hallucinogenic effect[s] . . . with witchcraft and charlatanism, and they refused to recognize the religious and mystical significance of these ceremonies."[7] Thus begins the conundrum before us today.

Centuries later, in the 1930s, Dr. Richard Evans Schultes traveled to Oaxaca, Mexico, to a village where he acquired mushrooms that later would be identified as *Psilocybe cubensis* and other hallucinogenic species. Together with Albert Hofmann,

---

[5] Corinne M. Hazel & Daniel G. Panaccione, *A New Species of Periglandula Symbiotic with the Morning Glory* Ipomoea tricolor, 117 MYCOLOGIA 602, 602–14 (2025) [10.1080/00275514.2025.2483634].

[6] For references to primary sources, see Carod-Artal, *Alucinógenos*.

[7] *Id.* at 47. For example, a Spanish physician and natural philosopher wrote, in 1591:

> It is said with truth of peyote, and ololiuhqui, that if they are taken by mouth, they so truly drive the wretch who takes them out of his mind that the devil and other terrible and frightful phantoms appear to him, and even warn him (so they say) of things to come; and it must all be tricks and lies of Satan, whose nature is to deceive with divine permission the wretch who on such occasions seeks him.

JUAN DE CÁRDENAS, PROBLEMAS Y SECRETOS MARAVILLOSOS DE LAS INDIAS 11 (2d ed., Imp. Del Museo N. de Arqueología 1913) (1591) (translated from original Spanish).

4

who synthesized psilocybin for the first time, Schultes coauthored *Plants of the Gods*, about psilocybin and other natural psychedelic plants that had been sacred through past and present indigenous spiritual history:

> The use of hallucinogenic plants has been a part of human experience for many millennia, yet modern Western societies have only recently become aware of the significance that these plants have had in shaping the history of primitive and even of advanced cultures. . . . [T]hese mind-altering plants . . . have long played an important role in the religious rites of early civilizations and are still held in veneration and awe as sacred elements by certain peoples who have continued to live in cultures less developed bound to ancient traditions and ways of life.[8]

Following the work of Dr. Schultes, retired banker and pioneering ethnobotanist Gordon Wasson returned to Oaxaca in the 1950s, participating with others in mushroom ceremonies that he would most famously write about in a 1957 *Life* magazine article entitled, "Seeking the Magic Mushroom."[9] Wasson's article is widely considered to have reintroduced to the broader public a sacred mushroom culture that, since the conquistadors, had effectively gone into hiding (and that arguably wished to stay that way, since Wasson also infamously included identifying information against the will of locals).[10]

---

[8] RICHARD EVANS SCHULTES & ALBERT HOFMANN, PLANTS OF THE GODS: ORIGINS OF HALLUCINOGENIC USE 9 (Alfred van der Marck Editions 1987).

[9] R. Gordon Wasson, *Seeking the Magic Mushroom*, LIFE, May 13, 1957, at 100.

[10] *See* H. B. Urban, *Still Seeking the Magic Mushroom: R. Gordon Wasson and the Complex Origins of Psychedelic Scholarship on Mysticism*, in MYSTICISM AND THE

This history rediscovered by Schultes, Wasson, and others would lead, ultimately, to a series of Supreme Court cases and laws recognizing the protected use of religious sacraments that were since scheduled on the Controlled Substances Act, 21 U.S.C. §§ 801–971—but not without further resistance. Most notably, the Supreme Court refused to afford First Amendment protection for use of peyote as a sacrament in *Emp. Div. v. Smith*, 494 U.S. 872 (1990). The Court held that the free exercise of religion offers no protection from the application of a rule of general applicability. *Id.* at 878–82, 890. The Court's decision, however, received bipartisan criticism, and Congress was motivated to act.

In 1993, Congress legislatively overturned the diminished constitutional scrutiny adopted in *Smith* by enacting of the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb–2000bb-4. The *Smith* decision is no longer the correct analysis under federal law, having had its analysis overturned by statute for all federal government activity. Many states adopted similar legislation when RFRA was construed, in *City of Boerne v. Flores*, 521 U.S. 507 (1997), to apply exclusively to federal enforcement activity. As of 2024, Utah is one of those states that has its own version of RFRA. UTAH CODE ANN. § 63-G-33-201.

---

MARGINS: INTERDISCIPLINARY APPROACHES TO THE STUDY OF MYSTICISM (D. M. Odorisio ed., Palgrave Macmillan 2025).

With respect to RFRA and the religious use of psychedelics—the original impetus for the statute, following the decision in *Smith*—the air was cleared in 2006. In a unanimous 8-0 decision, the Supreme Court applied RFRA and upheld the right of practitioners in the branch of the União do Vegetal church in New Mexico to use ayahuasca, a plant-based sacramental preparation with a long history of religious use. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006).

