Case No. 25-4115

# United States Court of Appeals
# for the Tenth Circuit

Bridger Lee Jensen, Singularism, and Psyche Healing and Bridging, LLC,

*Plaintiffs-Appellees,*

v.

Utah County, Provo City, and Jeffrey Gray,

*Defendants-Appellants,*

*On appeal from the United States District Court for the District of Utah Case No. 2:24-cv-00887-JNP-CMR, the Honorable Judge N. Parrish*

## APPELLEES' MOTION TO ABATE PROCEEDINGS AND POSTPONE ORAL ARGUMENT

Tanner J. Bean
Jacqueline M. Rosen
Fabian VanCott
95 South State Street, Suite 2300
Salt Lake City, Utah 84111
(801) 531-8900
tbean@fabianvancott.com
jrosen@fabianvancott.com
*Counsel for Plaintiffs - Appellees*

April 22, 2026

Pursuant to Fed. R. App. P. 27 and 34(b) and 10th Cir. R. 27.1 and 34.1(A)(3), Plaintiffs-Appellees Bridger Lee Jensen, Singularism, and Psyche Healing and Bridging, LLC (collectively hereinafter "Singularism") hereby respectfully move the Court to abate all proceedings in this case and postpone oral argument until the Supreme Court of the United States has issued its decision in *St. Mary Catholic Parish in Littleton et al. v. Lisa Roy et al.*, Case No. 25-581 (U.S. Apr. 20, 2026). Singularism also requests supplemental briefing following the decision in *St. Mary*.

Pursuant to 10th Cir. R. 27.1 and 34.1(A)(3)(b)(i), Singularism's counsel conferred with counsel for Defendants-Appellees Utah County, Provo City, and Jeffrey Gray (collectively hereinafter "the government") on April 20-21, 2026 regarding the government's position on abatement and postponement. The government opposes abatement and postponement.

Both Singularism's and the government's position is that this case is not suitable for submission on the briefs. As the parties' briefs show, this appeal presents several complex questions related to the granting of an anti-suit injunction and the standards governing claims of religious

free exercise under the First Amendment, as well as municipal liability for violations of the Fourth Amendment. Further, as discussed below, this Court's general applicability standard under the First Amendment is under review by the Supreme Court.

Singularism's counsel is available to participate in oral argument during the next regularly scheduled term of court following the Supreme Court's decision in *St. Mary*.

## GROUNDS AND RELIEF SOUGHT

Where an issue pertinent to an appeal before this Court is being reviewed by the Supreme Court, this Court routinely abates the proceedings to wait for the Supreme Court to render controlling law. *See Ortega v. Grisham*, 162 F.4th 1056, 1063 n.4 (10th Cir. 2025); *Courage to Change Ranches Holding Co. v. El Paso Cnty., Colorado*, 73 F.4th 1175, 1190-91 (10th Cir. 2023) (appeal abated after Supreme Court granted certiorari in another case); *Jacobson v. Credit Control Servs., Inc.*, 815 F.3d 688, 688-89 (10th Cir. 2016) (same); *Women's Health Care Servs., P.A. v. Operation Rescue, Nat.*, 24 F.3d 107, 108 (10th Cir. 1994) (same); *Terrell v. I.N.S.*, 157 F.3d 806, 808 (10th Cir. 1998) (same). This Court has even instructed district courts to abate further proceedings until a

decision of the Supreme Court is issued. *See, e.g., Newland v. Sebelius*, 542 F. App'x 706, 710 (10th Cir. 2013) (unpublished).

Additionally, Federal Rule of Appellate Procedure 34(b) contemplates a motion to postpone oral argument, permitting such motion where "filed reasonably in advance of the hearing date." Tenth Circuit Rule 34.1(A)(3)(a) specifies that a motion to postpone oral argument "must be made more than 20 days before the scheduled argument date."

The Court's routine abatement procedure, Rule 34(b), and Tenth Circuit Rule 34.1(A)(3) are an expression of the Court's inherent power to stay proceedings. *See Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936) ("the power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.").

On April 20, 2026, the Supreme Court of the United States granted a petition for certiorari in *St. Mary Catholic Parish in Littleton et al. v. Lisa Roy et al.*, Case No. 25-581. That petition was taken from this Court's recent First Amendment religious free exercise decision, *St. Mary Cath. Par. in Littleton v. Roy*, 154 F.4th 752, 768 (10th Cir. 2025), in

which this Court interpreted the general applicability standard the Supreme Court articulated in *Fulton v. City of Philadelphia, Pennsylvania*, 593 U.S. 522 (2021) and *Tandon v. Newsom*, 593 U.S. 61 (2021). The general applicability standard, originating from the Supreme Court's decision in *Employment Division, Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872 (1990), determines whether a plaintiff's religious free exercise claim will be subject to strict scrutiny or rational basis review under the First Amendment.

In *St. Mary*, the Supreme Court accepted the plaintiff's question presented regarding the general applicability standard: "Whether proving a lack of general applicability under *Employment Division v. Smith* requires showing unfettered discretion or categorial exemptions for identical secular conduct." Pet. for Writ of Certiorari, at i, attached as <u>Exhibit A</u>. This precise question is before the Court in this case. *See* Appellants' Br., at 25-34; Appellees' Br., at 52-70; Appellants' Reply Br., at 10-21.

Although Singularism has argued that the Court need not reach the First Amendment analysis in this case because of jurisdictional issues and because the anti-suit injunction analysis can be completed without a

review of the First Amendment issues, *see* Appellees' Br., at 36-52, should the Court reach the First Amendment question, the Supreme Court's decision in *St. Mary* should control. Indeed, should the Court reach the First Amendment analysis, the Court will necessarily be required to apply the general applicability standard, the scope of which is under review in *St. Mary*.

Accordingly, in order to preserve the parties' and the Court's resources and to decide this case upon the forthcoming decision in *St. Mary*, Singularism moves the Court to abate the proceedings and postpone oral argument until the next regularly scheduled term of court following the Supreme Court's decision in *St. Mary*.

Abating the proceedings and postponing oral argument will not prejudice the parties. While the appeal is pending, Singularism has the benefit of the preliminary injunction issued by the district court, protecting its religious free exercise. *See* Mem. Decision and Order Granting Mot. for Stay of Proceedings, at 8, attached as Exhibit B. And the government has the benefit of a stay of discovery issued by the district court while the appeal proceeds. *Id.* at 8-9. Both stand to benefit from the clarity the Supreme Court will provide in *St. Mary*.

## CONCLUSION

Accordingly, Singularism requests the Court abate the proceedings and postpone oral argument until the next regularly scheduled term of court following the Supreme Court's decision in *St. Mary*. Following the decision in *St. Mary*, Singularism requests the opportunity to submit supplemental briefing on the impact of *St. Mary* upon this proceeding.

Dated: April 22, 2026          Respectfully submitted,

/s/ *Tanner J. Bean*
Tanner J. Bean
Jacqueline M. Rosen
FABIAN VANCOTT
95 South State Street, Suite 2300
Salt Lake City, Utah 84111
(801) 531-8900
tbean@fabianvancott.com
jrosen@fabianvancott.com

*Counsel for Plaintiffs-Appellees*

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT</u>

This document complies with the type-volume limit of Fed. R. App. P. 27(d)(2)(A) because this document contains 1002 words.

This document complies with the typeface and type style requirements of Fed. R. App. P. 27(d)(1)(E), Fed. R. App. P. 32(a)(5), R. App. P. 32(a)(6), and 10th Cir. R. 32(A) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated: April 22, 2026          Respectfully submitted,

/s/ *Tanner J. Bean*
Tanner J. Bean
Jacqueline M. Rosen
FABIAN VANCOTT
95 South State Street, Suite 2300
Salt Lake City, Utah 84111
(801) 531-8900
tbean@fabianvancott.com
jrosen@fabianvancott.com

*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF DIGITAL SUBMISSION

I certify that with respect to the foregoing:

(1)     All required privacy redactions have been made per 10th Cir. R. 25.5;

(2)     If required to file additional hard copies, that the ECF submission is an exact copy of those documents;

(3)     The digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program Microsoft Defender Antivirus, Version 1.449.228.0, last updated April 21, 2026, and according to the program, they are free of viruses.


Dated: April 22, 2026          Respectfully submitted,

/s/ *Tanner J. Bean*
Tanner J. Bean
Jacqueline M. Rosen
FABIAN VANCOTT
95 South State Street, Suite 2300
Salt Lake City, Utah 84111
(801) 531-8900
tbean@fabianvancott.com
jrosen@fabianvancott.com

*Counsel for Plaintiffs-Appellees*

# EXHIBIT A

No. _____

# In the Supreme Court of the United States

ST. MARY CATHOLIC PARISH IN LITTLETON,
ST. BERNADETTE CATHOLIC PARISH IN LAKEWOOD,
DANIEL SHELEY, LISA SHELEY, AND
THE ARCHDIOCESE OF DENVER,

*Petitioners,*

v.

LISA ROY, IN HER OFFICIAL CAPACITY AS EXECUTIVE
DIRECTOR OF THE COLORADO DEPARTMENT OF
EARLY CHILDHOOD, AND DAWN ODEAN, IN HER OFFICIAL
CAPACITY AS DIRECTOR OF COLORADO'S UNIVERSAL
PRESCHOOL PROGRAM,

*Respondents.*

*ON PETITION FOR A WRIT OF CERTIORARI TO THE UNITED
STATES COURT OF APPEALS FOR THE TENTH CIRCUIT*

## PETITION FOR A WRIT OF CERTIORARI

MARK L. RIENZI
ERIC C. RASSBACH
  *Counsel of Record*
JOSEPH C. DAVIS
NICHOLAS R. REAVES
JORDAN T. VARBERG
AMANDA G. DIXON
THE BECKET FUND FOR
  RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW
  Suite 400
Washington, D.C. 20006
(202) 955-0095
erassbach@becketfund.org
*Counsel for Petitioners*

## QUESTIONS PRESENTED

Colorado's so-called universal preschool program pays for families to send their children to the preschool of their choice, public or private. To participate, preschools must ensure all families have an "equal opportunity" to enroll regardless of, *inter alia*, race, religious affiliation, sexual orientation, gender identity, income level, or disability. Colorado nonetheless permits numerous exemptions from this requirement, both categorical and discretionary, allowing preschools to admit only "children of color," "gender-nonconforming children," "the LGBTQ community," low-income families, and children with disabilities. But Colorado excludes Catholic preschools because they admit only families who support Catholic beliefs, including on sex and gender.

The Tenth Circuit upheld Colorado's decision to exclude Catholic preschools. Applying *Employment Division* v. *Smith*, it held that Colorado's secular exemptions and discretion did not undermine general applicability. In so doing, the court sided with the minority position in an entrenched and acknowledged 7-4 split over what kinds of exemptions and discretion undermine general applicability. The court also eschewed *Carson* v. *Makin*, concluding that its rule was inapplicable because Colorado's exclusion was not "on the explicit basis" of religion.

The questions presented are:

1. Whether proving a lack of general applicability under *Employment Division* v. *Smith* requires showing unfettered discretion or categorical exemptions for identical secular conduct.

ii

2. Whether *Carson* v. *Makin* displaces the rule of *Employment Division* v. *Smith* only when the government explicitly excludes religious people and institutions.