Despite all these advancements, the ethos of the conquistadors persists. The DEA's Diversion Control Division issued a "Guidance Regarding Petitions for Religious Exemption from the Controlled Substances Act Pursuant to the Religious Freedom Restoration Act," which invites applicants to pursue its administrative process—but only if they refrain from the religious use of controlled substances while the petition is pending. The guidance has existed since 2009 and was revised in 2020,[11] yet until recently the DEA had not approved a petition absent court intervention. In May 2024, the Government Accountability Office admonished the DEA's approach as overly prohibitive and obstructionist.[12] One year later, in May

---

[11] Drug Enf't Admin., Diversion Control Div., *Guidance Document* (Nov. 20, 2020), https://www.deadiversion.usdoj.gov/GDP/(DEA-DC-5)(EO-DEA-007)(Version2)RFRA_Guidance_(Final)_11-20-2020.pdf (last visited Feb. 12, 2026).

[12] U.S. Gov't Accountability Off., *DEA Should Improve Its Religious Exemptions Petition Process for Psilocybin (Mushrooms) and Other Controlled Substances*,

2025, the DEA approved its first applicant under the petition process—the Church of Gaia (Spokane, Washington).[13]

## NOVEL PSYCHEDELIC SPIRITUAL CHURCHES

CODE's concerns arise within a documented shift in American religious life. As participation in organized, majority-faith religion has declined, interest in entheogenic religious practice has grown, and scholars describe "novel psychedelic spiritual communities" ("NPSCs") as an increasingly prominent way Americans pursue transcendence, community, and meaning through structured, sacramental use of psychedelics in religious settings.[14] These communities often call themselves "churches," emphasize radical inclusivity, and frequently lack single denominational lineages.[15] And while the word "religion" can connote dogmatism or top-down hierarchy, many still "view psychedelic use as an ancient, if not the most ancient,

GAO-24-106630 (May 30, 2024), https://www.gao.gov/products/gao-24-106630 (last visited Feb. 12, 2026).

[13] CHURCH OF GAIA, LEGAL INFORMATION, https://www.churchgaia.org/about-us/legal-information (last visited Feb. 12, 2026).

[14] Jeffrey Breau, *Charting Novel Psychedelic Spiritual Communities*, Research Reflections Series, Ctr. for the Study of World Religions (Harv. Divinity Sch.) (Mar. 17, 2025), https://dash.harvard.edu/handle/1/42720243.

[15] *Id*.

form of religion."[16] Researchers observing CODE and similar NPSCs report that participants describe ceremonies as "communion" and "sacred," and that shared interpretation functions as a hermeneutic practice within the community.[17,18] Despite their varied organizational structures, NPSCs reflect sincere religious organizations and a growing form of American religious life.[19]

Singularism likewise reflects common features of NPSCs, including but not limited to embracing multiple religious belonging[20]—participation in more than one religious tradition simultaneously—which is common around the world[21] and in the United States.[22] Avoiding rigid doctrine and messianic leadership may also be

---

[16] *Id.*; See also Brad Stoddard, *Entheogens: Psychedelic Religion in the United States, Part Two*, 17 RELIGION COMPASS e12477 (2023) [10.1111/rec3.12477].

[17] Jeffrey Breau, *What Makes Psychedelic Experiences Sacred?*, Ctr. for the Study of World Religions (Harv. Divinity Sch.) (Oct. 21, 2025), https://cswr.hds.harvard.edu/news/2025/10/21/what-makes-psychedelic-experiences-sacred.

[18] Brad Stoddard, *Entheogens: Psychedelic Religion in the United States, Part One*, 17 RELIGION COMPASS e12474 (2023), https://doi.org/10.1111/rec3.12474.

[19] Breau, *Charting Novel*.

[20] A. van der Braak, *Multiple Religious Belonging and Comparative Theology,* in A COMPANION TO COMPARATIVE THEOLOGY 531, 531–47 (Paul Valkenberg ed., Brill 2022) [10.1163/9789004388390_030].

[21] Catherine Cornille, *Multiple Religious Belonging and Christian Identity* (2012), https://scholarcommons.scu.edu/sc_lectures/1

[22] Pew Research Ctr., Pew Forum on Religion & Pub. Life, *Eastern, New Age Beliefs Widespread: Many Americans Mix Multiple Faiths* (Dec. 2009),

especially important in psychedelic-using communities. Psychedelics are thought to increase suggestibility and can contribute to grandiosity, and their misuse can cause significant religious harm.[23] Singularism appears to consciously seek to avoid these risks. Its articles of belief, for example, include a section cautioning against "cultish behavior." App-1:233.

Against this backdrop, the government's effort to broadly characterize NPSC ceremonies as illicit commercial activity misconstrues both their purpose and their practice. Treating entheogenic worship as an unregulated drug marketplace collapses a sacrament into a commodity and ignores the governance, screening, and pastoral structures that define these communities. Recreational access is not why participants join a church; entheogenic churches exist to facilitate sincere religious exercise in which these substances are understood and used as sacraments and tools of communion.