3. Whether *Employment Division* v. *Smith* should be overruled.

iii

## RULE 29.6 DISCLOSURE STATEMENT

No Petitioner has a parent corporation. No publicly held corporation owns any portion of any of the Petitioners, and none of the Petitioners is a subsidiary or an affiliate of any publicly owned corporation.

iv

# RELATED PROCEEDINGS

*St. Mary Catholic Parish in Littleton, et al.* v. *Roy, et al.*, District of Colorado, No. 1:23-cv-2079-JLK (June 4, 2024)

*St. Mary Catholic Parish in Littleton, et al.* v. *Roy, et al.*, Tenth Circuit, No. 24-1267 (Sep. 30, 2025)

v
# TABLE OF CONTENTS

**Page**

QUESTIONS PRESENTED............................................i

CORPORATE DISCLOSURE STATEMENT..............ii

RELATED PROCEEDINGS .......................................iii

TABLE OF AUTHORITIES.....................................viii

INTRODUCTION ........................................................ 1

OPINIONS BELOW ................................................... 4

JURISDICTION ......................................................... 4

CONSTITUTIONAL, STATUTORY, AND
REGULATORY PROVISIONS INVOLVED .............. 4

STATEMENT OF THE CASE ................................... 4

    A.  Colorado's universal preschool program........... 4

    B.  The Archdiocese of Denver and
        its Catholic preschools ...................................... 6

    C.  Colorado permits exemptions from
        the equal opportunity Mandate ....................... 8

    D.  The Department denies Petitioners'
        request for a religious accommodation ........... 10

    E.  Procedural background.................................... 11

REASONS FOR GRANTING THE PETITION......... 13

    I.  The decision below exacerbates a
       7-4 split over the test for determining
       whether a law is generally applicable
       under the Free Exercise Clause. ..................... 14

        A.  Seven courts evaluate all discretion
            and categorical exemptions to

vi

determine whether they undermine the government's asserted interests in a similar way. ......................... 15

B. Four courts consider only unfettered discretion and categorical exemptions for identical secular conduct. ..................... 19

C. The decision below is wrong. ...................... 21

II. Lower courts are defying *Carson*'s prohibition on denying religious people benefits "because of their religious exercise." .......................................... 24

III. *Employment Division* v. *Smith* should be overruled. ....................................... 30

IV. This case is an excellent vehicle to address issues of nationwide importance. .................................................... 33

CONCLUSION ....................................................... 35

APPENDIX

Opinion, *St. Mary Catholic Parish* v. *Roy*, No. 24-1267 (10th Cir. Sep. 30, 2025) ................... 1a

Judgment, *St. Mary Catholic Parish* v. *Roy*, No. 24-1267 (10th Cir. Sep. 30, 2025) ................. 49a

Findings of Fact, Conclusions of Law, and Order for Entry of Judgment, *St. Mary Catholic Parish* v. *Roy*, No. 23-cv-2079 (D. Colo. June 4, 2024) ............... 50a

Order on the Parties' Joint Status Report, *St. Mary Catholic Parish* v. *Roy*, No. 23-cv-2079 (D. Colo. June 4, 2024), Dkt. 65 ............................................................ 173a

vii

Final Judgment, *St. Mary Catholic Parish* v. *Roy*, No. 23-cv-2079 (D. Colo. June 4, 2024), Dkt. 117 ...................... 184a

Colorado Revised Statutes § 26.5-4-202 ................ 187a

Colorado Revised Statutes § 26.5-4-203 ................ 192a

Colorado Revised Statutes § 26.5-4-204 ................ 195a

Colorado Revised Statutes § 26.5-4-205 ................ 202a

Universal Preschool Program Rules & Regulations, 8 Colo. Code Regs. § 1404-1 ......... 209a

Trial Exhibit 2, Archdiocese of Denver, Catholic School Community Beliefs and Commitments, *St. Mary Catholic Parish* v. *Roy*, No. 23-cv-2079 (D. Colo. Jan. 2, 2024) .............. 216a

Trial Exhibit 5, Guidance for Issues Concerning the Human Person and Sexual Identity, *St. Mary Catholic Parish* v. *Roy*, No. 23-cv-2079 (D. Colo. Jan. 2, 2024) .................................... 242a

Trial Exhibit 10, Email Regarding Directive Not to Participate in UPK Colorado, *St. Mary Catholic Parish* v. *Roy*, No. 23-cv-2079 (D. Colo. Jan. 2, 2024) .............. 280a

Trial Exhibit 11, Coalition Letter to Governor Polis, *St. Mary Catholic Parish* v. *Roy*, No. 23-cv-2079 (D. Colo. Jan. 2, 2024) .................................... 283a

viii

Trial Exhibit 12, Defendant Roy's
   Response to Coalition Letter,
   *St. Mary Catholic Parish* v.
   *Roy,* No. 23-cv-2079
   (D. Colo. Jan. 2, 2024) ...................................... 288a

Trial Exhibit 13, Universal Preschool
   (UPK) Colorado Program Service
   Agreement, *St. Mary Catholic Parish*
   v. *Roy,* No. 23-cv-2079
   (D. Colo. Jan. 2, 2024) ...................................... 291a

Declaration of Dawn Odean in Support
   of Defendants' Motion to Dismiss
   Plaintiffs' Amended Complaint,
   *St. Mary Catholic Parish* v. *Roy,*
   No. 23-cv-2079 (D. Colo. Oct. 6, 2023),
   Dkt. 38-1 .......................................................... 300a

Excerpts from Transcript of Bench Trial,
   *St. Mary Catholic Parish* v. *Roy*,
   No. 23-cv-2079 (D. Colo. Jan. 2, 2024).............. 308a

Excerpts from Transcript of Bench Trial,
   *St. Mary Catholic Parish* v. *Roy*,
   No. 23-cv-2079 (D. Colo. Jan. 3, 2024).............. 321a

Excerpts from Defendants' Proposed
   Findings of Fact and Conclusions
   of Law, *St. Mary Catholic Parish* v.
   *Roy*, No. 23-cv-2079
   (D. Colo. Jan. 26, 2024), Dkt. 109 ..................... 372a

ix

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*303 Creative LLC* v. *Elenis*,
   6 F.4th 1160 (10th Cir. 2021) ........................ 20, 21

*American Legion* v. *American Humanist
   Ass'n*,
   588 U.S. 29 (2019) ............................................... 30

*Bates* v. *Pakseresht*,
   146 F.4th 772 (9th Cir. 2025) ............................. 16

*Blackhawk* v. *Pennsylvania*,
   381 F.3d 202 (3d Cir. 2004).................................. 17

*Brox* v. *Woods Hole, Martha's Vineyard
   & Nantucket Steamship Auth.*,
   83 F.4th 87 (1st Cir. 2023) .................................. 19

*Carson* v. *Makin*,
   596 U.S. 767, 781 (2022) .......... 2, 13, 25, 26, 28, 29

*Catholic Charities Bureau, Inc.* v.
   *Wisconsin Lab. & Indus. Rev.
   Comm'n*,
   605 U.S. 238 (2025) ............................................. 29

*City of Boerne* v. *Flores*,
   521 U.S. 507 (1997) ............................................. 31

x

*Civil Rts. Dep't* v. *Cathy's Creations, Inc.*,
109 Cal. App. 5th 204
(Cal. Ct. App. 2025) ......................................... 20-21

*Crosspoint Church* v. *Makin*,
719 F. Supp. 3d 99 (D. Me. 2024) ........................ 28

*Dobbs* v. *Jackson Women's Health Org.*,
597 U.S. 215 (2022) ............................................. 31

*Dr. A* v. *Hochul*,
142 S. Ct. 2569 (2022) ................................. 1, 14-15

*Emilee Carpenter, LLC* v. *James*,
107 F.4th 92 (2d Cir. 2024) ................................. 19

*Employment Div.* v. *Smith*,
494 U.S. 872 (1990) ............................. 2, 14, 32, 33

*Espinoza* v. *Montana Dep't of Revenue*,
591 U.S. 464 (2020) ....................................... 25, 30

*Fellowship of Christian Athletes* v.
*District of Columbia*,
743 F. Supp. 3d 73 (D.D.C. 2024) ........................ 16

*Fellowship of Christian Athletes* v.
*San Jose Unified School District*,
82 F.4th 664 (9th Cir. 2023) .................... 15, 16, 21

*Fraternal Order of Police* v.
*City of Newark*,
170 F.3d 359 (3d Cir. 1999)................................. 17

*Fulton* v. *City of Philadelphia*,
593 U.S. 522 (2021) .................. 1-2, 3, 22, 23, 31-32

xi

*Kennedy* v. *Bremerton Sch. Dist.*,
    597 U.S. 507 (2022) .............................................. 14

*Kim* v. *Board of Educ. of Howard Cnty.*,
    93 F.4th 733 (4th Cir. 2024) ............................... 27

*Klein* v. *Oregon Bureau of Lab. &
    Indus.*,
    143 S. Ct. 2686 (2023) ......................................... 32

*Koire* v. *Metro Car Wash*,
    707 P.2d 195 (Cal. 1985) ..................................... 20

*Little Sisters of the Poor Saints Peter &
    Paul Home* v. *Pennsylvania*,
    591 U.S. 657 (2020) .............................................. 32

*Loper Bright Enters.* v. *Raimondo*,
    603 U.S. 369 (2024) .............................................. 32

*Mahmoud* v. *Taylor*,
    606 U.S. 522 (2025) ............................. 1, 13, 25, 29

*Maryville Baptist Church, Inc.* v.
    *Beshear*,
    957 F.3d 610 (6th Cir. 2020) ............................... 24

*Midrash Sephardi, Inc.* v. *Town of
    Surfside*,
    366 F.3d 1214 (11th Cir. 2004) ........................... 18

*Miller* v. *McDonald*,
    130 F.4th 258 (2d Cir. 2025) ............................... 19

*Mitchell County* v. *Zimmerman*,
    810 N.W.2d 1 (Iowa 2012).................................... 18

xii

*Monclova Christian Academy* v. *Toledo-Lucas County Health Department*,
984 F.3d 477 (6th Cir. 2020) ............................... 17

*North Coast Women's Care Med. Grp.* v. *Super. Ct.*,
189 P.3d 959 (Cal. 2008) ..................................... 20

*Omychund* v. *Barker*,
1 Atk. 22, 26 Eng. Rep. 15 (Ch. 1744) ................. 32

*Roman Catholic Diocese of Albany* v. *Harris*,
145 S. Ct. 2794 (2025) ........................................ 32

*Sherbert* v. *Verner*,
374 U.S. 398 (1963) ................................. 13, 25, 29

*Smith* v. *City of Atlantic City*,
138 F.4th 759 (3d Cir. 2025) .......................... 17, 22

*Spillane* v. *Lamont*,
323 A.3d 1007 (Conn. 2024) ................................ 20

*St. Dominic Academy* v. *Makin*,
744 F. Supp. 3d 43 (D. Me. 2024) ........................ 28

*Hawaii* v. *Armitage*,
319 P.3d 1044 (Haw. 2014) ............................. 18-19

*Louisiana* v. *Spell*,
339 So.3d 1125 (La. 2022) .................................... 18

*Stormans, Inc.* v. *Wiesman*,
794 F.3d 1064 (9th Cir. 2015) .............................. 20

xiii

*Tandon* v. *Newsom*,
    593 U.S. 61 (2021) ........................................ 14, 22

*Thomas* v. *Review Bd.*,
    450 U.S. 707 (1981) ...................................... 25, 29

*Trinity Lutheran Church of
Columbia, Inc.* v. *Comer*,
    582 U.S. 449 (2020) ............................................ 25

*We The Patriots USA, Inc.* v. *Hochul*,
    17 F.4th 266 (2d Cir. 2021) ............................ 19-20

*Yeshiva Univ.* v. *YU Pride All.*,
    143 S. Ct. 1 (2022) ............................................ 32

*Youth 71Five Ministries* v. *Williams*,
    153 F.4th 704 (9th Cir. 2025) ............................ 27