Taking this all into account, let us consider the case of Singularism and the practical stakes of government enforcement choices

---

https://www.pewresearch.org/religion/2009/12/09/many-americans-mix-multiple-faiths/.

[23] Jeffrey Breau, *What a Psychedelic Church Reveals about Religion and the Law*, *Bill of Health* (Petrie-Flom Ctr., Harv. L. Sch.) (Nov. 28, 2025), https://petrieflom.law.harvard.edu/2025/11/28/what-a-psychedelic-church-reveals-about-religion-and-the-law/.

## ARGUMENT

**I.      Protecting Sacred Space and Associational Privacy Requires Limits on Worship-Surveillance, Seizure of Sacrament, and Identity Exposure**

When executive actors treat religious worship as a surveillance opportunity—through covert participation, a search that sweeps in sacred writings and sacramental materials, and enforcement exposing participant identities—the constitutional injury is immediate. The First Amendment protects not only belief, but the conditions that make communal worship possible: confidentiality, trust, and the freedom to gather without fear of government scrutiny. Once sacred confidences are seized or identities are exposed, the harm is not easily undone—and the same enforcement choices would trigger alarm if routinely directed at majority-faith congregations.

These risks are compounded when enforcement effectively places untrained investigators in the role of religious gatekeepers, judging whether an unfamiliar faith is "legitimate" based on indirect cues rather than any objective standard. CODE understands that law enforcement are trained to investigate crime, not to evaluate the meaning of sacrament or the role confidentiality plays in ceremony. Even where the government asserts compelling interests in public health, safety, and diversion control, the Constitution requires enforcement choices that remain neutral toward religion and avoid unnecessary burdens on religious exercise—particularly where less intrusive alternatives are obviously available.

11

**A. Undercover Infiltration of Worship is Not Neutral Policing and Requires Good-Faith and Strict Adherence to the Scope of Consent**

The Free Exercise Clause subjects non-neutral or non-generally applicable burdens on religious exercise to strict scrutiny, and those limits apply fully to executive enforcement actions as well as legislation. U.S. Const. amend. I; *Ashaheed v. Currington*, 7 F.4th 1236, 1243–44 (10th Cir. 2021); *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993); *Shrum v. City of Coweta*, 449 F.3d 1132, 1144–45 (10th Cir. 2006).

Government action is not neutral when it burdens religious exercise because officials deem the beliefs illegitimate, restrict conduct because of its religious character, or act with intolerance toward religious practice. *Janny v. Gamez*, 8 F.4th 883, 911–12 (10th Cir. 2021) (citing *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021); *Emp. Div. v. Smith*, 494 U.S. 872, 877 (1990)). Neutrality is assessed in context—including the sequence of events and decisionmaker statements—particularly where officials treat a faith as categorically illegitimate. *Janny*, 8 F.4th at 911; (citing *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 584 U.S. 617, 638–39 (2018)).

These constraints are especially important when officers enter worship settings through covert participation. Even if the invited-informer doctrine defeats a categorical Fourth Amendment warrant requirement, the First Amendment imposes independent limits: infiltration must serve a good-faith law-enforcement purpose

12

and remain within the scope of invitation, to prevent "unbridled and inappropriate covert activity" directed at First Amendment activity. *Presbyterian Church (USA) v. U.S.*, 752 F. Supp. 1505, 1516 (D. Ariz. 1990); *see U.S. v. Aguilar*, 883 F.2d 662, 705 (9th Cir. 1989).

### 1. Where Worship Invites Sunlight, Covert Infiltration Is Especially Suspect

Where a minority-faith community invites sunlight through open engagement and transparency about its practices, covert infiltration is especially difficult to justify. Transparency does not waive constitutional protection because the Free Exercise Clause safeguards outward religious practice, not only inward beliefs. *Dr. A. v. Hochul*, 142 S. Ct. 552, 555 (2021) (quoting *Emp. Div.*, 494 U.S. at 877). The Constitution "commits government itself to religious tolerance," and even slight indications that official action rests on "animosity to religion or distrust of its practices" trigger constitutional concern;. *Church of the Lukumi*, 508 U.S. at 547. It likewise forbids presuppositions that religious beliefs or practices are illegitimate *Masterpiece Cakeshop,* 584 U.S. at 638–39. Nor does discretion or confidentiality in minority-faith ceremony negate sincerity—particularly where participants face prosecution or professional risk. *Church of the Holy Light of the Queen v. Mukasey*, 615 F. Supp. 2d 1210, 1219 (D. Or. 2009).

CODE does not contend that undercover investigations or controlled-substances enforcement are categorically unlawful. The narrower point is that when

13

the government deploys its most intrusive tools inside worship settings—aimed at sacred materials, member identity, and pastoral communications—those choices impose immediate First Amendment burdens on minority religions. Where the government asserts interests in health, safety, and diversion control, and the organization operates with aligned goals and structured safeguards, covert participation can function less as neutral fact-gathering than as a legitimacy test without an objective standard, with predictable effects on worship and association. In those circumstances, good-faith engagement and narrowly tailored, less intrusive means should be the government's starting point.