*Zorach* v. *Clauson*,
    343 U.S. 306 (1952) ............................................ 25

## Statutes & Regulations

28 U.S.C. 1254 .......................................................... 4

Cal. Civ. Code § 51.................................................... 20

Cal. Civ. Code §§ 51.2-51.4....................................... 20

Colo. Rev. Stat. §§ 26.5-4-201 *et seq.* ................... 4, 10

8 Code of Colorado Regulations § 1404-1 ................... 4

## Constitution

U.S. Const. Amend. I.................................................. 4

xiv

**Other Authorities**

Stephanie Hall Barclay & Matthew M. Krauter, *The Untold Story of the Proto*-Smith *Era: Justice O'Connor's Papers and the Court's Free Exercise Revolution*, 174 U. Pa. L. Rev. (forthcoming 2026) ............................................... 31

Allison H. Friedman-Krauss et al., *Executive Summary*, *The State of Preschool 2024 Yearbook,* NIEER, (last visited Nov. 12, 2025) .................................. 33

Nicole Stelle Garnett, Tim Rosenberger & J. Theodore Austin, *The Persistence of Religious Discrimination in Publicly Funded Pre-K Programs*, Manhattan Institute (Jan. 21, 2025) ..................................... 34

Lindsey Jensen, *Not enough UPK childcare providers for families applying again this year,* KOAA News5, Aug. 1, 2024 ............................................... 6

NIEER*, National Report: State-by-State Disparities Widening in Preschool Access, Quality, Funding* (Apr. 18, 2024) ...................................... 34

## INTRODUCTION

Free Exercise Clause jurisprudence is of two minds. On the one hand, there is the rule of *Employment Division* v. *Smith*, which transformed free exercise doctrine by shifting the judicial focus from religious exercise and the real-world burdens government imposes on it to the abstract qualities of the law imposing the burden. Courts have spent the ensuing decades divining what it means for a law to be "neutral" and "generally applicable," generating an ongoing series of splits for this Court to resolve.

On the other hand, there are separate lines of free exercise precedent that stand entirely outside the rule of *Smith*. This Court's church autonomy decisions in cases like *Hosanna-Tabor* have never been subject to *Smith*. And just last Term, this Court explained that, under a line of precedent rooted in *Wisconsin* v. *Yoder*, courts "need not ask whether the law at issue is neutral or generally applicable." *Mahmoud* v. *Taylor*, 606 U.S. 522, 564 (2025).

The decision below exacerbates existing conflicts and confusion in the lower courts over both aspects of current free exercise jurisprudence.

First, the decision below exacerbates a 7-4 split over how to apply *Smith*'s neutrality-and-general-applicability rule. Three Justices have already deemed this conflict "widespread, entrenched, and worth addressing," *Dr. A* v. *Hochul*, 142 S. Ct. 2569, 2570 (2022) (Thomas, J., dissenting from denial of certiorari, joined by Alito and Gorsuch, JJ.), and it has only grown more so since. On one side, four circuits and three state high courts agree that *Fulton* v. *City of Philadelphia* requires courts to assess *all* avenues of

2

discretion and categories of exemptions from a law to see if any undermine the government's asserted interest "in a similar way." 593 U.S. 522, 534 (2021). On the other side, two circuits (including the Tenth) and two state high courts drastically narrow the general-applicability analysis, looking only for "unfettered" discretion and considering only secular exemptions identical to the requested religious accommodation.

Second, the decision below exacerbates confusion over when to apply *Smith*'s neutrality-and-general-applicability rule. In *Carson* v. *Makin*, this Court articulated a clear rule: If religious groups are excluded from a government funding program "because of their religious exercise," strict scrutiny applies. 596 U.S. 767, 781 (2022). But the Tenth Circuit rejected this reading, concluding that *Carson* prohibits only exclusions that are "explicit[ly]" "targeted" at "religious use" or status. The Tenth Circuit thus joins the Ninth and Fourth Circuits in recasting *Carson* in *Smith*'s mold.

Both the conflict over general applicability under *Smith* and the confusion over *Carson*'s relationship to *Smith* can only be resolved by this Court. And each is sufficient grounds for this Court to grant review.

But on a deeper level, the Court will never be able to put Free Exercise Clause jurisprudence on a firm foundation until it reckons with *Smith* itself. *Smith's* rule was supposed to mark a return to "common sense" and "practicality," while avoiding "anarchy" and forms of adjudication "horrible to contemplate." 494 U.S. 872, 885 & n.2, 888, 889 n.5 (1990). As a majority of this Court's Justices have already acknowledged, *Smith* has not lived up to its claims in practice. See *Fulton*, 593 U.S. at 543 (Barrett, J., concurring, joined by Kavanaugh, J., concurring) ("difficult to see why

3

the Free Exercise Clause—lone among the First Amendment freedoms—offers nothing more than protection from discrimination"); *id.* at 545 (Alito, J., concurring, joined by Thomas and Gorsuch, JJ.) ("fundamentally wrong"). *Smith* has instead been the kind of dysfunctional and difficult-to-administer precedent that generates church-state conflicts rather than resolving them.

This case is paradigmatic of the problems *Smith* poses for religious people. Colorado created a universal preschool program that funds families to send children to the public or private preschool of their choice—but not the Archdiocese of Denver's Catholic preschools. Why the exclusion? Because, Colorado says, these preschools' religious practice of admitting only families who support Catholic teachings, including on sex and gender, is "discrimination." Yet Colorado has permitted many exemptions, both categorical and discretionary, from the "equal opportunity" rule it has invoked against Catholic preschools. And far from facilitating "universal" preschool, Colorado's exclusion of Catholic preschools *reduces* access, pushing parents and children toward preschools that share the government's views on these issues and penalizing the religious schools and families who disagree. All in a program the Tenth Circuit calls a "model" under *Smith*.

This Court promised in *Obergefell* that religious groups would be protected when they dissent from secular orthodoxies about marriage and sexuality. The Free Exercise Clause simply cannot do that important work—which this Court has described as "at the heart of our pluralistic society"—if it can be so easily evaded.

4

## OPINIONS BELOW

The Tenth Circuit's opinion is reported at 154 F.4th 752 and reproduced at App.1a. The district court's opinion is reported at 736 F.Supp.3d 956 and reproduced at App.50a.

## JURISDICTION

The Tenth Circuit issued its opinion and judgment on September 30, 2025. App.1a, 48a. This Court has jurisdiction under 28 U.S.C. 1254(1).

## CONSTITUTIONAL, STATUTORY, AND REGULATORY PROVISIONS INVOLVED

The First Amendment to the United States Constitution provides in relevant part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof[.]" U.S. Const. Amend. I.

Colo. Rev. Stat. §§ 26.5-4-201 *et seq.* is reproduced in relevant part at App.187a-208a.

8 Code of Colorado Regulations § 1404-1 is reproduced in relevant part at App.209a-215a.

## STATEMENT OF THE CASE

### A. Colorado's universal preschool program

In 2020, Colorado voters passed a ballot proposition to provide state funding for its universal preschool program (UPK). The General Assembly then codified this program into law, allowing preschools to begin receiving funding for the 2023-24 school year. Colo. Rev. Stat. §§ 26.5-4-201 *et seq.* (UPK statute). UPK is administered by the Department of Early Childhood and covers the cost of fifteen hours per week of "preschool services" for all Colorado children "regardless of their

5

economic circumstances." App.188a. The program's primary purpose is "[t]o provide children in Colorado access to voluntary, high-quality, universal preschool services free of charge in the school year before a child enrolls in kindergarten." App.195a.

Colorado's universal preschool program is a "[m]ixed delivery system," meaning both public and private preschools participate. App.6a. The UPK statute requires the Department to adopt via regulation "quality standards" for participating preschools. *Ibid.* These standards include an equal opportunity mandate (the Mandate) that "each preschool provider provide eligible children an equal opportunity to enroll and receive preschool services regardless of race, ethnicity, religious affiliation, sexual orientation, gender identity, lack of housing, income level, or disability[.]" App.204a. Identical language is included in the Department's regulations and UPK preschool contracts. App.6a, 62a, 212a. And Respondents have conceded that the government's interest in enforcing each of the Mandate's protected characteristics is "the same." See Ex. 21 to Pl's. Mot. Summary J. at 15:10-16:16, *Darren Patterson Christian Acad.* v. *Roy*, No. 23-1557 (D. Colo. June 21, 2024), ECF.78-21.

To enroll in a preschool that participates in Colorado's universal preschool program, families first sign up via the Department's online portal. App.7a. They then rank up to five UPK preschools before being "matched" with a preschool by the Department's algorithm. *Ibid.* The Department requires UPK preschools to admit every family matched with them until their program is full, *unless* the preschool receives a Department-approved exemption. *Ibid.* The Department

6

grants exemptions "to help match preschools with specific groups of students that they are designed to serve." App.7a, 41a ("making sure that UPK's website matched families with the right preschools for their children").

Despite Colorado's efforts to recruit a broad range of preschools, its universal preschool program has suffered from a shortage of licensed preschools in particular geographic areas, meaning that not every interested family is able to find an available seat.[1]

### B. The Archdiocese of Denver and its Catholic preschools

Petitioner the Archdiocese of Denver currently oversees thirty-four Catholic preschools. The central mission of these parish preschools is to partner with families "to bring [their] child to encounter Jesus Christ and the truths of our Catholic faith through their intellectual, spiritual, moral, and human formation." App.235a. To help advance this mission, the Archdiocese requires all administrators, teachers, and staff to sign a statement of "Community Beliefs and Commitments," by which they affirm that they will support the teachings of the Catholic Church and refrain from conduct that would "discredit, disgrace, or bring scandal to" the school. App.221a, 228a, 234a. Parents are required to sign a similar statement at the time of enrollment, which explains that "all Catholic school families must understand and display a positive and supportive attitude toward the Catholic Church,

---

[1]   *E.g.*, Lindsey Jensen, *Not enough UPK childcare providers for families applying again this year*, KOAA News5, Aug. 1, 2024, https://perma.cc/T8YJ-UL28.

7

her teachings, her work, and the mission of the Catholic school." App.240a.

This alignment between what the school teaches and what parents want for their children is "vital" because Archdiocesan "schools do not function in [their] mission to help bring children to Jesus Christ if not for bringing them to Jesus Christ through your family." App.235a. If a family actively opposes the teachings of the Catholic Church and lives as "a counter-witness to Catholic doctrine or morals," their participation in the school community would directly impair the ability of the school to form its students in the faith. App.240a, 272a-275a, 316a-317a.

The Archdiocese provides parish preschools—including those of Petitioners St. Mary and St. Bernadette—with binding guidance on how to implement these beliefs in several ways. App.308a-320a; see App.242a-279a. The Archdiocese instructs its school leaders to be "abundantly clear" at the time of a family's enrollment about what the school teaches on matters of faith, and specifically on sexual orientation and gender identity. App.314a-318a. "If the family doesn't see eye to eye on [the Catholic Church's teachings regarding biological sex and marriage], we ask our school leaders to please not admit the child out of abundant respect for the family." App.318a.[2]

---

[2] Making families aware of these religious beliefs and expectations at the time of enrollment also helps avoid unnecessary conflicts. Although many parish preschools have been licensed for decades, the Department agrees that not one "has any history of a complaint from an LGBTQ family or other person alleging LGBTQ-based discrimination." App.306a.

8

If a child is enrolled and only later "begins asserting an identity that's at odds with his or her biological sex," school leaders are directed to "share with the parents the church's teaching" and to "explain that we would not be able to make accommodations that we might see in secular institutions," like using "pronouns," "bathroom[s]" and "uniform[s]" that are "inconsistent with the child's biological sex." App.318a-319a; see also App.319a ("every preschool is expected to follow this guidance").