The Ninth Circuit case, *Mockaitis v. Harcleroad*, illustrates why courts should scrutinize purpose, scope, and tailoring where enforcement intrudes into sacramental space. 104 F.3d 1522 (9th Cir. 1997). There, the prosecutor's decision to record a jailhouse sacramental confession was not treated as neutral investigative work; the Ninth Circuit held that the prosecutor's actions substantially burdened Free Exercise because a Catholic sacramental confession depends on absolute confidentiality, and recording it undermined the sacrament itself. *Id.* at 1530–33. Applying RFRA, the court rejected the tactic as unnecessary where ordinary investigative methods could pursue the government's goals without compromising a core religious practice. *Id*. The court also warned against allowing judicial authorization to "wire a church"

14

whenever the government believed privileged religious communications might yield evidence. *Id.* at 1533.

Such a warning should not turn on whether a faith is familiar or popular. When a minority-faith community invites transparency, yet the government chooses covert participation and enforcement tools reaching sacred materials, member identity, or pastoral communications, courts should require "scrupulous exactitude" (discussed in the next section) to the scope of invitation and examine less intrusive alternatives. Here, it strains credulity to conclude extended covert participation was necessary to understand practices that Singularism openly disclosed.

### 2. The Warrant Execution Confirmed Sacred Materials and Produced Immediate Chilling Effects

When warrants foreseeably implicate expressive or sacred materials, the Fourth Amendment requires "scrupulous exactitude." *Maryland v. Macon*, 472 U.S. 463, 468 (1985) (quoting *Stanford v. Texas*, 379 U.S. 476, 485 (1965)); *Camfield v. City of Okla. City*, 248 F.3d 1214, 1230 (10th Cir. 2001); *Pleasant v. Lovell*, 876 F.2d 787, 794 (10th Cir. 1989); see also *Lau v. Cty. of L.A.*, No. 2:25-cv-04766-SPG-BFM, 2025 U.S. Dist. LEXIS 264794, at *14 (C.D. Cal. Sep. 30, 2025) (referral for prosecution may objectively chill protected activity). Free Exercise protections likewise extend beyond overt hostility; ostensibly secular enforcement choices may still substantially burden religious exercise. *Janny*, 8 F.4th at 912; *Shrum*, 449 F.3d at 1144. When officials cross that line, it is "more an egregious trespass into

15

constitutionally well-marked terrain than an accidental inching across some vaguely-defined legal border." *Janny*, 8 F.4th at 918 (quoting *Wagenmann v. Adams*, 829 F.2d 196, 209 (1st Cir. 1987)).

Searches in entheogenic church settings impose lasting harms. CODE members attend ceremony with the reasonable expectation they are engaging in a private religious practice—not performing their faith under a government spotlight. Many fear even being placed on a membership list given the risk of subpoenas and compelled testimony about intensely personal spiritual experiences. Those concerns are not speculative. CODE has pastoral communications and sensitive screening and safety information, and the prospect that those materials could be seized, copied, or weaponized would chill participation and fracture the trust the community depends on—undermining candid safety screening and decimating the church's ability to function as a secure religious community.

That is what happened here. Officers immediately recognized that what they were seizing was "holy sacrament" central to Singularism's faith. App-4:018. Mr. Jensen identified sacramental psilocybin secured in a safe, and officers photographed "journey" records that Singularism regards as scripture. App-4:017–4:018. Despite a contemporaneous notice letter from Singularism's attorney that this was an openly disclosed entheogenic religious practice, county and city attorneys refused to consider any religious-exemption issues and moved toward a prosecution referral.

16

App-6:014. Officers then directed Mr. Jensen to cease operations and indicated criminal charges were forthcoming. *Id*. The next day, police threatened the landlord with enforcement consequences unless it evicted the church. *Id*.

A warrant is not insulated from First Amendment scrutiny when probable cause is built through material misstatements or omissions that shape the magistrate's understanding of whether the targeted "papers" are ordinary evidence or presumptively protected religious expression. See *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978). In this Circuit, material omissions that undermine probable cause are evaluated the same way as affirmative falsehoods. *Salmon v. Schwarz*, 948 F.2d 1131, 1137 (10th Cir. 1991).

Such a level of scrutiny is especially necessary where enforcement follows covert participation in worship, and the affidavit reframes openly disclosed religious practice as a criminal "guise," while minimizing or omitting context bearing on sincerity and protected religious character. App-6:053. With such a posture, the chilling harm is not merely a downstream consequence of execution; it is foreseeable at the moment the government seeks judicial authorization to seize or copy sacred writings and member-adjacent records.