Petitioners Daniel and Lisa Sheley are parishioners at St. Mary Catholic Parish in Littleton. The Sheleys' Catholic faith directs them to provide a Catholic education for their children. App.84a. They have five children currently attending Petitioner St. Mary's school, two of whom are in preschool now. And they have another child who will begin preschool in 2028.

### C. Colorado permits exemptions from the equal opportunity Mandate

The equal opportunity Mandate requires all UPK preschools to give families an "equal opportunity" to enroll and receive services regardless of any protected characteristic. App.6a. Both the Department and the Tenth Circuit agree that every UPK preschool must "follow the letter of the [Mandate] as enshrined in state law." App.26a, 32a (Mandate "is a hard limit"). Yet it turns out the Department has granted numerous exemptions—both written in regulations and permitted in practice.

***Income level and disability exemptions.*** The Department has created by regulation two categorical exemptions from the Mandate. First, it permits UPK preschools to consider income level by allowing Head

9

Start preschools to prioritize low-income families. App.347a ("families that are above a certain income threshold" can be excluded); App.8a, 35a-37a. Preschools can also consider a child's disability to reserve seats for children "with an Individualized Education Program (IEP)." App.8a, 35a-37a, 347a (agreeing that "some UPK providers only serve children with certain disabilities"). Both Department-created regulatory exemptions violate the plain terms of the Mandate by denying Colorado families an "equal opportunity" to enroll in UPK preschools based on a protected characteristic.[3]

*"Catchall" exemption.* The Department—during trial—announced new proposed regulations creating a "catchall" exemption that allows UPK preschools to "grant preference to an eligible child" based on "the child and/or family being a part of a specific community." App.9a, 350a-352a. This preference was created to be "inclusive of different types of communities." App.340a, 344a.

Respondent Dawn Odean, the director of Colorado's universal preschool program, testified at trial that this catchall exemption would allow UPK preschools to admit only "gender-nonconforming children" and to prioritize serving "children of color from

---

[3]    The UPK regulations initially included a "congregation" exemption, permitting "faith-based" providers to limit enrollment to their "congregation." App.66a-70a. The Department took the position in litigation that this would *not* allow Petitioners to consider sexual orientation or gender identity when enrolling families. App.70a. After the district court held this exemption violated the Mandate, Colorado revised its regulations during the appeal and removed it. App.16a-17a, 16a n.8.

10

historically underserved areas," and "the LGBTQ community." App.353a-355a. Calling the Mandate an "antidiscrimination provision," she claimed that these exemptions are consistent with the Mandate. Specifically, she said she interprets the Mandate to allow UPK preschools to "prioritize[ ] families who have historically been discriminated against." App.337a, 353a-354a.And she repeatedly articulated this view: "it's the law to ensure that these children and their families who historically have been discriminated against aren't[.]" App.342a; see App.322a, 335a, 363a (similar). Odean was "unaware" that Catholics have been historically discriminated against. App.363a.

***Statutory exemption.*** The UPK statute also includes an express grant of discretion: "[T]he department may allow a preschool provider that does not meet the quality standards to participate in the preschool program for a limited time while working toward compliance." Colo. Rev. Stat. § 26.5-4-205(1)(b)(II).

### D. The Department denies Petitioners' request for a religious accommodation

On February 17, 2023, the Archdiocese requested an accommodation from the Mandate that would allow its preschools to admit only families who agree with the Catholic Church's teachings, including on gender and sexuality. The request explained that enforcing the Mandate against faith-based preschools' sincere religious exercise "will severely restrict the ability of faith-based providers to participate in the program without compromising their sincerely held religious beliefs." App.283a.

11

The Department responded that no religious accommodation would be provided, and that "no provider may discriminate against children or families in violation of state statute." App.289a-290a. This bars Petitioners from participating in UPK unless they are willing to compromise their religious beliefs. App.367a ("the [Mandate] is the obstacle to their participating," "[i]f they're choosing to discriminate"); Resp. C.A. Br. 13 (characterizing Plaintiffs' adherence to their religious practices as seeking "permission to discriminate"); App.280a-282a.

### E. Procedural background

Petitioners filed suit on August 18, 2023, and requested a preliminary injunction enabling them to participate in UPK for the 2023-24 school year. Instead of ruling on the preliminary injunction motion, the court set a discovery and briefing schedule before holding a three-day bench trial with ten witnesses in January 2024. Citing *Employment Division* v. *Smith*, the court declined to apply strict scrutiny to what it called the "sexual-orientation and gender-identity aspects of the equal-opportunity requirement," instead holding that they were "neutral and generally applicable." App.100a-135a. The court entered final judgment in June 2024. App.172a.

The Tenth Circuit affirmed, again relying on *Smith*. It first held that *Carson*, *Espinoza*, and *Trinity Lutheran* were "distinguish[able]" because *other* religious schools were "welcome participants in Colorado's UPK program." App.21a. Therefore, according to the Tenth Circuit, the Mandate did not exclude religious schools "on the explicit basis that they were religious and not secular." *Ibid.* After concluding *Carson* did not

12

apply, the court found that Petitioners' religious exercise was only "infringed incidentally," and applied *Smith*. App.22a. Rejecting Petitioners' general applicability arguments, the court held that the Mandate did not permit any "comparable" categorical exemptions, App.40a, and "the Department has no discretion to waive the nondiscrimination requirement." App.34a. Indeed, the Tenth Circuit deemed Colorado's program "a model example of maintaining neutral and generally applicable nondiscrimination laws while nonetheless trying to accommodate the exercise of religious beliefs." App.42a.[4]

During this litigation, two parish preschools—Wellspring Catholic Academy (the parish school of Petitioner St. Bernadette) and Guardian Angels Catholic School—closed their doors due to shortfalls in funding and decreased enrollment. Across the Archdiocese, parish preschool enrollment has declined almost twenty percent since UPK was enacted. And families committed to Catholic education, like the Sheleys, are missing out on thousands of dollars of state funding solely because they chose a Catholic preschool for their children.

---

[4]　The district court and Tenth Circuit agreed that Petitioners Daniel Sheley, Lisa Sheley, St. Mary Catholic Parish in Littleton, and St. Bernadette Catholic Parish in Lakewood have standing. App.16a-18a. On appeal, Respondents do not dispute these Petitioners' standing. See Resp. C.A. Br. 75-79. The district court, however, held that the Archdiocese of Denver did not have associational standing to represent its preschools. App.14a.The Tenth Circuit found that resolving this question was unnecessary as the relief sought by all Petitioners was essentially the same, and it therefore declined to address the issue. App.17a-18a.

13

## REASONS FOR GRANTING THE PETITION

The decision below misreads this Court's decisions in *Fulton* and *Carson*. In so doing, the Tenth Circuit exacerbated a 7-4 split among the lower courts, undermined the rule this Court articulated in *Carson*, and provided a clear example of why *Smith* should be overruled.

First, there is a deep, acknowledged split over how to apply *Fulton* to determine which secular exemptions undermine general applicability in the free exercise context. Seven courts consider *all* secular exemptions and government discretion in determining whether any would undermine the government's asserted interest. Four courts, meanwhile, use a cramped set of potential secular comparators, looking only for *identical* secular exemptions and *unfettered* discretion.

Second, the Tenth Circuit held that *Carson* governs only when the government excludes religious groups "on the explicit basis" that their conduct is religious. App.21a-22a. This contradicts *Carson*'s clear rule: Excluding religious schools from a public benefit "because of their religious exercise" triggers strict scrutiny. 596 U.S. 767, 778-781 (2022) (citing *Sherbert* v. *Verner*, 374 U.S. 398 (1963)); see also *Mahmoud* v. *Taylor*, 606 U.S. 522, 561 (2025) (access to public benefits cannot be conditioned "on parents' willingness to accept a burden on their religious exercise"). By limiting *Carson* to explicitly religious exclusions, the Tenth Circuit joins a growing number of courts that have read *Carson* solely to prohibit religious targeting. But *Carson* should not be so easy to circumvent.

14

In both instances, the source of the mischief is the unsound rule of *Smith*, which will only continue to resist predictable application and distort other free-exercise doctrines until this Court addresses it. This case therefore also presents an opportunity to reconsider *Smith* and put the Free Exercise Clause back onto the right path.

**I. The decision below exacerbates a 7-4 split over the test for determining whether a law is generally applicable under the Free Exercise Clause.**

*Fulton* confirmed that, under *Smith*, a law "lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way," or if it provides "a mechanism for individualized exemptions." 593 U.S. 522, 534 (2021); see also *Kennedy* v. *Bremerton Sch. Dist.*, 597 U.S. 507, 526 (2022); *Tandon* v. *Newsom*, 593 U.S. 61, 62 (2021). A 7-4 split has developed among the lower courts over the interpretation of *Smith*'s general applicability rule.

The majority rule evaluates all discretion and categorical exemptions permitted by a regulatory scheme to determine if they pose a similar threat to the government's asserted interest as the prohibited religious conduct. The minority rule, which the court here embraced, holds that only *unfettered* discretion or categorical exemptions for *identical* secular conduct can undermine general applicability.

Three Justices of this Court have explicitly acknowledged this split, correctly identifying it as "widespread," "entrenched," and worthy of this Court's review. *Dr. A* v. *Hochul*, 142 S. Ct. 2569, 2570 (2022)

15

(Thomas, J., dissenting from denial of certiorari, joined by Alito and Gorsuch, JJ.) (split over whether law is "generally applicable" if it "exempts secular conduct that similarly frustrates the specific interest that the [law] serves"). The split has only grown since then, with the addition of *six* more decisions—including an en banc Ninth Circuit decision, a Second Circuit decision, and the decision below, which recognized the split by expressly rejecting the leading case on the other side.

**A. Seven courts evaluate all discretion and categorical exemptions to determine whether they undermine the government's asserted interests in a similar way.**

The leading case for the majority rule is the Ninth Circuit's decision in *Fellowship of Christian Athletes* v. *San Jose Unified School District*, 82 F.4th 664 (9th Cir. 2023) (en banc) (*FCA*). There, a school district claimed that a religious student group's requirement that its leaders share its religious beliefs about marriage constituted religious and sexual orientation discrimination in violation of the district's nondiscrimination policy. The district, however, had discretion to grant exemptions from the policy when doing so aligned with its "Board-adopted equity policy." *Id.* at 687. And the district permitted exemptions for secular student groups that discriminated "on the basis of sex and ethnicity." *Id.* at 688.

The en banc Ninth Circuit found this scheme violated "bedrock requirements of the Free Exercise Clause." *FCA*, 82 F.4th at 686. On discretion, the court rejected the argument that discretion mattered only if it was "unfettered." *Id.* at 687. Rather, under *Fulton*,

16

the "mere existence of a discretionary mechanism * * * can be sufficient to render a policy not generally applicable" because it allows the government to favor secular conduct over religious conduct. *Id.* at 687-688 (calling a focus on "unfettered" discretion "overly narrow"); accord *Bates* v. *Pakseresht*, 146 F.4th 772, 797 (9th Cir. 2025) (rejecting argument that discretion must be "completely unfettered").