The officers' contemporaneous acknowledgment of the materials' religious character underscores the constitutional stakes at the warrant stage. When executing officers are affirmatively notified that seized items are scripture and sacrament

17

integral to a faith community, the analysis cannot end with a magistrate's signature. The First Amendment requires courts to examine whether the warrant process itself accounted for the heightened protections applicable to sacred writings and member-adjacent materials.

Practically, this means demanding particularity and minimization measures designed to segregate protected religious materials from the outset—not after copying and dissemination have already occurred. Otherwise, the constitutional injury is effectively baked into the warrant's execution. When law enforcement lacks training to assess religious sincerity, yet effectively treats a church's practices as illegitimate to obtain a warrant and seize sacred materials, that exercise of executive discretion warrants heightened constitutional scrutiny. App-1:293–1:298.

On this record, procedural formalities do not end the analysis. Where a warrant foreseeably reaches sacred or expressive materials, "scrupulous exactitude" is required, and the Court must account for the downstream burdens of seizure, copying, and prosecutorial use—especially where, as here, the community invited transparency and less intrusive means were available.

## B. Religion-Targeted Surveillance and Identity Exposure Are Cognizable First Amendment Harms

When covert infiltration turns into enforcement, a second and foreseeable harm follows: religion-targeted surveillance and identity exposure that has a chilling effect on association and can shrink a minority faith community before any merits

18

adjudication. As the Third Circuit recognized in *Hassan v. City of N.Y.*, "Different religious groups have borne the brunt of majority oppression during different times, and the battle against religious prejudice continues," 804 F.3d 277, 303-04 (3d Cir. 2015), and allegations of covert monitoring, reduced attendance, and self-censorship can describe concrete First Amendment injuries. *Id.* at 287–88, 309; *Shrum*, 449 F.3d at 1144–45. Courts likewise recognize that covert surveillance can inhibit First Amendment activity and produce cognizable chilling effects. *Riggs v. City of Albuquerque*, 916 F.2d 582, 585–86 (10th Cir. 1990) (distinguishing *Laird v. Tatum*, 408 U.S. 1 (1972)).

The First Amendment also protects the associational privacy needed for collective religious expression. *Citizens Against Rent Control v. City of Berkeley*, 454 U.S. 290, 294–95 (1981); *NAACP v. Alabama,* 357 U.S. 449, 462–63 (1958). The Tenth Circuit applies the same principle where disclosure is likely to impede future collective expression. *In re Motor Fuel Temperature Sales Practices Litig.*, 641 F.3d 470, 479–80 (10th Cir. 2011). Chilling effects are concrete organizational harms for churches when connected to surveillance-linked withdrawal from services, reduced participation, canceled activities, diverted clergy time, and impaired ministry. *Presbyterian Church (USA) v. U.S.*, 870 F.2d 518, 521–22 (9th Cir. 1989); *Philadelphia Yearly Meeting of the Religious Society of Friends v. U.S. Dep't of Homeland Sec.,* 767 F. Supp. 3d 293, 313–14 (D. Md. 2025).

19

The record in Singularism's case reflects the same markers of targeting and chilling effects. Singularism requires extensive personal disclosures and formal commitments to confidentiality and privacy. App-1:133–1:141, 140–141, 144, 148, 153, 160–162. Its doctrine "Write Your Own Scripture" treats voyagers' revelations during ceremony as "living scripture." App-1:231–1:234; App-1:243–1:244. In that context, photographing participant writings and exposing identity predictably deters participation and burdens association—and the record confirms concrete harm through diminished community participation and measurable operational and financial losses. App-3:015.

CODE's experience confirms why religion-targeted surveillance and identity exposure impose a cognizable First Amendment burden—especially for entheogenic faiths. Members enter ceremony and often disclose the most personal dimensions of their lives—grief after a child's suicide, fear and pain during a cancer diagnosis, or other profoundly private struggles—precisely because that private sanctuary is understood to be confidential and spiritually safe. Many CODE members are also licensed professionals (including doctors and lawyers) who reasonably fear that disclosure of their religious practice could jeopardize careers and licenses, making surveillance or compelled disclosure uniquely chilling.

History underscores why First and Fourth Amendment protections crucially matter as minority faiths in America have repeatedly been singled out for religious

20

animus and exceptional government scrutiny. This includes, for example, the once-new religious movement of the Latter-day Saints that is now well-accepted in Utah. The Constitution simply must protect the sanctuary of intimate religious communion and associational privacy, so adherents can sincerely express themselves together without fear that government agents will infiltrate, expose identities, or unfurl the most private contours of their religious lives into the spotlight.