Turning to the secular comparators, the Ninth Circuit held that district-permitted exemptions from other aspects of the non-discrimination provision—*i.e.,* allowing clubs to distinguish among students based on their sex and ethnicity—were comparable to the religious accommodation FCA sought regarding a student leader's sexual orientation and religion. This was because "[w]hether [the secular exemptions] are based on gender, race, or faith, each * * * pose[s] an identical risk to the District's stated interest in ensuring equal access for all student to all programs." *FCA*, 82 F.4th at 689. The Ninth Circuit thus treated *different* secular exemptions from the non-discrimination provision as "comparable" because those exemptions for other protected characteristics still undermined the district's asserted interest in ensuring equal treatment. *Ibid.*; contra App.38a-39a (holding that only exemptions for the same form of "discrimination" are comparable).[5]

The Third, Sixth, and Eleventh Circuits, and the state supreme courts of Louisiana, Iowa, and Hawaii,

---

[5]    Several district courts have also applied this approach to general applicability. See *Fellowship of Christian Athletes* v. *District of Columbia*, 743 F. Supp. 3d 73, 90-92 (D.D.C. 2024) (collecting cases).

17

have likewise refused to cabin general applicability as the court did below.

In *Blackhawk* v. *Pennsylvania*, the Third Circuit agreed that the general applicability of a bear-possession permitting requirement was undermined both through "discretionary exemptions" and by "categorical exemptions." 381 F.3d 202, 209-211 (3d Cir. 2004) (Alito, J.). The court rejected the defendant's argument that the government's discretion was permissible because the discretion was objectively tailored to its interests—*i.e.*, not unfettered. *Id.* at 209-210. The court separately explained that the "state's interest in raising money is undermined by *any exemption*" that would similarly undercut that asserted interest. *Id.* at 211 (emphasis added). It did not cabin relevant exemptions solely to identical conduct, instead treating exemptions for "circuses and zoos" as comparable to the requested religious exemption. *Ibid.* See also *Fraternal Order of Police* v. *City of Newark*, 170 F.3d 359, 365 (3d Cir. 1999) (Alito, J.) (treating medical and religious beard accommodations as comparable); *Smith* v. *City of Atlantic City*, 138 F.4th 759, 772 (3d Cir. 2025) (rejecting focus on one "provision" "in isolation" and instead considering all exemptions that could similarly undermine the government's interest).

In *Monclova Christian Academy* v. *Toledo-Lucas County Health Department*, the Sixth Circuit compared the pandemic-era closing of religious schools not just to also-closed secular schools, but also to still-open "gyms, tanning salons, office buildings, and the Hollywood Casino." 984 F.3d 477, 482 (6th Cir. 2020). The court rejected a "myopic focus solely on" the portion of the restrictions that applied to schools, as that would "allow for easy evasion of the Free Exercise guarantee

18

of equal treatment." *Id.* at 481. It further reasoned that this Court "routinely identifies as comparable" secular activities that are "very different" from the prohibited religious conduct at issue, but which pose a similar threat to the government's interests. *Ibid.*

In *Midrash Sephardi, Inc.* v. *Town of Surfside*, the Eleventh Circuit similarly held that private clubs were valid comparators to a synagogue seeking to build in a downtown commercial district. 366 F.3d 1214, 1234-1235 (11th Cir. 2004). The court rejected the argument that they were not comparable because private club patrons were more likely to spend time and money at the other retail establishments in the downtown commercial zone. *Ibid.*

The supreme courts of Louisiana, Iowa, and Hawaii likewise evaluate all secular conduct posing similar risks to the government's interests. See *Louisiana* v. *Spell*, 339 So.3d 1125, 1135-1137 (La. 2022) (comparing exemptions allowing "Walmart, Target and Home Depot" to remain open during COVID to denied exemptions for churches); *Mitchell County* v. *Zimmerman*, 810 N.W.2d 1, 15-16 (Iowa 2012) (road ordinance not generally applicable when it banned traditional Amish carriage wheels because of road damage but allowed school buses to use ice grips and snow studs year-round); *Hawaii* v. *Armitage*, 319 P.3d 1044, 1067 (Haw. 2014) (law banning access to protected island

19

not generally applicable because it incorporated discretionary permit process).[6]

## B. Four courts consider only unfettered discretion and categorical exemptions for identical secular conduct.

Four courts—the Tenth Circuit, the Second Circuit, Connecticut, and California—take a myopic view of what types of discretion or exempted secular conduct can undermine general applicability.

In *Emilee Carpenter, LLC* v. *James*, the Second Circuit held that New York's public accommodations law was generally applicable despite express exemptions allowed by the same statute for discrimination based on sex and gender identity, claiming that "unique policy and legal considerations" distinguish those exemptions from a religious exemption from the same law based on sexual orientation. 107 F.4th 92, 111 (2d Cir. 2024) (government's "interests in prohibiting discrimination on different protected grounds [listed in public accommodations law] are not identical"); see also *Miller* v. *McDonald*, 130 F.4th 258, 267 (2d Cir. 2025) (per curiam), petition for cert. pending, No. 24-681 (filed Aug. 4, 2025) (concluding that religious and medical exemptions are not comparable). The Second Circuit has also held that *Fulton* bars only discretionary exemptions that are "unfettered" and not "objectively defined." *We The Patriots USA, Inc.* v.

---

[6]    The First Circuit has left open the question whether all secular exemptions must be considered in determining general applicability. See *Brox* v. *Woods Hole, Martha's Vineyard & Nantucket Steamship Auth.*, 83 F.4th 87, 100 (1st Cir. 2023) (leaving open question whether existing medical exemption had to be compared with requested religious exemption).

20

*Hochul*, 17 F.4th 266, 288-289 (2d Cir. 2021) (quoting *303 Creative LLC* v. *Elenis*, 6 F.4th 1160, 1187 (10th Cir. 2021), rev'd on other grounds, 600 U.S. 570 (2023), and *Stormans, Inc.* v. *Wiesman*, 794 F.3d 1064, 1081-1082 (9th Cir. 2015)).

Connecticut has followed the Second Circuit's lead. In *Spillane* v. *Lamont*, the Connecticut Supreme Court held that a law's medical exemptions, which vested substantial discretion in medical providers, did not defeat general applicability because its application by government officials was not "entirely discretionary" and was "framed in objective terms." 323 A.3d 1007, 1024-1025 (Conn. 2024) (citing *We The Patriots*).

California follows the same path. *North Coast Women's Care Medical Group* v. *Superior Court* held in a single sentence that California's public accommodations law, the Unruh Act, is neutral and generally applicable under *Smith* because its text calls for equal services for all. 189 P.3d 959, 965 (Cal. 2008). *North Coast* ignored the Unruh Act's express, categorical exemption for age discrimination in housing, and its judicially created exemption for any discrimination that is "reasonable" and consistent with "public policy." Cal. Civ. Code §§ 51.2-51.4; *Koire* v. *Metro Car Wash*, 707 P.2d 195, 197-198 (Cal. 1985). It also ignored that the Act does not "confer any right or privilege * * * limited by law"—a carveout that has been used to exempt discriminatory practices at both insurance companies and car rental agencies. Cal. Civ. Code § 51(c). California courts have continued to rely on *North Coast* despite this Court's intervening decisions. See *Civil Rts. Dep't* v. *Cathy's Creations, Inc.*, 109 Cal. App. 5th 204, 265 (Cal. Ct. App. 2025), as modified on

21

denial of reh'g (Mar. 5, 2025), petition for cert. pending, No. 25-233 (filed Aug. 26, 2025) ("*Fulton* does not fatally undercut *North Coast*").

The decision below reaffirmed the Tenth Circuit's position in this split. After first trying to "interpret" away the secular exemptions, the court concluded that exemptions from the Mandate based on disability and income level weren't "comparable" to exemptions based on sexual orientation and gender identity because the conduct they prohibit isn't the same. App.39a-40a (each protected characteristic addresses different "barriers" to equal access). See also *303 Creative*, 6 F.4th at 1188 (refusing to consider the law's discretionary exemption because it was not "entirely discretionary"), rev'd on other grounds, 600 U.S. 570 (2023).

In the decision below, the Tenth Circuit also expressly broke with the Ninth Circuit's decision in *Fellowship of Christian Athletes*. The court first noted that "[w]e are not bound by th[at] case," then sought to distinguish the decision by claiming that "disability and income level are fundamentally different from other suspect classifications" protected by Colorado's Mandate. App.40a-41a. But by concluding that these varied exemptions from the same Mandate *aren't* comparable for free exercise purposes, the Tenth Circuit simply reinforced the split. Contra *FCA*, 82 F.4th at 689 (evaluating *all* exemptions from district's non-discrimination requirement to determine what is "comparable" under *Tandon*).

### C. The decision below is wrong.

The decision below conflicts with *Fulton* and *Tandon* v. *Newsom* both in its comparability analysis and

22

in its failure to recognize Respondents' discretion to create exemptions. On comparability, the Tenth Circuit said that that disability and income level exemptions from the Mandate aren't "comparable" to exemptions based on sexual orientation and gender identity, because they address different "barriers to equal access." App.40a (barriers are "completely different and thus not comparable").

That flips general applicability analysis on its head. Instead of assessing whether multiple exemptions to the same law undermine the government's interest in similar ways, the Tenth Circuit did exactly what this Court has said *not* to do: It focused on the different reasons Colorado exempts others from complying with the Mandate. See *Tandon*, 593 U.S. at 62. Even *assuming* children with disabilities face "different barriers" to enrollment than, *e.g.*, children who identify as transgender, denying equal access in either case "undermines the government's asserted interests [in enforcing the Mandate] in a similar way." *Fulton*, 593 U.S. at 534. Here, all the protected characteristics are treated identically in the same statutory sentence, and Respondents conceded their interest in all of them is the same. App.6a; see p. 5, *supra*. Permitting a government to "divvy up its exemption regimes provision-by-provision"—or here, word-by-word—"would permit governments to subvert free exercise through clever drafting." *Atlantic City*, 138 F.4th at 772.

On discretion, the Tenth Circuit simply ignored the ample discretion Respondents have to accommodate preschools that require exemptions from the Mandate's plain text. That conflicts with *Fulton*'s holding that a law burdening religious exercise is not generally

23

applicable whenever "it invites the government to consider the particular reasons for a person's conduct" through some discretionary mechanism—"regardless whether any exceptions have been given." 593 U.S. at 523, 537.

The trial record shows the Department has many forms of discretion. Respondent Odean testified that the catchall exemption could be used to allow preschools to admit only "gender-nonconforming children" and to prioritize serving "children of color from historically underserved areas" and "the LGBTQ community." See pp. 9-10, *supra*. Similarly, the UPK statute permits exemptions from quality standards to "allow a preschool provider that does not meet the quality standards to participate in the preschool program for a limited time while working toward compliance with the quality standards." App.33a.

Respondents' actions also confirm they have broad discretion: The Department consistently treats the Mandate not as a strict obligation, but as a flexible provision that allows it to take into consideration all kinds of *other* important interests (*e.g.*, helping kids with disabilities and prioritizing historically discriminated against communities), while nevertheless refusing to accommodate sincere religious exercise. Respondents believe these preferences are permissible because they interpret the Mandate "to ensure that these children and their families who historically have been discriminated against aren't." App.322a, 342a. Indeed, this interpretation of the Mandate is so flexible that the only providers who had to seek (and were denied) exemptions were a handful of religious preschools. See Ex. 21 to Pl's. Mot. Summary J. at 77:5-19, *Darren Patterson Christian Acad.* v. *Roy*, No. 1:23-

24

cv-1557 (D. Colo. June 21, 2024), ECF No. 78-21 (listing Petitioners St. Mary and St. Bernadette alongside three other religious preschools).

Respondents contend there are no exemptions at all because they "interpret[ ]" the Mandate to implicitly permit these exemptions. *E.g.*, Resp. C.A. Br. 8, App.36a. But "that is word play." *Maryville Baptist Church, Inc.* v. *Beshear*, 957 F.3d 610, 614 (6th Cir. 2020) (rejecting attempt to use clever drafting and interpretation to get around practical impact of the law). What matters is the real operation of the law. If the Mandate can be read to accommodate other interests *despite* the law's plain text, Respondents could similarly interpret the Mandate to respect the First Amendment and accommodate Petitioners.