## II.    Even if Federal Claims Are Dismissed, the Lower Court Should Retain Supplemental Jurisdiction Over Related State Claims

Even if this Court dismisses all federal claims, supplemental jurisdiction over state law claims should be retained, after balancing all factors for judicial economy, convenience, fairness, and comity. The parties are far along in their pretrial efforts—but most importantly, Plaintiffs filed this action in state court, and the Defendants removed to federal district court, which so far has ruled in Plaintiffs' favor largely on *state* claims (particularly, Utah's RFRA). Allowing Defendants to regain a state forum by simply deleting federal claims has the appearance of forum manipulation that should, balanced with other factors, favor retaining supplemental jurisdiction. Additionally, Utah's RFRA is not novel or complex, and in fact, federal courts are arguably best positioned to decide any RFRA claim.

For the purposes of this amicus brief, we will assume generally that the district court had the constitutional power to exercise supplemental jurisdiction. The issue

21

we will focus on is whether, balancing all relevant factors, supplemental jurisdiction

should be retained even if Defendants succeed in having all federal claims dismissed.

### A. Substantial Time and Energy Has Been Expended

As the Tenth Circuit has observed, "A federal court justifiably may retain

jurisdiction of the pendent claims <u>if substantial time and energy have been expended</u>

on the case prior to disposition of the federal claims." *Jones v. Intermountain Power*

*Project*, 794 F.2d 546, 550 (10th Cir. 1986) (emphasis added).[24] In *Thatcher Enters.*

*v. Cache Cnty. Corp.*, the Tenth Circuit also included "the nature and extent of

pretrial proceedings" as a factor for supplemental jurisdiction. 902 F.2d 1472, 1478

(10th Cir. 1990). Finally, citing *Jones* and *Thatcher*, the Tenth Circuit acknowledged,

"We have previously expressed concern that district courts be aware of the extent of

the litigants' pretrial efforts." *Anglemyer v. Hamilton Cnty. Hosp.*, 58 F.3d 533, 541

(10th Cir. 1995).

---

[24] A similar interpretation of pendent jurisdiction case *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715 (1966), is found in Justice Powell's dissent (with Chief Justice Burger and Justice Rehnquist joining) in *Hagans v. Lavine*,

> The correct reading of *Gibbs*, as a matter of common sense and in light of deeply rooted notions of federalism, is that the federal claim must have more than a glimmer of merit and must continue to do so <u>at least until substantial judicial resources have been committed to the lawsuit</u>. If either of those conditions is not met, a district court has no business deciding issues of state law.

415 U.S. 528, 552 (1974) (emphasis added).

In *Jones*, the state-law claims made it all the way to the jury, but the district court ruled that the federal-law claims failed and did not submit them to the jury. 794 F.2d at 548–49. The Tenth Circuit held that even though the federal claims were "tenuous," they satisfied constitutionality requirements; regarding judicial economy, convenience, and fairness, the Tenth Circuit held that "it would be extremely inefficient, inconvenient and unfair to the litigants and the other participants in the trial for us to hold now that the district court improperly exercised its pendent jurisdiction." *Id.* at 550.

In *Thatcher*, plaintiffs sued in federal court, alleging federal constitutional and antitrust issues, plus a state-law claim for removing county officials from office. The case made it to summary judgment, which the district court granted for defendants, dismissing all of the federal claims. With no federal claims remaining, the district court dismissed the remaining state-law claim to remove county officials. 902 F.2d at 1473. Noting that supplemental jurisdiction "is a doctrine of discretion," the Tenth Circuit held that the district court did not abuse its discretion when dismissing the state-law claim. *Id.* at 1478. As mentioned, the Tenth Circuit included "the nature and extent of pretrial proceedings" in its analysis; however, the Court didn't consider the extent of pretrial proceedings in detail. *Id.*

In *Anglemyer*, the plaintiff sued in federal court, raising federal constitutional claims, and state-law claims for breach of contract and violation of a specific state

23

risk management act. Like in *Thatcher*, the district court granted summary judgment for the defendant on all federal claims and dismissed the remaining state claims. 58 F.3d at 534–35. However, unlike in *Thatcher*, the Tenth Circuit went into detail about the extent of pretrial proceedings when considering the dismissal of the state claims. The Court noted that an argument to "avoid the expense and delay of another round of pretrial proceedings in state court . . . is not unsound." *Id.* at 541. But the Tenth Circuit ultimately held that there was "an independent reason" for dismissing the state-law claims, by declaring that the state risk management act issue was novel and complex. *Id.* (citing 28 U.S.C. § 1367(c)(1)) (novelty and complexity of state-law claims will be discussed later in this amicus brief). Thus, it did "not have to decide whether the court insufficiently took the extent of the pretrial proceedings into consideration." *Id.*

Amicus also notes one exchange in the appellate record, in which the district court judge noted that if all federal claims are dismissed, "I think that unless we have invested years in discovery and we have got a pending trial . . . the Tenth Circuit has been pretty clear that the default is to remand [the remaining state-law claims]. But maybe there is a Tenth Circuit case out there that I'm not aware of." App-8:037. While the three Tenth Circuit cases cited above were at trial or summary judgment, amicus points out that the standard in the Tenth Circuit is whether "substantial time and energy have been expended" *Jones*, 794 F.2d at 550.