## II. Lower courts are defying *Carson*'s prohibition on denying religious people benefits "because of their religious exercise."

The Tenth Circuit also defied this Court's *Trinity Lutheran–Espinoza–Carson* line of precedent by limiting the rule of *Carson* to situations where the law excluding religious people from a generally available benefit is phrased in explicitly religious terms. A growing number of lower courts have made the same move, rejecting *Carson*'s straightforward rule and offering an easy workaround for governments to pick winners and losers among religious groups in public programs. This radical narrowing of *Carson* should be rejected before it metastasizes further.

1. This Court has long held that "[a] person may not be compelled to choose between [religious] exercise" and "participation in an otherwise available pub-

25

lic program," regardless of whether the exclusion is explicit or "neutral on its face." *Thomas* v. *Review Bd.*, 450 U.S. 707, 708, 717 (1981). So when government conditions "a benefit or privilege" on a person's "willingness to violate" her religious beliefs, it triggers strict scrutiny. *Sherbert*, 374 U.S. at 404-409. This rule reflects the straightforward principle that, under the First Amendment, each faith must "flourish" or wither "according to the zeal of its adherents and the appeal of its dogma," *Zorach* v. *Clauson*, 343 U.S. 306, 313 (1952)—not because the government has put a thumb on the scale.

The Court has repeatedly applied this rule in the context of religious education, holding that excluding religious schools from otherwise-available public benefits is "odious to our Constitution," *Trinity Lutheran Church of Columbia, Inc.* v. *Comer*, 582 U.S. 449, 467 (2020); that the rule applies equally to tuition aid as to other types of benefits, *Espinoza* v. *Montana Dep't of Revenue*, 591 U.S. 464, 475-476 (2020); and that the rule applies not only when schools are excluded because of their religious status but also *because of their religious exercise*," *Carson*, 596 U.S. at 781 (emphasis added). Cf. *Mahmoud*, 606 U.S. at 561 ("Public education is a public benefit, and the government cannot 'condition' its 'availability' on parents' willingness to accept a burden on their religious exercise.").

Indeed, *Carson* repeatedly confirmed that the First Amendment presumptively prohibits "enactments that exclude some members of the community from an otherwise generally available public benefit *because of their religious exercise*." *Carson,* 596 U.S. at 781 (emphasis added); see also *id.* at 785 ("the prohibition on

26

denying the benefit based on a recipient's *religious exercise*" (emphasis added)); *id.* at 789 ("Regardless of how the benefit and restriction are described, the program operates to identify and exclude otherwise eligible schools on the basis of their *religious exercise*." (emphasis added)).

In reaching these conclusions, this Court has eschewed *Smith*, relying instead on the separate public benefits line of free exercise caselaw originating with *Sherbert* and passing through *Thomas, Trinity Lutheran, Espinoza,* and *Carson*. In short, when it comes to free exercise cases concerning access to public benefits, *Carson* is the governing standard, and *Smith* is at best a backup rule.

2. Despite this clear instruction, several states have sought to dramatically narrow the rule of *Trinity Lutheran*, *Espinoza*, and *Carson*. They claim that religious people can be excluded from generally available public benefit programs based on their religious exercise as long as the exclusion isn't *explicitly* religious. And so far, several lower courts—the Fourth Circuit, the Ninth Circuit, and now the Tenth Circuit, have agreed. The rule in these courts is that religious groups can be excluded "because of their religious exercise," *Carson*, 596 U.S. at 781, as long as the exclusion was not made "on the explicit basis" that the burdened activity was religious, and as long as religion was not "specifically targeted." App.21a, 22a.

Courts taking this cramped view of *Carson* have followed a common pattern.

In *Youth 71Five Ministries* v. *Williams*, an Oregon "Youth Community Investment Grant Program" with-

27

drew grants from an otherwise-eligible Christian ministry because the ministry required its employees and volunteers to agree with a "Christian statement of faith," a violation of the program's nondiscrimination requirements. 153 F.4th 704, 714 (9th Cir. 2025). The Ninth Circuit rejected the ministry's *Carson* claim, saying that "unlike the religious-use prohibition at issue in *Carson*," the challenged "[r]ule does not deny funding based on a practice exclusive to religious organizations." *Id.* at 719. The Ninth Circuit went on to hold that *Smith* was the right rule to apply, not *Carson*, and that the religious plaintiffs' claims failed under the *Smith* standard. *Id.* at 720.

Similarly, in *Kim* v. *Board of Education of Howard County*, the Fourth Circuit concluded that *Trinity Lutheran*, *Espinoza*, and *Carson* "stand only for the point that religious schools cannot be excluded from grant programs solely because of their religious character." 93 F.4th 733, 748 (4th Cir. 2024). That is because, the court said, "[t]he programs in those cases *explicitly* barred public funds from going to religious actors 'solely because of their religious character.'" *Ibid.* (emphasis added). The Fourth Circuit thus distinguished *Carson* and applied the rule of *Smith*, finding that the exclusion of the religious plaintiff from a benefits program was both neutral and generally applicable. *Id.* at 747-748.

In the decision below, the Tenth Circuit similarly refused to apply strict scrutiny, distinguishing "the *Carson* line of cases" on the ground that they "addressed laws that targeted 'religious status' and 'religious use' on the explicit basis that they were religious and not secular." App.21a. It described the exclusion

28

of Catholic preschools from UPK as "not a targeted burden on religious use." App.22a. And it held that "when a particular religious practice is alleged to be infringed incidentally, rather than religious status or use being specifically targeted, the Supreme Court requires that the law at issue be neutral and generally applicable." *Ibid.* That is, *Carson* doesn't apply; *Smith* does.[7]

3. The decision below is wrong. Under *Carson*, when "otherwise eligible schools" are "exclude[d]" from a benefits program "on the basis of their religious exercise," the exclusion triggers strict scrutiny. 596 U.S. at 789; accord *id.* at 785. Here, there is no question that the parish preschools are otherwise eligible for UPK funding. And there is no question that those preschools have been excluded from that benefit "because of their religious exercise," *id.* at 781—namely, their religiously motivated policies related to sex and gender. So, under *Carson*, the exclusion should have been "subjected to 'the strictest scrutiny.'" *Id.* at 780.

It defies *Carson* to reject this conclusion because the exclusion does not "specifically target[]" religious exercise "on the explicit basis that" it is "religious."

---

[7]    Even the town-tuitioning program at issue in *Carson* itself has now been held to be outside the reach of *Carson*. In *St. Dominic Academy* v. *Makin*, 744 F. Supp. 3d 43 (D. Me. 2024), and *Crosspoint Church* v. *Makin*, 719 F. Supp. 3d 99 (D. Me. 2024), religious schools sued over Maine's town-tuitioning program. While *Carson* was pending, Maine amended its laws to exclude from public funding schools that "discriminate" based on "sexual orientation or gender identity." *St. Dominic*, 744 F. Supp. 3d at 53. As a result, the district court treated the exclusion of those schools as governed by *Smith* rather than *Carson*, and upheld it. *Id.* at 69-70, 77-79; *Crosspoint*, 719 F. Supp. 3d at 117-123.

29

App.21a-22a. *Carson* itself embraced no such limitation. And both before and after *Carson*, this Court has applied the prohibition on religious-exercise-based benefits exclusions even when the exclusion is "neutral on its face." *Thomas*, 450 U.S. at 717; see also *Sherbert*, 374 U.S. at 401. In *Mahmoud*, for example, this Court applied "the *Carson* line of cases" (App.21a), where parents were excluded from the "benefit" of public education if they exercised their religion by declining to submit their children to "LGBTQ+-inclusive" instruction. 606 U.S. at 561, 563 (citing *Trinity Lutheran*). And the Court did so even though the County did not deny opt-outs "on the explicit basis that" objections were "religious" (App.21a), but rather had a "no-opt-out" policy that said nothing about religion at all. *Mahmoud*, 606 U.S. at 538, 563.

Nor does it matter that Colorado has included *other* "religious schools as welcome participants." App.21a. In *Carson* itself, Maine didn't exclude *all* religious schools, but only those that "present[ed] academic material through the lens of th[eir] faith." 596 U.S. at 786-787. And differentiation *between* religions is constitutionally problematic—indeed, "fundamentally foreign to our constitutional order." *Catholic Charities Bureau, Inc.* v. *Wisconsin Lab. & Indus. Rev. Comm'n*, 605 U.S. 238, 249 (2025); see also *id.* at 250 ("eligibility" "ultimately turn[ed] on inherently religious choices," like whether to "serve only co-religionists").

*Carson* thus controls. "Regardless of how the benefit and restriction are described," the "operat[ion]" is the same: Catholic preschools have been excluded from UPK "because of [their] religious exercise." *Carson*, 596 U.S. at 781, 789. And this Court's holdings in

30

this area have "turned on the substance of free exercise protections, not on the presence or absence of magic words." *Id.* at 785.

This case presents the Court with the opportunity to stop lower courts' misbegotten effort to constrain *Carson* and reduce the protection of the Free Exercise Clause to a question of targeting only. It's especially appropriate to do so here, where the Department has put not just "a thumb" but an anvil "on the scale"— promising free tuition at any state-licensed preschool *unless* the preschool adheres to traditional religious beliefs that the State's "legislative majorities * * * find unseemly or uncouth." *Espinoza*, 591 U.S. at 513-514 (Gorsuch, J., concurring).

### III. *Employment Division* v. *Smith* should be overruled.

*Smith* is at the root of both errors identified above. The Tenth Circuit looked to *Smith* instead of *Carson* because it concluded that Colorado's actions only "infringed incidentally" Petitioners' religious exercise. App.22a. And the Tenth Circuit's general applicability analysis confirms that this standard is easily misapplied. Worse, *Smith* continues to exert a gravitational pull on supposedly separate forms of free exercise analysis: By limiting *Carson* to "explicit" religious exclusions, App.21a, the Tenth Circuit refashioned an admittedly "independent line of precedent," App.19a, into merely another iteration of the stingiest applications of *Smith*'s prohibition on religious targeting.

In *Smith*, the Court "ambitiously attempted" to impose "a test that would bring order and predictability." *American Legion* v. *American Humanist Ass'n*, 588 U.S. 29, 48 (2019). But that test was not derived from

31

the text, history, or tradition of the Free Exercise Clause. See *City of Boerne* v. *Flores*, 521 U.S. 507, 565 (1997) (Souter, J., dissenting) (*Smith* Court "never had" briefing and argument on *Smith*'s historical merits as a general matter—not even in "*Smith* itself."); see also Stephanie Hall Barclay & Matthew M. Krauter, *The Untold Story of the Proto-*Smith *Era: Justice O'Connor's Papers and the Court's Free Exercise Revolution*, 174 U. Pa. L. Rev. (forthcoming 2026), https://papers.ssrn.com/sol3/papers.cfm?abstract_id= 5143931 (describing *Smith* Court's "near total lack of discussion about the historical and textual meaning of the Free Exercise Clause"). And *Smith* has not delivered the administrability it promised.

Instead of a clear standard, *Smith*'s framework has proven highly malleable and unpredictable. Indeed, application of the test has "generated a long list of Circuit conflicts." *Dobbs* v. *Jackson Women's Health Org.*, 597 U.S. 215, 284 (2022); see pp. 14-23, *supra*; *Fulton*, 593 U.S. at 608-612 (Alito, J., concurring). As this case and recent history demonstrate, "judges across the country continue to struggle to understand and apply *Smith*'s test even thirty years after it was announced." *Fulton*, 593 U.S. at 626 (Gorsuch, J., concurring) (noting the Court's corrections to lower-court misapplication in COVID cases). The neutrality-and-general-applicability rule has thus invited semantic games and religious gerrymandering. See pp. 19-24, *supra*; *Fulton*, 593 U.S. at 624 (Gorsuch, J., concurring).