24

Given the extensive briefing, hearings, protective orders, and this motion to dismiss, it is fair to say substantial time and energy have been expended, particularly considering the resources of a small entheogenic church and its founder. Regardless, pretrial efforts are one factor, and this case has a major differentiating feature from the above-cited cases: the Defendants who now seek to remand the state-law claims (which so far are the most dispositive) are the ones who removed this case from state court in the first place. This final point brings up concerns over forum manipulation, which we consider next.

### B. Concerns Over Forum Manipulation

The Supreme Court in *Carnegie-Mellon Univ. v. Cohill* was explicit about forum manipulation, noting the concern that "a plaintiff whose suit has been removed to federal court will be able to regain a state forum simply by deleting all federal-law claims from the complaint and requesting that the district court remand the case." 484 U.S. 343, 357 (1988). While the Court determined that no categorical prohibition is warranted, the Court recognized,

> A district court can consider whether the plaintiff has engaged in any manipulative tactics when it decides whether to remand a case. If the plaintiff has attempted to manipulate the forum, the court should take this behavior into account in determining whether the balance of factors to be considered under the pendent jurisdiction doctrine support a remand in the case.

*Id.*

Here, the Defendants, not Plaintiffs, were the ones who insisted on a federal forum and removed this case to federal court, only to later attempt to "delet[e] all federal-law claims from the complaint and request[] that the district court remand the case." While it is not the business of this amicus curiae to accuse any party of forum manipulation, the practical result is certainly of concern. Imagine a scenario where a small church like that of the amicus curiae files a suit in state court, like the Plaintiffs, only to have the case removed, litigated substantially, and remanded back to the very state court where the church wanted to start in the first place. Allowing Defendants to succeed with remanding state claims at this point would be inefficient, inconvenient, and unfair—not to mention exorbitantly expensive to Plaintiffs and similarly situated future parties, including the present amicus curiae.

### C. Utah's RFRA Is Not Novel or Complex—and Comity Favors Federal Review of RFRA Claims

For purposes of 28 U.S.C. § 1367(c)(1), the state laws at issue here, including Utah's RFRA—the dispositive law so far—are not novel or complex. As one district court recently observed, "What makes a state law issue novel is unclear from binding Tenth Circuit caselaw." *Shook v. U.S.*, No. 1:2017mc00024 (D.N.M. 2021) (citing *Roe v. Cheyenne Mountain Conf. Resort, Inc.*, 124 F.3d 1221, 1236–37 (10th Cir. 1997); *Anglemyer v. Hamilton Cty. Hosp.*, 58 F.3d 533, 541 (10th Cir. 1995)). The district court in *Shook* therefore outlined a test. First, the court noted, "Novel does not just mean new," citing sample definitions like "interestingly new or unusual"

from the Oxford English Dictionary. "Novel, accordingly, means both new and noteworthy," the court declared, concluding that "a State law issue is novel when it is: (i) new; and (ii) concerns a notable State matter." *Id.*

> We agree with Plaintiffs' counsel:
>
> This case does not raise a novel or complex issue of state law. Utah's RFRA was based upon the federal RFRA statute, which has been interpreted in a wealth of case law for over thirty years. While Utah's statute is new, this Court is certainly equipped to interpret a state law, particularly where that law is similar to and was based upon a federal law and federal constitution.

[App-3:189]. Of course, Utah's RFRA is also not the only state version of the federal RFRA. Currently, twenty-nine states have RFRA statues.[25] Notably, all Tenth Circuit cases Defendants cited in support of *Smith* took place in states that did not have their own RFRA. Appellants' Br., at 26–34 (citing *Chiles v. Salazar*, 116 F.4th 1178 (10th Cir. 2004) (Colorado has no RFRA); *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643 (10th Cir. 2006) (Wyoming passed their RFRA in 2025); *St. Mary Cath. Par. in Littleton v. Roy*, 154 F.4th 752 (10th Cir. 2025) (also Colorado)).

Since *Gonzales v. O Centro Espirita Beneficente União do Vegetal,* 546 U.S. 418 (2006) (discussed above), multiple entheogenic churches have prevailed against federal government action under the federal RFRA. An entheogenic church achieved

---

[25] *See* Becket, "Federal & State RFRA Map," https://becketfund.org/research-central/rfra-info-central/map/, accessed February 6, 2026.

success in *Church of the Holy Light of the Queen v. Mukasey*, 615 F. Supp. 2d 1210, 1219 (D. Or. 2009), vacated sub nom. *Church of the Holy Light of Queen v. Holder*, 443 F. App'x 302 (9th Cir. 2011); and there were recent exemptions for entheogenic churches through settlements, after court action, in *Church of the Eagle and Condor v. Garland* (D. Ariz. April 22, 2024), and *Church of the Celestial Heart v. Garland* (E.D. Cal. January 9, 2024). Also, as mentioned, the DEA approved its first applicant under its RFRA guidance in May 2025, a year after being admonished for prohibitive and obstructionist practices.