If *Smith* were rooted in text, history, and tradition, continuing to straighten out these repeated tangles would be a worthy task for this Court. But *Smith* is rootless. *Smith* "paid shockingly little attention to the text of the Free Exercise Clause. Instead of examining

32

what readers would have understood its words to mean when adopted, the opinion merely asked whether it was 'permissible' to read the text to have the meaning that the majority favored." *Fulton*, 593 U.S. at 564 (Alito, J., concurring) (quoting *Smith*, 494 U.S. at 878).

In short, the *Smith* test will not "work itself pure." *Loper Bright Enters.* v. *Raimondo*, 603 U.S. 369, 419 (2024) (Gorsuch, J., concurring) (quoting *Omychund* v. *Barker*, 1 Atk. 22, 33, 26 Eng. Rep. 15, 23 (Ch. 1744)). Only if this Court confronts *Smith* head on can it bring the jurisprudence of the Free Exercise Clause back into sync with its text, history, and tradition.

That renaissance of the Free Exercise Clause cannot come too soon. Religious people across the country are stuck in forever conflicts precisely because of the (sometimes willful) confusion among the lower courts over the meaning of the Free Exercise Clause. See, *e.g.*, *Pennsylvania* v. *President*, No. 25-2575 (3d Cir. appeal filed by Little Sisters of the Poor Aug. 20, 2025), on remand from *Little Sisters of the Poor Saints Peter & Paul Home* v. *Pennsylvania,* 591 U.S. 657 (2020) (complaint filed Oct. 11, 2017) (religious order helping the elderly poor); *Klein* v. *Oregon Bureau of Lab. & Indus.,* No. A159899 (Or. Ct. App. argued Jan. 30, 2024), on remand from *Klein* v. *Oregon Bureau of Lab. & Indus.,* 143 S. Ct. 2686 (2023) (complaint filed Jan. 17, 2013) (religious baker); *Miller* v. *Civil Rts. Dep't*, No. 25-233 (petition for cert. filed Aug. 26, 2025) (administrative complaint filed Oct. 18, 2017) (religious baker); *Yeshiva Univ.* v. *YU Pride All.*, 143 S. Ct. 1 (2022) (religious university); *Roman Catholic Diocese of Albany* v. *Harris,* 145 S. Ct. 2794 (2025) (second

33

GVR; religious groups seeking protection from abortion mandate). Religious people should not have to endure years of litigation because the law is unclear and state governments are unyielding.

## IV. This case is an excellent vehicle to address issues of nationwide importance.

This case is an excellent vehicle to resolve the questions presented. It comes to the Court after final judgment and with a robust record reflecting the three-day bench trial in the district court. Both the district court and the Tenth Circuit fully addressed the legal issues presented by each of the first two questions presented, with the Tenth Circuit noting its disagreement with the en banc Ninth Circuit's majority position. And both courts below explicitly relied on *Smith* to rule against Petitioners, even grasping the nettle and embracing not only *Smith*'s rule but also its much-criticized reasoning. *E.g.,* App.23a ("While the Constitution protects religious freedom, * * * the government must be able to enforce the law equally against everyone, no matter an individual's beliefs, lest we 'permit every citizen to become a law unto himself'" (quoting *Smith*, 494 U.S. at 879)). There are thus no barriers preventing this Court from reaching and resolving all the questions presented.

And those questions are important. Indeed, getting the Free Exercise Clause analysis right has only become *more* critical as government funding programs—especially in the education context—become ubiquitous. Enrollment in state-funded preschool programs alone reached an all-time high of over 1.75 million children in 2023-24. Allison H. Friedman-Krauss et al., *Executive Summary*, *The State of Preschool 2024 Year-*

34

*book*, NIEER, https://perma.cc/CN23-A455. And a record sixteen states plus the District of Columbia are now providing universal preschool funding, reflecting a trend toward mixed-delivery systems that integrate (and fund) private providers. NIEER, *National Report: State-by-State Disparities Widening in Preschool Access, Quality, Funding* (Apr. 18, 2024), https://perma.cc/5KNE-FYA9. Recent research into these programs also shows that—even after *Fulton* and *Carson*—"exclusion of religious providers is pervasive." Nicole Stelle Garnett, Tim Rosenberger & J. Theodore Austin, *The Persistence of Religious Discrimination in Publicly Funded Pre-K Programs*, Manhattan Institute (Jan. 21, 2025), https://perma.cc/PJ7D-VKJ8 (describing various ways in which states use participation requirements to bar or dissuade religious preschools).

Perversely, this imposes the greatest harm on those who can least afford it: low-income and historically disadvantaged families. Religious schools—and Catholic schools in particular—are "more likely to be associated with better civic outcomes," including "political tolerance, political participation, civic knowledge and skills, and voluntarism and social capital." EdChoice Br. at 27-29, *St. Mary Catholic Parish* v. *Roy*, No. 24-1267 (10th Cir. Aug. 21, 2024). Colorado is thus excluding the very schools that are the best at advancing civic values for children who are left out.

Nor are government attempts at religious exclusion by any means limited to education. In our pluralistic society, religious organizations participate in all kinds of government programs as they seek to serve both neighbor and country—education, job training,

35

refugee and immigration support, housing, social services, disaster relief, historic preservation, food assistance, and more. The Tenth Circuit's opinion paves the way for governments to exclude religious groups with politically unpopular beliefs from any of these programs—simply by invoking "nondiscrimination." That opens the door to even more religious gerrymandering. All but the most unsophisticated government actors will be able to craft neutral-sounding requirements that give them broad discretion to flexibly accommodate favored secular groups while penalizing disfavored religious believers.

Finally, this Court also need not speculate about the practical effect of the Tenth Circuit's decision. Since litigation began, two Archdiocesan preschools have closed, and enrollment at Archdiocesan preschools is down almost twenty percent. Families like the Sheleys have been forced to either follow the dictates of their faith at the cost of thousands of dollars per year or abandon their religious exercise. Colorado is thus imposing enormous—and unconstitutional—pressure on religious preschools to conform or close, and it is doing so in a way that the Tenth Circuit held up as a "model" to be replicated elsewhere. Allowing the decision below to stand will only fuel and expand this pressure campaign, which is damaging to religious groups, our country, and the rule of law.

## CONCLUSION

The Court should grant the petition.

36

Respectfully submitted.

MARK L. RIENZI
ERIC C. RASSBACH
  *Counsel of Record*
JOSEPH C. DAVIS
NICHOLAS R. REAVES
JORDAN T. VARBERG
AMANDA G. DIXON
THE BECKET FUND FOR
  RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW,
  Suite 400
Washington, D.C. 20006
(202) 955-0095
erassbach@becketfund.org

*Counsel for Petitioners*

NOVEMBER 2025

**APPENDIX OMITTED**

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BRIDGER LEE JENSEN, SINGULARISM, and PSYCHE HEALING AND BRIDGING, LLC,<br><br>   Plaintiffs,<br><br>v.<br><br>UTAH COUNTY, PROVO CITY, JEFFREY GRAY, TROY BEEBE, BRIAN WOLKEN, JACKSON JULIAN, and JOHN DOES 1–4,<br><br>   Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING MOTION FOR STAY OF PROCEEDINGS**<br><br>Case No. 2:24-cv-00887-JNP-CMR<br><br>Chief District Judge Jill N. Parrish |

Defendants request a stay of further proceedings pending the resolution of Defendants' appeal of the court's August 4, 2025 Order. ECF No. 112. The court GRANTS the motion for stay.

## BACKGROUND

Plaintiffs are members and affiliates of Singularism, a religious tradition that uses psilocybin (a Schedule I controlled substance) as a sacrament to encounter the Divine. ECF No. 56 at 1. When Plaintiff Bridger Lee Jensen founded Singularism in November 2023, he notified Utah County and Provo City about Singularism's religious use of the entheogen and invited officials to approach him with any questions about the religion. *Id.* About a year later in November 2024, Provo City officers executed a search warrant at Singularism's center and seized its stock of psilocybin mushrooms along with its sacred scripture. *Id.* at 2. The government also threatened criminal charges against Jensen. *Id.*

Plaintiffs then filed suit in state court against Utah County, Provo City, and several

government officials, seeking a temporary restraining order and preliminary injunction to require return of the mushrooms and scripture and seeking to enjoin any threatened criminal prosecution. *Id.* Defendants removed the case to federal court on November 27. *Id.* The TRO motion, filed again in this court, invoked the Free Exercise Clause of the First Amendment, the Free Exercise Clause of the Utah Constitution, and the Utah Religious Freedom Restoration Act ("RFRA"). *Id.*

On December 13, 2024, the court held an evidentiary hearing on Plaintiffs' motion for a temporary restraining order. *Id.* At the hearing, Plaintiffs presented the testimony of several witnesses to establish the sincerity of their religion. *Id.* The court found the witnesses credible and ruled that Plaintiffs had shown a likelihood of success on their claim under the Utah RFRA. *Id.* Accordingly, on December 16, the court entered a limited temporary restraining order requiring Defendants to return the psylocibin mushrooms and records as soon as practicable. ECF No. 24. On December 18, the State of Utah, through the Utah County Attorney's Office and Defendant Utah County Attorney Jeffrey Gray, then initiated a criminal action against Mr. Jensen in state court. ECF No. 92 at 15.

Shortly after the government filed criminal charges against Mr. Jensen, Plaintiffs moved for an anti-suit injunction against the state-court prosecution, and Defendants moved to dismiss Plaintiffs' claims. *Id.* at 16. The motion to dismiss argued that (1) Plaintiffs' First Amendment claim failed because the Utah Controlled Substances Act is neutral and generally applicable; and (2) Plaintiffs' Fourth Amendment claim failed because of Defendants' alleged absolute immunity. ECF No. 40 at 5, 10. It further argued that the court should decline to exercise supplemental jurisdiction over the state law claims. *Id.* at 12. In response to the motion for an anti-suit injunction, Defendants argued that the court was precluded from enjoining the state prosecution due to *Younger* abstention and because injunctive relief was inappropriate under the federal Anti-

Injunction Act. ECF No. 50 at 5, 9.

The court deferred on ruling on these two motions until the Utah Attorney General had an opportunity to present evidence or argument on the constitutional questions underlying the motions. ECF No. 92 at 3. On February 20, 2025, the court preliminarily enjoined Defendants from treating Plaintiffs' religious use of psilocybin as unlawful under the Utah Controlled Substances Act. *Id.*

On April 11, 2025, the Attorney General notified the court that he joined in and adopted the arguments made in Defendants' briefing on their motion to dismiss. ECF No. 102. On August 4, 2025, the court denied Defendants' motion to dismiss and granted Plaintiffs' motion for anti-suit injunction, ordering Defendants to cease further proceedings in the state prosecution. *Id.* at 32. Defendants subsequently appealed the court's August 4 Order to the Tenth Circuit. ECF No. 105. On October 7, Defendants moved to stay the proceedings pending resolution of the appeal. ECF No. 112. Specifically, Defendants request a stay of discovery and motion practice, rather than a stay of any prior order. *Id.* at 3. Plaintiffs oppose the motion. ECF No. 115.

## LEGAL STANDARD

"[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). When considering a motion for stay, a court must "balanc[e] the competing interests on both sides." *Commodity Futures Trading Comm'n v. Chilcott Portfolio Mgmt., Inc.*, 713 F.2d 1477, 1484 (10th Cir. 1983). The movant must "make a strong showing of necessity" or "a clear case of hardship or inequity." *Id.* (citing, with respect to the latter, *Landis*, 299 U.S. at 255); *see also Nken v. Holder*, 556 U.S. 418, 433 (2009) ("A stay is not a matter of right.").