Generally speaking, the present case is the first case in which there is a *state* government action challenging a state RFRA; however, RFRA laws are neither novel nor complex. Given RFRA's history, federal courts are arguably in the best position to decide a state RFRA issue, meaning comity *favors* supplemental jurisdiction. In any event, Plaintiffs wanted to bring this action in state court first, and Defendants removed to federal court. The proverbial elephant in the courtroom here is RFRA, which Defendants are clearly attempting to avoid. RFRA laws are neither new nor complex, and the district court's election to exercise supplemental jurisdiction over Utah's RFRA and other state-law claims should be upheld.[26]

---

[26] Amicus also supports the district court's ruling that abstention exceptions apply for the anti-suit injunction, but due to space limitations is unable to elaborate on this issue in this amicus brief.

## CONCLUSION

For these reasons, *amicus curiae* urge this Court to affirm the district court's order denying Defendants' motion to dismiss and granting Plaintiffs' motion for anti-suit injunction.

**STATEMENT PURSUANT TO Fed. R. App. P. 29(a) & 10th Cir. R. 29.2**

Pursuant to Rule 29(a) of the Federal Rules of Appellate Procedure and 10th Cir. R. 29.2, the undersigned states that all parties have consented to the filing of this *amicus curiae* brief. The undersigned further states that no counsel for a party authored this brief in whole or in part, and no counsel for a party made a monetary contribution intended to fund the preparation or submission of this brief. In addition, no persons or entities including the *amicus curiae* joining this brief, their members, or their counsel made a monetary contribution to the preparation or submission of the brief.

Dated: February 18, 2026           Respectfully submitted,

/s/ *Melissa E. Dean*
MELISSA E. DEAN
Florida Bar No. 1031982
The Law Office of Melissa Dean, PLLC
322 E Central Blvd., Unit 515
Orlando, FL 32801
Phone: (772) 919-2748
Email: melissadeanesq@gmail.com

/s/ *David A. Carn*
DAVID A. CARN
Alabama Bar No. 2418A58C
430 George Wallace Dr., No. 104
Gadsden, AL 35903
Phone: (256) 399-8599
Email: david@davidcarn.com

30

/s/ *Ronald W. McNutt*

RONALD W. MCNUTT

TN BPR No. 010804

1822 Primrose Avenue

Nashville, TN 37212

Phone: (615) 298-1735

Email: ronaldwmcnutt@gmail.com

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because this brief contains 6,308 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and by 10th Cir. Rule 32(B).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5), and the type style requirements of Fed. R. App. P. 32(a)(6), and 10th Cir. R. 32(A) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman font.

Dated: February 18, 2026            Respectfully submitted,

/s/ *Melissa E. Dean*
MELISSA E. DEAN
Florida Bar No. 1031982
The Law Office of Melissa Dean, PLLC
322 E Central Blvd., Unit 515
Orlando, FL 32801
Phone: (772) 919-2748
Email: melissadeanesq@gmail.com

/s/ *David A. Carn*
DAVID A. CARN
Alabama Bar No. 2418A58C
430 George Wallace Dr., No. 104
Gadsden, AL 35903
Phone: (256) 399-8599
Email: david@davidcarn.com

/s/ *Ronald W. McNutt*
RONALD W. MCNUTT

32

TN BPR No. 010804
1822 Primrose Avenue
Nashville, TN 37212
Phone: (615) 298-1735
Email: ronaldwmcnutt@gmail.com

*Counsel for Amicus Curiae*

## CERTIFICATE OF DIGITAL SUBMISSION

The undersigned certify that with respect to the foregoing:

(1)    All required privacy redactions have been made per 10th Cir. R. 25.5;

(2)    If required to file additional hard copies, that the ECF submission is an exact copy of those documents; and

(3)    The digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program Microsoft Defender Antivirus, Version 1.445.130.0, last updated February 18, 2026, and according to the program, they are free of viruses.

Dated: February 18, 2026       Respectfully submitted,

/s/ *Melissa E. Dean*
MELISSA E. DEAN
Florida Bar No. 1031982
The Law Office of Melissa Dean, PLLC
322 E Central Blvd., Unit 515
Orlando, FL 32801
Phone: (772) 919-2748
Email: melissadeanesq@gmail.com

/s/ *David A. Carn*
DAVID A. CARN
Alabama Bar No. 2418A58C
430 George Wallace Dr., No. 104
Gadsden, AL 35903
Phone: (256) 399-8599
Email: david@davidcarn.com

34

/s/ *Ronald W. McNutt*

RONALD W. MCNUTT

TN BPR No. 010804

1822 Primrose Avenue

Nashville, TN 37212

Phone: (615) 298-1735

Email: ronaldwmcnutt@gmail.com

*Counsel for Amicus Curiae*