Defendants argue that in considering the motion to stay, the court should weigh the following factors: "(1) whether a stay would promote judicial economy; (2) whether a stay would avoid confusion and inconsistent results; and (3) whether a stay would unduly prejudice the parties or create undue hardship." *Consumer Fin. Prot. Bureau v. Fin. Asset Mgmt., Inc.*, No. 223CV00382HCNJCB, 2024 WL 1330010, at *1 (D. Utah Mar. 28, 2024) (quoting *Fed. Trade Comm'n v. Nudge, LLC*, No. 2:19-cv-00867-DBB-DAO, 2021 WL 254110, at *2 (D. Utah Jan. 26, 2021)). While this three-part test first arose in *Meadows Indem. Co. v. Baccala & Shoop Ins. Servs., Inc.*, 760 F. Supp. 1036, 1045 (E.D.N.Y. 1991), it has been closely associated with the Supreme Court's explication of a district court's inherent power to stay a case outlined in *Landis v. North American Company*. 299 U.S. at 254; *see, e.g.*, *Consumer Fin. Prot. Bureau*, No. 223CV00382HCNJCB, 2024 WL 1330010, at *1; *TravelPass Grp., LLC v. Benjamin & Bros., LLC*, No. 217CV00247JNPPMW, 2017 WL 2841221, at *2 (D. Utah July 3, 2017). Accordingly, the court refers to this three-factor standard as the "inherent power" standard.[1]

In contrast, Plaintiffs argue that when a party moves for a stay pending appeal involving the same parties, the court must weigh four factors as expressed by the Supreme Court in *Nken v.*

---

[1] Other courts have focused simply on the requirement described in *Landis* that the movant must show "a clear case of hardship or inequity" to receive a stay. *Landis*, 299 U.S. at 255; *see, e.g.*, *Ben Ezra, Weinstein, & Co., Inc. v. Am. Online Inc.*, 206 F.3d 980, 987 (10th Cir. 2000) ("When applying for a stay, a party must demonstrate 'a clear case of hardship or inequity' if 'even a fair possibility' exists that the stay would damage another party."); *Creative Consumer Concepts, Inc. v. Kreisler*, 563 F.3d 1070, 1080 (10th Cir. 2009) (same); *United States ex rel. Brooks v. Stevens-Henager Coll., Inc.*, No. 215CV00119JNPEJF, 2017 WL 5241002, at *1 (D. Utah June 23, 2017) (denying a motion to stay discovery pending a motion for reconsideration using the same standard); *Fucci v. Bowser*, No. 2:20-CV-00004, 2022 WL 1773015, at *2 (D. Utah June 1, 2022) (granting a stay of a case pending the resolution of another Tenth Circuit appeal using the same standard). The court here incorporates that heavy burden when balancing the relevant factors.

4

*Holder* (the "*Nken* standard"): "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." 556 U.S. 418, 434 (2009).

Courts in this circuit, and indeed, even in this district, have taken varying approaches when addressing motions to stay.[2] But it is clear that, within this district, the "traditional stay factors" as expressed in the *Nken* standard generally apply to cases in which the movant is attempting to stay an order—or, at minimum, the effect of an order—that is being appealed. *See Nken*, 556 U.S. at 426; *see, e.g.*, *Stichting Mayflower Mountain Fonds v. City of Park City Utah*, No. 2:04CV925DAK, 2009 WL 1107639, at *1 (D. Utah Apr. 23, 2009) (denying a stay of proceedings

---

[2] Some courts, for example, have considered a set of five factors outlined by *String Cheese Incident, LLC v. Stylus Shows, Inc.* No. 1:02-CV-01934-LTB-PA, 2006 WL 894955, at *2 (D. Colo. Mar. 30, 2006) (weighing "(1) plaintiff's interests in proceeding expeditiously with the civil action and the potential prejudice to plaintiff of a delay; (2) the burden on the defendants; (3) the convenience to the court; (4) the interests of persons not parties to the civil litigation; and (5) the public interest"); *see, e.g.*, *Martin v. SGT Inc.*, No. 2:19-CV-00289, 2019 WL 12043488, at *1 (D. Utah Aug. 21, 2019) (reviewing a motion to stay "discovery, deadlines, and other proceedings" pending a motion to dismiss using the *String Cheese* factors).

Further, a distinct standard generally applies to patent cases pending resolution of *inter partes* review. *White Knuckle LP, LLC v. Elec. Arts Inc.*, No. 1:15-CV-00036-DN-BCW, 2016 WL 3959689, at *2 (D. Utah July 20, 2016) (weighing "(1) whether granting a stay would likely simplify the issues before the court; (2) the stage of the litigation; and (3) a balancing of prejudice to the parties"); *C.R. Bard, Inc. v. Med. Components, Inc.*, No. 2:12-CV-032-RJS-EJF, 2020 WL 10352265, at *2 (D. Utah Feb. 28, 2020) (stating "courts typically look to those factors only when deciding whether to stay litigation pending USPTO inter partes reexamination proceedings"); *see also Ampersand Ave., LLC v. Vanilla Bay, Inc.*, No. 119CV00068DAKCMR, 2020 WL 6290479, at *1 (D. Utah Oct. 27, 2020) (applying the same standard to a motion for stay pending final resolution of a Trademark Trial and Appeal Board proceeding); *Menchacha-Estrada v. Synchrony Bank*, No. 2:17CV831DAK, 2017 WL 4990561 (D. Utah Oct. 30, 2017) (applying the same standard to a motion for stay pending a consolidated appeal to the D.C. Circuit).

pending an appeal of a motion to clarify an order regarding discovery); *KSTU, LLC v. Aereo, Inc.*, No. 14-4020, 2014 WL 1687749, at *1 (10th Cir. Mar. 7, 2014) (unpublished) (considering a motion to stay a preliminary injunction pending its appeal); *Wyoming v. United States Dep't of Interior*, No. 18-8027, 2018 WL 2727031, at *1 (10th Cir. June 4, 2018) (unpublished) (considering a motion for a stay of an order pending its appeal); *Gardner v. Long*, No. 2:18-CV-00509-RJS, 2021 WL 5911350, *1–2 (D. Utah Dec. 2, 2021) (considering a stay of a motion for attorneys' fees pending an appeal of a final judgment); *Jensen v. Utah Cnty.*, No. 2:24-CV-00887-JNP-CMR, 2025 WL 42150, at *1–2 (D. Utah Jan. 7, 2025) (considering a motion to stay a portion of a TRO pending resolution of a motion for preliminary injunction).

In contrast, courts in this district look to the "inherent power" standard when issuing stay orders to preserve judicial economy and avoid inconsistent results. *See, e.g.*, *Sparks v. Saxon Invs., LLC*, No. 2:09CV151DAK, 2009 WL 2886029, at *4–5 (D. Utah Sept. 3, 2009) (considering a motion to stay pending arbitration); *TravelPass Grp., LLC*, No. 217CV00247JNPPMW, 2017 WL 2841221, at *2 (same); *Wakaya Perfection, LLC v. Youngevity Int'l, Inc.*, No. 2:16-CV-00315-DN, 2019 WL 977916, *1–2 (D. Utah Feb. 28, 2019) (staying a case pending the outcome of a parallel state litigation); *Consumer Fin. Prot. Bureau*, No. 223CV00382HCNJCB, 2024 WL 1330010, at *1 (staying a case pending the outcome of a case before the Supreme Court).

Indeed, courts have used the "inherent power" standard in contexts that closely resemble that of the instant case—a motion for stay of proceedings and discovery pending an appeal of a prior order. *See, e.g.*, *Dirtt Env't Sols., Inc. v. Henderson*, No. 1:19-CV-144 DBB DBP, 2021 WL 3726604, *1–2 (D. Utah Aug. 23, 2021). The court accordingly reviews the current motion to stay under the "inherent power" standard.

**ANALYSIS**

The court considers whether the requested stay would promote judicial economy, would avoid confusion and inconsistent result, and would unduly prejudice the parties or create undue hardship. *Consumer Fin. Prot. Bureau*, No. 223CV00382HCNJCB, 2024 WL 1330010, at *1. The court finds that these factors weigh in favor of a stay.

First, "[t]he factor of judicial economy is 'measured in terms of simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay.'" *Capitol Specialty Ins. Corp. v. Sw. Clubs, Inc.*, No. 12-01299 MCA/LAM, 2015 WL 11117308, at *3 (D.N.M. Mar. 31, 2015) (quoting *CMAX, Inc. v. Hall*, 300 F.3d 265, 268 (9th Cir. 1962)). Defendants argue that the appeal will resolve threshold issues that will significantly impact "the trajectory and propriety of discovery and proceedings in this matter." ECF No. 112 at 2.

The first issue Defendants raise on appeal is this court's holding that Defendants waived any *Younger* abstention defense by removing the case from state court to federal court. *See* ECF No. 115-1 at 7. The second issue Defendants raise is the court's finding that they brought the prosecution in bad faith and that Plaintiffs will suffer irreparable harm from the prosecution. *Id.* If either of those issues are reversed on appeal, Defendants argue that either state court will be the likely forum for the case or the scope of discovery will be altered. ECF No. 112 at 2. The final issue Defendants raise is their alleged immunity from Plaintiffs' Fourth Amendment search and seizure claims. ECF No. 115-1 at 7. They argue that allowing discovery and litigation to continue pending a determination of immunity on appeal would "eviscerate the very purpose and benefit" of said immunity. ECF No. 112 at 2.

Plaintiffs argue that proceeding with discovery would not be premature because all of the discovery subjects that Plaintiffs have identified are also relevant to claims that are not being

appealed. ECF No. 115 at 10. But at this stage it is not clear that the scope of discovery would be unchanged regardless of the outcome of the appeal. Rather, it appears clearly possible that the resolution of the appealed issues will affect discovery to at least some degree. If, for example, the Tenth Circuit's ruling leads to the case being remanded to state court, discovery will proceed based on that forum's procedural rules. Or, if the Tenth Circuit reverses the court's ruling on Defendants' immunity claim, the scope of discovery will likely change, even if there some level of overlap between the discovery subjects relevant to the other claims.

Thus, the court finds that a stay would promote judicial economy. *Dirtt Env't Sols., Inc. v. Henderson*, No. 1:19-CV-144 DBB DBP, 2021 WL 3726604, at *2 (D. Utah Aug. 23, 2021) ("Avoiding costly and duplicative piecemeal litigation is a hallmark of judicial economy and thus supports a stay."). Indeed, both parties would benefit from avoiding discovery that might prove to be unnecessary and premature. Similarly, the court finds that a stay would avoid any motion practice and discovery that might ultimately be inconsistent with the Tenth Circuit order.

The stay would also not unduly prejudice Plaintiffs. The motion would not stay any existing order issued by the court, including the injunction currently in effect. ECF No. 92. Plaintiffs highlight the risk of witness memories fading or evidence being lost, but the court finds that any potential prejudice from a stay would be mitigated by the relatively short expected duration of the stay pending only the Tenth Circuit's ruling. In addition, several witnesses have already provided relevant testimony, and parties have a duty to preserve evidence. Considering all of the factors, the court finds a stay to be warranted.

## CONCLUSION AND ORDER

For the above reasons, the court GRANTS Defendants' motion to stay. All further proceedings and discovery are stayed pending resolution of Defendants' appeal of the August 4

Order before the Tenth Circuit.

Signed December 4, 2025.

BY THE COURT

_____
Jill N. Parrish
United States Chief District Judge